1  JASON D. RUSSELL (SBN 169219)
    jason.russell@skadden.com
2  PETER B. MORRISON (SBN 230148)
    peter.morrison@skadden.com
3  HILLARY A. HAMILTON (SBN 218233)
    hillary.hamilton@skadden.com
4  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    300 South Grand Avenue, Suite 3400
5  Los Angeles, California 90071-3144
    Telephone:  (213) 687-5000
6  Facsimile:   (213) 687-5600

7  Attorneys for Specially Appearing Defendants
    Fenix International Limited and Fenix Internet LLC

8

9               UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11                SOUTHERN DIVISION

12

| | |
|---|---|
| N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated, | CASE NO.: 8:24-cv-01655-FWS-SSC |
| Plaintiffs, | **DECLARATION OF ANTONY WHITE KC IN SUPPORT OF SPECIALLY APPEARING DEFENDANTS FENIX INTERNATIONAL LIMITED AND FENIX INTERNET LLC'S MOTION TO DISMISS FOR FORUM NON CONVENIENS** |
| v. | |
| FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC, MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC, | |
| Defendants. | |

## DECLARATION OF ANTONY WHITE KC

I, Antony Dennis Lowndes White KC, under penalty of perjury, declare and state as follows:

1.      I am over the age of twenty-one years, suffer from no legal disability, and am competent to make this declaration and testify to the statements and facts contained herein.

2.      I am barrister-at-law called to the bar of England and Wales in 1983, and was appointed Queen's Counsel in 2001. Upon the Death of Queen Elizabeth II, I became King's Counsel. I have practiced as a self-employed barrister in England since 1984.

3.      I am also a member of the bar of Northern Ireland, and I have been admitted on several occasions to the bars of Gibraltar and the Isle of Man to appear as an advocate in cases in those jurisdictions.

4.      I am a member of the London barristers' chambers, Matrix Chambers, Griffin Building, Gray's Inn, London WC1R 5LN. A copy of relevant pages of my Chambers website biography is attached hereto as **Exhibit A**. I obtained a law degree (MA) from Cambridge University.

5.      My legal expertise includes, but is not limited to, electronic commerce, privacy and data protection, commercial litigation, and international arbitration. In the field of electronic commerce, data protection, and privacy, where the relevant parties often include consumers, I have regularly advised and appeared in cases involving consumer protection law. In addition, a significant amount of my practice involves jurisdictional disputes, often involving litigation arising out of events occurring partly or wholly in foreign countries (including the United States) where there are issues about whether a claim can or must be brought in England.

6.      I have been asked by Skadden, Arps, Slate, Meagher & Flom LLP to address the following questions in the context of the actions filed by anonymous Plaintiffs N.Z., R.M., B.L., S.M., and A.L. (collectively, the "Plaintiffs") against Defendants Fenix International Limited ("FIL") and Fenix Internet LLC ("Fenix Internet") (collectively, the "Fenix Defendants" or the "Defendants") in the United States District Court for the Central

1

District of California ("the US Proceedings"):

      a.   Whether the English courts would accept jurisdiction over the Plaintiffs' claims if proceedings advancing similar claims were to be brought against the Fenix Defendants in England ("Equivalent English Proceedings");

      b.   Whether, under English law, the exclusive jurisdiction clauses agreed to by the Plaintiffs are valid and enforceable;

      c.   Whether English law would provide a remedy in respect of the claims advanced by the Plaintiffs; and

      d.   Whether the English courts would provide a convenient forum for the efficient, just, and expeditious resolution of such claims.

7.    In the interest of simplicity, I will hereafter refer to only "English law" and the law or courts of England, rather than to "England and Wales."

8.    To address these questions, I have considered the following:

      a.   The Class Action Complaint ("Complaint") filed by the Plaintiffs in the US Proceedings;

      b.   The Declaration of Mr. Lee Taylor ("Taylor Decl.") dated October 24, 2024;

      c.   The Terms of Service (the "Terms of Service") for the website www.OnlyFans.com ("the Website") that were in effect at the time Plaintiffs filed their Complaint; and

      d.   The applicable case law, textbook extracts, and statutory materials referenced herein.

**Jurisdiction of the English Courts Over Equivalent English Proceedings**

9.    With regard to the Plaintiffs, I understand from Mr. Taylor's Declaration that the Plaintiffs must have agreed to the Terms of Service when they signed up as Fans on the Website, and that all Plaintiffs further must have affirmatively agreed to the updated Terms of Service that went into effect on December 15, 2021. (Taylor Decl. ¶¶ 16-36.)

10.     Section 16.a of the applicable Terms of Service contains the following two provisions:

a.     "If you are a consumer, your agreement with us is governed by English law and English law will apply to (i) any claim that you have arising out of or in connection with your agreement with us or your use of OnlyFans, and (ii) any claim that we have against you that arises out of or in connection with your agreement with us or your use of OnlyFans (including, in both cases, non-contractual disputes or claims). You will also be able to rely on mandatory rules of the law of the country where you live."

b.     "If you are a consumer resident **outside** of the United Kingdom or the European Union, any claim which you have or which we have arising out of or in connection with your agreement with us or your use of OnlyFans (including, in both cases, non-contractual disputes or claims) must be brought in the courts of England and Wales."

(*Id.*, Ex. A at 13 (emphasis in original).)

11.     In my view it is clear that the English courts would accept jurisdiction over Equivalent English Proceedings brought against either FIL or Fenix Internet based on the allegations in the US Proceedings.

12.     In summary, as explained below, FIL, which I understand is incorporated in England and Wales with its headquarters in London, could be sued as of right (*i.e.*, without seeking the permission of the court) in the English courts.

13.     In any case, I am informed that FIL has confirmed that if proceedings were commenced against it in the English courts arising out of the facts alleged in the US Proceedings it would take no objection based on jurisdiction or forum (*see* Taylor Decl. ¶ 38).

3

14.    Proceedings could be served on Fenix Internet outside the jurisdiction, but in any case I am informed that Fenix Internet has also offered to stipulate to jurisdiction and service should proceedings in England or Wales be commenced (*see* Taylor Decl. ¶ 39).

15.    The procedure of English civil litigation is governed by the Civil Procedure Rules 1998, as amended (the "CPR"). The CPR provide that civil litigation is commenced by service of a claim form, the modern English equivalent of a writ.

16.    Proceedings before the English courts against FIL or Fenix Internet would be started by serving a claim form issued in accordance with Part 7 of the CPR. In some situations, primarily where a defendant is present within England and Wales as is the case with FIL, the claim form can be served on the defendant without obtaining the permission of the court. In other situations, including in particular some (but not all) cases where a defendant is not present within England and Wales, the permission of the court may be required to serve the claim form on the defendant outside England and Wales. The rules governing whether the permission of the court is required before a claim form can be served on a defendant are contained in Part 6 of the CPR.

17.    Under English law, jurisdiction over a claim is *prima facie* established by service within the jurisdiction.

18.    In the case of a claim against FIL based on the allegations made by the Plaintiffs in the US Proceedings, service of the claim form can be effected without obtaining the permission of the court. This is because FIL is a company incorporated and registered in England and Wales and it can either be served at its principal office or any place within the jurisdiction where it carries on its activities and which has a real connection with the claim under CPR 6.3(2)(a) read together with CPR 6.9(2)(6), or at its registered office under CPR 6.3(2)(b) read together with § 1139 of the Companies Act 2006. These are parallel statutory bases for service of proceedings on a company incorporated and registered in England and Wales.

19.    The availability of these straightforward bases for service of the claim form on FIL, coupled with the confirmation given by FIL in Mr. Taylor's Declaration that, if

4

proceedings are commenced against it in the English courts arising out of the facts alleged in the US Proceedings, it will take no objection based on jurisdiction or forum, means that there is no realistic prospect that the Plaintiffs might encounter any difficulty in effecting service on FIL.

20.    In the case of a claim against Fenix Internet based on the allegations made by the Plaintiffs in the US Proceedings, service of the claim form on Fenix Internet can be effected without obtaining the permission of the court even though Fenix Internet is not present within England and Wales.

21.    This is because CPR 6.33(2B) permits service of a claim form outside England and Wales without the permission of the court where a contract contains a term to the effect that the English courts shall have jurisdiction to determine the claim. The exclusive jurisdiction clauses in the Terms of Service are just such a term, and, accordingly, service can be effected under CPR 6.33(2B). Alternatively, should the Plaintiffs raise any concerns about the availability of service under CPR 6.33(2B), the California court could require Fenix Internet to provide an address for service in England on a named solicitor for the purposes of CPR 6.7 (which provides for service within England and Wales without the permission of the court where the defendant has given in writing the business address within the jurisdiction of a solicitor as an address at which the defendant may be served with the claim form).

22.    The confirmation given by Fenix Internet in Mr. Taylor's Declaration that, if proceedings are commenced against it in the English courts arising out of the facts alleged in the US Proceedings, it will stipulate to jurisdiction and service in England or Wales, means that there is no realistic prospect that the Plaintiffs might encounter any difficulty in effecting service on Fenix Internet.

**The Exclusive Jurisdiction Clause**

23.    Section 16.a of the Terms of Service contains an exclusive jurisdiction clause as a matter of English law. In *Sinochem International Oil (London) Co. Ltd v Mobil Sales and Supply Corp Ltd* [2000] 1 All ER (Comm) 758 at [32] the test for identifying an

exclusive jurisdiction clause was formulated as:

> "[W]hether on its proper construction the clause obliges the parties to resort to the relevant jurisdiction, irrespective of whether the word 'exclusive' is used . . . Or to put the issue in another way: is the obligation contained in the clause the intransitive one to submit to a jurisdiction if it is chosen by the other contracting party, or is it the transitive one to submit all disputes to the chosen jurisdiction?"

