Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile:  (213) 330-7152
Email:  christopherp@hbsslaw.com

Robert B. Carey (*pro hac vice*)
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile:  (602) 840-3012
Email:  rob@hbsslaw.com
          leonarda@hbsslaw.com
          michellak@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC, MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC,<br><br>Defendants. | Case No. 8:24-cv-01655-FWS-SSC<br><br>**DECLARATION OF JONATHAN KIRK KC IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS FENIX INTERNATIONAL LIMITED'S AND FENIX INTERNET LLC'S MOTION TO DISMISS FOR FORUM NON CONVENIENS**<br><br>Hon. Fred W. Slaughter |

I, Jonathan Kirk KC, under penalty of perjury, declare and state as follows:

1.      My name is Jonathan Kirk KC and I have been a practising barrister for 29 years, with my main area of expertise being consumer law and consumer finance. I finished my law degree (LLB Hons) at Kings College London in 1994 and then completed the Bar Vocational Course the following year. In November 1995 I was called to the Bar of England and Wales at Lincoln's Inn and have practised as a full time barrister since that time. I was appointed as Queen's Counsel in April 2010. I became King's Counsel in September 2022 on the death of Queen Elizabeth II.

2.      I am the principal author and editor of the Pink Book on consumer law (*Consumer and Trading Standards: Law and Practice* published by Lexis Nexis) and have been for each of the 12 editions since it was first published in 2001. I am also the co-author of the legal textbook *Mis-selling Financial Services (Kirk, Samuels & Finch)* published by Edward Elgar and one of the two general editors of *Kirk & Kingham*, The *Encyclopaedia of Financial Services,* published by Thomson Reuters.

3.      I am currently ranked as the only star individual silk (i.e., King's Counsel) for consumer law by Chambers & Partners and a Band 1 KC by the Legal 500.[1] I have frequently appeared in the English courts on consumer law matters, including the Court of Appeal and UK Supreme Court. For example, I represented *ParkingEye* in the Supreme Court in *Beavis v ParkingEye*, which remains the seminal English authority on civil penalties and unfair contract terms in consumer contracts

4.      Over my career I have acted for numerous well-known companies on consumer law issues including British Airways, Apple, Amazon, Ebay, Norton, McAfee, Tesco, Asda, Lloyds Bank, Barclays Bank, Ticketmaster, Carpetright and

---

[1] The two main legal directories in the UK.

Wren. I have also acted for many UK consumer law regulators including National Trading Standards, Ofgem, the Office for Product Safety and Standards and numerous local authority trading standards departments. I also advise and act for the UK Government on a variety of national consumer law and financial services law issues.

5.     I am a barrister at Gough Square Chambers, which is ranked the leading consumer law set of barrister's chambers in the UK. My professional address is Gough Square Chambers, 6-7 Gough Square, London EC4A 3DE, United Kingdom. Curriculum vitae and the details of my experience are set out in **Annex 1** of this Expert Opinion.

6.     I was requested by Plaintiffs' counsel on behalf of the anonymised putative class Plaintiffs, N.Z., R.M., B.L., S.M., and A.L., to provide my professional opinion on the above-captioned court proceeding in the view of English Law and to respond to the Declaration of Mr. Antony White KC (the 'AW Declaration') on this regard. A list of the documents which were provided to me for review for the purpose of preparing this Expert Opinion is attached as **Annex 2** to this Expert Opinion. References to English Law should be read as references to the law as it applies in England and Wales.

**The following is my expert opinion:**

**Introduction**

7.     I am instructed to provide an Opinion on the applicability of English law to the contractual arrangements between the Defendants and United States ('US') consumers using the OnlyFans website. I am asked, in particular, to address:

(a)     Whether the exclusive jurisdiction clause in the OnlyFans' contract terms is lawful and enforceable under English law?

(b)     Whether the clause purporting to limit liability in relation to US consumers to USD 250 is lawful under English law?

(c)     The capacity of US consumers to bring analogous proceedings in the English civil court system.

**Summary of opinion**

8.     In my opinion the exclusive jurisdiction clause is highly likely to be considered an unfair term in a consumer contract under Part 2 of the Consumer Rights Act 2015 ('CRA 2015'), and is therefore unlawful under English law. An English court would almost certainly find that it is not binding in a consumer contract. It follows that I disagree with the conclusion reached in the AW Declaration, which fails even to address this fundamental aspect of UK consumer law.

9.     The effect of forcing a US consumer to litigate in the courts of England over small amounts is that an individual consumer claim is very unlikely to be economical. The jurisdiction clause effectively operates as a bar to litigation. There is equally no good reason that an international company of this size and resource would be materially prejudiced by defending litigation in the country where the consumers that it substantially trades with live.

10.     I accept that an exclusive jurisdiction clause in a contract negotiated between commercial parties may well be upheld by an English Court where there is no 'good reason' to depart from it. But that is plainly very different to a contract under which a consumer pays relatively small amounts to a company that, I am instructed, trades internationally and generated USD 8.6 billion revenue in fiscal year 2023 from the US for providing services to US consumers.

11.     Where an exclusive jurisdiction clause is unlawful, in my opinion an English court would also find that an (in this case, English law) applicable law clause is also an unfair term. I also consider that the clause limiting liability to USD 250 for US consumers is a prohibited term in a consumer contract under section 57 of the Consumer Rights Act 2015 ('CRA 2015').

12.    I agree with the AW Declaration that there is a mechanism through which group litigation could be advanced in the English court system.[2] However, I disagree that this is analogous to a US class action, which can proceed on a class member opt-out basis. With the exception of certain actions for breaches of competition law,[3] group litigation in the English courts is opt-in, subject to the discussion of representative actions below. It would therefore require each claimant to be identified and to consent to the proceedings, including the risk of incurring adverse costs, including the adverse party's legal fees.

**Relevant facts**

13.    My summary of the relevant facts is drawn from the Complaint and from my instructions. The OnlyFans platform is a subscription-based content-sharing website directed towards consumers. It has been hugely successful to the extent that by late 2023 there were 300 million Fan accounts and over 4 million Creator accounts subscribed to the platform.

14.    The OnlyFans platform is owned by Fenix International Limited ("Fenix International") a company incorporated in England with its principal place of business in London. The turnover of Fenix International for the year 2023 was 6.6 billion USD. I am instructed that Fenix International has over 1,000 "associated members" located in the United States—including over 100 in California.

15.    Fenix International also wholly owns a Delaware limited liability company called Fenix Internet LLC ("Fenix Internet"), which, according to the defendants, provides only payment processing services in the US.

16.    In 2023, I am instructed that the OnlyFans platform collected over USD 8.6 billion revenue from fans located in the US. I am also instructed that the

---

[2] Primarily by a Group Litigation Order ('GLO') under Part 19 of the Civil Procedure Rules.

[3] Under Schedule 5 of the CRA 2015.

KIRK DECL. ISO PLS.' RESP. IOT DEFS.' MTD FOR FORUM NON CONVENIENS
Case No: 8:24-cv-01655-FWS-SSC

US consumers are responsible for approximately 66 percent of Fenix International's total global revenue.

17.    Fenix Internet's operation in the US includes taking payment from US consumers for the OnlyFans platform. It provides payment processing services for all US payments, which also includes payments between Fans and Creators after purchases are made on the OnlyFans platform.

18.    The detailed facts of the Plaintiffs' complaint are set out in the Class Action Complaint, which I have considered. The essence of the claim is that Fenix International and Fenix Internet mislead their US consumer users of the OnlyFans website by making false and deceptive advertising statements and omissions regarding the supposedly authentic and/or direct nature of the communications with Creators that share content; and that the communications are, in fact, with individuals with agencies (i.e. with professional "chatters"), such as Agency Defendants. These communications are alleged to have violated various US privacy, racketeering and consumer protection laws. For the purposes of this Declaration, however, it is not necessary to comment on the merit of the complaint or the merits of any potential defences.

