1  JASON D. RUSSELL (SBN 169219)
   jason.russell@skadden.com
2  PETER B. MORRISON (SBN 230148)
   peter.morrison@skadden.com
3  HILLARY A. HAMILTON (SBN 218233)
   hillary.hamilton@skadden.com
4  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   2000 Avenue of the Stars, Suite 200N
5  Los Angeles, California 90067
   Telephone:   (213) 687-5000
6  Facsimile:   (213) 687-5600

7  Attorneys for Specially Appearing Defendants
   Fenix International Limited and Fenix Internet LLC

8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11                 SOUTHERN DIVISION

12
   N.Z., R.M., B.L., S.M., and A.L.,        )   CASE NO.: 8:24-cv-01655-FWS-SSC
13 individually and on behalf of            )
   themselves and all others similarly      )   **DECLARATION OF HILLARY A.**
14 situated,                                )   **HAMILTON IN SUPPORT OF**
                                            )   **SPECIALLY APPEARING**
15                         Plaintiffs,      )   **DEFENDANTS FENIX**
                                            )   **INTERNATIONAL LIMITED'S AND**
16        v.                                )   **FENIX INTERNET LLC'S REPLY IN**
                                            )   **SUPPORT OF MOTION TO DISMISS**
17                                          )   **FOR FORUM NON CONVENIENS**
   FENIX INTERNATIONAL                      )
18 LIMITED, FENIX INTERNET LLC,             )
   BOSS BADDIES LLC, MOXY                   )
19 MANAGEMENT, UNRULY                       )   Judge:      Hon. Fred W. Slaughter
   AGENCY LLC (also d/b/a DYSRPT            )   Courtroom:  10D
20 AGENCY), BEHAVE AGENCY                   )   Date:       January 30, 2025
   LLC, A.S.H. AGENCY, CONTENT              )   Time:       10:00 a.m.
21 X, INC., VERGE AGENCY, INC.,             )
   AND ELITE CREATORS LLC,                  )
22                                          )
                          Defendants.       )
23

24

25

26

27

28

## <u>DECLARATION OF HILLARY A. HAMILTON</u>

I, Hillary A. Hamilton, declare and state as follows:

1.    I am an attorney admitted to practice before the courts of the State of California and have been admitted to this Court. I am a counsel in the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for Specially Appearing Defendants Fenix International Limited and Fenix Internet LLC (together, "Fenix Defendants"). I submit this declaration in support of the Fenix Defendants' Reply in Support of Motion to Dismiss for Forum Non Conveniens (the "Motion"). This declaration is based on my own personal knowledge and if called upon to do so, I could and would testify competently thereto.

2.    Attached hereto as **Exhibit 1** is a true and correct copy of the Consolidated Amended Complaint in the case *In re: Apple Inc. Device Performance Litig.*, Case No. 5:18-md-02827-EJD (N.D. Cal.) (ECF 145). A copy of this complaint was obtained at my direction by downloading it from PACER.

3.    Attached hereto as **Exhibit 2** is a true and correct copy of a declaration by Jonathan Kirk KC in the case *In re: Apple Inc. Device Performance Litig.*, Case No. 5:18-md-02827-EJD (N.D. Cal.) (ECF 176-8), which was filed by Defendant Apple Inc. in support of its Motion to Dismiss Plaintiffs' Consolidated Amended Complaint (ECF 176) on August 9, 2018. A copy of this declaration was obtained at my direction by downloading it from PACER.

4.    Attached hereto as **Exhibit 3** is a true and correct copy of a "Notice of An Application to Commence Collective Proceedings Under Section 47B of the Competition Act 1998" dated November 10, 2023, in the case *Hammond v. Amazon.com, Inc. and others*, Case No. 1595/7/7/23 (CAT), where Hammond was represented by Hagens Berman EMEA LLP. A copy of this application was obtained at my direction by downloading it from the Competition Appeal Tribunal's website, publicly available at https://www.catribunal.org.uk/cases/15957723-robert-hammond.

5.    Attached hereto as **Exhibit 4** is a true and correct copy of a Ruling dated February 5, 2024, in the related cases *Hunter v. Amazon.com, Inc. and others*, Case No.

1

1568/7/7/22 (CAT), and *Hammond v. Amazon.com, Inc. and others*, Case No. 1595/7/7/23 (CAT). A copy of this ruling was obtained at my direction by downloading it from the Competition Appeal Tribunal's website, publicly available at https://www.catribunal.org.uk/cases/15957723-robert-hammond.

6.     Attached hereto as **Exhibit 5** is a true and correct copy of the docket in the case *Shakoor and 711 others v. Daimler AG and others*, Case No. CL-2021-000185, EHWC (Comm), which was filed by Hagens Berman EMEA LLP on March 26, 2021. A copy of this docket was obtained at my direction by downloading it from LexisNexis.

7.     Attached hereto as **Exhibit 6** is a true and correct copy of the "Generic Particulars of Claim" filing in the case *Shakoor and 711 others v. Daimler AG and others*, Case No. CL-2021-000185, EHWC (Comm), which was filed by Hagens Berman EMEA LLP on March 26, 2021 as Docket Entry #2 on the docket attached hereto as Exhibit 5. A copy of this filing was obtained at my direction by downloading it from Westlaw.

8.     Attached hereto as **Exhibit 7** is a true and correct copy of the docket in the case *Aamir and 7387 others v. Mercedes-Benz Group AG and others*, Case No. CL-2023-000006, EHWC (Comm), which was filed by Hagens Berman EMEA LLP on January 11, 2023. A copy of this docket was obtained at my direction by downloading it from Westlaw.

9.     Attached hereto as **Exhibit 8** is a true and correct copy of the docket in the case *Ahmadey and another v. Mercedez-Benz Group AG and others*, Case No. KB-2023-002303, EHWC (KB), which was filed by Hagens Berman EMEA LLP on May 18, 2023. A copy of this docket was obtained at my direction by downloading it from Westlaw.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on December 27, 2024, at Middlebury, Vermont.


By:_____*/s/ Hillary A. Hamilton*_____
            Hillary A. Hamilton

# Exhibit 1

**COTCHETT, PITRE & McCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: 650-697-6000
Facsimile: 650-697-0577
*jcotchett@cpmlegal.com*
*mmolumphy@cpmlegal.com*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206243)
350 Sansome Street, Suite 400
San Francisco, California 94104
Telephone: 415-772-4700
Facsimile: 415-772-4707
*lking@kaplanfox.com*

David A. Straite (admitted *pro hac vice*)
850 Third Avenue
New York, New York 10022
Telephone: 212-687-1980
Facsimile: 212-687-7714
*dstraite@kaplanfox.com*

*Interim Co-Lead Class Counsel*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| IN RE: APPLE INC. DEVICE PERFORMANCE LITIGATION | Case No. 5:18-md-02827-EJD |
| | **CLASS ACTION** |
| This Document Relates To: | **CONSOLIDATED AMENDED COMPLAINT** |
| ALL ACTIONS. | |
| | Hon. Edward J. Davila |

CONSOLIDATED AMENDED COMPLAINT                    No. 5:18-MD-02827-EJD

**TABLE OF CONTENTS**

                                                                                                              **Page**

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE .......................................................................................... 8

INTRADISTRICT ASSIGNMENT ..................................................................................... 9

PARTIES ............................................................................................................................ 9

      A. PLAINTIFFS ........................................................................................................ 9

      B. DEFENDANTS AND THEIR RELEVANT CORPORATE STRUCTURE ....................... 101

CHOICE OF LAW: DESIGNED BY APPLE IN CUPERTINO, CALIFORNIA ........................ 102

SUBSTANTIVE ALLEGATIONS ..................................................................................... 104

I.     APPLE ISSUED MATERIALLY FALSE STATEMENTS EMANATING FROM
CALIFORNIA TO SELL DEFECTIVE DEVICES TO THE CLASS ............................................ 104

     A.    iPhones ................................................................................................ 106

II.   IPHONE 5 ................................................................................................................ 106

III.  IPHONE 5S ............................................................................................................. 108

IV.  IPHONE 5C ............................................................................................................ 109

V.   IPHONE 6 AND 6 PLUS ......................................................................................... 110

VI.  IPHONE 6S AND IPHONE 6S PLUS ....................................................................... 112

VII.   IPHONE SE ......................................................................................................... 114

VIII.   IPHONE 7 AND IPHONE 7 PLUS .......................................................................... 115

     B.    iPads .................................................................................................... 117

Fourth Generation iPad ................................................................................................. 117

iPad Mini ........................................................................................................................ 117

iPad Air .......................................................................................................................... 118

iPad Mini 2 ..................................................................................................................... 119

Update to Fourth Generation iPad ............................................................................... 120

iPad Air 2 ....................................................................................................................... 120

The iPad Mini 3 .................................................................................................. 121

iPad Pro and iPad Mini4 ..................................................................................... 121

9.7-Inch iPad Pro. .............................................................................................. 123

Fifth Generation iPad ......................................................................................... 123

iPad Pro in 10.5-inch and 12.9-inch Models...................................................... 124

Sixth Generation iPad ........................................................................................ 125

IX.    APPLE'S MATERIALLY FALSE STATEMENTS AND OMISSIONS CONCERNING THE IOS SOFTWARE ....................................................................................... 126

X.     THE INHERENT DEFECTS IN THE DEVICES ........................................... 133

A. KEY POWER COMPONENTS OF THE DEVICES ..................................................... 133

B. APPLE COMPOUNDED THE DEFECTS BY STRESSING DEVICE BATTERIES WITH POWER-HUNGRY SOFTWARE: IOS UPDATES ...................................................... 137

C. THE RELEASE OF IOS 10 WAS SECRETLY DESIGNED TO CAMOUFLAGE THE DEFECTS..... 139

D. APPLE RELEASED IOS 10.2.1 TO FURTHER CONCEAL THE DEFECTS ............................... 141

E. THE DEFECTS IN APPLE'S DEVICES, AND THE IMPACT OF THROTTLING, IS EVIDENCED BY INDEPENDENT ANALYSIS ........................................................... 144

XI.    APPLE'S REVENUES DEPEND ON SELLING NEW DEVICES, AND THE "UPGRADE" FINANCIAL MODEL WAS CRITICALLY FAILING IN 2016-2017 .................................. 147

XII.   RELATED CASES AND PROCEEDINGS ...................................................... 151

A. UNITED STATES – CALIFORNIA STATE COURT ..................................................... 151

B. UNITED STATES – FEDERAL CASES NOT CONSOLIDATED ...................................... 151

C. UNITED STATES – CONGRESSIONAL AND SENATE PROCEEDINGS.......................... 152

D. UNITED STATES – FEDERAL REGULATORY PROCEEDINGS ..................................... 152

E. CANADA – REGULATORY PROCEEDINGS ............................................................. 153

F. CANADA – LITIGATION ....................................................................................... 153

G. CANADA – LITIGATION – QUEBEC ..................................................................... 154

H. ISRAEL – REGULATORY PROCEEDINGS................................................................ 154

I. ISRAEL – LITIGATION ......................................................................................... 154

J.  FRANCE – CRIMINAL PROCEEDINGS ...................................................................... 155

K. ITALY – REGULATORY PROCEEDINGS .................................................................... 155

L. CHINA – REGULATORY PROCEEDINGS .................................................................... 155

M.   RUSSIA – LITIGATION ........................................................................................... 155

N. SOUTH KOREA – LITIGATION ................................................................................ 156

O. SOUTH KOREA – REGULATORY PROCEEDINGS ...................................................... 156

XIII.    APPLE'S SOFTWARE LICENSE AGREEMENTS ................................................. 156

CLASS ALLEGATIONS ................................................................................................ 158

TOLLING OF APPLICABLE LIMITATIONS PERIODS .................................................... 162

CAUSES OF ACTION
ON BEHALF OF THE CLASS ........................................................................................ 163

COUNT 1
VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT,
18 U.S.C. § 1030, et seq. ............................................................................................. 163

COUNT 2
VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT, .................................... 164

COUNT 3
VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW, ........................ 167

COUNT 4
VIOLATIONS OF CALIFORNIA'S FALSE AND MISLEADING ADVERTISING
LAW, 171

COUNT 5
CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT, .................................. 173

COUNT 6
TRESPASS TO CHATTELS .......................................................................................... 174

COUNT 7
FRAUD ...................................................................................................................... 175

COUNT 8
CONSTRUCTIVE FRAUD ........................................................................................... 176

COUNT 9
    FRAUDULENT INDUCEMENT ................................................................. 178

COUNT 10
    BREACH OF CONTRACT ....................................................................... 179

COUNT 11
    BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING ............................. 181

COUNT 12
    MONEY HAD AND RECEIVED ................................................................. 182

COUNT 13
    FRAUDULENT OMISSION OR CONCEALMENT ............................................... 182

COUNT 14
    FRAUDULENT MISREPRESENTATION ......................................................... 184

COUNT 15
    NEGLIGENT MISREPRESENTATION ........................................................... 186

COUNT 16
    QUASI-CONTRACT / UNJUST ENRICHMENT ................................................. 186

COUNT 17
    VIOLATION OF THE CONSUMER PROTECTION FROM UNFAIR TRADING
    REGULATIONS 2008 (2008 No. 1277)186……………………………………………… 190

COUNT 18
    VIOLATION OF THE CONSUMER RIGHTS ACT 2015 (2015 C. 15).............................. 189

COUNT 19
    Ala. Code §§ 8-19-1, et seq. ................................................................. 191

COUNT 20
    ALASKA CONSUMER PROTECTION ACT
    Alaska Stat. §§ 45.50.471, et seq.............................................................. 193

COUNT 21
    ARIZONA CONSUMER FRAUD ACT,
    A.R.S. §§ 44-1521, et seq. .................................................................... 195

COUNT 22
    ARKANSAS DECEPTIVE TRADE PRACTICES ACT,
    A.C.A. §§ 4-88-101, et seq. ................................................................... 196

COUNT 23 ................................................................................... 198

CONSOLIDATED AMENDED COMPLAINT            iv            NO. 5:18-MD-02827-EJD

COLORADO CONSUMER PROTECTION ACT,
Colo. Rev. Stat. §§ 6-1-101, et seq. ........................................................ 198

COUNT 24
Connecticut Unfair Trade Practices Act,
C.G.S.A. § 42-110g............................................................................... 200

COUNT 25
DELAWARE CONSUMER FRAUD ACT,
6 Del. Code §§ 2513, et seq. .................................................................. 202

COUNT 26
DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT
D.C. Code §§ 28-3904, et seq. ............................................................... 204

COUNT 27
FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,
Fla. Stat. §§ 501.201, et seq. ................................................................. 206

COUNT 28
GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT,
O.C.G.A. §§ 10-1-390, et seq. ............................................................... 207

COUNT 29
HAWAII UNFAIR PRACTICES AND UNFAIR COMPETITION ACT,
Haw. Rev. Stat. §§ 480-1, et seq. ........................................................... 209

COUNT 30
HAWAII UNIFORM DECEPTIVE TRADE PRACTICE ACT,
Haw. Rev. Stat. §§ 481A-3, et seq. ......................................................... 211

COUNT 31
IDAHO CONSUMER PROTECTION ACT,
Idaho Code §§ 48-601, et seq.................................................................. 212

COUNT 32
ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT,
815 ILCS § 505, et seq.......................................................................... 213

COUNT 33
ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT,
815 ILCS §§ 510/2, et seq...................................................................... 215

COUNT 34
Indiana Deceptive Consumer sales Act,
Ind. Code §§ 24-5-0.5-1, et seq.............................................................. 216

CONSOLIDATED AMENDED COMPLAINT           v           No. 5:18-MD-02827-EJD

Exhibit 1, Page 6

9

COUNT 35
    IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT,
Iowa Code § 714H ................................................................................. 220

COUNT 36
    KANSAS CONSUMER PROTECTION ACT,
K.S.A. §§ 50-623, et seq. ...................................................................... 221

COUNT 37
    KENTUCKY CONSUMER PROTECTION ACT,
Ky. Rev. Stat. §§ 367.110, et seq. ......................................................... 223

COUNT 38
    LOUISIANA UNFAIR TRADE PRACTICES AND  CONSUMER PROTECTION LAW,
La. Rev. Stat. Ann. §§ 51:1401, et seq. ................................................. 224

COUNT 39
    MAINE UNFAIR TRADE PRACTICES ACT,
5 Me. Rev. Stat. §§ 205, 213, et seq. ..................................................... 226

COUNT 40
    MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT,
10 Me. Rev. Stat. §§ 1212, et seq. ......................................................... 228

COUNT 41
    MARYLAND CONSUMER PROTECTION ACT,
Md. Comm. Code §§ 13-301, et seq. ...................................................... 229

COUNT 42
    MASSACHUSETTS CONSUMER PROTECTION ACT,
Mass. Gen. Laws Ann. Ch. 93A, §§ 1, et seq. ....................................... 231

COUNT 43
    MICHIGAN CONSUMER PROTECTION ACT,
Mich. Comp. Laws Ann. §§ 445.903, et seq. .......................................... 233

COUNT 44
    MINNESOTA CONSUMER FRAUD ACT,
Minn. Stat. §§ 325F.68, et seq. and Minn. Stat. §§ 8.31, et seq. ............ 235

COUNT 45
    MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT,
Minn. Stat. §§ 325D.43, et seq. ............................................................. 236

COUNT 46
    MISSISSIPPI CONSUMER PROTECTION ACT,
Miss. Code §§ 75-24-1, et seq. .............................................................. 237

COUNT 47
        MISSOURI MERCHANDISE PRACTICES ACT,
Mo. Rev. Stat. §§ 407.010, et seq. ........................................................................ 239

COUNT 48
        MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT,
M.C.A. §§ 30-14-101, et seq. .................................................................................. 241

COUNT 49
        NEBRASKA CONSUMER PROTECTION ACT,
Neb. Rev. Stat. §§ 59-1601, et seq. ........................................................................ 242

COUNT 50
        NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT,
Neb. Rev. Stat. §§ 87-301, et seq. .......................................................................... 243

COUNT 51
        NEVADA DECEPTIVE TRADE PRACTICES ACT,
Nev. Rev. Stat. Ann. §§ 598.0903, et seq. .............................................................. 245

COUNT 52
        NEW HAMPSHIRE CONSUMER PROTECTION ACT,
N.H.R.S.A. §§ 358-A, et seq. ................................................................................. 247

COUNT 53
        NEW JERSEY CONSUMER FRAUD ACT,
N.J. Stat. Ann. §§ 56:8-1, et seq. ........................................................................... 248

COUNT 54
        NEW MEXICO UNFAIR PRACTICES ACT,
N.M. Stat. Ann. §§ 57-12-2, et seq. ....................................................................... 249

COUNT 55
        NEW YORK GENERAL BUSINESS LAW,
N.Y. Gen. Bus. Law §§ 349, et seq. ....................................................................... 251

COUNT 56
        NORTH CAROLINA UNFAIR TRADE PRACTICES ACT,
N.C. Gen. Stat. Ann. §§ 75-1.1, et seq. .................................................................. 252

COUNT 57
        NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING ACT,
N.D. Cent. Code §§ 51-15-01, et seq. ..................................................................... 254

COUNT 58
        OHIO CONSUMER SALES PRACTICES ACT,
Ohio Rev. Code §§ 1345.01, et seq. ....................................................................... 255

COUNT 59
    OHIO DECEPTIVE TRADE PRACTICES ACT,
Ohio Rev. Code §§ 4165.01, et seq. ................................................................. 257

COUNT 60
    OKLAHOMA CONSUMER PROTECTION ACT,
Okla. Stat. Tit. 15, §§ 751, et seq. ..................................................................... 258

COUNT 61
    OREGON UNLAWFUL TRADE PRACTICES ACT,
Or. Rev. Stat. §§ 646.608, et seq. ...................................................................... 260

COUNT 62
    PENNSYLVANIA UNFAIR TRADE PRACTICES ANDCONSUMER PROTECTION LAW,
73 Pa. Cons. Stat. §§ 201-2 & 201-3, et seq. ..................................................... 262

COUNT 63
    RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,
R.I. Gen. Laws §§ 6-13.1, et seq. ...................................................................... 264

COUNT 64
    SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT,
S.C. Code Ann. §§ 39-5-10, et seq. ................................................................... 266

COUNT 65
    SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT, 268
S.D. Codified Laws §§ 37-24-1, et seq. .............................................................. 268

COUNT 66
    TENNESSEE CONSUMER PROTECTION ACT,
Tenn. Code Ann. §§ 47-18-101, et seq. .............................................................. 270

COUNT 67
    Deceptive Trade Practices—Consumer Protection Act,
Texas Bus. & Com. Code §§ 17.41, et seq. ........................................................ 273

COUNT 68
    UTAH CONSUMER SALES PRACTICES ACT,
Utah Code §§ 13-11-1, et seq. ........................................................................... 276

COUNT 69
    VERMONT CONSUMER FRAUD ACT,
Vt. Stat. Ann. tit. 9, §§ 2451, et seq. ................................................................. 278

COUNT 70
    Virgin Islands Consumer Fraud and Deceptive Business Practices Act,
V.I. Code tit. 12A, §§ 301, et seq. ..................................................................... 281

COUNT 71
    Virgin Islands Consumer Protection Law,
V.I. Code tit. 12A, §§101, et seq. ....................................................................... 283

COUNT 72
    VIRGINIA CONSUMER PROTECTION ACT,
Va. Code Ann. §§ 59.1-196, et seq. .................................................................... 285

COUNT 73
    WASHINGTON CONSUMER PROTECTION ACT,
Wash. Rev. Code Ann. §§ 19.86.020, et seq. ...................................................... 288

COUNT 74
    West Virginia Consumer Credit and PROTECTION ACT,
W. Va. Code §§ 46A-6-101, et seq. ..................................................................... 289

COUNT 75
    WISCONSIN DECEPTIVE TRADE PRACTICES ACT,
Wis. Stat. § 100.18, et seq. .................................................................................. 293

COUNT 76
    WYOMING CONSUMER PROTECTION ACT,
Wyo. Stat. Ann. §§ 40-12-101, et seq. ................................................................ 295

PRAYER FOR RELIEF .......................................................................................... 297

JURY DEMAND ..................................................................................................... 297

## INTRODUCTION

1.        Plaintiffs file this Consolidated Class Action Complaint for Damages and Equitable Relief against Apple Inc. ("Apple," the "Company," or "Defendant") on behalf of themselves and all persons worldwide who purchased, owned, used, or leased one or more of Apple's Devices[1] (the "Class" as defined herein) for fraudulent misrepresentations and omissions, and other unlawful and unfair business practices.

2.        After years of customer frustration and attrition, on December 20, 2017, Apple admitted to one of the largest consumer frauds in history, affecting hundreds of millions of mobile devices across the globe.  Prompting the admission were reports of unexplained shutdowns of certain Devices surfacing more than two years earlier, with consumers complaining their Devices were suddenly shutting down even though the batteries were more than 30% charged.  Complaints accelerated in the autumn of 2016 and were accompanied by reports of unexplained heating.

3.        Even the inventor of Apple's iPod – Tony Fadell – publicly reported that his own iPhone repeatedly shut down despite the battery showing significant remaining charge and despite Apple running a diagnostic and claiming his battery was fine: "***It's happening to me every other day—especially while using the mapping app. Have to always carry an external battery to revive it***." Tony Fadell Twitter Comment, Dec. 1, 2016, https://goo.gl/cEZ8JL (emphasis added).

4.        Worse, these devices could not be powered back on unless plugged into a power socket – a problem that Apple later admitted would be an "inconvenience" given that these are ***mobile*** devices.

5.        Despite the growing chorus of complaints, Apple remained silent until November 2016, when it finally admitted a problem, but limited its admission to a small serial

---

[1] As used herein, the term "Devices" are the following products designed and marketed by Apple for sale: the iPhone 5, iPhone 5s, iPhone 5c, iPhone SE, iPhone 6, iPhone 6s, iPhone 6 Plus, iPhone 6s Plus, iPhone 7, iPhone 7 Plus, the Fourth Generation iPad, iPad Mini, iPad Air, iPad Mini 2, Update to Fourth Generation iPad, iPad Air 2, iPad Mini 3, iPad Mini 4, iPad Pro, 9.7-Inch iPad Pro, Fifth Generation iPad, iPad Pro 10.5-inch and 12.9 inch models, and Sixth Generation iPad.

1    range of iPhone 6s Devices manufactured in September and October 2015 because the batteries

2    were exposed to "ambient air" during assembly.  Apple charged $79 in the United States to replace

3    a battery at the time (and a similar price outside of the United States), but offered a free battery

4    replacement to this small number of owners of Devices in the "limited serial range."

5         6.      Within days of Apple's November 2016 announcement, it became clear that a far

6    greater number of Devices were affected than Apple was letting on.  For example, on December 13,

7    2016, Ben Gilbert (Senior Tech Correspondent for Business Insider) reported the result of his

8    investigation of massive demand and delays associated with the battery replacement program, and

9    concluded: "It's not clear if this level of demand is because the shutdown problem is more

10    widespread than Apple's letting on or because there are millions of iPhone 6S phones in the wild

11    that were manufactured between September and October 2015." *See* Ben Gilbert, "There is no Real

12    Plan: A Longtime Apple Store Employee Says the iPhone Battery Replacement Plan is a Mess,"

13    *Business Insider* (Dec. 13, 2016).  A week later, Mr. Gilbert's colleague, Dave Smith, reported that

14    "Apple hasn't figured out the true cause or at minimum hasn't disclosed it to the public. Apple has

15    a replacement program, but it doesn't appear to cover all of those people affected by this bug."

16    Dave Smith, "Apple is Losing its Focus Again," *Business Insider* (Dec. 20, 2016).

17         7.      In addition to the work being done by *Business Insider*, *Fortune* was also

18    investigating. A week after Mr. Smith's report, Fortune's law & blockchain reporter Jeff John

19    Roberts confirmed that the "bug" extended beyond the originally-identified iPhone 6s devices.

20    "***Apple refuses to come clean about what's going on***. While the company is running a limited

21    battery replacement program for some iPhone 6s models, it's still pretending things are just fine

22    with other models." Jeff John Roberts, "Why It's Time for Apple to Come Clean About the iPhone

23    Battery," *Fortune* (Dec. 27, 2016) (emphasis added). Indeed, in a statement emailed to Mr. Roberts,

24    Apple finally admitted that the problem extended beyond the previously identified iPhone 6s

25    models, and hinted at a remedial software fix to come:

26

27          A small number of customers outside of the affected range have also reported an unexpected

28          shutdown. Some of these shutdowns can occur under normal conditions in order for the
      iPhone to protect its electronics. In an effort to gather more information, we are including

CONSOLIDATED AMENDED COMPLAINT     2     NO. 5:18-MD-02827-EJD

additional diagnostic capability in an iOS software update which will be available next week. This will allow us to gather information over the coming weeks which may potentially help us improve the algorithms used to manage battery performance and shutdown. If such improvements can be made, they will be delivered in future software updates.

*Id.* Mr. Roberts concluded: "Tim Cook, the ball is in your court: a new year is approaching, and 2017 would be a great time for Apple to restore the iPhone's once-impeccable reputation." *Id.*

8.      2017 arrived, and as expected Apple installed software updates on the Devices to gather additional diagnostic data in early January 2017. Based in part on that diagnostic data, on January 23, 2017, Apple released a software update, known as iOS 10.2.1. Apple told consumers that the update was to fix "bugs" or improve "security" on the Devices and a month later Apple told a reporter at TechCrunch that the software update had largely addressed the shutdown problem. *See* Matthew Panzarino, "Apple Says iOS 10.2.1 has Reduced Unexpected iPhone 6s Shutdown Issues by 80%," *TechCrunch* (Feb. 23, 2017); *see also* Liam Tung, "iPhone 6, 6s sudden shutdown? We've almost fully cured issue with iOS 10.2.1, says Apple," ZDNet (Feb. 24, 2017) (citing Apple's disclosure to *TechCrunch*) ("Apple has almost fixed a power-management issue that's been causing iPhones to shut down unexpectedly").

9.      Missing from these statements to consumers or to the tech press was the true purpose of the software update – to conceal a much larger defect than the public knew—namely, there was a mismatch between the Devices' hardware, including their processing chips and rechargeable lithium-ion batteries, and the ever-increasing demands placed on the Devices via Apple's constantly-updating iOS software platform. This mismatch is referred to as the "Defect(s)." And the software update did not "fix" or "cure" the Defect – it instead concealed it by secretly throttling the Devices' performance to reduce the number of unexpected shutdowns to a more manageable volume. Apple partially "cured" one defect by making another defect more aggressive – accomplished by violating federal computer fraud laws and a host of various state laws. For eleven months, the secret remained uncovered as Apple continued to hide the whole truth.

---

CONSOLIDATED AMENDED COMPLAINT          3          NO. 5:18-MD-02827-EJD

1      10.      Apple's secret throttling did not stop at iOS 10.2.1.  On December 2, 2017,

2  another set of throttling code was inserted in iOS 11.2[2], but Apple again told consumers the update

3  was primarily to fix "bugs" and provide "improvements."  Apple did not reveal the Defects.

4      11.      Only after independent research was published online in mid-December 2017

5  demonstrating the marked degradation of performance in a large sampling of the Devices after

6  installation of the Updates, did Apple begin to come clean.  On December 20, 2017, Apple tacitly

7  admitted that the Updates intentionally slowed the Devices (the "December 20 Admission") stating,

8  in relevant part:

9          Our goal is to deliver the best experience for customers, which includes overall
           performance and prolonging the life of their devices.  Lithium—ion batteries become
10          less capable of supplying peak current demands when in cold conditions, have a low
           battery charge or as they age over time, which can result in the device unexpectedly
11          shutting down to protect its electronic components.

12          Last year we released a feature for iPhone 6, iPhone 6s and iPhone SE to ***smooth out***
           the instantaneous peaks only when needed to prevent the device from unexpectedly
13          shutting down during these conditions.  We've now extended that feature to iPhone 7,
           with iOS 11.2, and plan to add support for other products in the future.[3]
14

15      12.      The December 20 Admission, however, contained the further misrepresentation

16  that the code was designed to "***smooth out***" allegedly "[unexpected] instantaneous peaks" in

17  performance.  A downpour of media reports ensued, several of which used the more appropriate

18  term—"throttle"—to define this "smooth[ing]" feature that Apple inserted into the code for the iOS

19  10.2.1 update.

20

21

22  _____

23

24  [2] As used herein, the term "Updates" refers, unless otherwise stated, to iOS 10.2.1 and iOS 11.2.
    All of the iOS updates, however, issued by Apple prior to iOS 11.3 are part of Apple's misconduct
25  and subsequent cover-up.  iOS 12.2 beta was released June 25, 2018.  Each of these later versions
    of iOS after iOS 11.2 are nothing more than Apple's attempt to further conceal the extent of its
26  aberrant behavior.

27  [3] Shara Tibiken, "Apple admits slowing older iPhones, says it's to prevent battery issues," *C/Net*
    (Dec. 20, 2017) (available online at https://www.cnet.com/news/apple-slows-down-older-iphone-
    battery-issues/#ftag=CAD-09-10aai5b) (last visited July 1, 2018).

28

CONSOLIDATED AMENDED COMPLAINT          4          NO. 5:18-MD-02827-EJD

13.     As explained herein, the batteries have a limited number of charge and discharge cycles, and they degrade over time.  The batteries give off current which is used to drive the processor (*i.e.* the chips) in each of the Devices to perform tasks (*i.e.* play video, open applications, transmit data, etc).  The throttling via the Updates permitted Apple to have the batteries draw less current to run the Devices for the same amount of time as a new battery, but the trade-off was that the processing speed was slowed down.  This is akin to a driver going slower to get better gas mileage.  As new and more demanding iOS updates are added, users experience even slower performance as the processor originally provided with the Devices struggle—not only due to their own limitations—but the limitations of the batteries to provide enough power current to keep pace with the new demands (the "Battery Issues").  Given the constant iOS upgrades requiring the processors in Apple's Devices to perform more and more tasks, the batteries were inadequate for the Devices from day one.

14.     Worse yet, due to the Defects and Battery Issues, consumers would logically be required to continually recharge their Devices to attempt to refill the "gas tank" with more power.  This constant recharging only feeds the further degradation of the battery.  Ironically, in Apple's U.S. Patent No. 9,912,186, issued March 6, 2018, and discussing charging techniques, it acknowledges that: "***Continued use of a lithium-polymer battery over time may also produce swelling in the battery's cells. . . a user of a device may not be aware of the battery's swelling and/or degradation until the swelling results in physical damage to the device.***"  The application for this patent was in process since at least 2011.

15.     While Plaintiffs and the Class need not attribute any motive behind Apple's intentional degradation of the Devices, it is evident that Apple continued to do so for the simple reason most frauds are committed: money.  Although technically complex in part, the scheme was logical and simple:  The Devices were designed defectively, and Apple released software updates to conceal the Defects, all the while exacerbating the effects of the Defects — principally decreased performance — so that Device users had no choice but to purchase new batteries or upgrade their Devices, resulting in additional payments to Apple and a sustained (albeit forced) customer base.

---

CONSOLIDATED AMENDED COMPLAINT             5             NO. 5:18-MD-02827-EJD

16.      Further highlighting Apple's dependence on the "success" of its defective products, the Devices represented at least 70% of Apple's overall revenue for at least fiscal years 2013 to 2017 (nearly $800 billion), and to date.  Critically, in 2016 — just prior to the first of the Updates — Apple was stumbling for the first time in 15 years in iPhone sales, was facing a saturated iPhone market, decreased sales of iPads (and even its Mac product line), the end or phasing out of third party vendor "two-year" service contracts, and increased competition overall.

17.      As such, a perfect storm was brewing for Apple, with a host of problems threatening its continued ability to profit in the smartphone and tablet markets.  ***No time, and particularly during 2016 and 2017***, was a good time for Apple to reveal that its Devices were defective.  And so, the sly saga progressed.

18.      Apple's December 20 Admission therefore had to deliver a false "all is well" message in claiming that the Updates were simply were a "smooth[ing] out" of power flow.  Apple continued to use the very calculated term "smooth[ing] out" in its December 28, 2017 "apology" (as defined herein).  Apple engaged in crisis communication at its finest, and most dishonest.

19.      Following the Company's December 20 Admission, Apple's statements and conduct reveal a carefully orchestrated public relations maneuver to continue to conceal and misrepresent the true extent of Apple's misconduct with regard to the Devices and the Defects.  Apple has failed, even today, to affirmatively tell consumers that the Company sold them Devices that suffered from Defects, which Defects impair their central functioning and purpose.

20.      While Apple also "apologize[d]" on December 28, 2017, the apology is just more public relations machinations.  In fact, the December 28, 2017 Apple statement (the "Apology") merely confirmed the earlier undisclosed material facts – facts which Apple should have disclosed long before. As stated by Apple in the "Apology":

> iOS 10.2.1 (released January 2017) includes updates for previous models of iPhone to prevent them from unexpectedly shutting down.  This includes a feature for iPhone 6, iPhone 6 Plus, iPhone 6s, iPhone 6s Plus, and iPhone SE to dynamically manage the instantaneous performance peaks, only when needed, to prevent the device from unexpectedly shutting down.  This capability was also extended to iPhone 7 and iPhone 7 Plus with iOS 11.2, and we will continue improving our power management feature in the future.  This feature's only intent is to prevent unexpected shutdowns so that the iPhone can still be used.  This power management feature is specific to iPhone

and does not apply to any other Apple products.

This power management works by looking at a combination of the device temperature, battery state of charge, and battery impedance. Only if these variables require it, iOS will dynamically manage the maximum performance of some system components, such as the CPU and GPU, in order to prevent unexpected shutdowns. As a result, the device workloads will self-balance, allowing a smoother distribution of system tasks, rather than larger, quick spikes of performance all at once. In some cases, a user may not notice any differences in daily device performance. The level of perceived change depends on how much power management is required for a particular device.

In cases that require more extreme forms of this power management, the user may notice effects such as:

Longer app launch times

Lower frame rates while scrolling

Backlight dimming (which can be overridden in Control Center)

Lower speaker volume by up to -3dB

Gradual frame rate reductions in some apps

During the most extreme cases, the camera flash will be disabled as visible in the camera UI

Apps refreshing in background may require reloading upon launch

21.     While government officials and regulators, both domestic and foreign, are investigating and/or examining Apple's conduct,[4] it is insufficient to help members of the Class, each of whom are forced to choose among four harms going forward: 1) turn off the "throttling" feature, subjecting the Device to increased risk of unexpected shutdowns; or 2) keep the "throttling" feature on, subjecting the Device to reduced performance; or 3) buy a new battery, paying money now ($29 in the United States and a similar amount in other countries) and not knowing whether or when the Device will again be at risk for unexpected shutdown; or 4) upgrade to a new Device. So

_____

[4] See Tom Schoenberg, *et al.*, "U.S. Probes Apple Over Updates That Slow Older iPhones," *Bloomberg* (Jan. 30, 2018), https://www.bloomberg.com/news/articles/2018-01-30/u-s-said-to-probe-apple-over-updates-that-slow-older-iphones-jd1yahj7; Mikey Campbell, "Apple explains iPhone battery throttling to Canadian parliament, says not planned obsolescence," *Appleinsider* (March 1, 2018), https://appleinsider.com/articles/18/03/01/apple-explains-iphone-battery-throttling-to-canadian-parliament-says-not-planned-obsolescence.

CONSOLIDATED AMENDED COMPLAINT                7                NO. 5:18-MD-02827-EJD

1    not only are Plaintiffs and the Class entitled to damages for past harms, each and every Class

2    member who has not yet upgraded must necessarily choose which of the four harms above they

3    "prefer" in the future.

4        22.        As discussed herein, Apple includes a California choice-of-law provision in the

5    Software License Agreement accompanying its iOS software, ostensibly applicable on a near-global

6    basis.  Plaintiffs accordingly allege claims under both federal and California law, and in the

7    alternative under (or in some cases, in addition to) the laws of other jurisdictions.

8                                **JURISDICTION AND VENUE**

9        23.        This Consolidated Complaint is intended to serve as a superseding complaint as

10   to all other complaints consolidated in this multidistrict litigation, and to serve for all purposes as

11   the operative pleading for the Class defined below.  As set forth herein, this Court has general

12   jurisdiction over Apple and original jurisdiction over Plaintiffs' claims.

13       24.        This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C.

14   § 1331, because Plaintiffs allege that Apple violated the Computer Fraud and Abuse Act, 18 U.S.C.

15   § 1030, *et seq.*

16       25.        This Court also has subject-matter jurisdiction pursuant to the Class Action

17   Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in

18   controversy exceeds the sum of $5,000,000, and Apple is a citizen of a State different from that of

19   at least one Class member.

20       26.        This Court also has supplemental jurisdiction over the state law claims pursuant

21   to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

22       27.        Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because

23   Apple's principal place of business is located in this District and substantial parts of the events or

24   omissions giving rise to the claims occurred in the District.  Venue is also proper in this Court

25   because Apple is located here, the causes of action arose here, and as Apple has admitted, the

26   Devices at issue herein have always been designed, manufactured, and tested by Apple in this

27   District.

28

CONSOLIDATED AMENDED COMPLAINT            8            NO. 5:18-MD-02827-EJD

**INTRADISTRICT ASSIGNMENT**

28.      Assignment of the cases originally filed within this District to the San Jose Division is proper pursuant to Local Rule 3-2-(c)-(e), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Santa Clara County, California.

**PARTIES**

**A. Plaintiffs**[5]

**ALABAMA**

29.      **Plaintiff Joseph Taylor** is a resident and citizen of the State of Alabama and he acquired an iPhone 6 on April 8, 2015. Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Device. Taylor downloaded and installed iOS 10.2.1 on his Device in or around January or February of 2017.

30.      Not only did Taylor's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Taylor's Device operated to fundamentally change.  Taylor's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Taylor revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Taylor's Device would operate. Accordingly, not only was Taylor's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Taylor's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

---

[5] With the filing of this Consolidated Amended Complaint in this multidistrict jurisdiction case, several Plaintiffs have been "added" that were not in the original filed complaints before the Judicial Panel on Multidistrict Litigation or otherwise transferred to this Court.  Accordingly, Plaintiffs have filed a separate complaint with this Court on behalf of the added Plaintiffs, and are seeking intra-district transfer and consolidation, for the sake of ensuring subject matter jurisdiction.

1    Taylor did not receive the benefit of his bargain, and was injured as a result.  If Taylor had been

2    told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

3    Device after sale, Taylor would not have purchased the Device, or would have paid substantially

4    less for it.

5                                  **ALABAMA**

6         31.       **Plaintiff Khendle Harvest Williams** is a resident and citizen of the State of

7    Alabama and she purchased an iPhone 6 Plus in or around Fall 2014 and subsequently an iPhone 7

8    Plus for herself in or around Fall 2016. She also purchased an iPhone 6, 6s, and subsequently a 7

9    Plus for her daughter, all shortly after the models' corresponding release dates.  Prior to her

10   purchases of the Devices, she did not know, nor could she have known through reasonable

11   diligence, of the Battery Issues and Defects in her Devices.

12        32.       Not only did Williams's Devices not operate as Apple warranted and promised

13   initially, but Apple never represented or warranted that iOS updates would cause the way

14   Williams's Devices operated to fundamentally change.  Williams's Devices did not operate as

15   promised in Apple's advertisements, representations, and the information publicly available in the

16   marketplace.  Additionally, none of the packaging in which the Devices were sold to Williams

17   revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to

18   "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which

19   Williams's Devices would operate.  Accordingly, not only were Williams's Devices defective at the

20   point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with

21   Williams's Devices via its misrepresentations and omissions with the iOS software Updates.  As a

22   result of Apple's actions, Williams did not receive the benefit of her bargains, and was injured as a

23   result.  If Williams had been told of these Defects, Battery Issues, and the deceptive manner in

24   which Apple would damage the Device after sale, Williams would not have purchased the Devices

25   or would have paid substantially less for them.

26

27

28

**ALASKA**

33.     **Plaintiff Loren Haller** is a resident and citizen of the State of Alaska and he purchased an iPhone 6 on or around October 2014, an iPhone 6s on or around November 2015, an iPhone 7 on or around October 2016, and an iPhone 7 Plus on or around January 2017. Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence of the Battery Issues and Defects in his Devices.

34.     Not only did Haller's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Haller's Devices operated to fundamentally change.  Haller's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Haller revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Haller's Devices would operate. Accordingly, not only was Haller's Devices defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Haller's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Haller did not receive the benefit of his bargain, and was injured as a result.  If Haller had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Haller would not have purchased the Device, or would have paid substantially less for it.

**ARIZONA**

35.     **Plaintiff Alex Eugene Rodriguez** is a resident and citizen of the State of Alaska and he purchased an iPhone SE in or about July or August 2016 in Arizona. Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence of the Battery Issues and Defects in his Device.  Rodriguez downloaded and installed iOS updates as they were recommended.

36.        Not only did Rodriguez's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Rodriguez's Device operated to fundamentally change.  Rodriguez's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Rodriguez revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Rodriguez's Device would operate.  Accordingly, not only was Rodriguez's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Rodriguez's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Rodriguez did not receive the benefit of his bargain, and was injured as a result.  If Rodriguez had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Rodriguez would not have purchased the Device, or would have paid substantially less for it.

### ARIZONA

37.        **Plaintiff Jonathan David** is a resident and citizen of the State of Arkansas and he purchased an iPhone 6 in March 2015 in Arizona.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence of the Battery Issues and Defects in his Device.  At time of initial purchase, the Device operated on iOS 8.   David downloaded and installed iOS 10 on his Device in the fall of 2016.

38.        Not only did David's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10 or any of the future updates would cause the way David's Device operated to fundamentally change.  David's Device, particularly after installation of iOS 10, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to David revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed

---

CONSOLIDATED AMENDED COMPLAINT            12            NO. 5:18-MD-02827-EJD

1    pursuant to which David's Device would operate.  Accordingly, not only was David's Device

2    defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated

3    the problems with David's Device via its misrepresentations and omissions with the iOS software

4    Updates.  As a result of Apple's actions, David did not receive the benefit of his bargain, and was

5    injured as a result.  If David had been told of these Defects, Battery Issues, and the deceptive

6    manner in which Apple would damage the Device after sale, David would not have purchased the

7    Device, or would have paid substantially less for it.

8                                              **ARIZONA**

9              39.       **Plaintiff Daphne Bowles Rodriguez** is a resident and citizen of the State of

10   Arizona and she purchased an iPhone 5 in or around 2012 or 2013, an iPhone 6 in or around 2014

11   or 2015, and an iPhone 7 in 2017.  Prior to her purchases of the Devices, she did not know, nor

12   could she have known through reasonable diligence, of the Battery Issues and Defects in her

13   Devices.  At time of initial purchases, the Devices operated on the latest version of iOS.

14             40.       Not only did Rodriquez's Devices not operate as Apple warranted and promised

15   initially, but Apple never represented or warranted that iOS updates would cause the way

16   Rodriquez's Devices operated to fundamentally change.  Rodriquez's Devices did not operate as

17   promised in Apple's advertisements, representations, and the information publicly available in the

18   marketplace.  Additionally, none of the packaging in which the Devices were sold to Rodriquez

19   revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to

20   "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which

21   Rodriquez's Devices would operate.  Accordingly, not only were Rodriquez's Devices defective at

22   the point of sale due to Battery Issues and Design Defects, but Apple exacerbated the problems with

23   Rodriquez's Devices via its misrepresentations and omissions with the iOS software Updates.  As a

24   result of Apple's actions, Rodriquez did not receive the benefit of her bargain, and was injured as a

25   result.  If Rodriquez had been told of these Defects, Battery Issues, and the deceptive manner in

26   which Apple would damage the Devices after sale, Rodriquez would not have purchased the

27   Devices, or would have paid substantially less for them.

28

CONSOLIDATED AMENDED COMPLAINT              13              NO. 5:18-MD-02827-EJD

**ARIZONA**

41.       **Plaintiff Trent Young** is a resident and citizen of the State of Arizona and he purchased an iPhone 6s in September 2015. Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Device.  Young regularly downloaded and installed iOS updates when prompted.

42.       Not only did Young's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Young's Device operated to fundamentally change.  Young's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Young revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Young's Device would operate. Accordingly, not only was way Young's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Young's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Young did not receive the benefit of his bargain, and was injured as a result.  If Young had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Young would not have purchased the Device, or would have paid substantially less for it.

**ARKANSAS**

43.       **Plaintiff Cynthia Stacy** is a resident and citizen of the State of Arkansas and she purchased an iPhone 6 Plus on or around 2015.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in her Device.

44.       Not only did Stacy's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Stacy's Device operated to fundamentally change.  Stacy's Device did not operate as promised in Apple's

CONSOLIDATED AMENDED COMPLAINT          14          NO. 5:18-MD-02827-EJD

1  advertisements, representations, and the information publicly available in the marketplace.

2  Additionally, none of the packaging in which the Device was sold to Stacy revealed that there were

3  any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

4  otherwise regulate the battery power and speed pursuant to which Stacy's Device would operate.

5  Accordingly, not only was Stacy's Device defective at the point of sale due to its Battery Issues and

6  Design Defects, but Apple exacerbated the problems with Stacy's Device via its misrepresentations

7  and omissions with the iOS software Updates.  As a result of Apple's actions, Stacy did not receive

8  the benefit of her bargain, and was injured as a result.  If Stacy had been told of these Defects,

9  Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Stacy

10  would not have purchased the Device, or would have paid substantially less for it.

## CALIFORNIA

12        45.        **Plaintiff Amanda Holman** is a resident and citizen of the State of California

13  and she purchased an iPhone 5 in January 2015 and an iPhone 6 Plus in October 2016.  Prior to her

14  purchase of the Devices, she did not know, nor could she have known through reasonable diligence,

15  of the Battery Issues and Defects in her Devices.  At time of initial purchase, her Devices operated

16  on their factory-installed iOS versions.   Holman downloaded and installed iOS 9 on her iPhone 5 in

17  or around October 2015 and iOS 10.3.1 on her iPhone 6 Plus in or around May 2017.

18        46.        Not only did Holman's Devices not operate as Apple warranted and promised

19  initially, but Apple never represented or warranted that iOS 9, 10.3.1, or any of the future updates

20  would cause the way Holman's Devices operated to fundamentally change.  Holman's Devices,

21  particularly after installation of iOS 9 and 10.3.1, respectively, did not operate as promised in

22  Apple's advertisements, representations, and the information publicly available in the marketplace.

23  Additionally, none of the packaging in which the Devices were sold to Holman revealed that there

24  were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

25  otherwise regulate the battery power and speed pursuant to which Holman's Devices would operate.

26  Accordingly, not only were Holman's Devices defective at the point of sale due to its Battery Issues

27  and Design Defects, but Apple exacerbated the problems with Holman's Devices via its

28

1  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

2  Holman did not receive the benefit of her bargain and was injured as a result.  If Holman had been

3  told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

4  Devices after sale, Holman would not have purchased the Devices, or would have paid substantially

5  less for them.

6                                                    **CALIFORNIA**

7                47.        **Plaintiff John Webb** is a resident and citizen of the State of California and he

8  purchased an iPhone 7 Plus on January 4, 2017.  Prior to his purchase of the Device, he did not

9  know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in

10  his Device.  At time of initial purchase, the Device operated on iOS 10.  Webb downloaded and

11  installed iOS 11 on his iPhone 7 Plus in or around September 2017.

12                48.        Not only did Webb's Device not operate as Apple warranted and promised

13  initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

14  cause the way Webb's Device operated to fundamentally change.  Webb's Device, particularly after

15  installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and

16  the information publicly available in the marketplace.  Additionally, none of the packaging in which

17  the Device was sold to Webb revealed that there were any Defects, Battery Issues, or that Apple

18  would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed

19  pursuant to which Webb's Device would operate.  Accordingly, not only was Webb's Device

20  defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated

21  the problems with Webb's Device via its misrepresentations and omissions with the iOS software

22  Updates.  As a result of Apple's actions, Webb did not receive the benefit of his bargain, and was

23  injured as a result.  If Webb had been told of these Defects, Battery Issues, and the deceptive

24  manner in which Apple would damage the Device after sale, Webb would not have purchased the

25  Device, or would have paid substantially less for it.

26

27

28

CONSOLIDATED AMENDED COMPLAINT                16                    NO. 5:18-MD-02827-EJD

**CALIFORNIA**

49.     **Plaintiff Laura Gail Diamond** is a resident and citizen of the State of California and she has purchased multiple generations of the iPhone dating back to the iPhone 4 generation, including an iPhone 6 and 6s Plus in fall 2015, and an iPhone 7 in fall 2016.  Prior to her purchases of the Devices, she did not know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in her Devices.  At time of initial purchase, the Devices operated on their factory-installed iOS versions.

50.     Not only did Diamond's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11.1 or any future updates would cause the way Diamond's Devices operated to fundamentally change.  Diamond's Devices, for example after installation of iOS 11.1 on her iPhone 7, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Diamond revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Diamond's Devices would operate.  Accordingly, not only were Diamond's Devices defective at the point of sale due to their Battery Issues and Design Defects, but Apple exacerbated the problems with Diamond's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Diamond did not receive the benefit of her bargain and was injured as a result.  If Diamond had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale, Diamond would not have purchased the Devices, or would have paid substantially less for them.

**CALIFORNIA**

51.     **Plaintiff Robert Gilson** is a resident and citizen of the State of California and he purchased an iPhone 6 Plus.  Prior to his purchases of the Device, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Device.  At time

---

1  of initial purchase, the Device operated on iOS 8.   In or around January 2017, Gilson downloaded

2  and installed iOS 10.2.1 on his Device.

3      52.    Not only did Gilson's Device not operate as Apple warranted and promised

4  initially, but Apple never represented or warranted that iOS 10.2.1 or any future updates would

5  cause the way Gilson's Device operated to fundamentally change.  Gilson's Device, particularly

6  after installation of iOS 10.2.1, did not operate as promised in Apple's advertisements,

7  representations, and the information publicly available in the marketplace.  Additionally, none of

8  the packaging in which the Device was sold to Gilson revealed that there were any Defects, Battery

9  Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the

10  battery power and speed pursuant to which Gilson's Device would operate.  Accordingly, not only

11  was Gilson's Device defective at the point of sale due to its Battery Issues and Design Defects, but

12  Apple exacerbated the problems with Gilson's Device via its misrepresentations and omissions with

13  the iOS software Updates.  As a result of Apple's actions, Gilson did not receive the benefit of his

14  bargain and was injured as a result.  If Gilson had been told of these Defects, Battery Issues, and the

15  deceptive manner in which Apple would damage the Device after sale, Gilson would not have

16  purchased the Device, or would have paid substantially less for it.

17  **CALIFORNIA**

18      53.    **Plaintiff Romeo Alba** is a resident and citizen of the State of California and he

19  purchased an iPhone 6 Plus in September 2014.  Prior to his purchases of the Device, he did not

20  know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in

21  his Device.  At time of initial purchase, the iPhone 6 Plus operated on iOS 8.   In or around October

22  2017, Alba downloaded and installed iOS 11 on his iPhone 6 Plus.

23      54.    Not only did Alba's Device not operate as Apple warranted and promised

24  initially, but Apple never represented or warranted that iOS 11 or any future updates would cause

25  the way Alba's Device operated to fundamentally change.  Alba's Device, particularly after

26  installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and

27  the information publicly available in the marketplace.  Additionally, none of the packaging in which

28

CONSOLIDATED AMENDED COMPLAINT    18    NO. 5:18-MD-02827-EJD

1    the Device was sold to Alba revealed that there were any Defects, Battery Issues, or that Apple

2    would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed

3    pursuant to which Alba's Device would operate.  Accordingly, not only was Alba's Device

4    defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated

5    the problems with Alba's Device via its misrepresentations and omissions with the iOS software

6    Updates.  As a result of Apple's actions, Alba did not receive the benefit of his bargain, and was

7    injured as a result.  If Alba had been told of these Defects, Battery Issues, and the deceptive manner

8    in which Apple would damage the Device after sale, Alba would not have purchased the Device, or

9    would have paid substantially less for it.

10                                          **CALIFORNIA**

11           55.        **Plaintiff Sara Hawes** is a resident and citizen of the State of California and she

12    leased multiple generations of the iPhone, including an iPhone 5 (in August 2013), two iPhone 6

13    Devices (in September and October 2014), and an iPhone 7 (in September 2016).  Prior to her lease

14    of the Devices, she did not know, nor could she have known through reasonable diligence, of the

15    Battery Issues and Defects in her Devices.  At time of initial lease, the Devices operated on their

16    factory-installed iOS versions.

17           56.        Not only did Hawes's Devices not operate as Apple warranted and promised

18    initially, but Apple never represented or warranted that any of the future iOS updates would cause

19    the way Hawes's Devices operated to fundamentally change.  Hawes's Devices, particularly after

20    installation of subsequent iOS versions, did not operate as promised in Apple's advertisements,

21    representations, and the information publicly available in the marketplace.  Additionally, none of

22    the packaging in which the Devices were sold to Hawes revealed that there were any Defects,

23    Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

24    the battery power and speed pursuant to which Hawes's Devices would operate.  Accordingly, not

25    only were Hawes's Devices defective at the point of lease due to its Battery Issues and Design

26    Defects, but Apple exacerbated the problems with Hawes's Devices via its misrepresentations and

27    omissions with the iOS software Updates.  As a result of Apple's actions, Hawes did not receive the

28

1   benefit of her bargain and was injured as a result.  If Hawes had been told of these Defects, Battery

2   Issues, and the deceptive manner in which Apple would damage the Devices after sale, Hawes

3   would not have leased the Devices, or would have paid substantially less for them.

4                                   **CALIFORNIA**

5          57.      **Plaintiff Thomas Cook** is a resident and citizen of the State of California, and

6   he purchased an iPhone 6 on October 18, 2014.  Prior to his purchase of the Device, he did not

7   know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in

8   his Device.  At time of initial purchase, the Device operated on iOS 8.   Cook downloaded and

9   installed iOS 10.2.1 on his Device in or around January 2017.

10         58.      Not only did Cook's Device fail to operate as Apple warranted and promised

11  initially, but Apple never represented or warranted that iOS 10.2.1 or any future updates would

12  cause the way Cook's Device operated to fundamentally change.  Cook's Device, particularly after

13  installation of iOS 10.2.1, did not operate as promised in Apple's advertisements, representations,

14  and the information publicly available in the marketplace.  Additionally, none of the packaging in

15  which the Device was sold to Cook revealed that there were any Defects, Battery Issues, or that

16  Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

17  speed pursuant to which Cook's Device would operate.  Accordingly, not only was Cook's Device

18  defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated

19  the problems with Cook's Device via its misrepresentations and omissions with the iOS software

20  Updates.  As a result of Apple's actions, Cook did not receive the benefit of his bargain, and was

21  injured as a result.  If Cook had been told of these Defects, Battery Issues, and the deceptive

22  manner in which Apple would damage the Device after sale, Cook would not have purchased the

23  Device, or would have paid substantially less for it.

24                                  **CALIFORNIA**

25         59.      **Plaintiff Ida Villegas** is a resident and citizen of the State of California and she

26  purchased an iPhone 5 around the time of its release.  Prior to her purchase of the Device, she did

27

28

CONSOLIDATED AMENDED COMPLAINT              20              NO. 5:18-MD-02827-EJD

1  not know, nor could she have known through reasonable diligence, of the Battery Issues and

2  Defects in her Device.

3       60.     Not only did Villegas's Device not operate as Apple warranted and promised

4  initially, but Apple never represented or warranted that iOS updates would cause the way Villegas's

5  Device operated to fundamentally change.  Villegas's Device did not operate as promised in

6  Apple's advertisements, representations, and the information publicly available in the marketplace.

7  Additionally, none of the packaging in which the Device was sold to Villegas revealed that there

8  were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

9  otherwise regulate the battery power and speed pursuant to which Villegas's Device would operate.

10  Accordingly, not only was way Villegas's Device defective at the point of sale due to its Battery

11  Issues and Design Defects, but Apple exacerbated the problems with Villegas's Device via its

12  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

13  Villegas did not receive the benefit of her bargain, and was injured as a result.  If Villegas had been

14  told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

15  Device after sale, Villegas would not have purchased the Device, or would have paid substantially

16  less for it.

17                      **CALIFORNIA**

18       61.     **Plaintiff Heidi Valle** is a resident and citizen of the State of California and she

19  purchased an iPhone 5s, 6 Plus, and 7 roughly as the devices became available for sale.  Prior to her

20  purchases of the Devices, she did not know, nor could she have known through reasonable

21  diligence, of the Battery Issues and Defects in her Device.  Valle regularly updated iOS as

22  prompted.

23       62.     Not only did Valle's Devices not operate as Apple warranted and promised

24  initially, but Apple never represented or warranted that iOS updates would cause the way Valle's

25  Devices operated to fundamentally change.  Vales's Devices did not operate as promised in Apple's

26  advertisements, representations, and the information publicly available in the marketplace.

27  Additionally, none of the packaging in which the Devices were sold to Valle revealed that there

28

CONSOLIDATED AMENDED COMPLAINT      21      No. 5:18-MD-02827-EJD

1   were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

2   otherwise regulate the battery power and speed pursuant to which Valle's Devices would operate.

3   Accordingly, not only were Valles's Devices defective at the point of sale due to its Battery Issues

4   and Design Defects, but Apple exacerbated the problems with Valle's Devices via its

5   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

6   Valle did not receive the benefit of her bargain, and was injured as a result.  If Valle had been told

7   of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

8   Devices after sale, Valle would not have purchased the Devices, or would have paid substantially

9   less for it.

**CALIFORNIA**

10

11      63.      **Plaintiff Samara Diner** is a resident and citizen of the State of California and

12   she purchased an iPhone 6 in late 2016.  Prior to her purchase of the Device, she did not know, nor

13   could she have known through reasonable diligence, of the Battery Issues and Defects in her

14   Device.  At time of initial purchase, the Device operated on the latest version of iOS.   Diner

15   downloaded and installed the latest versions of iOS on her Device within a couple days of receiving

16   any update notifications.

17      64.      Not only did Diner's Device not operate as Apple warranted and promised

18   initially, but Apple never represented or warranted that any version of iOS or any of the future

19   updates would cause the way Diner's Device operated to fundamentally change.  Diner's Device,

20   after continued installations, did not operate as promised in Apple's advertisements,

21   representations, and the information publicly available in the marketplace.  Additionally, none of

22   the packaging in which the Device was sold to Diner revealed that there were any Defects, Battery

23   Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the

24   battery power and speed pursuant to which Diner's Device would operate.  Accordingly, not only

25   was Diner's Device defective at the point of sale due to its Battery Issues and Design Defects, but

26   Apple exacerbated the problems with Diner's Device via its misrepresentations and omissions with

27   the iOS software Updates.  As a result of Apple's actions, Diner did not receive the benefit of her

28

CONSOLIDATED AMENDED COMPLAINT            22            NO. 5:18-MD-02827-EJD

1    bargain, and was injured as a result.  If Diner had been told of these Defects, Battery Issues, and the

2    deceptive manner in which Apple would damage the Device after sale, Diner would not have

3    purchased the Device, or would have paid substantially less for it.

4                                   **COLORADO**

5          65.    **Plaintiff Gary Merenstein** is a resident and citizen of the State of Colorado and

6    he purchased an iPhone 5c in the Fall of 2013 and an iPhone SE in 2016.  Prior to his purchases of

7    the Devices, he did not know, nor could he have known through reasonable diligence, of the Battery

8    Issues and Defects in his Devices.  At time of initial purchase, the iPhone 5c operated on iOS 7 and

9    the iPhone SE operated on iOS 9.

10         66.    Not only did Merenstein's Devices not operate as Apple warranted and promised

11   initially, but Apple never represented or warranted that any future iOS updates would cause the way

12   Merenstein's Devices operated to fundamentally degrade.  Merenstein's Devices, particularly after

13   installation of the Updates in his iPhone SE, did not operate as promised in Apple's advertisements,

14   representations, and the information publicly available in the marketplace.  Additionally, none of

15   the packaging in which the Devices were sold to Merenstein revealed that there were any Defects,

16   Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

17   the battery power and speed pursuant to which Merenstein's Devices would operate.  Not only were

18   Merenstein's Devices defective at the point of sale due to their Battery Issues and Defects, but

19   Apple exacerbated the problems with Merenstein's Devices via its misrepresentations and

20   omissions with the iOS software Updates.  As a result of Apple's actions, Merenstein did not

21   receive the benefit of his bargain, and was injured as a result.  If Merenstein had been told of these

22   Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices after

23   sale, Merenstein would not have purchased the Devices, or would have paid substantially less for

24   them.

25                                   **COLORADO**

26         67.    **Plaintiff Steven Connolly** is a resident and citizen of the State of Idaho and he

27   purchased two iPhone 6 Devices on February 14, 2015 in Colorado while a Colorado resident.

28

CONSOLIDATED AMENDED COMPLAINT            23            NO. 5:18-MD-02827-EJD

1   Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable

2   diligence, of the Battery Issues and Defects in his Devices.  At time of initial purchase, the iPhone 6

3   Devices operated on iOS 8.

4        68.        Not only did Connolly's Devices not operate as Apple warranted and promised

5   initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

6   cause the way Connolly's Devices operated to fundamentally change.  Connolly's Devices,

7   particularly after installation of iOS 11, did not operate as promised in Apple's advertisements,

8   representations, and the information publicly available in the marketplace.  Additionally, none of

9   the packaging in which the Devices were sold to Connolly revealed that there were any Defects,

10  Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

11  the battery power and speed pursuant to which Connolly's Devices would operate.  Accordingly,

12  not only were Connolly's Devices defective at the point of sale due to its Battery Issues and Design

13  Defects, but Apple exacerbated the problems with Connolly's Devices via its misrepresentations

14  and omissions with the iOS software Updates.  As a result of Apple's actions, Connolly did not

15  receive the benefit of his bargain and was injured as a result.  If Connolly had been told of these

16  Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices after

17  sale, Connolly would not have purchased the Devices, or would have paid substantially less for

18  them.

19                                   **COLORADO**

20       69.        **Plaintiff Bryan Schell** is a resident of France and citizen of the State of

21  Wyoming and he purchased an iPhone 5s on May 15, 2014 in Colorado.  Prior to his purchase of

22  the Device, he did not know, nor could he have known through reasonable diligence, of the Battery

23  Issues and Defects in his Device.  At time of initial purchase, the Device operated on iOS 7.

24       70.        Not only did Schell's Device not operate as Apple warranted and promised

25  initially, but Apple never represented or warranted that iOS 9 or any of the future updates would

26  cause the way Schell's Device operated to fundamentally change.  Schell's Device, particularly

27  after installation of iOS 9, did not operate as promised in Apple's advertisements, representations,

28

---

CONSOLIDATED AMENDED COMPLAINT            24            NO. 5:18-MD-02827-EJD

and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Schell revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Schell's Device would operate. Accordingly, not only was Schell's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Schell's Device via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Schell did not receive the benefit of his bargain, and was injured as a result. If Schell had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Schell would not have purchased the Device, or would have paid substantially less for it.

## CONNECTICUT

71.     **Plaintiff Sandra Merola** is a resident and citizen of the State of Connecticut and she purchased an iPhone 6 Plus in 2015 and purchased an iPhone 7 Plus in December 2017. Prior to her purchases of the Devices, she did not know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in her Devices.

72.     Not only did Merola's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Merola's Devices operated to fundamentally change. Merola's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Merola revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Merola's Devices would operate. Accordingly, not only were Merola's Devices defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Merola's Devices via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Merola did not receive the benefit of her bargain, and was injured as a result. If Merola had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

CONSOLIDATED AMENDED COMPLAINT          25          NO. 5:18-MD-02827-EJD

1    Device after sale, Merola would not have purchased the Devices, or would have paid substantially

2    less for them.

3                                            **CONNECTICUT**

4          73.     **Plaintiff Ashley Ann Antonucci** is a resident and citizen of the State of

5    Connecticut and she purchased an iPhone 6 shortly after it was released.  Prior to her purchase of

6    the Device, she did not know, nor could she have known through reasonable diligence, of the

7    Battery Issues and Defects in her Device.

8          74.     Not only did Antonucci's Device not operate as Apple warranted and promised

9    initially, but Apple never represented or warranted that iOS updates would cause the way

10   Antonucci's Device operated to fundamentally change.  Antonucci's Device did not operate as

11   promised in Apple's advertisements, representations, and the information publicly available in the

12   marketplace.  Additionally, none of the packaging in which the Device was sold to Antonucci

13   revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to

14   "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which

15   Antonucci's Device would operate.  Accordingly, not only was way Antonucci's Device defective

16   at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the

17   problems with Antonucci's Device via its misrepresentations and omissions with the iOS software

18   Updates.  As a result of Apple's actions, Antonucci did not receive the benefit of her bargain, and

19   was injured as a result.  If Antonucci had been told of these Defects, Battery Issues, and the

20   deceptive manner in which Apple would damage the Device after sale, Antonucci would not have

21   purchased the Device, or would have paid substantially less for it.

22                                             **DELAWARE**

23         75.     **Plaintiff Aisha Boyd** is a resident and citizen of the State of Delaware and she

24   purchased an iPhone 6 on December 12, 2015.  Prior to her purchase of the Device, she did not

25   know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in

26   her Device.  At time of initial purchase, the Device operated on iOS 8.  Boyd downloaded and

27   installed iOS 11 on her Device in or around October 2017.

28

---

CONSOLIDATED AMENDED COMPLAINT               26               NO. 5:18-MD-02827-EJD

76.    Not only did Boyd's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Boyd's Devices operated to fundamentally change.  Boyd's Devices, particularly after installation of iOS 11 and 11.3, respectively, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Boyd revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Boyd's Devices would operate.  Accordingly, not only were Boyd's Devices defective at the point of sale due to their Battery Issues and Design Defects, but Apple exacerbated the problems with Boyd's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Boyd did not receive the benefit of her bargain and was injured as a result.  If Boyd had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale, Boyd would not have purchased the Devices, or would have paid substantially less for them.

### DELAWARE

77.    **Plaintiff Irwin Darack** is a resident and citizen of the State of Pennsylvania and he purchased an iPhone 6 on April 22, 2015 in Delaware.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Device.  At time of initial purchase, the Device operated on iOS 8.  Darack downloaded and installed iOS 11 on his Device in the fall of 2017.

78.    Not only did Darack's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Darack's Device operated to fundamentally change. Darack's Device, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Darack revealed that there were any Defects, Battery Issues, or that

CONSOLIDATED AMENDED COMPLAINT                27                NO. 5:18-MD-02827-EJD

1    Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

2    speed pursuant to which Darack's Device would operate.  Accordingly, not only was Darack's

3    Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple

4    exacerbated the problems with Darack's Device via its misrepresentations and omissions with the

5    iOS software Updates.  As a result of Apple's actions, Darack did not receive the benefit of his

6    bargain, and was injured as a result.  If Darack had been told of these Defects, Battery Issues, and

7    the deceptive manner in which Apple would damage the Device after sale, Darack would not have

8    purchased the Device, or would have paid substantially less for it.

9                                    **DISTRICT OF COLUMBIA**

10            79.        **Plaintiff Brandi S. White** is a resident and citizen of the District of Columbia

11    and she purchased an iPhone 6s in July 2016.  Prior to her purchase of the Device, she did not

12    know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in

13    her Device.

14            80.        Not only did White's Device not operate as Apple warranted and promised

15    initially, but Apple never represented or warranted that iOS updates would cause the way White's

16    Device operated to fundamentally change.  White's Device did not operate as promised in Apple's

17    advertisements, representations, and the information publicly available in the marketplace.

18    Additionally, none of the packaging in which the Device was sold to White revealed that there were

19    any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

20    otherwise regulate the battery power and speed pursuant to which White's Device would operate.

21    Accordingly, not only was White's Device defective at the point of sale due to its Battery Issues

22    and Design Defects, but Apple exacerbated the problems with White's Device via its

23    misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

24    White did not receive the benefit of her bargain, and was injured as a result.  If White had been told

25    of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

26    Device after sale, White would not have purchased the Device, or would have paid substantially

27    less for it.

28

CONSOLIDATED AMENDED COMPLAINT            28              NO. 5:18-MD-02827-EJD

**DISTRICT OF COLUMBIA**

81.      **Plaintiff Lauren Weintraub** is a resident and citizen of the District of Columbia and she leased an iPhone 6 on September 21, 2014 and an iPhone 7 in October 2016.  Prior to her lease of the Devices, she did not know, nor could she have known through reasonable diligence of the Battery Issues and Defects in her Devices.  At time of initial lease, the iPhone 6 operated on iOS 8 and the iPhone 7 operated on iOS 10.   Weintraub downloaded and installed iOS 9 on her iPhone 6 in or around September 2016 and iOS 11 on her iPhone 7 on October 19, 2017.

82.      Not only did Weintraub's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 9, 11, or any of the future updates would cause the way Weintraub's Devices operated to fundamentally change.  Weintraub's Devices, particularly after installation of iOS 9 and 11, respectively, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Weintraub revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Weintraub's Devices would operate.  Accordingly, not only were Weintraub's Devices defective at the point of lease due to their Battery Issues and Design Defects, but Apple exacerbated the problems with Weintraub's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Weintraub did not receive the benefit of her bargain, and was injured as a result.  If Weintraub had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale, Weintraub would not have leased the Devices, or would have paid substantially less for them.

**FLORIDA**

83.      **Plaintiff Sandra Brodsky** is a resident and citizen of the State of Florida and she, her husband, and her two children have leased iPhones dating back to the first generation, including the iPhone 6 Plus, iPhone 6s Plus, iPhone 7, and iPhone 7 Plus, as well as purchasing the iPad Air 2.  Prior to her purchase of the Devices, she did not know, nor could she have known

---

CONSOLIDATED AMENDED COMPLAINT            29            NO. 5:18-MD-02827-EJD

1    through reasonable diligence of the Battery Issues and Defects in her Devices.  At time of initial

2    lease and purchase, the Devices operated on their factory-installed iOS versions.

3        84.    Not only did Brodsky's Devices not operate as Apple warranted and promised

4    initially, but Apple never represented or warranted that the future iOS updates would cause the way

5    Brodsky's Devices operated to fundamentally change.  Brodsky's Devices, particularly after

6    installation of subsequent iOS updates, did not operate as promised in Apple's advertisements,

7    representations, and the information publicly available in the marketplace.  Additionally, none of

8    the packaging in which the Devices were sold to Brodsky revealed that there were any Defects,

9    Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

10    the battery power and speed pursuant to which Brodsky's Devices would operate.  Accordingly, not

11    only were Brodsky's Devices defective at the point of sale or lease due to their Battery Issues and

12    Design Defects, but Apple exacerbated the problems with Brodsky's Devices via its

13    misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

14    Brodsky and her family did not receive the benefit of their bargain, and were injured as a result.  If

15    Brodsky and her family had been told of these Defects, Battery Issues, and the deceptive manner in

16    which Apple would damage the Devices after sale, they would not have purchased or leased the

17    Devices, or would have paid substantially less for them.

18                            **FLORIDA**

19        85.    **Plaintiff Stephen Margolis** is a resident and citizen of the State of Florida and

20    he leased multiple generations of the iPhone, including an iPhone 6 on December 30, 2014 and an

21    iPhone 7 on October 14, 2016, and also purchased multiple generations of the iPad, including a

22    sixth generation iPad.  Prior to his lease and purchase of the Devices, he did not know, nor could he

23    have known through reasonable diligence, of the Battery Issues and Defects in his Devices.  At time

24    of initial lease and purchase, the Devices operated on their factory-installed iOS versions.

25        86.    Not only did Margolis's Devices not operate as Apple warranted and promised

26    initially, but Apple never represented or warranted that any of the future iOS updates would cause

27    the way Margolis's Devices operated to fundamentally change.  Margolis's Devices, particularly

28

CONSOLIDATED AMENDED COMPLAINT        30        NO. 5:18-MD-02827-EJD

1    after installation of subsequent iOS updates, like iOS 11 on his iPhone 7, did not operate as

2    promised in Apple's advertisements, representations, and the information publicly available in the

3    marketplace.  Additionally, none of the packaging in which the Devices were sold to Margolis

4    revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to

5    "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which

6    Margolis's Devices would operate.  Accordingly, not only were Margolis's Devices defective at the

7    point of sale or lease due to their Battery Issues and Design Defects, but Apple exacerbated the

8    problems with Margolis's Devices via its misrepresentations and omissions with the iOS software

9    Updates.  As a result of Apple's actions, Margolis did not receive the benefit of his bargain, and

10    was injured as a result.  If Margolis had been told of these Defects, Battery Issues, and the

11    deceptive manner in which Apple would damage the Devices after sale, Margolis would not have

12    purchased or leased the Devices, or would have paid substantially less for them.

13                                          **FLORIDA**

14          87.    **Plaintiff Jessica Greenshner** is a resident and citizen of the State of Indiana and

15    she purchased an iPhone 6 in November 2015 in Florida and an iPhone 7 in the fall of 2016 in

16    Floridaa.  Prior to her purchase of the Devices, she did not know, nor could she have known

17    through reasonable diligence, of the Battery Issues and Defects in her Devices.  At time of initial

18    purchase, the iPhone 6 operated on iOS 8 and the iPhone 7 operated on iOS 10.

19          88.    Not only did Greenshner's Devices not operate as Apple warranted and promised

20    initially, but Apple never represented or warranted that future iOS updates would cause the way

21    Greenshner's Device operated to fundamentally change.  Greenshner's Devices, particularly after

22    installation of subsequent iOS updates, did not operate as promised in Apple's advertisements,

23    representations, and the information publicly available in the marketplace.  Additionally, none of

24    the packaging in which the Devices were sold to Greenshner revealed that there were any Defects,

25    Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

26    the battery power and speed pursuant to which Greenshner's Devices would operate.  Accordingly,

27    not only were Greenshner's Devices defective at the point of sale due to their Battery Issues and

28

---

CONSOLIDATED AMENDED COMPLAINT          31          NO. 5:18-MD-02827-EJD

1    Design Defects, but Apple exacerbated the problems with Greenshner's Devices via its

2    misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

3    Greenshner did not receive the benefit of her bargain, and was injured as a result.  If Greenshner

4    had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would

5    damage the Devices after sale, Greenshner would not have purchased the Devices, or would have

6    paid substantially less for them.

7                                        **GEORGIA**

8           89.      **Plaintiff Jason Ratner** is a resident and citizen of the State of Georgia, and he

9    purchased four iPhone 5c Devices in June 2015 and two iPhone 6s Devices in May 2017 for him

10   and his family.  Prior to his purchase of the Devices, he did not know, nor could he have known

11   through reasonable diligence, of the Battery Issues and Defects in his Devices.  At time of initial

12   purchase, the Devices operated on their factory-installed iOS versions.   Ratner and his family

13   downloaded and installed iOS 10 on their iPhone 5c Devices in the summer of 2016 and iOS 11.4

14   on his iPhone 6s in May 2018.

15          90.      Not only did Ratner's Devices fail to operate as Apple warranted and promised

16   initially, but Apple never represented or warranted that iOS 10, 11.4, or any of the future updates

17   would cause the way Ratner's Devices operated to fundamentally change.  Ratner's Devices,

18   particularly after installation of 10 and 11.4, respectively, did not operate as promised in Apple's

19   advertisements, representations, and the information publicly available in the marketplace.

20   Additionally, none of the packaging in which the Devices were sold to Ratner revealed that there

21   were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

22   otherwise regulate the battery power and speed pursuant to which Ratner's Devices would operate.

23   Accordingly, not only were Ratner's Devices defective at the point of sale due to its Battery Issues

24   and Design Defects, but Apple exacerbated the problems with Ratner's Devices via its

25   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

26   Ratner did not receive the benefit of his bargain and was injured as a result.  If Ratner had been told

27   of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

28

---

CONSOLIDATED AMENDED COMPLAINT                32                NO. 5:18-MD-02827-EJD

1   Devices after sale, Ratner would not have purchased the Devices, or would have paid substantially

2   less for them.

3                                             **GEORGIA**

4           91.     **Plaintiff Tamica Gordon** is a resident and citizen of the state of Georgia and

5   she purchased an iPhone 6s on or around December 22, 2015.  Prior to her purchase of the device,

6   she did not know, nor could she have known through reasonable diligence, of the battery issues and

7   defects in her device.  At time of initial purchase or lease, the device operated on the current version

8   of iOS available at the time.   Tamica downloaded and installed version 11.3 of iOS on her device

9   at some point after the purchase of her device.

10          92.     Not only did Gordon's device not operate as apple warranted and promised

11  initially, but apple never represented or warranted that iOS 11.3 or any of the future updates would

12  cause the way Gordon's device operated to fundamentally change.  Gordon's device, particularly

13  after installation of iOS 11.3, did not operate as promised in apple's advertisements,

14  representations, and the information publicly available in the marketplace.  Additionally, none of

15  the packaging in which the device was sold to Gordon revealed that there were any defects, battery

16  issues, or that apple would use the updates to "smooth," "throttle," or otherwise regulate the battery

17  power and speed pursuant to which Gordon's device would operate.  Accordingly, not only was

18  Gordon's device defective at the point of sale due to its battery issues and design defects, but apple

19  exacerbated the problems with Gordon's device via its misrepresentations and omissions with the

20  ios software updates.  As a result of apple's actions, Gordon did not receive the benefit of her

21  bargain, and was injured as a result.  If Gordon had been told of these defects, battery issues, and

22  the deceptive manner in which apple would damage the device after sale, Gordon would not have

23  purchased the device, or would have paid substantially less for it.

24                                            **HAWAII**

25          93.     **Plaintiff Amy Brown** is a resident and citizen of the State of Hawaii and she

26  purchased an iPhone 6 on March 7, 2015.  Prior to her purchase of the Device, she did not know,

27

28

CONSOLIDATED AMENDED COMPLAINT                33                        NO. 5:18-MD-02827-EJD

1  nor could she have known through reasonable diligence, of the Battery Issues and Defects in her

2  Device.  At time of initial purchase, her Device operated on iOS 8.

3  94.    Not only did Brown's Device not operate as Apple warranted and promised

4  initially, but Apple never represented or warranted that iOS 10 or any of the future updates would

5  cause the way Brown's Device operated to fundamentally change.  Brown's Device, particularly

6  after installation of iOS 10, did not operate as promised in Apple's advertisements, representations,

7  and the information publicly available in the marketplace.  Additionally, none of the packaging in

8  which the Device was sold to Brown revealed that there were any Defects, Battery Issues, or that

9  Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

10  speed pursuant to which Brown's Device would operate.  Accordingly, not only was Brown's

11  Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple

12  exacerbated the problems with Brown's Device via its misrepresentations and omissions with the

13  iOS software Updates.  As a result of Apple's actions, Brown did not receive the benefit of her

14  bargain, and was injured as a result.  If Brown had been told of these Defects, Battery Issues, and

15  the deceptive manner in which Apple would damage the Device after sale, Brown would not have

16  purchased the Device, or would have paid substantially less for it.

17  **HAWAII**

18  95.    **Plaintiff Ruth Beauchan** is a resident and citizen of the State of Hawaii and she

19  purchased an iPhone 6 in California in late 2013 or early 2014. Prior to her purchase of the Device,

20  she did not know, nor could she have known through reasonable diligence, of the Battery Issues and

21  Defects in her Device.

22  96.    Not only did Beauchan's Device not operate as Apple warranted and promised

23  initially, but Apple never represented or warranted that iOS updates would cause the way

24  Beauchan's Device operated to fundamentally change.  Beauchan's Device, particularly after

25  installation of iOS updates in late 2016/early 2017, did not operate as promised in Apple's

26  advertisements, representations, and the information publicly available in the marketplace.

27  Additionally, none of the packaging in which the Device was sold to Beauchan revealed that there

28

CONSOLIDATED AMENDED COMPLAINT    34    NO. 5:18-MD-02827-EJD

1    were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

2    otherwise regulate the battery power and speed pursuant to which Beauchan's Device would

3    operate.  Accordingly, not only was way Beauchan's Device defective at the point of sale due to its

4    Battery Issues and Design Defects, but Apple exacerbated the problems with Beauchan's Device

5    via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

6    actions, Beauchan did not receive the benefit of her bargain, and was injured as a result.  If

7    Beauchan had been told of these Defects, Battery Issues, and the deceptive manner in which Apple

8    would damage the Device after sale, Beauchan would not have purchased the Device, or would

9    have paid substantially less for it. Ultimately, the function of Beauchan's Device degraded too

10   much for her to continue using and she replaced it with an iPhone 7 on April 18, 2017 in Hawaii.

**HAWAII / OREGON**

12        97.        **Plaintiff Eric Tanovan** is a resident and citizen of California and he leased an

13   iPhone 6 in November 2014 in Hawaii and an iPhone 7 Plus in June 2017 in Oregon, both while

14   residing in Hawaii.  Prior to his purchases of the Devices, he did not know, nor could he have

15   known through reasonable diligence, of the Battery Issues and Defects in his Devices.  At time of

16   initial purchase, the iPhone 6 operated on iOS 8 and the iPhone 7 Plus operated on iOS 10.

17        98.        Not only did Tanovan's Devices not operate as Apple warranted and promised

18   initially, but Apple never represented or warranted that any of the future iOS updates would cause

19   the way Tanovan's Devices operated to fundamentally change.  Tanovan's Devices, particularly

20   after installation of updates like iOS 10 on his iPhone 6 and iOS 11 on his iPhone 7 Plus, did not

21   operate as promised in Apple's advertisements, representations, and the information publicly

22   available in the marketplace.  Additionally, none of the packaging in which the Devices were sold

23   to Tanovan revealed that there were any Defects, Battery Issues, or that Apple would use the

24   Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to

25   which  Tanovan's Devices would operate.  Accordingly, not only were Tanovan's Devices

26   defective at the point of sale due to their Battery Issues and Design Defects, but Apple exacerbated

27   the problems with Tanovan's Devices via its misrepresentations and omissions with the iOS

28

---

CONSOLIDATED AMENDED COMPLAINT          35          NO. 5:18-MD-02827-EJD

1   software Updates.  As a result of Apple's actions, Tanovan did not receive the benefit of his

2   bargain, and was injured as a result.  If Tanovan had been told of these Defects, Battery Issues, and

3   the deceptive manner in which Apple would damage the Devices after sale, Tanovan would not

4   have purchased the Devices, or would have paid substantially less for them.

5                               **IDAHO**

6          99.       **Plaintiff Linda Sauer** is a resident and citizen of the State of Idaho and she

7   purchased an iPhone 5s in or around 2015.  Prior to her purchase of the Device, she did not know,

8   nor could she have known through reasonable diligence, of the Battery Issues and Defects in her

9   Device.  At time of initial purchase, the Device operated on iOS 7.  Sauer downloaded and installed

10  iOS 8 on her Device after purchase.

11         100.      Not only did Sauer's Device not operate as Apple warranted and promised

12  initially, but Apple never represented or warranted that any of the future iOS updates would cause

13  the way Sauer's Device operated to fundamentally change.  Sauer's Device, after installation of

14  subsequent iOS versions, did not operate as promised in Apple's advertisements, representations,

15  and the information publicly available in the marketplace.  Additionally, none of the packaging in

16  which the Device was sold to Sauer revealed that there were any Defects, Battery Issues, or that

17  Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

18  speed pursuant to which Sauer's Device would operate.  Accordingly, not only was Sauer's Device

19  defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated

20  the problems with Sauer's Device via its misrepresentations and omissions with the iOS software

21  Updates.  As a result of Apple's actions, Sauer did not receive the benefit of her bargain and was

22  injured as a result.  If Sauer had been told of these Defects, Battery Issues, and the deceptive

23  manner in which Apple would damage the Device after sale, Sauer would not have purchased the

24  Device, or would have paid substantially less for it.

25                              **ILLINOIS**

26         101.      **Plaintiff Rifah Alexander** is a resident and citizen of the State of Illinois and

27  she purchased an iPhone 6 Plus on April 19, 2015.  Prior to her purchase of the Device, she did not

28

---

CONSOLIDATED AMENDED COMPLAINT          36          NO. 5:18-MD-02827-EJD

1    know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in

2    her Device.

3         102.    Not only did Alexander's Device not operate as Apple warranted and promised

4    initially, but Apple never represented or warranted that iOS updates would cause the way

5    Alexander's Device operated to fundamentally change.  Alexander's Device did not operate as

6    promised in Apple's advertisements, representations, and the information publicly available in the

7    marketplace.  Additionally, none of the packaging in which the Device was sold to Alexander

8    revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to

9    "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which

10   Alexander's Device would operate.  Accordingly, not only was Alexander's Device defective at the

11   point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with

12   Alexander's Device via its misrepresentations and omissions with the iOS software Updates.  As a

13   result of Apple's actions, Alexander did not receive the benefit of her bargain, and was injured as a

14   result.  If Alexander had been told of these Defects, Battery Issues, and the deceptive manner in

15   which Apple would damage the Device after sale, Alexander would not have purchased the Device,

16   or would have paid substantially less for it.

17                                      **ILLINOIS**

18        103.    **Plaintiff Andrew Yashchuk** is a resident and citizen of the State of Texas and

19   he purchased two iPhone 6 Pluses in or around September 2014 in Illinois.  Prior to his purchase of

20   the Devices, he did not know, nor could he have known through reasonable diligence, of the Battery

21   Issues and Defects in his Devices.

22        104.    Not only did Yashchuk's Devices not operate as Apple warranted and promised

23   initially, but Apple never represented or warranted that any iOS update would cause the way

24   Yashchuk's Devices operated to fundamentally change, let alone render any of his Devices

25   inoperable.  Yashchuk's Devices did not operate as promised in Apple's advertisements,

26   representations, and the information publicly available in the marketplace.  Additionally, none of

27   the packaging in which the Devices were sold to Yashchuk revealed that there were any Defects,

28

CONSOLIDATED AMENDED COMPLAINT            37            NO. 5:18-MD-02827-EJD

1    Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

2    the battery power and speed pursuant to which Yashchuk's Devices would operate.  Accordingly,

3    not only were Yashchuk's Devices defective at the point of sale due to its Battery Issues and Design

4    Defects, but Apple exacerbated the problems with Yashchuk's Device via its misrepresentations

5    and omissions with the iOS software Updates.  As a result of Apple's actions, Yashchuk did not

6    receive the benefit of his bargain, and was injured as a result.  If Yashchuk had been told of these

7    Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices after

8    sale, Yashchuk would not have purchased the Devices, or would have paid substantially less for

9    them.

10                                     **INDIANA**

11          105.    **Plaintiff Alisha Boykin** is a resident and citizen of the State of Tennessee and

12    she purchased an iPhone 6s on October 14, 2015 in Indiana while residing in Indiana.  Prior to her

13    purchase of the Device, she did not know, nor could she have known through reasonable diligence,

14    of the Battery Issues and Defects in her Device.  At time of initial purchase, the Device operated on

15    iOS 9.   Boykin downloaded and installed iOS 11 on her Device in the fall of 2017.

16          106.    Not only did Boykin's Device not operate as Apple warranted and promised

17    initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

18    cause the way Boykin's Device operated to fundamentally change.  Boykin's Device, particularly

19    after installation of iOS 11, did not operate as promised in Apple's advertisements, representations,

20    and the information publicly available in the marketplace.  Additionally, none of the packaging in

21    which the Device was sold to Boykin revealed that there were any Defects, Battery Issues, or that

22    Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

23    speed pursuant to which Boykin's Device would operate.  Accordingly, not only was Boykin's

24    Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple

25    exacerbated the problems with Boykin's Device via its misrepresentations and omissions with the

26    iOS software Updates.  As a result of Apple's actions, Boykin did not receive the benefit of her

27    bargain and was injured as a result.  If Boykin had been told of these Defects, Battery Issues, and

28

CONSOLIDATED AMENDED COMPLAINT            38            NO. 5:18-MD-02827-EJD

1  the deceptive manner in which Apple would damage the Device after sale, Boykin would not have

2  purchased the Device, or would have paid substantially less for it.

3                                          **IOWA**

4          107.    **Plaintiff Tammy Greenfield** is a resident and citizen of the State of Iowa and

5  she purchased five iPhone 6s Devices on September 12, 2015 for her and her family.  Prior to her

6  purchase of the Devices, she did not know, nor could she have known through reasonable diligence,

7  of the Battery Issues and Defects in her Devices.  At time of initial purchase, the Devices operated

8  on iOS 9.

9          108.    Not only did Greenfield's Devices not operate as Apple warranted and promised

10  initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

11  cause the way Greenfield's Devices operated to fundamentally change.  Greenfield's Devices,

12  particularly after installation of iOS 11, did not operate as promised in Apple's advertisements,

13  representations, and the information publicly available in the marketplace.  Additionally, none of

14  the packaging in which the Devices were sold to Greenfield revealed that there were any Defects,

15  Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

16  the battery power and speed pursuant to which Greenfield's Devices would operate.  Accordingly,

17  not only were Greenfield's Devices defective at the point of sale due to its Battery Issues and

18  Design Defects, but Apple exacerbated the problems with Greenfield's Devices via its

19  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

20  Greenfield did not receive the benefit of her bargain and was injured as a result.  If Greenfield had

21  been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage

22  the Devices after sale, Greenfield would not have purchased the Devices, or would have paid

23  substantially less for them.

24                                         **KANSAS**

25          109.    **Plaintiff Natasha Bryant** is a resident and citizen of the State of Kansas and she

26  purchased an iPhone 5c on November 29, 2013 and an iPhone 6 Plus on July 1, 2016.  Prior to her

27  purchase of the Devices, she did not know, nor could she have known through reasonable diligence,

28

---

CONSOLIDATED AMENDED COMPLAINT            39            NO. 5:18-MD-02827-EJD

of the Battery Issues and Defects in her Devices.  At time of initial purchase, the iPhone 5c Device operated on iOS 7 and the iPhone 6 Plus operated on iOS 8.

110.     Not only did Bryant's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10 or any of the future updates would cause the way Bryant's Devices operated to fundamentally change.  Bryant's Devices, particularly after installation of iOS 10, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Bryant revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Bryant's Devices would operate.  Accordingly, not only were Bryant's Devices defective at the point of sale due to their Battery Issues and Design Defects, but Apple exacerbated the problems with Bryant's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Bryant did not receive the benefit of her bargain and was injured as a result.  If Bryant had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale, Bryant would not have purchased the Devices, or would have paid substantially less for them.

**KANSAS**

111.     **Plaintiff John Farris** is a resident and citizen of the State of Texas and he purchased an iPhone 6 on October 29, 2014 and and an iPhone 6s on August 2, 2017, both in Kansas while a resident of Kansas.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Devices.  At time of initial purchase, the iPhone 6 Device operated on iOS 8.   In February 2017, Apple automatically downloaded and installed iOS 10.2.1 on Farris's iPhone 6 Device.

112.     Not only did Farris's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10.2.1 or any of the future updates would cause the way Farris's Device operated to fundamentally change.  Farris's Device, particularly after installation of iOS 10.2.1, did not operate as promised in Apple's advertisements,

1    representations, and the information publicly available in the marketplace. Additionally, none of

2    the packaging in which the Device was sold to Farris revealed that there were any Defects, Battery

3    Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the

4    battery power and speed pursuant to which Farris's Device would operate. Accordingly, not only

5    was Farris's Devices defective at the point of sale due to its Battery Issues and Design Defects, but

6    Apple exacerbated the problems with Farris's Devices via its misrepresentations and omissions with

7    the iOS software Updates. As a result of Apple's actions, Farris did not receive the benefit of his

8    bargain and was injured as a result. If Farris had been told of these Defects, Battery Issues, and the

9    deceptive manner in which Apple would damage the Devices after sale, Farris would not have

10    purchased the Devices, or would have paid substantially less for them.

11                                           **KENTUCKY**

12            113.      **Plaintiff Herman Praszkier** is a resident and citizen of the Commonwealth of

13    Kentucky and he has purchased multiple generations of iPhones, including two iPhone 5 Devices,

14    two iPhone 6 Plus Devices, and two iPhone 7 Devices. Prior to his purchase of the Devices, he did

15    not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects

16    in his Devices. At time of initial purchase, the Devices operated on their factory-installed iOS

17    versions.

18            114.      Not only did Praszkier's Devices not operate as Apple warranted and promised

19    initially, but Apple never represented or warranted that any of the future iOS updates would cause

20    the way Praszkier's Devices operated to fundamentally change. Praszkier's Devices, particularly

21    after installation of subsequent iOS versions, did not operate as promised in Apple's

22    advertisements, representations, and the information publicly available in the marketplace.

23    Additionally, none of the packaging in which the Devices were sold to Praszkier revealed that there

24    were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

25    otherwise regulate the battery power and speed pursuant to which Praszkier's Devices would

26    operate. Accordingly, not only were Praszkier's Devices defective at the point of sale due to their

27    Battery Issues and Design Defects, but Apple exacerbated the problems with Praszkier's Devices

28

CONSOLIDATED AMENDED COMPLAINT       41       NO. 5:18-MD-02827-EJD

1   via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

2   actions, Praszkier did not receive the benefit of his bargain and was injured as a result.  If Praszkier

3   had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would

4   damage the Devices after sale, Praszkier would not have purchased the Devices, or would have paid

5   substantially less for them.

6                                                        **KENTUCKY**

7          115.     **Plaintiff Lawrence Pethick** is a resident and citizen of the State of Michigan

8   and he purchased multiple generations of the iPhone and iPad in Kentucky while a Kentucky

9   resident, including the iPhone 5, and 6 (purchased in November 2015) and the iPad Air and Air

10  Mini.  Prior to his purchases of the Devices, he did not know, nor could he have known through

11  reasonable diligence, of the Battery Issues and Defects in his Devices.  At time of initial purchase,

12  the Devices operated on the factory-installed iOS versions.

13         116.     Not only did Pethick's Devices not operate as Apple warranted and promised

14  initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

15  cause the way Pethick's Devices operated to fundamentally change.  Pethick's Devices, particularly

16  after installation of iOS 11, did not operate as promised in Apple's advertisements, representations,

17  and the information publicly available in the marketplace.  Additionally, none of the packaging in

18  which the Devices were sold to Pethick revealed that there were any Defects, Battery Issues, or that

19  Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

20  speed pursuant to which Pethick's Devices would operate.  Accordingly, not only were Pethick's

21  Devices defective at the point of sale due to its Battery Issues and Design Defects, but Apple

22  exacerbated the problems with Pethick's Devices via its misrepresentations and omissions with the

23  iOS software Updates.  As a result of Apple's actions, Pethick did not receive the benefit of his

24  bargain and was injured as a result.  If Pethick had been told of these Defects, Battery Issues, and

25  the deceptive manner in which Apple would damage the Devices after sale, Pethick would not have

26  purchased the Devices, or would have paid substantially less for them.

27

28

CONSOLIDATED AMENDED COMPLAINT              42                    NO. 5:18-MD-02827-EJD

**LOUISIANA**

117.     **Plaintiff Kenyotta Smith** is a resident and citizen of the State of Louisiana and she purchased an iPhone 6s on June 22, 2016.  Prior to her purchase of the Device, she did not know,  nor could she have known through reasonable diligence, of the Battery Issues and Defects in her Device.

118.     Not only did Smith's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Smith's Device operated to fundamentally change.  Smith's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Smith revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Smith's Device would operate. Accordingly, not only was way Smith's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Smith's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Smith did not receive the benefit of her bargain, and was injured as a result.  If Smith had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Smith would not have purchased the Device, or would have paid substantially less for it.

**MAINE**

119.     **Plaintiff Judith Thompson** is a resident and citizen of the State of Maine and she purchased an iPhone 6 on October 14, 2014.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence of the Battery Issues and Defects in her Device.  At time of initial purchase, the Device operated on version 8 of iOS.   Thompson downloaded and installed version 11.2 of iOS on her Device in or around December 2017.

120.     Not only did Thompson's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that version 8 of iOS or any of the future updates

---

CONSOLIDATED AMENDED COMPLAINT                    43                    NO. 5:18-MD-02827-EJD

1   would cause the way Thompson's Device operated to fundamentally change.  Thompson's Device,

2   after installation of various versions of iOS, did not operate as promised in Apple's advertisements,

3   representations, and the information publicly available in the marketplace.  Additionally, none of

4   the packaging in which the Device was sold to Thompson revealed that there were any Defects,

5   Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

6   the battery power and speed pursuant to which Thompson's Device would operate.  Accordingly,

7   not only was Thompson's Device defective at the point of sale due to its Battery Issues and Design

8   Defects, but Apple exacerbated the problems with Thompson's Device via its misrepresentations

9   and omissions with the iOS software Updates.  As a result of Apple's actions, Thompson did not

10  receive the benefit of her bargain, and was injured as a result.  If Thompson had been told of these

11  Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after

12  sale, Thompson would not have purchased the Device, or would have paid substantially less for it.

13                                          **MAINE**

14          121.    **Plaintiff Drew Victory** is a resident and citizen of the State of Maine and he

15  purchased an iPhone 6 and an iPhone 6s.  Prior to his purchases of the Devices, he did not know,

16  nor could he have known through reasonable diligence of the Battery Issues and Defects in his

17  Devices.

18          122.    Not only did Drews's Devices not operate as Apple warranted and promised

19  initially, but Apple never represented or warranted that iOS updates would cause the way Drew's

20  Devices operated to fundamentally change.  Drew's Devices did not operate as promised in Apple's

21  advertisements, representations, and the information publicly available in the marketplace.

22  Additionally, none of the packaging in which the Devices were sold to Drew revealed that there

23  were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

24  otherwise regulate the battery power and speed pursuant to which Drew's Devices would operate.

25  Accordingly, not only were Drew's Devices defective at the point of sale due to their Battery Issues

26  and Design Defects, but Apple exacerbated the problems with Drew's Devices via its

27  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

28

---

CONSOLIDATED AMENDED COMPLAINT          44          NO. 5:18-MD-02827-EJD

1   Drew did not receive the benefit of his bargain, and was injured as a result.  If Drew had been told

2   of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

3   Devices after sale, Drew would not have purchased the Devices, or would have paid substantially

4   less for them.

5                                           **MARYLAND**

6           123.    **Plaintiff Johnjulee Ray** is a resident and citizen of the State of Maryland and

7   she purchased an iPhone 6 Plus in or around December 2014.  Prior to her purchase of the Device,

8   she did not know, nor could she have known through reasonable diligence, of the Battery Issues and

9   Defects in her Device.

10          124.    Not only did Ray's Device not operate as Apple warranted and promised

11  initially, but Apple never represented or warranted that iOS updates would cause the way Ray's

12  Device operated to fundamentally change.  Ray's Device did not operate as promised in Apple's

13  advertisements, representations, and the information publicly available in the marketplace.

14  Additionally, none of the packaging in which the Device was sold to Ray revealed that there were

15  any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

16  otherwise regulate the battery power and speed pursuant to which Ray's Device would operate.

17  Accordingly, not only was Ray's Device defective at the point of sale due to its Battery Issues and

18  Design Defects, but Apple exacerbated the problems with Ray's Device via its misrepresentations

19  and omissions with the iOS software Updates.  As a result of Apple's actions, Ray did not receive

20  the benefit of her bargain, and was injured as a result.  If Ray had been told of these Defects,

21  Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Ray

22  would not have purchased the Device, or would have paid substantially less for it.

23                                         **MASSACHUSETTS**

24          125.    **Plaintiff Laura Ciccone** is a resident and citizen of the Commonwealth of

25  Massachusetts and she purchased an iPhone 6s in 2016.  Prior to her purchase of the Device, she did

26  not know, nor could she have known through reasonable diligence, of the Battery Issues and

27  Defects in her Device.

28

---

CONSOLIDATED AMENDED COMPLAINT          45          NO. 5:18-MD-02827-EJD

126.      Not only did Ciccone's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Ciccone's Device operated to fundamentally change.  Ciccone's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Ciccone revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Ciccone's Device would operate. Accordingly, not only was Ciccone's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Ciccone's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Ciccone did not receive the benefit of her bargain, and was injured as a result.  If Ciccone had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Ciccone would not have purchased the Device, or would have paid substantially less for it.

## MASSACHUSETTS

127.      **Plaintiff Jonathan Jed Meyers** is a resident and citizen of the Commonwealth of Massachusetts and he purchased an iPhone 6 in or about April 2015. Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Device.  Meyers downloaded and installed iOS updates on his Device at or around their release dates.

128.      Not only did Meyers's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Meyers's Device operated to fundamentally change.  Meyers's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Meyers revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Meyer's Device would operate.

---

CONSOLIDATED AMENDED COMPLAINT          46          NO. 5:18-MD-02827-EJD

1   Accordingly, not only was Meyers's Device defective at the point of sale due to its Battery Issues

2   and Design Defects, but Apple exacerbated the problems with Meyers's Device via its

3   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

4   Meyers did not receive the benefit of his bargain, and was injured as a result.  If Meyers had been

5   told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

6   Device after sale, Meyers would not have purchased the Device, or would have paid substantially

7   less for it.

8                                        **MASSACHUSETTS**

9        129.    **Plaintiff Aja Johnson** is a resident and citizen of the Commonwealth of

10  Massachusetts and she purchased two iPhone 6 Plues and an iPhone 7.  Prior to her purchases of the

11  Devices, she did not know, nor could she have known through reasonable diligence, of the battery

12  issues and defects in her Devices.  At time of initial purchase, the Devices operated on various

13  versions of iOS.   Johanson downloaded and installed various versions of iOS on her Devices on

14  various dates, as prompted.

15       130.    Not only did Johnson's Devices not operate as Apple warranted and promised

16  initially, but Apple never represented or warranted that various versions of iOS or any of the future

17  updates would cause the way Johnson's Devices operated to fundamentally change.  Johnson's

18  Devices, particularly after installation of various versions of iOS, did not operate as promised in

19  Apple's advertisements, representations, and the information publicly available in the marketplace.

20  Additionally, none of the packaging in which the Devices were sold to Johnson revealed that there

21  were any defects, battery issues, or that Apple would use the updates to "smooth," "throttle," or

22  otherwise regulate the battery power and speed pursuant to which Johnson's Devices would

23  operate.  Accordingly, not only were Johnson's Devices defective at the point of sale due to its

24  battery issues and design defects, but Apple exacerbated the problems with Johnson's Devices via

25  its misrepresentations and omissions with the iOS software updates.  As a result of Apple's actions,

26  Johnson did not receive the benefit of her bargain, and was injured as a result.  If Johnson had been

27  told of these defects, battery issues, and the deceptive manner in which apple would damage the

28

CONSOLIDATED AMENDED COMPLAINT            47            NO. 5:18-MD-02827-EJD

1    Devices after sale, Johnson would not have purchased the Devices, or would have paid substantially

2    less for them.

3                                          **MICHIGAN**

4          131.    **Plaintiff Steven Henry** is a resident and citizen of the State of Michigan and he

5    purchased an iPhone 7 in October 2016. Prior to his purchase of the Device, he did not know, nor

6    could he have known through reasonable diligence, of the Battery Issues and Defects in his Device.

7    At time of initial purchase, the Device operated on iOS 10. Henry downloaded and installed iOS

8    11.2.1 on his Device in December 2017.

9          132.    Not only did Henry's Device not operate as Apple warranted and promised

10   initially, but Apple never represented or warranted that iOS 11.2.1 or any of the future updates

11   would cause the way Henry's Device operated to fundamentally change. Henry's Device,

12   particularly after installation of iOS 11.2.1, did not operate as promised in Apple's advertisements,

13   representations, and the information publicly available in the marketplace. Additionally, none of

14   the packaging in which the Device was sold to Henry revealed that there were any Defects, Battery

15   Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the

16   battery power and speed pursuant to which Henry's Device would operate. Accordingly, not only

17   was Henry's Device defective at the point of sale due to its Battery Issues and Design Defects, but

18   Apple exacerbated the problems with Henry's Device via its misrepresentations and omissions with

19   the iOS software Updates. As a result of Apple's actions, Henry did not receive the benefit of his

20   bargain and was injured as a result. If Henry had been told of these Defects, Battery Issues, and the

21   deceptive manner in which Apple would damage the Device after sale, Henry would not have

22   purchased the Device, or would have paid substantially less for it.

23                                         **MICHIGAN**

24         133.    **Plaintiff Timothy Baldwin** is a resident and citizen of the State of Michigan and

25   he purchased an iPhone 6s on March 10, 2016. Prior to his purchase of the Device, he did not

26   know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in

27

28

CONSOLIDATED AMENDED COMPLAINT            48            NO. 5:18-MD-02827-EJD

1    his Device.  At time of initial purchase, the Device operated on iOS 9.  Baldwin downloaded and

2    installed iOS 11.2 on his Device in or around December 2017.

3         134.    Not only did Baldwin's Device not operate as Apple warranted and promised

4    initially, but Apple never represented or warranted that iOS 11.2 or any of the future updates would

5    cause the way Baldwin's Device operated to fundamentally change.  Baldwin's Device, particularly

6    after installation of iOS 11.2, did not operate as promised in Apple's advertisements,

7    representations, and the information publicly available in the marketplace.  Additionally, none of

8    the packaging in which the Device was sold to Baldwin revealed that there were any Defects,

9    Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

10   the battery power and speed pursuant to which Baldwin's Device would operate.  Accordingly, not

11   only was Baldwin's Device defective at the point of sale due to its Battery Issues and Design

12   Defects, but Apple exacerbated the problems with Baldwin's Device via its misrepresentations and

13   omissions with the iOS software Updates.  As a result of Apple's actions, Baldwin did not receive

14   the benefit of his bargain and was injured as a result.  If Baldwin had been told of these Defects,

15   Battery Issues, and the deceptive manner in which Apple would damage the Device after sale,

16   Baldwin would not have purchased the Device, or would have paid substantially less for it.

17                                    **MINNESOTA**

18        135.    **Plaintiff Kristin Hansen** is a resident and citizen of the State of Minnesota and

19   she has purchased several iPhones for her and her family, including the iPhone 6, 6s, and SE in

20   2015.  Prior to her purchase of the Devices, she did not know, nor could she have known through

21   reasonable diligence, of the Battery Issues and Defects in her Devices.  At time of initial purchsae,

22   the Devices operated on their factory-installed iOS versions.  Hansen and her family downloaded

23   and installed iOS 11.1 on their Devices in or around November 2017.

24        136.    Not only did Hansen's Devices not operate as Apple warranted and promised

25   initially, but Apple never represented or warranted that iOS 11.1 or any of the future updates would

26   cause the way Hansen's Devices operated to fundamentally change.  Hansen's Devices, particularly

27   after installation of iOS 11.1, did not operate as promised in Apple's advertisements,

28

---

CONSOLIDATED AMENDED COMPLAINT          49          NO. 5:18-MD-02827-EJD

1  representations, and the information publicly available in the marketplace.  Additionally, none of

2  the packaging in which the Devices were sold to Hansen revealed that there were any Defects,

3  Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

4  the battery power and speed pursuant to which Hansen's Devices would operate.  Accordingly, not

5  only were Hansen's Devices defective at the point of sale due to its Battery Issues and Design

6  Defects, but Apple exacerbated the problems with Hansen's Devices via its misrepresentations

7  and omissions with the iOS software Updates.  As a result of Apple's actions, Hansen did not receive

8  the benefit of her bargain and was injured as a result.  If Hansen had been told of these Defects,

9  Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale,

10  Hansen would not have purchased the Devices, or would have paid substantially less for them.

**MISSISSIPPI**

12  137.    **Plaintiff Mary Jackson** is a resident and citizen of the State of Mississippi and

13  she purchased an iPhone 6 on December 3, 2014.  Prior to her purchase of the Device, she did not

14  know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in

15  her Device.

16  138.    Not only did Jackson's Device not operate as Apple warranted and promised

17  initially, but Apple never represented or warranted that iOS updates would cause the way Jackson's

18  Device operated to fundamentally change.  Jackson's Device did not operate as promised in

19  Apple's advertisements, representations, and the information publicly available in the marketplace.

20  Additionally, none of the packaging in which the Device was sold to Jackson revealed that there

21  were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

22  otherwise regulate the battery power and speed pursuant to which Jackson's Device would operate.

23  Accordingly, not only was Jackson's Device defective at the point of sale due to its Battery Issues

24  and Design Defects, but Apple exacerbated the problems with Jackson's Device via its

25  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

26  Jackson did not receive the benefit of her bargain, and was injured as a result.  If Jackson had been

27  told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

28

CONSOLIDATED AMENDED COMPLAINT          50          NO. 5:18-MD-02827-EJD

1    Device after sale, Jackson would not have purchased the Device, or would have paid substantially

2    less for it.

3                                      **MISSISSIPPI**

4        139.    **Plaintiff Alvin Davis** is a resident and citizen of the State of Mississippi and he

5    purchased an iPhone 6s on December 13, 2016.  Prior to his purchase of the Device, he did not

6    know, nor could he have known through reasonable diligence of the Battery Issues and Defects in

7    his Device.

8        140.    Not only did Davis's Device not operate as Apple warranted and promised

9    initially, but Apple never represented or warranted that iOS updates would cause the way Davis's

10   Device operated to fundamentally change.  Davis's Device did not operate as promised in Apple's

11   advertisements, representations, and the information publicly available in the marketplace.

12   Additionally, none of the packaging in which the Device was sold to Davis revealed that there were

13   any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

14   otherwise regulate the battery power and speed pursuant to which Davis's Device would operate.

15   Accordingly, not only was way Davis's Device defective at the point of sale due to its Battery

16   Issues and Design Defects, but Apple exacerbated the problems with Davis's Device via its

17   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

18   Davis did not receive the benefit of his bargain, and was injured as a result.  If Davis had been told

19   of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

20   Device after sale, Davis would not have purchased the Device, or would have paid substantially less

21   for it.

22                                      **MISSOURI**

23       141.    **Plaintiff Kim Burton** is a resident and citizen of the State of Missouri and she

24   purchased an iPhone 5s on September 20, 2013, which was delivered between October 8-11, 2013.

25   She also purchased an iPad Mini on or around November 26, 2014.  Prior to her purchase of the

26   Devices, she did not know, nor could she have known through reasonable diligence, of the Battery

27

28

CONSOLIDATED AMENDED COMPLAINT          51          NO. 5:18-MD-02827-EJD

1    Issues and Defects in her Devices.  Burton downloaded and installed an iOS 11 update on her

2    Devices in December 2017, specifically iOS 11.2.1 for her iPad Mini.

3        142.    Not only did Burton's Devices not operate as Apple warranted and promised

4    initially, but Apple never represented or warranted that iOS updates would cause the way Burton's

5    Devices operated to fundamentally change.  Burton's Devices, particularly after installation of one

6    of the iOS 11 updates, did not operate as promised in Apple's advertisements, representations, and

7    the information publicly available in the marketplace.  Additionally, none of the packaging in which

8    the Devices were sold to Burton revealed that there were any Defects, Battery Issues, or that Apple

9    would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed

10    pursuant to which Burton's Devices would operate.  Accordingly, not only were Burton's Device

11    defective at the point of sale due to their Battery Issues and Design Defects, but Apple exacerbated

12    the problems with Burton's Device via its misrepresentations and omissions with the iOS software

13    Updates.  As a result of Apple's actions, Burton did not receive the benefit of her bargain, and was

14    injured as a result.  If Burton had been told of these Defects, Battery Issues, and the deceptive

15    manner in which Apple would damage the Device after sale, Burton would not have purchased the

16    Device, or would have paid substantially less for it.

17                                **MISSOURI**

18        143.    **Plaintiff Christopher Gautreaux** is a resident and citizen of the State of

19    Missouri and he leased multiple generations of the iPhone for him and his family, including an

20    iPhone 5, an iPhone 5s, two iPhone 6 Plus devices leased on October 17, 2014 and February 27,

21    2015, an iPhone 6s on December 1, 2015, and an iPhone 7 Plus on January 30, 2017.  Prior to his

22    lease of the Devices, he did not know, nor could he have known through reasonable diligence, of

23    the Battery Issues and Defects in his Devices.  At time of initial lease, the Devices operated on their

24    factory-installed iOS versions.

25        144.    Not only did Gautreaux's Devices not operate as Apple warranted and promised

26    initially, but Apple never represented or warranted that any of the future iOS updates would cause

27    the way Gautreaux's Devices operated to fundamentally change.  Gautreaux's Devices, particularly

28

CONSOLIDATED AMENDED COMPLAINT          52          NO. 5:18-MD-02827-EJD

1  after installation of subsequent iOS updates, did not operate as promised in Apple's advertisements,

2  representations, and the information publicly available in the marketplace.  Additionally, none of

3  the packaging in which the Devices were sold to Gautreaux revealed that there were any Defects,

4  Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

5  the battery power and speed pursuant to which Gautreaux's Devices would operate.  Accordingly,

6  not only were Gautreaux's Devices defective at the point of lease due to its Battery Issues and

7  Design Defects, but Apple exacerbated the problems with Gautreaux's Devices via its

8  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

9  Gautreaux did not receive the benefit of his bargain and was injured as a result.  If Gautreaux had

10  been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage

11  the Devices after sale, Gautreaux would not have leased the Devices, or would have paid

12  substantially less for them.

### MISSOURI

14  145.    **Plaintiff Charlie Bell Daily** is a resident and citizen of the State of Missouri and

15  she purchased an iPhone 6s Plus in or about mid-2016.   Prior to her purchase of the Device, she did

16  not know, nor could she have known through reasonable diligence, of the Battery Issues and

17  Defects in her Device.

18  146.    Not only did Daily's Device not operate as Apple warranted and promised

19  initially, but Apple never represented or warranted that any of the iOS updates would cause the way

20  Daily's Device operated to fundamentally change.  Daily's Device, particularly after installation of

21  a version of iOS, did not operate as promised in Apple's advertisements, representations, and the

22  information publicly available in the marketplace.  Additionally, none of the packaging in which the

23  Device was sold to Daily revealed that there were any Defects, Battery Issues, or that Apple would

24  use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant

25  to which Daily's Device would operate.  Accordingly, not only was Daily's Device defective at the

26  point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with

27  Daily's Device via its misrepresentations and omissions with the iOS software Updates.  As a result

28

---

CONSOLIDATED AMENDED COMPLAINT               53               NO. 5:18-MD-02827-EJD

1    of Apple's actions, Daily did not receive the benefit of her bargain, and was injured as a result.  If

2    Daily had been told of these Defects, Battery Issues, and the deceptive manner in which Apple

3    would damage the Device after sale, Daily would not have purchased the Device, or would have

4    paid substantially less for it.

5                                                  **MISSOURI**

6          147.     **Plaintiff William C. Ellis** is a resident and citizen of the State of Missouri and

7    he purchased an iPhone 7 in or about 2016.  Prior to his purchase of the Device, he did not know,

8    nor could he have known through reasonable diligence, of the Battery Issues and Defects in his

9    Device.

10         148.     Not only did Ellis' Device not operate as Apple warranted and promised initially,

11   but Apple never represented or warranted that iOS updates would cause the way Ellis' Device

12   operated to fundamentally change.  Ellis' Device did not operate as promised in Apple's

13   advertisements, representations, and the information publicly available in the marketplace.

14   Additionally, none of the packaging in which the Device was sold to Ellis revealed that there were

15   any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

16   otherwise regulate the battery power and speed pursuant to which Ellis's Device would operate.

17   Accordingly, not only was Ellis' Device defective at the point of sale due to its Battery Issues and

18   Design Defects, but Apple exacerbated the problems with Ellis' Device via its misrepresentations

19   and omissions with the iOS software Updates.  As a result of Apple's actions, Ellis did not receive

20   the benefit of his bargain, and was injured as a result.  If Ellis had been told of these Defects,

21   Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Ellis

22   would not have purchased the Device, or would have paid substantially less for it.

23                                                **MONTANA**

24         149.     **Plaintiff Michelle Martino** is a resident and citizen of the State of Montana and

25   she purchased an iPhone 6 Plus in Fall 2014. Prior to her purchase of the Device, she did not know,

26   nor could she have known through reasonable diligence, of the Battery Issues and Defects in her

27

28

CONSOLIDATED AMENDED COMPLAINT              54              NO. 5:18-MD-02827-EJD

1    Device.  Martino downloaded and installed a version of iOS on her Device in or around December

2    2017.

3        150.    Not only did Martino's Device not operate as Apple warranted and promised

4    initially, but Apple never represented or warranted that iOS updates would cause the way Martino's

5    Device operated to fundamentally change.  Martino's Device did not operate as promised in

6    Apple's advertisements, representations, and the information publicly available in the marketplace.

7    Additionally, none of the packaging in which the Device was sold to Martino revealed that there

8    were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

9    otherwise regulate the battery power and speed pursuant to which Martino's Device would operate.

10   Accordingly, not only was Martino's Device defective at the point of sale due to its Battery Issues

11   and Design Defects, but Apple exacerbated the problems with Martino's Device via its

12   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

13   Martino did not receive the benefit of her bargain, and was injured as a result.  If Martino had been

14   told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

15   Device after sale, Martino would not have purchased the Device, or would have paid substantially

16   less for it.

17                                    **NEBRASKA**

18       151.    **Plaintiff Kevin Browne** is a resident and citizen of the State of Nebraska and he

19   purchased an iPhone 6s Plus on October 2, 2015.  Prior to his purchase of the Device, he did not

20   know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in

21   his Device.

22       152.    Not only did Browne's Device not operate as Apple warranted and promised

23   initially, but Apple never represented or warranted that iOS updates would cause the way Browne's

24   Device operated to fundamentally change.  Browne's Device did not operate as promised in

25   Apple's advertisements, representations, and the information publicly available in the marketplace.

26   Additionally, none of the packaging in which the Device was sold to Browne revealed that thise

27   were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

28

---

CONSOLIDATED AMENDED COMPLAINT                55                NO. 5:18-MD-02827-EJD

1   othiswise regulate the battery power and speed pursuant to which Browne's Device would operate.

2   Accordingly, not only was way Browne's Device defective at the point of sale due to its Battery

3   Issues and Design Defects, but Apple exacerbated the problems with Browne's Device via its

4   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

5   Browne did not receive the benefit of his bargain, and was injured as a result.  If Browne had been

6   told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

7   Device after sale, Browne would not have purchased the Device, or would have paid substantially

8   less for it.

9              **NEBRASKA**

10      153.     **Plaintiff Jill Klingman** is a resident and citizen of the State of Nebraska and

11   she purchased an iPhone 6 in or around 2015 and an iPhone 7 on October 28, 2017.  Prior to her

12   purchase of the Devices, she did not know, nor could she have known through reasonable diligence,

13   of the Battery Issues and Defects in her Devices.  At time of initial purchase, the iPhone 6 operated

14   on iOS 8 and the iPhone 7 operated on iOS 10.  Klingman downloaded and installed iOS 10 on her

15   iPhone 6 in or around November 2016.

16      154.      Not only did Klingman's Devices not operate as Apple warranted and

17   promised initially, but Apple never represented or warranted that any of the future iOS updates

18   would cause the way Klingman's Devices operated to fundamentally change.  Klingman's Devices,

19   particularly after installation of subsequent iOS versions, did not operate as promised in Apple's

20   advertisements, representations, and the information publicly available in the marketplace.

21   Additionally, none of the packaging in which the Devices were sold to Klingman revealed that there

22   were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

23   otherwise regulate the battery power and speed pursuant to which Klingman's Devices would

24   operate.  Accordingly, not only were Klingman's Devices defective at the point of sale due to its

25   Battery Issues and Design Defects, but Apple exacerbated the problems with Klingman's Devices

26   via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

27   actions, Klingman did not receive the benefit of her bargain, and was injured as a result.  If

28

CONSOLIDATED AMENDED COMPLAINT     56     NO. 5:18-MD-02827-EJD

1    Klingman had been told of these Defects, Battery Issues, and the deceptive manner in which Apple

2    would damage the Devices after sale, Klingman would not have purchased the Devices, or would

3    have paid substantially less for them.

4                                                    **NEVADA**

5         155.    **Plaintiff Angela Boykin** is a resident and citizen of the State of Nevada and she

6    purchased an iPhone 6s on February 25, 2016.  Prior to her purchase of the Device, she did not

7    know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in

8    her Device.  At time of initial purchase, the Device operated on iOS 9.

9         156.    Not only did Boykin's Device not operate as Apple warranted and promised

10   initially, but Apple never represented or warranted that iOS 10.3.2 or any of the future updates

11   would cause the way Boykin's Device operated to fundamentally change.  Boykin's Device,

12   particularly after installation of 10.3.2, did not operate as promised in Apple's advertisements,

13   representations, and the information publicly available in the marketplace.  Additionally, none of

14   the packaging in which the Device was sold to Boykin revealed that there were any Defects, Battery

15   Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the

16   battery power and speed pursuant to which Boykin's Device would operate.  Accordingly, not only

17   was Boykin's Device defective at the point of sale due to its Battery Issues and Design Defects, but

18   Apple exacerbated the problems with Boykin's Device via its misrepresentations and omissions

19   with the iOS software Updates.  As a result of Apple's actions, Boykin did not receive the benefit of

20   her bargain and was injured as a result.  If Boykin had been told of these Defects, Battery Issues,

21   and the deceptive manner in which Apple would damage the Device after sale, Boykin would not

22   have purchased the Device, or would have paid substantially less for it.

23                                                   **NEVADA**

24        157.    **Plaintiff Barbara Moriello** is a resident and citizen of the State of Nevada and

25   she purchased an iPhone 6 on in April 2015.  Prior to her purchase of the Device, she did not know,

26   nor could she have known through reasonable diligence, of the Battery Issues and Defects in her

27

28

CONSOLIDATED AMENDED COMPLAINT           57           NO. 5:18-MD-02827-EJD

1   Device.  At time of initial purchase, the Device operated on iOS 8.  Moriello downloaded and

2   installed iOS 11 on her Device in or around the fall of 2017.

3       158.    Not only did Moriello's Device not operate as Apple warranted and promised

4   initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

5   cause the way Moriello's Device operated to fundamentally change.  Moriello's Device,

6   particularly after installation of 11, did not operate as promised in Apple's advertisements,

7   representations, and the information publicly available in the marketplace.  Additionally, none of

8   the packaging in which the Device was sold to Moriello revealed that there were any Defects,

9   Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

10  the battery power and speed pursuant to which Moriello's Device would operate.  Accordingly, not

11  only was Moriello's Device defective at the point of sale due to its Battery Issues and Design

12  Defects, but Apple exacerbated the problems with Moriello's Device via its misrepresentations and

13  omissions with the iOS software Updates.  As a result of Apple's actions, Moriello did not receive

14  the benefit of her bargain and was injured as a result.  If Moriello had been told of these Defects,

15  Battery Issues, and the deceptive manner in which Apple would damage the Device after sale,

16  Moriello would not have purchased the Device, or would have paid substantially less for it.

17                              **NEW HAMPSHIRE**

18      159.    **Plaintiff Thomas Toth** is a resident and citizen of the State of New Hampshire

19  and he purchased two iPhone 5s Devices for him and his wife in March 2015 in Massachusetts and

20  two iPhone 7 Devices for him and his wife in July 2017 in New Hampshire. Prior to his purchase of

21  the Devices, he did not know, nor could he have known through reasonable diligence, of the Battery

22  Issues and Defects in his Devices.  At time of initial purchase, the iPhone 5s Devices operated on

23  iOS 7 and the iPhone 7 Devices operated on iOS 10.   Toth and his wife downloaded and installed

24  iOS 10.2.1 in January 2017 and iOS 10.3 in April 2017, respectively, on their iPhone 5s Devices.

25      160.    Not only did Toth's Devices not operate as Apple warranted and promised

26  initially, but Apple never represented or warranted that iOS 10.2.1, 10.3 or any of the future updates

27  would cause the way Toth's Devices operated to fundamentally change.  Toth's Devices,

28

CONSOLIDATED AMENDED COMPLAINT              58              NO. 5:18-MD-02827-EJD

1  particularly after installation of iOS 10.2.1 and 10.3, did not operate as promised in Apple's

2  advertisements, representations, and the information publicly available in the marketplace.

3  Additionally, none of the packaging in which the Devices were sold to Toth revealed that there

4  were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

5  otherwise regulate the battery power and speed pursuant to which Toth's Devices would operate.

6  Accordingly, not only were Toth's Devices defective at the point of sale due to its Battery Issues

7  and Design Defects, but Apple exacerbated the problems with Toth's Devices via its

8  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

9  Toth did not receive the benefit of his bargain and was injured as a result.  If Toth had been told of

10  these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices

11  after sale, Toth would not have purchased the Devices, or would have paid substantially less for

12  them.

**NEW JERSEY**

13

14  161.    **Plaintiff Caren Schmidt** is a resident and citizen of the State of New Jersey and

15  she purchased an iPhone 5 in 2014 and an iPhone 6s in November 2016.  Prior to her purchase of

16  the Devices, she did not know, nor could she have known through reasonable diligence, of the

17  Battery Issues and Defects in her Devices.  At time of initial purchase, the Devices operated on their

18  factory-installed iOS versions.

19  162.    Not only did Schmidt's Devices not operate as Apple warranted and promised

20  initially, but Apple never represented or warranted that iOS 10, 11.3, or any of the future updates

21  would cause the way Schmidt's Devices operated to fundamentally change.   Schmidt's Devices,

22  particularly after installation of 10 and 11.3, respectively, did not operate as promised in Apple's

23  advertisements, representations, and the information publicly available in the marketplace.

24  Additionally, none of the packaging in which the Devices were sold to Schmidt revealed that there

25  were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

26  otherwise regulate the battery power and speed pursuant to which Schmidt's Devices would

27  operate.  Accordingly, not only were Schmidt's Devices defective at the point of sale due to their

28

---

CONSOLIDATED AMENDED COMPLAINT              59              NO. 5:18-MD-02827-EJD

1   Battery Issues and Design Defects, but Apple exacerbated the problems with Schmidt's Devices via

2   its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

3   Schmidt did not receive the benefit of her bargain, and was injured as a result.  If Schmidt had been

4   told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

5   Devices after sale, Schmidt would not have purchased the Devices, or would have paid substantially

6   less for them.

7                                **NEW JERSEY**

8           163.    **Plaintiff Jacquelyn O'Neill** is a resident and citizen of the State of New Jersey

9   and she purchased an iPhone 6 on March 21, 2015.  Prior to her purchase of the Device, she did not

10  know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in

11  her Device.  At time of initial purchase, the Device operated on its factory-installed iOS versions.

12          164.    Not only did O'Neill's Device not operate as Apple warranted and promised

13  initially, but Apple never represented or warranted that iOS 10.2.1 or any of the future updates

14  would cause the way O'Neill's Device operated to fundamentally change.  O'Neill's Device,

15  particularly after installation of iOS 10.2.1, did not operate as promised in Apple's advertisements,

16  representations, and the information publicly available in the marketplace.  Additionally, none of

17  the packaging in which the Device was sold to O'Neill revealed that there were any Defects,

18  Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

19  the battery power and speed pursuant to which O'Neill's Device would operate.  Accordingly, not

20  only was O'Neill's Device defective at the point of sale due to its Battery Issues and Design

21  Defects, but Apple exacerbated the problems with O'Neill's Device via its misrepresentations and

22  omissions with the iOS software Updates.  As a result of Apple's actions, O'Neill did not receive

23  the benefit of her bargain and was injured as a result.  If O'Neill had been told of these Defects,

24  Battery Issues, and the deceptive manner in which Apple would damage the Device after sale,

25  O'Neill would not have purchased the Device, or would have paid substantially less for it.

26

27

28

CONSOLIDATED AMENDED COMPLAINT          60          NO. 5:18-MD-02827-EJD

**NEW MEXICO**

165.    **Plaintiff Brandon Farmer** is a resident and citizen of the State of New Mexico and he purchased several generations of the iPhone, including an iPhone 5, 5s, 6, and 7.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Devices.  At time of initial purchase, the Devices operated on their factory-installed iOS version.

166.    Not only did Farmer's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Farmer's Devices operated to fundamentally change.  Farmer's Devices, particularly after installation of subsequent iOS versions, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Farmer revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Farmer's Devices would operate.  Accordingly, not only were Farmer's Devices defective at the point of sale due to their Battery Issues and Design Defects, but Apple exacerbated the problems with Farmer's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Farmer did not receive the benefit of his bargain and was injured as a result.  If Farmer had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Farmer would not have purchased the Device, or would have paid substantially less for it.

**NEW MEXICO**

167.    **Plaintiff Patrick DeFillippo** is a resident and citizen of the State of New Mexico and he purchased several generations of the iPhone, including an iPhone 5 and an iPhone 7.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Devices.  At time of initial purchase, the Devices operated on their factory-installed iOS version.

1  168.    Not only did DeFillippo's Devices not operate as Apple warranted and promised

2  initially, but Apple never represented or warranted that any of the future iOS updates would cause

3  the way DeFillippo's Devices operated to fundamentally change.  DeFillippo's Devices,

4  particularly after installation of subsequent iOS versions, did not operate as promised in Apple's

5  advertisements, representations, and the information publicly available in the marketplace.

6  Additionally, none of the packaging in which the Devices were sold to DeFillippo revealed that

7  there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle,"

8  or otherwise regulate the battery power and speed pursuant to which DeFillippo's Devices would

9  operate.  Accordingly, not only were DeFillippo's Devices defective at the point of sale due to their

10  Battery Issues and Design Defects, but Apple exacerbated the problems with DeFillippo's Devices

11  via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

12  actions, DeFillippo did not receive the benefit of his bargain and was injured as a result.  If

13  DeFillippo had been told of these Defects, Battery Issues, and the deceptive manner in which Apple

14  would damage the Device after sale, DeFillippo would not have purchased the Device, or would

15  have paid substantially less for it.

**NEW YORK**

17  169.    **Plaintiff Aniledis Batista** is a resident and citizen of the State of New York and

18  she purchased an iPhone 6 in 2015 and an iPhone 7 Plus in August 2017.  Prior to her purchase of

19  the Devices, she did not know, nor could she have known through reasonable diligence, of the

20  Battery Issues and Defects in her Devices.  At time of initial purchase, her iPhone 6 operated on

21  iOS 8 and her iPhone 7 Plus operated on iOS 10.

22  170.    Not only did Batista's Devices not operate as Apple warranted and promised

23  initially, but Apple never represented or warranted that iOS 10, 11, or any of the future updates

24  would cause the way Batista's Devices operated to fundamentally change.  Batista's Devices,

25  particularly after installation of iOS 10 and 11, respectively, did not operate as promised in Apple's

26  advertisements, representations, and the information publicly available in the marketplace.

27  Additionally, none of the packaging in which the Devices were sold to Batista revealed that there

28

were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Batista's Devices would operate. Accordingly, not only were Batista's Devices defective at the point of sale due to their Battery Issues and Design Defects, but Apple exacerbated the problems with Batista's Devices via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Batista did not receive the benefit of her bargain and was injured as a result. If Batista had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale, Batista would not have purchased the Devices, or would have paid substantially less for them.

### NEW YORK

171.    **Plaintiff Benjamin Lazarus** is a resident and citizen of the State of New York and he purchased an iPhone 5 on September 13, 2013 and an iPhone 7 on December 13, 2016. Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Devices. At time of initial purchase, the Devices operated on their factory-installed iOS versions.

172.    Not only did Lazarus's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way  Lazarus's Devices operated to fundamentally change. Lazarus's Devices, particularly after installation of subsequent iOS versions, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Lazarus revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Lazarus's Devices would operate. Accordingly, not only were Lazarus's Devices defective at the point of sale due to their Battery Issues and Design Defects, but Apple exacerbated the problems with Lazarus's Devices via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Lazarus did not receive the benefit of his bargain and was injured as a result. If Lazarus had been told of these Defects,

1    Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale,

2    Lazarus would not have purchased the Devices, or would have paid substantially less for them.

3                                    **NEW YORK**

4            173.    **Plaintiff Judy Milman** is a resident and citizen of the State of New York and

5    she purchased an iPhone 6s in March 2016.  Prior to her purchase of the Device, she did not know,

6    nor could she have known through reasonable diligence, of the Battery Issues and Defects in her

7    Device.  At time of initial purchase, the Device operated on iOS 9.  Milman downloaded and

8    installed iOS 10 on her Device in or around September 2016.

9            174.    Not only did Milman's Device not operate as Apple warranted and promised

10   initially, but Apple never represented or warranted that iOS 10 or any of the future updates would

11   cause the way Milman's Device operated to fundamentally change.  Milman's Device, particularly

12   after installation of iOS 10, did not operate as promised in Apple's advertisements, representations,

13   and the information publicly available in the marketplace.  Additionally, none of the packaging in

14   which the Device was sold to Milman revealed that there were any Defects, Battery Issues, or that

15   Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

16   speed pursuant to which Milman's Device would operate.  Accordingly, not only was Milman's

17   Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple

18   exacerbated the problems with Milman's Device via its misrepresentations and omissions with the

19   iOS software Updates.  As a result of Apple's actions, Milman did not receive the benefit of her

20   bargain and was injured as a result.  If Milman had been told of these Defects, Battery Issues, and

21   the deceptive manner in which Apple would damage the Device after sale, Milman would not have

22   purchased the Device, or would have paid substantially less for it.

23                                 **NORTH CAROLINA**

24           175.    **Plaintiff Sherri Yelton** is a resident and citizen of the State of North Carolina

25   and she purchased an iPhone 6s in January 2016.  Prior to her purchase of her Device, she did not

26   know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in

27

28

CONSOLIDATED AMENDED COMPLAINT          64          NO. 5:18-MD-02827-EJD

1    her Device.  At time of initial lease, the Device operated on iOS 9.  Yelton downloaded and

2    installed iOS 11 on her Device in the fall of 2017.

3          176.      Not only did Yelton's Device not operate as Apple warranted and promised

4    initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

5    cause the way Yelton's Device operated to fundamentally change.  Yelton's Device, particularly

6    after installation of iOS 11, did not operate as promised in Apple's advertisements, representations,

7    and the information publicly available in the marketplace.  Additionally, none of the packaging in

8    which the Device was sold to Yelton revealed that there were any Defects, Battery Issues, or that

9    Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

10   speed pursuant to which Yelton's Device would operate.  Accordingly, not only was Yelton's

11   Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple

12   exacerbated the problems with Yelton's Device via its misrepresentations and omissions with the

13   iOS software Updates.  As a result of Apple's actions, Yelton did not receive the benefit of her

14   bargain and was injured as a result.  If Yelton had been told of these Defects, Battery Issues, and the

15   deceptive manner in which Apple would damage the Device after sale, Yelton would not have

16   purchased the Device, or would have paid substantially less for it.

17                                    **NORTH CAROLINA**

18         177.      **Plaintiff Brinley McGill** is a resident and citizen of the State of North Carolina

19   and she purchased an iPhone 6s Plus on or about June or July of 2016.  Prior to her purchase of the

20   Device, she did not know, nor could she have known through reasonable diligence, of the Battery

21   Issues and Defects in her Device.

22         178.      Not only did McGill's Device not operate as Apple warranted and promised

23   initially, but Apple never represented or warranted that iOS updates would cause the way McGill's

24   Device operated to fundamentally change.  McGill's Device did not operate as promised in Apple's

25   advertisements, representations, and the information publicly available in the marketplace.

26   Additionally, none of the packaging in which the Device was sold to McGill revealed that there

27   were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

28

---

CONSOLIDATED AMENDED COMPLAINT          65          NO. 5:18-MD-02827-EJD

1  otherwise regulate the battery power and speed pursuant to which McGill's Device would operate.

2  Accordingly, not only was McGill's Device defective at the point of sale due to its Battery Issues

3  and Design Defects, but Apple exacerbated the problems with McGill's Device via its

4  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

5  McGill did not receive the benefit of her bargain, and was injured as a result.  If McGill had been

6  told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

7  Device after sale, McGill would not have purchased the Device, or would have paid substantially

8  less for it.

9  **NORTH CAROLINA**

10  179.    **Plaintiff Jeanette Taylor** is a resident and citizen of the State of North Carolina

11  and she purchased an iPhone 6 and an iPhone SE in or about September 2017.  Prior to her purchase

12  of the Devices, she did not know, nor could she have known through reasonable diligence, of the

13  Battery Issues and Defects in her Devices.  At time of initial purchase, the Devices operated on a

14  certain iOS.   Taylor installed an update on her Devices in or around October or November 2017.

15  180.    Not only did Taylor's Devices not operate as Apple warranted and promised

16  initially, but Apple never represented or warranted that iOS updates would cause the way Taylor's

17  Devices operated to fundamentally change.  Taylor's Devices did not operate as promised in

18  Apple's advertisements, representations, and the information publicly available in the marketplace.

19  Additionally, none of the packaging in which the Devices was sold to Taylor revealed that there

20  were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

21  otherwise regulate the battery power and speed pursuant to which Taylor's Devices would operate.

22  Accordingly, not only were Taylor's Devices defective at the point of sale due to their Battery

23  Issues and Design Defects, but Apple exacerbated the problems with Taylor's Devices via its

24  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

25  Taylor did not receive the benefit of her bargain, and was injured as a result.  If Taylor had been

26  told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

27

28

1   Devices after sale, Taylor would not have purchased the Devices, or would have paid substantially

2   less for it.

3                                    **NORTH DAKOTA/ALASKA**

4          181.    **Plaintiff Matthew Shaske** is a resident and citizen of the State of North Dakota

5   and he leased three iPhone 6 Devices for him and his family in early 2015 in Alaska while residing

6   in Alaska and three iPhone 7 Devices for him and his family in February 2017 in North Dakota

7   while residing in North Dakota.  Prior to his lease of the Devices, he did not know, nor could he

8   have known through reasonable diligence, of the Battery Issues and Defects in his Device.  At time

9   of initial purchase, his iPhone 6 Devices operated on iOS 8.  Shaske and his family downloaded and

10  installed iOS 10 on their Devices in or around September 2016.

11         182.    Not only did Shaske's Devices not operate as Apple warranted and promised

12  initially, but Apple never represented or warranted that iOS 10 or any of the future updates would

13  cause the way Shaske's Devices operated to fundamentally change.  Shaske's Devices, particularly

14  after installation of iOS 10, did not operate as promised in Apple's advertisements, representations,

15  and the information publicly available in the marketplace.  Additionally, none of the packaging in

16  which the Devices were sold to Shaske revealed that there were any Defects, Battery Issues, or that

17  Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

18  speed pursuant to which Shaske's Devices would operate.  Accordingly, not only were Shaske's

19  Devices defective at the point of lease due to their Battery Issues and Design Defects, but Apple

20  exacerbated the problems with Shaske's Devices via its misrepresentations and omissions with the

21  iOS software Updates.  As a result of Apple's actions, Shaske did not receive the benefit of his

22  bargain and was injured as a result.  If Shaske had been told of these Defects, Battery Issues, and

23  the deceptive manner in which Apple would damage the Devices after sale, Shaske would not have

24  leased the Devices, or would have paid substantially less for them.

25                                            **OHIO**

26         183.    **Plaintiff Kelly A. Jankowski** is a resident and citizen of the State of Ohio and

27  she purchased an iPhone 6 approximately four years ago.  Prior to her purchase of the Device, she

28

CONSOLIDATED AMENDED COMPLAINT          67          NO. 5:18-MD-02827-EJD

1    did not know, nor could she have known through reasonable diligence, of the Battery Issues and

2    Defects in her Device.

3        184.    Not only did Jankowski's Device not operate as Apple warranted and promised

4    initially, but Apple never represented or warranted that iOS updates would cause the way

5    Jankowski's Device operated to fundamentally change.  Jankowski's Device did not operate as

6    promised in Apple's advertisements, representations, and the information publicly available in the

7    marketplace.  Additionally, none of the packaging in which the Device was sold to Jankowski

8    revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to

9    "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which

10    Jankowski's Device would operate.  Accordingly, not only was way Jankowski's Device defective

11    at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the

12    problems with Jankowski's Device via its misrepresentations and omissions with the iOS software

13    Updates.  As a result of Apple's actions, Jankowski did not receive the benefit of her bargain, and

14    was injured as a result.  If Jankowski had been told of these Defects, Battery Issues, and the

15    deceptive manner in which Apple would damage the Device after sale, Jankowski would not have

16    purchased the Device, or would have paid substantially less for it.

17    **OHIO**

18        185.    **Plaintiff Kristin Bilic** is a resident and citizen of the State of Ohio and she

19    purchased an iPhone 6 on December 5, 2014.  Prior to her purchase of the Device, she did not

20    know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in

21    her Device.

22        186.    Not only did Bilic's Device not operate as Apple warranted and promised

23    initially, but Apple never represented or warranted that iOS updates would cause the way Bilic's

24    Device operated to fundamentally change.  Bilic's Device did not operate as promised in Apple's

25    advertisements, representations, and the information publicly available in the marketplace.

26    Additionally, none of the packaging in which the Device was sold to Bilic revealed that there were

27    any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

28

CONSOLIDATED AMENDED COMPLAINT    68    NO. 5:18-MD-02827-EJD

1   otherwise regulate the battery power and speed pursuant to which Bilic's Device would operate.

2   Accordingly, not only was way Bilic's Device defective at the point of sale due to its Battery Issues

3   and Design Defects, but Apple exacerbated the problems with Bilic's Device via its

4   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

5   Bilic did not receive the benefit of her bargain, and was injured as a result.  If Bilic had been told of

6   these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device

7   after sale, Bilic would not have purchased the Device, or would have paid substantially less for it.

8                                               **OHIO**

9        187.    **Plaintiff Samuel Mangano** is a resident and citizen of the State of Ohio and he

10  has leased multiple generations of the iPhone, including two iPhone 5c Devices and an iPhone 6 for

11  him and his family in September 2014 and three iPhone 7 Devices for him and his family in

12  September 2016.  Prior to his lease of the Devices, he did not know, nor could he have known

13  through reasonable diligence, of the Battery Issues and Defects in his Devices.  At time of initial

14  lease, the Devices operated on their factory-installed iOS versions.

15       188.    Not only did Mangano's Devices not operate as Apple warranted and promised

16  initially, but Apple never represented or warranted that any of the future iOS updates would cause

17  the way Mangano's Devices operated to fundamentally change.  Mangano's Devices, particularly

18  after installation of subsequent iOS versions, did not operate as promised in Apple's

19  advertisements, representations, and the information publicly available in the marketplace.

20  Additionally, none of the packaging in which the Devices were sold to Mangano revealed that there

21  were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

22  otherwise regulate the battery power and speed pursuant to which Mangano's Devices would

23  operate.  Accordingly, not only were Mangano's Devices defective at the point of lease due to their

24  Battery Issues and Design Defects, but Apple exacerbated the problems with Mangano's Devices

25  via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

26  actions, Mangano did not receive the benefit of his bargain and was injured as a result.  If Mangano

27  had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would

28

CONSOLIDATED AMENDED COMPLAINT          69          NO. 5:18-MD-02827-EJD

1  damage the Devices after sale, Mangano would not have purchased the Devices, or would have paid

2  substantially less for them.

3                                    **OKLAHOMA**

4       189.    **Plaintiff Sarah Stone** is a resident and citizen of the State of Oklahoma and she

5  purchased an iPhone 7 Plus in late 2016 or early 2017.  Prior to her purchase of the Device, she did

6  not know, nor could she have known through reasonable diligence, of the Battery Issues and

7  Defects in her Device.

8       190.    Not only did Stone's Device not operate as Apple warranted and promised

9  initially, but Apple never represented or warranted that iOS updates would cause the way Stone's

10  Device operated to fundamentally change.  Stone's Device did not operate as promised in Apple's

11  advertisements, representations, and the information publicly available in the marketplace.

12  Additionally, none of the packaging in which the Device was sold to Stone revealed that there were

13  any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

14  otherwise regulate the battery power and speed pursuant to which Stone's Device would operate.

15  Accordingly, not only was way Stone's Device defective at the point of sale due to its Battery

16  Issues and Design Defects, but Apple exacerbated the problems with Stone's Device via its

17  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

18  Stone did not receive the benefit of her bargain, and was injured as a result.  If Stone had been told

19  of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

20  Device after sale, Stone would not have purchased the Device, or would have paid substantially less

21  for it.

22                                    **OREGON**

23       191.    **Plaintiff Susan Rutan** is a resident and citizen of the State of California and she

24  purchased an iPhone 6s Plus in Oregon.  Prior to her purchase of the Device, she did not know, nor

25  could she have known through reasonable diligence, of the Battery Issues and Defects in her

26  Device.

27

28

CONSOLIDATED AMENDED COMPLAINT          70          NO. 5:18-MD-02827-EJD

192.    Not only did Rutan's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Rutan's Device operated to fundamentally change. Rutan's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Rutan revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Rutan's Device would operate. Accordingly, not only was Rutan's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Rutan's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Rutan did not receive the benefit of her bargain, and was injured as a result.  If Rutan had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Rutan would not have purchased the Device, or would have paid substantially less for it

**OREGON**

193.    **Plaintiff Megan Mesloh** is a resident and citizen of the State of Oregon and she purchased an iPhone 5c on June 24, 2014.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence of the Battery Issues and Defects in her Device.  At time of initial purchase, the Device operated on the latest version of iOS.   Mesloh downloaded and installed version 10.2 of iOS on her Device.

194.    Not only did Mesloh's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that version 10.2 of iOS or any future versions would cause the way Mesloh's Device operated to fundamentally change.  Mesloh's Device, particularly after installation of version 10.2 of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Mesloh revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Mesloh's Device would operate.

---

CONSOLIDATED AMENDED COMPLAINT          71          NO. 5:18-MD-02827-EJD

1   Accordingly, not only was Mesloh's Device defective at the point of sale due to its Battery Issues

2   and Design Defects, but Apple exacerbated the problems with Mesloh's Device via its

3   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

4   Mesloh did not receive the benefit of her bargain, and was injured as a result.  If Mesloh had been

5   told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

6   Device after sale, Mesloh would not have purchased the Device, or would have paid substantially

7   less for it.

8                                                    **PENNSYLVANIA**

9               195.     **Plaintiff Beckie Erwin** is a resident and citizen of the Commonwealth of

10   Pennsylvania and she purchased three iPhone 6s's in July 2016, two of which were for her children.

11   Prior to her purchase of the Devices, she did not know, nor could she have known through

12   reasonable diligence of the Battery Issues and Defects in her Devices.

13               196.     Not only did Erwin's Devices not operate as Apple warranted and promised

14   initially, but Apple never represented or warranted that iOS updates would cause the way Erwin's

15   Devices operated to fundamentally change.  Erwin's Devices did not operate as promised in

16   Apple's advertisements, representations, and the information publicly available in the marketplace.

17   Additionally, none of the packaging in which the Devices were sold to Erwin revealed that there

18   were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

19   otherwise regulate the battery power and speed pursuant to which Erwin's Devices would operate.

20   Accordingly, not only was Erwin's Devices defective at the point of sale due to their Battery Issues

21   and Design Defects, but Apple exacerbated the problems with Erwin's Devices via its

22   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

23   Erwin did not receive the benefit of her bargain, and was injured as a result.  If Erwin had been told

24   of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

25   Devices after sale, Erwin would not have purchased the Devices, or would have paid substantially

26   less for it.

27

28

CONSOLIDATED AMENDED COMPLAINT            72            NO. 5:18-MD-02827-EJD

**PENNSYLVANIA**

197.    **Plaintiff Darlane Saracina** is a resident and citizen of the Commonwealth of Pennsylvania and she purchased an iPhone 5s and iPhone 6s Plus on various dates.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in her Devices.  At time of initial purchase, the Devices operated on various versions of iOS.   Saracina downloaded and installed various versions of iOS on her Devices on various dates.

198.    Not only did Saracina's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that versions of iOS or any of the future updates would cause the way Saracina's Devices operated to fundamentally change.  Saracina's Devices, particularly after installation of various versions of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Saracina revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Saracina's Devices would operate.  Accordingly, not only were Saracina's Devices defective at the point of sale due to their Battery Issues and Design Defects, but Apple exacerbated the problems with Saracina's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Saracina did not receive the benefit of her bargain, and was injured as a result.  If Saracina had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale, Saracina would not have purchased the Devices, or would have paid substantially less for them.

**RHODE ISLAND**

199.    **Plaintiff Stephen Heffner** is a resident and citizen of the State of Rhode Island and he purchased an iPhone 6.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Device.  After purchasing the device, Heffner downloaded and installed iOS 8.3 on his Device.

---

1    200.    Not only did Heffner's Device not operate as Apple warranted and promised

2    initially, but Apple never represented or warranted that iOS 8.3 or any of the future updates would

3    cause the way Heffner's Device operated to fundamentally change.  Heffner's Device, particularly

4    after installation of iOS 8.3, did not operate as promised in Apple's advertisements, representations,

5    and the information publicly available in the marketplace.  Additionally, none of the packaging in

6    which the Device was sold to Heffner revealed that there were any Defects, Battery Issues, or that

7    Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

8    speed pursuant to which Heffner's Device would operate.  Accordingly, not only was Heffner's

9    Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple

10   exacerbated the problems with Heffner's Device via its misrepresentations and omissions with the

11   iOS software Updates.  As a result of Apple's actions, Heffner did not receive the benefit of his

12   bargain, and was injured as a result.  If Heffner had been told of these Defects, Battery Issues, and

13   the deceptive manner in which Apple would damage the Device after sale, Heffner would not have

14   purchased the Device, or would have paid substantially less for it.

15                              **RHODE ISLAND**

16   201.    **Plaintiff Brian Macinanti** is a resident and citizen of the State of RHODE

17   ISLAND and he purchased an iPhone 6 on or around September 23, 2015.  Prior to his purchase of

18   the Device, he did not know, nor could he have known through reasonable diligence, of the Battery

19   Issues and Defects in his Device.  At time of initial purchase, the Device operated on version of 9.0

20   of iOS.  Macinanti downloaded and installed version 11.4 of iOS on his Device in or around June

21   2017.

22   202.    Not only did Macinanti's Device not operate as Apple warranted and promised

23   initially, but Apple never represented or warranted that version 9.0 of iOS or any future updates

24   would cause the way Macinanti's Device operated to fundamentally change.  Macinanti's Device,

25   after installation of versions of iOS, did not operate as promised in Apple's advertisements,

26   representations, and the information publicly available in the marketplace.  Additionally, none of

27   the packaging in which the Device was sold to Macinanti revealed that there were any Defects,

28

---

CONSOLIDATED AMENDED COMPLAINT            74            NO. 5:18-MD-02827-EJD

Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Macinanti's Device would operate. Accordingly, not only was Macinanti's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Macinanti's Device via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Macinanti did not receive the benefit of his bargain and was injured as a result. If MACINANTI had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Macinanti would not have purchased the Device, or would have paid substantially less for it.

### SOUTH CAROLINA

203.     **Plaintiff Charlene Lowery** is a resident and citizen of the State of South Carolina and she purchased an iPhone 6 in or about 2016. Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in her Device.

204.     Not only did Lowery's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Lowery's Device operated to fundamentally change. Lowery's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Lowery revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Lowery's Device would operate. Accordingly, not only was Lowery's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Lowery's Device via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Lowery did not receive the benefit of her bargain, and was injured as a result. If Lowery had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

1    Device after sale, Lowery would not have purchased the Device, or would have paid substantially

2    less for it.

3                                    **SOUTH CAROLINA**

4          205.    **Plaintiff Patti Burriss** is a resident and citizen of the State of South Carolina

5    and she purchased an iPhone 6 in the fall of 2014.  She traded in her iPhone 6 for an iPhone 7 (her

6    "Device") in the spring of 2016.  She also purchased an iPad Air in approximately 2014 and two

7    iPad Air 2 Devices in approximately 2016.  Prior to her purchase of the Device, she did not know,

8    nor could she have known through reasonable diligence, of the Battery Issues and Defects in her

9    Device.

10         206.    Not only did Burriss's Device not operate as Apple warranted and promised

11   initially, but Apple never represented or warranted that iOS updates would cause the way Burriss's

12   Device operated to fundamentally change.  Burriss's Device did not operate as promised in Apple's

13   advertisements, representations, and the information publicly available in the marketplace.

14   Additionally, none of the packaging in which the Device was sold to Burriss revealed that there

15   were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

16   otherwise regulate the battery power and speed pursuant to which Burriss's Device would operate.

17   Accordingly, not only was way Burriss's Device defective at the point of sale due to its Battery

18   Issues and Design Defects, but Apple exacerbated the problems with Burriss's Device via its

19   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

20   Burriss did not receive the benefit of her bargain, and was injured as a result.  If Burriss had been

21   told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

22   Device after sale, Burriss would not have purchased the Device, or would have paid substantially

23   less for it.

24                                    **SOUTH DAKOTA**

25         207.    **Plaintiff Denise Bakke** is a resident and citizen of the State of South Dakota and

26   she purchased an iPhone 5s in August 2015 and an iPhone 6 in August 2016.  Prior to her purchase

27

28

CONSOLIDATED AMENDED COMPLAINT              76              NO. 5:18-MD-02827-EJD

1    of the Devices, she did not know, nor could she have known through reasonable diligence of the

2    Battery Issues and Defects in her Devices.

3        208.    Not only did Bakke's Devices not operate as Apple warranted and promised

4    initially, but Apple never represented or warranted that iOS updates would cause the way Bakke's

5    Devices operated to fundamentally change.  Bakke's Devices did not operate as promised in

6    Apple's advertisements, representations, and the information publicly available in the marketplace.

7    Additionally, none of the packaging in which the Devices were sold to Bakke revealed that there

8    were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

9    otherwise regulate the battery power and speed pursuant to which Bakke's Devices would operate.

10   Accordingly, not only were Bakke's Devices defective at the point of sale due to their Battery

11   Issues and Design Defects, but Apple exacerbated the problems with Bakke's Devices via its

12   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

13   Bakke did not receive the benefit of her bargain, and was injured as a result.  If Bakke had been told

14   of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

15   Devices after sale, Bakke would not have purchased the Devices, or would have paid substantially

16   less for it.

17                              **TENNESSEE**

18       209.    **Plaintiff Jodi Johnson** is a resident and citizen of the State of Tennessee and she

19   purchased an iPhone 5s in or around 2015.  Prior to her purchase of the Device, she did not know,

20   nor could she have known through reasonable diligence, of the Battery Issues and Defects in her

21   Device.  At time of initial purchase, the Device operated on iOS 7.  Johnson downloaded and

22   installed iOS 11 on her Device in or around November or December 2017.

23       210.    Not only did Johnson's Device not operate as Apple warranted and promised

24   initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

25   cause the way Johnson's Device operated to fundamentally change.  Johnson's Device, particularly

26   after installation of iOS 11, did not operate as promised in Apple's advertisements, representations,

27   and the information publicly available in the marketplace.  Additionally, none of the packaging in

28

CONSOLIDATED AMENDED COMPLAINT         77              NO. 5:18-MD-02827-EJD

1   which the Device was sold to Johnson revealed that there were any Defects, Battery Issues, or that

2   Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

3   speed pursuant to which Johnson's Device would operate.  Accordingly, not only was Johnson's

4   Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple

5   exacerbated the problems with Johnson's Device via its misrepresentations and omissions with the

6   iOS software Updates.  As a result of Apple's actions, Johnson did not receive the benefit of her

7   bargain, and was injured as a result.  If Johnson had been told of these Defects, Battery Issues, and

8   the deceptive manner in which Apple would damage the Device after sale, Johnson would not have

9   purchased the Device, or would have paid substantially less for it.

**TEXAS**

11       211.      **Plaintiff Lillie Reap Diaz** is a resident and citizen of the State of Texas and she

12   purchased an iPhone 6 in 2015.  Prior to her purchase of the Device, she did not know, nor could

13   she have known through reasonable diligence, of the Battery Issues and Defects in her Device.

14       212.      Not only did Diaz's Device not operate as Apple warranted and promised

15   initially, but Apple never represented or warranted that iOS updates would cause the way Diaz's

16   Device operated to fundamentally change.  Diaz's Device, particularly after installation of an iOS

17   update in late 2016/early 2017, did not operate as promised in Apple's advertisements,

18   representations, and the information publicly available in the marketplace.  Additionally, none of

19   the packaging in which the Device was sold to Diaz revealed that there were any Defects, Battery

20   Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the

21   battery power and speed pursuant to which Diaz's Device would operate.  Accordingly, not only

22   was way Diaz's Device defective at the point of sale due to its Battery Issues and Design Defects,

23   but Apple exacerbated the problems with Diaz's Device via its misrepresentations and omissions

24   with the iOS software Updates.  As a result of Apple's actions, Diaz did not receive the benefit of

25   her bargain, and was injured as a result.  If Diaz had been told of these Defects, Battery Issues, and

26   the deceptive manner in which Apple would damage the Device after sale, Diaz would not have

27   purchased the Device, or would have paid substantially less for it.

28

CONSOLIDATED AMENDED COMPLAINT          78          NO. 5:18-MD-02827-EJD

**TEXAS**

213.     **Plaintiff Craig Jonathan Moore** is a resident and citizen of the State of Texas and he purchased an iPhone 6s in the fall of 2016. Due to problems with his Device, he traded it in for an iPhone 7 Plus in 2017.  Prior to his purchases of the Devices, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Device.

214.     Not only did Moore's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Moore's Devices operated to fundamentally change.  Moore's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Moore revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Moore's Device would operate.  Accordingly, not only were Moore's Devices defective at the point of sale due to their Battery Issues and Design Defects, but Apple exacerbated the problems with Moore's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Moore did not receive the benefit of his bargain, and was injured as a result.  If Moore had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale, Moore would not have purchased the Devices, or would have paid substantially less for it.

**UTAH**

215.     **Plaintiff Annamarie Vinacco** is a resident and citizen of the State of Utah and she purchased an iPhone 6 Plus in the fall of 2014 and an iPad Pro in 2016.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in her Devices.  At time of initial purchase, her iPhone 6 Plus operated on iOS 8 and her iPad Pro operated on iOS 9.

216.     Not only did Vinacco's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

1    cause the way Vinacco's Devices operated to fundamentally change.  Vinacco's Devices,

2    particularly after installation of iOS 11, did not operate as promised in Apple's advertisements,

3    representations, and the information publicly available in the marketplace.  Additionally, none of

4    the packaging in which the Devices were sold to Vinacco revealed that there were any Defects,

5    Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

6    the battery power and speed pursuant to which Vinacco's Devices would operate.  Accordingly, not

7    only were Vinacco's Devices defective at the point of sale due to their Battery Issues and Design

8    Defects, but Apple exacerbated the problems with Vinacco's Devices via its misrepresentations and

9    omissions with the iOS software Updates.  As a result of Apple's actions, Vinacco did not receive

10   the benefit of her bargain and was injured as a result.  If Vinacco had been told of these Defects,

11   Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale,

12   Vinacco would not have purchased the Devices, or would have paid substantially less for them.

13                                              **UTAH**

14        217.    **Plaintiff Henry Becker** is a resident and citizen of the State of Utah and he

15   purchased an iPhone 6 Plus for himself on March 30, 2015 and an iPhone 6 for his wife on June 2,

16   2015.  Prior to his purchase of the Devices, he did not know, nor could he have known through

17   reasonable diligence, of the Battery Issues and Defects in his Devices.  At time of initial purchase,

18   their iPhone 6 and 6 Plus operated on iOS 8, and the iPhone X Devices operated on iOS 11.  Becker

19   and his wife downloaded and installed iOS 11 on their iPhone 6 and 6 Plus Devices in the fall of

20   2017.

21        218.    Not only did Becker's Devices not operate as Apple warranted and promised

22   initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

23   cause the way Becker's Devices operated to fundamentally change.  Becker's Devices, particularly

24   after installation of iOS 11, did not operate as promised in Apple's advertisements, representations,

25   and the information publicly available in the marketplace.  Additionally, none of the packaging in

26   which the Devices were sold to Becker revealed that there were any Defects, Battery Issues, or that

27   Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and

28

CONSOLIDATED AMENDED COMPLAINT          80          NO. 5:18-MD-02827-EJD

1   speed pursuant to which Becker's Devices would operate.  Accordingly, not only were Becker's

2   Devices defective at the point of sale due to their Battery Issues and Design Defects, but Apple

3   exacerbated the problems withBecker's Devices via its misrepresentations and omissions with the

4   iOS software Updates.  As a result of Apple's actions, Becker did not receive the benefit of his

5   bargain and was injured as a result.  If Becker had been told of these Defects, Battery Issues, and

6   the deceptive manner in which Apple would damage the Devices after sale, Becker would not have

7   purchased the Devices, or would have paid substantially less for them.

8                                                **VERMONT**

9          219.    **Plaintiff Georgiana D'Alessandro** is a resident and citizen of the State of

10  Vermont and she purchased an iPhone 6 in or about March 2015.  Prior to her purchase of the

11  Device, she did not know, nor could she have known through reasonable diligence, of the Battery

12  Issues and Defects in her Device.  D'Alessandro downloaded and installed iOS updates as

13  recommended.

14         220.            Not only did D'Alessandro's Device not operate as Apple warranted and

15  promised initially, but Apple never represented or warranted that iOS updates would cause the way

16  D'Alessandro's Device operated to fundamentally change.  D'Alessandro's Device did not operate

17  as promised in Apple's advertisements, representations, and the information publicly available in

18  the marketplace.  Additionally, none of the packaging in which the Device was sold to

19  D'Alessandro revealed that there were any Defects, Battery Issues, or that Apple would use the

20  Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to

21  which D'Alessandro's Device would operate.  Accordingly, not only was D'Alessandro's Device

22  defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated

23  the problems with D'Alessandro's Device via its misrepresentations and omissions with the iOS

24  software Updates.  As a result of Apple's actions, D'Alessandro did not receive the benefit of her

25  bargain, and was injured as a result.  If D'Alessandro had been told of these Defects, Battery Issues,

26  and the deceptive manner in which Apple would damage the Device after sale, D'Alessandro would

27  not have purchased the Device, or would have paid substantially less for it.

28

---

CONSOLIDATED AMENDED COMPLAINT              81                    NO. 5:18-MD-02827-EJD

**VIRGINIA**

1

2        221.        **Plaintiff Aurelia Flores** is a resident and citizen of the Commonwealth of

3   Virginia and she purchased an iPhone 6s and iPad Mini.  Prior to her purchase of the Devices, she

4   did not know, nor could she have known through reasonable diligence of the Battery Issues and

5   Defects in her Devices.  At time of initial purchase, the Devices operated on the current version of

6   iOS at that time.  Flores downloaded and installed version 11.4 of iOS on her Devices.

7        222.        Not only did Flores's Devices not operate as Apple warranted and promised

8   initially, but Apple never represented or warranted that version 11.4 of iOS or any of the future

9   updates would cause the way Flores's Devices operated to fundamentally change.  Flores's

10  Devices, particularly after installation of version 11.4 of iOS, did not operate as promised in

11  Apple's advertisements, representations, and the information publicly available in the marketplace.

12  Additionally, none of the packaging in which the Devices were sold to Flores revealed that there

13  were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

14  otherwise regulate the battery power and speed pursuant to which Flore's Devices would operate.

15  Accordingly, not only were Flore's Devices defective at the point of sale due to their Battery Issues

16  and Design Defects, but Apple exacerbated the problems with Flore's Devices via its

17  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

18  Flores did not receive the benefit of her bargain, and was injured as a result.  If Flores had been told

19  of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

20  Devices after sale, Flores would not have purchased the Devices, or would have paid substantially

21  less for them.

22                                **WASHINGTON**

23        223.        **Plaintiff Thomas Anthony Ciccone** is a resident and citizen of the State of

24  Washington and he purchased an iPhone 6s in June 2014.  Prior to his purchase of the Device, he

25  did not know, nor could he have known through reasonable diligence, of the Battery Issues and

26  Defects in his Device.

27

28

CONSOLIDATED AMENDED COMPLAINT          82          NO. 5:18-MD-02827-EJD

1      224.     Not only did Ciccone's Device not operate as Apple warranted and promised

2    initially, but Apple never represented or warranted that iOS updates would cause the way Ciccone's

3    Device operated to fundamentally change.  Ciccone's Device did not operate as promised in

4    Apple's advertisements, representations, and the information publicly available in the marketplace.

5    Additionally, none of the packaging in which the Device was sold to Ciccone revealed that there

6    were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

7    otherwise regulate the battery power and speed pursuant to which Ciccone's Device would operate.

8    Accordingly, not only was way Ciccone's Device defective at the point of sale due to its Battery

9    Issues and Design Defects, but Apple exacerbated the problems with Ciccone's Device via its

10    misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

11    Ciccone did not receive the benefit of his bargain, and was injured as a result.  If Ciccone had been

12    told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the

13    Device after sale, Ciccone would not have purchased the Device or would have paid substantially

14    less for it.

15                  **WASHINGTON**

16      225.     **Plaintiff Kristopher Kingston** is a resident and citizen of the State of

17    Washington and he purchased an iPhone 6s Plus in January 2016.  Prior to his purchase of his

18    Device, he did not know, nor could he have known through reasonable diligence, of the Battery

19    Issues and Defects in his Device.  At time of initial purchase, his Device operated on iOS 9.

20    Kingston downloaded and installed iOS 11 on the Device in the fall of 2017.

21      226.     Not only did Kingston's Device not operate as Apple warranted and promised

22    initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

23    cause the way Kingston's Device operated to fundamentally change.  Kingston's Device,

24    particularly after installation of iOS 11, did not operate as promised in Apple's advertisements,

25    representations, and the information publicly available in the marketplace.  Additionally, none of

26    the packaging in which the Device was sold to Kingston revealed that there were any Defects,

27    Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

28

---

CONSOLIDATED AMENDED COMPLAINT       83       No. 5:18-MD-02827-EJD

1   the battery power and speed pursuant to which Kingston's Device would operate.  Accordingly, not

2   only was Kingston's Device defective at the point of sale due to its Battery Issues and Design

3   Defects, but Apple exacerbated the problems with Kingston's Device via its misrepresentations and

4   omissions with the iOS software Updates.  As a result of Apple's actions, Kingston did not receive

5   the benefit of his bargain, and was injured as a result.  If Kingston had been told of these Defects,

6   Battery Issues, and the deceptive manner in which Apple would damage the Device after sale,

7   Kingston would not have purchased the Device, or would have paid substantially less for it.

### WEST VIRGINIA

9      227.    **Plaintiff Tonya Margarette Thompson** is a resident and citizen of the State of

10   West Virginia and she purchased an iPhone 7 Plus in the summer of 2017 after her iPhone 5c

11   seemed to slow down. Prior to her purchase of the Device, she did not know, nor could she have

12   known through reasonable diligence, of the Battery Issues and Defects in her Device.  Thompson

13   also replaced two 6s Pluses for her children in approximately the same timeframe.

14      228.    Not only did Thompson's Device not operate as Apple warranted and promised

15   initially, but Apple never represented or warranted that iOS would cause the way Thompson's

16   Device operated to fundamentally change.  Thompson's Device did not operate as promised in

17   Apple's advertisements, representations, and the information publicly available in the marketplace.

18   Additionally, none of the packaging in which the Device was sold to Thompson revealed that there

19   were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

20   otherwise regulate the battery power and speed pursuant to which Thompson's Device would

21   operate.  Accordingly, not only was way Thompson's Device defective at the point of sale due to its

22   Battery Issues and Design Defects, but Apple exacerbated the problems with Thompson's Device

23   via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

24   actions, Thompson did not receive the benefit of her bargain, and was injured as a result.  If

25   Thompson had been told of these Defects, Battery Issues, and the deceptive manner in which Apple

26   would damage the Device after sale, Thompson would not have purchased the Device, or would

27   have paid substantially less for it.

28

CONSOLIDATED AMENDED COMPLAINT     84     NO. 5:18-MD-02827-EJD

**WISCONSIN**

229.    **Plaintiff Dale Johnson** is a resident and citizen of the State of Wisconsin and he purchased an iPhone 6s Plus on March 1, 2016.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Device.  At time of initial purchase, the Device operated on iOS 9.  Johnson downloaded and installed iOS 11.2 on his Device in December 2017.

230.    Not only did Johnson's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11.2 or any of the future updates would cause the way Johnson's Device operated to fundamentally change.  Johnson's Device, particularly after installation of iOS 11.2, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Johnson revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Johnson's Device would operate.  Accordingly, not only was Johnson's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Johnson's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Johnson did not receive the benefit of his bargain and was injured as a result.  If Johnson had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Johnson would not have purchased the Device, or would have paid substantially less for it.

**WISCONSIN**

231.    **Plaintiff Kyle Herman** is a resident and citizen of the State of Wisconsin and he purchased an iPhone 6 on May 6, 2016.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in his Device.  At time of initial purchase, the Device operated on its factory-installed iOS versions.  Herman downloaded and installed iOS 10.0 on his Device in September 2016.

---

CONSOLIDATED AMENDED COMPLAINT                85                NO. 5:18-MD-02827-EJD

1       232.      Not only did Herman's Device not operate as Apple warranted and promised

2    initially, but Apple never represented or warranted that iOS 10.0 or any of the future updates would

3    cause the way Herman's Device operated to fundamentally change. Herman's Device, for example

4    after installation of iOS 10.0, did not operate as promised in Apple's advertisements,

5    representations, and the information publicly available in the marketplace. Additionally, none of

6    the packaging in which the Device was sold to Herman revealed that there were any Defects,

7    Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

8    the battery power and speed pursuant to which Herman's Device would operate. Accordingly, not

9    only was Herman's Device defective at the point of sale due to its Battery Issues and Design

10    Defects, but Apple exacerbated the problems with Herman's Devices via its misrepresentations and

11    omissions with the iOS software Updates. As a result of Apple's actions, Herman did not receive

12    the benefit of his bargain and was injured as a result. If Herman had been told of these Defects,

13    Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale,

14    Herman would not have purchased the Devices, or would have paid substantially less for them.

15                      **WYOMING**

16       233.      **Plaintiff Quinn Lewis** is a resident and citizen of the State of Wyoming and he

17    purchased an iPhone 6 on November 24, 2017. Prior to his purchase of the Device, he did not

18    know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in

19    his Device. At time of initial purchase, the Device operated on its factory-installed iOS. Lewis

20    downloaded and installed iOS 11.3 on his Device in or around April 2018.

21       234.      Not only did Lewis's Device not operate as Apple warranted and promised

22    initially, but Apple never represented or warranted that iOS 11.3 or any of the future updates would

23    cause the way Lewis's Device operated to fundamentally change. Lewis's Device, particularly after

24    installation of iOS 11.3, did not operate as promised in Apple's advertisements, representations, and

25    the information publicly available in the marketplace. Additionally, none of the packaging in which

26    the Device was sold to Lewis revealed that there were any Defects, Battery Issues, or that Apple

27    would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed

28

CONSOLIDATED AMENDED COMPLAINT       86       NO. 5:18-MD-02827-EJD

1    pursuant to which Lewis's Device would operate.  Accordingly, not only was Lewis's Device

2    defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated

3    the problems with Lewis's Device via its misrepresentations and omissions with the iOS software

4    Updates.  As a result of Apple's actions, Lewis did not receive the benefit of his bargain and was

5    injured as a result.  If Lewis had been told of these Defects, Battery Issues, and the deceptive

6    manner in which Apple would damage the Device after sale, Lewis would not have purchased the

7    Device, or would have paid substantially less for it.

8                                        **PUERTO RICO**

9            235.    **Plaintiff Shiriam Torres** is a resident and citizen of Puerto Rico and she

10   purchased an iPhone 6s in October 2015 and an iPhone 7 Plus in March 2017.  Prior to her purchase

11   of the Devices, she did not know, nor could she have known through reasonable diligence, of the

12   Battery Issues and Defects in her Devices.  At time of initial purchase, her iPhone 6s operated on

13   iOS 9 and her iPhone 7 Plus operated on iOS 10.

14           236.    Not only did Torres's Devices not operate as Apple warranted and promised

15   initially, but Apple never represented or warranted that any of the future iOS updates would cause

16   the way Torres's Devices operated to fundamentally change. Torres's Devices, particularly after

17   installation of subsequent iOS versions, did not operate as promised in Apple's advertisements,

18   representations, and the information publicly available in the marketplace.  Additionally, none of

19   the packaging in which the Devices were sold to Torres revealed that there were any Defects,

20   Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate

21   the battery power and speed pursuant to which Torres's Devices would operate.  Accordingly, not

22   only were Torres's Devices defective at the point of sale due to its Battery Issues and Design

23   Defects, but Apple exacerbated the problems with Torres's Devices via its misrepresentations and

24   omissions with the iOS software Updates.  As a result of Apple's actions, Torres did not receive the

25   benefit of her bargain and was injured as a result.  If Torres had been told of these Defects, Battery

26   Issues, and the deceptive manner in which Apple would damage the Devices after sale, Torres

27   would not have purchased the Devices, or would have paid substantially less for them.

28

CONSOLIDATED AMENDED COMPLAINT             87              NO. 5:18-MD-02827-EJD

**VIRGIN ISLANDS (US)**

237.    **Plaintiff Adam Shapiro** is a resident and citizen of the United States Virgin Islands and he purchased two iPhone 6s Devices for his wife and child in or around 2015 in Florida and an iPhone 7 Plus for himself in or around 2016 in Florida.  Shapiro has also purchased multiple generations of iPad Devices.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence of the Battery Issues and Defects in his Devices.  At time of initial purchase, the Devices operated on their factory-installed iOS version.

238.    Not only did Shapiro's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Shapiro's Devices operated to fundamentally change.  Shapiro's Devices, particularly after installation of subsequent iOS versions, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Shapiro revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Shapiro's Devices would operate.  Accordingly, not only were Shapiro's Devices defective at the point of sale due to their Battery Issues and Design Defects, but Apple exacerbated the problems with Shapiro's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Shapiro did not receive the benefit of his bargain and was injured as a result.  If Shapiro had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Devices after sale, Shapiro would not have purchased the Devices, or would have paid substantially less for them.

**BELGIUM**

239.    **Plaintiff Marianne Wagner** is a resident and citizen of the Country of Belgium and she purchased an iPhone 6s in June 2017.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in her Device.  Wagner downloaded and installed the first iOS update available on her Device.

CONSOLIDATED AMENDED COMPLAINT                88                NO. 5:18-MD-02827-EJD

1    240.    Not only did Wagner's Device not operate as Apple warranted and promised

2    initially, but Apple never represented or warranted that iOS updates would cause the way Wagner's

3    Device operated to fundamentally change.  Wagner's Device, particularly after installation of her

4    initial iOS update, did not operate as promised in Apple's advertisements, representations, and the

5    information publicly available in the marketplace.  Additionally, none of the packaging in which the

6    Device was sold to Wagner revealed that there were any Defects, Battery Issues, or that Apple

7    would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed

8    pursuant to which Wagner's Device would operate.  Accordingly, not only was Wagner's Device

9    defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated

10    the problems with Wagner's Device via its misrepresentations and omissions with the iOS software

11    Updates.  As a result of Apple's actions, Wagner did not receive the benefit of her bargain, and was

12    injured as a result.  If Wagner had been told of these Defects, Battery Issues, and the deceptive

13    manner in which Apple would damage the Device after sale, Wagner would not have purchased the

14    Device, or would have paid substantially less for it.

15                                    **BRAZIL**

16    241.    **Plaintiff Guilherme Canoa de Oliveira** is a resident and citizen of Brazil and

17    he purchased an iPhone 6s on November 17, 2016.  Prior to his purchase of the Device, he did not

18    know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in

19    his Device.  At time of initial purchase, the Device operated on iOS 9.  Canoa de Oliveira

20    downloaded and installed iOS 11.2.2 on his Device in or around January 2018.

21    242.    Not only did Canoa de Oliveira's Device not operate as Apple warranted and

22    promised initially, but Apple never represented or warranted that iOS 11.2.2 or any of the future

23    updates would cause the way Canoa de Oliveira's Device operated to fundamentally change.  Canoa

24    de Oliveira's Device, particularly after installation of iOS 11.2.2, did not operate as promised in

25    Apple's advertisements, representations, and the information publicly available in the marketplace.

26    Additionally, none of the packaging in which the Device was sold to Canoa de Oliveira revealed

27    that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth,"

28

CONSOLIDATED AMENDED COMPLAINT          89          NO. 5:18-MD-02827-EJD

1   "throttle," or otherwise regulate the battery power and speed pursuant to which Canoa de Oliveira's

2   Device would operate.  Accordingly, not only was Canoa de Oliveira's Device defective at the point

3   of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with

4   Canoa de Oliveira's Device via its misrepresentations and omissions with the iOS software

5   Updates.  As a result of Apple's actions, Canoa de Oliveira did not receive the benefit of his bargain

6   and was injured as a result.  If Canoa de Oliveira had been told of these Defects, Battery Issues, and

7   the deceptive manner in which Apple would damage the Device after sale, Canoa de Oliveira would

8   not have purchased the Device, or would have paid substantially less for it.

**CANADA**

10       243.    **Plaintiff Hanpeng Chen** is a resident and citizen of Canada and he purchased an

11   iPhone 6 in or around September 2015.  Prior to his purchase of the Device, he did not know, nor

12   could he have known through reasonable diligence, of the Battery Issues and Defects in his Device.

13   At time of initial purchase, his Device operated on iOS 8.  In or around July 2016, Apple provided a

14   new iPhone 6 to Chen when his original Device had color distortion on its screen.  Chen

15   downloaded iOS 11 on his new Device in or around October 2017.

16       244.    Not only did Chen's Device not operate as Apple warranted and promised

17   initially, but Apple never represented or warranted that any of the future iOS updates would cause

18   the way Chen's Device operated to fundamentally change.  Chen's Device, particularly after

19   installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and

20   the information publicly available in the marketplace.  Additionally, none of the packaging in which

21   the Device was sold to Chen revealed that there were any Defects, Battery Issues, or that Apple

22   would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed

23   pursuant to which Chen's Device would operate.  Accordingly, not only were Chen's Device

24   defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated

25   the problems with Chen's Device via its misrepresentations and omissions with the iOS software

26   Updates.  As a result of Apple's actions, Chen did not receive the benefit of his bargain and was

27   injured as a result.  If Chen had been told of these Defects, Battery Issues, and the deceptive manner

28

---

CONSOLIDATED AMENDED COMPLAINT     90     No. 5:18-MD-02827-EJD

1  in which Apple would damage the Device after sale, Chen would not have purchased the Device, or

2  would have paid substantially less for it.

3  **CANADA**

4  245.     **Plaintiff Elisa Gaudio** is a resident and citizen of Canada and she purchased an

5  iPhone 6 Plus November 11, 2014.  Prior to her purchase of the Device, she did not know, nor

6  could she have known through reasonable diligence, of the Battery Issues and Defects in her

7  Device.  At time of initial purchase, her Device operated on iOS 9.

8  246.     Not only did Gaudio's Device not operate as Apple warranted and promised

9  initially, but Apple never represented or warranted that any of the future iOS updates would cause

10  the way Gaudio's Device operated to fundamentally change.  Gaudio's Devices, particularly after

11  installation of subsequent iOS versions, did not operate as promised in Apple's advertisements,

12  representations, and the information publicly available in the marketplace.  Additionally, none of

13  the packaging in which the Device was sold to Gaudio revealed that there were any Defects, Battery

14  Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the

15  battery power and speed pursuant to which Gaudio's Device would operate.  Accordingly, not only

16  was Gaudio's Device defective at the point of sale due to its Battery Issues and Design Defects, but

17  Apple exacerbated the problems with Gaudio's Device via its misrepresentations and omissions

18  with the iOS software Updates.  As a result of Apple's actions, Gaudio did not receive the benefit of

19  her bargain and was injured as a result.  If Gaudio had been told of these Defects, Battery Issues,

20  and the deceptive manner in which Apple would damage the Device after sale, Gaudio would not

21  have purchased the Device, or would have paid substantially less for it.

22  **CHILE**

23  247.     **Plaintiff Corporación Nacional de Consumidores y Usuarios de Chile**

24  ("CONADECUS") is a private non-profit organization with its principal place of business in

25  Santiago, Chile.  CONADECUS has represented hundreds of thousands Chilean consumers in

26  collective- or diffuse-interest actions to date.  CONADECUS has standing to pursue this action on

27  behalf of its members or constituents under *Hunt v. Wash. State Apple Advertising Comm'n*, 432

28

---

CONSOLIDATED AMENDED COMPLAINT          91          NO. 5:18-MD-02827-EJD

1    U.S. 333 (1977). CONADECUS's members, Chilean consumers, purchased the iPhone 5, 5s, 5c, 6,

2    6 Plus, 6s, 6s Plus, SE, 7, and 7 Plus Devices.  Prior to their purchase of the Devices, they did not

3    know, nor could they have known through reasonable diligence, of the Battery Issues and Defects

4    in their Devices.

5          248.    Not only did CONADECUS's members' Devices not operate as Apple warranted

6    and promised initially, but Apple never represented or warranted that any of the future iOS updates

7    would cause the way CONADECUS's members' Devices operated to fundamentally change.

8    CONADECUS's members' Devices, particularly after installation of subsequent iOS versions, did

9    not operate as promised in Apple's advertisements, representations, and the information publicly

10    available in the marketplace.  Additionally, none of the packaging in which the Devices were sold

11    to CONADECUS's members revealed that there were any Defects, Battery Issues, or that Apple

12    would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed

13    pursuant to which CONADECUS's members' Devices would operate.  Accordingly, not only were

14    CONADECUS's members' Devices defective at the point of sale due to their Battery Issues and

15    Design Defects, but Apple exacerbated the problems with CONADECUS's members' Devices via

16    its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions,

17    CONADECUS's members did not receive the benefit of their bargain and were injured as a result.

18    If CONADECUS's members had been told of these Defects, Battery Issues, and the deceptive

19    manner in which Apple would damage the Devices after sale, CONADECUS's members would not

20    have purchased the Devices, or would have paid substantially less for them.

21                                          **CHINA**

22          249.    **Plaintiff Kaixuan Ni** is a permanent resident of the United States residing in

23    California and a citizen of the People's Republic of China and he purchased an iPhone 6 Plus in

24    2015 in China.  Prior to his purchases of the Device, he did not know, nor could he have known

25    through reasonable diligence, of the Battery Issues and Defects in his Device.  At time of initial

26    purchase, his Device operated on iOS 8.

27

28

CONSOLIDATED AMENDED COMPLAINT          92          NO. 5:18-MD-02827-EJD

250.     Not only did Ni's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Ni's Device operated to fundamentally change.  Ni's Device, particularly after installation of new iOS updates, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Ni revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Ni's Device would operate.  Accordingly, not only was Ni's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Ni's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Ni did not receive the benefit of his bargain, and was injured as a result.  If Ni had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Ni would not have purchased the Device, or would have paid substantially less for it.

### COLOMBIA

251.     **Plaintiff Dr. Juliana Caceres** is a citizen of Colombia and she purchased an iPhone 6s on December 1, 2016 at Mac Center in Bogotá, Colombia.  Caceres is a pediatric pulmonologist working and residing in Bogotá, Colombia.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in her Device.  At time of initial purchase, the Device operated on iOS 10.   Caceres' general practice is to update her software when it becomes available, and she upgraded to iOS 10.2.1.

252.     Not only did Caceres' Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10.2.1 or any of the future updates would cause the Device operation to fundamentally change.  Caceres' Device, particularly after installation of iOS 10.2.1, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in

---

CONSOLIDATED AMENDED COMPLAINT          93          NO. 5:18-MD-02827-EJD

which the Device was sold revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which the Device would operate. Accordingly, not only was the Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with the Device via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Caceres did not receive the benefit of her bargain, and was injured as a result. If Caceres had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Caceres would not have purchased the Device, or would have paid substantially less for it

## INDIA

253.    **Plaintiff Nakul Chandra** is a resident and citizen of INDIA and he purchased an iPhone 7 on October 26, 2016. Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence of the Battery Issues and Defects in his Device. At time of initial purchase, the Device operated on the latest version of iOS at the time.

254.    Not only did Chandra's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any version of iOS or future updates would cause the way Chandra's Device operated to fundamentally change. Chandra's Device, after installation of versions of iOS did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Chandra revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Chandra's Device would operate. Accordingly, not only was Chandra's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Chandra's Device via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Chandra did not receive the benefit of his bargain, and was injured as a result. If Chandra had been told of these Defects,

CONSOLIDATED AMENDED COMPLAINT            94            NO. 5:18-MD-02827-EJD

Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Chandra would not have purchased the Device, or would have paid substantially less for it.

### JAPAN

255.    **Plaintiff Prof. Arisa Wakabayashi** is a citizen and resident of Japan, temporarily living in New York on research cebatical, and she purchased an iPhone 5s 2014 at a Bic Camera store in Tokyo.  Wakabayashi is a professor of law at Komazawa University and is currently a resident of New York, NY for a year while on a teaching sabbatical at Fordham University.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in her Device.  At time of initial purchase, the Device operated on iOS 8.  Wakabayashi's general practice is to update her software when it becomes available, and she upgraded to iOS 10.2.1.  In January 2018, Wakabayashi upgraded to an iPhone X to improve performance.

256.    Not only did Wakabayashi's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10.2.1 or any of the future updates would cause the Device operation to fundamentally change.  Wakabayashi's Device, particularly after installation of iOS 10.2.1, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which the Device would operate.  Accordingly, not only was the Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with the Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Wakabayashi did not receive the benefit of her bargain, and was injured as a result.  If Wakabayashi had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Wakabayashi would not have purchased the Device, or would have paid substantially less for it

CONSOLIDATED AMENDED COMPLAINT        95        NO. 5:18-MD-02827-EJD

**MEXICO**

257.    **Plaintiff Linda Sonna** is a citizen of the United States and permanent resident of Mexico, and she purchased an iPhone SE on September 1, 2017.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Battery Issues and Defects in her Device.

258.    Not only did Sonna's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Sonna's Device operated to fundamentally change.  Sonna's Device, particularly after installation of subsequent iOS versions, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Sonna revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Sonna's Device would operate.  Accordingly, not only was Sonna's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Sonna's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Sonna did not receive the benefit of her bargain, and was injured as a result.  If Sonna had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Sonna would not have purchased the Device, or would have paid substantially less for it.

**THE NETHERLANDS**

259.    **Plaintiff Lilav Akrawy** is a resident and citizen of the Netherlands and she purchased an iPhone 6 on November 13, 2014.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence of the Battery Issues and Defects in her Device.  At time of initial purchase, the Device operated on iOS 8.  Akrawy downloaded and installed iOS 11 on her Device in or around September 2017.

260.    Not only did Akrawy's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would

CONSOLIDATED AMENDED COMPLAINT              96              No. 5:18-MD-02827-EJD

Exhibit 1, Page 106

cause the way Akrawy's Device operated to fundamentally change. Akrawy's Device, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Akrawy revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Akrawy's Device would operate. Accordingly, not only was Akrawy's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Akrawy's Device via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Akrawy did not receive the benefit of her bargain, and was injured as a result. If Akrawy had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Akrawy would not have purchased the Device, or would have paid substantially less for it.

**NORWAY**

261.    **Plaintiff Burim Daci** is a resident and citizen of Norway and he purchased an iPhone 6s in December 2016. Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence of the Battery Issues and Defects in his Device. At time of initial purchase, the Device operated on the latest version of iOS.

262.    Not only did Daci's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any version of iOS or any future updates would cause the way Daci's Device operated to fundamentally change. Daci's Device, after installation of various versions of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to DACI revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Daci's Device would operate. Accordingly, not only was Daci's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Daci's Device via its misrepresentations and omissions with

CONSOLIDATED AMENDED COMPLAINT             97             NO. 5:18-MD-02827-EJD

1   the iOS software Updates.  As a result of Apple's actions, Daci did not receive the benefit of his

2   bargain, and was injured as a result.  If Daci had been told of these Defects, Battery Issues, and the

3   deceptive manner in which Apple would damage the Device after sale, Daci would not have

4   purchased the Device, or would have paid substantially less for it.

5                                                    **PERU**

6          263.      **Plaintiff Pedro Luis Espejo Miranda** is a resident and citizen of PERU and he

7   purchased an iPhone 5s at the end of 2013.  Prior to his purchase of the Device, he did not know,

8   nor could she have known through reasonable diligence of the Battery Issues and Defects in his

9   Device.  At time of initial purchase, the Device operated on the current version of iOS at that time.

10         264.      Not only did Espejo's Device not operate as Apple warranted and promised

11  initially, but Apple never represented or warranted that any versions of iOS or any of the future

12  updates would cause the way Espejo's Device operated to fundamentally change.  Espejo's Device,

13  after installation of versions of iOS, did not operate as promised in Apple's advertisements,

14  representations, and the information publicly available in the marketplace.  Additionally, none of

15  the packaging in which the Device was sold to Espejo revealed that there were any Defects, Battery

16  Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the

17  battery power and speed pursuant to which Espejo's Devices would operate.  Accordingly, not only

18  was Espejo's Device defective at the point of sale due to their Battery Issues and Design Defects,

19  but Apple exacerbated the problems with Espejo's Device via its misrepresentations and omissions

20  with the iOS software Updates.  As a result of Apple's actions, Espejo did not receive the benefit of

21  his bargain, and was injured as a result.  If Espejo had been told of these Defects, Battery Issues,

22  and the deceptive manner in which Apple would damage the Devices after sale, ESPEJO would not

23  have purchased the Device, or would have paid substantially less for it.

24                                                  **RUSSIA**

25         265.      **Plaintiff Roman Dubianskii** is a resident and citizen of RUSSIA and he

26  purchased an iPhone 5s in December 2013.  Prior to his purchase of the Device, he did not know,

27

28

CONSOLIDATED AMENDED COMPLAINT          98          NO. 5:18-MD-02827-EJD

1   nor could he have known through reasonable diligence, of the Battery Issues and Defects in his

2   Device.  At time of initial purchase, the Device operated on the current version of iOS.

3       266.    Not only did Dubianskii's Device not operate as Apple warranted and

4   promised initially, but Apple never represented or warranted that versions of iOS or any of the

5   future updates would cause the way Dubianskii's Device operated to fundamentally change.

6   Dubianskii's Device, after installation of versions of iOS, did not operate as promised in Apple's

7   advertisements, representations, and the information publicly available in the marketplace.

8   Additionally, none of the packaging in which the Device was sold to Dubianskii revealed that there

9   were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or

10  otherwise regulate the battery power and speed pursuant to which Dubianskii's Device would

11  operate.  Accordingly, not only was Dubianskii's Device defective at the point of sale due to their

12  Battery Issues and Design Defects, but Apple exacerbated the problems with Dubianskii's Device

13  via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

14  actions, Dubianskii did not receive the benefit of his bargain, and was injured as a result.  If

15  Dubianskii had been told of these Defects, Battery Issues, and the deceptive manner in which Apple

16  would damage the Device after sale, Dubianskii would not have purchased the Device, or would

17  have paid substantially less for it.

18                              **SOUTH KOREA**

19      267.    **Plaintiff Heekyung Jo** is a resident and citizen of South Korea and she

20  purchased an iPhone 6 in or about 2014.  Prior to her purchase of the Device, she did not know, nor

21  could she have known through reasonable diligence, of the Battery Issues and Defects in her

22  Device.  Jo downloaded and installed iOS updates as recommended.

23      268.    Not only did Jo's Device not operate as Apple warranted and promised initially,

24  but Apple never represented or warranted that iOS updates would cause the way Jo's Device

25  operated to fundamentally change.  Jo's Device did not operate as promised in Apple's

26  advertisements, representations, and the information publicly available in the marketplace.

27  Additionally, none of the packaging in which the Device was sold to Jo revealed that there were any

28

---

CONSOLIDATED AMENDED COMPLAINT          99          NO. 5:18-MD-02827-EJD

Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Jo's Device would operate. Accordingly, not only was Jo's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Jo's Device via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Jo did not receive the benefit of her bargain, and was injured as a result. If Jo had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Jo would not have purchased the Device, or would have paid substantially less for it.

**SOUTH KOREA**

269.    **Plaintiff Youngro Lee** is a resident and citizen of the South Korea, and he purchased an iPhone 6s on or about November 2015. Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Battery Issues and Defects in her Device. Lee downloaded and installed the iOS updates on his Device as recommended.

270.    Not only did Lee's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Lee's Device operated to fundamentally change. Lee's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Lee revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Lee's Device would operate. Accordingly, not only was Lee's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Lee's Device via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Lee did not receive the benefit of her bargain, and was injured as a result. If Lee had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Lee would not have purchased the Device, or would have paid substantially less for it.

### UNITED KINGDOM

271.    **Plaintiff Kushagra Sharma** is a resident and citizen of the United Kingdom and he purchased an iPhone 6 Plus in April 2016.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence of the Battery Issues and Defects in his Device.  At time of initial purchase, the Device operated on the latest version of iOS.

272.    Not only did Sharma's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any version of iOS or any future updates would cause the way Sharma's Device operated to fundamentally change.  Sharma's Device, after installation of a version of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Sharma revealed that there were any Defects, Battery Issues, or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Sharma's Device would operate.  Accordingly, not only was Sharma's Device defective at the point of sale due to its Battery Issues and Design Defects, but Apple exacerbated the problems with Sharma's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Sharma did not receive the benefit of his bargain, and was injured as a result.  If Sharma had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, Sharma would not have purchased the Device, or would have paid substantially less for it.

### B. Defendants and Their Relevant Corporate Structure

273.    Apple Inc. ("Apple"), is a corporation that was created under the laws of the State of California, and has its principal place of business in Cupertino, California.  Apple is the world's largest information technology company by revenue and the world's third-largest mobile phone developer.  There are currently over one billion Apple products in active use worldwide.

274.    Throughout the events at issue here, Apple has operated through its directors, officers, employees and agents, and each such person acted within the course and scope of such

1    agency, representation or employment and was acting with the consent, permission and

2    authorization of Apple.

3        275.    Apple has represented that the "design, manufacture, and testing" of the Devices

4    "has always been done by [ ] Apple Inc., which is based in California."  *See* Exhibit 4 (Transcript of

5    House of Commons Standing Committee on Industry, Science, and Technology).

6        **CHOICE OF LAW: DESIGNED BY APPLE IN CUPERTINO, CALIFORNIA**

7        276.    By using their Devices or downloading a software update, Device users are

8    presented with the iOS Software License Agreement. There are separate Software License

9
10   **12. Controlling Law and Severability.** This License will be governed by and construed in accordance
     with the laws of the State of California, excluding its conflict of law principles. This License shall not be
     governed by the United Nations Convention on Contracts for the International Sale of Goods, the
11   application of which is expressly excluded. If you are a consumer based in the United Kingdom, this
     License will be governed by the laws of the jurisdiction of your residence.  If for any reason a court of
     competent jurisdiction finds any provision, or portion thereof, to be unenforceable, the remainder of this
12   License shall continue in full force and effect.

13   Agreements for each version of iOS software including: iPhone iOS 3.1, iOS 4.1, iOS 5.0, iOS 5.1,

14   iOS 6.0, iOS 7.0, iOS 8.0, iOS 8.1, iOS 9.0, iOS 9.1, iOS 10, iOS 11, and iOS 11.2. The agreements

15   do not differ in material terms, and provide that California law governs the agreements[6]:

16   *See, e.g.,* Exhibits 5, 6 (Samples of Agreements).

17       277.    To the extent they apply, the iOS Software Licensing Agreements are effective at

18   the point of sale—as soon as the customers turn on their Devices—and are thus part of the benefit

19   of the consumers' bargain.  Without the iOS, for which there is a purported licensing agreement, the

20   Devices simply do not work.

21       278.    Apple elected to have California law govern all claims and disputes concerning

22   the common software required to operate all of the Devices at issue in this lawsuit.  Accordingly,

23   _____

24

25

26   [6] California law applies unless the consumer is based in the United Kingdom.  A subclass is
     bringing their claims based upon the United Kingdom's licensing agreements, and choice of law
27   provisions therein.  As will be demonstrated by Plaintiffs in their subsequent class certification
     brief(s), trial plans and other techniques can be adopted by the Court to ensure manageability of
28   such separate classes.

CONSOLIDATED AMENDED COMPLAINT         102         NO. 5:18-MD-02827-EJD

1    the application of California law to all of the class members' claims is fair, appropriate, and an

2    election affirmatively made by Apple consistent in its agreements.

3         279.    By using their Devices, consumers are told that they agree to be bound by

4    California law as consumers must run Apple's proprietary iOS to use their Devices.

5         280.    Beyond Apple's election of California law to govern the claims described herein,

6    the State of California has a significant interest in regulating the conduct of businesses operating

7    within its borders.  California, which seeks to protect the rights and interests of California and all

8    residents and citizens of the United States against a company headquartered and doing business in

9    California, has a greater interest in the claims of Plaintiffs and class members than any other state or

10   country and is most intimately concerned with the claims and outcome of this litigation.

11        281.    The principal place of business of Apple, located at 1 Apple Park Way (formerly

12   1 Infinite Loop) in Cupertino, California, is the "nerve center" of its business activities—the place

13   where its high-level officers direct, control, and coordinate the corporation's activities, including its

14   marketing, software development, and major policy, financial, and legal decisions.  As admitted by

15   Apple in its Form 10-K for the fiscal period ended September 24, 2016 (the "2016 Form 10-K"),

16   "most of the Company's key personnel" are from Silicon Valley.

17        282.    Indeed, Apple's Devices proudly display that they were "Designed by Apple in

18   California."

19        283.    Apple's response to the allegations herein, and corporate decisions surrounding

20   such response, were made from and in California.

21        284.    Apple's breaches of duty to Plaintiffs and the Class emanated from California,

22   and the Devices at issue herein were designed, manufactured, and tested in California.

23        285.    Application of California law with respect to Plaintiffs' and Class members'

24   claims is neither arbitrary nor fundamentally unfair because California has a state interest in the

25   claims of the Plaintiffs and the Class based upon Apple's significant and ongoing contacts with

26   California.

27

28

CONSOLIDATED AMENDED COMPLAINT        103        NO. 5:18-MD-02827-EJD

1      286.      Under California's choice of law principles, which are applicable to this action,

2  the common law of California applies to the common law claims of all class members.

3  Additionally, given California's significant interest in regulating the conduct of businesses

4  operating within its borders, California's consumer protection laws may be applied to non-resident

5  Plaintiffs and class members.

6                              **SUBSTANTIVE ALLEGATIONS**

7  I.      **APPLE ISSUED MATERIALLY FALSE STATEMENTS EMANATING FROM**

8                **CALIFORNIA TO SELL DEFECTIVE DEVICES TO THE CLASS**

9      287.      The first Apple "smartphone" blazed onto the market in 2007, and the first Apple

10  iPad did the same in 2010.[7]  These two product lines have historically comprised the majority of

11  Apple's product sales since at least 2013.

12      288.      Apple engaged in a multiple year, consistent marketing plan of constantly

13  introducing new iterations or generations of the Devices that emphasized battery power designed to

14  keep pace with ever improving processor "chips," and a panoply of ever-increasing, cutting edge

15  features loaded onto the Devices.[8]  Apple's statements were materially false in view of the Defects,

16  and were designed to cause consumers to upgrade their Devices.[9]

17

18  _____

19

20  [7] Upon information and belief, the following entities have manufacturing, supply and/or other
   contracting business relationships with Apple for hardware or other features on one or more of the

21  Devices: Pegatron Corporation, Hon Hai Precision Industry Co., Ltd. (Foxconn Technology
   Group), Compal Electronics, Inc., and Wistron Corp.

22  [8] As stated in Apple's 2016 Form 10-K at 4: "The Company believes that sales of its innovative and

23  differentiated products are enhanced by knowledgeable salespersons who can convey the value of
   the hardware and software integration and demonstrate the unique solutions that are available on its

24  products.  The Company further believes providing direct contact with its targeted customers is an
   effective way to demonstrate the advantages of it products over those of its competitors and

25  providing a high-quality sales and after-sales support experience is critical to attracting new and
   retaining existing customers."

26  [9] As admitted by Apple in its 2016 Form 10-K at 5: "The Company's future financial condition and
   operating results depend on the Company's ability to continue to develop and offer new innovative

27  products and services in each of the markets in which it competes."  *See also* 2016 Form 10-K at 9:
   "Due to the highly volatile and competitive nature of the industries in which the Company

28  competes, the Company must continually introduce new products, services and technologies,

CONSOLIDATED AMENDED COMPLAINT          104          NO. 5:18-MD-02827-EJD

289.    Apple has also marketed its Devices in a fashion to drive consumers to consider their Devices, particularly iPhones, as an extension of themselves—something they cannot live without, do not have to be weighed down carrying, and do not need to haul around a battery cord to intermittently keep powered.  Apple CEO Timothy Cook, during the March 21, 2016 Apple Special Event at the Company's then-current Cupertino headquarters, stated that Apple knows iPhones are "deeply personal" and an "extension of ourselves."  The Devices, when operating as promised, are to be a one-stop location for all forms of personal and business use, including, but not limited to, cell phone, e-mail and internet usage, messaging, calendars, calculators, photos and photo editing, watching videos, movies and television programming, monitoring health, receiving digital print magazine subscriptions, reading digital books, playing video games, and a host of other applications (collectively the "Features").

290.    Apple has thus cultivated a dependent relationship between consumers and their Devices, and has exploited that relationship to fuel consumer demand to buy more devices to make money.[10]  Perhaps borrowing a cue from the car industry, Apple self-created a market designed to lure consumers into buying the "latest and greatest" model of the Devices, with the central theme of the marketing ploy being Devices with access to Apple's i0S system to provide more Features, powerful processor chips, and long lasting battery life, all the while in thinner and more light-weight versions.[11]  The parade of Apple's constant marketing plan for each of the Devices

---

enhance existing products and services, effectively stimulate customer demand for new and upgraded products and successfully manage the transition to these new and upgraded products."

[10] As detailed in the chart herein at Section IV, for nearly every year since at least the fiscal year ended 2013, sales of the Devices collectively accounted for at least 70% percent of Apple's revenues (2013: 72.1%; 2014: 72.3%; 2015: 76.2%; 2016: 72.8%; 2017: 70%) and totaled nearly $800 billion.

[11] In addition, with little variation, the key elements of the box packaging for the Devices was substantially similar and included references to Apple's Cupertino, California address, as well as statements on the box, inserts and/or Devices representing: "Designed by Apple in California." While the packaging contains certain literature, none of the literature contained disclosures regarding the Defects, making Apple's omissions and inadequate disclosures materially false and misleading.

---

demonstrates the marketing message Apple sought to convey: faster, longer battery life, more

Features, all crammed into increasingly thinner and lighter physical boundaries.

### A.    iPhones

### II.    IPHONE 5

291.    On September 12, 2012, Apple issued a press release from San Francisco,

California, captioned "Apple Introduces iPhone 5: Thinnest, Lightest iPhone Ever Features All-

New Aluminum Design, Stunning 4-Inch Retina Display, A 6 Chip & Ultrafast Wireless."  The

device was slated to run on iOS 6 initially.  The press release states, in pertinent part (with emphasis

added):

> … *the thinnest and lightest iPhone ever* . . . an Apple-designed A6 chip for *blazing fast performance*; and ultrafast wireless technology[]—all while delivering *even better battery life*.[]

*        *        *

> "iPhone 5 is the most beautiful consumer device that we've ever created," said Philip Schiller, Apple's senior vice president of Worldwide Marketing. "We've packed an amazing amount of innovation and advanced technology into a thin and light, jewel-like device with a stunning 4-inch Retina display, *blazing fast A6 chip, ultrafast wireless, even longer battery life*; and we think customers are going to love it."

> iPhone 5 is the thinnest smartphone in the world, . . . 18 percent thinner and 20 percent lighter than iPhone 4S.

*        *        *

> The all-new A6 chip was designed by Apple to maximize performance and power efficiency to support all the incredible new features in iPhone 5, including the stunning new 4-inch Retina display—*all while delivering even better battery life. With up to twice the CPU and graphics performance, almost everything you do on iPhone 5 is blazing fast* for launching apps, loading web pages and downloading email attachments.

292.     On September 12, 2012, Apple hosted a Special Event in San Francisco, California to announce the iPhone5.[12]  The Special Event underscored the false representations about the device and failed to disclose the Defects.

293.     In addition to marketing the iPhone 5 via its press release and Special Event, Apple posted similar advertising on its website and in stores for these products.  Apple boasted about its new design being "[t]he thinnest, lightest, fastest iPhone ever":



All-new design.
The thinnest, lightest, fastest iPhone ever.

**Thin, sleek, and very capable.**
It's hard to believe a phone so thin could offer so many features: a larger display, a faster chip, the latest wireless technology, an 8MP iSight camera, and more. All in a beautiful aluminum body designed and made with an unprecedented level of precision. iPhone 5 measures a mere 7.6 millimeters thin and weighs just 112 grams.[1] That's 18 percent thinner and 20 percent lighter than iPhone 4S. The only way to achieve a design like this is by relentlessly considering (and reconsidering) every single detail — including the details you don't see.

Learn more about the design of iPhone 5 ▸

18% Thinner

20% Lighter

12% Less Volume

294.     Apple's marketing materials further boasted "[p]erformance and graphics up to twice as fast.  With battery life to spare."  That is, "even at is accelerated speed, iPhone 5 has more

---

[12] As with all Devices (and the majority of the Updates) identified herein, Apple routinely hosts a "Special Event" presentation for the new product and/or iOS.  These Special Events are traditionally hosted from a location in California, and are attended by Apple executives and staff, as well as media and other persons in the technology field.  These events are videotaped, posted on Apple's website, and also reposted online by various media or other sources.

than twice enough battery power to last throughout the day—up to 8 hours of browsing on a cellular connection, up to 8 hours of talk time, and up to 10 hours of video playback time."

295.     As set forth herein, these were materially false statements that failed to warn Plaintiffs and the Class of the known Defects.

### III.     IPHONE 5S

296.     On September 10, 2013, Apple unveiled the iPhone 5s at its Cupertino, California headquarters.  It was released on September 20, 2013, along with its lower-cost counterpart, the iPhone 5C.  These devices, upon initial release, operated on iOS 7 software.

297.     Apple's September 10, 2013 press release, issued from Cupertino, California, is captioned "Apple Announces iPhone 5s—The Most Forward-Thinking Smartphone in the World." The press release states, in pertinent part (with emphasis added):

Apple today announced iPhone 5s, the most forward-thinking iPhone yet, featuring an all-new A7 chip, making iPhone 5s the world's first smartphone with 64-bit desktop-class architecture for *blazing fast performance* in the palm of your hand. iPhone 5s redefines the best smartphone experience in the world with amazing new features all *packed into a remarkable thin and light design*. . . .

* * *

The all-new A7 chip in iPhone 5s brings 64-bit desktop-class architecture to a smartphone for the first time. With up to twice the CPU and graphics performance, *almost everything you do on iPhone 5s is faster and better than ever*, from launching apps and editing photos to playing graphic-intensive games—*all while delivering great battery life*. . . .

* * *

iPhone 5s features a remarkable *thin and light*, precision-crafted design that customers around the world love, including an anodized aluminum body with diamond cut chamfered edges, a stunning 4-inch Retina display and glass inlays. . . .

CONSOLIDATED AMENDED COMPLAINT          108          NO. 5:18-MD-02827-EJD

298.    On September 10, 2013, Apple also hosted a Special Event from Cupertino, California to announce the product.  The Special Event simply underscored the false representations about the device and failed to disclose the Defects.[13]

299.    In addition to the press release and marketing of the new iPhone 5s, and the Special Event, Apple used similar advertising on its website and in its stores to market the thinness of the phone, its extended battery life, and fast speeds as part of its overall marketing scheme.



## IV.    IPHONE 5C

300.    On September 10, 2013, Apple unveiled the iPhone 5c at its Cupertino, California headquarters.  It was released on September 20, 2013, along with its higher-end counterpart, the iPhone 5s.  These devices, upon initial release, operated on iOS 7 software.

---

[13] For example, during the Special Event, Apple's SVP, Worldwide Marketing, stated the following of the iPhone 5s: "What about battery life we're really happy to tell you the team has done a phenomenal job they do have battery life that's equal or greater than the iPhone 5 had 10 hours 3G talktime eight hours 3G browsing 10 hours LTE browsing Wi-Fi browsing video playback 40 hours of music listening up to 250 hours of standby so that's the first of our breakthrough technologies in the iPhone 5s a 64-bit class architecture an incredible performance of a7 and m7."  P. Schiller SVP, Worldwide Marketing, Apple, Apple Special Event at 45:22 (Sept. 10, 2013) available at: (https://www.youtube.com/watch?v=yBX-KpMoxYk).

301.     Apple's September 10, 2013 press release, issued from Cupertino, California, is captioned "Apple Introduces iPhone 5c—The Most Colorful iPhone Yet."  The press release states, in pertinent part (with emphasis added):

> . . . iPhone 5c is built on a foundation of features people know and love like the beautiful 4-inch Retina display, *blazing fast performance* of the A6 chip, and the 8 megapixel iSight camera—***all while delivering great battery life***. . . .

> *         *         *

> iPhone 5c comes with all the features customers love in iPhone 5, and more. The Apple-designed A6 chip provides incredible performance and power efficiency, all while delivering great battery life, so almost everything you do on iPhone 5c is blazing fast, from launching apps and loading web pages to downloading email attachments.

302.     On September 10, 2013, Apple also hosted a Special Event from Cupertino, California to announce the product.  The Special Event simply underscored the false representations about the device and failed to disclose the Defects.[14]  In addition to the press release, Special Event and marketing of the new iPhone 5c, Apple used similar advertising on its website and in its stores to market the its extended battery life and fast speeds as part of its overall marketing scheme.

## V.     IPHONE 6 AND 6 PLUS

303.     On September 19, 2014, the iPhone 6 and iPhone 6 Plus were released for sale (with pre-ordering available on September 12, 2014).  These devices, on the initial date of release, operated on iOS 8 software.

304.     Apple's September 9, 2014 press release for the iPhone 6 and iPhone 6 Plus, issued from Cupertino, California, is captioned "Apple Announces iPhone6 & iPhone 6 Plus—The Biggest Advancements in iPhone History," and states in pertinent part (emphasis added):

> Apple today announced iPhone6 and iPhone 6 Plus, the biggest advancements in iPhone history . . . in an all-new ***dramatically thin*** and seamless design.  . . .

---

[14]   For example, during the Special Event, P. Schiller, Apple's SVP, Worldwide Marketing stated of the iPhone 5c: "It's powered by an apple designed a6 chip that gives great performance and great battery life in fact the battery inside the iPhone 5c is slightly larger than the battery was in the iPhone 5 before.") - P. Schiller SVP, Worldwide Marketing, Apple, Apple Special Event at 25:36 - 25:44 (Sept. 10, 2013) available at: (https://www.youtube.com/watch?v=yBX-KpMoxYk).

engineered to be the ***thinnest ever*** . . . [and include] the Apple-designed A8 chip with second generation 64-bit desktop-class architecture for ***blazing fast performance and power efficiency*** . . . . Both models include iOS8, the latest version of the world's most advanced mobile operating system, featuring a simpler, *faster* and more intuitive user experience . . . .

\*        \*        \*

iPhone 6 and iPhone 6 Plus are the biggest advancements in iPhone history," said Tim Cook, Apple's CEO. "The iPhone is the most loved smartphone in the world with the highest customer satisfaction in the industry and we are making it much better in every way. Only Apple can combine the ***best hardware, software*** and services at this unprecedented level and we think customers are going to love it.

\*        \*        \*

With second generation 64-bit desktop-class architecture, the all-new A8 chip offers ***faster performance*** and is more energy efficient, delivering higher sustained performance with ***great battery life***.

305.    On September 9, 2014, Apple hosted a Special Event from Cupertino, California to announce iPhone 6 and iPhone 6 Plus. The Special Event simply underscored the false representations about the devices and failed to disclose the Defects.

306.    In addition to marketing the iPhone 6 and iPhone 6 Plus via the September 9, 2014 press release and Special Event, Apple posted similar advertising on its website and in stores for these products.

---

CONSOLIDATED AMENDED COMPLAINT        111        NO. 5:18-MD-02827-EJD

Exhibit 1, Page 121

307.    Consistent with previous messaging, Apple touted the iPhone 6's thin design.



308.    Apple advertised that iPhone 6's A8 chip was the "fastest yet," "power efficient," and could "sustain higher performance—so you can play graphics-intensive games or enjoy video at higher frame rates for longer than ever" with the promise of:

# Great battery life. Even while powering great new features.

iPhone 6 is designed to be incredibly efficient. So you can spend your day taking advantage of all its new features and apps while getting better battery life.*

## VI.    IPHONE 6S AND IPHONE 6S PLUS

309.    On September 25, 2015, the iPhone 6s and iPhone 6s Plus were released for sale (with pre-ordering on September 12, 2015), and initially operated on iOS9 software.

310.          Apple's September 9, 2015 press release for the iPhone 6s and iPhone 6s Plus, issued from San Francisco, California is captioned "Apple Introduces iPhone 6s & iPhone 6s Plus," and states in pertinent part (emphasis added):

> . . . the most advanced iPhones ever . . . .  iPhone 6s and iPhone 6s Plus also introduce a transformative new approach to photography called Live Photos, bringing still images to life by capturing a moment in motion. Live Photos, 3D Touch and other advancements in the new iPhones are powered by the Apple-designed A9 chip, the most advanced chip ever in a smartphone, ***delivering faster performance and great battery life.***

> *            *            *

> A9, Apple's third generation 64-bit chip powers these innovations with 70 percent faster CPU and 90 percent faster GPU performance than the A8, all with gains in **energy *efficiency for great battery life*.**  The A9 chip and iOS 9 are architected together for optimal performance where it matters most, in real world usage.  M9, Apple's next-generation motion coprocessor, is embedded into A9, allowing more features to ***run all the time at lower power***, including "Hey Siri," without iPhone needing to be plugged in.

> *            *            *

> . . . The foundation of iOS is even stronger with software updates that require less space to install and advanced security features to further protect your devices.

311.          On September 9, 2015, Apple hosted a Special Event from San Francisco, California to announce the iPhone 6s and iPhone 6s Plus. The Special Event simply underscored the false representations about the devices and failed to disclose the Defects.[15]

---

[15] For example, during the Special Event, P. Schiller, SVP, Worldwide Marketing, for Apple stated: "Thank you, Craig . . .  Inside your iPhone is the fastest chip we've ever built into a phone, the new A9 chip, also our third-generation 64-bit chip. It's built with a new transistor architecture. It means we can drive faster performance while being more energy efficient. And our software team has worked together with our chip team to enable it to be maximum performance for the kinds of tasks we do every day. And it delivers a big jump in performance. Compared to the A8, it is 70% faster at CPU tasks, and at graphics tasks, it's 90% faster. This is a big jump in performance. It's going to make using our phone so much faster and a lot more fun." P. Schiller, SVP, Worldwide Marketing, Apple Special Event for iPhone 6S, iPhone 6S Plus, at 27 (Sept. 9, 2015).

CONSOLIDATED AMENDED COMPLAINT          113          NO. 5:18-MD-02827-EJD

312.      In addition to the marketing of the iPhone 6s and iPhone 6s Plus via the September 9, 2015 press release and Special Event, Apple posted similar advertising on its website and in stores for these products.

### VII.    IPHONE SE

313.      On March 21, 2016, Apple announced the iPhone SE for release in April 2016.  The iPhone SE operated on iOS 9.3 software upon release.

314.      Apple's March 21, 2016 press release for the iPhone SE, issued from Cupertino, California, is captioned "Apple Introduces the iPhone SE—The Most Powerful Phone with a Four-Inch Display."  The press release states, in pertinent part (with emphasis added):

> Apple today introduced iPhone SE, *the most powerful phone* with a four-inch display . . . . iPhone SE offers *exceptional performance* with the same 64-bit A9 chip offered in iPhone 6s and iPhone 6s Plus for *blazing fast speeds, longer battery life*, faster wireless, a 12-megapixel iSight® camera featuring Live Photos and 4K video, and Touch ID with Apple Pay.
>
> *        *        *
>
> . . . The 64-bit A9 chip, introduced in iPhone 6s and iPhone 6s Plus, offers iPhone SE customers two times faster CPU and three times faster GPU performance compared to iPhone 5s, all with gains in energy efficiency for improved battery life.

315.      The iPhone SE was also introduced at the Apple Special Event held in Cupertino, California on March 23, 2016.  The Special Event simply underscored the false representations about the device and failed to disclose the Defects.[16]  In addition to the marketing of the iPhone SE

---

[16]  For example, during the March 2016 Special Event, Apple's Vice President iPhone Product Marketing, Greg Joswiak, stated the following (emphasis added):

. . . the iPhone SE delivers incredible battery improvements across the board.

*        *        *

But it's on the inside where the iPhone SE really shines.  It's got advanced technologies that make this the *most powerful four-inch phone ever. It's incredibly powerful* which makes it even better to do the things that iPhone customers want to do, including playing the most graphic intensive games. So at the heart of the iPhone SE, of course, is our chips: our amazing Apple A9 chip with its

via the March 21, 2016 press release, Apple posted similar advertising on its website and in stores for these products.

### VIII.   IPHONE 7 AND IPHONE 7 PLUS

316.          On September 16, 2016, the iPhone 7 and iPhone 7 Plus were released for sale (with pre-ordering on September 9, 2016), initially operating on iOS 10 software.

317.          Apple's September 7, 2016 press release for the iPhone 7 and iPhone 7 Plus, issued from San Francisco, California is captioned "Apple introduces iPhone 7 & iPhone 7 Plus, the best, most advanced iPhone ever," and states in pertinent part (emphasis added):

> Including Breakthrough New Camera Systems, **the Best Battery Life Ever** in an iPhone and Water & Dust Resistance
>
> *          *          *
>
> Apple today introduced iPhone 7 and iPhone 7 Plus, *the best, most advanced* iPhone ever, packed with unique innovations that improve all the ways iPhone is used every day. The new iPhone features new advanced camera systems that take pictures like never before, ***more power and performance with the best battery life ever*** in an iPhone . . . .
>
> *          *          *
>
> More Performance & Battery Life
>
> The new custom-designed Apple A10 Fusion chip features a new architecture that powers these innovations, making it the ***most powerful chip*** ever in a smartphone, while also getting ***more time between charges with the longest battery life ever*** in an iPhone.  The A10 Fusion's CPU now has four cores, seamlessly integrating two high-performance cores that run up to ***two times faster*** than iPhone 6, and two high-efficiency cores that are capable of running at just one-fifth the power of the high-performance cores.  Graphics performance is also *more powerful*, running up to ***three times faster*** than iPhone 6 at as little as half the power, enabling a new level of gaming and professional apps.
>
> *          *          *
>
> iPhone 7 and iPhone 7 Plus come with *iOS 10, **the biggest release ever of the world's most advanced*** mobile operating system.

embedded M9 motion coprocessor.  This means that the iPhone SE has the same processing performance as the iPhone 6S which is literally double the speed of the iPhone 5S.

CONSOLIDATED AMENDED COMPLAINT          115          NO. 5:18-MD-02827-EJD

318.        Apple also held a Special Event on September 7, 2016 from San Francisco, California to introduce the iPhone 7 and iPhone 7 Plus.  The Special Event simply underscored the false representations about the devices and failed to disclose the Defects.

319.        In addition to the marketing of the iPhone 7 and iPhone 7 Plus via the September 7, 2016 press release and Special Event, Apple posted similar advertising on its website and in stores for these products.



320.        Apple's CEO Tim Cook raved about the new Devices during the Company's quarterly earnings call with analysts on October 25, 2016 stating:

> As for our newest products, we're thrilled with the customer response to iPhone 7 and iPhone 7 Plus.  These are the best iPhones we've ever made, with breakthrough camera systems, immersive stereo speakers, and the best iPhone performance in battery life ever, thanks to the custom-designed Apple A10 Fusion chip.  They feature the brightest, most colorful iPhone displays to date and come in gorgeous new finishes. Demand continues to outstrip supply, but we're working very hard to get them into customers' hands as quickly as possible.[17]

---

[17] In addition to (or a component of) the Defects described herein, certain of the Devices have been reported as causing fire, explosions and/or injuries.  *See e.g.* Anthony Cuthbertson, "Apple Store Evacuated After iPhone Battery Explosion," *Newsweek* (Jan. 10, 2018) (Available online at http://www.newsweek.com/iphone-battery-mysterious-explosion-causes-apple-store-evacuation-776529) (last visited June 18, 2018).  As recently as May 11, 2018, reports have surfaced of an iPhone

**B.     iPads**

321.          Each iPad described herein sold by Apple to consumers was encased in a box with labeling and inserts substantially similar to that described in section above for the iPhones.

**Fourth Generation iPad**

322.          On October 23, 2012, Apple issued a press release from San Jose, California, announcing the fourth generation iPad.  This iPad initially ran on iOS 6 and was the first iPad to feature a Retina display.[18]  The press release advertised that the iPad included (with emphasis added):

> [A] new Apple-designed A6X chip that delivers up ***to twice the CPU performance*** and up to twice the graphics performance of the A5X chip, all while delivering *an* ***incredible 10 hours of battery life*** in the ***same thin and light*** iPad design. Other new features include a FaceTime HD camera, twice the Wi-Fi performance when compared to previous iPad models and support for additional LTE carriers worldwide.[6]

323.          On October 23, 2012, Apple hosted a Special Event from San Jose, California to announce the Fourth Generation iPad.  The Special Event simply underscored the false representations about the device, and failed to disclose the Defects.

**iPad Mini**

324.          Simultaneous to the October 23, 2012 announced release of the fourth generation iPad, Apple also announced the all-new iPad mini.  The iPad mini debuted on iOS 6, "the world's most advance mobile operating system with over 200 new features."  The press release

---

6s exploding and catching fire.  Upon information and belief, Apple's throttling of the Devices may also have been out of fear of a massive recall akin to what its competitor, Samsung Electronics Co., Ltd undertook related to one of its phones in 2016 (the "Samsung Recall") due to consumer injuries related to lithium-ion batteries contained within their product.

[18] iOS 6 was first announced via an Apple press release issued on June 11, 2012 from San Francisco, California, promising that the update would introduce 200 new features.

---

CONSOLIDATED AMENDED COMPLAINT          117          NO. 5:18-MD-02827-EJD

contained the following representations, in pertinent part, concerning the iPad mini (with emphasis

added):

> [A] completely new iPad design that is ***23 percent thinner and 53 percent lighter*** than
> the third generation iPad. The new iPad mini features a stunning 7.9-inch Multi-Touch
> display . . . ***ultrafast*** wireless performance[1] and ***an incredible 10 hours of battery
> life***[]—every inch an iPad, yet in a revolutionary design you can hold in one hand . . .
> iPad mini is as thin as a pencil and as light as a pad of paper, yet packs a fast A5 child,
> FaceTime HD and 5 megapixel iSight cameras and ultrafast wireless—***all while
> delivering up to 10 hours of battery life*** . . . The dual-core ***A5 chip delivers responsive
> graphics and a fast,*** fluid Multi-Touch experience, while still providing all-day
> battery life . . . iPad mini features dual-band 802.11n Wi-Fi support for speeds up to
> 150 Mbps,[] which is twice the Wi-Fi performance compared to previous iPad
> models.[19]

## iPad Air

325.     On October 22, 2013, Apple issued a press release from San Francisco,

California, announcing the release of the iPad Air, which initially ran on iOS 7.  The release was

captioned as "Apple Announces iPad Air—Dramatically Thinner, Lighter & More Powerful iPad"

and included advertising statements (emphasis added) that the iPad Air is:

> [T]he latest generation of [Apple's] category defining device, featuring a stunning 9.7-
> inch Retina display in a ***new thinner and lighter design***, Precision-engineered to
> weigh just one pound, iPad Air is 20 percent ***thinner and 28 percent lighter*** than the
> fourth generation iPad, and with a narrower bezel the borders of iPad Air are
> ***dramatically thinner***—making content even more immersive . . . [The] iPad Air . . .
> ***delivers all-day battery life in the lightest full-sized tablet in the world*** . . . [T]he new
> ***power-efficient A7 chip*** allows the battery to be even smaller, helping reduce the
> overall volume by 24 percent from the previous generation while doubling its
> performance and maintaining its up to 10-hour battery life[1] . . . With up to twice the
> CPU and graphics performance on iPad Air . . . ***almost everything you do is faster
> and better*** than ever, from launching apps and editing photos to playing graphic-
> intensive games—all while delivering ***all-day battery life***.

---

[19] At Apple's Special Event, held on October 23, 2012 in San Jose, California, it was represented
by Apple's SVP Worldwide Marketing that: "[T]he new iPad Mini with Retina display is also
powered by this brand new A7 chip with its 64-bit architecture. This delivers a ***huge jump in
performance*** for iPad Mini up to ***four times*** faster at CPU tasks and up to ***eight times faster*** at
graphics tasks. You're going to feel performance across everything you do that's so fast. And still
that great ***all day 10-hour battery life.***"

P. Schiller SVP, Worldwide Marketing, Apple Special Event at 1:17:01-1:17:21 (Oct. 22, 2013)
*available at*: (https://www.youtube.com/watch?v=4FunXnJQxYU).

CONSOLIDATED AMENDED COMPLAINT          118          NO. 5:18-MD-02827-EJD

326.      Apple also conducted a Special Event on October 22, 2013. The Special Event simply underscored the false representations about the device and failed to disclose the Defects.[20]

### iPad Mini 2[21]

327.      On the same day as the release of the iPad Air, Apple also announced via press release from San Francisco, California the new iPad Mini with 7.9-inch Retina display, which similarly initially ran on iOS 7. Moreover, the press release stated, in pertinent part, that the new iPad Mini had "***the same amazingly thin and light design***," including that (emphasis added):

> [F]eature[s] the ***powerful and power-efficient*** Apple-designed A7 chip with 64-bit desktop-class architecture, ultrafast wireless with *faster* built-in Wi-Fi and expanded LTE cellular connectivity . . . 'It is so ***thin, light and powerful***, once you hold one in your hand you will understand what a tremendous advancement this is,' said Philip Schiller, Apple's senior vice president of Worldwide Marketing . . . [with] ***up to four times the CPU and eight times the graphic performance*** on iPad mini with Retina display, almost everything you do is ***faster and better than ever***, from launching apps and editing photos to playing graphic-intensive games—all while ***delivering all day battery life***.

---

[20]  For example, during the Special Event, Apple executive J. Ivie stated, in pertinent part (emphasis added) that:

> The new A7 chip is ***incredibly powerful***. And also, ***very power efficient***. Because of this efficiency, the ***battery could get smaller yet critically without any loss in battery life***. And of course, by reducing the battery size, the product became significantly lighter. We reduced the dimensions of the bezel with less mass. The iPad S still retains its structural rigidity. There's a simplicity to it, but there's nothing precious about it. This integrity, this durability inspires confidence in a product that's meant to be taken places, handled, and really used. With the iPad, we set out to redefine mobile computing. Up until now, 64-bit architecture is something you'd normally only find in desktop computers. The new Apple-designed A7 chip brings 64-bit technology. All of its advanced computing graphics to this ultra-portable, 1-pound device. But even with all of this added processing power, ***iPad Air still has an impressive 10-hour battery life***.

J. Ive, SVP of Design, Apple Special Event at 1:13:04 (Oct. 22, 2013) *available at*: https://www.youtube.com/watch?v=4FunXnJQxYU

[21] Initially, Apple called the iPad mini 2 the "iPad mini with Retina® display."

CONSOLIDATED AMENDED COMPLAINT          119          NO. 5:18-MD-02827-EJD

328.        On October 22, 2013, Apple also announced the release of the iPad Mini2 at the Special Event.  The Special Event simply underscored the false representations about the device and failed to disclose the Defects.[22]

### Update to Fourth Generation iPad

329.        On March 18, 2014, Apple announced through a press release from Cupertino, California that the "iPad with Retina display replaces iPad 2 as the most affordable 9.7-inch iPad."  The press release, titled "Apple Updates Most Affordable 9.7-inch iPad with Retina display, Improved Cameras & Enhanced Performance—Now Available Starting at $399" featured the iPad's (with emphasis added):

> [F]ast A6X chip, and 5MP iSight camera, offering a *dramatic upgrade in performance, power and value* compared to the iPad 2 it replaces,' said Philip Schiller, Apple's senior vice president of Worldwide Marketing.  The iPad line sets the gold-standard in mobile computing and all iPads have access to the largest and best ecosystem of more than 500,000 iPad optimized apps from the App Store.

### iPad Air 2

330.        The iPad Air 2 was introduced through a press release issued on October 16, 2014 from Cupertino, California.  The iPad Air 2 initially ran on iOS 8.1, and at the time of its release, it was advertised (emphasis added) as:

> [T]he *thinnest and most powerful* iPad ever. Now just 6.1 mm thin and weighing less than a pound, the iPad Air 2 features an improved Retina display for enhanced contrast and richer, more vibrant colors . . . [a] second generation 64-bit A8X chip, all-new iSight and FaceTime HD cameras, faster WiFi and LTE wireless, and includes the revolutionary Touch ID fingerprint identity sensor.  Engineered for unmatched portability and ease of use, iPad Air 2 offers a beautiful, precision unibody enclosure

---

[22]  For example, during the Special Event on October 22, 2013, Apple's SVP Worldwide Marketing (P. Schiller) also stated (emphasis added):

> And the new iPad Mini with Retina display is also powered by this brand new A7 chip with its 64-bit architecture. This delivers a *huge jump in performance* for iPad Mini up to four times faster at CPU tasks and up to *eight times faster* a graphics tasks. You're going to feel performance across everything you do that's *so fast*. And still that *great all day 10-hour battery life*.

P. Schiller SVP, Worldwide Marketing, Apple Special Event at 1:17:01-1:17:21 (Oct. 22, 2013) available at: (https://www.youtube.com/watch?v=4FunXnJQxYU).

of anodized aluminum for durability and a solid feel . . . the new Apple-designed A8X chip [ ] delivers a ***40 percent improvement in CPU performance and 2.5 times the graphic performance of iPad*** Air, while still delivers the up to ***10-hour battery life***[] users expect while working, playing games or surfing the web.

331.     The iPad Air 2 was also discussed at the October 16, 2014 Apple Special Event in Cupertino, California.  The Special Event simply underscored the false representations about the device and failed to disclose the Defects.[23]

### The iPad Mini 3

332.     Alongside the iPad Air 2, Apple introduced the iPad Mini 3 on October 16, 2014 in Cupertino, California via press release.  The iPad mini 3 similarly ran on iOS 8.1, but continued to feature a "stunning Retina display, amazing A7 chip, 5MP iSight camera, FaceTime HD camera and ultrafast wireless."  Upgrades to the iPad mini 3 included Touch ID "so users can unlock their iPad with just the touch of a finger and make purchases easily and securely within apps using Apple Pay.[1]"

### iPad Pro and iPad Mini4

333.     On September 9, 2015, Apple issued a press release from San Francisco, California, announcing the iPad Pro, which came with Apple's new iOS 9.  As stated in the release, in pertinent part (with emphasis added):

Apple today introduced the all-new iPad Pro, featuring a stunning 12.9-inch Retina display with 5.6 million pixels, the most ever in an iOS device, and groundbreaking performance with the new 64-bit A9X chip, rivaling most portable PCs. The new larger iPad Pro is ***thin and light*** and provides ***all-day battery life***.

\*     \*     \*

---

[23] During the Apple Special Event, P. Schiller, SVP of Worldwide Marketing at Apple stated:

Just look what the team is done the original iPad started with an A4 chip and now we're ***12X faster*** than that with iPad air 2. But check out this graphics performance we're now at a 180x faster. . . . And all this power in such a thin package the team has worked to ensure that you have that ***great all-day battery life 10 hours of battery*** so you don't have to give up any of that.

P. Schiller SVP, Worldwide Marketing, Apple Special Event at 45:01 (Oct. 16, 2014) *available at*: https://www.youtube.com/watch?v=sBfvJn-fpnc.

---

CONSOLIDATED AMENDED COMPLAINT          121          NO. 5:18-MD-02827-EJD

iPad Pro is the ***most advanced and powerful iPad*** . . . far and away the fastest iOS device we have ever made — its A9X chip beats most portable PCs in both CPU and graphics tasks, but is ***thin and light*** enough to hold all day . . .

*     *     *

iPad Pro delivers ***groundbreaking performance and energy efficiency, so you can tackle the most demanding tasks.*** Apple's powerful new 64-bit A9X chip, with third-generation 64-bit architecture, provides desktop-class CPU performance and console-class graphics. Ultra-fast wireless connectivity . . . . *All-day 10-hour battery life** delivers the efficiency that users have come to expect from iPad.

334.     On September 9, 2015, Apple hosted a Special Event from San Francisco, California to announce the release of the product, and reportedly the iPad Mini4 as well. The Special Event simply underscored the false representations about the devices and failed to disclose the Defects.

335.     Subsequent advertisements, focusing on the thinness and speed of the iPad Mini4, also failed to disclose the Defects.

There's more to mini than meets the eye. iPad mini 4 puts uncompromising performance and potential in your hand. It's thinner and lighter than ever before, yet powerful enough to help you take your ideas even further.



# Ridiculously light.
# Seriously thin.

iPad mini 4 puts everything you love about iPad into an incredibly sleek and portable design. So you can enjoy FaceTime calls with friends or get work done, wherever and whenever you want.

**9.7-Inch iPad Pro.**

336.          On March 21, 2016, from Cupertino, California, Apple issued a press release that introduced the all-new 9.7-inch iPad Pro, which initially ran on iOS 9.3 (with emphasis added).

> The new iPad Pro delivers ***incredible performance with the 64-bit A9X chip that rivals most portable PCs***, along with a four-speaker audio system that is twice as powerful[1] . . . 'iPad Pro is a new generation of iPad that is indispensable and immersive, enabling people to be more productive and more creative. It's ***incredibly fast, extremely portable*** . . .

*          *          *

> Pro Performance
>
> The new iPad Pro is just 6.1mm *thin* and weighs just under one pound, yet delivers ***groundbreaking performance***, connectivity and versatility so you can tackle the most demanding tasks wherever you go. The ***powerful A9X chip with third-generation 64-bit architecture provides performance that rivals many laptops and console-class graphics, while also delivering all day battery life.***[] Ultrafast wireless connectivity . . . .

337.          On March 21, 2016, Apple hosted a Special Event Keynote from Cupertino, California, to announce the 9.7-inch iPad Pro. The Special Event simply underscored the false representations about the device and failed to disclose the Defects. For example, during the Special Event, Apple's P. Schiller stated (emphasis added) that:

> iPad Pro changes the way people discover, capture, edit, design and produce. At the heart of its versatility is its performance. ***The A9X chip was designed specifically for iPad Pro to provide more power than most PCs in a thin, light, intuitive device you can take anywhere with you.*** The immersive iPad experience starts with its retina display. Each one is individually calibrated, so you always see vibrant color, contrast, and clarity.

**Fifth Generation iPad**[24]

338.          On March 21, 2017, Apple announced via press release from Cupertino, California it had "updated its most popular-sized iPad, featuring a brighter 9.7-inch Retina display

---

[24] The fifth generation iPad was introduced as the "9.7-inch iPad."

and best-in-class performance at its most affordable price ever."  The new iPad initially came with

iOS 10.  As stated by Apple in the press release (emphasis added), the iPad was:

> [d]esigned for unmatched portability and ease of use, along with ***incredible performance and all-day battery life***, iPad is the world's most popular tablet and primary computing device for millions of customers around the world . . . Philip Schiller, Apple's senior vice president of Worldwide Marketing[] [stated] 'New customers and anyone looking to upgrade will love this new iPad for use at home, in school, and for work, with its gorgeous Retina display, our ***powerful A9*** chip, and access to more than 1.3 million apps designed specifically for it.' . . . The Apple-designed A9 chip with 64-bit desktop-class architecture delivers ***fast processing and graphics performance*** for apps and games, ***while maintaining the same all-day battery life[1] customers have come to expect from iPad***.

### iPad Pro in 10.5-inch and 12.9-inch Models

339.    The iPad Pro in 10.5-inch and 12.9-inch models was announced in a press

release on June 5, 2017 from San Jose, California.  The all-new iPad Pro models were initially set

to be powered by iOS 11, which "will radically change what users can do with the iPad."  Apple

further advertised in the press release that the new iPad Pro models featured (with emphasis added):

> [T]he world's most advance display with ProMotion technology and incredible performance with the new A10X Fusion chip.  The new 10.5-inch model reduces the borders by nearly 40 percent to fit into an incredibly compact package that still weighs just one pound.  Combined with powerful new iPad features in iOS 11 coming this fall, like the all-new Files app, customizable Dock, ***improved multitasking*** and deeper integration of Apple Pencil, iPad Pro gives users the ability to be even more productive and creative.
>
> 'These are by far the ***most powerful*** iPads we've ever created . . .' said Greg Jaswiak, Apple's vice president of Product Marketing.
>
>       *      *      *
>
> Groundbreaking Performance Powered by A10X Fusion Chip
>
> iPad Pro delivers ***groundbreaking performance***, . . . The powerful new 64-bit A10X Fusion chip provides performance that is faster than most PC laptops shipping today, so tacking complex tasks like editing photos and 4k video, rendering 3D images or playing games feels effortless.  A six-core CPU and 12-core GPU deliver ***up to 30 percent faster CPU performance and 40 percent faster graphics performance than the industry-leading A9X chip, while delivering-all day battery life.***[]

340.    The iPad Pro model was also discussed at the June 2017 WWDC Keynote, held

at the San Jose McEnery Convention Center, with Apple executive Joswiak emphasizing that these

iPad Pro models have "amazing performance, again especially for devices so thin and light and a

---

CONSOLIDATED AMENDED COMPLAINT          124          NO. 5:18-MD-02827-EJD

1  simple one-pound package you can take with you everywhere you go. And what's also cool is,

2  *despite all this performance, the new iPad Pro still delivers the same all day 10-hour battery that*

3  *our iPad users love.*"[25]

4      341.      Moreover, on Apple's conference call with analysts to release financial

5  results for the third fiscal quarter of 2017, CEO Tim Cook exclaimed that "the all-new 10.5-inch

6  iPad Pro, launched in June, features the world's most advanced display with ProMotion technology

7  and is more powerful than most PC desktops."[26]

8                      **Sixth Generation iPad[27]**

9      342.      The sixth generation iPad was released on March 27, 2018, running on the

10  iOS11.3 software. In a press release from Chicago, Illinois, Apple announced the new iPad would

11  come with "Apple Pencil plus even greater performance, starting at $329." The announcement also

12  emphasized that:

13          The new iPad is more versatile and capable than ever, features a large Retina display,
14          the A10 Fusion chip and advanced sensors that help deliver immersive augmented
            reality, and provides unmatched portability, ease of use and all-day battery life.[]

15                          *      *      *

16          The new iPad features the Apple-designed A10 Fusion chip with 64-bit desktop-class
17          architecture, delivering 40 percent faster CPU and 50 percent faster graphics
            performance for seamless multitasking and graphics-intensive apps.[]

18
19      343.      On March 27, 2018, Apple hosted a Special Event from Chicago, Illinois, to

20  announce this iPad. The Special Event simply underscored the ongoing false representations about

21  the device and failed to disclose the Defects.

22

23      _____

24

25

26  [25] G. Joswiak 2017 WWDC Keynote at 1:43:44-1:43:52, available at:
    https://developer.apple.com/videos/play/wwdc2017/101/?time=6229 (emphasis added).

27  [26] T. Cook 2017 Q3 Earnings Call at 2.

28  [27] The Sixth Generation iPad is also known as "iPad 2018".

CONSOLIDATED AMENDED COMPLAINT        125        NO. 5:18-MD-02827-EJD

## IX.    APPLE'S MATERIALLY FALSE STATEMENTS AND OMISSIONS CONCERNING THE IOS SOFTWARE

344.    As admitted by Apple in its 2016 Form 10-K at 9: "The Company's financial condition and operating results depend substantially on the Company's ability to continually improve iOS and iOS devices in order to maintain their functional and design advantages."

345.    In line with Apple's admitted emphasis on iOS, the Company progressively issued numerous updates to iOS from the initial sale of each of the Devices and continuing through to the present date. As set forth herein, the first of the Devices, largely the iPads, ran on iOS6 when initially released. Going forward in time, each new iOS release promised even better features and performance, all material misstatements directed to the Class. The following outlines the various main versions of iOS released for one or more of the Devices since June 11, 2012. Major updates to iOS, such as iOS 6, 7, 8, 9, 10, 11 and 12, are generally announced by Apple via press releases and Special Event presentations.

346.    As further detailed above, it was Apple's constant release of these updates, each with new Features and requiring a further draw on the batteries and processor chips of the Devices to run that contributed to the Defects.

347.    With regard to the Devices at issue herein, Apple kicked off (for certain of the iPads) with iOS6.

348.    On June 11, 2012, Apple issued a press release from San Francisco, California, announcing that iOS 6 would be released in the Fall of 2012, and would introduce 200 new features.

349.    On January 28, 2013, Apple issued a press release from Cupertino, California, announcing, "Apple Updates iOS to 6.1.," and promising that users could experience "ultrafast wireless performance** to browse, download and stream content at blazing fast speeds." Moreover, it was represented that:

> iOS 6 is the world's most advanced mobile operating system, and with nearly 300 million iPhone, iPad and iPod touch devices on iOS 6 in just five months, it may be the most popular new version of an OS in history," said Philip Schiller, Apple's senior vice president of Worldwide Marketing. "iOS 6.1 brings LTE support to even more

CONSOLIDATED AMENDED COMPLAINT    126    NO. 5:18-MD-02827-EJD

markets around the world, so even more users can enjoy ultrafast Safari browsing . . .

*    *    *

Availability

iOS 6.1 is available as a free software update today. iOS 6.1 is compatible with iPhone 5, iPhone 4S, iPhone 4, iPhone 3GS, iPad (third and fourth generation), iPad mini, iPad 2 and iPod touch (fourth and fifth generation).

350.    On June 10, 2013, Apple unveiled iOS 7 through a press release from San Francisco, California. Apple represented iOS 7 as "the most significant iOS update since the original iPhone, featuring a stunning new user interface." Moreover, according to Jony Ive, Apple's senior vice president of Design, iOS 7 has "a profound and enduring beauty in simplicity, in clarity, in efficiency."

351.    On September 10, 2013, Apple issued a press release from Cupertino, California, announcing that iOS 7 would be available for the public to download on September 18, 2013 for "iPhone, iPad and iPod touch users as a free software update." The release represented that "iOS 7 has been engineered with deep technical and design integration with both the iPhone 5s and iPhone 5C" as:

Apple engineered iOS 7 to take full advantage of the advanced 64-bit technologies in iPhone 5s, including the native 64-bit kernel, libraries and drivers. Al the built-in apps have been re-engineered for 64-bit, and iOS 7 provides a seamless developer transition with Xcode support and the ability to run both 32-bit and 64-bit apps.

352.    On June 2, 2014, Apple issued a press release from San Francisco, California announcing the "unveiling" of iOS 8, stating, in pertinent part, that it provided a "simpler, faster and more intuitive user experience." Another press release on iOS 8 was released from Cupertino, California on September 9, 2014 reiterating this statement.

353.    Apple also featured iOS 8 during a June 15, 2015 Apple Special Event it hosted in San Francisco, California, wherein Craig Federighi, SVP, Software Engineering stated (with emphasis added):

Next, you guessed it, iOS. Now our current big release of iOS is iOS 8 and iOS 8 was a huge release with tons of new features for users and a phenomenal set of technologies . . . . So, we're now looking forward to iOS 9 and as we can see of what we wanted to accomplish, first and foremost, we wanted to elevate the foundations of the

CONSOLIDATED AMENDED COMPLAINT        127        NO. 5:18-MD-02827-EJD

platform.   Things like ***extending your battery life, improving performance*** and enhancing security to protect customer data.[28]

354.        On June 8, 2015, Apple issued a press release from San Francisco, California, announcing the "preview" of iOS 9.  The release stated, in pertinent part (emphasis added):

> iOS 9 makes the foundation of iOS even stronger with refinements including battery optimization that provides a typical user with an additional hour of battery life**, and a low-power mode to help further extend battery life.

355.        On the same day, June 8, 2016, at the Apple WWDC 2015 Keynote, Craig Federighi, SVP Software Engineering at Apple stated the following about iOS 9 (with emphasis added):

> Now with battery life, we focused on real-world use cases and ***optimized them***, and we're seeing *an* ***addition of one hour of typical use on a full charge on iPhone***. Now we know that for a lot if you're running low on power, you start searching all over for switches and turning off features in the hope of extending your battery life, a little bit further. Well now in iOS 9 we give you a single switch in what we call low-power mode.  It pulls levers that you didn't even know existed and is able to extend battery life for ***additional three hours of typical use on top of that additional hour.  It's really great.***[29]

356.        Then on September 9, 2016, Apple issued a press release from San Francisco, California, announcing that iOS 9 was available for download starting September 16, 2016.  Apple further represented iOS 9 as (emphasis added):

> [T]he world's most advanced mobile operating system, will be available on Wednesday, September 16 as a free update for iPhone, iPad and iPod touch users. iOS 9 makes iOS devices more intelligent and proactive with powerful search and improved Siri features, all while protecting users' privacy.
>
> The way you interact with iPad gets even better with iOS 9, thanks to new multitasking features . . . Built-in apps become more powerful . . .
>
> 'iOS 9 is packed with intelligence that makes every experience with iPhone and iPad

---

[28] C. Federighi, SVP, Software Engineering, Apple Special Event at 23:16-24:28 (June 15, 2015).

[29] C. Federighi, SVP, Software Engineering, Apple, Apple WWDC 2015 Keynote at 63:13-63:57 (emphasis added).

CONSOLIDATED AMENDED COMPLAINT          128          NO. 5:18-MD-02827-EJD

*even more powerful* — Siri can do more than ever and new proactive assistance helps you get more done before you ask, all while protecting users' privacy," said Craig Federighi, Apple's senior vice president of Software Engineering. "With iOS 9 we focused on strengthening the foundation of iOS with a deep focus on quality, and with the help of more than one million users who participated in our first ever public beta program, we're excited to release the best version of iOS yet.'

\*        \*        \*

iPad Experience

iOS 9 delivers new multitasking features designed specifically for iPad that allow you to do even more. . .

\*        \*        \*

This latest release makes the foundation of iOS even stronger with refinements including battery optimization that provides a typical user with an additional hour of battery life, and a low-power mode to further extend battery life.

357.        Notably, Apple developed it A9 chip and iOS 9 together "for *optimal performance where it matters most, in real world usage*."[30]

358.        On June 13, 2016, Apple issued a press release from San Francisco, California previewing iOS 10, "the biggest iOS release ever."  In iOS 10, Apple purported to make "accessing the information you need is easier and quicker than ever."  The release also featured "'beautifully redesigned apps for Music, Maps, and News that are more intuitive and more powerful, making everything you love about your iPhone and iPad even better,' said Craig Federighi, Apple's senior vice president of Software Engineering."  iOS 10 also "increase[ed] security and privacy with powerful technologies like Differential Privacy."

359.        On January 23, 2017, Apple issued a press release announcing the release of iOS 10.2.1.  Shortly thereafter, Apple caused the issuance of a notification to appear on the Devices advising that iOS 10.2.1 was available for installation.  As alleged herein, iOS 10.2.1 was designed by Apple to throttle the Devices, contrary to what Apple stated about the update.

360.        Apple represented as follows concerning the update on the Devices:

---

[30] Apple iPhone 6 Press Release (Sept. 9, 2015).

CONSOLIDATED AMENDED COMPLAINT        129        NO. 5:18-MD-02827-EJD

1
2
3
4
5
6
7
8
9

iOS 10.2.1
Apple Inc.
72.1 MB

iOS 10.2.1 includes bug fixes and improves the security of your
iPhone or iPad.

For information on the security content of Apple software
updates, please visit this website:
https://support.apple.com/en-gb/HT201222

10      361.      On September 18, 2017, Apple issued a press release announcing the availability

11  of iOS 11.  As stated in the release, in pertinent part:

12          Starting Tuesday, iPhone and iPad customers around the world will be able to update
            their devices to iOS 11, a major update to the world's most advanced mobile operating
13          system and the biggest software release ever for iPad.

14      362.      According to later reports by Apple at the 2018 WWDC: "iOS 11 supports

15  devices that were introduced as far back as 2013, like the iPhone 5S.  And we just love the way

16  customers race to update to our newest releases.  In fact, half of our customers upgraded to iOS 11

17  in just seven weeks.  It's incredible.  Now as we stand here today, 81 percent of our over a billion

18  active iOS devices are running our latest release."[31]

19
20
21
22
23
24
25
26
27

28  [31] C. Federighi 2018 WWDC Keynote at 10:59-11:44.

CONSOLIDATED AMENDED COMPLAINT          130          No. 5:18-MD-02827-EJD

363.    On December 2, 2017, Apple announced the release of iOS 11.2.0. Shortly thereafter, Apple caused the issuance of a notification to appear on the Devices advising that iOS 11.2.0 was available for installation. Apple represented as follows concerning the update:



**iOS 11.2**
Apple Inc.
430.7 MB

iOS 11.2 introduces Apple Pay Cash to send, request and receive money from friends and family with Apple Pay. This update also includes bug fixes and improvements.

For information on the security content of Apple software updates, please visit this website:
https://support.apple.com/en-gb/HT201222

364.    As alleged herein, iOS 11.2.0 was another update designed to throttle the Devices and exacerbate the Defects.

365.    Just weeks after the issuance of iOS 11.2.0, Apple was forced to issue the December 20 Admission, followed eight days later by the Apology. In a series of the Updates issues after 11.2.0 (including, but not limited to, 11.2.1, and the 11.3 and 11.4 series), Apple proceeded to attempt to cover its tracks and quell consumer ire, though failing to admit the Defects. Apple's latest software machination is iOS 12.

366.    On June 4, 2018, Apple issued a press release from San Jose, California, announcing iOS12, which stated that the update (emphasis added):

> [I]s designed to make everyday tasks on iPhone and iPad faster and more responsive with performance improvements across the system. Camera launches up to 70 percent faster, the keyboard appears up to 50 percent faster and typing is more responsive. ***Even when there is a lot going on across the system, apps can launch up to twice as fast***. From iPhone 5s, introduced in 2013, to the most advanced iPhone ever, iPhone X, iOS 12 brings performance improvements to more devices than any previous version.

367.        Apple also announced iOS 12 at the 2018 WWDC Keynote held at the San

Jose McEnery Convention Center (at 14:22-14:51) with Apple's Senior Vice President of Software

Engineering, Craig Federighi, stating in pertinent part (emphasis added):

> Well now on IOS 12, we're m*uch smarter.* **When we detect that you** need **a burst of**
> **performance, like when you begin scrolling or launching an app, we ramp up**
> **processor performance instantly to its highest states, delivering high performance**
> **and to ramp it down just as fast to preserve battery life. Now, these are just some of**
> **the improvements that are coming to not just our older devices, but the full range of**
> **devices, and that's a quick update on performance.**[32]

368.        Similarly, at the 2018 WWDC, Apple's Federighi represented that iOS 12

was intended to: "[D]eliver[ ] all of these features across such a wide range of devices while

maintaining high performance is a challenge we take really seriously, and so for iOS 12, we are

doubling down on performance.  We're working top to bottom making improvements, to make your

device faster and more responsive, and because we want these changes to be available to the full

range of our customers, iOS12 will be available on all the same devices as iOS 11.  This is the

largest base ever supported by an Apple release.  And we're focusing our efforts especially on the

oldest devices."[33]

369.        Apple's iOS12 remains part of its crisis public relations effort.  Apple continues

to conceal the Defects inherent in the Devices that caused the need for the Updates.  With the filing

of this action, consumers are now able to climb into the driver's seat to obtain full relief for the

damages they have suffered, and to prevent Apple's ongoing repetition of the misconduct.  As

highlighted in a recent media article "what most users have been asking for" is for the updates to

"focus on improving reliability and performance for the devices people already own."[34]  Apple

---

[32] 2018 WWDC Keynote at 14:22-14:51.

[33] 2018 WWDC Keynote at 12:09-12:58.

[34] Kof Leswing, "The new version of iOS is the strongest sign yet that Apple finally believes the customer is always right," *Business Insider* (June 27, 2018) (Available online at https://www.yahoo.com/finance/news/version-ios-strongest-sign-yet-183500270.html) ("For most people, there's only one feature in the latest version of IOS that matters: a big bump in performance.") (last checked June 27, 2018).

CONSOLIDATED AMENDED COMPLAINT          132          NO. 5:18-MD-02827-EJD

1    knew this was the focus of consumers from the outset—indeed it was the center of its marketing

2    plan—and yet it purposefully denied that to consumers by throttling the Devices without any

3    disclosure or authorization.

## X.    THE INHERENT DEFECTS IN THE DEVICES

5    370.    At all material times, Apple developed and sold Devices that contained an

6    inherent mismatch between battery performance and the operational needs of the Devices.

7    Although it is foreseeable that lithium-ion batteries degrade over time, Apple knowingly failed to

8    plan for the power requirements of its Devices during the normal life of the battery.

9    371.    On information and belief, this inadequate planning was the product of the

10    improper design of the batteries (such as their designed margin for degradation), the rated power

11    that Apple's iOS software demanded from the batteries, and/or a combination thereof (the

12    "Defects").  As a result of the Defects, the Devices were inadequate to meet the power needs of the

13    iOS system for the normal lifetime of a battery.

14    372.    And because Apple hermetically sealed the defective batteries within the

15    Devices, preventing consumers from easily replacing the batteries, the Defects caused even greater

16    harm.

### A.    Key Power Components of the Devices

18    373.    Apple's power mismatch stems in part from the premium Apple placed on

19    designing ever "thinner" Devices while nonetheless promising "faster" and "stronger" performance

20    with "long" battery life.  This design model places critical limitations on battery size.

21    374.    The exploded-view diagram below,[35] of an iPhone 7, shows how major

22    components are integrated into the device:

23

24    _____

25

26

27    [35] Adrian Diaconescu, "Preliminrya iphone 7 BOM Isout : cheapert o make than galazy S7, costlier
than iPhone 6s," Pocketnow (Sept. 21, 2016 (available at http://pocketnow.com/2016/09/21/iphone-
7-manufacturing-costs-galaxy-s7-iphone-6s).

28

CONSOLIDATED AMENDED COMPLAINT          133          NO. 5:18-MD-02827-EJD

Exhibit 1, Page 143



375.      The main printed circuit board (PCB), also called the main logic board, is nestled against the battery, as depicted in the image below, from an iPhone 6.  The integrated circuits and other small components comprising the main logic board are the "brain," so to speak, of the mobile device, and are responsible substantial power usage.[36]

---

[36] Q Novo, The Anatomy of an iPhone 6, https://qnovo.com/anatomy-of-an-iphone/ (last visited June 30, 2018).



376.    The back side of the logic board (depicted below) houses, among other things, two power management integrated circuits (called PMICs), a primary and a secondary one. The primary PMIC provides a number of critical functions such as providing voltage rails to the logic board as well as battery charging. This is also where the primary battery management functions tend to reside.[37]



---

[37] *Id.*

377.    Similarly, the main components of an iPad can be seen in this exploded view of an iPad Air:



378.    Apple was among the first companies to sell a smartphone with non-user replaceable lithium-ion batteries.  Indeed, "before the iPhone, cell phones without user-replaceable batteries were almost unheard of."[38]

379.    Apple chose to equip its Devices with a battery that is not replaceable by users.  Special skills and tools, including a pentalobe screwdriver, are required to replace the lithium-ion batteries in the Devices.  Apple also chose to not sell replacement batteries directly to consumers and instead requires consumers seeking a new battery to pay for the battery and battery installation by an Apple representative.

380.    Critically, the batteries used in the Devices require careful handling and packaging, and while rechargeable, there are limits to how often they can be recharged.  Lithium-ion batteries work on ion and electron movement between the positive and negative electrodes.  The

---

[38] Kyle Wiens, "Apple's Latest 'Innovation' is Turning Planned Obsolescence into Planned Failure," IFixit (Jan. 20, 2011) (available at https://www.ifixit.com/blog/2011/01/20/apples-latestinnovation-is-turning-planned-obsolescence-into-planned-failure).

CONSOLIDATED AMENDED COMPLAINT          136          NO. 5:18-MD-02827-EJD

1  primary measure of battery performance is capacity.  A lithium-ion battery's capacity is degraded

2  over time by discharge/recharge cycles, elevated temperatures, and aging.

3         381.     It is well known to smartphone manufacturers, including Apple, that lithium-ion

4  batteries degrade over time as the number of discharge/recharge cycles increases.

5         382.     Apple represents that its battery is "designed to retain up to 80% of its original

6  capacity at 500 complete charge cycles."[39]

7         383.     This representation, plainly designed to convey to consumers how long the

8  battery in their Device should continue to function well, is misleading.  It only tells half of the

9  story.  It may (or may not) be that Apple's batteries retain a certain "capacity" (i.e., how long they

10  could hold a charge before needing to be recharged) once they reach the age of 500 charge cycles,

11  but that says nothing about the rate at which they are able to deliver power at that point in their life.

12         384.     In actuality, Apple's batteries (as designed) degraded overly quickly, such that

13  they were incapable of delivering the power required to run the Devices during the normal life of a

14  lithium-ion battery.

15

16         **B.     Apple Compounded the Defects by Stressing Device Batteries With**

17              **Power-Hungry Software: iOS Updates**

18         385.     Apple's battery designs were also inadequate because they could not handle the

19  power demands of the software Apple mandated users to run.

20         386.     When Apple releases a new operating system, it pushes the software directly to

21  the customers' device through a red signal with a number in it that notifies users of the existence of

22  an available "software update."

23

24

25  _____

26

27  [39] Apple, Battery Service and Recycling, https://www.apple.com/batteries/service-and-recycling

28  (last visited June 1, 2018).

CONSOLIDATED AMENDED COMPLAINT          137          NO. 5:18-MD-02827-EJD



387.     Within minutes, device owners can click on the prompt and download the new operating system.

388.     It is very difficult, if not impossible, for typical Apple owners to avoid downloading an iOS update.  As one site explains:

> The bad news is there's no easy way to stop iOS from repeatedly throwing this alert at you....

> To encourage people to get on the latest version of iOS, Apple implemented a feature called Automatic Downloads.  This download updates in the background, and once it is downloaded, you are pushed to install it.  Apple typically installs the software update at night when the iPhone, or iPad, is plugged in and charging.[40]

---

[40] Lucy Hattersley, "How to Stop iOS Nagging You to Update to the Latest Version," MacWorld (July 6, 2016) (available at https://www.macworld.co.uk/how-to/iphone/how-stop-ios-nagging-you-update-latest-version-3641478). In this context, "jailbreaking" means to modify the iPhone to remove restrictions imposed by Apple and install apps not unauthorized by Apple. Navid Nield, "What is jailbreaking?" Tech Radar (June 6, 2016) (available at https://www.techradar.com/how-to/phone-and-communications/mobile-phones/what-is-jailbreaking-1322927).

389.     Turning off the updates and the daily push notifications requires users to delve deep into their settings or to forgo WiFi, which ordinary customers would not do.[41]

**C.     The Release of iOS 10 Was Secretly Designed to Camouflage the Defects**

390.     In the Fall of 2016, iPhone users reported increasing occurrences of sudden shutdowns of iPhones 5 and 6 running versions of iOS 10 software, including when their devices indicated that battery life was still at or above 30%. [42, 43]   As noted herein, even the inventor of the iPod, Tony Fadell, voiced concern about this problem, commenting that the battery on his own iPhone kept shutting down despite having a significant amount of charge left in it: "It's happening to me every other day-especially while using the mapping app. Have to always carry an external battery to revive it....  Issue with battery/shutdown algorithms?!"[44]

391.     As Apple was aware, and confirmed with the diagnostic information it obtained, the shutdown problem was the foreseeable consequence of a serious design defect in Apple's iPhones.  The speed for which Apple's products are known and marketed to consumers comes from powerful processing units which are supposed to perform calculations and render graphics on its smart-phones at top speeds.  As these processing units become faster and more powerful, however, they also require more power from the phone's battery.

392.     A further complication is that the impedance of lithium-ion batteries used in iPhones increases as the cells age, resulting in both a reduction in overall battery capacity and a reduction in the battery's ability to produce peak power output.[45]

---

[41] Hattersly, How to Stop iOS Nagging You, *supra*.

[42] Apple Discussion Thread, https://discussions.apple.com/message/30989226?start=165&tstart=0 (last visited June 30, 2018).

[43] Apple Discussion Thread,https://discussions.apple.com/message/30989226?start=165&tstart=0 (last visited June 30, 2018).

[44] Tony Fadell Twitter Comment, Dec. 1, 2016, https://twitter.com/tfadell/status/804232051595640833.

[45] Apple, iPhone Battery and Performance, https://support.apple.com/en-us/HT208387 (last visited June 30, 2018).

CONSOLIDATED AMENDED COMPLAINT          139          NO. 5:18-MD-02827-EJD

Exhibit 1, Page 149

393.    The amount of power that the processing unit requires during its daily operation varies: sometimes very little; sometimes a great deal; and the battery should be designed and capable of producing enough peak power to keep pace with even the processor's highest demands. A battery and processor must be designed such that even as the battery ages and loses performance, it will still be capable of meeting the processor's peak power demands for years to come.

394.    Electronics manufacturers like Apple are aware of this fact and thus must design batteries to be more powerful than they need to be so that as they grow weaker, they still have the ability to meet the processor's peak power demands.

395.    Apple's iPhone 6, for example, uses Apple's proprietary A8 System on a Chip ("SoC") as its processor.  This processor has low-power cores and high-power cores.  The low power cores perform most of the day-to-day functions of the iPhone, and the high-power cores handle more graphically intensive activities such as gaming, recording and editing video, running certain applications at other times.[46]

396.    When the high-power cores are active, they can draw peak power from the battery, which the battery should be capable of meeting for the lifetime of the smart-phone.[47]  But when the battery ages and is unable to deliver the peak power demanded by the phone's processor, the processor and phone switch off and will not turn on again until the phone is plugged into the wall.

397.    The shutdown problem iPhone users were experiencing in Fall 2016 thus resulted from a significant design defect:  the battery was not designed with enough power to meet

---

[46] See, e.g., Mike Wuerthele, "'A!1 Fusion' in iPhone X appears to be a six core processor, according to iOS 11 leak," Apple Insider (Sept. 10, 2017), https://appleinsider.com/articles/17/09/10/a11-fusion-in-iphone-x-appears-to-be-a-six-core-processor-according-to-ios-11-leak; Ryan Smith, "Analyzing Apple's A8 SoC: PowerVR GX6450 & More," AnandTech (Sept. 10, 2014), https://www.anandtech.com/show/8514/analyzing-apples-a8-soc-gx6650-more.

[47]    Reddit Thread, PSA: iPhone slow?  Try replacing your battery!, https://www.reddit.com/r/iphone/comments/7inu45/psa_iphone_slow_try_replacing_your_battery/.

1   the peak demands of the phone's processor as the battery aged.  The result was that iPhones worked

2   as expected when new, but even after a few months or years, began to cease functioning, i.e.,

3   switching off at random intervals, when the iPhone processor required too much power of its

4   flagging iPhone battery.

5        **D.    Apple Released iOS 10.2.1 To Further Conceal the Defects**

6        398.     After confirming this defect with the software diagnostics it surreptitiously

7   deployed in user's Devices, Apple could have been transparent with its millions of customers and

8   disclosed the defect.  Instead, Apple released iOS 10.2.1 on January 23, 2017 as a seemingly

9   routine update of its operating system.

10       399.     The alert to download iOS 10.2.1 stated that the update included "bug fixes" and

11   improvements in device security.  A depiction of the original iOS 10.2.1 notification on an iPhone

12   is set forth below:



400.      Sometime in February 2017, Apple added to its "Read Me" notes the following statement to be displayed on users' iPhones with the software upgrade:  iOS 10.2.1 "also improves power management during peak workloads to avoid unexpected shutdowns on iPhone."[48]

401.      On or about February 23, 2017, Apple issued a statement that "[w]ith iOS 10.2.1, Apple made improvements to reduce occurrences of unexpected shutdowns that a small number of users were experiencing with their iPhone."[49]

402.      Throughout 2017, however, Apple failed to inform customers that the "fix" to the shutdown problem in iOS 10.2.1 came with a significant – and undisclosed – tradeoff: the update artificially slowed down the processors in Apple's Devices.  The software change Apple introduced with iOS 10.2.1 concerns the "*powerd*" system, short for "power daemon," which controls CPU and GPU speed and power.[50]  In computer science parlance, Apple concealed within the iOS updates secret commands which "underclocked" the processors in the affected phones, causing them to perform calculations across the board at a slower rate than the hardware was capable of supporting, and slower than they had operated before the iOS updates.

403.      Running at a slower rate after the update, the processors in Apple's Devices would demand less power during peak operation. This diminished requirement for peak power would reduce and eliminate instances where the processor would outpace its battery, meaning that even in their weakened condition, the older batteries could supply enough peak power to meet the now reduced demands of the processors.  Although this "fix" would prevent outright shutdowns, it would slow the customers' product and would scale, meaning as the batteries continued to grow

---

[48] Apple Support, Download iOS 10.0-10.3.3 Information, https://support.apple.com/kb/dl1893?locale=en_US; *see also* February 2, 2018 Letter from Cynthia Hogan to Committee on Energy & Commerce, U.S. House of Representatives.

[49] Matthew Panzarino, "Apple says iOS 10.2.1 has reduced unexpected iPhone 6s shutdown issues by 80%," Tech Crunch (Feb. 23, 2017), https://techcrunch.com/2017/02/23/apple-says-ios-10-2-1-has-reduced-unexpected-iphone-6s-shutdown-issues-by-80/.

[50] Michael Potuck, "Geekbench developer links iPhone performance issues to battery age and iOS updates," 9 to 5 Mac (Dec. 18, 2017), http://9to5mac.com/2017/12/18/iphone-battery-performance-issues/.

weaker, the fix would continue to slow the processors so that demand never outpaced available power.[51]

404.    Neither the software update notification nor the software update release notes made any mention of this severe throttling effect.  Apple concealed the problem; Apple concealed the solution; and Apple concealed that its solution would slow its customers' products.

405.    Users of Apple devices immediately began reporting reduced functionality, but there was no way for ordinary consumers to quantify these inklings or give them credence.

406.    As detailed herein, Apple had to continue releasing the "throttling" software in future versions of its iOS as new Devices went to market.  On September 19, 2017, Apple released iOS 11.  Immediately upon downloading iOS 11, existing Apple iPhone and iPad users began to experience a marked decrease in battery life on their Devices.

407.    One study of thousands of iPhone users within a monitored network compared the relative battery life of existing iPhones operating on iOS 10 versus iOS 11.  The chart below shows the rate at which an iPhone with a fully charged battery lost battery power:[52]



---

[51] Reddit Thread, PSA: iPhone slow?  Try replacing your battery!, *supra*.

[52] Liarna LA Porta, "iPhone users charged up over iOS 11 battery drain," Wander (Sept. 21, 2017), https://wandera.com/blog/ios-11-battery-drain/.

408.    This study revealed that existing iPhones operating on the iOS 10 software on average drained to 0% battery after 240 minutes (4 hours), whereas those operating on iOS 11 on average drained to 0% battery after only 96 minutes (just over 1½ hours).  In other words, iOS 11 reduced the average iPhone's battery life by more than 60%.  The study demonstrates the substantially increased power demands that Apple foist upon users' Devices through its iOS update.

### E.    The Defects in Apple's Devices, and the Impact of Throttling, Is Evidenced by Independent Analysis

409.    As set forth above, on December 9, 2017, a Reddit user by the handle "TeckFire" posted online benchmarks (measurements of the speed with which a phone's processor performs its computations) of his iPhone 6 operating on its old battery, and again after he had replaced it with a new battery. The iPhone's processor's speed had remarkably increased over 50%.  This was incongruous: a new battery alone should not have had any impact on the processor speed.[53]

410.    Then on December 18, 2017, spurred by the ensuing discussion from TeckFire's post, John Poole, a software engineer at Primate Labs, published a report based on an analysis of 100,000 iPhones and concluding that the decrease in performance of the affected iPhones was caused by the iOS 10.2.1 and iOS 11.2 updates, and not the normal decreased function that would be caused by an aging battery.[54]

411.    Poole's analysis, which measures computer processing benchmarks, showed that after updating an iPhone 6s to an iOS 11, there were more "cluster points" where performance would slow down.  The chart below shows phone performance before and after iOS updates that use a "throttling" program.  Ordinarily, operations run smoothly until the battery dies.  The "power management" update bottled up user performance at several points to limit the taxing of the battery:

---

[53] Reddit Thread, PSA: iPhone slow?  Try replacing your battery!, *supra*.

[54] John Poole, "iPhone Performance and Battery Age," Primate Labs (Dec. 18, 2017) (available at https://www.geekbench.com/blog/2017/12/iphone-performance-and-battery-age/). *See also* Exhibit 4 (Testimony of John Poole to House of Commons Standing Committee on Industry, Science, and Technology.

CONSOLIDATED AMENDED COMPLAINT          144          NO. 5:18-MD-02827-EJD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



412.     As Poole explained, "where the peaks happen represents the cluster of phones running at that particular performance level.  And the height of the peaks (in blue) represents the relative frequency of benchmarks being performed at that performance level."  This translates to a real loss of performance.   For example, "the iPhone 6s is slowed down by nearly 60%."  This "effectively turns the device's performance into that of a device 1-2 generations older."[55]

413.     A processor's speed is set, in part, by its clock speed which is measured in Hertz (Hz); the faster a processor is clocked, the faster a processor will normally perform tasks.  For example, Apple advertises the iPhone 6 as having a processor speed of 1.4 GHz.[56]  But benchmark tests run by iPhone 6 users following the iOS 10.2.1 update revealed a processor speed of 600MHz;[57] *less than half as fast as Apple advertises*.[58]

414.     As noted above, on December 20, 2017, Apple admitted to journalists that the iOS 10.2.1 and iOS 11 software updates included a throttling "feature" to slow down older iPhone models.

415.     Attempting to deflect attention from its misdeed, in connection with its December 2017 "revelations" it also asserted: "We now believe that another contributor to these user experiences is the continued chemical aging of the batteries in older iPhone 6 and iPhone 6s devices, many of which are still running on their original batteries."[59]

416.     Other smart phone manufacturers, however, use similar lithium-ion batteries and have not experienced the same problems or resorted to throttling their phones' performance.

---

[55] Paulo Santos, "Apple: All You Wanted to Know on the iPhone Throttling Scandal," Seeking Alpha (Dec. 26, 2017), (available at https://seekingalpha.com/article/4133931-apple-wanted-know-iphone-throttling-scandal).

[56] 1.4 GHz = 1,400,000,000 Hz.

[57] 600 MHz = 600,000,000 Hz.

[58] Tom Warren and Nick Statt, "Apple confirms iPhones with older batteries will take hits in performance," The Verge (Dec. 20, 2017) (available at https://www.theverge.com/2017/12/20/16800058/apple-iphone-slow-fix-battery-life-capacity).

[59] Apple website, "A Message to Our Customers about iPhone Batteries and Performance," dated December 28, 2017, available at: https://www.apple.com/iphone-battery-and-performance/.

CONSOLIDATED AMENDED COMPLAINT          146          NO. 5:18-MD-02827-EJD

1  Samsung, for example, guarantees its Galaxy S7 and Note & lithium-ion batteries will retain 95%

2  of their capacity for at least two years; likewise, LG and Google warranty their smart phones'

3  batteries for two years.  Apple's warranty is shorter:

> Your battery is designed to retain up to 80% of its original capacity at 500 complete charge cycles.  The one-year warranty includes service coverage for a defective battery.  If it is out of warranty, Apple offers a battery service for $79, plus $6.95 shipping, subject to local tax.[60]

7  417.    Apple has failed to address, or deny, the fact that it never asked its purchasers for

8  their authorization to slow down their devices, nor inform them of this change.[61]  As a result,

9  Plaintiffs and other Class members were not notified when the power management technique was

10  taking effect and were deceived into thinking that their devices were no longer capable of providing

11  an adequate level of performance.  Furthermore, they were not informed of Apple's own misgivings

12  about the ability of its batteries to deliver on Apple's representations.

13  **XI.    APPLE'S REVENUES DEPEND ON SELLING NEW DEVICES, AND THE**

14  **"UPGRADE" FINANCIAL MODEL WAS CRITICALLY FAILING IN 2016-2017**

15  418.    As set forth above, Plaintiffs and the Class need not plead Apple's motive for

16  deceit.  While the discovery process will be used to hone the reasons for Apple's malfeasance, it is

17  apparent that Apple was and is financially dependent on selling new versions of the Devices.  Some

18  have even raised concerns that Apple engages in a "planned obsolescence" scheme to send

19  consumers rushing to upgrade their Devices.  Under any scenario, Apple's conduct was unlawful

20  and fraudulent, and also unfair to consumers by causing them to believe their Devices were failing.

---

[60] Apple, Battery Service and Recycling, https://www.apple.com/batteries/service-and-recycling/ (last visited June 30, 2018).  The iPad battery warranty is also one year, Apple warrants that "Your battery is designed to retain up to 80% of its original capacity at 1000 complete charge cycles."

[61] Apple website, "A Message to Our Customers about iPhone Batteries and Performance," dated December 28, 2017, available at: https://www.apple.com/iphone-battery-and-performance/.  See also Apple Maximizing Battery Performance Website, https://www.apple.com/batteries/maximizing-performance/ (last visited December 21, 2017) (emphasis added).

CONSOLIDATED AMENDED COMPLAINT          147          NO. 5:18-MD-02827-EJD

Exhibit 1, Page 157

419.     As detailed in the chart below, sales of the Devices comprised the bulk of Apple's total sales from at least fiscal year ("FY") 2013-2017,[62] and continuing thru the latest Form 10-Q's filed by the Company for FY 2018:[63]



420.     In April 2016, news of the pending financial woes Apple faced from declining iPhone sales hit the news media.  On April 27, 2016, Apple filed its Form 10-Q for the quarterly fiscal period ending March 26, 2016 ("2Q16") reporting that, for the first time since Apple began selling iPhones in 2007, the company sold fewer iPhones than it had sold in the same quarter the previous year (*i.e.* the second fiscal quarter of 2015, or "2Q15").[64]  iPhone sales were down 16% in

_____

[62] Data in this chart is dervied from Apple's Form 10-K Annual Reports filed with the SEC for the fiscal years ending 2013-2017.   Apple's fiscal year ends on the 52- or 53-week period that ends on the last Saturday of September in a given calendar year.  Apple historically also counted on ramped up sales just prior to the holiday season when it released the "latest and greatest" iPhone just before its fiscal year end.  This trick worked for Apple in both 2012 and 2014, where the Company enjoyed unit sales jumps of 29% and 46%, respectively, when a "radically new" iPhone was released (iPhone 5 released September 21, 2012) and (iPhones 6 and 6 Plus released September 19, 2014).

[63] Fiscal year 2018 ("FY 2018") cumulative sales of the Devices, as a percentage of Apple's overall revenue, is 66.6% for iPhones and 6.6% for iPads.  *See* Reports on Form 10-Q filed by Apple for the quarterly periods ended December 30, 2017 ("1Q18") and March 31, 2018 ("2Q18").

[64]     *See* Apple Form 10-Q for 2Q16 filed April 27, 2016 at 25.  *See also* Brian Barrett, "Apple's iPhone Sales Just Fell for the First Time—It Won't Be the Last," *Wired* (April 26, 2016) (citing

CONSOLIDATED AMENDED COMPLAINT     148     NO. 5:18-MD-02827-EJD

2Q16 from 2Q15.  Indeed, the 2Q16 Form 10-Q reflects that Apple's unit sales in *each* major product line had declined from 2Q15—iPad declined by 19% and Mac by 12%.

421.    On July 27, 2016, Apple filed its Form 10-Q for the quarterly fiscal period ended June 25, 2016 (the "3Q16 Form 10Q").  The 3Q16 Form 10Q (at 24-25) also reported an ongoing decline of unit sales across iPhone (15%) and iPad (9%), as compared to the third fiscal quarter of 2015 ("3Q15").

422.    These downward unit sales trends ultimately caused Apple to report an annual sales decline for the first time since 2001.[65]

423.    As admitted by Apple in its Annual Report on Form 10-K for the fiscal year ended September 24, 2016, filed with the SEC on October 26, 2016 (the "2016 Form 10-K"), iPhones suffered an 8% decline over fiscal year 2015 ("FY15") unit sales:

> iPhone net sales decreased during 2016 compared to 2015. The Company believes the sales decline was due primarily to a lower rate of iPhone upgrades during 2016 compared to 2015 and challenging macroeconomic conditions in a number of major markets in 2016.

424.    With regard to iPads, which suffered a 17% decline over FY15 unit sales, the 2016 Form 10-K stated:

> iPad net sales decreased during 2016 compared to 2015 primarily due to lower unit sales and the effect of weakness in most foreign currencies relative to the U.S. dollar, partially offset by higher ASPs due to a shift in mix to higher-priced iPads.  The Company believes the decline in iPad sales is due in part to a longer repurchase cycle for iPads and some level of cannibalization from the Company's other products.

425.    By the Fall of 2016, the smartphone industry was facing slowing growth due to a stagnating market with more consumers "holding onto their smartphones longer" and waiting to

---

both 16% drop in 2Q16 and 32% drop from 4Q15), https://www.wired.com/2016/04/iphone-sales-decline/.  The iPhone is "so critical to Apple's balance sheet that its fall led to a *13 percent* drop in the company's revenue." *Id*. (emphasis added). And although Apple still saw room for growth in China, analysts observed that "Apple's not going to double their sales anymore." *Id.*

[65] *See* Seth Fiegerman, "Apple's annual sales fall for first time since 2001," *CNN Money* (Oct. 25, 2016), http://money.cnn.com/2016/10/25/technology/apple-earnings-decline/index.html.

CONSOLIDATED AMENDED COMPLAINT          149          NO. 5:18-MD-02827-EJD

1   upgrade their devices.  Worse yet, growth in the market was predicted to come from international

2   markets favoring lower priced devices from Android vendors, as opposed to the premium

3   smartphone prices demanded by Apple.[66]

4       426.     In addition, in late 2016, Apple was reportedly experiencing increased

5   competition in the "smartphone" market. Competitors were ramping up their own versions of

6   smartphones at the end of 2016, just before the Updates were issued.  For example, in October

7   2016, Google was launching its smartphone, known as the "Pixel."  As reported in an October 25,

8   2016 online article published by Rupert Neate on theguardian.com, entitled, "Apple's annual profits

9   fall for first time in 15 years as iPhone sales decline":

10
11         The iPhone, which first launched in June 2007, has transformed the telecoms industry
          but Apple is now facing more intense competition from the likes of Google, which last
          week released its first branded smartphone, the Pixel, and upstart rivals offering much
12         cheaper smartphone devices in key markets such as China.[67]

13       427.     Therefore, Apple was in a crunch to find ways to increase sales (*i.e.*, consumers

14   upgrading to buy new versions of the Devices)—and avoid a recall like Samsung — just at the time

15   it was forced to launch the Updates to mask the Defects.[68]

16
17
18

---

19   [66] *See, e.g.*, Elad Nathanson, "2016: A Pivotal For The Smartphone Industry," *Forbes* (Sept. 12,
2016), https://www.forbes.com/sites/eladnatanson/2016/09/12/2016-a-pivotal-year-for-the-
20   smartphone-industry/#7b516c68386e.  In addition, between late 2016 and early 2017, third-party
vendors phased out two-year service contracts where consumers could buy the newest iPhone for a
21   bargain price.  *See, e.g.*, Aaron Pressman, "The Death of the $199 iPhone Marks A New Era for
Wireless," *Fortune* (Jan. 11, 2017), http://fortune.com/2017/01/11/death-of-the-199-iphone-
22   wireless-subsidy (discussing how the end of two-year service contracts with lower pricing on new
phones was a factor in changing consumer purchasing patterns toward maintaining phones longer).

23   [67] *See* Rupert Neate, "Apple's annual profits fall for first time in 15 years as iPhone sales decline,"
*The Guardian* (Oct. 25, 2016), https://www.theguardian.com/technology/2016/oct/25/apple-profits-
24   sales-decline-2016-iphone-7 (last visited July 2, 2018).

25   [68] *See* Associated Press, "Sales of iPhones decline, but Apple predicts a better-than-expected
holiday season," *Los Angeles Times* (Oct. 25, 2016), http://www.latimes.com/business/la-fi-tn-
26   apple-earns-20161025-snap-story.html ("After stumbling in 2016, Apple is betting on a better year
ahead. The Silicon Valley tech giant is forecasting a return to growth in iPhone sales this winter
27   after a rare slump that depressed Apple's revenue and stock performance over the last three quarters.
Apple has been struggling with shrinking demand for its signature products at a time when analysts
28   say it is increasingly difficult for tech companies to come up with dramatically new features.  Many

CONSOLIDATED AMENDED COMPLAINT     150     No. 5:18-MD-02827-EJD

428.    Apple's conduct, described herein, was intentionally deceptive and, separately, was malicious in that it was intended to cause economic injury to Plaintiffs and the Class. On information and belief based on the course of conduct described above, one or more of Apple's officers, directors or managing agents authorized or ratified Apple's misconduct.

## XII.    RELATED CASES AND PROCEEDINGS

### A.    United States – California State Court

429.    There are currently four related class actions pending in California state courts. Two of them – *Rosalia v. Apple, Inc*., CGC-18-564832 (San Francisco) and *Tandel v. Apple, Inc*., 17CIV05874 (San Mateo) – are being coordinated under C.C.P. § 404.1, and Judge Karnow recommended pursuant to CRC 3.530 that the Judicial Council assign a trial judge in San Francisco. *See* Apple OS Cases, Proceeding No. 4976, Order Dated June 26, 2018.  The other two cases are not yet formally coordinated – *Santino v. Apple, Inc*., BC690396 (Los Angeles) and *Krueger v. Apple Inc*., 18CV329447 (Santa Clara), but Judge Karnow noted both in his Order Dated June 26, 2018 and said "the parties should consider a stipulated order adding on other cases." *Id*. at 1, n.1. Apple moved to stay proceedings in the lead case (*Rosalia*) "pending the outcome of the parallel federal litigation" but Judge Karnow deferred ruling at least until the Judicial Counsel assigns a coordination trial judge.

### B.    United States – Federal Cases Not Consolidated

430.    Three federal cases have not yet been consolidated with the MDL.  Two are *pro se* cases, one pending in New York and one recently transferred to the Northern District of California by the JPML and related to the MDL, but not yet consolidated.  *See Oliver v. Apple Inc*, 5:18-MD-3638-EJD (N.D. Cal.); *see also* JMPL Conditional Transfer Order No. 4 [*Oliver* ECF No. 11].  The third case (*Donahoe v. Apple, Inc*., 1:18-cv-0763 (N.D. Ohio)) is a class action asserted on behalf of Ohio residents, and the plaintiff's motion to vacate the JPML's conditional transfer order

---

consumers are holding on to their old smartphones and PCs for longer, seeing little reason to buy a new model that's only slightly better.").

CONSOLIDATED AMENDED COMPLAINT              151              NO. 5:18-MD-02827-EJD

1  no. 2 has been assigned to the July 26, 2018 Panel meeting in Santa Fe, New Mexico.  The matter

2  has been designated for consideration without oral argument.

3  **C.    United States – Congressional and Senate Proceedings**

4  431.    On January 12, 2018, the United States House of Representatives Committee on

5  Energy and Commerce wrote a letter to Apple CEO Tim Cook requesting responses to 13

6  questions.  *See* Exhibit 1.  On February 2, 2018, Apple responded by letter.  *See* Exhibit 2.  It is not

7  clear whether the investigation is continuing because the previous day, February 1, 2018, following

8  reports of related investigations at the Department of Justice and Securities and Exchange

9  Commission (*see* below, Section V.D.), two members of Congress (Rep. Robin Kelly of Illinois and

10  Emanuel Cleaver II of Missouri) not directly involved in the House investigation said that "we

11  don't know what will come of the DOJ and SEC probes" and suggested that further House action

12  would await word from the DOJ and SEC.

13  432.    On January 10, 2018, the United States Senate Committee on Commerce,

14  Science & Transportation launched an investigation of the Defect and the Update.  Chairman Sen.

15  John Thune sent a letter to Apple CEO Tim Cook posing eight questions, and during an interview

16  with CNBC said:

17

18  They [Apple] just acknowledged after the holidays that this is actually happening, which is
    an admission that we think is long overdue but that being the case, we at least now want to

19  find out what they are doing to inform consumers. The fact remains there are a lot of
    unanswered questions about this practice and obviously I think consumers have a right to

20  know and so we're going to make sure that Apple is forthcoming and responsive and we'll
    take additional steps as necessary.

21

22  On February 2, 2018, Apple responded to Sen. Thune's letter, and promised to update the

23  Committee.  *See* Exhibit 3.  The investigation in ongoing.

24  **D.    United States – Federal Regulatory Proceedings**

25  433.    On January 30, 2018, Bloomberg News reported that both the Securities and

26  Exchange Commission and the Department of Justice were independently investigating Apple for

27  how it disclosed information related to the Updates.  The agencies have demanded documents and

28

---

CONSOLIDATED AMENDED COMPLAINT          152          NO. 5:18-MD-02827-EJD

information, according to anonymous sources who spoke to Bloomberg News.  Although the agencies declined to comment to the reports, Apple confirmed both investigations, said "we have received questions from some government agencies and we are responding to them."

**E.     Canada – Regulatory Proceedings**

434.     On March 1, 2018, the Standing Committee on Industry, Science and Technology in the Canadian House of Commons held hearings on the Defect and Updates.  A transcript of the hearing appears as Exhibit 4 to this Complaint.  Those providing testimony included a representative of the Canadian Competition Bureau (Ms. Alexa Gendron-O'Donnell), who confirmed that her office is investigating Apple related to the Defect and the Update, and that she has the ability to participate in information-sharing with investigators in the United States, France, Israel and South Korea.

435.     Importantly, when Nathaniel Erskine-Smith (Member of Parliament for Beaches-East York) asked Apple to disclose internal communications, opinions or advice given to Apple Canada or Apple Inc. regarding whether the Defect should be made public, Apple's representative refused:  "I'm not going to make that undertaking . . . If the committee wants to make a direction about things, we'll reconsider. But the fact is, as people here know, Apple is exposed to a number of class actions in the United States."  Member of Parliament Brian Masse, who pushed for the committee to study the issue, said the reason for his push "was about Canada responding to a problem that is obviously international."

**F.     Canada – Litigation**

436.     On February 23, 2018, plaintiff Cherif Saleh filed a statement of claim in the Ontario Superior Court of Justice against Apple Inc. and Apple Canada Inc. alleging eight common law and statutory counts and seeking damages and punitive damages on behalf of a class of Canadian citizens, excluding Quebec, related to the Defect and the Software Updates.   On March 2, 2018, plaintiff Antonio Gaudio filed a similar statement of claim against Apple, Inc. and Apple Canada, Inc. in the Ontario Superior Court on behalf of a class that includes all persons, corporations, and other entities in Canada, excluding residents of Quebec, who purchased a Device.

---

CONSOLIDATED AMENDED COMPLAINT          153          NO. 5:18-MD-02827-EJD

Exhibit 1, Page 163

The plaintiffs in both cases have agreed to cooperate with each other and have temporarily agreed to hold the action in abeyance in favor of MDL 2827 and are willing to discuss having the Canadian court officially stay the actions in favor of MDL 2827 if the stay would comport with the principles of the cross-border notice protocols set forth by the American Bar Association in August 2011.

### G.     Canada – Litigation – Quebec

437.     On December 29, 2017, Plaintiff Raphael Badaoui filed a class action in Quebec Superior Court (District of Montreal) against Apple Canada Inc. and Apple Inc., Case No. 500-06-000897-179.  The plaintiff is seeking class action status on behalf of all consumers in Quebec who purchased certain Apple Devices and were injured as a result of the Defect and the Updates.  The case is pending.

### H.     Israel – Regulatory Proceedings

438.     On April 9, 2018, the Israeli Consumer Protection and Fair Trade Authority (part of the Economy Ministry) announced that it launched an investigation into Apple for possible breaches of duty to users to disclose that the Updates would slow the performance of certain model iPhones.  Rony Friedman, CEO of Apple Israel, was questioned in a private session about whether Apple provided "essential" information on the true purpose and effect of the Software Updates. The investigation continues.

### I.     Israel – Litigation

439.     Five class actions have been filed against Apple in Israel. A hearing was held at the district court in Tel Aviv on April 10, 2018, in which it was agreed that all five class actions will be consolidated and an amended motion for class action would be filed within 90 days (in Israel, the motion for class action precedes the motion to dismiss).  As written in the court's decision, the reason for 90 days is to follow after the consolidated amended complaint in the United States.  Lead counsel have been appointed by the Court and have conferred with Lead Counsel in the United States.  Israeli counsel are now preparing the amended and consolidated motion.

**J.      France – Criminal Proceedings**

440.      On December 27, 2018, an environmental group called HOP ("Halte à l'Obsolescence Programmée" or "Stop the Programmed Obsolescence") filed a complaint with the Prosecutor of the French Republic asserting counts under Article L. 441-2 of the French Consumer Code (planned obsolescence) and Article L. 441-1 of the Consumer Code (deception) against Apple France.  Article L. 441-2 prohibits "the practice of planned obsolescence that is defined by the use of techniques by which the head of the marketing of a product is to deliberately reduce the life span to increase the replacement rate."  HOP alleged that Apple's purposefully slowdown of iPhones via the Updates was done deliberately in violation of the Consumer Code, which is a <u>criminal</u> offense.  According to French media, prosecutors accepted the complaint and opened a formal probe on January 5, 2018.

**K.      Italy – Regulatory Proceedings**

441.      On January 18, 2018, Italy's antitrust enforcer (the Autorit Garante della Concorrenza e del Mercato) ("AGCM") announced that it launched an investigation into consumer complaints that Apple was purposefully slowing certain Devices after software updates in order to force Italian citizens to buy news ones, based on faked obsolescence.  The AGCM claims that if the behavior were proven, it would violate Articles 20, 21, 22 and 24 of the consumer code.  The investigation is continuing.

**L.      China – Regulatory Proceedings**

442.      On January 15, 2018, the Xinhua state news agency reported that the Shanghai Consumer Council wrote to Apple asking it to explain the reports of the Device Defects and slowing caused by the Updates.  The Council said it received almost three times as many complaints about Apple products in 2017 compared to just two years prior.  The investigation is continuing.

**M.      Russia – Litigation**

443.      Starting in January, 2018, individual lawsuits were filed against Apple in the Tverskoy (Moscow district) court, led by legal services firm Lex Borealis in Moscow.  Legal

---

1    funding is reportedly being provided by NLF Group. Attorneys at Lex Borealis said in a joint

2    statement with NLF Group that in addition to the early suits filed, they were handling "at least

3    several hundred" claims running into "several tens of millions of rubles." Although the actions

4    started in Moscow, counsel for the early claimants said they would consider similar litigation in the

5    provinces.

6    **N.    South Korea – Litigation**

7    444.    In March 2018, an opt-in class action suit on behalf of more than 60,000 named

8    plaintiffs was filed in Seoul against Apple Inc. and its Korean subsidiary in the Seoul Central

9    District Court, alleging purposeful Device degradation. It set a record for the most number of

10    plaintiffs in a single lawsuit. It followed two earlier suits by a consumer advocacy group called

11    Citizens United for Consumer Sovereignty brought on behalf of 401 plaintiffs and 122 plaintiffs,

12    respectively. The plaintiffs are seeking compensation damages on behalf of those customers who

13    opt in (out of approximately 10 million Korean buyers of certain Apple Devices), and lead counsel

14    in the action reported to the press that they are watching the U.S. litigation closely.

15    **O.    South Korea – Regulatory Proceedings**

16    445.    Following a complaint made by Seoul-based Citizens United for Consumer

17    Sovereignty (the same group discussed above) against Apple CEO Tim Cook and the head of

18    Apple's Korean subsidiary, the Seoul Central District Prosecutors Office opened a formal probe

19    with its intellectual property crime unit. The CUCS claimed that Apple deliberately slowed older

20    model iPhones in order to push Apple customers towards newer, more expensive modes of the

21    company's phones as part of a planned obsolescence strategy. The probe is continuing.

22    **XIII.    APPLE'S SOFTWARE LICENSE AGREEMENTS**

23    446.    In order to use any Device sold by Apple, consumers must use Apple's

24    proprietary iOS, which provides the code by which the Devices are operated. Without the iOS, the

25    Devices do not work as they are intended.

26

27

28

CONSOLIDATED AMENDED COMPLAINT          156          No. 5:18-MD-02827-EJD

447.    Apple claims that Device users agree to be bound by the iOS Software License Agreement by using their Devices or downloading software updates[69]  Although the iOS Software License Agreements differ slightly based upon country in which the Device was sold and by version of iOS, the material terms are the same, and—with the exception of the United Kingdom and as previously described herein—provide that California law governs the agreement.

448.    Consumers do not have a choice in selecting software for use on their Devices other than choosing the timing of a software upgrade; that is, consumers must use Apple's operating system if they do not want to risk voiding the warranties that are provided with the sale of any Device.

449.    Accordingly, consumers must use Apple's operating system, ostensibly subject to the terms of the iOS Software License Agreement, to use their Devices.  The iOS Software License Agreement is thus part of the benefit of Plaintiffs' and class members' bargains when purchasing Devices to the extent they apply.

450.    Because of this, to the extent they apply, the iOS Software License Agreements are part of the benefit of consumers' bargain when purchasing the Devices, because consumers expect that their Devices will *operate* as advertised and intended upon purchase of the Devices.

451.    Apple's iOS Software License Agreement attempts to include language that disclaims certain warranties; however, the agreement is one-sided, does not allow consumers to negotiate separate terms, is an unconscionable contract of adhesion, and would essentially render consumers' Devices incapable of operation—and from performing *any* function—if the operating software were corrupted, ceased to function, and restricted the use of Devices as they were intended and marketed to be used.

---

[69] Versions of those agreements for each iOS, incorporated herein by reference, are available at https://www.apple.com/legal/sla/ (last visited June 27, 2018).  A sample of these agreements are also attached hereto as Exhibits 5, 6.

452.    Additionally, the limitation period in the iOS Software License Agreement prevents consumers from discovering any defects in operating software within the applicable and unenforceable limitations period even with the use of diligence as Apple is in the exclusive control of information regarding its proprietary software.

453.    Any limitations periods in the iOS Software License Agreement are thus unconscionable and unenforceable.

454.    Additionally, attempts to limit liability for software Updates that would cause Devices to become inoperable are unconscionable and unenforceable, as the operating software is *necessary* in order to use the Devices, and fully realize the benefit of consumers' bargains.

### CLASS ALLEGATIONS

455.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of the following class:

**All purchasers, owners, users or lessees of the following Apple Devices: the Apple iPhone 5, 5s, 5c, 6, 6s 6 Plus, 6s Plus, SE, 7, 7 Plus, and the Apple iPad, including the Fourth Generation, Mini, Air, Mini 2, Update to Fourth Generation, Air 2, Mini 3, Mini 4, Pro, and 9.7-Inch Pro, Fifth Generation, 10.5-Inch Pro, 12.9-Inch Pro, and Sixth Generation in the United States and Foreign Countries**.[70]

456.    If necessary, Plaintiffs also seek to represent subclasses of individuals who purchased Apple Devices in each of the 50 states and U.S. territories, as well as foreign countries with representative plaintiffs as addressed in this Complaint.  As detailed below in their respective

---

[70] For purposes of this Consolidated Amended Complaint, "Foreign Countries" refers to Argentina, Australia, Azerbaijan, Belgium, Brazil, Canada, Chile, China, Columbia, the Czech Republic, Denmark, France, Germany, Greece, Hong Kong, India, Italy, Japan, Malaysia, Mexico, the Netherlands, New Zealand, Nigeria, Norway, Peru, Poland, Portugal, Romania, Russia, Saudi Arabia, South Africa, South Korea, Spain, Sweden, Switzerland, Taiwan, Turkey, the Ukraine, and Venezuela.

CONSOLIDATED AMENDED COMPLAINT          158          NO. 5:18-MD-02827-EJD

1    causes of action, each state subclass is referenced by the name of its state (i.e., the Alabama

2    Subclass, the Washington Subclass, etc.).

3        457.    Plaintiff Sharma also seeks to represent a separate class of individuals who

4    purchased Apple Devices in the United Kingdom, referred to herein as the "U.K. Subclass."

5        458.    Collectively, unless otherwise so stated, the above-defined classes and subclasses

6    are referred to herein as the "Class."

7        459.    Excluded from the Class and U.K. Class are Apple, its subsidiaries, affiliates,

8    officers, directors, and employees and persons who have settled with and validly released Apple

9    from separate, non-class legal actions against Apple based on the conduct alleged herein.

10       460.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1)**.  The members of each

11   class are so numerous and geographically dispersed that individual joinder of all class members is

12   impracticable.  Plaintiffs are informed and believe—based upon the publicly-available information

13   discussed herein—that there are millions of class members, making joinder impracticable.  Those

14   individuals' identities are available through Apple's records, and class members may be notified of

15   the pendency of this action by recognized, Court-approved notice dissemination methods.

16       461.    **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2)**

17   **and 23(b)(3)**.  Apple has acted with respect to Plaintiffs and the other members of the proposed

18   Class in a manner generally applicable to each of them. There is a well-defined community of

19   interest in the questions of law and fact involved, which affect all class members.  The questions of

20   law and fact common to the Class predominate over the questions that may affect individual class

21   members, including the following:

22           a.    Whether Apple designed, manufactured, advertised, promoted, and sold Devices that

23                 it knew contained Defects or Battery Issues, and withheld that information from

24                 consumers or purposefully misrepresented the Devices to consumers;

25           b.    Whether Apple designed updated iOS to address Defects or Battery Issues in a

26                 manner that slowed the performance of those Devices;

27           c.    Whether and to what extent Apple disclosed the effect of iOS Updates to Device

28

---

CONSOLIDATED AMENDED COMPLAINT          159          NO. 5:18-MD-02827-EJD

performance;

d. Whether Apple used the iOS modification to profit from Plaintiffs and the other class members by inducing them to buy new replacements for their Devices;

e. Whether Apple is subject to liability for fraudulently concealing material facts from Plaintiffs and the other class members;

f. Whether Apple is subject to liability for violating the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, and other applicable and similar laws of the United States and territories and laws of foreign countries (such as the United Kingdom);

f. Whether Apple's conduct has violated the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and other applicable and similar laws of the United States and territories and laws of foreign countries (such as the United Kingdom);

g. Whether Apple's conduct has violated the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*;

h. Whether Apple's conduct has violated Cal. Penal Code § 502.

i. Whether Apple's conduct violated any additional federal law, law from any United States state or territory, or similar laws of foreign countries;

j. Whether Apple has been unjustly enriched as a result of its fraudulent conduct, such that it would be inequitable for Apple to retain the benefits conferred upon it by Plaintiffs and the other class members;

k. Whether compensatory or consequential damages should be awarded to Plaintiffs and the other class members;

l. Whether punitive damages should be awarded to Plaintiffs and the other class members;

m. Whether restitution should be awarded to Plaintiffs and the other class members; and

n. Whether other, additional relief is appropriate, and what that relief should be.

CONSOLIDATED AMENDED COMPLAINT    160    NO. 5:18-MD-02827-EJD

462.    **Typicality: Federal Rule of Civil Procedure 23(a)(3)**.  Plaintiffs' claims are typical of other class members' claims because Plaintiffs and class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

463.    **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4)**.  Plaintiffs are adequate class representatives because their interests do not conflict with the interests of class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

464.    **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**.  The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Apple.  Such individual actions would create a risk of adjudications that would be dispositive of the interests of other class members and impair their interests.  Apple has acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

465.    Injunctive relief is particularly necessary in this case because: (1) Plaintiffs desire to purchase products with the same qualities and attributes as Apple advertised the Devices to have; (2) if Apple actually manufactured Devices with the qualities and attributes as deceptively represented, Plaintiffs would purchase those Devices; (3) but Plaintiffs do not have the ability to determine whether Apple's representations are true concerning the Devices if they purchase such Devices in the future.  Indeed, Plaintiffs, and putative class members, in the future will likely want to purchase Devices manufactured by Apple; however, they expect that Apple will not misrepresent or conceal defects in those Devices (or subsequently-released iPhones and iPads), and will provide clear explanations regarding the Updates to those Devices (without concealing or misrepresenting what the Updates will do).

---

CONSOLIDATED AMENDED COMPLAINT    161    NO. 5:18-MD-02827-EJD

466.    **Superiority: Federal Rule of Civil Procedure 23(b)(3)**.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Apple, so it would be impracticable for class members to individually seek redress for Apple's wrongful conduct.  Even if class members could afford litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## TOLLING OF APPLICABLE LIMITATIONS PERIODS

467.    **Discovery Rule Tolling.**  Neither Plaintiffs nor the other class members could have discovered through the exercise of reasonable diligence that their Devices were defective within the time period of any applicable statutes of limitation.  Nor could they have determined with the exercise of any reasonable diligence that the Updates to the iOS would further exacerbate the problems with their Devices.

468.    **Fraudulent Concealment Tolling.**  Throughout the time period relevant to this action, Apple concealed from and failed to disclose to Plaintiffs and the other class members vital information concerning the Defects, Battery Issues, and problems with the Updates described herein.  Indeed, Apple kept Plaintiffs and the other class members ignorant of vital information essential to the pursuit of their claims.  As a result, neither Plaintiffs nor the other class members could have discovered the Defect, Battery Issues, or problems with the iOS Updates, even upon reasonable exercise of diligence.

469.    Despite its knowledge of the above, Apple failed to disclose and concealed, and continues to conceal, critical information from Plaintiffs and the other class members, even though, at any point in time, it could have done so through individual correspondence, media release, or by

CONSOLIDATED AMENDED COMPLAINT    162    NO. 5:18-MD-02827-EJD

1    other means. Although Apple has issued public apologies for throttling Device speeds in its iOS

2    Updates, it has not fully revealed the true nature of the Device Defects and Battery Issues.

3        470.    Plaintiffs and the other Class members justifiably relied on Apple to disclose any

4    defects in their Devices or issues that the iOS Updates would cause to those Devices, because same

5    were hidden and not discoverable through reasonable efforts by Plaintiffs and class members.

6        471.    Thus, the running of all applicable statutes of limitation have been suspended

7    with respect to any claims that Plaintiffs and the other class members have sustained as a result of

8    the Defects, Battery Issues, or iOS Updates, by virtue of the fraudulent concealment doctrine.

9        472.    **Estoppel.** Apple was under a continuous duty to disclose to Plaintiffs and the

10   other class members the true nature, quality, and character of its Devices and iOS Updates. Apple,

11   however, concealed the true nature, quality, and character of the Devices and iOS Updates, as

12   described herein. Based upon the foregoing, Apple is estopped from relying on any statutes of

13   limitations in defense of this action.

14                        **CAUSES OF ACTION**

15                     **ON BEHALF OF THE CLASS**

16                             **COUNT 1**

17        **VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT,**

18                        *18 U.S.C. § 1030, et seq.*

19       473.    The Plaintiffs identified above ("Plaintiff," for purposes of this Count),

20   individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged

21   herein. In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

22       474.    Apple caused Plaintiff and class members to download and install iOS Updates

23   to their Devices without informing its customers that the iOS Updates contained code that would

24   diminish Device performance, or throttle performance, in order to compensate for undisclosed

25   Defects in those Devices. Accordingly, Plaintiff and class members did not give permission for

26   Apple to install iOS Updates onto their Devices—nor could they—as Apple did not provide

27   material information to Plaintiff and class members regarding the updates.

28

---

CONSOLIDATED AMENDED COMPLAINT          163          NO. 5:18-MD-02827-EJD

475.    Apple violated 18 U.S.C. § 1030(a) by knowingly causing the transmission of iOS software Updates to Plaintiff and class members' devices to access, collect, and transmit information to Devices, which are protected computers as defined in 18 U.S.C. § 1030(e)(2)(B) because they are used in interstate commerce and/or communication.  By transmitting information to class members' Devices, Apple intentionally caused damage without authorization to class members' devices by impairing the ability of those Devices to operate as warranted, represented, and advertised.

476.    Apple violated 18 U.S.C. § 1030(a)(5)(A)(iii) by intentionally accessing Plaintiff and class members' Devices—protected computers—without authorization, and as a result, caused damage to Plaintiff and class members' Devices by impairing the integrity of those Devices.

477.    Apple's conduct has caused loss to Plaintiff and class members in real, economic damages.  Plaintiff and class members have additionally suffered loss by reason of these violations, in terms of added expense in operating their Devices, which have been throttled, or in the purchase of new, unthrottled Devices.

478.    Unless Apple is restrained and enjoined, Apple will continue to commit such acts.  Plaintiff's remedy at law is thus inadequate to compensate for these inflicted and threatened injuries, entitling Plaintiff to remedies including injunctive relief as provided by § 1030(g).

479.    Plaintiff and the Class seek all monetary and non-monetary relief allowed by law, including damages and punitive damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the Consumer Fraud and Abuse Act.

## COUNT 2

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT,

*Cal. Civ. Code § 1750, et seq.*

480.    The Plaintiffs identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the California Subclass.

481.     The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

482.     In accordance with the liberal application and construction of the CLRA, application of the CLRA to all class members is appropriate, given that Apple's conduct as described herein originated from California, the Devices and iOS code were designed and originated in California, and Apple's uniform iOS Software License Agreement provides that California law shall apply.

483.     Apple's uniform iOS Software License Agreement governs the reach of the Class's claims because Apple's violations of the CLRA were caused, in part, by the installation of certain operating software that throttled Device performance in order to further conceal the Defects and Battery Issues in Apple's Devices.

484.     Apple is a "person" as defined by Civil Code §§ 1761(c) and 1770, and has provided "services" as defined by Civil Code §§ 1761(b) and 1770.

485.     Plaintiff and the class members are "consumers" as defined by Civil Code §§ 1761(d) and 1770, and have engaged in a "transaction" as defined by Civil Code §§ 1761(e) and 1770.

486.     Apple's acts and practices were intended to and did result in the sales of products and services to Plaintiff and the class members in violation of Civil Code § 1770, including:

   a.  Representing that goods or services have characteristics that they do not have;

   b.  Representing that goods or services are of a particular standard, quality, or grade when they were not;

   c.  Advertising goods or services with intent not to sell them as advertised; and

   d.  Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

487.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

488.     Had Apple disclosed to Plaintiffs and class members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in common business practices that ultimately hurt consumers, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the class members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

489.     As a direct and proximate result of Apple's violations of California Civil Code § 1770, Plaintiff and class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

490.     Apple has already received notice of the class members' intent to seek damages in compliance with California Civil Code § 1782(a), and, on January 24, 2018, responded and rejected such Section 1782 notice.  Apple also received a supplemental notice pursuant to California Civil Code § 1782 concerning its wrongful conduct as alleged herein by Plaintiff and class members.  Any further notice would be an exercise in futility for Plaintiff.

491.     Plaintiff and the Class seek all monetary and non-monetary relief allowed by law, including damages and punitive damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the CLRA.

CONSOLIDATED AMENDED COMPLAINT          166          NO. 5:18-MD-02827-EJD

**COUNT 3**

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW,**

*Cal. Bus. & Prof. Code § 17200, et seq.*

492.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the California Subclass.

493.    In accordance with the liberal application and construction of the UCL, application of the UCL to all class members is appropriate, given that Apple's conduct as described herein originated from California, the Devices and iOS code were designed and originated in California, and Apple's uniform iOS Software License Agreement provides that California law shall apply.

494.    Apple's uniform iOS Software License Agreement governs the reach of the Class's claims because Apple's violations of the UCL were caused, in part, by the installation of certain operating software that throttled Device performance in order to further conceal the Defects and Battery Issues in Apple's Devices.

495.    Apple is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

496.    Apple violated Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

497.    Apple's "unfair" acts and practices include:

a.   Knowingly designing, developing, manufacturing, advertising, and selling Devices with significant defects that result in the Devices not operating as intended, represented, or advertised under normal usage;

b.   Developing software Updates that merely hide the aforementioned Defects and Battery Issues by throttling Device performance, resulting in the Devices operating at slower speeds than intended, represented, or advertised under normal usage;

c.   Concealing material information from consumers regarding its Devices, the Battery Issues, and Defects so that consumers were unable to make informed choices when

CONSOLIDATED AMENDED COMPLAINT            167            NO. 5:18-MD-02827-EJD

1    purchasing the Devices;

2        d.   Concealing material information from consumers regarding the Updates to operating

3             software, so that consumers would not nor could they know that the Updates

4             throttled their Devices; and

5        e.   Using uniform, deceptive business practices such as throttling software to slow down

6             Devices, requiring consumers to spend additional money on replacement batteries or

7             Devices as a result of the Defects and Battery Issues.

8        498.    Apple has engaged in "unlawful" business practices by violating multiple laws,

9    including the CLRA, Cal. Civ. Code §§ 1780, *et seq.*, and California common law.

10       499.    Apple's unlawful, unfair, and deceptive acts and practices include:

11       a.   Knowingly designing, developing, manufacturing, advertising, and selling Devices

12            with significant defects that result in the Devices not operating as intended,

13            represented, or advertised under normal usage;

14       b.   Developing software Updates that merely hide the aforementioned Defects and

15            Battery Issues by throttling Device performance, resulting in the Devices operating

16            at slower speeds than intended, represented, or advertised under normal usage;

17       c.   Concealing material information from consumers regarding its Devices, the Battery

18            Issues, and Defects so that consumers were unable to make informed choices when

19            purchasing the Devices;

20       d.   Concealing material information from consumers regarding the Updates to operating

21            software, so that consumers would not nor could they know that the Updates

22            throttled their Devices; and

23       e.   Using uniform, deceptive business practices such as throttling software to slow down

24            Devices, requiring consumers to spend additional money on replacement batteries or

25            Devices as a result of the Defects and Battery Issues.

26       500.    Apple violated § 17200's prohibition against engaging in unlawful acts and

27    practices by engaging in false and misleading advertising and by omitting material facts from

28

---

CONSOLIDATED AMENDED COMPLAINT        168        NO. 5:18-MD-02827-EJD

purchasers of its Devices.  As alleged more fully herein, Apple's marketing and sale of Devices, and more specifically its failure to inform customers of the negative and throttling impact iOS Updates would have on those Devices, violated Cal. Civ. Code § 1750, *et seq.*, common law, and other statutory violations as alleged herein.  Plaintiff reserves the right to allege other violations of the law, which constitute other unlawful business acts and practices.  Apple's conduct is ongoing and continues to this date.

501.    Apple violated § 17200's prohibition against unfair conduct by failing to inform its customers about the Defects and Battery Issues in the Devices; engaging in a pattern or practice of concealing those facts and urging its customers to install regular updates to the iOS software to throttle those devices—thereby depriving those Device owners of the performance of those devices that existed at the time of purchase.  This conduct is substantially injurious to consumers, offends public policy, is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct— crippling Devices that are, in many instances, consumers' lifelines—outweighs any alleged benefit.  Specifically, the utility gained by "upgrading" the iOS software of the Devices was outweighed by the diminishment of the Device functionality.  Apple engaged in this conduct at the expense of its customers' rights when other, lawful alternatives were available (such as providing customers' with full information about the Devices and iOS software, or offering batteries to customers who experienced Battery Issues).

502.    Apple engaged in this conduct to gain an unfair commercial advantage over its competitors, seeking to avoid public knowledge of the Battery Issues and Defects in its Devices to avoid damage to its sales or reputation.  It withheld critical and material information from Plaintiff and class members, competitors, and the marketplace, all to its unfair competitive advantage.

503.    Apple's business practices, as alleged herein, constitute fraudulent conduct because they were likely to deceive, and did deceive, class members into purchasing Devices, and upgrading those Devices with iOS Updates, when those Devices were defective and the Updates would only throttle the Devices instead of fixing them.

CONSOLIDATED AMENDED COMPLAINT              169              NO. 5:18-MD-02827-EJD

504.     Apple's representations and omissions—all which emanated from California—were material because they were likely to deceive reasonable consumers.

505.     California law prohibits unauthorized computer access and fraud pursuant to Cal. Penal Code § 502.

506.     As a result of Apple's installation of iOS Upgrades on Plaintiff's and class members' devices, Apple knowingly accessed and without permission altered, damaged, deleted, destroyed, and otherwise used any data stored on Plaintiff's and class members' devices.

507.     Plaintiff and class members did not know that Apple's iOS Update would throttle Device performance; accordingly, Apple did not have permission to install iOS Updates on class members' Devices.

508.     Apple accessed and without permission altered and used data on class members' Devices to execute a scheme or artifice to defraud the class members' by, among other things, maintaining market share, convincing Plaintiff and class members to purchase new Devices, and to otherwise ensure that Plaintiff and class members would not discover Apple's underlying fraud regarding its omissions and misrepresentations regarding the Devices.  As a result, Apple violated Cal. Penal Code § 502.

509.     The iOS Updates led to the deterioration of the Devices and functionality of the Devices as a whole, driving customers to purchase new Devices who would not have outlaid the additional costs had they known the truth, and Apple not concealed the Device Defects and Battery Issues.

510.     As a direct and proximate result of Apple's unfair, unlawful, and fraudulent acts and practices, Plaintiff and class members were injured and lost money or property, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

511.     Apple acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff and class members' rights.  Apple's

CONSOLIDATED AMENDED COMPLAINT          170          NO. 5:18-MD-02827-EJD

1   knowledge of the Devices' performance issues, and release of software to throttle phone

2   performance, put it on notice that the Devices were not as it advertised.

3         512.     Plaintiff and class members seek all monetary and non-monetary relief allowed

4   by law, including restitution of all profits stemming from Apple's unfair, unlawful, and fraudulent

5   business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of

6   Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

7   **COUNT 4**

8   **VIOLATIONS OF CALIFORNIA'S FALSE AND MISLEADING ADVERTISING**

9   **LAW,**

10   *Cal. Bus. & Prof. Code § 17500, et seq.*

11         513.     The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count),

12   individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged

13   herein.  In the alternative, Plaintiff brings this claim on behalf of the California Subclass.

14         514.     Apple's acts and practices, as described herein, have deceived and/or are likely

15   to continue to deceive class members and the public.  As described in Counts I and II above, and

16   throughout this Complaint, Apple misrepresented the Devices, concealed the Devices' defects and

17   Battery Issues, concealed the throttling capabilities of its updated operational software, and

18   misrepresented the purpose of iOS Updates.

19         515.     By its actions, Apple disseminated uniform advertising regarding iOS Updates

20   based out of California, and governed by California law.  The advertising was, by its very nature,

21   unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et*

22   *seq.*  Such advertisements were intended to and likely did deceive the consuming public for the

23   reasons detailed herein.

24         516.     The above-described false, misleading, and deceptive advertising Apple

25   disseminated continues to have a likelihood to deceive in that Apple failed to disclose the true

26   nature of the iOS Updates and the Devices.  Apple failed to instigate a public information campaign

27   to alert consumers of the Defects and Battery Issues and the iOS Updates.  Instead, Apple continued

28

---

1    to misrepresent the true nature of the iOS Updates and the Devices, continuing to deceive

2    consumers.

3         517.    Apple continued to misrepresent to consumers that its Devices were fast and had

4    long battery lives, however, the Devices contained Defects and Battery Issues.  Had Apple

5    disclosed those issues, rather than falsely advertising the Devices' properties, consumers would

6    have not purchased or paid significantly less for the Devices.

7         518.    In making and disseminating the statements alleged herein, Apple knew, or

8    should have known, its advertisements were untrue and misleading in violation of California law.

9    Plaintiff and other class members based their purchasing decisions on Apple's omitted material

10   facts.  The revenues to Apple attributable to products sold in those false and misleading

11   advertisements amount to hundreds of millions of dollars.  Plaintiff and class members were injured

12   in fact and lost money and property as a result.

13        519.    The misrepresentations and non-disclosures by Apple of the material facts

14   described and detailed herein constitute false and misleading advertising and, therefore, constitute

15   violations of Cal. Bus. & Prof Code § 17500, *et seq.*

16        520.    As a result of Apple's wrongful conduct, Plaintiff and the class members lost

17   money.  Plaintiff and the class members are therefore entitled to restitution as appropriate for this

18   cause of action.

19        521.    Plaintiff and class members seek all monetary and non-monetary relief allowed

20   by law, including restitution of all profits stemming from Apple's unfair, unlawful, and fraudulent

21   business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of

22   Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

23

24

25

26

27

28

**COUNT 5**

**CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT,**

*Cal. Penal Code § 502, et seq.*

522.     The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the California Subclass.

523.     In pushing Updates to its iOS to unsuspecting users of its Devices, Apple violated the California Penal Code, Computer Data Access and Fraud Act, Cal. Penal Code § 502, *et seq.*

524.     When Apple provided iOS Updates to consumers—Plaintiffs and class members—they did not know, nor could they in the exercise of reasonable diligence know, that the software Updates contained code that would throttle their Devices, designed solely to further conceal the Defects and Battery Issues in those Devices.

525.     Because consumers did not know that the iOS Updates contained such throttling code, they did not give Apple permission to access their Devices to alter the data or computer systems on those Devices.

526.     Apple provided the iOS Updates to consumers as part of a scheme or artifice to defraud and deceive, because it provided the Updates to consumers ***instead of*** informing them of the Defects and Battery Issues inherent on their Devices.  Indeed, Apple could have informed consumers that the Battery Issues they were having with their Devices could be resolved via a battery replacement.  Apple instead chose concealment, and throttling Devices via the installation of software that would do so.

527.     Apple offered iOS Updates to consumers to throttle their Devices as a means to encourage consumers to purchase new devices, wrongfully obtaining money from those consumers.

528.     By offering the iOS Updates to consumers, instead of revealing the truth, Apple disrupted or caused the disruption of consumer services when it improperly and unlawfully throttled users and class members' Devices.  Plaintiffs and class members did not consent to having their

---

CONSOLIDATED AMENDED COMPLAINT          173          NO. 5:18-MD-02827-EJD

Devices throttled, and had they known that the iOS Updates would throttle their Devices, they would not have installed the iOS Updates.

529.    As a result of Apple's unlawful conduct, Plaintiffs and class members were damaged in an amount to be determined at trial.

530.    Plaintiff and the Class seek all monetary and non-monetary relief allowed by law, including damages and punitive damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the CDAFA

## COUNT 6

### TRESPASS TO CHATTELS

531.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

532.    California common law prohibits the intentional intermeddling with personal property in the possession of another, without consent, that results in either a) the deprivation of the use of that personal property; or b) the impairment of the condition, quality, or usefulness of the property.

533.    Apple impaired the condition, quality, and usefulness of Plaintiff and class members' Devices, or parts of them, without their knowledge or consent.  Such acts constituted an intentional interference with the use and enjoyment of the Devices.

534.    Apple acted intentionally, because it knew that Plaintiff and class members were downloading computer software onto their Devices that reduced the performance of the Devices. Plaintiff and other class members only consented to the installation of iOS Updates that would improve performance, not diminish performance.

535.    Apple engaged in deception to gain access to the Devices and install new computer software or iOS Updates.

536.    Plaintiff and class members suffered actual damages as a result of Apple's actions in an amount to be determined at trial.

CONSOLIDATED AMENDED COMPLAINT          174          NO. 5:18-MD-02827-EJD

537.     Furthermore, Plaintiff seeks punitive damages because Apple's trespass was committed from wanton or malicious motives, or reckless disregard of the rights of Plaintiff and the Class, for the purpose of concealing the Defect.

## COUNT 7

### FRAUD

538.     The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

539.     At the time Plaintiff and class members purchased their Devices, Apple did not disclose, but instead concealed and misrepresented, the Battery Issues and Defects in the Devices as discussed herein.

540.     Further, Apple represented that Updates to its iOS were designed to improve Device performance, and otherwise resolve issues that could have a negative impact on Plaintiffs' and class members' device experiences.

541.     Apple omitted that the Updates to its iOS were actually designed to further conceal the Defects and Battery Issues in the Devices.  Further, Apple omitted and affirmatively misrepresented the true reason for the Updates for its Devices—that such Updates were designed to downgrade Device speed and processing capabilities in order to disguise fundamental Device Defects and Battery Issues.

542.     Apple knew, or should have known, that these Updates were falsely portrayed to the consumer public.

543.     Apple also knew that its omissions and misrepresentations regarding the Updates and Devices were material, and that a reasonable consumer would rely upon Apple's representations (and corresponding omissions) in making purchasing decisions.

544.     Apple, by its clear admissions in December 2017, in fact intended to deceive Plaintiff and class members.

545.     Plaintiff and class members did not know—nor could they have known through reasonable diligence—about the Defects and Battery Issues in the Devices, nor could they have known about what the Upgrades were designed to really do.

546.     Plaintiff and class members would have been reasonable in relying on Apple's misrepresentations (and corresponding omissions) in making their purchasing decisions and downloading Updates.

547.     Plaintiff and class members had a right to rely upon Apple's representations (and corresponding omissions) as Apple maintained a monopolistic control over what the Updates to the iOS included, and what information was available regarding the Defects and Battery Issues in the Devices, when Updates were provided to consumers, how those Updates were promoted to consumers, and why consumers should update their iOS.

548.     Plaintiff and class members sustained damages as a result of their reliance on Apple's omissions and misrepresentations, thus causing Plaintiff and class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

**COUNT 8**

**CONSTRUCTIVE FRAUD**

549.     The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.  This cause of action is brought in the alternative to fraud.

550.     At the time Plaintiff and class members purchased their Devices, Apple did not disclose, but instead concealed and misrepresented, the Battery Issues and Defects in the Devices as discussed herein.

551.     Further, Apple represented that Updates to its iOS were designed to improve Device performance, and otherwise resolve issues that could have a negative impact on Plaintiff's and class members' device experiences.

552.    Apple omitted that the Updates to its iOS were actually designed to further conceal the Defects and Battery Issues in the Devices.  Further, Apple omitted and affirmatively misrepresented the true reason for the Updates for its Devices—that such Updates were designed to downgrade Device speed and processing capabilities in order to disguise fundamental Device Defects and Battery Issues.

553.    Apple knew, or should have known, that these Updates were falsely portrayed to the consumer public.

554.    Apple also knew that its omissions and misrepresentations regarding the Updates and Devices were material, and that a reasonable consumer would rely upon Apple's representations (and corresponding omissions) in making purchasing decisions.

555.    Apple had an obligation not to omit or misrepresent Defects, Battery Issues, or the purpose of Updates because: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of Devices and Updates; (c) Plaintiff and class members relied upon Apple to make full disclosures based upon the relationship between Plaintiff and class members, who relied upon Apple's representations and omissions, and were reasonable in doing so, with the full knowledge of Apple that they did and would have been reasonable in doing so.

556.    Plaintiff and class members did not know—nor could they have known through reasonable diligence—about the Defects and Battery Issues in the Devices, nor could they have known about what the Upgrades were designed to really do.

557.    Plaintiff and class members would have been reasonable in relying on Apple's misrepresentations (and corresponding omissions) in making their purchasing decisions and downloading Updates.

558.    Plaintiff and class members had a right to rely upon Apple's representations (and corresponding omissions) as Apple maintained a monopolistic control over what the Updates to the iOS included, and what information was available regarding the Defects and Battery Issues in the

---

CONSOLIDATED AMENDED COMPLAINT                177                NO. 5:18-MD-02827-EJD

1    Devices, when Updates were provided to consumers, how those Updates were promoted to

2    consumers, and why consumers should update their iOS.

3        559.    Apple breached its duty to Plaintiff and class members to make full disclosures

4    of the Defects, Battery Issues, and Updates.

5        560.    Plaintiff and class members sustained damages as a result of their reliance on

6    Apple's omissions and misrepresentations, and Apple's breach of its duty, thus causing Plaintiff

7    and class members to sustain actual losses and damages in a sum to be determined at trial.

8                                    **COUNT 9**

9                          **FRAUDULENT INDUCEMENT**

10       561.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count),

11   individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged

12   herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

13       562.    At the time Plaintiff and class members purchased their Devices, Apple did not

14   disclose, but instead concealed and misrepresented, the Battery Issues and Defects in the Devices as

15   discussed herein.

16       563.    Further, Apple represented that Updates to its iOS were designed to improve

17   Device performance, and otherwise resolve issues that could have a negative impact on Plaintiff's

18   and class members' device experiences.

19       564.    Apple omitted that the Updates to its iOS were actually designed to further

20   conceal the Defects and Battery Issues in the Devices.  Further, Apple omitted and affirmatively

21   misrepresented the true reason for the Updates for its Devices—that such Updates were designed to

22   downgrade Device speed and processing capabilities in order to disguise fundamental Device

23   Defects and Battery Issues.

24       565.    Apple knew, or should have known, that these Updates were falsely portrayed to

25   the consumer public.

26

27

28

CONSOLIDATED AMENDED COMPLAINT          178          NO. 5:18-MD-02827-EJD

566.     Apple also knew that its omissions and misrepresentations regarding the Updates and Devices were material, and that a reasonable consumer would rely upon Apple's representations (and corresponding omissions) in making purchasing decisions.

567.     Apple, by its clear admissions in December 2017, in fact intended to deceive Plaintiff and class members.

568.     Plaintiff and class members did not know—nor could they have known through reasonable diligence—about the Defects and Battery Issues in the Devices, nor could they have known about what the Upgrades were designed to really do.

569.     Plaintiff and class members would have been reasonable in relying on Apple's misrepresentations (and corresponding omissions) in making their purchasing decisions and downloading Updates.

570.     Plaintiff and class members had a right to rely upon Apple's representations (and corresponding omissions) as Apple maintained a monopolistic control over what the Updates to the iOS included, and what information was available regarding the Defects and Battery Issues in the Devices, when Updates were provided to consumers, how those Updates were promoted to consumers, and why consumers should update their iOS.

571.     Apple intended to induce—and did, indeed, induce—Plaintiff and class members from purchasing Devices and downloading Updates based upon its affirmative representations and omissions.

572.     Plaintiff and class members sustained damages as a result of their reliance on Apple's omissions and misrepresentations, thus causing Plaintiff and class members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT 10

### BREACH OF CONTRACT

573.     The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

CONSOLIDATED AMENDED COMPLAINT          179          NO. 5:18-MD-02827-EJD

574.     Apple solicited and invited Plaintiffs and class members to buy new Devices. Plaintiff and class members accepted Apple's offers and bought Devices from Apple.

575.     Plaintiff and class members formed contracts with Apple at the time they purchased their Apple Devices.  The terms of the contracts include promises and affirmations made by Apple on its website and through marketing that the Devices would perform as advertised, even after updating the latest iOS.

576.     Further, Plaintiff and class members entered into implied contracts with Apple wherein Apple agreed not to purposefully interfere with, negatively affect, or otherwise harm Plaintiff's and class members' Devices or usage of the Devices.

577.     Updates to the iOS are governed by an agreement that provides that California law shall govern the agreement between Plaintiff and class members on one hand, and Apple on the other.

578.     Plaintiff reasonably relied upon representations that the Devices would perform as advertised and warranted, and class members would be reasonable in relying upon those same representations.

579.     Plaintiff and class members performed their obligations under their contracts with Apple.

580.     Apple's Devices did not perform as advertised or promised.  Accordingly, Apple breached its contract with customers.

581.     As a result of Apple's breach, Plaintiff and class members have been damaged in an amount equal to the purchase price of the Devices.

582.     All conditions precedent to Apple's liability under its contractual obligations, including notice, have been performed by Plaintiff and the Class.

CONSOLIDATED AMENDED COMPLAINT          180          NO. 5:18-MD-02827-EJD

**COUNT 11**

**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

583.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

584.    In every contract or agreement there is an implied promise of good faith and fair dealing under California law.

585.    As described herein, contracts with California choice of law provisions govern the agreements between Apple and its customers.

586.    In dealings between Apple and its customers, Apple has power affecting the rights of its users.

587.    Apple entered into contracts with the class members at the Plaintiff at the time of the download of the iOS Updates.

588.    Apple contractually promised in the iOS 10.2.1 update and later Updates to "deliver the best experience for its customers, which includes overall performance and prolonging the life of their devices."

589.    Each Plaintiff did all, or substantially all, of the things that the contracts required them to do.

590.    The iOS 10.2.1 update throttled Device performance as a means to mitigate issues customers were experiencing with Battery Issues.

591.    Apple did not inform customers that, rather than throttling devices by installing iOS 10.2.1, those customers could replace the batteries in their Devices.

592.    Despite its contractual promises to prolong the life of the devices, Apple instead purposefully took actions to reduce the life of the devices, and purposefully failed to notify customers that replacing the battery would restore performance that had been artificially throttled by iOS 10.2.1 and later updates to iOS.

593.    Apple's actions were objectively unreasonable given Apple's promises.

---

CONSOLIDATED AMENDED COMPLAINT    181    NO. 5:18-MD-02827-EJD

594.    Apple's conduct evaded the spirit of the bargain made between Apple and the Plaintiff and class members.

595.    As a result of Apple's misconduct and breach of its duty of good faith and fair dealing, Plaintiff and the Class suffered damages.  Plaintiff and the class members did not receive the benefit of the bargain for which they contracted and for which they paid valuable consideration.

## COUNT 12

### MONEY HAD AND RECEIVED

596.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

597.    As a result of the Plaintiff's and class members' purchase of the Devices, Apple obtained money for its own use and benefit, and, as a result of its breaches of contract and breaches of the good faith and fair dealing implied in those agreements, became indebted to the Plaintiff and class members in an amount to be determined at trial.

598.    No part of any of the monies due and owing to Plaintiff and class members has been repaid, although Plaintiff and class members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

## COUNT 13

### FRAUDULENT OMISSION OR CONCEALMENT

599.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

600.    At all relevant times, Apple was engaged in the business of designing, manufacturing, distributing, and selling the Devices.

601.    Apple, acting through its representatives or agents, delivered Devices to its own retail stores, distributors, and various other distribution channels.

CONSOLIDATED AMENDED COMPLAINT          182          NO. 5:18-MD-02827-EJD

602.    Apple willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Devices and iOS Updates.

603.    Rather inform consumers of the truth regarding Device Defects and Battery Issues, and that the iOS Updates would degrade Device performance, Apple concealed material information related to Device Defects, Battery Issues, and that iOS Updates would throttle Devices.

604.    Apple omitted this material information to drive up sales and maintain its market power, as consumers would not purchase Devices, or would pay substantially less for them, had consumers known the truth.

605.    Plaintiff and the class members accepted the terms of use, which were silent on the performance-throttling features that Apple installed in their Devices.  Plaintiff and class members had no way of knowing about the Devices' Defects, Battery Issues, or that the iOS Updates would throttle their Devices.

606.    Plaintiff and class members could not have discovered the above information on their own, because Apple was in the exclusive possession of such information.

607.    Although Apple had a duty to ensure the accuracy of the release statements published with respect to iOS Updates, and to ensure accuracy of information regarding the performance of its Devices, it did not fulfill these duties.

608.    Plaintiff and class members sustained injury due to the purchase of Devices that did not live up to performance representations, and the installation of iOS Updates that throttled Devices without their knowledge.  Plaintiff and class members are entitled to recover full or partial refunds for Devices or batteries they purchased due to Apple's misrepresentations, or they are entitled to damages for the diminished value of their Devices, amounts to be determined at trial.

609.    Apple's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's and class members' rights and well-being, and in part to enrich itself in California at the expense of consumers.  Apple's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of

competitor devices.  Apple's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT 14**

**FRAUDULENT MISREPRESENTATION**

610.     The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

611.     At all relevant times, Apple was engaged in the business of designing, manufacturing, distributing, and selling the Devices.

612.     Apple, acting through its representatives or agents, delivered Devices to its own retail stores, distributors, and various other distribution channels.

613.     Apple willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Devices and iOS Updates.

614.     Rather inform consumers of the truth regarding Device Defects and Battery Issues, and that the iOS Updates would degrade Device performance, Apple misrepresented the Devices' speed, power, and battery life, and misrepresented the content of pertinent iOS Updates, telling its customers that the iOS Updates would *improve* the overall functionality of the Devices.

615.     Apple made these material misrepresentations to boost or maintain sales of the Devices, and in order to falsely assure purchasers of Devices that Apple is a reputable company and that its Devices and iOS Updates are reliable and able to perform as promised.  The false representations were material to consumers because the representations played a significant role in the value of the Devices purchased.

616.     Plaintiff and the class members accepted the terms of use, which were silent on the performance-throttling features that Apple installed in their Devices.  Plaintiff and class members had no way of knowing that Apple's misrepresentations as to the contents of the subject iOS Updates were misleading.

CONSOLIDATED AMENDED COMPLAINT          184          NO. 5:18-MD-02827-EJD

617.     Plaintiff and class members could not have discovered the misleading nature of Apple's misrepresentations on their own, because Apple was in the exclusive possession of such information.

618.     Although Apple had a duty to ensure the accuracy of the release statements published with respect to iOS Updates, and to ensure accuracy of information regarding the performance of its Devices, it did not fulfill these duties.

619.     Apple misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales for its Devices were falling and to maintain and grow its reputation as a premier designer and vendor of the Devices.  Such benefits came at the expense of Plaintiff and class members.

620.     Plaintiff and class members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiff's and class members' actions were justified given Apple's misrepresentations.  Apple was in the exclusive control of material facts, and such facts were not known to the public.

621.     Due to Apple's misrepresentations, Plaintiff and class members sustained injury due to the purchase of Devices that did not live up to performance representations, and the installation of iOS Updates that throttled Devices without their knowledge.  Plaintiff and class members are entitled to recover full or partial refunds for Devices or batteries they purchased due to Apple's misrepresentations, or they are entitled to damages for the diminished value of their Devices, amounts to be determined at trial.

622.     Apple's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's and class members' rights and well-being, and in part to enrich itself in California at the expense of consumers.  Apple's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor devices.  Apple's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

CONSOLIDATED AMENDED COMPLAINT          185          NO. 5:18-MD-02827-EJD

## COUNT 15

### NEGLIGENT MISREPRESENTATION

623.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

624.    Apple negligently and recklessly omitted certain material facts regarding the Devices and impact of the iOS Upgrade on those Devices.  Apple failed to warn consumers that its Devices contained material Defects—including Defects and Battery Issues—that resulted in the Devices not performing as warranted or advertised.  Additionally, Apple then failed to warn consumers that the iOS Update it designed to address the Defects and Battery Issues would actually degrade Device performance, resulting in a loss of functionality and performance so that the Devices did not perform as advertised or warranted.

625.    The advertisements and warranties, which were made expressly through uniform representations from Apple that emanated from its corporate headquarters in California, were material and would have been considered by a reasonable consumer in making purchasing decisions.

626.    Plaintiff and class members acquired Devices and downloaded iOS Updates believing that the Devices would function as advertised.

627.    As a result, Plaintiff and class members were directly and proximately injured by Apple's negligence in failing to inform Plaintiff and class members of the material Defects in the Devices and that the iOS Updates would cause Device performance degradation.

## COUNT 16

### QUASI-CONTRACT / UNJUST ENRICHMENT

628.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.  This claim is brought in the alternative to contract-based causes of action.

CONSOLIDATED AMENDED COMPLAINT          186          No. 5:18-MD-02827-EJD

629.     Plaintiff and class members purchased Devices from Apple, and those Devices were not as Apple represented them to be, enticing Plaintiff and the Class to purchase the Devices. Had Plaintiff and the Class known of the Defects, they would have paid less for their Devices and would not have paid for repairs, service or upgrades caused by the Defect.

630.     Accordingly, Plaintiff and class members were damaged, and Apple was unjustly enriched by the purchase price of those Devices.

631.     Plaintiff and class members are entitled to damages in the amount Apple was unjustly enriched, to be determined at trial.

632.     Furthermore, Apple's conduct was willful, intentionally deceptive, and intended to cause economic injury to Plaintiff and the Class.  Apple is therefore liable to pay punitive damages under California law.

## CLAIMS ON BEHALF OF THE UNITED KINGDOM SUBCLASS

## COUNT 17

## VIOLATION OF THE CONSUMER PROTECTION FROM UNFAIR TRADING REGULATIONS 2008 (2008 No. 1277)

### (on behalf of the United Kingdom Subclass)

633.     The United Kingdom Plaintiff identified above ("Plaintiff," for purposes of this Count and the following Count under United Kingdom law), individually and on behalf of the United Kingdom Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

634.     The Consumer Protection from Unfair Trading Regulations 2008 (2008 No. 1277) (the "Regulations") prohibits unfair commercial practices and misleading commercial practices, whether through misleading actions or omissions. Plaintiff asserts a claim against Defendant for violation of the Regulations, on behalf of the United Kingdom Subclass.

635.     Plaintiff and members of the United Kingdom Subclass were, at all relevant times, "consumers" as defined in Part 1, Provision 2 of the Regulations.

636.     Defendant was, at all relevant times, a "trader" as defined in Part 1, Provision 2 of the Regulations.

CONSOLIDATED AMENDED COMPLAINT          187          NO. 5:18-MD-02827-EJD

Exhibit 1, Page 197

637.    Defendant's actions constitute unfair commercial practices as defined in Part 2, Provisions 3 of the Regulations, as they contravened the requirements of professional diligence and materially distorted or were likely to materially distort the economic behavior of average consumers in the United Kingdom.

638.    Similarly, Defendant's actions constituted misleading actions and/or omissions as defined in Part 2, Provisions 5 and 6 of the Regulations.

639.    In particular, and without limitation, Defendant knowingly or recklessly made the following representations contrary to the Consumer Protection from Unfair Trading Regulations:

    a.    Defendant falsely represented that the Devices were of a particular standard, quality, or grade when they were of another;

    b.    Defendant falsely represented that the Devices had performance, characteristics, uses, or benefits they did not have; and

    c.    Defendant falsely gave to the public warranties and guarantees of the performance, efficacy, or length of life of the Devices that were not based on an adequate or proper test thereof.

640.    Defendant expressly but falsely warranted to Plaintiff and the United Kingdom Subclass the qualities of the Devices. Defendant materially misrepresented these qualities by providing a product that Defendant has admitted it knew suffered a battery defect, knew to suffer unexpected shutdowns, and knew—and intended—to suffer slow processing after the iOS 10.2.1 and iOS 11 Software Updates.

641.    Defendant knowingly sold defective Devices without informing consumers of multiple defects of which it knew.

642.    Defendant knew that the iOS 10 and iOS 11 Updates would slow the Devices' processing speed, weaken the Devices' processing power, and deteriorate the Devices' performance and functionality.

CONSOLIDATED AMENDED COMPLAINT        188        NO. 5:18-MD-02827-EJD

643.    Defendant fraudulently omitted to disclose facts within its knowledge to Plaintiff and United Kingdom Subclass, including: (i) that the iOS 10.2.1 and iOS 11 Updates would cause the Devices to run more slowly, and (ii) that the decrease in processing speed could be ameliorated, at least in part, by replacing the battery.

644.    Defendant falsely, misleadingly, and deceptively made representations about the iOS 10.2.1 and iOS 11 Updates by highlighting only the positive aspects of these updates and intentionally concealing the updates' performance-degrading, negative effects.

645.    Specifically, Defendant made identical or substantially similar false, misleading and deceptive marketing statements as those cited above throughout the United Kingdom.

646.    In the absence of Defendant's unfair and misleading commercial practices alleged hereinabove, Plaintiff and the United Kingdom Subclass would not have purchased the Devices, or would not have paid as much as they in fact paid for the Devices.

647.    Plaintiff and the United Kingdom Subclass seek redress for Defendant's unfair and misleading commercial practices pursuant to section 27K the Regulations, as amended by The Consumer Protection (Amendment) Regulations 2014 (2014 No. 870).

648.    As a result of Defendant's unfair and misleading commercial practices, Plaintiff and the United Kingdom Subclass were damaged in amounts to be proven at trial.

### <u>COUNT 18</u>

### VIOLATION OF THE CONSUMER RIGHTS ACT 2015 (2015 C. 15)

#### (on behalf of United Kingdom Subclass)

649.    Plaintiff reasserts and reallege the allegations contained in Paragraphs 1-472 of this Complaint.

650.    The Consumer Rights Act 2015 (the "Act") requires that written, oral or implied contracts for goods, digital content or services in the United Kingdom be of satisfactory quality on the standard of a "reasonable person."

651.    Plaintiff asserts a claim against Defendant for violation of the Act, on behalf of the United Kingdom Subclass for purchases on or after March 26, 2015.

CONSOLIDATED AMENDED COMPLAINT    189    NO. 5:18-MD-02827-EJD

652.     Plaintiff and members of the United Kingdom Subclass were, at all relevant times, "consumers" as defined in Chapter 1, section 2 of the Act.

653.     Defendant was, at all relevant times, a "trader" as defined in Chapter 1, section 2 of the Act.

654.     The Devices are "goods" as defined in Chapter 1, section 2 of the Act.

655.     The iOS 10.2.1 and later Software Updates are "digital content" as defined in Chapter 1, section 2 of the Act.

656.     Pursuant to Chapter 2, section 9 and Chapter 3, section 34 of the Act, Defendant's contract for sale of the Affected Phones and its provision of the Software Updates to Plaintiff and the members of the United Kingdom Subclass included terms that required the Devices and the Software Updates to be of a satisfactory quality.

657.     Pursuant to Chapter 2, section 10 and Chapter 3, section 35, Defendant's contract for sale of the Devices and its provision of the Software Updates to Plaintiff and the members of the United Kingdom Subclass included terms that required the Devices and the Software Updates to be for a particular purpose.

658.     Pursuant to Chapter 2, section 11 and Chapter 3, section 36, Defendant's contract for sale of the Devices and its provision of the Software Updates to Plaintiff and the members of the United Kingdom Subclass included terms that required the Devices and the Software Updates to be as described.

659.     The Devices, which suffered from the Defect, were not of a satisfactory quality, were not fit for their particular purpose and were not as described and breached the terms described in Chapter 2, sections 9, 10 and 11.

660.     The Software Updates, which slowed the Affected Phones' processing speed, weakened the Devices' processing power, and deteriorated the Devices' performance and functionality, were not of a satisfactory quality, were not fit for their particular purpose and were not as described and breached the terms described in Chapter 3, sections 34, 35 and 36.

---

CONSOLIDATED AMENDED COMPLAINT          190          NO. 5:18-MD-02827-EJD

661.    Plaintiff and the United Kingdom Subclass have a right to enforce the breached terms under Chapter 2, section 19 and Chapter 3, section 42 of the Act.

662.    As a result of Defendant's conduct, Plaintiffs and the United Kingdom Subclass were damaged in amounts to be proven at trial.

## CLAIMS ON BEHALF OF THE ALABAMA SUBCLASS

### COUNT 19
### ALABAMA DECEPTIVE TRADE PRACTICES ACT,

*Ala. Code §§ 8-19-1, et seq.*

663.    The Alabama Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Alabama Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

664.    Apple is a "person" as defined by Ala. Code § 8-19-3(5).

665.    Plaintiff and Alabama Subclass members are "consumers" as defined by Ala. Code § 8-19-3(2).

666.    Apple received notice pursuant to Ala. Code § 8-19-10(e) concerning its wrongful conduct as alleged herein by Plaintiff and Alabama Subclass members.  However, sending pre-suit notice pursuant to Ala. Code § 8-19-10(e) would have been an exercise in futility for Plaintiff, as Apple has already been informed of the allegedly unfair and unlawful conduct as described herein as of the date of the first-filed lawsuit in December 2017, and has yet to offer class members remedy in accordance with similar consumer protection statutes.

667.    Apple advertised, offered, or sold goods or services in Alabama, and engaged in trade or commerce directly or indirectly affecting the people of Alabama.

668.    Apple engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5, including:

   a.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have;

   b.  Representing that goods or services are of a particular standard, quality, or grade, or that

CONSOLIDATED AMENDED COMPLAINT            191            NO. 5:18-MD-02827-EJD

Exhibit 1, Page 201

1       goods are of a particular style or model, if they are of another; and

2         c.   Engaging in any other unconscionable, false, misleading, or deceptive act or practice in

3            the conduct of trade or commerce.

4       669.     Apple's representations and omissions were material because they were likely to

5 deceive reasonable consumers.

6       670.     Apple intended to mislead Plaintiff and Alabama Subclass members and induce

7 them to rely on its misrepresentations and omissions.

8       671.     Had Apple disclosed to Plaintiff and Alabama Subclass members that it

9 misrepresented the Devices and operating software, omitted material information regarding the

10 Defects and Battery Issues, omitted material information regarding the operating software, and was

11 otherwise engaged in deceptive, common business practices, Apple would have been unable to

12 continue in business and it would have been forced to disclose the uniform defects in its Devices.

13 Instead, Apple represented that its Devices were continually improving in speed and battery life and

14 performed better than other devices on the market.  Plaintiff and the Alabama Subclass members

15 acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they

16 could not have discovered.

17       672.     Apple acted intentionally, knowingly, and maliciously to violate the Alabama

18 Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Alabama Subclass

19 members' rights.  Apple's knowledge of the Devices' performance issues, and release of software

20 to throttle phone performance, put it on notice that the Devices were not as it advertised.

21       673.     As a direct and proximate result of Apple's deceptive acts and practices, Plaintiff

22 and Alabama Subclass members have suffered and will continue to suffer injury, ascertainable

23 losses of money or property, and monetary and non-monetary damages, including from not

24 receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in

25 dealing with Device performance issues.

26

27

28

CONSOLIDATED AMENDED COMPLAINT     192     NO. 5:18-MD-02827-EJD

674.     Apple's deceptive acts and practices caused substantial injury to Plaintiff and Alabama Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

675.     Plaintiff and the Alabama Subclass seek all monetary and non-monetary relief allowed by law, including the greater of (a) actual damages or (b) statutory damages of $100; treble damages; injunctive relief; attorneys' fees, costs, and any other relief that is just and proper.

### CLAIMS ON BEHALF OF THE ALASKA SUBCLASS

### COUNT 20

### ALASKA CONSUMER PROTECTION ACT,

### *Alaska Stat. §§ 45.50.471, et seq.*

676.     The Alaska Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Alaska Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

677.     Apple advertised, offered, or sold goods or services in Alaska and engaged in trade or commerce directly or indirectly affecting the people of Alaska.

678.     Alaska Subclass members are "consumers" as defined by Alaska Stat. § 45.50.561(4).

679.     Apple received notice pursuant to Alaska Stat. § 45.50.535 concerning its wrongful conduct as alleged herein by Plaintiff and Alaska Subclass members.  However, sending pre-suit notice pursuant to Alaska Stat. § 45.50.535 is an exercise in futility for Plaintiff, as Apple has already been informed of the allegedly unfair and unlawful conduct as described herein as of the date of the first-filed lawsuit in December 2017, and has yet to offer class members remedy in accordance with similar consumer protection statutes.

680.     Apple engaged in unfair or deceptive acts and practices in the conduct of trade or commerce, in violation Alaska Stat. § 45.50.471, including:

    a.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have;

---

b.  Representing that goods or services are of a particular standard, quality, or grade, when they are of another;

c.  Advertising goods or services with intent not to sell them as advertised;

d.  Engaging in any other conduct creating a likelihood of confusion or of misunderstanding and which misleads, deceives, or damages a buyer in connection with the sale or advertisements of its goods or services; and

e.  Using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of its goods or services whether or not a person was in fact misled, deceived, or damaged.

681.      Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

682.      Apple intended to mislead Plaintiff and Alaska Subclass members and induce them to rely on its misrepresentations and omissions.

683.      Apple acted intentionally, knowingly, and maliciously to violate Alaska's Consumer Protection Act, and recklessly disregarded Plaintiff and Alaska Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

684.      As a direct and proximate result of Apple's unfair and deceptive acts and practices, Plaintiff and Alaska Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

685.      Plaintiff and the Alaska Subclass seek all monetary and non-monetary relief allowed by law, including the greater of (a) three times their actual damages or (b) statutory

CONSOLIDATED AMENDED COMPLAINT    194    NO. 5:18-MD-02827-EJD

1    damages in the amount of $500; punitive damages; reasonable attorneys' fees and costs; injunctive

2    relief; and any other relief that is necessary and proper.

### CLAIMS ON BEHALF OF THE ARIZONA SUBCLASS

### COUNT 21

### ARIZONA CONSUMER FRAUD ACT,

*A.R.S. §§ 44-1521, et seq.*

7    686.    The Arizona Plaintiff(s) identified above ("Plaintiff," for purposes of this Count),

8    individually and on behalf of the Arizona Subclass, repeats and alleges Paragraphs 1-472, as if fully

9    alleged herein.

10    687.    Apple is a "person" as defined by A.R.S. § 44-1521(6).

11    688.    Apple advertised, offered, or sold goods or services in Arizona and engaged in

12    trade or commerce directly or indirectly affecting the people of Arizona.

13    689.    Apple engaged in deceptive and unfair acts and practices, misrepresentation, and

14    the concealment, suppression, and omission of material facts affecting the people of Arizona in

15    connection with the sale and advertisement of "merchandise" (as defined in Arizona Consumer

16    Fraud Act, A.R.S. § 44-1521(5)) in violation of A.R.S. § 44-1522(A).

17    690.    Apple's representations and omissions were material because they were likely to

18    deceive reasonable consumers.

19    691.    Apple intended to mislead Plaintiff and Arizona Subclass members and induce

20    them to rely on its misrepresentations and omissions.

21    692.    Had Apple disclosed to Plaintiff and Arizona Subclass members that it

22    misrepresented the Devices and operating software, omitted material information regarding the

23    Defects and Battery Issues, omitted material information regarding the operating software, and was

24    otherwise engaged in deceptive, common business practices, Apple would have been unable to

25    continue in business and it would have been forced to disclose the uniform defects in its Devices.

26    Instead, Apple represented that its Devices were continually improving in speed and battery life and

27    performed better than other devices on the market.  Plaintiff and the Arizona Subclass members

28

CONSOLIDATED AMENDED COMPLAINT          195          NO. 5:18-MD-02827-EJD

1    acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they

2    could not have discovered.

3        693.    Apple acted intentionally, knowingly, and maliciously to violate Arizona's

4    Consumer Fraud Act, and recklessly disregarded Plaintiff and Arizona Subclass members' rights.

5    Apple's knowledge of the Devices' performance issues, and release of software to throttle phone

6    performance, put it on notice that the Devices were not as it advertised.

7        694.    As a direct and proximate result of Apple's unfair and deceptive acts and

8    practices, Plaintiff and Arizona Subclass members have suffered and will continue to suffer injury,

9    ascertainable losses of money or property, and monetary and non-monetary damages, including

10   from not receiving the benefit of their bargain in purchasing the Devices, and increased time and

11   expense in dealing with Device performance issues.

12       695.    Plaintiff and Arizona Subclass members seek all monetary and non-monetary

13   relief allowed by law, including compensatory damages; disgorgement; punitive damages;

14   injunctive relief; and reasonable attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE ARKANSAS SUBCLASS**

**COUNT 22**

**ARKANSAS DECEPTIVE TRADE PRACTICES ACT,**

*A.C.A. §§ 4-88-101, et seq.*

19       696.    The Arkansas Plaintiff(s) identified above ("Plaintiff," for purposes of this

20   Count), individually and on behalf of the Arkansas Subclass, repeats and alleges Paragraphs 1-472,

21   as if fully alleged herein.

22       697.    Apple is a "person" as defined by A.C.A. § 4-88-102(5).

23       698.    Apple's products and services are "goods" and "services" as defined by A.C.A.

24   §§ 4-88-102(4) and (7).

25       699.    Apple advertised, offered, or sold goods or services in Arkansas and engaged in

26   trade or commerce directly or indirectly affecting the people of Arkansas.

27

28

CONSOLIDATED AMENDED COMPLAINT        196        NO. 5:18-MD-02827-EJD

700.    The Arkansas Deceptive Trade Practices Act ("ADTPA"), A.C.A. §§ 4-88-101, *et seq.*, prohibits unfair, deceptive, false, and unconscionable trade practices.

701.    Apple engaged in acts of deception and false pretense in connection with the sale and advertisement of services in violation of A.C.A. § 4-88-1-8(1) and concealment, suppression and omission of material facts, with intent that others rely upon the concealment, suppression or omission in violation of A.C.A. § 4-88-1-8(2), and engaged in the following deceptive and unconscionable trade practices defined in A.C.A. § 4-88-107:

a.  Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services and as to goods being of a particular standard, quality, grade, style, or model;

b.  Advertising goods or services with the intent not to sell them as advertised;

c.  Employing consistent bait-and-switch advertising of an attractive but insincere offer to sell a product or service which the seller in truth does not intend or desire to sell, as evidenced by acts demonstrating an intent not to sell the advertised product or services;

d.  Knowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of ignorance; and

e.  Engaging in other unconscionable, false, or deceptive acts and practices in business, commerce, or trade.

702.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

703.    Apple intended to mislead Plaintiff and Arkansas Subclass members and induce them to rely on its misrepresentations and omissions.

704.    Had Apple disclosed to Plaintiffs and class members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices.  Instead, Apple

CONSOLIDATED AMENDED COMPLAINT          197          NO. 5:18-MD-02827-EJD

1  represented that its devices were continually improving in speed and battery life and performed

2  better than other devices on the market.  Plaintiff and the Arkansas Subclass members acted

3  reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could

4  not have discovered.

5      705.     Apple acted intentionally, knowingly, and maliciously to violate Arkansas's

6  Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Arkansas Subclass

7  members' rights.  Apple's knowledge of the Devices' performance issues, and release of software

8  to throttle phone performance, put it on notice that the Devices were not as it advertised.

9      706.     As a direct and proximate result of Apple's unconscionable, unfair, and

10  deceptive acts or practices and Plaintiff and Arkansas Subclass members' reliance thereon, Plaintiff

11  and Arkansas Subclass members have suffered and will continue to suffer injury, ascertainable

12  losses of money or property, and monetary and non-monetary damages, including from not

13  receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in

14  dealing with Device performance issues.

15      707.     Plaintiff and the Arkansas Subclass members seek all monetary and non-

16  monetary relief allowed by law, including actual financial losses; injunctive relief; and reasonable

17  attorneys' fees and costs.

18  ## CLAIMS ON BEHALF OF THE COLORADO SUBCLASS

19  ## COUNT 23

20  ## COLORADO CONSUMER PROTECTION ACT,

21  *Colo. Rev. Stat. §§ 6-1-101, et seq.*

22      708.     The Colorado Plaintiff(s) identified above ("Plaintiff," for purposes of this

23  Count), individually and on behalf of the Colorado Subclass, repeats and alleges Paragraphs 1-472,

24  as if fully alleged herein.

25      709.     Apple is a "person" as defined by Colo. Rev. Stat. § 6-1-102(6).

26      710.     Apple engaged in "sales" as defined by Colo. Rev. Stat. § 6-1-102(10).

27

28

CONSOLIDATED AMENDED COMPLAINT          198          NO. 5:18-MD-02827-EJD

711.    Plaintiff and Colorado Subclass members, as well as the general public, are actual or potential consumers of the products and services offered by Apple or successors in interest to actual consumers.

712.    Apple engaged in deceptive trade practices in the course of its business, in violation of Colo. Rev. Stat. § 6-1-105(1), including:

a.    Knowingly making a false representation as to the characteristics of products and services;

b.    Representing that services are of a particular standard, quality, or grade, though Apple knew or should have known that there were or another;

c.    Advertising services with intent not to sell them as advertised; and

d.    Failing to disclose material information concerning its services which was known at the time of an advertisement or sale when the failure to disclose the information was intended to induce the consumer to enter into the transaction.

713.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

714.    Apple intended to mislead Plaintiff and Colorado Subclass members and induce them to rely on its misrepresentations and omissions.

715.    Had Apple disclosed to Plaintiff and Colorado Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Colorado Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

---

CONSOLIDATED AMENDED COMPLAINT          199          NO. 5:18-MD-02827-EJD

716.     Apple acted intentionally, knowingly, and maliciously to violate Colorado's Consumer Protection Act, and recklessly disregarded Plaintiff and Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

717.     As a direct and proximate result of Apple's deceptive trade practices, Colorado Subclass members suffered injuries to their legally protected interests.

718.     Apple's deceptive trade practices significantly impact the public, because Apple is the second-largest Device manufacturer in the world, with hundreds of thousands of sales of those Devices to Colorado consumers.

719.     Plaintiff and Colorado Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of: (a) actual damages, or (b) $500, or (c) three times actual damages (for Apple's bad faith conduct); injunctive relief; and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE CONNECTICUT SUBCLASS

## COUNT 24

### Connecticut Unfair Trade Practices Act,

### *C.G.S.A. § 42-110g*

720.     The Connecticut Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Connecticut Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

721.     Apple is a "person" as defined by C.G.S.A. § 42-110a(3).

722.     Apple is engaged in "trade" or "commerce" as those terms are defined by C.G.S.A. § 42-110a(4).

723.     At the time of filing this Complaint, Plaintiff has sent notice to the Attorney General and Commissioner of Consumer Protection pursuant to C.G.S.A. § 42-110g(c). Plaintiff will provide a file-stamped copy of the Complaint to the Attorney General and Commissioner of Consumer Protection.

---

CONSOLIDATED AMENDED COMPLAINT          200          NO. 5:18-MD-02827-EJD

724.    Apple advertised, offered, or sold goods or services in Connecticut, and engaged in trade or commerce directly or indirectly affecting the people of Connecticut.

725.    Apple engaged in deceptive acts and practices and unfair acts and practices in the conduct of trade or commerce, in violation of the C.G.S.A. § 42-110b, including:

    a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have;

    b.    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

    c.    Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

726.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

727.    Apple intended to mislead Plaintiff and Connecticut Subclass members and induce them to rely on its misrepresentations and omissions.

728.    Had Apple disclosed to Plaintiff and Connecticut Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market. Plaintiff and the Connecticut Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

729.    Apple acted intentionally, knowingly, and maliciously to violate the Connecticut Unfair Trade Practices Act, and recklessly disregarded Plaintiff and Connecticut Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

---

CONSOLIDATED AMENDED COMPLAINT      201      NO. 5:18-MD-02827-EJD

730.     As a direct and proximate result of Apple's deceptive acts and practices, Plaintiff and Connecticut Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

731.     Apple's deceptive acts and practices caused substantial, ascertainabile injury to Plaintiff and Connecticut Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

732.     Apple's violations of Connecticut law were done with reckless indifference to the Plaintiff and the Connecticut Subclass or was with an intentional or wanton violation of those rights.

733.     Plaintiff requests damages in the amount to be determined at trial, including statutory and common law damages, attorneys' fees, and punitive damages.

### CLAIMS ON BEHALF OF THE DELAWARE SUBCLASS

### COUNT 25

### DELAWARE CONSUMER FRAUD ACT,

### *6 Del. Code §§ 2513, et seq.*

734.     The Delaware Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Delaware Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

735.     Apple is a "person" that is involved in the "sale" of "merchandise," as defined by 6 Del. Code § 2511(7), (8), and (6).

736.     Apple advertised, offered, or sold goods or services in Delaware and engaged in trade or commerce directly or indirectly affecting the people of Delaware.

737.     Apple used and employed deception, fraud, false pretense, false promise, misrepresentation, and the concealment, suppression, and omission of material facts with intent that

others rely upon such concealment, suppression and omission, in connection with the sale and advertisement of merchandise, in violation of 6 Del. Code § 2513(a).

738.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

739.     Apple acted intentionally, knowingly, and maliciously to violate Delaware's Consumer Fraud Act, and recklessly disregarded Plaintiff and Delaware Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

740.     Had Apple disclosed to Plaintiff and Delaware Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Delaware Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

741.     Apple's unlawful trade practices were gross, oppressive, and aggravated, and Apple breached the trust of Plaintiff and the Delaware Subclass members.

742.     As a direct and proximate result of Apple's unlawful acts and practices, Plaintiff and Delaware Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

743.     Plaintiff and Delaware Subclass members seek all monetary and non-monetary relief allowed by law, including damages under 6 Del. Code § 2525 for injury resulting from the

direct and natural consequences of Apple's unlawful conduct; injunctive relief; and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE DISTRICT OF COLUMBIA SUBCLASS

### COUNT 26

### DISTRICT OF COLUMBIA CONSUMER PROTECTION

### PROCEDURES ACT,

### *D.C. Code §§ 28-3904, et seq.*

744.    The District of Columbia Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the District of Columbia Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

745.    Apple is a "person" as defined by D.C. Code § 28-3901(a)(1).

746.    Apple is a "merchant" as defined by D.C. Code § 28-3901(a)(3).

747.    Plaintiff and District of Columbia Subclass members are "consumers" who purchased or received goods or services for personal, household, or family purposes, as defined by D.C. Code § 28-3901.

748.    Apple advertised, offered, or sold goods or services in District of Columbia and engaged in trade or commerce directly or indirectly affecting the people of District of Columbia.

749.    Apple engaged in unfair, unlawful, and deceptive trade practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of goods and services in violation of D.C. Code § 28-3904, including:

    a.  Representing that goods or services have characteristics that they do not have;

    b.  Representing that goods or services are of a particular standard, quality, grade, style, or model, when they are of another;

    c.  Misrepresenting a material fact that has a tendency to mislead;

    d.  Failing to state a material fact where the failure is misleading;

    e.  Advertising or offering goods or services without the intent to sell them as advertised or offered; and

f.    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

750.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

751.    Apple intended to mislead Plaintiff and District of Columbia Subclass members and induce them to rely on its misrepresentations and omissions.

752.    The above unfair and deceptive practices and acts by Apple were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and District of Columbia Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

753.    Apple acted intentionally, knowingly, and maliciously to violate the District of Columbia's Consumer Protection Procedures Act, and recklessly disregarded Plaintiff and District of Columbia Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

754.    As a direct and proximate result of Apple's unfair, unlawful, and deceptive trade practices, Plaintiff and District of Columbia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

755.    Plaintiff and District of Columbia Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, restitution, injunctive relief, punitive damages, attorneys' fees and costs, the greater of treble damages or $1500 per violation, and any other relief that the Court deems proper.

CONSOLIDATED AMENDED COMPLAINT          205          No. 5:18-MD-02827-EJD

**CLAIMS ON BEHALF OF THE FLORIDA SUBCLASS**

**COUNT 27**

**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**

*Fla. Stat. §§ 501.201, et seq.*

756.    The Florida Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Florida Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

757.    Plaintiff and Florida Subclass members are "consumers" as defined by Fla. Stat. § 501.203.

758.    Apple advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida.

759.    Apple engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1).

760.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

761.    Had Apple disclosed to Plaintiff and Florida Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Florida Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

762.    As a direct and proximate result of Apple's unconscionable, unfair, and deceptive acts and practices, Plaintiff and Florida Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-

---

CONSOLIDATED AMENDED COMPLAINT    206    NO. 5:18-MD-02827-EJD

1    monetary damages, including from not receiving the benefit of their bargain in purchasing the

2    Devices, and increased time and expense in dealing with Device performance issues.

3        763.    Plaintiff and Florida Subclass members seek all monetary and non-monetary

4    relief allowed by law, including actual or nominal damages under Fla. Stat. § 501.21; declaratory

5    and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any

6    other relief that is just and proper.

7    **CLAIMS ON BEHALF OF THE GEORGIA SUBCLASS**

8    **COUNT 28**

9    **GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT,**

10    *O.C.G.A. §§ 10-1-390, et seq.*

11        764.    The Georgia Plaintiff(s) identified above ("Plaintiff," for purposes of this Count),

12    individually and on behalf of the Georgia Subclass, repeats and alleges Paragraphs 1-472, as if fully

13    alleged herein.

14        765.    Apple, Plaintiff, and Georgia Subclass members are "persons" within the

15    meaning of § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia

16    UDTPA").

17        766.    Apple received notice pursuant to O.C.G.A. § 10-1-399 concerning its wrongful

18    conduct as alleged herein by Plaintiff and Georgia Subclass members.  However, sending pre-suit

19    notice pursuant to O.C.G.A. § 10-1-399 is an exercise in futility for Plaintiff, as Apple has already

20    been informed of the allegedly unfair and unlawful conduct as described herein as of the date of the

21    first-filed lawsuit in December 2017, and has yet to offer class members remedy in accordance with

22    similar consumer protection statutes.

23        767.    Apple engaged in deceptive trade practices in the conduct of its business, in

24    violation of O.C.G.A. § 10-1-372(a), including:

25          a.    Representing that goods or services have characteristics that they do not have;

26          b.    Representing that goods or services are of a particular standard, quality, or grade if

27            they are of another;

28

CONSOLIDATED AMENDED COMPLAINT    207    NO. 5:18-MD-02827-EJD

     c.    Advertising goods or services with intent not to sell them as advertised; and

     d.    Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

768.    Apple's deceptive trade practices include:

     a.    Knowingly designing, developing, manufacturing, advertising, and selling Devices with significant defects that result in the Devices not operating as intended, represented, or advertised under normal usage;

     b.    Developing software Updates that merely hide the aforementioned Defects and Battery Issues by throttling Device performance, resulting in the Devices operating at slower speeds than intended, represented, or advertised under normal usage;

     c.    Concealing material information from consumers regarding its Devices, the Battery Issues, and Defects so that consumers were unable to make informed choices when purchasing the Devices;

     d.    Concealing material information from consumers regarding the Updates to operating software, so that consumers would not nor could they know that the Updates throttled their Devices; and

     e.    Using uniform, deceptive business practices such as throttling software to slow down Devices, requiring consumers to spend additional money on replacement batteries or Devices as a result of the Defects and Battery Issues.

769.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

770.    Apple intended to mislead Plaintiff and Georgia Subclass members and induce them to rely on its misrepresentations and omissions.

771.    In the course of its business, Apple engaged in activities with a tendency or capacity to deceive.

772.    Apple acted intentionally, knowingly, and maliciously to violate Georgia's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Georgia Subclass

1    members' rights.  Apple's knowledge of the Devices' performance issues, and release of software

2    to throttle phone performance, put it on notice that the Devices were not as it advertised.

3        773.    Had Apple disclosed to Plaintiff and Georgia Subclass members that it

4    misrepresented the Devices and operating software, omitted material information regarding the

5    Defects and Battery Issues, omitted material information regarding the operating software, and was

6    otherwise engaged in deceptive, common business practices, Apple would have been unable to

7    continue in business and it would have been forced to disclose the uniform defects in its Devices.

8    Instead, Apple represented that its Devices were continually improving in speed and battery life and

9    performed better than other devices on the market.  Plaintiff and the Georgia Subclass members

10   acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they

11   could not have discovered.

12       774.    As a direct and proximate result of Apple's deceptive trade practices, Plaintiff

13   and Georgia Subclass members have suffered and will continue to suffer injury, ascertainable losses

14   of money or property, and monetary and non-monetary damages, including from not receiving the

15   benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with

16   Device performance issues.

17       775.    Plaintiff and Georgia Subclass members seek all relief allowed by law, including

18   injunctive relief, and reasonable attorneys' fees and costs, under O.C.G.A. § 10-1-373.

19   **CLAIMS ON BEHALF OF THE HAWAII SUBCLASS**

20   **COUNT 29**

21   **HAWAII UNFAIR PRACTICES AND UNFAIR COMPETITION ACT,**

22   ***Haw. Rev. Stat. §§ 480-1, et seq.***

23       776.    The Hawaii Plaintiff(s) identified above ("Plaintiff," for purposes of this Count),

24   individually and on behalf of the Hawaii Subclass, repeats and alleges Paragraphs 1-472, as if fully

25   alleged herein.

26       777.    Plaintiff and Hawaii Subclass members are "consumers" as defined by Haw.

27   Rev. Stat. § 480-1.

28

CONSOLIDATED AMENDED COMPLAINT        209        NO. 5:18-MD-02827-EJD

778.     Plaintiffs, the Hawaii Subclass members, and Apple are "persons" as defined by Haw. Rev. Stat. § 480-1.

779.     Apple advertised, offered, or sold goods or services in Hawaii and engaged in trade or commerce directly or indirectly affecting the people of Hawaii.

780.     Apple engaged in unfair or deceptive acts or practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the goods and services purchased by Hawaii Subclass members in violation of Haw. Rev. Stat. § 480-2(a).

781.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

782.     Apple intended to mislead Plaintiff and Hawaii Subclass members and induce them to rely on its misrepresentations and omissions.

783.     The foregoing unlawful and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.

784.     Apple acted intentionally, knowingly, and maliciously to violate Hawaii's Unfair Practices and Unfair Competition Act, and recklessly disregarded Plaintiff and Hawaii Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

785.     As a direct and proximate result of Apple's deceptive acts and practices, Plaintiff and Hawaii Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

786.     Plaintiff and Hawaii Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, benefit of the bargain damages, treble damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT 30

### HAWAII UNIFORM DECEPTIVE TRADE PRACTICE ACT,

#### *Haw. Rev. Stat. §§ 481A-3, et seq.*

787.    The Hawaii Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Hawaii Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

788.    Plaintiff and Hawaii Subclass members are "persons" as defined by Haw. Rev. Stat. § 481A-2.

789.    Apple engaged in unfair and deceptive trade practices in the conduct of its business, violating Haw. Rev. Stat. § 481A-3, including:

    a.  Representing that goods or services have characteristics that they do not have;

    b.  Representing that goods or services are of a particular standard, quality, or grade if they are of another;

    c.  Advertising goods or services with intent not to sell them as advertised; and

    d.  Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

790.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

791.    The above unfair and deceptive practices and acts by Apple were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiff and Hawaii Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

792.    As a direct and proximate result of Apple's unfair, unlawful, and deceptive trade practices, Plaintiff and Hawaii Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

CONSOLIDATED AMENDED COMPLAINT                211                NO. 5:18-MD-02827-EJD

793.     Plaintiff and Hawaii Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, attorneys' fees and costs, and any other relief that the Court deems proper.

## CLAIMS ON BEHALF OF THE IDAHO SUBCLASS

## COUNT 31

### IDAHO CONSUMER PROTECTION ACT,

### *Idaho Code §§ 48-601, et seq.*

794.     The Idaho Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Idaho Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

795.     Apple is a "person" as defined by Idaho Code § 48-602(1).

796.     Apple's conduct as alleged herein pertained to "goods" and "services" as defined by Idaho Code § 48-602(6) and (7).

797.     Apple advertised, offered, or sold goods or services in Idaho and engaged in trade or commerce directly or indirectly affecting the people of Idaho.

798.     Apple engaged in unfair and deceptive acts or practices, and unconscionable acts and practices, in the conduct of trade and commerce with respect to the sale and advertisement of goods and services, in violation of Idaho Code §§ 48-603 and 48-603(C), including:

    a.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

    b.  Representing that goods are of a particular standard, quality, or grade when they are of another;

    c.  Advertising goods or services with intent not to sell them as advertised;

    d.  Engaging in other acts and practices that are otherwise misleading, false, or deceptive to consumers; and

    e.  Engaging in unconscionable methods, acts or practices in the conduct of trade or commerce.

CONSOLIDATED AMENDED COMPLAINT          212          NO. 5:18-MD-02827-EJD

1    799.    Apple's representations and omissions were material because they were likely to

2    deceive reasonable consumers.

3    800.    Apple intended to mislead Plaintiff and Idaho Subclass members and induce

4    them to rely on its misrepresentations and omissions.  Apple knew its representations and omissions

5    were false.

6    801.    Apple acted intentionally, knowingly, and maliciously to violate Idaho's

7    Consumer Protection Act, and recklessly disregarded Plaintiff and Idaho Subclass members' rights.

8    Apple's knowledge of the Devices' performance issues, and release of software to throttle phone

9    performance, put it on notice that the Devices were not as it advertised.

10    802.    As a direct and proximate result of Apple's unfair, deceptive, and

11    unconscionable conduct, Plaintiff and Idaho Subclass members have suffered and will continue to

12    suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages,

13    including from not receiving the benefit of their bargain in purchasing the Devices, and increased

14    time and expense in dealing with Device performance issues.

15    803.    Plaintiff and Idaho Subclass members seek all monetary and non-monetary relief

16    allowed by law, including damages, punitive damages, injunctive relief, costs, and attorneys' fees.

17    **CLAIMS ON BEHALF OF THE ILLINOIS SUBCLASS**

18    **COUNT 32**

19    **ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT,**

20    ***815 ILCS §§ 505, et seq.***

21    804.    The Illinois Plaintiff(s) identified above ("Plaintiff," for purposes of this Count),

22    individually and on behalf of the Illinois Subclass, repeats and alleges Paragraphs 1-472, as if fully

23    alleged herein.

24    805.    Apple is a "person" as defined by 815 ILCS §§ 505/1(c).

25    806.    Plaintiff and Illinois Subclass members are "consumers" as defined by 815 ILCS

26    §§ 505/1(e).

27

28

CONSOLIDATED AMENDED COMPLAINT         213         NO. 5:18-MD-02827-EJD

Exhibit 1, Page 223

807.     Apple's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 ILCS § 505/1(f).  Apple's conduct is described in full detail above.

808.     Apple's deceptive, unfair, and unlawful trade acts or practices, in violation of 815 ILCS § 505/2.

809.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

810.     Apple intended to mislead Plaintiff and Illinois Subclass members and induce them to rely on its misrepresentations and omissions.

811.     The above unfair and deceptive practices and acts by Apple were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefit to consumers or to competition.

812.     Apple acted intentionally, knowingly, and maliciously to violate Illinois's Consumer Fraud Act, and recklessly disregarded Plaintiff and Illinois Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

813.     As a direct and proximate result of Apple's unfair, unlawful, and deceptive acts and practices, Plaintiff and Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

814.     Plaintiff and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

CONSOLIDATED AMENDED COMPLAINT             214             NO. 5:18-MD-02827-EJD

<u>**COUNT 33**</u>

**ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT,**

*815 ILCS §§ 510/2, et seq.*

815.    The Illinois Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Illinois Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

816.    Apple is a "person" as defined by 815 ILCS §§ 510/1(5).

817.    Apple engaged in deceptive trade practices in the conduct of its business, in violation of 815 ILCS §§ 510/2(a), including:

    a.    Representing that goods or services have characteristics that they do not have;

    b.    Representing that goods or services are of a particular standard, quality, or grade if they are of another;

    c.    Advertising goods or services with intent not to sell them as advertised; and

    d.    Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

818.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

819.    The above unfair and deceptive practices and acts by Apple were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Illinois Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

820.    As a direct and proximate result of Apple's unfair, unlawful, and deceptive trade practices, Plaintiff and Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

821.     Plaintiff and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

### CLAIMS ON BEHALF OF THE INDIANA SUBCLASS

### COUNT 34

**Indiana Deceptive Consumer sales Act,**

*Ind. Code §§ 24-5-0.5-1, et seq.*

822.     The Indiana Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Indiana Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

823.     Apple is a "person" as defined by Ind. Code § 24-5-0.5-2(a)(2).

824.     Apple is a "supplier" as defined by § 24-5-0.5-2(a)(1), because it regularly engages in or solicits "consumer transactions" within the meaning of § 24-5-0.5-2(a)(3)(A).

825.     Apple engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions, in violation of Ind. Code § 24-5-0.5-3(a).

826.     Apple's representations and omissions include both implicit and explicit representations and were carried out as a scheme or artifice to defraud.

827.     Apple's acts and practices were "unfair" because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

828.     The injury to consumers from Apple's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury.  The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

829.     Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making.  By withholding important information from consumers about the performance of its Devices, and defects within those Devices, Apple created an asymmetry of

---

1   information between it and consumers that precluded consumers from taking action to avoid or
2   mitigate injury.
3       830.    Apple's business practices, in concealing material information or
4   misrepresenting the qualities, characteristics, and performance of its Devices, had no countervailing
5   benefit to consumers or to competition.
6       831.    Apple's acts and practices were "abusive" for numerous reasons, including:
7       a.  Because they materially interfered with consumers' ability to understand a term or
8           condition in a consumer transaction, interfering with consumers' decision-making.
9       b.  Because they took unreasonable advantage of consumers' lack of understanding
10          about the material risks, costs, or conditions of a consumer transaction; consumers
11          lacked an understanding of the material risks and costs of a variety of their
12          transactions.
13      c.  Because they took unreasonable advantage of consumers' inability to protect their
14          own interests; consumers could not protect their interests due to the asymmetry in
15          information between them and Apple concerning Apple's Devices.
16      d.  Because Apple took unreasonable advantage of consumers' reasonable reliance that
17          it was providing truthful and accurate information about its Devices.
18      832.    Apple also engaged in "deceptive" acts and practices in violation of Indiana
19   Code § 24-5-0.5-3(a) and § 24-5-0.5-3(b), including:
20      a.  Misrepresenting that the subject of a consumer transaction has sponsorship,
21          approval, performance, characteristics, accessories, uses, or benefits it does not have
22          which the supplier knows or should reasonably know it does not have;
23      b.  Misrepresenting that the subject of a consumer transaction is of a particular standard,
24          quality, grade, style, or model, if it is not and if the supplier knows or should
25          reasonably know that it is not; and
26      c.  Misrepresenting that the subject of a consumer transaction will be supplied to the
27          public in greater quantity (i.e., greater speed, longer battery life) than the supplier
28

CONSOLIDATED AMENDED COMPLAINT        217        NO. 5:18-MD-02827-EJD

Exhibit 1, Page 227

230

1        intends or reasonably expects.

2        833.        Apple intended to mislead Plaintiff and Indiana Subclass members and induce

3    them to rely on its misrepresentations and omissions.

4        834.        Apple's representations and omissions were material because they were likely to

5    deceive reasonable consumers.

6        835.        Had Apple disclosed to Plaintiff and Indiana Subclass members that it

7    misrepresented the Devices and operating software, omitted material information regarding the

8    Defects and Battery Issues, omitted material information regarding the operating software, and was

9    otherwise engaged in deceptive, common business practices, Apple would have been unable to

10   continue in business and it would have been forced to disclose the uniform defects in its Devices.

11   Instead, Apple represented that its Devices were continually improving in speed and battery life and

12   performed better than other devices on the market.  Plaintiff and the Indiana Subclass members

13   acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they

14   could not have discovered.

15       836.        Apple had a duty to disclose the above-described facts due to the circumstances

16   of this case, the sensitivity and extensiveness of the defects in its Devices, and the generally-

17   accepted standards regarding product safety.  Apple's duty to disclose also arose from its:

18       a.  Possession of exclusive knowledge regarding the defects in its Devices;

19       b.  Possession of exclusive knowledge regarding throttling code in its operating

20           software;

21       c.  Active concealment of the Devices defects;

22       d.  Active concealment of the fact that its operating software throttled Device

23           performance;

24       e.  Incomplete representations about Device safety and performance, while purposefully

25           withholding material facts from Plaintiff and the Indiana Subclass that contradicted

26           these representations.

27

28

CONSOLIDATED AMENDED COMPLAINT        218        NO. 5:18-MD-02827-EJD

837.    Apple acted intentionally, knowingly, and maliciously to violate Indiana's Deceptive Consumer Sales Act, and recklessly disregarded Plaintiff and Indiana Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

838.    Apple received notice pursuant to Ind. Code § 24-5-0.5-5 concerning its wrongful conduct as alleged herein by Plaintiff and Indiana Subclass members.  Apple has had constructive notice of Plaintiff's demand for relief for the Indiana Subclass pursuant to Ind. Code § 24-5-0.5-5 since the filing of the first case, which contained substantially similar allegations. Accordingly, sending pre-suit notice pursuant to Ind. Code § 24-5-0.5-5 is an exercise in futility for Plaintiff, as Apple has not cured its unfair, abusive, and deceptive acts and practices, or its violations of Indiana Deceptive Consumer Sales Act were incurable.

839.    Apple's conduct includes incurable deceptive acts that Apple engaged in as part of a scheme, artifice, or device with intent to defraud or mislead, under Ind. Code § 24-5-0.5-2(a)(8).

840.    As a direct and proximate result of Apple's uncured or incurable unfair, abusive, and deceptive acts or practices, Plaintiff and Indiana Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

841.    Apple's violations present a continuing risk to Plaintiff and Indiana Subclass members as well as to the general public.

842.    Plaintiff and Indiana Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $500 for each non-willful violation; the greater of treble damages or $1,000 for each willful violation; restitution; reasonable attorneys' fees and costs; injunctive relief; and punitive damages.

**CLAIMS ON BEHALF OF THE IOWA SUBCLASS**

**COUNT 35**

**IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT,**

*Iowa Code § 714H*

843.    The Iowa Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Iowa Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

844.    Apple is a "person" as defined by Iowa Code § 714H.2(7).

845.    Plaintiff and Iowa Subclass members are "consumers" as defined by Iowa Code § 714H.2(3).

846.    Apple's conduct described herein related to the "sale" or "advertisement" of "merchandise" as defined by Iowa Code §§ 714H.2(2), (6), & (8).

847.     Apple engaged in unfair, deceptive, and unconscionable trade practices, in violation of the Iowa Private Right of Action for Consumer Frauds Act, as described throughout and herein.

848.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

849.    Apple intended to mislead Plaintiff and Iowa Subclass members and induce them to rely on its misrepresentations and omissions.

850.    Apple acted intentionally, knowingly, and maliciously to violate Iowa's Private Right of Action for Consumer Frauds Act, and recklessly disregarded Plaintiff and Iowa Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

851.    As a direct and proximate result of Apple's unfair, deceptive, and unconscionable conduct, Plaintiff and Iowa Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages,

1    including from not receiving the benefit of their bargain in purchasing the Devices, and increased

2    time and expense in dealing with Device performance issues.

3        852.    Plaintiff has provided the requisite notice to the Iowa Attorney General, the

4    office of which approved the filing of this class action lawsuit pursuant to Iowa Code § 714H.7.

5        853.    Plaintiff and Iowa Subclass members seek all monetary and non-monetary relief

6    allowed by law, including injunctive relief, damages, punitive damages, and reasonable attorneys'

7    fees and costs.

8    **CLAIMS ON BEHALF OF THE KANSAS SUBCLASS**

9    **COUNT 36**

10   **KANSAS CONSUMER PROTECTION ACT,**

11   *__K.S.A. §§ 50-623, et seq.__*

12       854.    The Kansas Plaintiff(s) identified above ("Plaintiff," for purposes of this Count),

13   individually and on behalf of the Kansas Subclass, repeats and alleges Paragraphs 1-472, as if fully

14   alleged herein.

15       855.    K.S.A. §§ 50-623, *et seq.* is to be liberally construed to protect consumers from

16   suppliers who commit deceptive and unconscionable practices.

17       856.    Plaintiff and Kansas Subclass members are "consumers" as defined by K.S.A. §

18   50-624(b).

19       857.    The acts and practices described herein are "consumer transactions," as defined

20   by K.S.A. § 50-624(c).

21       858.    Apple is a "supplier" as defined by K.S.A. § 50-624(l).

22       859.    Apple advertised, offered, or sold goods or services in Kansas and engaged in

23   trade or commerce directly or indirectly affecting the people of Kansas.

24       860.    Apple's representations and omissions were material because they were likely to

25   deceive reasonable consumers.

26       861.    Apple intended to mislead Plaintiff and Kansas Subclass members and induce

27   them to rely on its misrepresentations and omissions.

28

CONSOLIDATED AMENDED COMPLAINT    221    NO. 5:18-MD-02827-EJD

862.    Had Apple disclosed to Plaintiff and Kansas Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Kansas Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

863.    Apple also engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of K.S.A. § 50-627, including: knowingly taking advantage of the inability of Plaintiff and the Kansas Subclass to reasonably protect their interests, due to their lack of knowledge (*see* K.S.A. § 50-627(b)(1)); and requiring Plaintiff and the Kansas Subclass to enter into a consumer transaction on terms that Apple knew were substantially one-sided in favor of Apple (*see* K.S.A. § 50-627(b)(5)).

864.    Plaintiff and the Kansas Subclass had unequal bargaining power with respect to their purchase and/or use of Apple's Devices because of Apple's omissions and misrepresentations.

865.    The above unfair, deceptive, and unconscionable practices and acts by Apple were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Kansas Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

866.    Apple acted intentionally, knowingly, and maliciously to violate Kansas's Consumer Protection Act, and recklessly disregarded Plaintiff and Kansas Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

867.    As a direct and proximate result of Apple's unfair, deceptive, and unconscionable trade practices, Plaintiff and Kansas Subclass members have suffered and will

---

CONSOLIDATED AMENDED COMPLAINT                  222                  NO. 5:18-MD-02827-EJD

1    continue to suffer injury, ascertainable losses of money or property, and monetary and non-

2    monetary damages, including from not receiving the benefit of their bargain in purchasing the

3    Devices, and increased time and expense in dealing with Device performance issues.

4          868.      Plaintiff and Kansas Subclass members seek all monetary and non-monetary

5    relief allowed by law, including civil penalties or actual damages (whichever is greater), under

6    K.S.A. §§ 50-634 and 50-636; injunctive relief; and reasonable attorneys' fees and costs.

7    **CLAIMS ON BEHALF OF THE KENTUCKY SUBCLASS**

8    **COUNT 37**

9    **KENTUCKY CONSUMER PROTECTION ACT,**

10    *Ky. Rev. Stat. §§ 367.110, et seq.*

11          869.      The Kentucky Plaintiff(s) identified above ("Plaintiff," for purposes of this

12    Count), individually and on behalf of the Kentucky Subclass, repeats and alleges Paragraphs 1-472,

13    as if fully alleged herein.

14          870.      Apple is a "person" as defined by Ky. Rev. Stat. § 367.110(1).

15          871.      Apple advertised, offered, or sold goods or services in Kentucky and engaged in

16    trade or commerce directly or indirectly affecting the people of Kentucky, as defined by Ky. Rev.

17    Stat. § 367.110(2).

18          872.      Apple engaged in unfair, false, misleading, deceptive, and unconscionable acts or

19    practices, in violation of Ky. Rev. Stat. § 367.170, as described herein.

20          873.      Apple's representations and omissions were material because they were likely to

21    deceive reasonable consumers.

22          874.      Apple intended to mislead Plaintiff and Kentucky Subclass members and induce

23    them to rely on its misrepresentations and omissions.

24          875.      Plaintiff and Kentucky Subclass members' purchased goods or services for

25    personal, family, or household purposes and suffered ascertainable losses of money or property as a

26    result of Apple's unlawful acts and practices.

27

28

876.     The above unlawful acts and practices by Apple were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Kentucky Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

877.     Apple acted intentionally, knowingly, and maliciously to violate Kentucky's Consumer Protection Act, and recklessly disregarded Plaintiff and Kentucky Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

878.     As a direct and proximate result of Apple's unlawful acts and practices, Plaintiff and Kentucky Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

879.     Plaintiff and Kentucky Subclass members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, restitution or other equitable relief, injunctive relief, and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE LOUISIANA SUBCLASS

### COUNT 38

### LOUISIANA UNFAIR TRADE PRACTICES AND

### CONSUMER PROTECTION LAW,

*La. Rev. Stat. Ann. §§ 51:1401, et seq.*

880.     The Louisiana Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Louisiana Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

881.     Apple, Plaintiff, and the Louisiana Subclass members are "persons" within the meaning of the La. Rev. Stat. Ann. § 51:1402(8).

882.     Plaintiff and Louisiana Subclass members are "consumers" within the meaning of La. Rev. Stat. Ann. § 51:1402(1).

883.     Apple engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. Ann. § 51:1402(10).

884.     The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. § 51:1405(A). Unfair acts are those that offend established public policy, while deceptive acts are practices that amount to fraud, deceit, or misrepresentation.

885.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

886.     Apple intended to mislead Plaintiff and Louisiana Subclass members and induce them to rely on its misrepresentations and omissions.

887.     Apple's unfair and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiff and Kentucky Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

888.     Apple acted intentionally, knowingly, and maliciously to violate Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiff and Louisiana Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

889.     Had Apple disclosed to Plaintiff and Louisiana Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Louisiana Subclass members

CONSOLIDATED AMENDED COMPLAINT          225          NO. 5:18-MD-02827-EJD

1    acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they

2    could not have discovered.

3        890.    As a direct and proximate result of Apple's unfair and deceptive acts and

4    practices, Plaintiff and Louisiana Subclass members have suffered and will continue to suffer

5    injury, ascertainable losses of money or property, and monetary and non-monetary damages,

6    including from not receiving the benefit of their bargain in purchasing the Devices, and increased

7    time and expense in dealing with Device performance issues.

8        891.    Plaintiff and Louisiana Subclass members seek all monetary and non-monetary

9    relief allowed by law, including actual damages; treble damages for Apple's knowing violations of

10   the Louisiana CPL; declaratory relief; attorneys' fees; and any other relief that is just and proper.

11   ### CLAIMS ON BEHALF OF THE MAINE SUBCLASS

12   ### COUNT 39

13   **MAINE UNFAIR TRADE PRACTICES ACT,**

14   *5 Me. Rev. Stat. §§ 205, 213, et seq.*

15       892.    The Maine Plaintiff(s) identified above ("Plaintiff," for purposes of this Count),

16   individually and on behalf of the Maine Subclass, repeats and alleges Paragraphs 1-472, as if fully

17   alleged herein.

18       893.    Apple is a "person" as defined by 5 Me. Stat. § 206(2).

19       894.    Apple's conduct as alleged herein related was in the course of "trade and

20   commerce" as defined by 5 Me. Stat. § 206(3).

21       895.    Plaintiff and Maine Subclass members purchased goods and/or services for

22   personal, family, and/or household purposes.

23       896.    A demand for relief in the form substantially similar to that required by 5 Me.

24   Rev. Stat. § 213(1-A) was already sent at the commencement of this lawsuit but Apple has not

25   made a written tender of settlement or offer of judgment.  Apple received supplemental notice

26   pursuant to 5 Me. Rev. Stat. § 213(1-A) concerning its wrongful conduct as alleged herein by

27

28

CONSOLIDATED AMENDED COMPLAINT         226         NO. 5:18-MD-02827-EJD

Plaintiff and Maine Subclass members, but this and any subsequent demand was and would be an exercise in futility.

897.     Apple engaged in unfair and deceptive trade acts and practices in the conduct of trade or commerce, in violation of 5 Me. Rev. Stat. §207.

898.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

899.     Had Apple disclosed to Plaintiff and Maine Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Maine Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

900.     As a direct and proximate result of Apple's unfair and deceptive acts and conduct, Plaintiff and Maine Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

901.     Plaintiff and the Maine Subclass members seek all monetary and non-monetary relief allowed by law, including damages or restitution, injunctive and other equitable relief, and attorneys' fees and costs.

CONSOLIDATED AMENDED COMPLAINT          227          NO. 5:18-MD-02827-EJD

## **COUNT 40**

### **MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT,**

### *10 Me. Rev. Stat. §§ 1212, et seq.*

902.    The Maine Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Maine Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

903.    Apple is a "person" as defined by 10 Me. Rev. Stat. § 1211(5).

904.    Apple advertised, offered, or sold goods or services in Maine and engaged in trade or commerce directly or indirectly affecting the people of Maine.

905.    Apple engaged in deceptive trade practices in the conduct of its business, in violation of 10 Me. Rev. Stat. §1212, including: representing that goods or services have characteristics that they do not have; representing that goods or services are of a particular standard, quality, or grade if they are of another; advertising goods or services with intent not to sell them as advertised; and engaging in other conduct that creates a likelihood of confusion or misunderstanding.

906.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

907.    Apple intended to mislead Plaintiff and Maine Subclass members and induce them to rely on its misrepresentations and omissions.

908.    Had Apple disclosed to Plaintiff and Maine Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Maine Subclass members acted

CONSOLIDATED AMENDED COMPLAINT          228          NO. 5:18-MD-02827-EJD

1    reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could

2    not have discovered.

3        909.    As a direct and proximate result of Apple's deceptive trade practices, Plaintiff

4    and Maine Subclass members have suffered and will continue to suffer injury, ascertainable losses

5    of money or property, and monetary and non-monetary damages, including from not receiving the

6    benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with

7    Device performance issues.

8        910.    Maine Subclass members are likely to be damaged by Apple's ongoing deceptive

9    trade practices.

10       911.    Plaintiff and the Maine Subclass members seek all monetary and non-monetary

11   relief allowed by law, including damages or restitution, injunctive or other equitable relief, and

12   attorneys' fees and costs.

### CLAIMS ON BEHALF OF THE MARYLAND SUBCLASS

### COUNT 41

### MARYLAND CONSUMER PROTECTION ACT,

#### *Md. Comm. Code §§ 13-301, et seq.*

17       912.    The Maryland Plaintiff(s) identified above ("Plaintiff," for purposes of this

18   Count), individually and on behalf of the Maryland Subclass, repeats and alleges Paragraphs 1-472,

19   as if fully alleged herein.

20       913.    Apple is a person as defined by Md. Comm. Code § 13-101(h).

21       914.    Apple's conduct as alleged herein related to "sales," "offers for sale," or

22   "bailment" as defined by Md. Comm. Code § 13-101(i) and § 13-303.

23       915.    Maryland Subclass members are "consumers" as defined by Md. Comm. Code §

24   13-101(c).

25       916.    Apple advertises, offers, or sell "consumer goods" or "consumer services" as

26   defined by Md. Comm. Code § 13-101(d).

27

28

---

CONSOLIDATED AMENDED COMPLAINT         229         NO. 5:18-MD-02827-EJD

917.    Apple advertised, offered, or sold goods or services in Maryland and engaged in trade or commerce directly or indirectly affecting the people of Maryland.

918.    Apple engaged in unfair and deceptive trade practices, in violation of Md. Comm. Code § 13-301, including:

a.    False or misleading oral or written representations that have the capacity, tendency, or effect of deceiving or misleading consumers;

b.    Representing that consumer goods or services have a characteristic that they do not have;

c.    Representing that consumer goods or services are of a particular standard, quality, or grade that they are not;

d.    Failing to state a material fact where the failure deceives or tends to deceive;

e.    Advertising or offering consumer goods or services without intent to sell, lease, or rent them as advertised or offered;

f.    Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services or the subsequent performance with respect to an agreement, sale lease or rental.

919.    Apple engaged in these unfair and deceptive trade practices in connection with offering for sale or selling consumer goods or services or with respect to the extension of consumer credit, in violation of Md. Comm. Code § 13-303.

920.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

921.    Apple intended to mislead Plaintiff and Maryland Subclass members and induce them to rely on its misrepresentations and omissions.

922.    Had Apple disclosed to Plaintiff and Maryland Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the

CONSOLIDATED AMENDED COMPLAINT        230        NO. 5:18-MD-02827-EJD

1    Defects and Battery Issues, omitted material information regarding the operating software, and was

2    otherwise engaged in deceptive, common business practices, Apple would have been unable to

3    continue in business and it would have been forced to disclose the uniform defects in its Devices.

4    Instead, Apple represented that its Devices were continually improving in speed and battery life and

5    performed better than other devices on the market.  Plaintiff and the Maryland Subclass members

6    acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they

7    could not have discovered.

8        923.    Apple acted intentionally, knowingly, and maliciously to violate Maryland's

9    Consumer Protection Act, and recklessly disregarded Plaintiff and Maryland Subclass members'

10   rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle

11   phone performance, put it on notice that the Devices were not as it advertised.

12       924.    As a direct and proximate result of Apple's unfair and deceptive acts and

13   practices, Plaintiff and Maryland Subclass members have suffered and will continue to suffer

14   injury, ascertainable losses of money or property, and monetary and non-monetary damages,

15   including from not receiving the benefit of their bargain in purchasing the Devices, and increased

16   time and expense in dealing with Device performance issues.

17       925.    Plaintiff and Maryland Subclass members seek all monetary and non-monetary

18   relief allowed by law, including damages, disgorgement, injunctive relief, and attorneys' fees and

19   costs.

20                **CLAIMS ON BEHALF OF THE MASSACHUSETTS SUBCLASS**

21                                **COUNT 42**

22                **MASSACHUSETTS CONSUMER PROTECTION ACT,**

23                *Mass. Gen. Laws Ann. Ch. 93A, §§ 1, et seq.*

24       926.    The Massachusetts Plaintiff(s) identified above ("Plaintiff," for purposes of this

25   Count), individually and on behalf of the Massachusetts Subclass, repeats and alleges Paragraphs 1-

26   472, as if fully alleged herein.

27

28

CONSOLIDATED AMENDED COMPLAINT        231              NO. 5:18-MD-02827-EJD

927.    Apple and Massachusetts Subclass members are "persons" as meant by Mass. Gen. Laws. Ann. Ch. 93A, § 1(a).

928.    Apple operates in "trade or commerce" as meant by Mass. Gen. Laws Ann. Ch. 93A, § 1(b).

929.    Apple advertised, offered, or sold goods or services in Massachusetts and engaged in trade or commerce directly or indirectly affecting the people of Massachusetts, as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(b).

930.    Demand for relief in a form substantially similar to that required by Mass. Gen. Laws Ann. Ch. 93A § 9(3) was sent to Apple upon the commencement of the original lawsuit in this matter; however, Apple did not remedy its unfair and deceptive acts and practices, nor did it offer relief to the class members by way of settlement or judgment.  Apple received supplemental notice pursuant to Mass. Gen. Laws Ch. 93A § 9(3) concerning its wrongful conduct as alleged herein by Plaintiff and Massachusetts Subclass members, but this and any additional demand are and would be futile.

931.    Apple engaged in unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of Mass. Gen. Laws Ann. Ch. 93A, § 2(a).

932.    Apple's acts and practices were "unfair" because they fall within the penumbra of common law, statutory, and established concepts of unfairness, given that Apple solely held the true facts about its defective Devices and throttling software.

933.    Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making.  By withholding important information from consumers about the defects in its Devices and the subsequent implementation of operating software meant to throttle device performance in light of those defects, Apple created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

934.     Apple's practices, omissions, and misrepresentations had no countervailing benefit to consumers or to competition.

935.     Apple intended to mislead Plaintiff and Massachusetts Subclass members and induce them to rely on its misrepresentations and omissions.  Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

936.     Apple acted intentionally, knowingly, and maliciously to violate Massachusetts's Consumer Protection Act, and recklessly disregarded Plaintiff and Massachusetts Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

937.     As a direct and proximate result of Apple's unfair and deceptive practices, Plaintiff and Massachusetts Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

938.     Plaintiff and Massachusetts Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, double or treble damages, injunctive or other equitable relief, and attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE MICHIGAN SUBCLASS

### COUNT 43

### MICHIGAN CONSUMER PROTECTION ACT,

#### *Mich. Comp. Laws Ann. §§ 445.903, et seq.*

939.     The Michigan Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Michigan Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

940.     Apple and Michigan Subclass members are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

CONSOLIDATED AMENDED COMPLAINT          233          NO. 5:18-MD-02827-EJD

941.        Apple advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

942.        Apple engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including:

a.    Representing that its goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c);

b.    Representing that its goods and services are of a particular standard or quality if they are of another in violation of Mich. Comp. Laws Ann. § 445.903(1)(e);

c.    Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and

d.    Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

943.        Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

944.        Apple intended to mislead Plaintiff and Michigan Subclass members and induce them to rely on its misrepresentations and omissions.

945.        Apple acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Plaintiff and Michigan Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

946.        As a direct and proximate result of Apple's unfair, unconscionable, and deceptive practices, Plaintiff and Michigan Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages,

CONSOLIDATED AMENDED COMPLAINT            234            NO. 5:18-MD-02827-EJD

including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

947.    Plaintiff and Michigan Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, injunctive relief, and any other relief that is just and proper.

## CLAIMS ON BEHALF OF THE MINNESOTA SUBCLASS

### COUNT 44

### MINNESOTA CONSUMER FRAUD ACT,

*Minn. Stat. §§ 325F.68, et seq. and Minn. Stat. §§ 8.31, et seq.*

948.    The Minnesota Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Minnesota Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

949.    Apple, Plaintiff, and members of the Minnesota Subclass are each a "person" as defined by Minn. Stat. § 325F.68(3).

950.    Apple goods, services, commodities, and intangibles are "merchandise" as defined by Minn. Stat. § 325F.68(2).

951.    Apple engaged in "sales" as defined by Minn. Stat. § 325F.68(4).

952.    Apple engaged in fraud, false pretense, false promise, misrepresentation, misleading statements, and deceptive practices in connection with the sale of merchandise, in violation of Minn. Stat. § 325F.69(1), as described herein.

953.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

954.    Apple intended to mislead Plaintiff and Minnesota Subclass members and induce them to rely on its misrepresentations and omissions.

955.    Apple's fraudulent, misleading, and deceptive practices affected the public interest, including millions of Minnesotans who purchased and/or used Apple's Devices.

956.     As a direct and proximate result of Apple's fraudulent, misleading, and deceptive practices, Plaintiff and Minnesota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

957.     Plaintiff and Minnesota Subclass members seek all monetary and non-monetary relief allowed by law, including damages, injunctive or other equitable relief, and attorneys' fees, disbursements, and costs.

## COUNT 45

### MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT,

### *Minn. Stat. §§ 325D.43, et seq.*

958.     The Minnesota Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Minnesota Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

959.     By engaging in deceptive trade practices in the course of its business and vocation, directly or indirectly affecting the people of Minnesota, Apple violated Minn. Stat. § 325D.44, including the following provisions: representing that its goods and services had characteristics, uses, and benefits that they did not have, in violation of Minn. Stat. § 325D.44(1)(5); representing that goods and services are of a particular standard or quality when they are of another, in violation of Minn. Stat. § 325D.44(1)(7); advertising goods and services with intent not to sell them as advertised, in violation of Minn. Stat. § 325D.44(1)(9); and engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding, in violation of Minn. Stat. § 325D.44(1)(13).

960.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

961.     Apple intended to mislead Plaintiff and Minnesota Subclass members and induce them to rely on its misrepresentations and omissions.

---

CONSOLIDATED AMENDED COMPLAINT          236          NO. 5:18-MD-02827-EJD

962.     Had Apple disclosed to Plaintiff and Minnesota Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market. Plaintiff and the Minnesota Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

963.     Apple acted intentionally, knowingly, and maliciously to violate Minnesota's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Minnesota Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

964.     As a direct and proximate result of Apple's deceptive trade practices, Plaintiff and Minnesota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

965.     Plaintiff and Minnesota Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief and attorneys' fees and costs.

### CLAIMS ON BEHALF OF THE MISSISSIPPI SUBCLASS

### COUNT 46

### MISSISSIPPI CONSUMER PROTECTION ACT,

### *Miss. Code §§ 75-24-1, et seq.*

966.     The Mississippi Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Mississippi Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

967. Apple is a "person," as defined by Miss. Code § 75-24-3.

968. Apple advertised, offered, or sold goods or services in Mississippi and engaged in trade or commerce directly or indirectly affecting the people of Mississippi, as defined by Miss. Code § 75-24-3.

969. Prior to filing suit, Plaintiff made reasonable attempts to resolve Plaintiff's claims via informal dispute resolution processes; however, such processes were unsuccessful.

970. The above-described conduct violated Miss. Code Ann. § 75-24-5(2), including: representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising goods or services with intent not to sell them as advertised.

971. Apple intended to mislead Plaintiff and Mississippi Subclass members and induce them to rely on its misrepresentations and omissions.

972. Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

973. Had Apple disclosed to Plaintiff and Mississippi Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market. Plaintiff and the Mississippi Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

974. Apple had a duty to disclose the above-described facts due to the circumstances of this case. Apple's duty to disclose arose from its: possession of exclusive knowledge regarding the defects in its Devices; possession of exclusive knowledge regarding the operating software it

---

CONSOLIDATED AMENDED COMPLAINT        238        NO. 5:18-MD-02827-EJD

Exhibit 1, Page 248

1  developed to throttle performance in its Devices as a result of the defects; active concealment of the

2  defects in its Devices and purpose of the throttling operating software; and incomplete

3  representations about its Devices, Device performance, battery life of Devices, and the throttling

4  software.

5       975.     Apple acted intentionally, knowingly, and maliciously to violate Mississippi's

6  Consumer Protection Act, and recklessly disregarded Plaintiff and Mississippi Subclass members'

7  rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle

8  phone performance, put it on notice that the Devices were not as it advertised.

9       976.     As a direct and proximate result of Apple's unfair and deceptive acts or practices

10  and Plaintiff and Mississippi Subclass members' purchase of goods or services primarily for

11  personal, family, or household purposes, Plaintiff and Mississippi Subclass members have suffered

12  and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-

13  monetary damages, including from not receiving the benefit of their bargain in purchasing the

14  Devices, and increased time and expense in dealing with Device performance issues.

15       977.     Apple's violations present a continuing risk to Plaintiff and Mississippi Subclass

16  members as well as to the general public as, *inter alia*, its omissions and misrepresentations have

17  not been corrected.

18       978.     Plaintiff and Mississippi Subclass members seek all monetary and non-monetary

19  relief allowed by law, including actual damages, restitution and other relief under Miss. Code § 75-

20  24-11, injunctive relief, punitive damages, and reasonable attorneys' fees and costs.

21  <u>**CLAIMS ON BEHALF OF THE MISSOURI SUBCLASS**</u>

22  <u>**COUNT 47**</u>

23  **MISSOURI MERCHANDISE PRACTICES ACT,**

24  <u>*Mo. Rev. Stat. §§ 407.010, et seq.*</u>

25       979.     The Missouri Plaintiff(s) identified above ("Plaintiff," for purposes of this

26  Count), individually and on behalf of the Missouri Subclass, repeats and alleges Paragraphs 1-472,

27  as if fully alleged herein.

28

CONSOLIDATED AMENDED COMPLAINT     239     NO. 5:18-MD-02827-EJD

980.    Apple is a "person" as defined by Mo. Rev. Stat. § 407.010(5).

981.    Apple advertised, offered, or sold goods or services in Missouri and engaged in trade or commerce directly or indirectly affecting the people of Missouri, as defined by Mo. Rev. Stat. § 407.010(4), (6) and (7).

982.    Plaintiff and Missouri Subclass members purchased or leased goods or services primarily for personal, family, or household purposes.

983.    Apple engaged in unlawful, unfair, and deceptive acts and practices, in connection with the sale or advertisement of merchandise in trade or commerce, in violation of Mo. Rev. Stat. § 407.020(1), as described herein.

984.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

985.    Apple intended to mislead Plaintiff and Missouri Subclass members and induce them to rely on its misrepresentations and omissions.

986.    Apple acted intentionally, knowingly, and maliciously to violate Missouri's Merchandise Practices Act, and recklessly disregarded Plaintiff and Missouri Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

987.    As a direct and proximate result of Apple's unlawful, unfair, and deceptive acts and practices, Plaintiff and Missouri Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

988.    Plaintiff and Missouri Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, punitive damages, attorneys' fees and costs, injunctive relief, and any other appropriate relief.

---

CONSOLIDATED AMENDED COMPLAINT    240    NO. 5:18-MD-02827-EJD

## CLAIMS ON BEHALF OF THE MONTANA SUBCLASS

## COUNT 48

### MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT,

*M.C.A. §§ 30-14-101, et seq.*

989.    The Montana Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Montana Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

990.    Apple is a "person" as defined by MCA § 30-14-102(6).

991.    Plaintiff and Montana Subclass members are "consumers" as defined by M.C.A. § 30-14-102(1).

992.    Apple advertised, offered, or sold goods or services in Montana and engaged in trade or commerce directly or indirectly affecting the people of Montana, as defined by M.C.A. § 30-14-102(8).

993.    Apple engaged in unfair and deceptive acts and practices in the conduct of trade or commerce, in violation M.C.A. § 30-14-103, as described herein.

994.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

995.    Had Apple disclosed to Plaintiff and Montana class members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market. Plaintiff and the Montana Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

---

CONSOLIDATED AMENDED COMPLAINT          241          NO. 5:18-MD-02827-EJD

996.    Apple's acts described above are unfair and offend public policy; they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

997.    Apple acted intentionally, knowingly, and maliciously to violate Montana's Unfair Trade Practices and Consumer Protection Act, and recklessly disregarded Plaintiff and Montana Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as advertised.

998.    As a direct and proximate result of Apple's unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce, Plaintiff and Montana Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

999.    Plaintiff and Montana Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of (a) actual damages or (b) statutory damages of $500, treble damages, restitution, attorneys' fees and costs, injunctive relief, and other relief that the Court deems appropriate.

### CLAIMS ON BEHALF OF THE NEBRASKA SUBCLASS

### COUNT 49

### NEBRASKA CONSUMER PROTECTION ACT,

#### *Neb. Rev. Stat. §§ 59-1601, et seq.*

1000.    The Nebraska Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Nebraska Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1001.    Apple and Nebraska Subclass members are each a "person" as defined by Neb. Rev. Stat. § 59-1601(1).

1002.    Apple advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska, as defined by Neb. Rev. Stat. § 59-1601.

1003.    Apple engaged in unfair and deceptive acts and practices in conducting trade and commerce, in violation of Neb. Rev. Stat. § 59-1602, as described herein.

1004.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1005.    As a direct and proximate result of Apple's unfair and deceptive acts and practices, Plaintiff and Nebraska Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1006.    Apple's unfair and deceptive acts and practices complained of herein affected the public interest, including the large percentage of Nebraskans who have purchased and/or used Apple Devices.

1007.    Plaintiff and Nebraska Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, the greater of either (1) actual damages or (2) $1,000, civil penalties, and reasonable attorneys' fees and costs.

## COUNT 50

### NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT,

### *Neb. Rev. Stat. §§ 87-301, et seq.*

1008.    The Nebraska Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Nebraska Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1009.    Apple and Nebraska Subclass members are "persons" as defined by Neb. Rev. Stat. § 87-301(19).

CONSOLIDATED AMENDED COMPLAINT          243          NO. 5:18-MD-02827-EJD

Exhibit 1, Page 253

1010.    Apple advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska.

1011.    Apple engaged in deceptive trade practices in the course of its business, in violation of Neb. Rev. Stat. §§ 87-302(a)(5), (8), and (10), including: represented that goods and services have characteristics, uses, benefits, or qualities that they do not have; represented that goods and services are of a particular standard, quality, or grade if they are of another; and advertised its goods and services with intent not to sell them as advertised and in a manner calculated or tending to mislead or deceive.

1012.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1013.    Apple intended to mislead Plaintiff and Nebraska Subclass members and induce them to rely on its misrepresentations and omissions.

1014.    Had Apple disclosed to Plaintiff and Nebraska Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Nebraska Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1015.    Apple acted intentionally, knowingly, and maliciously to violate Nebraska's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Nebraska Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1016.    As a direct and proximate result of Apple's deceptive trade practices, Plaintiff and Nebraska Subclass members have suffered and will continue to suffer injury, ascertainable

CONSOLIDATED AMENDED COMPLAINT    244    NO. 5:18-MD-02827-EJD

losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1017.    Apple's deceptive trade practices complained of herein affected consumers at large, including the large percentage of Nebraskans who purchased and/or used Apple Devices.

1018.    Plaintiff and Nebraska Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, civil penalties, and attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE NEVADA SUBCLASS

## COUNT 51

### NEVADA DECEPTIVE TRADE PRACTICES ACT,

### *Nev. Rev. Stat. Ann. §§ 598.0903, et seq.*

1019.    The Nevada Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Nevada Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1020.    Apple advertised, offered, or sold goods or services in Nevada and engaged in trade or commerce directly or indirectly affecting the people of Nevada.

1021.    Apple engaged in deceptive trade practices in the course of its business or occupation, in violation of Nev. Rev. Stat. §§ 598.0915 and 598.0923, including:

    a.   Knowingly making a false representation as to the characteristics, uses, and benefits of goods or services for sale in violation of Nev. Rev. Stat. § 598.0915(5);

    b.   Representing that goods or services for sale are of a particular standard, quality, or grade when Apple knew or should have known that they are of another standard, quality, or grade in violation of Nev. Rev. Stat. § 598.0915(7);

    c.   Advertising goods or services with intent not to sell them as advertised in violation of Nev. Rev. Stat § 598.0915(9);

    d.   Failing to disclose a material fact in connection with the sale of goods or services in

1     violation of Nev. Rev. Stat. § 598.0923(A)(2); and

2     e.    Violating state and federal statutes or regulations relating to the sale of goods or

3           services in violation of Nev. Rev. Stat. § 598.0923(A)(3).

4     1022.    Apple's representations and omissions were material because they were likely to

5     deceive reasonable consumers.

6     1023.    Had Apple disclosed to Plaintiff and Nevada Subclass members that it

7     misrepresented the Devices and operating software, omitted material information regarding the

8     Defects and Battery Issues, omitted material information regarding the operating software, and was

9     otherwise engaged in deceptive, common business practices, Apple would have been unable to

10    continue in business and it would have been forced to disclose the uniform defects in its Devices.

11    Instead, Apple represented that its Devices were continually improving in speed and battery life and

12    performed better than other devices on the market.  Plaintiff and the Nevada Subclass members

13    acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they

14    could not have discovered.

15    1024.    Apple acted intentionally, knowingly, and maliciously to violate Nevada's

16    Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Nevada Subclass members'

17    rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle

18    phone performance, put it on notice that the Devices were not as it advertised.

19    1025.    As a direct and proximate result of Apple's deceptive trade practices, Plaintiff

20    and Nevada Subclass members have suffered and will continue to suffer injury, ascertainable losses

21    of money or property, and monetary and non-monetary damages, including from not receiving the

22    benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with

23    Device performance issues.

24    1026.    Plaintiff and Nevada Subclass members seek all monetary and non-monetary

25    relief allowed by law, including damages, punitive damages, and attorneys' fees and costs.

26

27

28

CONSOLIDATED AMENDED COMPLAINT          246          NO. 5:18-MD-02827-EJD

**CLAIMS ON BEHALF OF THE NEW HAMPSHIRE SUBCLASS**

**COUNT 52**

**NEW HAMPSHIRE CONSUMER PROTECTION ACT,**

*N.H.R.S.A. §§ 358-A, et seq.*

1027.     The New Hampshire Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the New Hampshire Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1028.     Apple is a "person" under the New Hampshire Consumer Protection statute.

1029.     Apple advertised, offered, or sold goods or services in New Hampshire and engaged in trade or commerce directly or indirectly affecting the people of New Hampshire, as defined by N.H.R.S.A. § 358-A:1.

1030.     Apple engaged in unfair and deceptive acts or practices in the ordinary conduct of its trade or business, in violation of N.H.R.S.A. § 358-A:2, including:

   a.   Representing that its goods or services have characteristics, uses, or benefits that they do not have in violation of N.H.R.S.A. § 358-A:2.V;

   b.   Representing that its goods or services are of a particular standard or quality if they are of another in violation of N.H.R.S.A. § 358-A:2.VII; and

   c.   Advertising its goods or services with intent not to sell them as advertised in violation of N.H.R.S.A. § 358-A:2.IX.

1031.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1032.     Apple acted intentionally, knowingly, and maliciously to violate New Hampshire's Consumer Protection Act, and recklessly disregarded Plaintiff and New Hampshire Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised. Apple's acts and practices went beyond the realm of strictly private transactions.

1033.    As a direct and proximate result of Apple's unfair and deceptive acts and
practices, Plaintiff and New Hampshire Subclass members have suffered and will continue to suffer
injury, ascertainable losses of money or property, and monetary and non-monetary damages,
including from not receiving the benefit of their bargain in purchasing the Devices, and increased
time and expense in dealing with Device performance issues.

1034.    Plaintiff and New Hampshire Subclass members seek all monetary and non-
monetary relief allowed by law, including actual damages, punitive damages, equitable relief
(including injunctive relief), restitution, civil penalties, and attorneys' fees and costs.

<u>CLAIMS ON BEHALF OF THE NEW JERSEY SUBCLASS</u>

<u>COUNT 53</u>

**NEW JERSEY CONSUMER FRAUD ACT,**

*<u>N.J. Stat. Ann. §§ 56:8-1, et seq.</u>*

1035.    The New Jersey Plaintiff(s) identified above ("Plaintiff," for purposes of this
Count), individually and on behalf of the New Jersey Subclass, repeats and alleges Paragraphs 1-
472, as if fully alleged herein.

1036.    Apple is a "person," as defined by N.J. Stat. Ann. § 56:8-1(d).

1037.    Apple sells "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) & (e).

1038.    The New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1, *et seq.*, prohibits
unconscionable commercial practices, deception, fraud, false pretense, false promise,
misrepresentation, as well as the knowing concealment, suppression, or omission of any material
fact with the intent that others rely on the concealment, omission, or fact, in connection with the
sale or advertisement of any merchandise.

1039.    Apple's representations and omissions were material because they were likely to
deceive reasonable consumers.

1040.    Apple intended to mislead Plaintiff and New Jersey Subclass members and
induce them to rely on its misrepresentations and omissions.

1    1041.    Apple acted intentionally, knowingly, and maliciously to violate New Jersey's

2    Consumer Fraud Act, and recklessly disregarded Plaintiff and New Jersey Subclass members'

3    rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle

4    phone performance, put it on notice that the Devices were not as it advertised.

5    1042.    As a direct and proximate result of Apple's unconscionable and deceptive

6    practices, Plaintiff and New Jersey Subclass members have suffered and will continue to suffer

7    injury, ascertainable losses of money or property, and monetary and non-monetary damages,

8    including from not receiving the benefit of their bargain in purchasing the Devices, and increased

9    time and expense in dealing with Device performance issues.

10    1043.    Plaintiff and New Jersey Subclass members seek all monetary and non-monetary

11    relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble

12    damages, restitution, and attorneys' fees, filing fees, and costs.

13    ## CLAIMS ON BEHALF OF THE NEW MEXICO SUBCLASS

14    ## COUNT 54

15    ### NEW MEXICO UNFAIR PRACTICES ACT,

16    *N.M. Stat. Ann. §§ 57-12-2, et seq.*

17    1044.    The New Mexico Plaintiff(s) identified above ("Plaintiff," for purposes of this

18    Count), individually and on behalf of the New Mexico Subclass, repeats and alleges Paragraphs 1-

19    472, as if fully alleged herein.

20    1045.    Apple is a "person" as meant by N.M. Stat. Ann. § 57-12-2.

21    1046.    Apple was engaged in "trade" and "commerce" as meant by N.M. Stat. Ann. §

22    57-12-2(C) when engaging in the conduct alleged.

23    1047.    The New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2, *et seq.*,

24    prohibits both unfair or deceptive trade practices and unconscionable trade practices in the conduct

25    of any trade or commerce.

26

27

28

CONSOLIDATED AMENDED COMPLAINT          249          NO. 5:18-MD-02827-EJD

1048.    Apple engaged in unconscionable, unfair, and deceptive acts and practices in connection with the sale of goods or services in the regular course of its trade or commerce, including the following:

    a.  Knowingly representing that its goods and services have characteristics, benefits, or qualities that they do not have, in violation of N.M. Stat. Ann. § 57-12-2(D)(5);

    b.  Knowingly representing that its goods and services are of a particular standard or quality when they are of another in violation of N.M. Stat. Ann. § 57-12-2(D)(7);

    c.  Knowingly using exaggeration, innuendo, or ambiguity as to a material fact or failing to state a material fact where doing so deceives or tends to deceive in violation of N.M. Stat. Ann. § 57-12-2(D)(14);

    d.  Taking advantage of the lack of knowledge, experience, or capacity of its consumers to a grossly unfair degree to Plaintiff's and the New Mexico Subclass' detriment in violation of N.M. Stat. Ann. § 57-2-12(E)(1); and

    e.  Performing these acts and practices in a way that results in a gross disparity between the value received by Plaintiff and the New Mexico Subclass and the price paid, to their detriment, in violation of N.M. Stat. § 57-2-12(E)(2).

1049.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1050.    Apple intended to mislead Plaintiff and New Mexico Subclass members and induce them to rely on its misrepresentations and omissions.

1051.    Apple acted intentionally, knowingly, and maliciously to violate New Mexico's Unfair Practices Act, and recklessly disregarded Plaintiff and New Mexico Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1052.    As a direct and proximate result of Apple's unfair, deceptive, and unconscionable trade practices, Plaintiff and New Mexico Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-

1    monetary damages, including from not receiving the benefit of their bargain in purchasing the

2    Devices, and increased time and expense in dealing with Device performance issues.

3        1053.    Plaintiff and New Mexico Subclass members seek all monetary and non-

4    monetary relief allowed by law, including injunctive relief, actual damages or statutory damages of

5    $100 (whichever is greater), treble damages or statutory damages of $300 (whichever is greater),

6    and reasonable attorneys' fees and costs.

7                    **CLAIMS ON BEHALF OF THE NEW YORK SUBCLASS**

8                                **COUNT 55**

9                        **NEW YORK GENERAL BUSINESS LAW,**

10                        _N.Y. Gen. Bus. Law §§ 349, et seq._

11        1054.    The New York Plaintiff(s) identified above ("Plaintiff," for purposes of this

12    Count), individually and on behalf of the New York Subclass, repeats and alleges Paragraphs 1-

13    472, as if fully alleged herein.

14        1055.    Apple engaged in deceptive acts or practices in the conduct of its business, trade,

15    and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, as described

16    herein.

17        1056.    Apple's representations and omissions were material because they were likely to

18    deceive reasonable consumers.

19        1057.    Apple acted intentionally, knowingly, and maliciously to violate New York's

20    General Business Law, and recklessly disregarded Plaintiff and New York Subclass members'

21    rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle

22    phone performance, put it on notice that the Devices were not as it advertised.

23        1058.    As a direct and proximate result of Apple's deceptive and unlawful acts and

24    practices, Plaintiff and New York Subclass members have suffered and will continue to suffer

25    injury, ascertainable losses of money or property, and monetary and non-monetary damages,

26    including from not receiving the benefit of their bargain in purchasing the Devices, and increased

27    time and expense in dealing with Device performance issues.

28

---

CONSOLIDATED AMENDED COMPLAINT          251          NO. 5:18-MD-02827-EJD

1059.     Apple's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the millions of New Yorkers who purchased and/or used Apple's Devices.

1060.     The above deceptive and unlawful practices and acts by Apple caused substantial injury to Plaintiff and New York Subclass members that they could not reasonably avoid.

1061.     Plaintiff and New York Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

## CLAIMS ON BEHALF OF THE NORTH CAROLINA SUBCLASS

## COUNT 56

### NORTH CAROLINA UNFAIR TRADE PRACTICES ACT,

### *N.C. Gen. Stat. Ann. §§ 75-1.1, et seq.*

1062.     The North Carolina Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the North Carolina Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1063.     Apple advertised, offered, or sold goods or services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. Ann. § 75-1.1(b).

1064.     Apple engaged in unfair and deceptive acts and practices in or affecting commerce, in violation of N.C. Gen. Stat. Ann. § 75-1.1, as described herein.

1065.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1066.     Apple intended to mislead Plaintiff and North Carolina Subclass members and induce them to rely on its misrepresentations and omissions.

1067.     Had Apple disclosed to Plaintiff and North Carolina Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was

CONSOLIDATED AMENDED COMPLAINT          252          NO. 5:18-MD-02827-EJD

1    otherwise engaged in deceptive, common business practices, Apple would have been unable to

2    continue in business and it would have been forced to disclose the uniform defects in its Devices.

3    Instead, Apple represented that its Devices were continually improving in speed and battery life and

4    performed better than other devices on the market.  Plaintiff and the North Carolina Subclass

5    members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of

6    which they could not have discovered.

7           1068.    Apple acted intentionally, knowingly, and maliciously to violate North

8    Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiff and North Carolina

9    Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of

10   software to throttle phone performance, put it on notice that the Devices were not as it advertised.

11          1069.    As a direct and proximate result of Apple's unfair and deceptive acts and

12   practices, Plaintiff and North Carolina Subclass members have suffered and will continue to suffer

13   injury, ascertainable losses of money or property, and monetary and non-monetary damages,

14   including from not receiving the benefit of their bargain in purchasing the Devices, and increased

15   time and expense in dealing with Device performance issues.

16          1070.    Apple's conduct as alleged herein was continuous, such that after the first

17   violations of the provisions pled herein, each week that the violations continued constitute separate

18   offenses pursuant to N.C. Gen. Stat. Ann. § 75-8.

19          1071.    Plaintiff and North Carolina Subclass members seek all monetary and non-

20   monetary relief allowed by law, including actual damages, treble damages, and attorneys' fees and

21   costs.

22

23

24

25

26

27

28

**CLAIMS ON BEHALF OF THE NORTH DAKOTA SUBCLASS**

**COUNT 57**

**NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING ACT,**

*N.D. Cent. Code §§ 51-15-01, et seq.*

1072.    The North Dakota Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the North Dakota Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1073.    Apple, Plaintiff, and each member of the North Dakota Subclass is a "person," as defined by N.D. Cent. Code § 51-15-01(4).

1074.    Apple sells and advertises "merchandise," as defined by N.D. Cent. Code § 51-15-01(3) and (5).

1075.    Apple advertised, offered, or sold goods or services in North Dakota and engaged in trade or commerce directly or indirectly affecting the people of North Dakota.

1076.    Apple engaged in deceptive, false, fraudulent, misrepresentative, unconscionable, and substantially injurious acts and practices in connection with the sale and advertisement of merchandise, in violation of N.D. Cent. Code § 51-15-01, as described herein.

1077.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1078.    Apple's above-described acts and practices caused substantial injury to Plaintiff and North Dakota Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

1079.    Apple intended to mislead Plaintiff and North Dakota Subclass members and induce them to rely on its misrepresentations and omissions.

1080.    Apple acted intentionally, knowingly, and maliciously to violate North Dakota's Unlawful Sales or Advertising Law, and recklessly disregarded Plaintiff and North Dakota Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

---

CONSOLIDATED AMENDED COMPLAINT             254             NO. 5:18-MD-02827-EJD

1081.    As a direct and proximate result of Apple's deceptive, unconscionable, and substantially injurious practices, Plaintiff and North Dakota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1082.    Plaintiff and North Dakota Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, damages, restitution, treble damages, civil penalties, and attorneys' fees, costs, and disbursements.

### CLAIMS ON BEHALF OF THE OHIO SUBCLASS

### COUNT 58

### OHIO CONSUMER SALES PRACTICES ACT,

### *Ohio Rev. Code §§ 1345.01, et seq.*

1083.    The Ohio Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Ohio Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1084.    Plaintiff and Ohio Subclass members are "persons," as defined by Ohio Rev. Code § 1345.01(B).

1085.    Apple was a "supplier" engaged in "consumer transactions," as defined by Ohio Rev. Code §§ 1345.01(A) & (C).

1086.    Apple advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

1087.    Apple engaged in unfair and deceptive acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code §§ 1345.02, including:

    a.    Apple represented that its goods, services, and intangibles had performance characteristics, uses, and benefits that it did not have, in violation of Ohio Rev. Code § 1345.02(B)(1); and

    b.    Apple represented that its goods, services, and intangibles were of a particular

---

CONSOLIDATED AMENDED COMPLAINT    255    NO. 5:18-MD-02827-EJD

standard or quality when they were not, in violation of Ohio Rev. Code § 1345(B)(2).

1088.     Apple engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code Ann. § 1345.03, including:

a.   Knowingly taking advantage of the inability of Plaintiff and the Ohio Subclass to reasonably protect their interest because of their ignorance of the issues discussed herein (Ohio Rev. Code Ann. § 1345.03(B)(1)); and

b.   Requiring Plaintiff and the Ohio Subclass to enter into a consumer transaction on terms that Apple knew were substantially one-sided in favor of Apple (Ohio Rev. Code Ann. § 1345.03(B)(5)).

1089.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1090.     Apple intended to mislead Plaintiff and Ohio Subclass members and induce them to rely on its misrepresentations and omissions.

1091.     Apple acted intentionally, knowingly, and maliciously to violate Ohio's Consumer Sales Practices Act, and recklessly disregarded Plaintiff and Ohio Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1092.     Apple's unfair, deceptive, and unconscionable acts and practices complained of herein affected the public interest, including the millions of Ohioans who purchased and/or used Apple's Devices.

1093.     As a direct and proximate result of Apple's unfair, deceptive, and unconscionable acts and practices, Plaintiff and Ohio Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

CONSOLIDATED AMENDED COMPLAINT          256          NO. 5:18-MD-02827-EJD

1094.    Plaintiff and the Ohio Subclass members seek all monetary and non-monetary relief allowed by law, including declaratory and injunctive relief, the greater of actual and treble damages or statutory damages, attorneys' fees and costs, and any other appropriate relief.

## COUNT 59

### OHIO DECEPTIVE TRADE PRACTICES ACT,

### *Ohio Rev. Code §§ 4165.01, et seq.*

1095.    The Ohio Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Ohio Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1096.    Apple, Plaintiff, and Ohio Subclass members are a "person," as defined by Ohio Rev. Code § 4165.01(D).

1097.    Apple advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

1098.    Apple engaged in deceptive trade practices in the course of its business and vocation, in violation of Ohio Rev. Code § 4165.02, including:

   a.    Representing that its goods and services have characteristics, uses, benefits, or qualities that they do not have, in violation of Ohio Rev. Code § 4165.02(A)(7);

   b.    Representing that its goods and services are of a particular standard or quality when they are of another, in violation of Ohio Rev. Code § 4165.02(A)(9); and

   c.    Advertising its goods and services with intent not to sell them as advertise, in violation of Ohio Rev. Code § 4165.02(A)(11).

1099.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1100.    Apple intended to mislead Plaintiff and Ohio Subclass members and induce them to rely on its misrepresentations and omissions.

1101.    Apple acted intentionally, knowingly, and maliciously to violate Ohio's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Ohio Subclass members'

---

CONSOLIDATED AMENDED COMPLAINT          257          NO. 5:18-MD-02827-EJD

rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1102.    As a direct and proximate result of Apple's deceptive trade practices, Plaintiff and Ohio Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1103.    Plaintiff and Ohio Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, actual damages, attorneys' fees, and any other relief that is just and proper.

**CLAIMS ON BEHALF OF THE OKLAHOMA SUBCLASS**

**COUNT 60**

**OKLAHOMA CONSUMER PROTECTION ACT,**

***Okla. Stat. Tit. 15, §§ 751, et seq.***

1104.    The Oklahoma Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Oklahoma Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1105.    Apple is a "person," as meant by Okla. Stat. tit. 15, § 752(1).

1106.    Apple's advertisements, offers of sales, sales, and distribution of goods, services, and other things of value constituted "consumer transactions" as meant by Okla. Stat. tit. 15, § 752(2).

1107.    Apple, in the course of its business, engaged in unlawful practices in violation of Okla. Stat. tit. 15, § 753, including the following:

    a.  Making false representations, knowingly or with reason to know, as to the characteristics, uses, and benefits of the subjects of its consumer transactions, in violation of Okla. Stat. tit. 15, § 753(5);

    b.  Representing, knowingly or with reason to know, that the subjects of its consumer

---

CONSOLIDATED AMENDED COMPLAINT          258          NO. 5:18-MD-02827-EJD

transactions were of a particular standard when they were of another, in violation of Okla. Stat. tit 15, § 753(7);

    c.  Advertising, knowingly or with reason to know, the subjects of its consumer transactions with intent not to sell as advertised, in violation of Okla. Stat. tit 15, § 753 (8);

    d.  Committing unfair trade practices that offend established public policy and was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers as defined by section 752(14), in violation of Okla. Stat. tit. 15, § 753(20); and

    e.  Committing deceptive trade practices that deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person as defined by section 752(13), in violation of Okla. Stat. tit. 15, § 753(20).

1108.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1109.    Apple intended to mislead Plaintiff and Oklahoma Subclass members and induce them to rely on its misrepresentations and omissions.

1110.    Had Apple disclosed to Plaintiff and Oklahoma Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market. Plaintiff and the Oklahoma Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1      1111.    The above unlawful practices and acts by Apple were immoral, unethical,

2  oppressive, unscrupulous, and substantially injurious. These acts caused substantial injury to

3  Plaintiff and Oklahoma Subclass members.

4      1112.    Apple acted intentionally, knowingly, and maliciously to violate Oklahoma's

5  Consumer Protection Act, and recklessly disregarded Plaintiff and Oklahoma Subclass members'

6  rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle

7  phone performance, put it on notice that the Devices were not as it advertised.

8      1113.    As a direct and proximate result of Apple's unlawful practices, Plaintiff and

9  Oklahoma Subclass members have suffered and will continue to suffer injury, ascertainable losses

10 of money or property, and monetary and non-monetary damages, including from not receiving the

11 benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with

12 Device performance issues.

13     1114.    Plaintiff and Oklahoma Subclass members seek all monetary and non-monetary

14 relief allowed by law, including actual damages, civil penalties, and attorneys' fees and costs.

15                **CLAIMS ON BEHALF OF THE OREGON SUBCLASS**

16                              **COUNT 61**

17                **OREGON UNLAWFUL TRADE PRACTICES ACT,**

18                        *Or. Rev. Stat. §§ 646.608, et seq.*

19     1115.    The Oregon Plaintiff(s) identified above ("Plaintiff," for purposes of this Count),

20 individually and on behalf of the Oregon Subclass, repeats and alleges Paragraphs 1-472, as if fully

21 alleged herein.

22     1116.    Apple is a "person," as defined by Or. Rev. Stat. § 646.605(4).

23     1117.    Apple engaged in the sale of "goods and services," as defined by Or. Rev. Stat.

24 § 646.605(6)(a).

25     1118.    Apple sold "goods or services," as defined by Or. Rev. Stat. § 646.605(6)(a).

26     1119.    Apple advertised, offered, or sold goods or services in Oregon and engaged in

27 trade or commerce directly or indirectly affecting the people of Oregon.

28

CONSOLIDATED AMENDED COMPLAINT          260          NO. 5:18-MD-02827-EJD

1120.    Apple engaged in unlawful practices in the course of its business and occupation, in violation of Or. Rev. Stat. § 646.608, included the following:

a.    Representing that its goods and services have approval, characteristics, uses, benefits, and qualities that they do not have, in violation of Or. Rev. Stat. § 646.608(1)(e);

b.    Representing that its goods and services are of a particular standard or quality if they are of another, in violation of Or. Rev. Stat. § 646.608(1)(g);

c.    Advertising its goods or services with intent not to provide them as advertised, in violation of Or. Rev. Stat. § 646.608(1)(i); and

d.    Concurrent with tender or delivery of its goods and services, failing to disclose any known material defect, in violation of Or. Rev. Stat. § 646.608(1)(t).

1121.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1122.    Apple intended to mislead Plaintiff and Oregon Subclass members and induce them to rely on its misrepresentations and omissions.

1123.    Had Apple disclosed to Plaintiffs and Oregon Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Oregon Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1124.    Apple acted intentionally, knowingly, and maliciously to violate Oregon's Unlawful Trade Practices Act, and recklessly disregarded Plaintiff and Oregon Subclass members'

1    rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle

2    phone performance, put it on notice that the Devices were not as it advertised.

3        1125.    As a direct and proximate result of Apple's unlawful practices, Plaintiff and

4    Oregon Subclass members have suffered and will continue to suffer injury, ascertainable losses of

5    money or property, and monetary and non-monetary damages, including from not receiving the

6    benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with

7    Device performance issues.

8        1126.    Plaintiff and Oregon Subclass members seek all monetary and non-monetary

9    relief allowed by law, including equitable relief, actual damages or statutory damages of $200 per

10   violation (whichever is greater), punitive damages, and reasonable attorneys' fees and costs.

11                **CLAIMS ON BEHALF OF THE PENNSYLVANIA SUBCLASS**

12                                    **COUNT 62**

13                   **PENNSYLVANIA UNFAIR TRADE PRACTICES AND**

14                        **CONSUMER PROTECTION LAW,**

15                      *73 Pa. Cons. Stat. §§ 201-2 & 201-3, et seq.*

16       1127.    The Pennsylvania Plaintiff(s) identified above ("Plaintiff," for purposes of this

17   Count), individually and on behalf of the Pennsylvania Subclass, repeats and alleges Paragraphs 1-

18   472, as if fully alleged herein.

19       1128.    Apple is a "person," as meant by 73 Pa. Cons. Stat. § 201-2(2).

20       1129.    Plaintiff and Pennsylvania Subclass members purchased goods and services in

21   "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family,

22   and/or household purposes.

23       1130.    Apple engaged in unfair methods of competition and unfair or deceptive acts or

24   practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. Ann. § 201-3,

25   including the following:

26           a.   Representing that its goods and services have characteristics, uses, benefits, and

27                qualities that they do not have (73 Pa. Stat. Ann. § 201-2(4)(v));

28

---

CONSOLIDATED AMENDED COMPLAINT         262         NO. 5:18-MD-02827-EJD

b.   Representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Stat. Ann. § 201-2(4)(vii)); and

c.   Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)).

1131.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1132.     Apple intended to mislead Plaintiff and Pennsylvania Subclass members and induce them to rely on its misrepresentations and omissions.

1133.     Had Apple disclosed to Plaintiffs and Pennsylvania Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market. Plaintiff and the Pennsylvania Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1134.     Apple acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiff and Pennsylvania Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1135.     As a direct and proximate result of Apple's unfair methods of competition and unfair or deceptive acts or practices and Plaintiff's and the Pennsylvania Subclass' reliance on them, Plaintiff and Pennsylvania Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including

---

CONSOLIDATED AMENDED COMPLAINT      263      No. 5:18-MD-02827-EJD

1  from not receiving the benefit of their bargain in purchasing the Devices, and increased time and

2  expense in dealing with Device performance issues.

3     1136.    Plaintiff and Pennsylvania Subclass members seek all monetary and non-

4  monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever

5  is greater), treble damages, attorneys' fees and costs, and any additional relief the Court deems

6  necessary or proper.

7  **CLAIMS ON BEHALF OF THE RHODE ISLAND SUBCLASS**

8  **COUNT 63**

9  **RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,**

10  *R.I. Gen. Laws §§ 6-13.1, et seq.*

11     1137.    The Rhode Island Plaintiff(s) identified above ("Plaintiff," for purposes of this

12  Count), individually and on behalf of the Rhode Island Subclass, repeats and alleges Paragraphs 1-

13  472, as if fully alleged herein.

14     1138.    Plaintiff and Rhode Island Subclass members are each a "person," as defined by

15  R.I. Gen. Laws § 6-13.1-1(3).

16     1139.    Plaintiff and Rhode Island Subclass members purchased goods and services for

17  personal, family, or household purposes.

18     1140.    Apple advertised, offered, or sold goods or services in Rhode Island and engaged

19  in trade or commerce directly or indirectly affecting the people of Rhode Island, as defined by R.I.

20  Gen. Laws § 6-13.1-1(5).

21     1141.    Apple engaged in unfair and deceptive acts and practices, in violation of R.I.

22  Gen. Laws § 6-13.1-2, including:

23        a.   Representing that its goods and services have characteristics, uses, and benefits that

24             they do not have (R.I. Gen. Laws § 6-13.1-52(6)(v));

25        b.   Representing that its goods and services are of a particular standard or quality when

26             they are of another (R.I. Gen. Laws § 6-13.1-52(6)(vii));

27        c.   Advertising goods or services with intent not to sell them as advertised (R.I. Gen.

28

---

CONSOLIDATED AMENDED COMPLAINT          264          NO. 5:18-MD-02827-EJD

Laws § 6-13.1-52(6)(ix));

    d.   Engaging in any other conduct that similarly creates a likelihood of confusion or misunderstanding (R.I. Gen. Laws § 6-13.1-52(6)(xii));

    e.   Engaging in any act or practice that is unfair or deceptive to the consumer (R.I. Gen. Laws § 6-13.1-52(6)(xiii)); and

    f.   Using other methods, acts, and practices that mislead or deceive members of the public in a material respect (R.I. Gen. Laws § 6-13.1-52(6)(xiv)).

1142.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1143.    Apple intended to mislead Plaintiff and Rhode Island Subclass members and induce them to rely on its misrepresentations and omissions.

1144.    Apple acted intentionally, knowingly, and maliciously to violate Rhode Island's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Rhode Island Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1145.    As a direct and proximate result of Apple's unfair and deceptive acts, Plaintiff and Rhode Island Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1146.    Plaintiff and Rhode Island Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $200 per Subclass Member (whichever is greater), punitive damages, injunctive relief, other equitable relief, and attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE SOUTH CAROLINA SUBCLASS**

**COUNT 64**

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT,**

*S.C. Code Ann. §§ 39-5-10, et seq.*

1147.    The South Carolina Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the South Carolina Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1148.    Apple is a "person," as defined by S.C. Code Ann. § 39-5-10(a).

1149.    South Carolina's Unfair Trade Practices Act (SC UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20.

1150.    Apple advertised, offered, or sold goods or services in South Carolina and engaged in trade or commerce directly or indirectly affecting the people of South Carolina, as defined by S.C. Code Ann. § 39-5-10(b).

1151.    Apple's acts and practices had, and continue to have, the tendency or capacity to deceive.

1152.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1153.    Apple intended to mislead Plaintiff and South Carolina Subclass members and induce them to rely on its misrepresentations and omissions.

1154.    Had Apple disclosed to Plaintiffs and South Carolina Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the South Carolina Subclass

---

CONSOLIDATED AMENDED COMPLAINT         266              NO. 5:18-MD-02827-EJD

members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1155.    Apple had a duty to disclose the above-described facts due to the circumstances of this case.  Apple's duty to disclose also arose from its:

    a.    Possession of exclusive knowledge regarding the defects in its Devices;

    b.    Possession of exclusive knowledge regarding the operating software it used to throttle the Devices;

    c.    Active concealment or misrepresentations regarding the operating software it used to throttle the Devices or the defects in the Devices; and

    d.    Incomplete representations about the Devices and operating software, while purposefully withholding material facts from Plaintiff and the South Carolina Subclass that contradicted these representations.

1156.    Apple's business acts and practices offend an established public policy, or are immoral, unethical, or oppressive.

1157.    Apple's unfair and deceptive acts or practices adversely affected the public interest because such acts or practices have the potential for repetition; Apple engages in such acts or practices as a general rule; and such acts or practices impact the public at large, including millions of South Carolina Subclass members that purchased and/or used an Apple Device.

1158.    Apple unfair and deceptive acts or practices have the potential for repetition because the same kinds of actions occurred in the past, as described herein, thus making it likely that these acts or practices will continue to occur if left undeterred. Additionally, Apple's policies and procedures create the potential for recurrence of the complained-of business acts and practices.

1159.    Apple's violations present a continuing risk to Plaintiff and South Carolina Subclass members as well as to the general public.

1160.    Apple intended to mislead Plaintiff and South Carolina Subclass members and induce them to rely on its misrepresentations and omissions.

1161.    Apple acted intentionally, knowingly, and maliciously to violate South Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiff and South Carolina Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised. In light of this conduct, punitive damages would serve the interest of society in punishing and warning others not to engage in such conduct and would deter Apple and others from committing similar conduct in the future.

1162.    As a direct and proximate result of Apple's unfair and deceptive acts or practices, Plaintiff and South Carolina Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1163.    Plaintiff and South Carolina Subclass members seek all monetary and non-monetary relief allowed by law, including damages for their economic losses, treble damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### CLAIMS ON BEHALF OF THE SOUTH DAKOTA SUBCLASS

### COUNT 65

### SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT,

*S.D. Codified Laws §§ 37-24-1, et seq.*

1164.    The South Dakota Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the South Dakota Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1165.    Apple is a "person," as defined by S.D. Codified Laws § 37-24-1(8).

1166.    Apple advertises and sells "merchandise," as defined by S.D. Codified Laws § 37-24-1(6), (7), & (13).

---

CONSOLIDATED AMENDED COMPLAINT        268        NO. 5:18-MD-02827-EJD

1167.    Apple advertised, offered, or sold goods or services in South Dakota and engaged in trade or commerce directly or indirectly affecting the people of South Dakota, as defined by S.D. Codified Laws § 37-24-1(6), (7), & (13).

1168.    Apple knowingly engaged in deceptive acts or practices, misrepresentation, concealment, suppression, or omission of material facts in connection with the sale and advertisement of goods or services, in violation of S.D. Codified Laws § 37-24-6, as described herein.

1169.    Apple intended to mislead Plaintiff and South Dakota Subclass members and induce them to rely on its misrepresentations and omissions.

1170.    Apple representations and omissions were material because they were likely to deceive reasonable consumers.

1171.    Had Apple disclosed to Plaintiff and South Dakota class members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market. Plaintiff and the South Dakota Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1172.    Apple had a duty to disclose the above facts because members of the public, including Plaintiff and the South Dakota Subclass. Apple's duty to disclose also arose from its:

a.   Possession of exclusive knowledge regarding the defects in Apple's Devices;

b.   Possession of exclusive knowledge regarding operating software created to throttle Device performance;

c.   Active concealment of the defects in its Devices or regarding operating software to throttle performance of such Devices; and

CONSOLIDATED AMENDED COMPLAINT        269        NO. 5:18-MD-02827-EJD

d.   Incomplete representations about the Devices and operating software, while purposefully withholding material facts from Plaintiff and the South Dakota Subclass that contradicted these representations.

1173.   As a direct and proximate result of Apple's deceptive acts or practices, misrepresentations, and concealment, suppression, and/or omission of material facts, Plaintiff and South Dakota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1174.   Apple's violations present a continuing risk to Plaintiff and South Dakota Subclass members as well as to the general public.

1175.   Plaintiff and South Dakota Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE TENNESSEE SUBCLASS

### COUNT 66

### TENNESSEE CONSUMER PROTECTION ACT,

### *Tenn. Code Ann. §§ 47-18-101, et seq.*

1176.   The Tennessee Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Tennessee Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1177.   Apple is a "person," as defined by Tenn. Code § 47-18-103(13).

1178.   Plaintiff and Tennessee Subclass members are "consumers," as meant by Tenn. Code § 47-18-103(2).

1179.   Apple advertised and sold "goods" or "services" in "consumer transaction[s]," as defined by Tenn. Code §§ 47-18-103(7), (18) & (19).

---

CONSOLIDATED AMENDED COMPLAINT          270          NO. 5:18-MD-02827-EJD

1180.    Apple advertised, offered, or sold goods or services in Tennessee and engaged in trade or commerce directly or indirectly affecting the people of Tennessee, as defined by Tenn. Code §§ 47-18-103(7), (18) & (19).  And Apple's acts or practices affected the conduct of trade or commerce, under Tenn. Code § 47-18-104.

1181.    Apple intended to mislead Plaintiff and Tennessee Subclass members and induce them to rely on its misrepresentations and omissions.

1182.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1183.    Had Apple disclosed to Plaintiffs and Tennessee Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Tennessee Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1184.    Apple had a duty to disclose the above facts due to the circumstances of this case.  Apple's duty to disclose arose from its:

    a.  Possession of exclusive knowledge regarding the defects in the Devices;

    b.  Possession of exclusive knowledge regarding the operating software that throttles performance of the Devices;

    c.  Active concealment of the defects in the Devices and operating software that throttles performance of those Devices; and

    d.  Incomplete representations about the defects in the Devices and operating software that throttles performance of those Devices, while purposefully withholding material facts from Plaintiff and the Tennessee Subclass that contradicted these

CONSOLIDATED AMENDED COMPLAINT              271              NO. 5:18-MD-02827-EJD

1    representations.

2    1185.    Apple's "unfair" acts and practices caused or were likely to cause substantial

3    injury to consumers, which was not reasonably avoidable by consumers themselves and not

4    outweighed by countervailing benefits to consumers or to competition.

5    1186.    The injury to consumers was and is substantial because it was non-trivial and

6    non-speculative and involved a monetary injury. The injury to consumers was substantial not only

7    because it inflicted harm on a significant and unprecedented number of consumers, but also because

8    it inflicted a significant amount of harm on each consumer.

9    1187.    Consumers could not have reasonably avoided injury because Apple's business

10    acts and practices unreasonably created or took advantage of an obstacle to the free exercise of

11    consumer decision-making. By withholding important information from consumers as described

12    herein, Apple created an asymmetry of information between it and consumers that precluded

13    consumers from taking action to avoid or mitigate injury.

14    1188.    Apple's business practices had no countervailing benefit to consumers or to

15    competition.

16    1189.    By misrepresenting and omitting material facts, Apple violated the following

17    provisions of Tenn. Code § 47-18-104(b):

18        a.    Representing that goods or services have sponsorship, approval, characteristics,

19            ingredients, uses, benefits or quantities that they do not have;

20        b.    Representing that goods or services are of a particular standard, quality or grade, if

21            they are of another;

22        c.    Advertising goods or services with intent not to sell them as advertised; and

23        d.    Representing that a consumer transaction confers or involves rights, remedies or

24            obligations that it does not have or involve.

25    1190.    Apple acted intentionally, knowingly, and maliciously to violate Tennessee's

26    Consumer Protection Act, and recklessly disregarded Plaintiff and Tennessee Subclass members'

27

28

CONSOLIDATED AMENDED COMPLAINT        272        NO. 5:18-MD-02827-EJD

1   rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle

2   phone performance, put it on notice that the Devices were not as it advertised.

3       1191.    As a direct and proximate result of Apple's unfair and deceptive acts or

4   practices, Plaintiff and Tennessee Subclass members have suffered and will continue to suffer

5   injury, ascertainable losses of money or property, and monetary and non-monetary damages,

6   including from not receiving the benefit of their bargain in purchasing the Devices, and increased

7   time and expense in dealing with Device performance issues.

8       1192.    Apple's violations present a continuing risk to Plaintiff and Tennessee Subclass

9   members as well as to the general public.

10      1193.    Plaintiff and Tennessee Subclass members seek all monetary and non-monetary

11  relief allowed by law, including injunctive relief, actual damages, treble damages for each willful or

12  knowing violation, attorneys' fees and costs, and any other relief that is necessary and proper.

13                  **CLAIMS ON BEHALF OF THE TEXAS SUBCLASS**

14                              **COUNT 67**

15              **Deceptive Trade Practices—Consumer Protection Act,**

16                  ***Texas Bus. & Com. Code §§ 17.41, et seq.***

17      1194.    The Texas Plaintiff(s) identified above ("Plaintiff," for purposes of this Count),

18  individually and on behalf of the Texas Subclass, repeats and alleges Paragraphs 1-472, as if fully

19  alleged herein.

20      1195.    Apple is a "person," as defined by Tex. Bus. & Com. Code § 17.45(3).

21      1196.    Plaintiffs and the Texas Subclass members are "consumers," as defined by Tex.

22  Bus. & Com. Code § 17.45(4).

23      1197.    Apple advertised, offered, or sold goods or services in Texas and engaged in

24  trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. &

25  Com. Code § 17.45(6).

26      1198.    Apple engaged in false, misleading, or deceptive acts and practices, in violation

27  of Tex. Bus. & Com. Code § 17.46(b), including:

28

---

CONSOLIDATED AMENDED COMPLAINT          273          No. 5:18-MD-02827-EJD

    a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

    b.   Representing that goods or services are of a particular standard, quality or grade, if they are of another; and

    c.   Advertising goods or services with intent not to sell them as advertised.

1199.    Apple intended to mislead Plaintiff and Texas Subclass members and induce them to rely on its misrepresentations and omissions.

1200.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1201.    Had Apple disclosed to Plaintiff and Texas Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market. Plaintiff and the Texas Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1202.    Apple had a duty to disclose the above facts due to the circumstances of this case. Apple's duty to disclose arose from its:

    a.   Possession of exclusive knowledge regarding the defects in its Devices;

    b.   Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the defects;

    c.   Active concealment of the defects in its Devices and purpose of the throttling operating software; and

    d.   Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1203.    Apple engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3).  Apple engaged in acts or practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

1204.    Consumers, including Plaintiffs and Texas Subclass members, lacked knowledge about the above business practices, omissions, and misrepresentations because this information was known exclusively by Apple.

1205.    Apple intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result.  The unfairness resulting from Apple's conduct is glaringly noticeable, flagrant, complete, and unmitigated.

1206.    Apple acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Plaintiff and Texas Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1207.    As a direct and proximate result of Apple's unconscionable and deceptive acts or practices, Plaintiffs and Texas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.  Apple's unconscionable and deceptive acts or practices were a producing cause of Plaintiffs' and Texas Subclass members' injuries, ascertainable losses, economic damages, and non-economic damages.

1208.    Apple's violations present a continuing risk to Plaintiffs and Texas Subclass members as well as to the general public.

1209.    Plaintiffs and the Texas Subclass seek all monetary and non-monetary relief allowed by law, including economic damages, damages for mental anguish, treble damages for each

act committed intentionally or knowingly, court costs, reasonably and necessary attorneys' fees, injunctive relief, and any other relief which the court deems proper.

### CLAIMS ON BEHALF OF THE UTAH SUBCLASS

### COUNT 68

### UTAH CONSUMER SALES PRACTICES ACT,

### *Utah Code §§ 13-11-1, et seq.*

1210.    The Utah Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Utah Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1211.    Apple is a "person," as defined by Utah Code § 13-11-1(5).

1212.    Apple is a "supplier," as defined by Utah Code § 13-11-1(6), because it regularly solicits, engages in, or enforces "consumer transactions," as defined by Utah Code § 13-11-1(2).

1213.    Apple engaged in deceptive and unconscionable acts and practices in connection with consumer transactions, in violation of Utah Code § 13-11-4 and Utah Code § 13-11-5, as described herein.

1214.    Apple intended to mislead Plaintiff and Utah Subclass members and induce them to rely on its misrepresentations and omissions.

1215.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1216.    Had Apple disclosed to Plaintiffs and class members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Utah Subclass members acted reasonably

CONSOLIDATED AMENDED COMPLAINT          276          NO. 5:18-MD-02827-EJD

1    in relying on Apple's misrepresentations and omissions, the truth of which they could not have

2    discovered.

3        1217.    Apple had a duty to disclose the above facts due to the circumstances of this

4    case. Apple's duty to disclose arose from its:

5        a. Possession of exclusive knowledge regarding the defects in its Devices;

6        b. Possession of exclusive knowledge regarding the operating software it developed to

7            throttle performance in its Devices as a result of the defects;

8        c. Active concealment of the defects in its Devices and purpose of the throttling

9            operating software; and

10       d. Incomplete representations about its Devices, Device performance, battery life of

11           Devices, and the throttling software.

12       1218.    Apple intentionally or knowingly engaged in deceptive acts or practices,

13   violating Utah Code § 13-11-4(2) by:

14       a. Indicating that the subject of a consumer transaction has sponsorship, approval,

15           performance characteristics, accessories, uses, or benefits, if it has not;

16       b. Indicating that the subject of a consumer transaction is of a particular standard,

17           quality, grade, style, or model, if it is not;

18       c. Indicating that the subject of a consumer transaction has been supplied in accordance

19           with a previous representation, if it has not;

20       d. Indicating that the subject of a consumer transaction will be supplied in greater

21           quantity (e.g. more data security) than the supplier intends.

22       1219.    Apple engaged in unconscionable acts and practices that were oppressive and led

23   to unfair surprise, as shown in the setting, purpose, and effect of those acts and practices.

24       1220.    In addition, there was an overall imbalance in the obligations and rights imposed

25   by the consumer transactions in question, based on the mores and industry standards of the time and

26   place where they occurred. There is a substantial imbalance between the obligations and rights of

27   consumers, such as Plaintiff and the Utah Subclass, who purchase Devices based upon the publicly-

28

CONSOLIDATED AMENDED COMPLAINT        277        No. 5:18-MD-02827-EJD

1  available information in the marketplace, and Apple, which has exclusive knowledge of any defects

2  in those Devices and software developed to address those defects.

3      1221.    Apple's acts and practices were also procedurally unconscionable because

4  consumers, including Plaintiff and the Utah Subclass, had no practicable option but to purchase

5  Devices based upon publicly-available information, despite Apple's omissions and

6  misrepresentations.  Apple exploited this imbalance in power, and the asymmetry of information, to

7  profit by selling defective Devices, throttling them, and then encouraging consumers to spend more

8  money on new devices when the throttling became unbearable.

9      1222.    As a direct and proximate result of Apple's unconscionable and deceptive acts or

10  practices, Plaintiffs and Utah Subclass members have suffered and will continue to suffer injury,

11  ascertainable losses of money or property, and monetary and non-monetary damages including

12  from not receiving the benefit of their bargain in purchasing the Devices, and increased time and

13  expense in dealing with Device performance issues.

14      1223.    Apple's violations present a continuing risk to Plaintiffs and Utah Subclass

15  members as well as to the general public.

16      1224.    Plaintiff and Utah Subclass members seek all monetary and non-monetary relief

17  allowed by law, including actual damages, statutory damages of $2,000 per violation, amounts

18  necessary to avoid unjust enrichment, under Utah Code §§ 13-11-19, *et seq.*, injunctive relief, and

19  reasonable attorneys' fees and costs.

### CLAIMS ON BEHALF OF THE VERMONT SUBCLASS

### COUNT 69

### VERMONT CONSUMER FRAUD ACT,

### *Vt. Stat. Ann. tit. 9, §§ 2451, et seq.*

24      1225.    The Vermont Plaintiff(s) identified above ("Plaintiff," for purposes of this

25  Count), individually and on behalf of the Vermont Subclass, repeats and alleges Paragraphs 1-472,

26  as if fully alleged herein.

27

28

---

CONSOLIDATED AMENDED COMPLAINT          278          NO. 5:18-MD-02827-EJD

1226.    Plaintiff and Vermont Subclass members are "consumers," as defined by Vt. Stat. Ann. tit. 9, § 2451a(a).

1227.    Apple's conduct as alleged herein related to "goods" or "services" for personal, family, or household purposes, as defined by Vt. Stat. Ann. tit. 9, § 2451a(b).

1228.    Apple is a "seller," as defined by Vt. Stat. Ann. tit. 9, § 2451a(c).

1229.    Apple advertised, offered, or sold goods or services in Vermont and engaged in trade or commerce directly or indirectly affecting the people of Vermont.

1230.    Apple engaged in unfair and deceptive acts or practices, in violation of Vt. Stat. tit. 9, § 2453(a), as described herein.

1231.    Apple intended to mislead Plaintiff and Vermont Subclass members and induce them to rely on its misrepresentations and omissions.

1232.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1233.    Under the circumstances, consumers had a reasonable interpretation of Apple's representations and omissions.

1234.    Apple had a duty to disclose these facts due to the circumstances of this case. Apple's duty to disclose also from its:

    a.    Possession of exclusive knowledge regarding the defects in its Devices;

    b.    Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the defects;

    c.    Active concealment of the defects in its Devices and purpose of the throttling operating software; and

    d.    Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1235.    Apple's acts and practices caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

---

CONSOLIDATED AMENDED COMPLAINT    279    No. 5:18-MD-02827-EJD

1236.    The injury to consumers was and is substantial because it was non-trivial and non-speculative; and involved a concrete monetary injury.  The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

1237.    Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Apple created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

1238.    Apple's business practices had no countervailing benefit to consumers or to competition.

1239.    Apple is presumed, as a matter of law under Vt. Stat. Ann. tit. 9, § 2457, to have intentionally violated the Vermont Consumer Protection Act because it failed to sell goods or services in the manner and of the nature advertised or offered.

1240.    Apple acted intentionally, knowingly, and maliciously to violate Vermont's Consumer Fraud Act, and recklessly disregarded Plaintiff and Vermont Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1241.    As a direct and proximate result of Apple's unfair and deceptive acts or practices, Plaintiffs and Vermont Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1242.    Apple's violations present a continuing risk to Plaintiffs and Vermont Subclass members as well as to the general public.

1243.    Apple received notice pursuant to Tex. Bus. & Com. Code Ann. § 17.505 concerning its wrongful conduct as alleged herein by Plaintiff and Texas Subclass members.

CONSOLIDATED AMENDED COMPLAINT         280         NO. 5:18-MD-02827-EJD

1    However, sending pre-suit notice pursuant to Tex. Bus. & Com. Code Ann. § 17.505 is an exercise

2    in futility for Plaintiff, as Apple has already been informed of the allegedly unfair and unlawful

3    conduct as described herein as of the date of the first-filed lawsuit in December 2017, and has yet to

4    offer class members remedy in accordance with similar consumer protection statutes.

5        1244.    Plaintiff and Vermont Subclass members seek all monetary and non-monetary

6    relief allowed by law, including injunctive relief, restitution, actual damages, disgorgement of

7    profits, treble damages, punitive/exemplary damages, and reasonable attorneys' fees and costs.

8    <u>**CLAIMS ON BEHALF OF THE VIRGIN ISLANDS SUBCLASS**</u>

9    <u>**COUNT 70**</u>

10    **Virgin Islands Consumer Fraud**

11    **and Deceptive Business Practices Act,**

12    <u>*V.I. Code tit. 12A, §§ 301, et seq.*</u>

13        1245.    Plaintiffs, on behalf of the Virgin Islands Subclass, repeat and allege Paragraphs

14    1-472, as if fully alleged herein.

15        1246.    Apple is a "person," as defined by V.I. Code tit. 12A, § 303(h).

16        1247.    Plaintiff and Virgin Islands Subclass members are "consumers," as defined by

17    V.I. Code tit. 12A, § 303(d).

18        1248.    Apple advertised, offered, or sold goods or services in the Virgin Islands and

19    engaged in trade or commerce directly or indirectly affecting the people of the Virgin Islands.

20        1249.    Apple engaged in unfair and deceptive acts and practices, in violation of V.I.

21    Code tit. 12A, § 304, as described herein.

22        1250.    Apple's acts and practices were "unfair" under V.I. Code tit. 12A, § 304 because

23    they caused or were likely to cause substantial injury to consumers which was not reasonably

24    avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or

25    to competition.

26        1251.    The injury to consumers from Apple's conduct was and is substantial because it

27    was non-trivial and non-speculative; and involved a monetary injury.  The injury to consumers was

28

CONSOLIDATED AMENDED COMPLAINT        281        NO. 5:18-MD-02827-EJD

substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

1252.    Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Apple created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

1253.    Apple's inadequate data security had no countervailing benefit to consumers or to competition.

1254.    Apple's acts and practices were "deceptive" under V.I. Code tit. 12A, §§ 303 & 304 because Apple made representations or omissions of material facts that had the capacity, tendency or effect of deceiving or misleading consumers, including Plaintiff and Virgin Islands Subclass members.

1255.    Apple intended to mislead Plaintiff and Virgin Island Subclass members and induce them to rely on its misrepresentations and omissions.

1256.    Apple's representations and omissions were material because they were likely to unfairly influence or deceive reasonable consumers.

1257.    Apple had a duty to disclose the above-described facts due to the circumstances of this case.  Apple's duty to disclose arose from its:

    a.  Possession of exclusive knowledge regarding the defects in its Devices;

    b.  Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the defects;

    c.  Active concealment of the defects in its Devices and purpose of the throttling operating software; and

    d.  Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

CONSOLIDATED AMENDED COMPLAINT                282                NO. 5:18-MD-02827-EJD

1258.    Apple acted intentionally, knowingly, and maliciously to violate the Virgin Island's Consumer Fraud and Deceptive Business Practices Act, and recklessly disregarded Plaintiff and Virgin Islands Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.  Apple intentionally hid this information, callously disregarding the rights of consumers.

1259.    As a direct and proximate result of Apple's unfair and deceptive acts or practices, Plaintiff and Virgin Islands Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1260.    Apple's violations present a continuing risk to Plaintiff and Virgin Islands Subclass members as well as to the general public.

1261.    Plaintiff and Virgin Islands Subclass members seek all monetary and non-monetary relief allowed by law, including compensatory, consequential, treble, punitive, and equitable damages under V.I. Code tit. 12A, § 331, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT 71

### Virgin Islands Consumer Protection Law,

### *V.I. Code tit. 12A, §§101, et seq.*

1262.    Plaintiffs, on behalf of the Virgin Islands Subclass, repeat and allege Paragraphs 1-472, as if fully alleged herein.

1263.    Apple is a "merchant," as defined by V.I. Code tit. 12A, § 102(e).

1264.    Plaintiff and Virgin Islands Subclass members are "consumers," as defined by V.I. Code tit. 12A, § 102(d).

1265.    Apple sells and offers for sale "consumer goods" and "consumer services," as defined by V.I. Code tit. 12A, § 102(c).

CONSOLIDATED AMENDED COMPLAINT          283          NO. 5:18-MD-02827-EJD

1266.    Apple engaged in deceptive acts and practices, in violation of V.I. Code tit. 12A, § 101, as described herein.

1267.    Apple's acts and practices were "deceptive trade practices" under V.I. Code tit. 12A, § 102(a) because Apple:

    a.   Represented that goods or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; or that goods or services are of particular standard, quality, grade, style or model, if they are of another;

    b.   Used exaggeration, innuendo or ambiguity as to a material fact or failure to state a material fact if such use deceives or tends to deceive;

    c.   Offered goods or services with intent not to sell them as offered; and

    d.   Stated that a consumer transaction involves consumer rights, remedies or obligations that it does not involve.

1268.    Apple's acts and practices were also "deceptive" under V.I. Code tit. 12A, § 101 because Apple made representations or omissions of material facts that had the capacity, tendency or effect of deceiving or misleading consumers, including Plaintiff and Virgin Islands Subclass members.

1269.    Apple intended to mislead Plaintiff and Virgin Islands Subclass members and induce them to rely on its misrepresentations and omissions.

1270.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1271.    Apple had a duty to disclose the above-described facts due to the circumstances of this case. Apple's duty to disclose arose from its:

    a.   Possession of exclusive knowledge regarding the defects in its Devices;

    b.   Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the defects;

    c.   Active concealment of the defects in its Devices and purpose of the throttling

---

CONSOLIDATED AMENDED COMPLAINT    284    NO. 5:18-MD-02827-EJD

1   operating software; and

2       d.  Incomplete representations about its Devices, Device performance, battery life of

3           Devices, and the throttling software.

4   1272.   Apple acted intentionally, knowingly, and maliciously to violate the Virgin

5   Island's Consumer Protection Law, and recklessly disregarded Plaintiff and Virgin Island Subclass

6   members' rights.  Apple's knowledge of the Devices' performance issues, and release of software

7   to throttle phone performance, put it on notice that the Devices were not as it advertised.

8   1273.   As a direct and proximate result of Apple's deceptive acts or practices, Plaintiff

9   and Virgin Islands Subclass members have suffered and will continue to suffer injury, ascertainable

10  losses of money or property, and monetary and non-monetary damages, including from not

11  receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in

12  dealing with Device performance issues.

13  1274.   Apple's violations present a continuing risk to Plaintiff and Virgin Islands

14  Subclass members as well as to the general public.

15  1275.   Plaintiff and Virgin Islands Subclass members seek all monetary and non-

16  monetary relief allowed by law, including declaratory relief; injunctive relief, the greater of actual

17  damages or $500 per violation, compensatory, consequential, treble, and punitive damages;

18  disgorgement, and reasonable attorneys' fees and costs.

19  **CLAIMS ON BEHALF OF THE VIRGINIA SUBCLASS**

20  **COUNT 72**

21  **VIRGINIA CONSUMER PROTECTION ACT,**

22  *Va. Code Ann. §§ 59.1-196, et seq.*

23  1276.   The Virginia Plaintiff(s) identified above ("Plaintiff," for purposes of this

24  Count), individually and on behalf of the Virginia Subclass, repeats and alleges Paragraphs 1-472,

25  as if fully alleged herein.

26

27

28

CONSOLIDATED AMENDED COMPLAINT        285        NO. 5:18-MD-02827-EJD

1277. The Virginia Consumer Protection Act prohibits "[u]sing any . . . deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(14).

1278. Apple is a "person" as defined by Va. Code Ann. § 59.1-198.

1279. Apple is a "supplier," as defined by Va. Code Ann. § 59.1-198.

1280. Apple engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods" and "services," as defined by Va. Code Ann. § 59.1-198. Apple advertised, offered, or sold goods or services used primarily for personal, family or household purposes.

1281. Apple engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation in connection with consumer transactions, described herein.

1282. Apple intended to mislead Plaintiff and Virginia Subclass members and induce them to rely on its misrepresentations and omissions.

1283. Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1284. Had Apple disclosed to Plaintiff and Virginia Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market. Plaintiff and the Virginia Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1285. Apple had a duty to disclose these facts due to the circumstances of this case. Apple's duty to disclose also arose from its:

---

CONSOLIDATED AMENDED COMPLAINT          286          NO. 5:18-MD-02827-EJD

a. Possession of exclusive knowledge regarding the defects in its Devices;

b. Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the defects;

c. Active concealment of the defects in its Devices and purpose of the throttling operating software; and

d. Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1286.    The above-described deceptive acts and practices also violated the following provisions of VA Code § 59.1-200(A):

a. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

b. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and

c. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell them upon the terms advertised.

1287.    Apple acted intentionally, knowingly, and maliciously to violate Virginia's Consumer Protection Act, and recklessly disregarded Plaintiff and Virginia Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.  An award of punitive damages would serve to punish Apple for its wrongdoing and warn or deter others from engaging in similar conduct.

1288.    As a direct and proximate result of Apple's deceptive acts or practices, Plaintiffs and Virginia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

CONSOLIDATED AMENDED COMPLAINT         287              NO. 5:18-MD-02827-EJD

1289.    Apple's violations present a continuing risk to Plaintiffs and Virginia Subclass members as well as to the general public.

1290.    Plaintiff and Virginia Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the amount of $1,000 per violation if the conduct is found to be willful or, in the alternative, $500 per violation, restitution, injunctive relief, punitive damages, and attorneys' fees and costs.

### CLAIMS ON BEHALF OF THE WASHINGTON SUBCLASS

### COUNT 73

### WASHINGTON CONSUMER PROTECTION ACT,

#### *Wash. Rev. Code Ann. §§ 19.86.020, et seq.*

1291.    The Washington Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Washington Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1292.    Apple is a "person," as defined by Wash. Rev. Code Ann. § 19.86.010(1).

1293.    Apple advertised, offered, or sold goods or services in Washington and engaged in trade or commerce directly or indirectly affecting the people of Washington, as defined by Wash. Rev. Code Ann. § 19.86.010 (2).

1294.    Apple engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Wash. Rev. Code Ann. § 19.86.020, as described herein.

1295.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1296.    Apple acted intentionally, knowingly, and maliciously to violate Washington's Consumer Protection Act, and recklessly disregarded Plaintiff and Washington Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1297.    Apple's conduct is injurious to the public interest because it violates Wash. Rev. Code Ann. § 19.86.020, violates a statute that contains a specific legislation declaration of public

---

interest impact, and/or injured persons and had and has the capacity to injure persons. Further, its conduct affected the public interest, including the at least hundreds of thousands of Washingtonians affected by Apple's deceptive business practices.

1298.    As a direct and proximate result of Apple's unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and Washington Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1299.    Plaintiff and Washington Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE WEST VIRGINIA SUBCLASS

## COUNT 74

### West Virginia Consumer Credit and PROTECTION ACT,

### *W. Va. Code §§ 46A-6-101, et seq.*

1300.    The West Virginia Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the West Virginia Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1301.    Plaintiff and West Virginia Subclass members are "consumers," as defined by W. Va. Code § 46A-6-102(2).

1302.    Apple engaged in "consumer transactions," as defined by W. Va. Code § 46A-6-102(2).

1303.    Apple advertised, offered, or sold goods or services in West Virginia and engaged in trade or commerce directly or indirectly affecting the people of West Virginia, as defined by W. Va. Code § 46A-6-102(6).

1304.    Apple received notice pursuant to W. Va. Code § 46A-6-106(c) concerning its wrongful conduct as alleged herein by Plaintiff and West Virginia Subclass members.  However,

CONSOLIDATED AMENDED COMPLAINT        289        NO. 5:18-MD-02827-EJD

sending pre-suit notice pursuant to W. Va. Code § 46A-6-106(c) is an exercise in futility for Plaintiff, because, despite being on knowledge of the deceptive acts and practices complained of herein in this lawsuit as of the date of the first-filed lawsuit in December 2017, Apple has not cured its unfair and deceptive acts and practices.

1305.    Apple engaged in unfair and deceptive business acts and practices in the conduct of trade or commerce, in violation of W. Va. Code § 46A-6-104, as described herein.

1306.    Apple's unfair and deceptive acts and practices also violated W. Va. Code § 46A-6-102(7), including:

    a.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

    b.  Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another;

    c.  Advertising goods or services with intent not to sell them as advertised;

    d.  Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

    e.  Using deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; and

    f.  Advertising, displaying, publishing, distributing, or causing to be advertised, displayed, published, or distributed in any manner, statements and representations with regard to the sale of goods, which are false, misleading or deceptive or which omit to state material information which is necessary to make the statements therein not false, misleading or deceptive.

CONSOLIDATED AMENDED COMPLAINT        290        NO. 5:18-MD-02827-EJD

1307.    Apple's unfair and deceptive acts and practices were unreasonable when weighed against the need to develop or preserve business, and were injurious to the public interest, under W. Va. Code § 46A-6-101.

1308.    Apple's acts and practices were additionally "unfair" under W. Va. Code § 46A-6-104 because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

1309.    The injury to consumers from Apple's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury.  The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

1310.    Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making.  By withholding important information from consumers, Apple created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

1311.    Apple's business practices had no countervailing benefit to consumers or to competition.

1312.    Apple's acts and practices were additionally "deceptive" under W. Va. Code § 46A-6-104 because Apple made representations or omissions of material facts that misled or were likely to mislead reasonable consumers, including Plaintiff and West Virginia Subclass members.

1313.    Apple intended to mislead Plaintiff and West Virginia Subclass members and induce them to rely on its misrepresentations and omissions.

1314.    Apple representations and omissions were material because they were likely to deceive reasonable consumers.

1315.    Had Apple disclosed to Plaintiff and West Virginia Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the

CONSOLIDATED AMENDED COMPLAINT          291          NO. 5:18-MD-02827-EJD

Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the West Virginia Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1316.    Apple had a duty to disclose the above-described facts due to the circumstances of this case.  Apple's duty to disclose arose from its:

    a.  Possession of exclusive knowledge regarding the defects in its Devices;

    b.  Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the defects;

    c.  Active concealment of the defects in its Devices and purpose of the throttling operating software; and

    d.  Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1317.    Apple's omissions were legally presumed to be equivalent to active misrepresentations because Apple intentionally prevented Plaintiff and West Virginia Subclass members from discovering the truth regarding Apple's Device defects and operating system throttling capabilities.

1318.    Apple acted intentionally, knowingly, and maliciously to violate West Virginia's Consumer Credit and Protection Act, and recklessly disregarded Plaintiff and West Virginia Subclass members' rights.  Apple's unfair and deceptive acts and practices were likely to cause serious harm, and Apple knew that its deceptive acts would cause harm based upon its business practices and exclusive knowledge of the omissions and misrepresentations herein.

1319.    As a direct and proximate result of Apple's  unfair and deceptive acts or practices and Plaintiff and West Virginia Subclass members' purchase of goods or services,

CONSOLIDATED AMENDED COMPLAINT          292          NO. 5:18-MD-02827-EJD

1    Plaintiff and West Virginia Subclass members have suffered and will continue to suffer injury,

2    ascertainable losses of money or property, and monetary and non-monetary damages, including

3    from not receiving the benefit of their bargain in purchasing the Devices, and increased time and

4    expense in dealing with Device performance issues.

5        1320.    Apple's violations present a continuing risk to Plaintiff and West Virginia

6    Subclass members as well as to the general public.

7        1321.    Plaintiff and West Virginia Subclass members seek all monetary and non-

8    monetary relief allowed by law, including the greater of actual damages or $200 per violation under

9    W. Va. Code § 46A-6-106(a), restitution, injunctive and other equitable relief, punitive damages,

10   and reasonable attorneys' fees and costs.

11               **CLAIMS ON BEHALF OF THE WISCONSIN SUBCLASS**

12                                    **COUNT 75**

13                    **WISCONSIN DECEPTIVE TRADE PRACTICES ACT,**

14                         *Wis. Stat. § 100.18, et seq.*

15       1322.    The Wisconsin Plaintiff(s) identified above ("Plaintiff," for purposes of this

16   Count), individually and on behalf of the Wisconsin Subclass, repeats and alleges Paragraphs 1-

17   472, as if fully alleged herein.

18       1323.    Apple is a "person, firm, corporation or association," as defined by Wis. Stat.

19   § 100.18(1).

20       1324.    Plaintiff and Wisconsin Subclass members are members of "the public," as

21   defined by Wis. Stat. § 100.18(1).

22       1325.    With intent to sell, distribute, or increase consumption of merchandise, services,

23   or anything else offered by Apple to members of the public for sale, use, or distribution, Apple

24   made, published, circulated, placed before the public or caused (directly or indirectly) to be made,

25   published, circulated, or placed before the public in Wisconsin advertisements, announcements,

26   statements, and representations to the public which contained assertions, representations, or

27

28

---

CONSOLIDATED AMENDED COMPLAINT          293          No. 5:18-MD-02827-EJD

1    statements of fact which are untrue, deceptive, and/or misleading, in violation of Wis. Stat. §

2    100.18(1).

3         1326.    Apple also engaged in the above-described conduct as part of a plan or scheme,

4    the purpose or effect of which was to sell, purchase, or use merchandise or services not as

5    advertised, in violation of Wis. Stat. § 100.18(9).

6         1327.    Apple intended to mislead Plaintiff and Wisconsin Subclass members and induce

7    them to rely on its misrepresentations and omissions.

8         1328.    Apple's representations and omissions were material because they were likely to

9    deceive reasonable consumers.

10        1329.    Apple had a duty to disclose the above-described facts due to the circumstances

11   of this case.  Apple's duty to disclose arose from its:

12        a.   Possession of exclusive knowledge regarding the defects in its Devices;

13        b.   Possession of exclusive knowledge regarding the operating software it developed to

14            throttle performance in its Devices as a result of the defects;

15        c.   Active concealment of the defects in its Devices and purpose of the throttling

16            operating software; and

17        d.   Incomplete representations about its Devices, Device performance, battery life of

18            Devices, and the throttling software.

19        1330.    Apple's failure to disclose the above-described facts is the same as actively

20   representing that those facts do not exist.

21        1331.    Apple acted intentionally, knowingly, and maliciously to violate the Wisconsin

22   Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Wisconsin Subclass

23   members' rights.  Apple's knowledge of the Devices' performance issues, and release of software

24   to throttle phone performance, put it on notice that the Devices were not as it advertised.

25        1332.    As a direct and proximate result of Apple's deceptive acts or practices, Plaintiff

26   and Wisconsin Subclass members have suffered and will continue to suffer injury, ascertainable

27   losses of money or property, and monetary and non-monetary damages, including from not

28

CONSOLIDATED AMENDED COMPLAINT        294        NO. 5:18-MD-02827-EJD

receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1333.    Apple had an ongoing duty to all Apple customers to refrain from deceptive acts, practices, plans, and schemes under Wis. Stat. § 100.18.

1334.    Plaintiff and Wisconsin Subclass members seek all monetary and non-monetary relief allowed by law, including damages, reasonable attorneys' fees, and costs under Wis. Stat. § 100.18(11)(b)(2), injunctive relief, and punitive damages.

### CLAIMS ON BEHALF OF THE WYOMING SUBCLASS

### COUNT 76

### WYOMING CONSUMER PROTECTION ACT,

### *Wyo. Stat. Ann. §§ 40-12-101, et seq.*

1335.    The Wyoming Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Wyoming Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1336.    Apple is a "person" as defined by Wyo. Stat. Ann. § 42-12-102(i).

1337.    Plaintiff and Wyoming Subclass members engaged in "consumer transactions" as defined by Wyo. Stat. Ann. § 40-12-102(ii).

1338.    Apple is engaged in an "uncured unlawful deceptive trade practice" in accordance with Wyo. Stat. Ann. § 40-12-105 in that it had actual notice of its deceptive acts and practices when the first-filed case in this multidistrict litigation was filed in December 2017; however, it has not offered to adjust or modified the consumer transactions at issue in this case, nor has it offered to rescind the consumer transactions.  Accordingly, although notice was sent to Apple pursuant to Wyo. Stat. Ann. § 40-12-109, notice is an exercise in futility for Plaintiff.

1339.    Apple advertised, offered, or sold goods or services in Wyoming, and engaged in trade or commerce directly or indirectly affecting the people of Wyoming.

1340.    Apple engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Wyoming Consumer Protection Act, Wyo. Stat. Ann. §§ 40-12-101, *et seq.*, including:

    a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have;

    b.    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

    c.    Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

1341.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1342.    Apple intended to mislead Plaintiff and Wyoming Subclass members and induce them to rely on its misrepresentations and omissions.

1343.    Had Apple disclosed to Plaintiff and Wyoming Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defects and Battery Issues, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform defects in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Wyoming Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1344.    Apple acted intentionally, knowingly, and maliciously to violate the Wyoming Consumer Protection Act, and recklessly disregarded Plaintiff and Wyoming Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1345.     As a direct and proximate result of Apple's deceptive acts and practices, Plaintiff and Wyoming Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1346.     Apple's deceptive acts and practices caused substantial injury to Plaintiff and Wyoming Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

1347.     Plaintiff and the Wyoming Subclass seek all monetary and non-monetary relief allowed by law, actual damages, injunctive relief, attorneys' fees, costs, and any other relief that is just and proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all other class members,

respectfully request that the Court enter an Order:

a.     Declaring that this action is a proper class action, certifying the Classes and/or Subclasses as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

b.     Enjoining Apple from continuing the unfair business practices alleged in this Complaint;

c.     Ordering Apple to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other class members, as allowable by law;

d.     Ordering Apple to pay both pre- and post-judgment interest on any amounts awarded;

e.     Ordering Apple to pay attorneys' fees and costs of suit; and

f.     Ordering such other and further relief as may be just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

---

CONSOLIDATED AMENDED COMPLAINT          297          NO. 5:18-MD-02827-EJD

Respectfully submitted,

DATED:  July 2, 2018            s/ *Joseph W. Cotchett*
                                    Joseph W. Cotchett

Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
**COTCHETT, PITRE & MCCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
Facsimile: 650-697-05777
jcotchett@cpmlegal.com
mmolumphy@cpmlegal.com

DATED:  July 2, 2018            s/ *Laurence D. King*
                                    Laurence D. King

Laurence D. King (SBN 206423)
**KAPLAN FOX & KILSHEIMER LLP**
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone:  415-772-4700
Facsimile:  415-772-4707
lking@kaplanfox.com

David A. Straite (*pro hac vice*)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
dstraite@kaplanfox.com

*Interim Co-Lead Counsel*

Mark J. Dearman
**ROBBINS GELLER RUDMAN &
DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
(561) 750-3000
Mdearman@rgrdlaw.com

CONSOLIDATED AMENDED COMPLAINT            298            NO. 5:18-MD-02827-EJD

1   Eli Greenstein
    **KESSLER TOPAZ METZLER CHECK LLP**
2   1 Sansome Street, Suite 1850
    San Francisco, CA. 94104
3   (415) 400-3000
    egreenstein@ktmc.com
4

5   Derek Howard
    **DEREK G. HOWARD LAW FIRM**
6   42 Miller Ave
    Mill Valley, CA. 94941
7   (415) 432-7192
    derek@derekhowardlaw.com
8

9   Kyle McGee
    **GRANT & EISENHOFER P.A.**
10  485 Lexington Avenue, 29th Floor
    New York, NY. 10017
11  (646) 722-8505
    jeisenhofer@gelaw.com
12

13  Kenneth Johnston
    **JOHNSTON PRATT PLLC**
14  1717 Main Street, Suite 3000
    Dallas, TX. 75201
15  (214) 974-8000
    kjohnston@johnstonpratt.com
16

17  Kathleen Herkenhoff
    **HAEGGQUIST & ECK, LP**
18  225 Broadway, Suite 2050
    San Diego, CA. 92101
19  (619) 342-8000
    kathleenh@haelaw.com
20

21  Amy E. Keller
    **DICELLO LEVITT & CASEY LLC**
22  Ten North Dearborn Street, Eleventh Floor
    Chicago, IL. 60602
23  (312) 214-7900
    akeller@dlcfirm.com
24

25

26

27

28

CONSOLIDATED AMENDED COMPLAINT          299          NO. 5:18-MD-02827-EJD

Gayle Blatt
**CASEY GERRY SCHENK FRANCAVILLA**
**BLATT & PENFIELD LLP**
110 Laurel Street
San Diego, CA. 92101
(619) 238-1811
gmb@cglaw.com

Tina Wolfson
**AHDOOT & WOLFSON, P.C.**
8424 Santa Monica Blvd., Suite 575
West Hollywood, CA., 90069
(310) 474-9111
aw@ahdootwolfson.com

Ariana Tadler
**MILBERG TADLER PHILLIPS**
**GROSSMAN LLP**
1 Pennsylvania Plaza, Suite 1920
New York, NY. 10119
(212) 946-9453
atadler@milberg.com

Karin Swope
**KELLER ROHRBACK LLP**
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
(206) 623-1900
kswope@kellerrohrback.com

Tim Blood
**BLOOD HURST O'REARDON LLP**
501 West Broadway, Suite 1490
San Diego, CA. 92101
(619) 338-1100
tblood@bholaw.com

Melissa R. Emert
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017
(212) 687-7230
memert@ssbny.com

---

CONSOLIDATED AMENDED COMPLAINT      300      NO. 5:18-MD-02827-EJD

Exhibit 1, Page 310

Christopher Ridout
**ZIMMERMAN REED LLP**
2381 Rosecrans Blvd., Suite 328
El Segundo, CA. 90245
(562) 216-7383
Christopher.ridout@zimmreed.com

Charles E. Schaffer
**LEVIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19102
(215) 592-1500
cshaffer@lfsblaw.com

Doug McNamara
**COHEN MILSTEIN SELLERS & TOLL
LLC**
1100 New York Ave. NW, Suite 500
Washington, DC. 20005
(202) 408-4600
dmcnamara@cohenmilstein.com

Ben Barnow
**BARNOW & ASSOCIATES**
One North LaSalle Street, Suite 4600
Chicago, IL. 60602
(312) 621-2000
b.barnow@barnowlaw.com

Stanley Bernstein
**BERNSTEIN LIEBHARD LLP**
10 East 40th Street
New York, NY 10016
Direct: 212-951-2040
Main: (212) 779-1414
bernstein@bernlieb.com

Todd Garber
**FINKELSTEIN, BLANKINSHIP,
FREIPEARSON
& GARBER, LLP**
445 Hamilton Ave., Suite 605
White Plains, NY. 10601
(914) 298-3281 ext. 32803
tgarber@fbfglaw.com

Rosemary M. Rivas
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
(415) 291-2420
rrivas@zlk.com

Geoffrey Rushing
**SAVERI & SAVERI INC.**
706 Sansome Street, Suite 200
San Francisco, CA. 94111
(415) 217-6810
grushing@saveri.com

Stephen Rosenthal
**PODHURST ORSEK P.A.**
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL. 33131
(305) 358-2800
srosenthal@podhurst.com

Anthony Fata
**CAFFERTY CLOBES MERIWETHER &**
**SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL. 60606
(312) 782-4880
afata@caffertyclobes.com

*Plaintiffs' Executive Committee*

Joshua H. Eggnatz
**EGGNATZ PASCUCCI, P.A.**
5400 S. University Drive, Suite 417
Davie, FL 33328
(954) 889-3359
JEggnatz@JusticeEarned.com

Scott Cole
**SCOTT COLE & ASSOCIATES**
1970 Broadway, 9th Floor
Oakland, CA 94612
(510) 891-9800
scole@scalaw.com

CONSOLIDATED AMENDED COMPLAINT       302       NO. 5:18-MD-02827-EJD

Richard S. Wayne
**STRAUSS TROY**
150 E 4th St #4
Cincinnati, OH 45202-4018
(513) 629-9472
rswayne@strausstroy.com

Anthony G. Simon
**SIMON LAW FIRM, P.C.**
800 Market St., Suite 1700
St. Louis, MO 63101
(314) 485-4034
asimon@simonlawpc.com

Phong Tran
**JOHNSON FISTEL, LLP**
600 West Broadway, Suite 1540
San Diego, CA 92101
(619) 230-0063
Phongt@johnsonfistel.com

James Vlahakis
**SULAIMAN LAW GROUP, LTD.**
2500 South Highland Ave., Suite 200
Lombard, IL 60148
(312) 313-1613
jvlahakis@sulaimanlaw.com

Gordon M. Fauth, Jr.
**FINKELSTEIN THOMPSON LLP**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 398-8700
gfauth@finkelsteinthompson.com

Gary S. Graifman
**KANTROWITZ GOLDHAMER &
GRAIFMAN, P.C.**
747 Chestnut Ridge Road
Chestnut Ridge, NY 10977
(845) 262-2335
ggraifman@kgglaw.com

CONSOLIDATED AMENDED COMPLAINT    303    No. 5:18-MD-02827-EJD

Jeffrey Squire
**BRAGER EAGEL & SQUIRE, P.C.**
885 Third Avenue, Suite 3040
New York, NY 10022
(212) 308-5858
squire@bespc.com

Daniel Mulligan
**JENKINS, MULLIGAN & GABRIEL, LLP**
10085 Carroll Canyon Rd., Ste 210
San Diego, CA 92131
(858) 527-1792
dan@jmglawoffices.com

Jason Barnes
**BARNES & ASSOCIATES**
219 East Dunklin Street, Suite A
Jefferson City, MO 65109
(573) 634-8884
Jaybarnes5@zoho.com

Alexandra Steele
**GIRARDI KEESE**
1126 Wilshire Blvd.
Los Angeles, CA 90017
Tel: (213) 977-0211
asteele@girardikeese.com

Todd Werts
**LEAR WERTS LLP**
2003 West Broadway, Suite 107
Columbia, MO 65203
(573) 875-1991
werts@learwerts.com

Archie Grubb
**Beasley Allen**
4200 Northside Pkwy NW
Building One, Suite 100
Atlanta, GA 30327
Archie.grubb@beasleyallen.com

*Plaintiffs' Steering Committee*

---

CONSOLIDATED AMENDED COMPLAINT          304          No. 5:18-MD-02827-EJD

1                 **ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

2         I, Mark C. Molumphy, attest that concurrence in the filing of this document has been

3 obtained from the other signatory.  I declare under penalty of perjury under the laws of the United

4 States of America that the foregoing is true and correct.

5         Executed this 2nd day of July, 2018, at Burlingame, California.

6

7                                */s/ Mark C. Molumphy*
                               MARK C. MOLUMPHY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED COMPLAINT      305      NO. 5:18-MD-02827-EJD

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 320 of 457
Page ID #:1220
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 316 of 381

# EXHIBIT 1

GREG WALDEN, OREGON
CHAIRMAN

FRANK PALLONE, JR., NEW JERSEY
RANKING MEMBER

ONE HUNDRED FIFTEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON ENERGY AND COMMERCE
2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115

Majority  (202) 225–2927
Minority  (202) 225–3641

January 12, 2018

Mr. Tim Cook
Chief Executive Officer
Apple Inc.
One Infinite Loop
Cupertino, CA 95014

Dear Mr. Cook:

Recent media reports indicate that users of select Apple iPhone models have experienced diminished processor performance following the installation of software updates to the iPhone's operating system (iOS).[1] The diminution in processor performance has allegedly resulted in an overall slowdown of the iPhone's operations for these users. The Committee appreciates Apple's willingness to provide Committee staff with an initial briefing on this issue.

In December 2017, Apple acknowledged that it does, in fact, throttle processor speeds for select iPhone models, but only when needed to prevent an instantaneous shutdown attributable to a phone's reduced battery capacity.[2] Reports also suggest that the degree of processor throttling is not uniform, but rather varies depending on a battery's condition.[3] Apple maintains that the forced processor performance throttling is limited to its iPhone 6, iPhone 6s, iPhone 7, and iPhone SE models.[4] It remains unclear whether Apple provided consumers with adequate notice of the potential for a reduction in phone performance associated with an iOS update and what options consumers have, if any, to opt out of the throttling feature. It also remains unclear whether Apple plans to incorporate processor performance throttling in future iOS updates.

---

[1] See, e.g., Is Apple Slowing Down Old iPhones? Questions and Answers, N.Y. TIMES, Dec. 21, 2017, available at https://nyti.ms/2DqKdTY.

[2] Apple confirms iPhones with older batteries will take hits in performance, The Verge, Dec. 20, 2017 available at https://www.theverge.com/2017/12/20/16800058/apple-iphone-slow-fix-battery-life-capacity.

[3] Apple response to reports of worn batteries forcing iPhone CPU slowdowns, AppleInsider, Dec. 20, 2017 available at http://appleinsider.com/articles/17/12/20/apple-responds-to-reports-of-worn-battery-forcing-iphone-cpu-slowdown.

[4] The Verge, supra note 2.

Exhibit 1, Page 317

320

Letter to Mr. Cook
Page 2

In response to concerns over the belated disclosure of its performance-limiting software feature, Apple announced that it would offer battery replacements for out-of-warranty iPhones at a reduced cost and would be issuing an iOS update in early 2018 that will provide users with greater information on their iPhone's battery performance.[5] However, Apple has indicated to the Committee that, thus far, it is unable to ascertain whether it has taken the necessary steps to ensure that affected consumers will be able to obtain a replacement battery in a timely manner. Apple has also indicated that it has yet to develop policies to protect consumers should it fail to develop alternative methods to prevent instantaneous iPhone shutdowns, other than limiting processor performance, by the time the term of its reduced-cost battery replacement program expires at the end of 2018.

The Committee is also concerned over recent media reports which detailed that an iPhone battery overheated and began to emit smoke while the phone was undergoing repair in a Zurich, Switzerland Apple store, resulting in the store's evacuation and seven people receiving medical treatment.[6] In light of the recently announced battery replacement program, the Committee is concerned with ensuring the integrity of iPhone batteries, which Committee staff raised to Apple.

Pursuant to Rule X of the U.S. House of Representatives, the Committee on Energy and Commerce has jurisdiction over matters affecting telecommunications policy and consumer protection. We have a number of follow-up questions pertaining to Apple's decision to throttle the processing speed for certain iPhone models as well as the company's consumer protection policies. Therefore, we request you provide the Committee with the following information as well as a briefing with subject matter experts on these issues no later than January 26, 2018:

1. When and how did Apple first become aware of the need to develop an iOS software update to address instantaneous phone shutdowns attributable to battery degradation? When did Apple begin throttling iPhone processor performance through iOS software updates?

2. Prior to installation of an iOS software update, does Apple inform users of the potential for a reduction in processor performance associated with the update? If no, why not?

3. What steps, if any, is Apple taking to address potential security concerns that could develop if consumers become wary of iOS software updates that could reduce processor performance, and delay or fail to update as a result?

4. Does Apple utilize processor performance throttling for iPhone models that predate the iPhone 6? If so, please list the models. If no, why not?

5. Does Apple currently utilize processor performance throttling for iPhone 8 and iPhone X models that are operating with reduced battery capacities? If no, why not?

---

[5] Apple Inc., *A Message to Our Customers about iPhone Batteries and Performance,* Dec. 28, 2017 *available at* https://www.apple.com/iphone-battery-and-performance/.

[6] *Apple store in Zurich evacuated as phone battery overheats,* Reuters, Jan. 9, 2018 *available at* http://news.trust.org/item/20180109130122-tsylw.

Letter to Mr. Cook
Page 3

6.  Aside from replacing the battery, what alternatives, if any, are available to consumers whose iPhones may have their processor speeds throttled attributable to an iOS update? In the event there are alternatives for these consumers, how does Apple communicate them?

7.  What battery-related information will be provided to consumers in the forthcoming iOS update, referenced in Apple's December 28, 2017 statement? How will this information be provided? When does Apple anticipate releasing this update?

8.  Has Apple attempted to prevent battery-induced instantaneous iPhone shutdowns through means other than processor throttling through iOS updates? If so, please identify all alternative methods Apple has explored. If no, why not?

9.  Does Apple have a team dedicated to addressing battery-induced instantaneous iPhone shutdowns? If so, how many full-time employees are assigned to this issue?

10. Aside from processor throttling, please describe the actions, if any, Apple is taking to remedy instantaneous iPhone shutdowns attributable to degraded batteries;

11. How many customers are eligible to take advantage of its reduced-cost battery replacement offer, and how many does Apple anticipate will do so? Does Apple believe it will have a sufficient supply of replacement batteries to meet this demand?

12. Why did Apple choose to end the reduced cost replacement program for out-of-warranty iPhone batteries in December 2018?

13. If Apple does not develop a method to prevent instantaneous iPhone shutdowns other than processor throttling by the end of 2018, will it consider extending the term of its reduced cost replacement battery program?

If you have any questions about this letter, please contact Christopher Santini or Jessica Wilkerson of the Majority Committee staff at 202-225-2927. Thank you for your prompt attention to this matter.

Sincerely,

Greg Walden
Chairman

Marsha Blackburn
Chairman
Subcommittee on Communications
and Technology

Exhibit 1, Page 319

Letter to Mr. Cook
Page 4


Robert E. Latta
Chairman
Subcommittee on Digital Commerce
  and Consumer Protection

Gregg Harper
Chairman
Subcommittee on Oversight
  and Investigations


cc:    The Honorable Frank Pallone, Jr., Ranking Member

       The Honorable Diana DeGette, Ranking Member
       Subcommittee on Oversight and Investigations

       The Honorable Michael F. Doyle, Ranking Member
       Subcommittee on Communications and Technology

       The Honorable Janice D. Schakowsky, Ranking Member
       Subcommittee on Digital Commerce and Consumer Protection


Exhibit 1, Page 320

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 325 of 457
Page ID #:1225
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 321 of 381

# EXHIBIT 2

February 2, 2018



Chairman Greg Walden
United States House of Representatives
Committee on Energy and Commerce
Washington, D.C. 20515

Dear Chairman Walden, Chairwoman Blackburn, Chairman Latta, and Chairman
Harper,

Thank you for your inquiry regarding iPhones, batteries, and performance. We welcome
this opportunity to provide additional information and clarity on this issue and to answer
your questions.

Apple's recent actions related to performance of iPhones with older batteries were
based on providing our customers with the best experience. In this case, that meant
preventing iPhone 6 or later models from unexpectedly shutting down under certain
circumstances. As we said publicly, we have never — and would never — do anything
to intentionally shorten the life of any Apple product, or degrade the user experience to
drive customer upgrades. Our goal has always been to create products that our
customers love, and making iPhones last as long as possible is an important part
of that.

We want to provide a timeline of key events that led to where we are today, as well as
some technical background that we hope you will find helpful, in addition to the answers
to your questions.

Timeline

In fall 2016, we received reports from a few iPhone customers whose devices were
experiencing unexpected shutdowns. We found that a small number of iPhone 6s
devices had batteries that contained a battery component that was exposed to
controlled ambient air longer than it should have been before being assembled into
battery packs. We set up a program to replace those batteries for affected iPhone 6s
owners. We also discovered that other iPhones, under certain circumstances, were
experiencing unexpected shutdowns.

To learn more, we did a software update that included diagnostics to help us understand
whether we needed to improve the algorithms used to manage battery performance and
shutdowns. An iPhone is actually designed to shut down automatically under certain
conditions, such as extremely cold temperature. To an iPhone user, some of those
shutdowns might seem unexpected, but they are designed to protect the device's
electronics from low voltage.

Exhibit 1, Page 322



After gathering and analyzing data, we issued the iOS 10.2.1 software update in January, 2017, for iPhone 6, iPhone 6 Plus, iPhone 6s, iPhone 6s Plus, and iPhone SE. Then we looked at the diagnostic data made available by the update, and it indicated that the rate of unexpected shutdowns was greatly reduced for iPhone 6 and iPhone 6s owners. In February, 2017, we updated our iOS 10.2.1 ReadMe notes to let customers know the update "improves power management during peak workloads to avoid unexpected shutdowns." We also provided a statement to several press outlets and said that we were seeing positive results from the software update. We extended the same support for iPhone 7 and iPhone 7 Plus through iOS 11.2 in December, 2017.

Technical Background

As lithium-ion batteries chemically age, their ability to hold a charge diminishes. This may result in shorter amounts of time before a device needs to be recharged. In addition, a battery's ability to provide power quickly may decrease. In order for a phone to function properly, the electronics must be able to draw on instantaneous power from the battery. One attribute that affects this instantaneous power delivery is the battery's impedance. A battery with a high impedance is unable to provide power quickly enough to the system that needs it. A battery's impedance can increase if a battery has a higher chemical age. A battery's impedance will temporarily increase at a low state of charge and in a cold temperature environment. When coupled with a higher chemical age, the impedance increase will be more significant. These are characteristics of battery chemistry that are common to all lithium-ion batteries in the industry.

We do not want our customers to experience interruptions in the use of their iPhones, whether that is making an emergency phone call, taking a picture, sharing a post, or watching the end of a close game. To address the issue of unexpected shutdowns, we are constantly working to improve battery performance. We also have developed software that dynamically manages power usage when, and only when, an iPhone is at risk of an unexpected shutdown. This power management software helps keep iPhones on when they otherwise might turn off, by balancing the demand for power with the available supply of it.

While our intention has been to give our customers the best products and the best experiences, we have apologized to our customers and, as described here, have taken a number of steps to address the complaints.

Your questions and our answers are below.

*1. When and how did Apple first become aware of the need to develop an iOS software update to address instantaneous phone shutdowns attributable to battery degradation? When did Apple begin throttling iPhone processor performance through iOS software updates?*



As noted above, Apple became aware, through customer interaction and our own analysis, that a small number of users were experiencing unexpected shutdowns. We first delivered this power management feature to iPhone 6, iPhone 6 Plus, iPhone 6s, iPhone 6s Plus, and iPhone SE as part of iOS 10.2.1 in January 2017.

*2. Prior to installation of an iOS software update, does Apple inform users of the potential for a reduction in processor performance associated with the update? If no, why not?*

Once we verified that the feature was effective in avoiding unexpected shutdowns, we updated the iOS 10.2.1 ReadMe notes in February 2017. Specifically, the iOS 10.2.1 ReadMe notes said that 10.2.1 "also improves power management during peak workloads to avoid unexpected shutdowns on iPhone."

We also made this statement to Fortune, TechCrunch, and several other media outlets on February 23, 2017:

> With iOS 10.2.1, Apple made improvements to reduce occurrences of unexpected shutdowns that a small number of users were experiencing with their iPhone. iOS 10.2.1 already has over 50% of active iOS devices upgraded and the diagnostic data we've received from upgraders shows that for this small percentage of users experiencing the issue, we're seeing a more than 80% reduction in iPhone 6s and over 70% reduction on iPhone 6 of devices unexpectedly shutting down.

> We also added the ability for the phone to restart without needing to connect to power, if a user still encounters an unexpected shutdown. It is important to note that these unexpected shutdowns are not a safety issue, but we understand it can be an inconvenience and wanted to fix the issue as quickly as possible. If a customer has any issues with their device they can contact AppleCare.

As noted, the software update successfully reduced the incidence of unexpected shutdowns and that customers' experience with it was positive. We extended the same support to iPhone 7 and iPhone 7 Plus through iOS 11.2 in December 2017.

*3. What steps, if any, is Apple taking to address potential security concerns that could develop if consumers become wary of iOS software updates that could reduce processor performance, and delay or fail to update as a result?*

iOS leads the industry in software update adoption. As of January 18, 2018, 65% of devices were using iOS 11. Through compelling new features and upgrades and user

notifications, our customers have notice and incentives to update to the latest version of iOS.

In addition, iOS 11.3 will add new features to give customers greater visibility into the health of their iPhone's battery. The new software update will recommend if a battery needs to be serviced. It also will allow customers to see whether the power management feature that dynamically manages maximum performance to prevent unexpected shutdowns is on and they can choose to turn it off. These features will be listed in the ReadMe notes that customers see prior to installing an update. We will also make users aware through the press.

*4. Does Apple utilize processor performance throttling for iPhone models that predate the iPhone 6? If so, please list the models. If not, why not?*

Older iPhone models such as iPhone 5s and earlier have different system power demands than newer iPhone models and so did not experience the same issue.

*5. Does Apple currently utilize processor performance throttling for iPhone 8 and iPhone X models that are operating with reduced battery capacities? If no, why not?*

All iPhone models have basic performance management to ensure that the battery and overall system operates as designed and internal components are protected. And, in the case of hot temperature, the performance management ensures that the device stays within safety limits. Such basic performance management is required for safety and expected function, and it cannot be turned off.

iPhone 8, iPhone 8 Plus, and iPhone X models include hardware updates that allow a more advanced performance management system that more precisely allows iOS to anticipate and avoid an unexpected shutdown.

*6. Aside from replacing the battery, what alternatives, if any, are available to consumers whose iPhones may have their processors speeds throttled attributable to an iOS update? In the event there are alternatives for these consumers, how does Apple communicate them?*

The upcoming iOS 11.3 software update will allow customers to see if the power management feature related to unexpected shutdowns is on, and it will allow customers to turn it off.

*7. What battery-related information will be provided to consumers in the forthcoming iOS update, referenced in Apple's December 28, 2017 statement? How will this information be provided? When does Apple anticipate releasing this update?*



As we recently announced, iOS 11.3 will add new features to give customers greater visibility into the health of their iPhone's battery. The new software update will recommend if a battery needs to be serviced. It also will allow customers to see if the power management feature related to unexpected shutdowns are on, and it will allow customers to turn it off. The developer update will be available this month, and the user update will be available this spring. Each software update lists the features, fixes, and other improvements that are in the release.

In addition, we have an Apple Support article with information to help customers understand more about how their iPhone batteries work. It also includes tips to maximize battery performance.

*8. Has Apple attempted to prevent battery-induced instantaneous iPhone shutdowns through means other than processor throttling through iOS updates? If so, please identify all alternative methods Apple has explored. If no, why not?*

All iPhone models have basic performance management to allow the devices to function as designed. This includes handling of extreme heat or cold, as well as voltage management, so that internal components are not overburdened by performance needs.  Such basic performance management is required for safety and expected function, and it cannot be turned off.

*9. Does Apple have a team dedicated to addressing battery-induced instantaneous iPhone shutdowns? If so, how many full-time employees are assigned to this issue?*

Apple has both hardware and software product development teams comprised of many individuals who are dedicated to battery technology.

*10. Aside from processor throttling, please describe the actions, if any, Apple is taking to remedy instantaneous iPhone shutdowns attributable to degraded batteries.*

We have hardware and software research and development teams that are always working on ways to improve how iPhones manage performance.

*11. How many customers are eligible to take advantage of its reduced-cost battery replacement offer, and how many does Apple anticipate will do so? Does Apple believe it will have a sufficient supply of replacement batteries to meet this demand?*

This is difficult to estimate since we have not done something like this before. The program is available to anyone with an iPhone 6 or later, regardless of whether they have experienced performance issues. We wanted the battery

Exhibit 1, Page 326



replacement offer to be a substantial discount, and we anticipate that anyone who is eligible for it and who wishes to take advantage of it will be able to do so. We anticipate having adequate supply and are continuing to improve repair times so that customers can get their batteries replaced in a timely manner.

*12. Why did Apple choose to end the reduced cost replacement program for out-of-warranty iPhone batteries in December 2018?*

We are offering the discounted replacement battery for a full year to give customers an adequate opportunity to participate. We anticipate that anyone who is eligible for this offer and who wishes to take advantage of it will be able to do so, and we anticipate having adequate supply. We will continue to assess this situation as it develops.

*13. If Apple does not develop a method to prevent instantaneous iPhone shutdowns other than processor throttling by the end of 2018, will it consider extending the term of its reduced cost replacement battery program?*

Yes, we will continue to assess this situation as it develops.

We appreciate your attention to this issue and the opportunity to address your questions.


Sincerely,

Cynthia C. Hogan
Vice President for Public Policy, Americas
Apple

Exhibit 1, Page 327

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 332 of 457
Page ID #:1232
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 328 of 381

# EXHIBIT 3

Exhibit 1, Page 328

February 2, 2018

Chairman John Thune
United States Senate
Committee on Commerce, Science, and Transportation
Washington, D.C. 20510

Dear Chairman Thune,

Thank you for your inquiry regarding iPhones, batteries, and performance. We welcome this opportunity to provide additional information and clarity on this issue and to answer your questions.

Apple's recent actions related to performance of iPhones with older batteries were based on providing our customers with the best experience. In this case, that meant preventing iPhone 6 or later models from unexpectedly shutting down under certain circumstances. As we said publicly, we have never — and would never — do anything to intentionally shorten the life of any Apple product or degrade the user experience to drive customer upgrades. Our goal has always been to create products that our customers love, and making iPhones last as long as possible is an important part of that.

We want to provide a timeline of key events that led to where we are today, as well as some technical background that we hope you will find helpful, in addition to the answers to your questions.

Timeline

In fall 2016, we received reports from a few iPhone customers whose devices were experiencing unexpected shutdowns. We found that a small number of iPhone 6s devices had batteries that contained a battery component that was exposed to controlled ambient air longer than it should have been before being assembled into battery packs. We set up a program to replace those batteries for affected iPhone 6s owners. We also discovered that other iPhones, under certain circumstances, were experiencing unexpected shutdowns.

To learn more, we did a software update that included diagnostics to help us understand whether we needed to improve the algorithms used to manage battery performance and shutdowns. An iPhone is actually designed to shut down automatically under certain conditions, such as extremely cold temperature. To an iPhone user, some of those shutdowns might seem unexpected, but they are designed to protect the device's electronics from low voltage.

After gathering and analyzing data, we issued the iOS 10.2.1 software update in January, 2017, for iPhone 6, iPhone 6 Plus, iPhone 6s, iPhone 6s Plus, and iPhone SE.

Exhibit 1, Page 329



Then we looked at the diagnostic data made available by the update, and it indicated that the rate of unexpected shutdowns was greatly reduced for iPhone 6 and iPhone 6s owners. In February, 2017, we updated our iOS 10.2.1 ReadMe notes to let customers know the update "improves power management during peak workloads to avoid unexpected shutdowns." We also provided a statement to several press outlets and said that we were seeing positive results from the software update. We extended the same support for iPhone 7 and iPhone 7 Plus through iOS 11.2 in December, 2017.

<u>Technical Background</u>

As lithium-ion batteries chemically age, their ability to hold a charge diminishes. This may result in shorter amounts of time before a device needs to be recharged. In addition, a battery's ability to provide power quickly may decrease. In order for a phone to function properly, the electronics must be able to draw on instantaneous power from the battery. One attribute that affects this instantaneous power delivery is the battery's impedance. A battery with a high impedance is unable to provide power quickly enough to the system that needs it. A battery's impedance can increase if a battery has a higher chemical age. A battery's impedance will temporarily increase at a low state of charge and in a cold temperature environment. When coupled with a higher chemical age, the impedance increase will be more significant. These are characteristics of battery chemistry that are common to all lithium-ion batteries in the industry.

We do not want our customers to experience interruptions in the use of their iPhones, whether that is making an emergency phone call, taking a picture, sharing a post, or watching the end of a close game. To address the issue of unexpected shutdowns, we are constantly working to improve battery performance. We also have developed software that dynamically manages power usage when, and only when, an iPhone is at risk of an unexpected shutdown. This power management software helps keep iPhones on when they otherwise might turn off, by balancing the demand for power with the available supply of it.

While our intention has been to give our customers the best products and the best experiences, we have apologized to our customers and, as described here, have taken a number of steps to address the complaints.

Your questions and our answers are below.

*1. Did Apple notify its customers before it released this software update feature to throttle back processing performance for its iPhone 6, iPhone 6S, iPhone SE, and iPhone 7 with iOS 11.2? If so, when and how did Apple notify its customers?*

As explained above, we first delivered this power management feature to iPhone 6, iPhone 6 Plus, iPhone 6s, iPhone 6s Plus, and iPhone SE as part of iOS 10.2.1, in



January, 2017. Once we verified that the feature was effective in avoiding unexpected shutdowns, we updated the iOS 10.2.1 ReadMe notes in February, 2017. Specifically, the iOS 10.2.1 ReadMe notes said that this update "also improves power management during peak workloads to avoid unexpected shutdowns on iPhone."

We also made this statement to Fortune, TechCrunch, and several other media outlets on February 23, 2017:

> With iOS 10.2.1, Apple made improvements to reduce occurrences of unexpected shutdowns that a small number of users were experiencing with their iPhone. iOS 10.2.1 already has over 50% of active iOS devices upgraded and the diagnostic data we've received from upgraders shows that for this small percentage of users experiencing the issue, we're seeing a more than 80% reduction in iPhone 6s and over 70% reduction on iPhone 6 of devices unexpectedly shutting down.

> We also added the ability for the phone to restart without needing to connect to power, if a user still encounters an unexpected shutdown. It is important to note that these unexpected shutdowns are not a safety issue, but we understand it can be an inconvenience and wanted to fix the issue as quickly as possible. If a customer has any issues with their device they can contact AppleCare.

As noted, the software update successfully reduced the incidence of unexpected shutdowns and that customers' experience with it was positive. We deployed the same software update to iPhone 7 and iPhone 7 Plus through iOS 11.2 in December, 2017.

*2. Did Apple offer its customers the option of declining the software update feature to throttle back processing performance? If so, how? If not, why not?*

Our software updates are designed to provide new features and capabilities as well as fixes in order to improve the customer experience. All of our software updates are optional and the customer decides whether to update or not. We do not provide customers the option to install some features but not others. However, as we recently announced, iOS 11.3 will add new features to give customers greater visibility into the health of their iPhone's battery. The new software update will recommend if a battery needs to be serviced. It also will allow customers to see whether the power management feature that dynamically manages maximum performance to prevent unexpected shutdowns is on, and they can choose to turn it off.

*3. Did Apple release a similar software update feature to throttle back processing performance for earlier models, such as the iPhone 4, iPhone 5, and iPhone 5S? If so,*

Exhibit 1, Page 331

334

*when? Did Apple notify its customers before doing so? If so, when and how did Apple notify its customers?*

Older iPhone models such as iPhone 5s have different system power demands than newer iPhone models and so did not experience the same issue.

*4. Does Apple plan to release a similar software update feature to throttle back processing performance for newer phone models? What notice does it plan to provide to customers before doing so?*

All iPhone models have basic performance management to ensure that the battery and overall system operates as designed and internal components are protected. And, in the case of hot temperature, the performance management ensures that the device stays within safety limits. Such basic performance management is required for safety and expected function, and it cannot be turned off.

iPhone 8, iPhone 8 Plus, and iPhone X models include hardware updates that allow a more advanced performance management system that more precisely allows iOS to anticipate and avoid an unexpected shutdown.

*5. Has Apple tracked consumer complaints about processing performance that are likely to be attributable to this software update throttling feature? If so, how many such complaints has Apple received and how has Apple addressed such complaints?*

Apple always monitors customer feedback on a constant basis.

*6. How did Apple notify its customers regarding the option of replacing the iPhone battery?*

We notified the public of this offer through a December 28, 2017, message to our customers right on the front page of the Apple website, and the offer also has been widely reported in the press. We are offering out-of-warranty replacement batteries for $29 to anyone with an iPhone 6 or later, regardless of whether they have experienced performance issues.

*7. Apple is reducing the price of an out-of-warranty iPhone battery replacement to $29 for anyone with an iPhone 6 or later. In addition, Apple has issued an apology to consumers for the way it handled performance for iPhones with older batteries and how Apple communicated that process. How did Apple arrive at the $29 battery replacement figure? Did the company consider alternative plans to address the issue, such as providing a replacement battery free of charge to affected consumers?*



We wanted the battery replacement offer to be far below the cost of our regular price for an out-of-warranty replacement. And we are seeing strong demand for it. Anyone who has an iPhone 6 or later can make arrangements for a battery replacement at an Apple Store or an Apple Authorized Service Provider by using the Apple Customer Apple Support page. This offer is available through end end of December, 2018, so customers have plenty of time to take advantage of it.

*8. Has Apple explored whether consumers who paid the full, non-discounted price for a replacement battery in an effort to restore performance should be allowed to seek a rebate for some of the purchase price?*

Yes, we are exploring this and will update you accordingly.

We appreciate your attention to this issue and the opportunity to address your questions.

Sincerely,

Cynthia C. Hogan
Vice President for Public Policy, Americas
Apple

Exhibit 1, Page 333

336

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 338 of 457
Page ID #:1238
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 334 of 381

# EXHIBIT 4

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 339 of 457
Page ID #:1239
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 335 of 381



HOUSE OF COMMONS
CHAMBRE DES COMMUNES
CANADA

# Standing Committee on Industry, Science and Technology

INDU    •    NUMBER 097    •    1st SESSION    •    42nd PARLIAMENT

**EVIDENCE**

# Thursday, March 1, 2018

———

## Chair

**Mr. Dan Ruimy**

Exhibit 1, Page 335

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 340 of 457
Page ID #:1240
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 336 of 381

Exhibit 1, Page 336

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 341 of 457
Page ID #:1241
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 337 of 381

1

# Standing Committee on Industry, Science and Technology

**Thursday, March 1, 2018**

● (1530)

[*English*]

**The Chair (Mr. Dan Ruimy (Pitt Meadows—Maple Ridge, Lib.)):** Welcome, everybody. Pursuant to Standing Order 108(2), we're in the study of iPhone performances and their batteries with respect to the interests of Canadian consumers.

We'll have two panels today. From 3:30 to 4:30, we have the Competition Bureau, with Alexa Gendron-O'Donnell, the associate deputy commissioner, economic analysis directorate, competition promotion branch. We also have, from Primate Labs, John Poole, president.

After that we will take a quick break and we'll go right into the second panel with Apple Canada, where we have Jacqueline Famulak, regional counsel, Canada and Latin America, and Simon V. Potter, counsel, McCarthy Tétrault LLP.

We have the PowerPoint from Mr. Poole and we also have submissions from iPhone. If there's no objection, I think it would be okay to put it on our website. We have consent.

Committee, are we okay if everybody shares it?

**Some hon. members:** Agreed.

**The Chair:** Excellent.

We're going to get started.

Ms. O'Donnell, you have up to 10 minutes.

**Ms. Alexa Gendron-O'Donnell (Associate Deputy Commissioner, Economic Analysis Directorate, Competition Promotion Branch, Competition Bureau):** Thank you, Mr. Chair.

As mentioned, my name is Alexa Gendron-O'Donnell. I'm an Associate Deputy Commissioner at the Competition Bureau. I head up our Economic Analysis Branch.

[*Translation*]

I am pleased to appear today before the committee studying Apple iPhone performances and their batteries.

For the sake of clarity, I would like to say at the outset that I am unable to comment on the specifics of potential enforcement cases, as the law requires the bureau to conduct its enforcement work in confidence.

[*English*]

Specifically, this means that unfortunately I cannot respond as to whether or not we are currently investigating Apple on this or any other issue, nor can I speak to hypotheticals. I do, however, want to provide some context about the bureau and about its mandates. I'll highlight a few recent examples of enforcement cases within the digital economy.

[*Translation*]

The Competition Bureau, as an independent law enforcement agency, ensures that Canadian consumers and businesses prosper in a competitive and innovative marketplace that delivers competitive prices and more product choice.

The bureau is headed by the Commissioner of Competition and is responsible for the administration and enforcement of the Competition Act and three of Canada's labelling statutes.

[*English*]

The Competition Act provides the commissioner with the authority to investigate anti-competitive behaviour. The act contains both civil and criminal provisions and it also grants the commissioner the authority to make representations to regulators.

On the civil side, the bureau conducts investigations into false or misleading representation and other deceptive marketing practices, non-criminal competitor collaborations, abusive conduct by dominant companies; and it reviews mergers.

On the criminal side, the bureau conducts investigations into companies that knowingly or recklessly engage in false or misleading representations, deceptive telemarketing, pyramid schemes, bid rigging, price fixing, market allocation, and output restriction.

Owing to the unique types of investigations that we conduct, the Competition Bureau is staffed mainly by a mix of competition law officers, lawyers, and economists.

Given that many markets are global in scale, the Competition Bureau also regularly co-operates with its key international counterparts, including the U.S. and the EU, and has developed partnerships with other law enforcement agencies and government regulators both internationally and domestically.

Exhibit 1, Page 337

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 342 of 457
Page ID #:1242
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 338 of 381

The bureau has two enforcement branches that investigate anti-competitive activity in the marketplace. First, the mergers and monopolistic practices branch reviews proposed merger transactions and investigates practices that could negatively impact competition. The second one is the cartels and deceptive marketing practices branch which fights criminal or deceptive business practices that hurt consumers and competition in the market.

● (1535)

[*Translation*]

The bureau's advocacy, economic analysis, and international work is supported by the competition promotion branch, which actively encourages the adoption of pro-competition positions, policies, and behaviours by businesses, consumers, regulators, government, and international partners.

[*English*]

It's worth repeating in detail that, as a law enforcement agency, the bureau conducts its activities, including its investigations, in confidence, meaning that all non-public information gathered by the bureau in enforcement matters, whether obtained voluntarily or through the use of formal powers, is held on a confidential basis.

While a party under investigation may itself release information related to an investigation, the bureau does not comment publicly on an investigation or even its existence until the matter has either been made public by the party itself or until certain steps have been taken, such as filing an application with the competition tribunal or announcing a settlement.

Even in those instances, we are required by law to keep confidential any information that is not public. This is done to protect confidential information provided to us by our sources and also to avoid harming the reputation and integrity of defendants before their case has been adjudicated. This ultimately protects the integrity of the bureau's investigations. That said, the bureau can share confidential information with other law enforcement agencies, but solely for the purpose of administering and enforcing the act.

The goal of our enforcement is to protect Canadian consumers with specific and general deterrence of anti-competitive behaviour in the market. We've had a number of recent enforcement successes with a focus on the digital economy, and I'd really like to highlight those for you now.

Last week, through a consent agreement with Enterprise Canada car rental, the bureau reached a third resolution in its investigation of drip pricing in the car rental industry. That company agreed to pay a $1 million penalty for what the bureau concluded were false or misleading advertising for prices and discounts on car rentals. Those prices were unattainable by consumers because of additional mandatory fees tacked on right before checking out.

Following on the heels of earlier agreements with Avis, Budget, Hertz, and Dollar Thrifty, the total penalties paid by these companies thus far is now in excess of $5 million, and a further $250,000 was contributed to the bureau's investigative costs. Those companies involved have also agreed not to engage in this type of behaviour going forward.

In January of last year, Amazon agreed to pay $1 million in an administrative monetary penalty and $100,000 towards the bureau's investigative costs as part of a consent agreement resolving our concerns over their online pricing practices, which were implying greater savings available to consumers than was actually the case. Amazon also modified the way that it advertised its list prices on its website. It put policies and procedures in place to ensure that consumers were not misled by inaccurate savings claims.

Earlier this month, the Federal Court upheld the bureau's consent agreement with Apple and major e-book publishers Hachette, Macmillan, and Simon & Schuster. The agreements followed a bureau investigation that concluded an anti-competitive arrangement between four publishers and Apple led to higher e-book prices for Canadian consumers. This decision will allow retailers to offer discounts on e-books to consumers and ensure that a fourth consent agreement with publisher HarperCollins will enter into force.

In January of this year, the bureau took legal action against Ticketmaster and its parent company Live Nation to stop them from allegedly making deceptive marketing claims to consumers when advertising prices for sports and entertainment tickets. In this case, the commissioner is alleging that consumers have been led to believe that they can get tickets at a certain price when in fact mandatory fees imposed by companies often increase the advertised price by 20% to 65%. Among other things, the bureau is seeking an end to the alleged deceptive marketing practices, as well as an administrative monetary penalty.

On the competition promotion side, the bureau is actively engaged in advocacy within the digital economy. One of our most notable projects in this area is our recent market study on fintech, in which we examined the barriers to growth and the adoption of financial technology in Canada and provided a number of recommendations to help regulators and policy-makers continue to promote fintech in three key areas: how consumers pay for goods, how they obtain loans for themselves and their businesses, and how they receive financial advice.

Our final report recommended the modernization of laws and regulations to encourage the entry and adoption of new technologies while maintaining consumer confidence and safety in this rapidly evolving sector. We were extremely pleased to see a significant number of these recommendations incorporated in this week's federal budget.

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 343 of 457
Page ID #:1243
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 339 of 381

March 1, 2018                                INDU-97                                                 3

The bureau also recently released a discussion paper on the issue of big data, with a view to providing guidance on the application of the act and to initiate discussion on how this topical issue should affect competition policy in what is becoming an increasingly data-driven economy. Our findings were that the key principles of competition law enforcement remain valid in big data investigations and, further, that enforcement needs to strike the right balance between taking steps to prevent behaviour that truly harms competition and over-enforcement that chills innovation and dynamic competition.

Although unrelated to the digital economy, I did want to raise one final case with all of you, which is the bureau's participation in a class action settlement with Volkswagen. If approved by the courts, it will provide $290.5 million in compensation to consumers in the Volkswagen, Audi, and Porsche emissions case. Combined with last year's two-litre diesel vehicle settlement, the bureau's investigation has resulted in $2.39 billion in compensation for Canadian consumers. Volkswagen and Audi will also pay a penalty of $2.5 million specifically to address the bureau's concerns related to false or misleading advertising and environmental marketing claims that were made to promote certain vehicles with a three-litre diesel engine.

●(1540)

[*Translation*]

To stay within my allotted time, I will end my comments here. However, I will endeavour to answer any questions you have, recognizing that I am unable to speak to specifics about our enforcement work that has yet to be made public.

I would like to thank the committee for the opportunity to appear today.

[*English*]

Thank you, and I look forward to any questions you may have.

**The Chair:** Thank you very much. I look forward to asking you some questions.

We're going to move to Primate Labs. Mr. Poole, you have up to 10 minutes.

**Mr. John Poole (President, Primate Labs):** Mr. Chair, I'd like to take this opportunity to thank the committee for allowing me to appear today to discuss the topic of the performance of iPhones and their batteries. My name is John Poole. I'm the founder and president of Primate Labs, a software company based in Toronto.

Primate Labs develops Geekbench, which is a cross-platform benchmark available for Android, iOS, and other platforms. Geekbench provides an objective measure of performance for devices and computers. It reports this performance through a score. These scores are calibrated against a baseline machine and provide a relative measure. You can compare a device's performance against both the baseline and other devices that have run Geekbench. Higher scores indicate higher performance, with an approximate linear function such that double the score means double the performance.

Geekbench also uses the Geekbench browser, which is an online database. Whenever Geekbench is run, the benchmark results are uploaded to our server. We receive approximately 400,000 to 1.1

million results each month from our users. We are able to take these results and publish them to the public in general so that people can see the performance of various individual devices. We are also then able to collect these results and statistics on them, and report aggregate scores. Generally speaking, what we've done in the past is report the average score for each device, but as I will go into later, we also started looking at the distribution scores once we became aware of the performance issues with the iPhone.

Here are the particulars for the timeline of events that led us to conduct this analysis. In approximately September 2017, we started receiving complaints from Geekbench users that their phones felt slow. These reports were also backed up by reduced Geekbench scores. Normally, when we've seen reduced Geekbench scores from our users, we're able to identify a cause that leads to these lower scores. In this case we were unable to determine that cause, nor were we able to reproduce the results internally in our own laboratory testing.

We initially assumed that this was due to a software update—iOS 11—that Apple had released within approximately the same time frame. Whenever these updates come out, they cause the phone to potentially run a little slower for a while as the phone upgrades its internal databases and rearranges data to meet the new format of the operating system. Usually, these performance issues resolve themselves in a day or two as the phone finishes its background tasks. Our assumption leading up to December was that this was a software issue and that it would resolve itself fairly quickly for most users.

However, in December 2017 we came across a Reddit post with the title "PSA: iPhone slow? Try replacing your battery!" It contained the quote, "Apple slows down phones with low capacity batteries, replacing it"—meaning the battery—"makes them full speed again."

At this point, we changed our theory. We went from thinking this was a software issue to a hardware issue, and we started to dig in and look at the results that users had uploaded to our service to see if we could actually determine the scope and magnitude of this slowdown that users were experiencing. That led us to publish the article "iPhone Performance and Battery Age". This article contained kernel density plots of Geekbench scores for several iOS versions. We broke down the results by phone and by operating system version. Again, we based this on user benchmark data from the Geekbench browser. We used approximately 120,000 results from both iPhone 6 and iPhone 7.

Here is an example of the charts that were included in our article.

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 344 of 457
Page ID #:1244
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 340 of 381

4                                    INDU-97                              March 1, 2018

On the left, we have results from an iPhone 6 running iOS 10.2, and on the right we have results from an iPhone 6s running iOS 10.2.1. As you can see on the left, with iOS 10.2, the distribution is what we would expect from most devices. We have a large peak centred around the average score for that device. On the right, however, is where things get interesting. We see the large peak around the average, but we also see several smaller peaks at several lower tiers of performance. This suggested to us that the slowdown was happening to users, that it was affecting a non-trivial number of devices, and that the cause of it was introduced in iOS 10.2.1. However, from our data, we were unable to determine exactly what that change was or why it was introduced. Again, this is sort of repeating the description I just gave.

Apple made a couple of statements in December 2017 that sort of confirmed our results and also explained what was happening. Apple indicated that the change was due to a software update and that in the iPhone 6s, performance could be reduced for iOS 10.2.1.

● (1545)

This software change was introduced to work around the hardware issue. This hardware issue in particular was the battery. What happened was approximately in December 2016, users started to complain about sudden shutdowns of their iPhones. They'd be using a phone, and when the battery level hit approximately 30% as reported in the operating system, the phone would suddenly shut down.

What was happening under the covers when the sudden shutdown happened was that, when a processor runs at full power, the fastest performance, the sort of performance you'd expect when you're running a benchmark like Geekbench or any sort of demanding application on your phone, when the processor is running at a higher performance, it uses more power. As the battery degrades, as the battery ages, which all lithium-ion batteries do, the battery is no longer able to provide the power to the processor that it needs to run at that full performance. When that happened, the phone suddenly shut down.

The workaround that Apple introduced in iOS 10.2.1 was when it detected that the battery had degraded, when it detected that it no longer was able to deliver the power that the processor needed, the system as a whole would reduce the power, the performance of the processor, so it no longer overtaxed the battery.

One of the questions I was asked ahead of coming to the committee was, does this affect Canadian and American iPhones differently? Again, using the kernel density plots that we used in the original article, we looked at results from the iPhone 6s running, at the time, the latest operating system, iOS 11.2, and looked at approximately 190 Canadian results and just under 1,600 American results.

The classification of these results is a little ad hoc in that we're using the location of the phone when the benchmark was run, not the country where the phone was sold. It's entirely possible that we could have a few phones here in this dataset that are American phones running benchmarks in Canada or vice versa. Personally, I believe that these phones are very few in number and should not affect the majority of the dataset.

Again, here's another kernel density plot. On the left we have Canadian phones and on the right we have American phones. If you overlay the graphs, you'll see that the shape of both graphs is approximately similar, so the distribution of results is approximately the same. Similar distribution between the phones suggests there is not a difference in how this issue affects Canadian phones and American phones, or more broadly, Canadian consumers and American consumers.

Thank you.

● (1550)

**The Chair:** Thank you very much.

We're running a little short on time, so we're going to go right into questioning. We're going to start off with Ms. Ng.

You have five minutes.

**Ms. Mary Ng (Markham—Thornhill, Lib.):** Thank you, Mr. Chair.

Thank you both for coming here and appearing before us today on this important topic.

My first question is to you, Ms. O'Donnell, at the bureau. You've given us a number of examples, but are you able to talk to us about any actions or enforcement that might have been taken or that the bureau is undertaking around smart phones?

**Ms. Alexa Gendron-O'Donnell:** Unfortunately, as I mentioned before, unless something is already public, we unfortunately can't speak to whether or not we have something ongoing in the space. I think all of us refer back to our work on big data and some of the other things I mentioned just as examples of how the bureau is engaging with the fact that we are seeing a lot of new products and systems in the digital economy. It's something we're observing, but unfortunately, I can't speak to specifics on anything.

**Ms. Mary Ng:** Okay. Can you talk to us about the application of the Competition Act? Does it have jurisdiction to cover foreign firms?

**Ms. Alexa Gendron-O'Donnell:** The Competition Act certainly applies to companies that operate in Canada. There are provisions there, particularly when I think about our deceptive marketing provisions, that make it such that the person you are—quote, unquote—"deceiving" does not have to be in Canada, but as soon as a company is operating in Canada, they do have to comply with Canadian law, the Competition Act being one of those.

**Ms. Mary Ng:** I want to turn to Mr. Poole.

I take it from the presentation you've shared with us that the impetus for your company to look at this was a result of both data and consumer experience. Were there any other factors for you to look at this?

**Mr. John Poole:** Most of this was driven both by reports of our users and from the reports we were seeing in the media, especially around the time of the Reddit post. That's when interest in this topic really exploded, so mostly it was driven by that. You know, our individual customers were complaining that their phone performance had been reduced, and then users saw that you could have reduced performance, and then replacing the battery, of course, then suddenly made your phone operate as if it was new.

Exhibit 1, Page 340

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 345 of 457
Page ID #:1245
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 341 of 381

March 1, 2018                                    INDU-97                                              5

**Ms. Mary Ng:** I'm going to shift a little here.

Do you think the results constitute some evidence towards what some allege, that Apple engages in planned obsolescence of its products?

**Mr. John Poole:** When I initially wrote the article I said this was very unfortunate, because this seemed like planned obsolescence, older phones being made slower.

In this case, though, it's not based on the age of the phone; it's based on the ability of the battery to provide the power that the phone needs. Apple was dealing with a particular issue where their phones were shutting down abruptly. Given the option between a phone that shuts down abruptly and a phone that operates slightly slower, they made the decision that a slower phone was better.

Regarding Apple's perhaps lack of transparency around that issue, I'm not sure what they should have done. The lack of transparency was certainly disappointing and could definitely lead people to say this was an issue of planned obsolescence. However, I certainly don't think that's the case.

● (1555)

**Ms. Mary Ng:** Thank you.

Ms. O'Donnell, what role does the Competition Bureau take with respect to consumer protection?

**Ms. Alexa Gendron-O'Donnell:** Within our act, we have deceptive marketing provisions, and maybe I'll tell you a bit about those.

We have civil provisions and we also have criminal provisions. In our civil provisions, we're looking at representations to the public that are false or misleading in a material respect. When we look at that, we think about the general impression that the representation gives but also the literal impression. When we talk about material, that's our way of saying, to what extent did that representation cause a change in consumer behaviour? One example of that could be whether the consumer bought the product or not.

The criminal provisions are very similar, but obviously there's that extra element of criminal intent. We would ask, did they do it knowingly or recklessly? In that sense, it's a bit different. We involve our colleagues at the Public Prosecution Service of Canada to help with these. There are provisions there which, while they're not consumer protection per se—that's the mandate of our provincial colleagues—they are there to protect consumers from false or misleading advertising. Those are the ones that we enforce.

**Ms. Mary Ng:** All right, thank you. That was very helpful.

**The Chair:** Thank you very much.

[*Translation*]

Mr. Bernier, you have five minutes.

**Hon. Maxime Bernier (Beauce, CPC):** Thank you, Mr. Chair.

I would like to thank the witnesses for being with us today. We appreciate it very much.

[*English*]

My first question will be for Mr. Poole.

With regard to your research, did you have any feedback from some of your peers about the quality of your research and investigation?

**Mr. John Poole:** We haven't had much direct feedback on the research. Generally the feedback has been positive. Most people that we've spoken to, particularly with a statistics background, have said the research seems quite sound.

**Hon. Maxime Bernier:** With your conclusion and all that, you were saying that the Canadian iPhone and U.S. iPhone had the same challenges.

I'm sure that you've read the answer from Apple. What do you think about their position? You said "lack of transparency", but after that I think they came forward with a proposal. Do you think their position is a real one, or were they doing that deliberately to push the sales of the new phone?

**Mr. John Poole:** I'm not sure. Which proposal are you referring to from Apple?

**Hon. Maxime Bernier:** The answer after all that. The proposal they sent to the committee.

**Mr. John Poole:** I haven't read the proposal that Apple has sent to this committee.

**Hon. Maxime Bernier:** Okay, but you know what Apple said after that happened. Do you think they were doing that unintentionally or was it intentional to try to sell new phones?

**Mr. John Poole:** I'm not sure whether they were doing this intentionally to sell new phones.

I believe they should have been very transparent with this at the beginning when they reduced the performance of the phone. The fact that this was a mystery to basically all consumers, including me.... I think I'm fairly well positioned to comment on performance of phones, but this result caught me completely by surprise when I discovered it in December. I wish Apple had been very transparent from the beginning.

What their motives were, whether this was to sell more phones, to avoid a recall of existing phones, I unfortunately can't comment on that.

[*Translation*]

**Hon. Maxime Bernier:** All right, thank you.

I enjoyed your presentation on the Competition Bureau. You said that we cannot become involved in the bureau's internal affairs, and that is quite understandable.

Having said that, I imagine that consumers are quite concerned about what happened. Has the bureau received complaints about this specific file?

**Ms. Alexa Gendron-O'Donnell:** Unfortunately, whether or not we have received complaints and the number of complaints is also confidential information.

However, as you mentioned, our bureau accepts complaints and anyone can call us and report their concerns.

**Hon. Maxime Bernier:** I tried.

Thank you.

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 346 of 457
Page ID #:1246
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 342 of 381

[*English*]

**Mr. Colin Carrie (Oshawa, CPC):** Mr. Poole, in your opinion, did Apple misrepresent its product to the public in any way?

**Mr. John Poole:** It's hard to say. The claims that Apple makes about performance tend to coincide with device launches. That's when they really do talk the most like, "This phone is faster than the old phone; this is roughly by how much."

Most people in the industry look at the figures that manufacturers present as an optimistic best-case scenario. A device manufacturer will find the one benchmark that shows a 2X performance and will say, "up to two times the performance".

There are also, of course, factors that are outside a device manufacturer's control that might affect the performance of its phones. A great example of this would be thermals, where if your phone is in a hot environment, it will more likely run slower than the phone in the cold environment, simply due to the mechanics of how modern integrated circuits work.

In this particular case of having the battery start to slow down, I think Apple wasn't as forthcoming as it could have been about the condition of the battery. We've heard reports of users with a slow phone, and this was ahead of Apple's battery upgrade program that it announced in late December. They would know their phone was slow. They would be able to verify this with Geekbench or with other tools, and they would take their phone into an Apple store and say, "My battery is slow; I would like to upgrade this", and Apple would say, "No, no, your battery is fine." Clearly, Apple wasn't being as forthcoming as it could be.

To speak particularly to deceptive claims, I'm not sure how much Apple claims of its iPhones 6s two years after they've been released. The question is, of course, do consumers expect performance to degrade over time? I would expect the average consumer would not. Consumers are used to the idea of battery charge decreasing over time. As I mentioned before, lithium ion is a fairly established technology and everybody understands the batteries will reduce capacity over time. I don't think anybody expects their phone to suddenly get slower because of the quality or the age of their battery.

●(1600)

**The Chair:** Thank you.

We're going to move on to Mr. Masse. You have five minutes.

**Mr. Brian Masse (Windsor West, NDP):** Thank you, Mr. Chair.

Thank you to the witnesses for being here.

One of the reasons I proposed the study was to ensure that Canadian consumers are going to receive fair and equitable treatment. It's just my opinion, but I believe that the Competition Bureau does an excellent job with the resources it has and the legislation that's in place. However, it fails and pales in comparison to what other countries have in order to deal with consumer-related issues, not only in terms of competition but also privacy, and also the protection of public safety.

My first question to Mr. Poole is this. In your analysis of this, have you done this type of analysis for any other phones or operating systems, and if you have, what were the results of those? Your analysis that you did here with the graph is a good one for people to grasp and whatever. Is this a normal practice that you would do, or is this something that was developed because of the complaints coming in on the particular phones that you did them on?

**Mr. John Poole:** We developed these graphs in response to the public interest in the iPhone battery issue. We have run these charts for other phones. We've done a selective sampling of popular android handsets, as well as laptop computers, anything that basically runs off a battery. These problems currently are unique to iPhones.

**Mr. Brian Masse:** Have you subsequently done analyses on any other newer models of iPhones or previous phones, or has it just been this particular model?

**Mr. John Poole:** We've looked at the iPhone 6s, and we've also looked at the iPhone 7. The iPhone 7 has a similar issue. The performance issue started appearing in iOS 11.2. We believe it's too early for this defect to show up in the iPhone 8 or the iPhone 10.

**Mr. Brian Masse:** One of my concerns is whether this is a one-off or a pattern of behaviour. We've seen cases similar to Volkswagen and others, and I was involved previously with the Toyota file, where there were several statements by the company that turned out to be erroneous in terms of consumer protection and the problems related to their products.

Ms. Gendron-O'Donnell, I know you can't comment on specific cases, but will you be examining market share? Is that part of the process? In terms of a company releasing a product or influencing a product that's different from what they marketed and they gain market share based upon that, is that part of an overall analysis in terms of an investigation to see if it has advanced the company's percentage of market share and changed that for consumers and also other competitors?

**Ms. Alexa Gendron-O'Donnell:** Again, without being able to speak to the specifics of this case, in a general sense, the analysis that we undertake really depends on the part of the act that we are looking at. For example, in an abuse of dominance matter we are certainly looking to see whether the company is dominant. In a deceptive practices matter, I believe what you're referring to would come into play if we determined that penalties were required. We have a list of factors that can come into play when we're determining, for example, how large an administrative monetary penalty should be. One of them could in effect be how long the conduct took place, what was the breadth of the conduct, and the extent to which there were other factors such as profit made from this conduct. In certain ways, those kinds of analyses would fit with our investigations.

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 347 of 457
Page ID #:1247
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 343 of 381

● (1605)

**Mr. Brian Masse:** With that, not to this specific case, but I am of the opinion that the $35 compensation for the batteries is tenuous at best, especially with shipping costs. That's my personal opinion. I don't believe it's sufficient for consumers. However, for compensation on any product or service are you able to levy any type of correction, and can it be different from what's proposed in other countries?

France, Israel, South Korea, and the United States are having different investigations. Are you able, under the legislation, to communicate with their different agencies and organizations, governmental and justice, to participate in any type of information sharing?

**Ms. Alexa Gendron-O'Donnell:** I will say from a general perspective that we have a lot of co-operation with our counterpart agencies, as I mentioned in my opening remarks. Again, I can't speak to this case but we have various MOUs with all of these different agencies that allow us to speak with them, if it's appropriate, if we are enforcing the act.

With respect to how, I think what you're referring to is we're going back to this idea of what a remedy could look like.

**Mr. Brian Masse:** Yes.

**Ms. Alexa Gendron-O'Donnell:** When we, for example, negotiate consent agreements, that can take a large variety of forms. I'll point to a previous case we had with Telus where they committed to restitute up to $7.34 million to affected consumers. The form that penalty takes is very case-specific, depending on the facts of our investigation.

**Mr. Brian Masse:** Thank you.

Thank you, Mr. Chair.

**The Chair:** We're going to move to Mr. Baylis.

You have five minutes.

**Mr. Frank Baylis (Pierrefonds—Dollard, Lib.):** Thank you, Chair.

Mr. Poole, I'd like to understand a bit more of the technicalities. If I understood you correctly, barring this update, once my phone hits about 30% left on the battery, what will happen if I don't do this update?

**Mr. John Poole:** If you were not to apply this update to your phone, when your phone hits approximately 30% charge, if your battery had degraded past a certain point, then your phone would be susceptible to shutting down unexpectedly. When you launch an application or something, it would just shut off immediately.

**Mr. Frank Baylis:** Did that problem exist on previous phones? It started with the iPhone 6. Is that correct?

**Mr. John Poole:** I believe it did start with the iPhone 6. It was a large issue with the iPhone's success that attracted some media attention in approximately December 2016. That was the first phone where I'd heard of this in a widespread manner.

**Mr. Frank Baylis:** When that happens, I'd have a choice normally if I saw that happening. What would I normally have done if I didn't do the software update?

**Mr. John Poole:** If your phone was susceptible to shutting down abruptly, there wouldn't be a lot you could do. At the time, unfortunately, no one quite knew why these phones were shutting down abruptly. You might suspect it's the battery. You could go out and buy an external battery pack, a battery case for your phone, so that it would have more longevity. You could take it into an Apple store and have the battery replaced at your own personal cost. Those would be the options available to you.

**Mr. Frank Baylis:** Changing the battery or supplanting the battery.

**Mr. John Poole:** Exactly.

**Mr. Frank Baylis:** I didn't necessarily have to have it run slow. I could have had that choice, if I knew that either you change the battery and your phone could keep running at a normal rate.... I wasn't given that choice in this case, and I wasn't told about it. Something just happened, right?

**Mr. John Poole:** Exactly. When Apple released iOS 10.2.1, their release notes mentioned—I don't remember the exact wording—a vague notion about power management and some description of that. I don't believe it tied into the sudden shutdown issue. It certainly didn't mention it.

**Mr. Frank Baylis:** There was a coded thing, just looking at power management.

**Mr. John Poole:** Exactly, and once you applied that update, your phone would no longer shut down, but it might be running slower than it would were it a new phone.

**Mr. Frank Baylis:** That happened. They put this out. People unwittingly updated their phones. Then suddenly, because of your expertise, it came to your attention. Is that what happened?

**Mr. John Poole:** That's correct. Both when our customers were complaining about it and once we saw the Reddit post indicating that changing the battery could improve your phone performance, that's when we switched our theory from this being a software issue to a hardware issue. That's when we did the analysis and discovered just how severe and how widespread this issue was.

**Mr. Frank Baylis:** Have you seen anything like this in other technologies that you monitor, that a company might change something without advising people and it seriously degrades its performance?

**Mr. John Poole:** We've seen a lot of issues in the past where perhaps a new software update will cause a performance degradation. Usually, that's treated as a bug and fixed. It may be an oversight on the company's part, and it's immediately addressed in the subsequent update, or something—

● (1610)

**Mr. Frank Baylis:** But not done on purpose?

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 348 of 457
Page ID #:1248
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 344 of 381

8                                        INDU-97                              March 1, 2018

**Mr. John Poole:** Generally speaking, it's not on purpose. There may be slight drops—you know, 5% or 10%—due to a new technology or a new way to work around things. A perfect example of this would actually be the Spectre and Meltdown fixes that have come out recently to address security flaws, where there is the potential for having your device run slightly more slowly as a result of these fixes.

**Mr. Frank Baylis:** That's not hidden from the...?

**Mr. John Poole:** That has received a lot of publicity and people generally understand that this could be a side effect of applying—

**Mr. Frank Baylis:** But it was not hidden from the consumer?

**Mr. John Poole:** Not at all.

**Mr. Frank Baylis:** For this particular one, we can say—well, you can't speak to that.

This is a question for the Competition Bureau.

You said that you've done a lot of work with the digital economy. In your notes you also mentioned, which I found interesting, that you're doing a lot of work in fintech. A lot of people use their iPhones for banking now. You said that you were very happy —"extremely pleased" was your wording—with the recent budget.

What was in the recent budget that helped the Competition Bureau? What was the recommendation that you made to the government, which was in the budget and which you were pleased about?

**Ms. Alexa Gendron-O'Donnell:** Part of what I will do is provide you with the link to our fintech report for a bit more detail. The budget spoke about looking at things like open banking and spoke to fintech more generally. That is what I was referring to.

Fintech to us is a really important topic, as it's something that's evolving. It's really nice to see people interested as well—

**Mr. Frank Baylis:** It's evolving very fast, and the Competition Bureau had given the government some suggestions to be able to keep up, to make sure that it doesn't get abused. Is that...?

**Ms. Alexa Gendron-O'Donnell:** That's right. The suggestions are provided broadly, and really what we want to make sure is that there are both enough regulations, such that people are comfortable using this kind of new technology, but not so much that we're chilling potential innovation. Really, the report is about striking that balance, and the various suggestions that we make are for that purpose. Again, I'd be happy to provide that.

**Mr. Frank Baylis:** Do you feel that the budget struck that balance?

**Ms. Alexa Gendron-O'Donnell:** We think the budget started us down a path that is promising.

**Mr. Frank Baylis:** Thank you.

**The Chair:** Thank you.

We're going to move to Mr. Lloyd.

You have five minutes.

**Mr. Dane Lloyd (Sturgeon River—Parkland, CPC):** Mr. Chair, I'll be splitting my time with my colleague to my right.

My first question is for Mr. Poole.

What would you say is the value difference between replacing the battery and replacing an entire phone? Is there a significant difference in the value to Apple?

**Mr. John Poole:** The value to Apple right now, especially considering that they're operating the battery program at a severe discount.... I unfortunately can't speak to the particular costs of a new battery versus a new phone. It's a lot more revenue for Apple to sell a consumer a new phone than it is to sell them a new battery. We're talking perhaps in the order of magnitude of $100 for a battery before the program versus $1,000 for an iPhone.

**Mr. Dane Lloyd:** That's what's really interesting to me, because as a layperson who doesn't have the experience of someone like you, I expect our phones to just get slower over time. When that degradation happens, I think many of us would say to ourselves that perhaps it's time to get a new phone. When these slowdowns happen and they're due to batteries, not the phones themselves, I think many people will go and buy a new phone.

Would you say that this issue has led to a great growth of magnitude and value to Apple, as opposed to what would have been the case if it had been more transparent and had told people about the battery changes?

**Mr. John Poole:** It's hard to say how many people went out and bought a new phone versus replacing their battery due to this issue. I know anecdotally speaking that a number of our customers came to us after we published these results and said exactly that, that they had had a slow phone, that they had been confused and thought simply that it was time to upgrade, so they went out and purchased a new iPhone, realizing now in hindsight that they may have been able to replace the battery and have a phone that operated much faster than it had before.

I do know several analysts who have commented that this iPhone battery replacement program, the severe discount that Apple introduced in December, could have a material impact on the number of iPhone units that Apple ships this year.

**Mr. Dane Lloyd:** Would you say that because people are now aware of this battery issue, that will have a material negative impact on Apple's sales of new phones?

**Mr. John Poole:** I know several analysts are suggesting that, and their reasoning seems sound to me.

**Mr. Dane Lloyd:** You stated that it's unfortunate that it wasn't transparent, but you couldn't really say whether this was planned obsolescence. Would you say, then, that this lack of transparency essentially created a great deal of value for Apple?

**Mr. John Poole:** It's entirely possible that it could have. With consumers encountering a slow phone and deciding to upgrade, it could have shortened an upgrade cycle. Perhaps if the consumer would have held on to a phone for three or four years, then maybe this issue would have caused them to replace the phone after a year and a half instead.

Exhibit 1, Page 344

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 349 of 457
Page ID #:1249
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 345 of 381

March 1, 2018                                    INDU-97                                              9

● (1615)

**Mr. Dane Lloyd:** Thank you.

Ms. Gendron-O'Donnell, speaking more broadly and comparing our competition systems with those in other countries, I note from a number of articles that France is pursuing a criminal probe, and other jurisdictions seem to take very tough actions when they see these things happening. Do you see a reason for Canada to move in that direction?

**Ms. Alexa Gendron-O'Donnell:** As I mentioned before, Canada does have both civil and criminal provisions in its act. In terms of things like deceptive marketing and abuse of dominance, we do have quite strong provisions already, even if they are not identical to those of our counterparts. Obviously, the changes to the law itself rest with the department and ultimately with Parliament. I would say that if you look at the penalties available under our act, we have some quite strong ones.

**Mr. Dane Lloyd:** Sorry, I guess I took all the time from my colleague.

My final question would be, do we have a law in Canada against planned obsolescence?

**Ms. Alexa Gendron-O'Donnell:** The laws in Canada that we enforce don't often name specific types of conduct. We tend to have laws that are broader, for example, against deceptive marketing, against abuse of dominance. I think I described them a bit earlier, so you have a sense of what they cover. The idea is that those laws are designed to capture deceptive marketing generally, ensure truth in advertising generally, and look at abuse of dominance generally. This is kind of where those laws lie.

**Mr. Dane Lloyd:** In your opinion would it be helpful to your department to have more direct wording, such as specifically stating planned obsolescence, like they do in France?

**Ms. Alexa Gendron-O'Donnell:** As I said before, the Competition Bureau doesn't hold the policy function with respect to its laws. The department would be the one to speak to. I'm not in a position to comment on that.

**Mr. Dane Lloyd:** Okay. Thank you.

**The Chair:** Thank you very much.

We'll move to Mr. Sheehan for five minutes.

**Mr. Terry Sheehan (Sault Ste. Marie, Lib.):** Mr. Chair, before I begin my questioning I just need a point of clarification.

In our package we received a letter from the CRTC, addressed to you, dated February 26, 2018. In this letter the commission identifies how many complaints they have received related to the iPhone performance. Are we able to share that? Is that public information?

**The Chair:** Yes. It was circulated to the entire committee, so there is no objection. We'll actually put that letter on our website as well.

**Mr. Terry Sheehan:** Okay.

That leads into my first question, which is for Alexa from the Competition Bureau.

We have this letter from the CRTC where they identify the number of complaints they received, that being 20. I'm wondering if the

Competition Bureau would be able to identify the number of complaints they have received related to iPhones as well.

**Ms. Alexa Gendron-O'Donnell:** As I mentioned previously, we keep information, including complaints, confidential. We are a law enforcement agency, so we conduct our work in confidentiality. That's written into our act and that's also our procedure. We do that to maintain the integrity of our investigations until we get to a point where something can be made public. Alternatively, a party or a third party participating in our process can make anything public at any time, but the bureau itself maintains confidentiality.

**Mr. Terry Sheehan:** You're different from the CRTC in that sense, then, because we have information from them, but you don't....

**Ms. Alexa Gendron-O'Donnell:** That's right. I can't speak to the CRTC, but I can say that the bureau itself is a law enforcement agency. We work with confidentiality.

**Mr. Terry Sheehan:** Fair enough.

Mr. Poole, I caught an interview you did with CNBC back in December. You made some statements that were interesting. You told them that you felt that Apple could have been more transparent with its changes to software, and that it may not be the best idea to skip future updates. You also felt that their communication was not "well".

 Could you explain to this committee what you meant by those two statements?

**Mr. John Poole:** Here's what I meant by the first statement commenting on Apple's transparency, or lack thereof. I was disappointed when we discovered this, to realize that this was a change that Apple had introduced with basically no notification to the user. I think when they changed the performance, when they changed the way the phone functions in such a fundamental way, that should have been transparent to the user from the very beginning.

Also, if the battery was degrading to the point where it was affecting other functions on the phone, to have some sort of notification on the phone that would indicate that this was the case would have been great. We had users who'd gone through and said they were experiencing the slowdown. They'd go into the settings application on their phone to look to see whether there was any sort of report to advise people to take their phones or their batteries in for servicing, something which Apple does on other products that they provide. Their laptops, for example, will indicate if your battery is outside of spec and should be replaced. There were no notifications in this regard on the iPhone.

This was very much done under the radar without any real disclosure to customers that this was happening or what steps a consumer could take to either mitigate or remedy this sort of issue.

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 350 of 457
Page ID #:1250
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 346 of 381

10                                    INDU-97                          March 1, 2018

I would make another comment on encouraging consumers to continue to update their phones. When Apple releases new iPhone software updates, these software updates can include unfortunate changes like this which could affect the way the phone operates. They do also, however, include important security updates. If a user refused to update their phone, they could leave themselves vulnerable to various security issues which could cause nefarious third parties to compromise their phone, their personal information, their banking, and any sort of information that might already be on their phones.

I think as much as consumers have lost some trust in Apple, and the contents of their updates, I think it's still important for consumers to continue to apply the updates for these security reasons.

●(1620)

**Mr. Terry Sheehan:** Thank you.

I'm going to split the rest of my time with MP Longfield.

**Mr. Lloyd Longfield (Guelph, Lib.):** Thank you, and I'll try to sneak in two questions.

First, for Ms. Gendron-O'Donnell, when you're collaborating with other countries, could a problem in one country trigger an investigation in Canada?

**Ms. Alexa Gendron-O'Donnell:** We start our investigations in a number of ways, but speaking with our international counterparts is certainly among the ways we use to determine whether we should begin investigating certain issues.

**Mr. Lloyd Longfield:** Thank you, because with Canadian consumers and American producers, sometimes borders disappear.

**Ms. Alexa Gendron-O'Donnell:** I think we know that products and services are getting more global all the time and to us it underscores the need to work together.

**Mr. Lloyd Longfield:** Great. Thank you.

I have a quick technical question for Mr. Poole.

I'm a hydraulics specialist, so I'm translating this into pressure and flow. When you put power in, when you're trying to get too much pressure out, you can reduce your flow. It sounds like what they're doing in this case is a technical solution. Does your agency look at technical solutions, or do you just look at complaints? Let's say a battery is a replacement. You could put in a larger horsepower electric motor and a hydraulics system, or you could dial back your flow on motors to be able to get more things done with the same amount of power.

Do you look at technical solutions?

**Mr. John Poole:** We will occasionally look at certain issues. In regard to batteries, we tend to treat the battery as a black box that we don't fully understand.

Our expertise really lies in the processor itself, and generally speaking, we won't speak to the design of a phone, saying that a phone should have a larger battery or a smaller battery, something like that. Our focus really is on the processor itself.

**Mr. Lloyd Longfield:** Okay, thank you. Thanks, Mr. Chair.

**The Chair:** Thank you very much.

For the final question of this session, we go to Mr. Masse.

**Mr. Brian Masse:** Thank you, Mr. Chair.

Ms. Gendron-O'Donnell, I know that in Australia there's a mediation process going on with Apple on some of their marketing practices, but also in your notes you mentioned that the Federal Court recently upheld a bureau investigation with Hachette, Macmillan, Simon & Schuster, and as well, Apple.

Can you highlight that a little? I've been reading your comments here, and it appears that an agreement was reached and then later on was appealed in the courts, and then was upheld again. Can you please expand on what happened there? It seems that something was reached, and then it was challenged later on. That seems a bit different or unusual.

**Ms. Alexa Gendron-O'Donnell:** That's right. The bureau reached a consent agreement with a number of parties. Under the court system and under the law, a third party who has competitively been affected by a consent agreement can challenge, which is what happened in this case. That has now all been resolved, so the most recent consent agreements that the bureau entered into now stand. There are consent agreements in place with all the list of parties that you saw, that currently stand today.

**Mr. Brian Masse:** Can you confirm that Apple was part of that?

**Ms. Alexa Gendron-O'Donnell:** There's a public consent agreement available on the Competition Tribunal website with Apple and the Competition Bureau that outlines all of those details.

**Mr. Brian Masse:** Okay.

Last, Mr. Poole, with regard to your process now, will you be continuing to use your analyses for not only just Apple, but other phones and devices, in terms of speeds and updates? Is it something that you do on a regular basis and as part of your analyses?

●(1625)

**Mr. John Poole:** We'll be extending the statistical analysis, which we do on a regular basis, to include this sort of analysis for iOS and Android devices. We'll also investigate whether or not we'll need to extend this to both PC and Apple laptops.

**Mr. Brian Masse:** Thank you very much.

**The Chair:** Thank you very much to our two witnesses for coming in today and sharing such wonderful information.

We are going to suspend while we set everything up for our next panellists and then we'll go from there.

●(1625)
_____ (Pause) _____
●(1630)

**The Chair:** Welcome back, everybody.

We are on round two. With us today, from Apple Canada, we have Jacqueline Famulak, the regional counsel for Canada and Latin America, and Simon Potter, who is counsel with McCarthy Tétrault LLP.

Exhibit 1, Page 346

349

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 351 of 457
Page ID #:1251
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 347 of 381

March 1, 2018                                    INDU-97                                         11

You have 10 minutes to present to us. We'll then go into questions.

**Ms. Jacqueline Famulak (Regional Counsel, Canada and Latin America, Apple Canada Inc.):** Good afternoon. My name is Jacqueline Famulak. I manage legal and government affairs at Apple Canada Inc. I have been employed by Apple Canada for over 30 years.

Apple Canada Inc. is a sales and distribution entity. We also have 29 retail stores across Canada. The design, manufacture, and testing of devices has always been done by Apple's parent company, Apple Inc., which is based in California.

I'm here to help the standing committee understand the facts of Apple's efforts to make sure that users of Apple devices get all the benefits from the devices they use, and that these benefits last as long as possible, even in a world of rapid innovation.

Apple Inc. has recently answered a series of questions posed by the chairs of the United States Senate Committee on Commerce, Science and Transportation and the United States House of Representatives Committee on Energy and Commerce. Apple's comprehensive answers to those questions are attached to my written statement. I believe you have received it.

I am here today to answer your questions, but before doing so, I would like to share a few important points at the outset about Apple's actions regarding iPhone batteries and performance, and what the Canadian consumer may have experienced as a result of those actions.

First, Apple would never intentionally do anything to shorten the life of any Apple product or degrade the user experience in order to drive customer upgrades. Apple's entire philosophy and ethic is built around the goal of delivering cutting-edge devices that our customers love. Our motivation is always the user.

Second, Apple's actions related to the performance of iPhones with older batteries were designed specifically to prevent some older models from unexpectedly shutting down under certain circumstances, and we communicated this publicly. Let me explain.

In order for a phone to function properly, the electronics must be able to draw power from the battery instantaneously, but as lithium-ion batteries age, their ability to hold a charge diminishes, and their ability to provide power to the device decreases. Very cold temperatures can also negatively affect a battery's performance. A battery with a low state of charge may also cause the device to behave differently. These things are characteristics of battery chemistry that are common to all lithium-ion batteries used in all smart phones, not just Apple's.

If power demands cannot be met, the iPhone is designed to shut down automatically in order to protect the device's electronics from low voltage. We do not want our customers to experience interruptions in the use of their iPhones, whether that is making an emergency phone call, taking a picture, sharing a post, or watching the end of a movie.

To address the issue of unexpected shutdowns, we developed software that dynamically manages power usage when, and only when, the iPhone is facing the risk of an unexpected shutdown. This power management software helps keep iPhones on when they otherwise might turn off. It does this by balancing the demand for power with the available supply. The sole purpose of the software update in this case was to help customers to continue to use older iPhones with aging batteries without shutdowns, not to drive them to buy newer devices.

Third, Apple regularly provides software updates for iPhones and our other devices. These software updates can include everything from new features and bug fixes to security updates. Whenever we issue a software update, we include a ReadMe note that has a description of the contents of the update for the customer to review prior to the software installation. In the case of iOS 10.2.1, we stated in the ReadMe note "improves power management during peak workloads to avoid unexpected shutdowns on iPhone".

Those things said, our intention has been to give our customers the best products and the best experiences possible. We take our customer concerns seriously, and we have taken a number of steps to address them.

First, Apple is offering to provide out-of-warranty replacement batteries for $35 instead of the original price of $99 to anyone with an iPhone 6 or later, whether they have experienced any performance issues or not. This offer began on December 28, 2017, and is available through to the end of December 2018, so customers have plenty of time to take advantage of it.

● (1635)

Further, Apple is also providing customers with additional information on its website about iPhone batteries and performance, including tips to maximize battery performance.

In addition, iOS 11.3, which is now in public beta, will add new features to give customers easy access to information about the health of their iPhone's battery. It will be available this spring, and the new software will offer power management that will recommend if a battery needs to be serviced. It will also allow customers to see whether the power management is on, and they can choose to turn it off if they wish.

With that, I am ready to answer your questions.

Thank you.

**The Chair:** Thank you very much.

Just to be aware, we do need five minutes at the end for some committee business, so if we can keep our time tight, that would be great.

We're going to start off with Mr. Baylis.

You have five minutes.

**Mr. Frank Baylis:** Thank you, Chair.

Ms. Famulak, thank you for being here. If I understand the issue with the lithium-ion batteries—and we understand it thanks not to Apple, but thanks to Mr. Poole from Primate Labs who explained it to us—when the battery hits about 30%, there is this danger of instant shut-off. Is that correct?

Case 8:24-cv-01655-FWS-SSC   Document 95-1   Filed 12/27/24   Page 352 of 457
Page ID #:1252
Case 5:18-md-02827-EJD   Document 145   Filed 07/02/18   Page 348 of 381

12                                    INDU-97                              March 1, 2018

**Ms. Jacqueline Famulak:** Yes. There are a number of circumstances that might give rise to an unexpected shutdown. The chemical age of the battery itself—

**Mr. Frank Baylis:** Yes, it will shut down, and Apple did not want that to happen, so that's what they made this update for. Is that right?

**Ms. Jacqueline Famulak:** Correct. Originally, we found a limited range of iPhone 6s phones that were manufactured incorrectly. We offered a repair program for them. During that analysis, we discovered that other iPhone 6s phones were having shutdown issues.

**Mr. Frank Baylis:** So you had this thing that would shut down. You said you only wanted to do this.... Apple would never do anything to degrade the customer experience, right? You said that. It would only happen when and if it was needed, right? You mentioned also that you would not do anything to degrade the customer experience. Then you also stated this would only happen when and if needed.

**Ms. Jacqueline Famulak:** Yes. The software looks at the variables. It looks at chemical age. It looks at the room temperature. It looks at the state of charge of the battery. It looks at those and adjusts its levels accordingly in order to maximize the performance.

**Mr. Frank Baylis:** What we do know—and we have to say we know this only from Primate Labs, because Apple has not released any of the technicalities you're speaking to. We do know that the problem happens at 30% on the battery. We also know from their work and studies that, and it's estimated, your slowdown might happen anywhere from 70% to 30%.

Why would you slow the phone down if there's 70% left on the battery if you know the problem is only going to happen when there's 30% left? Why would you degrade the user experience right at 70%?

**Ms. Jacqueline Famulak:** We're not attempting to degrade it. What we're trying to prevent is the unexpected shutdown.

**Mr. Frank Baylis:** But we know it's not going to happen, and we don't know this from Apple. We know this from a Canadian company that discovered this problem, and we know it's going to happen around 30% battery life.

Why would you slow the phone down if it had more than 30% battery life?

●(1640)

**Ms. Jacqueline Famulak:** If there are other factors in existence, such as the chemical age of the battery or the ambient room temperature being very cold.... The software is looking at all three things and deciding at what point.

**Mr. Frank Baylis:** Is Apple ready to release the formula they use? Are you ready to put that out there to say this is why you use it in this way so that theory, what you're stating, can actually be tested?

**Ms. Jacqueline Famulak:** I would have to consult with the parent company in order to release that information.

**Mr. Frank Baylis:** Why would you not release it? I understood that Apple made all these changes and made no statement to anybody about them. Is that a fair statement that when you made this change, you didn't inform anybody?

**Ms. Jacqueline Famulak:** We informed people that we had solved the problem of the unexpected shutdowns. That's what the iOS offer was designed to do.

**Mr. Frank Baylis:** Didn't you feel it necessary to let them know that you were slowing down their phone?

**Ms. Jacqueline Famulak:** We felt it necessary to.... Yes. We felt it was very important to our customers, because what we were hearing from our customers was that the unexpected shutdown was a huge problem, and that a slower phone that can keep recording valuable information or keep watching a movie would be better.

**Mr. Frank Baylis:** I will come back to my question.

Maybe no one's complained to you, but I've heard it, and I have a phone that I complain about when it's slow. It may be news to Apple, but many people don't like a slow phone.

Having said that, if you did need to slow it down at a certain point, why would you slow it down before you needed to?

**Ms. Jacqueline Famulak:** When the other conditions are in existence.

**Mr. Frank Baylis:** That would mean you needed to, but you didn't.

**Ms. Jacqueline Famulak:** In order to preserve the components in the phone, the power will be managed.

**Mr. Frank Baylis:** Let's try another one.

Can you tell us at what point the battery life starts to die? Is it at 30%, as we were told by Mr. Poole, or is that incorrect? Is it at different points, not just 30%? Could it be at 40% or 50%?

**Ms. Jacqueline Famulak:** It's at different points.

**Mr. Frank Baylis:** It could be at different points. What points would those be?

**Ms. Jacqueline Famulak:** I don't have that information.

**Mr. Frank Baylis:** At what point do you absolutely...? What would be the worst-case scenario? I have 70% left on my phone and I need to slow it down at that point. Is that fair to say?

**Ms. Jacqueline Famulak:** It's going to depend on the user and the other factors in existence.

If you have 70% on your phone and it's very cold, the power management might be diverted and you might experience differences in performance, but when the room temperature changes, that might change again. That's what that power management was designed to do.

**Mr. Frank Baylis:** Why can't I know that? You've been found out. Why can't you just explain it? "This is the algorithm, and this is how it's going to work on your phone, Mr. Baylis." Why can't I know that?

**The Chair:** Very briefly, please.

**Ms. Jacqueline Famulak:** What we did do was provide the ReadMe document and the support pages on our website that explain how the power management works and what conditions it does work in.

**Mr. Frank Baylis:** Thank you, Ms. Famulak.

**The Chair:** Thank you very much.

Exhibit 1, Page 348

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 353 of 457
Page ID #:1253
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 349 of 381

March 1, 2018                                    INDU-97                                         13

We're going to move to Mr. Lloyd.

You have five minutes.

**Mr. Dane Lloyd:** Thank you.

Thank you for coming today and for your testimony.

These actions were unintentional, as you stated, yet it's very likely that because people would have bought new phones based on slower phones, Apple benefited financially. What are you doing to educate people about this problem with the phone?

**Ms. Jacqueline Famulak:** We have continued to provide information, make statements, and communicate to our customers.

I want to make it very clear that we still sell these models of phones. It's not that we're trying to get people to buy iPhone 8s or iPhone 10s, as much as they have different features.

In our statement, we reached out directly to customers who were hearing a lot of information from other sources. We felt it was necessary for us to communicate directly to the consumer and explain what was going on.

I don't think we ever—

**Mr. Dane Lloyd:** Are they telling people about this in the stores when they buy the phones? Have there been letter campaigns, email campaigns? What is being done?

**Ms. Jacqueline Famulak:** Our stores and all of our service providers are aware and have all the documentation and the technical information necessary to replace the batteries.

**Mr. Dane Lloyd:** I just wonder. I'm a person, I'm an iPhone user, and I like my iPhone, but if I hadn't heard about this in the news, I wouldn't know anything about this issue. I just spent 20 minutes on the Apple website and I couldn't find a single thing about this issue. It just feels as though Apple is not really telling people about this.

Can you explain why it's not more widespread?

**Ms. Jacqueline Famulak:** Because the software update was designed to avoid the unexpected shutdown, and that was very successful. The software did do that.

**Mr. Simon Potter (Counsel, McCarthy Tétrault LLP, Apple Canada Inc.):** If you'll allow me, there are several things on the website. I'll be very happy to send them to you later this afternoon or tomorrow morning.

**Mr. Dane Lloyd:** Thank you.

**The Chair:** Can you send it to the clerk, please?

**Mr. Simon Potter:** Of course, Mr. Chair. We'll do it through the clerk.

**The Chair:** Thank you.

**Mr. Dane Lloyd:** I appreciate that there is this battery campaign, a discount, but it doesn't seem as though very many people are aware of it. Will the pickup be significant? Are people replacing their batteries? How many people have gone in? How widespread is this?

● (1645)

**Ms. Jacqueline Famulak:** It's my understanding that we've have very good response to it and that our stores are very active in replacing batteries.

**Mr. Dane Lloyd:** Thank you.

How much longer do I have?

**The Chair:** A minute and a half.

**Mr. Dane Lloyd:** I guess I'll defer to my colleague.

Thank you.

**Mr. Colin Carrie:** Thank you very much, Mr. Chair.

You read out what you did in the case of iOS 10.2.1. You stated that it "improves power management during peak workloads to avoid unexpected shutdowns on iPhone". That was the representation you put with that update. Is that correct?

**Ms. Jacqueline Famulak:** You see it right before you install the software.

**Mr. Colin Carrie:** Yes. You know what? I have an iPhone, too, and I love it, but when I get your updates, I just do them. I don't read them, but that's my fault.

Did you have any other representations that mentioned the iOS update may reduce the performance of the user's iPhone?

**Ms. Jacqueline Famulak:** No. The words "power management" were meant to explain that the software will manage the power.

**Mr. Colin Carrie:** So you assumed that people would understand that.

**Ms. Jacqueline Famulak:** People who use batteries, I think—all devices have batteries nowadays—are used to the degrading of batteries. I think it's a welcome change to see somebody who's saying, "We have some software that's going to manage your battery performance and make it last longer."

**Mr. Colin Carrie:** I just don't see the two necessarily equating.

Did any of the representations you made mention the consequence of not installing the update?

**Ms. Jacqueline Famulak:** Most likely the unexpected shutdown, because that's what the software update was designed to do.

**Mr. Colin Carrie:** Mr. Poole was also saying that a lot of this was done under the radar and that many people would just automatically do it because they would be worried about not having the upgraded security, but perhaps some individuals might have wanted to make a different choice. Do you feel that you explained it well enough?

**Ms. Jacqueline Famulak:** I think that when people do a software upgrade and it has a ReadMe announcement prior to the upgrade that says "fixes security bug" or that updates a flaw somewhere in the software, they should be doing that. We encourage that, and I think that whether or not a person reads it, the fact that they no longer are having unexpected shutdowns is a benefit to them.

**The Chair:** Thank you very much.

Mr. Masse, you have five minutes.

**Mr. Brian Masse:** Thank you for being here today.

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 354 of 457
Page ID #:1254
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 350 of 381

One of the things I'm curious about is where you do your testing for the iPhone.

**Ms. Jacqueline Famulak:** We do it at our headquarters in California and probably at every manufacturing site where we would make batteries.

**Mr. Brian Masse:** Is that where you do your cold weather testing as well? It's a serious question, because when people are using their iPhones in very northern areas, cold would affect performance, and you identified that. Everybody knows that. Do you do your cold weather testing in California?

**Ms. Jacqueline Famulak:** We would probably be doing it in cold rooms, yes. We have extensive testing facilities for doing these things under all different temperatures.

**Mr. Brian Masse:** Okay. Who made the decision on a shutdown at 30%? What Mr. Baylis was getting at was that somebody decided on that 30% to have the software activate and go from being dormant, I guess, to active. Why was it not 20% or 40%? That's what I think he was getting at. Who made that decision?

**Ms. Jacqueline Famulak:** Mr. Poole used that 30% number, and I'm not sure it's entirely accurate. I described the other factors that come into play when a battery is going to determine whether it needs to manage its performance or whether it's just going to shut down.

**Mr. Brian Masse:** Okay. Let's get rid of the percentage. Who makes the decision? Obviously it was decided that the software be installed on the phones, and across the global platforms, I suppose. Who made that decision?

**Ms. Jacqueline Famulak:** To update the iOS for the unexpected shutdown?

**Mr. Brian Masse:** Yes, and to not disclose that to the public. Who in Apple decided? It's a known thing that you had there.

You have the product and then you have the software, which is designed to affect the phone. The phone then was affected, but that wasn't disclosed to the public. Who made that decision in Apple, in your organization, not to disclose that to the public, including Canadian operations? Who was that person?

**Ms. Jacqueline Famulak:** There was no decision made not to disclose. We did provide the statement that explained it.

If I could step back, when we first did the update, it was designed to prevent the unexpected shutdown, and it was successful. We have a huge number of our customers who do these updates regularly.

Moving forward, we started hearing that some of our customers were concerned about a slowness. We looked at the data and we found that the algorithm this offer was using.... Is it cold? Is the battery old? Is it depleted? It was that sort of thing. Also, how is it managing it? We provided a statement on December 28 that we put out to the public. We put it out directly to our customers so they would understand and to try to calm the noise that was going on about it, because all that information was causing concern.

●(1650)

**Mr. Brian Masse:** I still don't know who made that decision. That's important for me and for Canadian consumers. Was that decision made in California?

**Ms. Jacqueline Famulak:** This issue can affect phones world-wide.

**Mr. Brian Masse:** Why do you think Apple is now in front of the Department of Justice in the United States and in Spain, France, and South Korea? There are a number of different.... What is it about this case that is now bringing you in front of them? Do you think there was something wrong in what Apple did, and what was that?

**Ms. Jacqueline Famulak:** I don't think Apple did anything wrong.

**Mr. Brian Masse:** Okay, so is it generally the other countries, including Canada, and the consumers that are wrong, not Apple?

**Ms. Jacqueline Famulak:** No, I believe that we continue to communicate to the consumers in the best way we can by communicating to them directly about what they are experiencing. I can't comment at all about what the other countries have alleged or are investigating.

**Mr. Brian Masse:** With regard to the refund of $35, I notice that in all of your media things you mention that it's $99 and you do it for $35. Why was that figure chosen? Who chose that figure? It was $99 originally, and then there is shipping as well. Why not just replace the battery? You affected the performance anyway....

**Ms. Jacqueline Famulak:** To be clear on what the program is, it is a replacement program for $35, so we're not refunding people $35.

**Mr. Brian Masse:** Right.

**Ms. Jacqueline Famulak:** So anybody can go to a retail store or an authorized service provider in Canada and obtain the battery replacement for $35.

**Mr. Brian Masse:** If you live in northern Ontario, for example, you have to use shipping. Why wouldn't Apple cover that?

**Ms. Jacqueline Famulak:** I believe that we have service providers. We have over 1,300 service providers across Canada.

**Mr. Brian Masse:** In terms of the decisions, though, it was $99 and went down to $35. I just think you should be doing it, but that's my personal opinion. Where was that decision made? I'm curious. I think Canadian consumers want to know.

Is it all coming out of California? If that's the case, fine, but we're looking for answers here.

**Ms. Jacqueline Famulak:** The decision is made on a global basis, and the price is a Canadian price. I believe it's $29 U.S., so we have $35 Canadian, and it's applied equally around the world.

**Mr. Brian Masse:** Okay.

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 355 of 457
Page ID #:1255
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 351 of 381

March 1, 2018                                INDU-97                                                      15

With regard to moving forward, will Canadian consumers get reciprocity should Apple change its policies related to reimbursement or compensation when the court cases in the United States, Spain, France, and South Korea? Will Canadians receive the same treatment and immediately as those other countries undergo their separate investigations of Apple?

**Mr. Simon Potter:** Mr. Masse, thank you very much. This gives me an opportunity to speak as the lawyer here.

With respect, I think it's not appropriate to ask a company to decide in advance what to do about a result or a settlement that is unknown, in future, in an unknown country, and that you just wait to see—

**Mr. Brian Masse:** With all due respect, you're our witness here, and our chair will decide what's appropriate or not appropriate—

**Mr. Simon Potter:** I agree.

**Mr. Brian Masse:** I believe it's a fair question to ask whether or not Canadians are going to receive the same reciprocal treatment. I thought it would be a policy of Apple's.

Apparently there seems to be something with the $35, and that being matched, as you mentioned, with regard to American pricing. I want to make sure, though, that Canadian consumers are going to get the same.

Should Apple change and wipe out the $35, are Canadian consumers, for example, going to get the same thing? That seems like a policy decision by Apple.

**The Chair:** Mr. Masse, we're way over on your time.

We can't force the witness to answer. He's given his answer. You can try again when you come back to it, but we are going to move on.

Mr. Erskine-Smith, you have five minutes.

**Mr. Nathaniel Erskine-Smith (Beaches—East York, Lib.):** Thanks very much.

Thanks to the witness.

Apple successfully reduced the occurrence of unexpected shutdowns but slowed down launch times and performance. Now, today you've strangely said that Apple did nothing wrong, but the issue is disclosure, and Apple apologized for non-disclosure in relation to the slowed performance.

Was the non-disclosure intentional or inadvertent?

**Ms. Jacqueline Famulak:** We don't think that we miscommunicated anything at any time. What we originally said was—

● (1655)

**Mr. Nathaniel Erskine-Smith:** Why did you apologize?

**Ms. Jacqueline Famulak:** We apologized because our consumers were not hearing directly from us. Our consumers are the people who are relying on Apple to provide the information to them. There was a lot of noise in the media, and we wanted to make it very clear, so we apologized that we hadn't reached out sooner—

**Mr. Nathaniel Erskine-Smith:** So you think you disclosed to consumers the slowed performance issue?

**Ms. Jacqueline Famulak:** No. No, our apology was to not communicate with them directly.

**Mr. Nathaniel Erskine-Smith:** For non-disclosure, right.

Was the non-disclosure in relation to the slow performance intentional or inadvertent?

**Ms. Jacqueline Famulak:** We didn't not disclose anything. We didn't have anything to not disclose.

**Mr. Nathaniel Erskine-Smith:** But the slowed performance of the phone, the very reason you're attending today, that you did not disclose to consumers, was that non-disclosure intentional or inadvertent?

**Ms. Jacqueline Famulak:** It was not intentional.

**Mr. Nathaniel Erskine-Smith:** Okay, so if it was not intentional, what I would like is an undertaking for any internal correspondence, advice, or opinions for Apple Canada or its parent U.S. company with respect to whether the slowed performance issue associated with the update should have been disclosed to consumers.

**Mr. Simon Potter:** Are you asking for all the legal advice given to Apple?

**Mr. Nathaniel Erskine-Smith:** If you deem it to be solicitor-client privilege, so be it, but internal correspondence certainly isn't all solicitor-client privilege. It's any internal correspondence, advice, or opinions that you're able to disclose, absent solicitor-client privilege, for Apple Canada or its parent U.S. company with respect to whether the slowed performance issue associated with the update should be disclosed.

**Mr. Simon Potter:** I'm not going to make that undertaking. If the committee wants to make a direction about things, we'll reconsider. But the fact is, as people here know, Apple is exposed to a number of class actions in the United States—

**Mr. Nathaniel Erskine-Smith:** You're before a House of Commons committee that has subpoena powers, and you're at risk of contempt of the House not to answer our questions.

**Mr. Simon Potter:** I beg your pardon, Ms. Famulak is not here under subpoena—

**Mr. Nathaniel Erskine-Smith:** No, that we...okay, I'm just going to go on.

**Mr. Simon Potter:** —and if you issued one, it would be a different situation—

**Mr. Nathaniel Erskine-Smith:** Just one second, please.

**Mr. Simon Potter:** —and what I am saying...Mr. Chair, with respect, what I'm saying is—

**Mr. Nathaniel Erskine-Smith:** One second, please. Mr. Potter?

**Mr. Simon Potter:** —that there's a considerable amount of litigation out there.

**Mr. Nathaniel Erskine-Smith:** Okay, so it's a refusal to—

**The Chair:** Excuse me. Thank you.

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 356 of 457
Page ID #:1256
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 352 of 381

16                                      INDU-97                                      March 1, 2018

They're here voluntarily. They're not here under subpoena.

**Mr. Nathaniel Erskine-Smith:** I understand that.

**The Chair:** Please let Mr. Potter finish answering his question, and it's up to them how they choose to answer the question.

**Mr. Nathaniel Erskine-Smith:** So the answer is a refusal.

Of options in terms of notifying customers of the issue, encouraging battery replacements, making it easier to replace the batteries, why not give consumers the option and make it easy to replace batteries? You have airplane mode and low battery mode.

Why was the best course to proceed with this solution and not disclose to customers that there would be slower performance?

**Ms. Jacqueline Famulak:** To prevent the unexpected shutdown.

**Mr. Nathaniel Erskine-Smith:** Okay.

You're reducing prices through December 2018 for batteries. Is there an estimated cost to Apple for that?

**Ms. Jacqueline Famulak:** Well, it depends on the number of people who take us up on the replacement program, but I can—

**Mr. Nathaniel Erskine-Smith:** Has Apple not estimated a cost?

**Ms. Jacqueline Famulak:** We don't stand to profit from it, if that's what you're asking.

**Mr. Nathaniel Erskine-Smith:** Right, so there's a cost to Apple for offering this through December 2018. Apple has not estimated the cost to the company.

**Ms. Jacqueline Famulak:** I don't have that information for you.

**Mr. Nathaniel Erskine-Smith:** Can that information be provided to the committee?

**Ms. Jacqueline Famulak:** I'm not sure we would disclose that.

**Mr. Nathaniel Erskine-Smith:** Okay.

Is Apple ready to fully compensate consumers who purchase the new phone unnecessarily as a result of the material non-disclosure?

**Ms. Jacqueline Famulak:** The circumstances under which somebody decides to upgrade a phone are individual, so it would be very difficult to say that someone went out and purchased a new phone because their battery was low. All batteries degrade over time, so people eventually—

**Mr. Nathaniel Erskine-Smith:** We're not talking about batteries, though. We're talking about slow performance of the phone. If they don't know why there's slow performance, because there's been an update that slows their phone that they're unaware of, and they purchase a new phone because of that material non-disclosure, will they be compensated?

**Mr. Simon Potter:** If you'll allow me, Mr. Chair, the question, or a variation of it, is posed in four class actions in Canada and over 50 class actions in the United States. There will be a result, one way or another, on those things as to whether there was a material non-disclosure and who qualifies to be a member of the class in each case. Perhaps that's better left to those cases.

**The Chair:** Thank you very much.

We're going to move to Mr. Carrie.

**Mr. Colin Carrie:** Thank you very much, Mr. Chair.

Thanks again to the witnesses.

Canadians are big fans of your products. They really like them. I think in my house we have eight of your products. One of the things Mr. Poole brought to my attention that I wasn't aware of, as this was coming down the pike, was that there were Apple customers who went to Apple stores and had their devices evaluated, and they were told that there wasn't really a problem that was...I'm quoting improperly.

With this as a new experience for Apple, I suppose, has Apple put in some internal operational changes so that if something like this comes up, it could be brought to the public's attention a little quicker and maybe find a quicker solution?

● (1700)

**Ms. Jacqueline Famulak:** In terms of putting together a replacement program?

**Mr. Colin Carrie:** I'm thinking about in the future, if you have an issue like this, if your people on the front line are seeing some problems, if people are posting on the Internet—with the Internet people are becoming aware of things very quickly now. Has there been an update to your internal communications to improve them so if something like this happens in the future, consumers won't be as edgy about the product?

**Ms. Jacqueline Famulak:** I think one thing that we realized was that we communicated as much as we possibly could about the unexpected shutdown problem, the steps we took, and how people should update their software. December 28 was when we said to ourselves, "We need to talk directly to our customers, do it as soon as possible, and not let the noise out there affect them."

Yes, the lesson was learned. You always have to listen to your customers, and you need to react quickly when they have concerns.

**Mr. Colin Carrie:** Was Apple aware of how many customers out there perceived the company to be engaging in this term that was brought up with the questioning, this planned obsolescence thing?

**Ms. Jacqueline Famulak:** Absolutely not.

**Mr. Colin Carrie:** I'm just curious, why would an owner of an iPhone, knowing that replacing the battery might restore the performance of their device, choose to replace their iPhone if they knew just by replacing the battery they would get their performance back?

**Ms. Jacqueline Famulak:** Our newer devices have better features, and there's so much.... Even in the short period of time since the iPhone 6 was released to today, there are changes in the way that people use their smart phone devices, and so they may choose to go with the more modern, updated features on the new devices and choose to update that way rather than just replace the battery.

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 357 of 457
Page ID #:1257
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 353 of 381

March 1, 2018                                INDU-97                                          17

**Mr. Colin Carrie:** Okay. It appears that the wait time to get the batteries replaced is eight weeks for someone who has an older phone. I know now that I depend on my iPhone, and an eight-week wait might be....

**Ms. Jacqueline Famulak:** We're working as fast as we can.

**Mr. Colin Carrie:** That's good, thank you.

**The Chair:** We're going to move to Mr. Sheehan.

You have five minutes.

**Mr. Terry Sheehan:** Thank you, Mr. Chair, and thanks to our presenters.

I have a few questions.

We're trying to figure out the number of complaints. Obviously, you must track the number of complaints as they relate to the iPhone 6. Are you able to share with the committee how many complaints you've received about that?

**Ms. Jacqueline Famulak:** We received complaints about the unexpected shutdown and we were tracking that. That's how we sent off our engineers to solve the problem.

We have different categories that we record customer issues in, but I don't have numbers specifically for Canada.

**Mr. Terry Sheehan:** Would you say it's most of the phones or a small bit of the phones?

**Ms. Jacqueline Famulak:** I would say a very small number of phones.

**Mr. Terry Sheehan:** In talking with my constituents in Sault Ste. Marie who have iPhones and have had iPhones all along—they had the iPhone 4, the iPhone 5—their question is why the iPhone 6.

**Ms. Jacqueline Famulak:** The iPhones 4 and 5 were not affected because they didn't have the performance features that started coming out. As I described, every phone is better, has more stuff that you can do, and has enhanced components, so the 4 and 5 are not affected. They're also a smaller form factor. It started with the 6.

**Mr. Terry Sheehan:** Is it the same battery in the 4, the 5, and the 6?

**Ms. Jacqueline Famulak:** I believe it's a different battery. I can confirm that for you, if you'd like me to, but I think it has to do largely with the number of features and the form factor of the 4 and the 5.

**Mr. Terry Sheehan:** Yes, because that would be important information to know if it's the same battery in the 4 and 5 that was put in 6, and it's the performance issues, or is it a different battery and why.

**Ms. Jacqueline Famulak:** I'm not engineer, but I think even if it was the same battery, the performance of those devices was less than the new devices.

**Mr. Terry Sheehan:** Are the 7, the 8, and whatnot experiencing the same problems as the 6?

●(1705)

**Ms. Jacqueline Famulak:** Again, the new phones, the 8 and the 10 have a lot more features, and they're engineered differently. They have different batteries and different components in them, so they're not experiencing the problem.

**Mr. Terry Sheehan:** There are different batteries that are put in the phones at different times.

**Ms. Jacqueline Famulak:** Yes.

**Mr. Terry Sheehan:** Okay.

We'll need some engineers to help us through that.

In your message to your customers, you talked about your warranty. MP Carrie pointed out the length of time it's taking, and people are complaining about replacements for those batteries. People complain that because they didn't know it was an issue, as some of my colleagues on this side of the table have identified, they went out and purchased a new phone. They just thought the phone was at its end of life and not performing well, so they went out and purchased one out of pocket. That was a challenge.

Whether it was intentional or unintentional, one would assume that profits are going to peak. Sales went up during that time frame. Are you able to verify that sales went up for—

**Ms. Jacqueline Famulak:** —for newer devices? That's an interesting question, but our sales always go up in the month of December because it's Christmastime.

**Mr. Terry Sheehan:** Year after year, but was it more so this time?

**Ms. Jacqueline Famulak:** We came out with new devices also this year, the 8 and the 10 just before Christmas, so we're not sure.

**Mr. Terry Sheehan:** I guess that's something we could probably pull because it's a public company. We could probably see the numbers for ourselves if we wanted to.

**Ms. Jacqueline Famulak:** Apple Canada is not a public company. It's a private company.

**Mr. Terry Sheehan:** You can't get that information, then?

**Ms. Jacqueline Famulak:** You would have to look at the Apple Inc. sort of aggregate numbers.

**Mr. Terry Sheehan:** We'll assume that sales went up, anecdotally.

**Mr. Brian Masse:** Apple reported that the final quarter 2018 was the most successful quarter in its history from a revenue standpoint of $88 billion. That equates to a $20-billion profit, also a record for Apple.

**Mr. Terry Sheehan:** Thank you, Brian.

Continuing on with the ideas of either replacing the battery or buying a new phone, there was another solution that was posted on your website. You were going to issue an iOS software update with new features that give the user more visibility on the health of the iPhone battery. Has that happened yet?

**Ms. Jacqueline Famulak:** I mentioned that. That's iOS 11.3. It's in public beta now. It's going to be released in the springtime. It's going to give the user more information about their battery.

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 358 of 457
Page ID #:1258
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 354 of 381

We already do provide a lot of information on our support pages, on our website, but under 11.3, you'll be able to see on your phone the state of the battery and the performance. If you wish to have these features on, it will turn on the performance management, and it will notify you when it's time to replace your battery.

**Mr. Terry Sheehan:**  Okay, so that has been going ahead to circumvent many of the issues that are going on.

I think I'm running out of time, Mr. Chair.

**The Chair:** Yes, you have run out of time.

We're going to move to Mr. Longfield.

You have five minutes.

**Mr. Lloyd Longfield:** Thanks, Mr. Chair.

I really appreciate your coming in. It's a difficult thing to try to answer the range of questions. It feels like question period all of a sudden, so I thank you for doing the great job you're doing in keeping up with us.

I want to come more to the technical side. I started talking about this last time and ran out of time.

When you have so much available power, and from that power you're getting outputs, and depending on the number of applications, you're going to be able to operate at different speeds, from what I understand, the more you enhance the product, the more power you're going to be taking in order to drive the product.

As I mentioned, I was a machine designer in my previous life, and people would add things to my machines and then call me because it had shut down, breakers were thrown, and whatever else. You described the slowing down of the system so it could accommodate more things. You can do more things, but you have to sacrifice something in order to do that with the current design. I can empathize with the designers. Now you have a solution that wasn't available before so you can say that you could let the customers know when the conditions are changing or putting them into a risk mode so that they can choose whether to shut down or go more slowly. It sounds like the designers have been working in the background on the physical limitations because of the combination of what you're trying to do, how many applications you're trying to run, and what temperature you're operating at.

Am I summarizing the technical side of this?

**Ms. Jacqueline Famulak:** Yes. This is how it was explained to me—and I'm no engineer. The engineers developed a look-up table that is looking at different things. It's looking at the workload that the user is putting on it. Are they watching something or playing games? Then they're looking at the ambient room temperature.

Now, I mentioned cold temperatures, but the iPhone device will also shut off if it's extremely hot. That's a safety feature that's always existed. It's looking at ambient room temperature. It's looking at the chemical age of the battery, as batteries do age. Then it's looking at the charge status of the battery. It's dynamically operating, and as you said exactly, it's shifting energy in some place to compensate for something else. If it changes, it changes.

It's also really important to say that this doesn't happen to everybody all the time.

● (1710)

**Mr. Lloyd Longfield:** It sounds to me like it's a technical problem.

There was a news item today. A competitor's product—not an Apple product—got too hot on an airplane and burned a person who was operating the unit at the time. It sounds like physical characteristics are what we're bumping up against here, and you're working on some technical solutions.

I used to take the blame for people trying to get more horsepower than a machine could provide, and I had to explain horsepower. You can only get so much out of Mother Nature and especially when losses start increasing because of the age of the product.

On the testing of the units, then, over the range of temperature, is there a standard minimum temperature? I know when we used products out of Europe they tested at a slightly higher temperature than what we were testing in Canada and we had to make allowances for lower temperature operations.

When you're operating out of California, is there a global standard for temperature, where you're going from -20° to 40°, or something along those lines?

**Ms. Jacqueline Famulak:** I could probably take this away and try to get you more comprehensive answers, but what I can tell you is that the testing.... We have the same devices everywhere in the world and we have standards that we have to meet, different standards in different countries. What we do is make sure that we comply with all of them—

**Mr. Lloyd Longfield:** Right.

**Ms. Jacqueline Famulak:** —so we have to be testing very vigorously for all the various situations in order to make sure that we meet all the standards that are required.

**Mr. Lloyd Longfield:** Yes.

The technical comparisons in terms of marketing are probably not something you would normally market, for example, how many more features you're running on your phone compared to other phones, because—

**Ms. Jacqueline Famulak:** —the user experience is so different.

**Mr. Lloyd Longfield:** Right.

I wanted to put that on the table. I think I'm sympathizing possibly more than some of my colleagues because of my working in a field of trying to get as much power out of a machine as you can, and at some point you can't get any more power without changing something.

**Ms. Jacqueline Famulak:** I think you would also agree that you'd rather keep the hydraulic machines that you're familiar with running than have them unexpectedly shut down.

**Mr. Lloyd Longfield:** Absolutely. The worst failure you can have is an unexpected failure. It's better to have a predictable failure in any event, even on a phone.

**Ms. Jacqueline Famulak:** I agree.

**Mr. Lloyd Longfield:** Thank you, Mr. Chair.

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 359 of 457
Page ID #:1259
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 355 of 381

March 1, 2018                                INDU-97                                              19

**The Chair:** Thank you very much.

For the last two minutes, we go to Mr. Masse.

**Mr. Brian Masse:** Thank you, Mr. Chair.

Maybe I can clarify what I'm trying to reach. Does Apple have a policy in terms of consumer compensation that's global? We have a series of civil lawsuits that are out there, and then you have government investigations. Your compensation model for consumers, is that a universal policy among all Apple users, or is it different state by state?

**Ms. Jacqueline Famulak:** Can you clarify what you mean by compensation?

**Mr. Brian Masse:** The battery replacement, for example.... What I'm trying to get at is whether the Canadian consumers are guaranteed under Apple's policies to receive the same treatment as, for example, the United States customers or customers in France or customers in Israel. Do we get that automatically? Is that the policy of Apple, or does it go state by state to decide the policies on how it treats its consumers?

**Ms. Jacqueline Famulak:** Our customers worldwide are our reason to be so we have to listen to them. I can't imagine that we would favour one country's customer over another.

**Mr. Brian Masse:** Okay, but you don't know if that's the policy or not. I think it's a simple question I'm asking you.

**Ms. Jacqueline Famulak:** It's our philosophy to listen to our customers.

**Mr. Brian Masse:** There's a difference between a philosophy and a policy. Then I guess it's your philosophy, so then I expect it's the same thing—and this is what I'll come away with—that Canadian consumers are going to get the exact same treatment as anybody else in the world.

**Ms. Jacqueline Famulak:** They currently are.

**Mr. Brian Masse:** Okay, that's what I'm—

**The Chair:** Sorry, I just want to interrupt for a second.

I know you didn't have the answer, but could you follow up with that and forward it if you can get us the answer to that? I don't know if there is an answer.

**Mr. Simon Potter:** Certainly, Mr. Chair, we will find out if there's a better answer to give than the answer Ms. Famulak has already given, that Canadians have been treated identically to everybody so far, and whether there's any policy in place that makes that unexpected in future.

● (1715)

**Mr. Brian Masse:** Thank you. That's what we're looking for, whether or not that's the policy of provision.

I know that I have limited time, Mr. Chair.

I have another question. Apple, for example, in Canada has fallen from 73% of the market in 2010 to 51% of the market in 2017. This obviously has an effect on your operations, but is this a one-off? Have there been any other unknowing changes to software related to performance enhancement in the previous applications, or have there been subsequent to this any other slowdowns or deliberate changes without consumer knowledge? Is this a one-off at the end of the day?

**Ms. Jacqueline Famulak:** What we communicated is consistent with the way we always communicate to our customers about software updates and what we do with that ReadMe statement. As I described before, it could be different every time. There are always features that are being constantly re-evaluated and updated. Is this a one-off in terms of the power, are you asking, or the unexpected shutdown? We sure hope the unexpected shutdown problem is solved now.

**Mr. Brian Masse:** In terms of software performance, though, without customer knowledge, have any other updates had similar programming to what we're currently looking at?

**Ms. Jacqueline Famulak:** This is the current software right now, so as I described, 11.3 is coming out with some enhanced features.

**Mr. Brian Masse:** Right, okay.

Thank you very much for your time here today.

**The Chair:** Thank you very much.

I don't normally jump in with my own questions and comments. However, I will on this one. I had the same situation with my iPhone, and this is the first that I'm hearing.... My phone was shutting down at 30% and I took it to an Apple store and didn't hear anything about this. I love Apple. It's a great product for me. I was disappointed because I remember walking into the Apple store and being very frustrated with the lack of answers that I was getting because it wasn't an older phone. It was relatively new. Take that back for what it is. It was very frustrating for me.

Having said all that, I thank our guests for coming in. I hope it wasn't too uncomfortable, but we learned a lot today. We are going to suspend for two minutes and then we're going to go in camera.

[*Proceedings continue in camera*]

Exhibit 1, Page 355

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 360 of 457
Page ID #:1260
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 356 of 381

Exhibit 1, Page 356

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 361 of 457
Page ID #:1261
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 357 of 381

Exhibit 1, Page 357

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 362 of 457
Page ID #:1262
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 358 of 381

**Published under the authority of the Speaker of the House of Commons**

### SPEAKER'S PERMISSION

The proceedings of the House of Commons and its Committees are hereby made available to provide greater public access. The parliamentary privilege of the House of Commons to control the publication and broadcast of the proceedings of the House of Commons and its Committees is nonetheless reserved. All copyrights therein are also reserved.

Reproduction of the proceedings of the House of Commons and its Committees, in whole or in part and in any medium, is hereby permitted provided that the reproduction is accurate and is not presented as official. This permission does not extend to reproduction, distribution or use for commercial purpose of financial gain. Reproduction or use outside this permission or without authorization may be treated as copyright infringement in accordance with the *Copyright Act*. Authorization may be obtained on written application to the Office of the Speaker of the House of Commons.

Reproduction in accordance with this permission does not constitute publication under the authority of the House of Commons. The absolute privilege that applies to the proceedings of the House of Commons does not extend to these permitted reproductions. Where a reproduction includes briefs to a Committee of the House of Commons, authorization for reproduction may be required from the authors in accordance with the *Copyright Act*.

Nothing in this permission abrogates or derogates from the privileges, powers, immunities and rights of the House of Commons and its Committees. For greater certainty, this permission does not affect the prohibition against impeaching or questioning the proceedings of the House of Commons in courts or otherwise. The House of Commons retains the right and privilege to find users in contempt of Parliament if a reproduction or use is not in accordance with this permission.

Also available on the House of Commons website at the following address: http://www.ourcommons.ca

**Publié en conformité de l'autorité du Président de la Chambre des communes**

### PERMISSION DU PRÉSIDENT

Les délibérations de la Chambre des communes et de ses comités sont mises à la disposition du public pour mieux le renseigner. La Chambre conserve néanmoins son privilège parlementaire de contrôler la publication et la diffusion des délibérations et elle possède tous les droits d'auteur sur celles-ci.

Il est permis de reproduire les délibérations de la Chambre et de ses comités, en tout ou en partie, sur n'importe quel support, pourvu que la reproduction soit exacte et qu'elle ne soit pas présentée comme version officielle. Il n'est toutefois pas permis de reproduire, de distribuer ou d'utiliser les délibérations à des fins commerciales visant la réalisation d'un profit financier. Toute reproduction ou utilisation non permise ou non formellement autorisée peut être considérée comme une violation du droit d'auteur aux termes de la *Loi sur le droit d'auteur*. Une autorisation formelle peut être obtenue sur présentation d'une demande écrite au Bureau du Président de la Chambre.

La reproduction conforme à la présente permission ne constitue pas une publication sous l'autorité de la Chambre. Le privilège absolu qui s'applique aux délibérations de la Chambre ne s'étend pas aux reproductions permises. Lorsqu'une reproduction comprend des mémoires présentés à un comité de la Chambre, il peut être nécessaire d'obtenir de leurs auteurs l'autorisation de les reproduire, conformément à la *Loi sur le droit d'auteur*.

La présente permission ne porte pas atteinte aux privilèges, pouvoirs, immunités et droits de la Chambre et de ses comités. Il est entendu que cette permission ne touche pas l'interdiction de contester ou de mettre en cause les délibérations de la Chambre devant les tribunaux ou autrement. La Chambre conserve le droit et le privilège de déclarer l'utilisateur coupable d'outrage au Parlement lorsque la reproduction ou l'utilisation n'est pas conforme à la présente permission.

Aussi disponible sur le site Web de la Chambre des communes à l'adresse suivante : http://www.noscommunes.ca

Case 8:24-cv-01655-FWS-SSC   Document 95-1   Filed 12/27/24   Page 363 of 457
Page ID #:1263
Case 5:18-md-02827-EJD   Document 145   Filed 07/02/18   Page 359 of 381

# EXHIBIT 5

Exhibit 1, Page 359

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 364 of 457
Page ID #:1264
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 360 of 381

**ENGLISH**

**IMPORTANT: BY USING YOUR iPHONE, iPAD OR iPOD TOUCH ("iOS DEVICE"), YOU ARE AGREEING TO BE BOUND BY THE FOLLOWING TERMS:**

A.    **APPLE iOS SOFTWARE LICENSE AGREEMENT**
B.    **APPLE PAY SUPPLEMENTAL TERMS**
C.    **NOTICES FROM APPLE**

**APPLE INC.**
**iOS SOFTWARE LICENSE AGREEMENT**
**Single Use License**

**PLEASE READ THIS SOFTWARE LICENSE AGREEMENT ("LICENSE") CAREFULLY BEFORE USING YOUR iOS DEVICE OR DOWNLOADING THE SOFTWARE UPDATE ACCOMPANYING THIS LICENSE. BY USING YOUR iOS DEVICE OR DOWNLOADING A SOFTWARE UPDATE, AS APPLICABLE, YOU ARE AGREEING TO BE BOUND BY THE TERMS OF THIS LICENSE. IF YOU DO NOT AGREE TO THE TERMS OF THIS LICENSE, DO NOT USE THE iOS DEVICE OR DOWNLOAD THE SOFTWARE UPDATE.**

**IF YOU HAVE RECENTLY PURCHASED AN iOS DEVICE AND YOU DO NOT AGREE TO THE TERMS OF THE LICENSE, YOU MAY RETURN THE iOS DEVICE WITHIN THE RETURN PERIOD TO THE APPLE STORE OR AUTHORIZED DISTRIBUTOR WHERE YOU OBTAINED IT FOR A REFUND, SUBJECT TO APPLE'S RETURN POLICY FOUND AT http://www.apple.com/legal/sales_policies/.**

**1. General.**
(a) The software (including Boot ROM code, embedded software and third party software), documentation, interfaces, content, fonts and any data that came with your iOS Device ("Original iOS Software"), as may be updated or replaced by feature enhancements, software updates or system restore software provided by Apple ("iOS Software Updates"), whether in read only memory, on any other media or in any other form (the Original iOS Software and iOS Software Updates are collectively referred to as the "iOS Software") are licensed, not sold, to you by Apple Inc. ("Apple") for use only under the terms of this License. Apple and its licensors retain ownership of the iOS Software itself and reserve all rights not expressly granted to you. You agree that the terms of this License will apply to any Apple-branded app that may be pre-installed on your iOS Device, unless such app is accompanied by a separate license, in which case you agree that the terms of that license will govern your use of that app.

(b) Apple, at its discretion, may make available future iOS Software Updates for your iOS Device. The iOS Software Updates, if any, may not necessarily include all existing software features or new features that Apple releases for newer or other models of iOS Devices.  The terms of this License will govern any iOS Software Updates provided by Apple that replace and/or supplement the Original iOS Software product, unless such iOS Software Update is accompanied by a separate license in which case the terms of that license will govern.

**2. Permitted License Uses and Restrictions.**
(a) Subject to the terms and conditions of this License, you are granted a limited non-exclusive license to use the iOS Software on a single Apple-branded iOS Device. Except as permitted in Section 2(b) below, and unless as provided in a separate agreement between you and Apple, this License does not allow the iOS Software to exist on more than one Apple-branded iOS Device at a time, and you may not distribute or make the iOS Software available over a network where it could be used by multiple devices at the same time. This License does not grant you any rights to use Apple proprietary interfaces and other intellectual property in the design, development, manufacture, licensing or distribution of third party

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 365 of 457
Page ID #:1265
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 361 of 381

devices and accessories, or third party software applications, for use with iOS Devices. Some of those rights are available under separate licenses from Apple. For more information on developing third party devices and accessories for iOS Devices, please visit https://developer.apple.com/programs/mfi/. For more information on developing software applications for iOS Devices, please visit https://developer.apple.com.

(b) Subject to the terms and conditions of this License, you are granted a limited non-exclusive license to download iOS Software Updates that may be made available by Apple for your model of the iOS Device to update or restore the software on any such iOS Device that you own or control. This License does not allow you to update or restore any iOS Device that you do not control or own, and you may not distribute or make the iOS Software Updates available over a network where they could be used by multiple devices or multiple computers at the same time. If you download an iOS Software Update to your computer, you may make one copy of the iOS Software Updates stored on your computer in machine-readable form for backup purposes only, provided that the backup copy must include all copyright or other proprietary notices contained on the original.

(c) To the extent that Apple has preinstalled Apple-branded apps from the App Store on your iOS Device at the time of purchase ("Preinstalled Apps"), you will need to log into the App Store and associate these Preinstalled Apps with your App Store account in order to use them on your iOS Device. When you associate a Preinstalled App with your App Store account, you will at the same time be automatically associating all other Preinstalled Apps on your iOS Device. By choosing to associate the Preinstalled Apps with your App Store account, you agree that Apple may transmit, collect, maintain, process and use both the Apple ID used by your App Store account and a unique hardware identifier collected from your iOS Device, as unique account identifiers for the purpose of verifying the eligibility of your request and providing you access to the Preinstalled Apps through the App Store. If you do not wish to use a Preinstalled App, you can delete it from your iOS Device at any time.

(d) You may not, and you agree not to or enable others to, copy (except as expressly permitted by this License), decompile, reverse engineer, disassemble, attempt to derive the source code of, decrypt, modify, or create derivative works of the iOS Software or any services provided by the iOS Software or any part thereof (except as and only to the extent any foregoing restriction is prohibited by applicable law or by licensing terms governing use of open-source components that may be included with the iOS Software).

(e) The iOS Software may be used to reproduce materials so long as such use is limited to reproduction of non-copyrighted materials, materials in which you own the copyright, or materials you are authorized or legally permitted to reproduce. Title and intellectual property rights in and to any content displayed by, stored on or accessed through your iOS Device belong to the respective content owner. Such content may be protected by copyright or other intellectual property laws and treaties, and may be subject to terms of use of the third party providing such content. Except as otherwise provided herein, this License does not grant you any rights to use such content nor does it guarantee that such content will continue to be available to you.

(f) You agree to use the iOS Software and the Services (as defined in Section 5 below) in compliance with all applicable laws, including local laws of the country or region in which you reside or in which you download or use the iOS Software and Services. Features of the iOS Software and the Services may not be available in all languages or regions, some features may vary by region, and some may be restricted or unavailable from your service provider. A Wi-Fi or cellular data connection is required for some features of the iOS Software and Services.

(g) Use of the App Store requires a unique user name and password combination, known as an Apple ID. An Apple ID is also required to access app updates and certain features of the iOS Software and

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 366 of 457
Page ID #:1266
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 362 of 381

Services.

(h) You acknowledge that many features, built-in apps, and Services of the iOS Software transmit data and could impact charges to your data plan, and that you are responsible for any such charges. You can view and control which applications are permitted to use cellular data and view an estimate of how much data such applications have consumed under Cellular Data Settings. For more information, please consult the User Guide for your iOS Device.

(i) If you choose to allow automatic app updates, your iOS Device will periodically check with Apple for updates to the apps on your device and, if one is available, the update will automatically download and install onto your device. You can turn off the automatic app updates altogether at any time by going to Settings, tap iTunes & App Store, and under Automatic Downloads, turn off Updates.

(j) Using your iOS Device in some circumstances can distract you and may cause a dangerous situation (for example, avoid typing a text message while driving a car or using headphones while riding a bicycle). By using your iOS Device you agree that you are responsible for observing rules that prohibit or restrict the use of mobile phones or headphones (for example, the requirement to use hands-free options for making calls when driving).

**3. Transfer.** You may not rent, lease, lend, sell, redistribute, or sublicense the iOS Software. You may, however, make a one-time permanent transfer of all of your license rights to the iOS Software to another party in connection with the transfer of ownership of your iOS Device, provided that: (a) the transfer must include your iOS Device and all of the iOS Software, including all its component parts, original media, printed materials and this License; (b) you do not retain any copies of the iOS Software, full or partial, including copies stored on a computer or other storage device; and (c) the party receiving the iOS Software reads and agrees to accept the terms and conditions of this License.

**4. Consent to Use of Data.** When you use your device, your phone number and certain unique identifiers for your iOS Device are sent to Apple in order to allow others to reach you by your phone number when using various communication features of the iOS Software, such as iMessage and FaceTime.  When you use iMessage, Apple may hold your messages in encrypted form for a limited period of time in order to ensure their delivery. You may turn off FaceTime or iMessage by going to the FaceTime or Messages settings on your iOS Device. Certain features like Diagnostics & Usage, Location Services, Siri, Dictation and Spotlight may require information from your iOS Device to provide their respective functions. When you turn on or use these features, details will be provided regarding what information is sent to Apple and how the information may be used.  You can learn more by visiting http://www.apple.com/privacy/. At all times your information will be treated in accordance with Apple's Privacy Policy, which can be viewed at: http://www.apple.com/legal/privacy/.

**5. Services and Third Party Materials.**
(a) The iOS Software may enable access to Apple's iTunes Store, App Store, iBooks Store, Game Center, iCloud, Maps and other Apple and third party services and web sites (collectively and individually, "Services"). Such Services may not be available in all languages or in all countries. Use of these Services requires Internet access and use of certain Services may require an Apple ID, may require you to accept additional terms and may be subject to additional fees. By using this software in connection with an Apple ID, or other Apple Service, you agree to the applicable terms of service for that Service, such as the latest iTunes Store Terms and Conditions, latest iBooks Store Terms and Conditions for the country in which you access such Store(s) or Game Center Terms and Conditions, which you may access and review at http://www.apple.com/legal/internet-services/itunes/ww/, or the iCloud Terms and Conditions which can be found at http://www.apple.com/legal/internet-services/icloud/ww/, respectively.

(b) If you sign up for iCloud, certain iCloud features like "iCloud Photo Library", "My Photo Stream",

Exhibit 1, Page 362

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 367 of 457
Page ID #:1267
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 363 of 381

"iCloud Photo Sharing", "Back Up" and "Find My iPhone" may be accessed directly from the iOS Software.  You acknowledge and agree that your use of iCloud and these features is subject to the latest terms and conditions of the iCloud service, which you may access and review at: http://www.apple.com/legal/internet-services/icloud/ww/.

(c) News App Content. Your use of content accessed through the News application is limited solely to personal, noncommercial use, does not transfer any ownership interest to you in the content, and specifically excludes, without limitation, any commercial or promotional use rights in such content. Furthermore, you are prohibited from republishing, retransmitting and reproducing any images accessed through News as a stand-alone file.

(d) Maps. The maps service and features of the iOS Software ("Maps"), including map data coverage, may vary by region. When you use any location-based features within Maps, such as turn-by-turn navigation, traffic and local search, various location-related and usage information may be sent to Apple, including the real-time geographic location of your iOS Device, in order to process your request and help improve Maps. Such location and usage data is collected by Apple in a form that does not personally identify you. **By using Maps, you agree and consent to Apple's and its subsidiaries' and agents' transmission, collection, maintenance, processing, and use of this information, to provide and improve the Maps features and service, and other Apple products and services.**  Apple may also provide such information, in either an aggregated or non personally identifiable form, to its partners and licensees to help improve their map and location-based products and services. You may disable the location-based functionality of Maps by going to the Location Services setting on your iOS Device and turning off the individual location setting for Maps. Certain Maps features will however be unavailable if you disable the Location Services setting, such as turn-by-turn navigation.

(e) iBooks; Podcasts. If you choose to use the sync feature of the iBooks and Podcasts apps to synchronize your bookmarks, notes, collections and podcast subscription data across your iOS Devices and computers, you acknowledge that such data will be sent to Apple and stored in conjunction with the Apple ID you use for the iBooks Store or iTunes Store, in order to sync such data to your other devices and computers that are authorized to access content through that Apple ID. You can turn off syncing at any time by going to Settings and changing the syncing options for the iBooks and Podcasts apps, respectively.

(f) You understand that by using any of the Services, you may encounter content that may be deemed offensive, indecent, or objectionable, which content may or may not be identified as having explicit language, and that the results of any search or entering of a particular URL may automatically and unintentionally generate links or references to objectionable material. Nevertheless, you agree to use the Services at your sole risk and that Apple, its affiliates, agents, principals, or licensors shall have no liability to you for content that may be found to be offensive, indecent, or objectionable.

(g) Certain Services may display, include or make available content, data, information, applications or materials from third parties ("Third Party Materials") or provide links to certain third party web sites. By using the Services, you acknowledge and agree that Apple is not responsible for examining or evaluating the content, accuracy, completeness, timeliness, validity, copyright compliance, legality, decency, quality or any other aspect of such Third Party Materials or web sites. Apple, its officers, affiliates and subsidiaries do not warrant or endorse and do not assume and will not have any liability or responsibility to you or any other person for any third-party Services, Third Party Materials or web sites, or for any other materials, products, or services of third parties. Third Party Materials and links to other web sites are provided solely as a convenience to you.

(h) Neither Apple nor any of its content providers guarantees the availability, accuracy, completeness, reliability, or timeliness of stock information, location data or any other data displayed by any Services.

Exhibit 1, Page 363

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 368 of 457
Page ID #:1268
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 364 of 381

Financial information displayed by any Services is for general informational purposes only and should not be relied upon as investment advice. Before executing any securities transaction based upon information obtained through the Services, you should consult with a financial or securities professional who is legally qualified to give financial or securities advice in your country or region. Location data provided by any Services, including the Apple Maps service, is provided for basic navigational and planning purposes only and is not intended to be relied upon in situations where precise location information is needed or where erroneous, inaccurate, time-delayed or incomplete location data may lead to death, personal injury, property or environmental damage. You agree that, the results you receive from the Maps service may vary from actual road or terrain conditions due to factors that can affect the accuracy of the Maps data, such as, but not limited to, weather, road and traffic conditions, and geopolitical events. For your safety when using the navigation feature, always pay attention to posted road signs and current road conditions. Follow safe driving practices and traffic regulations, and note that walking directions may not include sidewalks or pedestrian paths.

(i) To the extent that you upload any content through the use of the Services, you represent that you own all rights in, or have authorization or are otherwise legally permitted to upload, such content and that such content does not violate any terms of service applicable to the Services. You agree that the Services contain proprietary content, information and material that is owned by Apple, the site owner or their licensors, and is protected by applicable intellectual property and other laws, including but not limited to copyright. You agree that you will not use such proprietary content, information or materials other than for permitted use of the Services or in any manner that is inconsistent with the terms of this License or that infringes any intellectual property rights of a third party or Apple. No portion of the Services may be reproduced in any form or by any means. You agree not to modify, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in any manner, and you shall not exploit the Services in any unauthorized way whatsoever, including but not limited to, using the Services to transmit any computer viruses, worms, trojan horses or other malware, or by trespass or burdening network capacity. You further agree not to use the Services in any manner to harass, abuse, stalk, threaten, defame or otherwise infringe or violate the rights of any other party, and that Apple is not in any way responsible for any such use by you, nor for any harassing, threatening, defamatory, offensive, infringing or illegal messages or transmissions that you may receive as a result of using any of the Services.

(j) In addition, Services and Third Party Materials that may be accessed, linked to or displayed on the iOS Device are not available in all languages or in all countries or regions. Apple makes no representation that such Services and Third Party Materials are appropriate or available for use in any particular location. To the extent you choose to use or access such Services and Third Party Materials, you do so at your own initiative and are responsible for compliance with any applicable laws, including but not limited to applicable local laws and privacy and data collection laws. Sharing or syncing photos through your iOS Device may cause metadata, including photo location data, to be transmitted with the photos. Apple and its licensors reserve the right to change, suspend, remove, or disable access to any Services at any time without notice. In no event will Apple be liable for the removal of or disabling of access to any such Services. Apple may also impose limits on the use of or access to certain Services, in any case and without notice or liability.

**6. Termination.** This License is effective until terminated. Your rights under this License will terminate automatically or otherwise cease to be effective without notice from Apple if you fail to comply with any term(s) of this License. Upon the termination of this License, you shall cease all use of the iOS Software. Sections 4, 5, 6, 7, 8, 9, 12 and 13 of this License shall survive any such termination.

**7. Disclaimer of Warranties.**
7.1     If you are a customer who is a consumer (someone who uses the iOS Software outside of your trade, business or profession), you may have legal rights in your country of residence which would

Exhibit 1, Page 364

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 369 of 457
Page ID #:1269
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 365 of 381

prohibit the following limitations from applying to you, and where prohibited they will not apply to you. To find out more about rights, you should contact a local consumer advice organization.

7.2     YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, USE OF THE iOS SOFTWARE AND ANY SERVICES PERFORMED BY OR ACCESSED THROUGH THE iOS SOFTWARE IS AT YOUR SOLE RISK AND THAT THE ENTIRE RISK AS TO SATISFACTORY QUALITY, PERFORMANCE, ACCURACY AND EFFORT IS WITH YOU.

7.3     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE iOS SOFTWARE AND SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE", WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND, AND APPLE AND APPLE'S LICENSORS (COLLECTIVELY REFERRED TO AS "APPLE" FOR THE PURPOSES OF SECTIONS 7 AND 8) HEREBY DISCLAIM ALL WARRANTIES AND CONDITIONS WITH RESPECT TO THE iOS SOFTWARE AND SERVICES, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES AND/OR CONDITIONS OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, QUIET ENJOYMENT, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS.

7.4     APPLE DOES NOT WARRANT AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE iOS SOFTWARE AND SERVICES, THAT THE FUNCTIONS CONTAINED IN, OR SERVICES PERFORMED OR PROVIDED BY, THE iOS SOFTWARE WILL MEET YOUR REQUIREMENTS, THAT THE OPERATION OF THE iOS SOFTWARE AND SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, THAT ANY SERVICE WILL CONTINUE TO BE MADE AVAILABLE, THAT DEFECTS IN THE iOS SOFTWARE OR SERVICES WILL BE CORRECTED, OR THAT THE iOS SOFTWARE WILL BE COMPATIBLE OR WORK WITH ANY THIRD PARTY SOFTWARE, APPLICATIONS OR THIRD PARTY SERVICES. INSTALLATION OF THIS iOS SOFTWARE MAY AFFECT THE AVAILABILITY AND USABILITY OF THIRD PARTY SOFTWARE, APPLICATIONS OR THIRD PARTY SERVICES, AS WELL AS APPLE PRODUCTS AND SERVICES.

7.5     YOU FURTHER ACKNOWLEDGE THAT THE iOS SOFTWARE AND SERVICES ARE NOT INTENDED OR SUITABLE FOR USE IN SITUATIONS OR ENVIRONMENTS WHERE THE FAILURE OR TIME DELAYS OF, OR ERRORS OR INACCURACIES IN, THE CONTENT, DATA OR INFORMATION PROVIDED BY THE iOS SOFTWARE OR SERVICES COULD LEAD TO DEATH, PERSONAL INJURY, OR SEVERE PHYSICAL OR ENVIRONMENTAL DAMAGE, INCLUDING WITHOUT LIMITATION THE OPERATION OF NUCLEAR FACILITIES, AIRCRAFT NAVIGATION OR COMMUNICATION SYSTEMS, AIR TRAFFIC CONTROL, LIFE SUPPORT OR WEAPONS SYSTEMS.

7.6     NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY APPLE OR AN APPLE AUTHORIZED REPRESENTATIVE SHALL CREATE A WARRANTY. SHOULD THE iOS SOFTWARE OR SERVICES PROVE DEFECTIVE, YOU ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES OR LIMITATIONS ON APPLICABLE STATUTORY RIGHTS OF A CONSUMER, SO THE ABOVE EXCLUSION AND LIMITATIONS MAY NOT APPLY TO YOU.

**8. Limitation of Liability.** TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, IN NO EVENT SHALL APPLE, ITS AFFILIATES, AGENTS OR PRINCIPALS BE LIABLE FOR PERSONAL INJURY, OR ANY INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, CORRUPTION OR LOSS OF DATA, FAILURE TO TRANSMIT OR RECEIVE ANY DATA (INCLUDING WITHOUT LIMITATION COURSE INSTRUCTIONS, ASSIGNMENTS AND MATERIALS), BUSINESS INTERRUPTION OR ANY OTHER COMMERCIAL DAMAGES OR LOSSES, ARISING OUT OF OR RELATED TO YOUR USE OR INABILITY TO USE THE iOS SOFTWARE AND SERVICES OR ANY THIRD PARTY SOFTWARE OR APPLICATIONS IN CONJUNCTION WITH THE iOS SOFTWARE OR SERVICES, HOWEVER CAUSED, REGARDLESS OF

Exhibit 1, Page 365

Case 8:24-cv-01655-FWS-SSC   Document 95-1   Filed 12/27/24   Page 370 of 457
Page ID #:1270
Case 5:18-md-02827-EJD   Document 145   Filed 07/02/18   Page 366 of 381

THE THEORY OF LIABILITY (CONTRACT, TORT OR OTHERWISE) AND EVEN IF APPLE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR PERSONAL INJURY, OR OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THIS LIMITATION MAY NOT APPLY TO YOU. In no event shall Apple's total liability to you for all damages (other than as may be required by applicable law in cases involving personal injury) exceed the amount of two hundred and fifty dollars (U.S.$250.00). The foregoing limitations will apply even if the above stated remedy fails of its essential purpose.

**9. Digital Certificates.** The iOS Software contains functionality that allows it to accept digital certificates either issued from Apple or from third parties. YOU ARE SOLELY RESPONSIBLE FOR DECIDING WHETHER OR NOT TO RELY ON A CERTIFICATE WHETHER ISSUED BY APPLE OR A THIRD PARTY. YOUR USE OF DIGITAL CERTIFICATES IS AT YOUR SOLE RISK. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, APPLE MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ACCURACY, SECURITY, OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS WITH RESPECT TO DIGITAL CERTIFICATES.

**10. Export Control.** You may not use or otherwise export or re-export the iOS Software except as authorized by United States law and the laws of the jurisdiction(s) in which the iOS Software was obtained. In particular, but without limitation, the iOS Software may not be exported or re-exported (a) into any U.S. embargoed countries or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce Denied Person's List or Entity List or any other restricted party lists. By using the iOS Software, you represent and warrant that you are not located in any such country or on any such list. You also agree that you will not use the iOS Software for any purposes prohibited by United States law, including, without limitation, the development, design, manufacture or production of missiles, nuclear, chemical or biological weapons.

**11. Government End Users.** The iOS Software and related documentation are "Commercial Items", as that term is defined at 48 C.F.R. §2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation", as such terms are used in 48 C.F.R. §12.212 or 48 C.F.R. §227.7202, as applicable. Consistent with 48 C.F.R. §12.212 or 48 C.F.R. §227.7202-1 through 227.7202-4, as applicable, the Commercial Computer Software and Commercial Computer Software Documentation are being licensed to U.S. Government end users (a) only as Commercial Items and (b) with only those rights as are granted to all other end users pursuant to the terms and conditions herein. Unpublished-rights reserved under the copyright laws of the United States.

**12. Controlling Law and Severability.** This License will be governed by and construed in accordance with the laws of the State of California, excluding its conflict of law principles. This License shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is expressly excluded. If you are a consumer based in the United Kingdom, this License will be governed by the laws of the jurisdiction of your residence.  If for any reason a court of competent jurisdiction finds any provision, or portion thereof, to be unenforceable, the remainder of this License shall continue in full force and effect.

**13. Complete Agreement; Governing Language.** This License constitutes the entire agreement between you and Apple relating to the iOS Software and supersedes all prior or contemporaneous understandings regarding such subject matter. No amendment to or modification of this License will be binding unless in writing and signed by Apple. Any translation of this License is done for local requirements and in the event of a dispute between the English and any non-English versions, the English version of this License shall govern, to the extent not prohibited by local law in your jurisdiction.

**14. Third Party Acknowledgements.** Portions of the iOS Software may utilize or include third party

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 371 of 457
Page ID #:1271
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 367 of 381

software and other copyrighted material. Acknowledgements, licensing terms and disclaimers for such material are contained in the electronic documentation for the iOS Software, and your use of such material is governed by their respective terms. Use of the Google Safe Browsing Service is subject to the Google Terms of Service (https://www.google.com/intl/en/policies/terms/) and to Google's Privacy Policy (https://www.google.com/intl/en/policies/privacy/).

**15. Use of MPEG-4; H.264/AVC Notice.**
(a) The iOS Software is licensed under the MPEG-4 Systems Patent Portfolio License for encoding in compliance with the MPEG-4 Systems Standard, except that an additional license and payment of royalties are necessary for encoding in connection with (i) data stored or replicated in physical media which is paid for on a title by title basis and/or (ii) data which is paid for on a title by title basis and is transmitted to an end user for permanent storage and/or use. Such additional license may be obtained from MPEG LA, LLC. See http://www.mpegla.com for additional details.

(b) The iOS Software contains MPEG-4 video encoding and/or decoding functionality. The iOS Software is licensed under the MPEG-4 Visual Patent Portfolio License for the personal and non-commercial use of a consumer for (i) encoding video in compliance with the MPEG-4 Visual Standard ("MPEG-4 Video") and/or (ii) decoding MPEG-4 video that was encoded by a consumer engaged in a personal and non-commercial activity and/or was obtained from a video provider licensed by MPEG LA to provide MPEG-4 video. No license is granted or shall be implied for any other use. Additional information including that relating to promotional, internal and commercial uses and licensing may be obtained from MPEG LA, LLC.  See http://www.mpegla.com.

(c) The iOS Software contains AVC encoding and/or decoding functionality, commercial use of H.264/ AVC requires additional licensing and the following provision applies: THE AVC FUNCTIONALITY IN THE iOS SOFTWARE IS LICENSED HEREIN ONLY FOR THE PERSONAL AND NON-COMMERCIAL USE OF A CONSUMER TO (i) ENCODE VIDEO IN COMPLIANCE WITH THE AVC STANDARD ("AVC VIDEO") AND/OR (ii) DECODE AVC VIDEO THAT WAS ENCODED BY A CONSUMER ENGAGED IN A PERSONAL AND NON-COMMERCIAL ACTIVITY AND/OR AVC VIDEO THAT WAS OBTAINED FROM A VIDEO PROVIDER LICENSED TO PROVIDE AVC VIDEO. INFORMATION REGARDING OTHER USES AND LICENSES MAY BE OBTAINED FROM MPEG LA L.L.C. SEE HTTP://WWW.MPEGLA.COM.

**16. Yahoo Search Service Restrictions.** The Yahoo Search Service available through Safari is licensed for use only in the following countries and regions: Argentina, Aruba, Australia, Austria, Barbados, Belgium, Bermuda, Brazil, Bulgaria, Canada, Cayman Islands, Chile, China, Colombia, Cyprus, Czech Republic, Denmark, Dominican Republic, Ecuador, El Salvador, Finland, France, Germany, Greece, Grenada, Guatemala, Hong Kong, Hungary, Iceland, India, Indonesia, Ireland, Italy, Jamaica, Japan, Latvia, Lithuania, Luxembourg, Malaysia, Malta, Mexico, Netherlands, New Zealand, Nicaragua, Norway, Panama, Peru, Philippines, Poland, Portugal, Puerto Rico, Romania, Singapore, Slovakia, Slovenia, South Korea, Spain, St. Lucia, St. Vincent, Sweden, Switzerland, Taiwan, Thailand, The Bahamas, Trinidad and Tobago, Turkey, UK, Uruguay, US and Venezuela.

**17. Microsoft Exchange Notice.** The Microsoft Exchange mail setting in the iOS Software is licensed only for over-the-air synchronization of information, such as email, contacts, calendar and tasks, between your iOS and Microsoft Exchange Server or other server software licensed by Microsoft to implement the Microsoft Exchange ActiveSync protocol.

EA1407
07/14/2016

------------------------
**Apple Pay Supplemental Terms and Conditions**

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 372 of 457
Page ID #:1272
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 368 of 381

These Apple Pay Supplemental Terms and Conditions (the "Supplemental Terms") supplement the iOS Software License Agreement (the "License"); both the terms of the License and these Supplemental Terms govern your use of the Apple Pay feature, which shall be deemed a "Service" under the License. Capitalized terms used in these Supplemental Terms have the meanings set forth in the License.

**1 Overview and Use Restrictions**

Apple Pay allows you to store virtual representations of credit, debit and prepaid cards, including store credit, debit and prepaid cards, which are supported by the Apple Pay feature ("Supported Payment Cards") and use supported iOS Devices to make contactless payments in select locations, or within apps or websites. Apple Pay also allows you to use rewards and gift cards that are saved in Wallet ("Apple Pay-Enabled Cards", and together with Supported Payment Cards, "Supported Cards") to make contactless rewards and gift card transactions in select stores as part of a contactless payment using Apple Pay. The Apple Pay features of the iOS Software may only be available in select regions, with select card issuers, and with select merchants. Features may vary by region, issuer, and merchant.

In order to use Apple Pay, you must have a card supported by the Apple Pay feature.  Supported Cards may change from time to time.  Supported Payment Cards are associated with an active iCloud account in order to use this feature. Supported Cards are only available to individuals aged 13 years or older, and may be subject to additional age-based restrictions imposed by iCloud or the Supported Card which you are trying to provision.

Apple Pay is intended for your personal use and you may only provision your own Supported Cards.  If you are provisioning a supported corporate card, you represent that you are doing so with the authorization of your employer and you are authorized to bind your employer to these terms of use and all transactions effected by use of this feature.

You agree not to use Apple Pay for illegal or fraudulent purposes, or any other purposes which are prohibited by the License and these Supplemental Terms.  You further agree to use Apple Pay in accordance with applicable law and regulation.  You agree not to interfere with or disrupt the Apple Pay service (including accessing the service through any automated means), or any servers or networks connected to the service, or any policies, requirements or regulations of networks connected to the service (including any unauthorized access to, use or monitoring of data or traffic thereon).

**2 Apple's Relationship With You**

Apple Pay enables you to create a virtual representation of your Supported Cards on your supported iOS Device, however Apple does not process payments or other non-payment card transactions (such as reward accrual and redemption), or have any other control over payments, returns, refunds, rewards, value, discounts or other commerce activity that may arise out of your use of this feature.  The terms of cardholder agreements you may have in place with your card issuer will continue to govern your use of your Supported Payment Cards and their use in connection with Apple Pay. Similarly, your participation in any merchant rewards or gift card programs and your use of Apple Pay-Enabled Cards in connection with Apple Pay will be subject to such merchant's terms and conditions. Nothing in the License or these Supplemental Terms modifies the terms of any cardholder or merchant agreement, and such terms will govern your use of the applicable Supported Card and its virtual representation on your iOS Device.

You agree that Apple is not a party to your cardholder or merchant agreements, nor is Apple responsible for the (a) content, accuracy or unavailability of any payment cards, rewards cards, gift cards, commerce activities, transactions or purchases while using Apple Pay functionality; (b) issuance of credit or assessing eligibility for credit; (c) accrual or redemption of rewards or stored value under a merchant's

Exhibit 1, Page 368

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 373 of 457
Page ID #:1273
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 369 of 381

program; or (d) funding or reloading of prepaid cards.  For all disputes or questions about payment cards, rewards cards, gift cards, or associated commerce activity, please contact your issuer or the applicable merchant.

**3 Privacy**

Apple Pay requires some information from your iOS Device in order to offer the full experience.  You can find more information on the data collected, used or shared as part of your use of Apple Pay by reading About Apple Pay and Privacy (which can be accessed by going to Wallet & Apple Pay on your iOS Device, or within the Watch app on a paired iOS Device) or by visiting http://www.apple.com/privacy.  By using Apple Pay, you agree and consent to Apple's and its subsidiaries' and agents' transmission, collection, maintenance, processing, and use of all of the foregoing information, to provide Apple Pay functionality.

**4 Security; Lost or Disabled Devices**

Apple Pay stores virtual representations of your Supported Cards and should be protected as you would protect your physical credit, debit, prepaid, rewards and gift cards.  Providing your device passcode to a third party or allowing a third party to add their fingerprint to use Touch ID may result in their ability to make payments and receive or redeem rewards or credit using Apple Pay on your device.   You are solely responsible for maintaining the security of your device and of your passcode.  You agree that Apple does not have any responsibility if you lose or share access to your device.  You agree that Apple does not have any responsibility if you make unauthorized modifications to iOS (such as by way of a "jailbreak").

If your device is lost or stolen and you have Find My iPhone enabled, you can use Find My iPhone to attempt to suspend the ability to pay with the virtual Supported Payment Cards on the device by putting it into Lost Mode. You can also erase your device, which will attempt to suspend the ability to pay with the virtual Supported Payment Cards on the device and will also attempt to remove the Apple Pay-Enabled Cards. You should also contact the issuer of your Supported Payment Cards and the merchant who issued your Apple Pay-Enabled Cards in order to prevent unauthorized access to your virtual Supported Cards.

If you report or Apple suspects fraudulent or abusive activity, you agree to cooperate with Apple in any investigation and to use any fraud prevention measures we prescribe.

**5 Limitation of Liability**

IN ADDITION TO THE DISCLAIMERS OF WARRANTIES AND LIMITATION OF LIABILITY SET FORTH IN THE LICENSE, APPLE DOES NOT ASSUME ANY LIABILITY FOR PURCHASES, PAYMENTS, TRANSACTIONS, OR OTHER COMMERCE ACTIVITY MADE USING THE APPLE PAY FEATURE, AND YOU AGREE TO LOOK SOLELY TO AGREEMENTS YOU MAY HAVE WITH YOUR CARD ISSUER, PAYMENT NETWORK, OR MERCHANT TO RESOLVE ANY QUESTIONS OR DISPUTES RELATING TO YOUR SUPPORTED CARDS, VIRTUAL SUPPORTED CARDS AND ASSOCIATED COMMERCE ACTIVITY.

-------------------------
**NOTICES FROM APPLE**
If Apple needs to contact you about your product or account, you consent to receive the notices by email. You agree that any such notices that we send you electronically will satisfy any legal communication requirements.

Exhibit 1, Page 369

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 374 of 457
Page ID #:1274
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 370 of 381

# EXHIBIT 6

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 375 of 457
Page ID #:1275
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 371 of 381

**ENGLISH**

**IMPORTANT: BY USING YOUR iPHONE, iPAD OR iPOD TOUCH ("iOS DEVICE"), YOU ARE AGREEING TO BE BOUND BY THE FOLLOWING TERMS:**

A.   **APPLE iOS SOFTWARE LICENSE AGREEMENT**
B.   **APPLE PAY SUPPLEMENTAL TERMS**
C.   **NOTICES FROM APPLE**

**APPLE INC.**
**iOS SOFTWARE LICENSE AGREEMENT**
**Single Use License**

**PLEASE READ THIS SOFTWARE LICENSE AGREEMENT ("LICENSE") CAREFULLY BEFORE USING YOUR iOS DEVICE OR DOWNLOADING THE SOFTWARE UPDATE ACCOMPANYING THIS LICENSE. BY USING YOUR iOS DEVICE OR DOWNLOADING A SOFTWARE UPDATE, AS APPLICABLE, YOU ARE AGREEING TO BE BOUND BY THE TERMS OF THIS LICENSE. IF YOU DO NOT AGREE TO THE TERMS OF THIS LICENSE, DO NOT USE THE iOS DEVICE OR DOWNLOAD THE SOFTWARE UPDATE.**

**IF YOU HAVE RECENTLY PURCHASED AN iOS DEVICE AND YOU DO NOT AGREE TO THE TERMS OF THE LICENSE, YOU MAY RETURN THE iOS DEVICE WITHIN THE RETURN PERIOD TO THE APPLE STORE OR AUTHORIZED DISTRIBUTOR WHERE YOU OBTAINED IT FOR A REFUND, SUBJECT TO APPLE'S RETURN POLICY FOUND AT <ins>https://www.apple.com/legal/sales_policies/</ins>.**

**1. General.**
(a) The software (including Boot ROM code, embedded software and third party software), documentation, interfaces, content, fonts and any data that came with your iOS Device ("Original iOS Software"), as may be updated or replaced by feature enhancements, software updates or system restore software provided by Apple ("iOS Software Updates"), whether in read only memory, on any other media or in any other form (the Original iOS Software and iOS Software Updates are collectively referred to as the "iOS Software") are licensed, not sold, to you by Apple Inc. ("Apple") for use only under the terms of this License. Apple and its licensors retain ownership of the iOS Software itself and reserve all rights not expressly granted to you. You agree that the terms of this License will apply to any Apple-branded app that may be built-in on your iOS Device, unless such app is accompanied by a separate license, in which case you agree that the terms of that license will govern your use of that app.

(b) Apple, at its discretion, may make available future iOS Software Updates. The iOS Software Updates, if any, may not necessarily include all existing software features or new features that Apple releases for newer or other models of iOS Devices.  The terms of this License will govern any iOS Software Updates provided by Apple, unless such iOS Software Update is accompanied by a separate license, in which case you agree that the terms of that license will govern.

(c) If you use the express setup feature to set up a new iOS Device based on your existing iOS Device, you agree that the terms of this License will govern your use of the iOS Software on your new iOS Device, unless it is accompanied by a separate license, in which case you agree that the terms of that license will govern your use of that iOS Software.

**2. Permitted License Uses and Restrictions.**
(a) Subject to the terms and conditions of this License, you are granted a limited non-exclusive license to use the iOS Software on a single Apple-branded iOS Device. Except as permitted in Section 2(b) below, and unless as provided in a separate agreement between you and Apple, this License does not allow the

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 376 of 457
Page ID #:1276
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 372 of 381

iOS Software to exist on more than one Apple-branded iOS Device at a time, and you may not distribute or make the iOS Software available over a network where it could be used by multiple devices at the same time. This License does not grant you any rights to use Apple proprietary interfaces and other intellectual property in the design, development, manufacture, licensing or distribution of third party devices and accessories, or third party software applications, for use with iOS Devices. Some of those rights are available under separate licenses from Apple. For more information on developing third party devices and accessories for iOS Devices, please visit https://developer.apple.com/programs/mfi/. For more information on developing software applications for iOS Devices, please visit https://developer.apple.com.

(b) Subject to the terms and conditions of this License, you are granted a limited non-exclusive license to download iOS Software Updates that may be made available by Apple for your model of the iOS Device to update or restore the software on any such iOS Device that you own or control. This License does not allow you to update or restore any iOS Device that you do not control or own, and you may not distribute or make the iOS Software Updates available over a network where they could be used by multiple devices or multiple computers at the same time. If you download an iOS Software Update to your computer, you may make one copy of the iOS Software Updates stored on your computer in machine-readable form for backup purposes only, provided that the backup copy must include all copyright or other proprietary notices contained on the original.

(c) To the extent that Apple has preinstalled Apple-branded apps from the App Store on your iOS Device at the time of purchase ("Preinstalled Apps"), you will need to log into the App Store and associate these Preinstalled Apps with your App Store account in order to use them on your iOS Device. When you associate a Preinstalled App with your App Store account, you will at the same time be automatically associating all other Preinstalled Apps on your iOS Device. By choosing to associate the Preinstalled Apps with your App Store account, you agree that Apple may transmit, collect, maintain, process and use both the Apple ID used by your App Store account and a unique hardware identifier collected from your iOS Device, as unique account identifiers for the purpose of verifying the eligibility of your request and providing you access to the Preinstalled Apps through the App Store. If you do not wish to use a Preinstalled App, you can delete it from your iOS Device at any time.

(d) You may not, and you agree not to or enable others to, copy (except as expressly permitted by this License), decompile, reverse engineer, disassemble, attempt to derive the source code of, decrypt, modify, or create derivative works of the iOS Software or any services provided by the iOS Software or any part thereof (except as and only to the extent any foregoing restriction is prohibited by applicable law or by licensing terms governing use of open-source components that may be included with the iOS Software).

(e) The iOS Software may be used to reproduce materials so long as such use is limited to reproduction of non-copyrighted materials, materials in which you own the copyright, or materials you are authorized or legally permitted to reproduce. Title and intellectual property rights in and to any content displayed by, stored on or accessed through your iOS Device belong to the respective content owner. Such content may be protected by copyright or other intellectual property laws and treaties, and may be subject to terms of use of the third party providing such content. Except as otherwise provided herein, this License does not grant you any rights to use such content nor does it guarantee that such content will continue to be available to you.

(f) You agree to use the iOS Software and the Services (as defined in Section 5 below) in compliance with all applicable laws, including local laws of the country or region in which you reside or in which you download or use the iOS Software and Services. Features of the iOS Software and the Services may not be available in all languages or regions, some features may vary by region, and some may be restricted or unavailable from your service provider. A Wi-Fi or cellular data connection is required for some

Exhibit 1, Page 372

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 377 of 457
Page ID #:1277
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 373 of 381

features of the iOS Software and Services.

(g) Use of the App Store requires a unique user name and password combination, known as an Apple ID. An Apple ID is also required to access app updates and certain features of the iOS Software and Services.

(h) You acknowledge that many features, built-in apps, and Services of the iOS Software transmit data and could impact charges to your data plan, and that you are responsible for any such charges. You can view and control which applications are permitted to use cellular data and view an estimate of how much data such applications have consumed under Cellular Data Settings. For more information, please consult the User Guide for your iOS Device.

(i) If you choose to allow automatic app updates, your iOS Device will periodically check with Apple for updates to the apps on your device and, if one is available, the update will automatically download and install onto your device. You can turn off the automatic app updates altogether at any time by going to Settings, tap iTunes & App Store, and under Automatic Downloads, turn off Updates.

(j) Using your iOS Device in some circumstances can distract you and may cause a dangerous situation (for example, avoid typing a text message while driving a car or using headphones while riding a bicycle). By using your iOS Device you agree that you are responsible for observing rules that prohibit or restrict the use of mobile phones or headphones (for example, the requirement to use hands-free options for making calls when driving).

**3. Transfer.** You may not rent, lease, lend, sell, redistribute, or sublicense the iOS Software. You may, however, make a one-time permanent transfer of all of your license rights to the iOS Software to another party in connection with the transfer of ownership of your iOS Device, provided that: (a) the transfer must include your iOS Device and all of the iOS Software, including all its component parts and this License; (b) you do not retain any copies of the iOS Software, full or partial, including copies stored on a computer or other storage device; and (c) the party receiving the iOS Software reads and agrees to accept the terms and conditions of this License.

**4. Consent to Use of Data.** When you use your device, your phone number and certain unique identifiers for your iOS Device are sent to Apple in order to allow others to reach you by your phone number when using various communication features of the iOS Software, such as iMessage and FaceTime.  When you use iMessage, Apple may hold your messages in encrypted form for a limited period of time in order to ensure their delivery. You may turn off FaceTime or iMessage by going to the FaceTime or Messages settings on your iOS Device. Certain features like Analytics, Location Services, Siri, and Dictation may require information from your iOS Device to provide their respective functions. When you turn on or use these features, details will be provided regarding what information is sent to Apple and how the information may be used.  You can learn more by visiting https://www.apple.com/privacy/. At all times your information will be treated in accordance with Apple's Privacy Policy, which can be viewed at: https://www.apple.com/legal/privacy/.

**5. Services and Third Party Materials.**
(a) The iOS Software may enable access to Apple's iTunes Store, App Store, iBooks Store, Game Center, iCloud, Maps and other Apple and third party services and web sites (collectively and individually, "Services"). Such Services may not be available in all languages or in all countries. Use of these Services requires Internet access and use of certain Services may require an Apple ID, may require you to accept additional terms and may be subject to additional fees. By using this software in connection with an Apple ID, or other Apple Service, you agree to the applicable terms of service for that Service, such as the latest Apple Media Services Terms and Conditions for the country in which you access such Services, which you may access and review at https://www.apple.com/legal/internet-services/itunes/

Exhibit 1, Page 373

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 378 of 457
Page ID #:1278
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 374 of 381

ww/ .

(b) If you sign up for iCloud, certain iCloud features like "iCloud Photo Library", "My Photo Stream", "iCloud Photo Sharing", "Back Up" and "Find My iPhone" may be accessed directly from the iOS Software.  You acknowledge and agree that your use of iCloud and these features is subject to the latest terms and conditions of the iCloud service, which you may access and review at: https:// www.apple.com/legal/internet-services/icloud/ww/.

(c) News App Content. Your use of content accessed through the News application is limited solely to personal, noncommercial use, does not transfer any ownership interest to you in the content, and specifically excludes, without limitation, any commercial or promotional use rights in such content. Furthermore, you are prohibited from republishing, retransmitting and reproducing any images accessed through News as a stand-alone file.

(d) Maps. The maps service and features of the iOS Software ("Maps"), including map data coverage, may vary by region. When you use any location-based features within Maps, such as turn-by-turn navigation, traffic and local search, various location-related and usage information may be sent to Apple, including the real-time geographic location of your iOS Device, in order to process your request and help improve Maps. Such location and usage data is collected by Apple in a form that does not personally identify you. **By using Maps, you agree and consent to Apple's and its subsidiaries' and agents' transmission, collection, maintenance, processing, and use of this information, to provide and improve the Maps features and service, and other Apple products and services.**  Apple may also provide such information, in either an aggregated or non personally identifiable form, to its partners and licensees to help improve their map and location-based products and services. You may disable the location-based functionality of Maps by going to the Location Services setting on your iOS Device and turning off the individual location setting for Maps. Certain Maps features will however be unavailable if you disable the Location Services setting, such as turn-by-turn navigation.

(e) iBooks; Podcasts. If you choose to use the sync feature of the iBooks and Podcasts apps to synchronize your bookmarks, notes, collections and podcast subscription data across your iOS Devices and computers, you acknowledge that such data will be sent to Apple and stored in conjunction with the Apple ID you use for the iBooks Store or iTunes Store, in order to sync such data to your other devices and computers that are authorized to access content through that Apple ID. You can turn off syncing at any time by going to Settings and changing the syncing options for the iBooks and Podcasts apps, respectively.

(f) You understand that by using any of the Services, you may encounter content that may be deemed offensive, indecent, or objectionable, which content may or may not be identified as having explicit language, and that the results of any search or entering of a particular URL may automatically and unintentionally generate links or references to objectionable material. Nevertheless, you agree to use the Services at your sole risk and that Apple, its affiliates, agents, principals, or licensors shall have no liability to you for content that may be found to be offensive, indecent, or objectionable.

(g) Certain Services may display, include or make available content, data, information, applications or materials from third parties ("Third Party Materials") or provide links to certain third party web sites. By using the Services, you acknowledge and agree that Apple is not responsible for examining or evaluating the content, accuracy, completeness, timeliness, validity, copyright compliance, legality, decency, quality or any other aspect of such Third Party Materials or web sites. Apple, its officers, affiliates and subsidiaries do not warrant or endorse and do not assume and will not have any liability or responsibility to you or any other person for any third-party Services, Third Party Materials or web sites, or for any other materials, products, or services of third parties. Third Party Materials and links to other web sites are provided solely as a convenience to you.

Exhibit 1, Page 374

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 379 of 457
Page ID #:1279
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 375 of 381

(h) Neither Apple nor any of its content providers guarantees the availability, accuracy, completeness, reliability, or timeliness of stock information, location data or any other data displayed by any Services. Financial information displayed by any Services is for general informational purposes only and should not be relied upon as investment advice. Before executing any securities transaction based upon information obtained through the Services, you should consult with a financial or securities professional who is legally qualified to give financial or securities advice in your country or region. Location data provided by any Services, including the Apple Maps service, is provided for basic navigational and planning purposes only and is not intended to be relied upon in situations where precise location information is needed or where erroneous, inaccurate, time-delayed or incomplete location data may lead to death, personal injury, property or environmental damage. You agree that, the results you receive from the Maps service may vary from actual road or terrain conditions due to factors that can affect the accuracy of the Maps data, such as, but not limited to, weather, road and traffic conditions, and geopolitical events. For your safety when using the navigation feature, always pay attention to posted road signs and current road conditions. Follow safe driving practices and traffic regulations, and note that walking directions may not include sidewalks or pedestrian paths.

(i) To the extent that you upload any content through the use of the Services, you represent that you own all rights in, or have authorization or are otherwise legally permitted to upload, such content and that such content does not violate any terms of service applicable to the Services. You agree that the Services contain proprietary content, information and material that is owned by Apple, the site owner or their licensors, and is protected by applicable intellectual property and other laws, including but not limited to copyright. You agree that you will not use such proprietary content, information or materials other than for permitted use of the Services or in any manner that is inconsistent with the terms of this License or that infringes any intellectual property rights of a third party or Apple. No portion of the Services may be reproduced in any form or by any means. You agree not to modify, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in any manner, and you shall not exploit the Services in any unauthorized way whatsoever, including but not limited to, using the Services to transmit any computer viruses, worms, trojan horses or other malware, or by trespass or burdening network capacity. You further agree not to use the Services in any manner to harass, abuse, stalk, threaten, defame or otherwise infringe or violate the rights of any other party, and that Apple is not in any way responsible for any such use by you, nor for any harassing, threatening, defamatory, offensive, infringing or illegal messages or transmissions that you may receive as a result of using any of the Services.

(j) In addition, Services and Third Party Materials that may be accessed, linked to or displayed on the iOS Device are not available in all languages or in all countries or regions. Apple makes no representation that such Services and Third Party Materials are appropriate or available for use in any particular location. To the extent you choose to use or access such Services and Third Party Materials, you do so at your own initiative and are responsible for compliance with any applicable laws, including but not limited to applicable local laws and privacy and data collection laws. Sharing or syncing photos through your iOS Device may cause metadata, including where and when the photo was taken, and depth information, to be transmitted with the photos. Use of Apple services (such as iCloud Photo Library) to share or sync such photos will involve Apple receiving and storing such metadata. Apple and its licensors reserve the right to change, suspend, remove, or disable access to any Services at any time without notice. In no event will Apple be liable for the removal of or disabling of access to any such Services. Apple may also impose limits on the use of or access to certain Services, in any case and without notice or liability.

**6. Termination.** This License is effective until terminated. Your rights under this License will terminate automatically or otherwise cease to be effective without notice from Apple if you fail to comply with any term(s) of this License. Upon the termination of this License, you shall cease all use of the iOS Software.

Exhibit 1, Page 375

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 380 of 457
Page ID #:1280
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 376 of 381

Sections 4, 5, 6, 7, 8, 9, 12 and 13 of this License shall survive any such termination.

**7. Disclaimer of Warranties.**

7.1    If you are a customer who is a consumer (someone who uses the iOS Software outside of your trade, business or profession), you may have legal rights in your country of residence which would prohibit the following limitations from applying to you, and where prohibited they will not apply to you. To find out more about rights, you should contact a local consumer advice organization.

7.2    YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, USE OF THE iOS SOFTWARE AND ANY SERVICES PERFORMED BY OR ACCESSED THROUGH THE iOS SOFTWARE IS AT YOUR SOLE RISK AND THAT THE ENTIRE RISK AS TO SATISFACTORY QUALITY, PERFORMANCE, ACCURACY AND EFFORT IS WITH YOU.

7.3    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE iOS SOFTWARE AND SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE", WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND, AND APPLE AND APPLE'S LICENSORS (COLLECTIVELY REFERRED TO AS "APPLE" FOR THE PURPOSES OF SECTIONS 7 AND 8) HEREBY DISCLAIM ALL WARRANTIES AND CONDITIONS WITH RESPECT TO THE iOS SOFTWARE AND SERVICES, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES AND/OR CONDITIONS OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, QUIET ENJOYMENT, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS.

7.4    APPLE DOES NOT WARRANT AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE iOS SOFTWARE AND SERVICES, THAT THE FUNCTIONS CONTAINED IN, OR SERVICES PERFORMED OR PROVIDED BY, THE iOS SOFTWARE WILL MEET YOUR REQUIREMENTS, THAT THE OPERATION OF THE iOS SOFTWARE AND SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, THAT ANY SERVICE WILL CONTINUE TO BE MADE AVAILABLE, THAT DEFECTS IN THE iOS SOFTWARE OR SERVICES WILL BE CORRECTED, OR THAT THE iOS SOFTWARE WILL BE COMPATIBLE OR WORK WITH ANY THIRD PARTY SOFTWARE, APPLICATIONS OR THIRD PARTY SERVICES. INSTALLATION OF THIS iOS SOFTWARE MAY AFFECT THE AVAILABILITY AND USABILITY OF THIRD PARTY SOFTWARE, APPLICATIONS OR THIRD PARTY SERVICES, AS WELL AS APPLE PRODUCTS AND SERVICES.

7.5    YOU FURTHER ACKNOWLEDGE THAT THE iOS SOFTWARE AND SERVICES ARE NOT INTENDED OR SUITABLE FOR USE IN SITUATIONS OR ENVIRONMENTS WHERE THE FAILURE OR TIME DELAYS OF, OR ERRORS OR INACCURACIES IN, THE CONTENT, DATA OR INFORMATION PROVIDED BY THE iOS SOFTWARE OR SERVICES COULD LEAD TO DEATH, PERSONAL INJURY, OR SEVERE PHYSICAL OR ENVIRONMENTAL DAMAGE, INCLUDING WITHOUT LIMITATION THE OPERATION OF NUCLEAR FACILITIES, AIRCRAFT NAVIGATION OR COMMUNICATION SYSTEMS, AIR TRAFFIC CONTROL, LIFE SUPPORT OR WEAPONS SYSTEMS.

7.6    NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY APPLE OR AN APPLE AUTHORIZED REPRESENTATIVE SHALL CREATE A WARRANTY. SHOULD THE iOS SOFTWARE OR SERVICES PROVE DEFECTIVE, YOU ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES OR LIMITATIONS ON APPLICABLE STATUTORY RIGHTS OF A CONSUMER, SO THE ABOVE EXCLUSION AND LIMITATIONS MAY NOT APPLY TO YOU.

**8. Limitation of Liability.** TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, IN NO EVENT SHALL APPLE, ITS AFFILIATES, AGENTS OR PRINCIPALS BE LIABLE FOR PERSONAL INJURY, OR ANY INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, CORRUPTION OR LOSS OF DATA,

Exhibit 1, Page 376

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 381 of 457
Page ID #:1281
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 377 of 381

FAILURE TO TRANSMIT OR RECEIVE ANY DATA (INCLUDING WITHOUT LIMITATION COURSE INSTRUCTIONS, ASSIGNMENTS AND MATERIALS), BUSINESS INTERRUPTION OR ANY OTHER COMMERCIAL DAMAGES OR LOSSES, ARISING OUT OF OR RELATED TO YOUR USE OR INABILITY TO USE THE iOS SOFTWARE AND SERVICES OR ANY THIRD PARTY SOFTWARE OR APPLICATIONS IN CONJUNCTION WITH THE iOS SOFTWARE OR SERVICES, HOWEVER CAUSED, REGARDLESS OF THE THEORY OF LIABILITY (CONTRACT, TORT OR OTHERWISE) AND EVEN IF APPLE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR PERSONAL INJURY, OR OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THIS LIMITATION MAY NOT APPLY TO YOU. In no event shall Apple's total liability to you for all damages (other than as may be required by applicable law in cases involving personal injury) exceed the amount of two hundred and fifty dollars (U.S.$250.00). The foregoing limitations will apply even if the above stated remedy fails of its essential purpose.

**9. Digital Certificates.** The iOS Software contains functionality that allows it to accept digital certificates either issued from Apple or from third parties. YOU ARE SOLELY RESPONSIBLE FOR DECIDING WHETHER OR NOT TO RELY ON A CERTIFICATE WHETHER ISSUED BY APPLE OR A THIRD PARTY. YOUR USE OF DIGITAL CERTIFICATES IS AT YOUR SOLE RISK. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, APPLE MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ACCURACY, SECURITY, OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS WITH RESPECT TO DIGITAL CERTIFICATES.

**10. Export Control.** You may not use or otherwise export or re-export the iOS Software except as authorized by United States law and the laws of the jurisdiction(s) in which the iOS Software was obtained. In particular, but without limitation, the iOS Software may not be exported or re-exported (a) into any U.S. embargoed countries or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce Denied Person's List or Entity List or any other restricted party lists. By using the iOS Software, you represent and warrant that you are not located in any such country or on any such list. You also agree that you will not use the iOS Software for any purposes prohibited by United States law, including, without limitation, the development, design, manufacture or production of missiles, nuclear, chemical or biological weapons.

**11. Government End Users.** The iOS Software and related documentation are "Commercial Items", as that term is defined at 48 C.F.R. §2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation", as such terms are used in 48 C.F.R. §12.212 or 48 C.F.R. §227.7202, as applicable. Consistent with 48 C.F.R. §12.212 or 48 C.F.R. §227.7202-1 through 227.7202-4, as applicable, the Commercial Computer Software and Commercial Computer Software Documentation are being licensed to U.S. Government end users (a) only as Commercial Items and (b) with only those rights as are granted to all other end users pursuant to the terms and conditions herein. Unpublished-rights reserved under the copyright laws of the United States.

**12. Controlling Law and Severability.** This License will be governed by and construed in accordance with the laws of the State of California, excluding its conflict of law principles. This License shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is expressly excluded. If you are a consumer based in the United Kingdom, this License will be governed by the laws of the jurisdiction of your residence.  If for any reason a court of competent jurisdiction finds any provision, or portion thereof, to be unenforceable, the remainder of this License shall continue in full force and effect.

**13. Complete Agreement; Governing Language.** This License constitutes the entire agreement between you and Apple relating to the iOS Software and supersedes all prior or contemporaneous understandings regarding such subject matter. No amendment to or modification of this License will be

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 382 of 457
Page ID #:1282
Case 5:18-md-02827-EJD     Document 145     Filed 07/02/18     Page 378 of 381

binding unless in writing and signed by Apple. Any translation of this License is done for local requirements and in the event of a dispute between the English and any non-English versions, the English version of this License shall govern, to the extent not prohibited by local law in your jurisdiction.

**14. Third Party Acknowledgements.** Portions of the iOS Software may utilize or include third party software and other copyrighted material. Acknowledgements, licensing terms and disclaimers for such material are contained in the electronic documentation for the iOS Software, and your use of such material is governed by their respective terms. Use of the Google Safe Browsing Service is subject to the Google Terms of Service (https://www.google.com/intl/en/policies/terms/) and to Google's Privacy Policy (https://www.google.com/intl/en/policies/privacy/).

**15. Use of MPEG-4; H.264/AVC Notice.**
(a) The iOS Software is licensed under the MPEG-4 Systems Patent Portfolio License for encoding in compliance with the MPEG-4 Systems Standard, except that an additional license and payment of royalties are necessary for encoding in connection with (i) data stored or replicated in physical media which is paid for on a title by title basis and/or (ii) data which is paid for on a title by title basis and is transmitted to an end user for permanent storage and/or use. Such additional license may be obtained from MPEG LA, LLC. See http://www.mpegla.com for additional details.

(b) The iOS Software contains MPEG-4 video encoding and/or decoding functionality. The iOS Software is licensed under the MPEG-4 Visual Patent Portfolio License for the personal and non-commercial use of a consumer for (i) encoding video in compliance with the MPEG-4 Visual Standard ("MPEG-4 Video") and/or (ii) decoding MPEG-4 video that was encoded by a consumer engaged in a personal and non-commercial activity and/or was obtained from a video provider licensed by MPEG LA to provide MPEG-4 video. No license is granted or shall be implied for any other use. Additional information including that relating to promotional, internal and commercial uses and licensing may be obtained from MPEG LA, LLC.  See http://www.mpegla.com.

(c) The iOS Software contains AVC encoding and/or decoding functionality, commercial use of H.264/AVC requires additional licensing and the following provision applies: THE AVC FUNCTIONALITY IN THE iOS SOFTWARE IS LICENSED HEREIN ONLY FOR THE PERSONAL AND NON-COMMERCIAL USE OF A CONSUMER TO (i) ENCODE VIDEO IN COMPLIANCE WITH THE AVC STANDARD ("AVC VIDEO") AND/OR (ii) DECODE AVC VIDEO THAT WAS ENCODED BY A CONSUMER ENGAGED IN A PERSONAL AND NON-COMMERCIAL ACTIVITY AND/OR AVC VIDEO THAT WAS OBTAINED FROM A VIDEO PROVIDER LICENSED TO PROVIDE AVC VIDEO. INFORMATION REGARDING OTHER USES AND LICENSES MAY BE OBTAINED FROM MPEG LA L.L.C. SEE http://www.mpegla.com.

**16. Yahoo Search Service Restrictions.** The Yahoo Search Service available through Safari is licensed for use only in the following countries and regions: Argentina, Aruba, Australia, Austria, Barbados, Belgium, Bermuda, Brazil, Bulgaria, Canada, Cayman Islands, Chile, China, Colombia, Cyprus, Czech Republic, Denmark, Dominican Republic, Ecuador, El Salvador, Finland, France, Germany, Greece, Grenada, Guatemala, Hong Kong, Hungary, Iceland, India, Indonesia, Ireland, Italy, Jamaica, Japan, Latvia, Lithuania, Luxembourg, Malaysia, Malta, Mexico, Netherlands, New Zealand, Nicaragua, Norway, Panama, Peru, Philippines, Poland, Portugal, Puerto Rico, Romania, Singapore, Slovakia, Slovenia, South Korea, Spain, St. Lucia, St. Vincent, Sweden, Switzerland, Taiwan, Thailand, The Bahamas, Trinidad and Tobago, Turkey, UK, Uruguay, US and Venezuela.

**17. Microsoft Exchange Notice.** The Microsoft Exchange mail setting in the iOS Software is licensed only for over-the-air synchronization of information, such as email, contacts, calendar and tasks, between your iOS and Microsoft Exchange Server or other server software licensed by Microsoft to implement the Microsoft Exchange ActiveSync protocol.

Exhibit 1, Page 378

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 383 of 457
Page ID #:1283
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 379 of 381

EA1520
09/22/2017

------------------------
**Apple Pay Supplemental Terms and Conditions**

These Apple Pay Supplemental Terms and Conditions (these "Supplemental Terms") supplement the iOS Software License Agreement (the "License"); both the terms of the License and these Supplemental Terms govern your use of the Apple Pay feature, which shall be deemed a "Service" under the License. Capitalized terms used in these Supplemental Terms have the meanings set forth in the License.

**1.    Overview and Use Restrictions**

Apple Pay allows you to:

- store virtual representations of credit, debit, and prepaid cards, including store credit, debit, prepaid cards, and the Apple Pay Cash card, which are supported by the Apple Pay feature ("Supported Payment Cards") and use supported iOS Devices to make contactless payments in select locations, or within apps or websites;
- use rewards and gift cards that are saved in Wallet ("Apple Pay-Enabled Cards", and together with Supported Payment Cards, "Supported Cards") to make contactless rewards and gift-card transactions in select stores as part of a contactless payment using Apple Pay; and
- send person to person payments to other Apple Pay users.

The Apple Pay features of the iOS Software may only be available in select regions, with select card issuers, financial institutions, and merchants. Features may vary by region, issuer, and merchant.

To use Apple Pay, you must have a Supported Card. Supported Cards may change from time to time. Additionally, in order to send or receive person to person payments, you must have an Apple Pay Cash card.

Supported Payment Cards and person to person payments are associated with the Apple ID you have signed into iCloud to use these features. Supported Cards are only available to individuals aged 13 years or older, and may be subject to additional age-based restrictions imposed by iCloud or the Supported Card which you are trying to provision. The Apple Pay Cash card and the ability to send and receive person to person payments are only available to individuals aged 18 years or older.

Apple Pay is intended for your personal use and you may only provision your own Supported Cards. If you are provisioning a supported corporate card, you represent that you are doing so with the authorization of your employer and you are authorized to bind your employer to these terms of use and all transactions effected by use of this feature. If you are sending or receiving a person to person payment, you represent that you are doing so for your own personal, non-commercial use.

You agree not to use Apple Pay for illegal or fraudulent purposes, or any other purposes which are prohibited by the License and these Supplemental Terms. You further agree to use Apple Pay in accordance with applicable laws and regulations. You agree not to interfere with or disrupt the Apple Pay service (including accessing the service through any automated means), or any servers or networks connected to the service, or any policies, requirements, or regulations of networks connected to the service (including any unauthorized access to, use, or monitoring of data or traffic thereon).

**2.    Apple's Relationship With You**

Apple Pay enables you to create a virtual representation of your Supported Cards on your supported iOS

Exhibit 1, Page 379

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 384 of 457
Page ID #:1284
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 380 of 381

Device.  However Apple does not process payments or other non-payment card transactions (such as reward accrual and redemption), receive, hold, or transfer your funds, or have any other control over payments, returns, refunds, rewards, value, discounts, or other commerce activity that may arise out of your use of this feature.

The terms of cardholder agreements you may have in place with your card issuer will continue to govern your use of your Supported Cards and their use in connection with Apple Pay. Similarly, your participation in any merchant rewards or gift card programs and your use of Apple Pay-Enabled Cards in connection with Apple Pay will be subject to such merchant's terms and conditions.

The Apple Pay Cash card and the ability to send and receive person to person payments are only available in the United States, and are services provided by Green Dot Bank, member FDIC. When you enable these features within Apple Pay, you are opening an account with Green Dot Bank, and when you send or receive a person to person payment or load or withdraw money from your Apple Pay Cash card, Green Dot Bank will be responsible for receiving and sending your money to the intended recipient. The financial institution responsible for offering Apple Pay Cash and person to person payments within Apple Pay is subject to change, and your use of such features are subject to their terms and conditions.

Nothing in the License or these Supplemental Terms modifies the terms of any cardholder, user, or merchant agreement, and such terms will govern your use of the applicable Supported Card or the person to person payment feature of Apple Pay and their virtual representation on your iOS Device. You agree that Apple is not a party to your cardholder or merchant agreements, nor is Apple responsible for the: (a) content, accuracy or unavailability of any payment cards, rewards cards, gift cards, commerce activities, transactions, or purchases while using Apple Pay functionality; (b) issuance of credit or assessing eligibility for credit; (c) accrual or redemption of rewards or stored value under a merchant's program; (d) funding or reloading of prepaid cards; (e) sending or receiving of person to person payments; or (f) loading, redeeming, or withdrawing money from your Apple Pay Cash card.

For all disputes or questions about payment cards, rewards cards, gift cards, or associated commerce activity, please contact your issuer or the applicable merchant. For questions regarding the Apple Pay Cash card or person to person payments, please contact Apple Support.

**3.  Privacy**

Apple Pay requires some information from your iOS Device in order to offer the full experience. Additionally, when you use your Apple Pay Cash card or send or receive person to person payments, additional information about your transactions is collected and retained to service your account and fraud prevention and regulatory purposes. You can find more information on the data collected, used, or shared as part of your use of Apple Pay, the Apple Pay Cash card, or person to person payments with Apple Pay by reading About Apple Pay and Privacy (which can be accessed by going to Wallet & Apple Pay on your iOS Device, or within the Watch app on a paired iOS Device) or by visiting https://www.apple.com/privacy. By using these features, you agree and consent to Apple's and its subsidiaries' and agents' transmission, collection, maintenance, processing, and use of all of the foregoing information, to provide Apple Pay functionality.

**4.  Security; Lost or Disabled Devices**

Apple Pay stores virtual representations of your Supported Cards and should be protected as you would protect cash or your physical credit, debit, prepaid, rewards, or gift cards. Providing your device passcode to a third party or allowing a third party to add their fingerprint to use Touch ID or enable Face ID may result in their ability to make payments, send, request, or receive person to person payments, withdraw money from your Apple Pay Cash card, or receive or redeem rewards or credit using Apple Pay

Exhibit 1, Page 380

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 385 of 457
Page ID #:1285
Case 5:18-md-02827-EJD    Document 145    Filed 07/02/18    Page 381 of 381

on your device. You are solely responsible for maintaining the security of your device and of your passcode. You agree that Apple does not have any responsibility if you lose or share access to your device. You agree that Apple does not have any responsibility if you make unauthorized modifications to iOS (such as by way of a "jailbreak").

You may need to enable additional security measures, such as two-factor authentication for your Apple ID, in order to access particular features of Apple Pay, including the Apple Pay Cash card and person to person payments with Apple Pay. If you subsequently remove those security features, you may not be able to continue to access particular features of Apple Pay.

If your device is lost or stolen and you have Find My iPhone enabled, you can use Find My iPhone to attempt to suspend the ability to pay with the virtual Supported Payment Cards or sending person to person payments on that device by putting it into Lost Mode. You can also erase your device, which will attempt to suspend the ability to pay with the virtual Supported Payment Cards or send person to person payments on the device and will also attempt to remove the Apple Pay-Enabled Cards. You should also contact the issuer of your Supported Payment Cards, the merchant who issued your Apple Pay-Enabled Cards, and Apple in the case of your Apple Pay Cash card in order to prevent unauthorized access to your Supported Cards.

If you report or Apple suspects fraudulent or abusive activity, you agree to cooperate with Apple in any investigation and to use any fraud prevention measures we prescribe.

**5.    Limitation of Liability**

IN ADDITION TO THE DISCLAIMERS OF WARRANTIES AND LIMITATION OF LIABILITY SET FORTH IN THE LICENSE, APPLE DOES NOT ASSUME ANY LIABILITY FOR PURCHASES, PAYMENTS, TRANSACTIONS, OR OTHER COMMERCE ACTIVITY MADE USING THE APPLE PAY FEATURE, AND YOU AGREE TO LOOK SOLELY TO AGREEMENTS YOU MAY HAVE WITH YOUR CARD ISSUER, PAYMENT NETWORK, FINANCIAL INSTITUTIONS, OR MERCHANT TO RESOLVE ANY QUESTIONS OR DISPUTES RELATING TO YOUR SUPPORTED CARDS, PERSON TO PERSON PAYMENTS, AND ASSOCIATED COMMERCE ACTIVITY.

-------------------------
**NOTICES FROM APPLE**
If Apple needs to contact you about your product or account, you consent to receive the notices by email. You agree that any such notices that we send you electronically will satisfy any legal communication requirements.

# Exhibit 2

1  THEODORE J. BOUTROUS, JR., SBN 132099
    tboutrous@gibsondunn.com
2  CHRISTOPHER CHORBA, SBN 216692
    cchorba@gibsondunn.com
3  THEANE EVANGELIS, SBN 243570
    tevangelis@gibsondunn.com
4  TIMOTHY W. LOOSE, SBN 241037
    tloose@gibsondunn.com
5  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
6  Los Angeles, CA  90071-3197
   Telephone:  213.229.7000
7  Facsimile:   213.229.7520

8  G. CHARLES NIERLICH, SBN 196611
    gnierlich@gibsondunn.com
9  RACHEL S. BRASS, SBN 219301
    rbrass@gibsondunn.com
10 GIBSON, DUNN & CRUTCHER LLP
   555 Mission Street, Suite 3000
11 San Francisco, CA  94105
   Telephone:  415.393.8200
12 Facsimile:   415.374.8458

13 *Attorneys for Defendant Apple Inc.*

14

15              **UNITED STATES DISTRICT COURT**

16              **NORTHERN DISTRICT OF CALIFORNIA**

17                     **SAN JOSE DIVISION**

18 IN RE: APPLE INC. DEVICE          CASE NO. 5:18-md-02827-EJD
   PERFORMANCE LITIGATION,
19                                    **PUTATIVE CLASS ACTION**

20 ————————————————————             **DECLARATION OF JONATHAN KIRK
                                     Q.C. IN SUPPORT OF MOTION TO
21 This Document Relates To:         DISMISS PLAINTIFFS' CONSOLIDATED
                                     CLASS ACTION COMPLAINT**
        ALL ACTIONS.
22

23                                    Judge:        Hon. Edward J. Davila
                                      Courtroom:    4, 5th Floor
24                                    Hearing Date: September 28, 2018
                                      Hearing Time: 10:00 a.m.
25

26

27

28

Gibson, Dunn &
Crutcher LLP

Exhibit 2, Page 1

### DECLARATION OF JONATHAN KIRK Q.C.

Pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure, I hereby declare as follows:

### BACKGROUND AND QUALIFICATIONS

1.      I am Jonathan Kirk Q.C., a barrister in independent practice at Gough Square Chambers, 6-7 Gough Square, London, EC4A 3DE, United Kingdom. I was called to the Bar of England and Wales in 1995 and appointed Queen's Counsel in 2010. I offer this declaration in support of Defendant's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint. The following is true of my own personal knowledge except where stated on information and belief, and as to those matters I am informed and believe they are true and, if called as a witness, I could and would testify competently thereto.

2.      I completed my degree in laws (LLB Hons) at Kings College London in 1994. The following year I completed my professional training as a barrister at the Inns of Court School of Law in London. I was called to the Bar by Lincoln's Inn in November 1995 and have been a practising barrister in England and Wales since that time. I was appointed as Her Majesty's Counsel (Queen's Counsel) in February 2010. I attach my current practising certificate issued by the Bar Council of England and Wales as Exhibit A.

3.      I am a specialist practitioner in UK and European Union ('EU') consumer law. I am the General Editor of *Consumer and Trading Standards: Law and Practice*, commonly known as the Pink Book, which is now in its 7th edition. It was published first in 2000 and I have been the General Editor for all of its editions. The Pink Book is the main textbook for legal practitioners that covers most aspects of UK consumer law, trading standards enforcement (the primary enforcement mechanism for consumer protection legislation) and EU consumer law as it affects the UK. In particular, the Pink Book covers in detail the two UK measures relied upon in relation to this claim, the Consumer Protection from Unfair Trading Regulations 2008 and the Consumer Rights Act 2015.

4.      I routinely advise consumer law regulators, consumer protection organisations and businesses on the application of UK consumer law. In particular, I am standing counsel to National Trading Standards ('NTS') and the Chartered Trading Standards Institute ('CTSI'). In 2017 I was

Gibson, Dunn &
Crutcher LLP

1

DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' COMPLAINT - CASE NO. 5:18-MD-02827-EJD

Exhibit 2, Page 2

387

1    made an honorary member of the CTSI for services to consumer protection law. I also advise the Bar

2    Council of England and Wales and the Law Society of England and Wales on consumer law

3    questions affecting the legal professions. In the two main legal practitioner directories (the Legal 500

4    and Chambers and Partners) I am one of two QCs in band 1 for consumer law for the UK. I have

5    appeared in numerous consumer law cases, including appellate cases in the UK Supreme Court. I

6    have represented parties in appellate cases involving both of the provisions relied upon in this claim.

7    　　　5.　　　I have been asked to provide the Court with background information concerning the

8    UK's consumer protection laws and regulations, as well as a discussion of the potential implications

9    of a U.S. court applying this law to claims made on behalf of UK consumers in a U.S. civil class

10   action.

11   　　　6.　　　I make this declaration as an expert on foreign law, having regard to Rule 44.1 of the

12   Federal Rules of Civil Procedure and the Northern District of California's local Rule 7-5.  In

13   compiling this declaration I have endeavoured to provide an accurate, objective, and impartial

14   statement of the law in order to assist the court in making its determination on Defendant's motion.

15   　　　　　　　　　　　SUMMARY OF OPINIONS

16   　　　7.　　　For the Court's convenience, I briefly summarize my opinions in this action, which are

17   set forth in more detail below:

18   　　　　　a.　　　This claim involves relatively complex legal issues concerning recently

19   enacted UK consumer protection legislation that has not currently been the subject of appellate

20   authority.

21   　　　　　b.　　　Those issues are likely to be the subject of parallel litigation in the English

22   courts because they are raised in current UK consumer protection cases.

23   　　　　　c.　　　The consumer protection provisions that have been relied upon by the

24   Plaintiffs implement European Union ('EU') laws, which must be interpreted in accordance with EU

25   interpretation principles. These are substantially different to traditional common law principles of

26   interpretation.

27

28

Gibson, Dunn &
Crutcher LLP

2

DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

Exhibit 2, Page 3

1          d.      The UK has a robust and respected legal system that would allow UK

2    consumer protection issues to be ventilated and determined in UK courts, on behalf of multiple

3    litigants, by UK judges that have long experience of applying English law and EU laws.

4                  OVERVIEW OF RELEVANT UK LAWS AND REGULATIONS

5          8.      The UK has its own laws that would govern the claims purportedly made on behalf of

6    UK consumers arising from purchases made in their home country, as well as its own legal regime

7    for enforcing these laws.

8          9.      I understand that the Plaintiffs' counsel have brought claims alleging breaches of two

9    UK provisions: A purported claim for violation of the Consumer Protection from Unfair Trading

10   Regulations 2008 (2008 No. 1277) ("CPUT") and the Consumer Rights Act 2015 (2015 c. 15)

11   ("CRA15").

12         10.     It is important to understand that most of UK consumer law now derives from the laws

13   of the European Union ('EU'). Both of the provisions relied upon in this claim implement EU law. It

14   should also be noted that most of these consumer protection provisions were implemented relatively

15   recently in the UK and have not yet been the subject of substantive litigation.[1]

16         11.     The Consumer Protection from Unfair Trading Regulations 2008 implements the EU

17   Unfair Commercial Practices Directive (2005/29/EC) ('UCPD') and the EU Misleading and

18   Comparative Advertising Directive (2006/114/EC) ('MCAD').

19         12.     The UK Consumer Rights Act 2015 implements, *inter alia*, the Consumer Sales

20   Directive (1999/44/EC) ('CSD'), the primary EU legislation that underpins the EU law requirement

21   for implied quality terms in consumer contracts for the sale of goods. It also implements the Unfair

22   Terms in Consumer Contracts Directive (93/13/EEC). In addition, the Consumer Contracts

23   (Information, Cancellation and Additional Charges) Regulations 2013 implement EU law on the pre-

24   contractual information that must be provided to consumers set out in the Consumer Rights Directive

25   (2011/83/EU). This legislation has not been referred to by Plaintiffs but is plainly highly relevant.

26   _____

27   [1]    The CRA15 came into force on 1st October 2015; Part 4A of CPUT came into force on 1st
     October 2014; The pre-contractual information provisions in the Consumer Contracts (Information,
28   Cancellation and Additional Charges) Regulations came into force on 13th June 2014.

Gibson, Dunn &                                            3
Crutcher LLP
         DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
                  PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

Exhibit 2, Page 4

13.    It is important to understand that there are various principles of EU law that apply when interpreting all of these provisions. This is not simply an application of traditional principles of statutory interpretation that can be found in the common law. These principles are different to traditional common law analysis and sometimes surprising in their result.

a.    EU law must be interpreted teleologically (purposively), not literally. EU laws are published in many different languages with no particular language version taking precedence. EU law is often drafted in general terms and in pursuit of broad aims and purposes. The process of interpretation places little emphasis on the literal drafting of legal provisions and focuses on the purpose gleaned from a variety of sources, such as the background recitals in an EU directive. [2] The approach of the Court of Justice of the European Union ('CJEU') to statutory interpretation is rather different to that of common law courts. As noted by the late Bingham J in *Customs and Excise Commissioners v Samex ApS*:[3] "The interpretation of Community instruments involves very often not the process familiar to common lawyers of laboriously extracting the meaning from words used but the more creative process of supplying flesh to a spare and loosely constructed skeleton."

b.    There is no doctrine of binding precedent at EU level. The distinction between the *ratio* of a judgment of the CJEU and *obiter* remarks is not recognised in EU law. The entirety of the judgment is seen as an expression of the will of the Court. The absence of a formal doctrine of binding precedent also means that the CJEU does not always indicate whether it is developing, distinguishing, departing from or altogether overruling its previous decisions.[4] Within the EU, a national court uncertain as to the meaning of an EU measure can currently seek an interpretative ruling from the CJEU, although this *may* change following the implementation of the Brexit referendum result in 2016.

---

2      See, for instance, Case C-562/08 *Muller Fleisch GmbH v Land Baden-Wurttemberg* [2010] ECR I-1391 at para 40, Case C-134/08 *Tyson Parketthandel* [2009] ECR I-2875 at para 16.
3      *Customs and Excise Commissioners v Samex ApS* [1983] 3 CMLR 194 (QBD), at 211.
4      See, for instance, Case C-368/95 *Familiapress v Bauer Verlag* [1997] ECR I-3689, which failed to make any reference to its previous ruling which pointed the other way (Joined Cases 60 and 61/84 *Cinetheque SA and Others v Federation Nationale des Cinemas Français* [1985] ECR 2605). The CJEU has only expressly overruled its decisions in a small number of cases. See, for instance, Case C-267, 268/91 *Criminal Proceedings against Keck and Mithouard* [1993] ECR I-6097.

4

Gibson, Dunn &
Crutcher LLP

Exhibit 2, Page 5

1        c.     The nature of EU law-making across many member states requires significant

2  harmonisation of legal standards, with member states required to implement both a minimum and

3  maximum legal standard. Minimal harmonisation measures act as minimum standards, with the EU

4  measure acting as a floor below which national legislation cannot fall. Maximum harmonisation, on

5  the other hand, prevents Member States from maintaining or adopting measures that are more

6  restrictive than the harmonising measure.[5] Under the maximum harmonisation model the

7  harmonising measure acts as both floor and ceiling. The rationale for this is that the same level of

8  consumer protection should apply across all member states. The provisions on which Plaintiffs rely

9  will include the interpretation of both minimal (for example the CRD) and maximum harmonisation

10  (the UCPD) directives. The effect of maximum harmonisation in EU law causes surprising results.

11  For example, measures must be interpreted so that they do not provide a greater level of consumer

12  protection than is provided in the EU law. The *Plus*[6] and *Total*[7] cases under the UCPD illustrate this

13  point. In both cases, Member States had unilaterally introduced blanket bans on certain commercial

14  practices they considered detrimental to consumers. The CJEU struck down both measures because

15  they exceeded the consumer protection envisaged in the UCPD.

16        d.     For the provisions relied upon there is an important *causal* threshold for

17  determining whether there is an actionable consumer claim. For example, in relation to CPUT, this

18  requires proof that the *'average consumer'* as defined in EU law would have made a different

19  *'transactional decision'*. Presumably, this would be advanced by Plaintiffs on the basis that UK

20  consumers would not, in the factual circumstances alleged, have purchased the particular Apple

21  product. Although the concept of the *average consumer* is an objective standard, a court should[8] have

22  regard to relevant cultural and linguistic factors relating to the consumers affected. It is plain that a

23  UK court is in a far better position to determine the relevance of those factors in relation to UK

24

25  5     See, for instance, Case C-44/01 *Hartlauer* [2003] ECR I-3095 on Directive 84/450 on
misleading advertising (superseded by Directive 2006/114/EEC).

26  6     Joint cases C-261/07 and C-299/07 *VTB-VAB NV v Total Belgium NV* and *Galatea BVBA v
Sanoma Magazines Belgium NV* [2010] All ER (EC) 694.

27  7     Case C-304/08 *Zentrale zur Bekämpfung unlauteren Wettbewerbs eV v Plus
Warenhandelsgesellschaft mbH* [2011] All ER (EC) 338.

28  8     Graffione (C-313/94) and Lifting (C-220/98)

Gibson, Dunn &
Crutcher LLP

5

DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

1  consumers.

2      14.    There are several specific legal reasons why, in my opinion the UK is the appropriate

3  forum for considering these consumer protection provisions in the context of UK consumers.

4          a.    This Court will need to make novel determinations of UK laws in the course of

5  applying the CRA15 to the UK claims. This is likely to be in parallel to a consideration of these

6  issues in the English courts. For example, the CRA15 sets out a framework that consolidates the key

7  consumer rights covering contracts for goods, services, digital content and the law relating to unfair

8  terms in consumer contracts. The CRA15 is relatively new and consequently, there is virtually no

9  interpretative appellate case law. In particular, the complicated rights relating to digital content under

10  Chapter 3 of the CRA15 have not yet been litigated in a domestic forum at all.

11          i)    Section 33 of the CRA15 sets out the types of contracts covered by the

12  Act. That section provides that Chapter 3 of the CRA15 does not apply to digital content which is

13  supplied entirely free of charge. However, free content supplied with goods for which a price is

14  payable is covered, as is content which is supplied free, but is not *"generally available to consumers*

15  *unless they have paid a price for it or for goods or services or other digital content."* The question

16  of whether free software updates supplied some time after the purchase of a mobile telephone can be

17  said to have been supplied *"with"* the telephone has not been litigated. Neither has the question of

18  whether such software updates may be considered to be *"not generally available"* to consumers

19  unless they have purchased a telephone.

20          ii)    The application of the requirements that digital content be of

21  *"satisfactory quality"* and *"fit for purpose"* have also not been litigated. By way of example, the

22  complaint in the present case alleges that Defendant's software updates sought to cure shutdowns by

23  "throttling" performance. However, it admits that the purpose of curing shutdowns was partially

24  achieved (at [9]). The question raised by this allegation — namely whether digital content can be

25  considered to be unfit for purpose and/or unsatisfactory quality if it achieves its stated purpose at

26  the expense of other capabilities of the product to which it is applied — has not been considered by a

27  domestic court.

28          iii)    The complaint also raises novel issues in relation to the requirement

Gibson, Dunn &
Crutcher LLP

6

DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

Exhibit 2, Page 7

1   that the digital content be *"as described."* The complaint in this case is not that the digital content

2   did not perform as described — i.e. to fix bugs and cure shutdowns — but rather that Defendant's

3   description of the digital content's functionality did not inform consumers that this would be

4   achieved at the expense of processor performance. This is therefore not an allegation of insufficient

5   performance when judged against the description given, but one of an insufficient description being

6   provided in the first place. Whether this would fall within the ambit of section 36 of the CRA15, and

7   whether Defendant was under a duty to provide the information which Plaintiff alleges is missing

8   from the description are not questions which have been considered by a domestic court.

9           iv)    In my opinion it is wholly undesirable for a court of foreign jurisdiction

10  to litigate such unsettled consumer protection issues of English law, when those issues can and

11  should be considered by domestic courts.

12          b.     The extent to which a supplier of goods must provide pre-contractual

13  information is governed in the UK by the Consumer Contracts (Information, Cancellation and

14  Additional Charges) Regulations 2013. This provision implements in the UK the EU Consumer

15  Rights Directive (2011/83/EU). The extent of the information obligation is potentially legally

16  complex, particularly in its interface with existing common law contractual obligations. It has not yet

17  been litigated in the UK courts.

18          c.     The redress regime under Part 4A of CPUT is relatively new and thus far

19  untested in the courts in any cases of significance. There are currently no appellate decisions on these

20  provisions. Over the next five years there is likely, however, to be a significant body of case law

21  developed in the English courts. There are currently several claims (for example, the Volkswagen

22  diesel "Group Litigation Order" ('GLO')) that are working their way through the courts. Key issues

23  under this part of the legislation will include whether Defendant's alleged acts should more properly

24  be characterised as actions or omissions (since damages are available only for the former), and how

25  quantum should be assessed under Regulations 27I (4) and (5) of CPUT.

26          d.     The current claims made in relation to *'contravening professional diligence'*

27  under regulation 3 of CPUT and for *'misleading omissions'* under regulation 6 of CPUT are unlikely

28  to be actionable in the UK as a civil claim by consumers. Part 4A of CPUT implemented a Law

7

DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

Exhibit 2, Page 8

1    Commission recommendation that these two provisions were too vague for a specific right of

2    redress.[9] There is a difficult legal question, however, as to whether they are relevant to the application

3    of the unfair terms regime, which will undoubtedly need to be considered in relation to the relevant

4    contractual terms. Again, this has not yet been considered by the English courts.

5                          THE RISK OF ENCROACHING UPON UK SOVEREIGNTY

6          15.    In my opinion the interpretation, by a U.S. court, of untested UK law may encroach

7    upon the sovereign authority of the UK to adjudicate matters related to consumer protection for UK

8    consumers. The UK has a robust system of regulation. Consumer protection laws are enforced in the

9    UK by both national (such as the Competition and Markets Authority ('CMA')) and local regulators

10   (local authority trading standards departments). There is also a wide range of sectoral regulators that

11   enforce consumer protection legislation in areas such as energy, water, railways and broadcasting.

12   Alongside those enforcement bodies, consumers are also entitled to bring their own civil actions

13   before the courts.

14         16.    The UK allows for three types of collective action: joint claims, representative actions,

15   and group litigation. Group litigation is closest in nature to a class action such as the present case. On

16   application, the High Court may make a GLO  under Part 19.11 of the English Civil Procedure Rules

17   ('CPR') where there are a number of claims raising common issues. There are currently 105 GLOs in

18   place that include claims concerning a wide variety of issues including personal injury, financial

19   services and the motor industry. A list of current GLOs is publicly available and can be accessed

20   online.[10]

21         17.    The GLO process works on the basis of an *opt-in* process. Where a claimant opts in,

22   the final decision on whether an individual claimant is allowed to be a party to the GLO remains as

23   the discretion of the court,[11] which has a wide-ranging oversight of the management of the group

24   action, including advertisement, identification of the issues, and cut-off dates for claimants to be

25

26   9       They are only actionable as criminal law provisions or at the suit of a public enforcement
     body under Part 8 of the Enterprise Act 2002 as public law injunctions.
27   10      https://www.gov.uk/guidance/group-litigation-orders#list-of-all-group-litigation-orders
28   11      Under paragraphs 6.3 and 6.4 of Practice Direction 19 of the CPR

Gibson, Dunn &
Crutcher LLP                                                    8
                    DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
                         PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

                                                                        Exhibit 2, Page 9

1  added to the group register. It is arguable that automatically opting-in all UK members of the class

2  usurps the function of the domestic English courts to manage group litigation within the ambit of the

3  appropriate procedural framework as contained in the CPR.

4       18.    Generally, English law operates on the basis of territorial jurisdiction. It is presumed

5  that a statutory provision will not apply overseas, unless a contrary intention is expressed. The UK

6  has rules providing for limitation on party choice in favour of consumer protection in the areas of:

7  choice of law and jurisdiction.

8         THE UK IS THE MORE APPROPRIATE FORUM TO HEAR THE CASE

9       19.    In my opinion the UK legal system provides an adequate and appropriate forum to

10  hear the claims of UK consumers. There are substantive consumer protection laws that will plainly

11  apply to this claim. The UK has a robust and respected legal system, which is best placed to address

12  the complexities of consumer protection claims brought by UK consumers.

13       20.    In litigation involving multiple claimants under UK consumer protection laws,

14  although there may well be common issues, it is usually necessary to consider evidential factors that

15  are specific to the individual claim/plaintiff. In this claim, factors such as causation, quantum and

16  consequential loss are likely to be in issue. Their resolution in an individual case is likely to require

17  evidence, which may be contested. That is not a process that can sensibly and proportionately be

18  achieved by a U.S. court for multiple UK consumers in a case of this nature.

19       21.    It is also likely that expert evidence on English and EU law will be required to resolve

20  the English consumers' case in the U.S. This is unsatisfactory because it will involve a U.S. judge

21  hearing evidence about English and EU law from UK lawyers, then deciding what the law in the UK

22  should be on the basis of evidence, rather than experience and jurisprudence. That is cumbersome,

23  costly and circumvents the obvious way that such UK consumer protection issues should be decided,

24  in a UK court by a UK judge.

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

1    Pursuant to 28 § U.S.C. 1746, I declare under penalty of perjury under the laws of the United
2    States of America that the foregoing is true and correct.
3        Executed on __9__ August, 2018.
4
5                                                        Jonathan Kirk Q.C.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

                                        10
            DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
                   PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

Case 8:24-cv-01655-FWS-SSC     Document 95-1     Filed 12/27/24     Page 398 of 457
Page ID #:1298
Case 5:18-md-02827-EJD   Document 176-8   Filed 08/09/18   Page 12 of 13

# EXHIBIT A

Case 8:24-cv-01655-FWS-SSC    Document 95-1    Filed 12/27/24    Page 399 of 457
Page ID #:1299
Case 5:18-md-02827-EJD    Document 176-8    Filed 08/09/18    Page 13 of 13

 

# Practising Certificate

The General Council of the Bar of England and Wales
hereby declares that

## Mr Jonathan Kirk QC

a self-employed barrister

is authorised to undertake the following reserved legal activities, subject to compliance with the relevant provisions of the BSB Handbook which includes the Code of Conduct for barristers:

The exercise of rights of audience before every court in relation to all proceedings

Administration Of Oaths

Immigration Work

Probate Activities

Reserved Instrument Activities

Registration as a public access practitioner

This certificate is valid from 01 April 2018 until 30 April 2019.

**Malcolm Cree CBE**
Chief Executive
Bar Council

**Dr Vanessa Davies**
Director General
Bar Standards Board

www.barcouncil.org.uk        www.barstandardsboard.org.uk
289-293 High Holborn, London WC1V 7HZ, DX: 240 LDE
Tel: 020 7242 0082   Fax: 020 7831 9217

Exhibit 2, Page 13

# Exhibit 3



COMPETITION APPEAL TRIBUNAL

**NOTICE OF AN APPLICATION TO COMMENCE COLLECTIVE PROCEEDINGS UNDER
SECTION 47B OF THE COMPETITION ACT 1998**

**CASE NO. 1595/7/7/23**

Pursuant to rule 76(8) of the Competition Appeal Tribunal Rules 2015 (S.I. 2015 No. 1648) ("the Rules"), the Registrar gives notice of the receipt on 7 June 2023 of an application to commence collective proceedings, under section 47B of the Competition Act 1998 ("the Act"), by Robert Hammond ("the Applicant/Proposed Class Representative") against (1) Amazon.com, Inc. (2) Amazon EU S.À.R.L (3) Amazon Services Europe S.À.R.L (4) Amazon EU Media S.À.R.L (5) Amazon Europe Core S.À.R.L. and (6) Amazon UK Services Ltd (together "the Proposed Defendants") ("the Application"). The Applicant/Proposed Class Representative is represented by Hagens Berman EMEA LLP, Melbourne House, 44-46 Aldwych, London, WC2B 4LL and Charles Lyndon Limited, 22 Eastcheap, London, EC3M 1EU (Reference: Amr El Sawaf/Robert Wilson).

The Application states that these proposed proceedings would combine claims for damages of a large number of persons (the "Proposed Class Members") who have suffered loss as a result of the conduct of the Proposed Defendants (collectively "Amazon"). The proposed class is more fully described below. The Application alleges that the Proposed Defendants abused its position of dominance in the market for intermediation services on online marketplaces (the "Relevant Market") in breach of the prohibition in Article 102 of the Treaty on the Functioning of the European Union ("Article 102 TFEU") (prior to 31 December 2020) and section 18 of the Act (the "Chapter II Prohibition"). The Application states that the claims are not at present brought in respect of any infringement decision but of a standalone nature, although this could change depending upon the outcome of pending regulatory investigations. The claims relate to the period from 1 October 2015 to at least June 2020 ("the Relevant Period").

According to the Application, the First Proposed Defendant, Amazon.com, Inc., is a US corporation registered in Seattle (State of Washington) and is the parent company of the Amazon Group and directly or indirectly the owner of the Second to the Sixth Defendants. The Second, Third, Fourth and Fifth Proposed Defendants are each registered in Luxembourg. The Sixth Proposed Defendant is headquartered in London.

The Application states that the Proposed Defendants are all entities within the Amazon group of companies. Amazon is a multinational technology company whose flagship offering, Amazon Marketplace, is the largest e-commerce retail platform of any kind in the UK. Amazon and third-party retailers sell goods side by side on Amazon Marketplace across a broad range of different product categories. In this capacity, Amazon Marketplace operates as a digital platform and two-sided market, connecting and intermediating transactions between buyers and sellers online. Amazon Marketplace generates revenue from selling both Amazon's own inventory and charging fees levied on sales of third-party seller product offerings. Amazon also sells optional services to sellers on its marketplace, including advertising and Fulfilled by Amazon ("FBA"). In addition, Amazon offers cloud computing though Amazon Web Services to businesses and a range of digital streaming services to consumers.

The Application further states that the claims relate to the way in which Amazon promotes its own products and the products of third-party sellers on its platform who use Amazon's own logistics service, FBA. FBA is a service offered to third-party sellers that delegates the entire order management to Amazon: storage of the product in Amazon's fulfilment centres, packaging and shipping to the final customer, as well as after-sales assistance and the management of any returns and refunds. Both Amazon and a significant number of its third-party sellers use FBA (together, "FBA Sellers") and receive preferential promotion on the platform, in particular in the Amazon "Buy Box" which reduces the competitive constraints imposed on those FBA sellers with the result that consumers pay more than they would otherwise have had to pay for FBA sellers' products.

As stated in the Application, when a consumer accesses the intermediation services provided by Amazon to search the product offerings on the Amazon Marketplace, Amazon does not simply list the offerings that match

1

the consumers search, it also uses its proprietary algorithm to choose one offer to be placed in the Buy Box. The Buy Box is the featured offer in the product search results that allows the consumer to purchase the product without selecting a particular seller or retail offering. When purchasing the offer in the Buy Box, the consumer buys directly from the seller that Amazon's algorithm selects among all the sellers offering the requested product. In theory, every seller including Amazon itself who offers a product in "new" condition and meets the minimum requirements competes to obtain the Buy Box. Amazon uses its proprietary algorithm, the Featured Merchant Algorithm ("FMA") to choose one offer to be placed in the Buy Box. The FMA applies filters to eliminate offers that do not meet the customers characteristics and those of the search. Next, the FMA estimates the probability that a customer will choose that particular offer based on five characteristics and populates a value for each of the five characteristics for the respective retailers offer. The FMA associates a weight for each of the five characteristics, determined through econometric and machine-learning methods applied to aggregate models for viewing and purchasing customers on the Amazon platform. The offer with the highest score is selected for the Buy Box. It is alleged that Amazon designed the FMA to give preferential treatment to itself and the third-party sellers that rely on Amazon's FBA service as their logistics provider.

The Applicant/Proposed Class Representative alleges that the nature of the harm arising in this case is the restriction or distortion of competition created by Amazon's FMA. The FMA enables third party sellers to increase their chances of "winning" the Buy Box by signing up to use Amazon's own fulfilment/logistics service. This reduces price and quality competition amongst sellers. Using FBA allows sellers to charge higher prices (while still maintaining a higher probability of winning the Buy Box than non-FBA sellers), than they otherwise would have to set if the FMA did not favour the use of Amazon's own logistics service.

The Applicant/Proposed Class Representative also alleges that by providing a discriminatory advantage in the allocation of the Buy Box to sellers that purchase FBA services in addition to intermediation services, Amazon significantly increased the attractiveness of its FBA services to sellers in a manner that rival marketplaces and logistics firms could not match.

The Applicant/Proposed Class Representative contends that as a result of the alleged abuse, UK consumers have been affected by Amazon's conduct as follows:

(a)  when purchasing a FBA Buy Box winning offer that was more expensive than another offer which would have won the Buy Box, but-for the manipulation of the Buy Box based on the discriminatory FMA; or

(b)  when they purchased a non-Buy Box winning FBA offer from a seller that had chosen to charge higher prices than they would have otherwise charged, but for the discriminatory advantages conferred on FBA sellers by the FMA; and

(c)  by the fact that Amazon was able to charge FBA sellers more for FBA services and/or in commission fees as a result of the exclusionary effects of its conduct on marketplace fulfilment services and/or other marketplaces.

The Applicant/Proposed Class Representative claims that the Proposed Class Members over the Relevant Period have collectively suffered significant losses in the form, *inter alia*, of overcharges on goods purchased on the Amazon Marketplace which loss the Applicant/Proposed Class Representative estimates to be between (including VAT and excluding interest): £1.221 billion and around £1.361 billion.

In the Application, the "Proposed Class" is defined as all natural consumers who purchased at least one product from Amazon's UK based e-commerce marketplace at Amazon.co.uk during the Relevant Period, including the personal representatives or administrators (where appointed) of such purchasers who are deceased at the date of the granting of the collective proceedings order.

The Application proposes that all persons who fall within the class definition (and are not excluded) and who are domiciled in the UK on the domicile date to be determined by the Tribunal are to be included in the Proposed Class. The Application provides for persons who fall within the class definition but who are not domiciled in the UK on the domicile date to be determined by the Tribunal are proposed to be permitted opt into the proceedings.

2

The Application estimates that the Proposed Class comprises approximately 49.4 million Class Members and that if necessary, this estimate could be refined further following disclosure from Amazon.

According to the Application, the Claims are suitable to be brought in collective proceedings because the Claims are brought on behalf of an identifiable class of persons, and the Claims raise common issues, namely:

    (a)  liability in relation to the alleged breaches of Article 102 TFEU and/or the Chapter II Prohibition;

    (b)  whether the Proposed Defendants were part of an undertaking that held a dominant position during the relevant period;

    (c)  If the Defendants held a dominant position, whether they abused that position,

    (d)  whether the conduct of the Proposed Defendants caused all, or virtually all, the Class Members to pay more for the products they purchased from FBA sellers on the Amazon Marketplace.

The Applicant/Proposed Class Representative submits that he would act fairly and adequately in the interests of the Class Members because:

1.  The Applicant/Proposed Class Representative  has extensive experience championing consumer rights spanning over more than 20 years, including leading research and development teams for a leading consumer protection organisation. He is also a former practising solicitor, from 1984, to 1994.

2.  The Applicant/Proposed Class Representative's own experience will be complemented by a consultative group, which includes individuals with relevant industry experience and has confirmed that he has sufficient capacity to act as class representative in this case, as he is semi-retired.

3.  The Applicant/Proposed Class Representative is not aware of any material interest that conflicts with the interests of the proposed class members, as although he is a UK consumer who has purchased products from Amazon during the Relevant Period, he has elected to be excluded from the Proposed Class and will not make a claim against Amazon in respect to the alleged infringement.

4.  The Applicant/Proposed Class Representative is aware that an application for a collective proceedings order was filed against some of the Amazon entities on behalf of an alternative class representative Julie Hunter. The Applicant/Proposed Class Representative is prepared to argue that he considers that he is best placed to act as the class representative in respect of the Claims and that his application should be preferred.

5.  The Applicant/Proposed Class Representative has adequate funding for the Claims and will be able to pay the Proposed Defendants' recoverable costs if ordered to do so. The Applicant/Proposed Class Representative has entered into a funding agreement and has obtained After The Event insurance.

6.  The Applicant/Proposed Class Representative has prepared a litigation plan for the proceedings, which includes:

    (a)  a proposed method for bringing the proceedings on behalf of the Proposed Class Members;

    (b)  a proposed method for informing Proposed Class Members of the Proposed Claims, updating Proposed Class Members as to the progress of the Proposed Claims, and engaging with Proposed Class Members;

    (c)  a plan for governance and consultation, taking into account the size and nature of the Proposed Class; and

    (d)  consideration of the costs of bringing the Proposed Claims and the potential for adverse cost liability.

The Applicant/Proposed Class Representative submits that these Claims are suitable for resolution through collective proceedings because:

3

Exhibit 3, Page 3

1. The proposed collective proceedings present an appropriate means for the fair and efficient resolution to the common issues.

2. The Application states that collective proceedings are in all likelihood the only economically viable method for individual class members to obtain compensation for losses suffered as a result of the infringement.

3. The nature of the claims which are relatively low in value on an individual basis but substantial in aggregate are, in the Proposed Class Representative's view, a prime example of the type of claims for which collective proceedings provisions were designed.

4. The Proposed Class consists of approximately 49.4 million members. A group of individuals of this number, each with substantially the same claims could only bring their claims by way of collective proceedings.

5. The Applicant / Proposed Class Representative submits that the Claims are suitable for an aggregate award of damages as a practical and proportionate means of assessing damages in collective proceedings and has included a provisional methodology in this regard.

6. As to alternative methods of dispute resolution, the Applicant/Proposed Class Representative states that he has invited the Proposed Defendants to engage in settlement discussions, but the Proposed Defendants declined.

According to the Application, the proposed collective proceedings should proceed on an opt-out basis as they are they only practical means for bringing the claims. As the proposed class is extremely numerous, and the value of each individual claim is relatively modest, the Application states opt-in proceedings would not be feasible in this case.

The relief sought in these proceedings is:

(1) Damages to be assessed on an aggregate basis;

(2) Simple interest;

(3) The costs of the Proposed Class Representative; and

(4) Any such further and other relief as the Tribunal may see fit.

Further details concerning the procedures of the Competition Appeal Tribunal can be found on its website at Alternatively, the Tribunal Registry can be contacted by telephone (020 7979 7979) or email (registry@catribunal.org.uk). Please quote the case number mentioned above in all communications.

*Charles Dhanowa OBE, KC (Hon)*

Registrar

Published 10 November 2023

4

Exhibit 3, Page 4

# Exhibit 4



Neutral citation [2024] CAT 8

Case Nos: 1568/7/7/22
1595/7/7/23

## IN THE COMPETITION APPEAL TRIBUNAL

Salisbury Square House
8 Salisbury Square
London EC4Y 8AP

5 February 2024

Before:

**SIR MARCUS SMITH**
(President)
**CHARLES BANKES**
**CAROLE BEGENT**

Sitting as a Tribunal in England and Wales

BETWEEN:

**JULIE HUNTER**

Applicant/Proposed Class Representative

- v -

**AMAZON.COM, INC. AND OTHERS**

Respondents/Proposed Defendants

AND BETWEEN:

**ROBERT HAMMOND**

Applicant/Proposed Class Representative

- v -

**AMAZON.COM, INC. AND OTHERS**

Respondents/Proposed Defendants

Heard at Salisbury Square House on 20 December 2023

_____

## RULING (CARRIAGE)

_____

Exhibit 4, Page 1

APPEARANCES

Marie Demetriou KC, Sarah Love and Tom Coates (instructed by Hausfeld & Co LLP)
appeared on behalf of Julie Hunter.

Philip Moser KC and Ben Rayment (instructed by Charles Lyndon Limited and Hagens
Berman EMEA LLP) appeared on behalf of Robert Hammond.

Jon Turner KC (instructed by Herbert Smith Freehills LLP) appeared on behalf of
Amazon.com, Inc.

Exhibit 4, Page 2

## CONTENTS

A.    INTRODUCTION ...................................................................4

B.    LEGAL FRAMEWORK: CARRIAGE DISPUTE ......................6

C.    DIFFERENCES BETWEEN THE TWO APPLICATIONS .........9

    (1)    Introduction ..................................................................9

    (2)    Abuse .............................................................................9

    (3)    Methodology ...............................................................10

    (4)    Class definition ..........................................................11

    (5)    Other issues ................................................................11

D.    OUR DECISION ON CARRIAGE ......................................12

    (1)    Overview .....................................................................12

    (2)    Our approach ..............................................................13

    (3)    A preferred methodology...........................................13

E.    DISPOSITION ................................................................15

A.     **INTRODUCTION**

1.     Ms Julie Hunter and Mr Robert Hammond have each filed applications for an
opt-out collective proceedings order at the Tribunal pursuant to section 47A and
B of the Competition Act 1998 ("CA 1998"). We refer to Ms Hunter and Mr
Hammond collectively as the "Applicants", and their applications as the
"Applications". Pursuant to the Applications, they apply for permission to bring
"stand-alone" claims for damages under section 47A of the CA 1998. They each
allege abuse of a dominant position by Amazon.com, Inc. and other Amazon
companies (together, "Amazon") in alleged infringement of Article 102 of the
Treaty on the Functioning of the European Union ("TFEU") (prior to 31
December 2020) and section 18 CA 1998 (also known as the "Chapter II
prohibition"). Ms Hunter's application, the first to be filed, was received by the
Tribunal on 15 November 2022. Mr Hammond's application was received by the
Tribunal on 7 June 2023. This Judgment concerns the preliminary issue of
"carriage dispute" with a view determining which of the Applicants is most
suitable to act as the proposed class representative for the purposes of Rule
78(2)(c) of the Competition Appeal Tribunal Rules 2015 (the "Rules").

2.     The alleged abuses by Amazon – no doubt questions of market definition and
dominance may arise if one or other of the Applications succeeds, but
dominance can be taken as read for present purposes –  concern the so-called
"Buy Box", through which purchases can be made on the "Amazon
Marketplace" online market and the related Featured Merchant Algorithm
("FMA"), which Amazon uses to select the "Featured Offer" featured in the Buy
Box. It is alleged that, in selecting the Featured Offer, Amazon favoured its own
retail offers and those of sellers that use Amazon's fulfilment service ("FBA
Sellers"). Amazon denies the allegations made in both Applications.

3.     Ms Hunter seeks an aggregate award of damages provisionally estimated at
between £539.6 million to £753.3 million before interest in relation to the period
between 14 November 2016 and 14 November 2022. Mr Hammond seeks an
award of damages provisionally estimated at between £1.221 billion and £1.361
billion before interest in relation to the period between 1 October 2015 and at
least 1 June 2020.

4.    There have been a number of investigations by regulatory authorities into Amazon's business practices in relation to the online market platform that is relevant to these Applications. Only the Italian Competition Authority has found an abuse in relation to the FMA, finding that Amazon abused its dominant position by making certain benefits conditional on the purchase of its logistics service offered to third-party retailers, and imposing behavioural measures on Amazon.[1] In a decision of December 2021, it imposed a fine of €1.1 billion on members of the Amazon group of companies and imposed behavioural measures on Amazon.[2]

5.    Both the European Commission and the Competition and Markets Authority have conducted investigations into the operation by Amazon of the Buy Box and the FMA. Each of those investigations was concluded without a formal finding of infringement against Amazon. Instead, those regulatory authorities chose to accept commitments from Amazon. Other regulatory authorities are also reported to be conducting similar investigations.

6.    In the absence of a binding decision by the European Commission or the Competition and Markets Authority, any case against Amazon relating to the FMA and Buy Box selection will therefore be a stand-alone case, in which the claimant will have to prove, to the requisite standard, that Amazon have breached Article 102 TFEU and/or the Chapter II Prohibition. In particular, we note that the inferences to be drawn from commitments offered by Amazon are limited: Amazon would be perfectly entitled to say that their conduct and systems in this regard were competition law compliant in any event, and that the commitments offered by them were offered in response to regulatory concern which would ultimately not have been well-founded.

7.    After the filing of Mr Hammond's Application, the Applications were case managed together. A case management hearing took place on 28 June 2023. At that hearing, the question whether carriage and certification should be determined together or at separate hearings was considered. By order of the

---

[1] *Authorità Garante della Concorrenza e del Mercato*, Case No. A528, 9 December 2021.
[2] Amazon is currently appealing this decision.

President made and drawn on 26 September 2023, it was directed that the question as to which of the Applicants would be the most suitable to act as class representative for the purpose of Rule 78(2) of the Rules 2015 would be heard separate to, and before, the issue of certification. This is the first occasion on which the Tribunal has heard a "carriage issue" as a preliminary issue in advance of the certification issue. This was not a controversial matter between the parties: the parties were in agreement that carriage should be dealt with first, following the approach of the Tribunal set out in *Pollack v Alphabet and Others* and *Arthur v Alphabet and Others* ('Pollack').[3]

8.  The Applications that Ms Hunter and Mr Hammond seek to bring are sufficiently similar that it would not be possible for the Tribunal to make an opt-out collective proceedings order in respect of both claims. That is due to the overlapping class members and the similarity of the claims. According to Rule 79(2)(c) of the Rules, in determining whether claims are eligible for inclusion in collective proceedings, the Tribunal will take into account whether any separate proceedings making claims of the same or similar nature have already been commenced by members of the class.

## B.   LEGAL FRAMEWORK: CARRIAGE DISPUTE

9.  In *Evans v. Barclays Bank plc and Michael O'Higgins FX Class Representative Limited v Barclays Bank plc*,[4] the Tribunal considered both carriage and certification in a single hearing. In its judgment on appeal of that decision in *Evans v Barclays Bank plc*,[5] the Court of Appeal made the following points:

(1)   The Tribunal should apply a test of "suitability". The discretion conferred on the Tribunal was broad and multifaceted in relation to carriage (at [139]).

(2)   The Tribunal is expert at how proceedings (in collective actions) play out "at the nuts-and-bolts level"; and is thus vastly better placed than the

---

[3] [2023] CAT 34.
[4] [2022] CAT 16.
[5] [2023] EWCA Civ 876.

Exhibit 4, Page 6

Court of Appeal to form a view on the weight to be attached to the various considerations (at [146]).

(3)     It is possible for the Tribunal to reach a decision on a carriage question without taking account of the merits of either case and that is what the Tribunal had done in that case (at [147]).

(4)     The mere fact that one putative class representative crafts a broader claim is not an indication that that claim is preferable (at [148]).

(5)     The question of which claim was the first to file is largely an irrelevant factor (at [153]).

10.     The Court of Appeal also said that the timing of a carriage decision was a matter for the Tribunal. It was open to the Tribunal "applying a robust approach" to make a decision on carriage before any hearing on certification. That is the course we have taken here, as described. As a result, as the Court of Appeal observed, there may be a "degree of rough and readiness about the exercise but, equally, the CAT, armed with its rapidly growing expertise in the area will know what sorts of facts and matters are relevant" (at [154]).

11.     A key aspect of the Tribunal's consideration of a carriage dispute (when heard independently of, and prior to, certification) is that it is required only to consider which of the cases is most suitable to advance first to a certification hearing. This requires a relative assessment of the two Applications; and is a different assessment to that which the Tribunal is required to make at the certification stage. We stress that this Ruling, and our consideration, is and has been limited to the question of carriage only. Certification thus constitutes an important, background, factor. The point we make is that nothing in the resolution of this carriage dispute can affect our future consideration of matters at the certification stage. In the Tribunal's judgment on case management and the handling of carriage disputes in *Pollack*, the President said (at [25]):

> "I am satisfied that…ordering carriage to be heard as a preliminary issue will not determine any of the aspects of either the Authorisation Condition or the Eligibility Condition…"

And at [25(3)]:

> "There can be no question of the Tribunal's consideration of the Authorisation Condition or the Eligibility Condition on certification being either diluted or distorted by the anterior consideration of carriage…The Tribunal must exercise its judgement according to what is the best case management outcome."

12. It is at the certification stage that an applicant for certification must place a methodology, a so-called "blueprint", before the Tribunal setting out how the claim will be advanced to trial. The test for the adequacy of this methodology is called the *Pro-Sys* test, derived from the judgment of the Canadian Supreme Court in *Pro-Sys Consultants v Microsoft Corporation*[6]. This test, which has undergone substantial articulation and development in this jurisdiction, requires the methodology advanced by a potential class representative to be:

> "…sufficiently credible or plausible to establish some basis in fact for the commonality requirement. This means that the methodology must offer a realistic prospect of establishing loss on a class-wide basis".

13. We received written submissions on the carriage issue from both Ms Hunter and Mr Hammond. Those submissions, rightly, placed stress on the extent to which the Applications met (or did not meet) the *Pro*-Sys test. Each Application was supported by a report from an economics expert setting out a proposed methodology for assessing market definition, dominance and estimating the aggregate damages suffered by each of the proposed claimant classes. The expert in Ms Hunter's case is Mr Harman of Berkeley Research Group; and in Mr Hammond's case, Dr Pike of Fideres Partners LLP. We also received brief written submissions from Amazon. We heard oral submissions at a hearing held on 20 December 2023. Further to these oral submissions, the methodology proposed by each expert in their reports in relation to the operation of the FMA was additionally clarified (at the request of the Tribunal) in subsequent written reports, a fourth report from Mr Harman dated 22 December 2023 ("Harman 4"), and a fourth report from Dr Pike dated 9 January 2024 ("Pike 4").

---

[6] [2013] SCC 57.

Exhibit 4, Page 8

## C.    DIFFERENCES BETWEEN THE TWO APPLICATIONS

### (1)    Introduction

14.    Both applications are unsurprisingly technical and voluminous. What follows is a necessarily broad-brush articulation of the general thrust of both applications. It would be inappropriate to go further into the detail, and we trust that both experts will be satisfied that we have done broad justice to their careful work. Expert evidence will, of course, be very important on the certification issues, which is a matter for a subsequent hearing. However, for present purposes in relation to the carriage issue, the expert evidence represents a key differentiator between the two Applications.

### (2)    Abuse

15.    We assume dominance in each case. Neither market definition nor dominance represents a basis for differentiating the Applications.

16.    In terms of abuse, Ms Hunter alleges that Amazon's selection of the offer set out in the Buy Box is systematically and unjustifiably biased in favour of Amazon's own retail offers and those of FBA Sellers (and in discriminating between Amazon and FBA Sellers, favours the former). This systemic bias is compounded by the prominent presentation and operation of the Buy Box presenting a Featured Offer without making easily accessible to consumers information of other options available for the same product. Ms Hunter also alleges that, by favouring FBA Sellers in the FMA, Amazon are likely to be disincentivising third party sellers from using cheaper logistics alternatives to FBA.

17.    Mr Hammond alleges that, by preferentially promoting its own products and those using FBA in its platform, in particular through the products featured in the Buy Box, Amazon have reduced the competitive constraints on those products with the result that customers pay more than they otherwise would for those products. Furthermore, the discriminatory selection of offers using FBA, Amazon foreclosed competition in the logistics market. Mr Hammond's claim

goes further than Ms Hunter's in relation to logistics, in that it argues that Amazon's conduct has excluded competitors from the logistics market.

18.    It is quite obvious – and neither applicant sought to contend otherwise – that the abuse of dominance alleged by the Applicants substantially overlaps: the differences are ones of nuance and – certainly at this stage of the proceedings – it would be impossible to suggest that one abuse was (in a relative sense) better framed than the other. Neither Applicant suggested otherwise.

**(3)    Methodology**

19.    There are substantial differences in the methodology proposed by Mr Harman (the expert retained by Ms Hunter) and that proposed by Dr Pike (the expert retained by Mr Hammond) in relation to the proof of abuse and or quantification of the overall loss suffered by consumers.

20.    In brief outline, Dr Pike's methodology focusses on the FMA. In order to establish a relevant counterfactual, Dr Pike proposes, if practical, to re-run a non-discriminatory version of the FMA. In other words, he proposes to operate the algorithm that was in fact operated by Amazon with the abuse "stripped out". If this is not possible, he proposes to model the outcome of such an exercise. In order to quantify the consumer loss, he proposes to look at two counterfactuals based on an "unbiased counterfactual"; one in which he holds sales volume constant, and one in which he holds sales prices constant.

21.    Mr Harman, on the other hand proposes to focus his analysis on actual consumer preferences to establish an appropriate counterfactual on which to assess consumer loss. In order to do so, he proposes to supplement data received on disclosure from Amazon with a conjoint analysis implemented through a consumer survey. He identifies three categories of loss: a universal loss which is suffered by class members where a cheaper alternative offer was available; a choice loss which is suffered by class members where a more preferred offer (whether on the basis of price or delivery time) was available with at least the same delivery speed and a further loss arising from dampened competition. Mr

Harman's methodology considers the FMA (Harman 1 at [7.4.11 (iii)-(iv)]) but does not seek to re-run it in the same manner as Dr. Pike's.

22.     Each Applicant made substantial criticisms of the methodology proposed by the other; and suggested that the other's methodology would face substantial difficulties at the certification stage. We found the oral submissions of counsel particularly helpful and would like to express our gratitude to each of Ms Demetriou, KC (for Ms Hunter) and Mr Moser, KC (for Mr Hammond) for the clarity of their expositions, and their ability to respond precisely to the questions of the Tribunal. As we will come to describe, we considered the expert evidence on different methodological approaches adopted by the Applications to be the key differentiator, and (although neither expert gave oral evidence before us) we found the oral representations of counsel in regard to methodology particularly helpful.

**(4)     Class definition**

23.     Ms Hunter's proposed class definition includes both natural and legal persons who were direct customers of Amazon. Mr Hammond limits his class definition to natural consumers. Mr Hammond submitted that the inclusion of legal persons in Mr Hunter's class would introduce analytical complexity, including in relation to VAT treatment and pass on; and might give rise to the risk of class conflict. In response, Ms Hunter contended that the inclusion of legal persons presents no intractable differences which justify their exclusion; and that their exclusion arbitrarily narrows the class and excludes persons who have suffered loss. We can see force on both sides of the case. Although the point is obviously material in terms of class definition, we do not consider it to be a helpful indicator in terms of carriage.

**(5)     Other issues**

24.     Ms Hunter's application was filed some five months before Mr Hammond, though Ms Hunter has appropriately not sought any advantage from being the first to file.

25.    Criticisms were made by each party about the start and end date of period of claim asserted by the other. During the course of the hearing, each party acknowledged that they are likely to need to make changes to the alleged period of claim.

26.    We have not attached weight to either of these two issues in reaching our conclusion. They do not, in this case at least, seem to us to be material.

**D.    OUR DECISION ON CARRIAGE**

**(1)    Overview**

27.    These are complex claims. Both Applicantss have advanced claims which reflect a significant amount of thought and work. It is clear to us that both experts have engaged with the issues in order to develop their methodology. Equally, each has made serious criticisms of the other and has questioned whether the other will pass the tests that must be met for certification.

28.    In our view, each party was successful in raising doubt and challenges about the methodology of the other; but neither was successful in persuading us that the other was inevitably bound to fail. We also recognise that this case is still at a very early stage, and these applications are (each of them) doing no more than articulating a claim that will develop and change as it progresses toward trial, assuming certification is ordered.

29.    It is also clear, given the complexity and differences between these two cases, that it is appropriate to make a decision on carriage at this early stage, however "rough and ready" the basis of that decision may be. To do otherwise, and to take both cases forward to certification, would lead not only to a lengthy and expensive certification hearing; but – given the experience of the Tribunal in *Evans* (referred to in [10] above) – "rolled up" carriage and certification hearings are not only more expensive, but do not appear to assist in resolving carriage disputes. The experiment of resolving carriage in a "rolled up" hearing (*Evans* was the first carriage dispute heard by the Tribunal) did not justify the

delay and expense. Such a course will (in future cases) need to be justified, if it is to be repeated.

**(2)    Our approach**

30.    We do not intend to parse the Applications for differences that may or may not exist as between them, where these differences were not emphasised by the Applicants themselves. Of the differences that were articulated before us, we intend to focus on those (in the event, there was only one) that clearly and distinctly separate the Applications, and in relation to which we can express a rational preference.

31.    We consider that the applications can rationally be differentiated by reference to the different methodologies that we have described at [20] to [21] above. We propose to consider those rival methodologies under two heads:

    (1)    First, why we consider one methodology to be clearly and distinctly better – more suited – to articulating and resolving the claims that the Applicants wish to bring.

    (2)    Secondly, whether there is a difference between these methodologies in terms of their practical workability and whether – taken at its most extreme – it can fairly be said that one or other of them simply "will not work".

We consider these two (related) questions below.

**(3)    A preferred methodology**

32.    Although the abuses alleged by the Applicants are sufficiently similar to oblige us to decide the question of carriage (see [9] and [18]), the Applicants' respective methodologies in seeking to demonstrate and quantify the alleged abuses are very different. Through Dr Pike, Mr Hammond seeks to re-run the algorithms without the abuses as alleged. The counterfactual, in this case, is thus closely aligned to the abuse. Should the process fail or not work as expected, Dr

Pike's fall-back is to model the operation of the algorithm without the features said to constitute the abuse.

33.  By contrast, Mr Harman's approach seeks to ascertain consumer preferences by other means, and to define the counterfactual outcome in this way. It will readily be appreciated that the approach does not necessarily align itself with the true counterfactual (the operation of Amazon's algorithm without the abuse), and runs the risk of importing a different way of ascertaining consumer preference which is at variance with the non-infringing aspects of the operation of the Amazon algorithm.

34.  Dr Pike (Pike 4 at [22] – [23]) puts the point as follows:

> "22.    …my model of Amazon's algorithm is based on input data on offers and information on the Buy Box winners selected by the actual algorithm. It therefore approximates the functioning of the actual algorithm. In contrast, Mr Harman's conjoint analysis, proposed as a method to determine an idealized, ahistorical "average" consumer preference across billions of purchases, uses no input or outcome data from the actual algorithm. As such, it is not a model of the algorithm but a replacement, which, instead of focusing solely on the discriminatory elements, substitutes Mr Harman's view of the relative importance to consumers of different offer characteristics for Amazon's.
>
> 23.    This difference stems from the fundamentally different conceptual approaches taken to identifying the counterfactual…Mr Harman's proposed methodology fails to distinguish between honest differences in predicted consumer preferences and abusive discrimination."

35.  If Dr Pike's approach were so unfeasible as to inevitably fail the *Pro-Sys* test, then this would be a reason for preferring Mr Harman's approach as a less satisfactory, but more workable, proxy for Dr Pike's better methodology. Mr Harman raises a series of concerns with Dr Pike's approach, culminating in his view (Harman 4 at [2.15]) that:

> "I am sceptical that the analysis that is central to Dr Pike's proposed methodology of "re-running the algorithm without discriminatory provisions" is feasible, robust or able to respond to defences Amazon has already indicated it will raise."

On the present evidence, and bearing in mind the approach to the resolution of carriage disputes described above, Dr Pike's methodology appears to be

sufficiently workable, either as a "re-run" without the abuse or as a "proxy" of that "re-run", to merit a more detailed examination in the context of a certification hearing. We are satisfied of this for, essentially, three related reasons. First, Dr Pike has been clear as to his methodology. He has clearly considered the difficulties, and considers that they can be overcome. We are reluctant to substitute our (inexpert) views for those of an expert. We are fortified in that approach by the evidence of Mr Harman. This is our second reason: whilst Mr Harman certainly expressed scepticism in regard to Dr Pike's proposed methodology, he stopped well short of saying that this approach could not be undertaken or was impossible. Thirdly, we are very conscious that proceedings of this sort – assuming this litigation is to proceed beyond certification – will require particularly careful, and likely quite intrusive, case management on the part of the Tribunal. We anticipate that Amazon's experts will be required to co-operate with those of any successful Applicant in establishing a case to trial.

36.    Accordingly, on the basis of the Tribunal's views on methodology, Mr Hammond is determined most suitable to act as the proposed class representative for the purposes of Rule 78(2)(c) of the Rules 2015.

## E.    DISPOSITION

37.    For the reasons given above, we resolve the carriage dispute in favour of Mr Hammond. We determine that he is the most suitable to act as proposed class representative.

38.    Ms Hunter's Application is stayed: should Mr Hammond's Application stumble, then the Tribunal would be prepared to consider lifting the stay, were:

(1)    Mr Hammond's Application for certification to fail or (possibly) were a successful application for certification to be revoked; and

(2)    Ms Hunter to continue to be willing to move her Application.

Amazon's position was that an application that lost on the issue of carriage should be dismissed. In the case of a hopeless application, that would be right: but Ms Hunter's Application is <u>not</u> hopeless. It is well put together, and has simply come second in a hard-fought race. In these circumstances, access to justice requires that we keep (insofar as we can) this alternative Application alive.

39.    We invite the parties to draw up an agreed order.

40.    This ruling is unanimous.

Sir Marcus Smith                    Charles Bankes                    Carole Begent
President

Charles Dhanowa OBE, KC (Hon)                    Date: 5 February 2024
Registrar

# Exhibit 5



# CL-2021-000185: Shakoor and 711 others v. Daimler AG and others

High Court of England & Wales - Queen's Bench Division - Commercial Court

London

**This case was retrieved on 16/12/2024**

## Header

**Case Number:** CL-2021-000185
**Date Filed:** 26/03/2021
**Date Full Case Retrieved:** 16/12/2024
**Status:** Closed
**Case Type:** Commercial Court - Part 7 Claim - Commercial fraud; Commercial Court Dockets

## Summary

**CE File URL**: https://efile.cefile-app.com/publicsearch/case/instance/view?caseNumber=CL-2021-000185
**Court Last Updated:** 15-05-2023 12:51 PM
**Court**: Queen's Bench

## Participants

| Litigants | Representatives |
|---|---|
| Shakoor, Abdus Sattar<br>**Claimant** | Hagens Berman EMEA LLP |
| Daimler AG<br>**Defendant** | Herbert Smith Freehills LLP |
| Mercedes-Benz Cars UK Limited<br>**Defendant** | Herbert Smith Freehills LLP |
| Mercedes-Benz Financial Services UK Limited<br>**Defendant** | Herbert Smith Freehills LLP |

## Proceedings

| Date | # | Proceeding Text | Details |
|---|---|---|---|
| 03/26/2021 | 1 | Filing - Claim Form (Part 7) | Filed Date :<br>29-03-2021 |

Exhibit 5, Page 1

CL-2021-000185: Shakoor and 711 others v. Daimler AG and others

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | | Claim Form (Part 7)(#) |
| 03/26/2021 | 2 | Filing - Particulars of Claim | Filed Date : 14-04-2021<br><br>Generic Particulars of Claim(#) |
| 04/21/2021 | 3 | Order by Judge - Order | Filed Date : 21-04-2021<br><br>Order approved by Mr Justice Foxton(#) |
| 05/04/2021 | 4 | Order by Judge - Order | Filed Date : 04-05-2021<br><br>Order approved by Mr Justice Bryan 4.5.21(#) |
| 06/14/2021 | 5 | Order by Judge - Order | Filed Date : 14-06-2021<br><br>Order approved 8th June 2021 by HHJ Pelling QC - 14/06/2021(#) |
| 08/20/2021 | 6 | Order by Judge - Order | Filed Date : 20-08-2021<br><br>Order approved by SEC on 20.08.21. JLF, 20.08.21.(#) |
| 11/12/2021 | 7 | Order by Judge - Order | Filed Date : 12-11-2021<br><br>Consent Order by Mr Justice Calver (#) |
| 11/17/2021 | 8 | Order by Judge - Order | Filed Date : 17-11-2021<br><br>Order approved by Cockerill J on 16.11.21. JLF, 17.11.21.(#) |
| 12/03/2021 | 9 | Order by Judge - Order | Filed Date : 03-12-2021<br><br>Order approved by Mr Justice Foxton 02.12.2021(#) |
| 12/07/2021 | 10 | Order by Judge - Order | Filed Date : 07-12-2021<br><br>Amended Order approved by Cockerill J on 07.12.21 JLF, 07.12.21. (#) |
| 04/24/2023 | 11 | Filing - Amended Claim Form | Filed Date : 24-04-2023<br><br>Amended Claim Form(#) |
| 04/27/2023 | 12 | Order by Judge - Order | Filed Date : 27-04-2023<br><br>Order approved by Mr Justice Foxton 26.04.2023(#) |

End of Document

Exhibit 5, Page 2

# Exhibit 6

**IN THE HIGH COURT OF JUSTICE**          **Claim No.**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**


**B E T W E E N:**

**MR ABDUS SATTAR SHAKOOR & OTHERS**

**Claimants**

**-and-**


**(1)    DAIMLER AG**

**(2)    MERCEDES-BENZ CARS UK LIMITED**

**(3)    MERCEDES-BENZ FINANCIAL SERVICES UK LIMITED**

**Defendants**


----------------------------------

**GENERIC PARTICULARS
OF CLAIM**

----------------------------------


Exhibit 6, Page 1

## I.    Parties

*The Claimants*

1.    The Claimants in this action are persons who purchased or leased "**Affected Diesels**" (defined below) in England or Wales that were manufactured by Daimler AG, and sold by Mercedes Benz Cars UK Limited and/or financed by Mercedes-Benz Financial Services UK Limited, and which are the subject of this claim.

2.    Each of the Affected Diesels contained the OM 607, OM 626, OM 642 and the OM 651 engines designed, developed, engineered and/or manufactured by the First Defendant.  As used herein, "**purchasers**" means all acquirers of Affected Diesels, whether by purchase, gift, hire purchase, lease, personal contract plan or other finance terms.

3.    The Claimants will each serve a Schedule of Information in the form directed by the Court containing details specific to their claim.

*The Defendants*

4.    The First Defendant is Daimler AG.  It is a German public company, listed on Germany's DAX, and is a multinational automotive corporation headquartered in Stuttgart, Baden-Wurttemberg, Germany.  Daimler AG is one of the largest German car manufacturers with an annual turnover in 2018 of EUR 172.7 billion and a net profit of EUR 2.7 billion.  Daimler is engaged in the design, manufacture, testing, sale and/or distribution of motor vehicles, including the Affected Diesels.

5.    The Second Defendant, Mercedes-Benz Cars UK Limited is an English private limited company, incorporated in England and Wales on 1 December 1989, with company number 02448457.  It is wholly owned by the First Defendant and was involved in selling Affected Diesels in the UK.

6.    The Third Defendant, Mercedes-Benz Financial Services UK Limited, is an English private limited company, incorporated in England and Wales on 21 February 1990, with company number 02472364.  It, too, is wholly owned by the First Defendant and was involved in provision of finance for and/or leasing of Affected Diesels.

7.    Save where they adopt all the claims in these Particulars of Claim, the Claimants will each set out in their Schedule of Information the causes of action upon which they rely and the Defendant(s) against whom they claim.

- 1 -

Exhibit 6, Page 2

8.    The Claimants' claims include claims for damages (including exemplary damages):

    8.1    in the tort of deceit;

    8.2    for breach of statutory duty;

    8.3    for breach of implied terms of contract;

    8.4    for claims under the Consumer Credit Act 1974 ("**CCA**"); and / or

    8.5    for claims under the Consumer Protection for Unfair Trading Regulations 2008 ("**CPUT**").

## II.    Introduction

9.    Diesel vehicles produce a wide range of polluting emissions, including oxides of nitrogen ("**NOx**").  Oxides of nitrogen include nitric oxide, nitrogen dioxide and nitrogen monoxide.  NOx emissions are seriously harmful to human health and the environment.

10.    A vehicle cannot be registered or licensed for use in the European Union ("**EU**") or the United Kingdom ("**UK**") unless the manufacturer issues a Certificate of Conformity ("**COC**") certifying compliance with all applicable regulatory acts in effect with respect to the vehicle, including that the vehicle satisfies emissions standards.

11.    The EU and UK regulatory schemes also prohibit the manufacturer from embedding "**Defeat Devices**" into the vehicles.  A Defeat Device is defined as any element of design which senses temperature, vehicle speed, engine speed, transmission gear, manifold vacuum or any other parameter for the purpose of activating, modulating, delaying or deactivating the operation of any part of the emission control system, that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use. Emissions Regulations (EC Regulation 715/2007) Article 3.10.

12.    The engines in the Affected Diesels contain Defeat Devices designed and installed with the purpose of detecting when the NOx emissions from those engines were being tested for compliance with regulatory standards.  When the entire emission control system is fully engaged, such as (but not limited to) when an Affected Vehicle is tested using the New European Driving Cycle ("**NEDC**") test, the emissions generally comply with applicable emissions regulations.

- 2 -

Exhibit 6, Page 3

427

However, during normal on-the-road driving the Defeat Devices limit or deactivate emissions controls—resulting in the Affected Diesels producing levels of NOx that are well above the maximum permitted emission values.

13.     The Defeat Devices were expressly prohibited by law, and their use meant that the Affected Vehicles could not be properly or lawfully certified as compliant with relevant legislation, or sold, registered nor put into service in the EU, including the UK.

14.     The First Defendant, in conjunction with Robert Bosch GmbH ("**Bosch**"), secretly designed, developed and engineered the Defeat Devices installed in engines to be incorporated in Affected Diesels in order to:

14.1    cheat the emissions testing regime;

14.2    deceive regulators, purchasers of the Affected Diesels, and suppliers of Affected Diesels by causing them to believe that the vehicles were properly and lawfully certified, sold, registered and put into service, and with emissions levels compliant with relevant standards;

14.3    enable the Affected Diesels to be advertised, marketed and supplied to purchasers as having market-leading environmental credentials, as containing advanced technology so as to minimise damage to the environment and pollution, and as environmentally responsible purchases, and to induce purchasers to buy the Affected Diesels on that basis; and

14.4    maintain and increase sales, profits and market-share in a highly competitive market (in which purported environmental credentials are and were especially appealing to consumers).

15.     In a judgment dated 17 January 2019, the German Federal Motor Transport Authority (the **KBA**) found that the First Defendant's diesel vehicles included prohibited Defeat Devices, and a notice was issued against the First Defendant for negligent violation of supervisory duties in the amount of €870 million. Moreover, on 17 December 2020, the ECJ confirmed that Defeat Devices could only be used in exceptional situations.   In addition, the US Department of Justice found that every diesel Mercedes from the years 2009 up to and including 2016 contained illegal defeat devices which switched off the EGR and SCR emission control systems of the cars during normal driving conditions and the existence of these instruments was being concealed by the First Defendant.

16.     Claimants have suffered loss and damage as a direct result of the Defendants' unlawful conduct as set out below.

- 3 -

### III.    The Regulatory Regime and its Effect

17.    The regulation of vehicle emissions in the EU and the UK is principally governed by EC Directive 2007/46/EC (the "**Framework Directive**"), EC Regulation 715/2007 (the "**Emissions Regulations**"), EC Regulation 692/2008 (the "**Testing Regulations**"), and—in the UK—by the Road Vehicles (Approval) Regulations 2009 and the Construction and Use Regulations 1986.  The relevant effects of the Framework Directive and these implementing Regulations are as set forth below.

18.    Mass manufactured vehicles (that is, those not benefiting from individual type approval) supplied to market in the UK must have a COC certifying that the vehicle has been manufactured in accordance with the applicable EC Whole Vehicle Type Approval for the relevant model granted pursuant to the Framework Directive (the **"EC Type Approval"**).

18.1    In particular, by regulation 6 of the Road Vehicles (Approval) Regulations 2009 (and by s.21 of the Vehicle Excise and Registration Act 1994), a vehicle cannot be registered or licensed for use in the UK unless the COC issued by the manufacturer and certifying compliance with all applicable regulatory acts is in effect with respect to the vehicle. Further, the COC only has effect for the purposes of registration if it is issued in respect of a type approval which is valid for the vehicle in question.

18.2    Article 4 of the Framework Directive provides that each EU Member State must appoint or establish an Approval Authority to manage EC Type Approval.  Each Member State is empowered to grant Type Approval to vehicles submitted to its Approval Authority for supply to market throughout the EU.  EC Type Approval is granted by the issue of an EC Type Approval Certificate pursuant to Chapter IV of the Framework Directive.

18.3    EC Type Approval can only be granted by an Approval Authority if the vehicle complies with **all** applicable regulatory acts set out in Annex IV of the Framework Directive.  Framework Directive article 5 states that the manufacturer is responsible for all aspects of the approval process and for ensuring conformity of production, whether or not that manufacture is directly involved in all stages of the construction of the vehicle.  A COC issued in accordance with this process then binds all other Member States to register and permit the sale of the vehicle to which the COC relates.  See Article 26.1 of the Framework Directive.

- 4 -

Exhibit 6, Page 5

18.4   Thus, without first EC Type Approval and then a COC, the Affected Diesels could not have been lawfully sold, registered or put into service in the UK or elsewhere in the EU on a mass manufactured basis.

19.   The pertinent Emissions Regulations (listed in Annex IV of the Framework Directive and by virtue of articles 17 and 18(2) for the purposes of EC Type Approval and issuance of a COC) are as follows.

19.1   Emissions Regulations Article 4(1) requires manufacturers to demonstrate that all new vehicles put into service are type approved in accordance with the Emissions Regulations.   These obligations include "meeting the emissions limits set out in Annex I and the implementing measure referred to in Article 5."

19.2   Article 4(2) requires manufacturers to ensure that type approval procedures for verifying conformity of production, durability of pollution control devices, and in-service conformity are met. It also requires manufacturers to ensure that emissions are effectively limited to comply with the prescribed limits throughout the normal life of the vehicles under normal conditions of use.

19.3   Article 5.1 requires manufacturers to equip vehicles so that components likely to affect emissions are designed, constructed and assembled so as to enable vehicles, in normal use, to comply with the Emissions Regulations.

19.4   Article 5.2 expressly prohibits the use of "defeat devices" that reduce the effectiveness of emissions control systems.  (For EURO 3 and EURO 4 type approvals, the use of defeat devices was similarly prohibited by Article 5 of Directive 70/220/EEC read with Annex 1 section 2.16 and section 5.1 paragraph 3 and with Article 2 of Directive 98/69/EC, as amended from time to time.)

(a)   A "**defeat device**" is defined as any element of design which senses temperature, vehicle speed, engine speed, transmission gear, manifold vacuum or any other parameter for the purpose of activating, modulating, delaying or deactivating the operation of any part of the emission control system, that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use.   Emissions Regulations (EC Regulation 715/2007) Article 3.10.  This definition was also provided for in materially identical terms at section 2.16, Annex 1 to Directive

- 5 -

70/220/EEC (as inserted by Directive 98/69/EC), the predecessor to the Emissions Regulations (and which applied to EURO 3 and EURO 4 emissions limits).

(b)   Article 5.2 contains three exceptions—none of which applies here—(i) if the need for the device is justified to protect the engine against damage or accident and for the safe operation of the vehicle, (ii) the device does not operate beyond the requirements for starting the engine, or (iii) the conditions are substantially included in the test procedures to verify evaporative emissions and average tailpipe emissions.

19.5   Thus, a manufacturer that places a vehicle on the market containing a defeat device breaches its directly applicable and effective duties under Articles 4.1, 4.2, 5.1 and 5.2 of the Emissions Regulations.

20.   All vehicles requiring EC Type Approval in the EU and to which the EURO 5 limits apply must be tested in accordance with the Testing Regulations. Pursuant to Article 3.5 of the Testing Regulations, all manufacturers are required to take technical measures so as to ensure that tailpipe and evaporative emissions are effectively limited throughout the normal life of a vehicle and under normal conditions of use. Further, per Article 3.6 all manufacturers are required to ensure that emissions tests results comply with the applicable limits under the test conditions specified by the Regulations. Article 3.1 and Annexes III and VIIII provide various testing procedures including a test on the exhaust gas emissions using the NEDC on a chassis dynamometer.

21.   Pursuant to the Road Vehicles (Approval) Regulations 2009 and section 21 of the Vehicle Excise and Registration Act 1992, no vehicle in the UK can be registered nor licensed for use in the UK unless a COC has been issued.

22.   In addition, pursuant to section 42 of the Road Traffic Act 1988, in order to be driven lawfully on a UK road, a vehicle must comply with regulation 61A of the Construction and Use Regulations 1986, which in turn requires that vehicles comply with the Emissions Regulations (see article 17.3 Emissions Regulations). Regulation 6 permits deemed compliance at first use but only with a valid COC.

23.   Until 1 July 2018 there was no criminal penalty in the UK for breach of the Emissions Regulations. However, on 1 July 2018 the UK Government enacted criminal penalties to deal with defeat devices (by regulation 16 the Road Vehicles (Defeat Devices, Fuel Economy and Type-Approval) (Amendment) Regulations 2018). As a result of that legislation, the UK now has a means of imposing a penalty or sanction for the use of defeat devices. Pursuant to section 42 Road Traffic Act 1988 and regulation 61A Constructions and Use Regulations 1986, for

- 6 -

all vehicles to which the Euro 5 limits apply, it is a criminal offence to drive a vehicle on a UK road when the vehicle does not comply with the Emissions Regulations, although all such vehicles are deemed to so comply if they are the subject of a valid COC (regulation 6 of the 1986 Regulations).

24.    The New Type Approval Regulation ("**NTAR**") supersedes the Framework Directive, and became EU Retained Law in the UK from 1 January 2021. The Road Vehicles (Approval) Regulations 2020 have been brought into force to implement the NTAR.

25.    The Court will apply the law in force at the time when the causes of action accrued, which means that the United Kingdom's exit from the EU has no effect on this case Section 4(1) (and paragraph 38, Schedule 8) of the EU (Withdrawal) Act 2018 is to similar effect.  In any event, the above provisions continue in English Law under section 3 of the 2018 Act.

26.    As to the meaning of "defeat device" at Article 3(10) of the Emissions Regulations (as set out in greater detail below), in a Preliminary Ruling on December 17, 2020, the European Court of Justice in Case 693/18 found that:

(1) "…*Article 3, paragraph 10 of Regulation No. 715/2007 must be interpreted as meaning that it is a 'defeat device' within the meaning of this provision, a device that detects any parameter related to the conduct of proceedings approval provided for by this regulation, for the purpose of improving the performance, during these [test] procedures, of the emission control system, and thus obtaining the approval of the vehicle, even if such improvement can also be observed, of ad hoc, under normal vehicle use conditions.*"  See paragraph 116(3).

(2) "…*Article 5, paragraph 2 a) of Regulation No. 715/2007 must be interpreted as meaning that a defeat device, such as that at issue, which consistently improves upon procedures approval, the performance of the vehicle emission control system for the purpose of complying with the emission limits set by this regulation, and thus to obtain the approval of these vehicles, cannot be covered by the exception to the prohibition of such devices provided for in this provision, relating to the protection of the engine against damage or accident and to the safe operation of the vehicle, even if this device contributes to preventing aging or clogging of the engine.*"  See paragraph 116(4).

27.    In summary, EC Type Approval was granted, and COCs issued, for all Affected Diesels.  As detailed below, the Affected Diesels could not otherwise have been lawfully sold, registered, put into service, or driven in the UK had the truth been known about the First Defendant's Defeat Devices.  The existence of the Defeat

- 7 -

Exhibit 6, Page 8

Devices was not disclosed to the Driver and Vehicles Standard Agency ("**DVSA**"), being the UK's "**Approval Authority**" at any point prior to the granting of the EC Type Approval, or during processes to validate the grant of COCs.

## IV.    The Illegal Defeat Devices Present in the Affected Diesels

28.    To produce a diesel engine with the desired combination of torque and power, economical fuel consumption and an emission level low enough to meet increasingly stringent European (including UK) and US government emission standards, the First Defendant developed the BlueTEC™ diesel engine.  The BlueTEC name is a generic trade name for the Mercedes emission control system, which consists of a number of in- and after-treatment technologies to reduce and control emissions from diesel vehicles.

29.    Although not all of the Affected Diesels sold in the UK used the BlueTEC name, they all used the same combination of technologies, including EGR, SCR and a DPF system.  When this entire emission control system is fully engaged, such as when a Mercedes is tested via a classic NEDC test, cleaner emissions result that comply with the Emissions Regulation.

30.    However, when this emission control system is limited or deactivated, the Affected Diesels produce extremely high levels of NOx that are well above the maximum permitted emission values.  The First Defendant intentionally programmed the Affected Diesels in such a manner so as to invoke the full operation of the EGR and SCR systems when the vehicles sensed that they were subject to testing protocols, but then limited or deactivated those systems when the testing parameters were not sensed—in other words, when the Affected Diesels were driven in normal use on the road.  None of the Defendants disclosed to consumers or regulators those unlawful emissions manipulations nor the use of the unlawful Defeat Devices.

31.    The EGR system is engineered so that it can be shut off by completely closing the valve which allows the exhaust gases to enter the intake opening.  A lower percentage of EGR indicates that the valve is more closed, which limits the amount of EGR.  Conversely, a high percentage indicates a high level of EGR, resulting in a more significant reduction of NOx emissions. The EGR percentage is regulated by the "EDC 17" engine control unit made by Bosch. This component determines under which conditions the EGR system can be partially switched on or off, and is programmed and set by the First Defendant's technicians in cooperation with its supplier, Bosch.  When the EGR is switched off, engine performance is improved and wear-and-tear reduced.

## V.    Representations by the Defendant

- 8 -

32.    In causing or permitting the Affected Diesels to be registered and/or put into service and/or sold, with the benefit of COCs for the Affected Diesels, the Defendants made the following express or implied representations ("**Representations**"):

32.1    The Affected Diesels complied with all statutory and regulatory requirements imposed by EU and UK law (including the Emissions Regulations, the Testing Regulations and the Euro 5 limits).

32.2    All requisite testing had been properly and honestly carried out to establish that compliance; and EC Type Approval, and all necessary consents, licenses and registration had been properly and honestly obtained without any misrepresentation to the regulators from whom they were obtained.

32.3    The Affected Diesels were fit to be lawfully sold, registered and put into service in the UK or any member state of the EU.

32.4    The Affected Diesels did not incorporate prohibited or illegal components; and did not incorporate Defeat Devices preventing the proper and accurate testing and recording of their emissions.

32.5    The Affected Diesels did not require modification in order to meet relevant emissions standards.

32.6    The First Defendant honestly believed 32.1 to 32.5 above to be the case.

33.    The Representations were made by each Defendant to, amongst others, potential purchasers of the Affected Vehicles.  The relevant Claimants rely in this respect on the following:

33.1    The First Defendant knew and intended that potential purchasers would be led by such conduct to believe, and would assume, that matters were as stated in paragraphs 32.1 to 32.6 above.

33.2    The whole process of development, manufacture, marketing and sale undertaken by the First Defendant, supported throughout by extensive marketing targeted directly at the ultimate purchaser was designed to induce consumers and business users to buy Affected Diesels.

33.3    The issue of a COC by the First Defendant in relation to each of the Affected Diesels, and the resultant issue of a V5 log-book, were essential steps in enabling them to communicate (by explicit certification) to potential purchasers

- 9 -

Exhibit 6, Page 10

that the Affected Diesels had been manufactured and tested so as to comply with all regulatory acts, and that an Affected Diesel was fit to be registered, licensed and to be lawfully driven on UK roads.

34.   Furthermore, annexed to these Particulars of Claim at Schedule 1, is a non-exhaustive list of public statements published by the Defendants in various annual reports and e-brochures. (**"False Statements"**). Such statements were made and/or authorised by the First Defendant and aimed at and intended to be read and relied upon by potential purchasers of the Affected Diesels. They reflected the knowledge and intention of the First Defendant that the promotion of the vehicles as having market-leading environmental credentials (and thus being an environmentally responsible purchase) would induce purchasers to buy them and enable the Defendants to increase sales, profits and market share in a highly competitive market place. The conduct of the First Defendant in this regard was calculated with the aim of making a substantial profit. It is to be inferred that such conduct was based on an assessment that the profits made would exceed the fines or compensation payable by reason of such conduct.

35.   Further, the Claimants will contend that the First Defendant knew and intended that the Second and Third Defendants would make the False Statements to potential purchasers and thereby indirectly made those statements to the purchasers and is responsible for them:

35.1   "*Our BLUETEC automobiles fulfil the strictest emission standards and are the cleanest diesel cars in the world*" – various Annual Reports of the First Defendant.

35.2   *"[T]he new diesel engine family stands out not just by virtue of its excellent fuel economy; it also boasts very low nitrogen-oxide emissions"* – 2016 Annual Report of the First Defendant.

35.3   "*Outstanding efficiency and emissions: the new diesel engines.  The exemplary efficiency and emissions of our new premium diesel engine already meet all of the known emission standards, while underlining the key role to be played by diesel drive systems in achieving challenging climate targets"* – 2016 Annual Report of the First Defendant.

35.4   "*Our latest, highly responsive power trains consume notably less fuel and emit less harmful emissions*" – C-Class e-brochure (2014).

35.5   *"The new C-Class is powered by a new kind of energy – innovation. Take the BlueTEC diesel engines with exceptionally low emission levels: complex catalytic converter technology helps reduce NOx emissions to*

- 10 -

Exhibit 6, Page 11

*create the purest and greatest driving pleasure. For reduced fuel consumption and lower emissions, the diesel engines feature exhaust turbo charging and direct injection as well as a further enhanced combustion process. As a result, the new C-Class already meets the stringent EU6 standard for exhaust emissions"* – C-Class e-brochure March 2014.

35.6   *"Boosts testosterone levels, cuts emissions"* – CLS-Class e-brochure March 2014.

36.   If and to the extent that the Defendants contend that any of these statements are not to be regarded as statements of fact and are "mere puffs", the Claimant will contend that the Defendants made these statements because they knew that the issue of emissions and efficiency were regarded as important ones to purchasers of the Affected Vehicles. As such, having made these statements, the Defendants came under an obligation to tell the whole truth about the matters covered by the statements.

## VI.   The Claims

### A.   The Tort of Deceit

37.   The Representations and False Statements were false.  Because of the presence of the Defeat Devices (whether or not they were "defeat devices" as defined in the Emissions Regulations), their activation and deactivation in differing modes of use and the First Defendant's deliberate, systematic and dishonest manipulation of the emissions testing regime:

37.1   The Affected Diesels did not comply with statutory and regulatory requirements imposed by EU and UK law and did not perform as purchasers of the Affected Vehicles were led to believe.

37.2   Testing of the Affected Diesels for NOx emissions had not been properly or honestly carried out.  EC Type Approval, and necessary consents, licences, and registration had been improperly and dishonestly obtained, including by deliberate concealment of the Defeat Devices and their operation from Approval Authorities and national regulators (including the DVSA) and by deliberate misrepresentation by means of the COCs.

37.3   The Affected Diesels were not fit to be lawfully sold, registered, or put into service in the UK or any member state of the EU.

- 11 -

Exhibit 6, Page 12

37.4　The Affected Diesels incorporated the Defeat Devices, which are prohibited and illegal components.

37.5　The Defeat Device (whether or not as defined in the Emissions Regulations) prevented the proper and accurate testing and recording of emissions from the Affected Diesels.

37.6　The Affected Diesels all require modification in order to meet relevant emissions standards.

37.7　The Affected Diesels would not have satisfied EU emissions testing if operating in mode 1 (that is, a normal mode).

37.8　The Defendants did not honestly believe that any of the matters or circumstances stated in paragraph 32.1 to 32.6 above were as there stated.

38.　The First Defendant made the Representations and False Statements directly or indirectly and did so in the knowledge that they were false (alternatively recklessly - not caring whether they were true or false) and with the intention to deceive purchasers of the Affected Diesels. The whole purpose of the conduct from which the Representations and False Statements are to be implied was to induce potential purchasers to buy or lease the Affected Diesels.

39.　As intended by the First Defendant, purchasers of the Affected Diesels were induced to buy or lease them by the Representations and False Statements. But for the Representations and/or False Statements, and their belief in the truth of them, no Claimant would have purchased or leased an Affected Diesel. Specifically, no Claimant would have done so if he or she had known that:

39.1　EC Type Approval, and hence the legality for supply, sale, and operation of the Affected Diesel within the EU including the UK, had been obtained through fraudulent means.

39.2　The Affected Diesel contained a Defeat Device (whether or not as defined in the Emissions Regulations) which was intended to cheat, and had indeed cheated, the emissions testing regime, and ensured that the vehicles produced less pollutants when being tested than in road use.

39.3　The Affected Diesels would require future modification in order to meet relevant emissions standards.

**B.　Breach of Statutory Duty**

- 12 -

Exhibit 6, Page 13

40.    By virtue of Article 288 of the Treaty on the Functioning of the EU and section 2(1) of the European Communities Act 1972, the directly applicable and directly effective provisions of the Emissions Regulations set out above have domestic effect, and thereby create clear and unconditional obligations upon the manufacturers of all relevant motor vehicles. The combined effect of Articles 4.1, 4.2, 5.1, and 5.2 of the Emissions Regulation is to: (i) prohibit manufacturers from incorporating defeat devices in any new vehicles marketed and sold in the EU, including in the UK; and (ii) require manufacturers to ensure vehicles are designed, constructed and equipped such that they will, in normal use, comply with the Emissions limits contained in the Emissions Regulations before such vehicles are placed on the market and sold in the EU.

41.    To ensure the full effectiveness of the Emissions Regulations, and more particularly of the provisions referred to in the preceding paragraph, EU law requires that those clear and unconditional obligations be enforceable not only by the authorities of Member States but also through the recognition and direct enforcement, by means of civil proceedings, of the correlative rights for consumers and competitors that arise from them.

42.    As particularised above, the Defendants have acted in breach of their obligations under Articles 4.1, 4.2, 5.1, and 5.2 of the Emissions Regulations by:

42.1    In the case of the First Defendant, manufacturing and supplying the Affected Diesels with Defeat Devices.

42.2    In the case of the First Defendant, failing to ensure that the Affected Diesels were designed, constructed and equipped such that they would, in normal use, comply with the emissions limits in Annex 1 to the Regulations.

42.3    Failing to ensure that the Affected Diesels were properly tested to see whether they met the emissions limits in Annex 1 to the Regulations before being placed on the market for sale in the EU and in the UK.

42.4    Failing to ensure that they had adequately and lawfully demonstrated that the Affected Vehicles met the emissions limits in Annex 1 to the Regulations before placing them on the market for sale in the EU and in the UK.

43.    Those breaches have caused loss and damage to the Claimants and are actionable by the Claimants as:

- 13 -

Exhibit 6, Page 14

43.1  Breaches of the statutory duty created by the Emissions Regulations, as read with Article 288 of the Treaty on the Functioning of the EU and section 2(1) European Communities Act 1972; or

43.2  A *sui generis* tort.

**C.    Breach of Contract**

44.  Those Claimants claiming for breach of contract (the "**Contractual Claimants**") were sold, or supplied on hire purchase or other finance terms, Affected Diesels by the Second and Third Defendants.

45.  It was an implied term of all the agreements between those Claimants, and the Second and Third Defendants that the Affected Vehicles supplied would be of satisfactory quality.  Those terms were implied:

45.1  Iinto contracts of sale entered into before 1 October 2015, by s.14(2) of the Sale of Goods Act 1979;

45.2  Iinto hire purchase agreements entered into before 1 October 2015, by s. 10 of the Supply of Goods (Implied Terms) Act 1973;

45.3  Iinto all consumer contracts entered into on or after 1 October 2015 by s. 9 of the Consumer Rights Act 2015.

46.  The Defendants, all of whom were "producers" of the Affected Diesels within the meaning of s.14(2D) of the Sale of Goods Act 1979 and s. 9(5) of the Consumer Rights Act 2015, made numerous public statements about, among other things, fuel efficiency and the environmental credentials of the Affected Vehicles by way of extensive marketing and advertising material disseminated in the UK by Defendants, including through brochures and other literature created by or on behalf of the Defendants and made available at showrooms and/or on websites.

47.  Examples of that material are given in Schedule 1.

*Breach of the term as to satisfactory quality*

48.  In breach of contract, the Affected Diesels were not of satisfactory quality in that:

48.1  The Affected Diesels were fitted with prohibited Defeat Devices.

48.2  The Affected Diesels did not meet the regulatory requirements to be lawfully registered, kept and used in the UK.

- 14 -

Exhibit 6, Page 15

48.3    The Affected Diesels require a modification or "fix" in order to comply with the Emissions Regulations and to meet regulatory requirements.

48.4    As a result of the above, the Affected Diesels were not fit for all the purposes for which goods of the kind in question are commonly supplied.

48.5    The NOx emissions levels for each of the Affected Vehicles as stated in the COCs, EC Type Approval Certificates, Form V55/4 or VSS/1 or V55/2, and/or the VS Log Books for the Affected Diesels were false.

48.6    As set out in Schedule 1, the Defendants' public statements in relation to the Affected Vehicles' environmental characteristics and/or compliance with the relevant emissions standards were false and/or misleading.

49.    The Claimants have suffered loss and damages as a result.

**D.    Claims under the Consumer Protection from Unfair Trading Regulations 2008**

50.    References to regulations in this document are to the Consumer Protection from Unfair Trading Regulations 2008 ("**CPUT**").

51.    Certain of those Claimants who are consumers (the "**CPUT Claimants**") entered into and/or made payments pursuant to contracts with the Second and Third Defendants on or after 1October 2014 (being the date that Part 4A of the CPUT Regulations entered into force) for the sale or supply of Affected Vehicles.

52.    The CPUT Claimants are "consumers" and the Affected Diesels are "products" within the meaning of regulation 2. The contracts, into which the CPUT Claimants entered for the supply of Affected Diesels, were business-to-consumer contracts and meet the first condition in regulation 27A(2)(a). The First Defendant was the manufacturer or importer of Affected Diesels to which the distinctive Mercedes mark was attached and so was a "producer" of Affected Diesels within the meaning of Regulation 27A(S)(a), (b) and/or (c). The Second Defendant is a "trader" within the meaning of regulation 2.

53.    The Defendants were aware that they have engaged in prohibited practices in relation to the Affected Diesels. Accordingly, the second condition in regulation 27A(4) has been met.

54.    The prohibited practices were significant factors in the CPUT Claimants' decisions to enter into contracts for the purchase of Affected Diesels or make payments in relation to them.  Accordingly, the third condition in regulation 27A(6) has been met.

- 15 -

Exhibit 6, Page 16

55.    By regulation 27A(l), the CPUT Claimants have a right to redress under Part 4A of the regulations.

*Prohibited Practices*

56.    By regulation 278(1), a "prohibited" practice means a commercial practice that is a misleading action under regulation 5.   By regulation 2(1), a "commercial practice" means "*any act, omission, course of conduct, representation or commercial communication (including advertising and marketing) by a trader which is directly connected with the promotion, sale or supply of a product to or from consumers, whether occurring before, during or after a commercial transaction (if any) in relation to a product.*"

57.    By regulation 5(1), a commercial practice is a misleading action if it satisfies the conditions in regulation 5(2) or 5(3).   A commercial practice satisfies the conditions of regulation 5(2):

57.1   if it contains false information and is therefore untruthful in relation to any of the matters in regulation 5(4) or if it or its overall presentation in any way deceives or is likely to deceive the average consumer (as defined in regulation 2(2)-(6)) in relation to any of the matters in regulation 5(4), even if the information is factually correct; and

57.2   if it causes or is likely to cause the average consumer to take a transactional decision (as defined in regulation 27B(2)) he would not have taken otherwise.

58.    A party claiming redress under CPUT is not required to prove that the trader knew that the information was false or deceptive.

59.    The Defendants engaged in the following commercial practices:

59.1   the making of representations to purchasers of Affected Diesels in the same terms as the Representations and False Statements set out above;

59.2   the selling or leasing of the Affected Diesels with the benefit of promises as to their satisfactory quality; and

59.3   the presentation of the Affected Diesels, by means including the sales literature generated by them (of which examples are given in Schedule 1) as having environmental and as containing advanced technology so as to minimise NOx emissions.

- 16 -

Exhibit 6, Page 17

60.     For reasons stated above, the commercial practices set out therein were misleading actions within the meaning of regulation 5 as they:

60.1    contained false information, and were untruthful in relation to matters referred to in regulation 5(4)-(5), and specifically in relation to:

(a)    5(4)(b) and 5(5) (the main characteristics of the Affected Diesels), including as to the benefits, risks, execution, composition, method of manufacture, fitness for purpose, specification, results to be expected from use, of the Affected Diesels; and results and material features of tests or checks carried out on the Affected Diesels;

(b)    5(4)(i) (the need for a service, part, replacement or repair); and

(c)    5(4)(k) (the consumer's rights, or risks the consumer may face);

60.2    by themselves and their overall presentation deceived and/or were likely to deceive average consumers in relation to those matters; and

60.3    caused or were likely to cause the average consumer (including the CPUT Claimants) to take a decision to enter into contracts with the Second and Third Defendants for the sale or supply of an Affected Diesel or to make a payment pursuant to such a contract, which he or she would not otherwise have taken.

61.     Further, the First Defendant committed additional misleading actions, for which the Second and Third Defendants were liable as set out above, under regulation 5(3)(b) because:

61.1    The New Car Code was a code of conduct satisfying regulation 5(3)(b)(i) to (ii).

61.2    The First Defendant failed to comply with the New Car Code in ways that caused or were likely to cause the average consumer (including the CPUT Claimants) to take a decision to enter into a contract with the dealers for the sale or supply of an Affected Diesel or to make a payment pursuant to such a contract, which he or she would not otherwise have taken.

61.3    The marketing materials for the Affected Diesels did not disclose the presence of the Defeat Devices and were therefore likely to mislead or be misunderstood.

61.4    The Defeat Devices meant that the Vehicles were not manufactured to a high quality standard that would meet consumer expectations because

- 17 -

they were only able to comply with the Emissions Regulations by employing Defeat Devices. The applicable legislation and regulatory requirements were not complied with.

62. Accordingly, the commercial practices summarised above were prohibited practices within the meaning of regulation 27B.

63. These prohibited practices were significant factors in the CPUT Claimants' decision to enter into contracts for the supply of Affected Diesels within the meaning of regulation 27A(6).

64. Each of the CPUT Claimants has made one or more payments for the Affected Vehicles to the Second or Third Defendants, or (in the case of Claimants identified as such in the Schedules) has agreed to make one or more payments for the Affected Diesels, and none of the Claimants has exercised a right to unwind, within the meaning of regulation 27I(I).

*Redress*

65. As a result of the matters stated above, the CPUT Claimants have the right to a discount of the purchase prices/payments paid and/or to reduce future payments by reference to the same discount for Affected Diesels and/or damages under regulations 27I and 27J respectively.

66. As to a discount (regulation 27I):

   66.1 The prohibited practices were serious or very serious, and at least more than minor. The CPUT Claimants rely especially on the behaviour of the Defendants, by which they cynically and deliberately set out to manipulate regulators and consumers across the globe for around a decade in order to increase or maintain sale volumes (and hence profits and market share), while at the same time advancing as a positive virtue in its marketing the falsehood of clean and compliant emissions.

   66.2 The CPUT Claimants are entitled to discounts of between 25% and 100% from the purchase prices/payments paid and/or to reduce future payments.

67. It is specifically denied that the provisions of Regulation 27I(6) apply to any claim, since there was at the time each CPUT Claimant entered into a contract of purchase, no "market price" for vehicles known to be Affected Diesels, whether new or used. In particular, the CPUT Claimants further aver that:

- 18 -

Exhibit 6, Page 19

67.1    The market prices envisaged by the CPUT Regulations must (as a matter of law) be in a market or markets readily accessible by the average consumer.

67.2    There would have been no market unless both of two conditions (the "Conditions") were met.

(a)    The Defendants had made an enforceable promise or commitment to remove any Defeat Device so as to: (i) make the vehicle as remedied eligible for grant of EC whole vehicle type approval, in particular because all emissions standards were satisfied in the prescribed tests; and to (ii) leave all key performance and reliability metrics unaltered (a "Fix Promise").

(b)    There was a clear and authoritative indication from competent national authorities that pending such fix being devised, approved and applied, such vehicles could nevertheless be lawfully used on the roads ("Continued Use Clearance").

68.    The market under Regulation 271(6)(b) assumes widespread knowledge of the Defeat Device but does not assume any Fix Promise or Continued Use Clearance, and accordingly would be a market for a vehicle:

68.1    known to have the defeat devices fixed, with all the particulars of those devices and how they work also known;

68.2    known not to satisfy emissions standards;

(a)    which were, or were likely in the future to be, unlawful for road use in Europe, pending any fix curing breach of emissions standards;

(b)    with uncertainty as to the feasibility, timing, cost and effects on performance and reliability of any future fix to make the vehicle as remedied eligible for grant of EC whole vehicle type approval.

69.    As for new cars, such Conditions would not have been met, whether at the time of contracting or thereafter.  There would have been no market for known-to- be-affected vehicles because the relevant authorities would immediately have required the Defendants not to sell any such new cars in the EU, or alternatively the Defendants would have chosen not to.

70.    The CPUT Claimants will plead further following disclosure of the correspondence between the Defendants and the relevant authorities, and each other, in anticipation of and following the incorporation of the defeat devices becoming public knowledge.

- 19 -

Exhibit 6, Page 20

71.    In any event, there is and will at trial be no "clear evidence" of the market price in such a market, within the meaning of Regulation 27(I)(6)(c) of the CPUT Regulations.

72.    In the alternative, if contrary to the CPUT's case that there was a market capable of providing a market price within the meaning of sections 27(I)(6)(b) and 27(I)(7) of the CPUT Regulations, then the price obtainable on such market would have been a fraction of the price in fact paid by the CPUT Claimants; and the CPUT Claimants are entitled to a percentage discount on all such past and future payments reflecting the difference between the two pursuant to Regulations 27(I0) of the CPUT Regulations.

### E    Consumer Credit Act 1974

73.    The agreements between the Third Defendant and those Claimants who entered into agreements with them were credit agreements within the meaning of section 140(c)(1) the Consumer Credit Act 1974 (the "**Finance Claimants**").

74.    By Consumer Credit Act 1974 s.140A(3), the Court should, when deciding whether the relationship between Third Defendant and relevant Claimants is or was unfair, treat anything done (or not done) by the First and Second Defendants as if done by the Third Defendant.

75.    The relationship between the Third Defendant and the Finance Claimants is unfair to the Finance Claimants because:

75.1    In entering into the relationship with the Third Defendant, the Claimants were misled by the Representations and False Statements (which were false).

75.2    The Defendants manufactured the Affected Diesels with the secret and unlawful Defeat Devices, and concealed and/or withheld from the Claimants all the matters stated above. Those matters comprised important information, which it was unfair to conceal or withhold.

75.3    The cash price of the Affected Diesels and, consequently, the payments under the finance agreements between the Finance Claimants and the Third Defendant were overstated. The Affected Diesels were worth less than the cash price for the same reasons as made the Affected Diesels not of satisfactory quality as set out above. Further, and as a corollary, the monthly repayments, costs of credit and final payment under the agreements were also all overstated.

- 20 -

Exhibit 6, Page 21

76.    As a result of the matters described above, the Finance Claimants have been left
uncertain as to: (i) when the proposed modifications to the Affected Diesels will
be implemented, (ii) exactly what the proposed modifications to the Affected
Diesels entail and how they work, (iii) the impact of the proposed modifications
on the performance and running costs of the Affected Diesels and the need for
future additional maintenance or repair, (iv) whether the Affected Diesels are
compliant with the Emissions Regulations, (v) whether the Affected Diesels emit
an unlawful and/or unsafe amount of NOx, (vi) the exact nature and effect of the
Defeat Devices, (vii) the true value of their vehicles, and (viii) whether it is in the
Finance Claimants' interests to exercise the option to purchase at the end of the
agreement and/or whether to terminate the agreement. There is also an unfair
imbalance of information between the Finance Claimants, the Defendants, and
the other manufacturers of Affected Vehicles

77.    The Affected Vehicles were marketed by the Defendants as "Euro 5" and "Euro
6" compliant and as more environmentally friendly than other comparable
vehicles when they were not, and in circumstances where the Affected Diesels
contained the Defeat Devices designed to manipulate regulators and consumers
as to the true level of NOx emissions from the Affected Diesels.

78.    The rights under the credit agreements have continued to be exercised and/or
enforced by the Third Defendant notwithstanding the fact that the Affected
Diesels do not comply with the Emissions Regulations, do not meet the
regulatory requirements for registration, and require modification.

79.    The Claimants in question, therefore, seek orders under section 140B of the
Consumer Credit Act 1974.

**VII  Remedies**

80.    The Claimants have each suffered loss and damage by reason of their purchase
or lease and/or subsequent use of an Affected Diesel, and are entitled to
damages (including exemplary damages) and/or statutory remedies under CPUT
or the Consumer Credit Act 1974:

80.1    As to the claims against the First Defendant for deceit and breach of
statutory duty, the measure of the Claimants' loss is the difference
between the price paid for an Affected Diesel and its actual value at the
time of purchase; alternatively, the difference between the value of the
Affected Diesel and the value of an equivalent vehicle without the defects,
assessed immediately after the modification has been performed, or else
at the date of trial.

- 21 -

Exhibit 6, Page 22

80.2 As to the claims for breach of contract against the Second and Third Defendants, the Contractual Claimants' financial loss is measured by the difference between the value of the Affected Diesels as warranted (that is, if they had been of satisfactory quality) and their actual value, at the date of acquisition, alternatively immediately after application of the modification, alternatively at trial.

81. Further, the Claimants have suffered, or will suffer, loss:

81.1 as a result of residual (after the modifications) and/or continuing loss in value of the Affected Diesels (including as a result of the stigma attached to them);

81.2 additional fuel consumption, and running and maintenance costs following the proposed remedial modifications (the effects of which are not presently known); and

81.3 such other loss and damage as may be further ascertained on disclosure by the Defendants and/or the obtaining of expert evidence by the parties.

82. Further, the Claimants (other than the Business Claimants) have suffered distress, disappointment, inconvenience and loss of enjoyment of their Affected Vehicles and seek compensation for the same in deceit or breach of statutory duty or for breach of contract.

83. Further, the Claimants seek exemplary damages for deceit. As described in paragraphs 15 to 67 above, the First Defendant has acted in deliberate and cynical disregard of the Claimants' rights. The First Defendants' actions have been motivated by a desire to increase their profits, and were based on a calculation or assumption that the gains to be made from their wrongdoing exceeded the likely fines or compensation payable.

84. The discount sought by the CPUT Claimants under the Consumer Protection from Unfair Trading Regulations 2008 is as stated above.

85. The Finance Claimants seek against the Third Defendant under section 140B of the Consumer Credit Act 1974, a discount on payments made and to be made, alternatively a payment to compensate them for loss as set out above in relation to the claim for deceit, conspiracy or breach of contract or otherwise as the Court may deem fit.

**Claim for interest**

- 22 -

Exhibit 6, Page 23

86.    Further, the Claimant claims interest under section 35A of the Senior Courts Act on such sum in damages as the Court shall award at such rate and for such period as the court thinks fit.

87.    AND THE CLAIMANT CLAIMS:

(1) Damages, including exemplary damages.

(2) Redress under the Consumer Protection from Unfair Trading Regulations 2008.

(3) Such orders under section 140B of the Consumer Credit Act 1974 as may be appropriate.

(4) Interest on those damages under section 35A of the Senior Courts Act 1981 to be assessed.

(5) Further or other relief.

(6) Costs.

**DAVID CAVENDER QC**

Served this  day of          2021 by Hagens Berman UK LLP, Fifth Floor, 10 Finsbury Square, London EC2A 1AF, solicitors for the Claimant.

**STATEMENT OF TRUTH**

The Claimant believes that the facts stated in these Particulars of Claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth. I am duly authorised by the Claimant to sign this statement.

Full name: Molly Ahmed    Position or office held: Solicitor, for Hagens Berman UK LLP

Signed.......................... (If signing on behalf of firm, company or corporation)

- 23 -

Exhibit 6, Page 24

Claim No.

**IN THE HIGH COURT OF JUSTICE**

**IN THE QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**BETWEEN:**

**Mr Abdus Sattar Shakoor & Others**

**(Claimants)**

**- and -**

**(1)  Daimler AG**

**(2) Mercedes Benz Cars UK Limited**

**(3) Mercedes Benz UK Financial**
**Services Limited**

**(Defendants)**

----------------------------------------

**GENERIC PARTICULARS OF CLAIM**

----------------------------------------

Hagens Berman UK LLP
10 Finsbury Square
London
EC2A 1AF
Ref: MJG/MSA
Solicitors for the Claimants

- 24 -

Exhibit 6, Page 25

449

# Exhibit 7

Aamir and 7387 others v. Mercedes-Benz Group AG and others, CL-2023-000006 (2023)

# Aamir and 7387 others v. Mercedes-Benz Group AG and others

**Docket**

**Case number**
CL-2023-000006

**Court**
King's Bench Division, Commercial Court

**Case type**
Civil

**Date Filed**
11 January 2023

**Case Status**
Open

**Last updated:** 16 December 2024

## Summary

Commercial Court - Part 7 Claim - Other

## Parties and Representation

| Role | Name | Legal representatives |
| --- | --- | --- |
| Claimant | Sahabat Aamir | Hagens Berman EMEA LLP |
| Claimant | 387 Claimants Other Claimants All those additional 7 | Hagens Berman EMEA LLP |
| Defendant | Mercedes-Benz Group AG | Litigant in Person |
| Defendant | Mercedes-Benz AG | Litigant in Person |
| Defendant | Mercedes-Benz Cars UK Limited | Litigant in Person |
| Defendant | Mercedes-Benz Financial Services UK Limited | Litigant in Person |
| Defendant | Mercedes Benz Retail Group UK Limited | Litigant in Person |

© 2024 Thomson Reuters. All rights reserved.

1

Exhibit 7, Page 1

## Docket proceedings

There are no Docket proceedings to display. Please select the Alert bell icon to be notified when any events become available.

Crown Copyright

# Exhibit 8

Ahmadey and another v. Mercedes-Benz Group AG and others, KB-2023-002303 (2023)

# Ahmadey and another v. Mercedes-Benz Group AG and others

**Docket**

**Case number**
KB-2023-002303

**Court**
King's Bench Division, King's Bench Claims

**Case type**
Civil

**Date Filed**
18 May 2023

**Case Status**
Open

**Last updated:** 16 December 2024

## Summary

Other Claims - Part 7 Claim - Miscellaneous

## Parties and Representation

| Role | Name | Legal representatives |
| --- | --- | --- |
| Claimant | Abdalla Ahmadey | Hagens Berman EMEA LLP |
| Claimant | Those persons identified in Schedule 1 appended to the Claim Form | Hagens Berman EMEA LLP |
| Defendant | Mercedes-Benz Group AG | Litigant in Person |
| Defendant | Mercedes-Benz AG | Litigant in Person |
| Defendant | Mercedes-Benz Cars UK Limited | Litigant in Person |
| Defendant | Mercedes-Benz Financial Services UK Limited | Litigant in Person |
| Defendant | Mercedes Benz Retail Group UK Limited | Litigant in Person |
| Defendant | Barons Autostar Limited | Litigant in Person |
| Defendant | Bell Truck Sales Limited | Litigant in Person |
| Defendant | Ciceley Commercials Limited | Litigant in Person |

© 2024 Thomson Reuters. All rights reserved.

1

Exhibit 8, Page 1

Ahmadey and another v. Mercedes-Benz Group AG and others, KB-2023-002303 (2023)

| | | |
|---|---|---|
| Defendant | City West Commercials Limited | Litigant in Person |
| Defendant | City West Country Limited | Litigant in Person |
| Defendant | Cruickshank Motors Limited | Litigant in Person |
| Defendant | Derwent Vehicles Limited | Litigant in Person |
| Defendant | Drayton Group Limited | Litigant in Person |
| Defendant | Esplanade Limited | Litigant in Person |
| Defendant | eStar Truck and Van Limited | Litigant in Person |
| Defendant | Euro Commercials (South Wales) Limited | Litigant in Person |
| Defendant | Falcon of Hull & Lincolnshire Limited | Litigant in Person |
| Defendant | Gerard Mann Limited | Litigant in Person |
| Defendant | Hughes of Beaconsfield Limited | Litigant in Person |
| Defendant | Inchape Retail Limited | Litigant in Person |
| Defendant | Intercounty Truck and Van Limited | Litigant in Person |
| Defendant | Jam 300 Limited | Litigant in Person |
| Defendant | Jardine Luxury Vehicles Limited | Litigant in Person |
| Defendant | JCB Medway Limited | Litigant in Person |
| Defendant | JCT600 (MBNY) Limited | Litigant in Person |
| Defendant | JCT600 (South Yorkshire) Limited | Litigant in Person |
| Defendant | L&L Inc Limited | Litigant in Person |
| Defendant | Lancaster Public Limited Company | Litigant in Person |
| Defendant | LSH Auto UK Limited | Litigant in Person |
| Defendant | Marshall Motor Group Limited | Litigant in Person |
| Defendant | Marshall North West Limited | Litigant in Person |
| Defendant | MB South Limited | Litigant in Person |
| Defendant | Mertrux Limited | Litigant in Person |
| Defendant | Midlands Truck & Van Limited | Litigant in Person |
| Defendant | Motus Group (UK) Limited | Litigant in Person |
| Defendant | Northside Truck & Van Limited | Litigant in Person |
| Defendant | Pentagon Limited | Litigant in Person |

© 2024 Thomson Reuters. All rights reserved.

2

Exhibit 8, Page 2

**Ahmadey and another v. Mercedes-Benz Group AG and others, KB-2023-002303 (2023)**

---

| Defendant | Rossetts (UK) Limited | Litigant in Person |
|---|---|---|
| Defendant | Rygor Commercials Limited | Litigant in Person |
| Defendant | S&B Commercials Limited | Litigant in Person |
| Defendant | Sandown Dorset and Wiltshire Limited | Litigant in Person |
| Defendant | Sandown Surrey and Hampshire Limited | Litigant in Person |
| Defendant | Sinclair Garages (Bridgend) Limited | Litigant in Person |
| Defendant | Sinclair Garages (Newport) Limited | Litigant in Person |
| Defendant | Snows Motor Group Limited | Litigant in Person |
| Defendant | Sparshatt Truck & Van Limited | Litigant in Person |
| Defendant | Vertu Motors (Continental) Limited | Litigant in Person |
| Defendant | Western Truck Rental Limited | Litigant in Person |

## Docket proceedings

There are no Docket proceedings to display. Please select the Alert bell icon to be notified when any events become available.

Crown Copyright

© 2024 Thomson Reuters. All rights reserved.    3

Exhibit 8, Page 3