Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Robert B. Carey (*pro hac vice*)
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email:  rob@hbsslaw.com
          leonarda@hbsslaw.com
          michellak@hbsslaw.com

*Attorneys for Plaintiffs*

*(Additional Counsel on Signature Page)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC, MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC,<br><br>*Defendants*. | Case No. 8:24-cv-01655-FWS-SSC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

011194-11/2686242 V1

1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................... 1

II.   JURISDICTION & VENUE ............................................................... 7

III.  PARTIES ............................................................................................ 8

    A.    Plaintiffs ................................................................................... 8

        1.    California Plaintiffs ....................................................... 9

            a.    Plaintiff N.Z. ...................................................... 9

            b.    Plaintiff R.M. ..................................................... 9

        2.    Out-of-State Plaintiffs .................................................. 9

            a.    Plaintiff B.L. ...................................................... 9

            b.    Plaintiff S.M. ..................................................... 9

            c.    Plaintiff A.L. .................................................... 10

    B.    Defendants ............................................................................. 10

        1.    Fenix / OnlyFans Defendants ................................... 10

        2.    Agency Defendants .................................................... 12

IV.   FACTS .............................................................................................. 14

    A.    History of OnlyFans .............................................................. 14

    B.    How OnlyFans Makes Money .............................................. 17

    C.    OnlyFans falsely promises Fans "authentic" and "direct" connections with Creators. .................................................... 24

    D.    OnlyFans allows the "Chatter Scams" because it financially benefits OnlyFans. ...................................................................... 32

    E.    Anatomy of the Chatter Scams ............................................ 34

        1.    Agencies exploit cheap labor to "farm" money from Fans by deceptively impersonating Creators. ......................... 35

2.  The success of Chatter Scams has spawned an entire ecosystem of third-party CRM tools to facilitate the deception of Fans on the OnlyFans platform. ..........................41

F.  OnlyFans knows or should know that Chatter Scams are rampant on the platform. ......................................................................44

1.  OnlyFans actively monitors the traffic on its platform—including information that would allow OnlyFans to detect the use of Chatters by a Creator account. ...................................................................................47

2.  Fans who discovered the Chatter Scams claim to have directly contacted OnlyFans only to be ignored. ......................53

G.  OnlyFans Actively Facilitates Chatter Scams ...................................57

H.  Agency-Specific Facts ......................................................................64

1.  Creators Inc. ...........................................................................64

2.  Moxy Management ..................................................................67

3.  Siren Agency ...........................................................................69

4.  Unruly Defendants ..................................................................72

5.  Content X .................................................................................76

6.  A.S.H. Agency .........................................................................78

7.  Verge Agency ..........................................................................79

I.  Plaintiffs' Stories .............................................................................81

1.  Plaintiff N.Z. ...........................................................................81

2.  Plaintiff R.M. ...........................................................................84

3.  Plaintiff B.L. ............................................................................87

4.  Plaintiff S.M. ...........................................................................90

5.  Plaintiff A.L. ............................................................................93

V.  CLASS ACTION ALLEGATIONS ...............................................................96

FIRST AMENDED CLASS ACTION COMPLAINT

A.    The Requirements of Rule 23(a)(1)-(4) Are Satisfied ....................... 97

1.    Numerosity ................................................................. 97

2.    Commonality .............................................................. 97

3.    Typicality ................................................................... 98

4.    Adequacy ................................................................... 99

B.    The Requirements of Rule 23(b)(2) Are Satisfied: Defendants' conduct generally applies to Class, making injunctive relief for the class as a whole appropriate. ....... 99

C.    The Requirements of Rule 23(b)(3) Are Satisfied ........................... 100

1.    Predominance ............................................................ 100

2.    Superiority ................................................................ 101

VI.    TOLLING OF STATUTE OF LIMITATIONS ........................................ 102

VII.    CAUSES OF ACTION ..................................................................... 103

COUNT I. VIOLATION OF RICO (18 U.S.C. § 1962(C)) (AGAINST ALL DEFENDANTS) ........................................................ 104

A.    Each Defendant is a Culpable Person Under RICO. ....................... 105

B.    The Content Fraud Enterprise is a RICO Enterprise. ..................... 105

C.    Pattern of Racketeering Activity ............................................... 108

D.    The Racketeering Activity or Predicate Acts ................................. 108

E.    Injury and Damages .............................................................. 116

COUNT II. RICO CONSPIRACY (18 U.S.C. § 1962(D)) (AGAINST ALL DEFENDANTS) .............................................................. 117

COUNT III. VIOLATION OF THE FEDERAL  VIDEO PRIVACY PROTECTION ACT (VPPA) (18 U.S.C. § 2710) (AGAINST ALL DEFENDANTS) ....................................................... 120

A.    The OnlyFans platform collects personally identifying information about Fans. .................................................... 120

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

B.    Defendants are video tape service providers under the Act. ................................................................. 122

COUNT IV. VIOLATION OF THE  CALIFORNIA COMPREHENSIVE DATA ACCESS AND FRAUD ACT (CAL. PENAL CODE § 502) (AGAINST ALL DEFENDANTS) ................................................... 125

COUNT V. VIOLATIONS OF THE  CALIFORNIA INVASION OF PRIVACY ACT (CIPA) CAL. PENAL CODE § 630, *ET SEQ.* (AGAINST ALL DEFENDANTS)................................................ 127

COUNT VI. VIOLATION OF THE FEDERAL WIRETAP ACT 18 U.S.C. § 2510, *ET SEQ.* (AGAINST AGENCY DEFENDANTS) ............................................................. 129

COUNT VII. BREACH OF CONTRACT (AGAINST ONLYFANS DEFENDANTS) ............................................................. 131

COUNT VIII. FRAUD & FRAUD BY CONCEALMENT (COMMON LAW) (AGAINST ONLYFANS DEFENDANTS).............. 132

A.    Fraud ........................................................... 132

B.    Fraud by Concealment ...................................... 133

C.    Plaintiffs and Class Members were injured. ................. 135

COUNT IX. DECEIT, IN VIOLATION OF CAL. CODE §§ 1709 & 1710 (AGAINST ONLYFANS DEFENDANTS ON BEHALF OF CALIFORNIA SUBCLASS)....................................... 135

COUNT X. VIOLATION OF CALIFORNIA'S  FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*) (AGAINST ONLYFANS DEFENDANTS ON BEHALF OF CALIFORNIA SUBCLASS) .............................. 137

COUNT XI. VIOLATION OF THE CALIFORNIA  UNFAIR COMPETITION LAW ("UCL") (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*) (AGAINST ONLYFANS DEFENDANTS ON BEHALF OF CALIFORNIA SUBCLASS)........................ 138

*Unlawful Act* ........................................ 139

-iv-

*Unfair Act* .................................................................................139

*Unfair, Deceptive, Untrue, or Misleading Advertising* ...............................140

PRAYER FOR RELIEF .................................................................141

DEMAND FOR JURY TRIAL .......................................................142

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

# I.    INTRODUCTION

1.    Romance scams have existed for a long time, but the prevalence of such scams and the financial toll they take on their victims have increased in recent years. According to the FTC, between 2017 and 2021, people "reported losing a staggering $1.3 billion to romance scams, more than any other FTC fraud category."[1] This disturbing upward trend has almost certainly been exacerbated by the ubiquity of online dating (which normalizes the idea of making romantic connections through the internet)—but also by an "epidemic of loneliness and isolation" that the U.S. Surgeon General warns is "an underappreciated public health crisis that has harmed individual and societal health."[2]

2.    This case goes beyond typical romance scams by involving an online platform used to perpetrate a systemic deception that exploits victims' trust on an unprecedented scale, affecting hundreds of thousands, or even millions, of people simultaneously.

3.    OnlyFans, a social media platform known almost exclusively for hosting sexually oriented content, has hundreds of millions of users (called "Fans") who pay for the privilege of communicating *directly* with *specific people* who post content on the platform (called "Creators") on a personal (indeed, often an intimate

---

[1] FEDERAL TRADE COMMISSION, *FTC Data Show Romance Scams Hit Record High; $547 Million Reported Lost in 2021* (Feb. 10, 2022), www.ftc.gov/news-events/news/press-releases/2022/02/ftc-data-show-romance-scams-hit-record-high-547-million-reported-lost-2021 (last visited April 23, 2025).

[2] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *Our Epidemic of Loneliness and Isolation* (2023), www.hhs.gov/sites/default/files/surgeon-general-social-connection-advisory.pdf (last visited April 23, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

1   and/or romantic) level.[3] But instead of interacting with a specific Creator, Fans end

2   up—unknowingly and without their consent—communicating with professional

3   "chatters" hired to impersonate that Creator in order to convince Fans to spend even

4   more money on the platform.

5        4.    Chatters are often hired by self-styled "management agencies"

6   operating OnlyFans accounts on behalf of multiple Creators, at the request of and

7   with the consent of the Creators. These agencies hire veritable fleets of Chatters—

8   often from countries like the Philippines and Venezuela, where they can get low-

9   cost, yet well-educated, workers who can convince Fans they are engaged in

10  "authentic" communication with a particular Creator.

11       5.    In addition to the blatant deception and fraud, the "Chatter Scams"

12  involve massive breaches of confidentiality and privacy violations in which

13  intimate communications and private and/or personal information about Fans—

14  including photos and videos—are distributed and/or accessible to numerous

15  unauthorized parties.

16       6.    OnlyFans knows about the agencies perpetrating the Chatter Scams;

17  indeed, it has co-hosted events with at least one agency named as a defendant in

18  this Complaint. In July 2023, Creators Inc. posted a video on Instagram with a

19  tagline that said "our collab with @ofmerch during Miami Swim Week was the real

20  cause behind the nationwide heatwave!" The video featured scantily clad Creators

21

22       [3] Although OnlyFans' Terms of Service refer to both creators and fans as
    "users," it has distinct account types for the two categories, which come with
23  different pre-requisites for opening an account, as well as specific Terms of Use for
    each type of account. For clarity, this Complaint will only use the term "Creator" to
24  refer to creator accounts, and the term "Fans" to refer exclusively to fan accounts.

25

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

walking down a runway wearing swimsuits featuring the OnlyFans logo, with signage in the background bearing the logos of both OnlyFans and Creators Inc. The profile "@ofmerch" describes itself as a profile "Featuring creators in official @onlyfans merch," and links directly to OnlyFans' online store at https://store.onlyfans.com/.[4]

7.    OnlyFans also knows that the use of Chatters blatantly violates many of its platform rules and policies, yet the company fails to enforce those policies in order to facilitate the widespread fraud that has resulted in massive profits for OnlyFans—which takes a 20% cut of everything a Creator earns on the platform.

8.    But OnlyFans' involvement is not limited to "looking the other way." Like other social media platforms, OnlyFans allows Creators to make individual profiles through which they can share content (text, photos, and videos) with their Fans—users of the platform who can open Fan accounts, subscribe to specific Creators' profiles (often for a monthly fee), and respond to Creators' content in the form of comments and/or "likes."

9.    OnlyFans also provides a wide variety of tools for Creators to "monetize" their content. Creators can charge Fans monthly subscription fees to view their accounts, in addition to selling pay-per-view content and/or custom content created by request for a particular Fan. The platform also allows Fans to send monetary tips to Creators in amounts up to $200 per transaction. In exchange, OnlyFans takes 20% of Creators' revenue from all three of these sources.

---

[4] Creators Inc. (@creatorsinc), INSTAGRAM (July 23, 2023) https://www.instagram.com/creatorsinc/reel/CvC2U3JASvS/ (last visited April 23, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

10.     Compared with other "content monetization" platforms, however, OnlyFans has permissive rules around the types of content that can be sold. As a result, OnlyFans has become almost exclusively known for sexually oriented content, which can be anything from a romantic connection to sexually explicit material—a fact which has made it the juggernaut of content monetization platforms. In 2021, the platform generated approximately $2 billion in revenue, representing well over 10 times the estimated revenue for Patreon (a content monetization platform catering primarily to artists and podcasters)—and over 40 times that of Medium (whose creators are primarily writers and bloggers). Yet recent estimates show OnlyFans' user base is only slightly over twice the size of Medium's user base: 210 million compared with 100 million.

11.     But OnlyFans' success cannot be explained solely by the fact that it hosts sexually oriented content. After all, the internet "democratized" access to pornography as much as anything else, and getting such content for free is a matter of a simple internet search.[5] This has led some observers to ask, why are people paying (and paying so much) for OnlyFans when they can get pornography for free?

---

[5] Indeed, some credit the adult film industry with allowing the internet to thrive in its early years. *See, e.g.,* Ross Benes, *How porn has been secretly behind the rise of the internet and other technologies*, BUSINESS INSIDER (May 7, 2017) https://www.businessinsider.com/porn-behind-internet-technologies-2017-5 (last visited April 23, 2025) ("[W]hile the military created the internet, it would not have found a solid consumer base without porn. Think of the military as the inventor and creator of a product and porn as the entrepreneur who brings the product to the masses.").

FIRST AMENDED CLASS ACTION COMPLAINT

12.     In a time of increasing concern about loneliness as a serious public health issue,[6] the answer to that question is that OnlyFans offers Fans a more personal connection to Creators—or at least that's the idea that OnlyFans is selling. Indeed, the promise of personal connection explains why Fans have flocked to the OnlyFans accounts of many "traditional" pornography stars—even though those same stars are featured in hundreds of videos that are accessible elsewhere for free.[7]

13.     OnlyFans is not coy or allusive about the fact that the core promise of its platform hinges on the authenticity of the personal interaction between Fans and Creators. Its marketing consistently revolves around this idea, with its website and other public statements teeming with references to "authenticity" and "meaningful" engagement.

14.     OnlyFans offers Fans a list of "subscription benefits" that include the ability to "direct message with this [Creator]." Both phrases appear on every single Creator profile because OnlyFans puts them there, encouraging Fans to subscribe to their favorite Creators so they can access VIP pages that promise a more intimate interaction—what some describe as a "girlfriend experience" or a "really real" experience where "you get to know people."[8]

---

[6] *See supra*, n.2.

[7] For example, Mia Malkova—who has made hundreds of videos over the course of her decade-long career in the adult film industry—says she has made over $285,000 in one month from her OnlyFans account. *MIA MALKOVA on OnlyFans, Making Millions, & Getting Her Heart Broken*, COOLKICKS PODCAST (December 13, 2022), https://www.youtube.com/watch?v=eCgdE7nlC78 (last visited April 23, 2025).

[8] Martina Biino and Madeline Berg, *The Secret of OnlyFans: It's much more than porn*, BUSINESS INSIDER (Jan. 18, 2024), www.businessinsider.com/how-

15.     The problem is: unbeknownst to most Fans on the site, the use of
Chatters creates an experience that is almost as far from "really real" as you can
get—an experience orchestrated by agencies, such as the Agency Defendants in this
lawsuit, who promise to help Creators effectively make money in their sleep by
signing up subscribers at scale and keeping subscribers engaged by (fraudulently)
maintaining the "personal" relationships Fans believe they have with Creators.

16.     Agency Chatters are trained to exploit emotional connections by
pretending to be personal friends or close acquaintances, using manipulative tactics
that prey on psychological biases and vulnerabilities. They never reveal that they
are not the actual Creators and, if questioned, they assure Fans that they are
interacting with the actual Creator. Agencies often refer to this as "farming" Fans
and equip Chatters with detailed scripts and processes designed to identify the most
emotionally invested targets and persuade them to spend money under the guise of
a personal relationship.

17.     OnlyFans actively facilitates this "farming" process by continuing to
cultivate the platform's image as one where individuals can pay for backstage/VIP
passes in order to get "personal" attention from Creators—and by providing tools
that make it easier for Chatters to fraudulently "maintain" personal relationships
with Fans and to monetize those relationships.

18.     OnlyFans claims to be monitoring everything that happens on its
platform but does nothing to stop the use of Chatters in violation of its promises to
the Fans on its platform.

onlyfans-became-outlet-source-help-loneliness-sadness-connection-sex-2024-1 (last
visited April 23, 2025).

## II.    JURISDICTION & VENUE

19.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

20.    Subject-matter jurisdiction also arises under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C. § 1961, *et seq*., and supplemental jurisdiction exists under 28 U.S.C. § 1367 for the state-law claims.

21.    This Court has personal jurisdiction over Plaintiffs because they are either residents of California or they consent to the Court's jurisdiction.

22.    This Court has personal jurisdiction over Defendants because they transact and conduct business and are alleged to have violated statutory and common law, in the State of California and this District. The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d).

23.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the State of California—including the deception and privacy violations perpetrated on Plaintiffs, some of whom are California residents—and the Court has personal jurisdiction over all Defendants. In addition, Agency Defendants reside in the District by virtue of owning and operating California-based companies.

24.    On April 9, 2025, the Court granted in part and denied in part the motion to dismiss for forum non conveniens filed by Defendants Fenix

-7-

011194-11/2686242 V1

International Limited and Fenix Internet LLC ("Fenix Defendants"). *See* Dkt. 117. Pursuant to that Order, the claims of Plaintiffs B.L., S.M., and A.L. against the Fenix Defendants were dismissed without leave to amend. Accordingly, only Plaintiffs N.Z. and R.M. assert claims against Fenix International Limited and Fenix Internet LLC in this Amended Complaint.

## III.    PARTIES

### A.    Plaintiffs

25.    Plaintiffs are users of OnlyFans, referred to as Fans, who subscribed to the accounts of one or more Creators represented by the Agency Defendants.

26.    Plaintiffs file this action under fictitious names and seek to proceed anonymously in order to preserve their right to privacy, and to avoid the significant social stigma attached to using OnlyFans as a result of the platform's association with explicitly sexual (NSFW) content—both of which drive the widespread use of pseudonyms by Fans on the platform (including Plaintiffs) to begin with. Given these concerns, Plaintiffs would be hesitant to maintain this action if their names were permanently associated with Defendants. *See Jane Roes 1-2 v. SFBSC Mgmt., LLC*, 77 F. Supp. 3d 990, 997 (N.D. Cal. 2015) (allowing exotic dancers to proceed using pseudonyms and noting that the "Ninth Circuit has recognized that courts grant anonymity where it is needed to 'preserve privacy in a matter of sensitive and highly personal nature'" and has allowed the use of pseudonyms in order to "'protect a person from . . . ridicule or personal embarrassment.'" (quoting *Does I thru XXIII v. Advanced Textile Corp*., 214 F.3d 1058, 1068 (9th Cir. 2000))).

27.    Moreover, Plaintiffs' ability to proceed anonymously will not prejudice Defendants. The use of pseudonyms as a matter of course on the

OnlyFans platform—and the fact that Defendants' profits are driven by the ability of Fans to remain anonymous—undercuts any suggestion that their doing so in public filings would offend the traditional presumption of openness in judicial proceedings. And because Plaintiffs are willing to privately disclose their identities to Defendants in the course of litigation, Defendants will be fully able to exercise their due process rights to assess and defend their claims.

1. **California Plaintiffs**

    a. **Plaintiff N.Z.**

28.    Plaintiff N.Z. is a resident and citizen of Cypress, California.

29.    During the relevant time period of this Complaint, Plaintiff N.Z. subscribed to at least one OnlyFans account managed by an Agency Defendant.

    b. **Plaintiff R.M.**

30.    Plaintiff R.M. is currently a resident and citizen in Folsom, California, but during the time period at issue in this Complaint, he was a resident of El Dorado Hills, California.

31.    During the relevant time period of this Complaint, Plaintiff R.M. subscribed to at least one OnlyFans account managed by an Agency Defendant.

2. **Out-of-State Plaintiffs**

    a. **Plaintiff B.L.**

32.    Plaintiff B.L. is a resident and citizen of Nashville, Tennessee.

33.    During the relevant time period of this Complaint, Plaintiff B.L. subscribed to at least one OnlyFans account managed by an Agency Defendant.

    b. **Plaintiff S.M.**

34.    Plaintiff S.M. is a resident and citizen of Atlanta, Georgia.

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

35.     During the relevant time period of this Complaint, Plaintiff S.M. subscribed to at least one OnlyFans account managed by an Agency Defendant.

### c.   Plaintiff A.L.

36.     Plaintiff A.L. is a resident and citizen of Madison, Wisconsin.

37.     During the relevant time period of this Complaint, Plaintiff A.L. subscribed to at least one OnlyFans account managed by an Agency Defendant.

38.     To the extent this Complaint includes allegations concerning Defendants Fenix International Limited or Fenix Internet LLC, those allegations are asserted solely by Plaintiffs N.Z. and R.M. Any claims by Plaintiffs B.L., S.M., or A.L. against those Defendants have been dismissed without leave to amend pursuant to the Court's April 9, 2025 Order. *See* Dkt. 117.

## B.   Defendants

### 1.   Fenix / OnlyFans Defendants

39.     Defendant **Fenix International Limited ("FIL")** is a private limited company registered in the United Kingdom and Hong Kong, with its principal place of business in London. FIL owns and operates the website and social media platform OnlyFans.com ("OnlyFans"), which it operates worldwide through various subsidiaries and affiliates, including in the United States, Manila, Singapore, Tokyo, New Delhi, and Bangkok.

40.     FIL contracts and pays for the servers that host OnlyFans and owns all intellectual property and trademarks related to OnlyFans—including trademarks registered in the United States.

41.     According to the company's LinkedIn profile, FIL has over 1,000 "associated members" located in the United States—including over 100 in

011194-11/2686242 V1

California. On information and belief, a substantial number of those individuals are employees or contractors of OnlyFans involved in the daily operations of the business and the OnlyFans website. These include management- and executive-level employees with titles such as Executive Vice President and Deputy General Counsel.

42.     Defendant **Fenix Internet LLC ("FIUSA")** is a Delaware limited liability company headquartered in Florida. FIUSA is a wholly owned subsidiary of FIL. On information and belief, FIUSA—at the direction of and under the control of FIL—directly or indirectly collects and receives all OnlyFans-related payments from Fans located in the United States, whose bank statements reflect the transaction as "Fenix Internet LLC." FIUSA then subtracts OnlyFans fees (including Subscription Fees, the OnlyFans' portion of the Creator Fees, and other charges) from those payments, and remits approximately the remainder of the Fan payments to the Creators.

43.     On information and belief, a substantial number of those Fans and Creators are located in California.

44.     On information and belief, FIUSA has not obtained the necessary licenses to provide money transmitter services in any of the states in which it performs those services—including California.

45.     Together, FIL and FIUSA are referred to throughout this Complaint as "OnlyFans Defendants," "OnlyFans," or "Fenix Defendants," except where it may be necessary to distinguish more specifically between the two entities.

-11-

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

### 2.    Agency Defendants

46.    The following Defendants are "management" agencies that purport to represent, act on behalf or, or are the agents of multiple Creators, and who in reality have unfettered access to and primary control over the OnlyFans accounts of their "Represented Creators." Each of these Defendants provides "Chatter services" for its Represented Creators: hiring individuals to interact with Fans, fraudulently misrepresent their identities, build a phony relationship engineered by people other than the Creators and based on emotions and vulnerabilities thought to be shared only with the Creators, and pretend to be the Represented Creators—with the express purpose of deceiving and manipulating Fans in order to maximize their willingness to purchase content from the Represented Creator accounts. These Defendants are referred to collectively as the "Agency Defendants."

47.    Each Agency represents or represented at least one Creator subscribed to and followed by a Plaintiff. The identities of those Creators and Plaintiffs—along with additional details about each Agency's conduct—are provided in Sections IV. H and I, below.

48.    Defendant **Boss Baddies LLC** ("Boss Baddies") was registered in Wisconsin on April 26, 2021. Boss Baddies' principal office is 2800 E Enterprises Avenue, Suite 333, Appleton, Wisconsin 54913-7889. Boss Baddies LLC has branches registered in Ohio and Washington. On information and belief, Boss Baddies LLC was actively doing business as Siren Agency at the time of the filing of this action, and is now doing business as Luxe Agency. This Amended Complaint will continue to refer to Boss Baddies as "Siren" throughout this

FIRST AMENDED CLASS ACTION COMPLAINT

1  Complaint. Siren lists Los Angeles, California as its principal place of business on

2  its website.

