Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile:  (213) 330-7152
Email:  christopherp@hbsslaw.com

Robert B. Carey (*pro hac vice*)
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile:  (602) 840-3012
Email:  rob@hbsslaw.com
        leonarda@hbsslaw.com
        michellak@hbsslaw.com

*Attorneys for Plaintiffs*

*(Additional Counsel on Signature Page)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC, MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC,<br><br>Defendants. | Case No. 8:24-cv-01655-FWS-SSC<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS FENIX INTERNATIONAL LIMITED'S AND FENIX INTERNET LLC'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, FAILURE TO STATE A CLAIM, AND IMPROPER VENUE**<br><br>**[REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL]**<br><br>Judge:      Hon. Fred W. Slaughter<br>Courtroom: 10D<br>Date:       September 4, 2025<br>Time:       10:00 a.m. |

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................. 1

II.     BACKGROUND ................................................................................... 2

III.    ARGUMENT ........................................................................................ 4

     A.      The Court Has Personal Jurisdiction Over Fenix
         Defendants. ................................................................................ 4

         1.      Fenix Purposefully Directed Its Conduct Toward—and
              Availed Itself of Doing Business in—California. ...................... 5

         2.      Plaintiffs' Claims Arise from Fenix's California
              Contacts ..................................................................................... 8

         3.      Exercising Jurisdiction Is Fair and Reasonable ......................... 9

         4.      The Court Has Personal Jurisdiction Over Fenix Under
              § 1965(b) Because Plaintiffs Allege a Single,
              Coordinated RICO Conspiracy ................................................ 10

         5.      Alternatively, Fenix's Contacts Support General
               Jurisdiction ............................................................................. 12

         6.      Venue is proper as to Plaintiff R.M. ....................................... 13

     B.      Plaintiffs did not consent—either explicitly or
         implicitly—to the Chatter Scams. ........................................... 14

     C.      Section 230 Does Not Bar Plaintiffs' Claims. ...................................... 16

         1.      The Fenix Defendants Ignore the Scores of Allegations
              in the FAC that Detail Their Affirmative
              Misrepresentations. ................................................................. 16

         2.      Section 230 does not apply to Fenix's Own Statements
              and Conduct. ........................................................................... 17

     D.      Plaintiffs Have Plausibly Alleged a Breach of Contract by
         the Fenix Defendants. .............................................................. 18

E.  Plaintiffs Allege a Colorable RICO and RICO Conspiracy
    Claim Against the Fenix Defendants ................................................. 20

F.  Plaintiffs plausibly allege that Fenix committed fraud and
    actively concealed the Chatter Scams. ............................................. 23

G.  Plaintiffs plausibly allege deceit under California Civil
    Code § 1709. ...................................................................................... 25

H.  Plaintiffs sufficiently plead their VPPA claim. ............................... 27

    1.  Defendants qualify as video tape service providers
        because they delivered audiovisual content as a core
        monetized feature of the platform. ........................................ 27

    2.  Plaintiffs qualify as consumers because they subscribed
        to and paid for video services operated by Defendants. ........... 28

    3.  Plaintiffs allege that Defendants Disclosed Personally
        Identifiable Information. ......................................................... 29

    4.  These disclosures were made to unauthorized third
        parties, outside the ordinary course of business. ................... 31

I.  Fenix's Violation of CIPA is Clear. .................................................. 32

    1.  The OnlyFans Terms of Service and Privacy Policy Do
        Not Disclose the Actual Interception Scheme. ....................... 33

    2.  Consent is a Fact-Intensive Inquiry and is Otherwise
        Inapplicable. ........................................................................... 34

    3.  Plaintiffs Have Adequately Pled Fenix's "Aiding and
        Abetting." ................................................................................ 35

J.  Plaintiffs adequately plead a CDAFA claim against Fenix. .............. 35

    1.  CDAFA applies to both unauthorized access and
        misuse of access—no "hacking" is required. ........................ 36

    2.  Plaintiffs allege that Fenix violated § 502(c)(2) by
        enabling the unauthorized copying and use of Fan
        communications. ...................................................................... 36

-ii-

PLS.' RESP. IOT FENIX DEFS.' MOTION TO DISMISS

3.   Fenix violated § 502(c)(3) by misusing platform services to enable fraud. ............................................ 36

4.   Fenix violated § 502(c)(7) by facilitating the use of private data to extract money. ................................. 37

5.   Plaintiffs allege concrete economic harm sufficient for CDAFA standing. .............................................. 37

K.   Plaintiffs Adequately Plead Standing and State a Claim Under All Three UCL Prongs .......................... 38

1.   Plaintiffs have UCL standing based on concrete economic harm. ..................................................... 38

2.   Under the UCL's Fraudulent Prong, the FAC adequately alleges a scheme likely to deceive the public. ...................................................... 38

3.   Under the UCL's Unfair Prong, Plaintiffs state a claim based on systematic impersonation fraud and platform-level exploitation. .................................... 40

4.   Under the UCL's Unlawful Prong, Plaintiffs allege multiple predicate violations. .......................... 41

L.   The FAC also states a claim under California's False Advertising Law. ............................................. 42

IV.   CONCLUSION .................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple & AT&T iPad Unlimited Data Plan Litig.*,
  802 F. Supp. 2d 1070 (N.D. Cal. 2011)................................................................. 25

*Archer v. NBCUniversal Media, LLC*,
  No. 2:24-CV-10744-AB-JC, 2025 U.S. Dist. LEXIS 129598 (C.D.
  Cal. July 2, 2025).............................................................................29, 30, 32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................... 25

*Barnes v. Yahoo!*,
  570 F.3d 1096 (9th Cir. 2009) .............................................................. 16, 17, 20

*Baumer v. Pachl*,
  8 F.3d 1341 (9th Cir. 1993) .............................................................................. 10

*Boschma v. Home Loan Ctr., Inc.*,
  198 Cal. App. 4th 230 (2011).......................................................................... 23

*Bray v. Kendall*,
  2010 WL 56181 (N.D. Cal. Jan. 5, 2010) .......................................................... 12

*Briskin v. Shopify, Inc.*,
  135 F.4th 739 (9th Cir. 2025).................................................................4, 5, 7, 9

*Briskin v. Shopify, Inc.*,
  135 F.4th at 750–51 ........................................................................................ 4, 7

*Brown v. Google LLC*,
  685 F. Supp. 3d 909 (N.D. Cal. 2023)............................................................... 18

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ......................................................................................... 10

*Butcher's Union Loc. No. 498 v. SDC Inv., Inc.*,
  788 F.2d 535 (9th Cir. 1986) ...................................................................... 10, 11

*Calise v. Meta Platforms, Inc.*,
  103 F.4th 732 .......................................................................................17, 20, 31

PLS.' RESP. IOT FENIX DEFS.' MOTION TO DISMISS

*Carey v. J.A.K.'s Puppies, Inc.*, 763 F. Supp. 3d 952, 983 (C.D. Cal. 2025) ................................................................................... 10, 22

*Cascade Yarns, Inc. v. Knitting Fever, Inc.*,
2011 WL 4538422 (W.D. Wash. Jan. 3, 2011) ........................... 11, 12

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ............................................................. 40, 41

*Comm. on Children's Television v. Gen. Foods Corp.*,
35 Cal. 3d 197 (1983) ...................................................................... 38

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) ......................................................... 18

*Doe v. Match Group*,
2022 WL 4551660 (C.D. Cal. Aug. 12, 2022) .................................. 13

*Doe v. Roblox Corp.*,
602 F. Supp. 3d 1243 (N.D. Cal. 2022) ............................................ 19

*Doe v. Walmart Inc.*,
2019 WL 499754 (N.D. Cal. Feb. 8, 2019) ....................................... 10

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ........................................................... 20

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ................................................ 27, 29, 31

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) ....................................................... 29

*ESAB Grp., Inc. v. Centricut, Inc.*,
126 F.3d 617 (4th Cir. 1997) ........................................................... 12

*Est. of Bride v. YOLO Techs., Inc.*,
112 F.4th 1168 ................................................................................. 19

*In re Facebook, Inc.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ........................................ 31, 37

*Gilbert v. Bank of Am.*,
No. C 13-01171 JSW, 2014 WL 4748494 (N.D. Cal. Sept. 23, 2014) ................................................................................................ 11

*Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma,
S.A.,*
972 F.3d 1101 (9th Cir. 2020) .................................................................... 8

*Goodyear Dunlop Tires Ops., S.A. v. Brown,*
564 U.S. 915 (2011) .................................................................................. 12

*In re Google Inc. Gmail Litig.,*
2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ......................................... 34

*Graham v. Bank of Am., N.A.,*
226 Cal. App. 4th 594 (2014) ................................................................... 26

*Howard v. Am. Online Inc.,*
208 F.3d 741 (9th Cir. 2000) .................................................................... 20

*In re Hulu Privacy Litig.,*
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ........................................... 27, 28, 31

*In re JUUL Labs, Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.,*
497 F. Supp. 3d 552 (N.D. Cal. 2020) ...................................................... 24

*Kwikset Corp. v. Superior Court,*
51 Cal. 4th 310 (2011) .............................................................................. 38

*Lazar v. Superior Ct.,*
12 Cal. 4th 631 (1996) ........................................................................ 23, 26

*LiMandri v. Judkins,*
52 Cal. App. 4th 326 (1997) ..................................................................... 23

*Lovejoy v. AT&T Corp.,*
92 Cal. App. 4th 85 (2001) ....................................................................... 26

*Mendoza v. Amalgamated Transit Union Int'l,*
30 F.4th 879 (9th Cir. 2022) ..................................................................... 24

*Mir v. Greines, Martin, Stein & Richland,*
No. 2:14-4132-CAS ................................................................................... 11

*Moore v. Trader Joe's Co.,*
4 F.4th 874 (9th Cir. 2021) ....................................................................... 39

*Oasis W. Realty, LLC v. Goldman,*
51 Cal. App. 5th 811 (2020) ..................................................................... 18

-vi-

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) (en banc) ............................................................ 21

