Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Robert B. Carey (*pro hac vice*)
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
        leonarda@hbsslaw.com
        michellak@hbsslaw.com

*Attorneys for Plaintiffs*

*(Additional Counsel on Signature Page)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC, MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC, <br><br> Defendants. | Case No. 8:24-cv-01655-FWS-SSC <br><br> **PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO THE AGENCY DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT** <br><br> Judge: Hon. Fred W. Slaughter <br> Courtroom: 10D <br> Date: September 4, 2025 <br> Time: 10:00 a.m. |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................... 1

II.   BACKGROUND ...................................................................... 2

III.  ARGUMENT ........................................................................... 3

    A.    The Forum Selection Clause Does Not Bar These Claims. .................. 3

    B.    Plaintiffs Overwhelmingly Demonstrate the Existence of
           a RICO Scheme. ....................................................................... 4

          1.    Rule 12(b)(6) Legal standard ...................................... 5

          2.    Each of the Required RICO Elements are Present ..................... 5

                a.    The FAC thoroughly outlines the Conspiracy's
                     Conduct ....................................................... 6

                b.    Fenix and the Agency Defendants Have Formed
                     a Clear Enterprise ....................................... 8

                     (1)    Defendants Are Engaged in A
                          Common Purpose ................................... 9

                     (2)    Plaintiffs Have Alleged a Structure
                          and an Ongoing Organization .............................. 12

                     (3)    The Content Fraud Scheme has
                          Sufficient Longevity ........................... 13

                  c.    The FAC Demonstrates a Pattern of
                     Racketeering Activity ....................................... 15

                  d.    Plaintiffs Have Sufficiently Alleged Damages .............. 18

                  e.    The Agency Defendants' Remaining Arguments
                     Miss the Mark ................................................ 20

    C.    Plaintiffs adequately plead a VPPA claim against each
           Agency Defendant. ................................................................... 21

1    1.    Each Agency Defendant qualifies as a "video tape
2         service provider" under the VPPA. ...........................................21

3    2.    Plaintiffs qualify as "consumers" of each Agency
4         Defendant's video services. .....................................................22

5    3.    Each Agency Defendant is plausibly alleged to have
          disclosed personally identifiable information in
6         violation of the VPPA. .............................................................23

7    4.    The agencies disclosed PII to unauthorized third parties
8         outside the ordinary course of business. ....................................25

9    D.   Plaintiffs plausibly allege violations of the Wiretap Act
10        and CIPA. ...........................................................................................26

11   1.    Plaintiffs state a valid CIPA "use" violation. ...........................29

12   2.    Consent is a disputed fact issue that cannot support
13        dismissal. ..................................................................................29

14   3.    The Agency Defendants 'Impersonation' Defense
15        misstates the law. ......................................................................31

16   E.   Plaintiffs sufficiently plead a CDAFA claim against the
17        Agency Defendants. ..........................................................................32

18   1.    Agencies violated § 502(c)(2) by accessing and using
19        private Fan data without user permission. ................................33

20   2.    Agencies violated § 502(c)(3) by misusing OnlyFans
          services to simulate Creator intimacy. ......................................34

21   3.    Agencies violated § 502(c)(7) by using private data to
22        extract payments under false pretenses. ...................................34

23   4.    Plaintiffs allege economic harm caused by the
24        Agencies' CDAFA violations. ...................................................34

25   IV.   CONCLUSION .............................................................................................35

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska v. Express Scripts, Inc.*,
　2025 WL 755436 (D. Ak. Mar. 10, 2025)..........................................................21

*Archer v. NBCUniversal Media, LLC*,
　2025 U.S. Dist. LEXIS 129598 (C.D. Cal. July 2, 2025) ...........................24, 25

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ...........................................................................................5

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ...........................................................................................5

*Bias v. Wells Fargo*,
　942 F. Supp. 2d 915, 941 (N.D. Cal. 2013) ...................................12, 13, 15, 17

*Boyle v. United States*,
　556 U.S. 938 (2009) ..........................................................................6, 8, 12, 13

*Bryant v. Mattel, Inc.*,
　573 F. Supp. 2d 1254 (C.D. Cal. 2007)...........................................................15

*Campbell v. Facebook Inc.*,
　77 F. Supp. 3d 836 (N.D. Cal. 2014)...............................................................26

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
　519 F.3d 969 (9th Cir. 2008) ...........................................................................19

*Carey v. J.A.K.*,
　763 F. Supp. 3d 952, 980–81 (C.D. Cal. 2025)...........................................18, 19

*CBC Framing, Inc. v. Flores*,
　2008 WL 11337555 (C.D. Cal. Sept. 22, 2008)...............................................13

*In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*,
　295 F. Supp. 3d 927 (N.D. Cal. 2018)........................................................10, 14

*D'Angelo v. Penney OpCo, LLC*,
　2023 WL 7006793 (S.D. Cal. Oct. 24, 2023)...............................................27, 28

PLS.' RESP. IOT AGENCY DEFS.' MOTIONS TO DISMISS FAC

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 ...................................................................................... 5, 6, 9, 15

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) ........................................................................ 24

*Ellis v. Cartoon Network, Inc.*,
  803 F.3d 1251 (11th Cir. 2015) .................................................................... 22

*Esparza v. Kohl's, Inc.*,
  723 F. Supp. 3d 934 (S.D. Cal. 2024) ........................................................... 29

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) ................................................................... 26, 31

*Ghanaat v. Numerade Labs, Inc.*,
  689 F. Supp. 3d 714 (N.D. Cal. 2023)........................................................... 23

*Glob. Master Int'l Group, Inc. v. Esmond Nat., Inc.*,
  76 F.4th 1266 (9th Cir. 2023) .......................................................... 18, 19, 20

*In re Google Inc. Gmail Litig.*,
  2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ............................................... 30

*Heiting v. Taro Pharm. USA, Inc.*,
  728 F. Supp. 3d 1112 (C.D. Cal. 2024)......................................................... 26

*In re Hulu Privacy Litig.*,
  86 F. Supp. 3d 1090 (N.D. Cal. 2015)............................................... 21, 22, 25

*LD v. United Behavioral Health*,
  508 F. Supp. 3d 583 (N.D. Cal. 2020)............................................................. 9

*Mastel v. Miniclip SA*,
  549 F. Supp. 3d 1129 (E.D. Cal. 2021) ......................................................... 29

*Mata v. Zillow Grp., Inc.*,
  2024 WL 5161955 (S.D. Cal. Dec. 18, 2024) ................................................ 27

*Odom v. Microsoft Corp.*,
  486 F.3d 541 (9th Cir. 2007) (en banc)...................................................*passim*

*People v. Childs*,
  220 Cal. App. 4th 1079 (2013)...................................................................... 33

-iv-

*People v. Hawkins,*
   6 Cal. App. 5th 134 (2016) .................................................................. 33

*R.C. v. Walgreen Co.,*
   733 F. Supp. 3d 876 (C.D. Cal. 2024) .................................................. 30

*Reves v. Ernst & Young,*
   507 U.S. 170 (1993) ............................................................................ 6

*Swarts v. Home Depot, Inc.,*
   689 F.Supp.3d 732 (N.D. Cal. 2023) .................................................... 26

*Tatung Co., Ltd. v. Hsu,*
   2015 WL 11072178 (C.D. Cal. Apr. 23, 2015) ...................................... 7

*U.S. v. Fernandez,*
   388 F.3d 1199 (9th Cir. 2004) ............................................................ 21

*United States v. Friedman,*
   445 F.2d 1076 (9th Cir. 1971) ............................................................ 20

*United States v. Milheiser,*
   98 F.4th 935 (9th Cir. 2024) .................................................... 16, 19

*United States v. Pasha,*
   332 F.2d 193 (7th Cir. 1964) ............................................................ 32

*United States v. Vargas,*
   19 F.3d 32 (9th Cir. 1994) ...................................................... 14, 15, 20

