BETY JAVIDZAD (SBN 240598)
bety.javidzad@dentons.com
SAMANTHA FAHR (SBN 299409)
samantha.fahr@dentons.com
POOJA L. SHAH (SBN 330550)
pooja.l.shah@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Tel: 213 623 9300 / Fax: 213 623 9924

MICHAEL GEHRET (SBN 247869)
mike.gehret@dentons.com
TRINITY JORDAN (*Pro Hac Vice*)
trinity.jordan@dentons.com
JORDAN WESTGATE (*Pro Hac Vice*)
jordan.westgate@dentons.com
DENTONS DURHAM JONES & PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, Utah 84111-2184
Tel: 801 415 3000

Attorneys for Defendant
ELITE CREATORS LLC

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC, MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC,

Defendants.

Case No. 8:24-cv-01655-FWS-SSC

**DEFENDANT ELITE CREATORS, LLC'S REPLY IN SUPPORT OF MOTION TO DISMISS**

Judge: Hon. Fred W. Slaughter
Crtrm: 10D
Date: September 4, 2025
Time: 10:00 a.m.

Complaint Served: 8/05/2024

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1
ARGUMENT ........ 2
I. PLAINTIFFS HAVE NOT ALLEGED FACTS SUFFICIENT TO ESTABLISH A RICO ENTERPRISE OR CONSPIRACY UNDER CONTROLLING LAW. ........ 2
A. Plaintiffs Have Failed to Allege the Structure Necessary for a RICO Enterprise. ........ 2
B. Plaintiffs Have Failed to Allege That Creators Inc. Conducted or Participated in the Affairs of the Alleged Enterprise as Required Under RICO. ........ 7
C. The FAC Fails to Allege That Any Defendant Knew of or Communicated with Any Other Alleged Member of the Enterprise. ........ 9
II. PLAINTIFFS HAVE FAILED TO PLEAD THE ESSENTIAL ELEMENTS OF A VPPA VIOLATION. ........ 10
A. Defendants Are Not Video Service Providers Under the VPPA. ........ 10
B. Defendants Are Not Subscribers of the Agency Defendants Under the VPPA. ........ 15
III. Creators Inc. Did Not Violate CIPA or The Federal Wiretap Act. ........ 16
A. Plaintiffs Have Not Alleged Any Concrete Facts About Creators Inc. That Would Establish a Violation of CIPA or the Federal Wiretap Act. ........ 16
B. The FAC Fails to Plausibly Describe Interception of Any Communication While in Transit. ........ 17
IV. Creators Inc. Did Not Violate The CDAFA By Accessing Data Owned By Plaintiffs. ........ 20
CONCLUSION ........ 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 17

*Bias v. Wells Fargo & Co.*,
942 F. Supp. 2d 915 (N.D. Cal. 2013) .......... 4, 5, 6

*Boyle v. United States*,
556 U.S. 938 (2009) .......... 3, 4, 6

*CBC Framing, Inc. v. Flores*,
No. CV 08-00150, 2008 WL 11337555 (C.D. Cal. Sept. 22, 2008) .......... 5, 6

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001) .......... 8

*D'Angelo v. Penny OpCo, LLC,*
No. 23-CV-0981-BAS-DDL, 2023 WL 7006793 (S.D. Cal. Oct. 24, 2023) .......... 19

*Eclectic Props. E., LLC v. Marcus & Millichap Co*.,
751 F.3d 990 (9th Cir. 2014) .......... 17

*Esparza v. Gen Digital Inc.,*
No. CV 23-8223-KK-AGRX, 2024 WL 655986 (C.D. Cal. Jan. 16, 2024). .......... 19

*In re Google Assistant Privacy Litig*.,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 22

*In re Hulu Privacy Litigation*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... 14

*Konop v. Hawaiian Airlines,*
302 F.3d 868, 878 (9th Cir. 2002) .......... 18

*Mata v. Zillow Group., Inc.,*
2024 WL 5161955 (S.D. Cal. Dec. 18, 2024). .......... 19

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

*NovelPoster v. Javitch Canfield Grp.*,
140 F. Supp. 3d 938 (N.D. Cal. 2014)....................18

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007)....................4, 6

*Reves v. Ernst & Young*,
507 U.S. 170 (1993)....................7, 8, 9

*Theofel v. Farey-Jones*,
359 F.3d 1066 (9th Cir. 2004)....................18

*United States v. Carrazco-Gutierrez*,
168 F.3d 502 (9th Cir. 1999) (unpublished)....................10

*United States v. Friedman*,
445 F.2d 1076 (9th Cir. 1971)....................10

*United States v. Steiger*,
318 F.3d 1039 (11th Cir. 2003)....................18

*United States v. Vargas*,
19 F.3d 32 (9th Cir. 1994) (unpublished)....................10

*In re Vizio, Inc., Consumer Privacy Litigation*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017)....................13, 14, 15, 22

**Statutes**

Cal. Penal Code
§ 502 *et seq.*....................20
§ 502(e)(1)....................20, 22

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

# INTRODUCTION

Defendant Elite Creators, LLC ("**Creators Inc.**") filed its Motion to Dismiss Plaintiffs' First Amended Complaint on May 23, 2025 (ECF No. 125) (the "**Motion**"), adopting several arguments raised in Defendant Moxy Management's Motion to Dismiss filed the same day. (ECF Nos. 124.) Plaintiffs filed their Consolidated Response in Opposition (the "**Opposition**") on July 17, 2025. (ECF No. 142.)

