Oliver Rocos - State Bar No. 319059
orocos@birdmarella.com
Barr Benyamin - State Bar No. 318996
bbenyamin@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant Moxy Management

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC, MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC,

Defendants.

CASE NO. 8:24-cv-01655-FWS-SSC

**DEFENDANT MOXY MANAGEMENT'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Date: September 4, 2025
Time: 10:00 a.m.
Crtrm.: 10D

Assigned to Hon. Fred W. Slaughter

4074040.8

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 2

A. Plaintiffs Fail To Plead A RICO OR RICO Conspiracy Claim ..... 2

1. The Complete Absence Of Any Alleged Coordination Between Defendants Dooms Plaintiffs' RICO Claims ..... 3

a. Plaintiffs Concede They Must Plead Coordination Between RICO Defendants To Show Common Purpose And Structure ..... 3

b. Plaintiffs' Failure To Identify Any Coordination Prevents Them From Showing Structure Or Common Purpose ..... 5

c. Plaintiffs Allege Only That Defendants Acted Independently And In Their Own Self-Interest ..... 7

2. Plaintiffs Further Fail To Plead Any Actionable RICO Conduct ..... 7

3. Plaintiffs Fail To Plead A Concrete Injury ..... 9

B. Plaintiffs Fail To Plead A VPPA Claim ..... 10

1. Moxy Is Not A "Video Tape Service Provider" ..... 10

2. Plaintiffs Cannot Be "Subscribers" Because They Did Not Obtain Videos From Moxy-Managed Creators Or Moxy ..... 11

3. Moxy Did Not Disclose PII To Chatters ..... 13

4. The "Ordinary Course Of Business" Exception Applies ..... 13

C. Moxy Did Not Violate CIPA Or The Wiretap Act ..... 14

1. Moxy Does Not Intercept Fans' Communications ..... 14

2. Creators Consented to Moxy Receiving Fans Communications ..... 16

3. Moxy's "Impersonation" Defense Does Not Misstate The Law ..... 17

4. Plaintiffs Fail To State A CIPA "Use" Violation ..... 18

D. Moxy Did Not Violate CDAFA (Cal. Penal Code § 502) By Accessing Creators' Accounts ..... 19

1. Chatters Did Not Access Fans' Inboxes ..... 19

2. Plaintiffs Misapply Section 502(c)(3) .......... 20

3. Plaintiffs Wholly Misstate Section 502(c)(7) .......... 20

4. Plaintiffs Do Not Adequately Allege That They Suffered Economic Harm .......... 21

E. The Forum Selection Clause Bars Plaintiffs' Claims .......... 21

III. CONCLUSION .......... 22

CERTIFICATE OF COMPLIANCE .......... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alaska v. Express Scripts, Inc.*,
2025 WL 755436 (D. Ak. Mar. 10, 2025) (Opp. ) .......... 4

*Archer v. NBCUniversal Media, LLC*,
2025 U.S. Dist. LEXIS 129598 (C.D. Cal. July 2, 2025) .......... 14

*Bias v. Wells Fargo & Co.*,
942 F. Supp. 2d 915 (N.D. Cal. 2013) (Opp. ) .......... 4

*Boyle v. U.S.*,
556 U.S. 938 (2009) .......... 3, 4, 7

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) .......... 9

*Carter v. Scripps Networks, LLC*,
670 F. Supp. 3d 90 (S.D.N.Y. 2023) .......... 12

*CBC Framing, Inc. v. Flores*,
No. CV 08-00150, 2008 WL 11337555 (C.D. Cal. Sept. 22, 2008) (Opp. ) .......... 6, 7

*Clemons v. Waller*,
82 F. App'x 436 (6th Cir. 2003) .......... 18

*Coronavirus Rep. v. Apple, Inc.*,
85 F.4th 948 (9th Cir. 2023) .......... 8

*D'Angelo v. Penny OpCo, LLC*,
2023 WL 7006793 (S.D. Cal. Oct. 24, 2023) .......... 16

*Diaz v. Gates,* 420 F.3d 897 (9th Cir.2005) .......... 9

*Doan v. Singh*,
617 Fed.App'x. 684 (9th Cir. 2015) .......... 6

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... 13

*Erickson v. Pardus*,
551 U.S. 89 (2007) .......... 17

*Esparza v. Gen Digital Inc.*,
2024 WL 655986 (C.D. Cal. Jan. 16, 2024) .......... 16

*Gardner v. Starkist Co.*,
418 F. Supp. 3d 443 (N. D. Cal. 2019) .......... 6

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) .......... 12, 13

*Gomez v. Guthy-Renker, LLC*,
Case No. EDCV 14-01423 JGB, 2015 WL 4270042 (C.D. Cal. July 13, 2015) .......... 6

*Heiting v. Taro Pharms. USA, Inc.*, 728 F. Supp. 3d 1112
(C.D. Cal. 2024) .......... 14

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) .......... 18

*In re Hulu Privacy Litigation*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... 11, 14

*In re Outlaw Lab., LP Litig.*,
No. 18-CV-840-GPC-BGS, 2020 WL 5552558 (S.D. Cal. Sept. 16, 2020) .......... 6

*In re Nickelodeon Consumer Priv. Litig.*,
MDL No. 2443 (SRC), 2014 WL 3012873 (D.N.J. July 2, 2014) .......... 13

*In re Vizio, Inc., Consumer Privacy Litigation*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) .......... 11

*Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002) .......... 14

*Lakes v. Ubisoft, Inc.*,
777 F. Supp. 3d 1047 (N.D. Cal. 2025) .......... 17

*LD v. United Behavioral Health*,
508 F. Supp. 3d 583 (N.D. Cal. 2020) .......... 3

*Martin v. Meredith Corp.*,
657 F. Supp. 3d 277 (S.D.N.Y. 2023) .......... 11

*Mata v. Zillow Group., Inc.*,
2024 WL 5161955 (S.D. Cal. Dec. 18, 2024) ... 16

*Moore v. Kayport Package Express., Inc.*,
885 F.2d 531 (9th Cir. 1989) ... 8

*Nayab v. Cap. One Bank (USA), N.A.*,
942 F.3d 480 (9th Cir. 2019) ... 8

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007) (Opp. ) ... 4

*Oscar v. Univ. Students Co-Operative Ass'n*,
965 F.2d 783 (9th Cir.1992) ... 9

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) ... 17

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) ... 7

*Shaw v. Nissan N. Am. Inc.*,
220 F. Supp. 3d 1046 (C.D. Cal. 2016) ... 5

*U.S. v. Carrazco-Gutierrez*,
168 F.3d 502 (9th Cir. 1999) (Opp. (mis-cited as *U.S. v. Varrazco-Gutierrez*)) ... 5

