# EXHIBIT 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC, MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC,<br><br>Defendants. | Case No. 8:24-cv-01655-FWS-SSC<br><br>Hon. Fred W. Slaughter<br><br>**DECLARATION OF CELESTE H.G. BOYD** |

1          I, Celeste H.G. Boyd, hereby declare as follows:

2          1.     I am an attorney duly licensed to practice before all of the courts of the

3    State of California. I'm an attorney on Plaintiffs' team and work with Hagens

4    Berman Sobol Shapiro LLP. I have personal knowledge of the matters stated herein

5    and, if called upon, I could and would competently testify thereto.

6          2.     I submit this declaration to explain the hallucinated citations and

7    parentheticals raised by Defendants Fenix International Limited and Fenix Internet

8    LLC (collectively, "Fenix") in ECF Nos. 164 and 165, filed on August 18, 2025.

9          3.     On July 17, 2025, Plaintiffs filed their Response in Opposition to

10    Defendants' Motion to Strike Claims of Non-California Defendants and Fenix

11    Defendants' Motion for Request for Judicial Notice (ECF No. 138) ("Response to

12    RFJN"); their Response in Opposition to Fenix International Limited's and Fenix

13    Internet LLC's Motion to Dismiss for Lack of Personal Jurisdiction, Failure to State

14    a Claim, and Improper Venue (ECF No. 141) ("Response to Fenix MTD"); and

15    their Consolidated Response in Opposition to the Agency Defendants' Motions to

16    Dismiss the First Amended Complaint (ECF No. 142) ("Response to Agency

17    MTDs").

18          4.     On August 11, 2025, Plaintiffs filed their Response in Opposition to

19    Fenix International Limited's and Fenix Internet LLC's Motion for Partial

20    Reconsideration or Alternatively Certification of an Interlocutory Appeal (ECF No.

21    158).

22          5.     I made serious mistakes in my work on the briefs mentioned above,

23    and those mistakes are mine alone.

24    **Personal Circumstances**

25          6.     I am writing this declaration a little more than a week after my father's

26    death. I sincerely hope that my colleagues and the Court will forgive me a level of

27    sentimentality I would generally regard as unprofessional—even embarrassing. The

28

1   personal details included here are offered not to garner sympathy, but in a sincere
2   effort to wrest something of value out of a difficult situation.

3       7.      My father was a gifted musician who came to the United States from
4   Colombia in his twenties. He was also a man who struggled with the practical side
5   of life—promoting his music, handling finances, taking care of his health. After my
6   parents divorced when I was six, as the oldest of his four children I felt a heavy
7   responsibility for him. He gave up a lot of professional opportunities to stay near
8   his children, and I never wanted his sacrifices to be in vain. Throughout my life,
9   like my siblings, I felt an obligation to carry him—often at the expense of myself.

10      8.      His health declined steadily over decades. He developed diabetes after
11  a long hospitalization in my early twenties. He never managed his health or his
12  finances well and often resisted help until he was in crisis. I once had to file ten
13  years' worth of his tax returns in a single year when he finally admitted how far
14  behind he had fallen. In approximately 2015, he was diagnosed with Parkinson's,
15  and then eventually with congestive heart failure; he lived for decades in a rented
16  room off a friend's garage until it became clear that he needed more consistent help
17  than we could afford to pay for out of pocket. My sister had offered to take him in,
18  and he finally relented and agreed. He moved in with her in early 2024, but the
19  situation proved unsustainable, and late last year he entered a skilled nursing
20  facility after we finally secured Medicaid approval. Over the last few years he had
21  been to the emergency room and hospitalized repeatedly (too many times for me to
22  count without looking at his medical records).

23      9.      Through all of this, like many people, I was attempting to maintain a
24  meaningful career while balancing family obligations. After graduating from Yale
25  Law School, I married an active-duty military officer, and moved over 10 times in
26  15 years. We have two school-aged children born in two different countries less
27  than two years apart. I have worked (and lived) remotely for the last 17 years due to
28  my husband's military service. I have never had colleagues down the hall to lean

-2-
DECLARATION OF CELESTE H.G. BOYD

1    on, or much administrative support to pick up slack; the only time I worked out of

2    an office with colleagues was the year just after law school graduation, when I

3    moved back to my hometown of Albuquerque and worked at the New Mexico

4    Center on Law and Poverty while my husband was on deployment. After that, in

5    2008, I started a remote freelance legal practice, conducting primarily litigation-

6    related research and drafting for other attorneys.

