JASON D. RUSSELL (SBN 169219)
jason.russell@skadden.com
PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
HILLARY A. HAMILTON (SBN 218233)
hillary.hamilton@skadden.com
RAZA RASHEED (SBN 306722)
raza.rasheed@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2000 Avenue of the Stars, Suite 200N
Los Angeles, California 90067
Telephone:   (213) 687-5000
Facsimile:    (213) 687-5600

Attorneys for Specially Appearing Defendants
Fenix International Limited and Fenix Internet LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated,<br><br>                     Plaintiffs,<br><br>    v.<br><br>FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC, MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC,<br><br>                   Defendants. | CASE NO.: 8:24-cv-01655-FWS-SSC<br><br>**(1) SPECIALLY APPEARING DEFENDANTS FENIX INTERNATIONAL LIMITED'S AND FENIX INTERNET LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE CORRECTED BRIEFS; and**<br><br>**FILED UNDER SEPARATE COVER:**<br><br>**(2) DECLARATION OF JASON D. RUSSELL IN SUPPORT.**<br><br>Date:        September 25, 2025<br>Time:       10:00 a.m.<br>Judge:     Hon. Fred W. Slaughter<br>Courtroom:  10D |

1

**TABLE OF CONTENTS**

2    TABLE OF AUTHORITIES ........................................................................ii

3    PRELIMINARY STATEMENT ................................................................1

4    BACKGROUND .........................................................................................4

5    ARGUMENT ...............................................................................................6

6        I.    Over the Past Two Months, Plaintiffs' Counsel Failed to Review or
7            Supervise Filings To This Court on Multiple Occasions, Leading to
        Hallucinated Briefs ........................................................................6

8            A.    Robert Carey and Hagens Berman ..................................6

9            B.    Celeste Boyd ....................................................................9

10       II.   Plaintiffs' Counsel Filed a Frivolous, Self-Mooting Motion to
11          Continue ........................................................................................10

12      III.  Plaintiffs Should Not Be Rewarded With Additional Opportunities to
       Prejudice Defendants..................................................................12

13      IV.  Counsel's Efforts to Excuse Their Misconduct Lack Merit .................14

14   CONCLUSION ..........................................................................................20

15   CERTIFICATE OF COMPLIANCE .........................................................21

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s):</u>

## <u>CASES</u>

*ByoPlanet International, LLC v. Johansson*,
    Nos. 0:25-cv-60630-LEIBOWITZ, 0:25-cv-60646-LEIBOWITZ, 0:25-cv-60647-LEIBOWITZ, 0:25-cv-60712-LEIBOWITZ,
    2025 WL 2091025 (S.D. Fla. July 17, 2025) .......................................... 12

*EpicentRx, Inc. v. Superior Court*,
    18 Cal.5th 58 (2025) ......................................................................... 15

*Grant v. City of Long Beach*,
    96 F.4th 1255 (9th Cir. 2024) ....................................................... 2, 14

*Johnson v. Dunn*,
    No.: 2:21-cv-1701-AMM,
    2025 WL 2086116 (N.D. Ala. July 23, 2025) .............................. 3, 13, 14

*Lacey v. State Farm General Insurance Co.*,
    No. CV 24-5205 FMO (MAAx),
    2025 WL 1363069 (C.D. Cal. May 5, 2025) ................................ 9, 10, 14

*Link v. Wabash Railroad Co.*,
    370 U.S. 626 (1962) ....................................................................... 19, 20

*Mata v. Avianca, Inc.*,
    678 F. Supp. 3d 443 (S.D.N.Y. 2023) .................................................. 12

*Matter of Kostiv*,
    No. SBC-22-O-31036,
    2024 WL 5256333 (Cal. Bar Review Dep't Dec. 13, 2024) ..................... 8

*Mavy v. Commissioner of Social Securit y Administration*,
    No. CV-25-00689-PHX-KML (ASB),
    2025 WL 2355222 (D. Ariz. Aug. 14, 2025) ................................*passim*

*Palomo v. State Bar*,
    36 Cal. 3d 785 (1984) ......................................................................... 8

*Park v. Kim*,
    91 F.4th 610 (2d Cir. 2024) ................................................................ 7

*Pavelic & LeFlore v. Marvel Entertainment Group*,
    493 U.S. 120 (1989)............................................................................... 7

*Pioneer Investment Services Co. v. Brunswick Associates L.P.*,
    507 U.S. 380 (1993)............................................................................. 19

*Simmons v. State Bar*,
    70 Cal. 2d 361 (1969)........................................................................... 8

*Unioil, Inc. v. E.F. Hutton & Co.*,
    809 F.2d 548 (9th Cir. 1986), *overruled on other grounds by*
    *In re Keegan Management Co., Securities Litigation*,
    78 F.3d 431, 435 (9th Cir. 1996). ........................................................ 7

*United States v. Boyle*,
    469 U.S. 241 (1985)............................................................................. 19

*United States v. Hayes*,
    763 F. Supp. 3d 1054 (E.D. Cal. 2025) .............................................. 12

## STATUTES

28 U.S.C. §1927 .................................................................................... 11

## RULES

Fed. R. Civ. P. 11(b)(2)................................................................... 2, 7, 9

California Rule of Professional Conduct 1.0.1(h) ..................................... 8

California Rule of Professional Conduct 1.1(a)................................... 2, 10

California Rule of Professional Conduct 1.1(b) ..................................... 10

California Rule of Professional Conduct 1.16(a)(3)............................ 2, 10

California Rule of Professional Conduct 1.3(b) ..................................... 17

California Rule of Professional Conduct 3.1(a)(2)............................ 2, 7, 9

California Rule of Professional Conduct 5.1(b) ................................... 2, 8

Central District California Local Rule 11-6.1 ....................................... 21

Central District California Local Rule 83-3.1.2 ..................................... 8

1
2
3
## <u>OTHER AUTHORITIES</u>
4
California Bar Standing Cmte. on Professional Responsibility & Conduct,
   *Practical Guide for the Use of Generative Artificial Intelligence in the
   Practice of Law*,
   https://www.calbar.ca.gov/Portals/0/documents/ethics/Generative-AI-
   Practical-Guidance.pdf ................................................................................. 2, 9, 10

