Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Robert B. Carey (*pro hac vice*)
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
leonarda@hbsslaw.com
michellak@hbsslaw.com

*Counsel for Plaintiffs*

*(Additional Counsel on Signature Page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC (d/b/a Siren Agency), MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC (d/b/a CREATORS INC.),

*Defendants*.

Case No. 8:24-cv-01655-FWS-SSC

Hon. Fred W. Slaughter

**SECOND AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. JURISDICTION & VENUE ..... 7

III. PARTIES ..... 8

A. Plaintiffs ..... 8

1. California Plaintiffs ..... 9

a. Plaintiff N.Z. ..... 9

b. Plaintiff R.M. ..... 9

2. Out-of-State Plaintiffs ..... 10

a. Plaintiff B.L. ..... 10

b. Plaintiff S.M. ..... 10

c. Plaintiff A.L. ..... 10

B. Defendants ..... 10

1. Fenix / OnlyFans Defendants ..... 10

2. Agency Defendants ..... 12

IV. FACTS ..... 14

A. History of OnlyFans ..... 14

1. OnlyFans specifically targeted California to develop and grow its business. ..... 18

2. A significant portion of OnlyFans' Business is run from California and the United States. ..... 24

3. OnlyFans banking, payment, and other operations are based in California and the United States. ..... 28

4. OnlyFans TV has significant ties to California and is used to recruit Fans to the OnlyFans platform. ..... 31

C. How OnlyFans Makes Money ..... 42

D. OnlyFans falsely promises Fans "authentic" and "direct" connections with Creators. .......... 49

E. OnlyFans Terms of Service .......... 59

F. OnlyFans allows the "Chatter Scams" because it financially benefits OnlyFans. .......... 66

G. Anatomy of the Chatter Scams .......... 69

1. Agencies exploit cheap labor to "farm" money from Fans by deceptively impersonating Creators. .......... 70

2. An entire ecosystem of third-party CRM tools are facilitating the deception of Fans on the OnlyFans platform to further scale the Chatter Scams. .......... 76

H. OnlyFans allows Chatter Scams to run rampant on its platform. .......... 79

1. OnlyFans actively monitors the traffic on its platform, including information that would allow OnlyFans to detect the use of Chatters by a Creator account. .......... 82

2. OnlyFans intentionally markets to Agencies. .......... 87

3. Fans who discovered the Chatter Scams claim to have directly contacted OnlyFans only to be ignored. .......... 89

I. OnlyFans Actively Facilitates Chatter Scams .......... 93

J. Agency-Specific Facts .......... 99

1. Creators Inc. .......... 99

2. Moxy Management .......... 105

3. Siren Agency .......... 107

4. Unruly Defendants .......... 110

5. Content X .......... 115

6. A.S.H. Agency .......... 117

7. Verge Agency .......... 118

K. Plaintiffs' Stories .......... 121

1. Plaintiff N.Z. .......... 121

2. Plaintiff R.M. .......... 124

3. Plaintiff B.L. .......... 127

4. Plaintiff S.M. .......... 132

5. Plaintiff A.L. .......... 135

V. CLASS ACTION ALLEGATIONS .......... 138

A. The Requirements of Rule 23(a)(1)-(4) Are Satisfied .......... 140

1. Numerosity .......... 140

2. Commonality .......... 140

3. Typicality .......... 141

4. Adequacy .......... 141

B. The Requirements of Rule 23(b)(2) Are Satisfied: Defendants' conduct generally applies to Class, making injunctive relief for the class as a whole appropriate. .......... 142

C. The Requirements of Rule 23(b)(3) Are Satisfied .......... 142

1. Predominance .......... 142

2. Superiority .......... 143

VI. TOLLING OF STATUTE OF LIMITATIONS .......... 145

VII. CAUSES OF ACTION .......... 146

COUNT I. VIOLATION OF RICO (18 U.S.C. § 1962(C)) (AGAINST ALL DEFENDANTS) .......... 147

A. Each Defendant is a Culpable Person Under RICO. .......... 148

B. The Content Fraud Enterprise is a RICO Enterprise. .......... 148

C. Pattern of Racketeering Activity .......... 151

D. The Racketeering Activity or Predicate Acts .................................. 152

E. Injury and Damages ......................................................................... 159

COUNT II. VIOLATION OF RICO (18 U.S.C. § 1962(C)) (AGAINST ONLYFANS DEFENDANTS AND DEFENDANT ELITE CREATORS LLC) ......................................................................... 161

A. Each Defendant is a Culpable Person Under RICO. ........................ 162

B. The Content Fraud Enterprise is a RICO Enterprise. ....................... 162

C. Pattern of Racketeering Activity ...................................................... 165

D. The Racketeering Activity or Predicate Acts .................................. 165

E. Injury and Damages ......................................................................... 172

COUNT III. VIOLATION OF RICO (18 U.S.C. § 1962(C)) (AGAINST ONLYFANS DEFENDANTS AND DEFENDANT MOXY MANAGEMENT) ....................................................................... 173

A. Each Defendant is a Culpable Person Under RICO. ........................ 174

B. The Content Fraud Enterprise is a RICO Enterprise. ....................... 174

C. Pattern of Racketeering Activity ...................................................... 177

D. The Racketeering Activity or Predicate Acts .................................. 178

E. Injury and Damages ......................................................................... 184

COUNT IV. VIOLATION OF RICO (18 U.S.C. § 1962(C)) (AGAINST ONLYFANS DEFENDANTS AND DEFENDANT BOSS BADDIES LLC) .......................................................................... 186

A. Each Defendant is a Culpable Person Under RICO. ........................ 187

B. The Content Fraud Enterprise is a RICO Enterprise. ....................... 187

C. Pattern of Racketeering Activity ...................................................... 190

D. The Racketeering Activity or Predicate Acts .................................. 191

E. Injury and Damages ......................................................................... 196

COUNT V. VIOLATION OF RICO (18 U.S.C. § 1962(C)) (AGAINST ONLYFANS DEFENDANTS AND DEFENDANT UNRULY AGENCY LLC) ..... 197

A. Each Defendant is a Culpable Person Under RICO. ..... 198

B. The Content Fraud Enterprise is a RICO Enterprise. ..... 199

C. Pattern of Racketeering Activity ..... 201

D. The Racketeering Activity or Predicate Acts ..... 202

E. Injury and Damages ..... 209

COUNT VI. VIOLATION OF RICO (18 U.S.C. § 1962(C)) (AGAINST ONLYFANS DEFENDANTS AND DEFENDANT CONTENT X, INC.) ..... 210

A. Each Defendant is a Culpable Person Under RICO. ..... 212

B. The Content Fraud Enterprise is a RICO Enterprise. ..... 212

C. Pattern of Racketeering Activity ..... 215

D. The Racketeering Activity or Predicate Acts ..... 215

E. Injury and Damages ..... 221

COUNT VII. VIOLATION OF RICO (18 U.S.C. § 1962(C)) (AGAINST ONLYFANS DEFENDANTS AND DEFENDANT A.S.H. AGENCY) ..... 223

A. Each Defendant is a Culpable Person Under RICO. ..... 224

B. The Content Fraud Enterprise is a RICO Enterprise. ..... 224

C. Pattern of Racketeering Activity ..... 227

D. The Racketeering Activity or Predicate Acts ..... 228

E. Injury and Damages ..... 233

COUNT VIII. VIOLATION OF RICO (18 U.S.C. § 1962(C)) (AGAINST ONLYFANS DEFENDANTS AND DEFENDANT VERGE AGENCY, INC.) ..... 235

A. Each Defendant is a Culpable Person Under RICO. ........................ 236

B. The Content Fraud Enterprise is a RICO Enterprise. ........................ 236

C. Pattern of Racketeering Activity ........................ 239

D. The Racketeering Activity or Predicate Acts ........................ 239

E. Injury and Damages ........................ 245

COUNT IX. RICO CONSPIRACY (18 U.S.C. § 1962(D)) (AGAINST ALL DEFENDANTS) ........................ 247

COUNT X. VIOLATION OF THE FEDERAL VIDEO PRIVACY PROTECTION ACT (18 U.S.C. § 2710) (AGAINST ALL DEFENDANTS) ........................ 249

A. The OnlyFans platform collects personally identifying information about Fans. ........................ 250

B. Defendants are video tape service providers under the Act. ........................ 252

COUNT XI. BREACH OF CONTRACT—FAILURE TO PROVIDE PLATFORM WITH REASONABLE CARE AND SKILL (AGAINST FIL) ........................ 255

COUNT XII. BREACH OF CONTRACT—DIRECT MESSAGING REPRESENTATION (AGAINST FIL) ........................ 257

COUNT XIII. BREACH OF IMPLIED-IN-FACT CONTRACT (AGAINST FIL, IN THE ALTERNATIVE FOR COUNT XII) ........................ 259

COUNT XIV. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST FIL) ........................ 261

COUNT XV. PROMISSORY ESTOPPEL (AGAINST FIL, IN THE ALTERNATIVE TO COUNTS XI, XII, AND XIII) ........................ 262

COUNT XVI. BREACH OF CONTRACT—THIRD-PARTY BENEFICIARY OF CREATOR TERMS OF USE (AGAINST FIL) ........................ 263

COUNT XVII. FRAUD (COMMON LAW) (AGAINST ONLYFANS DEFENDANTS) ........................ 265

COUNT XVIII. DECEIT, IN VIOLATION OF CAL. CODE §§ 1709 & 1710 (AGAINST ONLYFANS DEFENDANTS ON BEHALF OF CALIFORNIA SUBCLASS) ............ 268

COUNT XIX. VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ*.) (AGAINST ONLYFANS DEFENDANTS ON BEHALF OF CALIFORNIA SUBCLASS) ............ 269

COUNT XX. VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.) (AGAINST ALL DEFENDANTS ON BEHALF OF CALIFORNIA SUBCLASS) ............ 272

*Unlawful Act* ............ 272

*Unfair Act* ............ 272

*Unfair, Deceptive, Untrue, or Misleading Advertising* ............ 273

PRAYER FOR RELIEF ............ 274

DEMAND FOR JURY TRIAL ............ 275

CERTIFICATE OF COMPLIANCE ............ 277

## I. INTRODUCTION

1. Romance scams have existed for a long time, but the prevalence of such scams and the financial toll they take on their victims have increased in recent years. According to the FTC, between 2017 and 2021, people "reported losing a staggering $1.3 billion to romance scams, more than any other FTC fraud category."[1] This disturbing upward trend has almost certainly been exacerbated by the ubiquity of online dating (which normalizes the idea of making romantic connections through the internet)—but also by an "epidemic of loneliness and isolation" that the former U.S. Surgeon General warns is "an underappreciated public health crisis that has harmed individual and societal health."[2]

2. This case goes beyond typical romance scams by involving an online platform used to perpetrate a systemic deception that exploits victims' trust on an unprecedented scale, affecting hundreds of thousands, or even millions, of people simultaneously.

3. OnlyFans, a social media platform known almost exclusively for hosting sexually oriented content, has hundreds of millions of users (called "Fans") who pay for the privilege of communicating *directly* with *specific people* who post content on the platform (called "Creators") on a personal (indeed, often an intimate

[1] FEDERAL TRADE COMMISSION, *FTC Data Show Romance Scams Hit Record High; $547 Million Reported Lost in 2021* (Feb. 10, 2022), www.ftc.gov/news-events/news/press-releases/2022/02/ftc-data-show-romance-scams-hit-record-high-547-million-reported-lost-2021 (last visited April 23, 2025).

[2] U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *Our Epidemic of Loneliness and Isolation* (2023), www.hhs.gov/sites/default/files/surgeon-general-social-connection-advisory.pdf (last visited April 23, 2025).

and/or romantic) level.[3] But instead of interacting with a specific Creator, Fans end up—unknowingly and without their consent—communicating with professional "chatters" hired to impersonate that Creator in order to convince Fans to spend even more money on the platform.

4. Chatters are often hired by self-styled "management agencies" operating OnlyFans accounts on behalf of multiple Creators, at the request of and with the consent of the Creators. These agencies hire veritable fleets of Chatters—often from countries like the Philippines and Venezuela, where they can get low-cost, yet well-educated, workers who can convince Fans they are engaged in "authentic" communication with a particular Creator.

5. In addition to the blatant deception and fraud, the "Chatter Scams" involve massive breaches of confidentiality and privacy violations in which intimate communications and private and/or personal information about Fans—including photos and videos—are distributed and/or accessible to numerous unauthorized parties.

6. OnlyFans knows about the agencies perpetrating the Chatter Scams; indeed, it has co-hosted events with at least one agency named as a defendant in this Complaint. In July 2023, Creators Inc. posted a video on Instagram with a tagline that said "our collab with @ofmerch Merch during Miami Swim Week was the real cause behind the nationwide heatwave!" The video featured scantily clad

[3] Although OnlyFans' Terms of Service refer to both creators and fans as "users," it has distinct account types for the two categories, which come with different pre-requisites for opening an account, as well as specific Terms of Use for each type of account. For clarity, this Complaint will only use the term "Creator" to refer to creator accounts, and the term "Fans" to refer exclusively to fan accounts.

Creators walking down a runway wearing swimsuits featuring the OnlyFans logo, with signage in the background bearing the logos of both OnlyFans and Creators Inc. [4] The profile "@ofmerch" describes itself as a profile "Featuring creators in official @onlyfans merch," and links directly to OnlyFans' online store at https://store.onlyfans.com/.

7. OnlyFans also knows that the use of Chatters blatantly violates many of its platform rules and policies, yet the company fails to enforce those policies in order to facilitate the widespread fraud that has resulted in massive profits for OnlyFans—which takes a 20% cut of everything a Creator earns on the platform.

8. But OnlyFans' involvement is not limited to "looking the other way." Like other social media platforms, OnlyFans allows Creators to make individual profiles through which they can share content (text, photos, and videos) with their Fans—users of the platform who can open Fan accounts, subscribe to specific Creators' profiles (often for a monthly fee), and respond to Creators' content in the form of comments and/or "likes."

9. OnlyFans also provides a wide variety of tools for Creators to "monetize" their content. Creators can charge Fans monthly subscription fees to view their accounts, in addition to selling pay-per-view content and/or custom content created by request for a particular Fan. The platform also allows Fans to send monetary tips to Creators in amounts up to $200 per transaction. In exchange, OnlyFans takes 20% of Creators' revenue from all three of these sources.

---

[4] Creators Inc. (@creatorsinc), INSTAGRAM (July 23, 2023) https://www.instagram.com/creatorsinc/reel/CvC2U3JASvS/ (last visited April 23, 2025).

10. Compared with other "content monetization" platforms, however, OnlyFans has permissive rules around the types of content that can be sold. As a result, OnlyFans was initially known for sexually oriented content, which can be anything from a romantic connection to sexually explicit material—a fact which has made it the juggernaut of content monetization platforms. In 2021, the platform generated over $1 billion in revenue, representing well over 10 times the estimated revenue for Patreon (a content monetization platform catering primarily to artists and podcasters)—and over 40 times that of Medium (whose creators are primarily writers and bloggers). Yet estimates show OnlyFans' user base at that time was only slightly over twice the size of Medium's user base: 210 million compared with 100 million.

11. In 2024, OnlyFans generated over $1.4 billion in revenue—an increase of four hundred million dollars in just three years.

12. But OnlyFans' success cannot be explained solely by the fact that it hosts sexually oriented content. After all, the internet "democratized" access to pornography as much as anything else, and getting such content for free is a matter of a simple internet search.[5] This has led some observers to ask, why are people paying (and paying so much) for OnlyFans when they can get pornography elsewhere for free?

---

[5] Indeed, some credit the adult film industry with allowing the internet to thrive in its early years. *See, e.g.,* Ross Benes, *How porn has been secretly behind the rise of the internet and other technologies*, BUSINESS INSIDER (May 7, 2017) https://www.businessinsider.com/porn-behind-internet-technologies-2017-5 (last visited April 23, 2025) ("[W]hile the military created the internet, it would not have found a solid consumer base without porn. Think of the military as the inventor and creator of a product and porn as the entrepreneur who brings the product to the masses.").

13. In a time of increasing concern about loneliness as a serious public health issue,[6] the answer to that question is that OnlyFans offers Fans a more personal connection to Creators—or at least that's the idea that OnlyFans is selling. Indeed, the promise of personal connection explains why Fans have flocked to the OnlyFans accounts of many "traditional" pornography stars—even though those same stars are featured in hundreds of videos that are accessible elsewhere for free.[7]

14. OnlyFans is not coy or allusive about the fact that the core promise of its platform hinges on the authenticity of the personal interaction between Fans and Creators. Its marketing consistently revolves around this idea, with its website and other public statements teeming with references to "authenticity" and "meaningful" engagement.

15. OnlyFans offers Fans a list of "Subscription Benefits" that include the ability to "direct message with this [Creator]." Both phrases appear on every single Creator profile because OnlyFans puts them there, encouraging Fans to subscribe to their favorite Creators so they can access VIP pages that promise a more intimate interaction—what some describe as a "girlfriend experience" or a "really real" experience where "you get to know people."[8]

---

[6] *See supra*, n.2.

[7] For example, Mia Malkova—who has made hundreds of videos over the course of her decade-long career in the adult film industry—says she has made over $285,000 in one month from her OnlyFans account. *MIA MALKOVA on OnlyFans, Making Millions, & Getting Her Heart Broken*, COOLKICKS PODCAST (December 13, 2022), https://www.youtube.com/watch?v=eCgdE7nlC78 (last visited April 23, 2025).

[8] Marta Biino and Madeline Berg, *The Secret of OnlyFans: It's much more than porn*, BUSINESS INSIDER (Jan. 18, 2024), www.businessinsider.com/how-onlyfans-

16. The problem is: Unbeknownst to most Fans on the site, the use of Chatters creates an experience that is almost as far from "really real" as you can get—an experience orchestrated by agencies, such as the Agency Defendants in this lawsuit, who promise to help Creators effectively make money in their sleep by signing up subscribers at scale and keeping subscribers engaged by (fraudulently) maintaining the "personal" relationships Fans believe they have with Creators.

17. Agency Chatters are trained to exploit emotional connections by pretending to be personal friends or close acquaintances, using manipulative tactics that prey on psychological biases and vulnerabilities. They never reveal that they are not the actual Creators and, if questioned, they assure Fans that they are interacting with the actual Creator. Agencies often refer to this as "farming" Fans and equip Chatters with detailed scripts and processes designed to identify the most emotionally invested targets and persuade them to spend money under the guise of a personal relationship.

18. OnlyFans actively facilitates this "farming" process by continuing to cultivate the platform's image as one where individuals can pay for backstage/VIP passes in order to get "personal" attention from Creators—and by providing tools that make it easier for Chatters to fraudulently "maintain" personal relationships with Fans and to monetize those relationships.

19. OnlyFans claims to be monitoring everything that happens on its platform but does nothing to stop the use of Chatters in violation of its promises to the Fans on its platform.

---

became-outlet-source-help-loneliness-sadness-connection-sex-2024-1 (last visited April 23, 2025).

## II. JURISDICTION & VENUE

20. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

21. Subject-matter jurisdiction also arises under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C. § 1961, *et seq*., and supplemental jurisdiction exists under 28 U.S.C. § 1367 for the state-law claims.

22. This Court has personal jurisdiction over Plaintiffs because they are either residents of California or they consent to the Court's jurisdiction.

23. This Court has personal jurisdiction over Defendants because they transact and conduct business as alleged herein and are alleged to have violated statutory and common law, in the State of California and this District as alleged herein. The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d).

24. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the State of California and the Court has personal jurisdiction over all Defendants. In addition, Agency Defendants reside in the District by virtue of owning and operating California-based companies based in this District, where they devised and executed the Chatter Scams.

25. On April 9, 2025, the Court granted in part and denied in part the motion to dismiss for forum non conveniens filed by Defendants Fenix International

Limited and Fenix Internet LLC ("Fenix Defendants"). *See* ECF No. 117. Pursuant to that Order, the claims of Plaintiffs B.L., S.M., and A.L. against the Fenix Defendants were dismissed without leave to amend. Accordingly, only Plaintiffs N.Z. and R.M. assert claims against Fenix International Limited and Fenix Internet LLC in this Amended Complaint.

26. On December 12, 2025, the Court affirmed that the forum selection clause found in the OnlyFans' Terms of Service was not enforceable against the California Plaintiffs. *See* ECF No. 208.

## III. PARTIES

### A. Plaintiffs

27. Plaintiffs are users of OnlyFans, referred to as Fans, who subscribed to the accounts of one or more Creators represented by the Agency Defendants.

28. Plaintiffs file this action under fictitious names and seek to proceed anonymously in order to preserve their right to privacy, and to avoid the significant social stigma attached to using OnlyFans as a result of the platform's association with explicitly sexual (NSFW) content—both of which drive the widespread use of pseudonyms by Fans on the platform (including Plaintiffs) to begin with. Given these concerns, Plaintiffs would be hesitant to maintain this action if their names were permanently associated with Defendants. *See Jane Roes 1-2 v. SFBSC Mgmt., LLC*, 77 F. Supp. 3d 990, 993 (N.D. Cal. 2015) (allowing exotic dancers to proceed using pseudonyms and noting that the "Ninth Circuit has recognized that courts grant anonymity where it is needed to 'preserve privacy in a matter of sensitive and highly personal nature'" and has allowed the use of pseudonyms in order to

"'protect a person from . . . ridicule or personal embarrassment.'" (quoting *Does I thru XXIII v. Advanced Textile Corp*., 214 F.3d 1058, 1068 (9th Cir. 2000))).

29. Moreover, Plaintiffs' ability to proceed anonymously will not prejudice Defendants. The use of pseudonyms as a matter of course on the OnlyFans platform—and the fact that Defendants' profits are driven by the ability of Fans to remain anonymous—undercuts any suggestion that their doing so in public filings would offend the traditional presumption of openness in judicial proceedings. And because Plaintiffs are willing to privately disclose their identities to Defendants in the course of litigation, Defendants will be fully able to exercise their due-process rights to assess and defend their claims.

**1. California Plaintiffs**

**a. Plaintiff N.Z.**

30. Plaintiff N.Z. was a resident and citizen of Cypress, California, during the time period at issue in this Complaint.

31. During the relevant time period of this Complaint, Plaintiff N.Z. subscribed to at least one OnlyFans account managed by an Agency Defendant.

**b. Plaintiff R.M.**

32. Plaintiff R.M. is currently a resident and citizen in Folsom, California, but during the time period at issue in this Complaint, he was a resident of El Dorado Hills, California.

33. During the relevant time period of this Complaint, Plaintiff R.M. subscribed to at least one OnlyFans account managed by an Agency Defendant.

### 2. Out-of-State Plaintiffs

#### a. Plaintiff B.L.

34. Plaintiff B.L. is a resident and citizen of Nashville, Tennessee.

35. During the relevant time period of this Complaint, Plaintiff B.L. subscribed to at least one OnlyFans account managed by an Agency Defendant.

#### b. Plaintiff S.M.

36. Plaintiff S.M. is a resident and citizen of Atlanta, Georgia.

37. During the relevant time period of this Complaint, Plaintiff S.M. subscribed to at least one OnlyFans account managed by an Agency Defendant.

#### c. Plaintiff A.L.

38. Plaintiff A.L. is a resident and citizen of Madison, Wisconsin.

39. During the relevant time period of this Complaint, Plaintiff A.L. subscribed to at least one OnlyFans account managed by an Agency Defendant.

40. To the extent this Complaint includes allegations concerning Defendants Fenix International Limited or Fenix Internet LLC, those allegations are asserted solely by Plaintiffs N.Z. and R.M. Any claims by Plaintiffs B.L., S.M., or A.L. against those Defendants have been dismissed without leave to amend pursuant to the Court's April 9, 2025 Order. *See* Dkt. 117.

## B. Defendants

### 1. Fenix / OnlyFans Defendants

41. Defendant **Fenix International Limited ("FIL")** is a private limited company registered in the United Kingdom and Hong Kong, with its principal place of business in London. FIL owns and operates the website and social media platform OnlyFans.com ("OnlyFans"), which it operates worldwide through various

subsidiaries and affiliates, including in the United States, Manila, Singapore, Tokyo, New Delhi, and Bangkok.

42. FIL contracts and pays for the servers that host OnlyFans and owns all intellectual property and trademarks related to OnlyFans—including trademarks registered in the United States.

43. According to the company's LinkedIn profile, FIL currently has over 2,200 "associated members" located in the United States—including over 200 in California. On information and belief, a substantial number of those individuals are employees or contractors of OnlyFans involved in the daily operations of the business and the OnlyFans website. These include management- and executive-level employees.

44. Defendant **Fenix Internet LLC ("FIUSA")** is a Delaware limited-liability company headquartered in Florida. FIUSA is a wholly owned subsidiary of FIL. On information and belief, FIUSA—at the direction of and under the control of FIL—directly or indirectly collects and receives all OnlyFans-related payments from Fans located in the United States, whose bank statements reflect the transaction as "Fenix Internet LLC." FIUSA then subtracts OnlyFans fees (including Subscription Fees, the OnlyFans' portion of the Creator Fees, and other charges) from those payments, and remits approximately the remainder of the Fan payments to the Creators.

45. On information and belief, a substantial number of those Fans and Creators are located in California.

46. On information and belief, FIUSA has not obtained the necessary licenses to provide money transmitter services in any of the states in which it performs those services, including California.

47. Together, FIL and FIUSA are referred to throughout this Complaint as "OnlyFans Defendants," "OnlyFans,"[9] or "Fenix Defendants," except where it may be necessary to distinguish more specifically between the two entities.

**2. Agency Defendants**

48. The following Defendants are "management" agencies that purport to represent, act on behalf or, or are the agents of multiple Creators, and who in reality have unfettered access to and primary control over the OnlyFans accounts of their "Represented Creators." Each of these Defendants provides "Chatter services" for its Represented Creators: hiring individuals to interact with Fans, fraudulently misrepresent their identities, build a phony relationship engineered by people other than the Creators and based on emotions and vulnerabilities thought to be shared only with the Creators, and pretend to be the Represented Creators—with the express purpose of deceiving and manipulating Fans in order to maximize their willingness to purchase content from the Represented Creator accounts. These Defendants are referred to collectively as the "Agency Defendants."

49. Each Agency represents or represented at least one Creator subscribed to and followed by a Plaintiff. The identities of those Creators and Plaintiffs—along with additional details about each Agency's conduct—are provided in Section IV.J, below.

[9] Plaintiffs will clarify when they referring to the OnlyFans platform, as opposed to Defendants, if it is not clear from the context.

50. Defendant **Boss Baddies LLC** ("Boss Baddies") was registered in Wisconsin on April 26, 2021. Boss Baddies' principal office is 2800 E Enterprises Avenue, Suite 333, Appleton, Wisconsin 54913-7889. Boss Baddies LLC has branches registered in Ohio and Washington. On information and belief, Boss Baddies LLC was actively doing business as Siren Agency at the time of the filing of this action and is now doing business as Luxe Agency. This Amended Complaint will continue to refer to Defendant Boss Baddies as "Siren" throughout this Complaint. Siren lists Los Angeles, California as its principal place of business on its website.

51. Defendant **Moxy Management** ("Moxy") was registered on June 21, 2021, as a California corporation. Moxy's principal place of business is 19016 Devonport Lane, Tarzana, CA 91356.

52. Defendant **Unruly Agency Limited Liability Company** ("Unruly") was registered on March 20, 2020, as a California Limited Liability Company. Unruly's principal place of business is 8581 Santa Monica Boulevard, Suite 403, West Hollywood, CA 90069. On information and belief, Unruly is doing business as Unruly Agency. On information and belief, **Dysrpt Agency** ("Dysrpt") is a trademark of Unruly and Unruly is also doing business as Dysrpt. Defendant **Behave Agency LLC** ("Behave") was originally formed in Delaware on June 24, 2020. On December 12, 2021, Behave was registered in California as a foreign LLC. Behave's principal office address is 16192 Coastal Highway, Lewes, Delaware 19958. On information and belief, Behave is a subsidiary of Unruly. Together, Unruly, Dysrpt, and Behave will be referred to in this Complaint as the "Unruly Defendants."

53. Defendant **A.S.H. Agency** ("A.S.H.") was formed by well-known adult film star Riley Reid in 2021. On information and belief, A.S.H.'s principal place of business is 299 Patrician Way, Pasadena, CA 91105.

54. Defendant **Content X, Inc.** ("Content X") was registered on September 1, 2020, as a California corporation. Content X's principal place of business is 21800 West Oxnard Street, Suite 940, Woodland Hills, California 91367. On information and belief, Content X, Inc. is doing business as Content X Studios.

55. Defendant **Verge Agency, Inc.** ("Verge") was originally formed in Delaware on March 24, 2021. On March 3, 2023, Verge Agency, Inc. was incorporated as a California corporation. Verge Agency, Inc.'s principal place of business is 10960 Wilshire Boulevard, 5th Floor, Los Angeles, California 90024. On information and belief, Verge Agency, Inc. is doing business as Verge Agency.

56. Defendant **Elite Creators LLC** ("Elite Creators") is a Florida LLC registered in June 2022. Elite Creators is doing business as Creators Inc., which, on information and belief, was created in September 2022. On information and belief, Elite Creators provides its "management services" in conjunction with multiple other companies, all of whom do business under the Creators Inc. brand. On information and belief, Creators Inc. is operating from its headquarters in Los Angeles. Elite Creators will be referred to in this Complaint as "Creators Inc."

## IV. FACTS

### A. History of OnlyFans

57. OnlyFans was founded in 2016 by 33-year-old British tech entrepreneur and investor Timothy Stokely, who had previously owned similar niche- and/or

custom-pornography sites including GlamGirls, GlamWorship, and Customs4U, and would go on to be described as "the king of homemade porn."[10]

58. Perhaps unsurprisingly given Stokely's background, OnlyFans immediately became dominated by (and known for) adult content and quickly acquired a significant user base. Within its first month, OnlyFans had over 1,000 paying subscribers, and the platform grew quickly from there, reaching 10,000 users by September 2016, and 100,000 users by January 2017. By mid-2018, the platform had over 1 million users and had paid over $10 million to Creators.

59. That same year, venture capitalist Leonid Radvinsky bought a controlling share in Defendant FIL, the company Stokely had incorporated to house the OnlyFans brand. Radvinsky, already the owner of one of the world's largest webcam sites,[11] was a veteran in the online pornography industry. He was also a veteran in the online deception business: At age 17, he helped start a company that made money by funneling traffic to pornography sites by falsely claiming to offer "hacked" and/or "illegal teen" passwords.[12]

---

[10] Charlotte Colombo, *Meet the king of homemade porn — a banker's son making millions*, THE TIMES (Sept. 14, 2021), www.thetimes.com/uk/society/article/meet-the-king-of-homemade-porn-a-bankers-son-making-millions-z9vhq9c9s (last visited April 23, 2025).

[11] On MyFreeCams, adult models broadcast themselves stripping or performing sex acts online in exchange for tips from viewers. *See* Matthew Field, *The elusive porn baron behind OnlyFans*, THE TELEGRAPH (October 1, 2022), https://web.archive.org/web/20240501112404/https://www.telegraph.co.uk/business/2022/10/01/elusive-porn-baron-behind-OnlyFans/# (last visited April 23, 2025).

[12] *Id.*

60. OnlyFans continued to grow steadily after the change in ownership, but the growth of its initial few years was dwarfed by the growth of the platform during the COVID-19 epidemic.

61. Just between March and April 2020, both the Fan base and the number of Creators on the platform grew by 75%, with the site becoming widely known enough that pop icon Beyoncé mentioned the platform in a song that year—boosting its recognition even further. Over the next year, multiple "mainstream" celebrities joined the platform, introducing OnlyFans to their existing Fans—many of whom, judging by the numbers, joined the platform as well.

62. By the end of the fiscal year 2020, more than 1.6 million Creator accounts had been created on the platform, and over 82 million Fans had signed up. Transactions on the platform in 2020 increased by 553%—to $2.4 billion.

63. In 2021, FIL reported an over 600% increase in profits—from $61 million in 2020 to $433 million in 2021.

64. According to publicly filed financial statements from FIL, the vast majority of OnlyFans' revenue comes from the 20% it collects from the content Creators. Since 2019, FIL has reported "major sources" of revenue in only two categories—both of which represent OnlyFans' cut of revenue generated by content Creators on the platform: "subscription-based payments," which the company describes as "transactions where the group facilitates Creator's providing content to Fans for a period of time," and "non-subscription-based payments," which include "one-time transactions such as messaging and access to content, that the group facilitates between the Fans and the Creators." The specific numbers are reproduced in **Figure 1**, below.

| Fiscal Year Ending | Subscription-based Revenue | | Non-subscription-based Revenue | | Total Revenue |
|---|---|---|---|---|---|
| 2019-11-30 | $87,000,000 | + | $73,000,000 | = | $160,000,000 |
| 2020-11-30 | $215,783,000 | + | $142,595,000 | = | $358,378,000 |
| 2021-11-30 | $489,000,000 | + | $443,000,000 | = | $932,000,000 |
| 2022-11-30 | $522,000,000 | + | $568,000,000 | = | $1,090,000,000 |
| 2023-11-30 | $540,895,000 | + | $765,801,000 | = | $1,306,696,000 |
| 2024-11-30 | $470,442,000 | + | $942,652,000 | = | $1,413,094,000 |

***Figure 1****. Defendant FIL's annual revenues as reported in the company's publicly filed financial statements, including Fenix International Limited, Annual Report and Financial Statements (covering Dec. 2023 to Nov. 2024, Dec. 2022 to Nov. 2023, Dec. 2021 to Nov. 2022, Dec. 2020, to Nov. 2021, Dec. 2019 to Nov. 2020, Dec. 2018 to Nov. 2019).*

65. In 2021, after OnlyFans' recorded record profits, the magazine Fast Company declared OnlyFans one of the "10 most innovative social media companies of 2021"—lauding the ability to find "creative ways to sell intimacy during a time of social distancing," and describing it as a "clever hack of the social sphere to monetize exclusive content."[13]

66. Those profits have continued to grow, with OnlyFans bringing in almost $500 million more in total revenue in 2024 than it made in 2021.

[13] Sarah Flynn, *The 10 Most Innovative Social Media Companies of 2021*, FAST COMPANY (Mar. 9, 2021), www.fastcompany.com/90600321/social-media-most-innovative-companies-2021 (last visited April 23, 2025).

**B. From its Inception, OnlyFans has Directed, and Continues to Direct, its Business Activities in California and the United States**

**1. OnlyFans specifically targeted California to develop and grow its business.**

67. California has been at the heart of OnlyFans' business model and explosive growth in the United States. From its earliest days, OnlyFans deliberately anchored its recruitment, executive leadership, and business operations in California, leveraging the state's status as the adult entertainment capital of the world.

68. The meteoric growth of OnlyFans in its first two years of operations was the result of a deliberate strategy by founder Tim Stokely to target adult entertainment performers in California, which since the 1970s became "the adult entertainment capital of the world."[14]

69. Stokely enlisted California-based adult entertainment leader Bill Fox to spearhead the recruitment of adult entertainment performers. Fox, a legendary webmaster and videographer from California, was instrumental in building OnlyFans' creator base, particularly by targeting California's robust adult entertainment community.[15]

---

[14] Melia Robinson, *How LA's 'Porn Valley' became the adult entertainment capital of the world*, BUSINESS INSIDER (Sep. 29, 2017), https://www.businessinsider.com/history-of-porn-valley-hugh-hefner-2017-9 (last visited Jan. 2, 2026).

[15] Andrew Marshall, Echo Wang, Rosa Furneaux, Jason Szep, Linda So, *OnlyFans Exposed | Part 7: How OnlyFans turned into a global empire bent on redefining porn*, REUTERS (Dec. 28, 2024) https://www.reuters.com/investigates/special-report/onlyfans-sex-origins/ (last visited Jan. 2, 2026).

70. According to Forbes, Fox was a "legendary adult-world webmaster and videographer" that Stokely used to "recruit adult performers to OnlyFans."[16]

71. The Forbes article further explains, quoting Brad Armstrong, an adult film veteran who directed 200 movies and who was once married to adult entertainer Jenna Jameson: "The English guys didn't know the adult industry; Bill [Fox] was the gate keeper and got their name out there and got people to sign up[.]"[17]

72. Further, as quoted to Armstong by Forbes, "At the beginning, he [Bill Fox] was integral, he laid the foundational bricks to get it going."[18]

73. Similarly, according to an April 2022 article regarding OnlyFans' "explosive growth", "Going from 0 to 1 is often a story of brute force. After the website launched, Stokely recruited someone who knew the inner workings of the adult industry to recruit adult performers and onboard them to the platform early on: Webmaster and videographer Bill Fox."[19]

74. Bill Fox was born in California in 1969 and lived there until his death in January of 2019.

---

[16] Will Yakowicz, *Why OnlyFans Will Never Shed Its Reputation For Sexually Explicit Content*, FORBES (Aug. 20 2021), https://www.forbes.com/sites/willyakowicz/2021/08/20/why-onlyfans-will-never-shed-its-reputation-for-sexually-explicit-content (last visited Jan. 2, 2026).

[17] *Id.*

[18] *Id.*

[19] Ruchin Kulkarni, *The explosive growth of OnlyFans*, PRODUCT HUNT (April 28, 2022), https://www.producthunt.com/stories/the-explosive-growth-of-onlyfans (last visited Jan. 2, 2026).

75. Bill Fox was also listed as a Manager of Rolling Fox Productions, LLC, a production company, located in Chatsworth, California.

76. Operating out of California (where he was born and lived), Bill Fox recruited adult entertainment performers in California (such as Kianna Dior, Nikki Delano, and Tia Kai) and beyond to join OnlyFans as Creators via his social media platforms, including but not limited to his Twitter account.

77. On or about October 27, 2017, Bill Fox posted on Twitter (now X) that it was "Just another day in the office onlyfansapp wears me out!! But life is GOOD[.]"[20]

78. In one tweet dated May 6, 2017, Fox's Twitter account provided "REASONS TO JOIN" OnlyFans and stated: "Join OnlyFans today, set a monthly subscription price and get paid for your content!"[21]




[20] @MrBillFox, X, https://x.com/MrBillFox/status/924112269105037312 (last visited Jan, 2, 2026).

[21] @MrBillFox, X, https://x.com/MrBillFox/status/860891169622020097 (last visited Jan 2, 2026).

79. Fox posted that same graphic in dozens of tweets, including on April 5, 2017, stating: "Another one of Another one of my followers just signed up at http://OnlyFans.com! Join today at https://onlyfans.com/mrbillfox?ref=240110."[22]

80. Fox also frequently retweeted OnlyFans Creators on his Twitter account.[23]

81. One adult entertainment Creator, CJ Miles, stated that Bill Fox recruited her to OnlyFans (at the time she had over 2.2 million followers on Instagram), saying that she "met [Fox] at his house [in Los Angeles] and he showed me all the girls and guys on OnlyFans that make money, and was like, 'you have to start your own[.]'"[24]

82. Miles also called Fox "the first owner of the platform."[25]

83. In a podcast interview in 2022, Miles (who claimed to have 50,000 followers on OnlyFans at the time) again described how she was recruited by Fox in Los Angeles around 2018, who she referred to as the "owner of OnlyFans" before Stokely.[26]

---

[22] @MrBillFox, X, https://x.com/MrBillFox/status/849686085462622210 (last visited Jan. 2, 2026).

[23] @MrBillFox, X, https://x.com/MrBillFox (last visited Jan. 2, 2026).

[24] Adam Goldsmith, *Call centre worker who made £76 a month quits for OnlyFans – and now earns fortune*, DAILY STAR (Mar. 14, 2022), https://www.dailystar.co.uk/love-sex/call-centre-worker-who-made-26461910 (last visited Jan. 2, 2026).

[25] *Id.*

[26] CJ Miles and Nara Ford - The Michael Sartain Podcast, YOUTUBE (Jan. 19, 2022), https://www.youtube.com/watch?v=Sp253Yf6yv4 (last visited Jan. 1, 2026).

84. On information and belief, Fox was the primary recruiter for OnlyFans from the time Stokley enlisted Fox's help until he died in 2019, which Fox did from Los Angeles, California.

85. Petra Ann Ouwehand, an American citizen and early director of OnlyFans, corroborated Fox's centrality to OnlyFans' growth: "By the end of 2017 . . . the platform took off. To expand in the U.S., said Petra, the Stokelys [owner/co-founder Tim Stokely] relied on Bill Fox, a prominent figure in California's porn industry."[27]

86. According to a December 2024 Reuters article, "Keni Styles, who worked for OnlyFans in the early years, recalled that the company's direction was a matter of fierce debate between Fox and Stokely. He recalled one Skype meeting, around 2018, descending into a yelling match between Fox and Tim Stokely. 'Bill wanted it to be just a straight-up adult porn site. Tim had this vision that he was going to challenge Facebook, he was going to challenge Instagram. He was going to bring mainstream YouTube content-creators to OnlyFans."[28]

87. In addition to targeting the California-based adult entertainment industry, OnlyFans also targeted at least two other California-based industries as recruiting sources for new OnlyFans Creators: Hollywood celebrities and comedians.

---

[27] Andrew Marshall, Echo Wang, Rosa Furneaux, Jason Szep, Linda So, *OnlyFans Exposed | Part 7: How OnlyFans turned into a global empire bent on redefining porn*, REUTERS (Dec. 28, 2024) https://www.reuters.com/investigates/special-report/onlyfans-sex-origins/ (last visited Jan. 2, 2026).

[28] *Id.*

88. In a May 2020 article, Stokely was quoted about OnlyFans' recruitment of celebrity Creators: "The surprise call-out from Beyoncé on the 'Savage' remix was very exciting for us, to say the least," he said. "Her stamp of approval comes on the heels of major stars joining the platform in recent weeks, including Blac Chyna, The-Dream, Safaree Samuels, and Casanova."[29]

89. In its 2023 Annual Report, the company stated that "As part of its brand development strategy OnlyFans has continued to invest in third party partnerships including sponsoring emerging and established Creators with a focus on sports and entertainment."

90. On information and belief, some of these celebrities are among OnlyFan's highest paid content creators, and those partnerships include many famous celebrities that live in the Los Angeles area, including Blac Chyna, Bella Thorne, Iggy Izalea, and Mia Khalifa.

91. OnlyFans also heavily marketed, and continues to market, to comedians as a source for recruiting Creators to the Platform, many of which are based in Los Angeles.[30]

92. OnlyFans has also hosted multiple other live events in California including OnlyFans "Meet-Up" events and launch parties.

---

[29] Jordan Rose, *OnlyFans Sees 15 Percent Spike in Traffic Following Beyoncé's Reference on "Savage" Remix*, COMPLEX (May 2, 2020), https://www.complex.com/music/a/j-rose/beyonce-onlyfans-reference-savage-remix-reportedly-increased-sites-traffic (last visited Jan. 2, 2026).

[30] Section IV.B.4, i*nfra.*

93. By going outside the adult entertainment world, OnlyFans has continued to expand its ties to California in an effort to expand its base of Fans and Creators on the OnlyFans platform.

**2. A significant portion of OnlyFans' Business is run from California and the United States.**

94. After the death of Bill Fox, and in an effort to bolster its operations and strengthen OnlyFans' ties to California, Fenix hired a California-based Chief Marketing and Communications Officer, Amrapali "Ami" Gan, in September 2020, who lived, and operated in this role, in the Los Angeles, California area.

95. Gan was in this role from September 2020 to December 2021, and had significant responsibility for the strategic direction of the company and was a regular part of the executive team running the company, all while she was living in, and working from, California.

96. Gan has stated that, as Chief Marketing and Communications Officer, "internally, [she] was doing a lot more than probably someone in a traditional CMO role would do where [she] had exposure to all aspects of the business working closely with the former CEO who's also the founder of the company as well as with the rest of the executive team so when it came time for that succession it was a very easy transition and that's where [she] bring[s] forth this unique perspective and a lot of learnings being with the company and that's why leading the business [she] ha[s] really put [C]reators at the heart of what [OnlyFans] do[es][.]"[31]

---

[31] Navigating Public Opinion: Running an Edgy Business - Amrapali Gan & Keily Blair (OnlyFans) & Kia Kokalitcheva (Axios), SLUSH YOUTUBE CHANNEL

97. In December 2021, California-based Gan was promoted from Chief Marketing Officer to Chief Executive Officer of OnlyFans.

98. Before joining OnlyFans, Gan resided in the Los Angeles area, and acted as the CEO of OnlyFans from Los Angeles until she left OnlyFans in in July 2023.

99. Gan purchased and lived in an apartment in Los Angeles from 2015 to 2023, and on October 20, 2023, she posted on Instagram that "[a]fter 17+ yrs living all over LA, it's always bittersweet returning to" Miami, noting that she was "[t]rading the west coast to move from LA to Miami." And she reported to the Federal Election Commission in 2020 that her residence was in Los Angeles, California.

100. Beginning in 2017 with Fox's recruitment of Creators in the adult entertainment industry and continuing with Gan's brand-development strategy, marketing efforts, and subsequent executive leadership of OnlyFans from California, OnlyFans was able to rapidly expand its Creator base. That expansion was largely centered in Los Angeles, and, as a result, California—particularly Los Angeles—emerged as a principal hub for OnlyFans Creators and the Agency Defendants.

101. Additionally, many OnlyFans executives, employees, contractors, and Creators work and reside in the United States and, in particular, California.

102. [redacted]

---

(Nov. 22, 2022), https://www.youtube.com/watch?v=fgOsTxLVpzM (last visited January 1, 2026).

[redacted].[32]

103. [redacted][33]

104. [redacted].[34]

105. [redacted][35]

106. [redacted].[36]

107. [redacted].[37]

108. [redacted].[38]

---

[32] Confidential Deposition of Fenix International, LLC Rule 30(b)(6) Designee Lee David Taylor ("Taylor Dep.") 304:11–12, 305:12–16 (*McFadden v. Fenix Internet, LLC*, Case No 1:22-cv-00125).

[33] *Id.* 306:2–14.

[34] *Id.* 309:19–20.

[35] *Id.* 311:5–10.

[36] *Id.* 310:16–311:10.

[37] *Id.* 304:13–23.

[38] *Id.*159:11–20, 161:13–162:7, 166:15–167:21.

109. [redacted].[39]

110. [redacted].[40]

111. [redacted][41]

112. Form 1099-NECs only have to be filed by entities that are engaged "in a trade or business in the United States."[42]

113. "Generally, a foreign person must be engaged in a U.S. trade or business during the tax year to be able to treat income received in that year as ECI [effectively connected income], which is taxable in the U.S."[43]

114. The IRS Instructions for Form 1099-NEC provide: "Enter nonemployee compensation (NEC) of $600 or more. Include fees, commissions, prizes and awards for services performed as a nonemployee, and other forms of compensation for services performed ***for your trade or business*** by an individual who is not your employee." (Emphasis added.)

---

[39] *Id.* 159:21–161:5, 170:23–171:14.

[40] *Id.* 168:9–19.

[41] FIUSA's Confidential Responses to Plaintiffs' Limited Jurisdictional Discovery Interrogatories, Response No. 3, Mar. 7, 2024 (*McFadden v. Fenix Internet, LLC*, Case No 1:22-cv-00125); Taylor Dep. 86:19–87:1.

[42] Effectively connected income (ECI), IRS (May 5, 2025), https://www.irs.gov/individuals/international-taxpayers/effectively-connected-income-eci (last visited Jan. 2, 2026).

[43] *Id.*

115. [redacted].[44]

116. [redacted].[45]

117. [redacted].[46]

118. [redacted].[47]

### 3. OnlyFans banking, payment, and other operations are based in California and the United States.

119. [redacted].

120. [redacted][48]

---

[44] FIUSA's Confidential Response to Request for Production No. 28, Aug. 28, 2025.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] FIL's Confidential Response to Request for Production No. 59, Aug. 28, 2025; FIUSA's Confidential Response to Request for Production No. 20, Aug. 28, 2025.

121. [redacted][49]

122. On information and belief, [redacted].

123. Since at least 2017, OnlyFans used Stripe to process Fan payments, which has its headquarters in San Francisco, California.

124. In December of 2025, OnlyFans began accepting payments via PayPal, which is headquartered in San Jose, California.

125. On X, OnlyFans Support is listed as an affiliate of OnlyFans.[50]

126. On X, the OnlyFans Support's account is based in the United States.[51]

127. On X, OnlyFans Merch is listed as an affiliate of OnlyFans.[52]

128. On X it states: "The Official Account of the @OnlyFans Merch Collection."[53]

129. On X, the OnlyFans Merch's account is based in the United States.[54]

---

[49] [redacted]/ (last visited Dec. 31, 2025).

[50] Affiliates (@OnlyFans), X, https://x.com/OnlyFans/affiliates (last visited Dec. 16, 2025).

[51] About this account (@OnlyFansSupport), X, https://x.com/OnlyFansSupport/about (last visited Dec. 16, 2025).

[52] Affiliates (@OnlyFans), X, https://x.com/OnlyFans/affiliates (last visited Dec.16, 2025).

[53] OnlyFans Merch (@OnlyFansMerch), X, https://x.com/OnlyFansMerch (last visited Dec. 16, 2025).

[54] About this account (@OnlyFansMerch), X, https://x.com/OnlyFansMerch/about (last visited Dec. 16, 2025).

130. That account links to the Amazon U.S. OnlyFans Merch Store.[55]

131. The seller on Amazon is listed as "OF Merch," business named "OF World, LLC," with a business address in Chicago, Illinois.[56]

132. OF World, LLC is identified as a subsidiary of FIL in its 2024 publicly available Annual Report, listing a business address in Wilmington, Delaware.

133. In addition to sales on Amazon, OnlyFans has created a "Shop" function on its website in order to enable Creators to sell products to Fans in California and worldwide.

134. To do so, OnlyFans has partnered with Spring EQ, formerly known as Teespring, Inc., which was based in California.

135. Spring EQ is operated by Amaze Holding Company, LLC, with its headquarters in Newport Beach, California.

136. Indeed, in its 2025 SEC filings, another Amaze entity, Amaze Software Inc., lists OnlyFans as one of its primary integration partners.[57]

137. FIL's publicly available Annual Reports shows that from 2020 to 2025 65–73% of its revenues came from the United States.

---

[55] OnlyFans Merch Store, AMAZON, https://www.amazon.com/stores/page/5E2216F9-1142-4638-B770-5710E7C0FF84?ingress=3 (last visited Dec. 16, 2025).

[56] About Seller OnlyFans Merch Store, AMAZON, https://www.amazon.com/sp?ie=UTF8&seller=A3VG1XG70665KI&asin=B0FQGPLDJR&ref_=dp_merchant_link&isAmazonFulfilled=1 (last visited Dec. 16, 2025).

[57] Amaze Holdings, Inc., SEC Form 10-Q, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (May 20, 2025), https://www.sec.gov/Archives/edgar/data/1880343/000155479525000143/amze0515form10q.htm (last visited Jan. 2, 2026).

138. On information and belief, California Creators and Fans generate more revenue for OnlyFans than any other state in the U.S.

**4. OnlyFans TV has significant ties to California and is used to recruit Fans to the OnlyFans platform.**

139. Part of the OnlyFans platform is OFTV (OnlyFans TV).

140. According to the OnlyFans website "OFTV is a free video platform featuring original content by OnlyFans creators."[58]

141. OFTV does not require a subscription but can be watched by anyone.

142. On X, OFTV is listed as an affiliate of OnlyFans.[59]

143. On X, OFTV's account is based in the United States.[60]

144. The purpose of OFTV is to drive traffic to the OnlyFans website and encourage people to sign up and subscribe to individual creators.

145. In the Strategic Report section of FIL's publicly available Annual Report for the year ended November 30, 2022 ("2022 Strategic Report"), FIL reported:

> During this reporting period, OnlyFans continued investing in original content with OnlyFans Creators, for OFTV (OF.TV.). OFTV is a free on-demand video streaming platform and app from OnlyFans. OFTV hosts safe-for-work videos and content from a wide variety of creators from fitness and cooking, to comedy, music and more, demonstrating the diverse range of creators on the OnlyFans platform . . . OnlyFans creators can share short

---

[58] OFTV Media, ONLYFANS, https://onlyfans.com/oftv/media (last visited Dec. 16, 2025).

[59] Affiliates (@OnlyFans), X, https://x.com/OnlyFans/affiliates (last visited Dec.16, 2025).

[60] About this account (@watchOFTV), X, https://x.com/watchOFTV/about (last visited Dec. 16, 2025).

> and long-form video content for their fans to watch, OnlyFans has continued to invest in sponsoring both emerging and established Creators across all genres including sports and entertainment. This has included investment in the flagship OnlyFans Creative Fund. This furthers The Group's strategy of being Creator first, supporting creative talent across the world to connect with their fans and monetise their content. These steps have enhanced OnlyFans' brand reputation as a foundational part of the Creator Economy.

146. In the 2022 Strategic Report, FIL identified OFTV as a way of "[m]aintaining and promoting our brand outside of traditional verticals."

147. FIL went on to report that OnlyFans "will remain focused on dedicating appropriate resources to marketing and brand awareness, particularly in new markets and in the promotion of OFTV content."

148. FIL also identified OFTV as a method of "Market Expansion," stating that OnlyFans "continues to invest in OFTV and original OFTV content to give creators an opportunity to share and promote their content to wider audiences. This remains a strategic priority for" OnlyFans. In other words, OFTV exists, in large part, to promote its Creators and increase subscriptions.

149. In the Strategic Report section of FIL's publicly available Annual Report for the year ended November 30, 2023 ("2023 Strategic Report"), it reported that OnlyFans "continued investing in OFTV" featuring "content which is developed by Creators independently or in partnership with OnlyFans," and was exploring "opportunities to license OFTV content to other platforms."

150. Like the 2022 Strategic Report, the 2023 Strategic Report listed OFTV as a way of "marketing and brand awareness."

151. In the Strategic Report section of FIL's Annual Report for the year ended November 20, 2024 ("2024 Strategic Report"), FIL reported:

> [OnlyFans] has continued to build on the proven success of OFTV. As a well-established on-demand video streaming platform and app, OFTV showcases content developed by Creators, both independently and in collaboration with OnlyFans. The platform exclusively hosts safe-for-work videos, highlighting the broad diversity of Creators on the OnlyFans platform, including categories such as fitness, cooking, comedy, music, and reality TV. . . . In addition, the successful licensing of OFTV content to Netflix UK during the year has further expanded OFTV's reach, opening new avenues for growth and audience engagement. In addition, OFTV has invested significantly in comedy through its flagship programme LMAOF, which has resulted in a diverse range of comedians joining the OnlyFans platform as Creators.

152. In the 2024 Strategic Report, FIL reports that OnlyFans "has entered into significant content and sponsorship agreements . . . This included physical assets, media content for the OnlyFans platform and original streaming content for OFTV."

153. On January 19, 2023, Gan, the then CEO of FIL, recorded an interview with Techcrunch, where she described the purpose of OFTV:[61]

> And I'm very proud to be leading the organization as we're kind of going into this new chapter of the business and with different investments that I've been making OFTV, for example, which I mentioned earlier, but that's our free streaming platform and app . . . And it's been another platform for creators to be able to have a voice to

[61] How OnlyFans Changed the Internet's Oldest Industry, TECH CRUNCH YOUTUBE CHANNEL (Jan. 19, 2023), https://www.youtube.com/watch?v=r6dYGhoMLWI (last visited Dec. 31, 2025).

> for fans to get to know: Oh, who is that? Let me learn a little bit about them before I then go and subscribe to their OnlyFans profile. . . . It's only available to OnlyFans creators to submit content to which, of course, we moderate, because we love to moderate, and it's been a great outlet. And that's where we're doing different investments into original content. . . . For example, we have a cooking show called "This is Fire." And Kazumi, who's a very well known adult content creator, took a part in the first season. She's going to be on season two, which we recently were filming.

154. This is Fire is filmed in Los Angeles, California.[62]

155. FIL films and pays for OFTV content to encourage Fans to subscribe to Creator accounts.

156. On every episode of OFTV, there is a description of the show, followed by links to subscribe to the featured Creators.

157. Much of the content on OFTV, which FIL invests in and promotes, is filmed and produced in California and promotes California Creators.

158. FIL directly produces "LMAOF" a comedy series that is filmed in part in Los Angeles, included multiples shows that were filmed at The Ice House Comedy Club in Pasadena, California.

159. One production company located in California, MoreTV, produces multiple shows for OFTV, including House of Sims and OnlyFans Creative Fund: Fashion Addition, the show specifically mentioned in the 2022 Strategic Report.

160. House of Sims is filmed in California and is described as follows: "British reality TV royalty, The Sims Family, pack up their lives in Essex to make

---

[62] This is Fire, IMDB, https://www.imdb.com/title/tt20599684/?ref_=fn_t_1 (last visited Jan. 2, 2025).

it big in Hollywood. Follow Chloe, Charlie, Frankie, Demi, and Georgia as they chase their dreams while living together under one roof."[63]

161. House of Sims is regularly promoted by OnlyFans on X.[64]

162. Under the Sims' partnership with OnlyFans, the family members agreed to open Creator accounts, which generates money for OnlyFans.[65]

163. When clicking on any episode of House of Sims, there will be a description of the show, but also provides links to "subscribe" to each of the Creators featured in the show, driving revenue for Only Fans:[66]




164. OnlyFans Creative Fund: Fashion Edition was filmed in Los Angeles, California, where the competitors were competing for $100,000 in cash prizes.[67]

---

[63] House of Sims, OFTV, https://of.tv/c/house-of-sims (last visited Dec. 16, 2025).

[64] @OnlyFans Post (Mar. 6, 2024), X, https://x.com/OnlyFans/status/1765486874359992604; @OnlyFans Post (May 31, 2023), X, https://x.com/OnlyFans/status/1663995676865200136; @OnlyFans Post (May 3, 2023), X, https://x.com/OnlyFans/status/1653910240608354305 (last visited Dec. 16, 2025).

[65] Todd Spangler, *British Reality Star Chloe Sims on Joining OnlyFans, Moving to L.A. for Upcoming 'House of Sims' Show on OFTV*, VARIETY (Apr. 21, 2023), https://variety.com/2023/digital/news/chloe-sims-onlyfans-house-of-sims-free-oftv-1235590986/ (last visited Dec. 16, 2025).

[66] House of Sims, OFTV, https://of.tv/v/pVqEq (last visited Dec. 23, 2025).

[67] Jennifer Braun, *OnlyFans launches Creative Fund Fashion Edition for fashion creators*, FASHION NETWORK (Mar. 7, 2022) https://us.fashionnetwork.com/news/Onlyfans-launches-creative-fund-fashion-edition-for-fashion-creators,1384658.html (last visited Dec. 16, 2025).

165. FIL flew creators to Los Angeles to film the show at the "Creative Space" studio.[68]

166. OnlyFans CEO described the Creative Fund as follows: "The Creative Fund allows us to develop opportunities for creators in a particular field. OnlyFans gives all creators a platform to express themselves and by focusing on fashion we're able to shine a spotlight on a new wave of creators in this inventive category as they look towards the future."[69]

167. Other OFTV shows were filmed in California, including Whitney Cummings Presents and Miss/Match.[70]

168. Whitney Cummings is a Los Angeles based comedian (represented by Creators Inc.) who OnlyFans promotes on its X account and has a paid OnlyFans account.[71]

---

[68] *Id.*; OnlyFans Creative Fund: Fashion Edition, SHORTY AWARDS, https://shortyawards.com/7th-impact/onlyfans-creative-fund-fashion-edition (last visited Dec. 31, 2025); Layla Ilchi, *EXCLUSIVE: OnlyFans Announces Creative Fashion Fund*, WOMEN'S WEAR DAILY (Mar. 3, 2022), https://wwd.com/fashion-news/fashion-scoops/onlyfans-creative-fashion-fund-details1235115541-1235115541/ (last visited Dec. 31, 2025).

[69] Jennifer Braun, *OnlyFans launches Creative Fund Fashion Edition for fashion creators*, FASHION NETWORK (Mar. 7, 2022), https://us.fashionnetwork.com/news/Onlyfans-launches-creative-fund-fashion-edition-for-fashion-creators,1384658.html (last visited Dec. 16, 2025).

[70] Whitney Cummings Presents, OFTV, https://of.tv/c/whitney-cummings-presents (last visited Dec. 16, 2025); Miss/Match, OFTV, https://of.tv/c/miss-match (last visited Dec. 16, 2025).

[71] @OnlyFans Post (May 14, 2023), X, https://x.com/OnlyFans/status/1657955020296585216; @OnlyFans Post (April 1, 2023), X, https://x.com/OnlyFans/status/1642174301683212290 (last visited Dec. 16, 2025).

169. In an episode titled: "Whitney Cummings: Mouthy," OnlyFans provides the following description, while providing a link to subscribe:

170. The Comedy Store, where the stand-up special was filmed, is located in West Hollywood, California.


Whitney Cummings: Mouthy
WHITNEY CUMMINGS PRESENTS Subscribe on OnlyFans
In her 6th stand-up special, a very pregnant Whitney Cummings returns to her roots at the Comedy Store to perform her riskiest material yet.
Subscribe: whitney

171. Miss/Match is hosted by Antje Utgaard, who lives in Los Angeles, California, and features dates between OnlyFans Creators.[72]

172. Miss/Match is filmed at a mansion in Los Angeles.

173. Creator Anna Louise (represented by Unruly), who Plaintiff B.L. subscribed to, was featured on an episode of Miss/Match. [73]

174. The episode included a link to subscribe to her account, which drives revenue to OnlyFans.[74]


Miss Match S6E2: Anna Louise / Jack Gentry
MISS/MATCH
Anna Louise is quick to catch the ick, so Jack Gentry has to work overtime to beat the "player" allegations. Can he dial back his Louisiana spice to Match her Midwest mindset?
Subscribe: awesomeantjay, officialannalouise and jfit98

---

[72] Miss/Match, OFTV, https://of.tv/c/miss-match (last visited Dec. 16, 2025); User Profile Antje Utgaard @AwesomeANTJAY, X, https://x.com/AwesomeANTJAY (last visited Dec. 16, 2025).

[73] Miss/Match S6E2: Anna Louise / Jack Gentry, OFTV, https://of.tv/v/6geGB (last visited Dec. 27, 2025).

[74] *Id.*

175. Creator Kaitlyn Krems (represented by Moxy), who Plaintiff S.M. subscribed to, was featured on an episode of Miss/Match.[75]

176. That episode included a link to subscribe to her account, which drives revenue to OnlyFans.[76]




177. Creator Mia Huffman, who is based in Los Angles and represented by Unruly, was featured on an episode of Miss/Match.[77]

178. That episode included a link to subscribe to her account, which drives revenue to OnlyFans.




179. Miss/Match is also regularly promoted by OnlyFans on X.[78]

180. Another show on OFTV, "In Real Life," is often filmed in California.

---

[75] Miss/Match S3E5 — Is Dom Dawson Ready to Stop Sliding Into DMs and Start A Life with Kaitlyn Krems?, OFTV, https://of.tv/v/abLuA (last visited Dec. 30, 2025).

[76] *Id.*

[77] Miss/Match S6E5: Kash / Mia Huffman, OFTV, https://of.tv/v/QSqKX (last visited Dec. 27, 2025).

[78] @OnlyFans Post (Oct. 19, 2022), X, https://x.com/OnlyFans/status/1582843397831737346; @OnlyFans Post (Aug. 18, 2023), X, https://x.com/OnlyFans/status/1692636626122383487; @OnlyFans Post (Sep. 1, 2023), X, https://x.com/OnlyFans/status/1697714832110145865 (last visited Dec. 16, 2025).

181. In Real Life is described as "OFTV's original interview show! Ride along with host Casey Boonstra as she takes some of the OF creators on action-packed adventures . . ."[79]

182. Casey Boonstra is an OnlyFans Creator and she is described in her OnlyFans profile as an "Aussie living in LA."[80]

183. One episode of "In Real Life" featured Breckie Hill (represented by Moxy), who Plaintiffs N.Z., S.M., and A.L. all subscribed to.

184. That episode was filmed in Los Angeles, where Hill is located, and specifically includes a link to subscribe to her account, which drives revenue to OnlyFans:[81]

> **In Real Life with Breckie Hill**
> IN REAL LIFE
>
> TikToker Breckie Hill and Casey master the art of aerial yoga and chat about Breckie's past, her incredible rise on social media, and what new heights the future holds for her.
>
> Subscribe: caseboon and breckie

185. Another episode of "In Real Life" featured Stefanie Gurzanski (represented by Unruly), who Plaintiff N.Z. subscribed to, and was filmed in Los Angeles where Gurzanski was located.[82]

---

[79] In Real Life with Lauren Alexis, OFTV, https://of.tv/c/in-real-life (last visited Dec. 26, 2025).

[80] Casey Boonstra OnlyFans Page (@caseboon), OnlyFans, https://onlyfans.com/caseboon (last visited Dec. 26, 2025).

[81] In Real Life with Breckie Hill, OFTV, https://of.tv/v/PPLwz (last visited Dec. 26, 2025).

[82] In Real Life with Stefanie Gurzanski, OFTV, https://of.tv/v/eAa8i (last visited Dec. 26, 2025).

186. The show included a link to Gurzanski's profile, which drives revenue to OnlyFans:[83]


In Real Life with Stefanie Gurzanski
IN REAL LIFE
Get ready to rage! Casey takes 2-time Vogue cover model Stefanie Gurzanski to a rage room to release some built-up stress in a healthy way... by smashing in car windows and throwing printers! Plus, Stef brings Casey behind the scenes of one of the Baby G mansions, shares her creative vision for her magazine, and details the ups and downs in her journey from Playboy model to businesswoman.
Subscribe: caseboon and stefbabyg

187. Another episode of "In Real Life" featured Sierra Skye (represented by Moxy), and was filmed in Los Angeles where Skye is based.[84]

188. The show included a link to Skye's profile, which drives revenue to OnlyFans:[85]


In Real Life with Sierra Skye
IN REAL LIFE
Since landing her first brand deal ten years ago, Sierra Skye has become one of the biggest names in swimwear modeling and a muse to both fans and brands alike. Now she's giving aerial hooping a spin while unraveling misconceptions, wardrobe malfunctions, and potential new products.
Subscribe: caseboon and sierraskye

189. Another episode of In Real Life featured Sky Bri, and was filmed in Los Angeles where Bri is based.[86]

---

[83] *Id.*

[84] In Real Life with Sierra Skye, OFTV, https://of.tv/v/RAwGn (last visited Dec. 30, 2025).

[85] *Id.*

[86] In Real Life with Sky Bri, OFTV, https://of.tv/v/Yyhga (last visited Dec. 26, 2025).

190. The show again includes a link to subscribe to Bri's account, which drives revenue for OnlyFans:[87]


**In Real Life with Sky Bri**
IN REAL LIFE

Sky Bri's career path has taken her from Amish Country in PA to the Wine Country of LA for a taste of the sweet life. There, she spills the juicy details of her sensational social media debut and how joining OF helped her finally become a fan of herself.

Subscribe: caseboon and skybri

191. Bri was also featured on a show called "Pillow Talk," which on information and belief is filmed in California.[88]

192. Sky Bri has her own OFTV show, "Sky Bri Loves XO," which is filmed in California.[89]

193. One of her shows is called "Splash Zone"—filmed in California—where different OnlyFans Creators compete in a water obstacle course.[90]

194. The Creators that appear on Splash Zone are linked in the description of the show, including Bri, which drives revenue to OnlyFans.

195. Stephanie Landor (represented by Creators Inc.), who Plaintiff S.M. subscribed to, was featured on an episode of an OFTV show called "Off the Air TV," which was filmed at the Creators. Inc. Los Angeles HQ mansion.[91]

---

[87] *Id.*

[88] Sky Bri Reveals Insane Stories – Pillow Talk, OFTV, https://of.tv/v/c7Mrt (last visited Dec. 26, 2025).

[89] Sky Bri Loves You XO Channel, OFTV, https://of.tv/c/sky-bri-loves-you-xo (last visited Dec. 26, 2025).

[90] Splash Zone - Sky Bri Loves You XO, OFTV https://of.tv/v/HHfEG (last visited Dec. 26, 2025).

[91] Stephh: Judge Judy, OF, and Ideal Date – Off the Air TV, OFTV, https://of.tv/v/JFd42 (last visited Dec. 30, 2025).

196. Summer Soderstrom (represented by Creators Inc.), who Plaintiff B.L. subscribed to, films her own show for OFTV.[92]

197. Soderstorm's show is filmed in Los Angeles, where she resides, and includes links to subscribe to her account, which drives revenues for OnlyFans.

198. Briana Armbruster (represented by Moxy), who Plaintiffs B.L. and A.L. subscribed to, also has a show on OFTV, some of which are filmed in Los Angeles.[93] The show includes a link to subscribe to Armbruster, which drives revenues for OnlyFans.[94]

199. Tara Electra, the CEO and Co-Founder of Unruly ,who Plaintiff A.L. subscribed to, hosts her own podcast on OFTV called "Billion Dollar Babie."[95]

200. The podcast, which on information and belief is filmed in Los Angeles, includes links to subscribe to Armbruster and the Creators on her podcast, which drives revenue to OnlyFans.[96]

## C. How OnlyFans Makes Money

201. The financial mechanics of OnlyFans' "clever hack" revolve around the multiplicity of ways that the platform has to part Fans from their money—all of which take advantage of various psychological biases and phenomena to steadily escalate Fan engagement and willingness to pay.

---

[92] Summer Soderstrom Channel, OFTV, https://of.tv/c/summer-soderstrom (last visited Dec. 30, 2025).

[93] The Ski Mask Girl Channel, OFTV, https://of.tv/c/the-ski-mask-girl (last visited Dec. 30, 2025).

[94] *Id.*

[95] Billion Dollar Babie Channel, OFTV, https://of.tv/c/billion-dollar-babie (last visited Dec. 30, 2025).

[96] *Id.*

202. The basic Fan experience on OnlyFans is like other social media sites. When a Fan logs in, they see their "home" screen, which features a "feed" containing posts—either from Creator accounts the Fan has subscribed to, or suggested posts from OnlyFans. Even before a Fan subscribes to any Creator profiles—and thus before OnlyFans "knows" anything about the Fan—OnlyFans automatically begins to populate the Fan's feed with sexually suggestive content. *See* **Figure 2** (New User Home Page).




***Figure 2**. New User Home Page.*

203. The site also automatically begins "suggesting" free Creator profiles that a Fan might want to subscribe to. With an account, Fans can click on these profiles but can see only "teaser" pages for a given Creator, containing a small

profile photo, a banner photo, and placeholder posts in which Fans can see the text of a post but not the photo. *See* **Figures 3 & 4**.




***Figure 3***. *Teaser Page.*




***Figure 4***. *Teaser Post.*

204. To see additional content, a Fan must subscribe to a Creator's page.

205. Clicking "Subscribe" then begins the barrage of "monetization opportunities" that made the OnlyFans platform popular with Creators initially.

206. For "Paid Accounts"—*i.e.*, those requiring a paid subscription—Fans must agree to pay a monthly fee ("Subscription Fee"), which is set through the Creator Account. On information and belief, Agency Defendants set the Subscription Fee for each of their Represented Creators.

207. OnlyFans' Terms of Service require Fans to agree to "auto-renew" any subscription they sign up for.[97] This can be modified, but only by taking the affirmative step of turning the auto-renew function "off" in the account settings—and only *after* the Fan signs up for the auto-renewal subscription.

208. To subscribe to ***any*** account—even a "Free Account"—Fans must add a payment card to their account.

209. This makes sense, because while Free Accounts do not charge a monthly Subscription Fee, those accounts can still charge Fans in multiple ways, including:

a. **PPV (Pay-Per-View) Content**, which can be offered via direct messages, posts, and/or live streams. OnlyFans emphasizes that especially "[f]or free profiles, using PPVs effectively is crucial to maximizing monetization on OnlyFans."; and

---

[97] Terms of Use for Fans ¶ 8(h), ONLYFANS, https://onlyfans.com/terms (last visited June 29, 2024). The current Terms of Use for Fans ¶ 9(j) still has the auto-renew requirement. https://onlyfans.com/terms (last visited Dec. 31, 2025).

b. **Creator Tips**, which can be in amounts up to $200, but without any limitation in a given timeframe, and can also be collected via posts, messages, streams, or just through a direct link on a Creator's profile. OnlyFans recommends that, to "maximize monetization," Creators have a "tip menu":

> **Create A Tip Menu**
> You can accept tips over DM in exchange for custom content, special requests, advice, recipes, lessons, or almost anything else. Many OnlyFans creators choose to put a tip menu on their pinned post, offering different types of content or engagement in exchange for tips.[98]

210. Indeed, OnlyFans specifically touts the high monetization potential of its Free Accounts. The Creator Center portion of its website emphasizes:

> **Free Accounts Still Earn Money**
> It might surprise you that some of the highest-earning creators on OnlyFans don't charge monthly subscription fees. Consider the other advantages that free accounts offer:
> • On average, free accounts gain subscribers more quickly
> • Fans are less likely to unsubscribe when you take content breaks
> • Free accounts have access to pay-per-view posts and streams, and can require Fans to tip first before sending a direct message[99]

211. Many free profiles, however, are simply "teaser" accounts intended to funnel Fans to accounts that require a paid subscription.

---

[98] Blog Post, *Creator Center*, *Maximizing Monetization*, ONLYFANS, https://blog.onlyfans.com/creator-center/ (last visited April 23, 2025).

[99] *Id*.

212. Indeed, OnlyFans encourages the use of multiple accounts to slowly reel in customers, encouraging Creators to "**Build Your Own 'VIP Section**'":

> A free profile paired with a paid subscription profile is another approach creators use to monetize on OnlyFans. By **teasing some content** on a free profile, you can let your subscribers know that there's more to unlock when they upgrade to your paid profile.
>
> Two tiers of access creates [sic] a low-pressure environment for you to cultivate new fans. Plus, it gives your "VIPs" a way to stay connected with you if they ever need to drop down a tier.[100]

213. Together, Subscription Fees, charges for PPV Content, and Creator Tips will be referred to as "Premium Content Fees" throughout this Complaint.

214. OnlyFans' platform took off, in large part because of the offer to engage in a connection—a two-way street—with the Creators. Indeed, from academics to marketing professionals, it's difficult to find any serious analysis of OnlyFans' success that doesn't attribute a large part of that success to its promise of "direct connection" between Creators and Fans. Commentators almost universally agree that the predominance of sexually explicit content on the platform—while it may play a large part in its initial attraction—cannot by itself explain OnlyFans' spectacular growth.

215. Instead, the site's most potent lure (and hook) is "the ability to interact directly with one of the content creators." This differentiates it from pornography, which, "while explicitly sexual, does not offer a personal relationship that one can

---

[100] Blog Post, *Creator Center, Advanced Earnings Tools*, ONLYFANS, https://blog.onlyfans.com/creator-center/ (last visited April 23, 2025).

curate for individuals."[101] And, on top of this, as one commentator wrote of OnlyFans' meteoric rise, "The platform was already compelling due to its sexually charged content, but what supercharged the content itself was its ability to be the "supply" for the "demand" of loneliness."[102]

216. Fans themselves have confirmed this insight. One Fan, upon discovering that he had been misled into communicating with Chatters and not the model he was following, asked ***"Why would anyone go on OnlyFans in the first place, when you can get content almost anywhere (free in most cases)? The opportunity to Direct Message the Creator you are subscribed to."***[103]

217. This explanation for the success of OnlyFans is echoed again and again in media coverage of the site—and by OnlyFans itself, often directly quoting Creators. For example, in a 2019 blog post, OnlyFans profiled a British model, noting that "her advice for OnlyFans creators is to prioritise communication with their fans," and highlighting a quote in which she emphasizes how critical "direct" messaging is for a Creator's bottom line:

> One of the most important things to remember to do is to answer all of your DMs! I know this may seem like a daunting job if you have fallen behind on them, but it's so important. **A lot of people join up just so they can chat with you on a one to one level.** Ignoring DMs or not replying before sending out a mass message could

---

[101] Julian Frazier, *The Dark Psychology of OnlyFans*, MEDIUM (Sep 22, 2022), https://medium.com/@julian.frazier.phd/the-dark-psychology-of-OnlyFans-735c22efde6 (last visited April 23, 2025).

[102] *Id*.

[103] User Post, *Was not chatting to the creator I was subscribed to*, PISSED CONSUMER (May 12, 2023), https://onlyfans.pissedconsumer.com/32/RT-P.html?sort=latest#reviews (last visited July 29, 2024).

> be losing you money. You could miss custom requests, important questions, requests for videos, tips for pics etc. This is a sure way of losing loyal subscribers![104]

**D. OnlyFans falsely promises Fans "authentic" and "direct" connections with Creators.**

218. OnlyFans is not coy or allusive about the fact that the core promise of its platform hinges on the **authenticity of the personal interaction between Fans and Creators**. Its marketing consistently revolves around this idea. Its website and other public statements teem with references to "authenticity" and "direct connection" and "meaningful" engagement.

219. On the OnlyFans website it has an "about" page, which promises "authentic connections," as follows:[105]

> OnlyFans is the 18 + subscription platform empowering creators to own their full potential, monetize their content, and develop authentic connections with their fans.

220. The OnlyFans website also has a page titled: "Our Mission, Vision and Values," which has been on the website since at least May 2022.[106]

221. Through December, 2024, one of OnlyFans' "Core Values" was titled "Empowerment – We Give You Control," which states: "Giving creators control to

[104] Blog Post, *How to Earn More on OnlyFans*, ONLYFANS (Oct. 21, 2019), https://web.archive.org/web/20200518163750/https://blog.OnlyFans.com/how-to-earn-more-on-OnlyFans/ (last visited April 23, 2025).

[105] About, ONLYFANS, https://onlyfans.com/about (last visited Jan. 1, 2026).

[106] Our Mission, Vision And Values, ONLYFANS, https://web.archive.org/web/20241229083106/https://onlyfans.com/values (last visited Jan. 2, 2026).

own and monetize their content and to foster ***authentic relationships*** with their followers and fanbase."[107]

222. OnlyFans removed that language from its "Values" in January 2025, instead stating: "We give creators the tools to control and monetize their content, and to grow their fanbase. We give fans the opportunity to choose who they subscribe to and the content they view."[108]

223. OnlyFans still represents as a value "Accountability – We Own it," stating: "We take responsibility for our words and actions, and own our results."[109]

224. The "Creator Center" portion of the site introduces OnlyFans as "revolutionizing the way creators connect with their online communities," and boasts that since 2016 "more than three million creators have joined the OnlyFans platform to share their creativity, monetize their content, and engage meaningfully with their fans."[110]

225. Describing the types of creators who use the site, OnlyFans emphasizes "models"—on information and belief, the category of creator most likely to be offering sexually explicit content—noting that "[s]ince its launch in

---

[107] *Id.* (emphasis added) (last visited Jan. 2, 2026).

[108] Our Mission, Vision And Values, ONLYFANS, https://onlyfans.com/values (last visited Jan. 2, 2026).

[109] *Id.*

[110] Creator Center, ONLYFANS, https://blog.onlyfans.com/creator-center/) (last visited April 23, 2025); *see also* https://web.archive.org/web/20241201120928/https://onlyfans.com/values (last visited Jan 2, 2026).

2016, models have flocked to OnlyFans to take ownership of how their image is monetized and to directly engage with fans."[111]

226. OnlyFans has used this type of language since the platform began. For example, an archived version of the OnlyFans home page from 2017 contains this mission statement:

> OnlyFans is the social platform **revolutionizing creator and fan connections.** The site is inclusive of artists and content creators from all genres and allows them to monetize their content **while developing authentic relationships with their fanbase.**

227. OnlyFans urges Fans to subscribe to specific Creators using the following language:

> **SUBSCRIBE AND GET THESE BENEFITS:**
> Full access to this user's content
> **Direct message with this user**
> Cancel your subscription at any time

228. This language is automatically generated by OnlyFans, cannot be removed or modified by Creators, and ***appears on every single creator's profile to this day.*** As soon as a user clicks the "Subscribe" button on ***any*** Creator profile—

[111] *Id.*

paid or free—a popup containing the subscription benefits language (and request for a payment card) appears:




***Figure 5****. Subscription Benefits Pop-up.*

229. Direct messaging or "DM" has a very specific and widely understood meaning. It indicates that messages are being sent between two people, they are only visible to the sender and recipient, and they are being sent in real time.[112]

230. OnlyFans' marketing on social media, like Twitter/X (referred to herein as Twitter) and Instagram likewise often and repeatedly endorsed, published, and emphasized the opportunity to "direct message," "DM," directly "chat," chat "1 on 1," and build personal and authentic relationships with specific Creators. Some of the many examples include:

[112] *See* Blog Post, *What is direct messaging?*, SLACK, https://slack.com/blog/collaboration/direct-messaging-guide#:~:text=Direct%20messaging%20is%20a%20private,your%20conversation%20history%20for%20reference (last visited July 29, 2024).

a. On January 17, 2021, OnlyFans posted this quote from a Creator on Twitter:[113]

> "What I love most is the ***direct messaging***. I'm able to chat to get to know and give each person more time" Jade Ramey. Have you chatted with Jade on OnlyFans yet? She can't wait to hear from you, so just drop her a message at: onlyfans.com/jaderamey #CreatorReviews

b. On February 9, 2021, OnlyFans posted on Twitter:[114]

> Go loco as the fabulous @anitta has officially joined us on OnlyFans! The Brazillian [sic] superstar is here to invite you to her world where you can catch her most exclusive content. She's so excited to meet you and ***you can even chat with her 1 on 1*** at: onlyfans.com/anitta

c. On February 20, 2021, OnlyFans posted on Twitter:[115]

> Prepare for chaos and fun as @harryjowsey has joined us on OnlyFans 👀 You now have the opportunity to ***chat with Harry 1 on 1*** and check out exclusive content you won't find anywhere else. So if It's not too hot to handle, connect with him at: onlyfans.com/harryjowsey

d. In the accompanying promotion video, Harry Jowsey, who is managed by Unruly, says: "I'll also be able to ***talk to you 1 on 1***, we can chat every single day, who knows where we'll take this."[116]

---

[113] @OnlyFans, TWITTER (Jan. 17, 2021), https://twitter.com/OnlyFans/status/1350895752571211777 (last visited July 29, 2024) (emphasis added).

[114] @OnlyFans, TWITTER (Feb. 9, 2021), https://twitter.com/OnlyFans/status/1359230912416935936 (last visited July 29, 2024) (emphasis added).

[115] @OnlyFans, TWITTER (Feb. 20, 2021), https://twitter.com/OnlyFans/status/1363247215351894019 (last visited July 26, 2024) (emphasis added).

[116] *Id.*

e. On May 26, 2021, OnlyFans posted on Twitter:[117]

> Get the bod of your dreams with Amanda Lee on OnlyFans! 🔥 The famous personal trainer, influencer, and fitness mom has joined us and is so excited to share her exclusive content and ***chat to all her fans in the DMs*** ❤️ So come say hi at: onlyfans.com/amandaeliselee 💋

f. On September 10, 2021, OnlyFans posted this quote from a Creator on Twitter:[118]

> Are you subscribed to adult creator 'Miss Hannah Nicole' on OnlyFans yet? 👀 🔥 Hannah is sharing unseen exclusive photos, videos, and ***loves getting to know her fans in the DMs*** 💋 🤩 So head over and chat with her at: onlyfans.com/misshannahnico….

g. On December 22, 2021, OnlyFans posted this quote from a Creator on Twitter:[119]

> "OnlyFans gave me a chance to share a different side of myself" heart 💛 DE Laura Vetter shares exclusive lifestyle & travel content and ***loves getting to know her fans 1-on-1***! ✈️ 📷 So introduce yourself at: onlyfans.com/lauravetter 💬 #OnlyFansAdvent

[117] @OnlyFans, TWITTER (May 26, 2021), https://twitter.com/OnlyFans/status/1397646448502640644 (last visited April 23, 2025) (emphasis added).

[118] @OnlyFans, TWITTER (Sept. 10, 2021), https://twitter.com/OnlyFans/status/1436381823446228994 (last visited April 23, 2025) (emphasis added).

[119] @OnlyFans, TWITTER (Dec. 22, 2021), https://twitter.com/OnlyFans/status/1473752805982752782 (last visited July 26, 2024) (emphasis added).

h. On January 6, 2022, OnlyFans posted this quote from a Creator on Twitter:[120]

> Did you know that actress, Influencer, and model @jordynwoods is on OnlyFans? ❤️ 🤩 Jordyn can't wait to ***chat with you***, share exclusive lifestyle content, and so much more! 💬 📷 So discover a new side of 'Heir Jordyn' at: onlyfans.com/jordynwoods #OnlyFanscreators

i. On October 22, 2022, OnlyFans posted this quote from a Creator on Twitter:[121]

> "OnlyFans has been an amazing platform for me to ***connect with my fans on a deeper level***, and I am so grateful for that!" - @rozmro

j. On September 30, 2022, OnlyFans posted this quote from a Creator on Twitter:[122]

> "I love that on OnlyFans I can ***talk one-on-one with my fans*** and use my creativity to create new and dynamic content for them. It's the perfect platform for sharing things I don't upload to my other social media accounts." - TV host/model @pattylopezdelac, bit.ly/3dS4itt

---

[120] @OnlyFans, TWITTER (Jan 6, 2022), https://twitter.com/OnlyFans/status/1479106211383369733 (last visited July 26, 2024) (emphasis added).

[121] @OnlyFans, TWITTER (Oct. 22, 2022), https://twitter.com/OnlyFans/status/1583900250489511937 (last visited July 29, 2023) (emphasis added).

[122] @OnlyFans, TWITTER (Sept. 30, 2022), https://x.com/OnlyFans/status/1575895007659233285 (last visited July 29, 2024) (emphasis added).

k. On November 2, 2022, OnlyFans featured a Creator in this Instagram post:[123]

> Get to know the more personal side of @pamibaby.
> She's ***chatting with her fans*** on OnlyFans!
> Subscribe at: PamiBaby
> #WelcomeToOnlyFans #PamiBaby

l. On November 16, 2022, OnlyFans posted this quote from a Creator on Twitter:[124]

> "Onlyfans has given me the opportunity to build an authentic community & connect with my fans 1-on-1 while allowing me to work on my own schedule & achieve financial freedom." - @whothefiskait
> 👉Connect with #KaitlenVilla on OnlyFans!

m. On December 16, 2022, OnlyFans posted on Twitter:[125]

> Meet the Sims that started it all, @Chloe_Sims "She's ***responding to DMs***, making ***custom content***, and more on OnlyFans!

n. On March 9, 2023, OnlyFans posted this quote from a Creator on Twitter:[126]

---

[123] @OnlyFans, INSTAGRAM (Nov. 2, 2022), https://www.instagram.com/p/CkeGR5zMSJ5/?hl=en (last visited July 19, 2024) (emphasis added).

[124] @OnlyFans, TWITTER (Nov. 16, 2022), https://x.com/OnlyFans/status/1592981269775646720 (last visited July 26, 2024) (emphasis added).

[125] @OnlyFans, TWITTER (Dec. 16, 2022), https://x.com/OnlyFans/status/1603935543720656897 (last visited July 26, 2024) (emphasis added).

[126] @OnlyFans, TWITTER (Mar. 9, 2023), https://x.com/OnlyFans/status/1633932464627548160 (last visited July 26, 2024) (emphasis added).

> "OnlyFans gives me a space to express myself and let off steam after my shift at the hospital ends. I love being able to chat with people ... and share a side of myself that not everyone gets to see!" - @Samthenurse13
> 🩺 The nurse will see you now: onlyfans.com/samanthalacey82

o. On May 3, 2024, OnlyFans posted this quote from a Creator on Instagram:

> "I've been a creator on OnlyFans for years, and I can't imagine life without this platform! I'm so grateful for all the amazing people I've met along the way. OnlyFans empowers me to express myself while ***connecting personally*** with my fans."[127]

p. On July 17, 2024, OnlyFans posted this quote from a Creator on Instagram:

> "Since joining OnlyFans in 2018, I have made so many amazing ***connections with my fans*** and built ***genuine relationships***."[128]

q. On April 19, 2025, OnlyFans posted this quote from a Creator on X:[129]

> "OnlyFans gives me the opportunity to connect with my fans on a more intimate, ***one-on-one level***. Unlike social media, I post content that allows me to ***interact with people individually***." - Francia James

---

[127] @OnlyFans, INSTAGRAM (May 3, 2023), https://www.instagram.com/p/C6hHkbNvRAv/?hl=en&img_index=1 (last visited July 26, 2024) (emphasis added).

[128] @OnlyFans, INSTAGRAM (Jul. 19, 2024), https://www.instagram.com/p/C9iEaYWvDLE/?hl=en&img_index=1 (last visited July 26, 2024) (emphasis added).

[129] @OnlyFans, X (April 23, 2025), https://x.com/OnlyFans/status/1913619685834096867 (last visited Jan. 2, 2026) (emphasis added).

🧡 Subscribe now: http://OnlyFans.com/Francety

r. On August 16 2025, OnlyFans posted this quote from a Creator on Instagram:[130]

> "On OF, I live my life on my own terms! I get to ***connect more authentically*** with the audience I've been building. Going online is a highlight of my day!" – @clairegrimes
>
> Connect with Claire! 📲 OF: ClaireGrimes

s. On October 22, 2025, OnlyFans posted this quote from a Creator on Instagram:[131]

> "“I've had an amazing experience as a creator on OF. I have the freedom ***to chat with my loyal followers*** and build lasting relationships while sharing my life outside of the industry.” - @EvaAngelina.tv
>
> Join Eva on OF 💫
> OF: EvaAngelina.Official

231. The problem, of course, is that truly “direct,” “1 on 1,” “genuine,” and “authentic” communication doesn't “scale up” very well, which means that OnlyFans' representations to Fans are directly at odds with its business model.

---

[130] @OnlyFans, INSTAGRAM (Aug. 16, 2025), https://www.instagram.com/p/DNlTF3KMsPE/?img_index=3 (last visited Jan. 2, 2026) (emphasis added).

[131] @OnlyFans, INSTAGRAM (October 22, 2025), https://www.instagram.com/p/DQHhMMHFWtp/?img_index=1 (last visited Jan. 2, 2026) (emphasis added).

**E. OnlyFans Terms of Service**

232. OnlyFans has "Terms of Service" ("TOS")—which OnlyFans defines as "the legally binding agreement between you and us which consists of" nine different documents: (1) Terms of Use for all Users ("TOU"); (2) Terms of Use for Fans ("Fan TOU"); (3) Terms of Use for Creators ("Creator TOU"); (4) Privacy Policy ("PP"); (5) Acceptable Use Policy ("AUP"); (6) Referral Program Terms ("RPT"); (7) Complaints Policy; (8) Platform to Business Regulation Terms; and (9) Community Guidelines.[132]

233. In the TOU OnlyFans promises: "We will use reasonable care and skill in providing OnlyFans to you."[133]

234. Under the TOU, "OnlyFans" in this context means its web platform.[134]

235. The TOU provides that "Your agreement with us does not give rights to any third parties, except that the exclusions and limitations of liability in section 14 (Who is responsible for any loss or damage suffered by you?) and the terms in

---

[132] TOU ¶ 2(k) (ECF No. 60-1 at 11). OnlyFans' Terms of Service were updated in August 2024 (effective September 1, 2024), after the original Complaint in this matter was filed on July 29, 2024. While some provisions were reworded or reorganized, the core structure and substance of the Terms—including the Acceptable Use Policy, Privacy Policy, and contractual terms governing Fan–Creator interactions—remain materially the same. For clarity and consistency, this Amended Complaint continues to refer to the pre-September 2024 version of the Terms where relevant and notes if there are any significant changes.

[133] TOU ¶ 9 (ECF No. 60-1 at 15). OnlyFans TOS still has this same promise. Terms of Use ¶ 15, ONLYFANS, https://onlyfans.com/terms (last visited Jan 1, 2026).

[134] TOU ¶ 2(a) (ECF No. 60-1 at 10).

section 16 (Terms relating to disputes) may be enforced by our subsidiary companies, employees, owners, representatives and agents."[135]

236. The TOU requires every Fan and Creator to make certain commitments: "Your commitments to us: When you register with and use OnlyFans, you make the following commitments to us:

a. If you previously had an account with OnlyFans, you confirm that your old account was not terminated or suspended by us because you violated any of our terms or policies.

b. You will make sure that all information which you submit to us is truthful, accurate and complete.

c. You will update promptly any of your information you have submitted to us as and when it changes.

d. You consent to receiving communications from us electronically, including by emails and messages posted to your OnlyFans account, and to the processing of your personal data as more fully detailed in our Privacy Policy.

e. You will keep your account/login details confidential and secure, including your user details, passwords and any other piece of information that forms part of our security procedures, and you will not disclose these to anyone else. You will contact support@onlyfans.com promptly if you believe someone has used or is using your account without your permission or if your account has been subject to any other breach of security. You also agree to ensure

[135] TOU ¶ 15(e) (ECF No. 60-1 at 21).

that you log out of your account at the end of each session, and to be particularly careful when accessing your account from a public or shared computer so that others are not able to access, view or record your password or other personal information.

f. You are responsible for all activity on your account even if, contrary to the Terms of Service, someone else uses your account.

g. You will comply in full with these Terms of Use for all Users, our Acceptable Use Policy and all other parts of the Terms of Service which apply to your use of OnlyFans."[136]

237. The TOU states: "These Terms of Use for all Users govern your agreement with us. Certain other terms or policies forming part of the Terms of Service will also apply to you and form part of your agreement with us, as follows:

a. Terms of Use for Fans – which contain additional terms which apply if you use OnlyFans as a Fan;

b. Terms of Use for Creators – which contain additional terms which apply if you use OnlyFans as a Creator;

c. Privacy Policy – which applies to all Users and tells you how we use your personal data and other information we collect about you;

d. Acceptable Use Policy – which applies to all Users and tells you what you can and can't do on OnlyFans;

e. Referral Program Terms – which outline the terms that apply if you participate in the OnlyFans Referral Program;

---

[136] TOU ¶ 7 (ECF No. 60-1 at 12–13).

f. Complaints Policy – which sets out the procedure for making a complaint about any aspect of OnlyFans, and how we will deal with that complaint;

g. Platform to Business Regulation Terms – which contain additional terms which apply to Creators who are established or resident in the European Union or the United Kingdom;

h. Our Community Guidelines – which provide additional terms and guidance regarding your interactions with OnlyFans."[137]

238. The TOU further states: "If there is any conflict between these Terms of Use for all Users and any of the terms or policies listed at section 17(a) to (h) above, ***the Terms of Use for all Users will apply to the extent of the conflict***."[138]

239. The TOU give FIL the right to "suspend or terminate your account" if a Fan or Creator is not following the TOS.[139]

240. The Fan TOU states: "BY USING OUR WEBSITE AS A FAN YOU AGREE TO THESE TERMS – PLEASE READ THEM CAREFULLY."[140]

241. The Fan TOU provides that only certain portions of the TOS apply to Fans: "Other terms which will apply to your use of OnlyFans: The following terms will also apply to your use of OnlyFans and you agree to them:

a. Our Terms of Use for all Users;

---

[137] TOU ¶ 17 (ECF No. 60-1 at 23–24).

[138] *Id.* (ECF No. 60-1 at 24) (emphasis added).

[139] TOU ¶ 8 (ECF No. 60-1 at 13–14).

[140] Fans TOU (ECF No. 60-1 at 24).

b. Our Privacy Policy – which tells you how we use your personal data and other information we collect about you;

c. Our Acceptable Use Policy – which tells you what you can and can't do on OnlyFans;

d. Our Complaints Policy – which sets out the procedure for making a complaint about any aspect of OnlyFans, and how we will deal with that complaint;

e. The Standard Contract between Fan and Creator – which does not form part of your agreement with us, but which governs and sets out the terms applicable to each Fan/Creator Transaction you enter into on OnlyFans; and

f. Our Community Guidelines – which provide additional terms and guidance regarding your interactions with OnlyFans."[141]

242. The Fan TOU specifies that the other TOS only applies to Fans in certain conditions. "Other terms which ***may*** apply to your use of OnlyFans: The following additional terms ***may*** apply to your use of OnlyFans:

a. ***If you are also a Creator***, the Terms of Use for Creators will apply to your use of OnlyFans as a Creator;

b. If you are a Creator who is established or resident in the European Union or the United Kingdom, then the Platform to Business Regulation Terms will also apply to you; and

[141] Fan TOU ¶ 3 (ECF No. 60-1 at 24–25).

c. If you participate in the OnlyFans referral program, the Referral Program Terms will apply to your use of the OnlyFans Referral Program."[142]

243. The Creator TOU states: "BY USING OUR WEBSITE AS A CREATOR YOU AGREE TO THESE TERMS – PLEASE READ THEM CAREFULLY."[143]

244. The Creator TOU provides: "We charge a fee to you of twenty per cent (20%) of all Fan Payments made to you . . . Our Fee includes the costs of providing, maintaining and operating OnlyFans and storing your Content."[144]

245. The Creator TOU provides: "Only individuals can be Creators. Every Creator is bound personally by the Terms of Service. If you have an agent, agency, management company or other third party which assists you with the operation of your Creator account (or operates it on your behalf), this does not affect your personal legal responsibility. Our relationship is with you, and not with any third party, and you will be legally responsible for ensuring that all Content posted and all use of your account complies with the Terms of Service."[145]

246. The Creator TOU provides: "We may withhold all or any part of the Creator Earnings due to you but not yet paid out: i. if we think that you have or may have seriously or repeatedly breached any part of the Terms of Service . . .for as

---

[142] Fan TOU ¶ 4 (ECF No. 60-1 at 25) (emphasis added). In the current TOS, the Creator TOS is no longer listed as part of the TOS, making it clear it does not apply to Fans. https://onlyfans.com/terms (last visited Jan. 1, 2026).

[143] Creator TOU (ECF No. 60-1 at 28).

[144] Creator TOU ¶ 5 (ECF No. 60-1 at 29).

[145] Creator TOU ¶ 7 (ECF No. 60-1 at 30).

long as is necessary to investigate the actual, threatened or suspected breach by you or the suspected unlawful activity (as applicable). If following our investigation, we conclude that (i) you have seriously or repeatedly breached any part of the Terms of Service . . . we may notify you that you have forfeited your Creator Earnings. . . . (e) If once we have finished our investigation we determine that Creator Earnings are forfeited, we will (unless prohibited by law) use our best efforts to ensure that any Fan Payments which resulted in forfeited Creator Earnings are returned to the relevant Fans who paid such Fan Payments."[146]

247. The AUP which "forms part of [all users] agreement with [OnlyFans]," states: "Do not use OnlyFans except for your own personal use and do not sell, rent, transfer, or share your account or any Content obtained from your use of OnlyFans to or with anyone else."[147]

248. The AUP provides: "Do not upload, post, display, or publish Content on OnlyFans that is illegal, fraudulent, defamatory, hateful, discriminatory, threatening or harassing, or which encourages or promotes violence or any illegal activity."[148]

249. "Do not use OnlyFans to engage in misleading or deceptive conduct, or conduct that is likely to mislead or deceive any other User."[149]

250. The AUP provides: "Do not do anything that violates our or someone else's rights, including intellectual property rights (examples of which are

---

[146] Creator TOU ¶ 13 (ECF no. 60-1 at 35–36).

[147] AUP ¶ 1 (ECF No. 60-1 at 39).

[148] AUP ¶ 3 (ECF No. 60-1 at 39).

[149] AUP ¶ 8 (ECF No. 60-1 at 41).

copyright, trademarks, confidential information, and goodwill), personality rights, unfair competition, privacy, and data protection rights."[150]

251. The AUP provides: "Do not impersonate us, one of our employees, another User, or any other person or company."[151]

252. The Standard Contract states that it "sets out the terms which govern each transaction between a Fan and a Creator on OnlyFans."[152]

253. The Standard Contract applies "[e]ach time a Fan/Creator Transaction is initiated on OnlyFans."[153]

254. The Standard Contract provides that "[t]he only parties to this agreement are the Fan and Creator participating in the Fan/Creator Transaction. Neither Fenix International Limited nor any of its subsidiary companies is a party to this agreement."[154]

**F. OnlyFans allows the "Chatter Scams" because it financially benefits OnlyFans.**

255. In economic theory terms, OnlyFans is what economists call a "two-sided market" or a "two-sided platform."[155] But the idea that OnlyFans is merely a facilitator—providing merely a "marketplace" between two groups of users—obscures the reality that OnlyFans has vastly lop-sided incentives when it comes to

---

[150] AUP ¶ 10 (ECF No. 60-1 at 41).

[151] AUP ¶ 11 (ECF No. 60-1 at 41–42).

[152] Standard Contract ¶ 1 https://web.archive.org/web/20240721211059/https://onlyfans.com/contract (last visited Dec. 29, 2025).

[153] *Id.* ¶ 2.

[154] *Id.* ¶ 3.

[155] Two-sided market, WIKIPEDIA, https://en.wikipedia.org/wiki/Two-sided_market (last visited July 29, 2024).

protecting the interests of each group, which has resulted in allowing the Chatter Scams to increase its own profits.

256. Because OnlyFans takes a cut of Creators' revenues—and those revenues represent the vast majority, if not all, of OnlyFans' own revenues—OnlyFans' ability to increase its own profit relies in large part on its ability to attract ***Creators***—something it has done by emphasizing their ability not just to make money from their content, but to increase that money exponentially by increasing and communicating with their Fan base.

257. The primary narrative of OnlyFans' own documents—in both publicly filed financial reports and public-facing materials (including the OnlyFans website)—revolves around the platform's goal of "empower[ing]" Creators to monetize their content. For example, FIL's financial reports filed in August 2023 emphasize that "[a]s OnlyFans continues to grow, The Group continues to invest in the scaling and development of the platform and product development **to better serve the Creator community** and to enhance its best in class safety controls."[156]

258. OnlyFans' marketing was geared almost exclusively towards Creators for at least the first few years of its existence.

259. For example, until at least mid-2019, OnlyFans' home page featured, on one side, a "Subscribe" button with the tagline: "Sign up to make money and interact with your fans!" On the other side, it showed an image of a smartphone

[156] *Fenix International Limited Strategic Report for the Year Ended 30 November 2022*, filed with UK Companies House at 1, https://find-and-update.company-information.service.gov.uk/company/10354575/filing-history/MzM5MDY3MzE3MWFkaXF6a2N4/document?format=pdf&download=0 (last visited Jul. 28, 2024) (emphasis added).

screen containing an "About" page for OnlyFans designed to look like a settings screen, with emphasis on the details of how (and how much) OnlyFans pays Creators. *See below*, **Figure 6**.




***Figure 6****. OnlyFans Home Page, geared toward Creators—not Fans.*

260. Only much later did OnlyFans change the subscription tagline to the more Fan-focused tagline: "Sign up to support your favorite creators."

261. Because OnlyFans profits when Creator accounts profit, OnlyFans has no incentive to protect Fans' interests and every incentive to encourage anything—or any entity—that increases a Creator's revenue and makes good on the platform's promise to "empower" Creators, regardless of the consequences for Fans.

262. Perhaps the most egregious activity implicitly encouraged and purposely overlooked or permitted by OnlyFans is the use of professional

"chatters" to impersonate OnlyFans Creators in order to manipulate Fans into paying as much as possible for PPV content and tips, and to use a single Creator account to develop as many "personal" relationships as possible—24 hours a day, 7 days a week. This Complaint refers to this as the "Chatter Scams."

**G. Anatomy of the Chatter Scams**

263. The Chatter Scams are primarily perpetrated by "management agencies" such as the Agency Defendants on behalf of and at the direction of the Creators. As described in more detail below, these agencies sell their services to OnlyFans Creators with promises that they can increase a Creator's revenue exponentially—without the Creator ever having to actually do what OnlyFans promises: "directly connect" with Fans. Together, while utilizing OnlyFans' intentionally permissive network environment, the Creators and Agency Defendants work in unison to sign up as many Fans as possible while ensuring the Creators have no real role in communications with their Fans.

264. Unlike simply posting content and charging for it, the Chatter Scams involve industrial levels of coordination and data management to convince individual Fans that they are actually having a direct interaction with a given Creator.

265. On information and belief, once a Creator engages an agency to operate his or her account, the agency takes over and operates all aspects of the Creator's account.

266. Working in partnership with their Creators—often with full permission and authority from those Creators—agencies contract with Chatters to conduct most, if not all, of the communications between the Creators and the Fans. Without

the Fans' knowledge, the Chatters impersonate the Creators when direct messaging with Fans.

**1. Agencies exploit cheap labor to "farm" money from Fans by deceptively impersonating Creators.**

267. Agencies often use Chatters of all genders and ages from countries like the Philippines or Venezuela, where they can find relatively well-educated, English-speaking (or even multilingual) workers—but pay them a fraction of what the required skillset would command in the U.S. labor market. On information and belief, most agencies pay Chatters approximately $3–$4 U.S. dollars per hour.

268. Chatter positions—sometimes referred to using deliberately oblique terms like "account manager" or "virtual assistant"—are openly advertised online, and entire online discussion forums have developed around the jobs. Some forums discuss how to get a chatter job, how Chatters can avoid scammers posing as "legitimate" agencies, what to expect in terms of pay, and even the difficulty of the working conditions.

269. For example, several Chatters post on the *r/onlyfanschatter* subreddit forum, where posts have included Chatters discussing the labor abuses they suffer at the hands of agencies, such as being forced to work 70-hour weeks or being fired for missing shifts for circumstances outside their control (*e.g.*, power outages). Another chatter lamented the fact that Chatters are being treated like "robots," and felt the need to assert: "We're humans, we feel."

270. One chatter (a man in Venezuela) laid out the logistical difficulties inherent in attempting to convince multiple Fans they were speaking to the same

young American model—and spoke in graphic detail about the psychological toll of the job:

> Talking to hundreds of weirdos per shift while looking at their d***s and telling them how big it is (even if it's not) is not that easy. You are always talking to 10–15 guys at the same time. You also have to send mass DMS (which they think is a dm just for them, but you are sending it to everyone) every 15–25 minutes… **It's actually a very organized job.** I am not saying it's the hardest, but definitely consuming. As for the payment, third world country payment so about 500$ monthly for us (which is nothing considering each creator's account made 15k-30k monthly

271. Chatters, once hired, are expected to learn as much as possible about the Creator they will be impersonating, and are often given very explicit directions about how to sound as much like the Creator as possible. One journalist who went "undercover" as an OnlyFans Chatter described his first assignment like this:

> The agency's manager sent me a background memo about the woman I'd be playing, a purported 21-year-old university student blessed with physical proportions that are in vogue these days. **To ensure that my performance was as authentic as possible, I spent two hours committing all of her details to memory:** her favorite programming language, her favorite sushi roll, her favorite classic rock band, the width of her rear end. The memo also contained notes regarding her preferred chatting style **(I had to strive to be "40 percent girly")** and a pricing guide to all the exclusive content in her "vault."[157]

272. Agencies even provide Chatters with actual "scripts" similar to those used by telemarketers and call center employees, which give Chatters a specific

---

[157] Brendan I. Koerner, *I Went Undercover as a Secret OnlyFans Chatter. It Wasn't Pretty*, WIRED, https://www.wired.com/story/i-went-undercover-secret-onlyfans-chatter-wasnt-pretty/ (last visited July 29, 2024) (emphasis added).

workflow to follow in order to maximize the amount of money extracted from any given Fan. One online commentator described how "***each 'chatter' is given a carefully designed script to follow in their messages***. The script has been designed, just as a sales script is, to lead the Fan into getting into a 'buying mood' and to end up buying content."

273. The interactions that often garner the most money are those in which a Fan pays for "custom" PPV content created (ostensibly) specifically for that individual Fan. It is very common for Fans to request custom videos from Creators—often spending hundreds of dollars for a single video.

274. To facilitate the generation of custom content, agencies have put in place sophisticated processes. The workflow for a given agency might vary slightly, but often looks like a variation of the following:

a. The agency requires a Creator to create a certain amount of "stock" content, in the form of prerecorded videos and contemporaneous still photos, on a regular (usually weekly) basis. That content is uploaded to the cloud using a service like Dropbox or Google Drive, which can then be accessed by agency employees or contractors and used to populate a Creator's OnlyFans "Vault"—a specific online location provided by OnlyFans and designed to keep "exclusive" content accessible only to paying customers.

b. Acting on behalf of and as the agent of the Creator, the agency provides Chatters with direct access to the Creator's OnlyFans account—whether directly (by providing Chatters with login

information) or indirectly (via third-party CRM (customer relationship management) software described below).[158]

c. Chatters communicate with Fans directly or indirectly through the OnlyFans account, impersonating the Creator in order to sell Fans content from the Creator's Vault and/or obtain Fans' requests for specific "custom" content.

d. When a Fan requests custom content, the Chatter notifies the Creator of the request ("Chatter–Fan Communication"). The specific communication technology varies, but on information and belief, always takes place outside of the OnlyFans platform itself—via, for example, a Slack channel, a text or WhatsApp message, a Google spreadsheet, or a third-party CRM application. There, the Chatter enters information about the custom request, including:

i. The date of request;

ii. The Fan's name and/or username;

iii. A link to the Fan's profile on OnlyFans;

iv. The price being charged for the custom content; and

v. A copy of the Fan's original communication providing details about the content desired.

275. In addition to requesting custom content, it is common for Fans to send their own photos or videos ("Fan-Generated Content") to a Creator and ask for the Creator's reaction to the content—in which case the Chatter–Creator

---

[158] Agencies almost universally require Creators, as a condition of "representation" by the agency, to provide direct access to and control over their OnlyFans accounts. Thus, the Creator never has to log into or operate the account for the operation to run smoothly.

Communication may also contain that Fan-Generated Content. Fan-Generated Content often contains extremely private or sensitive material of a sexual nature—in some cases, for example, asking a Creator to "rate" some aspect of the Fan's sexual anatomy.

276. Agencies do not require Chatters to be similar in any way to the Creators they impersonate: Indeed, reports abound on the internet of Filipino or Venezuelan males being paid to impersonate young American female Creators.

277. These reports—and other details about the Chatter Scams—have increasingly appeared as "exposés" in mainstream publications, including:

a. The New York Times, which, in May 2022, published an article entitled "The 'E-Pimps' of OnlyFans: Clever marketers have figured out how easy it is to simulate online intimacy at scale, ventriloquizing alluring models with cheap, offshore labor."

b. Wired Magazine ("I Went Undercover as a Secret OnlyFans Chatter. It Wasn't Pretty.") (May 15, 2024).

c. El País ("$500 a day to pretend to be a model: The big business behind OnlyFans 'chatters'") (November 2023).

d. Cosmopolitan Magazine ("Watch out for the OnlyFans pimps: can they really make you millions?") (June 24, 2024).

278. Some reports describe individual Chatters who are morally conflicted about their work.

279. For example, the Venezuelan chatter quoted above—after talking about the level of organization required for the job—went on to say:

> I feel bad because I talked to MANY guys who fell in love for a girl who doesn't even know they exist and we had to take as much money as we could from everyone, that was the goal.[159]

280. And in 2021, Chatters employed by the Unruly Defendants sued the agency for wage theft, unlawful termination, and the intentional infliction of emotional distress. As Business Insider reported:

> In the suit, [the Chatters] also broke an informal code of silence around the company by saying Unruly required them "to intentionally lie to, dupe, and mislead fans." . . . The lawsuit, which includes examples of conversations in which account managers pretended to be [model Abby Rao], says that the fans who pay to message Unruly ***clients believe they are "communicating directly with the models,"*** and they, in turn, divulge their "deepest and innermost personal secrets including sexual fantasies and fetishes, marital troubles, suicidal ideations, and other private desires to [the Chatters]."
>
> "For instance, one fan lamented the demise of his marriage (and provided intimate details regarding the same) and details about his sexual fantasies to [a chatter] believing that she was [Rao], and he continued to send in money on the basis of this deception," the lawsuit says. ***"You're basically a professional scammer," Emma said of working at Unruly.*** [160]

---

[159] MediaVSReality, *The Dirty Secrets About OnlyFans that Nobody Seems to Know*, MEDIUM, https://mediavsreality.medium.com/the-dirty-truth-about-onlyfans-c82b5ef1b151 (last visited July 29, 2024).

[160] Kat Tenbarge and Amanda Perelli, *Inside a secretive management firm for OnlyFans stars, where former staffers say they catfished fans to dupe them into paying to sext: 'You're basically a professional scammer*,' BUSINESS INSIDER, https://www.businessinsider.com/former-onlyfans-star-managers-say-they-catfished-fans-unruly-agency-2021-12 (last visited January 1, 2026) (emphasis added).

281. For the most part, though, the agencies engaged in Chatter Scams don't appear to have any qualms about defrauding Fans—often using terms like "farming" to refer to the process of fleecing or squeezing Fans for as much money as possible.

**2. An entire ecosystem of third-party CRM tools are facilitating the deception of Fans on the OnlyFans platform to further scale the Chatter Scams.**

282. Multiple companies in recent years have developed specialized tools designed to facilitate the use of a single OnlyFans account by multiple people, including, explicitly, teams of Chatters.

283. Tools such as Supercreator, CreatorHero, Infloww, and OnlyMonster are CRM platforms designed to allow agency team members to access OnlyFans simultaneously in order to manage Creator accounts and facilitate the Chatter Scams.

284. On information and belief, the Agency Defendants generally use CRM tools that access the Creator's OnlyFans account that simultaneously mirror a single live session inside a multi-seat dashboard. These tools let multiple chatters read and answer DMs concurrently, without requiring each chatter to separately log into the Creator's official OnlyFans account—and doing so without having to access the OnlyFans online interface.

285. The CRM tools generally function by automating interactions with the OnlyFans website using various web-based technologies that intercept messages and content simultaneously with their transmission, effectively cloning a Creator's inbox across several live user sessions. This provides Chatters and other agency

representatives with an alternate platform to simultaneously message and otherwise interact with Fans directly through Creator accounts in real time.

286. In other words, once the CRM platform is enabled, Fan messages sent to a Creator's account are simultaneously intercepted, diverted and routed through the CRM platform, where a Chatter impersonating the Creator can then respond to the Fan through the Creator's account in order to interact with the Fan, solicit subscribers and tips, sell content from the Creator's Vault, and/or obtain Fans' requests for specific "custom" content.

287. Indeed, this is precisely how a leading CRM platform, Supercreator, markets its product to Agencies:[161]




288. This practice is so prevalent that CRM platforms openly market their services to Creators and agencies, and have even begun marketing their ability to facilitate Chatter schemes through the use of AI, which allows Chatters to "chat

[161] Your OnlyFans Operating Platform, SUPERCREATOR, https://www.supercreator.app/access-managment (last visited December 29, 2025).

faster, sell easily, and improve on what really matters: building deeper, lasting relationships with fans."[162]

289. For example, Supercreator explicitly advertises to agencies and Creators their ability to facilitate the use of OnlyFans accounts by using Chatters. *See* **Figures 7 & 8** below, all taken from the Supercreator website:[163]




***Figure** 7. Screenshot from Supercreator website.*




***Figure 8**. Screenshot from Supercreator website.*

[162] Boost sales with AI Copilot, SUPERCREATOR, https://www.supercreator.app (last visited April 23, 2025).

[163] Features, SUPERCREATOR, https://supercreator.app/features/?utm_content=sess_1717808225737_3y8kr0lsb8u (last visited June 7, 2024).

290. For instance, Supercreator explicitly represents that its CRM software application seamlessly integrates with the OnlyFans platform:[164]




291. For its part, OnlyFans is either aware of, or intentionally ignorant to, the use of CRM software on its platform—not least because its use violates OnlyFans' Terms of Service—but chooses to do nothing to prevent the use of this software because of the increased revenues that CRM software facilitates.

**H. OnlyFans allows Chatter Scams to run rampant on its platform.**

292. The prevalence of Chatter Scams is far more than an open secret—myriad evidence demonstrates that OnlyFans is either aware of and actively facilitates Chatters, or is otherwise intentionally ignorant.

293. Indeed, despite the fact that the platform's policies contain specific terms purporting to prohibit Creators from allowing anyone else to even access their accounts, other terms found in the policies that apply only to Creators specifically contemplate that a Creator might "have an agent, agency, management company or other third party" which not only "assists" the Creator with "the operation of [the] Creator account," but possibly "operates it on…behalf" of the Creator.

---

[164] Frequently Asked Questions, SUPERCREATOR, https://www.supercreator.app/creators (last visited Jan. 2, 2026).

294. Tellingly, however, that language appears ***only*** in the provisions of the Creator TOU purporting to limit OnlyFans' liability for the actions of third parties, where it provides that "Only individuals can be Creators. Every Creator is bound personally by the Terms of Service. If you have an agent, agency, management company or other third party which assists you with the operation of your Creator account (or operates it on your behalf), this does not affect your personal legal responsibility."[165]

295. One Creator—formerly represented by Defendant Siren—described the incentives for the informal code of silence that exists in the industry with respect to the use of Chatters by agencies. In an interview posted on YouTube on December 24, 2022, in which she described the experience of being represented by Siren Agency, the Creator, named Riley Foxx, explained:

> [T]he reason a lot of [OnlyFans] models don't want to come forward and tell people what their experience is because [OnlyFans] is supposed to be this fan-based, personal experience that you're supposed to get with the model. So if you're saying, "Hey, I had this agency messaging for me," they're not going to look at that as, "oh, I wanted to better your experience." It's like, "wow, you couldn't even message me. And that's what it's for." So I totally get why people aren't coming out and speaking out about it. . . . Nobody wants to say, "Hey, there was someone messaging . . . that wasn't me messaging me—but it ***was***."[166]

[165] Creator TOU ¶ 7 (ECF No. 60-1 at 30).

[166] *Down The Siren Agency Rabbit Hole – Very Really Good #203*, VERY REALLY GOOD YOUTUBE CHANNEL (Dec. 24, 2022), https://www.youtube.com/watch?v=iWzaA9lAA2Y (last visited Jan. 2, 2026)

296. OnlyFans knows that its Creators are not personally chatting with Fans. For example, OnlyFans promotes that Fans can direct message with Chloe Sims, yet OnlyFans filmed an "OnlyFans Original" reality show that followed Ms. Sims while filming the show. Despite substantial time on camera for a long period of time, nowhere did it show Ms. Sims communicating with Fans. Yet, on information and belief, Ms. Sims brings in over $100,000 a month on OnlyFans.

297. But when a Fan communicates with Ms. Sims, she assures them it is her:




***Figure 9**. Screenshots of Chloe Sims OnlyFans chat.*

298. Similarly, Denise Richard reportedly makes $2,000,000 a month on OnlyFans. She also tells Fans that they are communicating directly with her, that she is "personally answering" comments, even though she could not possibly be direct messaging with her Fans:




***Figure 10***. *Screenshot of Denise Richards OnlyFans chat.*

299. Plaintiffs never consented to the disclosure of their communications with Creators to third parties—much less the contemporaneous interception of those electronic communications—and nothing on the OnlyFans platform provided any warning or disclosure to Plaintiffs that their messages could be routed to third-party agents impersonating Creators.

**1. OnlyFans actively monitors the traffic on its platform, including information that would allow OnlyFans to detect the use of Chatters by a Creator account.**

300. Evidence of OnlyFans' actual knowledge of the Chatter Scams is bolstered by evidence that at a minimum, OnlyFans *should know* about the scams simply by monitoring its own network logs—something it not only admits doing but actively touts as part of its emphasis on "safety."

301. In 2022, for example, OnlyFans' then-CEO Ami Gan told Time magazine that "[s]afety is ultimately the foundation of our entire business," boasting that the company's verification protocols were so robust that "**we have no anonymity on the platform; we know who everyone is**." She went on to describe what she called the platform's "very robust content moderation," confirming that not only can OnlyFans monitor the activity happening on Creator accounts, but the company prides itself on doing so:

> Everything on OnlyFans, we see it, we're able to view it, moderate it, and make sure that everyone is following our terms of service. While we do use some automated technologies to help us prioritize content, ultimately everything on the site is reviewed by a human.[167]

302. These statements are also consistent with OnlyFans' Privacy Policy, which claims to be collecting customer data ***for the specific purpose of detecting deceptive activity***— explaining that one of the reason the company collects and processes customer data is the purpose of "[m]onitoring transactions and company network, systems, applications, and data" in order to, among other things, "detect malicious, deceptive, fraudulent, or illegal activity."[168]

303. This not only (falsely) suggests to Fans that OnlyFans is actively trying to prevent fraud and deceptive conduct but demonstrates that OnlyFans has the *ability* to do so given the type of data it collects.

---

[167] Raisa Bruner, *OnlyFans CEO Ami Gan Wants to Dispel Misconceptions About the Company*, TIME (July 31, 2022), https://time.com/6202306/onlyfans-ceo-ami-gan-interview/ (last visited July 29, 2024) (emphasis added).

[168] Privacy Policy ¶ 11, OnlyFans, https://onlyfans.com/privacy (last visited July 29, 2024).

304. For example, data gathered about the use of the "company network" or "systems" includes information about how many different devices are logged into an account at a given time, as well as where those devices are located. The fact that OnlyFans routinely gathers this information is evident in the "security" emails it sends to users when an account is accessed from a new device or a new location, *see* **Figure 11** *below*—and the fact that it even provides account holders (both Fans and Creators) with information on specific "login sessions" occurring on their accounts, *see* **Figure 12** *below*.


OnlyFans

Hi [redacted],

We noticed a login to your account @u[redacted] from a new device. Was this you?

**New login**

| | |
|---|---|
| **Location*** | United States, Miami |
| **OS** | Windows 10 |
| **Browser** | Chrome 126.0 |

*Location is approximate based on the login's IP address.

**If this was you**

You can ignore this message. There's no need to take any action.

**If this wasn't you**

Complete these steps now to protect your account.

- Change your password.
- Review the login sessions that have access to your account and

***Figure 11***. *Email sent from OnlyFans to a user after a new login attempt.*




***Figure 12****. Screenshot of OnlyFans User Account showing multiple active login sessions, including the IP address from which each session originates.*

305. There is nothing remarkable about the OnlyFans platform collecting information sufficient to put the company on notice that Creator accounts are using Chatters, such as: (1) the number of devices logged into an account simultaneously, (2) the location of every device that logs into an account, and (3) the frequency and duration of logins, including those from different locations.

306. These type of network logs are industry standard and would be expected from any web-based platform. Rather, what would be truly remarkable—unbelievable even—is for the OnlyFans platform to somehow be unaware of the presence of Chatters or of CRM platforms due to the network logs it necessarily collects.

307. Upon information and belief, if OnlyFans was following its own policies and procedures, these network logs would not only identify Chatter and

CRM activity but would be a valid basis to flag suspicious activity occurring on Creator accounts.

308. Indeed, the OnlyFans platform itself contains all the digital evidence necessary to identify the Chatter Scams. For instance, the network logs, system artifacts, account-related metadata, messaging history, and associated IP-account information—all of which OnlyFans collects instantaneously—comprise the digital anatomy of the Chatter Scams, which are not hidden anywhere, but exist in plain sight.

309. OnlyFans has, therefore, either intentionally created a network environment that allows the Chatter Scams to proliferate—such as allowing unfettered logins from around the globe to facilitate Chatters, and compatibility with CRM browser extensions to integrate CRM platforms—or it has implemented procedures to bypass and/or ignore its own policies and procedures, which require that it monitor and respond to the exact network activity the Chatter Scams create.

310. If that weren't evidence enough, on information and belief, OnlyFans also tracks the volume of messaging traffic between Fans and Creator accounts that would demonstrate the use of Chatters.

311. For instance, even if agencies or CRM platforms were attempting to "mask" the number of concurrent users—for example, by routing traffic through shared IP addresses or simulating a single device login—something that does not appear to be occurring, OnlyFans actively maintains logs that would identify simultaneous message transmissions at volumes no individual could plausibly generate.

312. Moreover, due to the voluminous messaging traffic and corresponding login activity occurring simultaneously from locations across the globe, it is unclear how the OnlyFans platform could maintain any semblance of integrity or network security without actively accounting for the Chatter Scams. This is particularly acute because the OnlyFans platform is premised on delivering streaming content across the globe without interruption.

**2. OnlyFans intentionally markets to Agencies.**

313. Whatever else might be said about its network operations, any suggestion that OnlyFans is ignorant of the fact that Creators hire agencies to manage their accounts is undermined by the fact that not only was OnlyFans' original marketing focused entirely on the Creator-side of the platform (as described above), OnlyFans has specifically marketed directly to the agencies themselves.

314. The archives of the OnlyFans Blog show a post from February 20, 2019 titled "Unlocking the earning potential for agencies and talent managers," which explained that "as brands and manufacturers look to access influencers that synergise with their audience demographic, ***agencies have become a key ally to help develop subliminal content marketing campaigns and connect brands with the right type of influencer***."[169]

> Whilst OnlyFans has become a major force in the influencer market, enabling content creators to connect with fans on a higher value basis by attracting

---

[169] Blog Post, ONLYFANS, *Unlocking the Earning Potential for Agencies and Talent Managers*, https://web.archive.org/web/20220811014012/https://blog.OnlyFans.com/unlocking-the-earning-potential-for-agencies-and-talent-managers/ (last visited July 29, 2024) (emphasis added).

> subscribers from their loyal fanbase, **our platform also provides a substantial opportunity for agencies, agents and influencer management companies.** With content creators delivering exclusive content on OnlyFans, adding value to what they do on their mainstream platforms, typically 1%-5% of their audiences are gravitating to their OnlyFans account and paying for their content, at a subscription rate determined by the influencer.
>
> It also provides a differential to free-to-view platforms by encouraging a ***different kind of connection via direct messaging*** and requests for personalised content and ***1-on-1 interaction.***
>
> This model has proved highly effective. In just two and a half years, OnlyFans has amassed 50,000 content creators globally and it has paid out in excess of $100m to them in subscriber income. Indeed many boost their income via our referral programme too, receiving 5% of incomes from new creators they introduce to OnlyFans. This is additional to the incomes they receive from brand deals and ambassadorships.
>
> With agencies playing a pivotal role through their connections with influencers and the handling of their commercial interests via brand campaigns, ambassadorships and campaign management services, **the opportunity for agencies to gain by association with OnlyFans returns two primary benefits.**
>
> Next, it provides a significant final incentive for the agency to boost their own income by referring their network of influencers.[170]

315. Then, in a section titled "HOW YOUR AGENCY BENEFITS," OnlyFans provided a graphic representation of an "example agency model" in which the agency's annual income from the platform totaled nearly half a million

[170] *Id.* (emphasis added).

dollars, suggesting that engaging with the platform "and making OnlyFans a part of your agency proposition" could make a "significant impact on agency incomes" and that "***OnlyFans provides a lucrative opportunity for creators and agencies***," so "[w]hy not give us a call or email us to discuss the potential of OnlyFans to your agency business and influencer communities?"[171]

316. Not only did the post generally refer to income-generating opportunities, though. It also specifically referred to the "***additional income opportunities***" an agency might gain from "***assist[ing] creators on their subscriber content*** and campaigns for brands"—and strongly suggested that such assistance by agencies would in fact be critical to the ability of Creators to monetize content:

> Ensuring subscriber numbers grow and are retained ***comes down to ensuring the content experience is enhanced for paying fans,*** who are really at the heart of this. It's not simply a matter of expecting fans to pay for what they already get on Instagram, or other social platforms, for free. ***Getting this right depends of*** [sic] ***the expertise of agents to manage their creator communities*** and, in doing so, it provides a longterm income stream for creators and agency businesses.[172]

317. The post was still on the OnlyFans website as of August 2022.

**3. Fans who discovered the Chatter Scams claim to have directly contacted OnlyFans only to be ignored.**

318. In addition to the media exposés described above, online complaints by Fans who have discovered the scams have not only outlined the deception in detail, but specifically described complaining directly to OnlyFans, only to be ignored—or even retaliated against.

[171] *Id*. (emphasis added).

[172] *Id*. (emphasis added).

319. One Fan wrote a post entitled "OnlyFans – Was not chatting to the Creator I was subscribed to," in which the Fan detailed the process by which they learned that they had not been chatting with a Creator, but with a paid Chatter:

> Why would anyone go on OnlyFans in the first place, when you can get content almost anywhere (free in most cases)?
>
> The opportunity to Direct Message the creator you are subscribed to (DM). I was subscribed to a model who has a well established career outside of OnlyFans, so I know some things about her already. If I asked any questions about her past work which I am curious about, she would not answer. Instead, **there was always a push to unlock content.**
>
> The creator sent a preview pic where there was a guitar in the photo behind her. She is known as a guitar player and enthusiastic guitar collector in real life. I asked: "What make of guitar do you have there in the picture?" The answer: "I will check when I get back home. It was a gift from my mom." I was stalled for over 20 minutes before the creator returned with an answer which was Ibanez, which is a guitar brand. The fact that a guitar enthusiast didn't know what make her guitar was ringing alarm bells. It wasn't the creator I had been chatting to. She has hired a 'catfish' to impersonate her.
>
> This is a complete betrayal of trust, especially when you consider that I had said many things to this person in confidence, thinking it was the creator.
>
> This is literally fraud. It is a scam which is being perpetrated by creators on OnlyFans across the board. **OnlyFans are ultimately responsible for this.**
>
> Naturally, I complained to their tech support. They're useless. They said that [OnlyFans] do allow creators to hire a 3rd party to manage their account (but they

> didn't say anything about a 3rd party masquerading as the creator).
>
> **To say that I feel violated would be an understatement.** I hope that one day the authorities will catch up with [OnlyFans], and someone will go to jail for this fraud.
>
> User's recommendation: Don't do it! Avoid at all costs. This is the biggest scam going in the world today. Preferred solution: The scammers to be arrested.[173]

320. The next day, the Fan updated the post to note: "I'll never trust an online company that charges money to view creator content ever again."[174]

321. Another Fan wrote:

> **Consistent with other reviews,** I have found multiple circumstances where the content creator (model) is NOT the actual person communicating with you on [OnlyFans] even though they tell the subscriber they are in fact communicating. Many models PAY agents, management companies, and others to manage their feed on [OnlyFans] for them. **These "hired" people then "impersonate" the model and use the first person, "Yes its [sic] me", and "I", falsely and fraudulently, to give the subscriber the impression that they are communicating with the model, but in these cases, THEY ARE NOT!** Asking for a spontaneous photo with a time stamp, or a request to "put your finger on the tip of your nose" and take a photo, are denied, for the simple reason that the actual

---

[173] User Post, *Was not chatting to the creator I was subscribed to*, PISSED CONSUMER (May 12, 2023), https://onlyfans.pissedconsumer.com/was-not-chatting-to-the-creator-i-was-subscribed-to-202305124585869.html (last visited January 1, 2026) (emphasis added).

[174] User Post, *Hired staff impersonate models in chat. - FRAUD*, PISSED CONSUMER (Aug 05, 2023), https://onlyfans.pissedconsumer.com/hired-staff-impersonate-models-in-chat-fraud-202308054901447.html (last visited January 1, 2026) (emphasis added).

model IS NOT at the keyboard, and could not spontaneously do that for you. In these cases, **the subscriber is being deceived by an imposter [sic].**

[OnlyFans], for their part, when pushed to confirm or deny this, not only ADMITTED that "content creators can use agents, management companies, and other 3rd parties to OPERATE their account for them, but DEFENDED that its perfectly ok with them for IMPOSTERS [sic] to operate a content creator's account and [lie] to the subscriber about who they are chatting with. So a subscriber might think they are having an intimate chat with a professional model, but in reality, they are chatting perhaps with a STAFFER not even of the same sex as the model! *** **The conversation in chat with this STAFFER is designed to give a false sense of a true, real connection with the subscriber and is completely false, intended only to convince the subscriber to spend more money on behalf of the content creator.** The staffers are seemingly trained to embellish that a subscriber has actually created a true friendship with the model, when in reality, **this is closer to a CONFIDENCE / ROMANCE SCAM.**

In addition to the time stamp photo denials, simultaneous messaging on [OnlyFans] and [Instagram] for the exact same model, was easily busted as NOT THE SAME PERSON and that in one particular case NEITHER was the actual model, both the [OnlyFans] and [Instagram] streams were run by HIRED STAFFERS.

The FBI refers to this as "impersonating another person online for the purpose of soliciting money in another person's name"

[OnlyFans] refers to this as "described in our policies and guidelines."[175]

---

[175] *Id.*

322. A few weeks later, the Fan updated the review to include:

> OnlyFans spotted my review and rather than want to resolve a customer problem, they arrogantly sent me a message that instead, they TERMINATED my account! How's THAT for a customer experience?[176]

**I. OnlyFans Actively Facilitates Chatter Scams**

323. OnlyFans has meticulously crafted its reputation as a platform where Fans can communicate "directly" with Creators, and continues to work hard to sustain the illusion of "meaningful" and "authentic" engagement—despite knowing that its universal promise of "direct" connections is not realized by many (if not most) Fans. This is unsurprising, given that, as explained earlier, the amount of OnlyFans' profits bears a direct relationship to the amount of profits that can be generated by the platform's Creator accounts—which in turn relies on Fans' belief that OnlyFans offers a possibility for two-way personal interaction that distinguishes it from other social media sites where Fans can only "consume" content, which flows only one way: From Creators to Fans.

324. OnlyFans knew, and should have known, that its Creators were using Chatters to engage with Fans—including based on the revenue being generated by those Creators; the number of direct messages with Fans; the number of different login sessions to a given Creator's account, often from many different locations and IP addresses; and the number of Fan complaints (which OnlyFans ignored). Despite this, OnlyFans continued to promote its site as providing its Fans a direct connection with its Creators.

---

[176] *Id.*

325. On information and belief, OnlyFans willfully ignored or encouraged the use of Chatters because its entire revenue source relies on volume and Chatters facilitate high volumes of engagement for popular Creators.

326. In addition to the deception inherent in the schemes, however, the Chatter Scams depend on Fans' private communications and personal information being shared—without their consent—with multiple third parties.

327. Nothing in OnlyFans' Terms of Service (or any other document provided to Fans by OnlyFans) informs Fans of the possibility that their private communications might be disclosed to unauthorized third parties—much less do those documents obtain Fans' consent for such disclosures.

328. OnlyFans' failure to enforce its own policies goes beyond mere negligence and supports an inference that OnlyFans is acting intentionally to facilitate the Chatter Scams.

329. OnlyFans' refuses, or at best fails, to meaningfully enforce its own policies—despite its modification of the language of those policies over time designed to make the policies ***appear*** stricter with respect to Creator responsibilities and prohibitions on particular activities.

330. Agencies are violating explicit platform policies.

331. None of what agencies (including Agency Defendants) are doing to perpetuate the Chatter Scams is actually "allowed" by OnlyFans' TOS.

332. As outlined above, OnlyFans' TOU requires Fans and Creators to make a series of "commitments," including those that promise to protect personal and confidential information: **"You will keep your account/login details confidential and secure, including your user details, passwords and any other**

**piece of information that forms part of our security procedures, and you will not disclose these to anyone else**."[177]

333. As outlined above, the **AUP** prohibits both Fans and Creators from "misleading or deceptive conduct, or conduct that is likely to mislead or deceive any other User" and from doing " anything that violates our or someone else's rights, including intellectual property rights (examples of which are copyright, trademarks, confidential information, and goodwill), personality rights, unfair competition, privacy, and data protection rights."[178]

334. But OnlyFans' ability to control the Creator accounts on its platform and enforce its policies is not limited to suing for indemnification. OnlyFans also gives itself the power to, among other things:

a. **<u>Withhold Creator Earnings</u>** (the amount OnlyFans transfers to Creator accounts after taking its 20% cut)[179] in the event that, in OnlyFans' unilateral determination, an account has violated platform policies—or even when OnlyFans "suspect[s]. . .unlawful or fraudulent activity."[180] OnlyFans can even keep Creator Earnings that are unrelated to any breaches of policy or fraud—in order to set off its

---

[177] TOU ¶ 7 (ECF No. 60-1 at 12–13) (emphasis added).

[178] AUP ¶¶ 1, 10 (ECF No. 60-1 at 39, 41).

[179] Creator TOU ¶ 5 (ECF No. 60-1 at 29) ("We charge a fee to you [the creator] of twenty per cent (20%) of all Fan Payments made to you . . . . The remaining eighty per cent (80%) of the Fan Payment . . . is payable to you (called "**Creator Earnings**").

[180] Creator TOU ¶ 13(a)(iii) (ECF No. 60-1 at 35).

own losses—if, again, in OnlyFans' unilateral determination, the breaches cause (or even "may cause") any loss to OnlyFans.[181]

**b. <u>Conduct investigations</u>**, and withhold Creator Earnings "for as long as is necessary to investigate the actual, threatened or suspected breach by you or the suspected unlawful activity."[182]

c. **<u>Suspend Creator accounts</u>** for violations—or ***suspected violations***—of the platform's policies, or for violations of "any applicable law." OnlyFans may suspend the account for an indefinite amount of time, regardless of the impact on the Creator, and then "take any action we consider appropriate."[183]

d. **<u>Terminate Creator accounts</u>** "for any reason" with 30 days' notice, or "immediately and without prior notice" in the event OnlyFans "think[s]" a Creator has "or may have" breached the TOS; or threatens to do so "in a way which has or could have serious consequences for us or another User"; or takes "any action that in our opinion has caused or is reasonably likely to cause us to suffer a loss or that otherwise harms the reputation of OnlyFans."[184]

335. On information and belief, OnlyFans has never exercised any of its powers to prevent the use of Chatters by any Creator—much less a high-earning Creator—or rectify the violations of its terms, including those protecting the Fans'

---

[181] *Id.* ¶ 13(e) at 36.

[182] *Id.* ¶ 13(b) at 35.

[183] TOU ¶ 8(a)–(d) (ECF No. 60-1 at 13–14).

[184] *Id.*

rights to privacy and confidentiality of personal information, and those against impersonation and other deceptive acts. To the contrary, it generally refuses to do so and at times takes action against the complaining Fan, as described above. *See* Section IV.H.3 ("Fans who discovered the Chatter Scams claim to have directly contacted OnlyFans only to be ignored.").

336. Nor has OnlyFans (or any of the Agency Defendants) taken any actions that might put Fans on notice that OnlyFans' promise of connecting Fans personally and "directly" with Creators is false or misleading and done in a way that exposes their personal, confidential information and communications.

337. OnlyFans could require that Creator accounts explicitly disclose the use of third-party Chatters, as well as the fact that Fans' messages and personal information are shared with third parties and possibly stored in various servers around the world—something that is not currently (and, on information and belief, never has been) required by the Creator TOU.

338. OnlyFans could also provide a general disclaimer in the OnlyFans signup process that puts Fans on notice that they may not be communicating directly with the Creator whose name is on the OnlyFans account. Not only is this something that OnlyFans could easily do at the precise point in the signup process where it currently puts its misleading "Subscription Benefits" language, but there is precedent for such disclaimers on other sites that purport to offer "chatting" with real people—something increasingly common with the growing number of interactive "profiles" that purport to offer "chatting" with real people, but which actually use generative artificial intelligence to post content and respond to user messages. For example:

a. Facebook created several celebrity-inspired profiles in which users could interact with a celebrity in the form of a specific character. While the profiles contained an invitation from the celebrity to "message me," the chat windows in which users conducted the actual messaging contained a disclaimer noting: "Messages are generated by AI. Some may be inaccurate or inappropriate." *See* **Figure 13**, *below*.




***Figure 13***. *Screenshot of Facebook video demonstrating use of AI profiles.*

b. Likewise, a company selling "AI Assistants" meant to impersonate certain celebrities markets its platform saying "chat with the celebrities. Get up close and personal," but also provides the disclaimer below in **Figure 14** during its signup process:




***Figure 14**. Screenshot of AI assistant disclaimer.*

339. Together with the other facts alleged in this Complaint, the fact that, despite having the contractual tools to do so, OnlyFans refuses to put an end to the Chatter Scams—or even to require disclosures and/or consent for the use of Chatters—supports an inference that OnlyFans has chosen to actively and intentionally facilitate the use of Chatters.

## J. Agency-Specific Facts

### 1. Creators Inc.

340. The website for Creators Inc. describes the agency as "the largest and most dynamic social media management agency in the world," with a "vast network of 400+ Creators."[185]

[185] "Creators Inc." Agency Website, at https://creatorsinc.com/ (last visited July 29, 2024).

341. The website also describes its "Los Angeles Headquarters" as a "Co-working collaboration hub in Hollywood."[186]

342. That headquarters is located in a mansion in Los Angeles, California, where the Creators it represents create content.[187]

343. Creators Inc. holds multiple events and promotions in Los Angeles, California.

344. On its Facebook and Instagram, it promotes events and Creators in Los Angeles.

345. On an Instagram reel, Creators Inc. provides a tour of and described its Los Angeles HQ as follows: "You're checking out the Los Angeles headquarters of Creators Inc., located in the heart of the world's most creative city. This is the commune of the highest-earning content creators on earth and on any given day a space where ambitious creatives come together to collaborate and elevate their careers. . . . Thriving here means working together and inspiring each other to take action. We've committed to providing the tools for elite creators and those who are on their way. But a goal without a plan is a weak ass desire. So our mission here is not just to help you expand the limit on your dreams, but to execute on that even bigger. Understand, please, that this is the right moment to create content that will deepen your relationship to your audience. The paradigm has shifted and the old

---

[186] "Creators Inc." Agency Website, captured on Aug. 9, 2024, at https://web.archive.org/web/20240809180024/https://creatorsinc.com/lahq/ (last visited Dec. 29, 2025).

[187] Creators Inc. HQ Mansion Tour, ALEX & SARAH YOUTUBE CHANNEL (Mar. 20, 2024), https://www.youtube.com/watch?v=-lkQPI4LtQo (last visited Dec. 29, 2025); Creators Inc. LA HQ Tour (@creatorsinc), INSTAGRAM (May 9, 2023), https://www.instagram.com/reels/Cs143buA9by/ (last visited Dec. 29, 2025).

ways won't get you anywhere. These are the glory days of the digital age and all the platforms you need to succeed are in the palm of your hand. So come check out a Los Angeles headquarters and experience the new Hollywood."[188]

346. In a pinned post on Instagram it represents: "Hollywood has a new power player in town, OnlyFans. We are the global leader in OnlyFans monetization and celebrity paywall management. Creators Inc. represents, let's say, about sixty percent of the point of one percent. We are thrilled to manage probably ninety percent of all the A-list content creators, celebrities that you've ever heard of on OnlyFans."[189]

347. In that post it shows Whitney Cummings, as one of the Creators it represents.

348. On information and belief, the agency is primarily managed by Andrew Bachman, who serves as the CEO of the agency and is listed as a co-manager of Defendant Elite Creators.

349. On information and belief, Creators Inc. manages or at one point managed the accounts of the following Creators, who were subscribed to by either Plaintiff N.Z., Plaintiff B.L., Plaintiff S.M., and/or Plaintiff A.L.:

a. Stephanie Landor (aka @littlelandor • @stephlandor • @littlelandorvip)

b. Romey Marie (aka @romey_mae)

c. Jostasy Nick (aka Baby J • @jostasy)

[188] Creators Inc. LA HQ Tour (@creatorsinc), INSTAGRAM (May 9, 2023), https://www.instagram.com/reels/Cs143buA9by/ (last visited Dec. 29, 2025).

[189] Creators Inc. Post, INSTAGRAM (July 10, 2024), https://www.instagram.com/p/C9QqErCSw11/ (last visited Dec. 29, 2025).

d. Nala the Ninja (aka @nalafitness • @fitness_nala)

e. Elseana Panzer (aka @elseana)

f. McKinley Richardson (aka @mckinleyrichardson • @mckinleyexclusive)

g. Summer Soderstrom (aka @summersoderstrom)

350. Jotasy Nick, Nala the Ninja, and Summer Soderstrom are all located in Los Angeles, California.

351. As part of its management of those accounts, Creators Inc. provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

352. On information and belief, Creators, Inc. Chatter services were devised and implemented, at least in part, from its headquarters in Los Angeles, California.

353. On information and belief, Creators Inc. accesses and controls each Represented Creator's content, at least in part, from its headquarters in Los Angeles, California.

354. On information and belief, Creators Inc. helps its Creators film content and promote themselves in Los Angeles.

355. As alleged above, Creators Inc.'s clients are among the Creators that are featured on OFTV, including Summer Soderstrom, Stephanie Landor, and Whitney Cummings, who all film content in Los Angeles or were featured on shows filmed in Los Angeles.

356. Stephanie Landor was featured on an episode of "Off the Air TV," which was filmed at the Creators Inc. Los Angeles HQ mansion.[190]

357. Multiple episodes of "Off the Air TV" are filmed at the Creators Inc. Los Angeles HQ mansion.[191]

358. Creators Inc. uses taglines for its Creators' accounts that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform. For example:

a. Baby J (@Jostasy)'s OnlyFans account says:

> "🍓 I personally reply to every message, so messages with tips attached get priority! Please be patient if there isn't one!"

b. Romey (@romey_mae)'s OnlyFans account says:

> Your Sub[scription] Includes:
> 🖤 Instant access to all photos and videos on my timeline (700+)
> 🖤 Regular posts
> 🖤 My most EXPLICIT content
> 🖤 Access to DMs with me
> 🖤 Access to Exclusive Content

359. Creators Inc. has filed multiple lawsuits—including in California state courts—seeking to recover "management fees" allegedly owed to the agency by former Represented Creators. These include:

---

[190] Stephh: Judge Judy, OF, and Ideal Date – Off the Air TV, OFTV, https://of.tv/v/JFd42 (last visited Jan. 2, 2026).

[191] Off the Air TV Channel, OFTV, https://of.tv/c/off-the-air-tv (last visited Jan. 2, 2026).

a. *Creators Inc and Elite Creators LLC v. Megan McCarthy*, No. 2024-003685-CA-01 (Fl. Cir. Ct. of 11th Judicial Cir., Miami-Dade County, filed Feb. 29, 2024).

b. *Lexington Capital Management, LLC; Creators Inc., and Elite Creators, LLC. v. Elena Kamperi*, No. 23SMCV01175 (Cal. Super. Ct., L.A. Cty., filed Mar. 16, 2023).

c. *Creators Inc. and Elite Creators, LLC. v. Ava Hinojosa*, No. 24CHCV01901 (Cal. Super. Ct., L.A. Cty., filed May 17, 2024).

360. The agency's filings in these lawsuits demonstrate:

a. Creators Inc. takes between 20% and 30% commission on its Creators' earnings and has Represented Creators earning hundreds of thousands of dollars per month.

b. Creators Inc.'s "management services" include "staffing [creators'] account[s] with someone to respond to direct messages on the OnlyFans platform 24 hours a day, seven days a week.

c. Creators Inc.'s agreement requires its Represented Creators to provide the agency with access to their OnlyFans accounts, and specifically "not to change [their] account passwords." Indeed, the basis for the agency's breach-of-contract claim against one Creator was that "[b]y changing her passwords and blocking Creators Inc. from the account, [the Creator was] unlawfully attempting to avoid paying Creators Inc. the management fee owed" to the agency.

d. As part of its agreement with Represented Creators, Creators Inc. agrees to "have trained staff members helping [Creators] to manage [their] work load in the DMs."

361. On information and belief, nowhere does Creators Inc. disclose to Fans that it employs Chatters to impersonate its Represented Creators.

**2. Moxy Management**

362. Defendant Moxy Management ("Moxy") is a California corporation formed in 2021 and headquartered in Los Angeles, California, with its principal place of business located at 19016 Devonport Lane, Tarzana, CA 91356.

363. Moxy describes itself as a "management and consulting company" based in Los Angeles.

364. Moxy was founded by two "influencers," Ryan Nassif and Slater Davis. Nassif's LinkedIn profile lists his role in strategic planning and business development, while Davis's LinkedIn profile emphasizes his experience in digital marketing and brand management. Both founders emphasize their ability to leverage industry knowledge and networks to build Moxy's reputation as a management agency.

365. Moxy's marketing emphasizes its ability to help Creators "increase engagement with their fans and followers exponentially."

366. Moxy uses taglines for its Creators' accounts that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform. For example, Sierra Skye's profile tagline reads: "Keep this between us and let's have fun! Hehe 😈😛."

367. On information and belief, Moxy charges its Represented Creators a commission of 20–30% of their earnings.

368. On information and belief, Moxy manages over 100 OnlyFans accounts on behalf of individual Creators, with the majority of those Creators making $40,000–$80,000 per month, and over 10 making about $500,000 per month.

369. On information and belief, Moxy manages or at one point managed the accounts of the following Creators, who were subscribed to by either Plaintiff N.Z., Plaintiff R.M., Plaintiff B.L., Plaintiff S.M., and/or Plaintiff A.L.:

a. Breckie Hill (aka @breckie)
b. Briana Armbruster (aka @officialskimaskgirl • @skimaskgirluncensored)
c. Carolina Samani (aka @carolinasamani)
d. Chyanne Burden (aka @chyburd)
e. Claire Stone (aka @cclaire.bbearxo)
f. Cristy Senskey (aka @cristyann)
g. Julia Piccolino (aka @julia.pic)
h. Kaitlyn Krems (aka @kaitkrems )
i. Sierra Skye (aka @sierraskye)

370. Breckie Hill, Claire Stone, and Sierra Skye reside in Los Angeles, California.

371. As part of its management of those accounts, Moxy provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

372. On information and belief, Moxy's Chatter services were devised and implemented from its headquarters in Los Angeles, California.

373. On information and belief, Moxy accesses and controls each Represented Creator's content from its headquarters in Los Angeles, California.

374. Moxy's Services Agreement with models explicitly provides services including "Facilitation of all content that is posted on Paid Content Platforms including [OnlyFans]," and that: "On a daily basis, [Moxy] will respond to messages on Paid Content Platforms on behalf of [the Creator], and use its reasonable, good faith efforts to upsell the products and content Talent offers on Paid Content Platforms."

375. The Agreement also grants Moxy full access to and control over each Represented Creator's OnlyFans account, stipulating: "Talent has a duty to irrevocably grant to Company unfettered administrative access to [OnlyFans], for as long as Gross Earnings are generated."

376. Although Moxy generally takes advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers they have, on information and belief, Moxy's Represented Creators have subscriber bases so large that interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

377. On information and belief, nowhere does Moxy disclose to Fans that it employs Chatters to impersonate its Represented Creators.

**3. Siren Agency**

378. Defendant Boss Baddies d/b/a Siren Agency ("Siren") has multiple websites, where it has described itself as "a Los Angeles based full service, non-

exclusive talent agency" that is "here to handle the busy work and help [Creators] stay focused on expressing [themselves] creatively and growing [their] personal brand[s]."[192]

379. Indeed, one of Siren's websites promises "Growth Without Restrictions," and claims that Creators represented by the agency have over "450M+ followers."[193]

380. Siren operates primarily out of Los Angeles, California, where it maintains a lavish headquarters in a hillside residence with a swimming pool, dubbed "The Siren House" and featured in the agency's promotional videos on TikTok.

381. Siren's newer website uses the phrase "dedicated to empowering women in the industry" three separate times, despite being run someone who has been called "misogynist of the year" by one commentator, and lambasted in multiple YouTube videos for his demeaning dating advice and Siren's manipulative and exploitative practices in managing Creator accounts.[194]

382. On information and belief, Siren charges its Represented Creators a fee of approximately 30% of their earnings.

---

[192] Home Page, SIREN (Website #1), https://www.sirenagency.com/ (last visited July 29, 2024).

[193] *Id.*

[194] *See*, *e.g.*, *Down The Siren Agency Rabbit Hole*, VERY REALLY GOOD YOUTUBE CHANNEL (Dec. 24, 2022), https://web.archive.org/web/20240704070739/https://www.youtube.com/watch?v=iWzaA9lAA2Y (last visited July 29, 2024); Alex Lasker, Problematic dating coach branded As 'misogynist of the year in brutal video, IN THE KNOW BY YAHOO! (August 10, 2020), https://www.yahoo.com/lifestyle/problematic-tiktok-dating-coach-branded-192743046.html (last visited July 29, 2024).

383. On information and belief, Siren uses marketing—including taglines for its Creators' accounts—that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform.

384. On information and belief, Siren manages or at one point managed the account of the following Creator, who was subscribed to by Plaintiff A.L.:

a. Bri Jordan (@thebrijordan)

385. Bri Jordan resides in Los Angeles, California.

386. As part of their management of that and other accounts, Siren provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

387. On information and belief, Siren's Chatter services were devised and implemented from its headquarters in Los Angeles, California.

388. On information and belief, Siren accesses and controls each Represented Creator's content from its headquarters in Los Angeles, California.

389. A previous version of Siren's website contained text explicitly advertising "Content Management" services, which included "***Full service messaging*** and fan site support."[195]

390. In addition, the LinkedIn profile for the company showed employees with job titles including "Virtual Assistant" and "Chatter."[196]

---

[195] Home Page, SIREN (Website #2), https://web.archive.org/web/20230702030432/https://www.srn-agency.com/ (last visited July 27, 2024).

[196] Siren Agency, LINKEDIN, https://linkedin.com/company/siren-agency (last visited July 29, 2024).

391. Although Siren generally takes advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers its Creators have, on information and belief, Siren's Represented Creators have subscriber bases so large that interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

392. On information and belief, nowhere does Siren disclose to Fans that they employ Chatters to impersonate its Represented Creators.

**4. Unruly Defendants**

393. Defendant Unruly Agency LLC ("Unruly") is a California Limited Liability Company formed in 2020 in the State of California and headquartered in West Hollywood, California.

394. Unruly is the owner of the trademarks for Defendant Dysrpt Agency ("Dysrpt"), which, on information and belief, is a subsidiary of Unruly.

395. On information and belief, Defendant Behave Agency ("Behave") is also a subsidiary of Unruly.

396. Together, Unruly, Behave, and Dysrpt are referred to as "Unruly Defendants."

397. Unruly describes itself as a "management and consulting company" specializing in social media and influencer marketing. Its primary focus is on helping Creators maximize their earnings and engagement on platforms such as OnlyFans.

398. Behave describes "one of the top Los Angeles-based influencer agencies providing strategic marketing and content creating services."[197]

399. Unruly (and, on information and belief, its subsidiary agencies) were co-founded by Tara Niknejad (who is on OnlyFans as Tara Electra) and Nicky Gathrite.

400. On information and belief, the Unruly Defendants charge their Represented Creators a fee of approximately 30% of their earnings.

401. On information and belief, the Unruly Defendants emphasize—both in their general marketing and in taglines for their Creators' accounts—the personal nature of the interactions that Fans will have on the OnlyFans platform. For example:

a. The LinkedIn page for the agency claims: "Behave strives to provide models all the tools necessary to leave their digital footprint, promote their brand to a wider audience, and ***build genuine connections with their fans***."[198]

402. On information and belief, Unruly manages or at some point managed the accounts of the following Creators, who were subscribed to by either Plaintiff A.L., Plaintiff N.Z., Plaintiff R.M., and/or Plaintiff B.L.:

a. Anna Louise (aka @officialannalouise)

b. Kayla Lauren (aka @kaylalauren)

c. Mia Huffman (aka @prettybitchmia • @prettybitchmiavip)

---

[197] Behave Agency - About Us, https://behaveagency.com/about/ (last visited Dec. 31, 2025).

[198] Behave Agency, LINKEDIN, https://linkedin.com/company/behaveagency/ (last visited Jul. 25, 2024 (emphasis added).

d. Leah Ray (aka @leahray_x • @leahray_xx)

e. Nicky Gile (@nickygile • @nickygileprivate)

f. Sara Underwood (aka @saraunderwood)

g. Stefanie Gurzanski (aka @stefbabyg)

h. Tina Louise (aka @tinalouise)

i. Tara Electra (aka @billiondollarbabie)

j. Kinsey (aka @kinsey)

k. Emily Elizabeth (aka @emmilyelizabethh)

403. Kayla Lauren, Tina Louise, and Kinsey reside or did reside in Los Angeles, California.

404. On information and belief, Dysrpt manages or at some point managed the account of the following Creator, who was subscribed to by Plaintiff R.M.:

a. Emily Elizabeth (aka @emmilyelizabethh)

405. On information and belief, Behave manages or at some point managed the accounts of the following Creators, who were subscribed to by either Plaintiff B.L. and/or Plaintiff A.L:

a. Chloe Rosenbaum (aka @chloerosenbaum)

b. Kayla Simmons (aka @kaylasimmons)

c. Ryann Murphy (aka @itsryannmurphy)

406. Chloe Rosenbaum, Kayla Simmons, and Ryann Murphy reside or did reside in Los Angels, California.

407. As part of their management of those and other accounts, the Unruly Defendants provide Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

408. On information and belief, the Unruly Defendants' Chatter services were devised and implemented from its headquarters in Los Angeles, California.

409. On information and belief, Unruly Defendants access and control each Represented Creator's content from its headquarters in Los Angeles, California.

410. Unruly's provision of those services has been described in multiple lawsuits filed against the agency.

411. These include a suit by individuals employed as "account managers," such as *Machabeli v. Unruly Agency, LLC, et al.*, No. 21STCV41395 (Cal. Super. Ct., L.A. Cty, filed Dec. 9, 2021), in which the plaintiffs alleged that:

a. "[A]s their primary job duties, they were required to create, post and chat on behalf of – i.e., surreptitiously pretend to be – Defendants' models to provide the "full fantasy girlfriend experience" to paying visitors (or "Fans") to www.OnlyFans.com."

b. "Niknejad and Gathrite specifically informed" the plaintiffs "that, to provide this "full fantasy girlfriend experience," Fans would falsely believe that they were paying for direct interactions with Defendants' models."

c. Unruly directed the plaintiffs "to intentionally lie to, dupe, and mislead Fans into misbelieving that the Fans are paying to have direct, personal communications and interactions with Defendants' Models."

d. "Unwitting Fans divulged some of their deepest personal secrets including sexual fantasies, marital troubles, suicidal ideations and other private desires. For instance, one Fan lamented the demise of his marriage (and provided intimate details regarding the same) to [the

plaintiff] believing she was model Abby Rao, and continued to send her money on the basis of this deception."

412. Unruly has also been sued by its Represented Creators, at least one of whom claimed to be unaware of the fact that Unruly's Chatters were impersonating her. In *Stage v. Unruly Agency LLC et al.*, No. 22STCV06689 and *Quezada v. Unruly Agency LLC et al.* (both filed in Cal. Super. Ct., L.A. Cty. on Feb. 23, 2022), two of Unruly's Represented Creators alleged that:

a. "Unruly messaged subscribers of OnlyFans while pretending to be [the Creators] and solicited pictures of subscribers' penises in exchange for payment, without [the Creators'] consent or knowledge."

b. "Unruly, posing on behalf of [the Creators'], solicited a picture of a subscriber's penis and offered to 'rate' his penis in exchange for money."

c. When the Creators protested Unruly's unauthorized behavior, the agency's founders "claimed that [the Creators'] OnlyFans account[s] belonged to them, and threatened to sue [the Creators] if [they] did not continue allowing them to post and message sexually explicit content on [their] behalf to unknowing subscribers of OnlyFans."

413. Although the Unruly Defendants generally take advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers they have, on information and belief their Represented Creators have subscriber bases so large that interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

414. On information and belief, nowhere do the Unruly Defendants disclose to Fans that they employ Chatters to impersonate its Represented Creators.

**5. Content X**

415. Defendant Content X Studios ("Content X") is a California corporation registered in September 2020, with its Principal Address at 21800 W Oxnard St #940, Woodland Hills, CA 91367.

416. Headquartered in Los Angeles, CA and founded by well-known American actress and entertainer Bella Thorne and her manager, Thor Bradwell, Content X has described itself as a "full service production company."

417. Thorne, herself an OnlyFans Creator, has been reported to have earned one million dollars in a single day on the platform—which apparently "crashed the moment Thorne announced her $102 for six month subscription."[199]

418. On information and belief, Content X uses marketing—including taglines for its Creators' accounts—that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform.

419. On information and belief, Content X manages or at some point managed the accounts of the following Creators, who were subscribed to by either Plaintiff S.M. and/or Plaintiff B.L.

a. Bella Thorne (aka @bellathorne)

b. Abella Danger (aka @dangershewrote • @abelladangervip)

c. Mathilde Tantot (aka @mathildtanot)

---

[199] Lara Swift, *Why So Many Mainstream Celebrities Are Turning To OnlyFans*, NICKI SWIFT (March 9, 2023), https://www.nickiswift.com/1223642/why-so-many-mainstream-celebrities-are-turning-to-onlyfans/ (last visited July 29, 2024).

d. Pauline Tantot (aka @popstantot • @popstantotvip)

420. Bella Thorne and Abella Danger reside in Los Angeles, California.

421. On information and belief, as part of its management of those and other Creator accounts, Content X provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

422. This is supported by statements made by former Represented Creators of the agency, who, in a Rolling Stone article, discussed the sub-par nature of the Chatter services provided by Content X ("The way they would answer messages was super lazy [and] super robotic…"), as well as the pressure they received to provide "account managers" with sexually explicit photographs despite initial promises that they would not have to provide nude photos for their OnlyFans page (one Creator "[said] Content X staffers who managed her OnlyFans page wanted her to send them more risqué and lingerie content . . . [and] claims she was told by staffers as an incentive how much more money she could earn off risqué photos.").[200]

423. On information and belief, Content X's Chatter services were devised and implemented from its headquarters in Los Angeles, California.

424. Although Content X generally takes advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers they have, on information and belief Content X's Represented Creators have subscriber bases so large that

---

[200] Cheyenne Roundtree, '*It's a Hot Mess': Why Influencers Are Ditching Bella Thorne's OnlyFans Company*, ROLLING STONE (May 5, 2022), https://www.rollingstone.com/culture/culture-features/bella-thorne-onlyfans-content-x-1347011/ (last visited July 29, 2024).

interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

425. On information and belief, to provide those and other services, Content X has full access to and control over each Represented Creator's OnlyFans account.

426. On information and belief, Content X accesses and controls each Represented Creator's content from its headquarters in Los Angeles, California.

427. On information and belief, nowhere does Content X disclose to Fans that it employs Chatters to impersonate its Represented Creators.

**6. A.S.H. Agency**

428. Defendant A.S.H. (which stands for "All-Star Hustle") Agency ("A.S.H.") manages OnlyFans accounts on behalf of individual Creators, including what one journalist described as "some of the biggest fish in the industry," including "superstars like Angela White, Sky Bri, Kazumi, Violet Myers, Dainty Wilder, and more."[201]

429. A.S.H. is owned by adult entertainment star Riley Reid—who is herself in the top 0.01% of earners on the platform—and, on information and belief, uses marketing—including taglines for its Creators' accounts—that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform.

430. On information and belief, A.S.H. manages or at some point managed the accounts of the following Creators, who were subscribed to by either Plaintiff S.M., and/or Plaintiff N.Z.:

---

[201] Ryan Leutz, *Riley Reid and Ash Agency: From Adult Film Superstar to Entrepreneur Extraordinaire*, THE VILLAGE VOICE (June 27, 2023), https://www.villagevoice.com/riley-reid-and-ash-agency-from-adult-film-superstar-to-entrepreneur-extraordinaire/ (last visited July 29 2024).

a. Sky Bri (aka @skybri)

b. Jane Wilde (aka @janewilde)

c. Kaitlin Trujillo (aka @trukait • @freetrukait)

431. Sky Bri, Jane Wilde, and Kaitlin Trujillo all reside in Los Angeles, California. A.S.H.'s founder, Riley Reid, resides in Pasadena, California.

432. As part of its management of those and other accounts, A.S.H. provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

433. On information and belief, to provide those and other services, A.S.H. has full access to and control over each Represented Creator's OnlyFans account.

434. On information and belief, A.S.H.'s Chatter services were devised and implemented from its headquarters in Los Angeles, California.

435. On information and belief, A.S.H. accesses and controls each Represented Creator's content from its headquarters in Los Angeles, California.

436. Although A.S.H. generally takes advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers they have, on information and belief A.S.H.'s Represented Creators have subscriber bases so large that interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

437. On information and belief, nowhere does A.S.H. disclose to Fans that it employs Chatters to impersonate its Represented Creators.

**7. Verge Agency**

438. Defendant Verge Agency, Inc. (aka The Verge Agency, Inc.) ("Verge") was originally formed in Delaware on March 24, 2021. On March 3,

2023, Verge Agency, Inc. was registered in California as an out-of-state corporation. Verge's principal place of business is 10960 Wilshire Boulevard, 5th Floor, Los Angeles, CA 90024. On information and belief, Verge is doing business as Verge Agency.

439. Founded by former UC Berkeley cheerleader Jessica Bartlett, Verge describes itself as a "premier talent agency located in the heart of Los Angeles."

440. On information and belief, Verge uses taglines and captions for its Creators' accounts that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform. For example:

441. The first post on the "VIP" page for creator Mikayla Demaiter says:

> Welcome to my Only Fans! So excited to be here and have you! Here I'll be posting my most exclusive content, as well as the only place I will be responding to all my messages! Tip $100 to join VIP for unlimited FREE chat and MOST exclusive content! See you there! Excited for what's to come.

442. Another Represented Creator's account solicits paid subscriptions by saying: "Let me be your virtual girlfriend 💋."

443. Another Represented Creator's "VIP" page says "Hi there🎀You found my EXCLUSIVE page!😍 come talk to me ❤."

444. On information and belief, Verge manages or at some point managed the accounts of the following Creators, who were subscribed to by Plaintiff A.L.:

a. Katie Williams (aka @katie_dubbs)

b. Mikayla Demaiter (aka @mikayla_demaiter • @mikayladvip)

c. Chloe Rosenbaum (aka @chloerosenbaum)

445. Katie Williams and Choe Rosenbaum reside in Los Angeles, California.

446. As part of its management of those and other accounts, Verge provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

447. As of July 29, 2024, of the thirty-five LinkedIn members associated with Verge's profile, twenty-three were located in the Philippines, and many of those listed their positions at Verge using job titles that often refer to chatter positions, including: "Account Manager," "Virtual Assistant," "Social Media Account Manager," and "Chat Support."

448. On information and belief, Verge's Chatter services were devised and implemented from its headquarters in Los Angeles, California.

449. On information and belief, Verge accesses and controls each Represented Creator's content from its headquarters in Los Angeles, California.

450. Although Verge generally takes advantage of the ability of Creator accounts on OnlyFans to mask the number of subscribers they have, on information and belief Verge's Represented Creators have subscriber bases so large that interacting on a direct personal basis with even a fraction of those Fans would be physically impossible for a single individual.

451. On information and belief, nowhere does Verge disclose to Fans that it employs Chatters to impersonate its Represented Creators.

**K. Plaintiffs' Stories**

**1. Plaintiff N.Z.**

452. Plaintiff N.Z. has been an OnlyFans user from approximately 2020 to present. During 2020–2023, Plaintiff N.Z. subscribed to the following Creator accounts (collectively, for this section, "Subscribed Creator accounts"), which have been linked to—and, on information and belief, were used by—the Agency Defendants to perpetrate the Chatter Scams:

a. Breckie Hill (Moxy Management)

b. Sara Underwood, Nicky Gile, and Stefanie Gurzanski (Unruly)

c. Sky Bri and Kaitlin Trujillo (A.S.H. Agency)

d. McKinley Richardson (Creators Inc.)

453. As alleged herein, the Creators that Plaintiff N.Z. subscribed to were either located in Los Angeles, their accounts were being run by agencies in Los Angeles, or the Chatter Scams were devised and executed in Los Angeles.

454. Plaintiff N.Z. relied on OnlyFans' successful efforts to market itself as a "revolutionary" platform that allowed content Creators to have direct interactions with their Fans, as well as OnlyFans' representations that subscribing to a Creator's account gave him "benefits" that specifically included the ability to "[d]irect message with this user."

455. As a result, when he subscribed to each Creator's account, Plaintiff N.Z. expected and believed that any information or communication—but particularly any personal or sensitive information, including thoughts, feelings, and/or images of a private, emotional, and/or sexual nature—that he exchanged

with the Creator via her account on OnlyFans would be kept entirely private, confidential, and strictly between himself and the Creator.

456. Because of these expectations and beliefs, Plaintiff N.Z. felt comfortable sharing information through OnlyFans, and at all times relevant to this Complaint, he believed that when he was communicating with a Creator's account, he was communicating directly and privately with that Creator.

457. Plaintiff N.Z. communicated via direct message with each of the accounts listed above. Those communications included direct messages that contained personal and sensitive information, including information about his personal interests, sexual interests, professional occupation, and location.

458. After being solicited by the "Creators" (who on information and belief were Chatters), and based upon his belief that he was communicating directly with a Creator, Plaintiff N.Z. made the following purchases from or gave tips to the Creators:

a. On April 3, 2023, he paid Breckie Hill (Moxy Management)$10 for digital content;
b. On June 28, 2023, he paid Stefanie Gurzanski (Unruly) $40.50 for digital content and he tipped her $99 for a video;
c. On August 3, 2023, he paid Stefanie Gurzanski (Unruly) $70.50 for digital content;
d. On August 14, 2023, he paid Nicky Nicky Gile (Unruly) $69 for digital content;
e. On August 23, 2023, he paid McKinley Richardson (Creators Inc.) $20 for digital content;

f. On August 25, 2023, he paid McKinley Richardson (Creators Inc.) $35 for digital content;

g. On September 16, 2023, he tipped Stefanie Gurzanski (Unruly) $45;

h. On October 27, 2023, he tipped Stefanie Gurzanski (Unruly) $90;

i. On December 4, 2023, he paid Sky Bri (A.S.H. Agency) $25 for digital content; and

j. On November 22, 2024, he paid Nicky Nicky Gile (Unruly) $111 for digital content.

459. Plaintiff N.Z. did not consent to having any of his personal information or communications shared with anyone other than the Creator, and was unaware of the fact that his messages and their content were being disclosed to one or more agents or contractors of the Agency Defendants—including professional Chatters.

460. Although he was aware that "management agencies" existed, he believed they only assisted Creators with marketing and social media management, and Plaintiff N.Z. was not aware that the Creators listed above were utilizing management agencies until he contacted undersigned counsel, which occurred on approximately December 5, 2023.

461. He was not aware that Defendants were engaged in a scheme to deceive Fans into believing that Creators were communicating "directly" with their Fans when they were actually interacting with professional Chatters pretending to be the Creators—some of whom, on information and belief, shared almost no relevant characteristics in common with the Creators they were impersonating.

462. When he found out about the Chatter Scams, Plaintiff N.Z. felt betrayed and violated. He had divulged sensitive and/or personal information not to

the individuals he thought he was communicating with—but to impostors paid to impersonate those individuals.

463. If he had known about the Chatter Scams, or that any of his expectations or beliefs about the nature of the communication on OnlyFans were not true with respect to a particular Creator, he would not have subscribed to or interacted directly with the Creator's account at all—much less would he have paid any Premium Content Fees to do so.

464. Plaintiff N.Z. estimates that during the time he was using his OnlyFans account, he spent approximately $5,000 to $10,000 on Premium Content Fees—20% of which went to OnlyFans.

465. Plaintiff N.Z. did not receive what he paid for. He would not have paid as much for Premium Content Fees if he had known that he was communicating not with the Creators themselves, but with Chatters paid to impersonate the Creators.

466. After learning of the Chatter Scams, Plaintiff N.Z. altered his habits and no longer interacts with the Creators or shares any personal or private information since he no longer trusts that the Creator is not being impersonated by an unknown third party.

**2. Plaintiff R.M.**

467. Plaintiff R.M. was an OnlyFans user from approximately 2019 to 2023. During that time, Plaintiff R.M. subscribed to the following Creator accounts (collectively, for this section, "Subscribed Creator accounts"), which have been linked to—and, on information and belief, were used by—the Agency Defendants to perpetrate the Chatter Scams:

a. Chyanne Burden and Claire Stone (Moxy Management)

b. Emily Elizabeth (Unruly/Dysrpt Agency)

468. As alleged herein, the Creators that Plaintiff R.M subscribed to were either located in Los Angeles, their accounts were being run by agencies in Los Angeles, or the Chatter Scams were devised and executed in Los Angeles.

469. Plaintiff R.M. relied on OnlyFans' successful efforts to market itself as a "revolutionary" platform that allowed content Creators to have direct interactions with their Fans, as well as OnlyFans' representations that subscribing to a Creator's account gave him "benefits" that specifically included the ability to "[d]irect message with this user."

470. As a result, when he subscribed to each Creator's account, Plaintiff R.M. expected and believed that any information or communication—but particularly any personal or sensitive information, including thoughts, feelings, and/or images of a private, emotional, and/or sexual nature—that he exchanged with the Creator via her account on OnlyFans would be kept entirely private, confidential, and strictly between himself and the Creator.

471. Because of these expectations and beliefs, Plaintiff R.M. felt comfortable sharing information through OnlyFans, and at all times relevant to this Complaint, he believed that when he was communicating with a Creator's account, he was communicating directly and privately with that Creator.

472. Plaintiff R.M. communicated via direct message with each of the accounts listed above. Those communications included direct messages that contained personal and sensitive information, including information about his full legal name, social media accounts, personal interests, sexual interests, and location.

473. In addition, Plaintiff R.M. viewed videos sent to him via direct message through Creators' accounts—some of which he had specifically requested without knowing those videos had been sent by one or more agents or contractors of the Agency Defendants, including professional Chatters.

474. Plaintiff R.M. did not consent to having any of his personal information or communications shared with anyone other than the Creator and was unaware of the fact that his messages and their content were being disclosed to one or more agents or contractors of the Agency Defendants, including professional Chatters.

475. Plaintiff R.M. confronted Emily Elizabeth via direct message and she said it was her replying to messages.

476. Although he was aware that "management agencies" existed, he believed they only assisted Creators with marketing and social media management, and Plaintiff R.M. was not aware that the Creators listed above were utilizing management agencies until he contacted undersigned counsel, which occurred on approximately January 26, 2024.

477. He was not aware that Defendants were engaged in a scheme to deceive Fans into believing that Creators were communicating "directly" with their Fans when they were actually interacting with professional Chatters pretending to be the Creators—some of whom, on information and belief, shared almost no relevant characteristics in common with the Creators they were impersonating.

478. When he found out about the Chatter Scams, Plaintiff R.M. felt betrayed and violated. He had divulged sensitive and/or personal information not to

the individuals he thought he was communicating with—but to impostors paid to impersonate those individuals.

479. If he had known about the Chatter Scams, or that any of his expectations or beliefs about the nature of the communication on OnlyFans were not true with respect to a particular Creator, he would not have subscribed to or interacted directly with the Creator's account at all—much less would he have paid any Premium Content Fees to do so.

480. If he had known about the Chatter Scams from the beginning, he likely would not have signed up for an OnlyFans account in the first place.

481. After being solicited by the "Creators" (who on information and belief were Chatters), and based upon his belief that he was communicating directly with a Creator, Plaintiff R.M. purchased Premium Content.

482. Plaintiff R.M. estimates that during the time he was using his OnlyFans account, he spent approximately $200 to $300 on Premium Content Fees—20% of which went to OnlyFans.

483. Plaintiff R.M. did not receive what he paid for. He would not have paid any Premium Content Fees—and certainly would not have paid as much—if he had known that he was communicating not with the Creators themselves, but with Chatters paid to impersonate the Creators.

484. Plaintiff R.M. stopped using his OnlyFans account at the end of 2023, after learning of the Chatter Scams through the present litigation.

**3. Plaintiff B.L.**

485. Plaintiff B.L. has been an OnlyFans user starting in approximately 2020. During 2020–2023, Plaintiff B.L. subscribed to the following Creator

accounts (collectively, for this section, "Subscribed Creator accounts"), which have been linked to—and, on information and belief, were used by—the Agency Defendants to perpetrate the Chatter Scams:

a. Briana Armbruster and Sierra Skye (Moxy Management)

b. Tina Louise, Kayla Lauren, and Anna Louise (Unruly)

c. Ryann Murphy and Chloe Rosenbaum (Behave)

d. Mathilde Tantot and Pauline Tantot (Content X)

e. Summer Soderstrom (Creators Inc.)

486. As alleged herein, the Creators that Plaintiff B.L. subscribed to were either located in Los Angeles, their accounts were being run by agencies in Los Angeles, or the Chatter Scams were devised and executed in Los Angeles.

487. Plaintiff B.L. relied on OnlyFans' successful efforts to market itself as a "revolutionary" platform that allowed content Creators to have direct interactions with their Fans, as well as OnlyFans' representations that subscribing to a Creator's account gave him "benefits" that specifically included the ability to "[d]irect message with this user." As a result, when he subscribed to each Creator's account, Plaintiff B.L. expected and believed that any information or communication—but particularly any personal or sensitive information, including thoughts, feelings, and/or images of a private, emotional, and/or sexual nature—that he exchanged with the Creator via her account on OnlyFans would be kept entirely private, confidential, and strictly between himself and the Creator.

488. Because of these expectations and beliefs, Plaintiff B.L. felt comfortable sharing information through OnlyFans, and at all times relevant to this

Complaint, he believed that when he was communicating with a Creator's account, he was communicating directly and privately with that Creator.

489. Plaintiff B.L. communicated via direct message with each of the accounts listed above. Those communications included direct messages that contained personal and sensitive information, including personal photos and videos of himself, and information about his personal interests, hobbies, professional occupation, sexual interests and preferences, and location.

490. In addition, Plaintiff B.L. viewed videos sent to him via direct message from Creators' accounts—some of which he had specifically requested without knowing those videos had been sent by one or more agents or contractors of the Agency Defendants, including professional Chatters.

491. After being solicited by the "Creators" (who on information and belief were Chatters), and based upon his belief that he was communicating directly with a Creator, Plaintiff B.L. made the following purchases of photos and video content from the Creators:

a. On October 4, 2020, B.L. purchased digital content for $15 from Kayla Lauren (Unruly Agency);
b. On November 21, 2020, B.L. purchased digital content for $177 from Tina Louise (Unruly Agency);
c. On August 26, 2021, B.L. purchased digital content for $80 from Anna Louise (Unruly Agency);
d. On April 2, 2022, B.L. purchased digital content for $15 from Pauline Tantot (Content X);

e. On January 30, 2023, B.L. purchased a video for $15 from Summer Soderstrom (Creators Inc.);

f. On March 31, 2023, B.L. purchased a photo for $20 from Summer Soderstrom (Creators Inc.);

g. On April 14, 2023, B.L. purchased a video for $18 from Summer Soderstrom (Creators Inc.);

h. On May 10, 2023, B.L. purchased a photo for $29 from Mathilda Tantot (Content X);

i. On November 22, 2023, B.L. purchased digital content for $15 from Ski Mask Girl (Moxy Management); and

j. On November 26, 2023, B.L. purchased a video for $15 from Summer Soderstrom (Creators Inc.);

492. When Summer Soderstrom solicited B.L. to purchase content on March 31, 2023, she asked B.L. “do NOT share this babe promise??”

493. Plaintiff B.L. believed he was talking to the Creators, not to Chatters.

494. Plaintiff B.L. did not consent to having any of his personal information or communications shared with anyone other than the Creator and was unaware of the fact that his messages and their content were being disclosed to one or more agents or contractors of the Agency Defendants—including professional Chatters.

495. Although he was aware that “management agencies” existed, he believed they only assisted Creators with marketing and social media management, and Plaintiff B.L. was not aware that the Creators listed above were utilizing management agencies until he contacted undersigned counsel, which occurred on approximately February 21, 2024.

496. He was not aware that Defendants were engaged in a scheme to deceive Fans into believing that Creators were communicating "directly" with their Fans when they were actually interacting with professional Chatters pretending to be the Creators—some of whom, on information and belief, shared almost no relevant characteristics in common with the Creators they were impersonating.

497. When he found out about the Chatter Scams, Plaintiff B.L. felt betrayed and violated. He had divulged sensitive and/or personal information not to the individuals he thought he was communicating with—but rather to impostors paid to impersonate those individuals.

498. If he had known about the Chatter Scams, or that any of his expectations or beliefs about the nature of communication on OnlyFans were not true with respect to a particular Creator, he would not have interacted directly with the Creator's account at all. Plaintiff B.L. estimates that during the time he was using his OnlyFans account, he spent approximately $20,000 to $25,000 on Premium Content Fees—20% of which went to OnlyFans.

499. Plaintiff B.L. did not receive what he paid for. He would not have paid any Premium Content Fees—and certainly would not have paid as much—if he had known that he was communicating not with the Creators themselves, but with Chatters paid to impersonate the Creators.

500. Plaintiff B.L. did not stop using his OnlyFans account after learning of the Chatter Scams through the present litigation. However, he altered his habits and no longer interacts with the Creators or shares any personal or private information since he no longer trusts that the Creator is not being impersonated by an unknown third party.

**4. Plaintiff S.M.**

501. Plaintiff S.M. was an OnlyFans user from approximately 2018 to 2024. During that time, Plaintiff S.M. subscribed to the following Creator accounts (collectively, for this section, "Subscribed Creator accounts"), which have been linked to—and, on information and belief, were used by—the Agency Defendants to perpetrate the Chatter Scams:

a. Kaitlyn Krems and Breckie Hill (Moxy Management)

b. Jane Wilde (A.S.H. Agency)

c. Bella Thorne and Abella Danger (Content X Studios)

d. Stephanie Landor (Creators Inc.)

502. As alleged herein, the Creators that Plaintiff S.M. subscribed to were either located in Los Angeles, their accounts were being run by agencies in Los Angeles, or the Chatter Scams were devised and executed in Los Angeles.

503. Plaintiff S.M. relied on OnlyFans' successful efforts to market itself as a "revolutionary" platform that allowed content Creators to have direct interactions with their Fans, as well as OnlyFans' representations that subscribing to a Creator's account gave him "benefits" that specifically included the ability to "[d]irect message with this user."

504. As a result, when he subscribed to each Creator's account, Plaintiff S.M. expected and believed that any information or communication—but particularly any personal or sensitive information, including thoughts, feelings, and/or images of a private, emotional, and/or sexual nature—that he exchanged with the Creator via her account on OnlyFans would be kept entirely private, confidential, and strictly between himself and the Creator.

505. Because of these expectations and beliefs, Plaintiff S.M. felt comfortable sharing information through OnlyFans, and at all times relevant to this Complaint, he believed that when he was communicating with a Creator's account, he was communicating directly and privately with that Creator.

506. Plaintiff S.M. communicated via direct message with each of the accounts listed above. Those communications included direct messages that contained personal and sensitive information, including personal photos of himself, and information about his personal interests, sexual interests, professional occupation, and location.

507. In addition, Plaintiff S.M. viewed videos sent to him via direct message from the Subscribed Creator accounts—some of which he had specifically requested—without knowing those videos had been sent by one or more agents or contractors of the Agency Defendants—including professional Chatters.

508. After being solicited by the "Creators" (who on information and belief were Chatters), and based upon his belief that he was communicating directly with a Creator, Plaintiff B.L. purchased content from Bella Thorne (Content X), Abella Danger (Content X), and Stephanie Landor (Creators Inc.).

509. Plaintiff S.M. did not consent to having any of his personal information or communications shared with anyone other than the Creator he believed he was communicating with, and was unaware of the fact that his messages and their content were being disclosed to one or more agents or contractors of the Agency Defendants—including professional Chatters.

510. He had heard of management agencies, and even confronted several Creators via direct message regarding their possible use of management agencies to

run their accounts, but the Creators denied these claims and tried to make him feel guilty about questioning their authenticity.

511. Plaintiff S.M. confronted Bella Thorne, Stephanie Landor, Breckie Hill, and Kaitlyn Krems via direct message and they all said it was them replying to messages and/or denied using Chatters.

512. Plaintiff S.M. was not aware that the Creators listed above were utilizing management agencies until he contacted undersigned counsel, which occurred on approximately February 8, 2024.

513. He was not aware that Defendants were engaged in a scheme to deceive Fans into believing that Creators were communicating "directly" with their Fans when they were actually interacting with professional Chatters pretending to be the Creators—some of whom, on information and belief, shared almost no relevant characteristics in common with the Creators they were impersonating.

514. When he found out about the Chatter Scams, Plaintiff S.M. felt betrayed and violated. He had divulged sensitive and/or personal information not to the individuals he thought he was communicating with—but rather to impostors paid to impersonate those individuals.

515. If he had known about the Chatter Scams, or that any of his expectations or beliefs about the nature of the communication on OnlyFans were not true with respect to a particular Creator, he would not have subscribed to or interacted directly with the Creator's account at all—much less would he have paid any Premium Content Fees to do so.

516. If he had known about the Chatter Scams from the beginning, he likely would not have signed up for an OnlyFans account in the first place.

517. After being solicited by the "Creators" (who on information and belief were Chatters), and based upon his belief that he was communicating directly with a Creator, Plaintiff S.M. purchased Premium Content.

518. Plaintiff S.M. estimates that during the time he was using his OnlyFans account, he spent approximately $1,000 on Premium Content Fees—20% of which went to OnlyFans.

519. Plaintiff S.M. did not receive what he paid for. He would not have paid any Premium Content Fees—and certainly would not have paid as much—if he had known that he was communicating not with the Creators themselves, but with Chatters paid to impersonate the Creators.

520. Plaintiff S.M. stopped using his OnlyFans account on approximately February 8, 2024, after learning of the Chatter Scams through the present litigation.

**5. Plaintiff A.L.**

521. Plaintiff A.L. was an OnlyFans user from approximately 2021 to 2024.

522. During that time, Plaintiff A.L. subscribed to the following Creator accounts (collectively, for this section, "Subscribed Creator Accounts"), which have been linked to—and, on information and belief, were used by—the Agency Defendants to perpetrate the Chatter Scams:

a. Bri Jordan (Siren Agency)
b. Julia Piccolino, Breckie Hill, Carolina Samani, Briana Armbruster, Cristy Senskey, and Claire Stone (Moxy Management)
c. Tara Electra and Kinsey (Unruly Agency)
d. Kayla Simmons (Behave Agency)
e. Katie Williams and Mikayla Demaiter (Verge Agency)

f. Elseana Panzer, Jostasy Nick, and Nala (also known as Nala the Ninja and Fitness Nala) (Creators Inc.)

523. Plaintiff A.L. relied on OnlyFans' successful efforts to market itself as a "revolutionary" platform that allowed content Creators to have direct interactions with their Fans, as well as OnlyFans' representations that subscribing to a Creator's account gave him "benefits" that specifically included the ability to "[d]irect message with this user."

524. As a result, when he subscribed to each Subscribed Creator Account, Plaintiff A.L. expected and believed that any information or communication—but particularly any personal or sensitive information, including thoughts, feelings, and/or images of a private, emotional, and/or sexual nature—that he exchanged with the Creator via her account on OnlyFans would be kept entirely private, confidential, and strictly between himself and the Creator.

525. Because of these expectations and beliefs, Plaintiff A.L. felt comfortable sharing information through OnlyFans, and at all times relevant to this Complaint, he believed that when he was communicating with a Subscribed Creator Account, he was communicating directly and privately with that Creator.

526. Plaintiff A.L. communicated via direct message with each of the accounts listed above. Those communications included direct messages that contained personal and sensitive information, including personal photos of himself.

527. In addition, Plaintiff A.L. viewed videos sent to him via direct message through the Subscribed Creator Accounts—some of which he had specifically requested—without knowing those videos had been sent by one or

more agents or contractors of the Agency Defendants—including professional Chatters.

528. Plaintiff A.L. did not consent to having any of his personal information or communications shared with anyone other than the Creator he believed he was communicating with, and was unaware of the fact that his messages and their content were being disclosed to one or more agents or contractors of the Agency Defendants—including professional Chatters.

529. Although he was aware that "management agencies" existed, he believed they only assisted Creators with marketing and social media management, and Plaintiff A.L. was not aware that the Subscribed Creator Accounts were utilizing management agencies until he contacted undersigned counsel, which occurred on approximately March 27, 2024.

530. He was not aware that Defendants were engaged in a scheme to deceive users into believing that Creators were communicating "directly" with their Fans when they were actually interacting with professional Chatters pretending to be the Creators—some of whom, on information and belief, shared almost no relevant characteristics in common with the Creators they were impersonating.

531. When he found out about the Chatter Scams, Plaintiff A.L. felt betrayed and violated. He had divulged sensitive and/or personal information not to the individuals he thought he was communicating with—but to impostors paid to impersonate those individuals.

532. If he had known about the Chatter Scams, or that any of his expectations or beliefs about the nature of the communication on OnlyFans were not true with respect to a particular Creator, he would not have subscribed to or

interacted directly with the Creator's account at all—much less would he have paid any Premium Content Fees to do so.

533. If he had known about the Chatter Scams from the beginning, he likely would not have signed up for an OnlyFans account in the first place.

534. After being solicited by the "Creators" (who on information and belief were Chatters), and based upon his belief that he was communicating directly with a Creator, Plaintiff S.M. purchased Premium Content.

535. Plaintiff A.L. estimates that during the time he was using his OnlyFans account, he spent approximately $500–$600 on Premium Content Fees—20% of which went to OnlyFans.

536. Plaintiff A.L. did not receive what he paid for. He would not have paid any Premium Content Fees—and certainly would not have paid as much—if he had known that he was communicating not with the Creators themselves, but with Chatters paid to impersonate the Creators.

537. He stopped using his OnlyFans account after learning of the Chatter Scams through the present litigation.

## V. CLASS ACTION ALLEGATIONS

538. Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and all others similarly situated.

539. Plaintiffs seek to represent a nationwide class of OnlyFans users ("Nationwide Class") defined as:

> All persons residing in the United States who had a Fan account on OnlyFans and paid Premium Content Fees to any Creator who was represented by an Agency Defendant and that Agency Defendant used Chatters to

> communicate directly with these Fans on the OnlyFans platform during the Relevant Time Period.

540. Plaintiffs seek to represent a nationwide subclass of OnlyFans users ("VPPA Subclass") defined as:

> All persons residing in the United States who had a Fan account on OnlyFans, who shared PII (as defined by the Video Privacy Protection Act) with any Creator who was represented by an Agency Defendant and that Agency Defendant used Chatters to communicate directly with these Fans on the OnlyFans platform, and who paid Premium Content Fees to that Creator during the Relevant Time Period.

541. Plaintiffs N.Z. and R.M. ("California Plaintiffs") seek to represent a subclass of California residents ("California Subclass") defined as:

> All persons residing in California who had a Fan account on OnlyFans and paid Premium Content Fees to any Creator who was represented by any Agency Defendant and that Agency Defendant used Chatters to communicate directly with these Fans on the OnlyFans platform during the Relevant Time Period.

542. The "Relevant Time Period" means the period of time established by the Court for the claims alleged in this Complaint.

543. Excluded from the Classes (the members of which are collectively referred to as "Class Members") are Defendants and their co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; Class counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

544. Plaintiffs reserve the right to amend or modify the class definitions after having had an opportunity to conduct discovery.

**A. The Requirements of Rule 23(a)(1)-(4) Are Satisfied**

**1. Numerosity**

545. The Classes are so numerous that joinder of all members is unfeasible and impracticable. OnlyFans has millions of subscribers worldwide, and on information and belief, the practice of using Chatters to impersonate Creators is so widespread that any reasonable estimate indicates there are hundreds of thousands—if not millions—of Class Members.

**2. Commonality**

546. Common questions of law and fact exist as to all Class Members, which include, but are not limited to:

a. Whether OnlyFans Defendants misrepresented the nature of the communications between Fans and Creators;

b. Whether the Agency Defendants used Chatters, who were pretending to be the Represented Creators, to communicate with Fans;

c. Whether Agency Defendants released, transferred, disclosed and/or disseminated the personal or private information of Plaintiffs and Class Members—including personal communications and video-watching histories to unauthorized third parties, including Chatters;

d. Whether Defendants engaged in or conspired to engage in a RICO enterprise that harmed Plaintiffs and the Class Members;

e. Whether OnlyFans Defendants breached their contracts with Plaintiffs and the Class Members;

f. Whether Defendants are liable under each of the causes of action as alleged herein;

g. Whether Class Members were damaged and, if so, the appropriate measure of damages; and

h. Whether Class Members are entitled to damages, equitable relief, and other relief.

**3. Typicality**

547. Plaintiffs' claims are typical of the claims of the other members in the Classes, as they arise out of the uniform and pervasive conduct of Defendants, involve the same legal theories, and challenge the same practices of Defendants. Plaintiffs and all Class Members have been subjected to the same falsehoods and practices, hold the same rights, are entitled to the same legal and equitable relief, have suffered the same impact and injury, and sustained similar damage by paying for Premium Content Fees they would not have paid, or greater than that which they would have paid, had Defendants disclosed and/or taken action on the Chatter Scams and concomitant privacy and terms of service violations.

**4. Adequacy**

548. Plaintiffs and their counsel will fairly and adequately represent the interests of the Classes they seek to represent. Plaintiffs have no interests antagonistic to, or in conflict with, the interests of the other Class Members. Plaintiffs' lawyers are highly experienced in the prosecution of consumer class actions and complex commercial litigation, capable of providing the financial resources needed to litigate this matter to conclusion and have litigated other consumer rights matters in a class context.

**B. The Requirements of Rule 23(b)(2) Are Satisfied: Defendants' conduct generally applies to Class, making injunctive relief for the class as a whole appropriate.**

549. Rule 23(b)(2) requires that for certification of the Injunctive Relief Class, Plaintiff must show "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

550. Here, Defendants' actions and failures to act are systemic and uniform across the class, as are the terms of service and other contract documents. The relief the Class seeks would require injunctive relief that conforms Defendants' conduct to the law and existing contractual obligations.

551. Classwide equitable relief is appropriate under Rule 23(b)(2) because Defendants have acted on grounds that apply generally to the members of the Classes, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests. Classwide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Class.

**C. The Requirements of Rule 23(b)(3) Are Satisfied**

**1. Predominance**

552. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because the questions of law or fact common to class members predominate over any questions affecting only individual members. "The predominance analysis under Rule 23(b)(3) focuses on the relationship between the

common and individual issues in the case, and tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 964 (9th Cir. 2013) (citations and internal quotations omitted). Predominance "does not require a plaintiff seeking class certification to prove that each element of their claim is susceptible to classwide proof, so long as one or more common questions predominate." *Castillo v. Bank of Am., NA,* 980 F.3d 723, 730 (9th Cir. 2020) (citations and internal quotations omitted). Plaintiff must also present a method showing "that damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Plaintiffs have met all of these requirements. In this case, liability would be determined by common representations, acts, promises, and omissions, the proof of which every class member could use to prove liability. Damages could be determined using the records of Defendants or mechanically if by statutory damage awards, even though individual differences in damages does not preclude certification.

**2. Superiority**

553. A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiffs and the Class Members. Plaintiffs and the Class Members—many of whom are unaware of their rights—have been harmed by Defendant's misrepresentations.

554. Defendants have acted uniformly with respect to the Plaintiffs and Class Members. Defendants' scheme treated consumers as a Class to be uniformly deceived. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs and Class Members have all

suffered economic harm and damage because of Defendants' unlawful and wrongful conduct, which was directed toward Class Members and the public, rather than specifically or uniquely against any individual Class Members.

555. There is currently no pending litigation regarding Defendants' conduct and this class action will reduce the possibility of repetitious litigation relating to Defendants' wrongful actions and provides an efficient mechanism for adjudication for Class Members.

556. Absent a class action, most Class Members would find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the small size of the individual Class Members' claims, it is unlikely that the Class Members could individually afford to seek legal redress for Defendants' misconduct.

557. Class treatment in this Court, where a majority of Defendants reside where all Defendants do business, will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication by providing common answers to the common questions of knowledge, conduct, duty, and breach that predominate in this action.

558. Because this case involves common conduct by Defendants and all Class Members have suffered the same harm, there are no obvious difficulties in managing this case as a classwide action.

559. Classwide equitable relief is appropriate under Rule 23(b)(2) because Defendants have acted on grounds that apply generally to the members of the Classes, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the

ability of Class Members to protect their interests. Classwide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Class.

## VI. TOLLING OF STATUTE OF LIMITATIONS

560. The statutes of limitation applicable to Plaintiffs' claims are tolled as a result of Defendants' knowing and active concealment of the alleged conduct. Plaintiffs did not and could not have reasonably discovered the true nature of Chatter Scams because OnlyFans Defendants falsely represented to users that they were talking directly with Creators.

561. Agency Defendants, who were running their Represented Creators Accounts, did not disclose that the accounts were being run by agencies or that Plaintiffs and Class Members were communicating with Chatters most of the time. Moreover, Defendants denied that the communications were not coming from the Creator and/or terminated the accounts of Fans who challenged the authenticity of the communications and raised the Chatter issue.

562. Plaintiffs' claims are therefore tolled under the discovery rule.

563. The causes of action alleged herein did not accrue until Plaintiffs discovered or should have discovered the Chatter Scams.

564. To this day, Defendants do not publicly disclose the use of Chatters or that Fans will, for the most part, not have personal, authentic, and direct communications with the Creators because most, if not all, of those communications will be with Chatters.

565. Plaintiffs and other Class Members could not have learned about the full extent of the Chatter Scams or Defendants' misconduct through the exercise of reasonable diligence, especially with Defendants working to conceal the Chatter Scams.

566. For most users, the full extent of Chatter Scams is still unknown, making the discovery rule appropriate.

567. For these reasons, all applicable statutes of limitations have been tolled by the operation of the discovery rule.

## VII. CAUSES OF ACTION

568. Each of the following claims incorporates all other paragraphs in this Complaint.

569. To the extent any claim includes allegations on behalf of B.L., S.M., or A.L. ("Out-of-State Plaintiffs") against Fenix International Limited or Fenix Internet LLC, such allegations are withdrawn pursuant to the Court's Order on the Fenix Defendants' Motion to Dismiss for Forum Non Conveniens (Dkt. 117). Each claim below continues to refer to "Defendants," "Plaintiffs," and "Class Members" for ease of reading, and unless otherwise specified within a given Count:

a. "California Plaintiffs" bring claims against all Defendants on behalf of the Nationwide Class or, in the alternative, on behalf of the California Class.

b. "Out-of-State Plaintiffs" bring claims against the Agency Defendants on behalf of the Nationwide Class.

c. "Defendants" refers to the entities identified as defendants for each Count and should be read to exclude any Defendant as to whom a given Plaintiff's claims have been dismissed.

**COUNT I. VIOLATION OF RICO**
**(18 U.S.C. § 1962(c))**
**(Against All Defendants)**

570. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

571. Under 18 U.S.C. § 1961(4), an "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

572. A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

573. "Racketeering activity" includes wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1).

574. 18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

**A. Each Defendant is a Culpable Person Under RICO.**

575. Defendants are all culpable "persons" under 18 U.S.C.§ 1961(3), as each of them is an entity capable of holding a legal or beneficial interest in property.

**B. The Content Fraud Enterprise is a RICO Enterprise.**

576. For the purposes of this claim, the RICO enterprise, referred to in this Complaint as the "Content Fraud Enterprise," is an association-in-fact enterprise of FIL and FIUSA (the OnlyFans Defendants), and Boss Baddies, Moxy, Unruly, Behave, A.S.H., Content X, Verge, and Elite Creators (the Agency Defendants), along with the Agency Defendants' co-conspirators, their Represented Creators.

577. OnlyFans Defendants and Agency Defendants play different roles, but all cooperate on a common purpose: Using Chatters to extract Premium Content Fees from Plaintiffs and Class Members.

578. OnlyFans Defendants have, continually since its inception, promised to every Fan on the OnlyFans platform that they will be able to "direct message" with the Creators they subscribe to.

579. As described herein, each of these communications was made directly to Plaintiffs and the Class Members when they subscribed to each Creator on the OnlyFans platform.

580. OnlyFans Defendants have also communicated to Plaintiffs and the Class Members on the various platforms, including its website that they will be able to "direct message" with Creators, chat "1 on 1" with the Creators, and build "genuine" and "authentic" connections.

581. Each of the Agency Defendants manages the OnlyFans accounts of its Represented Creators, who are unnamed co-conspirators. On behalf of the Creators, the Agency Defendants use Chatters to post and communicate as the Represented Creator on that Creator's account—what has been described herein as the Chatter Scams—surreptitiously impersonating the Creator.

582. Agency Defendants implemented the Chatter Scams on behalf of the Creators they represent to convince Fans they were direct messaging with the Represented Creators and receiving the promised "1 on 1," chats, "direct messaging," or "authentic" experience, when in fact the Fans were speaking with third parties without their knowledge. As described herein, these false communications were made by the Agency Defendants on behalf of their Represented Creators to Plaintiffs and Class Members each time they engaged in a direct message with a Represented Creator.

583. The Agency Defendants' Chatter Scams are designed to use deception to maximize the Premium Content Fees paid to the Creators by the Fans as described herein, a portion of which is paid to the Agency Defendants.

584. Since their inception, the Agency Defendants engaged in the fraudulent activities by controlling and distributing misleading and false digital content to Fans through the Chatter Scams on behalf of the Creators, knowing that OnlyFans Defendants were monitoring the platform but would not enforce their anti-fraud policies.

585. OnlyFans Defendants—who possess network logs that record all digital activity occurring on the OnlyFans platform—are not only aware of the

Agency Defendants but actively facilitate their use of Chatters and CRM platforms that further enhance, and even automate, the Chatter Scams.

586. OnlyFans Defendants intentionally failed to enforce their anti-fraud policies—knowing non-enforcement would allow Agency Defendants to continue their fraudulent activities and increase and maximize a Creator's Premium Content Fees through the Chatter Scams—to continue to collect 20% of the revenue generated by the fraudulent activity.

587. OnlyFans Defendants received complaints from Fans about the use of Chatters, yet they continued to allow and support the fraudulent actions of the Agency Defendants.

588. OnlyFans is not only aware of and facilitates CRM platforms, on information and belief OnlyFans communicated to a large CRM that it has no intention of or plans to stop their use.

589. The OnlyFans Defendants' platform interface and marketing strategies are designed to maximize engagement and revenue, regardless of the authenticity of the content.

590.Beyond intentionally failing to police its own policies, the OnlyFans Defendants collect all of the digital evidence necessary to alert themselves to the presence of the Chatter Scams and are either intentionally ignoring this information or otherwise actively enable the Chatter Scams to operate on the OnlyFans platform.

591. OnlyFans Defendants' profit motive drives them to engage in fraudulent conduct, intentionally overlooking violations to maximize revenue.

592. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants such as Represented Creators and CRM platforms, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues and increase market share for Defendants and their unnamed co-conspirators.

**C. Pattern of Racketeering Activity**

593. The Content Fraud Enterprise is an ongoing, continuing group of entities associated together for the common purpose of fraudulently increasing the amount and number of Premium Content Fees each Fan pays.

594. The Content Fraud Enterprise has been ongoing since approximately 2016 and will continue as long as Defendants can continue to fraudulently collect Premium Content Fees from Plaintiffs and the Class Members.

595. While the OnlyFans Defendants and Agency Defendants are members of the Content Fraud Enterprise, and participated in and are part of the enterprise, they all have an existence separate and distinct from the enterprise. The Content Fraud Enterprise has a systematic linkage because there are financial ties and coordination of activities between the OnlyFans Defendants and the Agency Defendants.

596. The Content Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries and internationally, such as the marketing, promotion, advertisement, and sale of digital content on the OnlyFans platform.

### D. The Racketeering Activity or Predicate Acts

597. Defendants devised a scheme to defraud Fans by creating and promoting misleading digital content on the OnlyFans platform, falsely representing the nature, quality, and value of the content to induce Fans to pay Premium Content Fees.

598. Defendants acted with the specific intent to deceive and defraud Fans to increase their profits.

599. To carry out, or attempt to carry out the scheme to defraud, Defendants conducted or participated in the conduct of the affairs of the Content Fraud Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), that employed the use of the wire facilities, in violation of 18 U.S.C. § 1343.

600. Defendants participated in the scheme to defraud by using the internet to transmit and operate the Content Fraud Enterprise.

601. OnlyFans Defendants used the internet to communicate to Plaintiffs and Class Members that they could develop "authentic relationships" and "authentic connections" with Creators, which currently is on the OnlyFans website and has been on there since 2017, reiterated in May 2022 as set forth herein.

602. On January 17, 2021, OnlyFans Defendants represented on Twitter that Fans could "direct message[]" and "chat with a Creator."

603. On February 9, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

604. On February 20, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

605. On March 2, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat" with a Creator.

606. On May 26, 2021, OnlyFans Defendants represented on Twitter a Creator would "chat with all her fans in the DMs."

607. On September 10, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans in the DMs" and they could "chat with her."

608. On December 22, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans 1-on-1 . . . so introduce yourself."

609. On January 6, 2022, OnlyFans Defendants represented on Twitter that a Creator "can't wait to chat with you."

610. On March 8, 2022, OnlyFans Defendants represented on Twitter that a Creator "even chats with her fans in the DMs . . . So go and say hey."

611. On October 22, 2022, OnlyFans Defendants represented on Twitter that Fans could "connect" with a Creator on a "deeper level."

612. On September 30. 20222, OnlyFans Defendants represented on Twitter that Fans could "talk one-on-one with" a Creator.

613. On November 2, 2022, OnlyFans Defendants represented on Instagram that a Creator was "chatting with her fans."

614. On November 16, 2022, OnlyFans Defendants represented on Twitter that Fans could connect with a Creator "1-on-1."

615. On December 16, 2022, OnlyFans Defendants represented on Twitter that a Creator was "responding to DMs."

616. On August 19, 2023, OnlyFans Defendants represented on Instagram that Creator would "interact directly with [her] fans."

617. On May 3, 2024, OnlyFans Defendants represented on Twitter that Fans could "connect[] personally" with a Creator.

618. On June 18, 2024, OnlyFans Defendants represented on Instagram that a Creator made her living "chatting" with the Fans.

619. On July 17, 2024, OnlyFans Defendants represented on Instagram that a Creator makes "amazing connections with [her] fans and built genuine relationships."

620. OnlyFans Defendants made each of these statements to convince Fans to subscribe to Creators, collecting 20% of all those subscription fees, in addition to additional purchases made by the Fans after they subscribe.

621. OnlyFans Defendants used the internet to communicate to each Fan who subscribed to a Creator's account that they would be able to "Direct message with this user." OnlyFans Defendants' records will show the exact date each Plaintiff and Class Member subscribed to a Creator account and received this communication. Agency Defendants as co-conspirators and agents of the Represented Creators, transmitted multiple communications through the internet to Plaintiffs and Class Members, falsely representing they were Creators, to convince Plaintiffs and Class Members to pay Premium Content Fees. Defendants' records will show the exact date of each communication, some of those communications include:

622. Plaintiff N.Z. paid Breckie Hill (Moxy) $10 on April 3, 2023.

623. Plaintiff N.Z., he paid Stefanie Gurzanski (Unruly) a total of $139.50 on June 28, 2023, $70.50 on August 3, 2023, $45 on September 16, 2023, and $90 on October 27, 2023.

624. Plaintiff N.Z. paid On, he paid Nicky Nicky Gile (Unruly) $69 on August 14, 2023 and $111 on November 22, 2024.

625. Plaintiff N.Z. paid McKinley Richardson (Creators Inc.) $20 on August 23, 2023 and $35 on August 25, 2023.

626. Plaintiff N.Z. paid On, he paid Sky Bri (A.S.H. Agency) $25 on December 4, 2023.

627. Plaintiff B.L. subscribed to Briana Armbruster (Moxy) on November 28, 2023. The monthly subscription fee was $14.99 and he tipped an additional $87.00 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Briana Armbruster.

628. Plaintiff B.L. subscribed to Tina Louise (Unruly) on October 9, 2020. He tipped an additional $59.69 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Tina Louise.

629. Plaintiff B.L. subscribed to Kayla Lauren (Unruly) on October 9, 2020. He tipped an additional $44.00 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Kayla Lauren.

630. Plaintiff B.L. subscribed to Anna Louise (Unruly) on October 9, 2020. He tipped an additional $160.67 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Anna Louise.

631. Plaintiff B.L. subscribed to Ryann Murphy (Behave) on January 15, 2022. He tipped an additional $51.00 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Ryann Murphy.

632. Plaintiff B.L. subscribed to Mathilde Tantot (Content X) on May 13, 2021. He tipped an additional $294.31 during the length of his subscription. Plaintiff B.L. is still subscribed to Mathilde Tantot but no longer interacts with her.

633. Plaintiff B.L. subscribed to Pauline Tantot (Content X) on May 13, 2021. He tipped an additional $148.00 during the length of his subscription. Plaintiff B.L. is still subscribed to Pauline Tantot but no longer interacts with her.

634. Plaintiff B.L. subscribed to Summer Soderstrom (Creators Inc.) on January 3, 2023. He tipped an additional $76.00 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Summer Soderstrom.

635. Plaintiff S.M. subscribed to Bella Thorne (Content X) in 2020. The monthly subscription fee was approximately $20.00. He also made several payments for.

636. Plaintiff S.M. subscribed to Jane Wilde (A.S.H.) in 2023 for two months at approximately $4.99 per month. He also tipped her $40.00 for additional content.

637. Plaintiff S.M. subscribed to Abella Danger (Content X) from 2022–2024. He subscribed to both her free page and her VIP page at $19.99 per month. He tipped $100.00 to become a VIP subscriber.

638. Plaintiff S.M. subscribed to Steph Landor (Creators Inc.) from 2021–2023 to both her free page and her VIP page at approximately $20.00 per month.

He spent over $200.00 for content "of a hot and spicy nature," such as topless photos and shower and bath videos.

639. Plaintiff S.M. subscribed to Kaitlyn Krems (Moxy) from 2023–2024. He paid $100.00 to become a VIP subscriber. He sent her additional money as well.

640. Plaintiff S.M. subscribed to Breckie Hill (Moxy) in 2023. He paid $100.00 to become a VIP subscriber.

641. Plaintiff R.M. subscribed to Chyanne Burden (Moxy) on July 16, 2020. At the time, her page was free to subscribe to. He tipped an additional $55.00 during the length of his subscription. Plaintiff R.M. is still subscribed to Chyanne Burden but no longer tips or interacts with her. The current monthly subscription fee is approximately $20.00.

642. Plaintiff R.M. subscribed to Emily Elizabeth (Dysrpt) on October 7, 2022. He tipped an additional $65.00 to become a VIP subscriber. Plaintiff R.M. is still subscribed to Emily Elizabeth but no longer interacts with her.

643. Plaintiff R.M. confronted Emily Elizabeth via direct message and she said it was her replying to messages.

644. In addition to the acts of wire fraud identified above, Defendants' acts also include:

a. Promotion of fraudulent digital content through the OnlyFans platform to Plaintiffs and Class Members.

b. Electronic payment transactions processed by the platform—specifically by Defendant FIUSA—in which money was transferred from Fans to Defendants.

c. Communications between OnlyFans Defendants and Agency Defendants, instructing them on how to maximize profits through misleading content, as described herein.

d. Defendants' false and fraudulent representation to Plaintiffs and the Class Members about the value and/or authenticity of the digital content.

e. The fraudulent digital content itself.

f. Communications promoting fraudulent content.

g. Essential marketing and promotional materials.

h. Fraudulent advertisements and representations.

i. Fraudulently obtained payments from Fans.

j. Documents and communications that facilitated the fraudulent scheme.

k. False or misleading communications intended to obscure the fraud.

l. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, omitted, and actively concealed material facts about the true nature of the digital content.

m. Documents intended to facilitate the marketing and sale of fraudulent content.

n. Documents to process and receive payment for the digital content by unsuspecting Fans, including invoices and receipts.

o. Deposits of proceeds.

645. As described above, Defendants have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity within the past ten years.

646. Defendants used, directed the use of, and/or caused to be used, thousands of wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

647. The wire transmissions were made in furtherance of Defendants' scheme and common course of conduct to deceive Fans and lure them into paying money for a fraudulent "personal" virtual relationship and associated content.

648. Many of the precise dates of the fraudulent use of the interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

**E. Injury and Damages**

649. Plaintiffs and the Class Members are victims of this nationwide scheme, having signed up for the OnlyFans platform based on assurances from the OnlyFans Defendants that the digital content and direct messaging was authentic and as represented.

650. The OnlyFans Defendants falsely and fraudulently represented the value and authenticity of the digital content to Fans.

651. The Agency Defendants on behalf of the Represented Creators used the Chatter Scams to increase the Premium Content Fees paid by Plaintiffs and the Class Members, of which they took a portion.

652. Defendants' actions were done to induce Fans to pay Premium Content Fees, all to fraudulently increase Defendants' profits.

653. Defendants' scheme was reasonably calculated to deceive Plaintiffs and Fans through the execution of their complex and illegal scheme to misrepresent the authenticity of the digital content offered on the platform.

654. By reason of, and because of the conduct of Defendants, and each of them, and in particular, their pattern of racketeering activity, Plaintiffs and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

655. Paying Premium Content Fees they would not have paid, had they known they were communicating with Chatters, not the Creators.

656. The lost expectation of having direct, authentic communications, and the effort wasted communicating with Creators' Chatters.

657. Overpayment for the digital content that was not as represented.

658. Overpayment for digital content that was misrepresented as to the characteristics, source, or authenticity.

659. Other incidental and consequential expenses linked to the overpayment for the digital content, including, but not limited to, additional interest on financing, fees, and other financial harms.

660. Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to three times their actual damages, as well as costs and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT II. VIOLATION OF RICO**
**(18 U.S.C. § 1962(c))**
**(Against OnlyFans Defendants and Defendant Elite Creators LLC)**

661. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

662. Pursuant to Rule 8(b)(2), Fed. R. Civ. P., Plaintiffs allege RICO violations in the alternative against the OnlyFans Defendants and Elite Creators LLC (referred to herein as "Creators Inc.").

663. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

664. Under 18 U.S.C. § 1961(4), an "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

665. A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

666. "Racketeering activity" includes wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1).

667. 18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television

communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

**A. Each Defendant is a Culpable Person Under RICO.**

668. The OnlyFans Defendants and Defendant Elite Creators LLC are all culpable "persons" under 18 U.S.C.§ 1961(3), as each of them is an entity capable of holding a legal or beneficial interest in property.

**B. The Content Fraud Enterprise is a RICO Enterprise.**

669. For the purposes of this claim, the RICO enterprise, referred to in this Complaint as the "Content Fraud Enterprise," independently exists as an association-in-fact enterprise of FIL and FIUSA (the OnlyFans Defendants), Defendant Elite Creators LLC, and their co-conspirators, such as the CRM platforms described herein and those Creators that Creators Inc. represents.

670. The OnlyFans Defendants and Creators Inc. play different roles, but each cooperate toward a common purpose: using Chatters to extract Premium Content Fees from Plaintiffs and Class Members.

671. OnlyFans Defendants have, continually since its inception, promised to every Fan on the OnlyFans platform that they will be able to "direct message" with the Creators they subscribe to.

672. As described herein, each of these communications was made directly to Plaintiffs and the Class Members when they subscribed to each Creator represented by Creators Inc. on the OnlyFans platform.

673. OnlyFans Defendants have also communicated to Plaintiffs and the Class Members on the various platforms, including its website that they will be able

to "direct message" with Creators, chat "1 on 1" with the Creators, and build "genuine" and "authentic" connections.

674. Creators Inc. manages the OnlyFans accounts of its Represented Creators, who are unnamed co-conspirators. On behalf of its Creators, Creators Inc. directs Chatters to post and communicate as the Represented Creator on that Creator's account—what has been described herein as the Chatter Scams—surreptitiously impersonating the Creator.

675. Creators Inc. is utilizing the Chatter Scams on behalf of the Creators they represent to convince Fans they are directly messaging with Creators and receiving the promised "1 on 1," chats, "direct messaging," or "authentic" experience, when in fact the Fans were speaking with third parties without their knowledge. As described herein, these false communications were made by the OnlyFans Defendants and by Creators Inc., on behalf of their Represented Creators, to Plaintiffs and Class Members each time they engaged in a direct message with a Represented Creator.

676. The Chatter Scams are designed to use deception to maximize the Premium Content Fees paid to the Creators by the Fans as described herein, a portion of which is paid to Creators Inc.

677. Creators Inc. is engaged in the fraudulent activities described herein by controlling and distributing misleading and false digital content to Fans through the Chatter Scams on behalf of the Creators, knowing that OnlyFans Defendants were monitoring the platform but would not enforce their anti-fraud policies.

678. OnlyFans Defendants, who possess network logs that record all digital activity occurring on the OnlyFans platform, are not only aware of Creators Inc. but

actively facilitate its use of Chatters as well as CRM platforms that further enhance, and even automate, the Chatter Scams.

679. OnlyFans Defendants intentionally failed to enforce their anti-fraud policies, or otherwise actively police the platform's network activity—knowing non-enforcement would allow Creators Inc. to continue the pattern of fraudulent activities, thereby increasing and maximizing each Creator's Premium Content Fees through the Chatter Scams—to continue to collect 20% of the revenue generated by the fraudulent activity.

680. OnlyFans Defendants received complaints from Fans about the use of Chatters, yet they continued to allow and support the fraudulent actions of Creators Inc. and the related co-conspirators.

681. The OnlyFans Defendants' platform interface and marketing strategies are designed to maximize engagement and revenue, regardless of the authenticity of the content.

682. Beyond intentionally failing to police its own policies, the OnlyFans Defendants collect all of the digital evidence necessary to alert themselves to the presence of the Chatter Scams and are either intentionally ignoring this information or otherwise actively enable the Chatter Scams to operate on the OnlyFans platform.

683. OnlyFans Defendants' profit motive drives them to engage in fraudulent conduct, intentionally overlooking violations to maximize revenue.

684. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants such as Represented Creators, and CRM platforms have participated as co-conspirators with Defendants in these

offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues and increase market share for Defendants and their unnamed co-conspirators.

**C. Pattern of Racketeering Activity**

685. The Content Fraud Enterprise between the OnlyFans Defendants and Creators Inc. is an ongoing, continuing group of entities associated together for the common purpose of fraudulently increasing the amount and number of Premium Content Fees each Fan pays.

686. The Content Fraud Enterprise has been ongoing since approximately 2016 and will continue as long as the OnlyFans Defendants and Creators Inc. can continue to fraudulently collect Premium Content Fees from Plaintiffs and the Class Members.

687. While the OnlyFans Defendants and Creators Inc. are members of the Content Fraud Enterprise, and participated in and are part of the enterprise, they all have an existence separate and distinct from the enterprise. The Content Fraud Enterprise has a systematic linkage because there are financial ties and coordination of activities between the OnlyFans Defendants and Creators Inc.

688. The Content Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries and internationally, such as the marketing, promotion, advertisement, and sale of digital content on the OnlyFans platform.

**D. The Racketeering Activity or Predicate Acts**

689. OnlyFans Defendants and Creators Inc. devised a scheme to defraud Fans by creating and promoting misleading digital content on the OnlyFans

platform, falsely representing the nature, quality, and value of the content to induce Fans to pay Premium Content Fees.

690. OnlyFans Defendants and Creators Inc. acted with the specific intent to deceive and defraud Fans to increase their profits.

691. To carry out, or attempt to carry out the scheme to defraud, OnlyFans Defendants and Creators Inc. conducted or participated in the conduct of the affairs of the Content Fraud Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), that employed the use of the wire facilities, in violation of 18 U.S.C. § 1343.

692. OnlyFans Defendants and Creators Inc. participated in the scheme to defraud by using the internet to transmit and operate the Content Fraud Enterprise.

693. OnlyFans Defendants used the internet to communicate to Plaintiffs and Class Members that they could develop "authentic relationships" and "authentic connections" with Creators, which currently is on the OnlyFans website and has been on there since 2017, reiterated in May 2022 as set forth herein.

694. On January 17, 2021, OnlyFans Defendants represented on Twitter that Fans could "direct message[]" and "chat with a Creator."

695. On February 9, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

696. On February 20, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

697. On March 2, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat" with a Creator.

698. On May 26, 2021, OnlyFans Defendants represented on Twitter a Creator would "chat with all her fans in the DMs."

699. On September 10, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans in the DMs" and they could "chat with her."

700. On December 22, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans 1-on-1 . . . so introduce yourself."

701. On January 6, 2022, OnlyFans Defendants represented on Twitter that a Creator "can't wait to chat with you."

702. On March 8, 2022, OnlyFans Defendants represented on Twitter that a Creator "even chats with her fins in the DMs . . . So go and say hey."

703. On October 22, 2022, OnlyFans Defendants represented on Twitter that Fans could "connect" with a Creator on a "deeper level."

704. On September 30. 20222, OnlyFans Defendants represented on Twitter that Fans could "talk one-on-one with" a Creator.

705. On November 2, 2022, OnlyFans Defendants represented on Instagram that a Creator was "chatting with her fans."

706. On November 16, 2022, OnlyFans Defendants represented on Twitter that Fans could connect with a Creator "1-on-1."

707. On December 16, 2022, OnlyFans Defendants represented on Twitter that a Creator was "responding to DMs."

708. On August 19, 2023, OnlyFans Defendants represented on Instagram that Creator would "interact directly with [her] fans."

709. On May 3, 2024, OnlyFans Defendants represented on Twitter that Fans could "connect[] personally" with a Creator.

710. On June 18, 2024, OnlyFans Defendants represented on Instagram that a Creator made her living "chatting" with the Fans.

711. On July 17, 2024, OnlyFans Defendants represented on Instagram that a Creator makes "amazing connections with [her] fans and built genuine relationships."

712. OnlyFans Defendants made each of these statements to convince Fans to subscribe to Creators, collecting 20% of all those subscription fees, in addition to additional purchases made by the Fans after they subscribe.

713. OnlyFans Defendants used the internet to communicate to each Fan who subscribed to a Creator's account that they would be able to "Direct message with this user." OnlyFans Defendants' records will show the exact date each Plaintiff and Class Member subscribed to a Creator account and received this communication.

714. Creators Inc. as co-conspirators and agents of its Represented Creators, transmitted multiple communications through the internet to Plaintiffs and Class Members, falsely representing they were Creators, to convince Plaintiffs and Class Members to pay Premium Content Fees. Defendants' records will show the exact date of each communication, some of those communications include:

a. Plaintiff B.L. subscribed to Summer Soderstrom on January 3, 2023. He tipped an additional $76.00 during the length of his subscription. Plaintiff B.L. is not currently subscribed to Summer Soderstrom.

b. Plaintiff S.M. subscribed to Steph Landor from 2021–2023 to both her free page and her VIP page at approximately $20.00 per month. He spent over $200.00 for content based upon the belief he was communicating directly with Landor. He sent direct messages complaining and accusing her of not being truthful with her promised content. He was told her management team handles her OnlyFans account and they would be in touch with him.

c. Plaintiff N.Z. paid McKinley Richardson $20 on August 23, 2023.

d. Plaintiff N.Z. paid McKinley Richardson $35 on August 25, 2023.

715. Likewise, Represented Creators for Creators Inc. have repeatedly emphasized the direct connection that Fans will have on the OnlyFans Platform, for instance:

a. Baby J (@Jostasy)'s OnlyFans account says:

> "🍓 I personally reply to every message, so messages with tips attached get priority! Please be patient if there isn't one!"

b. Romey (@romey_mae)'s OnlyFans account says:

> Your Sub[scription] Includes:
> 🖤 Instant access to all photos and videos on my timeline (700+)
> 🖤 Regular posts
> 🖤 My most EXPLICIT content
> 🖤 Access to DMs with me
> 🖤 Access to Exclusive Content

716. Creators Inc.'s own management services for its Represented Creators includes "staffing [creators'] account[s] with someone to respond to direct messages on the OnlyFans platform 24 hours a day, seven days a week."

717. And as part of part of its agreement with Represented Creators, Creators Inc. agrees to "have trained staff members helping [Creators] to manage [their] work load in the DMs."

718. In addition to the acts of wire fraud identified above, OnlyFans Defendants' and Creators Inc.'s acts also include:

a. Promotion of fraudulent digital content through the OnlyFans platform to Plaintiffs and Class Members.
b. Electronic payment transactions processed by the platform—specifically by Defendant FIUSA—in which money was transferred from Fans to OnlyFans Defendants and Creators Inc.
c. Communications between OnlyFans Defendants and Creators Inc., instructing them on how to maximize profits through misleading content, as described herein.
d. Defendants' false and fraudulent representation to Plaintiffs and the Class Members about the value and/or authenticity of the digital content.
e. The fraudulent digital content itself.
f. Communications promoting fraudulent content.
g. Essential marketing and promotional materials.
h. Fraudulent advertisements and representations.
i. Fraudulently obtained payments from Fans.
j. Documents and communications that facilitated the fraudulent scheme.
k. False or misleading communications intended to obscure the fraud.

l. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, omitted, and actively concealed material facts about the true nature of the digital content.

m. Documents intended to facilitate the marketing and sale of fraudulent content.

n. Documents to process and receive payment for the digital content by unsuspecting Fans, including invoices and receipts.

o. Deposits of proceeds.

719. As described above, the OnlyFans Defendants and Creators Inc. have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity within the past ten years.

720. OnlyFans Defendants and Creators Inc. have used, directed the use of, and/or caused to be used, thousands of wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

721. The wire transmissions were made in furtherance of OnlyFans Defendants' and Creators Inc.'s scheme and common course of conduct to deceive Fans and lure them into paying money for a fraudulent "personal" virtual relationship and associated content.

722. Many of the precise dates of the fraudulent use of the interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

**E. Injury and Damages**

723. Plaintiffs and the Class Members are victims of this nationwide scheme, having signed up for the OnlyFans platform based on assurances from the OnlyFans Defendants that the digital content and direct messaging was authentic and as represented.

724. The OnlyFans Defendants falsely and fraudulently represented the value and authenticity of the digital content to Fans.

725. Creators Inc. on behalf of its Represented Creators used the Chatter Scams to increase the Premium Content Fees paid by Plaintiffs and the Class Members, of which they took a portion.

726. OnlyFans Defendants' and Creators Inc.'s actions were done to induce Fans to pay Premium Content Fees, all to fraudulently increase their profits.

727. OnlyFans Defendants' and Creators Inc.'s scheme was reasonably calculated to deceive Plaintiffs and Fans through the execution of their complex and illegal scheme to misrepresent the authenticity of the digital content offered on the platform.

728. By reason of, and because of the conduct the OnlyFans Defendants and Creators Inc., and in particular, their pattern of racketeering activity, Plaintiffs and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

729. Paying Premium Content Fees they would not have paid, had they known they were communicating with Chatters, not the Creators.

730. The lost expectation of having direct, authentic communications, and the effort wasted communicating with Creators' Chatters.

731. Overpayment for the digital content that was not as represented.

732. Overpayment for digital content that was misrepresented as to the characteristics, source, or authenticity.

733. Other incidental and consequential expenses linked to the overpayment for the digital content, including, but not limited to, additional interest on financing, fees, and other financial harms.

734. OnlyFans Defendants' and Creators Inc.'s violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to three times their actual damages, as well as costs and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT III. VIOLATION OF RICO**
**(18 U.S.C. § 1962(c))**
**(Against OnlyFans Defendants and Defendant Moxy Management)**

735. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

736. Pursuant to Rule 8(b)(2), Fed. R. Civ. P., Plaintiffs allege RICO violations in the alternative against the OnlyFans Defendants and Defendant Moxy Management ("Moxy").

737. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

738. Under 18 U.S.C. § 1961(4), an "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose,

(ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

739. A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

740. "Racketeering activity" includes wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1).

741. 18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

**A. Each Defendant is a Culpable Person Under RICO.**

742. The OnlyFans Defendants and Moxy are all culpable "persons" under 18 U.S.C.§ 1961(3), as each of them is an entity capable of holding a legal or beneficial interest in property.

**B. The Content Fraud Enterprise is a RICO Enterprise.**

743. For the purposes of this claim, the RICO enterprise, referred to in this Complaint as the "Content Fraud Enterprise," independently exists as an association-in-fact enterprise of FIL and FIUSA (the OnlyFans Defendants), Moxy, and their co-conspirators, such as the CRM platforms described herein and those Creators that Moxy represents.

744. The OnlyFans Defendants and Moxy play different roles, but each cooperate toward a common purpose: using Chatters to extract Premium Content Fees from Plaintiffs and Class Members.

745. OnlyFans Defendants have, continually since its inception, promised to every Fan on the OnlyFans platform that they will be able to "direct message" with the Creators they subscribe to.

746. As described herein, each of these communications was made directly to Plaintiffs and the Class Members when they subscribed to the Creators that Moxy represented on the OnlyFans platform.

747. OnlyFans Defendants have also communicated to Plaintiffs and the Class Members on the various platforms, including its website that they will be able to "direct message" with Creators, chat "1 on 1" with the Creators, and build "genuine" and "authentic" connections.

748. Moxy manages the OnlyFans accounts of its Represented Creators, who are unnamed co-conspirators. On behalf of its Creators, Moxy directs Chatters to post and communicate as the Represented Creator on that Creator's account—what has been described herein as the Chatter Scams—surreptitiously impersonating the Creator.

749. Moxy is utilizing the Chatter Scams on behalf of the Creators they represent to convince Fans they are directly messaging with Creators and receiving the promised "1 on 1," chats, "direct messaging," or "authentic" experience, when in fact the Fans were speaking with third parties without their knowledge. As described herein, these false communications were made by the OnlyFans Defendants and by Moxy, on behalf of their Represented Creators, to Plaintiffs and

Class Members each time they engaged in a direct message with a Represented Creator.

750. The Chatter Scams are designed to use deception to maximize the Premium Content Fees paid to the Creators by the Fans as described herein, a portion of which is paid to Moxy.

751. Moxy is engaged in the fraudulent activities described herein by controlling and distributing misleading and false digital content to Fans through the Chatter Scams on behalf of the Creators, knowing that OnlyFans Defendants were monitoring the platform but would not enforce their anti-fraud policies.

752. OnlyFans Defendants, who possess network logs that record all digital activity occurring on the OnlyFans platform, are not only aware of Moxy but actively facilitate its use of Chatters and CRM platforms that further enhance, and even automate, the Chatter Scams.

753. OnlyFans Defendants intentionally failed to enforce their anti-fraud policies, or otherwise actively police the platform's network activity—knowing non-enforcement would allow Moxy to continue the pattern of fraudulent activities, thereby increasing and maximizing each Creator's Premium Content Fees through the Chatter Scams—to continue to collect 20% of the revenue generated by the fraudulent activity.

754. OnlyFans Defendants received complaints from Fans about the use of Chatters, yet they continued to allow and support the fraudulent actions of Moxy and the related co-conspirators.

755. OnlyFans Defendants' platform interface and marketing strategies are designed to maximize engagement and revenue, regardless of the authenticity of the content.

756. Beyond intentionally failing to police its own policies, the OnlyFans Defendants collect all of the digital evidence necessary to alert themselves to the presence of the Chatter Scams and are either intentionally ignoring this information or otherwise actively enable the Chatter Scams to operate on the OnlyFans platform.

757. OnlyFans Defendants' profit motive drives them to engage in fraudulent conduct, intentionally overlooking violations to maximize revenue.

758. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants such as Represented Creators, and CRM platforms have participated as co-conspirators with OnlyFans Defendants and Moxy in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues and increase market share for OnlyFans Defendants and Moxy and their unnamed co-conspirators.

**C. Pattern of Racketeering Activity**

759. The Content Fraud Enterprise between the OnlyFans Defendants and Moxy is an ongoing, continuing group of entities associated together for the common purpose of fraudulently increasing the amount and number of Premium Content Fees each Fan pays.

760. The Content Fraud Enterprise has been ongoing since approximately 2016 and will continue as long as the OnlyFans Defendants and Moxy can continue

to fraudulently collect Premium Content Fees from Plaintiffs and the Class Members.

761. While the OnlyFans Defendants and Moxy are members of the Content Fraud Enterprise, and participated in and are part of the enterprise, they all have an existence separate and distinct from the enterprise. The Content Fraud Enterprise has a systematic linkage because there are financial ties and coordination of activities between the OnlyFans Defendants and Moxy.

762. The Content Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries and internationally, such as the marketing, promotion, advertisement, and sale of digital content on the OnlyFans platform.

**D. The Racketeering Activity or Predicate Acts**

763. OnlyFans Defendants and Moxy devised a scheme to defraud Fans by creating and promoting misleading digital content on the OnlyFans platform, falsely representing the nature, quality, and value of the content to induce Fans to pay Premium Content Fees.

764. OnlyFans Defendants and Moxy acted with the specific intent to deceive and defraud Fans to increase their profits.

765. To carry out, or attempt to carry out the scheme to defraud, OnlyFans Defendants and Moxy conducted or participated in the conduct of the affairs of the Content Fraud Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), that employed the use of the wire facilities, in violation of 18 U.S.C. § 1343.

766. OnlyFans Defendants and Moxy participated in the scheme to defraud by using the internet to transmit and operate the Content Fraud Enterprise.

767. OnlyFans Defendants used the internet to communicate to Plaintiffs and Class Members that they could develop "authentic relationships" and "authentic connections" with Creators, which currently is on the OnlyFans website and has been on there since 2017, reiterated in May 2022 as set forth herein.

768. On January 17, 2021, OnlyFans Defendants represented on Twitter that Fans could "direct message[]" and "chat with a Creator."

769. On February 9, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

770. On February 20, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

771. On March 2, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat" with a Creator.

772. On May 26, 2021, OnlyFans Defendants represented on Twitter a Creator would "chat with all her fans in the DMs."

773. On September 10, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans in the DMs" and they could "chat with her."

774. On December 22, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans 1-on-1 . . . so introduce yourself."

775. On January 6, 2022, OnlyFans Defendants represented on Twitter that a Creator "can't wait to chat with you."

776. On March 8, 2022, OnlyFans Defendants represented on Twitter that a Creator "even chats with her fins in the DMs . . . So go and say hey."

777. On October 22, 2022, OnlyFans Defendants represented on Twitter that Fans could "connect" with a Creator on a "deeper level."

778. On September 30. 20222, OnlyFans Defendants represented on Twitter that Fans could "talk one-on-one with" a Creator.

779. On November 2, 2022, OnlyFans Defendants represented on Instagram that a Creator was "chatting with her fans."

780. On November 16, 2022, OnlyFans Defendants represented on Twitter that Fans could connect with a Creator "1-on-1."

781. On December 16, 2022, OnlyFans Defendants represented on Twitter that a Creator was "responding to DMs."

782. On August 19, 2023, OnlyFans Defendants represented on Instagram that Creator would "interact directly with [her] fans."

783. On May 3, 2024, OnlyFans Defendants represented on Twitter that Fans could "connect[] personally" with a Creator.

784. On June 18, 2024, OnlyFans Defendants represented on Instagram that a Creator made her living "chatting" with the Fans.

785. On July 17, 2024, OnlyFans Defendants represented on Instagram that a Creator makes "amazing connections with [her] fans and built genuine relationships."

786. OnlyFans Defendants made each of these statements to convince Fans to subscribe to Creators, collecting 20% of all those subscription fees, in addition to additional purchases made by the Fans after they subscribe.

787. OnlyFans Defendants used the internet to communicate to each Fan who subscribed to a Creator's account that they would be able to "Direct message with this user." OnlyFans Defendants' records will show the exact date each Plaintiff and Class Member subscribed to a Creator account and received this communication.

788. Moxy as co-conspirators and agents of its Represented Creators, transmitted multiple communications through the internet to Plaintiffs and Class Members, falsely representing they were Creators, to convince Plaintiffs and Class Members to pay Premium Content Fees. Defendants' records will show the exact date of each communication, some of those communications include:

a. Plaintiff B.L. subscribed to Briana Armbruster (a Represented Creator of Moxy) on November 28, 2023. The monthly subscription fee was $14.99 and he tipped an additional $87.00 during the length of his subscription based on the belief that he was communicating directly with Armbruster. Plaintiff B.L. is not currently subscribed to Briana Armbruster.

b. Plaintiff S.M. subscribed to Kaitlyn Krems (a Represented Creator of Moxy) from 2023–2024. He paid $100.00 to become a VIP subscriber and purchased additional content based on the belief that he was communicating directly with Krems.

c. Plaintiff S.M. subscribed to Breckie Hill (a Represented Creator of Moxy) in 2023. He paid $100.00 to become a VIP subscriber based upon the belief that he was communicating directly with Hill.

d. Plaintiff R.M. subscribed to Chyanne Burden (a Represented Creator of Moxy) on July 16, 2020. At the time, her page was free to subscribe to. He tipped an additional $55.00 during the length of his subscription based on the belief that he was communicating directly with Burden. Plaintiff R.M. is still subscribed to Chyanne Burden but no longer tips or interacts with her. The current monthly subscription fee is approximately $20.00.

e. Plaintiff N.Z. paired Breckie Hill $10 on April 3, 2023.

789. As part of its agreement with its Represented Creators, Moxy provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

790. Moxy's Services Agreement with models explicitly provides services including "Facilitation of all content that is posted on Paid Content Platforms including [OnlyFans]," and that: "On a daily basis, [Moxy] will respond to messages on Paid Content Platforms on behalf of [the Creator], and use its reasonable, good faith efforts to upsell the products and content Talent offers on Paid Content Platforms."

791. The Agreement also grants Moxy full access to and control over each Represented Creator's OnlyFans account, stipulating: "Talent has a duty to irrevocably grant to Company unfettered administrative access to [OnlyFans], for as long as Gross Earnings are generated."

792. In addition to the acts of wire fraud identified above, the OnlyFans Defendants' and Moxy's acts also include:

a. Promotion of fraudulent digital content through the OnlyFans platform to Plaintiffs and Class Members.

b. Electronic payment transactions processed by the platform—specifically by Defendant FIUSA—in which money was transferred from Fans to OnlyFans Defendants and Moxy.

c. Communications between OnlyFans Defendants and Moxy, instructing them on how to maximize profits through misleading content, as described herein.

d. Defendants' false and fraudulent representation to Plaintiffs and the Class Members about the value and/or authenticity of the digital content.

e. The fraudulent digital content itself.

f. Communications promoting fraudulent content.

g. Essential marketing and promotional materials.

h. Fraudulent advertisements and representations.

i. Fraudulently obtained payments from Fans.

j. Documents and communications that facilitated the fraudulent scheme.

k. False or misleading communications intended to obscure the fraud.

l. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, omitted, and actively concealed material facts about the true nature of the digital content.

m. Documents intended to facilitate the marketing and sale of fraudulent content.

n. Documents to process and receive payment for the digital content by unsuspecting Fans, including invoices and receipts.

o. Deposits of proceeds.

793. As described above, the OnlyFans Defendants and Moxy have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity within the past ten years.

794. OnlyFans Defendants and Moxy have used, directed the use of, and/or caused to be used, thousands of wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

795. The wire transmissions were made in furtherance of OnlyFans Defendants' and Moxy's scheme and common course of conduct to deceive Fans and lure them into paying money for a fraudulent "personal" virtual relationship and associated content.

796. Many of the precise dates of the fraudulent use of the interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

**E. Injury and Damages**

797. Plaintiffs and the Class Members are victims of this nationwide scheme, having signed up for the OnlyFans platform based on assurances from the OnlyFans Defendants that the digital content and direct messaging was authentic and as represented.

798. The OnlyFans Defendants falsely and fraudulently represented the value and authenticity of the digital content to Fans.

799. Moxy on behalf of its Represented Creators used the Chatter Scams to increase the Premium Content Fees paid by Plaintiffs and the Class Members, of which they took a portion.

800. OnlyFans Defendants' and Moxy's actions were done to induce Fans to pay Premium Content Fees, all to fraudulently increase their profits.

801. OnlyFans Defendants' and Moxy's scheme was reasonably calculated to deceive Plaintiffs and Fans through the execution of their complex and illegal scheme to misrepresent the authenticity of the digital content offered on the platform.

802. By reason of, and because of the conduct the OnlyFans Defendants and Moxy, and in particular, their pattern of racketeering activity, Plaintiffs and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

803. Paying Premium Content Fees they would not have paid, had they known they were communicating with Chatters, not the Creators.

804. The lost expectation of having direct, authentic communications, and the effort wasted communicating with Creators' Chatters.

805. Overpayment for the digital content that was not as represented.

806. Overpayment for digital content that was misrepresented as to the characteristics, source, or authenticity.

807. Other incidental and consequential expenses linked to the overpayment for the digital content, including, but not limited to, additional interest on financing, fees, and other financial harms.

808. OnlyFans Defendants' and Moxy's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to three times their actual damages, as well as costs and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT IV. VIOLATION OF RICO**
**(18 U.S.C. § 1962(c))**
**(Against OnlyFans Defendants and Defendant Boss Baddies LLC)**

809. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

810. Pursuant to Rule 8(b)(2), Fed. R. Civ. P., Plaintiffs allege RICO violations in the alternative against the OnlyFans Defendants and Defendant Boss Baddies LLC d/b/a Siren Agency ("Siren").

811. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

812. Under 18 U.S.C. § 1961(4), an "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

813. A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

814. "Racketeering activity" includes wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1).

815. 18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

**A. Each Defendant is a Culpable Person Under RICO.**

816. The OnlyFans Defendants and Siren are all culpable "persons" under 18 U.S.C.§ 1961(3), as each of them is an entity capable of holding a legal or beneficial interest in property.

**B. The Content Fraud Enterprise is a RICO Enterprise.**

817. For the purposes of this claim, the RICO enterprise, referred to in this Complaint as the "Content Fraud Enterprise," independently exists as an association-in-fact enterprise of FIL and FIUSA (the OnlyFans Defendants), Siren, and their co-conspirators, such as the CRM platforms described herein and those Creators that Siren represents.

818. The OnlyFans Defendants and Siren play different roles, but each cooperate toward a common purpose: using Chatters to extract Premium Content Fees from Plaintiffs and Class Members.

819. OnlyFans Defendants have, continually since its inception, promised to every Fan on the OnlyFans platform that they will be able to "direct message" with the Creators they subscribe to.

820. As described herein, each of these communications was made directly to Plaintiffs and the Class Members when they subscribed to the Creators that Siren represented on the OnlyFans platform.

821. OnlyFans Defendants have also communicated to Plaintiffs and the Class Members on the various platforms, including its website that they will be able to "direct message" with Creators, chat "1 on 1" with the Creators, and build "genuine" and "authentic" connections.

822. Siren manages the OnlyFans accounts of its Represented Creators, who are unnamed co-conspirators. On behalf of its Creators, Siren directs Chatters to post and communicate as the Represented Creator on that Creator's account—what has been described herein as the Chatter Scams—surreptitiously impersonating the Creator.

823. Siren is utilizing the Chatter Scams on behalf of the Creators they represent to convince Fans they are directly messaging with Creators and receiving the promised "1 on 1," chats, "direct messaging," or "authentic" experience, when in fact the Fans were speaking with third parties without their knowledge. As described herein, these false communications were made by the OnlyFans Defendants and by Siren, on behalf of their Represented Creators, to Plaintiffs and Class Members each time they engaged in a direct message with a Represented Creator.

824. The Chatter Scams are designed to use deception to maximize the Premium Content Fees paid to the Creators by the Fans as described herein, a portion of which is paid to Siren.

825. Siren is engaged in the fraudulent activities described herein by controlling and distributing misleading and false digital content to Fans through the Chatter Scams on behalf of the Creators, knowing that OnlyFans Defendants were monitoring the platform but would not enforce their anti-fraud policies.

826. The OnlyFans Defendants, who possess network logs that record all digital activity occurring on the OnlyFans platform, are not only aware of Siren but actively facilitate its use of Chatters and CRM platforms that further enhance, and even automate, the Chatter Scams.

827. The OnlyFans Defendants intentionally failed to enforce their anti-fraud policies, or otherwise actively police the platform's network activity—knowing non-enforcement would allow Siren to continue the pattern of fraudulent activities, thereby increasing and maximizing each Creator's Premium Content Fees through the Chatter Scams—to continue to collect 20% of the revenue generated by the fraudulent activity.

828. The OnlyFans Defendants received complaints from Fans about the use of Chatters, yet they continued to allow and support the fraudulent actions of Siren and the related co-conspirators.

829. The OnlyFans Defendants' platform interface and marketing strategies are designed to maximize engagement and revenue, regardless of the authenticity of the content.

830. Beyond intentionally failing to police its own policies, the OnlyFans Defendants collect all of the digital evidence necessary to alert themselves to the presence of the Chatter Scams and are either intentionally ignoring this information

or otherwise actively enable the Chatter Scams to operate on the OnlyFans platform.

831. The OnlyFans Defendants' profit motive drives them to engage in fraudulent conduct, intentionally overlooking violations to maximize revenue.

832. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants such as Represented Creators, and CRM platforms have participated as co-conspirators with OnlyFans Defendants and Siren in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues and increase market share for OnlyFans Defendants and Siren and their unnamed co-conspirators.

**C. Pattern of Racketeering Activity**

833. The Content Fraud Enterprise between the OnlyFans Defendants and Siren is an ongoing, continuing group of entities associated together for the common purpose of fraudulently increasing the amount and number of Premium Content Fees each Fan pays.

834. The Content Fraud Enterprise has been ongoing since approximately 2016 and will continue as long as the OnlyFans Defendants and Siren can continue to fraudulently collect Premium Content Fees from Plaintiffs and the Class Members.

835. While the OnlyFans Defendants and Siren are members of the Content Fraud Enterprise, and participated in and are part of the enterprise, they all have an existence separate and distinct from the enterprise. The Content Fraud Enterprise has a systematic linkage because there are financial ties and coordination of activities between the OnlyFans Defendants and Siren.

836. The Content Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries and internationally, such as the marketing, promotion, advertisement, and sale of digital content on the OnlyFans platform.

**D. The Racketeering Activity or Predicate Acts**

837. The OnlyFans Defendants and Siren devised a scheme to defraud Fans by creating and promoting misleading digital content on the OnlyFans platform, falsely representing the nature, quality, and value of the content to induce Fans to pay Premium Content Fees.

838. The OnlyFans Defendants and Siren acted with the specific intent to deceive and defraud Fans to increase their profits.

839. To carry out, or attempt to carry out the scheme to defraud, OnlyFans Defendants and Siren conducted or participated in the conduct of the affairs of the Content Fraud Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), that employed the use of the wire facilities, in violation of 18 U.S.C. § 1343.

840. The OnlyFans Defendants and Siren participated in the scheme to defraud by using the internet to transmit and operate the Content Fraud Enterprise.

841. The OnlyFans Defendants used the internet to communicate to Plaintiffs and Class Members that they could develop "authentic relationships" and "authentic connections" with Creators, which currently is on the OnlyFans website and has been on there since 2017, reiterated in May 2022 as set forth herein.

842. On January 17, 2021, OnlyFans Defendants represented on Twitter that Fans could "direct message[]" and "chat with a Creator."

843. On February 9, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

844. On February 20, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

845. On March 2, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat" with a Creator.

846. On May 26, 2021, OnlyFans Defendants represented on Twitter a Creator would "chat with all her fans in the DMs."

847. On September 10, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans in the DMs" and they could "chat with her."

848. On December 22, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans 1-on-1 . . . so introduce yourself."

849. On January 6, 2022, OnlyFans Defendants represented on Twitter that a Creator "can't wait to chat with you."

850. On March 8, 2022, OnlyFans Defendants represented on Twitter that a Creator "even chats with her fins in the DMs . . . So go and say hey."

851. On October 22, 2022, OnlyFans Defendants represented on Twitter that Fans could "connect" with a Creator on a "deeper level."

852. On September 30. 20222, OnlyFans Defendants represented on Twitter that Fans could "talk one-on-one with" a Creator.

853. On November 2, 2022, OnlyFans Defendants represented on Instagram that a Creator was "chatting with her fans."

854. On November 16, 2022, OnlyFans Defendants represented on Twitter that Fans could connect with a Creator "1-on-1."

855. On December 16, 2022, OnlyFans Defendants represented on Twitter that a Creator was "responding to DMs."

856. On August 19, 2023, OnlyFans Defendants represented on Instagram that Creator would "interact directly with [her] fans."

857. On May 3, 2024, OnlyFans Defendants represented on Twitter that Fans could "connect[] personally" with a Creator.

858. On June 18, 2024, OnlyFans Defendants represented on Instagram that a Creator made her living "chatting" with the Fans.

859.On July 17, 2024, OnlyFans Defendants represented on Instagram that a Creator makes "amazing connections with [her] fans and built genuine relationships."

860. The OnlyFans Defendants made each of these statements to convince Fans to subscribe to Creators, collecting 20% of all those subscription fees, in addition to additional purchases made by the Fans after they subscribe.

861. The OnlyFans Defendants used the internet to communicate to each Fan who subscribed to a Creator's account that they would be able to "Direct message with this user." OnlyFans Defendants' records will show the exact date each Plaintiff and Class Member subscribed to a Creator account and received this communication.

862. Siren as co-conspirators and agents of its Represented Creators, transmitted multiple communications through the internet to Plaintiffs and Class Members, falsely representing they were Creators, to convince Plaintiffs and Class

Members to pay Premium Content Fees. Defendants' records will show the exact date of each communication.

863. Siren manages or at one point managed the account of the following Creator, who was subscribed to by Plaintiff A.L.:

a. Bri Jordan (@thebrijordan)

864. As part of their management of those and other accounts, Siren provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

865. A previous version of Siren's website contained text explicitly advertising "Content Management" services, which included "***Full service messaging*** and fan site support."

866. In addition to the acts of wire fraud identified above, OnlyFans Defendants' and Siren's acts also include:

a. Promotion of fraudulent digital content through the OnlyFans platform to Plaintiffs and Class Members.

b. Electronic payment transactions processed by the platform—specifically by Defendant FIUSA—in which money was transferred from Fans to OnlyFans Defendants and Siren.

c. Communications between OnlyFans Defendants and Siren, instructing them on how to maximize profits through misleading content, as described herein.

d. Defendants' false and fraudulent representation to Plaintiffs and the Class Members about the value and/or authenticity of the digital content.

e. The fraudulent digital content itself.

f. Communications promoting fraudulent content.

g. Essential marketing and promotional materials.

h. Fraudulent advertisements and representations.

i. Fraudulently obtained payments from Fans.

j. Documents and communications that facilitated the fraudulent scheme.

k. False or misleading communications intended to obscure the fraud.

l. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, omitted, and actively concealed material facts about the true nature of the digital content.

m. Documents intended to facilitate the marketing and sale of fraudulent content.

n. Documents to process and receive payment for the digital content by unsuspecting Fans, including invoices and receipts.

o. Deposits of proceeds.

867. As described above, the OnlyFans Defendants and Siren have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity within the past ten years.

868. The OnlyFans Defendants and Siren have used, directed the use of, and/or caused to be used, thousands of wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

869. The wire transmissions were made in furtherance of OnlyFans Defendants' and Siren's scheme and common course of conduct to deceive Fans and lure them into paying money for a fraudulent "personal" virtual relationship and associated content.

870. Many of the precise dates of the fraudulent use of the interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

**E. Injury and Damages**

871. Plaintiffs and the Class Members are victims of this nationwide scheme, having signed up for the OnlyFans platform based on assurances from the OnlyFans Defendants that the digital content and direct messaging was authentic and as represented.

872. The OnlyFans Defendants falsely and fraudulently represented the value and authenticity of the digital content to Fans.

873. Siren, on behalf of its Represented Creators, used the Chatter Scams to increase the Premium Content Fees paid by Plaintiffs and the Class Members, of which they took a portion.

874. The OnlyFans Defendants' and Siren's actions were done to induce Fans to pay Premium Content Fees, all to fraudulently increase their profits.

875. The OnlyFans Defendants' and Siren's scheme was reasonably calculated to deceive Plaintiffs and Fans through the execution of their complex and illegal scheme to misrepresent the authenticity of the digital content offered on the platform.

876. By reason of, and because of the conduct the OnlyFans Defendants and Siren, and in particular, their pattern of racketeering activity, Plaintiffs and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

877. Paying Premium Content Fees they would not have paid, had they known they were communicating with Chatters, not the Creators.

878. The lost expectation of having direct, authentic communications, and the effort wasted communicating with Creators' Chatters.

879. Overpayment for the digital content that was not as represented.

880. Overpayment for digital content that was misrepresented as to the characteristics, source, or authenticity.

881. Other incidental and consequential expenses linked to the overpayment for the digital content, including, but not limited to, additional interest on financing, fees, and other financial harms.

882. The OnlyFans Defendants' and Siren's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to three times their actual damages, as well as costs and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT V. VIOLATION OF RICO**
**(18 U.S.C. § 1962(c))**
**(Against OnlyFans Defendants and Defendant Unruly Agency LLC)**

883. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

884. Pursuant to Rule 8(b)(2), Fed. R. Civ. P., Plaintiffs allege RICO violations in the alternative against the OnlyFans Defendants and Defendant Unruly

Agency LLC (referred to with its subsidiaries as described herein as “Unruly Defendants”).

885. RICO makes it “unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise’s affairs through a pattern of racketeering activity.” 18 U.S.C. § 1962(c).

886. Under 18 U.S.C. § 1961(4), an “enterprise” may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise’s purpose.

887. A “person” is “any individual or entity capable of holding a legal or beneficial interest in property.” 18 U.S.C. § 1961(3).

888. “Racketeering activity” includes wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1).

889. 18 U.S.C. § 1343 provides that “[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.”

**A. Each Defendant is a Culpable Person Under RICO.**

890. The OnlyFans Defendants and the Unruly Defendants are all culpable “persons” under 18 U.S.C.§ 1961(3), as each of them is an entity capable of holding a legal or beneficial interest in property.

**B. The Content Fraud Enterprise is a RICO Enterprise.**

891. For the purposes of this claim, the RICO enterprise, referred to in this Complaint as the "Content Fraud Enterprise," independently exists as an association-in-fact enterprise of FIL and FIUSA (the OnlyFans Defendants), the Unruly Defendants, and their co-conspirators, such as the CRM platforms described herein and those Creators that the Unruly Defendants represent.

892. The OnlyFans Defendants and the Unruly Defendants play different roles, but each cooperate toward a common purpose: using Chatters to extract Premium Content Fees from Plaintiffs and Class Members.

893. The OnlyFans Defendants have, continually since its inception, promised to every Fan on the OnlyFans platform that they will be able to "direct message" with the Creators they subscribe to.

894. As described herein, each of these communications was made directly to Plaintiffs and the Class Members when they subscribed to the Creators that the Unruly Defendants represented on the OnlyFans platform.

895. The OnlyFans Defendants have also communicated to Plaintiffs and the Class Members on the various platforms, including its website that they will be able to "direct message" with Creators, chat "1 on 1" with the Creators, and build "genuine" and "authentic" connections.

896. The Unruly Defendants manage the OnlyFans accounts of its Represented Creators, who are unnamed co-conspirators. On behalf of its Creators, the Unruly Defendants direct Chatters to post and communicate as the Represented Creator on that Creator's account—what has been described herein as the Chatter Scams—surreptitiously impersonating the Creator.

897. The Unruly Defendants are utilizing the Chatter Scams on behalf of the Creators they represent to convince Fans they are directly messaging with Creators and receiving the promised "1 on 1," chats, "direct messaging," or "authentic" experience, when in fact the Fans were speaking with third parties without their knowledge. As described herein, these false communications were made by the OnlyFans Defendants and by the Unruly Defendants, on behalf of their Represented Creators, to Plaintiffs and Class Members each time they engaged in a direct message with a Represented Creator.

898. The Chatter Scams are designed to use deception to maximize the Premium Content Fees paid to the Creators by the Fans as described herein, a portion of which is paid to the Unruly Defendants.

899. The Unruly Defendants are engaged in the fraudulent activities described herein by controlling and distributing misleading and false digital content to Fans through the Chatter Scams on behalf of the Creators, knowing that OnlyFans Defendants were monitoring the platform but would not enforce their anti-fraud policies.

900. The OnlyFans Defendants, who possess network logs that record all digital activity occurring on the OnlyFans platform, are not only aware of the Unruly Defendants but actively facilitate their use of Chatters and CRM platforms that further enhance, and even automate, the Chatter Scams.

901. The OnlyFans Defendants intentionally failed to enforce their anti-fraud policies, or otherwise actively police the platform's network activity—knowing non-enforcement would allow the Unruly Defendants to continue the pattern of fraudulent activities, thereby increasing and maximizing each Creator's

Premium Content Fees through the Chatter Scams—to continue to collect 20% of the revenue generated by the fraudulent activity.

902. The OnlyFans Defendants received complaints from Fans about the use of Chatters, yet they continued to allow and support the fraudulent actions of the Unruly Defendants and the related co-conspirators.

903. The OnlyFans Defendants' platform interface and marketing strategies are designed to maximize engagement and revenue, regardless of the authenticity of the content.

904. Beyond intentionally failing to police its own policies, the OnlyFans Defendants collect all of the digital evidence necessary to alert themselves to the presence of the Chatter Scams and are either intentionally ignoring this information or otherwise actively enable the Chatter Scams to operate on the OnlyFans platform.

905. The OnlyFans Defendants' profit motive drives them to engage in fraudulent conduct, intentionally overlooking violations to maximize revenue.

906. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants such as Represented Creators, and CRM platforms have participated as co-conspirators with OnlyFans Defendants and the Unruly Defendants in these offenses, and have performed acts in furtherance of the conspiracy to increase or maintain revenues and increase market share for OnlyFans Defendants, the Unruly Defendants, and their unnamed co-conspirators.

**C. Pattern of Racketeering Activity**

907. The Content Fraud Enterprise between the OnlyFans Defendants and the Unruly Defendants is an ongoing, continuing group of entities associated

together for the common purpose of fraudulently increasing the amount and number of Premium Content Fees each Fan pays.

908. The Content Fraud Enterprise has been ongoing since approximately 2016 and will continue as long as the OnlyFans Defendants and the Unruly Defendants can continue to fraudulently collect Premium Content Fees from Plaintiffs and the Class Members.

909. While the OnlyFans Defendants and the Unruly Defendants are members of the Content Fraud Enterprise, and participated in and are part of the enterprise, they all have an existence separate and distinct from the enterprise. The Content Fraud Enterprise has a systematic linkage because there are financial ties and coordination of activities between the OnlyFans Defendants and the Unruly Defendants.

910. The Content Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries and internationally, such as the marketing, promotion, advertisement, and sale of digital content on the OnlyFans platform.

**D. The Racketeering Activity or Predicate Acts**

911. The OnlyFans Defendants and the Unruly Defendants devised a scheme to defraud Fans by creating and promoting misleading digital content on the OnlyFans platform, falsely representing the nature, quality, and value of the content to induce Fans to pay Premium Content Fees.

912. The OnlyFans Defendants and the Unruly Defendants acted with the specific intent to deceive and defraud Fans to increase their profits.

913. To carry out, or attempt to carry out the scheme to defraud, the OnlyFans Defendants and the Unruly Defendants conducted or participated in the conduct of the affairs of the Content Fraud Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), that employed the use of the wire facilities, in violation of 18 U.S.C. § 1343.

914. The OnlyFans Defendants and the Unruly Defendants participated in the scheme to defraud by using the internet to transmit and operate the Content Fraud Enterprise.

915. The OnlyFans Defendants used the internet to communicate to Plaintiffs and Class Members that they could develop "authentic relationships" and "authentic connections" with Creators, which currently is on the OnlyFans website and has been on there since 2017, reiterated in May 2022 as set forth herein.

916. On January 17, 2021, OnlyFans Defendants represented on Twitter that Fans could "direct message[]" and "chat with a Creator."

917. On February 9, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

918. On February 20, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

919. On March 2, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat" with a Creator.

920. On May 26, 2021, OnlyFans Defendants represented on Twitter a Creator would "chat with all her fans in the DMs."

921. On September 10, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans in the DMs" and they could "chat with her."

922. On December 22, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans 1-on-1 . . . so introduce yourself."

923. On January 6, 2022, OnlyFans Defendants represented on Twitter that a Creator "can't wait to chat with you."

924. On March 8, 2022, OnlyFans Defendants represented on Twitter that a Creator "even chats with her fins in the DMs . . . So go and say hey."

925. On October 22, 2022, OnlyFans Defendants represented on Twitter that Fans could "connect" with a Creator on a "deeper level."

926. On September 30. 20222, OnlyFans Defendants represented on Twitter that Fans could "talk one-on-one with" a Creator.

927. On November 2, 2022, OnlyFans Defendants represented on Instagram that a Creator was "chatting with her fans."

928. On November 16, 2022, OnlyFans Defendants represented on Twitter that Fans could connect with a Creator "1-on-1."

929. On December 16, 2022, OnlyFans Defendants represented on Twitter that a Creator was "responding to DMs."

930. On August 19, 2023, OnlyFans Defendants represented on Instagram that Creator would "interact directly with [her] fans."

931. On May 3, 2024, OnlyFans Defendants represented on Twitter that Fans could "connect[] personally" with a Creator.

932. On June 18, 2024, OnlyFans Defendants represented on Instagram that a Creator made her living "chatting" with the Fans.

933. On July 17, 2024, OnlyFans Defendants represented on Instagram that a Creator makes "amazing connections with [her] fans and built genuine relationships."

934. The OnlyFans Defendants made each of these statements to convince Fans to subscribe to Creators, collecting 20% of all those subscription fees, in addition to additional purchases made by the Fans after they subscribe.

935. The OnlyFans Defendants used the internet to communicate to each Fan who subscribed to a Creator's account that they would be able to "Direct message with this user." OnlyFans Defendants' records will show the exact date each Plaintiff and Class Member subscribed to a Creator account and received this communication.

936. The Unruly Defendants as co-conspirators and agents of its Represented Creators, transmitted multiple communications through the internet to Plaintiffs and Class Members, falsely representing they were Creators, to convince Plaintiffs and Class Members to pay Premium Content Fees. Defendants' records will show the exact date of each communication, some of those communications include:

a. Plaintiff N.Z. purchased content from and tipped Stefanie Gurzanski on June 28, 2023, totaling $139.30.

b. Plaintiff N.Z. purchased content from Stefanie Gurzanski on June 28, 2023, for $70.50.

c. Plaintiff N.Z. tipped Stefanie Gurzanski $70.50 on September 16, 2023.

d. Plaintiff N.Z. tipped Stefanie Gurzanski $90 on October 27, 2023;

e. Plaintiff N.Z. purchased content from Nicky Gile on August 14, 2023 for $69.

f. Plaintiff N.Z. purchased content from Nicky Gile on November 22, 2024 for $111.

937. The Unruly Defendants manage or at one point managed the account for numerous creators who were subscribed to by Plaintiffs A.L., N.Z., R.M. and Plaintiff B.L., including:

a. Anna Louise (aka @officialannalouise)

b. Kayla Lauren (aka @kaylalauren)

c. Mia Huffman (aka @prettybitchmia • @prettybitchmiavip)

d. Leah Ray (aka @leahray_x • @leahray_xx)

e. Nicky Gile (@nickygile • @nickygileprivate)

f. Sara Underwood (aka @saraunderwood)

g. Stefanie Gurzanski (aka @stefbabyg)

h. Tina Louise (aka @tinalouise)

i. Tara Electra (aka @billiondollarbabie)

j. Kinsey (aka @kinsey)

k. Emily Elizabeth (aka @emmilyelizabethh)

938. As part of their management of those and other accounts, the Unruly Defendants provide Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans’ knowledge.

939. As explained in a lawsuit filed against the Unruly Defendants by former "account managers," Unruly directed its account managers, "to intentionally lie to, dupe, and mislead Fans into misbelieving that the Fans are paying to have direct, personal communications and interactions with Defendants' Models."

940. In a separate lawsuit filed by a former Represented Creator, the Creator alleged that she was unaware that the Unruly Defendants' Chatters were impersonating her: "Unruly messaged subscribers of OnlyFans while pretending to be [the Creators] and solicited pictures of subscribers' penises in exchange for payment, without [the Creators'] consent or knowledge."

941. In addition to the acts of wire fraud identified above, the OnlyFans Defendants' and the Unruly Defendants' acts also include:

a. Promotion of fraudulent digital content through the OnlyFans platform to Plaintiffs and Class Members.
b. Electronic payment transactions processed by the platform—specifically by Defendant FIUSA—in which money was transferred from Fans to the OnlyFans Defendants and the Unruly Defendants.
c. Communications between the OnlyFans Defendants and the Unruly Defendants, instructing them on how to maximize profits through misleading content, as described herein.
d. Defendants' false and fraudulent representation to Plaintiffs and the Class Members about the value and/or authenticity of the digital content.
e. The fraudulent digital content itself.
f. Communications promoting fraudulent content.

g. Essential marketing and promotional materials.

h. Fraudulent advertisements and representations.

i. Fraudulently obtained payments from Fans.

j. Documents and communications that facilitated the fraudulent scheme.

k. False or misleading communications intended to obscure the fraud.

l. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, omitted, and actively concealed material facts about the true nature of the digital content.

m. Documents intended to facilitate the marketing and sale of fraudulent content.

n. Documents to process and receive payment for the digital content by unsuspecting Fans, including invoices and receipts.

o. Deposits of proceeds.

942. As described above, the OnlyFans Defendants and the Unruly Defendants have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity within the past ten years.

943. The OnlyFans Defendants and the Unruly Defendants have used, directed the use of, and/or caused to be used, thousands of wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

944. The wire transmissions were made in furtherance of the OnlyFans Defendants' and the Unruly Defendants' scheme and common course of conduct to

deceive Fans and lure them into paying money for a fraudulent "personal" virtual relationship and associated content.

945. Many of the precise dates of the fraudulent use of the interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

**E. Injury and Damages**

946. Plaintiffs and the Class Members are victims of this nationwide scheme, having signed up for the OnlyFans platform based on assurances from the OnlyFans Defendants that the digital content and direct messaging was authentic and as represented.

947. The OnlyFans Defendants falsely and fraudulently represented the value and authenticity of the digital content to Fans.

948. The Unruly Defendants, on behalf of its Represented Creators, used the Chatter Scams to increase the Premium Content Fees paid by Plaintiffs and the Class Members, of which they took a portion.

949. The OnlyFans Defendants' and the Unruly Defendants' actions were done to induce Fans to pay Premium Content Fees, all to fraudulently increase their profits.

950. The OnlyFans Defendants' and the Unruly Defendants' scheme was reasonably calculated to deceive Plaintiffs and Fans through the execution of their complex and illegal scheme to misrepresent the authenticity of the digital content offered on the platform.

951. By reason of, and because of the conduct the OnlyFans Defendants and the Unruly Defendants, and in particular, their pattern of racketeering activity,

Plaintiffs and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

952. Paying Premium Content Fees they would not have paid, had they known they were communicating with Chatters, not the Creators.

953. The lost expectation of having direct, authentic communications, and the effort wasted communicating with Creators' Chatters.

954. Overpayment for the digital content that was not as represented.

955. Overpayment for digital content that was misrepresented as to the characteristics, source, or authenticity.

956. Other incidental and consequential expenses linked to the overpayment for the digital content, including, but not limited to, additional interest on financing, fees, and other financial harms.

957. OnlyFans Defendants' and the Unruly Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to three times their actual damages, as well as costs and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

## COUNT VI. VIOLATION OF RICO (18 U.S.C. § 1962(c)) (Against OnlyFans Defendants and Defendant Content X, Inc.)

958. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

959. Pursuant to Rule 8(b)(2), Fed. R. Civ. P., Plaintiffs allege RICO violations in the alternative against the OnlyFans Defendants and Defendant Content X, Inc. d/b/a Content X Studios ("Content X").

960. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

961. Under 18 U.S.C. § 1961(4), an "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

962. A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

963. "Racketeering activity" includes wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1).

964. 18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

**A. Each Defendant is a Culpable Person Under RICO.**

965. The OnlyFans Defendants and Content X are all culpable "persons" under 18 U.S.C.§ 1961(3), as each of them is an entity capable of holding a legal or beneficial interest in property.

**B. The Content Fraud Enterprise is a RICO Enterprise.**

966. For the purposes of this claim, the RICO enterprise, referred to in this Complaint as the "Content Fraud Enterprise," independently exists as an association-in-fact enterprise of FIL and FIUSA (the OnlyFans Defendants), Content X, and their co-conspirators, such as the CRM platforms described herein and those Creators that Content X represents.

967. The OnlyFans Defendants and Content X play different roles, but each cooperate toward a common purpose: using Chatters to extract Premium Content Fees from Plaintiffs and Class Members.

968. The OnlyFans Defendants have, continually since its inception, promised to every Fan on the OnlyFans platform that they will be able to "direct message" with the Creators they subscribe to.

969. As described herein, each of these communications was made directly to Plaintiffs and the Class Members when they subscribed to each Creator represented by Content X on the OnlyFans platform.

970. The OnlyFans Defendants have also communicated to Plaintiffs and the Class Members on the various platforms, including its website that they will be able to "direct message" with Creators, chat "1 on 1" with the Creators, and build "genuine" and "authentic" connections.

971. Content X manages the OnlyFans accounts of its Represented Creators, who are unnamed co-conspirators. On behalf of its Creators, Content X directs Chatters to post and communicate as the Represented Creator on that Creator's account—what has been described herein as the Chatter Scams—surreptitiously impersonating the Creator.

972. Content X is utilizing the Chatter Scams on behalf of the Creators they represent to convince Fans they are directly messaging with Creators and receiving the promised "1 on 1," chats, "direct messaging," or "authentic" experience, when in fact the Fans were speaking with third parties without their knowledge. As described herein, these false communications were made by the OnlyFans Defendants and by Content X, on behalf of their Represented Creators, to Plaintiffs and Class Members each time they engaged in a direct message with a Represented Creator.

973. The Chatter Scams are designed to use deception to maximize the Premium Content Fees paid to the Creators by the Fans as described herein, a portion of which is paid to Content X.

974. Content X is engaged in the fraudulent activities described herein by controlling and distributing misleading and false digital content to Fans through the Chatter Scams on behalf of the Creators, knowing that OnlyFans Defendants were monitoring the platform but would not enforce their anti-fraud policies.

975. The OnlyFans Defendants, who possess network logs that record all digital activity occurring on the OnlyFans platform, are not only aware of Content X but actively facilitate its use of Chatters as well as CRM platforms that further enhance, and even automate, the Chatter Scams.

976. The OnlyFans Defendants intentionally failed to enforce their anti-fraud policies, or otherwise actively police the platform's network activity—knowing non-enforcement would allow Content X to continue the pattern of fraudulent activities, thereby increasing and maximizing each Creator's Premium Content Fees through the Chatter Scams—to continue to collect 20% of the revenue generated by the fraudulent activity.

977. The OnlyFans Defendants received complaints from Fans about the use of Chatters, yet they continued to allow and support the fraudulent actions of Content X and the related co-conspirators.

978. The OnlyFans Defendants' platform interface and marketing strategies are designed to maximize engagement and revenue, regardless of the authenticity of the content.

979. Beyond intentionally failing to police its own policies, the OnlyFans Defendants collect all of the digital evidence necessary to alert themselves to the presence of the Chatter Scams and are either intentionally ignoring this information or otherwise actively enable the Chatter Scams to operate on the OnlyFans platform.

980. The OnlyFans Defendants' profit motive drives them to engage in fraudulent conduct, intentionally overlooking violations to maximize revenue.

981. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants such as Represented Creators, and CRM platforms have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or

maintain revenues and increase market share for Defendants and their unnamed co-conspirators.

**C. Pattern of Racketeering Activity**

982. The Content Fraud Enterprise between the OnlyFans Defendants and Content X is an ongoing, continuing group of entities associated together for the common purpose of fraudulently increasing the amount and number of Premium Content Fees each Fan pays.

983. The Content Fraud Enterprise has been ongoing since approximately 2016 and will continue as long as the OnlyFans Defendants and Content X can continue to fraudulently collect Premium Content Fees from Plaintiffs and the Class Members.

984. While the OnlyFans Defendants and Content X are members of the Content Fraud Enterprise, and participated in and are part of the enterprise, they all have an existence separate and distinct from the enterprise. The Content Fraud Enterprise has a systematic linkage because there are financial ties and coordination of activities between the OnlyFans Defendants and Content X.

985. The Content Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries and internationally, such as the marketing, promotion, advertisement, and sale of digital content on the OnlyFans platform.

**D. The Racketeering Activity or Predicate Acts**

986. The OnlyFans Defendants and Content X devised a scheme to defraud Fans by creating and promoting misleading digital content on the OnlyFans

platform, falsely representing the nature, quality, and value of the content to induce Fans to pay Premium Content Fees.

987. The OnlyFans Defendants and Content X acted with the specific intent to deceive and defraud Fans to increase their profits.

988. To carry out, or attempt to carry out the scheme to defraud, OnlyFans Defendants and Content X conducted or participated in the conduct of the affairs of the Content Fraud Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), that employed the use of the wire facilities, in violation of 18 U.S.C. § 1343.

989. The OnlyFans Defendants and Content X participated in the scheme to defraud by using the internet to transmit and operate the Content Fraud Enterprise.

990. The OnlyFans Defendants used the internet to communicate to Plaintiffs and Class Members that they could develop "authentic relationships" and "authentic connections" with Creators, which currently is on the OnlyFans website and has been on there since 2017, reiterated in May 2022 as set forth herein.

991. On January 17, 2021, OnlyFans Defendants represented on Twitter that Fans could "direct message[]" and "chat with a Creator."

992. On February 9, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

993. On February 20, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

994. On March 2, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat" with a Creator.

995. On May 26, 2021, OnlyFans Defendants represented on Twitter a Creator would "chat with all her fans in the DMs."

996. On September 10, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans in the DMs" and they could "chat with her."

997. On December 22, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans 1-on-1 . . . so introduce yourself."

998. On January 6, 2022, OnlyFans Defendants represented on Twitter that a Creator "can't wait to chat with you."

999. On March 8, 2022, OnlyFans Defendants represented on Twitter that a Creator "even chats with her fins in the DMs . . . So go and say hey."

1000. On October 22, 2022, OnlyFans Defendants represented on Twitter that Fans could "connect" with a Creator on a "deeper level."

1001. On September 30. 20222, OnlyFans Defendants represented on Twitter that Fans could "talk one-on-one with" a Creator.

1002. On November 2, 2022, OnlyFans Defendants represented on Instagram that a Creator was "chatting with her fans."

1003. On November 16, 2022, OnlyFans Defendants represented on Twitter that Fans could connect with a Creator "1-on-1."

1004. On December 16, 2022, OnlyFans Defendants represented on Twitter that a Creator was "responding to DMs."

1005. On August 19, 2023, OnlyFans Defendants represented on Instagram that Creator would "interact directly with [her] fans."

1006. On May 3, 2024, OnlyFans Defendants represented on Twitter that Fans could "connect[] personally" with a Creator.

1007. On June 18, 2024, OnlyFans Defendants represented on Instagram that a Creator made her living "chatting" with the Fans.

1008. On July 17, 2024, OnlyFans Defendants represented on Instagram that a Creator makes "amazing connections with [her] fans and built genuine relationships."

1009. The OnlyFans Defendants made each of these statements to convince Fans to subscribe to Creators, collecting 20% of all those subscription fees, in addition to additional purchases made by the Fans after they subscribe.

1010. The OnlyFans Defendants used the internet to communicate to each Fan who subscribed to a Creator's account that they would be able to "Direct message with this user." OnlyFans Defendants' records will show the exact date each Plaintiff and Class Member subscribed to a Creator account and received this communication.

1011. Content X as co-conspirators and agents of its Represented Creators, transmitted multiple communications through the internet to Plaintiffs and Class Members, falsely representing they were Creators, to convince Plaintiffs and Class Members to pay Premium Content Fees. Defendants' records will show the exact date of each communication.

1012. Content X uses marketing—including taglines for its Creators' accounts—that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform.

1013. On information and belief, Content X manages or at some point managed the accounts of the following Creators, who were subscribed to by either Plaintiff S.M. and/or Plaintiff B.L.

a. Bella Thorne (aka @bellathorne)

b. Abella Danger (aka @dangershewrote • @abelladangervip)

c. Mathilde Tantot (aka @mathildtanot)

d. Pauline Tantot (aka @popstantot • @popstantotvip)

1014. On information and belief, as part of its management of those and other Creator accounts, Content X provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

1015. This is supported by statements made by former Represented Creators of Content X who, in a Rolling Stone article, discussed the sub-par nature of the Chatter services provided by Content X ("The way they would answer messages was super lazy [and] super robotic . . . ."), as well as the pressure they received to provide "account managers" with sexually explicit photographs despite initial promises that they would not have to provide nude photos for their OnlyFans page (one Creator "[said] Content X staffers who managed her OnlyFans page wanted her to send them more risqué and lingerie content . . . [and] claims she was told by staffers as an incentive how much more money she could earn off risqué photos.")

1016. In addition to the acts of wire fraud identified above, OnlyFans Defendants' and Content X's acts also include:

a. Promotion of fraudulent digital content through the OnlyFans platform to Plaintiffs and Class Members.

b. Electronic payment transactions processed by the platform—specifically by Defendant FIUSA—in which money was transferred from Fans to OnlyFans Defendants and Content X.

c. Communications between the OnlyFans Defendants and Content X, instructing them on how to maximize profits through misleading content, as described herein.

d. Defendants' false and fraudulent representation to Plaintiffs and the Class Members about the value and/or authenticity of the digital content.

e. The fraudulent digital content itself.

f. Communications promoting fraudulent content.

g. Essential marketing and promotional materials.

h. Fraudulent advertisements and representations.

i. Fraudulently obtained payments from Fans.

j. Documents and communications that facilitated the fraudulent scheme.

k. False or misleading communications intended to obscure the fraud.

l. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, omitted, and actively concealed material facts about the true nature of the digital content.

m. Documents intended to facilitate the marketing and sale of fraudulent content.

n. Documents to process and receive payment for the digital content by unsuspecting Fans, including invoices and receipts.

o. Deposits of proceeds.

1017. As described above, the OnlyFans Defendants and Content X have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity within the past ten years.

1018. The OnlyFans Defendants and Content X have used, directed the use of, and/or caused to be used, thousands of wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

1019. The wire transmissions were made in furtherance of OnlyFans Defendants' and Content X's scheme and common course of conduct to deceive Fans and lure them into paying money for a fraudulent "personal" virtual relationship and associated content.

1020. Many of the precise dates of the fraudulent use of the interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

**E. Injury and Damages**

1021. Plaintiffs and the Class Members are victims of this nationwide scheme, having signed up for the OnlyFans platform based on assurances from the OnlyFans Defendants that the digital content and direct messaging was authentic and as represented.

1022. The OnlyFans Defendants falsely and fraudulently represented the value and authenticity of the digital content to Fans.

1023. Content X on behalf of its Represented Creators used the Chatter Scams to increase the Premium Content Fees paid by Plaintiffs and the Class Members, of which they took a portion.

1024. The OnlyFans Defendants' and Content X's actions were done to induce Fans to pay Premium Content Fees, all to fraudulently increase their profits.

1025. The OnlyFans Defendants' and Content X's scheme was reasonably calculated to deceive Plaintiffs and Fans through the execution of their complex and illegal scheme to misrepresent the authenticity of the digital content offered on the platform.

1026. By reason of, and because of the conduct of the OnlyFans Defendants and Content X, and in particular, their pattern of racketeering activity, Plaintiffs and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

1027. Paying Premium Content Fees they would not have paid, had they known they were communicating with Chatters, not the Creators.

1028. The lost expectation of having direct, authentic communications, and the effort wasted communicating with Creators' Chatters.

1029. Overpayment for the digital content that was not as represented.

1030. Overpayment for digital content that was misrepresented as to the characteristics, source, or authenticity.

1031. Other incidental and consequential expenses linked to the overpayment for the digital content, including, but not limited to, additional interest on financing, fees, and other financial harms.

1032. The OnlyFans Defendants' and Content X's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to three times their actual damages, as well as costs and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT VII. VIOLATION OF RICO**
**(18 U.S.C. § 1962(c))**
**(Against OnlyFans Defendants and Defendant A.S.H. Agency)**

1033. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

1034. Pursuant to Rule 8(b)(2), Fed. R. Civ. P., Plaintiffs allege RICO violations in the alternative against the OnlyFans Defendants and Defendant A.S.H. Agency ("A.S.H.").

1035. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

1036. Under 18 U.S.C. § 1961(4), an "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

1037. A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

1038. "Racketeering activity" includes wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1).

1039. 18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

**A. Each Defendant is a Culpable Person Under RICO.**

1040. The OnlyFans Defendants and A.S.H. are all culpable "persons" under 18 U.S.C.§ 1961(3), as each of them is an entity capable of holding a legal or beneficial interest in property.

**B. The Content Fraud Enterprise is a RICO Enterprise.**

1041. For the purposes of this claim, the RICO enterprise, referred to in this Complaint as the "Content Fraud Enterprise," independently exists as an association-in-fact enterprise of FIL and FIUSA (the OnlyFans Defendants), A.S.H., and their co-conspirators, such as the CRM platforms described herein and those Creators that A.S.H. represents.

1042. The OnlyFans Defendants and A.S.H. play different roles, but each cooperate toward a common purpose: using Chatters to extract Premium Content Fees from Plaintiffs and Class Members.

1043. The OnlyFans Defendants have, continually since its inception, promised to every Fan on the OnlyFans platform that they will be able to "direct message" with the Creators they subscribe to.

1044. As described herein, each of these communications was made directly to Plaintiffs and the Class Members when they subscribed to each Creator represented by A.S.H. on the OnlyFans platform.

1045. The OnlyFans Defendants have also communicated to Plaintiffs and the Class Members on the various platforms, including its website that they will be able to "direct message" with Creators, chat "1 on 1" with the Creators, and build "genuine" and "authentic" connections.

1046. A.S.H. manages the OnlyFans accounts of its Represented Creators, who are unnamed co-conspirators. On behalf of its Creators, A.S.H. directs Chatters to post and communicate as the Represented Creator on that Creator's account—what has been described herein as the Chatter Scams—surreptitiously impersonating the Creator.

1047. A.S.H. is utilizing the Chatter Scams on behalf of the Creators they represent to convince Fans they are directly messaging with Creators and receiving the promised "1 on 1," chats, "direct messaging," or "authentic" experience, when in fact the Fans were speaking with third parties without their knowledge. As described herein, these false communications were made by the OnlyFans Defendants and by A.S.H., on behalf of their Represented Creators, to Plaintiffs and Class Members each time they engaged in a direct message with a Represented Creator.

1048. The Chatter Scams are designed to use deception to maximize the Premium Content Fees paid to the Creators by the Fans as described herein, a portion of which is paid to A.S.H.

1049. A.S.H. is engaged in the fraudulent activities described herein by controlling and distributing misleading and false digital content to Fans through the Chatter Scams on behalf of the Creators, knowing that the OnlyFans Defendants were monitoring the platform but would not enforce their anti-fraud policies.

1050. The OnlyFans Defendants, who possess network logs that record all digital activity occurring on the OnlyFans platform, are not only aware of A.S.H. but actively facilitate its use of Chatters as well as CRM platforms that further enhance, and even automate, the Chatter Scams.

1051. The OnlyFans Defendants intentionally failed to enforce their anti-fraud policies, or otherwise actively police the platform's network activity—knowing non-enforcement would allow A.S.H. to continue the pattern of fraudulent activities, thereby increasing and maximizing each Creator's Premium Content Fees through the Chatter Scams—to continue to collect 20% of the revenue generated by the fraudulent activity.

1052. The OnlyFans Defendants received complaints from Fans about the use of Chatters, yet they continued to allow and support the fraudulent actions of A.S.H. and the related co-conspirators.

1053. The OnlyFans Defendants' platform interface and marketing strategies are designed to maximize engagement and revenue, regardless of the authenticity of the content.

1054. Beyond intentionally failing to police its own policies, the OnlyFans Defendants collect all of the digital evidence necessary to alert themselves to the presence of the Chatter Scams and are either intentionally ignoring this information

or otherwise actively enable the Chatter Scams to operate on the OnlyFans platform.

1055. The OnlyFans Defendants' profit motive drives them to engage in fraudulent conduct, intentionally overlooking violations to maximize revenue.

1056. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants such as Represented Creators, and CRM platforms have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues and increase market share for Defendants and their unnamed co-conspirators.

**C. Pattern of Racketeering Activity**

1057. The Content Fraud Enterprise between the OnlyFans Defendants and A.S.H. is an ongoing, continuing group of entities associated together for the common purpose of fraudulently increasing the amount and number of Premium Content Fees each Fan pays.

1058. The Content Fraud Enterprise has been ongoing since approximately 2016 and will continue as long as the OnlyFans Defendants and A.S.H. can continue to fraudulently collect Premium Content Fees from Plaintiffs and the Class Members.

1059. While the OnlyFans Defendants and A.S.H. are members of the Content Fraud Enterprise, and participated in and are part of the enterprise, they all have an existence separate and distinct from the enterprise. The Content Fraud Enterprise has a systematic linkage because there are financial ties and coordination of activities between the OnlyFans Defendants and A.S.H.

1060. The Content Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries and internationally, such as the marketing, promotion, advertisement, and sale of digital content on the OnlyFans platform.

**D. The Racketeering Activity or Predicate Acts**

1061. The OnlyFans Defendants and A.S.H. devised a scheme to defraud Fans by creating and promoting misleading digital content on the OnlyFans platform, falsely representing the nature, quality, and value of the content to induce Fans to pay Premium Content Fees.

1062. The OnlyFans Defendants and A.S.H. acted with the specific intent to deceive and defraud Fans to increase their profits.

1063. To carry out, or attempt to carry out the scheme to defraud, the OnlyFans Defendants and A.S.H. conducted or participated in the conduct of the affairs of the Content Fraud Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), that employed the use of the wire facilities, in violation of 18 U.S.C. § 1343.

1064. The OnlyFans Defendants and A.S.H. participated in the scheme to defraud by using the internet to transmit and operate the Content Fraud Enterprise.

1065. The OnlyFans Defendants used the internet to communicate to Plaintiffs and Class Members that they could develop "authentic relationships" and "authentic connections" with Creators, which currently is on the OnlyFans website and has been on there since 2017, reiterated in May 2022 as set forth herein.

1066. On January 17, 2021, OnlyFans Defendants represented on Twitter that Fans could "direct message[]" and "chat with a Creator."

1067. On February 9, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

1068. On February 20, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

1069. On March 2, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat" with a Creator.

1070. On May 26, 2021, OnlyFans Defendants represented on Twitter a Creator would "chat with all her fans in the DMs."

1071. On September 10, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans in the DMs" and they could "chat with her."

1072. On December 22, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans 1-on-1 . . . so introduce yourself."

1073. On January 6, 2022, OnlyFans Defendants represented on Twitter that a Creator "can't wait to chat with you."

1074. On March 8, 2022, OnlyFans Defendants represented on Twitter that a Creator "even chats with her fins in the DMs . . . So go and say hey."

1075. On October 22, 2022, OnlyFans Defendants represented on Twitter that Fans could "connect" with a Creator on a "deeper level."

1076. On September 30. 20222, OnlyFans Defendants represented on Twitter that Fans could "talk one-on-one with" a Creator.

1077. On November 2, 2022, OnlyFans Defendants represented on Instagram that a Creator was "chatting with her fans."

1078. On November 16, 2022, OnlyFans Defendants represented on Twitter that Fans could connect with a Creator "1-on-1."

1079. On December 16, 2022, OnlyFans Defendants represented on Twitter that a Creator was "responding to DMs."

1080. On August 19, 2023, OnlyFans Defendants represented on Instagram that Creator would "interact directly with [her] fans."

1081. On May 3, 2024, OnlyFans Defendants represented on Twitter that Fans could "connect[] personally" with a Creator.

1082. On June 18, 2024, OnlyFans Defendants represented on Instagram that a Creator made her living "chatting" with the Fans.

1083. On July 17, 2024, OnlyFans Defendants represented on Instagram that a Creator makes "amazing connections with [her] fans and built genuine relationships."

1084. The OnlyFans Defendants made each of these statements to convince Fans to subscribe to Creators, collecting 20% of all those subscription fees, in addition to additional purchases made by the Fans after they subscribe.

1085. The OnlyFans Defendants used the internet to communicate to each Fan who subscribed to a Creator's account that they would be able to "Direct message with this user." The OnlyFans Defendants' records will show the exact date each Plaintiff and Class Member subscribed to a Creator account and received this communication.

1086. A.S.H. as co-conspirators and agents of its Represented Creators, transmitted multiple communications through the internet to Plaintiffs and Class Members, falsely representing they were Creators, to convince Plaintiffs and Class

Members to pay Premium Content Fees. Defendants' records will show the exact date of each communication, some of those communications include:

a. Plaintiff N.Z. paid Sky Bri $25 on December 4, 2023.

1087. A.S.H. uses marketing—including taglines for its Creators' accounts—that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform.

1088. A.S.H. manages or at some point managed the accounts of the following Creators, who were subscribed to by either Plaintiff S.M., and/or Plaintiff N.Z.:

a. Sky Bri (aka @skybri)

b. Jane Wilde (aka @janewilde)

c. Kaitlin Trujillo (aka @trukait • @freetrukait

1089. As part of its management of those and other accounts, A.S.H. provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

1090. On information and belief, to provide those and other services, A.S.H. has full access to and control over each Represented Creator's OnlyFans account.

1091. In addition to the acts of wire fraud identified above, the OnlyFans Defendants' and A.S.H.'s acts also include:

a. Promotion of fraudulent digital content through the OnlyFans platform to Plaintiffs and Class Members.

b. Electronic payment transactions processed by the platform—specifically by Defendant FIUSA—in which money was transferred from Fans to OnlyFans Defendants and A.S.H.

c. Communications between OnlyFans Defendants and A.S.H., instructing them on how to maximize profits through misleading content, as described herein.

d. Defendants' false and fraudulent representation to Plaintiffs and the Class Members about the value and/or authenticity of the digital content.

e. The fraudulent digital content itself.

f. Communications promoting fraudulent content.

g. Essential marketing and promotional materials.

h. Fraudulent advertisements and representations.

i. Fraudulently obtained payments from Fans.

j. Documents and communications that facilitated the fraudulent scheme.

k. False or misleading communications intended to obscure the fraud.

l. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, omitted, and actively concealed material facts about the true nature of the digital content.

m. Documents intended to facilitate the marketing and sale of fraudulent content.

n. Documents to process and receive payment for the digital content by unsuspecting Fans, including invoices and receipts.

o. Deposits of proceeds.

1092. As described above, the OnlyFans Defendants and A.S.H. have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity within the past ten years.

1093. The OnlyFans Defendants and A.S.H. have used, directed the use of, and/or caused to be used, thousands of wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

1094. The wire transmissions were made in furtherance of the OnlyFans Defendants' and A.S.H.'s scheme and common course of conduct to deceive Fans and lure them into paying money for a fraudulent "personal" virtual relationship and associated content.

1095. Many of the precise dates of the fraudulent use of the interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

**E. Injury and Damages**

1096. Plaintiffs and the Class Members are victims of this nationwide scheme, having signed up for the OnlyFans platform based on assurances from the OnlyFans Defendants that the digital content and direct messaging was authentic and as represented.

1097. The OnlyFans Defendants falsely and fraudulently represented the value and authenticity of the digital content to Fans.

1098. A.S.H. on behalf of its Represented Creators used the Chatter Scams to increase the Premium Content Fees paid by Plaintiffs and the Class Members, of which they took a portion.

1099. OnlyFans Defendants' and A.S.H.'s actions were done to induce Fans to pay Premium Content Fees, all to fraudulently increase their profits.

1100. OnlyFans Defendants' and A.S.H.'s scheme was reasonably calculated to deceive Plaintiffs and Fans through the execution of their complex and illegal scheme to misrepresent the authenticity of the digital content offered on the platform.

1101. By reason of, and because of the conduct the OnlyFans Defendants and A.S.H., and in particular, their pattern of racketeering activity, Plaintiffs and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

1102. Paying Premium Content Fees they would not have paid, had they known they were communicating with Chatters, not the Creators.

1103. The lost expectation of having direct, authentic communications, and the effort wasted communicating with Creators' Chatters.

1104. Overpayment for the digital content that was not as represented.

1105. Overpayment for digital content that was misrepresented as to the characteristics, source, or authenticity.

1106. Other incidental and consequential expenses linked to the overpayment for the digital content, including, but not limited to, additional interest on financing, fees, and other financial harms.

1107. The OnlyFans Defendants' and A.S.H.'s violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to three times their actual damages, as well as costs and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT VIII. VIOLATION OF RICO**
**(18 U.S.C. § 1962(c))**
**(Against OnlyFans Defendants and Defendant Verge Agency, Inc.)**

1108. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

1109. Pursuant to Rule 8(b)(2), Fed. R. Civ. P., Plaintiffs allege RICO violations in the alternative against the OnlyFans Defendants and Defendant Verge Agency, Inc. ("Verge").

1110. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

1111. Under 18 U.S.C. § 1961(4), an "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

1112. A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

1113. "Racketeering activity" includes wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1).

1114. 18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television

communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

**A. Each Defendant is a Culpable Person Under RICO.**

1115. The OnlyFans Defendants and Verge are all culpable "persons" under 18 U.S.C.§ 1961(3), as each of them is an entity capable of holding a legal or beneficial interest in property.

**B. The Content Fraud Enterprise is a RICO Enterprise.**

1116. For the purposes of this claim, the RICO enterprise, referred to in this Complaint as the "Content Fraud Enterprise," independently exists as an association-in-fact enterprise of FIL and FIUSA (the OnlyFans Defendants), Verge, and their co-conspirators, such as the CRM platforms described herein and those Creators that Verge represents.

1117. The OnlyFans Defendants and Verge play different roles, but each cooperate toward a common purpose: using Chatters to extract Premium Content Fees from Plaintiffs and Class Members.

1118. The OnlyFans Defendants have, continually since its inception, promised to every Fan on the OnlyFans platform that they will be able to "direct message" with the Creators they subscribe to.

1119. As described herein, each of these communications was made directly to Plaintiffs and the Class Members when they subscribed to each Creator represented by Verge on the OnlyFans platform.

1120. The OnlyFans Defendants have also communicated to Plaintiffs and the Class Members on the various platforms, including its website that they will be

able to "direct message" with Creators, chat "1 on 1" with the Creators, and build "genuine" and "authentic" connections.

1121. Verge manages the OnlyFans accounts of its Represented Creators, who are unnamed co-conspirators. On behalf of its Creators, Verge directs Chatters to post and communicate as the Represented Creator on that Creator's account—what has been described herein as the Chatter Scams—surreptitiously impersonating the Creator.

1122. Verge is utilizing the Chatter Scams on behalf of the Creators they represent to convince Fans they are directly messaging with Creators and receiving the promised "1 on 1," chats, "direct messaging," or "authentic" experience, when in fact the Fans were speaking with third parties without their knowledge. As described herein, these false communications were made by the OnlyFans Defendants and by Verge, on behalf of their Represented Creators, to Plaintiffs and Class Members each time they engaged in a direct message with a Represented Creator.

1123. The Chatter Scams are designed to use deception to maximize the Premium Content Fees paid to the Creators by the Fans as described herein, a portion of which is paid to Verge.

1124. Verge is engaged in the fraudulent activities described herein by controlling and distributing misleading and false digital content to Fans through the Chatter Scams on behalf of the Creators, knowing that OnlyFans Defendants were monitoring the platform but would not enforce their anti-fraud policies.

1125. The OnlyFans Defendants, who possess network logs that record all digital activity occurring on the OnlyFans platform, are not only aware of Verge but

actively facilitate its use of Chatters and the CRM platforms that further enhance, and even automate, the Chatter Scams.

1126. The OnlyFans Defendants intentionally failed to enforce their anti-fraud policies, or otherwise actively police the platform's network activity—knowing non-enforcement would allow Verge to continue the pattern of fraudulent activities, thereby increasing and maximizing each Creator's Premium Content Fees through the Chatter Scams—to continue to collect 20% of the revenue generated by the fraudulent activity.

1127. The OnlyFans Defendants received complaints from Fans about the use of Chatters, yet they continued to allow and support the fraudulent actions of Verge and the related co-conspirators.

1128. The OnlyFans Defendants' platform interface and marketing strategies are designed to maximize engagement and revenue, regardless of the authenticity of the content.

1129. Beyond intentionally failing to police its own policies, the OnlyFans Defendants collect all of the digital evidence necessary to alert themselves to the presence of the Chatter Scams and are either intentionally ignoring this information or otherwise actively enable the Chatter Scams to operate on the OnlyFans platform.

1130. The OnlyFans Defendants' profit motive drives them to engage in fraudulent conduct, intentionally overlooking violations to maximize revenue.

1131. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants such as Represented Creators, and CRM platforms have participated as co-conspirators with Defendants in these

offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues and increase market share for Defendants and their unnamed co-conspirators.

**C. Pattern of Racketeering Activity**

1132. The Content Fraud Enterprise between the OnlyFans Defendants and Verge is an ongoing, continuing group of entities associated together for the common purpose of fraudulently increasing the amount and number of Premium Content Fees each Fan pays.

1133. The Content Fraud Enterprise has been ongoing since approximately 2016 and will continue as long as the OnlyFans Defendants and Verge can continue to fraudulently collect Premium Content Fees from Plaintiffs and the Class Members.

1134. While the OnlyFans Defendants and Verge are members of the Content Fraud Enterprise, and participated in and are part of the enterprise, they all have an existence separate and distinct from the enterprise. The Content Fraud Enterprise has a systematic linkage because there are financial ties and coordination of activities between the OnlyFans Defendants and Verge.

1135. The Content Fraud Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries and internationally, such as the marketing, promotion, advertisement, and sale of digital content on the OnlyFans platform.

**D. The Racketeering Activity or Predicate Acts**

1136. The OnlyFans Defendants and Verge devised a scheme to defraud Fans by creating and promoting misleading digital content on the OnlyFans

platform, falsely representing the nature, quality, and value of the content to induce Fans to pay Premium Content Fees.

1137. The OnlyFans Defendants and Verge acted with the specific intent to deceive and defraud Fans to increase their profits.

1138. To carry out, or attempt to carry out the scheme to defraud, OnlyFans Defendants and Verge conducted or participated in the conduct of the affairs of the Content Fraud Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), that employed the use of the wire facilities, in violation of 18 U.S.C. § 1343.

1139. The OnlyFans Defendants and Verge participated in the scheme to defraud by using the internet to transmit and operate the Content Fraud Enterprise.

1140. The OnlyFans Defendants used the internet to communicate to Plaintiffs and Class Members that they could develop "authentic relationships" and "authentic connections" with Creators, which currently is on the OnlyFans website and has been on there since 2017, reiterated in May 2022 as set forth herein.

1141. On January 17, 2021, OnlyFans Defendants represented on Twitter that Fans could "direct message[]" and "chat with a Creator."

1142. On February 9, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

1143. On February 20, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat with [a Creator] 1 on 1."

1144. On March 2, 2021, OnlyFans Defendants represented on Twitter that Fans could "chat" with a Creator.

1145. On May 26, 2021, OnlyFans Defendants represented on Twitter a Creator would "chat with all her fans in the DMs."

1146. On September 10, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans in the DMs" and they could "chat with her."

1147. On December 22, 2021, OnlyFans Defendants represented on Twitter that a Creator "loves getting to know her fans 1-on-1 . . . so introduce yourself."

1148. On January 6, 2022, OnlyFans Defendants represented on Twitter that a Creator "can't wait to chat with you."

1149. On March 8, 2022, OnlyFans Defendants represented on Twitter that a Creator "even chats with her fins in the DMs . . . So go and say hey."

1150. On October 22, 2022, OnlyFans Defendants represented on Twitter that Fans could "connect" with a Creator on a "deeper level."

1151. On September 30. 20222, OnlyFans Defendants represented on Twitter that Fans could "talk one-on-one with" a Creator.

1152. On November 2, 2022, OnlyFans Defendants represented on Instagram that a Creator was "chatting with her fans."

1153. On November 16, 2022, OnlyFans Defendants represented on Twitter that Fans could connect with a Creator "1-on-1."

1154. On December 16, 2022, OnlyFans Defendants represented on Twitter that a Creator was "responding to DMs."

1155. On August 19, 2023, OnlyFans Defendants represented on Instagram that Creator would "interact directly with [her] fans."

1156. On May 3, 2024, OnlyFans Defendants represented on Twitter that Fans could "connect[] personally" with a Creator.

1157. On June 18, 2024, OnlyFans Defendants represented on Instagram that a Creator made her living "chatting" with the Fans.

1158. On July 17, 2024, OnlyFans Defendants represented on Instagram that a Creator makes "amazing connections with [her] fans and built genuine relationships."

1159. The OnlyFans Defendants made each of these statements to convince Fans to subscribe to Creators, collecting 20% of all those subscription fees, in addition to additional purchases made by the Fans after they subscribe.

1160. The OnlyFans Defendants used the internet to communicate to each Fan who subscribed to a Creator's account that they would be able to "Direct message with this user." The OnlyFans Defendants' records will show the exact date each Plaintiff and Class Member subscribed to a Creator account and received this communication.

1161. Verge as co-conspirators and agents of its Represented Creators, transmitted multiple communications through the internet to Plaintiffs and Class Members, falsely representing they were Creators, to convince Plaintiffs and Class Members to pay Premium Content Fees. Defendants' records will show the exact date of each communication.

1162. Verge uses marketing—including taglines for its Creators' accounts—that emphasize the personal nature of the interactions that Fans will have on the OnlyFans platform.

1163. Verge has at various times used taglines and captions for its Creators' accounts that promise a personal interaction between Fans and its Creators on the OnlyFans platform. For example, the first post on the "VIP" page for creator Mikayla Demaiter says:

> Welcome to my Only Fans! So excited to be here and have you! **Here I'll be posting my most exclusive content, as well as the only place I will be responding to all my messages!** Tip $100 to join VIP for unlimited FREE chat and MOST exclusive content! See you there! Excited for what's to come.

1164. Another Represented Creator's account solicits paid subscriptions by saying: "Let me be your virtual girlfriend 💋."

1165. Another Represented Creator's "VIP" page says "Hi there❣You found my EXCLUSIVE page!😍 come talk to me ❤."

1166. On information and belief, Verge manages or at some point managed the accounts of the following Creators, who were subscribed to Plaintiff A.L.:

a. Katie Williams (aka @katie_dubbs)

b. Mikayla Demaiter (aka @mikayla_demaiter • @mikayladvip)

1167. As part of its management of those and other accounts, Verge provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge.

1168. In addition to the acts of wire fraud identified above, the OnlyFans Defendants' and Verge's acts also include:

a. Promotion of fraudulent digital content through the OnlyFans platform to Plaintiffs and Class Members.

b. Electronic payment transactions processed by the platform—specifically by Defendant FIUSA—in which money was transferred from Fans to OnlyFans Defendants and Verge.

c. Communications between OnlyFans Defendants and Verge, instructing them on how to maximize profits through misleading content, as described herein.

d. Defendants' false and fraudulent representation to Plaintiffs and the Class Members about the value and/or authenticity of the digital content.

e. The fraudulent digital content itself.

f. Communications promoting fraudulent content.

g. Essential marketing and promotional materials.

h. Fraudulent advertisements and representations.

i. Fraudulently obtained payments from Fans.

j. Documents and communications that facilitated the fraudulent scheme.

k. False or misleading communications intended to obscure the fraud.

l. Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented, omitted, and actively concealed material facts about the true nature of the digital content.

m. Documents intended to facilitate the marketing and sale of fraudulent content.

n. Documents to process and receive payment for the digital content by unsuspecting Fans, including invoices and receipts.

o. Deposits of proceeds.

1169. As described above, the OnlyFans Defendants and Verge have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity within the past ten years.

1170. The OnlyFans Defendants and Verge have used, directed the use of, and/or caused to be used, thousands of wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

1171. The wire transmissions were made in furtherance of the OnlyFans Defendants' and Verge's scheme and common course of conduct to deceive Fans and lure them into paying money for a fraudulent "personal" virtual relationship and associated content.

1172. Many of the precise dates of the fraudulent use of the interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records.

**E. Injury and Damages**

1173. Plaintiffs and the Class Members are victims of this nationwide scheme, having signed up for the OnlyFans platform based on assurances from the OnlyFans Defendants that the digital content and direct messaging was authentic and as represented.

1174. The OnlyFans Defendants falsely and fraudulently represented the value and authenticity of the digital content to Fans.

1175. Verge on behalf of its Represented Creators used the Chatter Scams to increase the Premium Content Fees paid by Plaintiffs and the Class Members, of which they took a portion.

1176. The OnlyFans Defendants' and Verge's actions were done to induce Fans to pay Premium Content Fees, all to fraudulently increase their profits.

1177. The OnlyFans Defendants' and Verge's scheme was reasonably calculated to deceive Plaintiffs and Fans through the execution of their complex and illegal scheme to misrepresent the authenticity of the digital content offered on the platform.

1178. By reason of, and because of the conduct the OnlyFans Defendants and Verge, and in particular, their pattern of racketeering activity, Plaintiffs and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

1179. Paying Premium Content Fees they would not have paid, had they known they were communicating with Chatters, not the Creators.

1180. The lost expectation of having direct, authentic communications, and the effort wasted communicating with Creators' Chatters.

1181. Overpayment for the digital content that was not as represented.

1182. Overpayment for digital content that was misrepresented as to the characteristics, source, or authenticity.

1183. Other incidental and consequential expenses linked to the overpayment for the digital content, including, but not limited to, additional interest on financing, fees, and other financial harms.

1184. The OnlyFans Defendants' and Verge's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to three times their actual damages, as well as costs and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT IX. RICO CONSPIRACY**
**(18 U.S.C. § 1962(d))**
**(Against All Defendants)**

1185. **Agreement to Violate RICO.** The OnlyFans Defendants and Agency Defendants, along with the Agency Defendants' co-conspirators, knowingly agreed and conspired to violate 18 U.S.C. § 1962(c) by engaging in the pattern of racketeering activity described above.

1186. **Participation in Conspiracy**. Each Defendant knowingly agreed to and participated in the conspiracy by performing various acts to further the fraudulent scheme, including creating and distributing false digital content, and facilitating the transactions through the platform.

1187. **Overt Acts in Furtherance of the Conspiracy.** Defendants committed numerous overt acts in furtherance of the conspiracy, including but not limited to:

a. The OnlyFans Defendants' development and implementation of policies that ostensibly prohibited fraudulent activity but were intentionally not enforced.

b. The OnlyFans Defendants promised Fans that they could and would be direct messaging with Creators, knowing that the Agency Defendants were using Chatters to impersonate Creators in violation of OnlyFans' policies.

c. The OnlyFans Defendants' collection of 20% of the Premium Content Fees, knowing that the Agency Defendants were using Chatters to impersonate Creators in violation of OnlyFans' policies, and in response to which the OnlyFans Defendants took no action.

d. Agency Defendants' creation and sale of fraudulent digital content, knowing that the OnlyFans Defendants would not take action to stop or penalize such behavior.

e. Use of interstate wire communications to promote and facilitate the fraudulent scheme, including internet promotions and electronic transactions.

1188. **Injury and Causation.** As a direct and proximate result of the Defendants' conspiracy, Plaintiffs and the Class suffered financial harm through the purchase of fraudulent digital content in the form of Premium Content Fees, leading to significant monetary losses.

1189. Defendants' actions were the proximate cause of the Plaintiffs' and Class Members' injuries, as the fraudulent scheme depended on the implicit coordination and mutual support of all Defendants.

1190. By reason of, and because of the conduct of Defendants, and each of them, and in particular, their conspiracy to commit a pattern of racketeering activity, Plaintiffs and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

a. Paying Premium Content Fees they would not have paid, had they known they were communicating with Chatters, not the Creators.

b. The lost expectation of receiving authentic digital content.

c. Overpayment for the digital content that was not as represented.

d. Overpayment for digital content that they did not receive or that was misrepresented as to the source or authenticity.

1191. Other incidental and consequential expenses linked to the overpayment for the digital content, including, but not limited to, additional interest on financing, fees, and other financial harms.

1192. Defendants' violation of 18 U.S.C. § 1962(d) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to three times their actual damages, as well as costs and reasonable attorneys' fees under 18 U.S.C. 1964(c).

## COUNT X. VIOLATION OF THE FEDERAL VIDEO PRIVACY PROTECTION ACT (18 U.S.C. § 2710) (Against All Defendants)

1193. The Video Privacy Protection Act ("VPPA" or, in this claim, "the Act") was passed to protect the ability of Americans to obtain and watch video content in private spaces without risk that the businesses providing them those videos would disclose the nature of that content to anyone "without the watcher's consent."[202]

---

[202] "The Video Privacy Protection Act as a Model Intellectual Privacy Statute," Developments in the Law, Harvard Law Review, 131 Harv. L. Rev. 1766, available at https://harvardlawreview.org/print/vol-131/the-video-privacy-protection-act-as-a-model-intellectual-privacy-statute/ (last accessed Jan. 2, 2026).

1194. To that end, the Act prohibits a "video tape service provider" from knowingly disclosing a customer's "personally identifiable information" without that customer's consent.[203]

**A. The OnlyFans platform collects personally identifying information about Fans.**

1195. In its Privacy Policy, OnlyFans admits to collecting the following categories of information: "User Data," including a Fan's "email address" and "telephone number;" "Account Data," which includes: "profile name"; "password"; "avatars and headers of your Fan account"; "your subscriptions"; "comments on posts made from your Fan account"; "chat messages between you and other users"; "Commercial Information: Such as information about products or services purchased and your use of our Services"; credit card and payment information; and "Sensory Information: Such as pictures and videos (content) you upload to the Website."[204]

1196. Each time a Fan interacts with a Creator's account via OnlyFans, the platform collects and transmits sufficient information to identify the specific Fan, including the Fan's username, which can be used by anyone to locate and view the Fan's profile on OnlyFans.

---

[203] *See, e.g.*, *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015) ("to plead a plausible claim under section 2710(b)(1), a plaintiff must allege that (1) a defendant is a "video tape service provider," (2) the defendant disclosed "personally identifiable information concerning any customer" to "any person," (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by section 2710(b)(2)").

[204] Privacy Policy ¶¶ 9, 20 (California Specific Disclosures), ONLYFANS, https://onlyfans.com/privacy (last visited July 29, 2024).

1197. In addition, the OnlyFans platform allows Fans to share their personal information over chat—the OnlyFans platform has no limits on what type of personal information can be shared—which are stored and maintained on the OnlyFans platform.

1198. Each of the Plaintiffs in this case shared personal information in chats, which was stored by the OnlyFans platform in the chats that Plaintiffs believed were between Plaintiffs and the Creators.

1199. Plaintiff R.M shared his full legal name in the chat with the Creators that he subscribed to.

1200. Plaintiffs N.Z. and S.M. shared their full names and provided photos of his face in the chat with Creators that he subscribed to.

1201. Plaintiff B.L. linked his Twitter account to his OnlyFans profile and shared his real name in the chat with the Creators he subscribed to.

1202. The information provided by Plaintiffs, linked to their request for or viewing of any video content, is considered personally identifying information ("PII") about them,[205] since it would allow an ordinary person to connect each Plaintiff with the specific content that they requested and/or viewed—including the titles or filenames of videos, as well as the subject matter of those videos—and thus to identify the video-watching behavior of Plaintiffs.

1203. The Chatter Scams only function effectively through the nonconsensual disclosure of Fan PII: By creating a communication history

[205] The Act defines PII as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider," 18 U.S.C. § 2710(a)(3).

viewable by Chatters so that they can convincingly impersonate a specific Creator and pretend that the Creator has an ongoing relationship with the Fan—including intimate knowledge of the Fan's personal information, conversation history, and preferences, specifically with respect to video content—in order to manipulate Fans into purchasing additional content based on false pretenses.

**B. Defendants are video tape service providers under the Act.[206]**

1204. Each of the Agency Defendants is engaged in the business of selling and/or delivering audiovisual materials as the agent or representative of the Represented Creators.

1205. The OnlyFans Defendants are also engaged in the business of selling and/or delivering audiovisual materials. The entire purpose of the OnlyFans platform is to deliver content from Creators to Fans (and vice versa, with respect to Fan-Created Content).

1206. On information and belief, a substantial portion of that content is made up of prerecorded videos,[207] which OnlyFans not only stores, but organizes, on behalf of Creator accounts. OnlyFans describes this feature of the platform as "the Vault," which "stores all of your previously-posted or scheduled photos, ***videos***,

---

[206] 18 U.S.C.S. § 2710(a)(4) (defining video tape service provider as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials, or any person or other entity to whom a disclosure is made under subparagraph (D) or (E) of subsection (b)(2)").

[207] OnlyFans' TOU defines "content" as "***any material uploaded to OnlyFans*** by any User (whether a Creator or a Fan), including any photos, ***videos***, audio (for example music and other sounds), livestream material, data, text (such as comments and hashtags), metadata, images, interactive features, emojis, GIFs, memes, and any other material whatsoever." Terms of Use for All Users ¶ 2(c), ONLYFANS, https://onlyfans.com/terms (last visited June 29, 2024) (emphasis added).

and ***live streams***,"[208] and emphasizes the Vault's ability to "set aside content already shared with subscribers over DM," so that if a Creator "forgot which content you've sent out over messages or PPV, the Vault will remember for you."[209] OnlyFans also provides a "Stories" feature, which it describes as "videos that display for only 24 hours."[210]

1207. Plaintiffs and Class Members purchased Premium Content directly from the Agency Defendants, whose revenues are directly related to the amount of content purchased by Fans, and from the OnlyFans Defendants, since OnlyFans' fee structure effectively gives Defendants FIL and FIUSA what amounts to a "commission" on every video sold via the platform—whether by subscription or PPV.

1208. Defendants knowingly disclosed Plaintiffs' and Class Members' PII without their consent.

1209. Defendants know that the PII being disclosed is intended to be private and confidential, yet neither OnlyFans nor the Agencies informed Plaintiffs or Class Members of the possibility that their PII might be disclosed to anyone other than the Creator whose account they were interacting with ("Selected Creator").

1210. Neither OnlyFans nor the Agencies obtained Plaintiffs' or Class Members' consent for their PII to be disclosed to anyone other than the Selected

---

[208] Another feature that OnlyFans touts is automatically turning livestreams into prerecorded video. Blog Post, *Ultimate Guide to OnlyFans Features*, ONLYFANS (July 12, 2023), https://blog.onlyfans.com/ultimate-guide-to-onlyfans-features/ (last visited July 29, 2024) ("OnlyFans automatically adds your streamed videos to your Vault so fans can watch it later as a video-on-demand.").

[209] *Id.*

[210] *Id.*

Creator. Nor did Plaintiffs or Class Members give such consent to any other parties, including the selected Creators themselves.

1211. Plaintiffs and Class Members did not consent to having any of their communications or personal information, including PII, shared with anyone other than their selected Creators.

1212. Plaintiffs and Class Members were unaware of the fact that their PII (including names, usernames, messages, message content, and video viewing histories) were being disclosed to anyone other than their selected Creators.

1213. Through its platform, which facilitates the communication of information between Fan and Creator accounts, OnlyFans disclosed Plaintiffs' and Class Members' PII to unauthorized third parties, including Agencies and Chatters. OnlyFans made such disclosures knowing that Plaintiffs and Class Members had not consented to the disclosure of their PII to anyone other than their selected Creators.

1214. Each Agency Defendant also disclosed that PII to other people, including Chatters, despite knowing that Plaintiffs and Class Members had not consented to the disclosure of their PII to anyone other than their selected Creators. To facilitate the Chatter Scams, the Agencies allowed Chatters to have access to Creator Accounts on the OnlyFans platform—whether directly (by providing Chatters with login information) or indirectly (via third-party CRM software such as Supercreator, which, as outlined above in Section IV.G.2, is designed to facilitate the use of Chatters by agencies).

1215. None of the VPPA's exceptions to the consent requirement apply in this case. Specifically, Defendants' wrongful disclosures were not done in the

"ordinary course of business," but were done for the purpose of illegal and fraudulent conduct.

1216. Defendants' conduct is illegal, offensive, and contrary to Plaintiffs' and Class Members' expectations.

1217. As a result of these violations, Plaintiffs and the Class are entitled to statutory damages, punitive damages, attorneys' fees, and any other relief deemed appropriate by the Court.

**COUNT XI. BREACH OF CONTRACT—FAILURE TO PROVIDE PLATFORM WITH REASONABLE CARE AND SKILL**
**(Against FIL)**

1218. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

1219. FIL's TOU constitute a contract between FIL and Fans. This contract is separate from any Fan/Creator Transaction or any Standard Contract between Fan and Creator.

1220. If there is a conflict between the TOU and the other terms and policies in the TOS, including the Creator TOU (which do not apply to Fans) or the Standard Contract, the TOU will apply.

1221. Plaintiffs performed their contractual obligations by creating an account on OnlyFans and by subscribing to one or more Creators, and thereafter complying with all conditions in the TOU and with any applicable conditions in the TOS.

1222. TOU paragraph 9 provides: "We will use reasonable care and skill in providing OnlyFans to you."

1223. FIL failed to use reasonable care and skill in providing the "OnlyFans" website to Fans, as follows:

a. FIL permitted and actively marketed to management agencies that use Chatters to impersonate Creators, recruiting these agencies to the platform with promises of revenue;

b. FIL collected data sufficient to identify Chatter-operated accounts—including multiple simultaneous logins from disparate geographic locations—and failed to act on this information;

c. FIL designed and provided tools specifically intended to facilitate Chatter deception, including mass-message cloaking that disguises messages to thousands of Fans as personal communications, Fan spending analytics, and inter-shift notes features enabling Chatters to maintain the illusion of a continuous personal relationship;

d. FIL declined to exercise their contractual enforcement powers against Agency-operated accounts because Chatter operations increase Fan Payments on which FIL collect its twenty percent (20%) fee.

1224. FIL's conduct constitutes a breach of its promise to Fans to operate OnlyFans with reasonable care and skill.

1225. Moreover, the TOS establishes rules governing platform operation, including prohibitions on account sharing (TOU), impersonation (AUP), and misleading conduct (AUP), and provides FIL with enforcement mechanisms, including the power to withhold Creator earnings (Creator TOU), returning Fan

payments (Creator TOU), suspend or terminate accounts (TOU, Creator TOU), and terminate Creator relationships (Creator TOU).

1226. FIL knew that Agency-operated accounts systematically violated these TOS rules.

1227. Despite knowledge of Chatter-based operations, FIL continued to allow subscriptions and payments to occur for accounts serviced by Chatters for the direct messaging function, treating those accounts as TOS-compliant and collecting their twenty percent (20%) fee, while declining to exercise their enforcement powers or failing to use reasonable care and skill in providing the OnlyFans platform.

1228. Establishing platform rules and then knowingly permitting systematic violations of those rules and the California law—and at times facilitating such violations—while continuing to collect fees, is a failure to use reasonable care and skill in providing OnlyFans to Fans, and thus a breach of the express terms of the TOU.

1229. FIL's breach caused Plaintiffs damages in an amount to be proven at trial.

**COUNT XII. BREACH OF CONTRACT—DIRECT MESSAGING REPRESENTATION**
**(Against FIL)**

1230. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

1231. FIL's subscription interface starts by displaying this message as a Subscription Benefit: "Direct message with this user [Creator]." This language is

generated by FIL, cannot be modified by Creators, is the very first screen preceding a subscription, and is part of the OnlyFans platform—not the Creator's content.

1232. This representation is chosen and imposed by FIL as part of its website and describes what every subscription on OnlyFans includes. It is not part of the Fan/Creator Transaction. While FIL facilitates Fan/Creator Transactions, it does so only on FIL's terms—which include the "direct message with this user" commitment that appears at every subscription.

1233. This representation is an agreement between FIL and Fans about what the OnlyFans platform provides.

1234. The "direct message" feature is part of what the TOS grants Fans access to when they use "OnlyFans"—the TOS simply does not describe it. Because the TOS promises access to "OnlyFans" without defining what "OnlyFans" includes, evidence of the platform's features—including the "direct message" representation displayed at every subscription—is admissible either as undisputed context or to resolve ambiguity about what "OnlyFans" actually is.

1235. The Standard Contract between Fan and Creator does not shield FIL from liability. That contract provides that "the only parties to this agreement are the Fan and Creator"—FIL is not a party. Moreover, the "direct message with this user" representation is not part of the Standard Contract. The Standard Contract addresses pricing and payment, licensing of Content, and Creator obligations;[211] it says nothing about direct messaging as a feature or as an obligation of the Creator. The

[211] *See* Standard Contract ¶¶ 5–7, https://web.archive.org/web/20240721211059/https://onlyfans.com/contract (last visited Dec. 29, 2025).

"Direct message with this user" representation is made by FIL, in FIL's platform interface, as a term FIL imposes on every subscription. FIL cannot disclaim responsibility for its own representation—one that FIL created, markets, and displays at every subscription—by pointing to a separate contract to which FIL is not a party, and which does not address or govern the representation.

1236. Plaintiffs, after being advised that subscribing to the selected Creator would result in the ability to direct message with that Creator, performed by subscribing to that Creator and thereafter complying with all rules and conditions in the TOS (auto-renewal, content sharing, payment, etc.).

1237. FIL breached the contract by failing to provide direct messaging with Creators where the account was operated by an agency that handled responses by using Chatters to impersonate Creators.

1238. FIL knew its representation was false for Agency-represented accounts and that these Fans were not getting direct messaging with Creators, as promised.

1239. FIL's breach caused Plaintiffs damages in an amount to be proven at trial.

## COUNT XIII. BREACH OF IMPLIED-IN-FACT CONTRACT
## (Against FIL, in the Alternative for Count XII)

1240. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

1241. FIL displayed "direct message with this user" as a Subscription Benefit before every subscription. FIL touted this feature as something that enabled "authentic connections"—a core element of the OnlyFans brand. Every Fan was

shown this representation as part of the subscription process each time that Fan subscribed to a Creator on the OnlyFans platform.

1242. Plaintiffs performed their contractual obligations by subscribing, and by complying with all rules and conditions, including those regarding auto-renewal, content sharing, and payment when purchasing Creator content.

1243. Plaintiffs were promised a package of Subscription Benefits that included direct messaging; that is, Fans were provided a suite of benefits, and one of the main elements was a direct connection to the Creator.

1244. FIL's Terms of Service disclaims responsibility for Fan/Creator Transactions and state that those transactions are "contracts between Fans and Creators." The Standard Contract between Fan and Creator does not incorporate the Subscription Benefits displayed by FIL at the point of subscription. The Standard Contract addresses payment and content licensing; it does not address direct messaging.

1245. Because the "direct message with this user" representation is imposed by FIL and not addressed in either the TOS (where FIL disclaims any role in Fan/Creator Transactions) or the Standard Contract between Fan and Creator (which does not mention Subscription Benefits, including direct messaging), Fans' acceptance of the Subscription Benefits' offer results in an implied-in-fact contract between FIL and Fans.

1246. If the "direct message" representation is not deemed part of the express contract governing platform access—that is, the TOS—nor an inherent part of the OnlyFans platform given FIL's marketing and representations, and its engineering of this feature into every subscription interface, then Fans' acceptance of the stated

Subscription Benefits, including direct messaging, creates an implied-in-fact contract arising from the parties' conduct.

1247. FIL breached this contract by failing to provide direct messaging with Creators for subscriptions serviced by Chatters.

1248. FIL's breach caused Plaintiffs damages in an amount to be proven at trial.

**COUNT XIV. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against FIL)**

1249. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

1250. Every California contract contains an implied covenant of good faith and fair dealing. This covenant is implied by law, including in contracts such as those at issue here (between FIL and Fans), even if a party transgresses an express term. This claim is pleaded in addition to, not as an alternative to, express contract claims. The implied covenant attaches to the contracts between FIL and Fans and prohibits FIL from depriving Fans of their reasonable expectations under the contracts.

1251. Plaintiffs performed their contractual obligations by creating an account, subscribing to Creators, and abiding by the applicable TOS.

1252. FIL violated the covenant by:

a. Displaying "direct message with this user" while knowing it was false for Agency-operated Creator accounts that used Chatters;

b. Recruiting, enabling, or tolerating on FIL's site Agencies that use Chatters to impersonate Creators;

c. Providing tools designed to facilitate Chatter deception;

d. Collecting data that revealed Chatter-operated accounts and refusing to act;

e. Declining to enforce platform rules prohibiting account sharing, impersonation, and misleading conduct.

1253. FIL's operation of the platform—over which FIL retained complete discretion—was not conducted in good faith or with fair dealing toward Fans. FIL prioritized its twenty percent (20%) fee over Fans' rights to authentic connections and direct messages with the Creators they subscribed to—letting them get instead Chatters pretending to be the Creators they subscribed to.

1254. FIL's conduct caused Plaintiffs damages in amount to be proven at trial.

**COUNT XV. PROMISSORY ESTOPPEL**
**(Against FIL, in the Alternative to Counts XI, XII, and XIII)**

1255. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

1256. This Count is pleaded in the alternative to Counts XI, XII, and XIII.

1257. FIL promised Fans would receive "direct message with this user" as a Subscription Benefit. This language is generated and controlled solely by FIL.

1258. This promise relates to the Fan/Creator Transaction—it describes what Fans will receive when they subscribe to a Creator. But the promise was developed and promoted by FIL and is, as a standard practice, made by FIL, not by Creators. The Terms of Service do not account for this promise; the TOS disclaims responsibility for Fan/Creator Transactions. And the Standard Contract between

Fan and Creator does not incorporate this promise; the Standard Contract addresses payment and Content licensing but says nothing about direct messaging as a Subscription Benefit.

1259. Because the "direct message" representation is not part of either the integrated Terms of Service or the Standard Contract between Fan and Creator, Plaintiffs plead promissory estoppel in the alternative.

1260. Plaintiffs reasonably relied on this promise by subscribing and thereafter paying monies due under the subscription agreement even though the direct messaging was with someone other than the Creator.

1261. FIL knew the promise was false for Agency-operated accounts using Chatters.

1262. Plaintiffs were injured by their reliance.

1263. Plaintiffs suffered damages as a result in an amount to be proven at trial.

**COUNT XVI. BREACH OF CONTRACT—THIRD-PARTY BENEFICIARY OF CREATOR TERMS OF USE**
**(Against FIL)**

1264. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

1265. FIL entered into contracts with Creators through the Creator TOU. The Creator TOU includes provisions designed to protect Fans.

1266. The Creator TOU imposes a personal legal responsibility on Creators, which includes the following:

a. Only individuals can be Creators;

b. If Creators use an agent, agency, management company, or other third-party to assist with the operation of their account, it does not affect their personal legal responsibility; and

c. Creators are personally bound by the TOS, which includes keeping their account login details confidential and not disclosing them to anyone else, not engaging in misleading or deceptive conduct toward other Users; and not impersonating another User or any other person.

1267. The Creator TOU provides that if a Creator does not abide by the TOS, FIL may withhold any Creator Earnings and, if it determines that any Creator Earnings should be forfeited, FIL agrees to use its "best efforts to ensure that any Fan Payments which resulted from the forfeited Creator Earnings are returned to the relevant Fans who paid such Fan Payments."

1268. These provisions exist for the benefit of Fans. They ensure that Creator accounts are operated by actual Creators and that Fans are not deceived about who they are communicating with, and if they are deceived, any Fan payments are returned to them.

1269. Plaintiffs and Class Members are intended third-party beneficiaries of these provisions. Here, (1) the third-party Fans benefit from the contract, through at least security and monetary protection; (2) a motivating purpose of the contracting parties was to benefit the Fans; and (3) third-party enforcement is consistent with the contract's objectives. Fans benefit from the anti-deception provisions; those provisions exist to protect Fans; and permitting Fans to enforce them advances the contract's objective of ensuring platform integrity.

1270. FIL breached the Creator TOU by knowingly permitting Agency-operated accounts to violate these provisions systematically—permitting shared credentials, facilitating the use of Chatters, knowing and permitting Chatters to message as if they were the Creators, and deceiving Fans by claiming there was authentic communications going on in the Fans' transactions with Agencies known to use Chatters at volumes that a single human could not meet—while declining to exercise its contractual enforcement powers of forfeiting Creator Earnings and returning all Fan Payments to the Fans.

1271. FIL's breach caused Plaintiffs damages in an amount to be proven at trial.

**COUNT XVII. FRAUD**
**(COMMON LAW)**
**(Against OnlyFans Defendants)**

1272. OnlyFans Defendants falsely represented to Plaintiffs and Class Members that if they subscribed to Creators on the OnlyFans platform they would have "direct," "1 on 1," and "authentic" communications with those Creators.

1273. Every time Plaintiffs N.Z and R.M. or a Class Member subscribed to a Creator, OnlyFans specifically promised Plaintiffs and Class Members they would be able to "direct message with" that Creator.

1274. Each of these communications and representations were relayed/published to Plaintiffs and Class Members when they subscribed to a Creator on the OnlyFans platform, specifics of which are outlined below.

1275. OnlyFans made these representations knowing they were false.

1276. Plaintiffs and Class Members justifiably relied on these representations.

1277. OnlyFans falsely represented to Plaintiff R.M. that he would be direct messaging with Chyanne Burden (Moxy) on July 16, 2020, when he subscribed to her account.

1278. Plaintiff R.M. justifiably relied on that representation by subscribing to Burden.

1279. OnlyFans falsely represented to Plaintiff R.M. that he would be direct messaging with Emily Elizabeth (Dysrpt) on October 7, 2022, when he subscribed to her account.

1280. Between 2019 and 2023,[212] OnlyFans falsely represented to Plaintiff R.M. that he would be direct messaging with Claire Stone (Moxy Management), when he subscribed to her account.

1281. Plaintiff R.M. justifiably relied on that representation by subscribing to Stone.

1282. Between 2020 and 2022,[213] OnlyFans falsely represented to Plaintiff N.Z. that he would be direct messaging with Breckie Hill (Moxy Management), Sara Underwood (Unruly), Nicky Gile (Unruly), Stefanie Gurzanski (Unruly), Sky Bri (A.S.H. Agency), and Kaitlin Trujillo (A.S.H. Agency), and McKinley Richardson (Creators Inc.), when he subscribed to those accounts.

1283. Plaintiff N.Z. justifiably relied on those representations by subscribing to those accounts.

---

[212] While Plaintiff N.Z. does not have the exact dates he subscribed to Stone's account, on information and belief the OnlyFans Defendants have that information.

[213] While Plaintiff N.Z. does not have the exact dates he subscribed to these accounts, on information and belief the OnlyFans Defendants have that information.

1284. As alleged Sections IV.H and IV.I, OnlyFans knew that the Creators would not be engaging one-on-one with Plaintiffs and Class Members, but that many of the Creators were using Chatters to talk to their fans.

1285. OnlyFans Defendants made these representations to fraudulently induce Plaintiffs and Class Members to use the OnlyFans platform and services and increase the amount of Premium Content Fees they purchased, including processing payments made by Plaintiffs N.Z. and R.M.

1286. Plaintiffs N.Z. and R.M. and the Class were damaged by these false representations in an amount to be proven at trial.

1287. As a result of the OnlyFans Defendants' fraud, Plaintiffs and the Class were damaged in that they paid more for the services than they were worth at the time of use—and indeed, paid Premium Content Fees based on the promise of direct and authentic communication that they did not receive.

1288. Accordingly, OnlyFans Defendants are liable to Plaintiffs and the Class for damages in an amount to be proven at trial, for restitution, and, as a conscious wrongdoer, for disgorgement of all profits wrongfully obtained as a result of their wrongful conduct.

1289. The OnlyFans Defendants' acts and omissions were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and the representations that OnlyFans Defendants made to them, to enrich OnlyFans Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XVIII. DECEIT, IN VIOLATION OF CAL. CODE §§ 1709 & 1710**
**(Against OnlyFans Defendants on behalf of California Subclass)**

1290. California Civil Code § 1709 provides that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

1291. California Civil Code § 1710 defines "deceit" as (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or (4) a promise, made without any intention of performing it.

1292. The OnlyFans Defendants deceived Plaintiffs by making express statements that by subscribing to a Creator, Plaintiffs would be exclusively "direct messaging" with that Creator.

1293. California Civil Code §§ 1709 and 1710 define and prohibit deceitful practices. Deceit, as defined by these statutes, involves the willful misrepresentation or concealment of a material fact, with the intent to deceive or mislead another person, causing harm.

1294. The OnlyFans Defendants, through their actions as described in earlier claims, including in paragraph 1273–1283, *supra*, have willfully misrepresented and concealed material facts regarding the nature of the interactions on its platform, particularly the impersonation of Creators by third-party Chatters and the true source of the content sold. Such impersonations, which almost exclusively make up the communications occurring via direct messaging between Creators represented

by the Agency Defendants and their Fans, are not "direct messages." At best, the Chatters' messages are indirect and independent messages that are not confidential, not reviewed first (and in almost all cases, not at all) by the Creator, and the responses are not personal or authentic. Similarly, direct messages to the Creator from a Fan are not private or exclusively direct in the first instance, confidential, or handled by the Creator themself.

1295. These misrepresentations and concealments were made with the intent to deceive Plaintiffs and the Class and encourage them to engage with the platform and make purchases based on the misrepresented information.

1296. Plaintiffs and the Class relied on these misrepresentations and concealments to their detriment, resulting in financial and other damages.

1297. As a result of these deceitful practices, Plaintiffs and the Class have suffered harm and are entitled to compensatory damages, punitive damages, and any other relief deemed appropriate by the Court.

**COUNT XIX. VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*) (Against OnlyFans Defendants on behalf of California Subclass)**

1298. Cal. Bus. & Prof. Code § 17500 makes it unlawful for a company to induce the public to enter into an obligation related to personal property with a statement made in advertising, marketing, or publication, including any statement made on the internet, it knows is untrue or misleading, or with the exercise of reasonable care should know is untrue or misleading.

1299. The OnlyFans Defendants caused to be made or disseminated through California and the United States, through advertising, marketing, social media, product labels, and other publications, statements that were untrue or misleading,

and which were known, or which, if exercising reasonable care, would have been known to the OnlyFans Defendants, to be untrue and misleading to consumers, including to Plaintiffs and the Class.

1300. The OnlyFans Defendants violated Cal. Bus. & Prof. Code § 17500 because the misrepresentations that Plaintiffs and Class Members would be "direct messaging" with the Creators in a personal and authentic way were material and likely to deceive a reasonable consumer.

1301. The OnlyFans Defendants made the misrepresentations with the intent to induce consumers to use their platform and to pay additional amounts for Premium Content Fees.

1302. The OnlyFans Defendants made the misrepresentations knowing they were untrue, misleading, or without the exercise of reasonable care.

1303. California Plaintiffs and Class Members have suffered an injury in fact, including the loss of money or property, because of the OnlyFans Defendants' unfair, unlawful, and/or deceptive practices.

1304. In using OnlyFans, California Plaintiffs and Class Members relied on the OnlyFans Defendants' misrepresentations that they would be exclusively direct messaging with the Creators. OnlyFans made this representation every time a California Plaintiff or Class Member subscribed to a Creator. Had California Plaintiffs known this, they would not have used the platform and/or paid as much for the services.

1305. OnlyFans falsely advertised to Plaintiff R.M. that he would be direct messaging with Chyanne Burden (Moxy) on July 16, 2020, when he subscribed to her account.

1306. Plaintiff R.M. relied on that representation by subscribing to Burden.

1307. OnlyFans falsely advertised to Plaintiff R.M. that he would be direct messaging with Emily Elizabeth (Dysrpt) on October 7, 2022, when he subscribed to her account.

1308. Plaintiff R.M. relied on that representation by subscribing to Elizabeth.

1309. Between 2019 and 2023,[214] OnlyFans falsely represented to Plaintiff R.M. that he would be direct messaging with Claire Stone (Moxy Management), when he subscribed to her account.

1310. Plaintiff R.M. relied on that representation by subscribing to Stone.

1311. Between 2020 and 2022,[215] OnlyFans falsely advertised to Plaintiff N.Z. that he would be direct messaging with Breckie Hill (Moxy Management), Sara Underwood (Unruly), Nicky Gile (Unruly), Stefanie Gurzanski (Unruly), Sky Bri (A.S.H. Agency), and Kaitlin Trujillo (A.S.H. Agency), and McKinley Richardson (Creators Inc.), when he subscribed to those accounts.

1312. Plaintiff N.Z. relied on those representations by subscribing to those accounts.

1313. All the wrongful conduct alleged occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is ongoing, both in California and nationwide.

---

[214] While Plaintiff N.Z. does not have the exact dates he subscribed to Stone's account, on information and belief the OnlyFans Defendants have that information.

[215] While Plaintiff N.Z. does not have the exact dates he subscribed to these accounts, on information and belief the OnlyFans Defendants have that information.

1314. California Plaintiffs, individually and on behalf of the Class, request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs any money the OnlyFans Defendants acquired by false advertising, via restitution or disgorgement, and for any other just and proper relief.

**COUNT XX. VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, *ET SEQ*.) (Against All Defendants on behalf of California Subclass)**

1315. Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

1316. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*., proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

1317. Defendants are "persons" as defined by Cal. Bus. & Prof. Code § 17201.

***Unlawful Act***

1318. Defendants committed unlawful business practices in violation of the UCL, as follows:

a. The OnlyFans Defendants' conduct constitutes an unlawful business practice because they have violated: Deceit under California Civil Code § 1709 *et seq.*; and California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*

***Unfair Act***

1319. The OnlyFans Defendants' conduct constitutes an unfair business practice in, at a minimum, these ways:

a. By falsely promising to California Plaintiffs and the Class Members that they could and would direct message with the Creators;

b. By engaging in deceptive and misleading advertising to induce consumers to use their platform; and

c. By not enforcing their policies and terms of service regarding the confidentiality of communications or ensuring the Creators are engaging in direct communications with the Fans.

1320. As alleged in paragraphs 1304–1312 *supra*, OnlyFans made unfair representations to California Plaintiffs.

1321. The Agency Defendants' conduct constitutes an unfair business practice in, at a minimum, these ways:

a. By using Chatters to impersonate the Represented Creators; and

b. By using Chatters to facilitate the relationship to further the opportunity to collect (and solicit the purchase of) Premium Content Fees.

1322. Agency Defendants acted unfairly by using Chatters to solicit payments from Plaintiffs N.Z. and R.M. as previously alleged at paragraphs 458. 481, 622–626, and 641–643.

***Unfair, Deceptive, Untrue, or Misleading Advertising***

1323. As set forth in paragraphs 1304–1312, *supra*, OnlyFans Defendants falsely advertised that Fans could connect directly with the Creators, with the intent to induce consumers to use their platform.

1324. The OnlyFans Defendants knew, or should have known, that these representations were false because the majority, if not all, of the direct messages were not with Creators but Chatters.

1325. The OnlyFans Defendants' misrepresentations caused California Plaintiffs and Class Members to use the platform or pay more for its services. Absent those misrepresentations, Plaintiffs and Class Members would not have used the platform and/or paid as much for the services.

1326. All the wrongful conduct alleged occurred, and continues to occur, in the course of Defendants' business.

1327. California Plaintiffs and Class Members have suffered injury in fact, including lost money and undesirable service, as a result of Defendants' misrepresentations.

1328. Plaintiffs, individually and on behalf of the Class, request that this Court enter such orders or judgments as may be necessary to restore to California Plaintiffs and members of the Class via restitution or disgorgement, any monies Defendants acquired by unfair competition, as provided by Cal. Bus. & Prof. Code § 17203; and for such other relief as may be just and proper.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and for members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel and Plaintiffs as Class Representatives;

B. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint, including its representations that the OnlyFans platform provides "direct," "personal," or "authentic" communication with Creators—or any other language suggesting the same;

C. Costs, restitution, damages, and/or disgorgement, each in an amount to be determined;

D. Punitive damages;

E. Pre- and post-judgment interest on any amounts awarded;

F. Treble damages as provided by 18 U.S.C. § 1964(c);

G. Reasonable attorneys' fees and costs; and

H. Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

DATED: January 2, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By <u>/s/ *Robert B Carey*</u>

Robert B. Carey (*pro hac vice)*
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)

HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
leonarda@hbsslaw.com
michellak@hbsslaw.com

Christopher R. Pitoun (SBN 290235)
301 North Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Andrea R. Gold (*pro hac vice*)
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC 20006
Phone: (202) 973-0900
Facsimile: (202) 973-0950
Email: agold@tzlegal.com

Keith T. Vernon (*pro hac vice*)
TIMONEY KNOX LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Phone: (202) 349-9864
Facsimile: (215) 540-2643
Email: kvernon@timoneyknox.com

Andrew W. Knox (*pro hac vice*)
TIMONEY KNOX LLP
400 Maryland Ave.
Fort Washington, PA 19034
Phone: (215)540-2643
Facsimile: (215) 540-2643
Email: aknox@timoneyknox.com

Andrew C. Stone (*pro hac vice*)
Seth T. Goertz (*pro hac vice*)
DORSEY & WHITNEY LLP
2325 East Camelback Road, Suite 900
Phoenix, AZ 85016
Phone: (602) 735-2700
Facsimile: (602) 926-2471
Email: stone.andy@dorsey.com
goertz.seth@dorsey.com

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that all citations were checked and accurately reflect the propositions put forth which complies with this Court's Order entered on December 12, 2025 (ECF No. 207).

Dated: January 2, 2026

HAGENS BERMAN SOBOL SHAPIRO LLP
*/s/ Robert B. Carey*
Robert B. Carey