*See also* the summary of the case law in the leading textbook, Dicey, Morris & Collins on The Conflict of Laws, 16th edition, paragraph 12-073 – 12-074.

24.    In the case of Section 16.a of the Terms of Service the language is clear. The obligation is framed as a transitive obligation on both parties to submit their disputes to the English courts: "any claim which you have or which we have arising out of or in connection with your agreement with us or your use of OnlyFans (including, in both cases, non-contractual disputes or claims) must be brought in the courts of England and Wales." (Taylor Decl. Ex. A at 13.)

25.    The clause is mutual, couched in mandatory terms ("must"), and although it does not explicitly provide for exclusive jurisdiction, the test formulated in *Sinochem International* shows that this is not determinative ("irrespective of whether the word 'exclusive' is used"). Further, the clause also provides for English law to apply to any claim, and the court's observation in *Sinochem International* at [33] that "there is not much point in choosing a specific law to accompany a jurisdiction clause unless the intention is to make the courts where such law operates exclusive" is on point.

26.    As to the scope of the exclusive jurisdiction clause in Section 16.a of the Terms of Service, English law generally adopts a wide construction of such clauses, recognising that contracting parties are likely to wish to ensure that all claims arising out of a contractual relationship fall within the same dispute resolution regime chosen by them. This is well-established in the case of commercial contracts (*see Fiona Trust & Holding Corp v Privalov* [2007] Bus L.R. 1719 at [13] ("rational businessmen, are likely to have

intended any dispute arising out of the relationship into which they have entered or purported to enter to be decided by the same tribunal. The clause should be construed in accordance with this presumption unless the language makes it clear that certain questions were intended to be excluded . . . ")).[1] Although the *Fiona Trust* case formulated a rule of construction based on the presumed intentions of rational businessmen, English law would also assume that rational consumers and the rational businesses they contract with would prefer a one-stop shop dispute resolution mechanism to reduce the risk of fragmentation of disputes. For this reason a wide construction is given to jurisdiction agreements generally, and not only in a commercial context—*see Emmott v Michael Wilson & Partners* [2017] 2 All ER (Comm) 569[2] at [44(ii)] (clause expressed "in wide terms and it is likely that the parties intended that any dispute arising out of or connected with" their relationship should be covered by it, particularly where nothing in the language of their agreement indicated that the parties contemplated any other form of dispute resolution for any particular disputes that might arise from their arrangement), cited in the leading textbook, Lewison on the Interpretation of Contracts, 7th edition, para 18.16.

27.    The wording used in Section 16.a is very broad – "any claim which you have or which we have arising out of or in connection with your agreement with us or your use of OnlyFans (including, in both cases, non-contractual disputes or claims)." (Taylor Decl. Ex. A at 13.) The opening words "any claims" indicates that <u>all</u> claims are covered. The words "arising out of or in connection with" are a recognized formula which casts a very wide net. The addition of "or your use of OnlyFans" widens the scope beyond disputes relating to the agreement. The express inclusion of non-contractual disputes or claims underlines the width of the intended application of the clause. In my view it is clear that as a matter of English law the factual allegations relied on in support of the Plaintiffs' claims

---

[1] Although the *Fiona Trust* case concerned the scope of an arbitration clause, it is well established that the same principle of construction applies to jurisdiction clauses. *See e.g.*, *Sebastian Holdings Inc v Deutsche Bank AG* [2010] 2 CLC 300 at [39].

[2] Although the actual decision in *Emmott* was overturned on appeal on other grounds, the approach taken by the Judge to the interpretation of the clause in question was not questioned – *see* [2018] 1 CLC 77.

1  in the US Proceedings would be regarded as "arising out of or in connection with your
2  agreement with us or your use of OnlyFans (including, in both cases, non-contractual
3  disputes or claims)."

4      28.     The obligations set forth in Section 16.a are enforceable as a matter of English
5  law and will be enforced in the absence of strong reasons to the contrary.

6      29.     As Lord Bingham explained in the leading case of *Donohue v. Armco Inc.*
7  [2002] C.L.C. 440 at [24]:

8      "If contracting parties agree to give a particular court exclusive jurisdiction to
9      rule on claims between those parties, and a claim falling within the scope of
10     the agreement is made in proceedings in a forum other than that which the
11     parties have agreed, the English court will ordinarily exercise its discretion
12     (whether by granting a stay of proceedings in England, or by restraining the
13     prosecution of proceedings in the non-contractual forum abroad, or by such
14     other procedural order as is appropriate in the circumstances) to secure
15     compliance with the contractual bargain, unless the party suing in the non-
16     contractual forum (the burden being on him) can show strong reasons for
17     suing in that forum. ... the general rule is clear: where parties have bound
18     themselves by an exclusive jurisdiction clause effect should ordinarily be
19     given to that obligation in the absence of strong reasons for departing from it.
20     Whether a party can show strong reasons, sufficient to displace the other
21     party's prima facie entitlement to enforce the contractual bargain, will depend
22     on all the facts and circumstances of the particular case."

23     30.     As this quotation from *Donohue v Armco* states, the burden of showing strong
24 reasons not to enforce the clause is on the party opposing its enforcement. *See also Catlin*
25 *Syndicate Ltd v. Amec Foster Wheeler USA Corp* [2020] EWHC 2530 (Comm) at [33],
26 (applying *Donohue v. Armco* and granting injunction against suit filed in New Jersey).

27     31.     It is well established in English law that "strong reasons" do not include
28 factors of convenience that were foreseeable at the time that the contract was entered into

(save in exceptional circumstances involving the interests of justice); and it is not appropriate to embark upon a general balancing exercise. The party seeking to avoid the effect of an exclusive jurisdiction clause has to point to some factor which it could not have foreseen at the time the contract was concluded. See *Antec International Ltd v Biosafety USA Ltd* [2006] EWHC 47 (Comm) at [7].

32.  Exclusive jurisdiction clauses are subject to special rules under English law in relation to proceedings whose subject-matter is a matter relating to a consumer contract where the consumer is domiciled in the United Kingdom—*see* section 15B of the Civil Jurisdiction and Judgments Act 1982 (as amended). But these special rules do not apply to proceedings where the consumer is not domiciled in the UK.

33.  The reason for this is that absent statutory intervention consumers are treated in English law like other contracting parties. Recent statutory intervention in relation to jurisdiction clauses in consumer contracts has been based on EU law, significant parts of which have been retained post-Brexit as retained EU law. Under EU law applicable pre-Brexit, consumers habitually resident in EU member states had certain enhanced rights, including the right to sue in the court of the member state where they lived. In UK law (including retained EU law) applicable post-Brexit, UK-domiciled consumers continue to have similar enhanced rights, including the right to sue in the UK. The legislative policy underlying the protection of consumers in EU law (and therefore retained EU law) is to protect the EU law rights (and, post-Brexit, the UK law rights based on retained EU law) of consumers resident in an EU state prior to Brexit, or resident in the UK post-Brexit. The rationale is that the legal regime of the EU member state (pre-Brexit) or the UK (post-Brexit) is likely to be more protective of consumer rights than the "foreign" jurisdiction or applicable law.

34.  Where (as in the present case) a US-resident consumer agrees to an English law and jurisdiction clause, this does not involve any ousting of EU/UK law at all – rather it allows US consumers to take advantage of the (*ex hypothesi* more protective) UK legal regime.

35.     Accordingly, the "strong reasons" principle applies even though the Plaintiffs are US-resident consumers, and such "strong reasons" do not include factors of convenience that were foreseeable at the time that the contract was entered into. The party seeking to avoid the effect of an exclusive jurisdiction clause has to point to some factor which it could not have foreseen at the time the contract was formed. Based on my review of the Complaint and the Taylor Declaration, the Plaintiffs in the US Proceedings have provided no basis for an English court to find that strong reasons not to enforce the exclusive jurisdiction clause exist with respect to their claims. I reserve the right to supplement this declaration should the Plaintiffs provide further information or argument as to why they believe the exclusive jurisdiction clause should not be enforced.

36.     Based on my review of the Class Action Complaint, I have seen nothing inconsistent with the position relating to forum-selection clauses under English law which I have described above. As a matter of English law, the Plaintiffs, by bringing the claims set out in the Class Action Complaint, have acted in breach of contract by bringing those claims in a jurisdiction other than England, contrary to the obligation imposed by Section 16.a.

37.     Based upon the above analysis, the English court would accept jurisdiction over Plaintiffs' claims should Equivalent English Proceedings be commenced.

**English Courts Would Provide a Remedy with Respect to Plaintiffs' Claims**

38.     For the reasons detailed below, it is my opinion that English courts and English law would provide Plaintiffs with a potential remedy with respect to each aspect of the substance of their claims in the US Proceedings, subject always to proof of the relevant facts which are alleged in the US Proceedings.

39.     In this regard, I do not address the defenses to the Plaintiffs' claims which FIL or Fenix Internet may advance, nor do I express any view as to the merits of the claims alleged by the Plaintiffs. I consider only whether there are claims which would be open to the Plaintiffs under English law on the basis of the facts alleged by the Plaintiffs should they commence Equivalent English Proceedings.