19.    The focus of my consideration is the contractual terms between consumers using the OnlyFans platform and Fenix International, which are described on the OnlyFans website as the Terms of Service ('ToS'). I have been provided with ToS dated November and December 2021. The ToS purport to prevent US consumers bringing legal claims against Fenix International in the jurisdiction where they live, and apply English law to any claim brought by the consumer.

**English civil proceedings**

20.    I have been asked to address the effect of the exclusive jurisdiction clause and, as a consequence, will need to address the applicable law clause. In this respect it is important to analyse the realistic effect of exclusively choosing the

English courts and (then to the extent relevant) laws on an individual US consumer who wants to bring a damages claim against Fenix International and Fenix Internet.

21.    I am instructed that the loss for many US consumers is likely to be far below £10,000. In the English courts this would mean that an individual claim would automatically be allocated to the small claims track of the County Court, which applies for damages claims up to £10,000.[4] This is the lowest tier of the English civil court system and an important consequence of that allocation is that, even if the consumer wins their case, legal advice and representation costs (including attorney fees) are very rarely recoverable from the losing Defendant.[5]

22.    In my opinion, without any legal advice and representation, it would be extremely difficult for a US consumer to use English law and procedure to bring a civil claim in the English courts, as it would similarly be difficult for a UK consumer to bring a claim for a small amount in the US courts. For example, if an individual US consumer claims a loss of (say) £200, then it is very unlikely that the consumer could obtain sufficient legal services for less than the amount in dispute.[6] It is highly unlikely that any UK lawyer would take on a case based on a contingency fee where legal costs cannot ordinarily be recovered.

23.    It follows that such an exclusive jurisdiction clause is likely to be a very significant deterrent to an overseas consumer pursuing a small claim because it is unlikely to be economical to do so.

**Unfair terms in consumer contracts**

---

[4] CPR Part 26.8.

[5] Civil Procedure Rules 27:14(2) unless the Defendant had "behaved unreasonably" or there is a claim for specific performance, in which case costs are limited to a maximum of £100.

[6] Even the lower hourly rates for a London solicitor with under 4 years' experience are £260.

KIRK DECL. ISO PLS.' RESP. IOT DEFS.' MTD FOR FORUM NON CONVENIENS
Case No: 8:24-cv-01655-FWS-SSC

24.     The application of English law plainly includes the various laws applicable to consumers. A "Consumer" is defined as *"an individual acting for purposes that are wholly or mainly outside that individual's trade, business, craft or profession"* throughout consumer law provisions. It is clear that the Plaintiffs are consumers under English law, and their contracts with the Defendants are consumer contracts.

25.     A key aspect of English law protecting consumers are the provisions relating to unfair terms in consumer contracts. The effect of these provisions is that a contract term in a consumer contract that is unfair is treated as being unlawful and not binding on a consumer.[7]

26.     The law on unfair terms is now enacted in Part 2 of the Consumer Rights Act 2015 ('CRA 2015'), which derives from European Union law in the form of the Unfair Contract Terms Directive ('UTCCD').[8] It is a mandatory part of the English law applicable to consumers. Its place in English law was described recently by the High Court[9] as follows:

> "[Part 2 of the] Consumer Rights Act 2015 is … the enactment in the UK of EU Directive 93/13 on unfair terms in consumer contracts ("the UTCCD")….There can be no dispute that the UTCCD represents public policy. This has been authoritatively established by the decisions of the CJEU … [which are] authority for the proposition that consumer protection as regards the fairness of contractual terms had "equal standing to national rules which rank, within the domestic legal system, as rules of public policy". These decisions have the

---

[7] Section 62(3) of the CRA 2015.

[8] It was previously implemented in the Unfair Terms in Consumer Contracts Regulations 1999 and 1994.

[9] *Payward Inc. v Maxim Chechetkin* [2023] EWHC 1780 (Comm) [104-8] Bright J.

status of retained CJEU case law. Accordingly, they bind this
Court…. The fact that Consumer Rights Act 2015 is a UK statute,
rather than a mere English statute, arguably underlines its general
significance, in policy terms. This also means that it expresses the
policy of the UK as a whole".

27.     Section 71 of the CRA 2015 provides that an English Court has a
mandatory duty to consider whether the term in a consumer contract is unfair, even
if that issue is not raised by the parties. It follows that any English court applying
English law has a unilateral duty to consider whether the terms in a consumer
contract are unfair terms under Part 2 of the CRA 2015.

**The Unfairness Test**

28.     The basic assessment of fairness is by reference to the test in section
62(4) of the CRA 2015, which is supplemented by a non-exhaustive list of
illustrative unfair terms, known as the "grey list".[10] There are additionally certain
contract terms that are prohibited in all circumstances, such as those that seek to
restrict the liability of a trader to a consumer.[11]

29.     The primary test for determining whether a term is unfair in section
62(4) of the CRA 2015, provides:

"A term is unfair if, contrary to the requirement of good faith, it causes a
significant imbalance in the parties' rights and obligations under the contract
to the detriment of the consumer."[12]

30.     The test is usually distilled into two parts, (a) significant imbalance
and (b) good faith. These have to be assessed from the objective standpoint of the

---

[10] Schedule 2 of the CRA 2015.

[11] Section 64 of the CRA 2015.

[12] Implementing Article 3(1) UTCCD.

average consumer,[13] who is reasonably well informed, observant and circumspect.[14] The assessment is made at the time of contractual agreement and takes into account *"all the circumstances existing when the term was agreed"*.[15]

31.    In the context of group litigation it is also important to understand that the assessment of fairness is of the contractual term by reference to its effect on an individual contracting consumer, rather than by reference to any group of consumers or litigants.

*Significant Imbalance*

32.    Significant imbalance is an assessment of the rights and obligations in relation to a particular term, rather than comparison of each party's rights under the whole contract or the general strength of the parties. In *Director General of Fair Trading v First National Bank*[16] Lord Bingham explained this element of the test as follows:

 "The requirement of significant imbalance is met if a term is so weighted in favour of the supplier as to tilt the parties' rights and obligations under the contract significantly in his favour. This may be the granting to the supplier of a beneficial option or discretion or power, or by the imposing on the consumer of a disadvantageous burden or risk or duty."

*Good faith*

33.    In *First National* Lord Bingham gave the classic explanation of what good faith involves:

"The requirement of good faith in this context is one of fair and open dealing. Openness requires that the terms should be expressed fully, clearly and

---

[13] See *Aziz* (C-415/11) [2013] 3 CMLR 5 at [68] and *Andriciuc* (C-186/16) [2018] Bus LR 1081 at [47].

[14] S.64(4) and (5) CRA.

[15] S.62(5) of the CRA.

[16] [2002] 1 AC 481.

legibly, containing no concealed pitfalls or traps. Appropriate prominence should be given to terms which might operate disadvantageously to the customer. Fair dealing requires that a supplier should not, whether deliberately or unconsciously, take advantage of the consumer's necessity, indigence, lack of experience, unfamiliarity with the subject matter of the contract, weak bargaining position… Good faith in this context is not an artificial or technical concept… [i]t looks to good standards of commercial morality and practice."[17]

34.     Lord Millett added:

"It may also be necessary to consider… whether, in such cases, the party adversely affected by the inclusion of the term or his lawyer might reasonably be expected to object to its conclusion and press for its deletion."[18]

35.     When considering whether a term is contrary to the requirement of good faith, the Court of Justice of the European Union ('CJEU') in *Aziz* stated that the national court must assess whether the trader:

"dealing fairly and equitably with the consumer, could reasonably assume that the consumer would have agreed to such a term in individual contract negotiations".[19]

*UK consumer rights on jurisdiction*

36.     In approaching both *significant imbalance* and *good faith,* an English court is required to take into account a consumer's ordinary legal rights.[20] In the UK, and European Union ('EU'), consumer law is underpinned by an important

---

[17] At [17D] and [17F].

[18] At [54].

[19] At [69].