3      49.    Defendant **Moxy Management** ("Moxy") was registered on June 21,

4  2021, as a California corporation. Moxy's principal place of business is 19016

5  Devonport Lane, Tarzana, CA 91356.

6      50.    Defendant **Unruly Agency Limited Liability Company** ("Unruly")

7  was registered on March 20, 2020, as a California limited liability company.

8  Unruly's principal place of business is 8581 Santa Monica Boulevard, Suite 403,

9  West Hollywood, CA 90069. On information and belief, Unruly is doing business

10  as Unruly Agency. Upon information and belief, **Dysrpt Agency** ("Dysrpt") is a

11  trademark of Unruly and Unruly is also doing business as Dysrpt. Defendant

12  **Behave Agency LLC** ("Behave") was originally formed in Delaware on June 24,

13  2020. On December 12, 2021, Behave was registered in California as a foreign

14  LLC. Behave's principal office address is 16192 Coastal Highway, Lewes,

15  Delaware 19958. On information and belief, Behave is a subsidiary of Unruly.

16  Together, Unruly, Dysrpt, and Behave will be referred to in this Complaint as the

17  "Unruly Defendants."

18      51.    Defendant **A.S.H. Agency** ("A.S.H.") was formed by well-known

19  adult film star Riley Reid in 2021. On information and belief, A.S.H.'s principal

20  place of business is 299 Patrician Way, Pasadena, CA 91105.

21      52.    Defendant **Content X, Inc.** ("Content X") was registered on

22  September 1, 2020, as a California corporation. Content X's principal place of

23  business is 21800 West Oxnard Street, Suite 940, Woodland Hills, California

24

25

FIRST AMENDED CLASS ACTION COMPLAINT

91367. On information and belief, Content X, Inc. is doing business as Content X Studios.

53.     Defendant **Verge Agency, Inc.** ("Verge") was originally formed in Delaware on March 24, 2021. On March 3, 2023, Verge Agency, Inc. was incorporated as a California corporation. Verge Agency, Inc.'s principal place of business is 10960 Wilshire Boulevard, 5th Floor, Los Angeles, California 90024. On information and belief, Verge Agency, Inc. is doing business as Verge Agency.

54.     Defendant **Elite Creators LLC** ("Elite Creators") is a Florida LLC registered in June 2022. Defendant Creators Inc. ("Creators Incorporated") is a Florida corporation registered in September 2022. In documents filed with the Florida Secretary of State, Elite Creators is listed as the only officer or director of Creators Incorporated. On information and belief, Elite Creators provides its "management services" in conjunction with multiple other companies, all of whom do business under the Creators Inc. brand. The two Defendants named in this paragraph will be referred to in this Complaint as "Creators Inc."

## IV.    FACTS

## A.    History of OnlyFans

55.     OnlyFans was founded in 2016 by 33-year-old British tech entrepreneur and investor Timothy Stokely, who had previously owned similar niche- and/or custom-pornography sites including GlamGirls, GlamWorship, and Customs4U, and would go on to be described as "the king of homemade porn."[9]

---

[9] Charlotte Colombo, *Meet the king of homemade porn — a banker's son making millions*, THE TIMES (Sept. 14, 2021), www.thetimes.com/uk/society/article/meet-the-king-of-homemade-porn-a-bankers-son-making-millions-z9vhq9c9s (last visited April 23, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

56.     Perhaps unsurprisingly given Stokely's background, OnlyFans immediately became dominated by (and known for) adult content and quickly acquired a significant user base. Within its first month, OnlyFans had over 1,000 paying subscribers, and the platform grew quickly from there, reaching 10,000 users by September 2016, and 100,000 users by January 2017. By mid-2018, the platform had over 1 million users and had paid out over $10 million to Creators.

57.     That same year, venture capitalist Leonid Radvinsky bought a controlling share in Defendant FIL, the company Stokely had incorporated to house the OnlyFans brand. Radvinsky, already the owner of one of the world's largest webcam sites,[10] was a veteran in the online pornography industry. He was also a veteran in the online deception business: at age 17, he helped start a company that made money by funneling traffic to pornography sites by falsely claiming to offer "hacked" and/or "illegal teen" passwords.[11]

58.     OnlyFans continued to grow steadily after the change in ownership, but the growth of its initial few years was dwarfed by the growth of the platform during the COVID-19 epidemic.

59.     Just between March and April 2020, both the Fan base and the number of Creators on the platform grew by 75%, with the site becoming widely known enough that pop icon Beyoncé mentioned the platform in a song that year—

---

[10] On MyFreeCams, adult models broadcast themselves stripping or performing sex acts online in exchange for tips from viewers. *See* Matthew Field, *The elusive porn baron behind OnlyFans*, THE TELEGRAPH (October 1, 2022), https://web.archive.org/web/20240501112404/https://www.telegraph.co.uk/business/2022/10/01/elusive-porn-baron-behind-onlyfans/# (last visited April 23, 2025).

[11] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

boosting its recognition even further. Over the next year, multiple "mainstream" celebrities joined the platform, introducing OnlyFans to their existing Fans—many of whom, judging by the numbers, joined the platform as well.

60.    By the end of the fiscal year 2020, more than 1.6 million Creator accounts had been created on the platform, and over 82 million Fans had signed up. Transactions on the platform in 2020 increased by 553%—to $2.4 billion.

61.    In 2021, FIL reported an over 600% increase in profits—from $61 million in 2020 to $433 million in 2021.

62.    According to publicly filed financial statements from FIL, the vast majority of OnlyFans' revenue comes from the 20% it collects from the content Creators. Since 2019, FIL has reported "major sources" of revenue in only two categories—both of which represent OnlyFans' cut of revenue generated by content Creators on the platform: "subscription-based payments," which the company describes as "transactions where the group facilitates Creator's providing content to Fans for a period of time," and "non-subscription-based payments," which include "one-time transactions such as messaging and access to content, that the group facilitates between the Fans and the Creators." The specific numbers are reproduced in **Figure 1**, below.

| Fiscal Year Ending | Subscription-based Revenue | | Non-subscription-based Revenue | | Total Revenue |
|---|---|---|---|---|---|
| 2019-11-30 | $87,000,000 | + | $73,000,000 | = | $160,000,000 |
| 2020-11-30 | $285,000,000 | + | $263,000,000 | = | $548,000,000 |

-16-

011194-11/2686242 V1

| Fiscal Year Ending | Subscription-based Revenue | | Non-subscription-based Revenue | | Total Revenue |
|---|---|---|---|---|---|
| 2021-11-30 | $489,000,000 | + | $443,000,000 | = | $932,000,000 |
| 2022-11-30 | $522,000,000 | + | $568,000,000 | = | $1,090,000,000 |

*Figure 1. Defendant FIL's annual revenues as reported in the company's publicly filed financial statements, including Fenix International Limited, Annual Report and Financial Statements (covering Dec. 2021 to Nov. 2022, Dec. 2020, to Nov. 2021, Dec. 2019 to Nov. 2020, Dec. 2018 to Nov. 2019).*

63.    In 2021, after OnlyFans' recorded record profits, the magazine Fast Company declared OnlyFans one of the "10 most innovative social media companies of 2021"—lauding the ability to find "creative ways to sell intimacy during a time of social distancing," and describing it as a "clever hack of the social sphere to monetize exclusive content."[12]

**B.    How OnlyFans Makes Money**

64.    The financial mechanics of OnlyFans' "clever hack" revolve around the multiplicity of ways that the platform has to part Fans from their money—all of which take advantage of various psychological biases and phenomena to steadily escalate Fan engagement and willingness to pay.

65.    The basic Fan experience on OnlyFans is like other social media sites. When a Fan logs in, they see their "home" screen, which features a "feed" containing posts—either from Creator accounts the Fan has subscribed to, or suggested posts from OnlyFans. Even before a Fan subscribes to any Creator

---

[12] Sarah Flynn, *The 10 Most Innovative Social Media Companies of 2021*, FAST COMPANY (Mar. 9, 2021), www.fastcompany.com/90600321/social-media-most-innovative-companies-2021 (last visited April 23, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

profiles—and thus before OnlyFans "knows" anything about the Fan—OnlyFans automatically begins to populate the Fan's feed with sexually suggestive content. *See* **Figure 2** (New User Home Page).



***Figure 2****. New User Home Page.*

66.    The site also automatically begins "suggesting" free Creator profiles that a Fan might want to subscribe to. With an account, Fans can click on these profiles, but can see only "teaser" pages for a given Creator, containing a small profile photo, a banner photo, and placeholder posts in which Fans can see the text of a post but not the photo. *See* **Figures 3 & 4**.

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

1

2

3

4

5

6

7

8

9

10

11

12

13



***Figure 3**. Teaser Page.*

14

15

16

17

18

19

20

21

22

23

24



***Figure 4**. Teaser Post.*

25

-19-

FIRST AMENDED CLASS ACTION COMPLAINT

67.    To see additional content, a Fan must subscribe to a Creator's page.

68.    Clicking "Subscribe" then begins the barrage of "monetization opportunities" that made the OnlyFans platform popular with Creators initially.

69.    For "Paid Accounts"—*i.e.*, those requiring a paid subscription—Fans must agree to pay a monthly fee ("Subscription Fee"), which is set through the Creator Account. On information and belief, Agency Defendants set the Subscription Fee for each of their Represented Creators.

70.    OnlyFans' Terms of Service require Fans to agree to "auto-renew" any subscription they sign up for.[13] This can be modified, but only by taking the affirmative step of turning the auto-renew function "off" in the account settings— and only *after* the Fan signs up for the subscription.

71.    To subscribe to *any* account—even a "Free Account"—Fans must add a payment card to their account.

72.    This makes sense, because while Free Accounts do not charge a monthly Subscription Fee, those accounts can still charge Fans in multiple ways, including:

    a. **PPV (Pay-Per-View) Content**, which can be offered via direct messages, posts, and/or live streams. OnlyFans emphasizes that especially "[f]or free profiles, using PPVs effectively is crucial to maximizing monetization on OnlyFans."; and

    b. **Creator Tips**, which can be in amounts up to $200, but without any limitation in a given timeframe, and can also be collected via posts,

---

[13] Terms of Use for Fans ¶ 8(h), ONLYFANS, https://onlyfans.com/terms (last visited June 29, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

messages, streams, or just through a direct link on a Creator's profile.

OnlyFans recommends that, to "maximize monetization," Creators

have a "tip menu":

> **Create A Tip Menu**
> You can accept tips over DM in exchange for custom
> content, special requests, advice, recipes, lessons,
> or almost anything else. Many OnlyFans creators choose
> to put a tip menu on their pinned post, offering different
> types of content or engagement in exchange for tips.[14]

73.    Indeed, OnlyFans specifically touts the high monetization potential of

its free Creator accounts. The Creator Center portion of its website emphasizes:

> **Free Accounts Still Earn Money**
> It might surprise you that some of the highest-earning
> creators on OnlyFans don't charge monthly
> subscription fees. Consider the other advantages that
> free accounts offer:
> • On average, free accounts gain subscribers more
> quickly
> • Fans are less likely to unsubscribe when you take
> content breaks
> • Free accounts have access to pay-per-view posts and
> streams, and can require Fans to tip first before sending
> a direct message[15]

74.    Many free profiles, however, are simply "teaser" accounts intended to

funnel Fans to accounts that require a paid subscription.

75.    Indeed, OnlyFans encourages the use of multiple accounts to slowly

reel in customers, encouraging Creators to "**Build Your Own 'VIP Section'**":

---

[14] Blog Post, *Creator Center*, *Maximizing Monetization*, ONLYFANS,
https://blog.onlyfans.com/creator-center/ (last visited April 23, 2025).

[15] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

> A free profile paired with a paid subscription profile is
> another approach creators use to monetize on
> OnlyFans. By **teasing some content** on a free profile,
> you can let your subscribers know that there's more to
> unlock when they upgrade to your paid profile.
>
> Two tiers of access creates [sic] a low-pressure
> environment for you to cultivate new fans. Plus, it gives
> your "VIPs" a way to stay connected with you if they
> ever need to drop down a tier.[16]

76.    Together, Subscription Fees, charges for PPV Content, and Creator Tips will be referred to as "Premium Content Fees" throughout this Complaint.

77.    OnlyFans' platform took off, in large part because of the offer to engage in a connection—a two-way street—with the Creators. Indeed, from academics to marketing professionals, it's difficult to find any serious analysis of OnlyFans' success that doesn't attribute a large part of that success to its promise of "direct connection" between Creators and Fans. Commentators almost universally agree that the predominance of sexually explicit content on the platform—while it may play a large part in its initial attraction—cannot by itself explain OnlyFans' spectacular growth.

78.    Instead, the site's most potent lure (and hook) is "the ability to interact directly with one of the content creators." This differentiates it from pornography, which, "while explicitly sexual, does not offer a personal relationship that one can curate for individuals."[17] And, on top of this, as one commentator wrote of

---

[16] Blog Post, *Creator Center, Advanced Earnings Tools*, ONLYFANS, https://blog.onlyfans.com/creator-center/ (last visited April 23, 2025).

[17] Julian Frazier, *The Dark Psychology of OnlyFans*, MEDIUM (Sep 22, 2022), https://medium.com/@julian.frazier.phd/the-dark-psychology-of-OnlyFans-735c22efde6 (last visited April 23, 2025).

OnlyFans' meteoric rise, "The platform was already compelling due to its sexually charged content, but what supercharged the content itself was its ability to be the "supply" for the "demand" of loneliness."[18]

79.    Fans themselves have confirmed this insight. One Fan, upon discovering that he had been misled into communicating with Chatters and not the model he was following, asked *"Why would anyone go on OnlyFans in the first place, when you can get content almost anywhere (free in most cases)? The opportunity to Direct Message the Creator you are subscribed to."*[19]

80.    This explanation for the success of OnlyFans is echoed again and again in media coverage of the site—and by OnlyFans itself, often directly quoting Creators. For example, in a 2019 blog post, OnlyFans profiled a British model, noting that "her advice for OnlyFans creators is to prioritise communication with their fans," and highlighting a quote in which she emphasizes how critical "direct" messaging is for a Creator's bottom line:

> One of the most important things to remember to do is to answer all of your DMs! I know this may seem like a daunting job if you have fallen behind on them, but it's so important. **A lot of people join up just so they can chat with you on a one to one level.** Ignoring DMs or not replying before sending out a mass message could be losing you money. You could miss custom requests,

---

[18] *Id.*

[19] User Post, *Was not chatting to the creator I was subscribed to*, PISSED CONSUMER (May 12, 2023), https://onlyfans.pissedconsumer.com/32/RT-P.html?sort=latest#reviews (last visited July 29, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

important questions, requests for videos, tips for pics etc. This is a sure way of losing loyal subscribers![20]

## C.    OnlyFans falsely promises Fans "authentic" and "direct" connections with Creators.

81.    OnlyFans is not coy or allusive about the fact that the core promise of its platform hinges on the **authenticity of the personal interaction between Fans and Creators**. Its marketing consistently revolves around this idea. Its website and other public statements teem with references to "authenticity" and "direct connection" and "meaningful" engagement.

82.    On the OnlyFans website it has an "about" page, which promises "authentic connections," as follows:[21]

> OnlyFans is the 18 + subscription platform empowering creators to own their full potential, monetize their content, and develop authentic connections with their fans.

83.    The OnlyFans website also has a page titled: "Our Mission, Vision and Values," which has been on the website since at least May 2022.[22]

84.    One of OnlyFans' "Core Values" is titled "Empowerment – We Give You Control," which states: "Giving creators control to own and monetize their content and to foster *authentic relationships* with their followers and fanbase."[23]

---

[20] Blog Post, *How to Earn More on OnlyFans*, ONLYFANS (Oct. 21, 2019), https://web.archive.org/web/20200518163750/https://blog.OnlyFans.com/how-to-earn-more-on-OnlyFans/ (last visited April 23, 2025).

[21] About, ONLYFANS, https://onlyfans.com/about (last visited April 23, 2025).

[22] Our Mission, Vision And Values, ONLYFANS, https://onlyfans.com/values (last visited April 23, 2025).

[23] *Id.* (emphasis added).

85.     The "Creator Center" portion of the site introduces OnlyFans as "revolutionizing the way creators connect with their online communities," and boasts that since 2016 "more than three million creators have joined the OnlyFans platform to share their creativity, monetize their content, and engage meaningfully with their fans."[24]

86.     Describing the types of creators who use the site, OnlyFans emphasizes "models"—on information and belief, the category of creator most likely to be offering sexually explicit content—noting that "[s]ince its launch in 2016, models have flocked to OnlyFans to take ownership of how their image is monetized and to directly engage with fans."

87.     OnlyFans has used this type of language since the platform began. For example, an archived version of the OnlyFans home page from 2017 contains this mission statement:

> OnlyFans is the social platform **revolutionizing creator and fan connections.** The site is inclusive of artists and content creators from all genres and allows them to monetize their content **while developing authentic relationships with their fanbase.**

88.     OnlyFans urges Fans to subscribe to specific Creators using the following language:

> **SUBSCRIBE AND GET THESE BENEFITS:**
> Full access to this user's content
> **Direct message with this user**
> Cancel your subscription at any time

---

[24] Creator Center, ONLYFANS, https://blog.onlyfans.com/creator-center/) (last visited April 23, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT

89.     This language is automatically generated by OnlyFans, cannot be removed or modified by Creators, and ***appears on every single creator's profile.*** As soon as a user clicks the "Subscribe" button on ***any*** Creator profile—paid or free— a popup containing the subscription benefits language (and request for a payment card) appears:



***Figure 5***. *Subscription Benefits Pop-up.*

90.     Direct messaging or "DM" has a very specific meaning. It indicates that messages are being sent between two people, they are only visible to the sender and recipient, and they are being sent in real time.[25]

91.     OnlyFans' marketing on Social Media, like Twitter/X (referred to herein as Twitter) and Instagram likewise often and repeatedly endorsed, published, and emphasized the opportunity to "direct message," "DM," directly "chat," chat "1 on 1," and build personal and authentic relationships with specific Creators. Some of the many examples include:

---

[25] *See* Blog Post, *What is direct messaging?*, SLACK, https://slack.com/blog/collaboration/direct-messaging-guide#:~:text=Direct%20messaging%20is%20a%20private,your%20conversation%20history%20for%20reference (last visited July 29, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

a. On January 17, 2021, OnlyFans posted this quote from a Creator on Twitter: [26]

> "What I love most is the **direct messaging**. I'm able to chat to get to know and give each person more time" Jade Ramey. Have you chatted with Jade on OnlyFans yet? She can't wait to hear from you, so just drop her a message at: onlyfans.com/jaderamey #CreatorReviews

b. On February 9, 2021, OnlyFans posted on Twitter:[27]

> Go loco as the fabulous @anitta has officially joined us on OnlyFans! The Brazillian [sic] superstar is here to invite you to her world where you can catch her most exclusive content. She's so excited to meet you and **you can even chat with her 1 on 1** at: onlyfans.com/anitta

c. On February 20, 2021, OnlyFans posted on Twitter:[28]

> Prepare for chaos and fun as @harryjowsey has joined us on OnlyFans 👀 You now have the opportunity to **chat with Harry 1 on 1** and check out exclusive content you won't find anywhere else. So if It's not too hot to handle, connect with him at: onlyfans.com/harryjowsey

d. In the accompanying promotion video, Harry Jowsey, who is managed by Unruly, says: "I'll also be able to **talk to you 1 on 1**, we can chat every single day, who knows where we'll take this."[29]

---

[26] @OnlyFans, TWITTER (Jan. 17, 2021), https://twitter.com/OnlyFans/status/1350895752571211777 (last visited July 29, 2024) (emphasis added).

[27] @OnlyFans, TWITTER (Feb. 9, 2021), https://twitter.com/OnlyFans/status/1359230912416935936 (last visited July 29, 2024) (emphasis added).

[28] @OnlyFans, TWITTER (Feb. 20, 2021), https://twitter.com/OnlyFans/status/1363247215351894019 (last visited July 26, 2024) (emphasis added).

[29] *Id.*

-27-
FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

e.  On May 26, 2021, OnlyFans posted on Twitter:[30]

> Get the bod of your dreams with Amanda Lee on OnlyFans! 🔥 The famous personal trainer, influencer, and fitness mom has joined us and is so excited to share her exclusive content and ***chat to all her fans in the DMs*** ❤️ So come say hi to: onlyfans.com/amandaeliselee 💋

f.  On September 10, 2021, OnlyFans posted this quote from a Creator on Twitter:[31]

> Are you subscribed to adult creator 'Miss Hannah Nicole' on OnlyFans yet? 👀 🔥 Hannah is sharing unseen exclusive photos, videos, and ***loves getting to know her fans in the DMs*** 💋 😝 So head over and chat with her at: onlyfans.com/misshannahnico….

g.  On December 22, 2021, OnlyFans posted this quote from a Creator on Twitter:[32]

> "OnlyFans gave me a chance to share a different side of myself" heart 💛 DE Laura Vetter shares exclusive lifestyle & travel content and ***loves getting to know her fans 1-on-1***! 💨 📷 So introduce yourself at: onlyfans.com/lauravetter 💬 #OnlyFansAdvent

---

[30] @OnlyFans, Twitter (May 26, 2021), https://twitter.com/OnlyFans/status/1397646448502640644 (last visited April 23, 2025) (emphasis added).

[31] @OnlyFans, Twitter (Sept. 10, 2021), https://twitter.com/OnlyFans/status/1436381823446228994 (last visited April 23, 2025) (emphasis added).

[32] @OnlyFans, Twitter (Dec. 22, 2021), https://twitter.com/OnlyFans/status/1473752805982752782 (last visited July 26, 2024) (emphasis added).

-28-

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

h. On January 6, 2022, OnlyFans posted this quote from a Creator on Twitter:[33]

> Did you know that actress, Influencer, and model @jordynwoods is on OnlyFans? ❤️ 😄 Jordyn can't wait to **chat with you**, share exclusive lifestyle content, and so much more! 💬 📷 So discover a new side of 'Heir Jordyn' at: onlyfans.com/jordynwoods #OnlyFanscreators

i. On October 22, 2022, OnlyFans posted this quote from a Creator on Twitter:[34]

> "OnlyFans has been an amazing platform for me to **connect with my fans on a deeper level**, and I am so grateful for that!" - @rozmro

j. On September 30, 2022, OnlyFans posted this quote from a Creator on Twitter:[35]

> "I love that on OnlyFans I can **talk one-on-one with my fans** and use my creativity to create new and dynamic content for them. It's the perfect platform for sharing things I don't upload to my other social media accounts." - TV host/model @pattylopezdelac, bit.ly/3dS4itt

---

[33] @OnlyFans, TWITTER (Jan 6, 2022), https://twitter.com/OnlyFans/status/1479106211383369733 (last visited July 26, 2024) (emphasis added).

[34] @OnlyFans, TWITTER (Oct. 22, 2022), https://twitter.com/OnlyFans/status/1583900250489511937 (last visited July 29, 2023) (emphasis added).