*Opperman v. Path, Inc.*,
    84 F. Supp. 3d 962 (N.D. Cal. 2015) ................................................................ 15

*People v. Childs*,
    220 Cal. App. 4th 1079 (2013) ......................................................................... 36

*People v. McKale*,
    25 Cal. 3d 626 (1979) ....................................................................................... 41

*Poston v. Gen. Motors, LLC*,
    2024 WL 3558377 (S.D. Cal. July 22, 2024) ................................................... 25

*R.C. v. Walgreen Co.*,
    733 F. Supp. 3d 876 (C.D. Cal. 2024) .............................................................. 34

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
    119 F.3d 935 (11th Cir. 1997) .......................................................................... 12

*Salinas v. United States*,
    522 U.S. 52 (1997) ............................................................................................ 10

*Schnall v. Hertz Corp.*,
    78 Cal. App. 4th 1144 (2000) ..................................................................... 39, 40

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) .......................................................................... 4, 8

*Simeon Mgmt. Corp. v. FTC*,
    579 F.2d 1137 (9th Cir. 1978) .......................................................................... 39

*Sun Sav. & Loan Ass'n v. Dierdorff*,
    825 F.2d 187 (9th Cir. 1987) ............................................................................ 22

*United States v. Rogers*,
    321 F.3d 1226 (9th Cir. 2003) .......................................................................... 22

*In re Vizio, Inc., Consumer Privacy Litig.*,
    238 F. Supp. 3d 1204 (C.D. Cal. 2017) ...................................................... 15, 28

*Yamashita v. LG Chem, Ltd.*,
    62 F.4th 496 (9th Cir. 2023) ............................................................................... 8

PLS.' RESP. IOT FENIX DEFS.' MOTION TO DISMISS

**Statutes**

18 U.S.C. § 1343 ......................................................................................... 34

18 U.S.C. § 1965 ......................................................................................... 10

18 U.S.C. § 2710 ...........................................................................27, 28, 29, 31

28 U.S.C. § 1391(b) ..................................................................................... 14

47 U.S. Code § 230 ................................................................................*passim*

Cal. Bus. & Prof. Code § 17204 ................................................................ 38

Cal. Civ. Code §§ 1709–1710 .................................................................... 41

Cal. Penal Code § 502 ....................................................................35, 36, 37

Cal. Penal Code § 631(a) ............................................................................ 35

California Civil Code § 1709 ...........................................................25, 26, 41

California's Comprehensive Computer Data Access and Fraud Act
    (CDAFA) ............................................................................................. 35

California's False Advertising Law ............................................................. 42

False Advertising Law (Cal. Bus. & Prof. Code § 17500) ................... 41, 42

RICO ...............................................................................................*passim*

## I.    INTRODUCTION

This case is about a bait-and-switch at the heart of the OnlyFans platform. Users are promised direct communication with specific Creators. They pay money—often  lots of it—under the belief that they are chatting with the real person whose account they follow. In reality, many of those conversations are faked. Agencies that manage OnlyFans accounts, including the Agency Defendants named in this lawsuit, staff them with paid "Chatters"—often offshore workers paid low wages to impersonate Creators, mimic their voice, escalate intimacy, and push paid content. Fenix enables this deception by design—building and monetizing systems that facilitate impersonation while publicly denying knowledge that impersonations take place.

Fenix International Limited owns OnlyFans and, together with its U.S. subsidiary Fenix Internet LLC (together "Fenix" or "Fenix Defendants") operates the platform. Plaintiffs allege that Fenix facilitates this impersonation scheme through a combination of product design, selective enforcement, and financial incentives. Plaintiffs allege that Fenix knows what is happening, benefits from it, and protects the highest-earning operators from consequences. The Agencies, in turn, treat Creator accounts as commercial storefronts, staffed with Chatters trained to simulate emotional connection and push high-dollar content. What appears to be one-on-one communication is, in many cases, a scripted performance driven by conversion metrics. Plaintiffs allege that the Fenix Defendants know this—and conceal it.

Plaintiffs bring claims sounding in fraud, breach of contract, consumer protection, and privacy violations. At this stage, the question is not whether the

PLS.' RESP. IOT FENIX DEFS.' MOTION TO DISMISS

Fenix Defendants' scheme was lawful or justified. It is whether Plaintiffs have plausibly alleged misconduct. They have. The First Amended Complaint identifies who did what, when, and how—often using the Fenix Defendants' own materials—and is more than sufficient to survive the Fenix Defendants' multiple motions to dismiss.

This brief responds to the motion to dismiss filed by the Fenix Defendants. None of their arguments support dismissal.

## II. BACKGROUND

**The OnlyFans Platform.** OnlyFans is an online platform that allows users ("Fans") to subscribe to and interact with content creators ("Creators"), many of whom produce adult content. FAC ¶ 3. Fans pay monthly subscription fees and can also spend money on direct messages, tips, and pay-per-view (PPV) videos. *Id.* The platform markets itself as a vehicle for one-on-one connections between Fans and Creators, leading Fans to believe that what they are paying for is a personal relationship with the Creator whose account they follow. FAC ¶¶ 6, 8, 79, 109.

**The Chatter Scams.** In many cases, that one-on-one communication OnlyFans promises is fake. Plaintiffs allege that Creator accounts are often managed by third-party agencies—some of which are named as Defendants in this case—that use offshore workers ("Chatters") to impersonate Creators in private messages. FAC ¶¶ 112, 122–134. These Chatters are trained to mimic a Creator's voice, deepen emotional engagement, and maximize purchases of PPV content and other paid features. FAC ¶¶ 133–134, 151–156. Fans are not told that someone else is operating the Creator's account, and the OnlyFans interface is designed to sustain the illusion of real, personal interaction. FAC ¶¶ 144–149.

**Fenix's Role.** Fenix International Limited along with its U.S. subsidiary, Fenix Internet LLC, (together "Fenix") own and operate the OnlyFans platform. FAC ¶¶ 7, 108. It designs and controls the user interface, payment systems, moderation policies, and account analytics tools. FAC ¶¶ 135–145. Although Fenix's Terms of Service prohibit account sharing and impersonation, Plaintiffs allege that Fenix knowingly tolerates widespread violations of those rules— particularly when they generate substantial revenue. FAC ¶¶ 153–158. Fenix has the ability to detect impersonation through metadata anomalies, geolocation mismatches, and chat irregularities, yet it selectively enforces its policies and protects top-earning accounts. FAC ¶¶ 138–149.

**Plaintiffs' Experience.** Each named Plaintiff is a male OnlyFans user who subscribed to one or more Creator accounts, paid subscription fees, sent tips, and purchased content based on the belief that he was communicating directly with the Creator. FAC ¶¶ 241–299. Plaintiffs allege they were emotionally manipulated, deceived about the identity of the person they were speaking to, and financially exploited by a scheme designed to simulate intimacy for profit. *Id.*

**Procedural History.** Plaintiffs filed this action on July 29, 2024, and amended their complaint on April 23, 2025. Dkts. 1, 118. On April 9, 2025, the Court granted Fenix's forum non conveniens motion in part, dismissing the claims of three out-of-state Plaintiffs (B.L., S.M., and A.L.) against the Fenix Defendants. The Court denied the motion as to California-resident Plaintiffs N.Z. and R.M. *See* Dkt. 117. Plaintiffs' claims against the Agency Defendants were unaffected, and the First Amended Complaint reflects this outcome. *See* FAC ¶ 24 (limiting claims

against the Fenix Defendants to N.Z. and R.M.).[1] This brief responds to the Fenix Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, Failure to State a Claim, and Improper Venue ("Motion"), filed at Dkt. 121. Plaintiffs' oppositions to Fenix's other pending motions—including the motion to strike and request for judicial notice—are filed concurrently.

## III.   ARGUMENT

### A.   The Court Has Personal Jurisdiction Over Fenix Defendants.

To establish specific personal jurisdiction, Plaintiffs must show either (1) that the Fenix Defendants purposefully directed their conduct toward California, or (2) that they purposefully availed themselves of the privilege of conducting business here. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004); *Briskin v. Shopify, Inc.*, 135 F.4th 739, 750–51 (9th Cir. 2025).[2] Plaintiffs also must show that their claims arise from the Fenix Defendants' California contacts, and that exercising jurisdiction is fair and reasonable. *Id.* As explained below, both tests are satisfied based on Fenix's systematic engagement with California users and the harms that flowed directly from those contacts.

---

[1] The Defendants now argue that the forum non conveniens ruling requires dismissal of B.L., S.M., and A.L.'s claims in their entirety—including those asserted against the Agency Defendants—but that argument lacks merit. *See* Plaintiffs' Consolidated Response in Opposition to Defendants' Motion to Strike Claims of Non-CA Defendants and Fenix Defendants' Motion for Request for Judicial Notice ("Opp to Mot. to Strike and RFJN") at Section II. Plaintiffs address those arguments in full in Opp to Mot. to Strike and RFJN, filed concurrently with this brief.

[2] Courts in this Circuit generally apply the "purposeful availment" test to contract-based claims and the "purposeful direction" test to tort-based claims. *See Schwarzenegger*, 374 F.3d at 802. Because Plaintiffs assert both types of claims here, including deceptive practices and breach of contract, both tests are properly applied. *See Briskin v. Shopify, Inc.*, 135 F.4th at 750–51.

-4-

### 1.    Fenix Purposefully Directed Its Conduct Toward—and Availed Itself of Doing Business in—California.

***Purposeful Direction.*** For tort claims, the Ninth Circuit applies the "effects test" from *Calder v. Jones*, which asks whether the defendant: (1) committed an intentional act, (2) expressly aimed at the forum, and (3) caused harm that the defendant knew would be suffered in the forum. *Briskin v. Shopify, Inc.*, 135 F.4th 739, 751 (9th Cir. 2025).

Here, the FAC alleges that Fenix deliberately targeted California through platform design, Creator onboarding, identity verification, and a payment infrastructure that monetized impersonation-based chats. *See* FAC ¶¶ 3, 6–8, 98–100, 108–149, 224–225.



These figures represent roughly 10% of Fenix's global net revenue during that period. *See* FAC ¶ 132.