*United States v. Varrazco-Gutierrez,*
   168 F.3d 502 (9th Cir. 1992) ............................................................ 20

*Valenzuela v. Nationwide Mut. Ins. Co.,*
   686 F.Supp.3d 969 (C.D. Cal. Aug. 14, 2023) ............................... 27, 29

*Valenzuela v. Super Bright LEDs Inc.,*
   2023 WL 8424472 (C.D. Cal. Nov. 27, 2023) .................................... 31

*In re Vizio, Inc.,*
   238 F. Supp. 3d 1204 (C.D. Cal. 2017) .................................... 21, 22

*Walter v. Drayson,*
   538 F.3d 1244 (9th Cir. 2008) .................................................... 5, 6, 8

*In re WellPoint, Inc. Out of Network UCR Rates Litigation,*
     805 F. Supp. 2d 1002 (C.D. Cal. 2011) ................................................................. 10

**Statutes**

18 U.S.C. 1961 ....................................................................................................... 8, 15

18 U.S.C. §1343 ................................................................................................... 15, 30

18 U.S.C. § 1962(d) ..................................................................................................... 6

18 U.S.C. § 2710 ........................................................................................... 21, 22, 25

Cal. Penal Code § 502 ....................................................................................... 32, 33, 34

Federal Wiretap Act, 18 U.S.C. § 2511(1)(a) ........................................................... 26

Privacy Act, Cal. Penal Code § 631(a) ..................................................................... 26

**Other Authorities**

Fed. R. Civ. P. 9(b) .................................................................................................... 18

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 3, 5, 29

PLS.' RESP. IOT AGENCY DEFS.' MOTIONS TO DISMISS FAC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.    INTRODUCTION

This case challenges a deception central to the OnlyFans platform. Users are promised direct access to specific Creators—real people, offering real communication. But that promise is false. The direct messages OnlyFans promotes as real are, in fact, often written by paid "Chatters" trained to impersonate Creators in order to mimic intimacy and drive spending. Plaintiffs allege that third-party agencies, including the Agency Defendants named here, operate OnlyFans accounts at scale using these paid Chatters. Fans are promised real conversations with real Creators, while behind the scenes, agencies take over—hiring Chatters to deliberately manipulate Fans in order to extract maximum value from fabricated relationship. This isn't just commercial misrepresentation: it's an invasion of private space. Defendants Content X, Inc., Elite Creators LLC (aka Creators Inc.),[1] Moxy Management, Verge Agency, Inc., Unruly Agency LLC, and Behave Agency LLC (collectively, "Agency Defendants") are not passive intermediaries. Plaintiffs allege that the Agency Defendants controlled specific Creator accounts, managed pricing, trained Chatters, and directed the conversations that misled Fans into financial and emotional vulnerability. Plaintiffs' allegations show operations that were structured, professionalized, and support Plaintiffs' claims under RICO, federal and state privacy laws, consumer protection laws, and common law fraud. Each claim is plausibly alleged. Their motions to dismiss should be denied.

---

[1]    Plaintiffs allege that Creators Inc. is the entity and brand through which Elite Creators LLC provides its "management services." FAC ¶ 54.

PLS.' RESP. IOT AGENCY DEFS.' MOTIONS TO DISMISS FAC

## II.    BACKGROUND

OnlyFans is a platform that allows users ("Fans") to pay for access to content creators ("Creators"), many of whom produce adult material. First Amended Class Action Complaint ("FAC"), Dkt. 118 ¶¶ 3, 12, 17, 63. Fans pay monthly subscription fees, send tips, and purchase additional content—including pay-per-view (PPV) videos—often through "direct messages" with those Creators. FAC ¶¶ 14, 72, 76, 79, 109. OnlyFans markets itself as enabling direct, personal interactions between Fans and Creators. FAC ¶¶ 13, 14, 81–92, 404. That promise drives user engagement and spending, ¶ 12–14, 78–80—and, as Plaintiffs allege, it is also false. FAC ¶¶ 15, 81, 155, 168, 367, 505, 507–8.

Creator accounts are often operated by third-party agencies—some of whom are named as Agency Defendants here. FAC ¶¶ 4, 46, 212, 215, 222, 230, 239. Plaintiffs allege these agencies "contract with Chatters to conduct most, if not all, of the communications between the Creators and the Fans"—all "[w]ithout the Fans' knowledge." FAC ¶ 104. These Chatters impersonate Creators in the "direct messages" that OnlyFans promises Fans, with the goal of simulating emotional connection and driving monetization by steering Fans toward purchasing content and sending tips. FAC ¶¶ 16, 100, 104, 112(c), 124, 151–155.

In addition to the blatant deception and fraud, the "Chatter Scams" involve massive breaches of confidentiality and privacy violations in which intimate communications and private and/or personal information about Fans—including photos and videos—are distributed and/or accessible to numerous unauthorized parties. FAC ¶¶ 5, 136, 158, 461, 470, 494.

**Plaintiffs' Experiences.** Each Plaintiff is an OnlyFans user who subscribed to one or more Creator accounts. FAC ¶¶ 25, 29, 31, 33, 35, 37, 250, 263, 279, 309, 405–420. Plaintiffs paid subscription fees, sent tips, and purchased "premium" content under the belief that they were communicating directly with a Creator. FAC ¶¶ 251–261, 264–277, 280–289, 292–306. They allege that the messages were instead sent by Chatters hired and managed by the Agency Defendants, and that this impersonation caused both economic loss and emotional harm. FAC ¶¶ 338, 339, 437, 442, 445, 474, 484, 495, 526, 531.

**Procedural History.** Plaintiffs filed this case on July 29, 2024, and amended their complaint on April 23, 2025. Dkts. 1, 118. The Agency Defendants now move to dismiss under Rule 12(b)(6), arguing that the FAC fails to state any claim for relief against them. Dkts. 124–129.

### III.    ARGUMENT

The Agency Defendants ask this Court to ignore the reality alleged in detail in the 143-page FAC: that they helped build, operate, and profit from a platform-wide impersonation scheme designed to deceive Fans into spending money under false pretenses. The FAC provides specific, Defendant-linked allegations of conduct that supports liability under RICO, federal and state privacy laws, and California common law. No additional pleading is required. Each motion should be denied.

### A.    The Forum Selection Clause Does Not Bar These Claims.

The Agency Defendants argue that Plaintiffs' claims are barred by the forum selection clause in the OnlyFans Terms of Service. That argument fails for the reasons set forth in Plaintiffs' concurrently filed opposition to Defendants' motion

to strike ("Pls.' Opp. to Defs.' MTS") and enforce the clause. *See* Pls.' Opp. to Defs.' MTS at Section I. In short: (1) the Agency Defendants are not parties to the Terms and cannot invoke them; (2) equitable estoppel does not apply; and (3) even if it did, the clause would not require dismissal. Plaintiffs incorporate those arguments here.

**B.    Plaintiffs Overwhelmingly Demonstrate the Existence of a RICO Scheme.**

The Agency Defendants attack Plaintiffs' RICO claim for myriad reasons—few are tethered to the law. For instance, the Agency Defendants assert that for a viable RICO conspiracy to exist, every co-conspirator must be aware of and know every other co-conspirator. But this has never been the law and is easily dispelled.

More puzzling still, the Agency Defendants conflate what RICO requires, suggesting that Plaintiffs must plead specific "coordination" or "communication" among all participants to state a claim. But no court in this Circuit—or any other—has held that formal coordination or direct communication is a necessary element of a RICO enterprise at the pleading stage. More novel still, some Agency Defendants argue that they cannot have joined the conspiracy because it was formed before they existed—suggesting, incorrectly, that RICO liability attaches only to original participants in the enterprise. It is, however, black-letter law that an individual can join a conspiracy at any point in the life of a conspiracy so long as she is aware of the conspiracy's purpose and subsequently commits acts in furtherance of the scheme—all of which occurred here.