Plaintiffs' RICO claims fail because the FAC alleges only independent conduct by unrelated actors who never communicated or coordinated in any way. Plaintiffs cite no authority allowing a RICO enterprise or conspiracy claim absent coordination, communication, or even mutual awareness among the alleged participants. Every case they rely on involved substantial evidence of relationships or coordinated conduct.

Plaintiffs' Video Privacy Protection Act (the "**VPPA**") claim also fails. The FAC does not allege that Creators Inc. is a "video tape service provider" within the meaning of the statute or that Plaintiffs were "consumers" of Creators Inc.'s services. Instead, Plaintiffs' allegations rest entirely on their transactions with OnlyFans, not with Creators Inc., and they identify no facts showing any qualifying relationship under the VPPA.

Plaintiffs' claims under the California Invasion of Privacy Act (the "**CIPA**") and the federal Wiretap Act likewise fail. The FAC does not plausibly allege that Creators Inc. "intercepted" any communication while in transit. At most, Plaintiffs allege (on information and belief) that Creators Inc. used an unspecified customer relationship management tools to manage its own consenting clients' OnlyFans inboxes. Plaintiffs offer only conclusory statutory terms like "intercept" and "contemporaneous" without identifying any plausible mechanism for interception.

Plaintiffs' California Comprehensive Data Access and Fraud Act ("**CDAFA**") claim fares no better. The FAC alleges only that Creators Inc., with its clients' consent, accessed the clients' own OnlyFans inboxes. CDAFA protects only the "owner or lessee" of accessed data, and Plaintiffs cite no authority that a sender retains ownership of a message once delivered to a recipient's inbox. This theory conflicts with controlling Ninth Circuit and California precedent holding there is no privacy interest in internet messages.

For these reasons, and those set forth below, all claims against Creators Inc. should be dismissed with prejudice.

## ARGUMENT

### I. PLAINTIFFS HAVE NOT ALLEGED FACTS SUFFICIENT TO ESTABLISH A RICO ENTERPRISE OR CONSPIRACY UNDER CONTROLLING LAW.

#### A. Plaintiffs Have Failed to Allege the Structure Necessary for a RICO Enterprise.

Nowhere in the FAC do Plaintiffs allege that any Defendant ever communicated with any other Defendant regarding the subject of the alleged RICO enterprise, the "chatter" scheme. In fact, Plaintiffs implicitly concede this absence in their Opposition, asserting instead that "no court in this Circuit—or any other—has held that formal coordination or direct communication is a necessary element of a RICO enterprise at the pleading stage." (Opp'n at 4.) Yet Plaintiffs cite no authority supporting the proposition that a RICO enterprise or conspiracy can be found where there is no allegation that any Defendant communicated with—or was even aware of—any other member of the alleged RICO enterprise. On the contrary, the Supreme Court's clear guidance requires some actual relationship between the members of a RICO enterprise and every case Plaintiffs rely on involves defendants who engaged

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

in direct and sustained communication and coordination in furtherance of the alleged RICO enterprise.

The controlling authority on the requirements for pleading an association-in-fact RICO enterprise is *Boyle v. United States*, 556 U.S. 938 (2009)—a case Plaintiffs themselves cite multiple times in their Opposition. In *Boyle*, the Supreme Court held that an association-in-fact enterprise must possess at least three structural features: "a purpose, ***relationships among those associated with the enterprise***, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946 (emphasis added). The Court further clarified that "[t]he concept of 'associat[ion]' ***requires*** both ***interpersonal relationships*** and a common interest." *Id.* (second alteration in original) (emphasis added) (citation omitted). Notably, each case cited by Plaintiffs in the section of their Opposition addressing enterprise structure involves defendants who had direct interpersonal relationships. (*See* Opp'n at 12–13.)

Despite Plaintiffs' contention that *Boyle* sets a "low threshold" for pleading the structural requirements of a RICO enterprise, both the holding and the facts of *Boyle* demonstrate that Plaintiffs have failed to adequately plead a RICO violation. (Opp'n at 12.) The Court explained that each of the bank robberies that were the RICO predicates in *Boyle* "was typically carried out by a group of participants ***who met beforehand to plan the crime***, gather tools (such as crowbars, fishing gaffs, and walkie-talkies), and ***assign the roles that each participant would play*** (such as lookout and driver)." *Boyle*, 556 U.S. at 941 (emphasis added). The defendants in *Boyle* met in person before each alleged RICO violation to coordinate logistics, assign roles, and—afterward—divide the proceeds. *See id.* While *Boyle* makes clear that a formal hierarchy or long-term master plan is not required, it also confirms that some form of relationship, coordination, and role assignment is essential. None of



DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

that is alleged here. Plaintiffs' reliance on *Boyle* to suggest a "low threshold" for pleading an enterprise only underscores how far their FAC falls short of meeting it.

Another case Plaintiffs cite—*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007)—further illustrates the gulf between allegations sufficient to plead a RICO enterprise and those found in Plaintiffs' FAC. In *Odom*, the Ninth Circuit found that the plaintiff adequately alleged an enterprise between Microsoft and Best Buy, where the two companies entered into a cross-marketing agreement under which Best Buy promoted Microsoft's MSN service, and Microsoft invested $200 million and agreed to promote Best Buy through the MSN platform. *Id.* at 552. As part of the alleged scheme, Best Buy transferred customers' credit card information to Microsoft without the customers' consent, enabling Microsoft to enroll Best Buy customers in MSN service. *Id.* In holding that these allegations satisfied the enterprise requirement, the Ninth Circuit emphasized the existence of formal contractual relationships, coordinated marketing efforts, and extensive data transfers between the parties—all directed toward the common goal that formed the basis of the RICO claim. *Id.* No such allegations of coordination, agreements, or joint conduct exist in Plaintiffs' FAC.