*U.S. v. Turkette*,
452 U.S. 576 (1981) ... 2

*U.S. v. Vargas*,
19 F.3d 32 (9th Cir. 1994) (Opp. ) ... 5

*United States v. Pasha*,
332 F.2d 193 (7th Cir. 1964) ... 18

*Walter v. Drayson*,
538 F.3d 1244 (9th Cir. 2008) ... 7

*Wimo Labs LLC v. eBay Inc.*,
Case No. SACV 15-1330-JLS, 2016 WL 11507382 (C.D. Cal. Jan. 28, 2016) ... 5

**California Cases**

*People v. Childs*,
220 Cal. App. 4th 1079 (2013) .......... 20

**Federal Statutes**

18 U.S.C.
§ 1343 .......... 7
§ 2710 .......... 13
§ 2710(a)(1) .......... 12

RICO .......... *passim*

Wiretap Act .......... *passim*

**California Statutes**

Cal. Penal Code
§ 502 .......... 19
§ 502(c)(1) .......... 21
§ 502(c)(6) .......... 19
§ 502(c)(7) .......... 20, 21
§ 502(e)(1) .......... 20
§ 631(a) third clause .......... 18, 19

**Other Authorities**

CTA9 Rule 36-3 .......... 5

# I. INTRODUCTION

Plaintiffs' FAC hallucinates a range of supposed wrongdoing by Defendants, who purportedly are engaged in a sinister scheme to profit from the exploitation of sexual fantasies. The problem is that Plaintiffs cannot support their claims with any valid factual allegations.

The essence of a RICO claim is the formation of an enterprise by coordinated players sharing a common purpose. Try as they might, Plaintiffs cannot show that a RICO enterprise was formed in the absence of ***any communications between the defendants.*** Even Plaintiffs' own cases make clear that is not possible. Where, as here, a Plaintiff alleges only independent action by self-interested parties, there is no RICO claim.

Plaintiffs' VPPA claim fares even worse. By its express terms, the VPPA applies only to video tape service providers but ***there are no allegations that Moxy ever supplied a video to anyone***. Even without that fatal flaw, Plaintiffs' claim fails because Moxy also did not disclose any PII to third parties and, even if it had done so, it allegedly would have done so in the ordinary course of business and, therefore, in accordance with the statute.

The CIPA and Wiretap Act claims fail because they require interception and Plaintiffs have alleged none. The mere impersonation of Creators, which is the *highest* Plaintiffs allege, is not actionable. The Wiretap Act claim separately fails because Creators consented to any interception, a point Plaintiffs fail meaningfully to address.

Finally, Plaintiffs' CDAFA claim fails because Plaintiffs explicitly plead Moxy ***was authorized to access everything it accessed.*** Plaintiffs' attempts to save their claim by misstating the law cannot succeed.

Plaintiffs do not just barely miss the mark here. Instead, they are striving for claims where none exist and where, in many instances, their own express allegations prevent them from stating a cause of action. The fact remains that Plaintiffs

knowingly engaged in the fantasy of an intimate relationship by exchanging messages with OnlyFans Creators. They knew that those Creators have subscriber bases so large that it was "physically impossible" for them to interact with Plaintiffs "on a direct personal basis." FAC ¶191. Plaintiffs knew it was a fantasy, but nevertheless agreed to participate in it. They cannot now claim they were duped into paying anything, and their attempts to do so fail.

Plaintiffs already amended their claims once in light of Moxy's first Motion to Dismiss (ECF No. 65). They entirely failed to fix their pleading failures and should not get another opportunity to do so. This action should be dismissed with prejudice as to Moxy.

## II. ARGUMENT

### A. Plaintiffs Fail To Plead A RICO OR RICO Conspiracy Claim

As set forth in detail in Moxy's Motion to Dismiss (ECF No. 124, the "Motion" or "MTD"), Plaintiffs fail to plead any element of a RICO claim. In their Opposition (ECF No. 142, "Opp."), Plaintiffs nibble at the edges of those arguments, contending, for example, that it is irrelevant that the RICO enterprise allegedly began years before Moxy (or any other Agency Defendant) was formed and that it also is irrelevant that it has not alleged Moxy knows the other alleged members.[1] But Plaintiffs' opposition entirely ignores the fundamental and indispensable feature of a RICO claim: *there must be a* "group of persons associated together for a common purpose of engaging in a course of conduct" that violates the RICO statute. *U.S. v. Turkette*, 452 U.S. 576, 583 (1981). Without allegations of fact showing those features of association, like existence or communications between the alleged members, plaintiffs have done nothing more than allege that Moxy acted "independently and without coordination"

---

[1] There is, of course, a significant difference between not knowing *all* the members of a RICO conspiracy, which Plaintiffs claim is acceptable (Opp. at 20), and not knowing *any* of them, which is the case here.

with the other members. *Boyle v. U.S.*, 556 U.S. 938, 947 n.4 (2009). The Supreme Court is clear that such allegations are insufficient to adequately plead a RICO enterprise. *Id.*

Plaintiffs' attempted sleight of hand, in which they suggest that merely stating there is a RICO scheme can make it so, fails under not only the cases on which *Defendants* rely, but even those Plaintiffs themselves cite. The inescapable truth is that Plaintiffs have not come close to pleading a RICO scheme.

**1. The Complete Absence Of Any Alleged Coordination Between Defendants Dooms Plaintiffs' RICO Claims**

**a.** <u>Plaintiffs Concede They Must Plead Coordination Between RICO Defendants To Show Common Purpose And Structure</u>

Plaintiffs do not appear to dispute Moxy's position that in order to plead a RICO scheme, Plaintiffs must plead that the RICO members spoke with each other in order to coordinate their common purpose and to establish a RICO structure.