7        10.    In 2012, I joined Paynter Law—a small plaintiff-side litigation firm—

8    as Of Counsel, and continued to work remotely in that role for the next decade. The

9    firm has been co-counsel with Hagens Berman on a number of cases, and through

10    that relationship, I worked with Rob Carey multiple times over the course of a

11    decade. After my husband retired from active duty in 2021, we moved back to his

12    home state of California, where I took my third bar exam. I parted ways with my

13    prior firm, taught two classes at Stanford, relaunched my own practice as a legal

14    and communication consultant, and eventually began working with Rob Carey and

15    his team at Hagens Berman again, in a professional relationship that had been a

16    source of stability and pride for me over more than a decade. I include this

17    background not to rehearse my résumé, but because my unusual career path—

18    largely remote, without traditional support systems—helps explain why I turned to

19    AI tools in the way I did.[1]

20        11.    But as my father's decline accelerated, I was consumed with caring for

21    him from afar, while concealing from everyone—including my colleagues—just

22    how much it was taking out of me. Between the time that Defendants in this action

23

24

---

25    [1] I have worked almost entirely remotely for nearly two decades, without the

26    ordinary supports of colleagues or administrative staff. That context shaped how I

27    approached technology in my drafting process, and helps explain why I treated

      ChatGPT as a kind of substitute for the collaborative and logistical support I did not

28    otherwise have.

filed their Motions to Dismiss and related briefs (a total of 9 briefs),[2] and the time Plaintiffs' responses in opposition were due, my father was declining rapidly. He was hospitalized twice during that period, and both times his experience was extremely distressing. He was delirious, hated being poked and prodded, and had to be restrained by hospital staff when he became aggressive. Approximately a week before the original deadline for Plaintiffs' oppositions to Defendants' Motions to Dismiss in this action,[3] my siblings and I made the decision to place him on hospice.

12.    I have always prided myself on meticulous work. I did not get into and graduate from Yale Law School *without* being a perfectionist. But under the weight of my father's decline, my family responsibilities, and the demands of litigation, I had started to break down.

13.    I was diagnosed several years ago with ADHD, which helped explain why I have always struggled with planning, time management, and memory issues. Throughout my career, however, I have managed those challenges successfully through meticulous note-taking, color-coding, and even building custom databases to serve (I would joke) as an "externalized memory." But as my father declined, my usual coping structures broke down under the combined weight of my long-distance caring for him, the immediate daily care of my family, and the demands of the briefing schedule. I felt ashamed to admit how much I was struggling, even to my own family and the colleagues I should have trusted. In other words, the mistakes I made in doing my part on these opposition briefs, which included blending together sections from co-counsel, resulted from being overwhelmed and under-resourced. They didn't come from a general lack of awareness of my own particular needs, but

---

[2] Dkt. 121 (Fenix Mot. to Dismiss FAC), Dkt. 122 (Fenix RFJN re Mot. to Dismiss FAC), Dkt. 123 (Fenix Mot. to Strike), Dkts 124–129 (Agency Defs.' Mots. to Dismiss FAC).

[3] The original deadline was July 10, 2025, per Dkt. 133.

DECLARATION OF CELESTE H.G. BOYD

1  from a deep fear of admitting weakness and exposing myself to the judgment of

2  others. In that context, the promise of a "virtual" helper became increasingly

3  alluring.

4  **My experience with ChatGPT.**

5      14.    It was never my intent to use ChatGPT as a replacement for my own

6  professional judgment or skill, but simply as a tool—and, frankly, as something of

7  an accommodation. I've come to recognize that the specific mistakes I made came

8  out of an over-confidence in my own ability to independently develop foolproof

9  processes to take advantage of that accommodation in a way that was both efficient

10  and ethical. That over-confidence was ultimately driven by psychological factors,

11  but in attempting to explain the errors that I unwittingly allowed into the filed

12  briefs, I've had to recognize the way in which the behavior of the tool contributed

13  to my over-confidence in my ability to control it.

14      15.    When ChatGPT first came out, I reacted like many lawyers: skeptical

15  and blithely judgmental of attorneys who had embarrassed themselves by filing

16  briefs with "hallucinated" citations. After I began using it myself, though, I began

17  to think of it increasingly as simply another tool in my toolkit. I approached it

18  warily, but had to admit I was impressed.

19      16.    My genuine intent was to use the tool to assist me as I worked as a

20  mainly solo practitioner—a way to iterate more freely in my writing process and

21  "collaborate" more frequently in real time without feeling like I was interrupting

22  busy colleagues. I would feed it my raw notes on an opposition brief and ask it to

23  help me organize my own original thoughts into a coherent outline and/or narrative.

24  Then I would use Lexis to conduct the legal research, and draft an initial

25  argument—mostly in narrative form, but occasionally in rougher bullet-point form.

26  I would also paste material (sometimes full arguments, but often just single

27  passages, sentences, or even phrases) into the tool and ask it "spar" with me in

28

1   order to solidify my arguments—as well as for feedback and suggestions on the

2   structure or tone of my material.

3       17.    But while I enjoyed having a "robot" sounding board, I also knew I

4   had to develop processes to supervise its output, including thoroughly checking

5   everything produced by AI. As I continued to learn how to work with the tool, I

6   began to believe I could mitigate its tendencies to hallucinate—by giving it more

7   explicit instructions and well-crafted prompts—but I knew it was impossible to

8   fully control it, and tried to develop specific protocols that would allow me to

9   effectively check it at the end of the process.

10       18.    Unfortunately, as my personal stress mounted, I failed to follow my

11   own protocols for using AI. Instead of just use ChatGPT as a sounding board, I

12   began to rely on the tool to draft larger portions of the briefs, analyze the legal

13   research I performed, and combine and shorten work provided by other attorneys on

14   the case. I also failed to realize when (and to what extent) the tool was modifying

15   my own research/writing—supplementing and or cross-pollinating concepts and

16   authorities from outside sources even after being explicitly instructed not to do so.