Brooke S. Staley, et al., *Attention-Deficit/Hyperactivity Disorder Diagnosis,
   Treatment, and Telehealth Use in Adults — National Center for Health
   Statistics Rapid Surveys System, United States, October–November 2023*,
   Centers for Disease Control (Oct. 10, 2024),
   https://www.cdc.gov/mmwr/volumes/73/wr/mm7340a1.htm#:~:text=Discuss
   ion,used%20telehealth%20for%20ADHD%20services.......................................... 16

Damien Charlotin, Paris School of Advanced Business Studies,
   AI Hallucination Cases Database,
   https://www.damiencharlotin.com/hallucinations/?q=&sort_by=-
   date&period_idx=0 .................................................................................................. 18
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

## PRELIMINARY STATEMENT

Defendants Fenix International Limited and Fenix Internet LLC (collectively, "Fenix") respectfully oppose Plaintiffs' motion for leave to file corrected briefs (ECF 176, "Motion").[1] The Motion is unjustified given Plaintiffs' misconduct, including but not limited to Plaintiffs' seeking to continue the September 4 hearing via a regularly noticed Motion to Continue, which, as the Court recognized in its Order yesterday, was moot the instant it was filed. (*See* ECF 184 PageID#3135 n.1 (noting that "Plaintiffs' request for Continuances will be moot if addressed at the hearing set on September 25, 2025").)

In filings and public statements from August 20th to 29th, 2025, Plaintiffs admit that four separate briefs they filed with this Court—three oppositions to dispositive motions submitted on July 17, 2025, and one opposition submitted on August 11, 2025—were riddled with dozens of AI-hallucinated cases, quotations, and record citations. (*See* Declaration of Jason D. Russell ("Russell Decl.") Exs. 1-4; ECF 164, 168, 175-176, 178.) Plaintiffs admittedly outsourced their legal research and brief writing to a contract attorney named Celeste Boyd. (*See* ECF 176-1.) In turn, Ms. Boyd, a member of the bar of this Court, but not counsel of record in this action, freely used ChatGPT to draft and edit the oppositions to save time while caring for her ailing father, without verifying the integrity of her machine-generated work. (*See* ECF 176-2.)

Had Plaintiffs' counsel merely explained the circumstances that led to these submissions, Fenix would have briefly opposed the relief sought. But Plaintiffs' counsel chose to go further, attempting to justify and minimize the wrongdoing here and, incredibly, to lay blame on Fenix's counsel. The sworn factual statements offered by Plaintiffs' counsel are internally inconsistent and conflict with statements they made to the press to try and "spin" the narrative. Fenix is left with no choice but to correct the record and to address what may be the worst misuse of AI in any of the more than 200 public instances where AI was used in submissions to a United States court.

---

[1]    Unless otherwise noted, all emphasis is added, and all citations, brackets, footnotes and internal quotation marks are omitted from quoted material for ease of reading.

1   Based on the materials filed, none of Plaintiffs' *ten* attorneys that signed these briefs

2   from the Hagens Berman, Tycko & Zavareei, Dorsey & Whitney, and Timoney Knox law

3   firms supervised Ms. Boyd to ensure her compliance with Rule 11, this Court's Standing

4   Order, and California ethics standards regarding the use of generative AI, or verified the

5   citations in the briefs before signing and filing them. (ECF 176, PageID#2739, 2741-42.)

6   At best, Hagens Berman now claims to have performed a cursory "spot cite-check" of a

7   few cites in *one* of the four briefs, and then only because the signing attorney suspected AI

8   had been used. (ECF 176-1 ¶23.) Unfortunately, as this Court has already explained, this

9   "spot cite-check[]" did not reveal the errors riddling the brief—let alone the three other

10  filings that apparently went unchecked. (ECF 184 PageID#3138-39; *see also* ECF 178-1

11  ¶16.)

12      The conduct admitted to by Plaintiffs' counsel justifies—at a minimum—denying

13  Plaintiffs' current Motion and striking Plaintiffs' tainted briefs. *See, e.g.*, *Grant v. City of*

14  *Long Beach*, 96 F.4th 1255, 1257 (9th Cir. 2024) (striking AI-tainted briefs and dismissing

15  appeal). Plaintiffs' counsel were required to supervise Ms. Boyd's work and review the

16  cases she cited to ensure the integrity of Plaintiffs' filings. FRCP 11(b)(2); Cal. R. Prof'l

17  Conduct 5.1(b); Cal. Bar Standing Cmte. on Prof'l Responsibility & Conduct, *Practical*

18  *Guide for the Use of Generative Artificial Intelligence in the Practice of Law* 3,

19  https://www.calbar.ca.gov/Portals/0/documents/ethics/Generative-AI-Practical-

20  Guidance.pdf ("Cal. AI Ethics"). They chose not to do either. (*See* ECF 176-1 ¶14; ECF

21  176 PageID#2741 ("we did not check [Ms. Boyd's] work").) As this Court has already

22  explained, Plaintiffs "failed to sufficiently check the accuracy of the AI-generated content,"

23  contrary to Plaintiffs' purported "standard practice." (ECF 184 PageID#3138.)

24      Ms. Boyd was required to verify the integrity of the AI-generated portions of her

25  briefs and to withdraw from the representation if the strain of caring for her ailing father

26  was too intense to permit her to perform professionally competent work. Cal. R. Prof'l

27  Conduct 1.1(a), 1.16(a)(3), 3.1(a)(2). She chose not to do these things either. (ECF 176-2

28  ¶18.) None of these choices were Fenix's fault, which is why Fenix should not have to bear

the prejudice of responding to Plaintiffs' purportedly "corrected briefs," nor have resolution of Fenix's meritorious dispositive motions delayed while Plaintiffs attempt to file the briefs they should have submitted initially. *See Mavy v. Comm'r of Soc. Sec. Admin.*, 2025 WL 2355222, at *9 (D. Ariz. Aug. 14, 2025) (declining to permit briefs correcting AI hallucinations as failing to cure the prejudice and diminishing the seriousness of the violations); *Johnson v. Dunn*, 2025 WL 2086116, at *16 (N.D. Ala. July 23, 2025) (same).