40.     Pursuant to the choice-of-law clause in Section 16.a of the Terms of Service, the English court would apply its own conflict of laws analysis to each of the causes of action relied on in the US Proceedings. Plaintiffs would be free to ask an English court to consider whether any US law or California law provision should be applied by the English court.

41.     This analysis, conducted by the English court, would result in a potential remedy for the factual allegations underlying the Complaint, regardless of whether the English court opted to apply, on the one hand, the provisions of US law or California law, or, on the other hand, the corresponding English causes of action, discussed further below.

42.     In addition, it is open to the parties to litigation before the English courts to agree on the law applicable to their dispute. Therefore, if the parties agreed (or the California Court ordered) that certain of the Plaintiffs' claims were subject to US law or California law, then that provision would be applied by the English court.

43.     English courts commonly apply foreign law to the substance of disputes, and expert evidence is admitted to establish the foreign law in question. If the English court decides that the claims brought by the Plaintiffs are governed by US law or California law, the English court is competent to apply that law and will afford Plaintiffs similar remedies, if appropriate.

44.     If and to the extent that the English court decides that the claims brought by the Plaintiffs are governed by English law, those Plaintiffs will still have available claims and remedies.

45.     I note that paragraph 5 of the Complaint in the US Proceedings in the section headed "*Introduction*" characterizes the two main categories of allegations made by the Plaintiffs as "*deception and fraud*", and "*breaches of confidentiality and privacy violations in which intimate communications and private and/or personal information about Fans – including photos and videos – are distributed and/or accessible to numerous unauthorized parties*". As I shall explain below, English law includes well-established causes of action which provide remedies for deception and fraud, and for breaches of confidence and

11

privacy violations involving unauthorized use or disclosure of private or personal information.

46. I note that in relation to the first category of allegations ("*deception and fraud*"), the essential factual allegations made against the Defendants in the Plaintiffs' claims in the US Proceedings, as set out in the Complaint, are that although OnlyFans promotes itself as a social platform that allows Creators and users to develop personal, "authentic relationships with specific Creators", and represents to Fans that they will have the opportunity to "direct message" with specific Creators (*see, e.g.,* Complaint ¶ 89), the true position (which is known to and facilitated by OnlyFans) is that many high-earning Content Creators do not operate their own OnlyFans accounts themselves and do not actually communicate with Fans, but instead use "chatters" employed by third-party agencies hired by the Creators (*ibid*. ¶¶ 3-4).

47. I note that in relation to the second category of allegations ("*breaches of confidentiality and privacy violations*"), the essential factual allegations made against the Defendants in the Plaintiffs' claims in the US Proceedings, as set out in the Complaint, are that the OnlyFans platform collects personally identifying information ("PII") about Fans which is then shared without the Fans' consent with persons other than selected Creators, in particular with Agencies and chatters (*ibid.* ¶¶ 413-419), and that Agency Defendants, aided and abetted by the Defendants, accessed and used confidential communications sent by Fans consisting of private messages containing sensitive personal information without the Fans' consent (*ibid.* ¶¶ 427-428).

48. Based on these factual allegations the Plaintiffs' causes of action against the Fenix Defendants as set out in the Complaint are:

      a. Counts I and II—Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Conspiracy to Violate RICO (*ibid*. ¶¶ 347-403).

      b. Count III—Violation of the Federal Video Privacy Protection Act (*ibid*. ¶¶ 404-422).

    c.    Count IV—Violations of the California Invasion of Privacy Act (*ibid*. ¶¶ 423-434).

    d.    Count VI—Breach of Contract. No provisions of US law or state law are identified, but I presume this is based on California law based on where the lawsuit has been filed (*ibid*. ¶¶ 441-448).

    e.    Count VII—Fraud and Fraud by Concealment (common law). No provisions of US law or state law are identified, but I presume this is based on California law based on where the lawsuit has been filed (*ibid*. ¶¶ 449-462).

    f.    Count VIII—Deceit in Violation of Cal. Code §§ 1709 and 1710 (*ibid*. ¶¶ 463-470).

    g.    Count IX—Violation of California's False Advertising Law (*ibid*. ¶¶ 471-478).

    h.    Count X—Violation of California's Unfair Competition Law (*ibid*. ¶¶ 479-489).

49.    The remedies sought by the Plaintiffs in the US Proceedings are damages, restitution of funds, injunctive relief (including enjoining the Fenix Defendants from continuing the unlawful practices complained of), costs and interest.

50.    Should the English court decide that the claims brought by the Plaintiffs in Equivalent English Proceedings are governed by English law, the Plaintiffs will have available claims and remedies which are broadly comparable to the causes of action advanced and the remedies sought in the US Proceedings.

51.    So far as Counts I and II in the US Proceedings (RICO and RICO Conspiracy) are concerned, it appears from paragraphs 347-351 of the Complaint that RICO protects individuals against criminal enterprises committing fraudulent acts, and I note from paragraph 374 that the Plaintiffs' core allegation appears to be that the Defendants carried out a "scheme to defraud". (*Ibid*. ¶ 374) Paragraph 378 alleges that the Defendants used the internet to communicate false representations to Fans, and paragraph 379 alleges a

series of fraudulent misrepresentations and other fraudulent acts. These causes of action therefore fall into the first main category of allegations advanced by the Plaintiffs ("*deception and fraud*"). While there is no direct equivalent of RICO under English law, English law does contain a number of causes of action which provide remedies for misrepresentation and fraud. Where, as in the present case, the Plaintiffs and Defendants are in a contractual relationship, a claim for damages for misrepresentation can be established under English law without alleging or proving fraud under section 2(1) of the Misrepresentation Act 1967. Further, on the facts alleged in the Complaint, the tort of fraudulent misrepresentation (or deceit) could also be used by the Plaintiffs to claim damages. Where, as is alleged in the present case, the fraudulent misrepresentations involve a number of parties acting in concert, the tort of conspiracy to injure by unlawful means can be used to claim damages.

52.    So far as Counts III (Violation of the Federal Video Privacy Protection Act) and IV (Violation of the California Invasion of Privacy Act) are concerned, these causes of action fall into the second main category of allegations advanced by the Plaintiffs ("*breaches of confidentiality and privacy violations*"). As noted above, the essential allegations appear to be that Plaintiffs' PII was knowingly disclosed by the Defendants without their consent after being collected on the Website, (*ibid.* ¶¶ 406-407, 413), and that Plaintiffs' private messages on the Website were likewise knowingly disclosed to third parties other than the intended recipients without their consent. (*Ibid*. ¶¶ 427-430). Although English law does have a developed cause of action for breach of confidence which could be invoked by the Plaintiffs, in situations involving unauthorized use of private or personal information about individuals the most appropriate causes of action would be breach of statutory duty for violations of the data protection legislation, or misuse of private information.

53.    So far as the claim for breach of statutory duty for violation of the UK data protection legislation is concerned, the data protection legislation applicable as at the dates of the events relied on by the Plaintiffs as giving rise to their claims (2018 onwards – *see*

paragraphs 241, 254, 270, 282, 299 of the Complaint) was contained in two statutes: the retained (and revised) EU General Data Protection Regulation ((EU) 2016/679) (the "UK GDPR") and the Data Protection Act 2018 which implements and supplements the UK GDPR. That legislation confers a suite of rights to the protection of personal data on "data subjects", and correlative obligations on "data controllers" (and in some cases on "data processors"). A breach of the statutory obligations imposed on data controllers and data processors is actionable as the tort of breach of statutory duty. On the basis of the alleged facts relied on in the US Proceedings as amounting to violations of the Federal Video Privacy Protection Act and of the California Invasion of Privacy Act:

     a.    Each of the Plaintiffs would be a "data subject" for the purposes of the UK data protection legislation (Art 4(1) UK GDPR). The rights conferred by the UK GDPR on data subjects apply regardless of their nationality or place of residence (Recital (14) UK GDPR).

     b.    The facts alleged by the Plaintiffs in the Complaint summarized above would if established mean that Fenix Internet would be a "data controller" in relation to the Plaintiffs' data (Art 4(7) UK GDPR). The Terms of Service state that OnlyFans is operated by Fenix International, and this appears to be confirmed by Mr. Taylor's Declaration, and accepted in paragraph 37 of the Complaint. Paragraph 40 of the Complaint alleges that Fenix Internet has the limited role of providing payment processing services to Fenix International, and this appears to be confirmed by Mr. Taylor's Declaration. In those circumstances Fenix International will be a "data controller" and Fenix Internet will be a "data processor" (Art 4(7), (8) UK GDPR).

     c.    The Plaintiffs' PII which is alleged to have been knowingly disclosed by the Fenix Defendants without the Plaintiffs' consent after being collected on the Website (Complaint ¶¶ 406-407, 413), and the Plaintiffs' private messages on the Website which are alleged to have been knowingly

15

disclosed to third parties other than the intended recipients without their consent (*ibid*. ¶¶ 427-430), would be the Plaintiffs' "personal data" (Art 4(1) UK GDPR). In addition, information about the Plaintiffs' use of the Website to access sexual content, and any pictures or videos or messages containing sensitive personal information uploaded by them to the Website, would be likely to be data concerning sex life or sexual orientation which is a special category of "personal data" which attracts heightened protection under Art 9 UK GDPR.

    d.    The alleged collection, disclosure or other use of the Plaintiffs' information would be "processing" of their personal data (Art 4(2) UK GDPR).