[20] See *Aziz* [68] and *ParkingEye v Beavis* [2015] UKSC 67 [105(2)].

principle that consumers should ordinarily be able to commence proceedings against overseas defendants, that have directed activities towards the consumer's country, in the courts where the consumer lives.

37.    Before Brexit that fundamental principle was provided by the recast Brussels Regulation on jurisdiction.[21] The recitals[22] in the Brussels Regulation include the following statement of principle:

> "In relation to … consumer …. Contracts, the weaker party should be protected by rules of jurisdiction more favourable to his interests than the general rules."

38.    The rationale behind this principle of consumer protection was repeated in the unfair terms case of *Ocean Grupo*[23] by the CJEU:

> "[A contract term on jurisdiction] obliges the consumer to submit to the exclusive jurisdiction of a court which may be a long way from his domicile. This may make it difficult for him to enter an appearance. In the case of disputes concerning limited amounts of money, the costs relating to the consumer's entering an appearance could be a deterrent and cause him to forgo any legal remedy or defence…. In disputes where the amounts involved are often limited, the lawyers' fees may be higher than the amount at stake, which may deter the consumer from contesting the application of an unfair term."

39.    Following Brexit, the Brussels Regulation consumer protection rules were replaced by section 15B of the Civil Judgments and Jurisdiction Act 1982

---

[21] Articles 17-19 of Regulation 1215/2022 Regulation on the jurisdiction and the recognition and enforcement of judgments in civil and commercial matters. (**Brussels Regulation**).

[22] The preliminary text setting out the purpose of an EU measure and can be used to interpret the provisions.

[23] CJEU Oceano Grupo C-240/98 [22].

('CJJA'). It has been confirmed in the English Courts[24] that the new statutory provisions provide precisely the same level of consumer protection as was afforded to consumers by the Brussels Regulation.

40.    Section 15B states that where a consumer is domiciled in the UK the consumer may bring proceedings, in relation to a consumer contract,[25] in the courts where he is domiciled. It follows that, if the position here was interchanged, and the consumer was in the UK and the trader in the US, the consumer would automatically be able to bring proceeding in an English court, even if the contract included an exclusive jurisdiction clause in favour of the courts in a US state.

41.    I do not agree with the AW Declaration where it is stated[26] that Section 15B of the CJJA is not applicable to US consumers because its protection is afforded only to consumers in the UK. However, it is not necessary to resolve that reflexive conflicts law issue because a consumer's jurisdictional rights are plainly a significant factor that must be considered as part of the unfair terms analysis.

42.    I do not accept that the rationale for the express right to sue in a consumer's home state is that the legal regime of an EU member state (pre-Brexit) or the UK (post-Brexit) is "likely to be more protective of consumer rights than the 'foreign' jurisdiction or applicable law".[27] This ignores the clear language of the relevant legislation. As the AW Declaration accepts, the enhanced rights for consumers in EU law expressly included the "right to sue in the court of the member state where they lived") (emphasis added). This right applied even where

---

[24] *Soleymani v Nifty Gateway plc* [2023] 1 WLR 436.

[25] Including "a contract which has been concluded with a person who—(i) pursues commercial or professional activities in the part of the United Kingdom in which the consumer is domiciled, or (ii) by any means, directs such activities to that part or to other parts of the United Kingdom including that part, and which falls within the scope of such activities" section 15E(1)(c) of the CJJA.

[26] See paragraph 32 in the AW Declaration.

[27] See paragraph 33 in the AW Declaration.

an exclusive jurisdiction clause would otherwise have required them to sue in another EU state.[28] If the AW Declaration was right, such protection would not be required because the same EU laws, and therefore the same "enhanced protections", would apply equally in such other EU state.

43.    Instead, as I have set out above, and was repeated in *Ocean Grupo*, UK and EU consumer law is fundamentally underpinned by the principle that consumers should ordinarily be able to commence proceedings against overseas defendants, that have directed activities towards the consumer's country, in the courts where the consumer lives.

*Grey list terms*

44.    As I have indicated above, the substantive fairness test in section 62(4) of the CRA 2015 is supplemented by a statutory 'Grey List',[29] which is *"an indicative and non- exhaustive list of terms of consumer contracts that may be regarded as unfair"*.[30] The Grey List is taken directly from the Annex to the UTCCD.

45.    Both the EU and English courts have found exclusive jurisdiction terms to be unfair in consumer contracts by reference to paragraph 20[31] of the Grey List which refers to a contract term that:

46.    In *Oceano Grupo* (see above) the CJEU struck down an exclusive jurisdiction clause in a consumer contract for the purchase of a Spanish

---

[28] See Article 18(1) of the Brussels Regulation: "A consumer may bring proceedings against the other party to a contract either in the courts of the Member State in which that party is domiciled or, regardless of the domicile of the other party, in the courts for the place where the consumer is domiciled."

[29] Part 1 of Schedule 2 to the CRA 2015.

[30] Section 63(1) of the CRA 2015.

[31] Paragraph Q in the Annex to the UTCCD.

encyclopaedia by instalments.[32] The term sought to give exclusive jurisdiction to the courts of Barcelona. The term was found to be unfair by reference to the Grey List illustrative identified above.

> "Such a term thus falls within the category of terms which have the object or effect of excluding or hindering the consumer's right to take legal action…..Where a jurisdiction clause is included, without being individually negotiated, in a contract between a consumer and a seller or supplier and where it confers exclusive jurisdiction on a court in the territorial jurisdiction of which the seller or supplier has his principal place of business, it must be regarded as unfair within the meaning of Article 3 of Directive 93/13 on unfair terms in consumer contracts in so far as it causes, contrary to the requirement of good faith, a significant imbalance in the parties' rights and obligations arising under the contract, to the detriment of the consumer."[33]

47.    *Oceano Grupo* was decided before Brexit and it therefore remains binding on an English Court.[34] It was followed in *Standard Bank London v Apostolakis (No. 2),* where the English High Court struck down an exclusive jurisdiction clause in a consumer contract for financial services. The consumers were Greek and the contract purported to give exclusive jurisdiction to the English courts. Steel J. stated:

> "I recognise that in terms of a consumer contract the arrangements into which the defendants entered must be at the 'business' end of the scale given the size of the investments made. Nonetheless the purpose of the regulations is to protect consumers and it is into that category that they fall. The present

---

[32] It was repeated by the CJEU in *Penzugyi* C-137/08 [54] in relation to a car loan agreement containing a exclusive jurisdiction clause for the courts of a country foreign to the consumer borrower.

[33] [22]-[24].

[34] See section 6 of the European Union (Withdrawal) Act 2018.

proceedings alone demonstrate the potential cost and inconvenience of being bound to this jurisdiction, all conducted in a language that they do not speak. I conclude that the imbalance, which has taken the defendants by surprise, is contrary to good faith and, accordingly, that the jurisdiction clause is not binding."[35]

48.    The UK Competition and Markets Authority[36] ('CMA') has also issued guidance on the unfair terms provisions of the CRA 2015, including:[37]

"5.29.7 Exclusive jurisdiction: Consumers should not normally be prevented from starting legal proceedings in their local courts – for example, by a term requiring resort to the courts of England and Wales despite the fact that the contract is being used in another part of the UK having its own laws and courts. It is not fair for the consumer to be forced to travel long distances and use unfamiliar procedures to defend or bring proceedings.

5.29.8 Choice of Law: A contract may specify the applicable law that purports to govern the contractual relationships between the trader and the consumer. The Act makes provision to ensure that the consumer may not be deprived of the protection of the unfair terms provisions of Part 2 of the Act, where the 'consumer contract has a close connection with the United Kingdom' but the contract states that the law of a non-EAA state applies. In these circumstances, the unfair provisions of the Act will apply. Further, international conventions lay down rules on this issue, which are part of UK law.121 Terms which conflict with them are also likely to be unenforceable."

**(1)    Exclusive jurisdiction**

---

[35] [51] *Standard Bank London v Apostolakis (No. 2)* QBD [2002] CLC 939.

[36] The Competition and Markets Authority is the UK's national regulator of both competition and consumer law.