[35] @OnlyFans, TWITTER (Sept. 30, 2022), https://x.com/OnlyFans/status/1575895007659233285 (last visited July 29, 2024) (emphasis added).

k.  On November 2, 2022, OnlyFans featured a Creator in this Instagram post:[36]

> Get to know the more personal side of @pamibaby.
> She's ***chatting with her fans*** on OnlyFans!
> Subscribe at: PamiBaby
> #WelcomeToOnlyFans #PamiBaby

l.  On November 16, 2022, OnlyFans posted this quote from a Creator on Twitter:[37]

> "Onlyfans has given me the opportunity to build an authentic community & connect with my fans 1-on-1 while allowing me to work on my own schedule & achieve financial freedom." - @whothefiskait
> 👉Connect with #KaitlenVilla on OnlyFans!

m.  On December 16, 2022, OnlyFans posted on Twitter:[38]

> Meet the Sims that started it all, @Chloe_Sims " She's ***responding to DMs***, making ***custom content***, and more on OnlyFans!

n.  On March 9, 2023, OnlyFans posted this quote from a Creator on Twitter:[39]

---

[36] @OnlyFans, INSTAGRAM (Nov. 2, 2022), https://www.instagram.com/p/CkeGR5zMSJ5/?hl=en (last visited July 19, 2024) (emphasis added).

[37] @OnlyFans, TWITTER (Nov. 16, 2022), https://x.com/OnlyFans/status/1592981269775646720 (last visited July 26, 2024) (emphasis added).

[38] @OnlyFans, TWITTER (Dec. 16, 2022), https://x.com/OnlyFans/status/1603935543720656897 (last visited July 26, 2024) (emphasis added).

[39] @OnlyFans, TWITTER (Mar. 9, 2023), https://x.com/OnlyFans/status/1633932464627548160 (last visited July 26, 2024) (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT

> "OnlyFans gives me a space to express myself and let off steam after my shift at the hospital ends. I love being able to chat with people ... and share a side of myself that not everyone gets to see!" - @Samthenurse13
> 🩺 The nurse will see you now: onlyfans.com/samanthalacey82

    o.  On May 3, 2024, OnlyFans posted this quote from a Creator on Instagram:

> "I've been a creator on OnlyFans for years, and I can't imagine life without this platform! I'm so grateful for all the amazing people I've met along the way. OnlyFans empowers me to express myself while ***connecting personally*** with my fans."[40]

    p.  On July 17, 2024, OnlyFans posted this quote from a Creator on Instagram:

> "Since joining OnlyFans in 2018, I have made so many amazing ***connections with my fans*** and built ***genuine relationships***."[41]

    92.    The problem, of course, is that truly "direct," "1 on 1," "genuine," and "authentic" communication doesn't "scale up" very well, which means that OnlyFans' representations to Fans are directly at odds with its business model.

---

[40] @OnlyFans, INSTAGRAM (May 3, 2023), https://www.instagram.com/p/C6hHkbNvRAv/?hl=en&img_index=1 (last visited July 26, 2024) (emphasis added).

[41] @OnlyFans, INSTAGRAM (Jul. 19, 2024), https://www.instagram.com/p/C9iEaYWvDLE/?hl=en&img_index=1 (last visited July 26, 2024) (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT

**D.    OnlyFans allows the "Chatter Scams" because it financially benefits OnlyFans.**

93.    In economic theory terms, OnlyFans is what economists call a "two-sided market" or a "two-sided platform."[42] But the idea that OnlyFans is merely a facilitator—providing merely a "marketplace" between two groups of users—obscures the reality that OnlyFans has vastly lop-sided incentives when it comes to protecting the interests of each group, which has resulted in allowing the Chatter Scams to increase its own profits.

94.    Because OnlyFans takes a cut of Creators' revenues—and those revenues represent the vast majority, if not all, of OnlyFans' own revenues—OnlyFans' ability to increase its own profit relies in large part on its ability to attract *Creators*—something it has done by emphasizing their ability not just to make money from their content, but to increase that money exponentially by increasing and communicating with their Fan base.

95.    The primary narrative of OnlyFans' own documents—in both publicly filed financial reports and public-facing materials (including the OnlyFans website)—revolves around the platform's goal of "empower[ing]" Creators to monetize their content. For example, FIL's financial reports filed in August 2023 emphasize that "[a]s OnlyFans continues to grow, The Group continues to invest in the scaling and development of the platform and product development **to better serve the Creator community** and to enhance its best in class safety controls."[43]

---

[42] Two-sided market, WIKIPEDIA, https://en.wikipedia.org/wiki/Two-sided_market (last visited July 29, 2024).

[43] *Fenix International Limited Strategic Report for the Year Ended 30 November 2022*, filed with UK Companies House at 1, https://find-and-update.company-

FIRST AMENDED CLASS ACTION COMPLAINT

96.     OnlyFans' marketing was geared almost exclusively towards Creators for at least the first few years of its existence.

97.     For example, until at least mid-2019, OnlyFans' home page featured, on one side, a "Subscribe" button with the tagline: "Sign up to make money and interact with your fans!" On the other side, it showed an image of a smartphone screen containing an "About" page for OnlyFans designed to look like a settings screen, with emphasis on the details of how (and how much) OnlyFans pays Creators. *See below*, **Figure 6**.



**Figure 6**. *OnlyFans Home Page, geared toward Creators—not Fans.*

information.service.gov.uk/company/10354575/filing-history/MzM5MDY3MzE3MWFkaXF6a2N4/document?format=pdf&download=0 (last visited Jul. 28, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

98.    Only much later did OnlyFans change the subscription tagline to the more Fan-focused tagline: "Sign up to support your favorite creators."

99.    Because OnlyFans profits when Creator accounts profit, OnlyFans has no incentive to protect Fans' interests and every incentive to encourage anything—or any entity—that increases a Creator's revenue and makes good on the platform's promise to "empower" Creators, regardless of the consequences for Fans.

100.    Perhaps the most egregious activity implicitly encouraged and purposely overlooked or permitted by OnlyFans is the use of professional "chatters" to impersonate OnlyFans Creators in order to manipulate Fans into paying as much as possible for PPV content and tips, and to turn a single Creator account into as many "personal" relationships as possible—24 hours a day, 7 days a week. This Complaint refers to this as the "Chatter Scams."

**E.    Anatomy of the Chatter Scams**

101.    The Chatter Scams are primarily perpetrated by "management agencies" such as the Agency Defendants on behalf of and at the direction of the Creators. As described in more detail below, these agencies sell their services to OnlyFans Creators with promises that they can increase a Creator's revenue exponentially—without the Creator ever having to actually do what OnlyFans promises: "directly connect" with Fans. Together, the Creators and Agency Defendants work in unison to sign up as many Fans as possible while ensuring the Creators have no real role in communications with their Fans.

102.    Unlike simply posting content and charging for it, the Chatter Scams involve industrial levels of coordination and data management to convince

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

individual Fans that they are actually having a direct interaction with a given Creator.

103.   On information and belief, once a Creator engages an agency to operate his or her account, the agency takes over and operates all aspects of the Creator's account.

104.   Working in partnership with their Creators—often with full permission and authority from those Creators—agencies contract with Chatters to conduct most, if not all, of the communications between the Creators and the Fans. Without the Fans' knowledge, the Chatters impersonate the Creators when direct messaging with Fans.

1.   **Agencies exploit cheap labor to "farm" money from Fans by deceptively impersonating Creators.**

105.   Agencies often use Chatters of all genders and ages from countries like the Philippines or Venezuela, where they can find relatively well-educated, English-speaking (or even multilingual) workers—but pay them a fraction of what the required skillset would command in the U.S. labor market. On information and belief, most agencies pay Chatters approximately $3–$4 U.S. dollars per hour.

106.   Chatter positions—sometimes referred to using deliberately oblique terms like "account manager" or "virtual assistant"—are openly advertised online, and entire online discussion forums have developed around the jobs. Some forums discuss how to get a chatter job, how Chatters can avoid scammers posing as "legitimate" agencies, what to expect in terms of pay, and even the difficulty of the working conditions.

107.   For example, several Chatters post on the *r/onlyfanschatter* subreddit, where posts have included Chatters discussing the labor abuses they suffer at the

-35-
FIRST AMENDED CLASS ACTION COMPLAINT

1   hands of agencies, such as being forced to work 70-hour weeks or being fired for

2   missing shifts for circumstances outside their control (*e.g.*, power outages). Another

3   chatter lamented the fact that Chatters are being treated like "robots," and felt the

4   need to assert: "We're humans, we feel."

5        108.   One chatter (a man in Venezuela) laid out the logistical difficulties

6   inherent in attempting to convince multiple Fans they were speaking to the same

7   young American model—and spoke in graphic detail about the psychological toll of

8   the job:

9            Talking to hundreds of weirdos per shift while looking
             at their d***s and telling them how big it is (even if it's
10           not) is not that easy. You are always talking to 10–15
             guys at the same time. You also have to send mass
11           DMS (which they think is a dm just for them, but you
             are sending it to everyone) every 15–25 minutes… It's
12           actually a very organized job. I am not saying it's the
             hardest, but definitely consuming. As for the payment,
13           third world country payment so about 500$ monthly for
             us (which is nothing considering each creator's account
14           made 15k-30k monthly

15       109.   Chatters, once hired, are expected to learn as much as possible about

16  the Creator they will be impersonating, and are often given very explicit directions

17  about how to sound as much like the Creator as possible. One journalist who went

18  "undercover" as an OnlyFans chatter described his first assignment like this:

19           The agency's manager sent me a background memo
             about the woman I'd be playing, a purported 21-year-
20           old university student blessed with physical proportions
             that are in vogue these days. **To ensure that my**
21           **performance was as authentic as possible, I spent**
             **two hours committing all of her details to memory:**
22           her favorite programming language, her favorite sushi
             roll, her favorite classic rock band, the width of her rear
23           end. The memo also contained notes regarding her

-36-

FIRST AMENDED CLASS ACTION COMPLAINT

preferred chatting style (**I had to strive to be "40 percent girly"**) and a pricing guide to all the exclusive content in her "vault."[44]

110.    Agencies even provide Chatters with actual "scripts" similar to those used by telemarketers and call center employees, which give Chatters a specific workflow to follow in order to maximize the amount of money extracted from any given Fan. One online commentator described how "each 'chatter' is given a carefully designed script to follow in their messages. The script has been designed, just as a sales script is, to lead the Fan into getting into a 'buying mood' and to end up buying content."

111.    The interactions that often garner the most money are those in which a Fan pays for "custom" PPV content created (ostensibly) specifically for that individual Fan. It is very common for Fans to request custom videos from Creators—often spending hundreds of dollars for a single video.

112.    Agencies must have sophisticated processes in place to facilitate the generation of custom content. The workflow for a given agency might vary slightly, but often looks like a variation of the following:

   a.    The agency requires a Creator to create a certain amount of "stock" content, in the form of prerecorded videos and contemporaneous still photos, on a regular (usually weekly) basis. That content is uploaded to the cloud using a service like Dropbox or Google Drive, which can then be accessed by agency employees or contractors and used to

---

[44] Brendan I. Koerner, *I Went Undercover as a Secret OnlyFans Chatter. It Wasn't Pretty*, WIRED, https://www.wired.com/story/i-went-undercover-secret-onlyfans-chatter-wasnt-pretty/ (last visited July 29, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

populate a Creator's OnlyFans "Vault"—a specific online location provided by OnlyFans and designed to keep "exclusive" content accessible only to paying customers.

b. Acting on behalf of and as the agent of the Creator, the agency provides Chatters with direct access to the Creator's OnlyFans account—whether directly (by providing Chatters with login information) or indirectly (via third-party CRM software described below).[45]

c. Chatters communicate with Fans directly or indirectly through the OnlyFans account, impersonating the Creator in order to sell Fans content from the Creator's Vault and/or obtain Fans' requests for specific "custom" content.

d. When a Fan requests custom content, the chatter notifies the Creator of the request ("Chatter–Fan Communication"). The specific communication technology varies, but on information and belief, always takes place outside of the OnlyFans platform itself—via, for example, a Slack channel, a text or WhatsApp message, a Google spreadsheet, or a third-party CRM application. There, the chatter enters information about the custom request, including:

   i.  The date of request;
   ii. The Fan's name and/or username;

---

[45] Agencies almost universally require Creators, as a condition of "representation" by the agency, to provide direct access to and control over their OnlyFans accounts. Thus, the Creator never has to log into or operate the account for the operation to run smoothly.

-38-

FIRST AMENDED CLASS ACTION COMPLAINT

iii. A link to the Fan's profile on OnlyFans;

iv. The price being charged for the custom content; and

v. A copy of the Fan's original communication providing details about the content desired.

113. In addition to requesting custom content, it is common for Fans to send their own photos or videos ("Fan-Generated Content") to a Creator and ask for the Creator's reaction to the content—in which case the Chatter–Creator Communication may also contain that Fan-Generated Content. Fan-Generated Content often contains extremely private or sensitive material—in some cases, for example, asking a Creator to "rate" some aspect of the Fan's sexual anatomy.

114. Agencies do not require Chatters to be similar in any way to the Creators they impersonate: indeed, reports abound on the internet of Filipino or Venezuelan males being paid to impersonate young American female Creators.

115. These reports—and other details about the Chatter Scams—have increasingly appeared as "exposés" in mainstream publications, including:

    a. The New York Times, which, in May 2022, published an article entitled "The 'E-Pimps' of OnlyFans: Clever marketers have figured out how easy it is to simulate online intimacy at scale, ventriloquizing alluring models with cheap, offshore labor."

    b. Wired Magazine ("I Went Undercover as a Secret OnlyFans Chatter. It Wasn't Pretty.") (May 15, 2024).

    c. El País ("$500 a day to pretend to be a model: The big business behind OnlyFans 'chatters'") (November 2023).

    d. Cosmopolitan Magazine ("Watch out for the OnlyFans pimps: can they really make you millions?") (June 24, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

116.   Some reports describe individual Chatters who are morally conflicted about their work.

117.   For example, the Venezuelan chatter quoted above—after talking about the level of organization required for the job—went on to say:

> I feel bad because I talked to MANY guys who fell in love for a girl who doesn't even know they exist and we had to take as much money as we could from everyone, that was the goal.[46]

118.   And in 2021, Chatters employed by Defendant Unruly Agency sued the agency for wage theft, unlawful termination, and the intentional infliction of emotional distress. As Business Insider reported:

> In the suit, [the Chatters] also broke an informal code of silence around the company by saying Unruly required them "to intentionally lie to, dupe, and mislead fans." . . . The lawsuit, which includes examples of conversations in which account managers pretended to be [model Abby Rao], says that the fans who pay to message Unruly ***clients believe they are "communicating directly with the models,"*** and they, in turn, divulge their "deepest and innermost personal secrets including sexual fantasies and fetishes, marital troubles, suicidal ideations, and other private desires to [the Chatters]."

> "For instance, one fan lamented the demise of his marriage (and provided intimate details regarding the same) and details about his sexual fantasies to [a chatter] believing that she was [Rao], and he continued to send in money on the basis of this deception," the lawsuit says. ***"You're basically a professional scammer," Emma said of working at Unruly.***

---

[46] MediaVSReality, *The Dirty Secrets About OnlyFans that Nobody Seems to Know*, MEDIUM, https://mediavsreality.medium.com/the-dirty-truth-about-onlyfans-c82b5ef1b151 (last visited July 29, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

119.   For the most part, though, the agencies engaged in Chatter Scams don't appear to have any qualms about defrauding Fans—often using terms like "farming" to refer to the process of fleecing or squeezing Fans for as much money as possible.

**2.   The success of Chatter Scams has spawned an entire ecosystem of third-party CRM tools to facilitate the deception of Fans on the OnlyFans platform.**

120.   Multiple companies in recent years have developed specialized tools designed to facilitate the use of a single OnlyFans account by multiple people—including, explicitly, teams of Chatters.

121.   Tools such as Supercreator, CreatorHero, Infloww, and OnlyMonster are customer relationship management ("CRM") platforms designed to allow agency team members to access OnlyFans simultaneously in order to manage Creator accounts and facilitate the Chatter Scams.

122.   On information and belief, the Agency Defendants generally use CRM tools that access the Creator's OnlyFans account and then mirror a single live session inside a multi-seat dashboard. These tools let multiple chatters read and answer DMs concurrently, without ever opening the official OnlyFans interface in a visible browser tab.

123.   The CRM tools generally function by automating interactions with OnlyFans website using various web-based technologies that, on information and belief, intercept messages and content contemporaneously with their transmission, effectively cloning the Creator's inbox across several live user sessions. This provides Chatters and other agency representatives with an alternate platform to

FIRST AMENDED CLASS ACTION COMPLAINT

simultaneously message and otherwise interact with Fans directly through Creator accounts in real time.

124.   In other words, once the CRM platform is enabled, Fan messages sent to a Creator's account are simultaneously intercepted, diverted and routed through the CRM platform, where a Chatter impersonating the Creator can then respond to the Fan through the Creator's account in order to interact with the Fan, solicit subscribers and tips, sell content from the Creator's Vault, and/or obtain Fans' requests for specific "custom" content.

125.   This practice is so prevalent that CRM platforms openly market their services to Creators and Agencies, and have even begun marketing their ability to facilitate Chatter schemes through the use of AI, which allows Chatters to "chat faster, sell easily, and improve on what really matters: building deeper, lasting relationships with fans."[47]

126.   For example, an application called "Supercreator" explicitly advertises to agencies and Creators their ability to facilitate the use of OnlyFans accounts by using Chatters. *See* **Figures 7 & 8** below, all taken from the Supercreator website:[48]

---

[47] Boost sales with AI Copilot, SUPERCREATOR, https://www.supercreator.app (last visited April 23, 2025).

[48] Features, SUPERCREATOR, https://supercreator.app/features/?utm_content=sess_1717808225737_3y8kr0lsb8u (last visited accessed June 7, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT



*Figure 7. Screenshot from Supercreator website.*

*Figure 8. Screenshot from Supercreator website.*

127.    Nor do the agencies appear to have much fear of reprisal from OnlyFans—even though the Chatter Scams blatantly violate OnlyFans' company policies, as described in more detail below.

128.    On information and belief, OnlyFans is aware of the use of CRM software on its platform—as well as the fact that the use of such software violates OnlyFans' Terms of Service—but chooses to do nothing to prevent the use of such

-43-

software in order to continue profiting from the increased revenues facilitated by the CRM software.

**F.    OnlyFans knows or should know that Chatter Scams are rampant on the platform.**

129.    The prevalence of Chatter Scams has long been an open secret to industry insiders, and while OnlyFans sometimes publicly disavows any formal association with the management agencies, myriad evidence supports an inference that OnlyFans is aware of the Chatter Scams.

130.    Indeed, despite the fact that the platform's policies contain specific terms purporting to prohibit Creators from allowing anyone else to even access their accounts, other terms found in the policies specifically contemplate that a Creator might "have an agent, agency, management company or other third party" which not only "assists" the Creator with "the operation of [the] Creator account," but possibly "operates it on…behalf" of the Creator.

131.    Tellingly, however, that language appears *only* in the provisions of the policies purporting to limit OnlyFans' liability for the actions of third parties, where it provides that "Only individuals can be Creators. Every Creator is bound personally by the Terms of Service. **If you have an agent, agency, management company or other third party which assists you with the operation of your Creator account (or operates it on your behalf)**, this does not affect your personal legal responsibility."[49]

132.    One Creator—formerly represented by Defendant Siren Agency— described the incentives for the informal code of silence that exists in the industry

---

[49] Terms of Use for Creators ¶ 7, ONLYFANS, https://onlyfans.com/terms (last visited June 29, 2024) (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT

1    with respect to the use of Chatters by agencies. In an interview posted on YouTube,

2    in which she described the experience of being represented by Siren Agency, the

3    Creator, named Riley, explained:

4              [T]he reason a lot of [OnlyFans] models don't want to
              come forward and tell people what their experience is
5              because [OnlyFans] is supposed to be this fan-based,
              personal experience that you're supposed to get with
6              the model. So if you're saying, "Hey, I had this agency
              messaging for me," they're not going to look at that as,
7              "oh, I wanted to better your experience." It's like,
              "wow, you couldn't even message me. And that's what
8              it's for." So I totally get why people aren't coming out
              and speaking out about it. . . . Nobody wants to say,
9              "Hey, there was someone messaging . . . that wasn't me
              messaging me—but it *was*."
10

11          133.   OnlyFans knows that its Creators are not personally chatting with

12   Fans. For example, OnlyFans promotes that Fans can direct message with Chloe

13   Sims, *see* paragraph 91 *supra*, yet OnlyFans filmed an "OnlyFans Original" reality

14   show that followed Ms. Sims while filming the show. Despite substantial time on

15   camera for a long period of time, nowhere did it show Ms. Sims communicating

16   with Fans. Yet, on information and belief, Ms. Sims brings in over $100,000 a

17   month.

18

19

20

21

22

23

24

25                                                -45-
011194-11/2686242 V1

1

2

134.   But when a Fan communicates with Ms. Sims, she assures them it is her:

 

*Figure 9. Screenshots of Chloe Sims chat.*

135.   Similarly, Denise Richard reportedly makes $2,000,000 a month on OnlyFans. She also tells Fans that they are communicating directly with her, that she is "personally answering" comments, even though she could not possibly be direct messaging with her Fans:

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

1
2
3
4
5
6
7
8
9
10
11



12

*Figure 10.* Screenshot of Denise Richards chat.

13    136.   Plaintiffs never consented to the disclosure of their communications

14   with Creators to third parties—much less the contemporaneous interception of

15   those electronic communications—and nothing on the OnlyFans platform provided

16   any warning or disclosure to Plaintiffs that their messages could be routed to third-

17   party agents impersonating Creators.

18    **1.    OnlyFans actively monitors the traffic on its platform—including
            information that would allow OnlyFans to detect the use of Chatters
            by a Creator account.**
19

20    137.   Evidence of OnlyFans' actual knowledge of the Chatter Scams is

21   bolstered by evidence that if nothing else, OnlyFans *should know* about the scams

22   from monitoring its platform—something it not only admits doing, but actively

23   touts as part of its emphasis on "safety."

24

25

138.   In 2022, for example, OnlyFans' then-CEO Ami Gan told Time magazine that "[s]afety is ultimately the foundation of our entire business," boasting that the company's verification protocols were so robust that "we have no anonymity on the platform; we know who everyone is." She went on to describe what she called the platform's "very robust content moderation," confirming that not only can OnlyFans monitor the activity happening on Creator accounts, but the company prides itself on doing so:

> Everything on OnlyFans, we see it, we're able to view it, moderate it, and make sure that everyone is following our terms of service. While we do use some automated technologies to help us prioritize content, ultimately everything on the site is reviewed by a human.[50]

139.   These statements are also consistent with OnlyFans' Privacy Policy, which claims to be collecting customer data ***for the specific purpose of detecting deceptive activity***— explaining that one of the reason the company collects and processes customer data is the purpose of "[m]onitoring transactions and company network, systems, applications, and data" in order to, among other things, "detect malicious, deceptive, fraudulent, or illegal activity."[51]

140.   This not only (falsely) suggests to Fans that OnlyFans is actively trying to prevent fraud and deceptive conduct but demonstrates that OnlyFans has the *ability* to do so given the type of data it collects.

---

[50] Raisa Bruner, *OnlyFans CEO Ami Gan Wants to Dispel Misconceptions About the Company*, TIME (July 31, 2022), https://time.com/6202306/onlyfans-ceo-ami-gan-interview/ (last visited July 29, 2024) (emphasis added).

[51] Privacy Policy ¶ 11, OnlyFans, https://onlyfans.com/privacy (last visited July 29, 2024).

011194-11/2686242 V1

141.   For example, data gathered about the use of the "company network" or "systems" includes information about how many different devices are logged into an account at a given time, as well as where those devices are located. The fact that OnlyFans routinely gathers this information is evident in the "security" emails it sends to users when an account is accessed from a new device or a new location, *see* **Figure 11** *below*—and the fact that it even provides account holders (both Fans and Creators) with information on specific "login sessions" occurring on their accounts, *see* **Figure 12** *below*.