This commercial engagement was neither accidental nor incidental.

---

[3] Declaration of Robert B. Carey ("Carey Decl."), Ex. A, at Resp. No. 4.

[4] *Id.*

████████████████████████████████████[5] *See also Fenix Int'l Ltd. Annual Report* at 3 (reporting 4,118,000 total Creator accounts as of 2023).[6]

Fenix actively cultivated these relationships. Plaintiffs allege—and the platform confirms—that Fenix affirmatively verifies Creators by collecting government-issued ID, social media handles, and bank account details. FAC ¶¶ 135–136, 138, 224–225. ████████████████ ████████████████████ These steps were not mechanical—they were a necessary prerequisite to revenue participation in California.

Fenix also engaged in public-facing promotional conduct that reinforced its ties to the state. Executives promoted the platform alongside California-based Creators at public events. FAC ¶ 142. Fenix co-sponsored campaigns with Agency Defendants, including one featured at Miami Swim Week—but importantly, that campaign was launched and promoted by a California-based Agency Defendant. FAC ¶ 143. Each of these efforts in California helped normalize and scale the deceptive practices at the heart of this case.

Fenix's promotional activities extended to its most senior leadership. CEO Keily Blair has repeatedly appeared at public events in California to promote OnlyFans' business model and growth strategy—often alongside California-based

---

[5] Carey Decl., Ex. A, at Resp. Nos. 3 and 4.

[6] *Fenix International Ltd., Annual Report and Consolidated Financial Statements for the Year Ended 30 November 2024*, at 3, available at https://find-and-update.company-information.service.gov.uk/company/10354575/filing-history.

Creators.[7] These included speaking engagements at the 2024 Bloomberg Screentime conference in Los Angeles and the "Masters of Scale" summit series in San Francisco in both 2022 and 2025. Such appearances underscore Fenix's deliberate cultivation of a California audience through high-profile brand positioning.

Fenix's OFTV platform further reflects this intentionality. Several OFTV programs—such as *House of Sims* and *Surfing in California*—are filmed, set, or produced in California.[8] These shows are promoted to a U.S. audience and used to strengthen user attachment to California-based Creators and lifestyle content.

The Ninth Circuit in *Briskin* held that "express aiming" may be shown by the interactivity of a defendant's website, the geographic scope of its commercial ambitions, and whether the defendant engaged in conduct targeting users in the forum. 135 F.4th at 753–54. Fenix meets all three criteria. OnlyFans is an intensely interactive platform built around user-to-Creator engagement. Fenix did not passively permit commerce in California—it cultivated and monetized it.

---

[7] *See, e.g.,* https://variety.com/2024/digital/news/onlyfans-sex-content-creators-20-billion-dollars-ceo-1236175515/ (Keily Blair, speaker at Bloomberg Screentime conference, Los Angeles, CA, Oct. 2024); https://www.instagram.com/reel/DF8-yThSt4i/ (Blair speaking at "Masters of Scale" Summit, San Francisco, CA, 2022); https://www.linkedin.com/posts/keilyblair_mastersofscale-mossummit-summit2025-activity-7316429904344932352-K8AG?utm_source=share&utm_medium=member_desktop (Blair listed as speaker at 2025 "Masters of Scale" Summit in San Francisco, CA).

[8] *See, e.g., House of Sims,* https://www.tubefilter.com/2023/04/21/only-fans-reality-shows-house-of-sims-towie-model-farmers-oftv/ ("House of Sims will follow Chloe and her family members Frankie, Demi, and Charlie as they move from Essex to Los Angeles."); *Surfing in California,* https://www.youtube.com/watch?v=RUAgvUxAw6g.

*Purposeful Availment.* Fenix's conduct also satisfies the purposeful availment standard, which applies to Plaintiffs' contract-based claims. That test asks whether a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Courts assess a defendant's "entire course of dealing" with the forum—not merely the particular contract or incident giving rise to the claim. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1108 (9th Cir. 2020); *see also Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 503 (9th Cir. 2023) ("We examine whether the defendant deliberately reached out beyond its home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there.").

The same facts that establish purposeful direction also support purposeful availment. These are not the contacts of a passive website operator—they reflect a deliberate and sustained effort to engage with this forum and benefit from its laws.

## 2. Plaintiffs' Claims Arise from Fenix's California Contacts

Plaintiffs allege that they subscribed to Creator accounts, paid for personalized interactions, and were deceived by the Chatter Scams—which Fenix enabled and monetized. FAC ¶¶ 81–95, 122–149. These injuries stem directly from Fenix's California-facing operations—including the recruitment and onboarding of California-based Creators, the processing of payments from California-based Fans, and the concealment of Chatter Scams using standardized interface language that Fenix itself designed and controlled. FAC ¶¶ 98–100, 108–145, 224–225. Because the conduct giving rise to Plaintiffs' injuries occurred, in part, through Fenix's

-8-

intentional engagement with California users, the "arising from" prong is satisfied. *See Briskin v. Shopify, Inc.*, 135 F.4th 739, 750 (9th Cir. 2025) ("A claim arises out of a defendant's forum-related activities if it would not have occurred but for the defendant's contacts with the forum.").

### 3. Exercising Jurisdiction Is Fair and Reasonable

Fenix is a global company with extensive and sustained ties to California. As detailed above, ███████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████ .[9] ███████████████████████████████████ ████████████████████████████████████████.[10]

Fenix's relationships with California users were not fleeting or incidental. The company affirmatively verified California-based Creators and processed recurring payments from Fans in the state. FAC ¶¶ 39–43, 223–24. Defendants do not leave their market to chance. They decide where to do business—and explicitly exclude residents of nearly half the world's countries from participating as Creators.[11]  This is not a case where jurisdiction rests on isolated contacts—it rests on a sustained course of business that generated substantial revenue and user engagement in this forum.

Litigating in California poses no unfair burden. The state has a manifest interest in adjudicating deceptive business practices aimed at its residents—

---

[9] Carey Decl., Ex. A, at Resp. No. 4. This represents a substantial portion of its revenue, as Fenix reported total revenue of just over $2.7 billion from 2019 to 2022. FAC ¶ 62.

[10] Carey Decl., Ex. A, at Resp. Nos. 3 and 4.

[11] *See* Carey Decl., Ex. B, at 226:12–24 (███████████████████████████ ████████████████████████████████████████████████ █████████████████████████).

particularly those that implicate intimate impersonation and the unauthorized

sharing of private data. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77

(1985). Because Plaintiffs have satisfied the first two prongs of the specific

jurisdiction test, the burden shifts to Fenix to show that the exercise of jurisdiction

would nonetheless be unreasonable. Its Motion fails to do so.

### 4.    The Court Has Personal Jurisdiction Over Fenix Under § 1965(b) Because Plaintiffs Allege a Single, Coordinated RICO Conspiracy

Under § 1965(b) of the RICO statute, a court with personal jurisdiction over

one defendant may assert jurisdiction over other co-conspirators when three

requirements are met: (1) the court has personal jurisdiction over at least one

defendant; (2) no other district court could exercise jurisdiction over all defendants;

and (3) the defendants are alleged to have participated in a single nationwide RICO

conspiracy. *See* 18 U.S.C. § 1965(b); *Butcher's Union Loc. No. 498 v. SDC Inv.,

Inc.*, 788 F.2d 535, 539 (9th Cir. 1986); *Doe v. Walmart Inc.*, 2019 WL 499754, at

\*6 (N.D. Cal. Feb. 8, 2019). The third prong is satisfied where plaintiffs allege that

each defendant "was aware of the essential nature and scope of the enterprise and

intended to participate in it." *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993).

That participation need not be comprehensive: "[i]t suffices that [the conspirator]

adopt the goal of furthering or facilitating the criminal endeavor," even if by

agreeing to "only some of the acts leading to the substantive offense." *Salinas v.

United States*, 522 U.S. 52, 65 (1997). And specific intent may be inferred "by the

scheme itself," if the facts plausibly suggest a plan calculated to deceive. *Carey v.

J.A.K.'s Puppies, Inc.*, 763 F. Supp. 3d 952, 983 (C.D. Cal. 2025).

As described more fully below, Plaintiffs allege a single, coordinated scheme

in which the Fenix Defendants and Agency Defendants acted in concert to mislead

Fans into believing they were forming direct, authentic relationships with Creators. *See* Section E, *infra* (RICO). The FAC alleges that Fenix built trust and facilitated access by marketing OnlyFans as a platform for "authentic connections," while the Agency Defendants operationalized the deception by supplying Chatter labor and monetization strategies. FAC ¶¶ 13, 62, 112, 172–249. This model was financially interdependent: agencies extracted revenue from Fans, and Fenix took a 20 percent cut of every dollar. *Id.* ¶ 62. These allegations support a reasonable inference of mutual awareness and cooperation—*i.e.,* an agreement to participate in a common fraudulent enterprise. *See Cascade Yarns, Inc. v. Knitting Fever, Inc.*, 2011 WL 4538422, at *8 (W.D. Wash. Jan. 3, 2011) ("an agreement may be inferred from the specific acts and relationships alleged").

Fenix's reliance on *Butcher's Union* and similar cases is misplaced. In *Butcher's Union*, the Ninth Circuit found no § 1965(b) jurisdiction where plaintiffs alleged four independent conspiracies connected only by shared legal counsel. 788 F.2d at 537–39. Here, by contrast, Plaintiffs allege a single fraudulent scheme operating through a shared platform, unified economic model, and coordinated messaging. *See* FAC ¶¶ 13–18, 77–91, 156, 384–404. Nor do the *Gilbert* and *Mir* cases support Fenix's position. In *Gilbert*, plaintiffs alleged two distinct conspiracies with separate actors. *Gilbert v. Bank of Am.*, No. C 13-01171 JSW, 2014 WL 4748494, at *4 (N.D. Cal. Sept. 23, 2014). In *Mir*, the complaint failed to plead facts showing the defendant even *knew* of the conspiracy, much less intended to participate. *Mir v. Greines, Martin, Stein & Richland*, No. 2:14-4132-CAS FFMX, 2015 WL 4139435, at *13 (C.D. Cal. Jan. 12, 2015), *aff'd,* 676 F. App'x 699 (9th Cir. 2017). By contrast, the FAC here sets out detailed factual

allegations—not conclusory labels—about Fenix's role in facilitating and profiting from the Chatter Scams. This includes specific conduct, economic interdependence, and coordination across actors—hallmarks the Ninth Circuit has recognized as sufficient to infer agreement. *See Cascade Yarns*, 2011 WL 4538422, at *8; *see also* Section E, *infra*.