As outlined below, the FAC more than sufficiently demonstrates the existence of a RICO scheme between Defendants Fenix International Limited and

Fenix Internet LLC (collectively, "Fenix Defendants" or "Fenix") and the Agency Defendants.

### 1.  Rule 12(b)(6) Legal standard

The elements of a civil RICO claim are well established and not as onerous at the pleading stage as Defendants suggest. At the pleading stage, both the Ninth Circuit and the Supreme Court have maintained the principle that "'RICO is to be read broadly'" and "should 'be liberally construed to effectuate its remedial purposes.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985)). Moreover, a motion to dismiss pursuant to 12(b)(6) should not be granted where there are "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombl*y, 550 U.S. 544, 570 (2007).

The Ninth Circuit has likewise cautioned courts to be "mindful of *Odom'*s enjoiner ***not to be stingy in interpreting and applying RICO***." *Walter v. Drayson*, 538 F.3d 1244, 1247 (9th Cir. 2008) (emphasis added). Here, Plaintiffs have plausibly alleged a RICO claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.")

### 2.  Each of the Required RICO Elements are Present

Plaintiffs' RICO claim requires four straightforward elements: (1) conduct of (2) an enterprise affecting interstate commerce, (3) through a pattern (4) of racketeering activity. *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014; *Walter v. Drayson*, 538 F.3d 1244, 1247 (9th Cir.

2008) ("To state a claim under § 1962(c), a plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'") (quoting *Odom*, 486 F.3d at 547).[2] RICO's second element, the existence of an enterprise, requires the alleged enterprise to have "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).[3]

### a.    The FAC thoroughly outlines the Conspiracy's Conduct

To establish conduct, Plaintiffs must allege the Agency Defendants "participated in the operation or management of the enterprise itself," and that they played "some part in directing the enterprise's affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). While the Agency Defendants' must have had a role directing the enterprise's affairs, "significant control" or "primary responsibility" are not required. *Id.* at 179 n 4.

In the Ninth Circuit, courts consider the following factors when assessing a RICO defendant's conduct: (1) whether the defendant gave or took directions; (2) occupied a position in the "chain of command"; (3) knowingly implemented decisions of upper management; or (4) was indispensable to achievement of the enterprise's goal or "vital" to the mission's success. *Walter v. Drayson*, 538 F.3d

---

[2] Plaintiffs incorporate by reference their response to the Fenix Defendants' motion to dismiss regarding Plaintiffs' RICO conspiracy claims under 18 U.S.C. § 1962(d). And for the reasons outlined both there and below, Plaintiffs have properly pled a RICO conspiracy claim under 1962(d).

[3] The enterprise "need not have a hierarchical structure or a 'chain of command[.]'" *Boyle v. United States,* 556 U.S. 938, 944–45, 948 (2009).

1244, 1249 (9th Cir. 2008); *Tatung Co., Ltd. v. Hsu*, 2015 WL 11072178, at *19–20 (C.D. Cal. Apr. 23, 2015).

***Fenix created the OnlyFans ecosystem, while the Agency Defendants animate the scheme.*** The FAC outlines in robust detail the Agency Defendants' role in the Content Fraud Enterprise. The scheme itself starts with the OnlyFans website, which the Fenix Defendants own and operate, and which, as Plaintiffs allege, is "teeming with references to 'authenticity' and 'meaningful' engagement." FAC ¶ 13.

But instead of providing Fans an authentic relationship with the Creators, Fenix and the Agency Defendants have conspired to direct a fleet of professional "Chatters" to communicate with Fans in place of the actual Creators. Moreover, the use of professional Chatters is "primarily perpetrated by 'management agencies' such as the Agency Defendants on behalf of and at the direction of the Creators." FAC ¶ 101.

Thus, the Agency Defendants not only give directions in furtherance of the scheme but are indispensable to its success:

- **The Agency Defendants hire Chatters**: "Agencies often use Chatters of all genders and ages from countries like the Philippines or Venezuela, where they can find relatively well-educated, English-speaking (or even multilingual) workers—but pay them a fraction of what the required skillset would command in the U.S. labor market." FAC ¶ 105.

- **The Agency Defendants direct and train Chatters**: "Agencies even provide Chatters with actual 'scripts' similar to those used by telemarketers and call center employees, . . ." FAC ¶ 110.

- **The Agency Defendants coordinate and direct the workflow from Creators to Chatters**: "Agencies [ ] have sophisticated processes in place to facilitate the generation of custom content." FAC ¶¶ 112(a)–(d)(iii).

- **Agencies employ sophisticated Customer Relationship Management ("CRM") platforms to scale the use of Chatters**: "[T]he Agency Defendants generally use CRM tools that access the Creator's OnlyFans account and then mirror a single live session inside a multi-seat dashboard. These tools let multiple chatters read and answer DMs concurrently, . . . [t]his practice is so prevalent that CRM platforms openly market their services to Creators and Agencies, and have even begun marketing their ability to facilitate Chatter schemes through the use of AI[.]" FAC ¶¶ 122–125.[4]

The FAC easily satisfies the conduct-related factors under *Walter v. Drayson*: outlining how the Agency Defendants hire, train, and direct the chatters, thereby occupying a key position in the enterprise's overall operational structure.

### b.    Fenix and the Agency Defendants Have Formed a Clear Enterprise

The second RICO element, an enterprise, is also present here. "An enterprise includes any union or group of individuals associated in fact . . . . proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle*, 556 U.S. at 944–45 (internal quotations omitted); 18 U.S.C. § 1961(4).[5] According to the Supreme Court, "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods . . . ." *Boyle*, 556 U.S. at 948.

---

[4] Because the Chatters have made OnlyFans enormous profit and drive Fans to the platform, the Fenix Defendants rely upon the Agencies to direct the Chatter Scam. FAC ¶¶ 99–100.

[5] Per 18 U.S.C. § 1961(4), an enterprise is "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity."

On this issue, the Ninth Circuit's decision in *Odom* is instructive—and its absence from Defendants' briefing is conspicuous. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 550 (9th Cir. 2007). In *Odom*, an en banc panel of the Ninth Circuit reversed a district court's dismissal of RICO claims for failure to allege an associated-in-fact enterprise between Microsoft and Best Buy. In doing so, the court clarified that the statutory definition is "not very demanding" and that "an associated-in-fact enterprise [ ] does not require any particular organizational structure, separate or otherwise." *Odom*, 486 F.3d at 548, 551.

The Court further explained that "[t]o establish the existence of such an enterprise, a plaintiff must provide both 'evidence of an ongoing organization, formal or informal,' and evidence that the various associates function as a continuing unit.'" *Id.* at 552 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Thus, "plaintiffs must plead that the enterprise has (A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing *Boyle,* 556 U.S. at 946).

### (1)    Defendants Are Engaged in A Common Purpose

The common purpose in this case is clear: Fenix and the Agency Defendants are united in their scheme to extract premium content fees from Fans by fraudulently misrepresenting the nature of the relationship between Fans and Creators. FAC ¶¶ 362–375. Though they each have separate roles, their combined efforts are essential to the viability of the Content Fraud Enterprise.

Courts consistently recognize a common purpose in schemes where defendants collaborate to deceive customers for financial gain. *See LD v. United*

-9-

*Behavioral Health*, 508 F. Supp. 3d 583, 602 (N.D. Cal. 2020) (common purpose adequately alleged where defendants conspired to retain the spread between artificially low reimbursements and the amounts owed under the plans); *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, 295 F. Supp. 3d 927, 980 (N.D. Cal. 2018) (allegations that defendants shared common purpose of deceiving regulators into believing certain vehicles were compliant with emission standards sufficient to allege common purpose); *In re WellPoint, Inc. Out of Network UCR Rates Litigation*, 805 F. Supp. 2d 1002, 1033 (C.D. Cal. 2011) (common purpose alleged where plaintiff alleged defendants controlled and manipulated database in order to pay less to providers and subscribers to reduce price paid for service and increase the profits of the enterprise).