In *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 940–41 (N.D. Cal. 2013), another case cited by Plaintiffs, the court upheld RICO enterprise allegations based on detailed allegations of coordination between Wells Fargo and its affiliate, Premier Asset Services. The plaintiff alleged that Wells Fargo and Premier entered into a scheme aimed at inflating fees charged to Wells Fargo mortgage customers in which Premier would execute written agreements to provide mortgage-related services to Wells Fargo customers but would subcontract those services to third-party vendors selected by Wells Fargo. *Id.* at 941. Premier then marked up the costs and sent inflated invoices to Wells Fargo, which in turn passed those inflated charges on to

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

customers. *Id.* Wells Fargo, however, did not pay the inflated amounts; rather, pursuant to an agreement with Premier, it paid the subcontractors directly at the original, lower cost. *See id.* at 924. This arrangement allowed Wells Fargo to retain the difference as profit. *See id.* at 924, 941. According to the complaint, Wells Fargo directly communicated with Premier, instructed it to submit inflated invoices, and agreed to use those invoices to overcharge its customers—all with Premier's knowledge and participation. *Id.* at 938, 941. Plaintiffs here allege nothing comparable.

Most directly undermining Plaintiffs' position is the final case they cite in this section of their Opposition: *CBC Framing, Inc. v. Flores*, No. CV 08-00150, 2008 WL 11337555 (C.D. Cal. Sept. 22, 2008). There, the plaintiff construction company alleged that a group of project foremen submitted false paysheets containing hours for phantom employees. *Id.* at *2–4. The court dismissed the original complaint in part because it "did not even allege that defendants knew one another," and therefore failed to plead the existence of a RICO enterprise. *Id.* at *7. The court noted that, based on the allegations, "defendants' purported fraudulent activity could have been committed by a single project foreman without the knowledge or assistance of the others." *Id.*

The same deficiency exists here. According to the FAC, each Agency Defendant could have independently engaged in the alleged "chatter scheme" without any communication or coordination with the others; indeed, within the FAC, there is no allegation that any Defendants coordinated with anyone. In *CBC*, the plaintiffs were able to cure the defect by filing an amended complaint that alleged the defendants "***knew one another or were related, worked together*** on CBC projects, and ***associated as a group*** for the purpose of defrauding CBC through the submission of false payroll reports, among other criminal activities." *Id.* (emphasis

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

added). Plaintiffs here cannot make similar allegations, because—unlike in *CBC*—Defendants here did not have any contact or association with one another.

Every case cited by Plaintiffs in the section of their Opposition addressing the structure of the alleged RICO enterprise involved some form of communication, interpersonal relationships among the defendants, and at least a minimal level of coordination:

- In *Boyle*, the participants met in person before each robbery to plan the crime and assign roles, such as lookout and driver.
- In *Odom*, Microsoft and Best Buy entered into formal contracts and created infrastructure to enable the direct transfer of customer financial information, all in furtherance of a coordinated marketing and subscription scheme.
- In *Bias*, Wells Fargo directed its affiliate, Premier Asset Services, to submit inflated invoices that Wells Fargo agreed not to pay, pursuant to a coordinated scheme in which Wells Fargo would instead pay third-party vendors directly and retain the difference as profit.
- In *CBC*, many of the defendants were related by blood, worked together on the same construction projects, and met to coordinate their scheme involving the submission of inflated paysheets.

In stark contrast, Plaintiffs here do not allege that any Defendant ever communicated with any other—let alone communicated about the conduct at issue in this lawsuit, namely, the alleged use of "chatters" to increase profits.[1] Plaintiffs

[1] The FAC includes a single reference to a Creators Inc. social media post about a swimwear fashion show featuring OnlyFans-branded swimwear, but that allegation is entirely unrelated to the conduct at issue in this lawsuit and does not suggest any coordination among Defendants regarding the alleged "chatter" scheme.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

do not allege that Creators Inc. had any interaction, of any kind, with any other Defendant, including through meetings, contracts, or coordinated conduct. Nor do they cite a single case in which a court found an association-in-fact RICO enterprise absent any communication, agreement, or other interaction among the purported members.

Under Plaintiffs' theory, the only act that Creators Inc. allegedly took to "join" the RICO enterprise—which Plaintiffs claim had been operating for at least five years before Creators Inc. even existed—was its independent decision to hire "chatters" to respond to messages sent to its own clients. Plaintiffs allege no additional conduct by Creators Inc.: no communication with any other Defendant, and no direction given or received that would support its participation in a coordinated enterprise or conspiracy. (*See* Opp'n at 13 ("Agency Defendants operationalize the deception by directing professional chatters to impersonate Creators.")) But this entirely independent conduct, in the absence of any interaction or coordination among Defendants, is plainly insufficient to plead either a RICO enterprise or a RICO conspiracy. Accordingly, Plaintiffs' RICO claim (Count I) and RICO conspiracy claim (Count II) must be dismissed.

### B. Plaintiffs Have Failed to Allege That Creators Inc. Conducted or Participated in the Affairs of the Alleged Enterprise as Required Under RICO.