As to the common purpose of the RICO scheme, Plaintiffs plead it was the Agency Defendants' "collaborat[ion] to deceive customers for financial gain." Opp. at 9. Plaintiffs then cite in support of their position *LD v. United Behavioral Health*, 508 F. Supp. 3d 583, 602 (N.D. Cal. 2020). *Id.* In *LD*, the court only found that a RICO claim had properly been pled because the plaintiffs had properly alleged "*facts* that raise the inference" that the defendants, who were in direct contractual relationships with one another, had actually "collaborated and conspired to develop and use a database and pricing tool" that had defrauded plaintiffs. 508 F. Supp. 3d at 602 (emphasis added). In other words, collaboration, cooperation, and conspiracy was plead through allegations of direct contact and communications between the RICO defendants.

As to structure, Plaintiffs concede they must plead "functional coordination and organizational structure." Opp. at 13. Again, Plaintiffs cite in support of their

position cases where that structure was established at the pleading stage through allegations of *active communications* between the alleged RICO defendants. In *Boyle* (Opp. at 12), for example, the RICO activity "was typically carried out by a group of participants *who met beforehand to plan the crime*, gather tools (such as crowbars, fishing gaffs, and walkie-talkies), and *assign the roles that each participant would play* (such as lookout and driver)." 556 U.S. at 941 (emphases added). In *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915 (N.D. Cal. 2013) (Opp. at 12), the court upheld RICO enterprise allegations based in part on the detailed allegations of coordination between Wells Fargo and its affiliate, Premier Asset Services, to overcharge Wells Fargo's customers. *Id.* at 938, 941. And in *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) (Opp. at 9), the Ninth Circuit emphasized the existence of formal contractual relationships, coordinated marketing efforts, and extensive data transfers between the parties when determining that plaintiff had adequately pled coordination in furtherance of a common scheme.[2] 486 F.3d at 552. Finally, while Plaintiffs cite *Alaska v. Express Scripts, Inc.*, 2025 WL 755436, at *15 (D. Ak. Mar. 10, 2025) (Opp. at 21) for the proposition that "[a]n inability to describe the exact inner workings of the relationships between the enterprise members, without the benefit of discovery, is not dispositive" at the motion to dismiss stage, the plaintiff had nevertheless "allege[d] relationships between Express Scripts and other enterprise members both through informal associations and through formal organizations such as the Pharmaceutical Care Management Association."

Plaintiffs *nowhere* cite a single case where a RICO claim was plead *without* any evidence that the alleged members of the RICO enterprise had ever spoken with one

[2] Plaintiffs confusingly claim that *Odom* is absent from Defendants' briefing. Moxy cited that case in support of the very same point it makes here: Plaintiffs must, but have not, alleged the necessary "evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." MTD at 15.

another.[3]

**b.** Plaintiffs' Failure To Identify Any Coordination Prevents Them From Showing Structure Or Common Purpose

Despite that concession, supported by their own case law, Plaintiffs fail to identify so much as a *single* alleged communication between Moxy and any other supposed member of the alleged enterprise in the FAC.[4] Instead, Plaintiffs pretend that they have alleged such coordination merely by saying what it is that the defendants did in the supposed RICO scheme. That is insufficient as a matter of law.

As Moxy made clear in its Motion, courts consistently hold that a plaintiff's mere identification of what roles defendants may have played in a RICO enterprise is not sufficient. MTD at 15-16. Moxy cited, for example, *Shaw v. Nissan N. Am. Inc.*, 220 F. Supp. 3d 1046, 1057 (C.D. Cal. 2016), in which the court dismissed the RICO claim due to plaintiff's failure to allege facts supporting that there were any communications showing coordination. The court strongly contrasted the lack of allegations in the pleading with the complaint in *In re Takata Airbag Litigation*, which included "pages of references to specific communications" showing the defendants "acting as an enterprise" and "engaged in a collaborative scheme to defraud." *Id.* Moxy further cited *Wimo Labs LLC v. eBay Inc.*, Case No. SACV 15-1330-JLS (KESx), 2016 WL 11507382, at *3-4 (C.D. Cal. Jan. 28, 2016), in which the court dismissed the RICO claim because there were no allegations enterprise members "were even aware of one another's existence as participants in a scheme to

[3] Plaintiffs improperly cite a range of unpublished authorities throughout their Opposition, including at least *U.S. v. Vargas*, 19 F.3d 32 (9th Cir. 1994) (Opp. at 14, 15, 20) and *U.S. v. Carrazco-Gutierrez*, 168 F.3d 502 (9th Cir. 1999) (Opp. at 20 (mis-cited as *U.S. v. Varrazco-Gutierrez*)). Under CTA9 Rule 36-3, such unpublished decisions, which date from before 2007, "are not precedent" and should not be cited.

[4] That was not even possible for the majority of the RICO scheme's life, because Moxy did not exist for the first five years. MTD at 13-14.

defraud," much less any allegations that they communicated in such a way that suggested "they combined as an enterprise in furtherance of a fraudulent or unlawful purpose." Perhaps most notably, the court in *Gomez v. Guthy-Renker, LLC*, Case No. EDCV 14-01423 JGB (KKx), 2015 WL 4270042, at *8 (C.D. Cal. July 13, 2015), dismissed a RICO claim that sought to transform "routine commercial relationships" into a RICO enterprise, stressing that "[c]ourts have overwhelmingly rejected" such attempts. In short, Plaintiffs must allege facts supporting the RICO requirements.[5]

Crucially, however, Plaintiffs make no attempt at all to distinguish any of those authorities. If any valid response was possible, Plaintiffs (or perhaps their chosen AI product) certainly would have provided it. Indeed, far from *disputing* those authorities, Plaintiffs cite a further case that only supports *Moxy's* position. In *CBC Framing, Inc. v. Flores*, No. CV 08-00150, 2008 WL 11337555 (C.D. Cal. Sept. 22, 2008) (Opp. at 13), the plaintiff alleged that a group of managers submitted false paysheets containing hours for employees who had done no work and then collected the pay for themselves. *Id.* at *2–4. The court dismissed the original complaint in part because plaintiff "did not even allege that defendants knew one another," and therefore cannot have plead "that they had any kind of common purpose, organization