17   Because I ran out of time to do so, I also failed in not checking the briefs at the end

18   of the process.

19       19.    As my dad's situation worsened, and my ability to balance everything

20   suffered, I failed in my responsibility—allowing unacceptable errors to be

21   incorporated into the briefs that would have been avoided had I recognized that I

22   could not control the hallucinations and that I would be incapable of thoroughly

23   reviewing the final work product.[4] I compounded that error by failing to

---

[4] Although I was not mindful of it while drafting, I recognize that I was bound by the Court's standing order and its specific requirement that "[a]ny party who uses generative artificial intelligence . . . to generate any portion of a motion, brief, pleading, or other filing must attach to the filing a separate declaration disclosing the use of artificial intelligence and certifying that the filer has reviewed the source

communicate with my colleagues or co-counsel and ask them for help. I did not inform them that I was using AI to assist with the briefs—much less inform them that I had failed to review AI-generated material—and I turned in my final materials too late for them to perform a meaningful cite check. That was not their fault; it was mine.

20.     I offer these explanations not to let myself off the hook, but for two very intentional reasons: *First*, I need to understand the *specific* nature of my own mistakes in order to learn from them. *Second*, I feel a genuine sense of obligation to turn a mortifying professional and personal experience into something that others can learn from—and even possibly take solace in. I have had the privilege of earning a law degree from Yale Law, teaching legal research and writing (albeit briefly) at Stanford Law, and working for years with Hagens Berman and many of their talented attorneys. I recognize that no institution or colleague wants to see their name connected with this situation. My hope is only that the Court (and my colleagues) will reserve judgment long enough to recognize this not as a lack of research or ability, but as a lapse in judgment under difficult circumstances—one for which I take full responsibility.

21.     Our profession is a high-pressure environment. Lawyers are notorious for their high rates of mental health issues and substance abuse, and I have a deep suspicion that new technological tools—and perhaps specifically GPTs—are becoming the addictive substance of choice for many overwhelmed professionals. I am willing to absorb the public scrutiny and shame that comes from my candor here if it encourages those struggling to ask for help—and those around them to offer that help in a spirit of compassion rather than judgment.

---

material and verified that the artificially generated content is accurate and complies with the filer's Rule 11 obligations." Because I did not inform my co-counsel that I was using AI to assist with the Briefs, I hope that the Court will allow them to file the appropriate corrections to mitigate the effects of my mistakes.

**Iterative Process and Error Reconstruction**

22.     Rob and his team have asked for me to reconstruct the source(s) of specific errors that made their way into the Briefs, in order to help demonstrate that the errors did not result from an inability to do substantive research or a failure to understand my responsibility to exercise my own professional judgment about the characterization of that research in the filings.

23.     I have spent many hours (indeed, days) attempting to forensically reconstruct each error identified by opposing counsel in order to identify 1) the nature and provenance of the error, specifically including 2) any material or instructions I provided to ChatGPT that might have caused the error, 3) any material or instructions I failed to provide to ChatGPT that might have prevented the error, and 4) the nature and extent of my substantive underlying work.

24.     I have concluded that it is effectively impossible to create a comprehensive inventory of all the errors, as a result of multiple factors, including the iterative/collaborative nature of my interactions with ChatGPT; my inability, given the strain I was under, to maintain detailed records of those interactions, research notes, and drafts of argument text; and the cognitive/emotional strain that led to my over-reliance on the tool to begin with.[5]

25.     I have, however, compiled brief dossiers on some of the more serious errors in order to demonstrate the types of errors that occurred, the complicated nature of them, and my own misunderstandings or mistaken intuitions about the operation of the AI tool. Those are included as Appendix A to this Declaration.

26.     None of these examples or explanations is intended to excuse or minimize the errors—for which I take full responsibility, as explained above. I

---

[5] These factors are compounded by the fact that in at least one instance, I lost many hours of iterative work by mistakenly deleting an entire related Project (including many different chat threads) within ChatGPT—a deletion I discovered immediately, only to find that the process was not "undoable" or even documented in a way I could track.

1  submit them only to support the good faith of my assurance to the Court and my

2  colleagues that the errors in the filed briefs were not an attempt to shirk my

3  responsibility for researching and exercising my professional judgment in my

4  representations to the Court.

5        I declare under penalty of perjury under the laws of the United States that the

6  foregoing is true and correct.

7        Executed this 27th day of August, 2025, in Piedmont, California.

By _____

Celeste H.G. Boyd

DECLARATION OF CELESTE H.G. BOYD

# APPENDIX A

# ERROR CATEGORIES

The errors identified by defense counsel fall into the following categories:

1. A single hallucinated authority.
2. Authority cited for the correct proposition, but with an incorrect quotation or parenthetical.
3. Authority cited for the incorrect proposition and/or mischaracterized.
4. Incorrect record cites, including one resulting in mischaracterization of the Court's prior order.

Although, as I indicated in my Declaration, I am unable to produce a full inventory of all the errors identified, I have included detailed descriptions of some of the most serious errors below, in an attempt to give the Court a sense of how those errors occurred.