Separately, this Court has already explained that Plaintiffs' Motion to Continue the September 4 hearing was moot when it was filed. (ECF 184 PageID#3135 n.1.) That means the Motion to Continue was a waste of Defendants' and the Court's time that served no purpose beyond creating work for Defendants over Labor Day weekend. Although the Court (generously) chose to construe the Motion to Continue as an ex parte application before denying it, Plaintiffs had no reason to expect that the Court would address their motion before the hearing date. And Fenix was in the midst of finalizing its opposition to that motion, which would have been due on September 4th if treated as a regularly noticed motion, when the Court accelerated resolution of it and denied the continuance motion.

All of this is reason enough to deny Plaintiffs leave to file corrected briefs, but there is more. Plaintiffs' filings repeatedly proclaim they have been contrite and forthcoming with the Court about the shortcomings that led to the four AI-tainted briefs. (*See, e.g.*, ECF 176 PageID#2748.) The reality of the situation is less flattering. None of the filings submitted by the Hagens Berman firm acknowledge their misconduct in failing to supervise Ms. Boyd's work closely enough to learn that she was using AI at all, much less ensure that she did so in an ethically responsible way. To the contrary, Hagens Berman's filings attempt to minimize the firm's culpability by blaming Ms. Boyd, tight deadlines, and most implausibly, Fenix's counsel for this situation, even though Plaintiffs' lead attorney admits that he suspected AI hallucinations in one brief *before the filing*. (*See* ECF 176-1 ¶23, 178 PageID#3095 (arguing Fenix have "unclean hands" for revealing Plaintiffs' AI hallucinations to the Court, rather than opposing counsel); *see also* ECF 184 PageID#3138

3

(noting Plaintiffs "were advised that some citations were inaccurate and even spot cite-checked cases on July 17… yet failed to check the parenthetical quotes).) And Plaintiffs' excuses do not explain the filing of yet *another* opposition containing even more egregious AI errors weeks later, again without the required verification of the citations by the signing attorney.

For her part, Ms. Boyd attributes her misconduct to the strain from her father's declining health and subsequent passing (which is understandable, if not excusable), and also her ADHD diagnosis and the nature of remote work (which is neither understandable nor excusable). (ECF 176-2 ¶¶10 n.1, 13.) The attorneys from the other three firms appearing on the briefs have said nothing at all, even though it appears they may have drafted portions of some of the submissions containing AI-hallucinations. (ECF 176-1 ¶9.)

Read together, Plaintiffs' papers give an impression of a group of attorneys trying to manage bad litigation optics, rather than taking responsibility for their actions and omissions. The moving papers fail to meaningfully explain why none of Plaintiffs' counsel of record (or the more than 500 attorneys employed at their firms) cite-checked their briefs, how the same process failures could have occurred in four distinct filings, or why Ms. Boyd operated with so little supervision that Plaintiffs filed a brief where 11 of the 18 cases cited were tainted by AI hallucinations. (*See* ECF 168.) Plaintiffs' counsel's attempts to pass the buck and lack of contrition are all the more reason why the Court should decline to exercise its discretion to permit Plaintiffs to file "corrected" briefs, all to Defendants' prejudice.

For these reasons, and those below, the Court should deny the Motion for Leave.

## BACKGROUND

The Motion for Leave concerns Plaintiffs' efforts to remedy AI hallucinations in four briefs filed between July 17 and August 11, 2025.

On May 23, 2025, various Defendants moved to dismiss Plaintiffs' claims on a variety of grounds. (ECF 121, 124-29.) That same day, the Defendants filed a motion to strike claims asserted by the three Plaintiffs who do not reside in California, since the Court

1  already ruled that those Plaintiffs are bound by a forum selection clause requiring them to
2  litigate their claims in the courts of England and Wales. (ECF 123.)

3      Plaintiffs filed their oppositions to these motions seven weeks later, after requesting
4  and obtaining two extensions of time and a 9,000-word extension of the Court's default
5  word limit. (ECF 131, 133, 136.) Specifically, on July 17, 2025, Plaintiffs filed oppositions
6  to Fenix's motion to dismiss, a consolidated opposition to the Agency Defendants' motion
7  to dismiss, and an opposition to Defendants' motion to strike. (ECF 138, 140-1, 142.)

8      On July 31, 2025, Fenix filed a motion for partial reconsideration of the Court's prior
9  ruling declining to enforce a forum selection clause against the two California-resident
10  Plaintiffs. (ECF 147.) On August 11, 2025, after obtaining a four-day extension, Plaintiffs
11  filed an opposition to that motion. (ECF 151, 158.)

12      On August 18, 2025, Fenix filed reply briefs in support of their motions to dismiss
13  and for reconsideration. (ECF 163, 167.) In their reply briefs, Fenix catalogued more than
14  30 apparent AI hallucinations in Plaintiffs' oppositions to Fenix's motions. (ECF 164, 168.)

15      On August 21, 2025, Plaintiffs filed a notice to the Court admitting that there were
16  improper AI hallucinations in their briefing, and promising to file a motion for leave to
17  submit corrected briefs on August 27. (ECF 175.)

18      On August 28, 2025, Plaintiffs filed their Motion for Leave. In it they explain that
19  Plaintiffs' twelve counsel of record largely outsourced their legal research, brief-writing,
20  and quality-control process to contract attorney Celeste Boyd, and claim that she
21  improperly used AI to draft and edit the briefs in question but they did not catch the errors
22  because they trusted Ms. Boyd's work and did not have time to perform a proper cite-
23  check. (ECF 176 PageID#2737-2743.) Ms. Boyd submitted a declaration explaining she
24  routinely used ChatGPT to develop her arguments and edit her work, but failed to follow
25  her usual protocols for verifying ChatGPT's work because of her father's declining health,
26  and she thought ChatGPT's language prediction model would adhere to her instructions
27  not to use fake cases or make up language not present in real cases. (ECF 176-2.)

28

1    Seven hours after filing the Motion for Leave, Plaintiffs filed their Motion to

2  Continue, claiming (among other things) that they could not be prepared for the September

3  4 hearing date a week later due to their termination of Ms. Boyd, "who otherwise would

4  have been an integral member of the argument-preparation team," and, incredibly, blaming

5  Fenix for not alerting them to the AI hallucinations sooner and stipulating to their filing

6  corrected briefs. (ECF 178 PageID#3101, 3104.)