54. Further, each of the alleged violations of the Federal Video Privacy Protection Act and of the California Invasion of Privacy Act relied on in the US Proceedings would amount to a comparable alleged breach of the UK data protection legislation (subject of course to any defences that were available to Fenix Internet or Fenix International as data controller or Fenix Internet as data processor, about which I express no views). As to this:

    a.    The alleged breach of the Federal Video Privacy Protection Act by disclosing the Plaintiffs' information without their consent to Agency Defendants and chatters in circumstances where the Plaintiffs had allegedly been misled as to the purposes for which their information would be processed, would give rise to allegations of breach of Arts 5, 6 and 9 UK GDPR unless the data controller could demonstrate compliance with the strict requirements of the data processing principles in Art 5, and establish a lawful basis for the processing under 6, and identify an exception to the prohibition on processing special category data without the data subject's explicit consent under Art 9.

    b.    The alleged breach of the California Invasion of Privacy Act by allowing Agency Defendants and chatters to access and use the Plaintiffs' private

messages containing sensitive personal information without the Plaintiffs' consent in circumstances where the Plaintiffs had allegedly been misled as to the purposes for which their information would be processed, would similarly give rise to allegations of breach of Arts 5, 6 and 9 UK GDPR unless the data controller could demonstrate compliance with the strict requirements of the data processing principles in Art 5, and establish a lawful basis for the processing under 6, and identify an exception to the prohibition on processing special category data without the data subject's explicit consent under Art 9.

55.    The remedies potentially available in the English courts where a breach of the UK data protection legislation is made out include compensation (*see* Art 82 UK GDPR, and section 168 Data Protection Act 2018), and declaratory and injunctive relief as well as the right to erasure (Art 17 UK GDPR).

56.    In addition to the available claims for breach of the UK data protection legislation set out above, the Plaintiffs could also bring, on the basis of the facts alleged in the US Proceedings, a claim before the English courts alleging the common law tort for misuse of private information. This tort emerged in the early 2000s as a result of the incorporation into English law of the European Convention on Human Rights and Fundamental Freedoms ("ECHR") by the Human Rights Act 1998.  The tort was first recognised by the House of Lords in *Naomi Campbell v MGN Ltd* [2004] 2 AC 457, and has since been developed and applied in numerous appellate cases, including most recently by the Supreme Court in *ZXC v Bloomberg LP* [2022] AC 1158.  The tort of misuse of private information involves a two-stage test. At stage one the court considers whether the claimant has a reasonable expectation of privacy in respect of the information in question. Information for these purposes can include photographs or videos or other personal identifying information, as well as text. Information about the Plaintiffs' use of the Website to access sexual content, and any pictures or videos or messages containing sensitive personal information uploaded by them to the Website, would be very likely to be

information in relation to which they have a reasonable expectation of privacy. If the claimant has a reasonable expectation of privacy in respect of the information in question, the claimant's Art 8 ECHR right to respect for private life is engaged, and stage two involves balancing that privacy right against any countervailing right or interest in the disclosure or other use complained of. If the unauthorized and deceptive use of the Plaintiffs' private information alleged in the Complaint was made out, the Plaintiffs' privacy rights would be unlikely to be outweighed by any countervailing rights or interests. If liability is established the available remedies include damages and declaratory and injunctive relief.

57.    Count VI in the US Proceedings (breach of contract) appears to allege that a promise was made by the Fenix Defendants that the Plaintiffs could direct message with Creators, but were not provided those services. (*Ibid*. ¶¶ 441-444). English law has an equivalent and well-developed law of contract relating to consumers, and if the alleged facts were established, they would provide the basis for a claim of breach of contract under English law in Equivalent English Proceedings.

58.    The remaining Counts in the US Proceedings (Counts VII to X) all seem to fall into the first main category of allegations advanced by the Plaintiffs ("*deception and fraud*"). Count VII in the US Proceedings (fraud and fraud by concealment) appears to have two limbs. The first is an allegation that the Fenix Defendants made false representations to the Plaintiffs (*ibid*. ¶ 449), that these false representations were made knowingly by the Fenix Defendants (*ibid*. ¶ 451), intending that the Plaintiffs should rely on them (*ibid*. ¶ 452), and that the Plaintiffs did rely on the false representations. (*Ibid*. ¶ 453). The second is an allegation that the Fenix Defendants concealed facts from Plaintiffs (*ibid*. ¶ 454), by making "incomplete representations" (*ibid*. ¶ 455), that this was done intentionally by the Fenix Defendants (*ibid*.), that the facts concealed from Plaintiffs were material to Plaintiffs (*ibid*. ¶ 456), and that the Plaintiffs justifiably relied on the concealment of material facts. (*Ibid*. ¶ 457). Both limbs involve a claim that the Plaintiffs thereby suffered damage due to the false representations and concealed facts. (*Ibid*. ¶ 460).

1  The allegation that facts were concealed includes an allegation that incomplete
2  representations were made, deliberately withholding material facts which rendered the
3  incomplete representations false. If those alleged facts were established the Plaintiffs
4  would be able to pursue a claim under English law for fraudulent misrepresentation (or
5  deceit) in the Equivalent English Proceedings. See paragraph [51] above. The available
6  remedies would include damages and injunctive relief.

7       59.    Count VIII in the US Proceedings (deceit in violation of California Code
8  §§ 1709 and 1710) appears to repeat the factual allegations relied on in support of Count
9  VII, and contends that these alleged facts amount to deceit. As explained in paragraphs
10 [51] and [58] above, these alleged facts, if established, would provide the basis for a claim
11 for fraudulent misrepresentation under English law in Equivalent English Proceedings.

12      60.    Count IX in the US Proceedings (violation of California's False Advertising
13 Law) again appears to generally repeat the factual allegations relied on in support of Count
14 VII, and contends that the Fenix Defendants made or disseminated untrue or misleading
15 statements amounting to misrepresentations (*Ibid.* ¶ 472), that the Fenix Defendants made
16 those misrepresentations with the intent for Plaintiffs to rely on them (*ibid.* ¶ 474), and that
17 Plaintiffs were injured as a result. (*Ibid.* ¶ 475). If those alleged facts were established, the
18 Plaintiffs would be able to pursue a claim under English law for fraudulent
19 misrepresentation (or deceit) in the Equivalent English Proceedings – *see* paragraphs [51]
20 and [58] above. In addition, these alleged facts would also provide the basis for a claim
21 under the Consumer Protection from Unfair Trading Regulations 2008 (the "2008
22 Regulations"). The 2008 Regulations (which implemented the Unfair Commercial
23 Practices Directive 2005) prohibit "unfair commercial practices" of traders which are
24 directly connected with the promotion, sale, or supply of a "product" to or from consumers,
25 whether occurring "before, during or after a commercial transaction". The 2008
26 Regulations impose a general test of unfairness, including that "[a] commercial practice is
27 unfair if . . . it contravenes the requirements of professional diligence", where "professional
28 diligence" is defined as ". . . the standard of special skill and care which a trader may

19

reasonably be expected to exercise towards consumers which is commensurate with . . . the general principle of good faith in the trader's field of activity." This standard and its application to the behaviour of traders to consumers sets a general legal principle requiring fairness by traders in their behaviour to consumers.

61. Count X in the US Proceedings (violation of California's Unfair Competition Law) again appears to generally repeat the factual allegations relied on in support of Count VII, and contends that the Fenix Defendants committed unlawful business practices, and that their conduct constitutes an unfair business practice. (Complaint ¶¶ 482-83). If those alleged facts were established, the Plaintiffs would be able to pursue a claim under English law for fraudulent misrepresentation (or deceit) in the Equivalent English Proceedings – *see* paragraphs [51] and [58] above. These alleged facts would also provide the basis for a claim under the 2008 Regulations referred to in paragraph [60] above.

### The Courts of England Would Provide a Convenient Forum for the Efficient, Just and Expeditious Resolution of Such Similar Claims

62. The English courts would provide a convenient forum for the efficient, just and expeditious resolution of claims brought the Plaintiffs on the basis of the allegations made in the US Proceedings.

63. English courts have a strong and well-earned reputation for fairness in the resolution of disputes.

64. The English courts have a great deal of experience with foreign litigants.

65. Generally, in my experience, provided the claimant/s is determined to move forward without delay, cases in English courts proceed expeditiously toward a conclusion, usually reaching trial within 1-2 years of commencement.

66. I have already referred above to the remedies that could be granted by the English courts, and confirm that these include financial remedies and injunctive relief, remedies claimed by the Plaintiffs in the Complaint.

67. I note that the basis (or at least one basis) for the financial remedies claimed by the Plaintiffs in the Complaint appears to be that each spent a specific amount on

premium content fees, of which a percentage was paid to OnlyFans, without receiving what they paid for. The amounts allegedly spent by the Plaintiffs vary with some claiming to have spent as much as $20,000 to $25,000 (Complaint ¶ 279) or $5,000-$10,000 (*ibid.* ¶ 251), whilst others claim to have spent a thousand or several hundred dollars (*ibid.* ¶¶ 296, 312). I anticipate that the amount of money paid by each Plaintiff to OnlyFans would be ascertainable from the Defendants' records.

68.    I note that the Complaint contains a claim by the Plaintiffs on behalf of all members of a defined class and a sub-class. In English law there are various procedures analogous to a class action which the Plaintiffs could seek to deploy.