[37] Unfair contract terms guidance: CMA37 (publishing.service.gov.uk).

49.    In my opinion this exclusive jurisdiction clause is highly likely to be considered an unfair contract term under English law. I can see no reason that a court would depart from the decision of the CJEU in *Oceano Grupo* as this is an exclusive jurisdiction clause in a contract between a trader and a consumer in a court that is foreign to the consumer. In particular,

(a)    It is disproportionate for an international company, of the size and resource of Fenix International, to force a US consumer to litigate only in an English court. That is plainly a significant imbalance in the rights and obligations flowing from the exclusive jurisdiction clause.

(b)    The effect of this standard term, which is not negotiated between the parties, is likely to mean that it would not be economical for an individual US consumer ever to litigate against Fenix International over relatively small sums. It is highly unlikely that this would not have been a consideration when the clause was drafted by Fenix International. It is likely to amount to a breach of the requirement of good faith.

(c)    Most of Fenix International's global revenue (approximately 66 percent) is received from US consumers. Those consumer payments, both those by US fans and those made to US creators, are administrated by its wholly owned subsidiary in the US. Part of its management team and, in particular, its majority shareholder are based in the US, rather than the UK. It plainly has the resource and capacity to litigate in the US where most of its customers live.

(d)    An English court would inevitably compare the capacity of such an international business to litigate in the US courts against a consumer's capacity to do so in an English court. In this context an English court would be likely to find that the exclusive jurisdiction clause does not operate as an efficient means of resolving disputes, but as a device to deter consumer claims.

(e)    To the extent that the laws in California confer mandatory statutory rights on consumers, in considering "all of the circumstances" an English court

would be likely to consider the extent to which any of those rights might be abrogated, as either a legal or practical matter, in determining whether the exclusive jurisdiction clause is unfair. If enforcement would be likely to limit or abridge a consumer's mandatory rights in the US, an English court would be likely to find the clause to be unfair.

(f)    I am also instructed that an effect of the exclusive jurisdiction clause is that a US consumer would lose any right to a civil jury trial,[38] which is not available in the English courts. Although the unfair terms provisions are applied by reference to the average consumer,[39] which is an objective standard, this is not to the exclusion of relevant *"social, cultural and linguistic factors".*[40] In my view the loss of an important civil right derived from the US Constitution is also likely to be a factor pointing towards the unfairness of an exclusive jurisdiction term as a matter of English consumer law.

### Cases cited in the AW Declaration

50.    The common law cases cited in the AW Declaration are commercial cases that are plainly subservient to an English statute which implements mandatory consumer laws, such as the CRA 2015. I do not agree that an English court would generally adopt the same approach to interpreting or construing a

---

[38] I am instructed that, in US federal courts, the general operative rule is that, where the remedy requested is monetary damages, the plaintiff is entitled to a jury trial if properly demanded. The right derives from the Seventh Amendment to the US Constitution, which states that: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." The US Supreme Court has stated that *"[t]he aim of the amendment . . . is to preserve the substance of the common- law right of trial by jury . . . [such that] issues of law are to be resolved by the court and issues of fact are to be determined by the jury under appropriate instructions by the courts" Baltimore & Caroline Line v. Redman*, 295 U.S. 654, 657 (1935).

[39] Which is similar to the standard of the reasonable person.

[40] Case C-220/98 *Estee Lauder Cosmetics v Lancaster Group Gmbh* [2000] ECR I-117.

consumer contract as it would for a commercial contract.[41] There are numerous mandatory rights designed to protect consumers when contracting, for example:

(a)    section 69(1) of the CRA 2015 enshrines a form of the *contra proferentem* rule in consumer contracts, stating that *"if a term in a consumer contract, or a consumer notice, could have different meanings, the meaning that is most favourable to the consumer is to prevail."*

(b)    In section 2(4) of the CRA 2015 a trader disputing the status of a consumer bears the legal burden of proving that they were acting for a business purpose.

(c)    Under section 50 of the CRA 2015 creates the rule in a contract for services that *"anything that is said or written"* by the trader is to be treated as a term of the contract, where a consumer has relied upon it.

(d)    There are various statutory consumer rights that are implied into a consumer contract for services, such as the right for a service to be performed with reasonable care and skill, for a reasonable price where that is not agreed, and performance within a reasonable time.[42]

(e)    There are mandatory pre-contract information provisions in a consumer contract,[43] which must also be treated as terms of the contract.[44]

(f)    There are mandatory cancellation rights that are applicable to the provision of a service under a distance contract, where a consumer makes an online purchase.[45]

---

[41] See paragraph 26 of the AW Declaration.

[42] Chapter 4 of Part 1 to the CRA 2015.

[43] Under Chapter 1 of Part 2 of the Consumer Contracts (Information, Cancellation and Additional Charges) Regulations 2013 [regulation 9, 10 or 13].

[44] Section 50(3) of the CRA 2015.

[45] Chapter 3 of Part 2 to the Consumer Contracts (Information, Cancellation and Additional Charges) Regulations 2013.

(g)    There are prohibitions against a trader excluding or restricting liability (see below).[46]

(h)    There are statutory remedies for breaching the statutory rights, such as the right to enforce terms, repeat performance and the right to a price reduction.[47]

51.    There are equivalents for each of these provisions in relation to the sale of goods[48] or digital content.[49]

52.    It follows that I cannot agree with the assertion in the AW Declaration that an English court's approach to a consumer contract would be anything close to the exercise it performs when considering exclusive jurisdiction clauses in commercial contracts. There would be an obvious focus on the policy of protecting consumers in these circumstances.

53.    In any event, the cases cited in the AW Declaration are obviously factually very different. They all involved significant commercial disputes where the amounts in dispute were substantial.

(a)    The *Sinochem case*[50] cited at [23] and [25] in the AW Declaration involved a contractual USD 8 million dispute that arose between two oil companies over a fuel oil sale.

---

[46] Section 57 of the CRA 2015.

[47] Sections 55-56 of the CRA 2015.

[48] Chapter 2 of Part 1 to the CRA 2015.

[49] Chapter 3 of Part 1 to the CRA 2015.

[50] *Sinochem International Oil (London) Co. Ltd v Mobil Sales and Supply Corp Ltd* [2000] 1 All ER (Comm) 758.

-19-

(b)    The *Fiona Trust case*[51] cited at [26] in the AW Declaration concerned a commercial shipping dispute over an international charter party. The underlying litigation involved a claim for over USD 850 million.[52]

(c)    The *Emmott case*[53] cited at [26] in the AW Declaration involved a £4 million commercial dispute over a partnership agreement.

(d)    *Donohue v Armco*[54] cited at [29] and [30] in the AW Declaration involved a commercial dispute involving USD 40 million from a company management buyout.

(e)    *Catlin Syndicate*[55] cited at [30] in the AW Declaration involved a commercial insurance dispute involving an energy dispute over. £1.4 billion.

(f)    *Antec International Ltd v Biosafety USA Ltd*[56] concerned a commercial dispute between chemical manufacturing entities, and is addressing a non-exclusive jurisdiction clause in any event.

54.    In my opinion, even if the CRA 2015 did not apply, an English court would not uphold an exclusive jurisdiction clause in these circumstances. The common law test for whether to enforce an exclusive jurisdiction clause, as set out in *Sinochem,* is not rigid, it effectively means that an exclusive jurisdiction clause will be upheld unless there is a good reason to depart from it. Those "good reasons" include factors such as:

(a)    the relative convenience and expense of trial.

(b)    Where the evidence of fact is situated or more readily available.

---

[51] *Fiona Trust & Holding Corp v Privalov* [2007] Bus L.R. 1719.

[52] *See Fiona Trust & Holding Corporation v Privalov* [2010] EWHC 3199 (Comm).

[53] *Emmott v Michael Wilson & Partners* [2017] 2 All ER (Comm).

[54] *Donohue v Armco Inc.* [2002] C.L.C. 440.