**Figure 11**. *Email sent from OnlyFans to a user after a new login attempt.*

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10



11
12

*Figure 12. Screenshot of OnlyFans User Account showing multiple active login*

*sessions, including the IP address from which each session originates.*

13    142.   Although this information is ostensibly provided in order to put

14  account holders on notice of potentially unauthorized or malicious activity, the fact

15  that OnlyFans sends such notices demonstrates that the platform routinely collects

16  information sufficient to put the company on notice that Creator accounts are using

17  Chatters, including: (1) the number of devices logged into an account

18  simultaneously, (2) the location of every device that logs into an account, and (3)

19  the frequency and duration of logins, including those from different locations.

20    143.   On information and belief, OnlyFans also tracks information on

21  message traffic between Fans and Creator accounts that would indicate the use of

22  Chatters even where agencies attempt to hide the location of their Chatters.

23    144.   Thus, even if agencies or CRM platforms attempt to "mask" the

24  number of concurrent users—for example, by routing traffic through shared IP

25
FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

addresses or simulating a single device login—OnlyFans would have logged

simultaneous message transmissions at volumes that no individual could plausibly

generate.

145.    Any suggestion that OnlyFans is ignorant of the fact that Creators hire

agencies to manage their accounts is undermined by the fact that not only was

OnlyFans' original marketing focused entirely on the Creator-side of the platform

(as described above), OnlyFans has specifically marketed directly to the agencies

themselves.

146.    The archives of the OnlyFans Blog show a post in February 2019 titled

"Unlocking the earning potential for agencies and talent managers," which

explained that "as brands and manufacturers look to access influencers that

synergise with their audience demographic, *agencies have become a key ally to*

*help develop subliminal content marketing campaigns and connect brands with*

*the right type of influencer*."[52]

> Whilst OnlyFans has become a major force in the
> influencer market, enabling content creators to connect
> with fans on a higher value basis by attracting
> subscribers from their loyal fanbase, **our platform also**
> **provides a substantial opportunity for agencies,**
> **agents and influencer management companies.** With
> content creators delivering exclusive content on
> OnlyFans, adding value to what they do on their
> mainstream platforms, typically 1%-5% of their
> audiences are gravitating to their OnlyFans account and
> paying for their content, at a subscription rate
> determined by the influencer.

---

[52] Blog Post, ONLYFANS, *Unlocking the Earning Potential for Agencies and Talent Managers,* https://web.archive.org/web/20220811014012/ https://blog.OnlyFans.com/unlocking-the-earning-potential-for-agencies-and-talent-managers/ (last visited July 29, 2024) (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

It also provides a differential to free-to-view platforms by encouraging a ***different kind of connection via direct messaging*** and requests for personalised content and ***1-on-1 interaction.***

This model has proved highly effective. In just two and a half years, OnlyFans has amassed 50,000 content creators globally and it has paid out in excess of $100m to them in subscriber income. Indeed many boost their income via our referral programme too, receiving 5% of incomes from new creators they introduce to OnlyFans. This is additional to the incomes they receive from brand deals and ambassadorships.

With agencies playing a pivotal role through their connections with influencers and the handling of their commercial interests via brand campaigns, ambassadorships and campaign management services, **the opportunity for agencies to gain by association with OnlyFans returns two primary benefits.**

Next, it provides a significant final incentive for the agency to boost their own income by referring their network of influencers.[53]

147.    Then, in a section titled "HOW YOUR AGENCY BENEFITS," OnlyFans provided a graphic representation of an "example agency model" in which the agency's annual income from the platform totaled nearly half a million dollars, suggesting that that engaging with the platform "and making OnlyFans a part of your agency proposition" could make a "significant impact on agency incomes" and that "***OnlyFans provides a lucrative opportunity for creators and***

---

[53] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

*agencies*," so "[w]hy not give us a call or email us to discuss the potential of OnlyFans to your agency business and influencer communities?"[54]

148.   Not only did the post generally refer to income-generating opportunities, though. It also specifically referred to the "***additional income opportunities***" an agency might gain from "***assist[ing] creators on their subscriber content*** and campaigns for brands"—and strongly suggested that such assistance by agencies would in fact be critical to the ability of Creators to monetize content:

> Ensuring subscriber numbers grow and are retained ***comes down to ensuring the content experience is enhanced for paying fans,*** who are really at the heart of this. It's not simply a matter of expecting fans to pay for what they already get on Instagram, or other social platforms, for free. ***Getting this right depends of*** [sic] ***the expertise of agents to manage their creator communities*** and, in doing so, it provides a longterm income stream for creators and agency businesses.[55]

149.   The post was still on the OnlyFans website as of August 2022.

**2.    Fans who discovered the Chatter Scams claim to have directly contacted OnlyFans only to be ignored.**

150.   In addition to the media exposés described above, online complaints by Fans who have discovered the scams have not only outlined the deception in detail, but specifically described complaining directly to OnlyFans, only to be ignored—or even retaliated against.

151.   One Fan wrote a post entitled "OnlyFans - Was not chatting to the Creator I was subscribed to," in which the Fan detailed the process by which they learned that they had not been chatting with a Creator, but with a paid Chatter:

---

[54] *Id.*

[55] *Id.* (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

Why would anyone go on OnlyFans in the first place, when you can get content almost anywhere (free in most cases)?

The opportunity to Direct Message the creator you are subscribed to (DM). I was subscribed to a model who has a well established career outside of OnlyFans, so I know some things about her already. If I asked any questions about her past work which I am curious about, she would not answer. Instead, **there was always a push to unlock content.**

The creator sent a preview pic where there was a guitar in the photo behind her. She is known as a guitar player and enthusiastic guitar collector in real life. I asked: "What make of guitar do you have there in the picture?" The answer: "I will check when I get back home. It was a gift from my mom." I was stalled for over 20 minutes before the creator returned with an answer which was Ibanez, which is a guitar brand. The fact that a guitar enthusiast didn't know what make her guitar was ringing alarm bells. It wasn't the creator I had been chatting to. She has hired a 'catfish' to impersonate her.

This is a complete betrayal of trust, especially when you consider that I had said many things to this person in confidence, thinking it was the creator.

This is literally fraud. It is a scam which is being perpetrated by creators on OnlyFans across the board. **OnlyFans are ultimately responsible for this.**

Naturally, I complained to their tech support. They're useless. They said that [OnlyFans] do allow creators to hire a 3rd party to manage their account (but they didn't say anything about a 3rd party masquerading as the creator).

**To say that I feel violated would be an understatement.** I hope that one day the authorities

FIRST AMENDED CLASS ACTION COMPLAINT

1
2

> will catch up with [OnlyFans], and someone will go to
> jail for this fraud.

3
4

> User's recommendation: Don't do it! Avoid at all costs.
> This is the biggest scam going in the world today.
> Preferred solution: The scammers to be arrested.[56]

5       152.   The next day, the Fan updated the post to note: "I'll never trust an

6   online company that charges money to view creator content ever again."[57]

7       153.   Another Fan wrote:

8
9
10
11
12
13
14
15
16
17
18

> **Consistent with other reviews,** I have found multiple
> circumstances where the content creator (model) is
> NOT the actual person communicating with you on
> [OnlyFans] even though they tell the subscriber they
> are in fact communicating. Many models PAY agents,
> management companies, and others to manage their
> feed on [OnlyFans] for them. **These "hired" people
> then "impersonate" the model and use the first
> person, "Yes its [sic] me", and "I", falsely and
> fraudulently, to give the subscriber the impression
> that they are communicating with the model, but in
> these cases, THEY ARE NOT!** Asking for a
> spontaneous photo with a time stamp, or a request to
> "put your finger on the tip of your nose" and take a
> photo, are denied, for the simple reason that the actual
> model IS NOT at the keyboard, and could not
> spontaneously do that for you. In these cases, **the
> subscriber is being deceived by an imposter.**

19
20

> [OnlyFans], for their part, when pushed to confirm or
> deny this, not only ADMITTED that "content creators
> can use agents, management companies, and other 3rd

---

21      [56] User Post, *Was not chatting to the creator I was subscribed to*, PISSED
22   CONSUMER (May 12, 2023), https://onlyfans.pissedconsumer.com/32/RT-
P.html?sort=latest#reviews (last visited July 29, 2024).

23      [57] User Post, *Hired staff impersonate models in chat. - FRAUD*, PISSED
24   CONSUMER (Aug 05, 2023), https://onlyfans.pissedconsumer.com/23/RT-
P.html?sort=latest#reviews (last visited July 29, 2024).

25
FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

parties to OPERATE their account for them, but DEFENDED that its perfectly ok with them for IMPOSTERS to operate a content creator's account and [lie] to the subscriber about who they are chatting with. So a subscriber might think they are having an intimate chat with a professional model, but in reality, they are chatting perhaps with a STAFFER not even of the same sex as the model! *** **The conversation in chat with this STAFFER is designed to give a false sense of a true, real connection with the subscriber and is completely false, intended only to convince the subscriber to spend more money on behalf of the content creator.** The staffers are seemingly trained to embellish that a subscriber has actually created a true friendship with the model, when in reality, **this is closer to a CONFIDENCE / ROMANCE SCAM.**

In addition to the time stamp photo denials, simultaneous messaging on [OnlyFans] and [Instagram] for the exact same model, was easily busted as NOT THE SAME PERSON and that in one particular case NEITHER was the actual model, both the [OnlyFans] and [Instagram] streams were run by HIRED STAFFERS.

The FBI refers to this as "impersonating another person online for the purpose of soliciting money in another person's name"

[OnlyFans] refers to this as "described in our policies and guidelines."[58]

154.   A few weeks later, the Fan updated the review to include:

OnlyFans spotted my review and rather than want to resolve a customer problem, they arrogantly sent me a message that instead, they TERMINATED my account! How's THAT for a customer experience?[59]

---

[58] *Id.*

[59] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

### G.    OnlyFans Actively Facilitates Chatter Scams

155.    OnlyFans has meticulously crafted its reputation as a platform where Fans can communicate "directly" with Creators, and continues to work hard to sustain the illusion of "meaningful" and "authentic" engagement—despite knowing that its universal promise of "direct" connections is not realized by many (if not most) Fans. This is unsurprising, given that, as explained earlier, the amount of OnlyFans' profits bears a direct relationship to the amount of profits that can be generated by the platform's Creator accounts—which in turn relies on Fans' belief that OnlyFans offers a possibility for two-way personal interaction that distinguishes it from other social media sites where Fans can only "consume" content, which flows only one way: from Creators to Fans.

156.    OnlyFans knew, and should have known, that its Creators were using Chatters to engage with Fans—including based on the revenue being generated by those Creators; the number of direct messages with Fans; the number of different login sessions to a given Creator's account; and the number of Fan complaints (which OnlyFans ignored). Despite this, OnlyFans continued to promote its site as providing its Fans a direct connection with its Creators.

157.    Upon information and belief, OnlyFans willfully ignored or encouraged the use of Chatters because its entire revenue source relies on volume and Chatters facilitate high volumes for popular Creators.

158.    In addition to the deception inherent in the schemes, however, the Chatter Scams depend on Fans' private communications and personal information being shared—without their consent—with multiple third parties.

FIRST AMENDED CLASS ACTION COMPLAINT

159.   Nothing in OnlyFans' Terms of Service (or any other document provided to Fans by OnlyFans) informs Fans of the possibility that their private communications might be disclosed to unauthorized third parties—much less do those documents obtain Fans' consent for such disclosures.

160.   OnlyFans' failure to enforce its own policies goes beyond mere negligence and supports an inference that OnlyFans is acting intentionally to facilitate the Chatter Scams.

161.   OnlyFans' refuses, or at best fails, to meaningfully enforce its own policies—despite its modification of the language of those policies over time designed to make the policies *appear* stricter with respect to Creator responsibilities and prohibitions on particular activities.

162.   Agencies are violating explicit platform policies.

163.   None of what agencies (including Agency Defendants) are doing to perpetuate the Chatter Scams is actually "allowed" by OnlyFans' "Terms of Service" ("TOS")—which OnlyFans defines as "the legally binding agreement between you and us which consists of" nine different documents: (1) Terms of Use for all Users ("TOU"); (2) Terms of Use for Fans ("Fan TOU"); (3) Terms of Use for Creators; (4) Privacy Policy ("PP"); (5) Acceptable Use Policy ("AUP"); (6) Referral Program Terms ("RPT"); (7) Complaints Policy; (8) Platform to Business Regulation Terms; (9) Community Guidelines.[60]

---

[60] Terms, ONLYFANS, https://onlyfans.com/terms (last visited July 29, 2024). OnlyFans' Terms of Service were updated in August 2024 (effective September 1, 2024), after the original Complaint in this matter was filed on July 29, 2024. While some provisions were reworded or reorganized, the core structure and substance of the Terms—including the Acceptable Use Policy, Privacy Policy, and contractual

011194-11/2686242 V1

164.    OnlyFans' TOU requires Fans and Creators to make a series of "commitments," including those that promise to protect personal and confidential information:

> **You will keep your account/login details confidential and secure, including your user details, passwords and any other piece of information that forms part of our security procedures, and you will not disclose these to anyone else**. You will contact support@OnlyFans.com promptly if you believe someone has used or is using your account without your permission or if your account has been subject to any other breach of security. You also agree to ensure that you log out of your account at the end of each session, and to be particularly careful when accessing your account from a public or shared computer so that others are not able to access, view or record your password or other personal information.[61]

165.    And the **AUP** contains the following list of prohibitions applicable to Creator accounts:

> Do not use OnlyFans to engage in "misleading or deceptive conduct, or conduct that is likely to mislead or deceive any other User.  . . .
>
> Do not do **anything that violates our or someone else's rights,** including intellectual property rights (examples of which are copyright, trademarks, **confidential information**, and goodwill), personality

_____

terms governing Fan–Creator interactions—remain materially the same. For clarity and consistency, this Amended Complaint continues to refer to the pre-September 2024 version of the Terms where relevant.

[61] Terms of Use for All Users ¶ 7(e), ONLYFANS, https://onlyfans.com/terms (last visited July 29, 2024) (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT

rights, unfair competition, **privacy**, and data protection rights. . . .[62]

166.   But OnlyFans' ability to control the Creator accounts on its platform and enforce its policies is not limited to suing for indemnification. OnlyFans also gives itself the power to, among other things:

   a. **Withhold Creator Earnings** (the amount OnlyFans transfers to Creator accounts after taking its 20% cut)[63] in the event that, in OnlyFans' unilateral determination, an account has violated platform policies—or even when OnlyFans "suspect[s]…unlawful or fraudulent activity." Creator TOU ¶ 13(a).[64] OnlyFans can even keep Creator Earnings that are unrelated to any breaches of policy or fraud—in order to set off its own losses—if, again, in OnlyFans' unilateral determination, the breaches cause (or even "may cause") any loss to OnlyFans. Creator TOU ¶ 13(e).[65]

   b. **Conduct investigations**, and withhold Creator Earnings "for as long as is necessary to investigate the actual, threatened or suspected breach by you or the suspected unlawful activity." Creator TOU ¶ 13(b).[66]

---

[62] Acceptable Use Policy ¶ 13, ONLYFANS, https://onlyfans.com/terms (last visited July 29, 2024).

[63] Creator Terms of Use ¶ 5, ONLYFANS, https://onlyfans.com/terms (last visited July 29, 2024) ("We charge a fee to you [the creator] of twenty per cent (20%) of all Fan Payments made to you . . . . The remaining eighty per cent (80%) of the Fan Payment . . . is payable to you (called "**Creator Earnings**").

[64] *Id.* ¶ 13(a).

[65] *Id.* ¶ 13(e).

[66] *Id.* ¶ 13(b).

FIRST AMENDED CLASS ACTION COMPLAINT

c. **<u>Suspend Creator accounts</u>** for violations—or ***suspected violations***—of the platform's policies, or for violations of "any applicable law." OnlyFans may suspend the account for an indefinite amount of time, regardless of the impact on the Creator, and then "take any action we consider appropriate." TOU ¶ 8.[67]

d. **<u>Terminate Creator accounts</u>** "for any reason" with 30 days' notice, or "immediately and without prior notice" in the event OnlyFans "think[s]" a Creator has "or may have" breached the TOS; or threatens to do so "in a way which has or could have serious consequences for us or another User"; or takes "any action that in our opinion has caused or is reasonably likely to cause us to suffer a loss or that otherwise harms the reputation of OnlyFans." TOU ¶ 8.[68]

167.    On information and belief, OnlyFans has never exercised any of its powers to prevent the use of Chatters by any Creator—much less a high-earning Creator—or rectify the violations of its terms, including those protecting the Fans' rights to privacy and confidentiality of personal information, and those against impersonation and other deceptive acts. To the contrary, it generally refuses to do so and at times takes action against the complaining Fan, as described above. *See* Section IV.F.2 ("Fans who discovered the Chatter Scams claim to have directly contacted OnlyFans only to be ignored.").

---

[67] Terms of Use for All Users ¶ 8(a)-(d), ONLYFANS, https://onlyfans.com/terms (last visited July 29, 2024).

[68] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

168.    Nor has OnlyFans (or any of the Agency Defendants) taken any actions that might put Fans on notice that OnlyFans' promise of connecting Fans personally and "directly" with Creators is false or misleading and done in a way that exposes their personal, confidential information and communications.

169.    OnlyFans could require that Creator accounts explicitly disclose the use of third-party Chatters, as well as the fact that Fans' messages and personal information are shared with third parties and possibly stored in various servers around the world—something that is not currently (and, on information and belief, never has been) required by the Creator TOU.

170.    OnlyFans could provide a general disclaimer in the OnlyFans signup process that puts Fans on notice that they may not be communicating directly with the Creator whose name is on the OnlyFans account. Not only is this something that OnlyFans could easily do at the precise point in the signup process where it currently puts its misleading "Subscription Benefits" language, but there is precedent for such disclaimers on other sites that purport to offer "chatting" with real people—something increasingly common with the growing number of interactive "profiles" that purport to offer "chatting" with real people, but actually use generative artificial intelligence to post content and respond to user messages. For example:

a.    Facebook created several celebrity-inspired profiles in which users could interact with a celebrity in the form of a specific character. While the profiles contained an invitation from the celebrity to "message me," the chat windows in which users conducted the actual

FIRST AMENDED CLASS ACTION COMPLAINT

messaging contained a disclaimer noting: "Messages are generated by AI. Some may be inaccurate or inappropriate." *See* **Figure 13**, *below*.



***Figure 13****. Screenshot of Facebook video demonstrating use of AI profiles.*

b. Likewise, a company selling "AI Assistants" meant to impersonate certain celebrities markets its platform saying "chat with the celebrities. Get up close and personal," but also provides the disclaimer below in **Figure 14** during its sign-up process:

1
2
3
4
5
6
7
8
9
10
11
12



*Figure 14. Screenshot of AI assistant disclaimer.*

171.    Together with the other facts alleged in this Complaint, the fact that, despite having the contractual tools to do so, OnlyFans refuses to put an end to the Chatter Scams—or even to require disclosures and/or consent for the use of Chatters—supports an inference that OnlyFans has chosen to actively and intentionally facilitate the use of Chatters.

**H.    Agency-Specific Facts**

    **1.    Creators Inc.**

172.    The website for Creators Inc. describes the agency as "the largest and most dynamic social media management agency in the world," with a "vast network of 400+ Creators."[69]

_____

[69] "Creators Inc." Agency Website, at https://creatorsinc.com/ (last visited July 29, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

1    173.    The website also describes its "Los Angeles Headquarters" as a "Co-

2    working collaboration hub in Hollywood."

3    174.    On information and belief, the agency is primarily managed by

4    Andrew Bachman, who serves as the CEO of the agency and is listed as a co-

5    manager of Defendant Elite Creators.

6    175.    On information and belief, Creators Inc. manages or at one point

7    managed the accounts of the following Creators, who are followed by either

8    Plaintiff N.Z., Plaintiff B.L., Plaintiff S.M., and/or Plaintiff A.L.:

9        a.    Stephanie Landor (aka @littlelandor • @stephlandor •

10            @littlelandorvip)

11       b.    Romey Marie (aka @romey_mae)

12       c.    Jostasy Nick (aka Baby J • @jostasy)

13       d.    Nala the Ninja (aka @nalafitness • @fitness_nala)

14       e.    Elseana Panzer (aka @elseana)

15       f.    McKinley Richardson (aka @mckinleyrichardson •

16            @mckinleyexclusive)

17       g.    Summer Soderstrom (aka @summersoderstrom)

18   176.    Creators Inc. uses taglines for its Creators' accounts that emphasize the

19   personal nature of the interactions that Fans will have on the OnlyFans platform.

20   For example:

21       a.    Baby J (@Jostasy)'s OnlyFans account says:

22            "🍓 I personally reply to every message, so messages
             with tips attached get priority! Please be patient if there
23            isn't one!"

24       b.    Romey (@romey_mae)'s OnlyFans account says:

25                        -65-

Your Sub[scription] Includes:

🖤 Instant access to all photos and videos on my timeline (700+)

🖤 Regular posts

🖤 My most EXPLICIT content

🖤 Access to DMs with me

🖤 Access to Exclusive Content

177.   Creators Inc. has filed multiple lawsuits—including in California state courts—seeking to recover "management fees" allegedly owed to the agency by former Represented Creators. These include:

    a. *Creators Inc and Elite Creators LLC v. Megan McCarthy*, No. 2024-003685-CA-01 (Fl. Cir. Ct. of 11th Judicial Cir., Miami-Dade County, filed Feb. 29. 2024).

    b. *Lexington Capital Management, LLC; Creators Inc., and Elite Creators, LLC. v. Elena Kamperi*, No. 23SMCV01175 (Cal. Super. Ct., L.A. Cty., filed Mar. 16, 2023).

    c. *Creators Inc. and Elite Creators, LLC. v. Ava Hinojosa*, No. 24CHCV01901 (Cal. Super. Ct., L.A. Cty., filed May 17, 2024).

178.   The agency's filings in these lawsuits demonstrate:

    a. Creators Inc. takes between 20% and 30% commission on its Creators' earnings and has Represented Creators earning hundreds of thousands of dollars per month.

    b. Creators Inc.'s "management services" include "staffing [creators'] account[s] with someone to respond to direct messages on the OnlyFans platform 24 hours a day, seven days a week.

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

c. Creators Inc.'s agreement requires its Represented Creators to provide the agency with access to their OnlyFans accounts, and specifically "not to change [their] account passwords." Indeed, the basis for the agency's breach of contract claim against one Creator was that "[b]y changing her passwords and blocking Creators Inc. from the account, [the Creator was] unlawfully attempting to avoid paying Creators Inc. the management fee owed" to the agency.

d. As part of its agreement with Represented Creators, Creators Inc. agrees to "have trained staff members helping [Creators] to manage [their] work load in the DMs."

179. On information and belief, nowhere does Creators Inc. disclose to Fans that it employs Chatters to impersonate its Represented Creators.

**2. Moxy Management**

180. Defendant Moxy Management ("Moxy") is a California corporation formed in 2021 and headquartered in Los Angeles, California, with its principal place of business located at 19016 Devonport Lane, Tarzana, CA 91356.

181. Moxy describes itself as a "management and consulting company" based in Los Angeles.

182. Moxy was founded by two "influencers," Ryan Nassif and Slater Davis. Nassif's LinkedIn profile lists his role in strategic planning and business development, while Davis's LinkedIn profile emphasizes his experience in digital marketing and brand management. Both founders emphasize their ability to leverage industry knowledge and networks to build Moxy's reputation as a management agency.

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

183.   Moxy's marketing emphasizes its ability to help Creators "increase engagement with their fans and followers exponentially."

184.   Moxy uses taglines for its Creators' accounts that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform. For example, Sierra Skye's profile tagline reads: "Keep this between us and let's have fun! Hehe 😽😝."

185.   On information and belief, Moxy charges its Represented Creators a commission of 20–30% of their earnings.

186.   On information and belief, Moxy manages over 100 OnlyFans accounts on behalf of individual Creators, with the majority of those Creators making $40,000–$80,000 per month, and over 10 making approximately $500,000 per month.