Accordingly, the requirements for § 1965(b) jurisdiction are satisfied. Fenix does not dispute that the Court has jurisdiction over at least one defendant. Nor do they identify any alternative forum where all defendants could be jointly sued. And the FAC plausibly alleges a single, nationwide conspiracy—coordinated in purpose and effect—in which all Defendants knowingly participated. That is sufficient at the pleading stage to invoke § 1965(b).[12]

### 5.    Alternatively, Fenix's Contacts Support General Jurisdiction

Although Plaintiffs do not principally rely on general jurisdiction, Fenix's sustained commercial presence in California reinforces the fairness of litigating in this forum. *See Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011). From 2020 through 2024,

---

[12] Even if the Court finds § 1965(b) inapplicable, Plaintiffs also invoke § 1965(d) as an alternative basis for personal jurisdiction. *See* FAC ¶ 22. Although the Ninth Circuit has not directly addressed whether § 1965(d) permits nationwide jurisdiction, the Fourth and Eleventh Circuits have held that it does. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997). At least one district court in this Circuit has reached the opposite conclusion. *See Bray v. Kendall*, 2010 WL 56181, at *5 (N.D. Cal. Jan. 5, 2010). This Court need not resolve that question, because jurisdiction is proper under § 1965(b).

1    ██████████████████████[13] Fenix did not merely serve California users; it

2    maintained an operational footprint that included:

3    • Over 100 associated personnel in California. FAC ¶ 41.

4

5    • Co-branded promotional events with at least one Agency Defendant
      tied to California-based Creator accounts. FAC ¶ 6.

6    In 2023, Defendant Elite Creators LLC (publicly operating as Creators Inc.)

7    publicly co-branded a promotional campaign with OnlyFans, which featured

8    California-based Creators modeling OnlyFans-branded swimsuits on a runway

9

10   backed by signage bearing the logos of both companies. FAC ¶ 6. The campaign

11   was promoted through the Instagram account @ofmerch, which links directly to

12   Defendants' online store. While the event took place in Florida, the collaboration

13   was driven by a California agency and centered on California-based Creators—

14   further illustrating the state's centrality to Fenix's marketing strategy. These

15   contacts underscore the systematic nature of Fenix's integration with the California

16   market. At a minimum, they warrant additional jurisdictional discovery.

17

18   ### 6.    Venue is proper as to Plaintiff R.M.

19        Fenix argues that claims by Plaintiff R.M. should be transferred to Delaware

20   under the forum-selection clause in OnlyFans' Terms of Service. But the Court has

21   already rejected that argument in prior briefing. *See* Dkt. 117 at 2–3. The forum-

22   selection clause in question is not enforceable against Plaintiffs asserting claims

23   based on deception, and public policy weighs against transfer where the gravamen

24   of the action is fraud. *See Doe v. Match Group*, 2022 WL 4551660, at 6 (C.D. Cal.

25   Aug. 12, 2022). R.M. resides in California, and the claims he asserts arise from

26

27

28   _____
     [13] Carey Decl., Ex. A, at Resp. No. 4.

-13-

deceptive conduct orchestrated by a California-facing platform. Venue is proper under 28 U.S.C. § 1391(b).

## B.    Plaintiffs did not consent—either explicitly or implicitly—to the Chatter Scams.

Fenix repeatedly argues that Plaintiffs consent to the communications at issue, suggesting that Plaintiffs simply misunderstood the transactional nature of "fantasy" chats. Motion at 1, 13–15. But that framing distorts both the law and the nature of Plaintiffs' allegations. Plaintiffs do not allege they were misled about the *type* of content being offered—they allege they were lied to about *who* they were interacting with. And as the FAC very specifically alleges, OnlyFans builds its business on that distinction. The platform markets itself as offering "direct communication" and "authentic connection" with creators—not anonymous adult content. FAC ¶¶ 6, 8, 13, 109. The creator's identity is the central feature of the offering. This is not about access to media. It is about access to a *person*. As one misled fan quoted in the FAC asked: "Why would anyone go on OnlyFans in the first place, when you can get content almost anywhere (free in most cases)?" FAC ¶ 79. His answer is telling: "The opportunity to Direct Message the Creator you are subscribed to." *Id*. In other words, the emotional (and thus economic) value of the exchange depends entirely on its authenticity.

The Fenix Defendants exploit that illusion to turn emotionally intimate conversations into a revenue stream, while concealing that the person on the other end is not the Creator at all—but a stranger paid to mimic them.[14] That is not

---

[14] As the FAC alleges, these chatters are often low-wage workers in developing countries, hired to impersonate creators at scale, and the Agencies are paying them $3-$4 an hour. FAC ¶¶ 105–110. These workers are expected to "learn as much

"fantasy"—that is fraud. And even if some users today may approach OnlyFans as a platform for fantasy engagement, that is both factually disputed and legally irrelevant at the pleadings stage. As the FAC makes clear, the relevant conduct began during the platform's explosive growth in the COVID era—when OnlyFans aggressively marketed itself as a vehicle for real-time, personal connection. FAC ¶¶ 6, 8, 13, 109. Whether that promise has since eroded, or been reinterpreted by some users, is a factual dispute inappropriate for resolution on a motion to dismiss.

Regardless, consent obtained through deception is no consent at all. *See, e.g., In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1233 (C.D. Cal. 2017) (burying the opt-out provision in obscure settings menu or making the "off" function non-operational deprived consumers of ability to consent); *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 990–91 (N.D. Cal. 2015) (finding that allowing a app to use "find friends" feature did not consent to having contacts used in other, unauthorized ways). Plaintiffs allege they believed they were interacting with specific, real creators, and were never informed otherwise. FAC ¶¶ 3, 250–258, 263–275. Fenix concealed the Chatter Scams because they knew disclosure would disrupt payment. FAC ¶¶ 127–128, 140, 160–163. That is deception about the core nature of the transaction. Fenix's attempt to recast the Chatter Scams as "fantasy" is not a legal defense—it's part of the scheme.

---

about the Creator they will be impersonating and convince the Users they are communicating with the Creator directly.  FAC ¶¶ 109–117. They are also trained to exploit users' emotional vulnerability drive more purchases. FAC ¶¶ 2, 16, 46, 110–112.

PLS.' RESP. IOT FENIX DEFS.' MOTION TO DISMISS

**C.**    **Section 230 Does Not Bar Plaintiffs' Claims.**

The Fenix Defendants incorrectly attempt to claim Section 230 bars Plaintiffs' claims. Section 230 precludes liability for (1) internet service providers (2) whom a plaintiff seeks to treat as a publisher or speaker (3) of information provided by a third-party. *Barnes v. Yahoo!,* Inc., 570 F.3d 1096, 1100-01 (9th Cir. 2009). Fenix fails to meet the standard for both the second and third prongs of the test—Plaintiffs' claims do not seek to treat OnlyFans as a publisher, nor do the claims relate to information provided by third-parties.

The Fenix Defendants' half-hearted argument ignores both (a) the bulk of the allegations in the FAC that describe their violative conduct, and (b) relevant case law that makes clear Section 230 has no application to these claims.

**1.**    **The Fenix Defendants Ignore the Scores of Allegations in the FAC that Detail Their Affirmative Misrepresentations.**

The Fenix Defendants' Motion selectively cites the FAC to provide the false narrative that Plaintiffs' claims relate *only* to defendants' failure to "monitor third-party content." (Motion at 9–10.) In reality, the FAC alleges in great detail, how the Fenix Defendants *knew* about the "Chatters Scams" and then *promoted* the fraud for financial gain. *See, e.g.,* FAC ¶¶ 7, 13–14, 17–18, 62, 64–100, 112, 115–171, 250–323, 361–446, 449–451, 453–464, 467, 469–473, 482, 497–546. Fenix also ignores dozens of examples in the FAC detailing their direct public misrepresentations—many drawn from Fenix's own social media posts. *See* FAC ¶¶ 91, 384–404 (*e.g.*, standardized marketing claims about direct messaging and 1-on-1 chats); *see also infra* Section III.C.1 (citing specific examples).

These allegations make clear that the claims against the Fenix Defendants arise from their own direct statements and conduct rather than management of third-party content published on their website.

### 2. Section 230 does not apply to Fenix's Own Statements and Conduct.

Plaintiffs' claims do not treat OnlyFans as a publisher. The Ninth Circuit has articulated the standard for treatment as a "publisher," which occurs when the claims relate to the website "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes,* 570 F.3d at 1102. Here, Plaintiffs' claims arise out of the Fenix Defendants' direct statements and marketing efforts—not whether they published or withdrew third-party content from their website.

Plaintiffs' claims against the Fenix Defendants also do not target information provided by a third-party. Rather the allegations refer to statements made and marketing strategies implemented directly by OnlyFans. Section 230 has no applicability to statements made by Fenix. *Calise v. Meta Platforms, Inc*., 103 F.4th 732, 744 (9th Cir. 2024) (Section 230 doesn't apply when "Plaintiffs' claims seek to treat [the defendant] as the publisher or speaker of its own content—or content that it created or developed in whole or in part—rather than the publisher or speaker of entirely third-party content").

Section 230 provides no immunity to websites when the claims relate to the companies' own statements. This point is axiomatic. Indeed, the sole case cited by the Fenix Defendants related to their Section 230 argument supports this point. Motion at 9–10 (citing *Doe v. Grindr Inc.*, 128 F.4th 1148, 1152-53 (9th Cir. 2025)); *see also id.* at 1151 ("defendant loses its immunity" when the cause of

-17-

action "seeks to treat the defendant as the publisher or speaker of its *own* content") (quotations and citation omitted) (emphasis in original).