In this case, the OnlyFans Defendants provide the underlying website and corresponding commitment to provide with Fans an "authentic" and "direct" relationship with Creators whom the Agency Defendants represent and direct. FAC ¶¶ 81–84. The Agency Defendants hire, train, and direct an army of Chatters who utilize the OnlyFans platform and sophisticated CRM software applications to extract as many premium content fees from Fans as possible. FAC ¶¶ 3–4, 112, 120–128.

011194-11/2686242 V1                                    Case No: 8:24-cv-01655-FWS-SSC

This is no secret. It is so blatant that the CRM platforms openly advertise their ability to enhance Chatter Scams:[6]

**Figure 7**. *Screenshot from Supercreator website.*

The scheme's enormous profit also demonstrates its common purpose. For instance, nearly half of OnlyFans' total revenue for the years 2021–2022 (approximately $500 million) came from non-subscription sources, which it described as "one-time transactions such as messaging and access to content, that the group facilitates between Fans and Creators." FAC ¶¶ 61–63.[7] This revenue stream depends entirely on the Agency Defendants' Chatter operation, which Fenix actively permits while refusing to reveal its existence to Fans. FAC ¶¶ 137–149.

---

[6] FAC ¶ 126.

[7] This is also why Fenix actively permits the use of Chatters on OnlyFans and refuses to reveal their existence, despite maintaining all the data necessary to alert Fans that Chatters, rather than the Creators, are the ones communicating with them. FAC ¶¶ 137–149.

The common purpose uniting Fenix and the Agency Defendants is simple and well pleaded: Fenix and the Agency Defendants promise Fans a direct relationship with Creators, then exploit the illusion to extract premium fees.

### (2) Plaintiffs Have Alleged a Structure and an Ongoing Organization

RICO's structural element requires a "relationship among those associated with the enterprise." *Boyle*, 556 U.S. at 946. Importantly, neither a "hierarchy, role differentiation . . . [or] a chain of command" is required. *Id.* Indeed, courts have consistently found sufficient organization in loosely coordinated arrangements where participants work toward common goals.

The Supreme Court's decision in *Boyle* illustrates this low threshold. There, defendants participated in bank thefts through a group that was "loosely and informally organized," "did not appear to have a leader or hierarchy," and "did not appear to ever formulate any long-term master plan or agreement." *Id.* at 941. Despite this informal structure, the Court found sufficient organization for RICO purposes.

Likewise, in *Odom*, the court found an ongoing organization where Microsoft and Best Buy established "mechanisms" to transfer plaintiffs' information from Best Buy to Microsoft, which allowed Microsoft to activate customers' accounts without their knowledge or permission, and improperly bill them. *Odom*, 486 F.3d at 552.

Federal courts have applied this flexible standard to complex multi-party arrangements. In *Bias v. Wells Fargo*, a district court found sufficient organization where Wells Fargo, certain "'property preservation' vendors," and real estate

-12-

brokers "associated together for the *common purpose* of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up fees for default-related services on borrowers' accounts." 942 F. Supp. 2d 915, 941 (N.D. Cal. 2013); *see also CBC Framing, Inc. v. Flores*, 2008 WL 11337555, at *8 (C.D. Cal. Sept. 22, 2008) (collecting related cases). The key was their coordinated effort to achieve a shared fraudulent objective.

The same analysis applies here. The relationship between Fenix and the Agency Defendants evidences functional coordination and organizational structure that operates through defined roles and interdependent relationships:

- **OnlyFans' Platform**: OnlyFans provides the technological infrastructure and establishes credibility by promising "the authenticity of the personal interaction between Fans and Creators." FAC ¶ 13. This is the foundation upon which the fraud is built.

- **The Agency Defendants' Operational Role**: Agency Defendants operationalize the deception by directing professional chatters to impersonate Creators, while also implementing sophisticated CRM platforms designed to scale the fraud into a billion-dollar enterprise. [8]

While somewhat informal, the enterprise's structure operates in a well-designed and coordinated manner, always focused on achieving maximum profits. This is exactly the type of ongoing organization that courts consistently recognize under *Boyle* and *Odom*.

### (3)    The Content Fraud Scheme has Sufficient Longevity

The enterprise element requires "longevity sufficient to permit [the] associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. This element

---

[8] The website SuperCreator, a third-party CRM platform that directly markets to Agencies, and aggressively promotes its ability to enhance Chatter Scams, illustrating the unique role the Agency Defendants play. *See* supercreator.app/automation (last visited July 17, 2025).

focuses on whether the enterprise operated long enough to accomplish its fraudulent objectives, not on when particular defendants joined the scheme.

For instance, in *Odom*, the court found a two-year time span to be "far more than adequate" to establish a continuing unit. *Odom*, 486 F.3d at 553. The court emphasized that the "continuity requirement does not, in itself, require that every member be involved in each of the underlying acts of racketeering, . . . . the continuity requirement focuses on whether the associates' behavior was 'ongoing' rather than isolated activity." *Id.* (internal quotations omitted); *see also Chrysler*, 295 F. Supp. 3d at 982 (finding allegations that defendants participated in the scheme over the course of three vehicle model years sufficient).

The FAC alleges an enterprise operating from 2017 to the present—a period exceeding seven years. OnlyFans began promoting the scheme in at least 2017 by promising authentic Creator–Fan relationships, while Agency Defendants joined progressively on or around 2020. FAC ¶¶ 381–422. The enterprise continues to operate today, with evidence of each Agency Defendant's participation from 2021 onward—far exceeding the longevity thresholds established in *Odom* and *Chrysler*.

The Agency Defendants attack this element by turning it upside down. Instead of focusing on longevity, as the law requires, the Agency Defendants invent a red herring based upon corporate formation. According to the Agency Defendants, because the OnlyFans website was up and running before the Agency Defendants were ever formed, it is impossible for them to have ever joined the conspiracy. But this is not the law, nor does it accurately represent the FAC.

As the Ninth Circuit explained in *United States v. Vargas*, "a participant in the conspiracy need know only the 'essential nature of the plan and [his]

-14-

connections with it, without requiring evidence of knowledge of all its details or of the participation of others.'" 19 F.3d 32 (9th Cir. 1994). In other words, when a defendant participates in the acts of a RICO enterprise, the timing of its corporate formation is irrelevant.

This argument also mischaracterizes the FAC, which does not allege that the Agency Defendants joined a pre-existing OnlyFans enterprise, but rather that they became essential partners in developing and implementing the Content Fraud Enterprise—namely, the Chatter Scam. FAC ¶¶ 361–375. This is exactly the sort of ongoing relationship that RICO's longevity requirement is designed to capture.

### c.    The FAC Demonstrates a Pattern of Racketeering Activity

The third and fourth RICO elements require a pattern of racketeering activity. This is demonstrated through the commission of specific predicate acts—here, wire fraud under 18 U.S.C. §1343.[9] *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014); *Bias*, 942 F. Supp. 2d 915, 936–37 (N.D. Cal. 2013) ("Racketeering activity is also referred to as the predicate acts.") (internal quotation marks omitted); 18 U.S.C. § 1961(5) (defining a "pattern of racketeering activity" to require "at least two acts of racketeering activity").

Wire fraud requires three elements: "'(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud.'" *Bryant v. Mattel, Inc.,* 573 F. Supp. 2d 1254, 1264 (C.D. Cal. 2007) (quoting

---

[9] 18 U.S.C. 1961(1)( "[R]acketeering activity" means . . . (B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1343 (relating to wire fraud), . . ."

*United States v. Shipsey,* 363 F.3d 962, 971 (9th Cir. 2004)); *see also United States v. Milheiser*, 98 F.4th 935, 944 (9th Cir. 2024).