Plaintiffs also contend that they have adequately alleged that the Agency Defendants conducted the affairs of the alleged enterprise. (Opp'n at 6–8.) This argument fails. At most, Plaintiffs allege that each Agency Defendant independently conducted its own internal business operations. They do not allege that any Defendant directed, managed, or otherwise participated in the operation or management of the enterprise as a whole as required under *Reves v. Ernst & Young*,

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

507 U.S. 170, 185 (1993). Allegations that merely describe a defendant's own routine business conduct, untethered from any collective enterprise activity, are insufficient to satisfy RICO's conduct requirement.

RICO liability "depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (citation omitted) (emphasis in original); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) (same). Here, Plaintiffs have not alleged that any of the purported members of the enterprise even knew of one another's existence let alone directed one another.

In their argument in the Opposition that the Agency Defendants conducted the business of the enterprise, Plaintiffs rely exclusively on allegations describing conduct by each Agency Defendant in the operation of its *own* business. Plaintiffs assert that the Agency Defendants individually "hire Chatters," "direct and train Chatters," "coordinate and direct the workflow from Creators to Chatters," and "employ sophisticated Customer Relationship Management ('CRM') platforms to scale the use of Chatters." (Opp'n at 7–8.) But each of these activities pertains solely to the internal affairs of the individual Agency Defendants. None of these allegations describe conduct directed toward managing or operating the enterprise as a whole, or any other actor as required under *Reves*. Accordingly, Plaintiffs fail to allege that Creators Inc. conducted or participated in the conduct of the enterprise's affairs.

The FAC does not contain a single allegation that any Defendant communicated with—let alone directed or took direction from—any individual or entity outside its own business operations. More broadly, Plaintiffs tacitly concede that they have not alleged any direct communication among Defendants (Opp'n at 4), nor have they alleged that any Defendant even knew the others existed (*Id.* at 20). These omissions are fatal. If the alleged members of the enterprise were

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

unaware of one another and never interacted in any way, there can be no plausible claim that they "conducted" the affairs of a common RICO enterprise. Such a theory fails under the most basic requirements articulated in *Reves* and its progeny, and the RICO claims must therefore be dismissed.

### C. The FAC Fails to Allege That Any Defendant Knew of or Communicated with Any Other Alleged Member of the Enterprise.

Plaintiffs mischaracterize Creators Inc.'s argument about its interactions with other Defendants in its Motion to Dismiss. Creators Inc. did not contend that Plaintiffs must allege that *all* members of the alleged RICO enterprise knew each other. Rather, as set forth in the Defendant Moxy's Motion to Dismiss (*see* ECF No. 124 at 14–15), the Defendants argued that RICO liability cannot attach where a defendant is not alleged to have known of or interacted with *any* other member of the alleged enterprise or conspiracy. Plaintiffs' Opposition is a straw man argument, asserting that "the Agency Defendants insist that Plaintiffs must plead that all the members of the RICO enterprise knew each other." (Opp'n at 20.) That is not Creators Inc.'s position, and it was not Moxy's position. The actual argument is far narrower—and entirely consistent with established RICO precedent: at a minimum, a defendant must be alleged to have known of and participated in coordinated activity with at least one other participant in the enterprise or conspiracy.

The FAC does not include a single allegation that OnlyFans was aware of the existence of any Agency Defendant.[2] Likewise, there is no allegation that any

---

[2] The FAC alleges that Creators Inc. made a social media post regarding a swimwear fashion show with OnlyFans branded swimsuits and that Creators Inc. tagged "@OFMerch" a social media account associated with OnlyFans merchandise. (*See* FAC ¶ 6; *see also* Mot. at 13:8–17.) The FAC does not allege that OnlyFans reacted to that social media post or was even aware of it.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

Agency Defendant knew of the existence of any other Agency Defendant. This complete absence of alleged knowledge or awareness among the purported members of the enterprise further underscores the inadequacy of Plaintiffs' RICO theory.

To be sure, a defendant may be part of a conspiracy even if it does not know the identities of all alleged co-conspirators. However, a defendant cannot be part of a conspiracy if it does not know of the existence of *any* co-conspirator. Plaintiffs fail to allege that Creators Inc. knew or interacted with even one single other member of the alleged conspiracy. Moreover, every case Plaintiffs cite in this section of their brief involved allegations that the defendant knew and coordinated with at least one other alleged co-conspirator. (*See id.*)[3]

## II. PLAINTIFFS HAVE FAILED TO PLEAD THE ESSENTIAL ELEMENTS OF A VPPA VIOLATION.

Plaintiffs' attempts to salvage their deficient VPPA claim fail for multiple reasons: they mischaracterize the allegations in their own FAC, misconstrue the applicable legal standards, and misapply those standards to the facts alleged.

### A. Defendants Are Not Video Service Providers Under the VPPA.

#### 1. Plaintiffs misrepresent the FAC and provide no support for their argument that is actually alleged in the FAC.

[3] *See United States v. Friedman*, 445 F.2d 1076, 1080 (9th Cir. 1971) ("If we assume that Jacobs did not know that anyone other than himself, Friedman, and Schwartz was involved in disseminating the transcripts, or that if he did know that others were involved, he did not know who they were, the jury could nevertheless find that Jacobs was a co-conspirator."); *United States v. Vargas*, 19 F.3d 32, *1 (9th Cir. 1994) (unpublished) ("Vargas and Ceja assumed residence in a duplex in Escondido, California."); *United States v. Carrazco-Gutierrez*, 168 F.3d 502, *1 (9th Cir. 1999) (unpublished) (appellant was a drug courier for his brother, whom he knew).