[5] Numerous other cases find the same, including *Doan v. Singh*, 617 Fed.App'x. 684, 686 (9th Cir. 2015) ("[D]efendants are variously alleged to have 'conspired,' 'assisted,' 'colluded,' or 'help[ed].' Still, it is not clear what exactly each individual did, when they did it, or how they functioned together as a continuing unit. These bare assertions of a pattern of racketeering activity do not establish an enterprise and they do not, therefore, satisfy Plaintiffs' burden."); *Gardner v. Starkist Co.*, 418 F. Supp. 3d 443, 461 (N. D. Cal. 2019) (that the *seller* of canned tuna misrepresented it was "dolphin safe" did not mean plaintiff was able to plead a RICO scheme including the fisherman, importers, storers, canners and processors absent allegations they had collaborated in a structure with a common purpose); *In re Outlaw Lab., LP Litig.*, No. 18-CV-840-GPC-BGS, 2020 WL 5552558, at *15 (S.D. Cal. Sept. 16, 2020) (noting RICO claims fail where "allegations or facts did not provide a basis from which to find the RICO members acted in concert to do anything more than perform routine commercial activities").

or function." *Id.* at *7.

**c.** <u>Plaintiffs Allege Only That Defendants Acted Independently And In Their Own Self-Interest</u>

Where members of a RICO enterprise do not know one another and have no contact or communication, the defendants' alleged actions are independent and uncoordinated. As the Supreme Court made clear decades ago, allegations such as Plaintiffs' that "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates" are not enough to show membership in an enterprise. *Boyle*, 556 U.S. at 947 n.4.

Notably, both Moxy and Plaintiffs cited *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008), which held that a plaintiff must plead facts showing a defendant was not just "involved" in a RICO enterprise but also had "some part in directing its affairs." Motion at 19; *see also Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (RICO plaintiff must show defendant "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs" (emphasis in original)); Opp. at 8. But as in *Walter*, so too here: merely asserting that Moxy as was "involved" in enterprise was insufficient absent, at minimum, allegations that defendant had "some part in directing its affairs." Direction requires communication, without it Plaintiff has pled only that Moxy was acting for itself. All of the acts that Moxy allegedly directed were their own *internal* acts, not those of anyone else. Opp. at 7-8 (alleging Moxy hires, trains, and uses Chatters with its affiliated Creators). Plaintiffs do not allege anyone told Moxy to do that.

In short, Plaintiffs' failure to plead any coordination between Moxy and any other defendant is fatal to their RICO claims.

**2. Plaintiffs Further Fail To Plead Any Actionable RICO Conduct**

As Moxy explained in its Motion, Plaintiffs' assertion that Moxy engaged in the RICO predicate act of wire fraud under 18 U.S.C. § 1343 (FAC ¶382) was utterly

baseless. Motion at 19-21.

Rather than engaging with Moxy's arguments and the law in any meaningful way, Plaintiffs instead assert that Moxy "committed numerous predicate acts" before identifying only three: 1) its marketing of "its ability to help Creators 'increase engagement with their fans and followers exponentially,'" 2) its provision of "Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge," and 3) its contractual commitment with its Creator clients "to 'respond to messages'" on the Creators' behalf. Opp. at 16. Those are insufficient.

As to the first and third of those acts, those are neither directed at a Plaintiff nor are they false or otherwise unlawful. Plaintiffs cannot assert a RICO claim based upon either Moxy's *accurate* marketing to its Creator clients that it can help them increase fan engagement and grow followers, or its contractual commitment to respond to messages on Creators' behalf that it allegedly honored. FAC ¶¶ 183, 189.

As to the second of those acts, while it does at least reference an interaction between Moxy and individuals in Plaintiffs' position, it nonetheless fails as a matter of law. FRCP 9(b) requires Plaintiff to do more than just plead the conclusory statement that someone misled someone else. Instead, a Plaintiff stating a fraud claim must plead the "who, what, when, where, and how" of the supposed deception. *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 958 (9th Cir. 2023). Plaintiffs fail to do so because, among other things, they fail to plead (or even to argue they have pled) that any Plaintiff or anyone else ever interacted with a Chatter engaged by Moxy. Indeed, Plaintiffs allege only "on information and belief" that Moxy represented certain Creators, which is insufficient as a matter of law. *Moore v. Kayport Package Express., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) ("[A]llegations of fraud based on information and belief usually do not satisfy the particularity requirements under rule 9(b)."); *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 493–94 (9th Cir. 2019) ("[A]llegations 'based on information and belief may suffice,' 'so long as the

allegations are accompanied by a statement of facts upon which the belief is founded.'").

Plaintiffs' failure to plead *any* facts supporting that Moxy committed a predicate act is, alone, fatal to its RICO claim.

**3. Plaintiffs Fail To Plead A Concrete Injury**

A RICO plaintiff is required to plead facts showing that the RICO scheme caused it "concrete financial loss." *Oscar v. Univ. Students Co-Operative Ass'n*, 965 F.2d 783, 785 (9th Cir.1992) *abrogated on other grounds by Diaz v. Gates,* 420 F.3d 897 (9th Cir.2005). Plaintiffs have failed to do so here, because they have not shown that any of the "Premium Content Fees" they claim as harm were paid as a result of any alleged fraud rather than for other reasons.

Specifically, although the supposed "fraud" was that Plaintiffs were told they would have "authentic" interactions with Creators when they were in fact talking to Chatters, Premium Content Fees were paid for reasons *other than* to speak to Creators. For example, Plaintiffs concede that Pay-Per-View charges, which fall within Premium Content Fees, were paid to view custom material. FAC ¶111. And Creator Tips were paid for "custom content, special requests, advice, recipes, lessons, or almost anything else," but not for talking to a Creator. *Id.* ¶72. Plaintiffs' claim they paid Premium Content Fees to talk to Creators is plainly false given that some Plaintiffs *are still subscribed to Creators* despite alleging Chatters operate their accounts. *See, e.g.*, *id.* ¶¶404, 419 (alleging R.M. still subscribes to Chyanne Burden).