# EXAMPLE ERROR ANALYSES

## (1) *Doe v. Match Group*

PageID: 2225, Dkt. 141 (Pls.' Opp. to Fenix Defs' Mot. to Dismiss)

**ERROR TYPE:**

(#1) Source does not exist.

**FILED TEXT:**

> Fenix argues that claims by Plaintiff R.M. should be transferred to Delaware under the forum-selection clause in OnlyFans' Terms of Service. But the Court has already rejected that argument in prior briefing. See Dkt. 117 at 2–3. The forum-selection clause in question is not enforceable against Plaintiffs asserting claims based on deception, and **public policy weighs against transfer where the gravamen of the action is fraud.** ***See Doe v. Match Group***, **2022 WL 4551660, at 6 (C.D. Cal. Aug. 12, 2022).** R.M. resides in California, and the claims he asserts arise from deceptive conduct orchestrated by a California-facing platform. Venue is proper under 28 U.S.C. § 1391(b).

**ERRORS AS IDENTIFIED BY DEFENDANTS:**

Plaintiffs' Westlaw citation to *Doe v. Match Group*, 2022 WL 4551660 (C.D. Cal. Aug. 12, 2022) does not direct to any decision available on Westlaw. I ran a nationwide search for dockets or cases matching this case name via Bloomberg Law and Westlaw, and for any cases involving a Doe plaintiff and Match Group defendant. I was unable to find any docket or order matching Plaintiffs' citation or characterization of the case. Dkt. 164 ¶ 17.

**WHAT HAPPENED?**

The exact provenance of this error appears to have been in one of the chats that was accidentally deleted.[1] However, in reviewing my files, I found an early draft that contained a "placeholder" paragraph for the venue argument in the following form (blue highlights in original):

Venue is proper for RM.

Defendants argue briefly that claims by Plaintiff R.M. should be transferred to Delaware under the forum-selection clause in OnlyFans' Terms of Service. [CITE] [Did they make this argument before? Look at FNC briefing . . . ] [. . . nature of the claims is relevant, right? Fraud/misrep . . . ] R.M. resides in California, and the claims he asserts arise from deceptive conduct orchestrated by a California-facing platform. Venue is proper under 28 U.S.C. § 1391(b).

Given this language and the types of errors I have seen ChatGPT produce, I strongly suspect that at some stage in the drafting, ChatGPT extrapolated a proposition based on the note "[. . . nature of the claims is relevant, right? Fraud/misrep . . .]," and then fabricated a case to support the proposition.

The exact way it came up with the case name is unknown, but it had many "Doe" cases in its memory and/or previous chats that may have formed part of the basis of the hallucination, including, *e.g.*, Doe 1 v. AOL LLC, 552 F.3d 1077, Doe v. Grindr Inc., 128 F.4th 1148, 1151 (9th Cir. 2025), Doe v. Walmart Inc., 2019 U.S. Dist. LEXIS 21975, 2019 WL 499754, at *6 (N.D. Cal. Feb. 8, 2019).

---

[1]  *See* Decl. n. 5. A search of existing ChatGPT conversations for the term "Doe v. Match Group" found only messages in which the venue argument text appears in its final (erroneous) filed form.

APPENDIX A TO DECLARATION OF CELESTE H.G. BOYD

## (2)  *Calise v. Meta Platforms*

**ERROR TYPE:**

(#3) Case cited for the wrong proposition.

**FILED TEXT:**

Dkt. 141 (Pls.' Opp. to Fenix Defs' Mot. to Dismiss) • PageID: 2243

> The Ninth Circuit recently reaffirmed the VPPA's reach in *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024), holding that even partial identifiers combined with viewing behavior are sufficient to constitute PII. There, as here, the defendants argued that user-facing identifiers were too attenuated to trigger liability. The court rejected that view, emphasizing that the VPPA protects against disclosures that connect users to specific video behavior, even if the identifiers are platform-specific.

**ERRORS AS IDENTIFIED BY DEFENDANTS:**

> There was no VPPA claim at issue in *Calise*. . . . *Calise* does not contain any language discussing the reach of the VPPA, and the terms "personally identifiable information," "PII" and "identifiers" do not appear in that opinion. Dkt. 164 ¶ 43.

**WHAT HAPPENED?**

The citation to *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024), entered the drafting process through a Section 230 argument that co-counsel had prepared, which I gave to ChatGPT to review during the process of stitching together the various section drafts from different firms and attorneys.

In subsequent drafting sessions on the VPPA, I gave ChatGPT the following language (blue highlights in original):

> Plaintiffs' allegations provide stronger support than in Archer. The disclosures here are not backend transmissions to analytics partners. They are targeted, profit-driven disclosures that weaponize private viewing behavior for emotional manipulation—precisely the kind of harm Congress intended to prevent. As the Ninth Circuit has recognized, the VPPA was designed not just to avoid embarrassment, but "to ensure that consumers retain control over their personal information." *Eichenberger*, 876 F.3d at 984 [CHECK]; see also FAC ¶ (citing legislative history). See also *In re Facebook, Inc.*, 402

APPENDIX A TO DECLARATION OF CELESTE H.G. BOYD

F. Supp. 3d 767, 798 (N.D. Cal. 2019) ([. . .]²). The allegation of deliberate, revenue-generating use of user + video data puts this far closer to the heartland of VPPA violations than passive analytics cases like *Hulu*. [[CITE] . . . can we find a case on "partial" identifiers . . . ?].