7    On September 2, 2025, this Court denied Plaintiffs' Motion to Continue. The Court

8  found that Plaintiffs' Motion to Continue was moot when it was filed, and that Plaintiffs

9  "created the crisis" by "fail[ing] to sufficiently check the accuracy of the AI-generated

10  content." (ECF 184 PageID#3138.) The Court also explained that Plaintiffs "were on alert

11  that there were inaccurate citations since July 17, 2025," and thus had not been diligent in

12  seeking a continuance. (*Id.* PageID#3139.)

13                                   **ARGUMENT**

14    Plaintiffs' admissions prove that their counsel committed professional misconduct

15  during the preparation and filing of Plaintiffs' oppositions to Defendants' dispositive

16  motions and then compounded that misconduct by filing a frivolous, self-mooting Motion

17  to Continue that was irrelevant before it could be heard. Their attempts to justify or shift

18  the blame for that misconduct using unconvincing explanations and frivolous procedural

19  maneuvers have only compounded those mistakes. This misconduct has caused, and

20  continues to cause, a substantial waste of party and judicial resources. Plaintiffs should not

21  be rewarded for their counsel's misconduct with more briefing aimed at further prejudicing

22  the Defendants. Plaintiffs forfeited their right to oppose the Motions through their actions.

23  **I.    Over the Past Two Months, Plaintiffs' Counsel Failed to Review or Supervise**

24  **Filings To This Court on Multiple Occasions, Leading to Hallucinated Briefs**

25      **A.    Robert Carey and Hagens Berman**

26    Mr. Carey and his colleagues appear to have committed at least two different kinds

27  of professional misconduct in preparing and filing the briefs in question, and in their

28  subsequent communications to the Court.

*First*, FRCP 11(b)(2) specifies that: "By presenting to the court a… paper… an attorney… certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances… the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." FRCP 11(b)(2); Cal. R. Prof'l Conduct 3.1(a)(2) (same rule). The "duties imposed by Rule 11 require that attorneys read, and thereby confirm the existence and validity of, the legal authorities on which they rely." *Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024). Indeed, there is "no other way to ensure that the arguments made based on those authorities are 'warranted by existing law.'" *Id.* Notably, "the signing attorney cannot leave it to some trusted subordinate… to satisfy himself that the filed paper is factually and legally responsible; by signing he represents not merely the fact that it is so, but also the fact that he personally has applied his own judgment." *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 125 (1989). Put differently, Rule 11 duties are non-delegable. *Unioil, Inc. v. E.F. Hutton & Co.*, 809 F.2d 548, 558 (9th Cir. 1986) ("An attorney who signs the pleading cannot simply delegate to forwarding co-counsel his duty of reasonable inquiry.").

Here, Mr. Carey and his colleagues acknowledge they did not read the legal authorities cited by Ms. Boyd before filing the AI-tainted briefs. (ECF 176 PageID#2741.) Indeed, that much is obvious; as the Court explained, if the Hagens Berman team had conducted appropriate cite-checking, they surely would have discovered Ms. Boyd's misconduct. (*See* ECF 184 PageID#3138 (noting "Hagens Berman did not thoroughly cite check the attorney's AI-generated work product").) Accordingly, Mr. Carey and his team violated Rule 11(b)(2) by certifying that their briefs' legal contentions were accurate without having actually read the "authorities on which they rel[ied]." *Park*, 91 F.4th at 615; *Mavy*, 2025 WL 2355222, at *9 (finding a Rule 11 violation based on counsel's failure to review authorities cited in contract attorney's brief).

*Second*, Mr. Carey and his team violated the California Rules of Professional Conduct by failing to conduct meaningful supervision of Ms. Boyd's activities. *See* C.D.

Cal. Civ. L.R. 83-3.1.2 (attorneys practicing in this Court are bound by "the Rules of Professional Conduct of the State Bar of California"). California ethics rules require attorneys "having direct supervisory authority over another lawyer, whether or not a member or employee of the same law firm," to "make reasonable efforts to ensure that the other lawyer complies" with the Rules of Professional Conduct. Cal. R. Prof'l Conduct 5.1(b). Reasonable efforts are those that would be made by "a reasonably prudent and competent lawyer." *Id.* R. 1.0.1(h). Giving a subordinate "no supervision" amounts to willful misconduct. *See, e.g.*, *Palomo v. State Bar*, 36 Cal.3d 785, 795-96 (1984); *Simmons v. State Bar*, 70 Cal.2d 361, 367 n.3 (1969) (attorneys are responsible for events occurring as a result of court filings that the attorney should have supervised); *Matter of Kostiv*, 2024 WL 5256333, at *5 (Cal. Bar Review Dep't Dec. 13, 2024) (similar).

Here, to start, Mr. Carey claims that his team "are" aware that this Court requires attorneys to disclose use of AI when drafting briefs. (ECF 176-1 ¶23.) None of the tainted briefs contain any certification about the use of AI. (ECF 138, 140-1, 142, 158.) Mr. Carey claims he was unaware Ms. Boyd used AI, and thought she would never do so. (ECF 176-1 ¶23.) Yet, Ms. Boyd admits she regularly used AI in her work and she was unaware of the Court's disclosure requirement (despite being a member of the bar of this Court). (ECF 176-2 ¶¶14-21.) The only way this confusion between Hagens Berman and Ms. Boyd could have occurred is if no one on Mr. Carey's team informed Ms. Boyd of the AI disclosure requirement (assuming they were aware of it before Fenix cited it in their reply briefing) or exercised enough supervision over her work to learn of her apparently extensive and long-standing AI use.

Mr. Carey and his team dubiously claim they "reviewed the briefs [they filed on July 17] in full" but admit they failed to conduct professionally appropriate cite checking of Ms. Boyd's work that would have revealed the AI hallucinations, because they "did not think that forgoing a full cite-check would be problematic." (ECF 176-1 ¶11.) As Mr. Carey told the press shortly after the AI hallucinations came to light, because of their "longstanding relationship with" Ms. Boyd, he and his team "just didn't think we needed to check her

8

work." (Russell Decl. Ex. 2.) This admission conflicts with Mr. Carey's sworn statement claiming that shortly before *one* of the filings in question, he and his team discovered citation errors that led him to suspect improper AI use. (ECF 176-1 ¶23 (Mr. Carey thought errors "perhaps" occurred "from someone using AI")).) Rather than conducting a full cite-check of the filing in question, Mr. Carey allegedly pulled up a handful of randomly picked cases from the brief on Westlaw "to ensure that there were no 'fake' cases yet failed to check the parenthetical quotes." (ECF 184 PageID#3138.) Thus, even after Mr. Carey had notice of potentially improper citations, Hagens Berman submitted all three oppositions without taking any professionally reasonable steps to ensure their integrity.