69.    Collective proceedings in which claims are brought by a large number of individual claimants using a single Claim Form are one such procedure. This procedural approach is permitted by CPR 19.1 which provides that "[a]ny number of claimants or defendants may be joined as parties to a claim", and CPR 7.3 which provides that "[a] claimant may use a single claim form to start all claims which can be conveniently disposed of in the same proceedings".

70.    The use of a single Claim Form to bring very large numbers of relatively low value individual claims was developed in a case called *Abbott v Ministry of Defence* [2023] 1 WLR 4002, where several thousand low-value personal injury (deafness) claims were brought using a single Claim Form. The procedure adopted in *Abbott* has recently been approved by the Court of Appeal – with a relaxation of the test for joinder of such claims – in *Morris v Williams Solicitors* [2024] EWCA Civ 376 where large numbers of individuals sued a law firm using a single Claim Form alleging negligent advice. At [63] the Court of Appeal stated that "*Any number of claimants or defendants may be joined as parties to proceedings, and claimants may use a single claim form to start all claims which can be conveniently disposed of in the same proceedings*".

71.    This procedural approach is now commonly adopted in the English courts in data breach claims where each individual claimant's claim may be worth only a few hundred pounds. Although this procedural approach requires each claimant to opt in and

21

1  provide certain basic information to the solicitors bringing the case, the economies of scale
2  achieved by joining thousands of claimants in one action have led to the regular use of the
3  procedure. There would be no reason why the Plaintiffs' claims in the US Proceedings,
4  which as noted above appear to range in value between several hundred dollars and tens of
5  thousands of dollars, could not be pursued using this procedure. Such claims can be case
6  managed using generic pleadings, lead or test cases, preliminary issues, and other steps
7  which limit costs.

8      72.    The collective procedural routes available to the Plaintiffs would also include
9  a Group Litigation Order under CPR 19.11, which allows a group of people who wish to
10  bring claims that give rise to common or related issues of fact or law to apply to the court
11  for a group litigation order to be made, providing for the claims to be managed together,
12  usually by a single designated judge. The group litigation order will establish a register of
13  the claims included in the group, which is maintained by the claimants' lead solicitor. The
14  order may also make provision for how the litigation costs are to be shared among the
15  claimants. How the claims are managed is a matter for the designated judge, but procedures
16  typically used are to select one or more claims to be tried as test claims while the remaining
17  claims are stayed and to decide as preliminary issues common issues of law or fact which
18  are potentially dispositive of the litigation. Unless the court orders otherwise, a judgment
19  given or order made in the litigation is binding on all the claimants included in the group
20  register. *See* CPR r 19.12(1)(a).

21      73.    Another collective procedural route is a representative action under CPR 19.8
22  seeking declaratory relief to be followed by individual claims for compensation (*see Lloyd*
23  *v Google LLC* [2022] AC 1217 at [47]-[48], [58], [81], [84]), a representative action
24  seeking a global award of damages for all members of the class (a so-called "top-down"
25  award—*see Lloyd* (*ibid.*) at [53]-[55], [82]-[86]), or a representative action for individual
26  awards of damages provided these are of a uniform amount and do not require individual
27  assessment (*Lloyd* (*ibid.*) at [82]). A representative action under CPR 19.8 can also allow
28  a "bifurcated process whereby issues common to the claims of a class of persons may be

1  decided in a representative action which, if successful, can then form a basis for individual
2  claims for redress." *Lloyd* (*ibid.*) at [48]. The representative rule, which has existed since
3  1873, *Lloyd* (*ibid.*) at [68], imposes "no limit (either as a minimum or maximum) on the
4  number of people who may be represented," and only one limit is imposed: "that the
5  representative has the 'same interest' in the claim as the person(s) represented." *Lloyd*
6  (*ibid.*) at [69]. And "there is ordinarily no need for a member of the represented class to
7  take any positive step, or even to be aware of the existence of the action, in order to be
8  bound by the result." *Lloyd* (*ibid.*) at [77]. English courts have the discretion to "establish
9  a simple procedure for opting out of representation." *Lloyd* (*ibid.*)

10      74.    The English High Court has held that a representative claim may be pursued
11  which seeks to recover for each class member a readily ascertainable sum which will be
12  identifiable from the defendant's records, even if the sum in question differs from one class
13  member to another. The case which establishes this—*Commission Recovery Limited v*
14  *Marks and Clerk LLP* [2023] 2 All ER (Comm) 949—concerned a representative claim to
15  recover differing amounts of undisclosed commission payments unlawfully deducted from
16  moneys due to members of the claimant class, where the amounts deducted in relation to a
17  particular class member would be ascertainable from the defendant's records. This case
18  was upheld by the English Court of Appeal in *Commission Recovery Limited v Marks and*
19  *Clerk LLP* [2024] 2 All ER Comm 391, in a judgment which emphasized the flexibility of
20  the representative action procedure, holding that the representative claimant can use the
21  procedure to establish core propositions in relation to liability that would benefit all
22  members of the class as a step towards the recovery of financial remedies for class members
23  The English Supreme Court refused permission to appeal against the Court of Appeal's
24  decision. In my view there is no reason why the same approach could not be taken to the
25  present claim—the amounts paid by the Plaintiffs and each class member would
26  presumably be ascertainable from the Defendants' records of an individual's transaction
27  history if liability is established.

28

75.    I have noted above that the Plaintiffs' claim for injunctive relief in the US Proceedings includes enjoining Defendants from continuing the unlawful practices complained of. The wide jurisdiction of the English High Court to grant declaratory and injunctive relief enables it to grant comparable relief.

76.    The jurisdiction of the English High Court to grant declaratory relief is derived from statute, originally the Court of Chancery Act 1850, then section 50 of the Chancery Procedure Act 1852. The present statutory foundation is section 19 of the Senior Courts Act 1981, read together with CPR Part 40.20. The modern practice is to regard the availability of declaratory relief as a beneficial, discretionary and flexible remedy. The English High Court is particularly willing to grant appropriate declaratory relief where there is a 'test case', or it may affect a significant number of other cases, and it is in the public interest to decide the issue concerned.

77.    The jurisdiction of the English High Court to grant injunctive relief is also conferred by statute in section 37 of the Senior Courts Act 1981, and is in the widest terms. Section 37(1) states that: "The High Court may by order (whether interlocutory or final) grant an injunction . . . in all cases in which it appears to the court to be just and convenient to do so." The width of this jurisdiction has been repeatedly emphasised by the highest English courts. In a recent authoritative review of the law and practice in this area in *Convoy Collateral Ltd v Broad Ideas International* [2023] AC 389, Lord Leggatt at [57] approved the following statement of principle: "The powers of courts with equitable jurisdiction to grant injunctions are, subject to any relevant statutory restrictions, unlimited. Injunctions are granted only when to do so accords with equitable principles, but this restriction involves, not a defect of powers, but an adoption of doctrines and practices that change in their application from time to time". Lord Leggatt described the correctness of this statement of principle as "settled" at [58]. The judgment of Lord Leggatt also makes the important point at [28] that the claim before the English court in respect of which an injunction is sought does not have to arise under English law (as opposed to foreign law), it only has to be one which the English court regards as legally sustainable.

78.    These wide powers to grant declaratory and injunctive relief would enable the English High Court to grant a declaration that it would be unlawful for the Defendants to continue to offer services to Fans on the Website in the manner complained of by the Plaintiffs.

79.    It is thus my opinion that English courts would provide a fair, impartial, efficient, and, given the underlying facts alleged by the Plaintiffs in this matter, convenient forum for the resolution of this dispute, particularly given the parties' choice of forum.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 24, 2024, in London, England.

By: _____
   Signed by:
   Antony White KC
   4F40192028894AA
                 Antony White KC

# EXHIBIT A





Called: 1983

|

Silk: 2001

|

Called (Northern Ireland): 2016

> "Antony is practical and authoritative."
>
> CHAMBERS & PARTNERS 2023

**MAIN AREAS OF PRACTICE**

International Arbitration

Commercial Law

Civil Liberties and Human Rights

Media and Information Law

Data Protection

Defamation and Privacy

Private International Law

Public International Law

Public Law

Commercial Public Law

International Law

# ANTONY WHITE KC

Contact Antony: antonywhite@matrixlaw.co.uk | +44 (0)20 7404 3447

Contact Antony's Practice Team (Team X): TeamX@matrixlaw.co.uk

Antony's principal areas of practice are media and information law with a particular emphasis on privacy and data protection, and commercial law and arbitration.

Antony combines an intellectual approach with a relaxed and user-friendly manner.

## Media and Information Law

A leading silk in the area of media and information law, Antony has particular expertise in privacy and data protection, and also handles defamation and breach of confidence cases. He is regularly instructed in cutting edge cases in this area by tech companies, print and online publishers, broadcasters and other media organisations.

## Commercial Law

In the commercial field, his most recent cases have included commercial confidentiality, tech industry disputes, fraud and asset tracing, conflicts of laws and jurisdiction, commercial agency, foreign government guarantees, and an increasing number of heavy international arbitrations.