[55] *Catlin Syndicate Ltd v. Amec Foster Wheeler USA Corp* [2021] 2 CLC 15.

[56] *Antec International Ltd v Biosafety USA Ltd* [2006] EWHC 47 (Comm).

(c)    How closely the parties are connected to the country.

(d)    Whether the defendants genuinely desire trial in the foreign country, or are only seeking procedural advantage.

(e)    Whether the claimants would be prejudiced for any reason, including procedure.[57]

55.    In my opinion an English court would find that there was a good reason for the exclusive jurisdiction clause not to apply, even if the CRA 2015 did not apply. The most powerful and persuasive factor in that assessment is that the contract is between a US consumer and an international company with an obvious presence and huge financial interest in the US market. The services it provides are used by consumers in the US and the typical disputed amount would make it uneconomical to pursue an individual claim in the English courts. This does not fall into the foreseeable "factors of convenience" as suggested in the AW Declaration when addressing commercial contracts.

*Applicable law*

56.    If an English court was to determine that the exclusive jurisdiction clause was unfair, in my opinion, it would also be likely to determine that the applicable law clause was unfair. There are two primary reasons why using English law to determine a US consumer dispute in a US court would be unfair.

(a)    It would mean that an individual US consumer would be put to the expense of obtaining English counsel in US consumer litigation. This is likely to be expensive and wholly prohibitive to the typical consumer subject to the contract.

(b)    An award of damages is likely to be lower in the English courts. Under English conflicts of law principles, the applicable law governs the assessment of

---

[57] See *The Eleftheria* [1970] P 94, 99-100.

damages.[58] It follows that the Claimant's damages would be assessed under English legal principles. Damages are essentially compensatory and focus on loss. Punitive damages, usually referred to as exemplary damages, are rarely awarded in the English courts. They cannot be awarded for a breach of contract, however outrageous the defendant's conduct.[59] They are only available for certain torts in limited circumstances such as where the defendant's conduct has been oppressive.[60] I am instructed that treble damages are sought by the Plaintiffs in the present action under 18 U.S.C. Section 1964(c), which are also not available in the English courts.

### (2)    Limitation of liability

57.    Certain contractual terms purporting to limit a trader's liability in consumer contracts are prohibited by various provisions in Part 1 of the CRA 2015.[61] Under section 57 a term whereby a trader seeks to contractually exclude or restrict a right or remedy in relation to the provision of a service to a consumer is unlawful and is not binding.[62] In my opinion clause 14b of the contractual arrangements, which purports to limit liability in relation to US consumers to USD 250 is unlikely to be lawful under English law.

### (3)    Group litigation in the English courts

58.    The primary mechanism for bringing collective or 'group' action in the English courts is a Group Litigation Order ('GLO') under Part 19 of the Civil Procedure Rules ('CPR'). If a GLO is ordered a court can make a variety of case

---

[58] In English conflicts of law, the assessment of damages is a part of the substantive law, rather than the procedural. See Rome 1 Convention art 10(1)(c) and 12(1)(c), *Excalibur Ventures LLC v Texas Keystone Inc* [2013] EWHC 2767.

[59] *Addis v Gramophone Co Ltd* [1909] AC 488; *Malik v BCCI* [1998] 1 AC 20.

[60] *Rookes v Barnard* [1964] AC 1129.

[61] They need not be assessed for fairness, see section 62(8) of the CRA 2015.

[62] There are equally similar prohibitions for goods (section 31) and digital content (section 47).

management directions in relation to the determination of *"common or related issues of fact or law"*.

59.    A fundamental distinction between an English GLO and a US class action is that the GLO procedure is opt-in only. The claim is brought on behalf of those claimants (and only those claimants) who are identified in the proceedings and who authorise the claim to be brought on their behalf. Claimants will not be included unless they specifically opt in.

60.    This has several legal consequences for the claimants in a GLO, in particular:

(a)    The claimants must each consent to being an identified claimant in the proceedings.

(b)    Each identified claimant must pay a court issue fee.

(c)    Each claimant as a party to the proceedings is potentially liable, both jointly and severally, for the payment of adverse legal costs (i.e., the adverse party's legal fees).

61.    I note the AW Declaration suggests the Plaintiffs could use a single Claim Form to "bring very large numbers of relatively low value individual claims",[63] in accordance with *Morris v Williams Solicitors* [2024] EWCA Civ 376. As with GLOs, this procedural approach is purely opt-in and is not analogous to the class action brought by the Plaintiffs in these proceedings. It is also an uncertain process because its use ultimately depends upon whether a judge can be persuaded that it is 'convenient' to try the claims together, which is unlikely where there are material factual differences between the individual claimants.

62.    I have also been asked to comment on the capacity to bring representative actions under CPR Rule 19.8 (previously CPR Rule 19.6), which is the oldest of the English remedies for obtaining collective redress. It was developed

---

[63] Paragraph [70] of the AW Declaration.

1    in the Chancery Division of the High Court and remains subject to the requirement

2    that more than one person has the *"same interest"* in the claim.

3        63.    The same interest test has been construed strictly by the English

4    courts[64] and, up until recently, it was generally thought that a representative action

5    was not available where the remedy sought included damages.[65] In 2021 the

6    Supreme Court in *Lloyd v Google* clarified that there may be circumstances where a

7    representative action could be brought in relation to a damages claim, but not where

8    an "individualised assessment" of damages was necessary.[66] The representative

9    claim brought against Google for data protection breaches consequently failed,

10   although the position might have been different had the claimant proposed a

11   bifurcated process separating the assessment of liability from damages.[67]

12       64.    It remains the position that representative actions are rarely used in

13   the English courts as a mechanism for obtaining collective redress, primarily

14   because of the difficult issues raised by the same interest test (including where

15   individualised assessments of damages are required and therefore preclude a

16   representative claim). In commenting on the *Lloyd v Google* case, the authors of the

17   legal textbook "Class Actions in England and Wales"[68] question whether a

18   bifurcated process would ever be financially viable for claimants.

19       *"Another significant question is whether claims brought through a bifurcated*

20       *process of this sort will be financially viable, particularly where (as is often*

21       *the case in large group actions) the claim is reliant on the support of a*

22       *commercial litigation funder. Lord Leggat commented that the reason that*

23

24   ───────────
     [64] *Duke of Bedford v Ellis* [1901] AC 1 [8].

25   [65] See *Markt v Knight Steamship* [1910] 2 KB 1021.

26   [66] [2021] 3 WLR 1268 [80].

27   [67] Per Lord Leggatt [53] et seq.

28   [68] Second Edition published by Sweet & Maxwell, law stated as at 19/8/2022.

1   *Mr Lloyd had not proposed such a process in this case was "doubtless"*
2   *because success in the first, representative stage would not itself generate*
3   *any financial return for the funder or the represented class, so funding the*
4   *proceedings could only be economic if separate damages claims on behalf of*
5   *those individuals who opted in to the second stage would be economic. In*
6   *that case it was clear they would not be - given the relatively low value of the*
7   *individual claims the administrative costs of dealing with individual*
8   *claimants and obtaining evidence to prove quantum on an individual basis,*
9   *and the risk common to all opt-in class action procedures that only a*
10  *relatively small proportion of those eligible to join the action might do so.*
11  *In fact the challenges of funding a class action brought under this sort of*
12  *bifurcated process may be even greater than Lord Leggatt indicated, given*
13  *the potential "free rider" problem. Any funder who supported the initial*
14  *stage would only obtain a return if it signed a sufficient number of funding*
15  *agreements with individual claimants at the second stage - but at that point*
16  *there would be nothing to stop claimants obtaining funding from some other*
17  *funder, who might be able to offer more advantageous terms as they would*
18  *not have incurred costs at the initial stage which they needed to recoup."[69]*
19      65.    I accept that the law on representative actions is a developing area in
20  the English courts. However, I do not agree that either a GLO or representative
21  action is the equivalent of, or even analogous to, the very developed system of class
22  actions in the US, which I am instructed include (for example) a well-developed
23  opt-out procedure, and where there is no risk of incurring adverse legal fees being
24  made against the claimants except in exceptional circumstances, such as frivolous
25  litigation.
26
27  _____
28    [69] [1-021] Page 14.