187.   On information and belief, Moxy manages or at one point managed the accounts of the following Creators, who are followed by either Plaintiff N.Z., Plaintiff R.M., Plaintiff B.L., Plaintiff S.M., and/or Plaintiff A.L.:

      a.  Breckie Hill (aka @breckie)

      b.  Briana Armbruster (aka @officialskimaskgirl •

          @skimaskgirluncensored)

      c.  Carolina Samani (aka @carolinasamani)

      d.  Chyanne Burden (aka @chyburd)

      e.  Claire Stone (aka @cclaire.bbearxo)

      f.  Cristy Senskey (aka @cristyann)

      g.  Julia Piccolino (aka @julia.pic)

      h.  Kaitlyn Krems (aka @kaitkrems )

FIRST AMENDED CLASS ACTION COMPLAINT

i.   Sierra Skye (aka @sierraskye)

188.   As part of its management of those accounts, Moxy provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

189.   Moxy's Services Agreement with models explicitly provides services including "Facilitation of all content that is posted on Paid Content Platforms including [OnlyFans]," and that: "On a daily basis, [Moxy] will respond to messages on Paid Content Platforms on behalf of [the Creator], and use its reasonable, good faith efforts to upsell the products and content Talent offers on Paid Content Platforms."

190.   The Agreement also grants Moxy full access to and control over each Represented Creator's OnlyFans account, stipulating: "Talent has a duty to irrevocably grant to Company unfettered administrative access to [OnlyFans], for as long as Gross Earnings are generated."

191.   Although Moxy generally takes advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers they have, on information and belief, Moxy's Represented Creators have subscriber bases so large that interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

192.   On information and belief, nowhere does Moxy disclose to Fans that it employs Chatters to impersonate its Represented Creators.

**3.    Siren Agency**

193.   Defendant Boss Baddies d/b/a Siren Agency ("Siren") has multiple websites, where it has described itself as "a Los Angeles based full service, non-

FIRST AMENDED CLASS ACTION COMPLAINT

exclusive talent agency" that is "here to handle the busy work and help [Creators] stay focused on expressing [themselves] creatively and growing [their] personal brand[s]."[70]

194.    Indeed, one of Siren's websites promises "Growth Without Restrictions," and claims that Creators represented by the agency have over "450M+ followers."[71]

195.    Siren operates primarily out of Los Angeles, California, where it maintains a lavish headquarters in a hillside residence with a swimming pool, dubbed "The Siren House" and featured in the agency's promotional videos on TikTok.

196.    Siren's newer website uses the phrase "dedicated to empowering women in the industry" three separate times, despite being run someone who has been called "misogynist of the year" by one commentator, and lambasted in multiple YouTube videos for his demeaning dating advice and Siren's manipulative and exploitative practices in managing Creator accounts.[72]

197.    On information and belief, Siren charges its Represented Creators a fee of approximately 30% of their earnings.

---

[70] Home Page, SIREN (Website #1), https://www.sirenagency.com/ (last visited July 29, 2024).

[71] Id.

[72] See, e.g., Down The Siren Agency Rabbit Hole, VERY REALLY GOOD YOUTUBE CHANNEL (Dec. 24, 2022), https://web.archive.org/web/20240704070739/https://www.youtube.com/watch?v=iWzaA9lAA2Y (last visited July 29, 2024); Alex Lasker, Problematic dating coach branded As 'misogynist of the year in brutal video, IN THE KNOW BY YAHOO! (August 10, 2020), https://www.yahoo.com/lifestyle/problematic-tiktok-dating-coach-branded-192743046.html (last visited July 29, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

198.   On information and belief, Siren uses marketing—including taglines for its Creators' accounts—that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform.

199.   On information and belief, Siren manages or at one point managed the account of the following Creator, who is followed by Plaintiff A.L.:

    a.  Bri Jordan (@thebrijordan)

200.   As part of their management of those and other accounts, Siren provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

201.   A previous version of Siren's website contained text explicitly advertising "Content Management" services, which included "***Full service messaging*** and fan site support."[73]

202.   In addition, the LinkedIn profile for the company showed employees with job titles including "Virtual Assistant" and "Chatter."[74]

203.   Although Siren generally takes advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers its Creators have, on information and belief, Siren's Represented Creators have subscriber bases so large that interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

---

[73]  Home Page, SIREN (Website #2), https://web.archive.org/web/20230702030432/https://www.srn-agency.com/ (last visited July 27, 2024).

[74]  Siren Agency, LINKEDIN, https://linkedin.com/company/siren-agency (last visited Jul. 29, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

204.   On information and belief, nowhere does Siren disclose to Fans that they employ Chatters to impersonate its Represented Creators.

### 4.   Unruly Defendants

205.   Defendant Unruly Agency, LLC ("Unruly") is a California Limited Liability Company formed in 2020 in the State of California and headquartered in West Hollywood, California.

206.   Unruly is the owner of the trademarks for Defendant Dysrpt Agency ("Dysrpt"), which, on information and belief, is a subsidiary of Unruly.

207.   On information and belief, Defendant Behave Agency ("Behave") is also a subsidiary of Unruly.

208.   Together, Unruly, Behave, and Dysrpt are referred to as "Unruly Defendants."

209.   Unruly describes itself as a "management and consulting company" specializing in social media and influencer marketing. Its primary focus is on helping Creators maximize their earnings and engagement on platforms such as OnlyFans.

210.   Unruly (and, on information and belief, its subsidiary agencies) were co-founded by Tara Niknejad and Nicky Gathrite.

211.   On information and belief, the Unruly Defendants charge their Represented Creators a fee of approximately 30% of their earnings.

212.   On information and belief, the Unruly Defendants emphasize—both in their general marketing and in taglines for their Creators' accounts—the personal nature of the interactions that Fans will have on the OnlyFans platform. For example:

FIRST AMENDED CLASS ACTION COMPLAINT

a. The LinkedIn page for the agency claims: "Behave strives to provide models all the tools necessary to leave their digital footprint, promote their brand to a wider audience, and ***build genuine connections with their fans***."[75]

213.    On information and belief, Unruly manages or at some point managed the accounts of the following Creators, who are followed by either Plaintiff A.L., Plaintiff N.Z., Plaintiff R.M., and/or Plaintiff B.L.:

a. Anna Louise (aka @officialannalouise)

b. Kayla Lauren (aka @kaylalauren)

c. Mia Huffman (aka @prettybitchmia • @prettybitchmiavip)

d. Leah Ray (aka @leahray_x • @leahray_xx)

e. Nicky Gile (@nickygile • @nickygileprivate)

f. Sara Underwood (aka @saraunderwood)

g. Stefanie Gurzanski (aka @stefbabyg)

h. Tina Louise (aka @tinalouise)

i. Tara Electra (aka @billiondollarbabie)

j. Kinsey (aka @kinsey)

k. Emily Elizabeth (aka @emmilyelizabethh)

214.    On information and belief, Dysrpt manages or at some point managed the account of the following Creator, who is followed by Plaintiff R.M.:

a. Emily Elizabeth (aka @emmilyelizabethh)

---

[75]  Behave Agency, at https://linkedin.com/company/behaveagency/ (last visited Jul. 25, 2024 (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT

215.    On information and belief, Behave manages or at some point managed the accounts of the following Creators, who are followed by either Plaintiff B.L. and/or Plaintiff A.L:

    a.  Chloe Rosenbaum (aka @chloerosenbaum)

    b.  Kayla Simmons (aka @kaylasimmons)

    c.  Ryann Murphy (aka @itsryannmurphy)

216.    As part of their management of those and other accounts, the Unruly Defendants provide Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

217.    Unruly's provision of those services has been described in multiple lawsuits filed against the agency.

218.    These include a suit by individuals employed as "account managers," such as *Machabeli v. Unruly Agency, LLC, et al.*, No. 21STCV41395 (Cal. Super. Ct., L.A. Cty, filed Dec. 9, 2021), in which the plaintiffs alleged that:

    a.  "[A]s their primary job duties, they were required to create, post and chat on behalf of – i.e., surreptitiously pretend to be – Defendants' models to provide the "full fantasy girlfriend experience" to paying visitors (or "Fans") to www.OnlyFans.com."

    b.  "Niknejad and Gathrite specifically informed" the plaintiffs "that, to provide this "full fantasy girlfriend experience," Fans would falsely believe that they were paying for direct interactions with Defendants' models."

FIRST AMENDED CLASS ACTION COMPLAINT

  c. Unruly directed the plaintiffs "to intentionally lie to, dupe, and mislead Fans into misbelieving that the Fans are paying to have direct, personal communications and interactions with Defendants' Models."

  d. "Unwitting Fans divulged some of their deepest personal secrets including sexual fantasies, marital troubles, suicidal ideations and other private desires. For instance, one Fan lamented the demise of his marriage (and provided intimate details regarding the same) to [the plaintiff] believing she was model Abby Rao, and continued to send her money on the basis of this deception."

219. Unruly has also been sued by its Represented Creators, at least one of whom claimed to be unaware of the fact that Unruly's Chatters were impersonating her. In *Stage v. Unruly Agency LLC et al.*, No. 22STCV06689 and *Quezada v. Unruly Agency LLC et al.* (both filed in Cal. Super. Ct., L.A. Cty. on Feb. 23, 2022), two of Unruly's Represented Creators alleged that:

  a. "Unruly messaged subscribers of OnlyFans while pretending to be [the Creators] and solicited pictures of subscribers' penises in exchange for payment, without [the Creators'] consent or knowledge."

  b. "Unruly, posing on behalf of [the Creators'], solicited a picture of a subscriber's penis and offered to 'rate' his penis in exchange for money."

  c. When the Creators protested Unruly's unauthorized behavior, the agency's founders "claimed that [the Creators'] OnlyFans account[s] belonged to them, and threatened to sue [the Creators] if [they] did not

011194-11/2686242 V1

continue allowing them to post and message sexually explicit content on [their] behalf to unknowing subscribers of OnlyFans."

220.    Although the Unruly Defendants generally take advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers they have, on information and belief their Represented Creators have subscriber bases so large that interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

221.    On information and belief, nowhere do the Unruly Defendants disclose to Fans that they employ Chatters to impersonate its Represented Creators.

**5.    Content X**

222.    Defendant Content X Studios ("Content X") is a California corporation registered in September 2020, with its Principal Address at 21800 W Oxnard St #940, Woodland Hills, CA 91367.

223.    Headquartered in Los Angeles, CA and founded by well-known American actress and entertainer Bella Thorne and her manager, Thor Bradwell, Content X has described itself as a "full service production company."

224.    Thorne, herself an OnlyFans Creator, has been reported to have earned one million dollars in a single day on the platform—which apparently "crashed the moment Thorne announced her $102 for six month subscription."[76]

225.    On information and belief, Content X uses marketing—including taglines for its Creators' accounts—that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform.

---

[76] Lara Swift, *Why So Many Mainstream Celebrities Are Turning To OnlyFans*, NICKI SWIFT (March 9, 2023), https://www.nickiswift.com/1223642/why-so-many-mainstream-celebrities-are-turning-to-onlyfans/ (last visited July 29, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

226.   On information and belief, Content X manages or at some point managed the accounts of the following Creators, who are subscribed to by either Plaintiff S.M. and/or Plaintiff B.L.

      a.  Bella Thorne (aka @bellathorne)

      b.  Abella Danger (aka @dangershewrote • @abelladangervip)

      c.  Mathilde Tantot (aka @mathildtanot)

      d.  Pauline Tantot (aka @popstantot • @popstantotvip)

227.   On information and belief, as part of its management of those and other Creator accounts, Content X provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

228.   This is supported by statements made by former Represented Creators of the agency, who, in a Rolling Stone article, discussed the sub-par nature of the Chatter services provided by Content X ("The way they would answer messages was super lazy [and] super robotic…"), as well as the pressure they received to provide "account managers" with sexually explicit photographs despite initial promises that they would not have to provide nude photos for their OnlyFans page (one Creator "[said] Content X staffers who managed her OnlyFans page wanted her to send them more risqué and lingerie content . . . [and] claims she was told by staffers as an incentive how much more money she could earn off risqué photos.").[77]

---

[77] Cheyenne Roundtree, '*It's a Hot Mess': Why Influencers Are Ditching Bella Thorne's OnlyFans Company*, ROLLING STONE (May 5, 2022), https://www.rollingstone.com/culture/culture-features/bella-thorne-onlyfans-content-x-1347011/ (last visited July 29, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

229.    Although Content X generally takes advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers they have, on information and belief Content X's Represented Creators have subscriber bases so large that interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

230.    On information and belief, to provide those and other services, Content X has full access to and control over each Represented Creator's OnlyFans account.

231.    On information and belief, nowhere does Content X disclose to Fans that it employs Chatters to impersonate its Represented Creators.

**6.    A.S.H. Agency**

232.    Defendant A.S.H. (which stands for "All-Star Hustle") Agency ("A.S.H.") manages OnlyFans accounts on behalf of individual Creators, including what one journalist described as "some of the biggest fish in the industry," including "superstars like Angela White, Sky Bri, Kazumi, Violet Myers, Dainty Wilder, and more." [78]

233.    A.S.H. is owned by adult entertainment star Riley Reid—who is herself in the top 0.01% of earners on the platform—and, on information and belief, uses marketing—including taglines for its Creators' accounts—that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform.

---

[78] Ryan Leutz, *Riley Reid and Ash Agency: From Adult Film Superstar to Entrepreneur Extraordinaire*, THE VILLAGE VOICE (June 27, 2023), https://www.villagevoice.com/riley-reid-and-ash-agency-from-adult-film-superstar-to-entrepreneur-extraordinaire/ (last visited July 29 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

234.   On information and belief, A.S.H. manages or at some point managed the accounts of the following Creators, who are followed by either Plaintiff S.M., and/or Plaintiff N.Z.:

      a.   Sky Bri (aka @skybri)

      b.   Jane Wilde (aka @janewilde)

      c.   Kaitlin Trujillo (aka @trukait • @freetrukait)

235.   As part of its management of those and other accounts, A.S.H. provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

236.   On information and belief, to provide those and other services, A.S.H. has full access to and control over each Represented Creator's OnlyFans account.

237.   Although A.S.H. generally takes advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers they have, on information and belief A.S.H.'s Represented Creators have subscriber bases so large that interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

238.   On information and belief, nowhere does A.S.H. disclose to Fans that it employs Chatters to impersonate its Represented Creators.

**7.   Verge Agency**

239.   Defendant Verge Agency, Inc. (aka The Verge Agency, Inc.) ("Verge") was originally formed in Delaware on March 24, 2021. On March 3, 2023, Verge Agency, Inc. was registered in California as an out-of-state corporation. Verge's principal place of business is 10960 Wilshire Boulevard, 5th

FIRST AMENDED CLASS ACTION COMPLAINT

Floor, Los Angeles, CA 90024. On information and belief, Verge is doing business as Verge Agency.

240.   Founded by former UC Berkeley cheerleader Jessica Bartlett, Verge describes itself as a "premier talent agency located in the heart of Los Angeles."

241.   On information and belief, Verge uses taglines and captions for its Creators' accounts that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform. For example:

242.   The first post on the "VIP" page for creator Mikayla Demaiter says:

> Welcome to my Only Fans! So excited to be here and have you! Here I'll be posting my most exclusive content, as well as the only place I will be responding to all my messages! Tip $100 to join VIP for unlimited FREE chat and MOST exclusive content! See you there! Excited for what's to come.

243.   Another Represented Creator's account solicits paid subscriptions by saying: "Let me be your virtual girlfriend ⊘."

244.   Another Represented Creator's "VIP" page says "Hi there ♡ You found my EXCLUSIVE page! 😎 come talk to me ♥."

245.   On information and belief, Verge manages or at some point managed the accounts of the following Creators, who are followed by Plaintiff A.L.:

   a.   Katie Williams (aka @katie_dubbs)

   b.   Mikayla Demaiter (aka @mikayla_demaiter • @mikayladvip)

246.   As part of its management of those and other accounts, Verge provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

247.   Of the 35 LinkedIn members associated with Verge's profile, 23 are located in the Philippines, and many of those list their positions at Verge using job titles that often refer to chatter positions, including: "Account Manager," "Virtual Assistant," "Social Media Account Manager," and "Chat Support."

248.   Although Verge generally takes advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers they have, on information and belief Verge's Represented Creators have subscriber bases so large that interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

249.   On information and belief, nowhere does Verge disclose to Fans that it employs Chatters to impersonate its Represented Creators.

## I.   Plaintiffs' Stories

### 1.   Plaintiff N.Z.

250.   Plaintiff N.Z. has been an OnlyFans user from approximately 2020 to present. During 2020–2023, Plaintiff N.Z. subscribed to the following Creator accounts (collectively, for this section, "Subscribed Creator accounts"), which have been linked to—and, on information and belief, were used by—the Agency Defendants to perpetrate the Chatter Scams:

      a. Breckie Hill (Moxy Management)

      b. Sara Underwood, Nicky Gile, and Stefanie Gurzanski (Unruly)

      c. Sky Bri and Kaitlin Trujillo (A.S.H. Agency)

      d. McKinley Richardson (Creators Inc.)

251.   Plaintiff N.Z. relied on OnlyFans' successful efforts to market itself as a "revolutionary" platform that allowed content Creators to have direct interactions

FIRST AMENDED CLASS ACTION COMPLAINT

with their Fans, as well as OnlyFans' representations that subscribing to a Creator's account gave him "benefits" that specifically included the ability to "[d]irect message with this user."

252.   As a result, when he subscribed to each Creator's account, Plaintiff N.Z. expected and believed that any information or communication—but particularly any personal or sensitive information, including thoughts, feelings, and/or images of a private, emotional, and/or sexual nature—that he exchanged with the Creator via her account on OnlyFans would be kept entirely private, confidential, and strictly between himself and the Creator.

253.   Because of these expectations and beliefs, Plaintiff N.Z. felt comfortable sharing information through OnlyFans, and at all times relevant to this Complaint, he believed that when he was communicating with a Creator's account, he was communicating directly and privately with that Creator.

254.   Plaintiff N.Z. communicated via direct message with each of the accounts listed above. Those communications included direct messages that contained personal and sensitive information, including personal photos and videos of himself, and information about his personal interests, sexual interests, professional occupation, and location.

255.   Plaintiff N.Z. did not consent to having any of his personal information or communications shared with anyone other than the Creator, and was unaware of the fact that his messages and their content were being disclosed to one or more agents or contractors of the Agency Defendants—including professional Chatters.

256.   Although he was aware that "management agencies" existed, he believed they only assisted Creators with marketing and social media management,

011194-11/2686242 V1

and Plaintiff N.Z. was not aware that the Creators listed above were utilizing management agencies until he contacted undersigned counsel, which occurred on approximately December 5, 2023.

257.    He was not aware that Defendants were engaged in a scheme to deceive Fans into believing that Creators were communicating "directly" with their Fans when they were actually interacting with professional Chatters pretending to be the Creators—some of whom, on information and belief, shared almost no relevant characteristics in common with the Creators they were impersonating.

258.    When he found out about the Chatter Scams, Plaintiff N.Z. felt betrayed and violated. He had divulged sensitive and/or personal information not to the individuals he thought he was communicating with—but to imposters paid to impersonate those individuals.

259.    If he had known about the Chatter Scams, or that any of his expectations or beliefs about the nature of the communication on OnlyFans were not true with respect to a particular Creator, he would not have subscribed to or interacted directly with the Creator's account at all—much less would he have paid any Premium Content Fees to do so.

260.    Plaintiff N.Z. estimates that during the time he was using his OnlyFans account, he spent approximately $5,000 to $10,000 on Premium Content Fees— 20% of which went to OnlyFans.

261.    Plaintiff N.Z. did not receive what he paid for. He would not have paid as much for Premium Content Fees if he had known that he was communicating not with the Creators themselves, but with Chatters paid to impersonate the Creators.

FIRST AMENDED CLASS ACTION COMPLAINT

262.   Plaintiff N.Z. did not stop using his OnlyFans account after learning of the Chatter Scams through the present litigation. However, he altered his habits and no longer interacts with the Creators or shares any personal or private information since he no longer trusts that the Creator is not being impersonated by an unknown third party.

**2.   Plaintiff R.M.**

263.   Plaintiff R.M. was an OnlyFans user from approximately 2019 to 2023. During that time, Plaintiff R.M. subscribed to the following Creator accounts (collectively, for this section, "Subscribed Creator accounts"), which have been linked to—and, on information and belief, were used by—the Agency Defendants to perpetrate the Chatter Scams:

a.   Chyanne Burden and Claire Stone (Moxy Management)

b.   Emily Elizabeth (Dysrpt Agency)

264.   Plaintiff R.M. relied on OnlyFans' successful efforts to market itself as a "revolutionary" platform that allowed content Creators to have direct interactions with their Fans, as well as OnlyFans' representations that subscribing to a Creator's account gave him "benefits" that specifically included the ability to "[d]irect message with this user."

265.   As a result, when he subscribed to each Creator's account, Plaintiff R.M. expected and believed that any information or communication—but particularly any personal or sensitive information, including thoughts, feelings, and/or images of a private, emotional, and/or sexual nature—that he exchanged with the Creator via her account on OnlyFans would be kept entirely private, confidential, and strictly between himself and the Creator.

266.   Because of these expectations and beliefs, Plaintiff R.M. felt comfortable sharing information through OnlyFans, and at all times relevant to this Complaint, he believed that when he was communicating with a Creator's account, he was communicating directly and privately with that Creator.

267.   Plaintiff R.M. communicated via direct message with each of the accounts listed above. Those communications included direct messages that contained personal and sensitive information, including information about his full legal name, social media accounts, personal interests, sexual interests, and location.

268.   In addition, Plaintiff R.M. viewed videos sent to him via direct message through Creators' accounts—some of which he had specifically requested—without knowing those videos had been sent by one or more agents or contractors of the Agency Defendants—including professional Chatters.

269.   Plaintiff R.M. did not consent to having any of his personal information or communications shared with anyone other than the Creator, and was unaware of the fact that his messages and their content were being disclosed to one or more agents or contractors of the Agency Defendants—including professional Chatters.

270.   Plaintiff R.M. confronted Emily Elizabeth via direct message and she said it was her replying to messages.

271.   Although he was aware that "management agencies" existed, he believed they only assisted Creators with marketing and social media management, and Plaintiff R.M. was not aware that the Creators listed above were utilizing management agencies until he contacted undersigned counsel, which occurred on approximately January 26, 2024.

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

272.   He was not aware that Defendants were engaged in a scheme to deceive Fans into believing that Creators were communicating "directly" with their Fans when they were actually interacting with professional Chatters pretending to be the Creators—some of whom, on information and belief, shared almost no relevant characteristics in common with the Creators they were impersonating.

273.   When he found out about the Chatter Scams, Plaintiff R.M. felt betrayed and violated. He had divulged sensitive and/or personal information not to the individuals he thought he was communicating with—but to imposters paid to impersonate those individuals.

274.   If he had known about the Chatter Scams, or that any of his expectations or beliefs about the nature of the communication on OnlyFans were not true with respect to a particular Creator, he would not have subscribed to or interacted directly with the Creator's account at all—much less would he have paid any Premium Content Fees to do so.

275.   If he had known about the Chatter Scams from the beginning, he likely would not have signed up for an OnlyFans account in the first place.

276.   Plaintiff R.M. estimates that during the time he was using his OnlyFans account, he spent approximately $200 to $300 on Premium Content Fees—20% of which went to OnlyFans.

277.   Plaintiff R.M. did not receive what he paid for. He would not have paid any Premium Content Fees—and certainly would not have paid as much—if he had known that he was communicating not with the Creators themselves, but with Chatters paid to impersonate the Creators.