The facts in *Grindr* are wholly distinguishable from the allegations in the FAC. The claims alleged by the *Grindr* plaintiff involved defective design and negligence related to the website's operation. Each of the claims arose out of third-party content posted on the website, which "necessarily implicate[d] Grindr's roles as a publisher of third-party content." *Id*. at 1152. Plaintiffs' claims against the Fenix Defendants, conversely, allege the company engaged in fraudulent conduct, breached contractual obligations, and violated a variety of federal and state claims by knowingly promoting the Chatter Scams to unsuspecting Fans for the purpose of financial gain. Section 230 provides no immunity for the Fenix Defendants.

**D.    Plaintiffs Have Plausibly Alleged a Breach of Contract by the Fenix Defendants.**

To state a claim for breach of contract under California law, a plaintiff must allege: (1) the existence of a contract; (2) the plaintiff's performance or excuse for nonperformance; (3) the defendant's breach; and (4) resulting damages. *Oasis W. Realty, LLC v. Goldman*, 51 Cal. App. 5th 811, 825 (2020).

Fenix promised Plaintiffs that they would be able to send direct messages to the Creators they subscribed to. Before a user can purchase a subscription, the platform explicitly represents: *"Direct message with your favorite Creator."* FAC ¶¶ 3, 79, 87–92, 109. That is not background marketing. It is the core promise at the point of sale. Courts have recognized that when a platform uses clear, forward-looking language to induce a transaction, that language may constitute a binding contractual term. *See Brown v. Google LLC*, 685 F. Supp. 3d 909, 931 (N.D. Cal.

2023) ("'Will' and 'will not' language supports a reasonable inference that Google made a binding promise.").

Plaintiffs accepted that offer when they subscribed, paid for content, and relied on the representation that they would be communicating directly with Creators. FAC ¶¶ 250–278, 497–504. But instead of fulfilling that promise, Fenix knowingly permitted Agencies to replace Creators with Chatters—offshore workers paid to impersonate Creators in private message threads. FAC ¶¶ 122–139, 144–149, 500. These were not isolated violations. The FAC alleges that impersonation occurred at scale, driven by operations Fenix enabled and profited from. FAC ¶¶ 157–158. Plaintiffs paid for direct communication. What they got was a monetized lie.

Fenix's Terms of Service reinforce this understanding. The Terms prohibit impersonation, restrict account access to verified Creators, and reserve to Fenix the unilateral power to suspend or remove accounts that violate these rules. FAC ¶¶ 153–156. These Terms were not passive disclaimers. They were contractual controls—and Fenix was the only party with the authority to enforce them. *See Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1252 (N.D. Cal. 2022) (allowing breach claim where platform failed to enforce its own safety rules); *Est. of Bride v. YOLO Techs., Inc.*, 112 F.4th 1168, 1176 (9th Cir. 2024) (§ 230 does not shield platforms from liability for refusing to enforce their own Terms).

Fenix argues that Plaintiffs' claims are barred by contractual disclaimers or by § 230. *See* Motion at 9–10, 17–18. Neither defense applies. Plaintiffs identify specific contractual promises—onboarding language and Terms-based enforcement provisions—and allege that Fenix knowingly permitted those promises to be

-19-

violated. A platform cannot tell users they are paying to message a specific Creator, and then look the other way when impersonation drives profits. That is a breach of contract, not a failure to moderate content. *See Barnes v. Yahoo!*, 570 F.3d 1096, 1105 (9th Cir. 2009) ("Contract liability here would come not from Yahoo!'s publishing conduct, but from its manifest intention to be legally obligated to do something."); *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 741–42 (9th Cir. 2024) (contract-based obligations fall outside § 230).

Fenix also claims that impersonation was "implausible" because Chatters operated outside the official OnlyFans interface. Motion at 9. But the FAC alleges that Fenix had full visibility into these violations, including irregular IP logins, chat volume anomalies, and metadata patterns associated with Agency-run accounts. FAC ¶¶ 138–149. At the pleading stage, these facts are more than sufficient to support a reasonable inference that Fenix knew the promise it made was being broken—and chose not to stop it.

The FAC alleges a clear contractual promise, knowing breach, and resulting financial harm. Fenix told users they were paying to message Creators. It knew they were not—and profited anyway. That is enough to state a claim.

**E.    Plaintiffs Allege a Colorable RICO and RICO Conspiracy Claim Against the Fenix Defendants**

A civil RICO claim requires four elements: (1) conduct (2) of an enterprise affecting interstate commerce (3) through a pattern (4) of racketeering activity. *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). To plead a RICO conspiracy under § 1962(d), Plaintiffs must plausibly allege that each defendant "was aware of the essential nature and scope of the enterprise and intended to participate in it." *Howard v. Am. Online Inc.*, 208 F.3d

741, 751 (9th Cir. 2000). Courts must construe the statute "liberally… to effectuate its remedial purposes." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985)).

The Fenix Defendants argue that Plaintiffs' RICO claim is "devoid" of facts showing intent to defraud, but the FAC alleges—with detail and specificity—a coordinated, monetized deception that could not function without Fenix's participation. Motion at 11. Indeed, Fenix's design choices, revenue share, and marketing language not only support a strong inference of intent to defraud, but demonstrate that OnlyFans was engineered to enable this precise scheme.

Fenix's RICO liability is also not derivative or secondary. The FAC alleges:

- Fenix knew about and collaborated with agencies perpetrating the Chatter Scams, including through co-hosted promotional events. FAC ¶ 6.

- Fenix's business model centers on the promise of "authentic" one-on-one communication between Fans and Creators—a promise it knew was systematically false. FAC ¶¶ 13–15, 87, 91.

- Fenix actively markets these "direct" and "1-on-1" connections in standardized language across every Creator profile, on its homepage, and in branded social media posts. FAC ¶¶ 14, 91, 384–404.

- Fenix maintains platform tools that allow third-party Chatters to impersonate Creators at scale, while simultaneously concealing their involvement. FAC ¶¶ 17, 112–113, 120–127.

- Fenix profits directly from this impersonation: it takes 20% of every dollar extracted from Fans under the false pretense of real connection. FAC ¶ 62.

-21-

- Fenix's internal data and system access made it uniquely positioned to detect (and prevent) the use of Chatters. It chose not to do so. FAC ¶¶ 133–136.

Fenix's defense—that these allegations amount to mere omissions or passive indifference—mischaracterizes the FAC. Plaintiffs allege an affirmative scheme to defraud, sustained and scaled through coordinated conduct. That scheme includes misrepresentations in marketing copy, a deceptive user interface, and a revenue-sharing structure that incentivizes the very impersonation Fenix publicly disclaims. FAC ¶¶ 14, 384–404.

At the pleading stage, intent to defraud may be inferred from the structure of the scheme itself. *See Carey v. J.A.K.'s Puppies, Inc.*, 763 F. Supp. 3d 952, 983 (C.D. Cal. 2025) ("A plaintiff may establish the intent element of mail or wire fraud by alleging the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence."); *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003) (intent to defraud may be inferred from concealment); *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 195 (9th Cir. 1987) (intent "clearly conveyed 'by implication'" where scheme involved structural deception).

Finally, Fenix's argument that it is merely "facilitating communications among users" cannot be squared with the facts alleged. Motion at 9. This is not a neutral platform. Fenix designed and marketed OnlyFans as a vehicle for personalized intimacy, while quietly enabling and profiting from systematic impersonation. That is a RICO scheme—and Plaintiffs have plausibly alleged Fenix's knowing and intentional role in it.

Accordingly, Fenix's motion to dismiss Plaintiffs' RICO and RICO conspiracy claims should be denied.

**F.    Plaintiffs plausibly allege that Fenix committed fraud and actively concealed the Chatter Scams.**

Under California law, a claim for fraud requires: (1) a misrepresentation or concealment of a material fact; (2) knowledge of falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996). Fraudulent concealment, a subspecies of fraud, arises when the defendant suppresses or omits a material fact with the intent to deceive. *Boschma v. Home Loan Ctr., Inc.*, 198 Cal. App. 4th 230, 248 (2011). Claims based on concealment must also show that the defendant had a duty to disclose the withheld information. *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997).

Plaintiffs allege each of these elements with specificity. They do not claim they are disappointed with the emotional tone of the messages they received. They claim they were deceived about who was sending them—and that Defendants lied about that identity to drive revenue.

The FAC alleges that OnlyFans markets itself as a platform for authentic, direct communication—not generic adult content, but real interaction with a specific person. whose identity is the core of the transaction. FAC ¶¶ 3, 6, 8, 13, 79, 109. The Fenix Defendants know that the entire platform is built to reinforce that illusion of personal access—and deliberately conceal the Chatter Scams that undermine it.

The FAC details how the Chatter Scams replace real creators with paid impersonators: offshore workers trained to mimic a creator's voice, escalate intimacy, and monetize emotional connection. FAC ¶¶ 131–136, 151–156. Fenix does not merely tolerate this scheme—it facilitates and profits from it. Fenix

-23-

provides tools to help Agencies manage impersonation at scale, selectively enforces its TOS to shield high-revenue impersonators, and structures incentives around the paid messaging that make emotional fraud the most profitable use of the platform. FAC ¶¶ 134–138, 140–145, 160–163.

This is textbook fraud. Fenix conceals the truth to induce payment. Plaintiffs reasonably relied on the platform's promise of direct connection, sending money under false pretenses sustained by deliberate concealment. FAC ¶¶ 3, 8, 126, 144. Fenix makes sure the messages appear to come from the Creator and do not disclose that Chatters are operating behind the scenes. They design the product so that deception looks like authenticity.