**The Scheme to Defraud: Misrepresenting the Nature of Fan-Creator Interactions.** The FAC alleges a coordinated scheme whereby the defendants misrepresent the fundamental nature of what Fans purchase—direct, authentic communication with Creators. FAC ¶¶ 361–375. This goes to the heart of nearly every transaction on the OnlyFans platform, because Fans only agree to pay premium content fees because of the promised personal interaction with Creators. FAC ¶¶ 81–85, 151, 444.

**OnlyFans' Social Media Misrepresentations**: OnlyFans has repeatedly used Twitter to reinforce these false promises:

- January 17, 2021: Represented that Fans could "direct message" and "chat with a Creator." FAC ¶ 385.
- May 26, 2021: Represented that a Creator would "chat with all her fans in the DMs." FAC ¶ 389.
- May 3, 2024: Represented that Fans could "connect[] personally" with a Creator. FAC ¶ 400.

**The Agency Defendants' Acts**: The FAC demonstrates that ***each*** Agency Defendant has committed numerous predicate acts:

Moxy—Deceptive Marketing and Operations:

- Moxy markets its ability to help Creators "increase engagement with their fans and followers exponentially." FAC ¶ 183.
- Provides "Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge." FAC ¶ 188.
- Contractually commits to "respond to messages on Paid Content Platforms on behalf of [the Creator], and use its reasonable, good faith efforts to upsell the products and content." FAC ¶ 189.

Unruly—Systematic Impersonation:

-16-

- Provides "Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge." FAC ¶ 216.

- Unruly was even sued by one of its Creators, who[ ] claimed to be unaware of the fact that Unruly's Chatters were impersonating her." FAC ¶ 219.

Content X:

- "Content X provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge." FAC ¶¶ 227–228.

- According to a former Creator, "The way they would answer messages was super lazy [and] super robotic." FAC ¶ 228.

Verge—False Promise of a "Personal" Connection:

- Uses "taglines and captions for its Creators' accounts that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform. FAC ¶ 241.

- Intentionally posts false promises for its Creators, such as "I will be responding to all my messages! Tip $100 to join VIP for unlimited FREE chat and MOST exclusive content!" FAC ¶ 242.[10]

Creators Inc. (Elite Creators):

- Uses taglines for its Creators' accounts that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform. *E.g.*, FAC ¶ 176(a) ("I personally reply to every message").

- Openly admits, via lawsuits against its own Creators, that its "management services" include "staffing [creators'] account[s] with someone to respond to direct messages on the OnlyFans platform 24 hours a day, seven days a week." FAC ¶ 178(b).

Finally, as to intent, the systematic nature of the Chatter Scams, along with

Defendants' knowledge that Fans believe themselves to be communicating directly

with Creators, is more than sufficient. *See Bias*, 942 F. Supp. 2d at 937 ("Specific

---

[10] Each predicate act involved use of interstate wires through internet communications, social media platforms, and the OnlyFans website infrastructure. FAC ¶¶ 383–404, 441(e).

intent is satisfied by the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension, and this intention is shown by examining the scheme itself." (internal citations and quotations omitted).

Taken together, Plaintiffs have over the course of 150 pages provided an overwhelming description of the RICO predicate acts on behalf of each Defendant. This plainly satisfies the pleading requirements under RICO and Rule 9(b).

### d.    Plaintiffs Have Sufficiently Alleged Damages

RICO requires that plaintiffs allege "concrete financial loss" rather than "mere injury to a valuable intangible property interest." *Glob. Master Int'l Group, Inc. v. Esmond Nat., Inc.*, 76 F.4th 1266, 1274 (9th Cir. 2023). Ninth Circuit caselaw has, however, "established a low threshold for plaintiffs to show a concrete RICO injury." *Id.* Indeed, courts consistently recognize "that the overpayment of money is a tangible injury." *Id.* (citing *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 976 (9th Cir. 2008) ("In the ordinary context of a commercial transaction, a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money.").[11]

In *Carey v. J.A.K.'s Puppies, Inc.*, this district found that plaintiffs had properly alleged a concrete financial loss after purchasing puppies they didn't know were procured from a puppy mill. 763 F. Supp. 3d 952, 981 (C.D. Cal. 2025). The defendants "falsely represented puppies to be 'rescue' dogs" but were "instead

---

[11] *Carey v. J.A.K.'s Puppies, Inc.*, 763 F. Supp. 3d 952, 980–81 (C.D. Cal. 2025) ("In the RICO context, '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" (quoting *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002)).

obtained from puppy mills." And like here, plaintiffs alleged "that they would not have paid as much as they did for puppies that they knew came from puppy mills," which the court found to demonstrate a concrete financial loss. *Id.*

The same occurred in *Glob. Master Int'l Group, Inc.*, where the plaintiff claimed it overpaid for "fraudulently non-conforming supplements" that it received from defendant, which the Ninth Circuit found was a "claim [ ] for an injury to a cognizable property interest . . . ." *Glob. Master Int'l Group*, 76 F.4th at 1274 (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) ("[T]he word 'property' . . . comprehends anything of material value owned or possessed.").

To be clear, the FAC alleges multiple categories of concrete financial losses directly resulting from Defendants' fraudulent scheme:

- **Premium Content Fee Overpayments**: Plaintiffs paid premium content fees they would not have otherwise paid if they knew Chatters, rather than Creators, were providing the communications. FAC ¶ 433. These are classic overpayment damages under *Canyon County*. 519 F.3d at 976.

- **Subscription Fee Overpayments**: Plaintiffs paid subscription fees based on OnlyFans' and the Agency Defendants' false promise of a direct connection with Creators. FAC at ¶¶ 402–403, 405–420. These fees were only obtained because Defendants misrepresented the fundamental nature of the Fans' ability to connect with Creators. *See Milheiser*, 98 F.4th at 944 ("A misrepresentation will go to the nature of the bargain if it goes to price or quality, or otherwise to essential aspects of the transaction.").

- **Misrepresented Digital Content**: Plaintiffs overpaid for digital content that was misrepresented, including content that was "either not provided or other than what was promised." FAC ¶¶ 416–418, 420, 435.

- **Expectation Losses**: Plaintiffs lost the value of "having direct, authentic communications" and wasted effort "communicating with Chatters" rather than Creators. FAC ¶ 434. While this includes intangible elements, it nevertheless flows from, and is tied to, overpayment for services that were not provided as Defendants promised they would be.

-19-

PLS.' RESP. IOT AGENCY DEFS.' MOTIONS TO DISMISS FAC

If this is not enough to demonstrate a "concrete financial loss," it's hard to imagine a scenario that could. Plaintiffs have alleged multiple categories of loss, including overpayment for services that were either never rendered, or otherwise provided in a manner entirely different from what the Agency Defendants promised. These allegations satisfy the Ninth Circuit's low threshold and mirror the overpayment theories upheld in *Carey*, *Glob. Master Int'l Group*, and *Canyon County*.

### e. The Agency Defendants' Remaining Arguments Miss the Mark

**They "Must Know Each Other":** Creating their own RICO elements, the Agency Defendants insist that Plaintiffs must plead that all the members of the RICO enterprise knew each other. Dkt. 124 at 14–15. This is not now, nor has it ever been, a RICO requirement. Rather, a participant in the conspiracy must only know the "essential nature of the plan and [his] connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *United States v. Vargas*, 19 F.3d 32 (9th Cir. 1994); *see also United States v. Varrazco-Gutierrez*, 168 F.3d 502 (9th Cir. 1992) ("That Appellant may not have been aware of the identity of other participants to the [RICO] conspiracy is irrelevant."); *United States v. Friedman*, 445 F.2d 1076, 1080 (9th Cir. 1971) ("For it is well established that one can be a party to a conspiracy even though he does not know of the existence or identity of all his co-conspirators, and even though he does not participate in all of their acts.").