Plaintiffs argue in their Opposition that the Agency Defendants are Video Service Providers under the VPPA. Specifically, they claim:

> The FAC alleges that each Agency Defendant orchestrated the delivery of paid audiovisual content by managing the sending of unlock links and pricing of custom videos through Creator accounts. These videos were delivered via unlock links, PPV tips, and custom video transactions—each orchestrated by agency personnel operating through Creator accounts. FAC ¶¶ 111–112, 452, 455. The agencies managed chat interactions that prompted video unlocks and upsells, often using preloaded scripts and pricing tiers, in ways designed to maximize Fan spending. FAC ¶¶ 222–227.

(Opp'n at 22.) Not a single assertion in this paragraph of Plaintiffs' Opposition is supported by the citations Plaintiffs provide.

Plaintiffs' key claim is that the Agency Defendants sent links to fans allowing them to pay to unlock videos. However nowhere is this allegation found in the FAC. Specifically, though the word "unlock" is used twice in the FAC, in paragraphs 75 and 151, neither time in any way connected to the Agency Defendants.[4] The word "link" is used twice, neither in conjunction with either the word "unlock" or with any reference to the Agency Defendants. (*See* FAC ¶¶ 72; 112.d.iii.). Nor do Plaintiffs ever describe the Agency Defendants sending "unlock links" simply using other terms. Plaintiffs simply fabricated this assertion because it supported their argument even though it was not found in the FAC.[5]

---

[4] The word "unlocking" is used three times, but all three related to an OnlyFans blog post. *See* FAC ¶ 146 & n.52.

[5] Giving Plaintiffs' the benefit of the doubt that the Opposition contained a typographical error, counsel spent over an hour manually reviewing the FAC and





DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

Plaintiffs cite a series of paragraphs in the FAC as purported support for their claim, but none contains any factual allegations tying the conduct at issue to the Agency Defendants. For example, Paragraph 111 makes no reference to the Agency Defendants—indeed, it does not mention the word "agency" at all. Paragraph 112 also fails to identify any specific Agency Defendant; instead, it refers generically to what some hypothetical OnlyFans agency allegedly does with respect to custom videos. Plaintiffs did not use the defined term "Agency Defendant" in that paragraph or elsewhere in that section of the FAC, and the cited content includes only vague references to unnamed chatters (FAC ¶¶ 107–08, 117), a reporter who went "undercover" at an unidentified agency (*Id.* ¶ 109), and various online "exposés" (*Id.* ¶ 115). Aside from one reference to an unrelated lawsuit involving Unruly Agency, none of the cited material describes conduct attributable to Creators Inc. or any other Agency Defendant.

Paragraphs 452 and 455 are entirely conclusory and, in the case of Paragraph 455, demonstrably false. Plaintiffs cannot plausibly contend that any plaintiff—or any fan—purchased content directly from the Agency Defendants. The FAC itself is premised on the theory that Plaintiffs purchased content through the OnlyFans platform by paying OnlyFans. There is no allegation anywhere in the FAC that any fan paid money directly to Creators Inc. or to any other Agency Defendant; all transactions indisputably occurred through the OnlyFans platform. Thus, Paragraph 455's assertion that fans purchased content directly from the Agency Defendants runs counter to every other allegation in the FAC and is simply not true.

Paragraphs 222 to 227, the final section cited by Plaintiffs, bear no connection

---

electronically searching for the terms used in Plaintiffs' brief but was unable to locate any portion of the FAC that supports the claim asserted in this section of their Opposition.

Dentons US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
213 623 9300

to the assertion they are offered to support. These paragraphs concern only Defendant Content X and do not reference video unlocks, upsells, scripts, pricing tiers, or efforts to maximize fan spending. They are entirely unrelated to the conduct Plaintiffs attribute to the Agency Defendants.

Aside from a single conclusory paragraph, Plaintiffs cite no factual allegations in the FAC to support their claim that the Agency Defendants engaged in conduct qualifying them as video service providers.

**2. Plaintiffs' citations to case law purporting to support their theory that the Agency Defendants qualify as video service providers are likewise incorrect.**

Plaintiffs next argue that "the fact that Agency staff operated through OnlyFans' infrastructure does not insulate them from VPPA liability." (Opp'n at 22.) Plaintiffs make this assertion in an attempt to sidestep the undisputed reality that OnlyFans hosted all videos, processed all payments, and delivered all content exclusively through its own online platform. However, the authority Plaintiffs cite does not support their argument.

Plaintiffs first cite *In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017), arguing that the decision in that case stands for the proposition that someone can be a Video Service Provider "even if they deliver content through a third-party platform." (Opp'n at 22.) But *Vizio* is inapposite. In finding that Vizio could be a Video Service Provider, the district court there pointed to the fact that Vizio charged extra for its smart devices that had the functionality to allow streaming video delivery, that it advertised its devices as "a passport to a world of entertainment, movies, TV shows and more" and that it entered contracts with "content providers to enable consumers to access their programming on Vizio's

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

Smart TVs." *Vizio*, 238 F. Supp. 3d. at 1222. Neither these nor any similar factors are present here. Whereas Vizio profited directly by selling more expensive televisions that included video streaming functionality supported by specific streaming video services, the Agency Defendants never received any funds directly from any consumer: consumers paid OnlyFans; OnlyFans paid creators; and creators paid the Agency Defendants.