In Opposition, Plaintiffs correctly state that overpayment *can* constitute a compensable RICO loss. Opp. at 18. But the issue is not the law, it is the facts Plaintiffs have—or, more accurately, have not—alleged. According to Plaintiffs' own allegations, Premium Content Fees and Subscription Fees were paid for reasons *other than* to interact with Chatters. FAC ¶¶72, 111. Such damages cannot therefore form the basis of a RICO claim. *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975, 980-81 (9th Cir. 2008) (RICO claim dismissed where plaintiff failed to plead the

alleged RICO activity, rather than other acts, caused it any financial loss).

Seemingly recognizing the inadequacy of their allegations, Plaintiffs identify a new category of loss in Opposition: "Misrepresented Digital Content." Opp. at 19. But, again, Plaintiff fails to show any misrepresentation that could make that wrongful and, therefore, constitute an actionable loss. For example, Plaintiffs allege that Plaintiff S.M. subscribed to Kaitlyn Krems (an allegedly Moxy-affiliated Creator), "paid $100.00 to become a VIP subscriber," and "spent additional money to purchase photos but they were all bikini photos rather than explicit content." FAC ¶417. While Plaintiff may have wished for a more sexually explicit photograph, he does not say he was ever promised anything other than what he received.[6]

Plaintiffs' failure to plead facts connecting the alleged RICO fraud to their alleged harm is yet another reason their RICO claim fails.

### B. Plaintiffs Fail To Plead A VPPA Claim

#### 1. Moxy Is Not A "Video Tape Service Provider"

Moxy is not a "video tape service provider" under the VPPA because it does not, and Plaintiffs do not even allege it does, deliver video content to anyone. MTD at 23-24. Plaintiffs do not show otherwise.

Plaintiffs' contention that Paragraphs 111-112, 452, and 455 of the FAC allege "videos were delivered via unlock links, PPV tips, and custom video transactions—each orchestrated by agency personnel operating through Creator accounts" is false. Opp. at 22. Those paragraphs make only generalized and conclusory claims that "[i]t is common for Fans to request custom videos," that "[e]ach of the Agency Defendants is engaged in the business of selling and/or delivering audiovisual materials," and that Plaintiffs "purchased RC Content directly from the Agency Defendants." But

[6] The same is true for the allegations at Paragraph 418 of the FAC regarding another allegedly Moxy-affiliated Creator—Plaintiff S.M. may have wanted a different photograph from Breckie Hill, but does not allege he was promised more than he got.

Plaintiffs nowhere allege any *facts* supporting that any Plaintiff obtained video content particularly from Moxy or any Moxy-affiliated Creator, or even that Moxy or any affiliated Creator ever offered videos. The only content Plaintiffs allege they obtained from any Moxy-affiliated Creator are *photos* that Plaintiff S.M. obtained of Kaitlyn Krems and Breckie Hill. FAC ¶¶417-418. While Plaintiffs also cite Paragraphs 222–227 of the FAC (Opp. at 22), those concern only Content X and do not say anyone ever delivered video content.

Generalized allegations of this nature fall distantly short of satisfying Plaintiffs' burden to show Moxy is a "video tape service provider" under the VPPA.[7] *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 285 (S.D.N.Y. 2023) (dismissing VPPA claim because the "handful of generalized allegations saying [defendant] shares video titles" were unsupported by "specific allegations"). Plaintiffs' cited authorities do not show otherwise. That a defendant *can* be a video tape service provider "even if they deliver content through a third-party platform" does not matter if no video content was ever provided. Opp. at 22 (citing *In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017)). *In re Hulu Privacy Litigation*, 86 F. Supp. 3d 1090, 1092 (N.D. Cal. 2015) is similarly irrelevant, because Hulu is a streaming service—that clearly *does* deliver videos to consumers—and the Agency Defendants unquestionably are not.

**2. Plaintiffs Cannot Be "Subscribers" Because They Did Not Obtain Videos From Moxy-Managed Creators Or Moxy**

Even if Moxy is a video tape service provider (it is not), it is not liable because

---

[7] Even if Plaintiff *had* alleged they purchased video content, the contention it was purchased from Moxy is false. The FAC is premised on the theory that Plaintiffs purchased content through the OnlyFans platform by paying OnlyFans or Creators. *See, e.g.*, FAC ¶¶9, 42, 62, 69; *see also id.* ¶325-326 (defining purported classes as all US and CA residents "who had a Fan account on OnlyFans and paid Premium Content Fees to any Creator").

Plaintiffs are not "subscribers" under the statute.[8]

*First*, the VPPA "provides for an action by a renter, purchaser of [*sic*] subscriber ***of audio visual materials, and not a broader category of consumers***." *Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 99 (S.D.N.Y. 2023) (emphasis added). Accordingly, Plaintiffs cannot be "subscribers" because, as noted, *they did not view or obtain any video content from Moxy or Moxy-affiliated Creators*.

*Second*, even assuming Plaintiffs did obtain video content of Moxy-affiliated Creators, Plaintiffs are still not "consumers" or "subscribers" of *Moxy's* services. The *In re Vizio* decision Plaintiffs rely on in their Opposition dictates that "[t]he VPPA applies only if the consumer is a 'renter, purchaser, or subscriber of goods or services' ***from the video tape service provider***." *In re Vizio*, 238 F. Supp. 3d at 1222 (emphasis added). Such a showing is made by a direct exchange of value between the consumer and video tape service provider. *Id.* at 1223 (plaintiffs were "subscribers" where they paid video tape service provider a premium for its Smart TV); *see also Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 721 (N.D. Cal. 2023) (plaintiffs were subscribers where one had paid account with video tape service provider and other provided personal information, including name and email address, in exchange for access). But Plaintiffs were users only of *OnlyFans* and "subscribed to *Creator Accounts*." *See, e.g.*, FAC ¶¶250, 263, 279, 291, 308-309 (emphasis added). They never gave anything of value to Moxy, only to Creators or OnlyFans.[9] *Id.* ¶¶9, 42, 62, 69, 325-326. Plaintiffs are not "subscribers."

---

[8] The VPPA defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). Plaintiffs do not claim that they are "renter[s]" or "purchasers." Opp. at 22-23. For the reasons described below, any such claims would not save their VPPA claim regardless.

[9] Indeed, Moxy made its money by charging "its Represented Creators a commission of 20-30% of their earnings." FAC ¶185.