Apparently in response to my "can we find a case" note, ChatGPT "filled in the blank" by fabricating a description of a case that met the criteria, and because it now had the *Calise* case in its memory, it just attributed the fabricated description to that case.

In short: the case entered via a draft placeholder; ChatGPT hallucinated the description of the case to match the placeholder; and the fabricated version was repeated in subsequent drafts. I failed to catch the error before filing, and it ended up in the filed brief.

## (3) Mischaracterization of Court's Order re: RFJN

**ERROR TYPE:**

(#4) Inaccurate record cite/quote.

**FILED TEXT:**

PageID: 2123, Dkt. 138 (Pls' Opp. to Defs.' Mot. to Strike and RFJN)

Because the Court has not dismissed the Non-California Plaintiffs' claims against the Agency Defendants, and because the Agency Defendants have not shown that they can invoke the forum selection clause against Plaintiffs, the Court should deny Defendants' motion to strike. Because the Court has already rejected the previous request, the documents do not cover the relevant time-period, and the documents are disputed factually, the Court should also deny the Fenix RFJN.

---

² SEE QUOTE: [But the VPPA defines this broadly as "information which identifies a person as having requested or obtained specific video materials or services. . . ." 18 U.S.C. § 2710(a)(3). Or as the Ninth Circuit has put it, "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." Eichenberger, 876 F.3d 979, 985 (9th Cir. 2017) (quotations omitted). The plaintiffs adequately allege that Facebook regularly shared information about the videos that users received in their private messages and about videos they "liked." Complaint ¶¶ 424, 867, 868. And it is reasonable to infer, at least at the pleading stage, that when a user receives a video or likes a video, he watches the video, such that this information sheds significant light on his video-watching behavior.]

APPENDIX A TO DECLARATION OF CELESTE H.G. BOYD

**ERRORS AS IDENTIFIED BY DEFENDANTS:**

> "The court did not consider Fenix's Request for Judicial Notice in the context of Fenix's motion to dismiss for failure to state a claim or on personal jurisdiction grounds." Dkt. 164 ¶ 6.

**WHAT HAPPENED?**

The arguments that Fenix Defendants made in their Request for Judicial Notice in support of its Motion to Dismiss, Dkt. 122 ("Specially Appearing Defendants Fenix International Limited's and Fenix Internet LLC's Request for Judicial Notice and Notice of Documents Incorporated by Reference in Support of Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, and Failure to State a Claim."), were very similar to those previously argued in the context of the FNC Motion, Dkt. 63 ("Specially Appearing Defendants Fenix International Limited's and Fenix Internet LLC's Request for Judicial Notice and Notice of Documents Incorporated by Reference in Support of Motion to Dismiss for Forum Non Conveniens and Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim.").

Since Plaintiffs had previously responded to the arguments in Dkt. 63—*see* Dkt. 87—I assumed that would make the response to Dkt. 122 relatively easy to draft, and left the drafting of that argument for the end. ChatGPT had previously indicated that it understood the context of the Court's prior ruling,[3] so I requested assistance in "recycling" our prior responses for purposes of the MTD Opposition. My initial instructions to ChatGPT with respect to the new RFJN argument were:

> Please review 1) the RFJN filed by defendants in connection with the FNC briefing 2) the RFJN filed in connection with the recent MTD briefing 3) the Court's order on the FNC motions 4) the most recent version of Brief 2.

---

[3] In response to my query—"Did the court rule on the RFJN issues associated with the FNC motions?"—ChatGPT responded:

The Court granted the FNC motion filed by the Fenix Defendants and dismissed the claims of the out-of-state Plaintiffs (B.L., S.M., and A.L.) against Fenix . . . based on the forum-selection clause in the OnlyFans Terms of Service. It ruled that English and Welsh courts were the agreed-upon forum for those Plaintiffs' claims. [Dkt. 117; see also FAC ¶ 24]. . . . However, ***the Court did not expressly resolve whether to take judicial notice*** of the Terms and Privacy Policy that Fenix submitted via their RFJN in support of the FNC motion. . . . [I]n short: the Court ruled on the FNC motion itself (and thus indirectly the enforceability of the forum-selection clause), ***but expressly declined to resolve the RFJN issues.***

(emphasis added).

APPENDIX A TO DECLARATION OF CELESTE H.G. BOYD

> Propose a section I can add onto Brief 2 (the MTS response)
> that re-uses our prior RFJN arguments where appropriate (esp.
> re: the representations in the Taylor Declaration) without
> wasting too much space.

In response, the tool drafted an argument that contained the following language:

> The Court should deny or disregard the RFJN for three
> independent reasons. First, the Court has already declined to
> rely on these materials in its prior ruling. ***See*** Dkt. 117 at 3 n.2
> ("Because the court does not rely on any disputed terms, it
> need not and does not reach the parties' RFJN-related
> arguments.").