And Mr. Carey admits that weeks later, on August 11, due to Ms. Boyd's "last-minute drafting and editing, Hagens Berman again did not cite-check Ms. Boyd's work, given her history of excellence." (ECF 176-1 ¶13.) Even performing the same rudimentary "spot cite-checking" likely would have revealed that 11 of the 18 cases cited were misrepresented. (ECF 184 PageID#3138.) But for their August 11 brief, Hagens Berman apparently performed *no* cite-checking whatsoever.

## B. <u>Celeste Boyd</u>

While Fenix sympathizes with Ms. Boyd's personal situation, from an ethics perspective, she failed to take appropriate actions consistent with her professional obligations to the Court and her clients.

***First***, Ms. Boyd violated FRCP 11(b)(2) and California Rule of Professional Conduct 3.1(a)(2) by using ChatGPT to draft and revise her work without checking the integrity of the resulting legal citations. As Judge Wilner recently explained, "no reasonably competent attorney should out-source research and writing to [AI] technology – particularly without any attempt to verify the accuracy of that material." *Lacey v. State Farm Gen. Ins. Co.*, 2025 WL 1363069, at *3 (C.D. Cal. May 5, 2025). Yet Ms. Boyd used notoriously unreliable software to generate submissions to the Court without taking what she acknowledges to be necessary and appropriate steps to ensure the integrity of her work. (*See* ECF 176-2 ¶¶18-19); Cal. AI Ethics at 2 ("It is possible that generative AI outputs

9

could include information that is false, inaccurate, or biased. A lawyer must ensure competent use of the technology, including the associated benefits and risks, and apply diligence and prudence with respect to facts and law."). That was "flat-out wrong." *Lacey*, 2025 WL 1363069, at *3.

***Second***, Ms. Boyd's conduct violated Rule 1.1, prohibiting attorneys from "recklessly, with gross negligence, or repeatedly fail[ing] to perform legal services with competence," defined as "apply[ing] the (i) learning and skill, and (ii) mental, emotional, and physical ability reasonably necessary for the performance of" legal services. Cal. R. Prof'l Conduct 1.1(a)-(b); Cal. AI Ethics at 2. Ms. Boyd repeatedly outsourced critical aspects of her brief writing responsibilities to ChatGPT and failed to check its work, even though she knew that doing so was reckless and contrary to her own internal procedures. (*See* ECF 176-2 ¶¶18-19.) Ms. Boyd should have known better; indeed, she has apparently taught classes on legal technology (including AI use) at Stanford Law School. (Russell Decl. Ex. 6 (Ms. Boyd's CV).) She therefore repeatedly failed to perform legal services with professional competence.

Ms. Boyd states she failed to render professionally competent services due to the emotional strain of caring for her ailing father. (*See* ECF 176-2 ¶¶18-19.) The tremendous strain of providing end-of-life care for a loved one can be overwhelming for anyone. Yet as fiduciaries for their clients and officers of the Court, attorneys under extreme emotional strain must be prepared to "withdraw from the representation of a client if… the lawyer's mental or physical condition renders it unreasonably difficult to carry out the representation effectively." Cal. R. Prof'l Conduct 1.16(a)(3). When Ms. Boyd became so overwhelmed that it began to compromise her ability to follow her usual quality-control protocols, she needed to take steps to ensure that other attorneys on Plaintiffs' sizeable litigation team could pick up the slack. She did not.

## II.    **Plaintiffs' Counsel Filed a Frivolous, Self-Mooting Motion to Continue**

Plaintiffs committed further misconduct in their efforts to gain a litigation advantage from their improper use of AI. As shown, Rule 11 and multiple ethics rules prohibit

10

attorneys knowingly taking legally meritless positions in Court filings. And 28 U.S.C. §1927 prohibits parties from "multipl[ying] the proceedings in any case unreasonably and vexatiously."

Plaintiffs knowingly violated these rules by filing their Motion to Continue the September 4 hearing on Defendants' dispositive motions. Plaintiffs filed the Motion to Continue on August 28—a week before the hearing. But instead of filing an *ex parte* application, which would have allowed the Court to rule on Plaintiffs' request for a continuance before the hearing, Plaintiffs filed their Motion to Continue as a regularly noticed motion with a hearing set for September 25, 2025.

That conduct was frivolous and unreasonably multiplied these proceedings. As the Court recognized, by filing the Motion to Continue on regular notice, Plaintiffs made the Motion self-mooting. (*See* ECF 184 PageID#3135 n.1 (noting that "Plaintiffs' request for Continuances will be moot if addressed at the hearing set on September 25, 2025")).) Adding insult to injury, Plaintiffs filed the Motion late before Labor Day weekend, ensuring Fenix's counsel had to work the holiday weekend opposing a frivolous motion because its opposition would have been due on September 4th if treated as a regularly noticed motion.

Plaintiffs knew that this course was improper. Unlike the Motion for Leave, most of Plaintiffs' twelve attorneys of record declined to permit their names to appear on the Motion to Continue, which strongly suggests that all counsel *except* Hagens Berman understood the problems with this maneuver. Moreover, the day before they filed the Motion to Continue, Plaintiffs' counsel Leonard Aragon of the Hagens Berman firm emailed the Court's Courtroom Deputy for advice on how to present the Motion to Continue in light of the fact that *ex parte* applications are disfavored, claiming "Plaintiffs are prepared to file a motion to continue the hearing…, but the earliest we can set the hearing is September 25, which is after the relevant hearing." (Russell Decl. Ex. 5.)

Put differently, Plaintiffs knew that the Motion to Continue needed to be presented *ex parte* to have any chance of success (however remote), but knew they could not meet

the standard for emergency relief. The Court recognized this when it construed the Motion as an *ex parte* application, and denied it: "Because Plaintiffs failed to sufficiently check the accuracy of the AI-generated content, the court finds that Plaintiffs fail to adequately demonstrate they were 'without fault in creating the crisis that requires *ex parte* relief, or that the crisis occurred as a result of excusable neglect.'" (ECF 184 PageID#3135-38.)