## Publications

Contributor to Information Rights, Ed. Coppel, Fifth Edn (Hart, 2020)

Privacy and Trade Unions sections, Bullen & Leake & Jacobs Precedents of Pleadings, 19th edition (Sweet and Maxwell, 2019)

Administrative Law chapter of Civil Appeals edited by Sir Michael Burton, 2nd edn (2013)

Co-author, Privacy and The Media – The Developing Law (Matrix, 2002)

Contributor to The Freedom of Information Handbook, Ed. Carey

Contributor to Enforcing Contracts in Transition Economies (EBRD/BIICL, 2005)

**Antony's Privacy Notice**

*Antony is committed to protecting and respecting individual's privacy where and to the extent appropriate. In order to provide legal services to his clients, including advice, drafting and representation services, Antony needs to collect and hold personal data. This includes his client's personal data and the personal data of others who feature in the disputes and other matters upon which he is instructed. To read Antony's privacy notice in full, please see here.*

## DIRECTORY RECOMMENDATIONS

*"He is the leader in the market and is a pleasure to work with." "He is the doyen of data protection." "He is s"Antony is incredibly accessible and client friendly."uper smart and clients love working with him." "His judgement is always spot-on." "He is a go-to expert on data privacy."*

**Chambers & Partners, 2025, Data Protection**

*"Antony is very bright and has a good way of presenting things in court." "A pleasure to work with, he's a barrister who's effortless in his analysis."*

**Chambers & Partners, 2025, Commercial Dispute Resolution**

*"Antony is pre-eminent in his area and is the go-to KC if clients want the best there is. He has a towering intellect, which he combines with an effortless ability to make complex matters seem simple. On top of that, he is a pleasure to work with - highly engaged, responsive, and popular with clients."*

**Legal 500, 2025, Data protection**

*"Excellent judgement and an advocate whom judges respect and listen to. A team player and a good lawyer."*

**Legal 500, 2025, Commercial litigation**

*His written and oral advocacy are absolutely first rate - he is calm, measured and analytically and intellectually incisive, yet has an easily accessible and persuasive style.*

**Legal 500, 2024, Commercial Litigation**

*"He is calm, measured, analytical, intellectually incisive, and has an accessible and persuasive style."*

**Legal 500, 2024, Data Protection**

*"He's the kind of barrister you're lucky to get on your case; he works in all the big cases in the area. He's polite, decisive, realistic and an extremely strong advocate." "He's extremely calm, ordered and very easy to work with. He is incredibly sharp, knows the law inside out and has very good judgement in terms of how to present arguments." "His intellect is terrifying and his advocacy is unrivalled. He is a brilliant all-round lawyer." "He's strong across the board."*

**Chambers & Partners, 2024, Data Protection**

*"He is the one to instruct. His written advice is incredibly clear and he is very good in court." "His advice is mesmerising." "His intellect is terrifying, advocacy is unrivalled, he is a brilliant all-round lawyer. He is great."*

**Chambers & Partners, 2024, Defamation & Privacy**

*"A fantastic advocate." "Antony White is extremely personable and persuasive - a very skilled advocate."*

**Chambers & Partners, 2024, Group Litigation**

*"Antony is practical and authoritative."*

**Chambers & Partners, 2023, Defamation & Privacy**

*"Antony is super smart and very good at taking apart the other side on cross-examination in a quiet and very forensic way." "He has encyclopaedic knowledge of the law and is a joy to work with."*

**Chambers & Partners, 2023, Group Litigation**

*"He has exceptional experience of privacy and data security litigation cases, and has a detailed understanding of the underlying commercial and technological issues."*

**Chambers & Partners, 2023, Commercial Litigation**

*"Antony is absolutely brilliant to work with and is excellent. He's super for data protection matters and is really highly thought of." "Antony cannot be faulted in any area. He is a very strong senior counsel across the board in this practice area."*

**Chambers & Partners, 2023, Data Protection**

*"Very strong data privacy lawyer, very much at the top of this field."*

**Legal 500, 2023, Data Protection**

*"Antony is the doyen of complex defamation and privacy matters. His encyclopaedic knowledge of fraud is an essential ingredient for picking him in the high profile difficult matters in defamation, data protection and privacy matters. He is exceptional and a pleasure to deal with."*

**Legal 500, 2023, Defamation & Privacy**

*"Fabulous on strategy and tactics; a great advocate; delightful to work with."*

**Legal 500, 2023, Group Litigation**

*"Extremely calm, user-friendly, insightful, knowledgeable and commercial in his advice. An excellent all-round advocate and strategist."*

**Legal 500, 2023, Media and Entertainment**

*"He is an excellent advocate, has a very good feel for judges and is trusted by courts. He is very easy to work with. A real team player. Straightforward. Diligent."*

**Legal 500, 2023, Commercial Litigation**

*"He is a very talented advocate and a fantastic practitioner in the area." "He is hugely experienced and has great gravitas."*

**Chambers & Partners, 2022, Group Litigation**

*"An excellent advocate, who is very succinct and very straightforward in his submissions. Antony is trusted by judges and has a good feel for cases and how tribunals might be thinking. He also understands how to work in a team."*

**Chambers & Partners, 2022, Commercial Dispute Resolution**

*"He is the best on complex media and data protection disputes." "He's very client-friendly, has a great manner and is a really great advocate." "He's superb: he has encyclopedic knowledge of privacy and data protection but at the same time is able to approach problems from a pragmatic perspective."*

**Chambers & Partners, 2022, Data Protection**

*"The very best QC for data privacy work. He's doing all the leading cases and is a dream to work with."*

**Legal 500, 2022, Data Protection**

*"Antony is a very strong advocate, very clear in his advice and very personable."*

**Legal 500, 2022, Defamation & Privacy**

*"Antony is just the best of the best. His knowledge of data protection law is incredible and he has been involved in mɑ of the cutting edge media cases of recent years. You really cannot go wrong working with Antony."*

**Legal 2022, Media and Entertainment (Including Art and Cultural Property)**

*"Very intelligent, strategic, easy to work with, good with clients and crisp and authoritative in advocacy. A gem."*

*Legal 500, 2022, Commercial Litigation*

*"Extraordinarily clever and knows how to deliver difficult messages in exactly the right way."*

*"There are a number of barristers specialising in traditional media torts, and there are now a number of data protection specialists, too. However, there are not many who are genuinely expert in both fields. Antony White QC is one."*

*"Exceptional on all fronts, an excellent advocate in the courtroom but equally skilled at providing clear advice to clients on complex areas of law."*

*"A superb forensic advocate and a great team player."*

*"Incredibly persuasive, great at winning clients' trust and brilliant in Court."*

*"One of the best all-round barristers."*

*"First class in terms of service, and on-point and concise in his legal analysis."*

*"An extraordinary talent with an incredible brain."*

*"A strategic thinker of the highest calibre."*

*"Manages to make complex matters simple and knows the various legal regimes like the back of his hand." "He is great at finding the way forward in very difficult cases."*

*"He is fantastically bright and a pleasure to work with."*

*"A very likeable, modern and easy to use silk."*

*"Antony is a strategic thinker of the highest calibre. Excellent on his feet, he is also user-friendly."*

*"He just gets it – he is a genius and very thoughtful."*

*"He's wonderful, a truly gifted advocate and a complete delight."*

*"Really unbelievably intelligent."*

*"He provides extremely clever arguments and unique viewpoints on cutting-edge cases."*

---

Please consider the environment and only print this material if you absolutely need to. Please dispose of this material responsibly.

Exhibit A, Page 3





# ANTONY WHITE KC

**MAIN AREAS OF PRACTICE:**
Media and Information Law
Arbitration
Commercial and Corporate Law
Employment Law
Human Rights Law
International Law
Public Law

Called to the Bar 1983 (England & Wales)
Appointed to Silk 2001
Called to the Bar 2016 (Northern Ireland)

**CONTACT:**
antonywhite@matrixlaw.co.uk
+44 (0)20 7404 3447
Elizabeth Bousher, Senior Practice Manager
elizabethbousher@matrixlaw.co.uk

## NOTABLE CASES

## Media and Information Law

**Phone-hacking litigation 2013-2017** - leading counsel for NGN

**Leveson Inquiry** – acting for NGN

***Al Masarir v Kingdom of Saudi Arabia*** [2022] EWHC 2199 (QB)
(sovereign immunity, alleged hacking of phone in England by foreign state)

***ZXC v Bloomberg LP*** [2022] AC 1158 SC
(privacy rights in relation to criminal investigations)

***Lloyd v Google LLC*** [2021] 3 WLR 1268 SC
(compensation in data protection claims, representative action)
***Collins v Ticketmaster UK Ltd*** [2021] Costs LR 123
(available causes of action in data breach claims)

***Warren v DSG Retail Ltd*** [2021] EMLR 25
(available causes of action in data breach claims)

***HRH Duchess of Sussex v Associated Newspapers Ltd*** [2021] EMLR 15; [2021] 4 WLR 35; [2020] 1 WLR 4762; [2020] EMLR 21
(high profile privacy claim)
***Sicri v Associated Newspapers Ltd*** [2021] 4 WLR 9
(privacy in arrest, availability of reputational damages)

***Qatar Airways Group v Middle East News LLC*** [2020] EWHC 2975 (QB)
(malicious falsehood – jurisdiction where tort committed abroad)

***Dawson-Damer v Taylor Wessing LLP*** [2020] Ch 746
(data protection – LPP exemption; relevant filing system)

***NT1 v Google LLC*** [2019] QB 344
(right to be forgotten claims vs Google)

***Ali & Aslam v Channel 5*** [2019] EWCA Civ 677; [2018] EMLR 17
(privacy claim against broadcaster of documentary TV programme)

***Stunt v Associated Newspapers Ltd*** [2018] 1 WLR 6060
(compatibility of DPA journalistic exemption with EU law)

Antony White KC:
antonywhite@matrixlaw.co.uk
+44 (0)20 7404 3447
Elizabeth Bousher, Senior Practice Manager
elizabethbousher@matrixlaw.co.uk