66.    I also do not agree that the English courts would have the jurisdiction to order the injunctive relief sought by Plaintiffs in this case.[70] Injunctive relief for consumer law infringements in the English courts is generally only sought by regulators, such as the CMA and local authority trading standards departments, under Part 8 of the Enterprise Act 2002 ('EA 2002'), which implemented the EU Injunctions Directive.[71] The civil injunctive remedies under Part 8 EA 2002 for the infringement of consumer rights are not available to a private litigant.

**Conclusion**

67.    In my opinion the exclusive jurisdiction, applicable law and limitation of liability clauses in the ToS are each unfair terms and, under English law, are not binding in a consumer contract. In my opinion, there is no practical analogous proceeding available in the English courts to the type of proceeding filed by Plaintiffs in these US proceedings.

68.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22nd day of November, 2024, in London, England.

By _____
Jonathan Kirk KC
Gough Square Chambers
London EC4A 3DE

---

[70] Cf paragraph 77 of the AW Declaration.

[71] Directive 2009/22/EEC on injunctions protecting the collective interests of consumers.

# ANNEX 1

GOUGH
SQUARE
CHAMBERS

6-7 Gough Square
London, EC4A 3DE, UK
gsc@goughsq.co.uk
Tel. : 020 7353 0924
DX: DX 476 London

# Jonathan Kirk KC

CALL: 1995 | SILK: 2010



Jonathan Kirk KC is currently ranked as the star individual silk for Consumer Law and
Finance.

His practice can be divided into three main areas: **Consumer Law**, **Consumer
Finance** and **Food Law**.

## Consumer law

*"A formidable adversary who knows the business inside out."* Chambers and Partners,
2020 (Star Individual Silk)

*"An outstanding advocate who can distil the most complex of cases to something so
straightforward."* Legal 500, 2022 (Tier 1 KC)

For several years Jonathan has been ranked as the star individual silk for consumer law by
Chambers & Partners and a Band 1 KC by the Legal 500.

He has been the principal author and editor of the Pink Book on consumer law (*Consumer
and Trading Standards: Law and Practice* published by Lexis Nexis) for each of the 11
editions since it was first published in 2001.

Jonathan has been instructed to defend businesses in virtually all of the CMA's sectoral
investigations into consumer law infringements: including supermarket pricing, online retail,
package holidays, furniture, carpet pricing, airline refunds, ground rents, anti-virus
subscriptions, ticket reselling, dating websites and covid cancellation.

He recently represented British Airways in their successful defence to the CMA investigation
in relation to Covid refunds, and is currently instructed in the sectoral investigations into

supermarkets, online website architecture and greenwashing.

In the Supreme Court he represented the successful parking company in *Beavis v ParkingEye,* which now sets out the correct approach to the assessment of unfair terms in consumer contracts and the general application of the civil penalties doctrine.

Jonathan has also acted as an expert witness on consumer law in overseas courts. He was instructed by Apple as its expert witness on UK consumer law in the US courts for its defence of a global class action concerning the performance of older iPhone models.

For over 25 years he has advised and acted in some of most important trading standards litigation. In particular, he has defended numerous companies against allegations of mis-selling and misleading pricing, including the Tesco strawberries litigation. He was the legal adviser and draftsman for the current CTSI Pricing Practices Guide.

In 2023 he represented the successful appellants in the landmark *R (City of York) v AUH* litigation before the Court of Appeal concerning the territorial jurisdiction of a local authority. He also represented the traders in *R v X Limited* the first appellate consideration of the Consumer Protection from Unfair Trading Regulations.

Jonathan was previously an editor of *Miller: Product Liability and Safety Encyclopaedia* and has been involved in many of the most serious product safety cases including dangerous appliances (Whirlpool), cars (Vauxhall), personal protective equipment, electrical imports, toys, clothing and baby and childcare products. He advises the Office of Product Safety and Standards on national product safety issues.

Jonathan is also familiar with money laundering and confiscation, on which he co-authored the textbook: *The Proceeds of Crime Act 2002: A Practitioner's Guide,* published by Jordan.


## Consumer Finance

*"He is a real heavyweight. His strategy is phenomenal – he could pick a path through a minefield".* Legal 500 (Band 1 Leading Silk)

*"Jonathan Kirk KC Regularly defends high-profile corporations against claims of mis-selling and is an expert at advising companies nationwide on their regulatory and enforcement concerns."* Chambers and Partners (Star Individual Silk)

Jonathan is the co-author of the legal textbook *Mis-selling Financial Services (Kirk, Samuels & Finch now in its 2nd Edition)* published by Edward Elgar and one of the two general editors of *Kirk & Kingham,* The *Encyclopaedia of Financial Services,* published by Thomson Reuters.

In 2022 he was nominated as Silk of the Year for Consumer Finance and Group Litigation at the Legal 500 Bar Awards. His new textbook on Consumer Group Litigation will be published by Edward Elgar in 2024.

He represented the successful appellant in *CFL Finance Ltd v Bass, Gertner & Others* in the Court of Appeal's decision on the definition of credit under the Consumer Credit Act 1974, and its application to settlement agreements.

In 2023 he represented both timeshare providers in the High Court test case for the Financial Ombudsman's consideration of mis-selling allegations relating to timeshare lending, unfair relationships and collective investment schemes, *Regina (Shawbrook Bank) & R (Clydesdale Financial Services t/a Barclays Partner Finance) v Financial Ombudsman Service*.

He also acted for *Berkley Burke* in the long-running financial services litigation concerning the non-advised transfer of pension funds. He acted for the company in both the judicial review proceedings brought against the Financial Ombudsman Service and in defence of the related group litigation on collective investment schemes.

He has advised lenders in relation to a wide variety of other group litigation claims, including diesel emissions and business lease cars. He currently defends lenders in the mis-selling litigation over solar panels, motor finance (hidden commission), PPI and timeshare.

Jonathan is also instructed by various Government departments to advise on national consumer finance issues.

## Food Law

*"His knowledge is second to none. A first-class operator and a pleasure to work with."* Legal 500, 2023 (Band 1 Leading Silk)

*"A formidable adversary who knows the business inside out." "He's brilliant and a force to be reckoned with."* Chambers and Partners (Star Individual Silk)

A significant part of Jonathan's practice involves food and feed law and he is rated by Chambers & Partners in relation to life sciences.

He has appeared in the High Court, Divisional Court, Court of Appeal and Supreme Court on food law issues. In the Supreme Court he represented the successful appellant in *Torfaen CBC v Douglas Willis Limited* in relation to the labelling of meat products.

Over the years he has advised and represented most UK supermarkets on food and pricing issues. He represented Tesco in the Divisional Court on minimum durability labelling under the EU Food Information Regulation, *Regina (Tesco Stores Limited) v Birmingham City Council & Another*.

In 2023 he was involved in High Court litigation concerning the safety and Food Standards Agency regulation of raw pet foods, *Happy Hounds Wales Limited v Neath Port Talbot CBC*.

Jonathan represented the UK's CBD industry in submissions before the European Commission on the application of novel food laws to ingested CBD products. He has

advised numerous food businesses on novel foods and been involved in several applications for judicial review of the Food Standards Agency concerning its handling of CBD regulation.

## Background

Jonathan advises National Trading Standards, the Bar Council, the Law Society and various Government departments on consumer law issues.

He has been an Inns of Court advocacy tutor for nearly twenty years and in 2017 was made an honorary member of the CTSI for services to consumer law and trading standards.

As a junior barrister he defended a Rwandan Government Minister accused of genocide, *United Nations v Justin Mugenzi,* at the UN International Criminal Tribunal for Rwanda based in Arusha, Tanzania.

## Testimonials

"A very strong leader who is highly astute, picks up issues quickly and is technically outstanding. The expert at the Bar on consumer law"

**— Chambers UK Bar, 2022**

"A Rolls–Royce silk; exactly who you need on tricky consumer issues."