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

278.   Plaintiff R.M. stopped using his OnlyFans account at the end of 2023, after learning of the Chatter Scams through the present litigation.

**3.    Plaintiff B.L.**

279.   Plaintiff B.L. has been an OnlyFans user from approximately 2020 to present. During 2020–2023, Plaintiff B.L. subscribed to the following Creator accounts (collectively, for this section, "Subscribed Creator accounts"), which have been linked to—and, on information and belief, were used by—the Agency Defendants to perpetrate the Chatter Scams:

  a.  Briana Armbruster and Sierra Skye (Moxy Management)

  b.  Tina Louise, Kayla Lauren, and Anna Louise (Unruly)

  c.  Ryann Murphy and Chloe Rosenbaum (Behave)

  d.  Mathilde Tantot and Pauline Tantot (Content X)

  e.  Summer Soderstrom (Creators Inc.)

280.   Plaintiff B.L. relied on OnlyFans' successful efforts to market itself as a "revolutionary" platform that allowed content Creators to have direct interactions with their Fans, as well as OnlyFans' representations that subscribing to a Creator's account gave him "benefits" that specifically included the ability to "[d]irect message with this user." As a result, when he subscribed to each Creator's account, Plaintiff B.L. expected and believed that any information or communication—but particularly any personal or sensitive information, including thoughts, feelings, and/or images of a private, emotional, and/or sexual nature—that he exchanged with the Creator via her account on OnlyFans would be kept entirely private, confidential, and strictly between himself and the Creator.

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

281.   Because of these expectations and beliefs, Plaintiff B.L. felt comfortable sharing information through OnlyFans, and at all times relevant to this Complaint, he believed that when he was communicating with a Creator's account, he was communicating directly and privately with that Creator.

282.   Plaintiff B.L. communicated via direct message with each of the accounts listed above. Those communications included direct messages that contained personal and sensitive information, including personal photos and videos of himself, and information about his personal interests, hobbies, professional occupation, sexual interests and preferences, and location.

283.   In addition, Plaintiff B.L. viewed videos sent to him via direct message from Creators' accounts—some of which he had specifically requested—without knowing those videos had been sent by one or more agents or contractors of the Agency Defendants—including professional Chatters.

284.   Plaintiff B.L. did not consent to having any of his personal information or communications shared with anyone other than the Creator, and was unaware of the fact that his messages and their content were being disclosed to one or more agents or contractors of the Agency Defendants—including professional Chatters.

285.   Although he was aware that "management agencies" existed, he believed they only assisted Creators with marketing and social media management, and Plaintiff B.L. was not aware that the Creators listed above were utilizing management agencies until he contacted undersigned counsel, which occurred on approximately February 21, 2024.

286.   He was not aware that Defendants were engaged in a scheme to deceive Fans into believing that Creators were communicating "directly" with their

011194-11/2686242 V1

Fans when they were actually interacting with professional Chatters pretending to be the Creators—some of whom, on information and belief, shared almost no relevant characteristics in common with the Creators they were impersonating.

287.   When he found out about the Chatter Scams, Plaintiff B.L. felt betrayed and violated. He had divulged sensitive and/or personal information not to the individuals he thought he was communicating with—but to imposters paid to impersonate those individuals.

288.   If he had known about the Chatter Scams, or that any of his expectations or beliefs about the nature of the communication on OnlyFans were not true with respect to a particular Creator, he would not have interacted directly with the Creator's account at all. Plaintiff B.L. estimates that during the time he was using his OnlyFans account, he spent approximately $20,000 to $25,000 on Premium Content Fees—20% of which went to OnlyFans.

289.   Plaintiff B.L. did not receive what he paid for. He would not have paid any Premium Content Fees—and certainly would not have paid as much—if he had known that he was communicating not with the Creators themselves, but with Chatters paid to impersonate the Creators.

290.   Plaintiff B.L. did not stop using his OnlyFans account after learning of the Chatter Scams through the present litigation. However, he altered his habits and no longer interacts with the Creators or shares any personal or private information since he no longer trusts that the Creator is not being impersonated by an unknown third party.

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

**4.    Plaintiff S.M.**

291.    Plaintiff S.M. was an OnlyFans user from approximately 2018 to 2024. During that time, Plaintiff S.M. subscribed to the following Creator accounts (collectively, for this section, "Subscribed Creator accounts"), which have been linked to—and, on information and belief, were used by—the Agency Defendants to perpetrate the Chatter Scams:

    a.  Kaitlyn Krems and Breckie Hill (Moxy Management)

    b.  Jane Wilde (A.S.H. Agency)

    c.  Bella Thorne and Abella Danger (Content X Studios)

    d.  Stephanie Landor (Creators Inc. Agency)

292.    Plaintiff S.M. relied on OnlyFans' successful efforts to market itself as a "revolutionary" platform that allowed content Creators to have direct interactions with their Fans, as well as OnlyFans' representations that subscribing to a Creator's account gave him "benefits" that specifically included the ability to "[d]irect message with this user."

293.    As a result, when he subscribed to each Creator's account, Plaintiff S.M. expected and believed that any information or communication—but particularly any personal or sensitive information, including thoughts, feelings, and/or images of a private, emotional, and/or sexual nature—that he exchanged with the Creator via her account on OnlyFans would be kept entirely private, confidential, and strictly between himself and the Creator.

294.    Because of these expectations and beliefs, Plaintiff S.M. felt comfortable sharing information through OnlyFans, and at all times relevant to this

FIRST AMENDED CLASS ACTION COMPLAINT

1    Complaint, he believed that when he was communicating with a Creator's account,

2    he was communicating directly and privately with that Creator.

3        295.   Plaintiff S.M. communicated via direct message with each of the

4    accounts listed above. Those communications included direct messages that

5    contained personal and sensitive information, including personal photos of himself,

6    and information about his personal interests, sexual interests, professional

7    occupation, and location.

8        296.   In addition, Plaintiff S.M. viewed videos sent to him via direct

9    message from the Subscribed Creator accounts—some of which he had specifically

10   requested—without knowing those videos had been sent by one or more agents or

11   contractors of the Agency Defendants—including professional Chatters.

12       297.   Plaintiff S.M. did not consent to having any of his personal

13   information or communications shared with anyone other than the Creator he

14   believed he was communicating with, and was unaware of the fact that his

15   messages and their content were being disclosed to one or more agents or

16   contractors of the Agency Defendants—including professional Chatters.

17       298.   He had heard of management agencies, and even confronted several

18   Creators via direct message regarding their possible use of management agencies to

19   run their accounts, but the Creators denied these claims and tried to make him feel

20   guilty about questioning their authenticity.

21       299.   Plaintiff S.M. confronted Bella Thorne, Stephanie Landor, Breckie

22   Hill, and Kaitlyn Krems via direct message and they all said it was them replying to

23   messages and/or denied using Chatters.

24

25

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

300.   Plaintiff S.M. was not aware that the Creators listed above were utilizing management agencies until he contacted undersigned counsel, which occurred on approximately February 8, 2024.

301.   He was not aware that Defendants were engaged in a scheme to deceive Fans into believing that Creators were communicating "directly" with their Fans when they were actually interacting with professional Chatters pretending to be the Creators—some of whom, on information and belief, shared almost no relevant characteristics in common with the Creators they were impersonating.

302.   When he found out about the Chatter Scams, Plaintiff S.M. felt betrayed and violated. He had divulged sensitive and/or personal information not to the individuals he thought he was communicating with—but to imposters paid to impersonate those individuals.

303.   If he had known about the Chatter Scams, or that any of his expectations or beliefs about the nature of the communication on OnlyFans were not true with respect to a particular Creator, he would not have subscribed to or interacted directly with the Creator's account at all—much less would he have paid any Premium Content Fees to do so.

304.   If he had known about the Chatter Scams from the beginning, he likely would not have signed up for an OnlyFans account in the first place.

305.   Plaintiff S.M. estimates that during the time he was using his OnlyFans account, he spent approximately $1,000 on Premium Content Fees—20% of which went to OnlyFans.

306.   Plaintiff S.M. did not receive what he paid for. He would not have paid any Premium Content Fees—and certainly would not have paid as much—if he had

011194-11/2686242 V1

known that he was communicating not with the Creators themselves, but with Chatters paid to impersonate the Creators.

307.    Plaintiff S.M. stopped using his OnlyFans account on approximately February 8, 2024, after learning of the Chatter Scams through the present litigation.

**5.    Plaintiff A.L.**

308.    Plaintiff A.L. was an OnlyFans user from approximately 2021 to 2024.

309.    During that time, Plaintiff A.L. subscribed to the following Creator accounts (collectively, for this section, "Subscribed Creator Accounts"), which have been linked to—and, on information and belief, were used by—the Agency Defendants to perpetrate the Chatter Scams:

    a.  Bri Jordan (Siren Agency)

    b.  Julia Piccolino, Breckie Hill, Carolina Samani, Briana Armbruster, Cristy Senskey, and Claire Stone (Moxy Management)

    c.  Tara Electra and Kinsey (Unruly Agency)

    d.  Kayla Simmons (Behave Agency)

    e.  Katie Williams and Mikayla Demaiter (Verge Agency)

    f.  Elseana Panzer, Jostasy Nick, and Nala (also known as Nala the Ninja and Fitness Nala) (Creators Inc.)

310.    Plaintiff A.L. relied on OnlyFans' successful efforts to market itself as a "revolutionary" platform that allowed content Creators to have direct interactions with their Fans, as well as OnlyFans' representations that subscribing to a Creator's account gave him "benefits" that specifically included the ability to "[d]irect message with this user."

011194-11/2686242 V1

311.   As a result, when he subscribed to each Subscribed Creator Account, Plaintiff A.L. expected and believed that any information or communication—but particularly any personal or sensitive information, including thoughts, feelings, and/or images of a private, emotional, and/or sexual nature—that he exchanged with the Creator via her account on OnlyFans would be kept entirely private, confidential, and strictly between himself and the Creator.

312.   Because of these expectations and beliefs, Plaintiff A.L. felt comfortable sharing information through OnlyFans, and at all times relevant to this Complaint, he believed that when he was communicating with a Subscribed Creator Account, he was communicating directly and privately with that Creator.

313.   Plaintiff A.L. communicated via direct message with each of the accounts listed above. Those communications included direct messages that contained personal and sensitive information, including personal photos of himself.

314.   In addition, Plaintiff A.L. viewed videos sent to him via direct message through the Subscribed Creator Accounts—some of which he had specifically requested—without knowing those videos had been sent by one or more agents or contractors of the Agency Defendants—including professional Chatters.

315.   Plaintiff A.L. did not consent to having any of his personal information or communications shared with anyone other than the Creator he believed he was communicating with, and was unaware of the fact that his messages and their content were being disclosed to one or more agents or contractors of the Agency Defendants—including professional Chatters.

011194-11/2686242 V1

316.   Although he was aware that "management agencies" existed, he believed they only assisted Creators with marketing and social media management, and Plaintiff A.L. was not aware that the Subscribed Creator Accounts were utilizing management agencies until he contacted undersigned counsel, which occurred on approximately March 27, 2024.

317.   He was not aware that Defendants were engaged in a scheme to deceive users into believing that Creators were communicating "directly" with their Fans when they were actually interacting with professional Chatters pretending to be the Creators—some of whom, on information and belief, shared almost no relevant characteristics in common with the Creators they were impersonating.

318.   When he found out about the Chatter Scams, Plaintiff A.L. felt betrayed and violated. He had divulged sensitive and/or personal information not to the individuals he thought he was communicating with—but to imposters paid to impersonate those individuals.

319.   If he had known about the Chatter Scams, or that any of his expectations or beliefs about the nature of the communication on OnlyFans were not true with respect to a particular Creator, he would not have subscribed to or interacted directly with the Creator's account at all—much less would he have paid any Premium Content Fees to do so.

320.   If he had known about the Chatter Scams from the beginning, he likely would not have signed up for an OnlyFans account in the first place.

321.   Plaintiff A.L. estimates that during the time he was using his OnlyFans account, he spent approximately $500–$600 on Premium Content Fees—20% of which went to OnlyFans.

FIRST AMENDED CLASS ACTION COMPLAINT

322.   Plaintiff A.L. did not receive what he paid for. He would not have paid any Premium Content Fees—and certainly would not have paid as much—if he had known that he was communicating not with the Creators themselves, but with Chatters paid to impersonate the Creators.

323.   He stopped using his OnlyFans account after learning of the Chatter Scams through the present litigation.

## V.    CLASS ACTION ALLEGATIONS

324.   Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and all others similarly situated.

325.   Plaintiffs seek to represent a nationwide class of OnlyFans users ("Nationwide Class") defined as:

> All persons residing in the United States who had a Fan account on OnlyFans and paid Premium Content Fees to any Creator who was represented by an Agency Defendant and that Agency Defendant used Chatters to communicate directly with these Fans on the OnlyFans platform during the Relevant Time Period.

326.   Plaintiffs N.Z. and R.M. ("California Plaintiffs") seek to represent a subclass of California residents ("California Sub-Class") defined as:

> All persons residing in California who had a Fan account on OnlyFans and paid Premium Content Fees to any Creator who was represented by any Agency Defendant and that Agency Defendant used Chatters to communicate directly with these Fans on the OnlyFans platform during the Relevant Time Period.

327.   The "Relevant Time Period" means the period of time established by the Court for the claims alleged in this Complaint.

328.   Excluded from the Classes (the members of which are collectively referred to as "Class Members") are Defendants and their co-conspirators, officers,

-96-

011194-11/2686242 V1

directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; Class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

329. Plaintiffs reserve the right to amend or modify the class definitions after having had an opportunity to conduct discovery.

## A.    The Requirements of Rule 23(a)(1)-(4) Are Satisfied

### 1.    Numerosity

330. The Classes are so numerous that joinder of all members is unfeasible and impracticable. OnlyFans has millions of subscribers worldwide, and on information and belief, the practice of using Chatters to impersonate Creators is so widespread that any reasonable estimate indicates there are hundreds of thousands—if not millions—of Class Members.

### 2.    Commonality

331. Common questions of law and fact exist as to all Class Members, which include, but are not limited to:

    a. Whether OnlyFans Defendants misrepresented the nature of the communications between Fans and Creators;

    b. Whether the Agency Defendants used Chatters, who were pretending to be the Represented Creators, to communicate with Fans;

    c. Whether Agency Defendants released, transferred, disclosed and/or disseminated the personal or private information of Plaintiffs and Class

011194-11/2686242 V1

Members—including personal communications and video-watching histories to unauthorized third parties, including Chatters;

d. Whether Defendants engaged in or conspired to engage in a RICO enterprise that harmed Plaintiffs and the Class Members;

e. Whether OnlyFans Defendants breached their contracts with Plaintiffs and the Class Members;

f. Whether Defendants are liable under each of the causes of action as alleged herein;

g. Whether Class Members were damaged and, if so, the appropriate measure of damages; and

h. Whether Class Members are entitled to damages, equitable relief, and other relief.

### 3.    Typicality

332.    Plaintiffs' claims are typical of the claims of the other members in the Classes, as they arise out of the uniform and pervasive conduct of Defendants, involve the same legal theories, and challenge the same practices of Defendants. Plaintiffs and all Class Members have been subjected to the same falsehoods and practices, hold the same rights, are entitled to the same legal and equitable relief, have suffered the same impact and injury, and sustained similar damage by paying for Premium Content Fees they would not have paid, or greater than that which they would have paid, had Defendants disclosed and/or taken action on the Chatter Scams and concomitant privacy and terms of service violations.

011194-11/2686242 V1

1

### 4.    Adequacy

2      333.    Plaintiffs and their counsel will fairly and adequately represent the

3   interests of the Classes they seek to represent. Plaintiffs have no interests

4   antagonistic to, or in conflict with, the interests of the other Class Members.

5   Plaintiffs' lawyers are highly experienced in the prosecution of consumer class

6   actions and complex commercial litigation, capable of providing the financial

7   resources needed to litigate this matter to conclusion, and have litigated other

8   consumer rights matters in a class context.

9   **B.    The Requirements of Rule 23(b)(2) Are Satisfied: Defendants' conduct generally applies to Class, making injunctive relief for the class as a whole appropriate.**

10

11      334.    Rule 23(b)(2) requires that for certification of the Injunctive Relief

12   Class, Plaintiff must show "the party opposing the class has acted or refused to act

13   on grounds that apply generally to the class, so that final injunctive relief or

14   corresponding declaratory relief is appropriate respecting the class as a whole."

15      335.    Here, Defendants' actions and failures to act are systemic and uniform

16   across the class, as are the terms of service and other contract documents. The relief

17   the Class seeks would require injunctive relief that conforms Defendants' conduct

18   to the law and existing contractual obligations.

19      336.    Classwide equitable relief is appropriate under Rule 23(b)(2) because

20   Defendants have acted on grounds that apply generally to the members of the

21   Classes, and inconsistent adjudications with respect to the Defendants' liability

22   would establish incompatible standards and substantially impair or impede the

23   ability of Class Members to protect their interests. Classwide relief and Court

24   supervision under Rule 23 assures fair, consistent, and equitable treatment and

25

protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Class.

**C.    The Requirements of Rule 23(b)(3) Are Satisfied**

**1.    Predominance**

337.   Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because the questions of law or fact common to class members predominate over any questions affecting only individual members. "The predominance analysis under Rule 23(b)(3) focuses on the relationship between the common and individual issues in the case, and tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 964 (9th Cir. 2013) (citations and internal quotations omitted). Predominance "does not require a plaintiff seeking class certification to prove that each element of their claim is susceptible to classwide proof, so long as one or more common questions predominate." *Castillo v. Bank of Am., NA,* 980 F.3d 723, 730 (9th Cir. 2020) (citations and internal quotations omitted). Plaintiff must also present a method showing "that damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Plaintiffs have met all of these requirements. In this case, liability would be determined by common representations, acts, promises, and omissions, the proof of which every class member could use to prove liability. Damages could be determined using the records of Defendants or mechanically if by statutory damage awards, even though individual differences in damages does not preclude certification.

-100-

FIRST AMENDED CLASS ACTION COMPLAINT

## 2.    Superiority

338.    A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiffs and the Class Members. Plaintiffs and the Class Members—many of whom are unaware of their rights—have been harmed by Defendant's misrepresentations.

339.    Defendants have acted uniformly with respect to the Plaintiffs and Class Members. Defendants' scheme treated consumers as a Class to be uniformly deceived. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs and Class Members have all suffered economic harm and damage because of Defendants' unlawful and wrongful conduct, which was directed toward Class Members and the public, rather than specifically or uniquely against any individual Class Members.

340.    There is currently no pending litigation regarding Defendants' conduct and this class action will reduce the possibility of repetitious litigation relating to Defendants' wrongful actions and provides an efficient mechanism for adjudication for Class Members.

341.    Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the small size of the individual Class Members' claims, it is unlikely that the Class Members could individually afford to seek legal redress for Defendants' misconduct.

342.    Class treatment in this Court, where a majority of Defendants reside where all Defendants do business, will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication by providing

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

1    common answers to the common questions of knowledge, conduct, duty, and
2    breach that predominate in this action.

3        343.    Because this case involves common conduct by Defendants and all
4    Class Members have suffered the same harm, there are no obvious difficulties in
5    managing this case as a classwide action.

6        344.    Classwide equitable relief is appropriate under Rule 23(b)(2) because
7    Defendants have acted on grounds that apply generally to the members of the
8    Classes, and inconsistent adjudications with respect to the Defendants' liability
9    would establish incompatible standards and substantially impair or impede the
10   ability of Class Members to protect their interests. Classwide relief and Court
11   supervision under Rule 23 assures fair, consistent, and equitable treatment and
12   protection of all Class Members, and uniformity and consistency in Defendants'
13   discharge of their duties to perform corrective action regarding the Class.

14              **VI.    TOLLING OF STATUTE OF LIMITATIONS**

15       345.    The statutes of limitation applicable to Plaintiffs' claims are tolled as a
16   result of Defendants' knowing and active concealment of the alleged conduct.
17   Plaintiffs did not and could not have reasonably discovered the true nature of
18   Chatter Scams because OnlyFans Defendants falsely represented to users that they
19   were talking directly with Creators.

20       346.    Agency Defendants, who were running their Represented Creators
21   Accounts, did not disclose that the accounts were being run by agencies or that
22   Plaintiffs and Class Members were communicating with Chatters most of the time.
23   Moreover, Defendants denied that the communications were not coming from the
24   Creator and/or terminated the accounts of Fans who raised the chatter issue.

25

347.    Plaintiffs' claims are therefore tolled under the discovery rule.

348.    The causes of action alleged herein did not accrue until Plaintiffs discovered or should have discovered the Chatter Scams.

349.    To this day, Defendants do not disclose the use of Chatters or that users will, for the most part, not be having personal, authentic, and direct communications with the Creators because most, if not all, of those communications will be with Chatters.

350.    Plaintiffs and other Class Members could not have learned about the full extent of the Chatter Scam or Defendants' misconduct through the exercise of reasonable diligence, especially with Defendants working to conceal the Chatter Scam.

351.    For most users, the full extent of Chatter Scams is still unknown, making the discovery rule appropriate.

352.    For these reasons, all applicable statutes of limitations have been tolled by the operation of the discovery rule.

## VII.   CAUSES OF ACTION

353.    Each of the following claims incorporates all other paragraphs in this Complaint.

354.    To the extent any claim includes allegations on behalf of B.L., S.M., or A.L. ("Out-of-State Plaintiffs") against Fenix International Limited or Fenix Internet LLC, such allegations are withdrawn pursuant to the Court's Order on the Fenix Defendants' Motion to Dismiss for Forum Non Conveniens (Dkt. 117). Each claim below continues to refer to "Defendants," "Plaintiffs," and "Class Members" for ease of reading, and unless otherwise specified within a given Count:

FIRST AMENDED CLASS ACTION COMPLAINT

a.  "California Plaintiffs" bring claims against all Defendants on behalf of the Nationwide Class or, in the alternative, on behalf of the California Class.

b.  "Out-of-State Plaintiffs" bring claims against the Agency Defendants on behalf of the Nationwide Class.

c.  "Defendants" refers to the entities identified as defendants for each Count, and should be read to exclude any Defendant as to whom a given Plaintiff's claims have been dismissed.

## COUNT I. VIOLATION OF RICO
### (18 U.S.C. § 1962(c))
### (Against All Defendants)

355.   RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

356.   Under 18 U.S.C. § 1961(4), an "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

357.   A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

358.   "Racketeering activity" includes wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1).

359.   18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or

011194-11/2686242 V1

property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

**A.    Each Defendant is a Culpable Person Under RICO.**

360.   Defendants are all culpable "persons" under 18 U.S.C.§ 1961(3), as each of them is an entity capable of holding a legal or beneficial interest in property.

**B.    The Content Fraud Enterprise is a RICO Enterprise.**

361.   For the purposes of this claim, the RICO enterprise, referred to in this Complaint as the "Content Fraud Enterprise," is an association-in-fact enterprise of FIL and FIUSA (the OnlyFans Defendants), and Boss Baddies, Moxy, Unruly, Behave, A.S.H., Content X, Verge, and Elite Creators (the Agency Defendants), along with the Agency Defendants' co-conspirators, their Represented Creators.

362.   OnlyFans Defendants and Agency Defendants play different roles, but all cooperate on a common purpose: using Chatters to extract Premium Content Fees from Plaintiffs and Class Members.

363.   OnlyFans Defendants have, continually since its inception, promised to every Fan on the OnlyFans platform that they will be able to "direct message" with the Creators they subscribe to.

364.   As described herein, each of these communications was made directly to Plaintiffs and the Class Members when they subscribed to each Creator on the OnlyFans platform.

FIRST AMENDED CLASS ACTION COMPLAINT

365.   OnlyFans Defendants have also communicated to Plaintiffs and the Class Members on the various platforms, including its website that they will be able to "direct message" with Creators, chat "1 on 1" with the Creators, and build "genuine" and "authentic" connections.