The resulting harm is both economic and emotional. Plaintiffs lose money in direct payments. They are manipulated into sharing personal, intimate communications with strangers. FAC ¶¶ 8, 109, 120, 126. Fenix asks the Court to treat this as a subjective disappointment. *See* Motion at 8–9 (arguing allegations are implausible because Chatters "never opened the official OnlyFans interface" and Fenix lacked specific knowledge). But the allegations describe an objective scheme to extract money by lying about the nature of the service. *See Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879, 889 (9th Cir. 2022) ("Intent to defraud can be inferred from the totality of the circumstances."); *In re JUUL Labs, Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 634 (N.D. Cal. 2020) ("The allegations are detailed and plausible—and that is all that Rule 8 requires.").[15]

---

[15] To the extent Rule 9(b) applies, Plaintiffs satisfy its particularity requirement. Courts in the Ninth Circuit apply a somewhat relaxed standard in fraudulent

Fenix tries to avoid the weight of these allegations by calling the entire scheme "implausible." But that objection fails. Fenix argues that Plaintiffs' claims are implausible because Plaintiffs have no way to know what Fenix knows. *See* Motion at 9–10. But the FAC includes detailed allegations describing Fenix's role in designing, incentivizing, and profiting from the Chatter Scams. *See* FAC ¶¶ 134–138, 140–145, 160–163. Plaintiffs do not rely on vague speculation—they describe internal analytics tools, compensation structures, moderation policies, and selective enforcement practices that support a strong inference of knowledge. *Id.* Courts routinely find fraud plausible where defendants benefit from the deception and control the architecture enabling it. *See, e.g., In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1076 (N.D. Cal. 2011) (inferring knowledge from defendant's internal control over allegedly deceptive systems). Fenix also cites *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), but that case involved a bare legal conclusion—not detailed factual allegations like those in the FAC. Fenix's objection fails on its own terms.

## G.    Plaintiffs plausibly allege deceit under California Civil Code § 1709.

California Civil Code § 1709 imposes liability on "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk."

---

concealment cases, especially where the relevant facts are in the defendant's exclusive possession. *See, e.g., In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1075 (N.D. Cal. 2011); *Poston v. Gen. Motors, LLC*, 2024 WL 3558377, at *5 (S.D. Cal. July 22, 2024). Here, Plaintiffs identify the concealed fact (the use of paid Chatters to impersonate Creators), explain where disclosure would have been appropriate (e.g., during onboarding and communications), and allege the systems Fenix used to support and profit from that concealment. These allegations are more than sufficient to provide Fenix with notice and allow it to prepare a defense.

PLS.' RESP. IOT FENIX DEFS.' MOTION TO DISMISS

Cal. Civ. Code § 1709. This includes affirmative misrepresentations as well as deceptive omissions. *Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 93 (2001). Deceit under § 1709 requires the same elements as common-law fraud: misrepresentation or concealment of a material fact, knowledge of falsity, intent to induce reliance, actual reliance, and resulting harm. *Lazar*, 12 Cal. 4th 638; *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 606 (2014).

Plaintiffs plead exactly that. Fenix knowingly deceives users about a material fact—the identity of the person they are interacting with—in order to induce payment. That deception causes economic and emotional harm.

As the FAC alleges, the central promise of the OnlyFans platform is direct communication with specific Creators. FAC ¶¶ 6, 8, 13, 109. Defendants know that promise drives user engagement and revenue. They also know it is false. Through the Chatter Scams, paid impersonators—Chatters trained to mimic a Creator's voice, escalate emotional intimacy, and conceal their true identity—solicit payments from Fans in a process they refer to as "farming." FAC ¶¶ 16–17, 119, 131–134, 151–156.

This is not passive inaccuracy. It is willful deceit. Fenix builds and profits from a system designed to create the illusion of real connection while hiding the impersonation behind it. FAC ¶¶ 134–138, 140–145, 160–163. Users pay because they believe the interactions are real. Fenix structures the platform to reinforce that belief—and to prevent them from discovering the truth. FAC ¶¶ 126, 144. That is the definition of deceit: a deliberate lie about a material fact, made to induce action, resulting in harm. The statute requires no more. Plaintiffs plead exactly what § 1709 prohibits.

**H.    Plaintiffs sufficiently plead their VPPA claim.**

The VPPA prohibits video service providers from disclosing PII that links consumers to specific content, except in narrow circumstances. 18 U.S.C. § 2710. Plaintiffs plausibly allege each required element: the Fenix Defendants are providers, Plaintiffs are consumers, the Fenix Defendants disclosed PII, and the disclosures were not made in the ordinary course. *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984–86 (9th Cir. 2017). Each of these elements is satisfied here. The FAC alleges that agency-run accounts monetized access to private audiovisual content; that Plaintiffs paid for and viewed that content through those accounts; and that the Fenix Defendants disclosed user-specific viewing histories to overseas Chatters hired to impersonate Creators and maximize revenue from video sales. FAC ¶¶ 112, 449–452.

Fenix's contrary arguments mischaracterize the FAC and ignore controlling authority. This is not a passive analytics case like *Hulu*, where disclosures occurred through automated tracking pixels. The FAC alleges direct, user-specific disclosures made to third-party impersonators for the express purpose of monetizing emotional intimacy and video consumption.

**1.    Defendants qualify as video tape service providers because they delivered audiovisual content as a core monetized feature of the platform.**

The VPPA defines "video tape service provider" as "any person engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." 18 U.S.C. § 2710(a)(4). Courts interpret this definition to cover entities whose commercial model involves the distribution of video content as a central feature.

-27-

*See In re Vizio, Inc.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017); *In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015).

The FAC alleges that Agency Defendants—including Moxy, Unruly, Behave, and Content X—controlled the Creator accounts through which Plaintiffs accessed and purchased video content. FAC ¶ 112 (alleging agencies "operated" Creator pages and delivered video content through those pages). Agencies profited directly from monetized video content delivered through PPV unlocks, tips, and custom transactions. FAC ¶¶ 222–225 (detailing agency-controlled pricing and delivery structures); FAC ¶ 452 (alleging that video delivery occurred through agency-controlled channels).

Fenix argues that the agencies are not "video tape service providers" because they merely staffed accounts and did not themselves "deliver" video content. Motion at 11. But the FAC alleges that agencies directed content production, scheduled video drops, and responded to User video requests via chat interfaces. FAC ¶¶ 452–454 (alleging chatters handled distribution of paid videos under agency instruction). At the pleading stage, Plaintiffs need not prove that agencies themselves uploaded video files; it is enough that they orchestrated the delivery and monetization of audiovisual materials as part of their commercial model. *See In re Vizio*, 238 F. Supp. 3d at 1221.

**2.    Plaintiffs qualify as consumers because they subscribed to and paid for video services operated by Defendants.**

The VPPA protects "subscribers" of goods or services from video tape service providers. 18 U.S.C. § 2710(a)(1). Courts interpret the term to include individuals who pay to access video content, regardless of whether they interact

-28-

directly with the content host. *See Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015).

The FAC alleges that Plaintiffs subscribed to Creator accounts and paid to access PPV videos, many of which were sent through chat and message-based unlocks. FAC ¶¶ 112, 268, 447–462. These payments constituted a subscription to audiovisual services offered by the agencies, regardless of whether those agencies were identified on the front end. FAC ¶ 452 (alleging Plaintiffs interacted with agency-controlled accounts in connection with video content).

Fenix argues that Plaintiffs subscribed to OnlyFans or to individual Creators, not to the agencies themselves. Motion at 11. But the FAC alleges that the agencies operated the accounts, directed the video transactions, and received the proceeds. FAC ¶¶ 112, 454–455. Under the VPPA, this is sufficient to establish that Plaintiffs were "subscribers" of Fenix's video services.

### 3.    Plaintiffs allege that Defendants Disclosed Personally Identifiable Information.

The VPPA defines PII to include "information which identifies a person as having requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). The Ninth Circuit applies a common-sense standard: information qualifies as PII if it would "readily permit an ordinary person to identify a specific individual's video-watching behavior." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017).

The Fenix Defendants lean on *Eichenberger* to suggest that usernames or account handles are inherently anonymous. Motion at 12–13. But this District recently rejected that argument in a case squarely on point. In *Archer v. NBCUniversal Media, LLC*, No. 2:24-CV-10744-AB-JC, 2025 U.S. Dist. LEXIS

-29-

129598, at *11 (C.D. Cal. July 2, 2025), the court held that the transmission of Facebook IDs ("FIDs") and video URLs to a third party was enough to plead a VPPA violation. In denying the defendants' motion to dismiss, the court explicitly rejected arguments that plaintiffs had not alleged "the disclosure of [PII]." *Id.* at *7. Despite the fact that FIDs are platform-specific identifiers that do not necessarily reveal users' real-life identities, the court found that when combined with viewing behavior, FIDs were precisely the type of information that satisfies the VPPA's PII standard. *Id.* at *11–12. Thus, the court held, "Defendants disclosed Plaintiffs' PII by transmitting a combination of Plaintiffs' FIDs—identifying Plaintiffs; and video titles and URLs—revealing the video materials obtained or requested by Plaintiffs." *Id*. at *11.

That is exactly what Plaintiffs allege here. The FAC describes how Fenix combines Fan identifiers—such as usernames, account handles, and chat history—with video purchase behavior to simulate continuity and familiarity. FAC ¶¶ 144, 222–225, 449–456. These individual identifiers are shared with Chatters and used to manipulate those same individual Fans into buying more videos. A Fan's username is not isolated metadata; it is part of a deliberately cultivated record of what that user has viewed and how they've interacted. The only reason the scam works is because the user is recognizable from prior context.

That puts this case squarely within *Archer*. Indeed, in many respects Plaintiffs' allegations provide even stronger support for their VPPA claim. The disclosures here are not backend transmissions to analytics partners. They are targeted, profit-driven disclosures that weaponize private viewing behavior for emotional manipulation—precisely the kind of harm Congress intended to prevent.

-30-

As the Ninth Circuit has recognized, the VPPA was designed not just to avoid embarrassment, but "to ensure that consumers retain control over their personal information." *Eichenberger*, 876 F.3d at 984; *see also* FAC ¶ 447 (citing legislative history). *See also In re Facebook, Inc.*, 402 F. Supp. 3d 767, 798 (N.D. Cal. 2019) (PII includes "identifiers tied to video behavior"). The allegation of deliberate, revenue-generating use of user + video data puts this far closer to the heartland of VPPA violations than passive analytics cases like *Hulu*.