**They "Must Identify Specific Communications":** Defendants repeatedly insist that Plaintiffs must plead "coordination" and identify specific

-20-

communications between the Defendants. Dkt. 124 at 15–17. This is simply not the law. Just the opposite: "[a]n inability to describe the exact inner workings of the relationships between the enterprise members, without the benefit of discovery, is not dispositive at this stage." *See Alaska v. Express Scripts, Inc.*, 2025 WL 755436, at *15 (D. Ak. Mar. 10, 2025).[12]

Faced with the overwhelming allegations provided in the FAC, Agency Defendants are forced to create additional RICO elements to mount any kind of defense. But the requirements they've created would effectively gut RICO, by making enterprise liability impossible to plead. Accordingly, the Court should deny the Agency Defendants' motions to dismiss Plaintiffs' RICO claims.

**C.    Plaintiffs adequately plead a VPPA claim against each Agency Defendant.**

**1.    Each Agency Defendant qualifies as a "video tape service provider" under the VPPA.**

The VPPA defines "video tape service provider" to include "any person engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." 18 U.S.C. § 2710(a)(4). Courts interpret this definition to include businesses that monetize access to prerecorded video content as a central feature of their commercial model. *See In re Vizio, Inc.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017); *In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015).

---

[12] Defendants' reliance on *U.S. v. Fernandez* is similarly misplaced, as *Fernandez* does not address whether participants need to know each other. 388 F.3d 1199 (9th Cir. 2004). Dkt. 124 at 15. The portion of *Fernandez* upon which the Agency Defendants rely addresses a defendants' awareness of the essential scope and nature of the enterprise—which Plaintiffs have sufficiently alleged.

The FAC alleges that each Agency Defendant orchestrated the delivery of paid audiovisual content by managing the sending of unlock links and pricing of custom videos through Creator accounts. These videos were delivered via unlock links, PPV tips, and custom video transactions—each orchestrated by agency personnel operating through Creator accounts. FAC ¶¶ 111–112, 452, 455. The agencies managed chat interactions that prompted video unlocks and upsells, often using preloaded scripts and pricing tiers, in ways designed to maximize Fan spending. FAC ¶¶ 222–227.

The fact that Agency staff operated through OnlyFans' infrastructure does not insulate them from VPPA liability. Courts have routinely recognized that entities may qualify as video providers even if they deliver content through a third-party platform. *See In re Vizio*, 238 F. Supp. 3d at 1221 (manufacturer that sold smart TVs and tracked viewing data could qualify under the VPPA); *In re Hulu*, 86 F. Supp. 3d at 1095 (streaming platform liable under VPPA for disclosures tied to its embedded video player).

Here, the Agencies were not passive service vendors. They actively profited from the delivery of paid video content to Fans and structured those interactions around monetized unlocks. That places them within the category of entities courts have found may qualify as video service providers under the VPPA.

**2.    Plaintiffs qualify as "consumers" of each Agency Defendant's video services.**

The VPPA protects any "renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). Courts interpret "subscriber" broadly to include individuals who pay for or register to access video content, even if they never interact directly with the content provider. *See Ellis v.*

-22-

*Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 718 (N.D. Cal. 2023) (subscription may be financial, associational, or access-based).

The FAC alleges that Plaintiffs subscribed to Creator accounts operated by the Agency Defendants and paid to unlock private video content distributed by those accounts. FAC ¶¶ 111–112, 260, 276, 288, 305, 321, 414, 416, 455, Plaintiffs' payments for access to agency-controlled content is sufficient to establish "subscriber" status under the VPPA.

Agency Defendants argue that because Plaintiffs paid OnlyFans or Creators, not the agencies themselves, they were not consumers of agency services. But this misstates the statute. A plaintiff need not contract directly with the disclosing entity to qualify as a consumer. What matters is whether the defendant provided video services for which the plaintiff paid, and whether the defendant disclosed identifying information about that plaintiff. See *Ghanaat*, 689 F. Supp. 3d at 718–19 (subscriber status satisfied where plaintiff paid for access to content, even without a direct contractual relationship with the content provider). That is exactly what the FAC alleges here.

**3.    Each Agency Defendant is plausibly alleged to have disclosed personally identifiable information in violation of the VPPA.**

As explained in the concurrently filed Plaintiffs' Response in Opposition to Defendants Fenix International Limited's and Fenix Internet LLC's Motion to Dismiss ("Opp. to Fenix MTD"), the VPPA prohibits video service providers from knowingly disclosing personally identifiable information ("PII") that links a consumer to specific video content. *See* Opp. to Fenix MTD § H.3. The statute covers disclosures of platform-specific identifiers—such as usernames or account

-23-

handles—when paired with viewing behavior in a way that would allow an ordinary observer to associate the individual with particular video content. *See Archer v. NBCUniversal Media, LLC*, 2025 U.S. Dist. LEXIS 129598, at *11–12 (C.D. Cal. July 2, 2025); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017).

The FAC alleges that each Agency Defendant participated in the impersonation scheme by hiring or managing Chatters who were granted access to user-level purchase and viewing data in order to simulate personalized conversations and trigger additional video sales. FAC ¶¶ 449–452. These data disclosures were not incidental—they were the mechanism through which each agency drove video revenue. The FAC alleges that:

- **Creators Inc.** used taglines to emphasize the personal nature of the Creators' accounts while simultaneously using Chatters to impersonate the Creators. FAC ¶¶ 172–179, 449–455.

- **Moxy** maintained its own overseas Chatter teams and directly managed interactions tied to agency-controlled Creator accounts. FAC ¶¶ 183–191, 449–455.

- **Unruly** used third-party Chatter vendors to engage Fans under false pretenses, with access to video histories and purchase behaviors. FAC ¶¶ 213–220, 449–455.

- **Verge** emphasized the personal nature of the engagement with the Creators and masks the number of subscribers for each Creator to hide the use of Chatters. FAC ¶¶ 239–249, 449–455.

- **Content X** (now operating as HoneyDrip) operated a structured system of Fan targeting based on user-specific video interaction logs. FAC ¶¶ 226–231, 449–455.

These allegations are more than sufficient to state a VPPA claim against each agency. They describe the disclosure of individual viewing histories to impersonator Chatters—non-essential third parties—who used those records to manipulate consumers. This conduct is functionally similar to what the *Archer*

-24-

court found sufficient to plead a VPPA violation. If anything, the disclosures here are even more direct and exploitative.

### 4. The agencies disclosed PII to unauthorized third parties outside the ordinary course of business.

The VPPA prohibits disclosure of personally identifiable information "to any person" unless an exception applies. 18 U.S.C. § 2710(b)(1)–(2). The only potentially relevant exception here is for disclosures made in the "ordinary course of business," which the statute narrowly defines to include actions "necessary for… debt collection, order fulfillment, request processing, or the transfer of ownership." 18 U.S.C. § 2710(a)(2). Courts construe this exception strictly to avoid swallowing the rule. *See In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015).

The FAC alleges that each Agency Defendant allowed third-party Chatters to access or view Fan-specific purchase histories to overseas Chatters who were paid to impersonate Creators and emotionally manipulate Fans into buying more videos. FAC ¶¶ 449–455. These Chatters were not disclosed to Fans, were not necessary to account maintenance or delivery, and were not performing routine processing functions. They were undisclosed contractors hired to simulate personal engagement and drive additional video purchases. FAC ¶¶ 122–124, 188, 200, 216, 227, 235, 246.

This District recently held that disclosures of user and video data to a third party (Meta) were not protected by the "ordinary course" exception, even when transmitted through built-in platform tools. *Archer,*2025 U.S. Dist. LEXIS 129598, at *14. If disclosing user data through Facebook pixels is not routine enough to qualify, then disclosing it to offshore impersonators for commercial manipulation plainly exceeds the statute's narrow carveout.

-25-

Each Agency Defendants' role in structuring these disclosures—controlling access to video data and directing Chatters to use it to simulate personal familiarity—renders the ordinary-course defense inapplicable. These were not routine operations. They were monetized deceptions, deployed through unauthorized third parties.