Plaintiffs' next citation is both wrong and nonsensical. Plaintiffs cite *In re Hulu Privacy Litigation*, 86 F. Supp. 3d 1090 (N.D. Cal. 2015) and describe the holding as follows: "streaming platform liable under VPPA for disclosures tied to its embedded video player." (Opp'n at 22.) That characterization is incorrect in every respect. The cited decision is an order granting summary judgment in favor of Hulu—the very "streaming platform" Plaintiffs claim was found liable. Hulu was not held liable under the VPPA, and Plaintiffs' description of the case misstates both the procedural posture and the court's holding.

Second, Hulu's service bears no resemblance to the Agency Defendants. According to the order in *Hulu*,

> Hulu provides on-demand, online access to television shows, movies, and other pre-recorded video content from networks and studios through its website, www.hulu.com. (*See generally* 2d Am. Compl. ECF No. 83, ¶¶ 1, 17.) It offers a free service at hulu.com that allows users to watch video content on their computers. (*See* ECF No. 178—Joint Statement of Undisputed Facts ("JSUF") # 1.) It also offers a paid service called "Hulu Plus" that has more content and allows viewers to watch Hulu content on other devices such as tablets and smart phones.

*Hulu*, 86 F. Supp. 3d at 1092. Hulu offered video content from its own website and had its own paid subscription service. In contrast, Plaintiffs do not allege that the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

Agency Defendants had any of these characteristics. It is unclear how the decision relates to, much less supports, Plaintiffs' contention that the Agency Defendants can still be Video Service Providers when every video is hosted on the OnlyFans website and OnlyFans receives every payment for every piece of content sold.

Plaintiffs have cited no case to support their argument; it is simply not the law.

**B. Defendants Are Not Subscribers of the Agency Defendants Under the VPPA.**

According to a trial court decision cited by Plaintiffs in their Opposition, "[t]he VPPA applies only if the consumer is a 'renter, purchaser, or subscriber of goods or services' ***from the video tape service provider***." *Vizio*, 238 F. Supp. 3d at 1222 (emphasis added) (citation omitted). Thus, for Plaintiffs to have a claim against Creators Inc. under the VPPA, Plaintiffs must have rented or purchased *from* or subscribed *to* Creators Inc. The decision in *Vizio* makes this clear. In *Vizio*, the defendant was a manufacturer of smart tv devices. Those devices allowed consumers to subscribe to streaming services such as "Netflix, Hulu, and Pandora." *Id.* Although Vizio facilitated purchases from these streaming services, that was not sufficient for the plaintiffs to be "consumers" with respect to Vizio. *Id.* at 1222–23. In analyzing whether the plaintiffs were consumers of Vizio's services, the district court examined whether the plaintiffs had provided something of value *to Vizio*. *Id.* at 1223. The Court found the plaintiffs were consumers because they paid a premium for the Vizio Smart TVs and because Vizio continued to update the software. *Id.*

Here, Plaintiffs are not "consumers" of Creators Inc., even if Creators Inc. qualified as a Video Service Provider, which it does not. Plaintiffs argue they are consumers because they paid OnlyFans for content featuring creators allegedly managed by Creators Inc. But they do not allege they paid Creators Inc. directly or that they provided anything else of value to Creators Inc. Their theory appears to be



DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

that because the Agency Defendants may have profited indirectly from Plaintiffs' payments to OnlyFans, Plaintiffs are consumers of the Agency Defendants' services. But Plaintiffs cite no case holding that a person is a "consumer" under the VPPA where they did not provide value directly to the alleged Video Service Provider. The cases Plaintiffs do cite—in which courts found a consumer relationship based on users providing personally identifiable information directly to the Video Service Provider—are inapposite, as Plaintiffs do not allege that they provided any value or information directly to Creators Inc.

## III. CREATORS INC. DID NOT VIOLATE CIPA OR THE FEDERAL WIRETAP ACT.

In making their allegations related to the CIPA and federal Wiretap laws, Plaintiffs substitute obfuscation and speculation for proper pleading. Even still, their pleading fails to plausibly allege that any message was "intercepted" as required for them to state a violation of the laws at issue.

### A. Plaintiffs Have Not Alleged Any Concrete Facts About Creators Inc. That Would Establish a Violation of CIPA or the Federal Wiretap Act.

In their original Complaint, Plaintiffs did not explain any mechanism whereby any interception of messages plausibly could have occurred. (*See generally* Class Action Compl., ECF No. 1, filed July 29, 2024.) Recognizing this deficiency, Plaintiffs amended the FAC to add a new section describing non-defendant companies that develop what they call "CRM" software. (*See* FAC ¶¶ 120–28.)

As noted in Creators Inc.'s Motion, this section does not contain any concrete allegations about the conduct of Creators Inc. (*See* Mot. at 21:18–21.) Instead, the FAC alleges that, "*On information and belief*, the Agency Defendants *generally* use CRM tools." (*Id.* ¶ 122.) The FAC does not provide any hint of the basis for





DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

Plaintiffs' information or belief that any Agency Defendant uses a CRM. More fundamentally, the FAC does not allege that Creators Inc. uses any customer relationship management tool—let alone identify which of the four different CRMs it might use. Plaintiffs instead rest their claims on generalized allegations about what "the Agency Defendants" purportedly do, based solely on undisclosed information and belief, because they have no good-faith basis to allege that Creators Inc. uses a CRM. Calling this mode of pleading "guessing" would be charitable.

Even if they did allege Creators Inc. used some CRM software, Plaintiffs' FAC is still nothing other than speculation and legal conclusions. In the description of what the CRM software does, Plaintiffs again describe CRMs "generally" (*Id.* ¶ 123) and base even that understanding on "information and belief" rather than any concrete investigation of how the CRMs they describe in their FAC interact with the OnlyFans platform. The FAC is not bereft of concrete information about CRMs—Plaintiffs cite and screenshot advertisements from one CRM, Supercreator—but when it comes to the key element of how they operate and whether they intercept message in transit, Plaintiffs rely on what amounts to wishful guessing.