### 3. Moxy Did Not Disclose PII To Chatters

Moxy can only be liable under the VPPA if it disclosed PII to Chatters. *See* 18 U.S.C. § 2710)(b)(1). But it did not do so because it only had access to usernames. MTD at 25. Usernames are not PII because they do not "identify an actual, identifiable person and link that person to a specific video choice." *In re Nickelodeon Consumer Priv. Litig.*, MDL No. 2443 (SRC), 2014 WL 3012873, at *12 (D.N.J. July 2, 2014).

Plaintiffs argue the VPPA can cover "disclosures of platform-specific identifiers—such as usernames or account handles—when paired with viewing behavior in a way that would allow an ordinary observer to associate the individual with particular video content." Opp. 23-24 (citing *Archer v. NBCUniversal Media, LLC*, 2025 U.S. Dist. LEXIS 129598, at *11-12 (C.D. Cal. July 2, 2025) and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017)). But that does not save Plaintiffs because there are no allegations that happened here. Plaintiffs do not allege anything showing Moxy received "information that would 'readily permit *an ordinary person* to identify a specific individual's video-watching behavior.'" *Eichenberger*, 876 F.3d at 984.

Plaintiffs' related argument that a Fan's username "can be used by anyone to locate and view the Fan's profile on OnlyFans" (FAC ¶450) also is insufficient because Plaintiffs do not plead that such profiles contain information that would allow Chatters to derive their true identity. *See Ghanaat*, 689 F. Supp. 3d at 720 (N.D. Cal. 2023) (dismissing VPPA claims where unique identifier led to plaintiffs' Facebook profiles but plaintiffs "d[id] not allege their Facebook profiles contain any personal information, such as their names or email addresses").

In the absence of such allegations, Plaintiffs have not pled, and cannot plead, Moxy disclosed Plaintiffs' PII.

### 4. The "Ordinary Course Of Business" Exception Applies

Even if Plaintiffs *had* alleged Moxy disclosed PII, it was lawful under the

VPPA's "ordinary course of business" exception because it was for "order fulfillment [and] request processing." MTD at 25-26 (noting Plaintiffs allege at Paragraph ¶112(b)-(d) that information is disclosed *for the purpose of fulfilling a request*).

Plaintiffs' argument to the contrary relies entirely on a misrepresentation of case law. Specifically, while Plaintiffs cite *In re Hulu Privacy Litigation*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) for the proposition that "[c]ourts construe this exception narrowly to avoid swallowing the rule," (Opp. at 25), *In re Hulu* makes no mention of the VPPA's "course of ordinary business" exception *at all*. *See generally* 86 F. Supp. 3d 1090. And while Plaintiffs cite *Archer* to argue that "[t]his District recently held that disclosures of user and video data to a third party (Meta) were not protected by the 'ordinary course' exception, even when transmitted through built-in platform tools," (Opp. at 25), *Archer* also does not mention the "ordinary course of business" exception. *See* 2025 U.S. Dist. LEXIS 129598, at *15 (C.D. Cal. July 2, 2025).

Valid arguments cannot be built on hallucinations. Thus, the VPPA claim fails for this independent reason.

### C. Moxy Did Not Violate CIPA Or The Wiretap Act

#### 1. Moxy Does Not Intercept Fans' Communications

Moxy is only liable under CIPA or the Wiretap Act if it intercepted Plaintiffs' communications with Creators while those communications *were in transit*, not after they arrived in Creators' inboxes. *See* MTD at 28-29 (citing various cases, including *Heiting v. Taro Pharms. USA, Inc.*, 728 F. Supp. 3d 1112, 1124 (C.D. Cal. 2024) and *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 876 (9th Cir. 2002)). Moxy did not intercept Plaintiffs' communications while they were in transit because, as Plaintiffs allege, Creators gave Moxy and its Chatters "direct access" to their OnlyFans accounts (*see* FAC ¶¶103-104, ¶112(b)-(c)), and Chatters communicated with Fans "through the OnlyFans account[s]" (*id.* ¶112c.). Plaintiffs do not dispute that interception must occur while communications are in transit. *See* Opp. at 26-27.

Instead, they contend that their pleadings are sufficient to show that such interception has occurred. *Id.* at 28. They are wrong.

Plaintiffs fail to adequately plead that Moxy even uses a CRM tool. While they allege that "[o]n information and belief, the Agency Defendants generally use CRM tools," there are no factual allegations identifying the basis for that belief. FAC ¶122. Plaintiffs also do not allege that Moxy uses any of the CRM tools Plaintiffs mention. Reliance on such generalized allegations about what "the Agency Defendants" purportedly do, based solely on undisclosed information and belief, cannot sustain Plaintiffs' claim.

Further, although Plaintiffs argue that they have pled interception in Paragraphs 122, 123, 124, 492, and 493 of the FAC, those allegations are both conclusory and contradictory. Paragraph 123, for example, expressly states "Defendants generally use CRM tools that *access the Creator's OnlyFans account* and then *mirror a live session* inside a multi-seat dashboard," ***not*** that any messages are intercepted while in transit. (Emphasis added); *see also id.* ¶ 493 ("[O]ne popular CRM platform openly advertises that it mimics user behavior to simultaneously divert all messages *from the Creator's OnlyFans account* to the CRM platform in real time.") (emphasis added); *see also id.* ¶ 492 (omitting any discussion of interception). A CRM tool that obtains Fans' communications from Creators' inboxes is, by definition, not intercepting those communications in transit. The dissonance in Plaintiffs' allegations is most evident in Paragraph 491 of the FAC, which states, "The messages are *intercepted* and *then simultaneously diverted from the Creators OnlyFans inbox* to a CRM platform . . . ." *Id.* ¶491 (emphasis added). It is unclear how messages can at once be both *intercepted* and *diverted from a Creator's inbox*. This "Schrödinger's Chat" that Plaintiffs plead perfectly encapsulates why they fail to plead interception.