The text bolded in the passage above was both inappropriately placed in
quotation marks and inaccurate in its characterization of the Court's Order, in
which the Court had found that judicial notice was not *necessary* in order to
consider the materials in the *forum non conveniens* context—but had *not* said
that it declined to consider the materials. What the Court actually said was:

> Defendants request that the court take judicial notice of or
> incorporate by reference [certain documents] . . . The court
> need not take judicial notice of these documents for purposes
> of its analysis because it may consider evidence outside the
> pleadings in deciding a motion to dismiss for forum non
> conveniens. *See Doe 1 v. AOL*, LLC, 552 F.3d 1077, 1081 (9th
> Cir. 2009); *Dickens v. NXP Semiconductors*, 703 F. Supp. 3d
> 1013, 1019 (N.D. Cal. 2023); *Ioannidis/Riga v. M/V SEA
> CONCERT*, 132 F. Supp. 2d 847, 852 (D. Or. 2001).

Dkt. 117, at 3 n.2 (emphasis added). ChatGPT's mischaracterization of the
Order was then extrapolated into other parts of the RFJN argument, as well as
repeated in a summary of the argument, which appeared in the introduction and
conclusion of the brief.

## (4) *Mendoza v. Amalgamated Transit Union International*

**ERROR TYPE:**

(#3) Authority cited for the incorrect proposition and/or mischaracterized.

**FILED TEXT:**

PageID: 2236, Dkt. 141 (Pls.' Opp. to Fenix Defs' Mot. to Dismiss)

> But the allegations describe an objective scheme to extract
> money by lying about the nature of the service. See Mendoza
> v. Amalgamated Transit Union Int'l, 30 F.4th 879, 889 (9th
> Cir. 2022) ("Intent to defraud can be inferred from the totality
> of the circumstances.").

APPENDIX A TO DECLARATION OF CELESTE H.G. BOYD

**ERRORS AS IDENTIFIED BY DEFENDANTS:**

> "The quoted language does not appear in the text of Mendoza v. Amalgamated Transit Union International, 30 F.4th 879 (9th Cir. 2022). . . . Similar, but still different language appears in a 1979 D.C. Circuit case, *U.S. v. Alston*, 609 F.2d 531, 538 (D.C. Cir. 1979) . . . I ran a Westlaw search for the exact quoted language and found two cases containing this exact language. The first case was a 1986 Sixth Circuit appeal from a criminal conviction . . . . The second case was a 2012 First Circuit Bankruptcy Appellate Panel decision reviewing the denial of a motion for a new trial . . . ."

Dkt. 164 ¶ 29–30 (omissions intended solely for brevity).

**WHAT HAPPENED?**

The case appears first in a message generated by ChatGPT:

>  . . . But the allegations describe an objective scheme to extract money by lying about the nature of the service. That is textbook fraud. See *Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879, 889 (9th Cir. 2022) ("Intent to defraud can be inferred from the totality of the circumstances."); *In re JUUL Labs, Inc., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 634 (N.D. Cal. 2020) ("The allegations are detailed and plausible—and that is all that Rule 8 requires.").[^1]

Prior to that, I had given it the rough draft text below, and I have the JUUL case in my research folder, which suggests I likely also gave it that case at some point.

> The resulting harm is both economic and emotional. Plaintiffs lose money in direct payments. They are manipulated into sharing personal, intimate communications with strangers. FAC ¶¶ ▢. The law does not require more. Fenix asks the Court to treat this as a subjective disappointment. But the allegations describe an objective scheme to extract money by lying about the nature of the service. That is textbook fraud. Fenix tries to avoid the weight of these allegations by calling the entire scheme "implausible." [CITE] But that argument fails for multiple reasons. Fenix argues that Plaintiffs' claims are implausible because Plaintiffs have no way to know what Fenix knows. [CITE] But the FAC includes detailed allegations describing Fenix's role in designing, incentivizing, and profiting from the Chatter Scams. *See* FAC ¶¶ ▢. Plaintiffs do not rely on vague speculation—they describe internal analytics tools, compensation structures, moderation policies, and selective enforcement practices that support a strong inference of knowledge. FAC ¶ ▢. Fenix's argument is also

APPENDIX A TO DECLARATION OF CELESTE H.G. BOYD

inconsistent. It faults Plaintiffs for pleading collectively, while simultaneously asserting that the entire theory is implausible for any user. That tension undercuts its own position. *See, e.g., In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 634 (N.D. Cal. 2020) ("The allegations are detailed and plausible—and that is all that Rule 8 requires.").

After giving it that text, I instructed it: "I think as long as we're on this, let's add some more specific citations both to Fenix's arguments and to case law."

My intent was for it to pull from any prior research I had done. I had previously instructed it (repeatedly and in various ways) that any citations to case law should come from the cases or notes I had provided, and that it should never invent authority.

I have no record of the *Mendoza v. Amalgamated Transit* case in my files or notes, which strongly suggests that ChatGPT simply pulled the case from an outside source in response to my suggestion that we add more specific citations.

## (5) *Doe v. Roblox Corp.*

### ERROR TYPE:

(#3) Authority cited for the incorrect proposition and/or mischaracterized.