Because Plaintiffs filed the Motion to Continue fully aware it would be moot when filed, requiring Defendants and the Court to expend their resources to address a procedurally improper and facially frivolous motion, Plaintiffs' Counsel committed professional misconduct.

**III.**    **Plaintiffs Should Not Be Rewarded With Additional Opportunities to Prejudice Defendants**

Plaintiffs' admitted professional misconduct prejudiced Defendants and the Court. As one court recently explained in confronting similar AI hallucinations:

> Many harms flow from the submission of fake opinions. The opposing party wastes time and money in exposing the deception. The Court's time is taken from other important endeavors. The client may be deprived of arguments based on authentic judicial precedents. There is potential harm to the reputation of judges and courts whose names are falsely invoked as authors of the bogus opinions and to the reputation of a party attributed with fictional conduct. It promotes cynicism about the legal profession and the American judicial system. And a future litigant may be tempted to defy a judicial ruling by disingenuously claiming doubt about its authenticity.

*Mata v. Avianca, Inc.*, 678 F.Supp.3d 443, 448-49 (S.D.N.Y. 2023); *accord United States v. Hayes*, 763 F.Supp.3d 1054, 1063-64 (E.D. Cal. 2025); *ByoPlanet Int'l, LLC v. Johansson*, 2025 WL 2091025, at *2 (S.D. Fla. July 17, 2025).

Those harms are manifestly present here. As the redlines Plaintiffs submitted with their proposed corrected briefs show, Plaintiffs' oppositions were riddled with improper citations. (*See* ECF 176-4, 176-6, 176-8, 176-10.) Fenix were forced to spend significant

1  time and resources identifying and cataloguing more than 30 AI hallucinations that affected
2  Fenix directly.

3  Ironically, one reason Plaintiffs' counsel offered to explain their delayed Motion for
4  Leave is that verifying the citations in their corrected briefing was "a time-consuming
5  process given the length of the briefs *and the importance of reviewing every case cited* in
6  almost 100 pages of briefing." (ECF 178 PageID#3100.) Setting aside that Plaintiffs'
7  counsel should have performed that task *before* filing the offending briefs, that "time-
8  consuming process" meant even more time and effort for Fenix, because they: (1) did not
9  have the benefit of knowing which sections Ms. Boyd researched, (2) did not have the
10 benefit of Fenix's detailed declarations identifying the most problematic citations, and
11 (3) had to be triply sure that Plaintiffs' legal citations were, in fact, fake before alerting the
12 Court, lest they falsely accuse opposing counsel of misconduct. Now it will take more of
13 the Court's time to evaluate the papers the parties have filed in response to Plaintiffs'
14 misconduct, and to decide how to address these issues.

15 Plaintiffs are not entitled to exacerbate that prejudice to Fenix by submitting
16 "corrected" briefing that could have been avoided if Plaintiffs had followed Rule 11 and
17 the Rules of Professional Conduct. Filing corrected briefs does "not remediate the waste
18 and harm [Plaintiffs'] misconduct wrought" because it does not undo the prejudice to Fenix
19 or relieve the Court of the burden evaluating and responding to the misconduct. *See Mavy*,
20 2025 WL 2355222, at *9; *Johnson*, 2025 WL 2086116, at *16 (same). To the contrary,
21 permitting corrected briefing would make matters worse by delaying resolution of Fenix's
22 dispositive motions and requiring them to expend more resources responding to the
23 corrected briefs, while affording Plaintiffs even more time for their arguments.

24 Nor were Plaintiffs diligent in seeking to file "corrected" briefing. This Court found
25 Plaintiffs had been "on alert that there were inaccurate citations since July 17, 2025, and
26 even 'spot cite-checked cases' to ensure there were no fake cases." (ECF 184
27 PageID#3139.) This Court found that Plaintiffs "were not diligent in bringing these issues

28

to the court's attention" when it came to the Motion to Continue. (*Id.*) The same is true of Plaintiffs' Motion for Leave.

Moreover, allowing corrected briefing "would amplify the siren call of unverified AI for lawyers" by making counsel's misconduct essentially consequence-free. *Mavy*, 2025 WL 2355222, at *9; *Johnson*, 2025 WL 2086116, at *16. After all, why should attorneys bother spending time and energy cite-checking AI-tainted briefs if courts will simply permit them to fix any fake citations after the fact?

For these reasons, courts have repeatedly rejected pleas to "allow Counsel to file" amended briefs after submitting briefs with hallucinated citations. *Mavy*, 2025 WL 2355222, at *8; *Johnson*, 2025 WL 2086116, at *16 ("reject[ing] the invitation to consider that actual authorities stand for the proposition that the bogus authorities were offered to support"); *Lacey*, 2025 WL 1363069, at *4 (similar). To the contrary, courts have stricken briefs containing widespread AI hallucinations rather than allowing counsel to fix them. *See, e.g.*, *Grant*, 96 F.4th at 1257 (striking briefs and dismissing appeal). The Court should do the same here.

## IV.    Counsel's Efforts to Excuse Their Misconduct Lack Merit

Plaintiffs' counsel offer numerous excuses to minimize their misconduct and justify their requests for corrected briefing. All of their attempts are unpersuasive.

***First***, Mr. Carey and his Hagens Berman colleagues repeatedly insinuate that their culpability for this situation is diminished because they relied upon and trusted Ms. Boyd. (ECF 176 PageID#2738, ECF 176-1 ¶¶5-7, 11, 13-14.) For example, Plaintiffs repeatedly note that Ms. Boyd graduated from Yale Law School, as if an attorney's duty to supervise turns on which law school they attended. (ECF 176 PageID#2737; Russell Decl. Ex. 2.) Plaintiffs also believed Ms. Boyd to be "a high-level lawyer and brief writer," so they "didn't think [they] needed to check her work." (Russell Decl. Ex. 2; *accord* ECF 176 PageID#2741.)