**matrix**
chambers

*CG v Facebook Ireland* [2017] EMLR 12
(intermediary liability for private information posted online)

*Weller v Associated Newspapers Ltd* [2016] 1 WLR 1541
(Misuse of private information – photographs of children taken in public place)

*O v Rhodes* [2016] AC 219
(Use of Wilkinson v Downton tort to restrain publication of autobiography)

*Vidal-Hall v Google Inc* [2016] QB 1003
(Misuse of private information - is it a tort, compensation in data protection)

*Axon v Ministry of Defence* [2016] EMLR 20
(Naval Commander removed from command for bullying – no right to privacy)

*Mosley v Google Inc* [2015] EMLR 11
(Search engine liability for availability on the internet of private photographs)

*Hegglin v Google Inc* [2015] Costs LO 65
(Search engine; trolling)

*Bewry v Reed Elsevier* [2015] 1 WLR 2565
(Libel, extension of limitation period)

*Hannon & Dufour v NGN* [2015] EMLR 1
(Compensation for damage to reputation in breach of confidence claim)

*Karpov v Browder [*2014] EMLR 8
(Libel- foreign claimant – real and substantial tort)

*Tamiz v Google Inc* [2013] 1 WLR 2151 CA
(Liability of information society service providing blog platform for defamatory postings by blogger)

*Davison v Google Inc* [2012] 3 CMLR 6
(Liability of information society service providing blog platform for defamatory postings by blogger)

*Twentieth Century Fox v BT* [2012] Bus LR 1461
(Injunction against internet service provider under s.97A CDPA 1988)

*R (BT and TalkTalk) v Secretary of State* [2012] Bus LR 1766
(Compatibility of online infringement of copyright provisions of the Digital Economy Act 2010 with EU law)

*Trimingham v Associated Newspapers Ltd* [2012] 4 All ER 717
(Harassment claim against newspaper)

*Imerman v Tchenguiz* [2011] Fam 116 CA
(Privacy in computerized information; breach of confidence; relevance of "Hildebrand" rules)

2

Exhibit A, Page 5

Antony White KC:
antonywhite@matrixlaw.co.uk
+44 (0)20 7404 3447
Elizabeth Bousher, Senior Practice Manager
elizabethbousher@matrixlaw.co.uk

**matrix**
chambers

*A v Independent News and Media* [2010] 1 WLR 2262 CA
(Media rights of access to Court of Protection; media rights to receive
information under Art 10)

*Metropolitan International Schools v Google* [2009] EMLR 27 [2011] 1
WLR 1743
(Liability of search engine for libel)

*Author of a blog v Times Newspapers Ltd* [2009] EMLR 22
(Privacy - anonymous blogger's identity)

*Harrods Limited v Times Newspapers Ltd* [2006] EMLR 13
(Breach of confidence; public interest defence; disclosure)

*Naomi Campbell v MGN Ltd* [2004] 2 AC 457 HL
(Privacy / breach of confidence/ data protection)

*Sara Cox v MGN Ltd* [2003]
(Privacy)

*Marco Pierre White v New York Times* [2000]
(Defences of volenti and contributory negligence in libel proceedings)

*Cherie Blair v Associated Newspapers Ltd* [2000]
(Privacy)

*Keen v Dow Jones* [1999]
(Claimant's right to make statement in open Court after accepting
'commercial' payment into Court in contested action - impact of Articles 6
and 10 of ECHR)

*HRH Princess of Wales v Taylor* (comprised early 1995)
(Appeared for gym owner throughout this novel litigation relating to the
developing law of privacy)

*ITP v BBC Enterprise and Others Copyright Tribunal* (Feb 1992)
(Major copyright litigation under Schedule 17 of the Broadcasting Act 1990
relating to television and radio listings. Appeared for Time Out and Hello
Magazine)

*Bookbinder v Tebbit (No. 2)* [1992] 1 WLR 217
(Public interest immunity in relation to District Audit Service Reports in libel
proceedings)

*Derbyshire County Council v Times Newspapers Ltd* [1992] QB 770 CA
(Impact of Article 10 ECHR on English libel law - right of local authority to sue
in libel)

## Commercial Law

*TRW Pensions Trust v Indesit & ors* (2020) 190 Con LR 84
(joinder outside limitation period)

3

Exhibit A, Page 6

Antony White KC:
antonywhite@matrixlaw.co.uk
+44 (0)20 7404 3447
Elizabeth Bousher, Senior Practice Manager
elizabethbousher@matrixlaw.co.uk



***Eurasia Sports Ltd v Aguad*** [2020] LLR 303; [2018] 1 WLR 6089
(Service out of jurisdiction in online gambling industry fraud claim)

***Fortescue Metals Group v Argus Media*** [2020] EWHC 1304 (Ch)
(commercial breach of confidentiality, public interest defence)

***Agbara v Shell Petroleum Development Co of Nigeria*** [2019] EWHC 3340
(QB)
(enforcement of foreign judgment, breach of natural justice)

***Twentieth Century Fox v BT*** [2012] Bus LR 1461
(Injunction against internet service provider under s.97A CDPA 1988)

***R (BT and TalkTalk) v Secretary of State***  [2012] Bus LR 1766
(Challenge to the compatibility of the on-line infringement of copyright
provisions of the Digital Economy Act 2010 with EC law)

***Dowans Holdings SA v Tanzania Electricity Supply Corp*** [2011] 2 Lloyds
Rep 475
(Enforcement of NY Convention arbitration award subject to challenge under
law of the seat)

***AES Ust Kamenogorsk v Ust Kamenogorsk JSC*** [2011] 2 Lloyds Rep 233
(Arbitration anti-suit injunction and declaratory relief; recognition of foreign
judgments; submission to the jurisdiction of foreign courts)

***Internet Broadcasting Corporation v Mar LLC*** [2009] 2 Lloyds Rep 295
(Construction of exemption clauses)

***BNP Paribas v Wockhardt EU Operations AG*** (2009) 132 Con LR 177
(Penalty clauses)

***Barlow Clowes (In liquidation) v Henwood*** [2008] BPIR 778
(Commercial fraud, insolvency, domicile)

***Film Finance Inc v Royal Bank of Scotland*** [2007] 1 Lloyds Rep 382
(Construction of arbitration clauses)

***Republic of Pakistan v Zardari*** [2006] 2CLC 667
(Conflict of laws; constructive trusts)

***Marubeni Hong Kong and South China Ltd v The Mongolian
Government*** (No.2) [2005] 2 Lloyds Reports 231
(Performance bonds; discharge of foreign government guarantee under rule
in *Holme v Brunskill*)

***Arab National Bank v El Abdali*** [2005] 1 Lloyds Rep 541
(Jurisdiction of English Court over fraudulently obtained foreign arbitration
award)

***Tigana Ltd v Decoro Ltd*** [2003] EU LR 189
(Commercial agents' regulations)

Exhibit A, Page 7

Antony White KC:
antonywhite@matrixlaw.co.uk
+44 (0)20 7404 3447
Elizabeth Bousher, Senior Practice Manager
elizabethbousher@matrixlaw.co.uk



*Marubeni Hong Kong and South China Ltd v The Mongolian Government* [2002] 2 All ER (Comm) 873
(Foreign government guarantee, conflict of laws, test for validity of English jurisdiction clause where guarantee alleged to be ultra vires, forum non conveniens)

*Chellaram v Chellaram* [2002] 3 All ER 17
(Conflict of laws; jurisdiction of English court under Brussels Convention Article 5(6) and CPR 6.20 in relation to foreign trusts; forum non conveniens)

*Fyffes Group Ltd v Templeman* [2000] 2 Lloyds Reports 643
(Equitable remedies for bribery)

*Re Migration Services International Ltd* [2000] 1 BCLC 666
(Directors disqualification - impact of Section 216 Insolvency Act 1986)

*Jyske Bank (Gibraltar) Ltd v Spjeldnaes and Ors* [1999] 2 BCLC 101
(section 423 Insolvency Act 1986 and the Brussels Convention) and [1999] Lloyds Rep. (Banking) 511 Dishonest assistance in breach of fiduciary duty)

*Python (Monty) Pictures Ltd v Paragon Entertainment Corporation* [1998] EMLR 640
(Assignment of contracts - side letters)

*Padmanor Investments Ltd v Soundcraft Electronics Ltd* [1995] 4 All ER 683
(Effect of offers to compromise in three-party litigation)

*Attorney-General for Hong Kong v Reid* [1994] AC 324 PC
(Proprietary remedies of principal against bribed fiduciary)

*Sonangol UEE v Lundqvist* [1991] 2 QB 310 CA
($100 million international commercial fraud relating to oil trading. Worldwide mareva injunctions. Privilege against self-incrimination)

*R v Cross* [1990] 91 Cr. App. R 115 CA
(Insider dealing prosecution)

*Attorney General's Reference (No.1 of 1988)* [1989] AC 971 HL
(Insider dealing)

*Allied Arab Bank v Hajjar (No. 2)* [1988] QB 944
(Major International banking/commercial fraud)

## Employment Law

*Brennan v Sunderland City Council (No. 3)* [2012] ICR 1183 EAT
Third party proceedings in sex discrimination claim

*Enterprise Management Services v Connect-Up Ltd* [2012] IRLR 190
TUPE - service provision change