**— Band 1 Leading Silk, Legal 500**

## Notable cases

- ***Regina (Shawbrook Bank) & R (Clydesdale Financial Services t/a Barclays Partner Finance) v Financial Ombudsman Service***, [2023] EWHC 1069 (Admin) [2023] 5 WLUK 93 – judicial review test case in relation to FOS unfair relationships under the CCA 1974 and mis-selling complaints in relation to timeshare consumer credit and consideration of whether fractional timeshare amount to collective investment schemes.
- ***R v AUH* Number 2** [2023] 1 WLR 1399 Court of Appeal (LCJ) consideration of whether fraud and money laundering were offences "originating from" scheduled consumer offences under schedule 5 of the Consumer Rights Act 2015.
- ***R v AUH*** [2023] 1 WLR 106 Court of Appeal (LCJ) consideration of local authority territorial jurisdiction under Para 46 of Schedule 5 to the Consumer Rights Act 2015 and whether that confers a freestanding right to commence proceedings.
- ***Healthspan Limited v Food Standards Agency*** [2022], judicial review of the Food Standards Agency concerning the amnesty scheme for CBD suppliers.
- ***Happy Hounds Wales Limited v Neath Port Talbot CBC* [2022]** *High Court appeal against prohibition order over the supply raw pet feed and the requirement to be*

*authorised as a feed business.*

- ***Competition and Markets Authority v British Airways plc*** [2022] Defended BA in the CMA investigation concerning Covid 19 refunds for passengers unable to travel because of public health restrictions.
- ***CFL Finance Ltd v Bass, Gertner & Others*** [2021] EWCA Civ 228 | [2021] 4 All E.R. 717 | [2021] 2 WLUK 315 Court of Appeal decision on the application of the Consumer Credit Act 1974 to contractually binding settlement agreements.
- ***Competition and Markets Authority v A National House Builder*** [2021] defended house builder in the CMA investigation into escalating ground rents for leasehold properties
- ***Competition and Markets Authority v An anti-virus software provider*** [2021] defended a second anti-virus software provider in the CMA investigation into that sector.
- ***Regina (on the application of Tesco Stores Limited) v Birmingham Mct, Birmingham CC*** [2020] EWHC 799 (Admin) | [2021] 1 All E.R. 158 | [2021] 1 All E.R. (Comm) 240 Acted for Tesco in judicial review on the application of EU law deeming provision to food with an expired use by date.
- ***Competition and Markets Authority v An anti-virus software provider*** [2020] defended a company in the CMA investigation into the anti-virus software sector.
- ***Competition and Markets Authority v Bijou Weddings Group*** [2020] Defended wedding venue provider in CMA investigation into cancellation of weddings due to Covid 19 public health restrictions.
- ***In the matter of CBD oil, novel foods and the Commission of the European Union*** [2019] Represented CBD (cannabidiol) oil suppliers and manufacturers before the EU Commission (DG Sante) inquiry on the categorisation of CBD oil as a novel food for the purposes of the EU Novel Foods Regulation.
- ***R (Berkeley Burke SIPP Administration Ltd) v Financial Ombudsman Service, Charlton and the Financial Conduct Authority*** [2019 Bus LR 437] Acted on behalf of SIPP administrator in judicial review claim against FOS decision considered to be a test case for financial services sector in relation to the Ombudsman's right to impose duties on the basis of the FCA's general Principles for Business (PRIN Sourcebook).
- ***In Re Device Performance Litigation:*** [2018-9 California ND DC] Instructed to act as expert witness on UK consumer law in the US courts by US technology company in relation to a global class action concerning the performance of older models of mobile telephones.
- ***CMA v An online dating platform*** [2018] Defence of online dating platforms in CMA investigation and Part 8 Proceedings brought in relation to alleged misleading practices in the computer dating sector.
- ***CMA v An online ticker re-seller*** [2018]: Defended two online ticket re-sellers during the third phase of the CMA investigation and Part 8 proceedings into misleading pricing and a failure to provide material consumer information.
- ***Christian Littlewood v Powys County Council*** [2018] CTLC 293 Appeal to the Upper Tribunal against a Estate Agency prohibition order made against an estate agent convicted of insider dealing.
- ***CMA v An online gaming provider*** [2018] Defended online gaming business in CMA and Gambling Commission joint investigation, under Part 8 EA 2002, into misleading and unfair practices in the provision of online gambling facilities.

- *ASA v A sports goods retailer* [2018] Represented national sports goods retailer in defence of ASA complaints concerning misleading price promotions in advertisements.
- *Mohammed Arif and 175 others v BBSAL Ltd* [2017]] EWHC 3108 (Com) Defence of SIPP administrator in group litigation concerning allegedly mis-sold financial products.
- *Civil Aviation Authority v An online package holiday provider* [2017] – represented package holiday provider in Part 8 CAA investigation concerning alleged misleading advertising practices in the comparative sale of packaged flights and accommodation.
- *ASA v A contact lens manufacturer* [2017] acted for complainant business in ASA adjudication on misleading comparative advertising by competitor.
- *BBSAL v Charlton, Brown and Financial Ombudsman Service* [2017] EWHC 2396 (Comm); [2018] 1 Lloyd's Rep. 337; [2017] 10 WLUK 33; [2017] 2 C.L.C. 410; [2018] CTLC 1: Acted for pension administrator in litigation on the application of the Arbitration Act 1996 to the FOS jurisdiction.
- *R (On the application of the Consumers' Association) v Peterborough CC, Whirlpool* [2017] acted for the Primary Authority in judicial review and regulatory product safety enforcement proceedings concerning defective tumble dryers that caused domestic fires.
- *Surrey CC v Zenith Staybrite Ltd and 7 others* [2017] represented double glazing manufacturer in criminal enforcement proceedings under CPUTR 2008 in relation to misleading sales practices.
- *R (on the application of Stephanie Hudson) v Liverpool City Council* (High Court, QBD, 2016): contempt proceedings against the Council for breaching its undertaking to review its decision to restructure its consumer protection services.
- *R (Kingston upon Hull City Council) v Secretary of State for Business, Innovation and Skills, Newcastle City Council and Greggs plc* (High Court, Admin, 2016): represented Greggs plc, an interested party, in a judicial review of the endorsement by BIS' Better Regulation Delivery Office ('BRDO') of advice given under the Primary Authority Scheme to Greggs plc, concerning provision of sanitary facilities.
- *Competition and Markets Authority v Various Supermarkets* (2016): defended a supermarket in the CMA investigation into the Consumers' Association (Which?) super-complaint about pricing and promotional practices in the groceries market.
- *Makdessi v Cavendish Square Holdings BV; Beavis v ParkingEye Ltd* [2016] AC 1172; [2015] 3 WLR 1373 acted for parking company in appeal to Supreme Court concerning an £85 parking charge; case is now the leading decision on penalty clauses, re-examining the scope of the common law doctrine and the approach to challenges to unfair terms in consumer contracts.
- *Competition and Markets Authority v Seatwave, Viagogo, StubHub! and Get Me In!* (2015): defended the Getmein! website in the CMA investigation into the ticket re-selling market.
- *R (Hudson) v Liverpool City Council* (High Court, Admin, 2015): acted in judicial review proceedings against Liverpool CC in relation to the claim that it had drastically reduced its trading standards capacity and therefore breached its European and domestic consumer protection responsibilities.
- *Torfaen County Borough Council v Tesco Stores Limited* (2015) defended Tesco in allegation of mis-selling of peanuts under the Price Marking Order 2004.