366.   Each of the Agency Defendants manages the OnlyFans accounts of its Represented Creators, who are unnamed co-conspirators. On behalf of the Creators, the Agency Defendants use Chatters to post and communicate as the Represented Creator on that Creator's account—what has been described herein as the Chatter Scams—surreptitiously impersonating the Creator.

367.   Agency Defendants implemented the Chatter Scams on behalf of the Creators they represent to convince Fans they were direct messaging with the Represented Creators and receiving the promised "1 on 1," chats, "direct messaging." or "authentic" experience, when in fact the Fans were speaking with third parties without their knowledge. As described herein, these false communications were made by the Agency Defendants on behalf of their Represented Creators to Plaintiffs and Class Members each time they engaged in a direct message with a Represented Creator.

368.   The Agency Defendants' Chatter Scams are designed to use deception to maximize the Premium Content Fees paid to the Creators by the Fans as described herein, a portion of which is paid to the Agency Defendants.

369.   Since their inception, the Agency Defendants engaged in the fraudulent activities by controlling and distributing misleading and false digital content to Fans through the Chatter Scams on behalf of the Creators, knowing that

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

OnlyFans Defendants were monitoring the platform but would not enforce their anti-fraud policies.

370.   OnlyFans Defendants, who claim to monitor everything that happens on the OnlyFans platform, are aware of Agency Defendants and encourage the use of such agencies.

371.   OnlyFans Defendants intentionally failed to enforce their anti-fraud policies—knowing non-enforcement would allow Agency Defendants to continue their fraudulent activities and increase and maximize a Creator's Premium Content Fees through the Chatter Scams—to continue to collect 20% of the revenue generated by the fraudulent activity.

372.   OnlyFans Defendants received complaints from Fans about the use of Chatters, yet they continued to allow and support the fraudulent actions of the Agency Defendants.

373.   The OnlyFans Defendants' platform interface and marketing strategies are designed to maximize engagement and revenue, regardless of the authenticity of the content.

374.   OnlyFans Defendants' profit motive drives them to engage in fraudulent conduct, intentionally overlooking violations to maximize revenue.

375.   Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants such as Represented Creators, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues and increase market share for Defendants and their unnamed co-conspirators.

011194-11/2686242 V1

## C.    Pattern of Racketeering Activity

376.   The Content Fraud Enterprise is an ongoing, continuing group of entities associated together for the common purpose of fraudulently increasing the amount and number of Premium Content Fees each Fan pays.

377.   The Content Fraud Enterprise has been ongoing since approximately 2016 and will continue as long as Defendants can continue to fraudulently collect Premium Content Fees from Plaintiffs and the Class Members.

378.   While the OnlyFans Defendants and Agency Defendants are members of the Content Fraud Enterprise, and participated in and are part of the enterprise, they all have an existence separate and distinct from the enterprise. The Content Fraud Enterprise has a systematic linkage because there are financial ties and coordination of activities between the OnlyFans Defendants and the Agency Defendants.

379.   The Content Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries and internationally, such as the marketing, promotion, advertisement, and sale of digital content on the OnlyFans platform.

## D.    The Racketeering Activity or Predicate Acts

380.   Defendants devised a scheme to defraud Fans by creating and promoting misleading digital content on the OnlyFans platform, falsely representing the nature, quality, and value of the content to induce Fans to pay Premium Content Fees.

381.   Defendants acted with the specific intent to deceive and defraud Fans to increase their profits.

-108-

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

1    382.   To carry out, or attempt to carry out the scheme to defraud, Defendants

2  conducted or participated in the conduct of the affairs of the Content Fraud

3  Enterprise through a pattern of racketeering activity in violation of 18 U.S.C.

4  § 1962(c), that employed the use of the wire facilities, in violation of 18 U.S.C.

5  § 1343.

6    383.   Defendants participated in the scheme to defraud by using the internet

7  to transmit and operate the Content Fraud Enterprise.

8    384.   OnlyFans Defendants used the internet to communicate to Plaintiffs

9  and Class Members that they could develop "authentic relationships" and

10  "authentic connections" with Creators, which currently is on the OnlyFans website

11  and has been on there since 2017, reiterated in May 2022 as set forth herein.

12    385.   On January 17, 2021, OnlyFans Defendants represented on Twitter

13  that Fans could "direct message[]" and "chat with a Creator."

14    386.   On February 9, 2021, OnlyFans Defendants represented on Twitter

15  that Fans could "chat with [a Creator] 1 on 1."

16    387.   On February 20, 2021, OnlyFans Defendants represented on Twitter

17  that Fans could "chat with [a Creator] 1 on 1."

18    388.   On March 2, 2021, OnlyFans Defendants represented on Twitter that

19  Fans could "chat" with a Creator.

20    389.   On May 26, 2021, OnlyFans Defendants represented on Twitter a

21  Creator would "chat with all her fans in the DMs."

22    390.   On September 10, 2021, OnlyFans Defendants represented on Twitter

23  that a Creator "loves getting to know her fans in the DMs" and they could "chat

24  with her."

25

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

391.   On December 22, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans 1-on-1 . . . so introduce yourself."

392.   On January 6, 2022, OnlyFans Defendants represented on Twitter that a Creator "can't wait to chat with you."

393.   On March 8, 2022, OnlyFans Defendants represented on Twitter that a Creator "even chats with her fins in the DMs . . . So go and say hey."

394.   On October 22, 2022, OnlyFans Defendants represented on Twitter that Fans could "connect" with a Creator on a "deeper level."

395.   On September 30. 20222, OnlyFans Defendants represented on Twitter that Fans could "talk one-on-one with" a Creator.

396.   On November 2, 2022, OnlyFans Defendants represented on Instagram that a Creator was "chatting with her fans."

397.   On November 16, 2022, OnlyFans Defendants represented on Twitter that Fans could connect with a Creator "1-on-1."

398.   On December 16, 2022, OnlyFans Defendants represented on Twitter that a Creator was "responding to DMs."

399.   On August 19, 2023, OnlyFans Defendants represented on Instagram that Creator would "interact directly with [her] fans."

400.   On May 3, 2024, OnlyFans Defendants represented on Twitter that Fans could "connect[] personally" with a Creator.

401.   On June 18, 2024, OnlyFans Defendants represented on Instagram that a Creator made her living "chatting" with the Fans.

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

402.   On July 17, 2024, OnlyFans Defendants represented on Instagram that a Creator makes "amazing connections with [her] fans and built genuine relationships."

403.   OnlyFans Defendants made each of these statements to convince Fans to subscribe to Creators, collecting 20% of all those subscription fees, in addition to additional purchases made by the Fans after they subscribe.

404.   OnlyFans Defendants used the internet to communicate to each Fan who subscribed to a Creator's account that they would be able to "Direct message with this user." OnlyFans Defendants' records will show the exact date each Plaintiff and Class Member subscribed to a Creator account and received this communication. Agency Defendants as co-conspirators and agents of the Represented Creators, transmitted multiple communications through the internet to Plaintiffs and Class Members, falsely representing they were Creators, to convince Plaintiffs and Class Members to pay Premium Content Fees. Defendants' records will show the exact date of each communication, some of those communications include:

405.   Plaintiff B.L. subscribed to Briana Armbruster (Moxy) on November 28, 2023. The monthly subscription fee was $14.99 and he tipped an additional $87.00 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Briana Armbruster.

406.   Plaintiff B.L. subscribed to Tina Louise (Unruly) on October 9, 2020. He tipped an additional $59.69 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Tina Louise.

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

407.    Plaintiff B.L. subscribed to Kayla Lauren (Unruly) on October 9, 2020. He tipped an additional $44.00 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Kayla Lauren.

408.    Plaintiff B.L. subscribed to Anna Louise (Unruly) on October 9, 2020. He tipped an additional $160.67 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Anna Louise.

409.    Plaintiff B.L. subscribed to Ryann Murphy (Behave) on January 15, 2022. He tipped an additional $51.00 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Ryann Murphy.

410.    Plaintiff B.L. subscribed to Mathilde Tantot (Content X) on May 13, 2021. He tipped an additional $294.31 during the length of his subscription. Plaintiff B.L. is still subscribed to Mathilde Tantot but no longer interacts with her.

411.    Plaintiff B.L. subscribed to Pauline Tantot (Content X) on May 13, 2021. He tipped an additional $148.00 during the length of his subscription. Plaintiff B.L. is still subscribed to Pauline Tantot but no longer interacts with her.

412.    Plaintiff B.L. subscribed to Summer Soderstrom (Creators Inc.) on January 3, 2023. He tipped an additional $76.00 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Summer Soderstrom.

413.    Plaintiff S.M. subscribed to Bella Thorne (Content X) in 2020. The monthly subscription fee was approximately $20.00. He made several payments for content that was promised but never delivered or misleading. For example, he paid for a "topless picture" and received a picture of Ms. Thorne's back with no shirt and covering her breasts.

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

414.    Plaintiff S.M. subscribed to Jane Wilde (A.S.H.) in 2023 for two months at approximately $4.99 per month. He tipped $40.00 for a picture and video that was promised but not delivered. Ms. Wilde never replied to any of his messages regarding the content that was paid for but never delivered.

415.    Plaintiff S.M. subscribed to Abella Danger (Content X) from 2022–2024. He subscribed to both her free page and her VIP page at $19.99 per month. He tipped $100.00 to become a VIP subscriber and was led to believe he would receive exclusive "spicy content" monthly. He received the same photos that were posted on Ms. Danger's Instagram account. Ms. Danger never replied to any of his messages asking for a refund.

416.    Plaintiff S.M. subscribed to Steph Landor (Creators Inc.) from 2021–2023 to both her free page and her VIP page at approximately $20.00 per month. He spent over $200.00 for content "of a hot and spicy nature," such as topless photos and shower and bath videos. Instead, he received the same photos that were posted on Ms. Landor's Instagram account. He sent direct messages complaining and accusing her of not being truthful with her promised content. He was told her management team handles her OnlyFans account and they would be in touch with him.

417.    Plaintiff S.M. subscribed to Kaitlyn Krems (Moxy) from 2023–2024. He paid $100.00 to become a VIP subscriber. He spent additional money to purchase photos but they were all bikini photos rather than explicit content.

418.    Plaintiff S.M. subscribed to Breckie Hill (Moxy) in 2023. He paid $100.00 to become a VIP subscriber. Instead of explicit content, he only received a picture of Ms. Hill's face. When he questioned why, he received no response.

FIRST AMENDED CLASS ACTION COMPLAINT

419.   Plaintiff R.M. subscribed to Chyanne Burden (Moxy) on July 16, 2020. At the time, her page was free to subscribe to. He tipped an additional $55.00 during the length of his subscription. Plaintiff R.M. is still subscribed to Chyanne Burden but no longer tips or interacts with her. The current monthly subscription fee is approximately $20.00.

420.   Plaintiff R.M. subscribed to Emily Elizabeth (Dysrpt) on October 7, 2022. He tipped an additional $65.00 to become a VIP subscriber. He never received the picture he paid for with his VIP Picture Subscription. Plaintiff R.M. is still subscribed to Emily Elizabeth but no longer interacts with her.

421.   Plaintiff R.M. confronted Emily Elizabeth via direct message and she said it was her replying to messages.

422.   In addition to the acts of wire fraud identified above, Defendants' acts also include:

     a.  Promotion of fraudulent digital content through the OnlyFans platform to Plaintiffs and Class Members.

     b.  Electronic payment transactions processed by the platform—specifically by Defendant FIUSA—in which money was transferred from Fans to Defendants.

     c.  Communications between OnlyFans Defendants and Agency Defendants, instructing them on how to maximize profits through misleading content, as described herein.

     d.  Defendants' false and fraudulent representation to Plaintiffs and the Class Members about the value and/or authenticity of the digital content.

011194-11/2686242 V1

e.  The fraudulent digital content itself.

f.  Communications promoting fraudulent content.

g.  Essential marketing and promotional materials.

h.  Fraudulent advertisements and representations.

i.  Fraudulently obtained payments from Fans.

j.  Documents and communications that facilitated the fraudulent scheme.

k.  False or misleading communications intended to obscure the fraud.

l.  Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, omitted, and actively concealed material facts about the true nature of the digital content.

m. Documents intended to facilitate the marketing and sale of fraudulent content.

n.  Documents to process and receive payment for the digital content by unsuspecting Fans, including invoices and receipts.

o.  Deposits of proceeds.

423.  As described above, Defendants have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity within the past ten years.

424.  Defendants used, directed the use of, and/or caused to be used, thousands of wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

FIRST AMENDED CLASS ACTION COMPLAINT

425. The wire transmissions were made in furtherance of Defendants' scheme and common course of conduct to deceive Fans and lure them into paying money for a fraudulent "personal" virtual relationship and associated content.

426. Many of the precise dates of the fraudulent use of the interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

**E.     Injury and Damages**

427. Plaintiffs and the Class Members are victims of this nationwide scheme, having signed up for the OnlyFans platform based on assurances from the OnlyFans Defendants that the digital content and direct messaging was authentic and as represented.

428. The OnlyFans Defendants falsely and fraudulently represented the value and authenticity of the digital content to Fans.

429. The Agency Defendants on behalf of the Represented Creators used the Chatter Scams to increase the Premium Content Fees paid by Plaintiffs and the Class Members, of which they took a portion.

430. Defendants' actions were done to induce Fans to pay Premium Content Fees, all to fraudulently increase Defendants' profits.

431. Defendants' scheme was reasonably calculated to deceive Plaintiffs and Fans through the execution of their complex and illegal scheme to misrepresent the authenticity of the digital content offered on the platform.

432. By reason of, and because of the conduct of Defendants, and each of them, and in particular, their pattern of racketeering activity, Plaintiffs and Class

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

Members have been injured in their business and/or property in multiple ways, including but not limited to:

433.   Paying Premium Content Fees they would not have paid, had they known they were communicating with Chatters, not the Creators.

434.   The lost expectation of having direct, authentic communications, and the effort wasted communicating with Creators' Chatters.

435.   Overpayment for the digital content that was not as represented.

436.   Overpayment for digital content that was misrepresented as to the characteristics, source, or authenticity.

437.   Other incidental and consequential expenses linked to the overpayment for the digital content, including, but not limited to, additional interest on financing, fees, and other financial harms.

438.   Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to three times their actual damages, as well costs and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

### COUNT II. RICO CONSPIRACY
### (18 U.S.C. § 1962(d))
### (Against All Defendants)

439.   **Agreement to Violate RICO.** Defendants OnlyFans Defendants and Agency Defendants, along with the Agency Defendants' co-conspirators, knowingly agreed and conspired to violate 18 U.S.C. § 1962(c) by engaging in the pattern of racketeering activity described above.

*440.*   **Participation in Conspiracy.** Each Defendant knowingly agreed to and participated in the conspiracy by performing various acts to further the

-117-

FIRST AMENDED CLASS ACTION COMPLAINT

fraudulent scheme, including creating and distributing false digital content, and facilitating the transactions through the platform.

441.   **Overt Acts in Furtherance of the Conspiracy.** Defendants committed numerous overt acts in furtherance of the conspiracy, including but not limited to:

    a.  OnlyFans Defendants' development and implementation of policies that ostensibly prohibited fraudulent activity but were intentionally not enforced.

    b.  OnlyFans Defendants promised Fans that they could and would be direct messaging with Creators, knowing that the Agency Defendants were using Chatters to impersonate Creators in violation of OnlyFans' policies.

    c.  OnlyFans Defendants' collection of 20% of the Premium Content Fees, knowing that the Agency Defendants were using Chatters to impersonate Creators in violation of OnlyFans' policies, and in response to which OnlyFans Defendants took no action.

    d.  Agency Defendants' creation and sale of fraudulent digital content, knowing that OnlyFans Defendants would not take action to stop or penalize such behavior.

    e.  Use of interstate wire communications to promote and facilitate the fraudulent scheme, including internet promotions and electronic transactions.

442.   **Injury and Causation.** As a direct and proximate result of the Defendants' conspiracy, Plaintiffs and the Class suffered financial harm through the

-118-

011194-11/2686242 V1

1    purchase of fraudulent digital content in the form of Premium Content Fees, leading

2    to significant monetary losses.

3        443.    Defendants' actions were the proximate cause of the Plaintiffs' and

4    Class Members' injuries, as the fraudulent scheme depended on the implicit

5    coordination and mutual support of all Defendants.

6        444.    By reason of, and because of the conduct of Defendants, and each of

7    them, and in particular, their conspiracy to commit a pattern of racketeering

8    activity, Plaintiffs and Class Members have been injured in their business and/or

9    property in multiple ways, including but not limited to:

10            a.    Paying Premium Content Fees they would not have paid, had they

11                known they were communicating with Chatters, not the Creators.

12            b.    The lost expectation of receiving authentic digital content.

13            c.    Overpayment for the digital content that was not as represented.

14            d.    Overpayment for digital content that they did not receive or that was

15                misrepresented as to the source or authenticity.

16        445.    Other incidental and consequential expenses linked to the overpayment

17    for the digital content, including, but not limited to, additional interest on financing,

18    fees, and other financial harms.

19        446.    Defendants' violation of 18 U.S.C. § 1962(d) have directly and

20    proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs

21    and the Class are entitled to three times their actual damages, as well costs and

22    reasonable attorneys' fees under 18 U.S.C. 1964(c).

23

24

25

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

## COUNT III. VIOLATION OF THE FEDERAL VIDEO PRIVACY PROTECTION ACT (VPPA) (18 U.S.C. § 2710) (Against All Defendants)

447.   The Video Privacy Protection Act ("VPPA" or, in this claim, "the Act") was passed to protect the ability of Americans to obtain and watch video content in private spaces without risk that the businesses providing them those videos would disclose the nature of that content to anyone "without the watcher's consent."[79]

448.   To that end, the Act prohibits a "video tape service provider" from knowingly disclosing a customer's "personally identifiable information" without that customer's consent.[80]

**A.    The OnlyFans platform collects personally identifying information about Fans.**

449.   In its Privacy Policy, OnlyFans admits to collecting the following categories of information: "User Data," including a Fan's "email address" and "telephone number;" "Account Data," which includes: "profile name"; "password"; "avatars and headers of your Fan account"; "your subscriptions"; "comments on posts made from your Fan account"; "chat messages between you and other users"; "Commercial Information: Such as information about products or services

---

[79] "The Video Privacy Protection Act as a Model Intellectual Privacy Statute," Developments in the Law, Harvard Law Review, 131 Harv. L. Rev. 1766, available at https://harvardlawreview.org/print/vol-131/the-video-privacy-protection-act-as-a-model-intellectual-privacy-statute/ (last accessed Jul. 28, 2024).

[80] *See e.g.*, *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015).

FIRST AMENDED CLASS ACTION COMPLAINT

1    purchased and your use of our Services"; and "Sensory Information: Such as

2    pictures and videos (content) you upload to the Website."[81]

3         450.   Each time a Fan interacts with a Creator's account via OnlyFans, the

4    platform collects and transmits sufficient information to identify the specific Fan,

5    including the Fan's username, which can be used by anyone to locate and view the

6    Fan's profile on OnlyFans. Thus, any interaction related to a Fan's request for or

7    viewing of any video content is considered personally identifying information

8    ("PII") about that Fan,[82] since it would allow an ordinary person to connect an

9    individual Fan with the specific content that they requested and/or viewed—

10   including the titles or filenames of videos, as well as the subject matter of those

11   videos—and thus to identify the video-watching behavior of individual Fans,

12   including Plaintiffs and Class Members.

13        451.   Indeed, the Chatter Scams only function effectively through the

14   nonconsensual disclosure of Fan PII: by creating a communication history viewable

15   by Chatters so that they can convincingly impersonate a specific Creator and

16   pretend that the Creator has an ongoing relationship with the Fan—including

17   intimate knowledge of the Fan's history and preferences, specifically with respect

18   to video content—in order to manipulate Fans into purchasing additional content

19   based on false pretenses.

20

21

---

22   [81] Privacy Policy ¶¶ 9, 20 (California Specific Disclosures), ONLYFANS, https://onlyfans.com/privacy (last visited July 29, 2024).

23   [82] The Act defines PII as "information which identifies a person as having
24   requested or obtained specific video materials or services from a video tape service provider," 18 U.S.C. § 2710(a)(3).

25                                          -121-

**B.    Defendants are video tape service providers under the Act.[83]**

452.    Each of the Agency Defendants is engaged in the business of selling and/or delivering audiovisual materials as the agent or representative of the Represented Creators.

453.    The OnlyFans Defendants are also engaged in the business of selling and/or delivering audiovisual materials. The entire purpose of the OnlyFans platform is to deliver content from Creators to Fans (and vice versa, with respect to Fan-Created Content).[84]

454.    On information and belief, a substantial portion of that content is made up of prerecorded videos,[85] which OnlyFans not only stores, but organizes, on behalf of Creator accounts. OnlyFans describes this feature of the platform as "the Vault," which "stores all of your previously-posted or scheduled photos, *videos*,

---

[83] 18 U.S.C.S. § 2710(a)(4) (defining video tape service provider as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, or any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2)").

[84]    Another feature that OnlyFans touts is automatically turning livestreams into pre-recorded video. Blog Post, *Ultimate Guide to OnlyFans Features*, ONLYFANS (July 12, 2023), https://blog.onlyfans.com/ultimate-guide-to-onlyfans-features/ (last visited Jul. 29, 2024) ("OnlyFans automatically adds your streamed videos to your Vault so fans can watch it later as a video-on-demand.").

[85] OnlyFans' TOU defines "content" as "***any material uploaded to OnlyFans*** by any User (whether a Creator or a Fan), including any photos, *videos*, audio (for example music and other sounds), livestream material, data, text (such as comments and hashtags), metadata, images, interactive features, emojis, GIFs, memes, and any other material whatsoever." Terms of Use for All Users ¶ 2(c), ONLYFANS, https://onlyfans.com/terms (last visited June 29, 2024) (emphasis added).

FIRST AMENDED CLASS ACTION COMPLAINT

and *live streams*,"[86] and emphasizes the Vault's ability to "set aside content already shared with subscribers over DM," so that if a Creator "forgot which content you've sent out over messages or PPV, the Vault will remember for you."[87] OnlyFans also provides a "Stories" feature, which it describes as "videos that display for only 24 hours."[88]

455.    Plaintiffs and Class Members purchased RC Content directly from the Agency Defendants, whose revenues are directly related to the amount of content purchased by Fans, and from OnlyFans Defendants, since OnlyFans' fee structure effectively gives Defendants FIL and FIUSA what amounts to a "commission" on every video sold via the platform—whether by subscription or PPV.

456.    Defendants knowingly disclosed Plaintiffs' and Class Members' PII without their consent.

457.    Defendants know that the PII being disclosed is intended to be private and confidential, yet neither OnlyFans nor the Agencies informed Plaintiffs or Class Members of the possibility that their PII might be disclosed to anyone other than the Creator whose account they were interacting with ("Selected Creator").

458.    Neither OnlyFans nor the Agencies obtained Plaintiffs' or Class Members' consent for their PII to be disclosed to anyone other than the Selected

---

[86] Another feature that OnlyFans touts is automatically turning livestreams into pre-recorded video. Blog Post, *Ultimate Guide to OnlyFans Features*, ONLYFANS (July 12, 2023), https://blog.onlyfans.com/ultimate-guide-to-onlyfans-features/ (last visited Jul. 29, 2024) ("OnlyFans automatically adds your streamed videos to your Vault so fans can watch it later as a video-on-demand.").

[87] Id.

[88] Id.

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

Creator. Nor did Plaintiffs or Class Members give such consent to any other parties—including the Selected Creators themselves.

459.   Plaintiffs and Class Members did not consent to having any of their communications or personal information—including PII—shared with anyone other than their Selected Creators.