The Ninth Circuit recently reaffirmed the VPPA's reach in *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024), holding that even partial identifiers combined with viewing behavior are sufficient to constitute PII. There, as here, the defendants argued that user-facing identifiers were too attenuated to trigger liability. The court rejected that view, emphasizing that the VPPA protects against disclosures that connect users to specific video behavior, even if the identifiers are platform-specific. The allegations here go further: Plaintiffs describe the deliberate use of Fan-specific viewing histories to target emotionally vulnerable users and exploit them for profit. That is not metadata. It is manipulation.

### 4.    These disclosures were made to unauthorized third parties, outside the ordinary course of business.

The VPPA prohibits disclosure of PII "to any person" unless the disclosure falls within a narrow statutory exception—such as those made "in the ordinary course of business." 18 U.S.C. § 2710(b)(2)(D). That phrase is defined to cover only "debt collection, order fulfillment, request processing, or the transfer of ownership." 18 U.S.C. § 2710(a)(2). Courts construe this carveout narrowly to prevent it from swallowing the rule. *See In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015).

-31-

The FAC alleges that Fenix and its agency partners disclosed user-specific viewing histories to offshore Chatters. FAC ¶¶ 122, 226–227, 449–452. These Chatters were third parties, not disclosed to Plaintiffs, and not essential to platform operations. Their access to Fans' viewing data was not incidental—it was the mechanism by which they targeted emotionally invested users and manipulated them into further purchases. FAC ¶¶ 450–456.

This conduct falls outside the narrow ordinary-course safe harbor. In *Archer v. NBCUniversal Media, LLC*, 2025 U.S. Dist. LEXIS 129598, at \*14 (C.D. Cal. July 2, 2025), this District held that transmitting user identifiers and video URLs to Meta was not "ordinary course" conduct, even though the transmission occurred through standard website infrastructure. Here, the disclosures were even more deliberate: Chatters were given tailored access to video records for the express purpose of simulating human connection and driving purchases.

That is not billing, request processing, or technical administration. It is monetized deception carried out through undisclosed third-party agents—exactly the kind of exploitative disclosure the VPPA was enacted to prevent.

## I.    Fenix's Violation of CIPA is Clear.

Relying almost entirely on the Moxy Defendant's motion,[16] Fenix's only unique argument is that they could not have violated CIPA because the OnlyFans Terms of Service and Privacy Policy were sufficient to put Fans on notice that

---

[16] Plaintiffs reincorporate by reference here their response to the Agency Defendants' motion for Rule 12(b)(6) dismissal with respect to the CIPA and Wiretap Act claims.

Chatter interception was occurring on its platform. Motion 121 at 13–15. This is hard to take seriously.

### 1.    The OnlyFans Terms of Service and Privacy Policy Do Not Disclose the Actual Interception Scheme.

To start, there is nothing in the OnlyFans Terms of Service or its Privacy Policy that discloses to Fans their messages with Creators—which OnlyFans represented to be occurring "directly" between Fans and Creators—were actually being intercepted by a CRM software and re-routed to an entirely separate platform, where Chatters in another country were the ones responding to Fan messages. Just the opposite: the Terms prohibit impersonation, restrict account access to verified Creators, and reserve to Fenix the unilateral power to suspend or remove accounts that violate these rules. FAC ¶¶ 153–156.

Notably, Fenix only claims that its Terms of Service and Privacy Policy alerted Fans to the fact that **its platform** would "process 'customer data' . . . like 'chat messages…'"; "moderate . . . 'content sent in chat messages'"; and "share personal data" with "third-party service providers. . . ." Motion 121 at 14. This is entirely different from notifying Fans that a third party managing the *Creat*ors— *i.e.*, the Agency Defendants—was enlisting the help of another third party—CRM providers—to simultaneously intercept and re-route every single message that Fans sent certain Creators from the OnlyFans platform to an entirely separate software application. Moreover, the Terms of Service and Privacy Policy **provide no notice** that once the messages were re-routed, Chatters (not Creators) were the ones responding to Fan messages. (FAC at ¶¶ 490–493.)

PLS.' RESP. IOT FENIX DEFS.' MOTION TO DISMISS

### 2.    Consent is a Fact-Intensive Inquiry and is Otherwise Inapplicable.

More fundamentally, "the question of express consent is usually a question of fact, where a fact-finder needs to interpret the express terms of any agreements to determine whether these agreements ***adequately notify*** individuals regarding the interceptions." *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at \*15 (N.D. Cal. Mar. 18, 2014) (emphasis added). Likewise, implied consent is "an intensely factual question that requires consideration of the circumstances surrounding the interception to divine whether the party whose communication was intercepted was on notice." *Id.* (citing *Watkins v. L.M. Berry & Co.,* 704 F.2d 577, 582 (11th Cir.1983) ("Consent under Title III is not to be cavalierly implied. . . . It is the task of the trier of fact to determine the scope of the consent and to decide whether and to what extent the interception exceeded that consent.")). Any suggestion that Plaintiffs consented to the ***actual*** manner and form of interception that occurred here is, therefore, a fact intensive inquiry not ripe for 12(b)(6) adjudication.

Fenix's argument also fails because "consent is not a defense where the communication is intercepted for the purpose of committing any criminal or tortious act in violation of" state or federal law. *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 901 (C.D. Cal. 2024) (citing *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021)) (internal quotations omitted). In this case, Plaintiffs have plainly alleged their messages were intercepted in furtherance of a RICO scheme premised on violations of 18 U.S.C. § 1343. *Id.* ("To make use of the criminal/tortious intent exception, a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is independent of the intentional act of recording or

-34-

interception itself."). This, alone, is sufficient to defeat any consent-related exceptions under CIPA.

### 3.    Plaintiffs Have Adequately Pled Fenix's "Aiding and Abetting."

Plaintiffs have also alleged sufficient facts to demonstrate that Fenix "aided, agreed, conspired with, and/or permitted" the Agency Defendants to intercept and use Plaintiffs' communications "to solicit Premium Content Fees from Plaintiffs and the Class." FAC ¶ 482. CIPA's fourth clause creates liability for any party who "aids, agrees with, employs, or conspires with any person . . . to unlawfully do, or permit, or cause to be done any of the acts or things" outlined in CIPA. *See* Cal. Penal Code § 631(a). As alleged in the FAC, Fenix is not only aware of the Agency Defendants' use of CRM software to intercept Plaintiffs' messages, but intentionally chooses not to police such activity in order to profit from the increased revenues the CRM-enabled Chatters generate. (FAC ¶¶ 127–128.) This awareness, combined with Fenix's deliberate inaction and financial benefit from the scheme, establishes the requisite elements for aiding and abetting liability under CIPA's fourth clause.

### J.    Plaintiffs adequately plead a CDAFA claim against Fenix.

California's Comprehensive Computer Data Access and Fraud Act (CDAFA), Cal. Penal Code § 502, prohibits the unauthorized access, use, or copying of computer data, as well as the facilitation of such conduct by others. Plaintiffs allege that Fenix violated multiple provisions of this statute—including §§ 502(c)(2), (c)(3), and (c)(7)—by knowingly facilitating unauthorized access to private Fan communications and monetizing that data for commercial gain.

### 1.  CDAFA applies to both unauthorized access and misuse of access—no "hacking" is required.

Fenix argues that CDAFA liability arises only if someone bypassed technical barriers. Motion at 15–16. But the statute's plain text and California law make clear that CDAFA applies to any knowing access or use of computer data "without permission"—including where an actor exceeds the scope of access or uses data for impermissible purposes. *See People v. Childs*, 220 Cal. App. 4th 1079, 1100 (2013).

Plaintiffs allege that Fenix designed a platform that allowed impersonator Chatters to access Fan inboxes and message histories—without the Fans' knowledge or consent—and use that information to manipulate and monetize emotionally vulnerable users. FAC ¶¶ 122–124, 135–138, 144–148. That suffices to plead "access without permission."

### 2.  Plaintiffs allege that Fenix violated § 502(c)(2) by enabling the unauthorized copying and use of Fan communications.

Section 502(c)(2) prohibits knowingly accessing and, without permission, "taking, copying, or making use of any data from a computer." Plaintiffs allege that Fenix knowingly enabled its affiliates and contractors to access and exploit private Fan messages—including photos, videos, and emotional disclosures—in order to impersonate Creators and extract payments. *Id.* Fenix's systems tracked metadata revealing that accounts were being operated by teams of Chatters, not individual Creators, yet it took no action to restrict access. FAC ¶¶ 145–148, 469–72.

### 3.  Fenix violated § 502(c)(3) by misusing platform services to enable fraud.

Section 502(c)(3) prohibits "[k]nowingly and without permission using or causing to be used any computer services." Plaintiffs allege that Fenix built API

tools and CRM integrations that allowed third-party Chatters to access user communications and simulate Creator intimacy. FAC ¶¶ 122–124, 136, 155–156. These tools were not used to manage accounts—they were used to deceive Fans into paying for premium content and tips, generating revenue of which Fenix took a 20% cut.

### 4. Fenix violated § 502(c)(7) by facilitating the use of private data to extract money.

Section 502(c)(7) prohibits knowingly accessing a computer "in order to wrongfully control or obtain money, property, or data." Plaintiffs allege that Fenix knowingly allowed third parties to impersonate Creators using Fans' own data— then took a share of the resulting transactions. FAC ¶¶ 136–138, 145–148, 155– 156.

### 5. Plaintiffs allege concrete economic harm sufficient for CDAFA standing.

Fenix contends that CDAFA standing requires more than "privacy" or "emotional" injury. Motion at 15. But the FAC alleges direct financial losses: Fans paid for subscriptions, tipped impersonators, and purchased premium content because they were deceived into believing they were communicating with the Creator. FAC ¶¶ 255–256, 260, 281, 301, 314. That is more than sufficient to satisfy the statute's damages requirement at the pleadings stage. *See In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019) (CDAFA covers economic harm tied to unauthorized data use).