**D.     Plaintiffs plausibly allege violations of the Wiretap Act and CIPA.**

Both the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a), and the California Invasion of Privacy Act, Cal. Penal Code § 631(a) ("CIPA") prohibit the unauthorized interception of electronic communications, and the parties agree that "[t]he analysis for a violation of CIPA is the same as that under the federal Wiretap Act." *Swarts v. Home Depot, Inc.*, 689 F.Supp.3d 732, 747 (N.D. Cal. 2023); Dkt. 124 at 27. "CIPA prohibits any person from using electronic means to 'learn the contents or meaning' of any 'communication' 'without consent' or in an 'unauthorized manner.'" *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020). Likewise, "the Wiretap Act prohibits the unauthorized "interception" of an "electronic communication." *Id.* at 607 (citing 18 U.S.C. § 2511(1)(a)–(e)). That is precisely what Plaintiffs allege the Agency Defendants did: using sophisticated CRM software to intercept and divert Fan messages in real time, allowing their paid Chatters to take over OnlyFans accounts, access Fans' private messages in real time, and impersonate Creators in ongoing conversations.

"To plausibly allege that Plaintiffs' communications were intercepted while in transit, factual allegations regarding the method, or nature, of interception are required." *Heiting v. Taro Pharm. USA, Inc.*, 728 F. Supp. 3d 1112, 1122 (C.D. Cal. 2024); *see also Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 848 (N.D. Cal.

2014) (finding "in transit" requirement adequately pled where plaintiff alleged defendant scanned the content of private messages and reacted to the finding of the scan); *Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F.Supp.3d 969, 977-79 (C.D. Cal. Aug. 14, 2023) (finding plaintiff alleged "in transit" interception through code embedded on defendant's website, and the third party stated its ability to create "real time insights" and to collect data "as it happens").

While Plaintiffs "must do more than 'merely restate[ ] the pleading requirement of real time interception,' the standard is not overly burdensome." *Mata v. Zillow Grp., Inc*., 2024 WL 5161955, at *6 (S.D. Cal. Dec. 18, 2024) (quoting *Esparza v. Gen Digital Inc*., 2024 WL 655986, at *4 (C.D. Cal. Jan. 16, 2024)). A "pleading standard to the contrary would require the CIPA plaintiff to engage in a one-sided guessing game because the relevant information about data capture typically resides uniquely in the custody and control of the CIPA defendant and its third-party recorder." *D'Angelo v. Penney OpCo, LLC*, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023).

In *D'Angelo*, the court found that plaintiffs successfully pled a third-party intercepted their chats with JC Penney by alleging that JC Penney's website chat feature operated through a third-party's servers, allowing contemporaneous interception of the communications. *See* 2023 WL 7006793 at *8. The plaintiffs there further alleged a third-party "r[an] the chat service from its own servers, [even though] consumers interact[ed] with the chat service on Defendant's Website," making it appear as if they were communicating with a company representative. *Id.* Because the third-party "receive[d] the chat messages either before or

simultaneously with JC Penney", the court found that plaintiffs had plausibly demonstrated interception. *Id.*

The same analysis applies here. Using "tools that access the Creator's OnlyFans account and then mirror a single live session inside a multi-seat dashboard," the FAC outlines with precise detail exactly how the Agency Defendants employ third-party CRM software to intercept Fan communications with Creators. FAC ¶¶ 122–124, 490–491. The FAC also demonstrates that Plaintiffs' communications are "intercepted" while "in transit":

- "[O]nce the CRM platform is enabled, Fan messages sent to a Creator's account are simultaneously intercepted, diverted and routed through the CRM platform, where a Chatter impersonating the Creator can then respond to the Fan through the Creator's account…" FAC at ¶ 124.

- "CRM tools generally function by automating interactions with OnlyFans website using various web-based technologies that . . . effectively clon[e] the Creator's inbox across several live user sessions. This provides Chatters and other agency representatives with an alternate platform to simultaneously message and otherwise interact with Fans directly through Creator accounts in real time." FAC at ¶ 123.

- "Defendants generally use CRM tools that access the Creator's OnlyFans account and then mirror a single live session inside a multi-seat dashboard. These tools let multiple chatters read and answer DMs concurrently, without ever opening the official OnlyFans interface in a visible browser tab." FAC at ¶ 122.

- "This practice is necessary to facilitate the high volume of Chatters that many Agency defendants employ. Without it, each Chatter would individually need to log into a Creator's OnlyFans account and send messages directly from the Creator's inbox after they were received…" FAC at ¶ 492.

- "[O]ne popular CRM platform openly advertises that it mimics user behavior to simultaneously divert all messages from the Creator's OnlyFans account to the CRM platform in real time. Once the messages are accessible from the CRM platform, a high volume of Chatters impersonating the Creator can toggle between and respond to Class Members' messages on the Creator's behalf." FAC at ¶ 493.

-28-

Plaintiffs have more than sufficiently alleged the "method [and] nature" of the underlying interception.

### 1.    Plaintiffs state a valid CIPA "use" violation.

Plaintiffs have also sufficiently alleged that the Agency Defendants are using the intercepted content, *i.e.*, Fan messages. *See Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (explaining that clause three prohibits "attempting to use or communicate information obtained as a result of" an improper interception); *Esparza v. Kohl's, Inc.*, 723 F. Supp. 3d 934, 940–41 (S.D. Cal. 2024) (same).

Plaintiffs allege the Agency Defendants "used the information obtained in the [unlawfully intercepted] communications . . . to solicit Premium Content Fees" from Plaintiffs and the Class Members. FAC ¶ 481; *See also Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 979 (C.D. Cal. 2023) (allegations that third-party interception allowed chat transcripts to "be 'data harvested for financial gain.' . . . lead to a plausible inference that [ ] the information [ ] gather[ed]" was used "in some manner for [defendant's] benefit"); *Esparza v. Kohl's, Inc.*, 723 F. Supp. 3d 934, 943–44 (S.D. Cal. 2024) (same). Plaintiffs have sufficiently alleged use of the intercepted content.

### 2.    Consent is a disputed fact issue that cannot support dismissal.

The Agency Defendants next argue that the Creators consented to the interception of Fan messages through CRM applications and their consent transferred to the Agency Defendants. Dkt. 124 at 30–31. This argument fails for three reasons. First, consent is an issue of fact that is inappropriate for a Rule 12(b)(6) motion. Second, consent is not a defense where the communication was

intercepted for a tortious or criminal purpose. Third, simultaneous and unknown duplication do not meet the party-consent exception.

First, consent is a fact intensive inquiry, not ripe for adjudication at the 12(b)(6) stage. "[T]he question of express consent is usually a question of fact, where a fact-finder needs to interpret the express terms of any agreements to determine whether these agreements adequately notify individuals regarding the interceptions." *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *15 (N.D. Cal. Mar. 18, 2014). Likewise, implied consent is "an intensely factual question that requires consideration of the circumstances surrounding the interception to divine whether the party whose communication was intercepted was on notice." *Id.* (citing *Watkins v. L.M. Berry & Co.,* 704 F.2d 577, 582 (11th Cir.1983) ("It is the task of the trier of fact to determine the scope of the consent and to decide whether and to what extent the interception exceeded that consent.")).

Second, "consent is not a defense where the communication is intercepted for the purpose of committing any criminal or tortious act in violation of" state or federal law. *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 901 (C.D. Cal. 2024) (citing *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021)) (internal quotations omitted). Plaintiffs have plainly alleged their messages were intercepted in furtherance of a RICO scheme premised on violations of 18 U.S.C. § 1343. *Id.* ("To make use of the criminal/tortious intent exception, a plaintiff must plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is independent of the intentional act of recording or interception itself."). Plaintiffs RICO allegations

are sufficient to defeat any consent-related exceptions under the Wiretap Act and CIPA.