### B. The FAC Fails to Plausibly Describe Interception of Any Communication While in Transit.

Setting aside that Plaintiffs seem to be simply guessing that Creators Inc. might have used a CRM, Plaintiffs' next deficiency is in their description of how the alleged interception happened. In examining the adequacy of the allegations in a complaint, the Court should proceed in its analysis "by removing conclusory statements of law from the complaint" and by trimming all "legal conclusions" and "threadbare recitals of a cause of action," *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998 (9th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Further, in alleging that a message was "in transit" under

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

CIPA or the federal wiretap statutes, the plaintiff must allege the message was "acquired during transmission, not while . . . in electronic storage." *Konop v. Hawaiian Airlines*, Inc., 302 F.3d 868, 878 (9th Cir. 2002). The Ninth Circuit has held that an email message that had arrived in a user's inbox at the Internet Service Provider is no longer in transit. *Theofel v. Farey-Jones*, 359 F.3d 1066, 1075–77 (9th Cir. 2004); *see also United States v. Steiger*, 318 F.3d 1039, 1050 (11th Cir. 2003) ("[T]here is only a narrow window during which an E-mail interception may occur—the seconds or mili-seconds before which a newly composed message is saved to any temporary location following a send command." (alteration in original) (quoting Jarrod J. White, E–Mail @Work.com: Employer Monitoring of Employee E–Mail, 48 ALA. L. REV. 1079, 1083 (1997)); *NovelPoster v. Javitch Canfield Grp*., 140 F. Supp. 3d 938, 951–52 (N.D. Cal. 2014).

Under the applicable law, Plaintiffs' allegations fail to satisfy the requirement of alleging interception in transit. According to the FAC, Plaintiffs and other fans sent messages to content creators using the OnlyFans platform. (FAC ¶ 491 (noting that "communications [were] sent to a Selected Creator ***on the OnlyFans platform***") (emphasis added)). These messages were then stored in an inbox assigned to individual content creators, which were also on the OnlyFans platform. (*Id.*) Once those messages arrived in the content creator's inbox on the OnlyFans platform, they were no longer in transit but were instead in "electronic storage." *See Konop* 302 F.3d at 878. Thus, for Plaintiffs to sufficiently allege that the messages were intercepted they would have to allege, and describe how, the message were intercepted after Plaintiffs hit the send button on the OnlyFans website but before the messages arrived in the content creators' inbox on the OnlyFans website.

Plaintiffs' FAC does not describe a mechanism for interception of the messages before their arrival in content creators' OnlyFans inbox. Indeed, Plaintiffs

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

allege that the messages were "diverted ***from the Creator's OnlyFans account inbox***." (FAC ¶ 491 (emphasis added)). But if the message was diverted from the content creator's inbox, the message was no longer in transit since the content creator's inbox was the terminus of the communication. The FAC also describes the CRM software as "effectively cloning the Creator's inbox across several live user sessions." (*Id.* ¶ 123). Cloning the inbox is not "intercepting" messages in transit; it is copying them after they have already arrived in electronic storage. Such conduct does not violate CIPA or the federal Wiretap Act.

The shortfall in Plaintiffs' FAC is highlighted by comparison to the cases they cite and other cases in this District and the Ninth Circuit. Plaintiffs cite three cases for the proposition that their pleading burden is not high. But, in each of those cases, there was a description of the interception that plausibly explained how the messages could have been intercepted before arriving in the intended recipient's inbox. In *Mata v. Zillow Group., Inc.*, the plaintiff alleged that the defendant, Zillow, a real estate platform, included third-party trackers in its website that notified Meta (Facebook) when he watched videos. 2024 WL 5161955, at *1 (S.D. Cal. Dec. 18, 2024). In *Esparza v. Gen Digital Inc.*, the district court explained that the plaintiff alleged that the defendant allowed a third-party spyware company to install software on its website that rerouted chat communications by website visitors to the spyware company's servers and then allowed the spyware company to share data with Meta, Snapchat, and other social media companies. No. CV 23-8223-KK-AGRX, 2024 WL 655986, at *1 (C.D. Cal. Jan. 16, 2024). Finally, in *D'Angelo v. Penny OpCo, LLC*, the plaintiff alleged that JC Penney routed chats with its website through servers owned and operated by Vergic, a third party, and that Vergic could and did access the content of the chats. No. 23-CV-0981-BAS-DDL, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023). In each of these cases, the plaintiffs alleged that third-

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

party software was integrated into communications chains and that the plaintiffs' messages had been routed to third-party servers.

In contrast, Plaintiffs allege only that the CRMs enabled Defendants to access content creators' OnlyFans inboxes more efficiently. Although Plaintiffs recite conclusory statutory terms such as "intercept," "simultaneous," and "contemporaneous," they offer no plausible explanation of any mechanism by which the alleged interception could have occurred. In the cases Plaintiffs cite favorably, the pleadings identified a specific mechanism, such as the use of third-party servers. Here, by contrast, Plaintiffs allege solely "on information and belief" that the interception was accomplished through "various web-based technologies." (FAC ¶ 123.) Such conclusory, content-free pleading does not plausibly allege an interception in violation of CIPA or the federal Wiretap Act.