Finally, Plaintiffs' citations betray their contention that their pleadings are sufficient. Opp. at 27. In each of the three cases Plaintiffs cite, the plaintiffs plausibly alleged how the messages could have been intercepted before arriving in the intended

recipient's inbox. *See Mata v. Zillow Group., Inc.*, 2024 WL 5161955, at *1 (S.D. Cal. Dec. 18, 2024) (alleging that the defendant included third-party trackers on its website that notified third party when plaintiff watched videos); *Esparza v. Gen Digital Inc.*, 2024 WL 655986, at *1 (C.D. Cal. Jan. 16, 2024) (alleging defendant allowed third-party spyware provider to install software on defendant's website that rerouted users' chat communications to spyware provider's servers and allowed spyware provider to share data with others); *D'Angelo v. Penny OpCo, LLC*, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023) (alleging that defendant routed chats with its website through a third party's servers and third party could and did access the content of chats). In the absence of such allegations here, Plaintiffs have failed to plead interception.

**2. Creators Consented to Moxy Receiving Fans Communications**

Assuming that Moxy intercepted Fans' communications with Creators, such interception would not be actionable under the Wiretap Act because Creators consented to that interception. *See* MTD at 30-31. Plaintiffs offer three contentions for why Creators' consent does not bar Plaintiffs' CIPA and Wiretap Act claims.[10] In doing so, Plaintiffs seemingly fail to understand that Moxy contends that such consent bars only Plaintiffs' Wiretap Act claim, because the Wiretap Act is a one-party-consent statute. *See* MTD at 30-31 (citing 18 U.S.C. § 2511(2)(d)). Nevertheless, Plaintiffs' contentions are unconvincing even if applied just to that claim.

*First*, Plaintiffs' contention that "consent is a fact intensive inquiry, not ripe for adjudication at the 12(b)(6) stage" (Opp. at 30) ignores that Moxy's assertion of this defense is based on *Plaintiffs' own allegations* that Moxy, "[w]orking in partnership

---

[10] Plaintiffs' third contention relies on the party exception to CIPA and the Wiretap Act. Opp. at 31. For purposes of its Motion, Moxy does not—and need not—claim that the party exception applies.

with their Creators—*often with full permission and authority from those Creators—. . . contract with chatters to conduct most, if not all, of the communications between the Creators and the Fans.*" FAC ¶104 (emphasis added); *see id.* ¶4 (alleging Moxy operates "OnlyFans accounts…at the request of and with the consent of the Creators"). "When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Plaintiffs' allegations therefore mandate dismissal of their Wiretap Act claim.

*Second*, Plaintiffs' contention that "consent is not a defense where the communication is intercepted for the purpose of committing any criminal or tortious act" relies on a misapplication of that exception and presupposes that Plaintiffs have sufficiently pled a RICO violation. *See* Opp. at 30 (*quoting R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 901 (C.D. Cal. 2024)). As *R.C.* acknowledges, "[a]lleged interceptions fall within the tort or crime exception only where the primary motivation or a determining factor in the interceptor's actions has been to injure plaintiffs tortiously, . . . [and] cannot apply where the interceptor's purpose has plainly not been to perpetuate torts on millions of Internet users, but to make money." 733 F. Supp. 3d at 901 (quoting *In re Google Inc. Gmail Litigation*, 2014 WL 1102660, at *18 n.13 (N.D. Cal. Mar. 18, 2014)); *see also Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1058 (N.D. Cal. 2025) (holding crime-tort exception inapplicable where complaint alleged purpose of the interception was not "to perpetuate torts on millions of Internet users, but to make money"). Plaintiffs allege that Agency Defendants intercepted Fans' communications to solicit Premium Content Fees, not to perpetuate torts. *E.g.*, FAC ¶¶481, 490, 494. Separately, as explained in Moxy's Motion and this Reply, Plaintiffs have failed to sufficiently plead that Moxy violated RICO or any other law. The crime-tort exception therefore is inapplicable.

**3. Moxy's "Impersonation" Defense Does Not Misstate The Law**

The FAC is replete with allegations that Agency Defendants used Chatters to

"impersonate" Creators. *E.g.*, FAC ¶¶179, 188, 200, 216, 227, 235, 246. As explained in Moxy's Motion, impersonation is not interception under the Wiretap Act and (impliedly) CIPA. *See* MTD at 29-30 (citing *Clemons v. Waller*, 82 F. App'x 436 (6th Cir. 2003), *United States v. Pasha*, 332 F.2d 193, 198 (7th Cir. 1964), and *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 144 (3d Cir. 2015)).

Plaintiffs make no attempt to grapple with *Clemons* or *In Re Google Inc. Cookie Placement Consumer Priv. Litig.* (*see* Opp. at 31-32), which expressly hold that impersonation is not interception (*see* MTD at 29-30).

Instead, Plaintiffs attempt to distinguish *Pasha* through faulty reasoning and by obscuring its holding. *See* Opp. 31-32. Specifically, they contend that *Pasha*'s holding is rooted in that fact that "there was no tampering with the established means of communication" by the impersonators," or "[i]n other words, because the [impersonators] did not actually 'intercept' the call, there could be no violation of the Wiretap Act." *Id.* at 32. That misses the point. Moxy *does not* contend that impersonation vitiates liability when interception occurs. Moxy simply makes the point that impersonation, standing alone, is not interception. That rule is expressly stated in the portion of *Pasha*'s holding that Plaintiffs intentionally omit: "We believe that ***impersonation of the intended receiver is not an interception*** within the meaning of the statute." *Pasha*, 332 F.2d at 198 (citing *Seeber v. United States*, 329 F.2d 572 (9th Cir. 1964)) (emphasis added).

Plaintiffs' further attempt to distinguish *Pasha* on the grounds that Agency Defendants' alleged use of CRM platforms "constitutes interception" is of no moment because, as discussed above, Plaintiffs fail to plead that Moxy intercepts communications.

**4. Plaintiffs Fail To State A CIPA "Use" Violation**

As Moxy's Motion explains, for Moxy to have improperly "used" information under the third clause of Cal. Penal Code Section 631(a), it must have improperly

obtained that information in violation of the first or second clauses of Section 631(a). MTD at 30 (citing *Heiting*, 728 F. Supp. 3d at 1123). As explained above, Moxy did not intercept Fans' communications in violation of CIPA. Plaintiffs therefore fail to state a CIPA "use" violation.