### FILED TEXT:

PageID: 2231, Dkt. 141 (Pls.' Opp. to Fenix Defs' Mot. to Dismiss)

The Terms prohibit impersonation, restrict account access to verified Creators, and reserve to Fenix the unilateral power to suspend or remove accounts that violate these rules. FAC ¶¶ 153-156. These Terms were not passive disclaimers. They were contractual controls—and Fenix was the only party with the authority to enforce them. ***See Doe v. Roblox Corp*., 602 F. Supp. 3d 1243, 1252 (N.D. Cal. 2022) (allowing breach claim where platform failed to enforce its own safety rules)**; . . . .

### ERRORS AS IDENTIFIED BY DEFENDANTS:

"The complaint in *Doe v. Roblox* did not contain a breach of contract claim. . . . . The term 'safety rules' does not appear in the Roblox decision. The decision states that while plaintiff alleged 'children on Roblox have been exposed to lewd behavior, profanity, and other similar acts,' that conduct was not at issue in the decision. *Id*. at 1252 n.3 (stating that "this case is not about that type of behavior").

APPENDIX A TO DECLARATION OF CELESTE H.G. BOYD

Dkt. 164 ¶¶ 23–24.

**WHAT HAPPENED?**

I have a reference to this case in my notes in support of our fraud claims, which presumably is where ChatGPT found it. It comes from the following quote:

> To the extent that Universal contends that an affirmative misrepresentation requires an explicit misrepresentation, the Court finds this view too narrow. Even an implied assertion may be sufficient to deceive a reasonable consumer. ***See Doe v. Roblox Corp***., No. 3:21-CV-03943-WHO, 602 F. Supp. 3d 1243, 2022 U.S. Dist. LEXIS 83523, 2022 WL 1459568, at *10 (N.D. Cal. May 9, 2022) ("Under California law, a cause of action based in fraud may arise from conduct [*19] that is designed to mislead, and not only from verbal or written statements") (quotations and citations omitted) . . .

*Woulfe v. Universal City Studios LLC* 2022 U.S. Dist. LEXIS 235602, No. 2:22-cv-00459-SVW-AGR, 2022 U.S. Dist. LEXIS 235602, at *18-19 (C.D. Cal. Dec. 20, 2022) (emphasis added).

While drafting the breach of contract argument, I gave ChatGPT the following text:

> Where a platform offers specific commitments to users in a written agreement, and then knowingly permits conduct that violates those commitments, it may be held liable for breach— even if third parties carried out the conduct at issue. [[CITE: Lexis prompt LP-002]].

The rule statement was effectively "aspirational"—a statement of our ideal rule based on my initial research or informed intuition about the case law. (I sometimes use this as a technique in early drafts, knowing that the statement will be adjusted more precisely later.) The reference to "LP-002" was intended to flag the need to construct a Lexis search that I could use to find/verify the supporting legal authority.

Instead, ChatGPT responded with the following suggestion:

> Insert real case citations (you flagged placeholders). . .
> Contractual promise enforcement (platform case): Use *Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1252 (N.D. Cal. 2022).

I either didn't notice or lost track of where that case had come from, and the error was iterated. The next version of the section suggested by ChatGPT then attributed my original ("aspirational") text to the *Roblox* case:

> Where a platform makes specific commitments in its Terms of Service, and then knowingly permits conduct that violates those commitments, it may be held liable for breach—even if

APPENDIX A TO DECLARATION OF CELESTE H.G. BOYD

third parties carried out the conduct. *See Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1252 (N.D. Cal. 2022) ("A website operator may be liable for breach of contract when it fails to enforce rules it imposes on its own platform.").

And the version that ended up in the final brief condensed the mistake into a parenthetical. *See* "Filed Text" above.

## (6) *California ex rel. Van De Kamp v. Tahoe Regional Planning Agency*

**ERROR TYPE:**

(#3) Authority cited for the incorrect proposition.

**FILED TEXT:**

PageID: 2491, Dkt 158 (Pls' Opp. to Fenix Defs.' Mot. for Reconsideration)

*California ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1323 (9th Cir. 1985) ("Because either ground independently supports the judgment, we may affirm on the basis of either.");

**ERRORS AS IDENTIFIED BY DEFENDANTS:**

The quoted language does not appear in the text of California ex rel. Van De Kamp v. Tahoe Reg'/ Planning Agency, 766 F.2d 1319 (9th Cir. 1985). I ran a Westlaw search for the exact quoted language and found no cases containing this exact language.

Dkt. 168 ¶ 23.

**WHAT HAPPENED?**

During the drafting process, as described in my Declaration, I sometimes went back and forth with ChatGPT in order to hone arguments. At this point—approximately three days before my father's death—I had begun to rely on the tool far too much to pull authority from the appropriate places (*i.e.*, my notes and/or authority I had directly uploaded for it to review). In this instance, my prompt to the tool was:

Do we have other authority here?
Where an order rests on "two separate and independent" grounds, eliminating one does not compel a different result. {{See United States v. Woodbury, 263 F.2d 784, 788 (§ 1292(b) is intended for exceptional cases and does not authorize review where independent grounds support the judgment).}}[[CB: cite a broader authority (not just limited to 1292)?]]

In response, ChatGPT suggested the following, which ultimately made its way into the final brief:

> Yes — there's plenty of broader authority for the "independent grounds" principle that isn't confined to § 1292(b). . . . A few strong candidates: . . . Ninth Circuit - California ex rel. Van De Kamp v. Tahoe Regional Planning Agency, 766 F.2d 1319, 1323 (9th Cir. 1985) ("Because either ground independently supports the judgment, we may affirm on the basis of either.") . . .