If Mr. Carey and his team mean to suggest their misconduct is less severe because they justifiably relied on Ms. Boyd, they are mistaken. *See Mavy*, 2025 WL 2355222, at *7

1  (striking briefs and imposing other sanctions where plaintiffs' counsel "acknowledge[d] in
2  [their papers] that [they] bear[] responsibility as the signing attorney[s]," but "other
3  language… deflects that responsibility"). Ms. Boyd is not counsel of record in this case
4  and did not sign any of the tainted briefs. Mr. Carey and his team did. Mr. Carey and his
5  team thus had duties under Rule 11 to ensure their briefs' integrity, and under the California
6  Rules of Professional Conduct to appropriately supervise Ms. Boyd's work, including by
7  ensuring that she did not abuse ChatGPT. *Supra* §I.A. Plaintiffs admit that they failed to
8  discharge these duties. Their "decision to completely cede the accuracy of [their] Brief[s]
9  was intentional," as was their "subsequent decision to signify accuracy by signing" the
10 briefs. *Mavy*, 2025 WL 2355222, at *7. The fact that Mr. Carey and his team outsourced
11 the integrity of their briefs to Ms. Boyd was itself misconduct, not a reason why the Hagens
12 Berman team was somehow *less* culpable in submitting false papers to the Court. *See id.*
13 at *9 (rejecting defense of "I did not know AI was likely used, much less misused" because
14 "Counsel had a duty to know" and "review[] the document[s] before signing").

15 **Second**, Mr. Carey and his team suggest they were unable to conduct appropriate
16 cite-checking because Ms. Boyd submitted her drafts "late." (ECF 176 PageID#2739.) That
17 excuse does not withstand scrutiny. Fenix filed their motion to dismiss on May 23, and
18 subsequently gave Plaintiffs *two extensions of time* to file their opposition brief on July 17.
19 (ECF 121, 131, 133.) Nearly two months is more than enough time to draft and cite-check
20 a brief. If Ms. Boyd was not making timely progress on her work, it was Hagens Berman's
21 duty to manage the situation to ensure that they could either timely submit quality-
22 controlled briefs to the Court, or ask for additional time to file Plaintiffs' opposition. Their
23 decision to do neither is not an excuse for submitting hallucinated law to the Court.

24 Moreover, Plaintiffs largely fail to explain how Plaintiffs' August 11 opposition to
25 Fenix's motion for reconsideration came to misrepresent 11 of the 18 cases cited. Plaintiffs
26 had 11 days to draft that brief, which is more than the 10 days Fenix took to draft the motion
27 for reconsideration after the California Supreme Court issued *EpicentRx, Inc. v. Superior*
28 *Court*, 18 Cal.5th 58 (2025), and included a four-day extension agreed to by Fenix. (ECF

1   151.) If Ms. Boyd's late submission in July hindered Plaintiffs' ability to cite-check that
2   brief, Mr. Carey and his team should have enacted appropriate protocols to vet her next
3   submission four weeks later. Their failure to do so suggests that poor management, and not
4   timing issues, is to blame for Plaintiffs' cite-checking failures.

5   ***Third***, both Mr. Carey and Ms. Boyd cite extenuating circumstances—namely, the
6   health crisis and eventual passing of Ms. Boyd's father. (ECF 176-1 ¶15; ECF 176-2 ¶¶18-
7   19.) Mr. Carey's attempt to invoke Ms. Boyd's family medical crisis only highlights the
8   systemic failings of Hagens Berman. Mr. Carey admits that he and his team were aware
9   that Ms. Boyd's father was ill. (ECF 176-1 ¶15.) Mr. Carey should thus have exercised
10  even *more* supervision over Ms. Boyd's work, including by temporarily re-assigning her
11  tasks to other attorneys or obtaining additional staffing to support her. Instead, he and his
12  team failed to meaningfully supervise Ms. Boyd or check her work—despite Ms. Boyd's
13  personal circumstances. Moreover, Hagens Berman apparently terminated Ms. Boyd
14  shortly after her father's funeral, hardly a demonstration of the sympathy they profess.
15  (ECF 178 PageID#3101.)

16  And to be sure, Ms. Boyd deserves sympathy. Many attorneys know how
17  challenging it is to attempt to practice law while dealing with the decline and death of a
18  parent, and her lapses in judgment are at least understandable, even if they do not excuse
19  her professional misconduct. If Ms. Boyd had attributed her errors solely to her father's
20  health crisis, Fenix would not address the matter further.

21  But parts of Ms. Boyd's declaration involve more cynical justifications. For
22  example, she invokes her diagnosis of ADHD, Attention Deficit Hyperactivity Disorder, a
23  condition that affects more than 15 million American adults. (ECF 176-2 ¶13); Brooke S.
24  Staley, et al., *Attention-Deficit/Hyperactivity Disorder Diagnosis, Treatment, and*
25  *Telehealth Use in Adults — National Center for Health Statistics Rapid Surveys System,*
26  *United States, October–November 2023*, Centers for Disease Control (Oct. 10, 2024),
27  https://www.cdc.gov/mmwr/volumes/73/wr/mm7340a1.htm#:~:text=Discussion,used%2
28  0telehealth%20for%20ADHD%20services. Ms. Boyd also notes that she works remotely

16

as a solo practitioner, and came to rely upon ChatGPT as a substitute for absent professional colleagues. (ECF 176-2 ¶10 n.1 ("I treated ChatGPT as a kind of substitute for the collaborative and logistical support I did not otherwise have.").) If Ms. Boyd means to imply that her ADHD and remote work make her conduct more excusable, she is wrong. Millions of adults (including members of Fenix's legal team) manage complex tasks while working remotely and/or dealing with conditions like ADHD (and far more severe disadvantages), just as thousands of attorneys ethically practice law while dealing with family crises. It defies reality and demeans the profession's integrity to suggest ADHD or remote work make attorneys more susceptible to professional misconduct.

*Fourth*, Plaintiffs argue that their predicament is somehow Fenix's fault. Plaintiffs claim Fenix have no right to oppose Plaintiffs' request for corrected briefing because Fenix failed to alert Plaintiffs' counsel about the AI hallucinations sooner and should have stipulated to allow them to file corrected briefs. (ECF 178 PageID#3095.) This betrays Mr. Carey's and his colleagues' startling lack of contrition for their misconduct. It is also meritless. Plaintiffs submitted at least four filings containing AI hallucinations over a monthlong period. Those filings reflected a pattern of abject misconduct by Plaintiffs' counsel. In response, Fenix's counsel had two relevant duties: (1) file reply briefs containing ethically responsible arguments in favor of Fenix's dispositive motions, and (2) alert the Court about Plaintiffs' misconduct. Cal. R. Prof'l Conduct 1.3(b) (attorneys must act with "with commitment and dedication to the interests of the client"); 8.3(a) (attorneys must report misconduct to the tribunal overseeing the case); *see also* R. 3.4 (listing duties to opposing counsel, which do *not* include giving them opportunities to preemptively correct misconduct). Counsel for Fenix discharged both duties by filing reply briefs on August 18th that alerted the Court to fake citations, and provided valid legal arguments for dismissing this case and/or for partial reconsideration of Fenix's forum non conveniens motion. Plaintiffs' contention that Fenix should have let them quietly file corrected briefs to conceal their misconduct lacks merit and suggests that Plaintiffs misunderstand the roles and obligations of *opposing* counsel to their clients and this Court.