Exhibit A, Page 8

Antony White KC:
antonywhite@matrixlaw.co.uk
+44 (0)20 7404 3447
Elizabeth Bousher, Senior Practice Manager
elizabethbousher@matrixlaw.co.uk



***In the matter of Horan*** [2011] Eq LR 473
Disability discrimination; reasonable adjustments for disabled advocate

***Buckland v Bournemouth University*** [2011] QB 323 CA
Repudiatory breach cannot be cured; test of reasonableness in unfair dismissal

***Gibb v Maidstone etc NHS Trust*** [2010] IRLR 786 CA
Validity of "irrationally generous" public sector termination package

***Armstrong v Newcastle etc NHS Trust*** [2010] ICR 674 EAT
Equal pay - market forces GMF

***Hovell v Ashford and St Peters NHS Trust*** [2009] IRLR 734 CA
Equal pay; proof of equal value

***Brennan v Sunderland City Council*** [2009] ICR 479 EAT
Waiver of legal professional privilege in collective bargaining

***Nicholls v. Coventry City Council*** [2009] IRLR 345 EAT
Equal pay; GMF defences

***R (Marrion) v. Secretary of State*** [2009] CA
Firefighters' Pension Scheme

***Brennan v. UNISON*** [2008] ICR 955
Sex discrimination; collective agreements

***Walton Centre NHS Trust v. Bewley*** [2008] ICR 1047
Equal pay; hypothetical comparator

***Crowson Fabrics Ltd v Rider*** [2008] IRLR 288
Employee competition, confidential information, database right

***Cooper v Isle of Wight College*** [2008] IRLR 124
Deduction of pay in response to strike action

***Wetherill v Birmingham City Council*** [2007] 1RLR 781 CA
Unilateral variation of contracts of employment

***Dunnachie v Kingston-upon-Hull City Council*** [2005] IAC 226 HL
Compensation for injury to feelings or psychiatric injury in unfair dismissal proceedings

***Igen Ltd v Wong*** [2005] ICR 931 CA
Burden of proof in discrimination cases

***Murphy v Slough Borough Council*** [2005] ICR 721 CA
DDA claims by teacher employed at school with delegated budget

***Beart v HM Prison Service (No.2)*** [2005] ICR 1206 CA
DDA and unfair dismissal claims; causation

Exhibit A, Page 9

Antony White KC:
antonywhite@matrixlaw.co.uk
+44 (0)20 7404 3447
Elizabeth Bousher, Senior Practice Manager
elizabethbousher@matrixlaw.co.uk



***Crossley v Faithfull & Gould Holdings Ltd*** [2004] ICR 1615 CA
Employer's duty to safeguard economic well-being of employees

***Dunnachie v Kingston-upon-Hull City Council (No.3)*** [2004] ICR 227
Use of 'Ogden Tables' to calculate unfair dismissal compensation

***R (Arthurworry) v London Borough of Haringey*** [2002] ICR 279

Employer's duty of trust and confidence; disciplinary proceedings in advance of public inquiry

***Midland Mainline Ltd v RMT*** [2001] IRLR 813 CA
Industrial action - balloting requirements

***DTI v First Point International Ltd*** The Times 24 August 1999. Div Ct
Employment Agencies - lawfulness of appraisal for work overseas

***McVitae v UNISON*** [1996] IRLR 33
Disciplinary proceedings against trade union members following amalgamation of unions

***Barnsley MBC v Prest*** [1996] ICR 85 EAT
Redundancy payments

***Harrison v Kent County Council*** [1995] ICR 434 EAT
Refusal of employment because of past trade union activities

***Sunderland Polytechnic v Evans*** [1993] ICR 392 EAT Wages Act
Deductions in response to industrial action

***Johnstone v Bloomsbury Health Authority*** [1992] QB 333 CA
Hours of work of junior doctors; impact of UCTA on contracts of employment

***Deebank v West Midlands Residuary Body*** [1990] ICR 349 CA
Continuity of service in Local Government

***London Borough of Tower Hamlets v Rabin*** [1989] ICR 693 EAT
Race discrimination: Sabbath observance by Orthodox Jew

***Logan-Salton v Durham County Council*** [1989] IRLR 99 EAT
Consensual termination of employment contracts

***Miles v Wakefield DC*** [1987] AC 539 HL
Employers' right to deduct pay in response to industrial action

## Public Law and Local Government Law

***R (London Borough of Islington and ors) v Mayor of London*** (2013)
Challenge to closure of London fire stations

***R (BT and TalkTalk Group) v Secretary of State*** [2012] Bus LR 1766
Challenge to the compatibility of the on-line infringement of copyright provisions of the Digital Economy Act 2010 with EC law

Exhibit A, Page 10

Antony White KC:
antonywhite@matrixlaw.co.uk
+44 (0)20 7404 3447
Elizabeth Bousher, Senior Practice Manager
elizabethbousher@matrixlaw.co.uk



***R v Lord Chancellor ex parte Lightfoot*** [2000] QB 597 CA
Validity of delegated legislation abrogating common law and Article 6 ECHR
rights of access to the Courts

***Shine v UKCC Independent*** 18 October 1999. Div Ct
Right of appeal under section 12 of the Nurses Midwives and Health Visitors
Act 1997 where a nurse is cautioned for misconduct

***R v Mayor, Commonalty and Citizens of the City of London ex parte
Matson*** [1997] 1 WLR 765 CA
Duty to give reasons for rejecting Alderman elect in City election

***R v Secretary of State for Education ex parte C*** [1996] ELR 93
Gifted child/special education needs

***R v Sheffield HBRB ex parte Smith*** (1994) 28 HLR 36
Test for commercial tenancy under Housing Benefit Regulations

***R v Kirklees MBC ex parte C*** [1993] 2 FLR 187 CA
Detention of child in adult mental hospital outside Mental Health Act 1983

***R v Greenwich London Borough Council ex parte Lovelace and Fay
(No.2)*** [1992] QB 155 CA
Local authorities' rights against the Legal Aid Board

***R v Manchester Crown Court ex parte Killin*** The Times 31 October 1991;
[1992] COD 23
Abuse of process in criminal proceedings

***R v Merseyside Police Authority ex parte Alison Halford (Nos.1&2)***
(1991 and 1992 - unreported)
Judicial review of Police Authority decisions by highest-ranking woman police
officer

***R v Greenwich London Borough Council ex parte Lovelace and Fay***
[1991] 1 WLR 506; CA
Councillor's rights and duties to vote in accordance with conscience

***R v Derbyshire County Council ex parte Times Supplements Limited***
[1991] 3 Admin LR 241; DC
Improperly-motivated local authority decision-making

***R v Derbyshire County Council ex parte Noble*** [1990] ICR 808; CA
Public/private law distinction in judicial review

***R v Secretary of State for Education ex parte Hardy*** The Times, 28 July
1988; [1989] COD 186; DC
School closures

***Coin Street Community Builders v London Borough of Barking and
Dagenham*** The Times, 20 July 1988; CA
Local government re-organisation in London

Exhibit A, Page 11

Antony White KC:
antonywhite@matrixlaw.co.uk
+44 (0)20 7404 3447
Elizabeth Bousher, Senior Practice Manager
elizabethbousher@matrixlaw.co.uk



**Attorney-General v Observer Limited** [1988] 1 All ER 385
Effect of 'Spycatcher' injunction on library authorities

**R v Secretary of State for Home Department ex parte Herbage** [1987] QB 872
Availability of injunctive relief against the Crown in judicial review

**Short v London Borough of Tower Hamlets** [1985] 18 HLR 171 CA
Consultation duties under the Housing Act 1985

## Constitutional and Commonwealth Cases in the Privy Council

**A.G. for Trinidad & Tobago v Whiteman** [1992] 2 AC 240
Constitutional rights of arrested suspects

**Administrator General for Jamaica v Exley Ho**. (1992 - unreported)
Jamaica - practice in relation to res judicata and issue estoppel

**Harewood v Retese** [1990] 1 WLR 333
Admissibility of extrinsic evidence in contracts for sale of land

**Baird v Baird** [1990] 2 AC 548
Nomination of beneficiary under company pension scheme

**Crampad International Marketing Company v Thomas** [1989] 1 WLR 242
Jamaican landlord and tenant legislation

**Gordon v Chokolingo** (July 1988 - unreported)
Law of libel in Trinidad and Tobago

**Sookoo v AG for Trinidad & Tobago** [1986] AC 63
Constitutional propriety of continuation in office of Chief Justice after retirement age

### Other Cases

**Re a Debtor (No. 490-SD-1991)** [1992] 1 WLR 507
Setting aside of Statutory Demand in case of partly disputed debt

**Harrison v Tew** [1990] 2 AC 523 HL
Taxation of solicitor's bills

**Mount Carmel Investments Limited v Peter Thurlow Limited** [1998] 1 WLR 1078 CA
Limitation of actions

**R v Governor of Pentonville Prison ex parte Herbage (No. 3)** [1986] 84 Cr App R 149
Extradition

**matrix** chambers



**MAIN AREAS OF PRACTICE:**
Media and Information Law
Arbitration
Commercial and Corporate Law
Employment Law
Human Rights Law
International Law
Public Law

Called to the Bar 1983 (England & Wales)
Appointed to Silk 2001
Called to the Bar 2016 (Northern Ireland)

**CONTACT:**
antonywhite@matrixlaw.co.uk
+44 (0)20 7404 3447
Elizabeth Bousher, Senior Practice Manager
elizabethbousher@matrixlaw.co.uk