- **British Parking Association v A Private Parking Enforcement Company** (2015) defended a private parking company in disciplinary proceedings brought by the British Parking Association in relation to allegations of fraud by parking wardens falsely issuing parking tickets.
- **R (Wren Kitchens Limited) v Advertising Standards Authority** (2015): acted for Wren Kitchens Limited in ASA adjudication on price comparisons and in subsequent judicial review proceedings.
- **Av B Ltd** (High Court, Ch Div, 2015): represented corporate defendant in a  fraudulent misrepresentation trial concerning land in the Cayman islands.
- **OFGEM v Various Energy Companies** (2015): acted for OFGEM in allegations against energy companies under Part 8 EA and the Consumer Protection from Unfair Trading Regulations 2008 ('CPUT').
- **Office of Fair Trading v Carpetright PLC, SCS, Dreams, Furniture Village Limited, Homestyle Operations Limited, Harveys and Bensons for Beds** (2014): defended Carpetright PLC in the OFT's investigation into alleged misleading reference pricing in the furniture retail sector.
- **Hertfordshire County Council and London Borough of Brent v Wendy Fair Markets Limited**(High Court, Ch Div, 2014): claim under Part 8 EA 2002 for injunctive relief against market operators concerning consumer law infringements in relation to counterfeit goods.
- **Torfaen CBC v Douglas Willis Ltd** [2013] UKSC 59 (Supreme Court): food standards and minimum durability labelling.
- **R v X Limited** [2013] EWCA Crim 818 (Court of Appeal): first consideration of the meaning of 'commercial practice' under CPUT.
- **Birmingham CC v Tesco Stores Limited** (2013): Defended Tesco in allegation of misleading price promotions under CPUTR (strawberries).
- **Cheshire East v Salsa Enterprises Limited and Sean Ellman** (2013): defence of company accused of breaching CPUT by selling 'legal highs'.
- **R v Blake** (2013): defence of managing director of finance company prosecuted for breach of financial conduct provisions.
- **OFT v First Step Finance Limited** (2013): representation of company in relation to the revocation of its consumer credit licence.
- **House of Cars Ltd v Derby Car and Van Rental** (2012): first private prosecution under CPUT.
- **East Riding of Yorks v UK Parking Control Ltd** (2012) (CC, HC (QBD) and CofA): first trading standards enforcement of CPUT in private car parking enforcement.
- **R (LOCOG) v Sportsworld Limited, Events International Limited and International Corporate Events Limited** (2012): defence of national ticket sales company prosecuted under the provisions of the 2006 Olympic Act.
- **Brighton & Hove CC v Towers Property Developments Ltd** (High Court, Ch Div, 2011): first Part 8 EA 2002 and CPUT trading standards enforcement against land banking company.

## Publications

- Principal editor of *Consumer and Trading Standards: Law and Practice* ('the Pink Book'), published by Lexis Nexis (11th Edition, 2023)
- Co-author of *Kirk, Samuels and Finch* **Mis-selling Financial Services** (Edward Elgar, 2nd Edition 2022)
- General editor of *Kirk and Kingham*, the **Encyclopaedia of Financial Services,** published by Thomson Reuters
- Contributing Editor for **Miller: Product Liability and Safety Encyclopaedia** (2014-17) published by Lexis Nexis
- General editor of *Kirk and Ross* on **Modern Financial Regulation**, Jordan (2013)
- Co-Author of *Gumpert, Kirk and Bojarski*, **The Proceeds of Crime Act 2002: A Practitioner's Guide,** Jordan (2004)

## Directory quotes

- "An advocate of choice who is the Rolls-Royce of this type of work." *Chambers and Partners, 2023 (Star Individual)*
- "He offers high-level advice and always keeps the bigger picture in mind." *Chambers and Partners, 2023 (Star Individual)*
- "His knowledge is second to none. A first-class operator and a pleasure to work with." *Chambers and Partners, 2023 (Star Individual)*
- "A very strong leader who is highly astute, picks up issues quickly and is technically outstanding. The expert at the Bar on consumer law." *Chambers and Partners, 2022* (Star Individual Silk)
- "An outstanding advocate who can distil the most complex of cases to something so straightforward." *Legal 500, 2022* (Tier 1 KC)
- "A formidable adversary who knows the business inside out." "He's brilliant and a force to be reckoned with." *Chambers and Partners,* 2020 (Star Individual Silk)
- "Has a wealth of experience in the consumer law field" *Legal 500, 2019* (Tier 1 KC)
- "Jonathan Kirk KC Regularly defends high-profile corporations against claims of mis-selling and is an expert at advising companies nationwide on their regulatory and enforcement concerns." (Band 1 Leading Silk, *Chambers and Partners* 2018)
- "He is a real heavyweight. His strategy is phenomenal – he could pick a path through a minefield". (Band 1 Leading Silk, *Chambers and Partners* 2018)
- "He's respectful when working with solicitors and very practical with clients; he understands the law and gets the commercial reality." (Band 1 Leading Silk, *Chambers and Partners* 2017)
- "He's like a fine wine, and represents a real mark of quality. He's so accessible, and has a very easy manner which helps." (Band 1 Leading Silk, *Chambers and Partners* 2017)
- 'A Rolls–Royce silk; exactly who you need on tricky consumer issues.' (band 1 Leading KC in Consumer law, *Legal 500* 2016)
- "He is truly exceptional." (*Chambers and Partners* 2016)
- "A consumer law specialist who… has acted for some of the biggest household names especially within the food industry, and is adept at handling pricing and trading standards investigations." (*Chambers and Partners* 2016)

- "He is able to give us clear and practical guidance on what we need to do to ensure that we would be in the best possible position to succeed." (*Chambers and Partners* 2016)
- 'Clearly exceptional in consumer law; he will be any lawyer's first-choice counsel.' (*Legal 500* 2016)
- Jonathan Kirk KC is "particularly known for his expertise in food law, pricing issues and Trading Standards investigations. He is commended for his strong advocacy and noted for his superior communication skills when dealing with clients, judges and opponents." "He gives very pragmatic, commercial advice. He sets out the risks and offers practical solutions." "Always well prepared and on top of the case." (Band 1 Silk, *Chambers and Partners* 2015)
- Jonathan Kirk KC is 'A top–notch, fluent advocate', 'Acclaimed for his inventive approach to disputes, and his smooth and convincing in–court performance', 'He sees arguments one doesn't think of' (*Chambers and Partners* 2014)
- 'The best silk for high–pressure cases', and 'knows his area of law so much better than anyone else in court' (*Legal 500*, 2014)
- The 'current silk of the moment in consumer law and the one to use in substantial cases' (*Legal 500*, 2013)

## Education, qualifications, memberships

- Jonathan Kirk KC is a member of the Bar European Group, CTSI (honorary member) and the Food Law Group
- LLB Kings College London

## Privacy policy

Please see a short form of my privacy notice here: Short Form Notice

My full privacy notice may be viewed here: Full Privacy Notice

## Events

RLRU Virtual Seminar

OCTOBER 12, 2023 | 9:00 AM - 9:50 AM

RLRU Virtual Seminar

OCTOBER 8, 2024

Digital Markets, Competition and Consumers Act – transforming consumer enforcement

NOVEMBER 28, 2024 | 1:30 PM

News

Gough Square Chambers Shortlisted for 6 Group Litigation and Consumer awards at The
Legal 500 Bar Awards 2023

🕐 JULY 13, 2023

Gough Square Chambers retains No 1 spot in Consumer Law and gains 7 new rankings in
The Legal 500

🕐 OCTOBER 10, 2023

Chambers & Partners ranks Gough Square as Number 1 for Consumer Law

🕐 NOVEMBER 3, 2023

Chambers have received three nominations in this year's Legal 500 Bar Awards

🕐 JULY 9, 2024

Gough Square top-ranked by Chambers & Partners 2025

🕐 OCTOBER 18, 2024

# ANNEX 2

**Annex 2 - Documents Reviewed**

A.    Plaintiffs' Class Action Complaint, dated July 29, 2024;

B.    The OnlyFans' Terms of Service, last updated December 2021;

C.    Fenix International Limited and Fenix Internet's Memorandum of Law in Support
      of their Motion to Dismiss for Forum *Non Conveniens,* October 25, 2024;

D.    The Declaration of Antony White, KC, dated October 24, 2024.