460.   Plaintiffs and Class Members were unaware of the fact that their PII (including names, usernames, messages, message content, and video viewing histories) were being disclosed to anyone other than their Selected Creators.

461.   Through its platform, which facilitates the communication of information between Fan and Creator accounts, OnlyFans disclosed Plaintiffs' and Class Members' PII to other people, including Agencies and Chatters. OnlyFans made such disclosures knowing that Plaintiffs and Class Members had not consented to the disclosure of their PII to anyone other than their Selected Creators.

462.   Each Agency Defendant also disclosed that PII to other people, including Chatters, despite knowing that Plaintiffs and Class Members had not consented to the disclosure of their PII to anyone other than their Selected creators. To facilitate the Chatter Scams, the Agencies allowed Chatters to have access to Agency Accounts on the OnlyFans platform—whether directly (by providing Chatters with login information) or indirectly (via third-party CRM software such as SuperCreator, which, as outlined above in Section IV.E.2, is designed to facilitate the use of Chatters by agencies).

463.   None of the VPPA's exceptions to the consent requirement apply in this case. Specifically, Defendants' wrongful disclosures were not done in the

"ordinary course of business," but were done for the purpose of illegal and fraudulent conduct.

464.   Defendants' conduct is illegal, offensive, and contrary to Plaintiffs' and Class Members' expectations.

465.   As a result of these violations, Plaintiffs and the Class are entitled to statutory damages, punitive damages, attorneys' fees, and any other relief deemed appropriate by the Court.

## COUNT IV. VIOLATION OF THE
## CALIFORNIA COMPREHENSIVE DATA ACCESS AND FRAUD ACT
### (Cal. Penal Code § 502)
### (Against All Defendants)

466.   The California Comprehensive Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502 et seq., prohibits knowingly accessing computer systems, data, or services without permission, as well as knowingly providing or facilitating unauthorized access.

467.   Agency Defendants violated CDAFA by knowingly accessing, without permission, Plaintiffs' and Class Members' private messages stored on or transmitted via the OnlyFans Platform's computer systems.

468.   On information and belief, Agency Defendants accessed these systems using login credentials that were improperly shared or obtained, allowing them to impersonate Creators and thereby access confidential communications without Plaintiffs' consent.

469.   OnlyFans Defendants violated CDAFA by knowingly facilitating or assisting Agency Defendants and CRM vendors in gaining unauthorized access to the OnlyFans platform.

-125-

011194-11/2686242 V1

470.   Specifically, OnlyFans Defendants provided or permitted technical means, including, on information and belief, API endpoints, simultaneous logins, and software integrations, enabling Agency Defendants and their agents to improperly access Fans' private messages without the Fans' knowledge or consent.

471.   OnlyFans Defendants had actual or constructive knowledge that Agency Defendants used these provided means to impersonate Creators and to interact deceptively with Fans, yet they failed to implement available technical or procedural safeguards to prevent this unauthorized conduct. Such knowing facilitation and allowance of unauthorized third-party access constitutes independent violations of Cal. Penal Code § 502(c)(6) and (c)(7).

472.   OnlyFans Defendants also directly violated CDAFA, including but not limited to § 502(c)(2) and (c)(3), by knowingly accessing, taking, copying, and making use of Plaintiffs' and Class Members' communications, message contents, and associated user data in ways not authorized by Plaintiffs. OnlyFans Defendants' use, processing, and monetization of these communications exceeded any permission granted by Plaintiffs or was otherwise without Plaintiffs' knowledge or consent, particularly given the deceptive impersonation practices employed.

473.   Plaintiffs and Class Members never consented to third-party access or participation in their private communications, and any purported consent was invalid, having been procured by concealment, deception, or misrepresentation.

474.   As a direct result of these violations, Plaintiffs and Class Members suffered damages including invasion of privacy, emotional distress, and economic losses arising from fraudulent and deceptive practices enabled by unauthorized access.

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

475.   Pursuant to Cal. Penal Code § 502(e), Plaintiffs seek compensatory damages, injunctive and declaratory relief, punitive damages, and attorneys' fees and costs.

## COUNT V. VIOLATIONS OF THE
## CALIFORNIA INVASION OF PRIVACY ACT (CIPA)
## CAL. PENAL CODE § 630, *ET SEQ.*
### (Against All Defendants)

476.   To establish liability under CIPA, Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

    a.   "Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;" or

    b.   "Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained;" or

    c.   Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

477.   Penal Code § 631(a) applies to "new technologies" such as computers, the Internet, and email.

478.   Defendants are "persons" within the meaning of CIPA.

479.   The following items constitute machines, instruments, or contrivances under the CIPA, and even if they do not, Defendants' deliberate and purposeful

-127-

FIRST AMENDED CLASS ACTION COMPLAINT

scheme that facilitated its use of Plaintiffs' and the Class Members' communication

falls under the broad statutory catch-all category of "any other manner":

    a.  The computer code and programs OnlyFans Defendants used to or

          enable the Agency Defendants to track Plaintiffs' and Class Members'

          communications while they were on the OnlyFans website;

    b.  The programs the Agency Defendants used to execute the Chatter

          Scams;

    c.  California Plaintiffs' and Class Members' browsers and mobile

          applications;

    d.  California Plaintiffs' and Class Members' computing and mobile

          devices; and

    e.  The plan Defendants carried out to effectuate their use of Plaintiffs'

          and the Class Members' communications.

480.   Agency Defendants, as agents and representatives of the Represented

Creators, through their contractors (the Chatters), without the consent of all parties

to the communications—specifically without the consent of California Plaintiffs

and Class Members—read or learned the content of California Plaintiffs' and Class

Members' private messages.

481.   Agency Defendants, as the agents or representatives of the

Represented Creators, used the information obtained in the communications from

California Plaintiffs and Class Members to solicit Premium Content Fees, while

falsely claiming to be the Represented Creators.

482.   OnlyFans Defendants aided, agreed, conspired with, and/or permitted

Agency Defendants to obtain Plaintiffs' and Class Members' communications

FIRST AMENDED CLASS ACTION COMPLAINT

1    without their consent and to use those communications to solicit Premium Content

2    Fees from Plaintiffs and the Class.

3        483.    The communications obtained by the Agency Defendants, as agents or

4    representatives of the Represented Creators, constituted "confidential

5    communications" as that term is used in Section 632, because Plaintiffs and the

6    Class had objectively reasonable expectations of privacy in their devices and

7    activity—in particular the sending and receiving of private messages containing

8    sensitive personal information.

9        484.    Plaintiffs and the Class have additionally suffered loss by reason of

10    these violations, including, without limitation, violation of the right of privacy and

11    payment of Premium Content Fees that Plaintiff and the Class would not have paid

12    without the unlawful use of their confidential communications.

13        485.    Unless restrained and enjoined, Defendants will continue to commit

14    such acts.

15        486.    Plaintiffs have been injured by Defendants' violations of CIPA.

16        487.    Plaintiffs seek all monetary and non-monetary relief allowed by law,

17    including actual damages, statutory damages in accordance with § 637.2(a),

18    punitive damages, preliminary and other equitable or declaratory relief, and

19    attorneys' fees and costs.

20    **COUNT VI. VIOLATION OF THE FEDERAL WIRETAP ACT**
**18 U.S.C. § 2510, *ET SEQ*.**
21    **(Against Agency Defendants)**

22        488.    Title 1 of the Electronic Communications Privacy Act, known as the

23    "Wiretap Act," prohibits the interception of electronic communications.

24

25                                    -129-

489.    To establish a prima facie case under the Wiretap Act, Plaintiffs and the Class must show: (1) Agency Defendants intentionally (2) intercepted (3) the contents (4) of an electronic communication (5) Plaintiffs and the Class did not consent to the interception (6) the interception was done for the purpose of committing a criminal or tortious act and (7) Plaintiffs suffered damages.

490.    Agency Defendants have engaged in unauthorized interception and use of electronic communications of Plaintiffs and Class Members by monitoring and capturing their communications on the OnlyFans platform. This interception included the real-time acquisition of messages, images, and other electronic communications by Chatters, which Plaintiffs and Class Members were sending to Represented Creators, without Plaintiffs' or Class Members' knowledge or consent, for the purpose of fraudulently soliciting Premium Content Fees.

491.    Through the use of CRM platforms described above in Section IV.E.2, the Agency Defendants are simultaneously intercepting and diverting Class Member communications sent to a Selected Creator on the OnlyFans platform. The messages are intercepted and then simultaneously diverted from the Creator's OnlyFans account inbox to a CRM platform that allows numerous Chatters to seamlessly access and respond to messages in real time.

492.    This practice is necessary to facilitate the high volume of Chatters that many Agency Defendants employ. Without it, each Chatter would individually need to log into a Creator's OnlyFans account and send messages directly from the Creator's inbox after they were received—something that would overwhelm a specific account, causing loss of functionality.

011194-11/2686242 V1

493.   While a violation of the OnlyFans terms of use, this practice is no secret. Indeed, one popular CRM platform openly advertises that it mimics user behavior to simultaneously divert all messages from the Creator's OnlyFans account to the CRM platform in real time. Once the messages are accessible from the CRM platform, a high volume of Chatters impersonating the Creator can toggle between and respond to Class Members' messages on the Creator's behalf:

494.   The Fan communications intercepted through CRM platforms contained sensitive and private information, which Agency Defendants used to gain insights and financial advantage in the form of Premium Content Fees, thereby committing tortious acts including invasion of privacy and fraud.

495.   Plaintiffs and the Class have suffered harm as a result of the Agency Defendants' violations of the Federal Wiretap Act, including loss of privacy, emotional distress, and unauthorized use of their personal information.

496.   Plaintiffs and the Class are entitled to statutory damages, punitive damages, attorneys' fees, and any other relief the Court finds just and proper.

## COUNT VII. BREACH OF CONTRACT
### (Against OnlyFans Defendants)

497.   When Fans subscribe to Creator accounts on OnlyFans, they enter into a contractual relationship with the OnlyFans Defendants.

498.   When a Fan goes to subscribe to a Creator's page, OnlyFans Defendants promise that the Fan will be able to "[d]irect message with this" Creator.

FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

499.    Plaintiffs and Class Members accepted that promise by subscribing to that Creator, adding a payment card, and, in most cases, paying a monthly fee to OnlyFans for each Creator they subscribe to.

500.    OnlyFans Defendants breach that contract by failing to provide the promised services: direct messaging with the Creators.

501.    Instead, agencies are running the Creators' accounts and the majority, if not all, of the direct messages Plaintiffs and the Class Members engage in are with Chatters.

502.    Plaintiffs and Class Members also paid Creators tips and for pay-per-view content, believing that under the contract they had with OnlyFans they would be and were speaking directly with the Creators, which OnlyFans knows is not happening, as communications are being handled almost exclusively by the Agency Defendants' Chatters, not the Creators.

503.    Plaintiffs and Class Members have suffered injury in fact, including monetary damages in the form of subscription fees, tips, and pay-per-view content fees they would not have incurred, damages caused by the OnlyFans Defendants' breach of contract.

504.    Plaintiffs and Class Members may recover all damages associated with this breach in an amount to be proven at trial, including attorneys' fees and costs.

## COUNT VIII. FRAUD & FRAUD BY CONCEALMENT
### (COMMON LAW)
### (Against OnlyFans Defendants)

**A.    Fraud**

505.    OnlyFans Defendants falsely represented to Plaintiffs and Class Members that if they subscribed to Creators on the OnlyFans platform they would

-132-

011194-11/2686242 V1

1  have "direct," "1 on 1," and "authentic" communications with those Creators.

2  OnlyFans specifically promised Plaintiffs and Class Members they would be able to

3  "direct message with" Creators.

4    506.  These communications and representations were relayed/published to

5  Plaintiffs and Class Members as outlined in paragraphs 81–92, above.

6    507.  OnlyFans made these representations knowing they were false,

7  specifically knowing that most of the communications Plaintiffs and Class

8  Members engaged in would be with Chatters.

9    508.  OnlyFans Defendants made these representations to fraudulently

10  induce Plaintiffs and Class Members to use the OnlyFans platform and services and

11  increase the amount of Premium Content Fees they purchased.

12    509.  Plaintiffs and Class Members justifiably relied on these

13  representations.

14  **B.    Fraud by Concealment**

15    510.  OnlyFans Defendants knowingly and intentionally concealed and

16  suppressed the fact that the OnlyFans platform employed practices that facilitated

17  the Chatter Scams, with the intent to mislead Plaintiffs and the Class.

18    511.  OnlyFans Defendants owed Plaintiffs a duty to disclose the true nature

19  of their operations—all of which was in fact known by OnlyFans Defendants—

20  including the use of Chatters to impersonate content Creators, the extent of data

21  collection and sharing, and the impact on Fans' privacy, because Defendants:

22      a.  Intentionally concealed the foregoing from Plaintiffs and Class

23        Members; and/or

24

25
FIRST AMENDED CLASS ACTION COMPLAINT

011194-11/2686242 V1

b. Made incomplete representations about the characteristics of the OnlyFans platform through its widespread advertising and materials created by OnlyFans Defendants and provided to Fans, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

512.    The facts that OnlyFans Defendants misrepresented, omitted, and concealed were material to Plaintiffs and the Class. A product or service made by a reputable company that emphasizes direct and authentic communication is worth more than an otherwise comparable product or service made by a disreputable and dishonest company that conceals its Chatter Scams.

513.    Plaintiffs and the Class reasonably and justifiably relied on OnlyFans Defendants' concealment of material facts. No reasonable consumer would have used, paid a premium for, or paid as much in Premium Content Fees had OnlyFans Defendants revealed the true nature of its Chatter Scams.

514.    The truth about OnlyFans Defendants' Chatter Scams was known only to themselves and was not known by Plaintiffs and the Class, and could not have been discovered by Plaintiffs and the Class through any reasonable investigation, since OnlyFans Defendants used sophisticated methods to conceal the truth.

515.    Defendants actively concealed and/or suppressed that Plaintiffs and the Class would not be exclusively communicating directly with Creators, in whole or in part, to pad and protect its profits and to avoid the perception that its services did not or could not comply with its promises of direct Creator contact, which perception would hurt the brand's image and cost OnlyFans Defendants money, and it did so at the expense of Plaintiffs and the Class.

FIRST AMENDED CLASS ACTION COMPLAINT

**C.    Plaintiffs and Class Members were injured.**

516.    As a result of OnlyFans Defendants' intentional fraud, concealment and/or suppression of material facts, Plaintiffs and the Class were damaged in that they paid more for the services than they were worth at the time of use—and indeed, paid Premium Content Fees based on the promise of direct and authentic communication that they did not receive.

517.    Accordingly, OnlyFans Defendants are liable to Plaintiffs and the Class for damages in an amount to be proven at trial, for restitution, and, as a conscious wrongdoer, for disgorgement of all profits wrongfully obtained as a result of their wrongful conduct.

518.    OnlyFans Defendants' acts and omissions were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and the representations that OnlyFans Defendants made to them, in order to enrich OnlyFans Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT IX. DECEIT, IN VIOLATION OF CAL. CODE §§ 1709 & 1710**
**(Against OnlyFans Defendants on behalf of California subclass)**

519.    California Civil Code § 1709 provides that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

520.    California Civil Code § 1710 defines "deceit" as (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact, by one who is bound to

-135-

011194-11/2686242 V1

disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or (4) a promise, made without any intention of performing it.

521.    OnlyFans Defendants deceived Plaintiffs by making express statements that by subscribing to a Creator, Plaintiffs would be exclusively "direct messaging" with that Creator.

522.    California Civil Code §§ 1709 and 1710 define and prohibit deceitful practices. Deceit, as defined by these statutes, involves the willful misrepresentation or concealment of a material fact, with the intent to deceive or mislead another person, causing harm.

523.    OnlyFans Defendants, through their actions as described in earlier claims, have willfully misrepresented and concealed material facts regarding the nature of the interactions on its platform, particularly the impersonation of Creators by third-party Chatters and the true source of the content sold. Such impersonations, which almost exclusively make up the communications occurring via direct messaging between Creators represented by the Agency Defendants and their Fans, are not "direct messages." At best, the Chatters' messages are indirect and independent messages that are not confidential, not reviewed first (and likely not at all) by the Creator, and the responses are not personal or authentic. Similarly, direct messages to the Creator from a Fan are not private or exclusively direct in the first instance, confidential, or handled by the Creator themself.

524.    These misrepresentations and concealments were made with the intent to deceive Plaintiffs and the Class, and encourage them to engage with the platform and make purchases based on the misrepresented information.

-136-

FIRST AMENDED CLASS ACTION COMPLAINT

525.    Plaintiffs and the Class relied on these misrepresentations and concealments to their detriment, resulting in financial and other damages.

526.    As a result of these deceitful practices, Plaintiffs and the Class have suffered harm and are entitled to compensatory damages, punitive damages, and any other relief deemed appropriate by the Court.

## COUNT X. VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*)
### (Against OnlyFans Defendants on behalf of California Subclass)

527.    Cal. Bus. & Prof. Code § 17500 makes it unlawful for a company to induce the public to enter into an obligation related to personal property with a statement made in advertising, marketing, or publication, including any statement made on the internet, it knows is untrue or misleading, or with the exercise of reasonable care should know is untrue or misleading.

528.    OnlyFans Defendants caused to be made or disseminated through California and the United States, through advertising, marketing, social media, product labels, and other publications, statements that were untrue or misleading, and which were known, or which, if exercising reasonable care, would have been known to OnlyFans Defendants, to be untrue and misleading to consumers, including to Plaintiffs and the Class.

529.    OnlyFans Defendants violated Cal. Bus. & Prof. Code § 17500 because the misrepresentations that Plaintiffs and Class Members would be "direct messaging" with the Creators in a personal and authentic way were material and likely to deceive a reasonable consumer.

011194-11/2686242 V1

530.   OnlyFans Defendants made the misrepresentations with the intent to induce consumers to use their platform and to pay additional amounts for Premium Content Fees.

531.   California Plaintiffs and Class Members have suffered an injury in fact, including the loss of money or property, because of OnlyFans Defendants' unfair, unlawful, and/or deceptive practices.

532.   In using OnlyFans, California Plaintiffs and Class Members relied on OnlyFans Defendants' misrepresentations that they would be exclusively direct messaging with the Creators. Had Plaintiffs known this, they would not have used the platform and/or paid as much for the services.

533.   All the wrongful conduct alleged occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is ongoing, both in California and nationwide.

534.   California Plaintiffs, individually and on behalf of the Class, request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs any money OnlyFans Defendants acquired by false advertising, via restitution or disgorgement, and for any other just and proper relief.

## COUNT XI. VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")
### (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)
**(Against OnlyFans Defendants on behalf of California Subclass)**

535.   Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

536.   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., proscribes acts of unfair competition, including "any unlawful,

-138-

011194-11/2686242 V1

unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

537.    Defendants are "persons" as defined by Cal. Bus. & Prof. Code § 17201.

### Unlawful Act

538.    Defendants committed unlawful business practices in violation of the UCL, as follows:

    a.  OnlyFans Defendants' conduct constitutes an unlawful business practice because they have violated: the California Invasion of Privacy Act, Cal. Penal Code §§ 630 to 638; Deceit under California Civil Code § 1709 *et seq.*; and California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*

    b.  Agency Defendants' conduct constitutes an unlawful business practice because they have violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630 to 638.

### Unfair Act

539.    OnlyFans Defendants' conduct constitutes an unfair business practice in, at a minimum, these ways:

    a.  By falsely promising to California Plaintiffs and the Class Members that they could and would direct message with the Creators;

    b.  By engaging in deceptive and misleading advertising to induce consumers to use their platform; and

FIRST AMENDED CLASS ACTION COMPLAINT

c.  By not enforcing their policies and terms of service regarding the confidentiality of communications or ensuring the Creators are engaging in direct communications with the Fans.

540.  Agency Defendants' conduct constitutes an unfair business practice in, at a minimum, these ways:

a.  By using Chatters to impersonate the Represented Creators; and

b.  By using Chatters to facilitate the relationship to further the opportunity to collect (and solicit the purchase of) Premium Content Fees.

### Unfair, Deceptive, Untrue, or Misleading Advertising

541.  OnlyFans Defendants falsely advertised that Fans could connect directly with the Creators, with the intent to induce consumers to use their platform.

542.  OnlyFans Defendants knew, or should have known, that these representations were false because the majority, if not all, of the direct messages were not with Creators but Chatters.

543.  OnlyFans Defendants' misrepresentations caused California Plaintiffs and Class Members to use the platform or pay more for its services. Absent those misrepresentations, Plaintiffs and Class Members would not have used the platform and/or paid as much for the services.

544.  All the wrongful conduct alleged occurred, and continues to occur, in the course of Defendants' business.

545.  California Plaintiffs and Class Members have suffered injury in fact, including lost money and undesirable service, as a result of Defendants' misrepresentations.

-140-

011194-11/2686242 V1

546.    Plaintiffs, individually and on behalf of the Class, request that this Court enter such orders or judgments as may be necessary to restore to California Plaintiffs and members of the Class via restitution or disgorgement, any monies Defendants acquired by unfair competition, as provided by Cal. Bus. & Prof. Code § 17203; and for such other relief as may be just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and for members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel and Plaintiffs as Class Representatives;

B.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint, including its representations that the OnlyFans platform provides "direct," "personal," or "authentic" communication with Creators—or any other language suggesting the same;

C.    Costs, restitution, damages, and/or disgorgement, each in an amount to be determined;

D.    Punitive damages;

E.    Pre- and post-judgment interest on any amounts awarded;

F.    Treble damages as provided by 18 U.S.C. § 1964(c);

G.    Reasonable attorneys' fees and costs; and

H.    Such other or further relief as may be appropriate.

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1

1          **DEMAND FOR JURY TRIAL**

2      Plaintiffs demand a trial by jury on all issues so triable.

3    DATED: April 23, 2025          Respectfully submitted,

4                                   HAGENS BERMAN SOBOL SHAPIRO LLP

5                                   By /s/ *Robert B Carey*
                                    Robert B. Carey (*pro hac vice*)
6                                   Leonard W. Aragon (*pro hac vice*)
                                    Michella A. Kras (*pro hac vice*)
7
                                    HAGENS BERMAN SOBOL SHAPIRO LLP
8                                   11 West Jefferson, Suite 1000
                                    Phoenix, Arizona 85003
9                                   Telephone: (602) 840-5900
                                    Facsimile: (602) 840-3012
10                                  Email: rob@hbsslaw.com
                                          leonarda@hbsslaw.com
11                                        michellak@hbsslaw.com

12                                  Christopher R. Pitoun (SBN 290235)
                                    301 North Lake Avenue, Suite 920
13                                  Pasadena, California 91101
                                    Telephone: (213) 330-7150
14                                  Facsimile: (213) 330-7152
                                    Email: christopherp@hbsslaw.com
15

16                                  Andrea R. Gold (*pro hac vice*)
                                    David A. McGee (*pro hac vice*)
17                                  Shana H. Khader (*pro hac vice*)
18                                  TYCKO & ZAVAREEI LLP
                                    2000 Pennsylvania Avenue NW, Suite 1010
19                                  Washington, DC 20006
                                    Phone: (202) 973-0900
20                                  Facsimile: (202) 973-0950
                                    Email: agold@tzlegal.com
21                                        dmcgee@tzlegal.com
                                          skhader@tzlegal.com
22

23                                  Andrew C. Stone (*pro hac vice*)
                                    Seth T. Goertz (*pro hac vice*)
24                                  DORSEY & WHITNEY LLP

25                                          -142-

2325 East Camelback Road, Suite 900
Phoenix, AZ 85016
Phone: (602) 735-2700
Facsimile: (602) 926-2471
Email: stone.andy@dorsey.com
         goertz.seth@dorsey.com

*Attorneys for Plaintiffs*

FIRST AMENDED CLASS ACTION COMPLAINT
011194-11/2686242 V1