To the extent the Fenix Defendants argue that Agency conduct is relevant, those arguments are addressed in Plaintiffs' Consolidated Response in Opposition

to the Agency Defendants' Motions to Dismiss the First Amended Complaint ("Opp to Agency Defs.' MTD"), filed concurrently with this brief.

### K. Plaintiffs Adequately Plead Standing and State a Claim Under All Three UCL Prongs

#### 1. Plaintiffs have UCL standing based on concrete economic harm.

To establish standing under the UCL, a plaintiff must allege economic injury "as a result of" the defendant's unfair or deceptive conduct. Cal. Bus. & Prof. Code § 17204; *see also* Rutter Guide ¶ 3:167.1. That standard is satisfied here. The FAC alleges that each Plaintiff paid money to subscribe to and interact with what they believed were specific Creators—when in fact they were communicating with Chatters. FAC ¶¶ 81–94.

Fenix does not dispute that Plaintiffs paid money. It argues instead that its Terms of Service foreclose any claim of deception or loss. Motion at 10–11. But this is a merits defense, not a standing argument. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 327 (2011) ("The question of standing under the UCL... is not whether a plaintiff's claim is meritorious."). Plaintiffs allege that they would not have paid what they did had they known the truth. That is sufficient economic injury under Proposition 64.

Because the FAC pleads deceptive conduct, economic harm, and a causal link between the two, Plaintiffs have standing to assert their UCL and FAL claims.

#### 2. Under the UCL's Fraudulent Prong, the FAC adequately alleges a scheme likely to deceive the public.

A business practice is "fraudulent" under the UCL if it is "likely to deceive" members of the public, regardless of whether any individual was actually misled or whether the defendant intended to deceive. *Comm. on Children's Television v. Gen.*

-38-

*Foods Corp.*, 35 Cal. 3d 197, 211 (1983); *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1167 (2000). A likelihood of deception may arise from affirmative misstatements, misleading implications, or material omissions. *Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1145 (9th Cir. 1978). The relevant question is whether a reasonable consumer would likely be misled. *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021).

Here, the FAC alleges that the Fenix Defendants used uniform user interface labels (*e.g.,* "DM with this user," "authentic connection") to falsely suggest that Fans would be communicating directly with the advertised Creator. These representations appear on every Creator profile—not as content supplied by the Creator, but as standardized platform cues embedded by Fenix itself. FAC ¶¶ 81–92, 98–100, 134. Plaintiffs allege that these representations were knowingly false, because Fenix actively enabled and profited from a system in which Agencies used low-wage workers ("Chatters") to impersonate Creators for financial gain. FAC ¶¶ 112–127, 137–149. Fenix knew about these impersonations, facilitated them through its design choices and policy enforcement decisions, and collected 20% of the proceeds. FAC ¶¶ 7, 9, 130–136, 156–159.

Fenix argues that it made no misrepresentations and merely operated a platform where third-party fraud may have occurred. Motion at 10. But that reframing ignores the FAC's core allegation: that Fenix itself embedded deceptive representations in the interface and withheld material information about who Fans were actually communicating with. Fenix's role was not passive. The FAC alleges that Fenix knowingly cultivated the illusion of authenticity, monetized that illusion,

PLS.' RESP. IOT FENIX DEFS.' MOTION TO DISMISS

and failed to disclose facts that would have disabused consumers of their mistaken belief that they were speaking to Creators.

These allegations are more than sufficient under California law, which does not require Plaintiffs to plead intent to deceive, actual deception, or individualized reliance. *Schnall*, 78 Cal. App. 4th at 1167. The standard is whether the platform's practices were likely to mislead reasonable consumers—and the FAC pleads that they were.

### 3. Under the UCL's Unfair Prong, Plaintiffs state a claim based on systematic impersonation fraud and platform-level exploitation.

A business practice may be "unfair" under the UCL even if it is not deceptive or unlawful. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). The California Supreme Court has recognized that a practice may be "unfair" if it offends public policy, is immoral, unethical, oppressive, or unscrupulous, or causes injury to consumers that outweighs its benefits. *Id.*

The FAC alleges that Fenix operated and profited from a system that allowed Agencies to impersonate Creators in sexually and emotionally intimate chats without the Fan's knowledge or consent. FAC ¶¶ 98–102, 130–149. This impersonation occurred through a platform that Fenix controlled and monetized, and in some cases involved the distribution of private communications and sensitive content to third parties. FAC ¶¶ 156–159. The resulting harm to consumers—including emotional manipulation and financial loss—was severe. FAC ¶¶ 81–94.

Fenix's defense is that it cannot be liable for these harms because its Terms of Service disclosed that Creators could use third parties. Motion at 10–11. But this argument fails under longstanding California law. "A business may not escape UCL

unfairness liability merely by disclosing or disclaiming its conduct in a user agreement." *People v. McKale*, 25 Cal. 3d 626, 635 (1979). The issue is not whether the Terms legally permitted impersonation, but whether the conduct itself was unfair. Plaintiffs plausibly allege that it was.

These allegations state a claim under the unfair prong regardless of whether any affirmative misrepresentation occurred. The platform-level orchestration of intimate impersonation for profit—without user knowledge or informed consent—meets the standard for an unfair business practice.

### 4. Under the UCL's Unlawful Prong, Plaintiffs allege multiple predicate violations.

The "unlawful" prong of the UCL "borrows" violations of other laws and treats them as independently actionable. *Cel-Tech*, 20 Cal. 4th at 180. Here, the FAC identifies multiple predicate statutes, including California's statutory fraud provisions (Cal. Civ. Code §§ 1709–1710), the False Advertising Law (Cal. Bus. & Prof. Code § 17500), and the federal and state wiretap and privacy statutes. FAC ¶¶ 538–543.

Fenix argues that Plaintiffs fail to plead any predicate statute with sufficient specificity. Motion at 19–20. But this is incorrect. For example, Plaintiffs allege that Fenix's conduct constitutes "deceit" under Cal. Civ. Code § 1709, because it involved the concealment of material facts (the use of Chatters), with knowledge of their falsity and an intent to induce Fans to part with money. FAC ¶¶ 524–529. That is a complete claim under § 1709, and thus a valid UCL predicate.

Because each of these predicate violations is sufficiently pled, the FAC also states a claim under the UCL's unlawful prong.

**L.     The FAC also states a claim under California's False Advertising Law.**

The FAL prohibits any advertising that is untrue or misleading and made with actual or constructive knowledge of its falsity. Cal. Bus. & Prof. Code § 17500. "Advertising" under the statute includes any promotional message that is intended to induce a consumer to make a purchase. *Id.*

Plaintiffs allege that Fenix's standardized promotional statements—such as the promise of "authentic" or "direct" interactions with specific Creators—were false and misleading because Fenix knew that many Creators did not operate their own chats. FAC ¶¶ 98–102, 130–149. Fenix nonetheless continued to display these representations on Creator profiles, without disclosing the presence of Chatters. These statements are properly understood as advertising: they appear in marketing materials and user-facing features, and they are designed to induce Fans to subscribe, tip, or purchase content.

Fenix argues that it cannot be liable under the FAL because it did not personally make any false statements. Motion at 19–20. That is both factually and legally incorrect. The FAC alleges that Fenix crafted and embedded these representations into the platform interface. FAC ¶¶ 98–100. Liability under the FAL attaches to those who disseminate false or misleading statements with actual or constructive knowledge of their falsity. *See* Cal. Bus. & Prof. Code § 17500. No intent to deceive is required.

Plaintiffs further allege that Fenix had constructive and actual knowledge of the falsity of these statements, based on its extensive monitoring capabilities, awareness of Agency involvement, and financial entanglement in the impersonation scheme. FAC ¶¶ 133–149.

-42-

These allegations are sufficient to plead a claim under the FAL.

\*\*\*

The FAC alleges that Fenix Defendants knowingly promoted, enabled, and profited from deceptive impersonation practices that misled Plaintiffs and other consumers. That conduct is actionable under each of the UCL's three prongs and under the FAL. Fenix's defenses—grounded in overreading its Terms of Service and mischaracterizing the claims as third-party conduct—are both legally and factually unsupported. The motion should be denied.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Fenix Defendants' Motion to Dismiss.

DATED:  July 17, 2025          Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ *Robert B. Carey*

Robert B. Carey (*pro hac vice*)
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile:  (602) 840-3012
Email: rob@hbsslaw.com
          leonarda@hbsslaw.com
          michellak@hbsslaw.com

Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP

301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile:  (213) 330-7152
Email: christopherp@hbsslaw.com

Andrea R. Gold (*pro hac vice*)
David A. McGee (*pro hac vice*)
Shana H. Khader (*pro hac vice*)
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC 20006
Phone: (202) 973-0900
Facsimile: (202) 973-0950
Email: agold@tzlegal.com
        dmcgee@tzlegal.com
        skhader@tzlegal.com

Keith T. Vernon (*pro hac vice*)
TIMONEY KNOX LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Phone: (202) 349-9864
Facsimile: (215) 540-2643
Email: kvernon@timoneyknox.com

Andrew C. Stone (*pro hac vice*)
Seth T. Goertz (*pro hac vice*)
DORSEY & WHITNEY LLP
2325 E Camelback Road, Suite 300
Phoenix, AZ 85016
Phone: (602) 735-2691
Facsimile: (602) 926-2471
Email: stone.andy@dorsey.com
        goertz.seth@dorsey.com

*Attorneys for Plaintiffs*

011194-11/2686242 V1                                    Case No: 8:24-cv-01655-FWS-SSC

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiffs, certifies that this brief is one of three consolidated oppositions to Defendants' Motions (Dkts. 121–129), and contains 11,515 words which complies with the aggregate word limit specified in this Court's July 15, 2025 Order, Dkt. 137.

Dated: July 17, 2025

HAGENS BERMAN SOBOL SHAPIRO LLP
*/s/ Robert B. Carey*
Robert B. Carey

PLS.' RESP. IOT FENIX DEFS.' MOTION TO DISMISS

011194-11/2686242 V1                                                    Case No: 8:24-cv-01655-FWS-SSC