Third, the party exception to the Wiretap Act and CIPA do not apply here. "Courts perform the same analysis for both the Wiretap Act and CIPA regarding the party exemption . . . [because] [b]oth statutes contain an exemption from liability for a person who is a 'party' to the communication." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020). But, "simultaneous, unknown duplication and communication of [the messages] do not exempt a defendant from liability under the party exception." *Id.* at 608. The purpose of these statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party or 'an unseen auditor.'" *Id.* That is precisely what Plaintiffs allege here. And the Ninth Circuit has already rejected that the party exception would apply in an almost identical situation: "Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 608; *see also Valenzuela v. Super Bright LEDs Inc.*, 2023 WL 8424472, at *4 (C.D. Cal. Nov. 27, 2023) ("when a party to a conversation uses a phone extension to allow another, undisclosed person to listen, § 631 liability may attach").

### 3.    The Agency Defendants 'Impersonation' Defense misstates the law.

Last, the Agency Defendants' bizarrely claim that because the Chatters were merely impersonating the Creators, they could not have violated the Wiretap Act or CIPA. Dkt. 124 at 29–30; Dkt. 127 at 19. Defendants own cited case law is sufficient to dismiss this argument outright.

In *Pasha*, the Seventh Circuit case Agency Defendants cite, two FBI agents answered a ringing telephone while executing a search warrant and pretended to be the intended recipient of the call. *United States v. Pasha*, 332 F.2d 193, 198 (7th Cir. 1964). The defendant claimed that this was a violation of the Wiretap Act, a contention the court dismissed because "there was no tampering with the established means of communication." *Id.* But the court's underlying analysis, which the Agency Defendants ignore, explained that "**[i]nterception connotes a situation in which by surreptitious means a third party overhears a telephone conversation between two persons**." *Id* (emphasis added). In other words, because the agents did not actually "intercept" the call, there could be no violation of the Wiretap Act.

Here, Plaintiffs have alleged far more than what occurred in *Pasha*. Through the use of sophisticated CRM platforms, the Agency Defendants are causing Fan messages to be re-routed from their intended destination to an application owned and operated by the CRM platform, where Agency Chatters can respond to voluminous Fan messages on a 24/7 basis. FAC ¶¶ 100, 490–493. This constitutes interception under the statute—the systematic diversion of communications through technological means to unauthorized third parties—distinguishing it from the simple answering of an already-received call in *Pasha*.

## E.    Plaintiffs sufficiently plead a CDAFA claim against the Agency Defendants.

The California Comprehensive Computer Data Access and Fraud Act (CDAFA), Cal. Penal Code § 502, imposes liability on anyone who knowingly accesses, uses, or copies computer data "without permission," including to further fraud, obtain commercial advantage, or wrongfully control data. Cal. Penal Code §

-32-

502(c)(1), (c)(2), (c)(3), (c)(7). Courts have squarely rejected the notion that CDAFA liability requires "hacking" or circumvention of technical barriers. It is enough to plead that a defendant exceeded the scope of access or used authorized access for impermissible purposes. *See People v. Childs*, 220 Cal. App. 4th 1079, 1100 (2013); *People v. Hawkins*, 6 Cal. App. 5th 134, 150 (2016).

The FAC alleges that each Agency Defendant violated multiple CDAFA provisions by using Creator account access to impersonate Creators, exploit private Fan communications, and extract payments under false pretenses. This conduct was not disclosed to users, exceeded the scope of any authorized access, and caused economic harm. That is more than sufficient at the pleading stage.

### 1.    Agencies violated § 502(c)(2) by accessing and using private Fan data without user permission.

Section 502(c)(2) prohibits accessing and, without permission, "taking, copying, or making use of any data from a computer." Plaintiffs allege that Agency-employed Chatters accessed Fan inboxes, read confidential messages, and used the content of those messages—including emotional disclosures and prior video purchases—to craft manipulative responses. FAC ¶¶ 111–13, 124–27, 254–56, 267–269, 282–284, 295–297, 313–315.

Moxy argues that it had "full access and control" over the accounts, and thus any data access was authorized. Dkt. 124 at 14. But CDAFA does not turn on whether an entity has system credentials; it turns on whether the user consented to the access and use. See *Childs*, 220 Cal. App. 4th at 1100. The FAC alleges that Fans believed they were communicating directly with Creators—not with paid impersonators working off behavioral scripts. FAC ¶¶ 254–56, 265–269, 281–284,

-33-

293–297, 311–315. That deception removes any plausible claim of user "permission."

### 2.    Agencies violated § 502(c)(3) by misusing OnlyFans services to simulate Creator intimacy.

Section 502(c)(3) prohibits "[k]nowingly and without permission using or causing to be used any computer services." Plaintiffs allege that the Agencies used the OnlyFans platform—its messaging system, unlock mechanisms, and payment tools—to carry out deception at scale. FAC ¶¶ 122, 188–191, 200, 216, 226–227, 235, 246, 252–56, 269, 284–286, 301–02.

The Chatters were not passive account managers. They were active operators, trained to simulate human connection, build emotional dependence, and manipulate Fans into purchasing content. Agencies "caused" the platform to be used without permission by misrepresenting who was on the other end of the exchange.

### 3.    Agencies violated § 502(c)(7) by using private data to extract payments under false pretenses.

Section 502(c)(7) prohibits accessing a computer "in order to wrongfully control or obtain money, property, or data." Plaintiffs allege that Agency staff extracted payment from Fans using messages crafted from personal disclosures— then unlocked videos or asked for tips as if from the Creator herself. FAC ¶¶ 110– 112, 124–125, 260, 276, 288, 305, 321. The motive was economic, the mechanism was deception, and the effect was to divert funds to the Agencies without the user's consent.

### 4.    Plaintiffs allege economic harm caused by the Agencies' CDAFA violations.

The FAC pleads that Plaintiffs paid subscription fees, tipped impersonators, and purchased premium content because they were deceived into believing they

-34-

were communicating with real Creators. FAC ¶¶ 255–261, 265–276, 280–288, 293–305, 311–321. That is a direct economic loss caused by unauthorized access and use of user data—precisely the harm CDAFA was enacted to prevent. No more is required at the pleadings stage.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Agency Defendants' Motions to Dismiss.

DATED:  July 17, 2025                Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ Robert B Carey

Robert B. Carey (*pro hac vice*)
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
         leonarda@hbsslaw.com
         michellak@hbsslaw.com

Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Andrea R. Gold (*pro hac vice*)
David A. McGee (*pro hac vice*)
Shana H. Khader (*pro hac vice*)
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW, Suite 1010

-35-

Washington, DC 20006
Phone: (202) 973-0900
Facsimile: (202) 973-0950
Email: agold@tzlegal.com
         dmcgee@tzlegal.com
         skhader@tzlegal.com

Keith T. Vernon (*pro hac vice*)
TIMONEY KNOX LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Phone: (202) 349-9864
Facsimile: (215) 540-2643
Email: kvernon@timoneyknox.com

Andrew C. Stone (*pro hac vice*)
Seth T. Goertz (*pro hac vice*)
DORSEY & WHITNEY LLP
2325 E Camelback Road, Suite 300
Phoenix, AZ 85016
Phone: (602) 735-2691
Facsimile: (602) 926-2471
Email: stone.andy@dorsey.com
         goertz.seth@dorsey.com

*Attorneys for Plaintiffs*

-36-

PLS.' RESP. IOT AGENCY DEFS.' MOTIONS TO DISMISS FAC

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 9,335 words which complies with the extended word limit specified in this Court's July 15, 2025 Order, Dkt. 137.

Dated: July 17, 2025

HAGENS BERMAN SOBOL SHAPIRO LLP
*/s/ Robert B. Carey*
Robert B. Carey

PLS.' RESP. IOT AGENCY DEFS.' MOTIONS TO DISMISS FAC
011194-11/2686242 V1                                          Case No: 8:24-cv-01655-FWS-SSC