## IV. CREATORS INC. DID NOT VIOLATE THE CDAFA BY ACCESSING DATA OWNED BY PLAINTIFFS.

Plaintiffs claim in their Opposition that Creators Inc. and the other Agency Defendants violated the CDAFA, Cal. Penal Code § 502 *et seq.*, by accessing messages Plaintiffs sent to content creators. Their Opposition misquotes the FAC, and what is in the FAC fails to establish that Plaintiffs have a viable claim under the CDAFA.

The CDAFA provides a civil cause of action by "the owner or lessee of . . . data" who suffers damage or loss by reason of a violation of any of the provisions of the CDAFA. Cal. Penal Code § 502(e)(1). Thus, to have a claim under the CDAFA, Plaintiffs must be the owners of data that was accessed by Defendants.

Plaintiffs' Opposition claims that the FAC alleges that "Agency-employed Chatters ***accessed Fan inboxes***, read confidential messages, and used the content of

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

those messages." (Opp'n at 33.) This is false. No such allegation is found in the FAC, nor do they cite any paragraph of the FAC that contains such an allegation.

Rather, the FAC alleges that after being hired by content creators, the Agency Defendants acting "with full permission and authority from those Creators" operated the content creators' OnlyFans accounts, including accessing the content creators' message inboxes and sending messages on the creators' behalf. (*See, e.g.*, FAC ¶¶ 101, 103–04, 468.) Thus, Plaintiffs themselves allege that Creators Inc. and the other Agency Defendants had "full permission and authority" from the Creators they represented to access those Creators' OnlyFans accounts.

It is critical that Plaintiffs allege the Agency Defendants accessed their clients' OnlyFans inboxes—not the inboxes of fans such as Plaintiffs themselves. Because only an owner of data has a claim under CDAFA, Plaintiffs must establish that they are the owners of the data that they claim was accessed.

The only data the FAC plausibly alleges Creators Inc. accessed was contained in its clients' OnlyFans accounts, including those clients' inboxes. The FAC also expressly alleges that Creators Inc.'s clients consented to its access of the data in their OnlyFans accounts.[6] Nowhere in the FAC or the Opposition do Plaintiffs explain how they "own" the contents of a third-party's inbox on the OnlyFans platform. Plaintiffs cite no case for the proposition that the sender of a message has an ownership interest in the messages they send after those messages arrive in the

[6] At times, Plaintiffs seem to allege that Creators Inc.'s clients could not consent to give Creators Inc. access to their OnlyFans accounts. (*See* FAC ¶ 468 ("Agency Defendants accessed these systems using login credentials that were improperly shared or obtained")). However, at other times, Plaintiffs point to terms on the OnlyFans website that make clear that Creators can use agents to assist them in running their OnlyFans accounts or that agents can operate their OnlyFans accounts on the creators' behalf. (FAC ¶¶ 130–31.)

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

intended recipient's inbox. Concluding that Plaintiffs have an ownership interest in, and a right to control the dissemination of, messages they sent to third parties would contravene prevailing Ninth Circuit and California law, which hold that there is no privacy interest in messages transmitted over the internet. *See In re Google Assistant Privacy Litig*., 457 F. Supp. 3d 797, 817 (N.D. Cal. 2020) ("[T]here is no legally protected privacy interest and reasonable expectation of privacy in electronic messages, in general." (alteration in original) (citation omitted)).

Plaintiffs allege repeatedly that the messages the Agency Defendants accessed were "confidential." But nowhere do Plaintiffs point to a fact that would give them a good-faith basis to believe the creators they sent messages to would not share the contents of their messages. At most, Plaintiffs point to a paragraph in the OnlyFans Terms of Use that prohibits users from violating someone's "rights, including intellectual property rights (examples of which are copyright, trademarks, ***confidential information***, and goodwill), personality rights, unfair competition, ***privacy***, and data protection." (FAC ¶ 165 (emphasis in original)). However, this paragraph neither gives Plaintiffs an ownership interest in the data they allege Creators Inc. accessed (the contents of its clients' inboxes) sufficient to grant them standing under Section 502(e), nor establishes that Plaintiffs have a privacy right sufficient to require the message recipients to keep the contents of their messages private or confidential. Plaintiffs freely shared it with third parties who had no independent legal obligation to keep their messages private.

In short, Plaintiffs did not have an ownership interest in the data they allege the Agency Defendants accessed: messages in content creators' OnlyFans inboxes. The Creators, who (perhaps along with OnlyFans) did have some ownership interest in that data, gave Creators Inc. permission to access the Creators' inboxes. Plaintiffs

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

have not alleged that Creators Inc. accessed any data that Plaintiffs owned. As such, Plaintiffs do not state a claim under Section 502.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss all claims asserted by Plaintiffs against Creators Inc. in the Complaint.

Dated: August 18, 2025

Respectfully submitted,

DENTONS US LLP

By: */s/ Michael Gehret*
Michael Gehret
Bety Javidzad
Trinity Jordan
Jordan Westgate
Samantha Fahr
Pooja L. Shah

Attorneys for Defendant
ELITE CREATORS, LLC

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Elite Creators, LLC, certifies that this brief contains 6,670 words, which complies with the word limit of C.D. Cal. L.R. 11-6.1.

Dated: August 18, 2025

Respectfully submitted,

DENTONS US LLP

By: */s/ Michael Gehret*
Michael Gehret
Bety Javidzad
Trinity Jordan
Jordan Westgate
Samantha Fahr
Pooja L. Shah

Attorneys for Defendant
ELITE CREATORS, LLC