### D. Moxy Did Not Violate CDAFA (Cal. Penal Code § 502) By Accessing Creators' Accounts

Plaintiffs' contention that they have adequately pled a CDAFA claim under Cal. Penal §§ 502(c)(2), (3), and (7) overlooks their own self-defeating allegations.[11] Opp. at 32-34. Plaintiffs *expressly alleged* that Moxy had "full permission and authority" to access their affiliated-Creators' accounts and view "Plaintiffs' and Class Members' private messages." *See* MTD at 26 (citing FAC ¶¶4, 104, 190, 467). Because the CDAFA provisions relied on by Plaintiffs require access "without permission," (Opp. at 32), their CDAFA claim necessarily fails.

Rather than addressing that flaw, Plaintiffs attempt to distract the Court by referring to nonexistent allegations and a misstatement of the statute and applicable case law.

#### 1. Chatters Did Not Access Fans' Inboxes

In addressing their Section 502(c)(2) claim, Plaintiffs claim they alleged that "Agency-employed Chatters accessed ***Fan inboxes***," not merely Creators' inboxes. Opp. at 33 (emphasis added). That is absolutely false. The paragraphs Plaintiffs cite contain *no allegation that Moxy accessed inboxes other than those of its affiliated Creators*, nor do any other of the 525 paragraphs in the FAC. Plaintiffs pretend they have alleged that Moxy accessed inboxes it did not have permission to access, and thus acted unlawfully, because their claim as actually pled fails as a matter of law.

---

[11] To the extent Plaintiffs attempt to plead a claim against Moxy under Cal. Penal Code § 502(c)(6), that claim fails for the same reasons Plaintiffs' claims under CDAFA's other provisions fail. *See* FAC ¶471.

Plaintiffs attempt to circumvent this flaw by asserting "CDAFA does not turn on whether an entity has system credentials" but rather "on whether the user consented to the access and use." Opp. at 33 (citing *People v. Childs*, 220 Cal. App. 4th 1079, 1100 (2013)).[12] But the "user" is the person in the position of the *Creator*, not Plaintiffs. *See* Cal. Penal Code § 502(e)(1) (authorizing civil cause of action by "owner or lessee of . . . data"). Plaintiffs do not show that or how they "own" the contents of a Creator's inbox, and they cite no case for the proposition that the sender of a message has an ownership interest in the message once it arrives in the intended recipient's inbox. Plaintiffs' Section 502(c)(2) claim therefore fails.

**2. Plaintiffs Misapply Section 502(c)(3)**

Plaintiffs' contention that Agency Defendants violated Section 502(c)(3) because they "'caused' the [OnlyFans] platform to be used without permission by misrepresenting who was on the other side of the exchange" (Opp. at 34) stretches Section 502(c)(3) far beyond its intended reach. As Plaintiffs correctly note, Section 502(c)(3) prohibits "[k]nowingly and without permission using or causing to be used any computer services." Because Moxy's alleged use was, as already noted, expressly *with the permission* of its affiliated Creators, Moxy cannot have violated this provision. Nothing in the provision's language suggests that the permission can somehow be negated by misrepresenting one's identity while using a computer service, and Plaintiffs cite no legal authority for that proposition.

**3. Plaintiffs Wholly Misstate Section 502(c)(7)**

In addressing their Section 502(c)(7) claim, Plaintiffs erroneously cite that provision as stating that it "prohibits accessing a computer 'in order to wrongfully control or obtain money, property, or data.'" Opp. at 34. That is not what it says.[13]

---

[12] *Childs* does not address a violation of Section 502(c)(2). *See id.* at 1100-1101 (analyzing violation of Section 502(c)(5)).

[13] Plaintiffs seem to be partially quoting Section 502(c)(1). But even that provision

*See* Cal. Penal Code § 502(c)(7) (imposing liability on anyone who "[k]nowingly ***and without permission*** accesses or causes to be accessed any computer, computer system, or computer network" (emphasis added)). CDAFA is not some generalized set of rules that governs all the ways in which a computer may be lawfully used. Rather, it sets limits on how individuals and entities may access and use computer systems, accounts, and data belonging to others. When access occurs pursuant to permission, as Plaintiffs allege occurred here, CDAFA does not apply. Plaintiffs therefore do not have a CDAFA claim.

**4. Plaintiffs Do Not Adequately Allege That They Suffered Economic Harm**

Finally, Plaintiffs' CDAFA claim also fails because they do not show that they have suffered damages due a violation of CDAFA. Plaintiffs fail to address the law making clear that "invasion of privacy" and "emotional distress" do not qualify as damages under CDAFA, and thereby concede that point. *See* MTD at 27 (citation omitted); Opp. at 34-35. They instead focus on economic harm, claiming that they "paid subscription fees, tipped impersonators, and purchased premium content" due to Moxy's deceit, resulting in "a direct economic loss caused by unauthorized access and use of user data." Their claim fails for the same reasons they fail to plead an economic injury under RICO. *See* Section II.A.3, *supra*.

**E. The Forum Selection Clause Bars Plaintiffs' Claims**

Rather than addressing Moxy's arguments regarding the forum selection clause in their Opposition, Plaintiffs incorporate by reference their arguments made in

---

hinges on unauthorized use. *See* Cal. Penal Code § 502(c)(1) (imposing liability on anyone who "[k]nowingly accesses and without permission . . . uses any data, computer, computer system, or computer network in order to . . . wrongfully control or obtain money, property, or data."). Although Plaintiffs' CDAFA cause of action is not brought under Section 502(c)(1) (*see* FAC ¶¶466-475), Moxy's permission to access Creators' accounts defeats it regardless.

opposition to Defendants' Motion to Strike Claims of Non-California Defendants (ECF No. 138). For the sake of efficiency and avoiding duplicative arguments, Moxy incorporates by reference the arguments made in the Reply in Support Of The Motion To Strike Claims of Non-California Defendants (ECF No. 166).

## III. CONCLUSION

For the foregoing reasons and those stated in Moxy's Motion to Dismiss, Moxy respectfully requests that the Court grants its Motion to Dismiss in its entirety.

DATED: August 18, 2025 Respectfully submitted,

Oliver Rocos
Barr Benyamin
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP

By: ______________________________
Oliver Rocos
Attorneys for Defendant Moxy Management

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Moxy Management, certifies that this brief contains 7,000, which complies with the word limit of C.D. Cal. L.R. 11-6.1.

DATED: August 18, 2025

Oliver Rocos
Barr Benyamin
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP

By: ______________________
Oliver Rocos
Attorneys for Defendant Moxy Management