I have no idea where ChatGPT pulled the case from. The closest thing I could find in my notes/files was a reference to a different case containing "*Van de Kamp*" in the title, which appeared in a law journal article I reviewed while researching remedies—likely during the complaint-drafting process.[4] I don't remember giving that article to ChatGPT, but it's possible I did. It's also possible it was a pure hallucination and ChatGPT just pulled the case from the internet and fabricated the quote.

## (7)  Cascade Yarns, Inc. v. Knitting Fever, Inc.

**ERROR TYPE:**

(#3) Authority cited for the incorrect proposition, mischaracterized, and mis-quoted.

**FILED TEXT:**

PageID: 2223, Dkt. 141 (Pls.' Opp. to Fenix Defs' Mot. to Dismiss)

> These allegations support a reasonable inference of mutual awareness and cooperation—*i.e.*, an agreement to participate in a common fraudulent enterprise. *See Cascade Yarns, Inc. v. Knitting Fever, Inc.,* 2011 WL 4538422, at *8 (W.D. Wash. Jan. 3, 2011) ("an agreement may be inferred from the specific acts and relationships alleged"). . . .

PageID: 2224, Dkt. 141 (Pls.' Opp. to Fenix Defs' Mot. to Dismiss)

> This includes specific conduct, economic interdependence, and coordination across actors-hallmarks the Ninth Circuit has recognized as sufficient to infer agreement. *See Cascade Yarns,* 2011 WL 4538422, at *8; *see also* Section E, *infra.*

---

4    *See* Andrew F. Halaby and Patrick W. Kelly, "Disgorgement of Profits as a California Breach of Contract Remedy: Intellectual Property and Other Guideposts," 152 UC Davis Business L. J. 19 Ed. 2] (citing *Van de Kamp v. Bank of America*, 204 Cal. App. 3d 819, 865 (1988).

APPENDIX A TO DECLARATION OF CELESTE H.G. BOYD

**ERRORS AS IDENTIFIED BY DEFENDANTS:**

> I ran a Westlaw search for *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, 2011 WL 4538422 (W.D. Wash. Jan. 3, 2011) using the Westlaw number provided, which directed me to *Moe's Stop One, Inc. v. Ohio Liquor Control Commission*, No. 11AP-143, 2011 WL 4538422 (Ohio Ct. App. Sept. 30, 2011). The quoted language does not appear in *Moe's Stop One*. I ran a Westlaw search for *Cascade Yarns* using the name of the case, and found a January 3, 2011 order, available at *Cascade Yarns, Inc. v. Knitting Fever, In*c., No. C10-861 RSM 2011 WL 31862 (W.D. Wash. Jan. 3, 2011).

> The quoted language does not appear in the *Cascade Yarns* January 3, 2011 order. I searched the 43 orders in the *Cascade Yarns* case available on Westlaw for the quoted language. None of them contain the quoted language. I ran a Westlaw search for the exact quoted language and found no cases containing this exact language.¶ 15.

> Neither *Moe's Stop One* (which Plaintiffs' Westlaw citation directs to) nor the January 3, 2011 order in *Cascade Yarns* contain language describing those factors as Ninth Circuit hallmarks for inferring agreement.

> Dkt. 164 ¶¶ 13–15.

**WHAT HAPPENED?**

The *Cascade Yarns* citation first appeared in a brief section drafted by co-counsel (received Tue, Jul 15, 12:47 PM).

> *See Cascade Yarns, Inc. v. Knitting Fever, Inc.,* No. C10-861 RSM, 2011 U.S. Dist. LEXIS 279, at *28 (W.D. Wash. Jan. 3, 2011) ("Taking these allegations as true, the Court can infer from the specific acts and relationships alleged in the Amended Complaint that an agreement existed between these parties.").

I provided that text to ChatGPT (along with an entire section) with instructions to look for places to tighten the argument to conserve space. I do not see a specific request to convert citations to Westlaw; ChatGPT appears to have taken that on itself, and it then modified the language to this:

> These allegations establish "defined roles and interdependent relationships," sufficient to infer agreement. *See Cascade Yarns, Inc. v. Knitting Fever, Inc*., 2011 WL 4538422, at *8 (W.D. Wash. Jan. 3, 2011).

I commented generally on the relevant section that I'd "like to see more direct quotes from the case law" where possible. The next version it provided:

APPENDIX A TO DECLARATION OF CELESTE H.G. BOYD

> See *Cascade Yarns, Inc. v. Knitting Fever, Inc*., 2011 WL 4538422, at *8 (W.D. Wash. Jan. 3, 2011) (agreement may be inferred from "specific acts and relationships" among the parties).

After multiple rounds of additional edits, the final version was copied into my edits to co-counsel's draft (7/16/25, 3:47 PM):

> *See Cascade Yarns, Inc. v. Knitting Fever, Inc.*, 2011 WL 4538422, at *8 (W.D. Wash. Jan. 3, 2011) ("an agreement may be inferred from the specific acts and relationships alleged").

APPENDIX A TO DECLARATION OF CELESTE H.G. BOYD