17

1    ***Fifth***, Plaintiffs argue that their misconduct in this case is less egregious than in

2    other cases where attorneys have submitted false, AI-generated citations to federal courts.

3    (ECF 176 PageID#2744-48.) The opposite is true. In this case: (1) Plaintiffs outsourced

4    their legal research and brief writing almost entirely to a contract attorney; (2) that contract

5    attorney used ChatGPT to draft sections of her brief and edit other ones without making

6    sure that the resulting work contained accurate citations or alerting her colleagues that she

7    lacked the capacity to draft the briefs in a responsible way; (3) none of Plaintiffs' twelve

8    attorneys of record (or the roughly 500 other attorneys who work at their law firms, to say

9    nothing of paralegals) meaningfully supervised the contract attorney or cite-checked her

10   work, despite the lead attorney (Mr. Carey) admittedly being aware of the personal strain

11   the contract attorney was under and catching errors that led him to suspect that AI may

12   have been used to draft parts of one of the briefs; (4) as a result, Plaintiffs submitted four

13   AI-tainted briefs over a four-week period; and (5) after the AI hallucinations were exposed,

14   Plaintiffs' counsel repeatedly tried to minimize their culpability—including by blaming

15   opposing counsel—rather than taking responsibility for the numerous and systemic ethical

16   violations that led to the tainted briefs.

17   Damien Charlotin, a research fellow at the Paris School of Advanced Business

18   Studies, maintains a database of (at the time of filing) 212 cases where U.S. courts have

19   responded to AI hallucinations in briefs. *See* AI Hallucination Cases Database,

20   https://www.damiencharlotin.com/hallucinations/?q=&sort_by=-date&period_idx=0.

21   None of those cases appear to involve conduct as severe and pervasive as what happened

22   in this case.

23   The closest appears to be *Mavy v. Commissioner of Social Security*, a recent decision

24   from the District of Arizona. In that case, plaintiff's counsel hired an "experienced and

25   credentialed" contract attorney to draft a brief, based on the contract attorney's

26   "professionalism and prior performance." *Mavy*, 2025 WL 2355222, at *2. However, the

27   contract attorney submitted a draft brief containing several AI hallucinations, apparently

28   due to ongoing health struggles. *Id.* The filing attorney signed her name to the brief without

18

checking the accuracy of its citations. The Court found that the filing attorney's conduct in failing to review the brief violated Rule 11 and revoked her *pro hac vice* status, struck the brief, ordered her to give notice to the judges she misquoted, and referred her to the state bar for professional discipline. *Id.* at *13.

Remarkably, Mr. Carey argues that his conduct is somehow less culpable than the attorney in *Mavy* because, when he suspected that one of the tainted briefs might contain AI hallucinations, he "spot cite-checked" a couple of the cases on Westlaw without verifying that the quotations were correct or that the cases supported Plaintiffs' legal contentions. (ECF 176 PageID#2746.) In fact, Mr. Carey's conduct makes this case much worse. At least the attorney in *Mavy* had no idea that the brief she was signing was tainted. Mr. Carey apparently suspected there may be problems, but filed his brief (and two others) anyway without fully checking them, or requesting additional time to perform cite-checking. (ECF 184 PageID#3138 (finding "Hagens Berman were advised that some citations were inaccurate and even spot cite-checked cases on July 17… yet failed to check the parenthetical quotes").) Hagens Berman compounded that error weeks later, fully aware of the risk of AI and cognizant that Ms. Boyd was dealing with extreme personal circumstances, by submitting a brief containing 11 hallucinations out of 18 total citations, *with no cite-checking whatsoever*.

**Finally**, Plaintiffs argue that the Court should allow corrected briefs because their clients should not suffer any consequences from their attorneys' misconduct. (ECF 176 PageID#2748.) But a basic tenet of our legal system is that a client "cannot… avoid the consequences of the acts or omissions of" his attorney. *See, e.g.*, *Link v. Wabash Railroad Co.*, 370 U.S. 626, 633-34 (1962) ("There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client."); *United States v. Boyle*, 469 U.S. 241, 250 (1985) (similar); *Pioneer Investment Services Co. v. Brunswick Associates L.P.*, 507 U.S. 380, 396 (1993) (similar). "Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-

agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." *Link*, 370 U.S. at 634. Plaintiffs chose to be represented by Mr. Carey, Ms. Boyd, and the others. If those attorneys did not file the best briefs possible, Plaintiffs must live with that result. And, of course, Plaintiffs have recourse if their claims suffer due to the actions and omissions of their counsel.

## CONCLUSION

The Court should deny the Motion as meritless. Plaintiffs' decided to "us[e] AI-generated content in the Opposition Briefs without reviewing the content." (ECF 184 PageID#3138.) Fenix should not pay the price for Plaintiffs' misconduct.

Since they learned of Plaintiffs' misconduct, Fenix have sought the minimum relief necessary to protect themselves from unfair prejudice and comply with their duties to the Court, including revealing the AI hallucinations and opposing this Motion. But that does not mean that there are not bigger issues at stake, or that simply denying the Motion is sufficient. Fenix respectfully submit that the Court must ultimately decide what measures are necessary to remedy and deter this misconduct.

DATED: September 3, 2025    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:_____ */s/ Jason D. Russell*_____
JASON D. RUSSELL
*Attorneys for Specially Appearing Defendants*
Fenix International Limited and Fenix Internet LLC

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants Fenix International Limited and Fenix Internet LLC, certifies that this brief contains 6,985 words, which complies with the word limit of C.D. Cal. L.R. 11-6.1.


DATED: September 3, 2025    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:_____/s/ Jason D. Russell_____
JASON D. RUSSELL
*Attorneys for Specially Appearing Defendants*
Fenix International Limited and Fenix Internet LLC

21