Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Robert B. Carey (*pro hac vice*)
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
leonarda@hbsslaw.com
michellak@hbsslaw.com

*Counsel for Plaintiffs*

*(Additional Counsel on Signature Page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC (d/b/a Siren Agency), MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC (d/b/a CREATORS INC.),

Defendants.

Case No. 8:24-cv-01655-FWS-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT MOXY MANAGEMENT'S MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

| | |
|---|---|
| Judge: | Hon. Fred W. Slaughter |
| Courtroom: | 10D |
| Date: | March 19, 2026 |
| Time: | 10:00 a.m. |

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. ARGUMENT .......... 1

A. Moxy's arguments—that the Non-California Plaintiffs' claims should be dismissed for forum non conveniens—fail to establish that that this is not the proper forum. .......... 1

1. Moxy is not a party to the TOS and was expressly excluded from asserting rights based on the TOS. .......... 2

2. There is no basis to apply the TOS to Moxy under the closely related doctrine. .......... 3

B. The SAC establishes colorable RICO and RICO conspiracy claims. .......... 6

1. Moxy distorts the RICO pleading framework. .......... 6

a. The RICO Enterprise begins with the creation of OnlyFans. .......... 7

b. The SAC properly pleaded a Content Fraud Enterprise. .......... 9

(1) The Content Fraud Enterprise only exists because of the clear structure between and among its members. .......... 9

c. The common purpose uniting the Content Fraud Enterprise is clear .......... 11

2. The SAC thoroughly outlines Moxy's role and its predicate acts. .......... 14

a. Moxy plays a vital role directing the Content Fraud Enterprise. .......... 17

b. Moxy is liable for the acts of its co-conspirators. .......... 18

c. The SAC appropriately alleges damages. .......... 19

C. Plaintiffs have alleged that Moxy violated the VPPA. ........................ 20

1. Moxy disclosed PII to Chatters. ............................................. 20

2. Moxy knowingly disclosed PII to the Chatters. ........................ 22

3. Moxy's disclosure of PII was not authorized under the ordinary course of business exception. ..................................... 23

D. Plaintiffs have alleged that Moxy violated the UCL. .......................... 24

III. CONCLUSION ........................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Actimmune*,
No. C08-02376 MHP,
2009 WL 3740648 (N.D. Cal. Nov. 6, 2009) .... 25

*Alaska v. Express Scripts, Inc.*,
774 F. Supp. 3d 1150 (D. Alaska 2025) .... 16

*Archer v. NBCUniversal Media, LLC*,
794 F. Supp. 3d 716 (C.D. Cal. 2025) .... 20, 21

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
571 U.S. 49 (2013) .... 2

*Bannon v. United States*,
156 U.S. 464 (1895) .... 18

*Boyle v. United States*,
556 U.S. 938 (2009) .... 7, 9, 10

*Bromlow v. D & M Carriers, LLC*,
438 F. Supp. 3d 1021 (N.D. Cal. 2020) .... 4

*Bryant v. Mattel, Inc.*,
573 F. Supp. 2d 1254 (C.D. Cal. 2007) .... 15

*Carey v. J.A.K.'s Puppies, Inc.*,
763 F. Supp. 3d 952 (C.D. Cal. 2025) .... 15, 19

*Carijano v. Occidental Petroleum Corp.*,
643 F.3d 1216 (9th Cir. 2011) .... 1

*In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*,
295 F. Supp. 3d 927 (N.D. Cal. 2018) .... 12

*Concha v. London*,
62 F.3d 1493 (9th Cir. 1995) .... 16

*Eclectic Properties E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .......... 9

*Glob. Master Int'l Group, Inc. v. Esmond Nat., Inc.*,
76 F.4th 1266 (9th Cir. 2023) .......... 19

*Howard v. America Online*, *Inc.*,
208 F.3d 741 (9th Cir. 2000) .......... 14

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... 21

*In re Hulu Priv. Litig.*,
No. C 11–03764 LB,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) .......... 22, 24

*In re Jamster Mktg. Litig.*,
2009 WL 1456632 (S.D. Cal. May 22, 2009) .......... 13

*LD v. United Behavioral Health*,
508 F. Supp. 3d 583 (N.D. Cal. 2020) .......... 12

*Manetti-Farrow, Inc. v. Gucci Am., Inc.*,
858 F.2d 509 (9th Cir. 1988) .......... 3, 4, 5

*Markels v. AARP*,
689 F. Supp. 3d 722 (N.D. Cal. 2023) .......... 24

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) .......... 23

*Moore v. Kayport Package Exp., Inc.*,
885 F.2d 531 (9th Cir. 1989) .......... 16

*Nguyen v. Elsevier Inc.*,
No. 25-CV-00825-NC,
2025 WL 2901059, at *4 (N.D. Cal. Oct. 7, 2025) .......... 22

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007) (en banc) .......... 6, 7, 11, 12

*Punian v. Gillette Co.*,
No. 14-CV-05028-LHK,
2016 WL 1029607 (N.D. Cal. Mar. 15, 2016) .......... 24

*RJ v. Cigna Health & Life Ins. Co.*, 625 F. Supp. 3d 951 (N.D. Cal. 2022) ........ 16

*Salinas v. United States*, 522 U.S. 52 (1997) ........ 14, 18

*Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618 (7th Cir. 2014) ........ 24

*United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015), *as amended on denial of reh'g* (July 8, 2016) ........ 12

*United States v. Friedman*, 445 F.2d 1076 (9th Cir. 1971) ........ 8, 9

*United States v. Milheiser*, 98 F.4th 935 (9th Cir. 2024) ........ 15

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) ........ 15

*United States v. Perry*, 550 F.2d 524 (9th Cir. 1977) ........ 7

*United States v. Stapleton*, 293 F.3d 1111 (9th Cir. 2002) ........ 15

*United States v. Thomas*, 586 F.2d 123 (9th Cir. 1978) ........ 7

*Velaro, Inc. v. National Flood Services, LLC*, No. CV 20-5078-DMG (PDX), 2021 WL 8779924 (C.D. Cal. July 7, 2021) ........ 3, 4, 5

*Walter v. Drayson*, 538 F.3d 1244 (9th Cir. 2008) ........ 6

*In re WellPoint, Inc. Out of Network UCR Rates Litigation*, 805 F. Supp. 2d 1002 (C.D. Cal. 2011) ........ 12

**Statutes**

18 U.S.C. § 1343 ........ 15

18 U.S.C. § 1961 .......... 7

18 U.S.C. § 1962 .......... 6, 14

18 U.S.C. § 2710 .......... 20, 21, 23

**Rules**

Fed. R. Civ. P. 9 .......... 16, 25

## I. INTRODUCTION

Defendant Moxy Management ("Moxy") moves to dismiss (Dkt. 228) the Second Amended Complaint ("SAC") (Dkt. 221). Plaintiffs' allegations center on Moxy's unlawful conduct in operating the Chatter Scams.[1] Plaintiffs were Fans on the OnlyFans platform who subscribed to Creators managed by Moxy. Plaintiffs believed they were talking to those Creators. Instead, Moxy was running those accounts and using Chatters whose goal was to extract money from Plaintiffs while impersonating the Creators. Despite this, Moxy argues the entire case against it should be dismissed. Rather than truly grapple with allegations added to the SAC or analyze the applicable legal authority, Moxy makes cursory and conclusory arguments about why the SAC should be dismissed. Moxy's motion should be denied.

## II. ARGUMENT

### A. Moxy's arguments—that the Non-California Plaintiffs' claims should be dismissed for forum non conveniens—fail to establish that that this is not the proper forum.

Moxy did not cite the standard of review because it is fatal to its argument. "[To] prevail on a motion to dismiss based upon forum non conveniens, a defendant bears the burden of demonstrating an adequate alternative forum and that the balance of private and public interest factors favors dismissal." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011). This standard is different if there is an enforceable forum selection clause between the parties. *E.g.*,

[1] Unless otherwise defined herein, Plaintiffs adopt and use the definitions and capitalized terms from the SAC. Plaintiffs also incorporate by reference their oppositions to Dkts. 225, 227, 229-32.

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62-63 (2013).

The Non-California Plaintiffs and Moxy did not enter into an agreement containing a forum clause, or any agreement whatsoever. The Fenix Defendants are not parties to the claims by the Non-California Plaintiffs and, as explained below, the TOS does not give any rights to Moxy, including the right to invoke the forum selection clause. Because there is no contractual forum selection clause between the parties, Moxy has the burden to show why claims against a California corporation by U.S. citizens for actions occurring in the U.S. must be litigated in the U.K. Because Moxy has not even attempted to meet this standard, its motion fails as a matter of law.

Moxy's attempt to invoke the forum selection clause also fails for two additional reasons.

**1. Moxy is not a party to the TOS and was expressly excluded from asserting rights based on the TOS.**

Moxy's argues that the OnlyFans forum selection clause applies to the Non-California Plaintiffs' claims against Moxy. In making this argument, Moxy does not claim ***it*** is a party to the TOS or a beneficiary. This is because Moxy's argument is contrary to the plain language in the TOU (contained within the TOS), which explicitly excludes Moxy, as a third party, from asserting rights based on the TOS. SAC ¶ 235 ("Your agreement with us does not give rights to any third parties"); *see also* Plaintiffs' Consolidated Response in Opposition to Certain Agency Defendants' Motions to Dismiss SAC ("Verge Opposition"), Section II.A. In short, the TOS between Plaintiffs and OnlyFans does not give any rights to Moxy. The only exception is if Moxy was considered a subsidiary, employee, owner,

representative, or agent of OnlyFans, which it is not. Verge Opposition, § II.A.2. There is no basis to apply the forum clause to Plaintiffs' claims against Moxy.

**2. There is no basis to apply the TOS to Moxy under the closely related doctrine.**

Rather than grappling with any substantive legal arguments or factual distinctions present in this case, Moxy relies entirely on the Court's order to argue the forum selection applies, citing the same two cases the Court cited. Dkt. 228 at 13-14 (citing Dkt. 209 at 30-31).[2] Respectfully, those cases do not support a finding that the forum selection clause applies here for four reasons:

**First**, the cases Moxy and the Court cite, *Velaro, Inc. v. National Flood Services, LLC*, No. CV 20-5078-DMG (PDX), 2021 WL 8779924, at *5 (C.D. Cal. July 7, 2021), and *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n. 5 (9th Cir. 1988), are inapposite because both involve sophisticated entities and their related corporations where at least one corporation executed, and was bound to, a contract containing a forum selection clause. Facts not present here.

In *Velaro*, the non-signatory was the parent corporation that purchased the company that had (1) negotiated and signed the agreement with the forum selection clause, (2) negotiated the renewal of the same contract, and (3) was the reason the contract at issue was breached. *Velaro*, 2021 WL 8779924, at *5. Under these circumstances, the Court found that the forum selection clause applied to the parent corporation. *Id.* (citing *Comerica Bank v. Whitehall Specialties, Inc.*, 352 F. Supp.

[2] Moxy also argues that Plaintiffs do not sufficiently amend the SAC to support an argument that the forum clause does not apply. This argument fails for two reasons. First, Plaintiffs provided additional allegations about the TOS and TOU. SAC ¶¶ 232, 235. But more importantly, the legal basis for the Court's ruling can and should be revisited.

2d 1077, 1082 n. 6 (C.D. Cal. 2004) (holding that corporate officials that did not sign a contract were bound by a forum selection clause in the contract because the corporation signed it and the officials were "closely related to the contractual relationship")).

Similarly, in *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988), the parties to the agreement were two sophisticated corporations who distributed and sold Gucci-branded luxury products, each of whom expressly negotiated and agreed to the forum selection clause. *Id.* at 514-515. The non-signatories subject to the forum selection clause were related "Gucci" corporations—including Gucci America who signed a Consent and Ratification Agreement, consenting to the terms of the contract—and executives of the Gucci conglomerate with obvious ties to Italy or located in Italy, the forum selected by the corporations. *Id.* at 510-511.

In contrast, Plaintiffs are ordinary consumers who agreed to an adhesion contract with an unrelated party that expressly excluded Moxy from the agreement and stated that the contract gives Moxy no rights. Unlike the plaintiffs in *Mannetti-Farrow* and *Velaro*, the Plaintiffs (1) never negotiated the forum selection clause, (2) did not breach the contract giving rise to the claims, (3) have no relationship with the chosen forum, and (4) the entity trying to enforce the clause is explicitly excluded from the entire agreement. The cases have no application here.

**Second**, the more reasoned application of the "closely related doctrine" set forth in *Mannetti-Farrow* and *Valero*, is that a forum selection clause may be enforced against a non-signatory when it is foreseeable that the non-signatory will be subject to the clause. *Bromlow v. D & M Carriers, LLC*, 438 F. Supp. 3d 1021,

1029 (N.D. Cal. 2020) (subjecting party to forum selection clause because it was foreseeable that clause would apply and claims would move to different forum). This has no application here, where Moxy seeks to enforce a forum selection clause from an unrelated company, that explicitly excludes it from the agreement, and any reasonable consumer—based on the agreement's plain language—would objectively believe that the clause would not apply to their claims against Moxy, a company they would not even know they are dealing with until they learn of the Chatter Scams.

**Third**, Plaintiffs are aware of no case law applying the closely related doctrine to contracts of adhesion in a consumer context where the party seeking to enforce the clause is excluded from the contract, nor does Moxy cite any such cases involving consumer adhesion contracts. Indeed, the cases relied on by *Manetti-Farrow* and *Valero* support Plaintiffs' position. *See*, *e.g.*, *Velaro*, at *5 (citing *TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.*, 915 F.2d 1351, 1354 (9th Cir. 1990) (applying forum selection clause to dispute between airlines and diamond mining company because airline was a third party beneficiary under the contract where Third Circuit law "has held that a forum selection clause can restrict a third-party beneficiary to the designated forum.")). Here, Moxy is not a third-party beneficiary to the agreement and is explicitly excluded under the agreement. The doctrine does not apply to the Non-California Plaintiffs' consumer claims.

**Fourth**, the "closely related doctrine," as applied to this case and any similar consumer case, would be anathema to public policy. If Moxy, a California corporation with its headquarters in California, is correct and the forum selection

clause applies, it would be immune from suit. No reasonable consumer can or would litigate these claims in the U.K. against Moxy, and the Court's acceptance of Moxy's argument would apply to all Non-California consumers. Moxy could run amok because it would be cost prohibitive and economically infeasible to litigate relatively low dollar claims in a foreign country, especially when the consumer never agreed to do so. Like Verge, there is no reason to believe that Moxy truly wants to litigate in the U.K. or apply U.K. law. The reality is that Moxy is trying to avoid litigation, not change forums.

**B. The SAC establishes colorable RICO and RICO conspiracy claims.**

Moxy challenges Plaintiffs' RICO claim on three broad grounds: (i) failure to plead a RICO conspiracy, (ii) lack of specific conduct attributable to Moxy, and (iii) failure to allege appropriate damages. On each issue, Moxy misses the mark—ignoring longstanding case law and the weight of the allegations that, by hiring, training, and directing an army of Chatters to impersonate Represented Creators, it has made itself a vital member of the Content Fraud Enterprise.

**1. Moxy distorts the RICO pleading framework.**

Pleading a RICO enterprise is not nearly as daunting as Moxy claims. To start, "'RICO is to be read broadly'" and "should 'be liberally construed to effectuate its remedial purposes.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc) (citation omitted. Indeed, the Ninth Circuit has repeatedly cautioned district courts to be "mindful of *Odom*'s enjoinder not to be stingy in interpreting and applying *RICO*." *Walter v. Drayson*, 538 F.3d 1244, 1247 (9th Cir. 2008). To plead a substantive RICO claim under 18 U.S.C. § 1962(c), Plaintiffs

must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Odom*, 486 F.3d at 547.

A RICO enterprise consists of "any union or group of individuals associated in fact … proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle v. United States,* 556 U.S. 938, 944-45 (2009) (internal quotations omitted); 18 U.S.C. § 1961(4). "Such a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods." *Boyle*, 556 U.S. at 948.

**a. The RICO Enterprise begins with the creation of OnlyFans.**

Moxy first challenges the existence of an enterprise by claiming that because the Content Fraud Enterprise began in 2016, before Moxy was formed, it cannot have ever existed—or included Moxy. This is wrong. The comments to the Ninth Circuit's Jury Instructions on Conspiracy conclusively dispel this notion: "A single conspiracy can be established even though it took place during a long period of time during which new members joined and old members dropped out." Conspiracy—Knowledge of and Association with other Conspirators, Section 8.23, Ninth Circuit Manual of Model Criminal Jury Instructions; *see also United States v. Perry*, 550 F.2d 524, 533 (9th Cir. 1977) (holding that the law of conspiracy does not require proof "that all of the defendants met together at the same time and ratified the illegal scheme"); *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978) (holding that proof that the defendant "knew he was plotting in concert with others to violate the law was sufficient to raise the necessary inference that he joined in the overall agreement").

The Content Fraud Enterprise is not tethered to Moxy's corporate formation, but to OnlyFans' lies regarding direct access to Creators. The SAC explains that the "OnlyFans Defendants have, continually since its inception, promised to every Fan on the OnlyFans platform that they will be able to 'direct message' with the Creators they subscribe to." SAC ¶ 578. Because OnlyFans was founded in 2016, and from its inception it was deceiving Fans regarding the nature of the interactions they would have on the platform, the enterprise appropriately dates to 2016. SAC ¶ 57.

That Moxy was formed in 2021 and joined in the Content Fraud Enterprise does not absolve Moxy or change the analysis. To rule otherwise would turn more than 150 years of conspiracy-related jurisprudence on its head: "One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators." Conspiracy—Elements, Section 8.20, Ninth Circuit Manual of Model Criminal Jury Instructions; *see also United States v. Friedman*, 445 F.2d 1076, 1080 (9th Cir. 1971) ("[O]ne can be a party to a conspiracy even though he does not know of the existence or identity of all his co-conspirators [or] participate in all of their acts.").

By joining in an ongoing conspiracy, and taking critical steps to further that conspiracy, Moxy cannot escape liability because it joined after its creation.

### b. The SAC properly pleaded a Content Fraud Enterprise.

As to the formal enterprise elements, Moxy argues that Plaintiffs failed to allege any "coordination" among the co-conspirators or that the enterprise had a common purpose. It is wrong on both. To start, there is no formal "coordination" element under 1962(c). The formal elements of a RICO enterprise require "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014); *Boyle,* 556 U.S. at 944-45 (A RICO enterprise consists of "any union or group of individuals associated in fact … proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.").

#### (1) The Content Fraud Enterprise only exists because of the clear structure between and among its members.

RICO's structural element is not nearly as rigid as Moxy portrays. It does not require Plaintiffs to identify, pre-discovery, communications between or among the Defendants, nor does it require Plaintiffs to allege that every member of a wide-ranging conspiracy knew every other member. *Friedman*, 455 F.2d at 1080.

To meet RICO's structural element, Plaintiffs must plead the existence of a "relationship[] among those associated with the enterprise." *Boyle*, 556 U.S. at 946. Neither a "hierarchy, role differentiation … [or] a chain of command" is required. *Id.* Indeed, courts have consistently found sufficient organization in loosely coordinated arrangements where participants work toward common goals.

The Supreme Court's decision in *Boyle* illustrates this low threshold. There, defendants participated in bank thefts through a group that was "loosely and informally organized," "[did] not appear to have had a leader or hierarchy," and did

not appear to ever formulate any long-term master plan or agreement. *Id.* at 941. Despite this informal structure, the Court found sufficient organization for RICO.

The same analysis applies here. The relationship between OnlyFans and the Agency Defendants evidences functional coordination and organizational structure:

- **OnlyFans' Platform**: Fenix provides the underlying ecosystem and network infrastructure, all while establishing credibility and promising "the authenticity of the personal interaction between Fans and Creators." (SAC ¶¶ 218-19).
- **The Agency Defendants' Operational Role**: Agency Defendants operationalize the scheme by employing, training, and directing Chatters to impersonate Creators, while also implementing sophisticated CRM platforms designed to scale the Chatter Scam.

The SAC identifies each level of coordination between Fenix and the Agency Defendants: OnlyFans affirmatively markets to Agency Defendants (SAC ¶¶ 313-317), OnlyFans produces TV content featuring Represented Creators (SAC ¶¶ 192-199), both Fenix and the Agency Defendants enable/utilize third-party CRM tools to scale the Chatter Scams (SAC ¶¶ 300-312), and Fenix deliberately refuses to enforce its own well-touted policies (SAC ¶¶ 300-335).

Moxy is a vital member of the scheme, directing activity across all levels of the enterprise:

- **Moxy directs Represented Creators**, requiring them to cede control of their OnlyFans' account (SAC ¶ 375). Moxy's Services Agreement requires models allow Moxy to handle all messaging: "[o]n a daily basis, [Moxy] will respond to messages on Paid Content Platforms on

behalf of [the Creator], and use its reasonable, good faith efforts to upsell the products and content Talent offers on Paid Content Platforms." SAC ¶ 374.

- **Moxy hires, trains, and directs Chatters**. As part of its management of Creator accounts, "Moxy provides Chatter services, employing Chatters to impersonate the Creator and communicate with Fans without the Fans' knowledge." SAC ¶ 371.
- **Moxy utilizes Chatters to deceive Fans on the OnlyFans Platform**. The SAC alleges that Plaintiff S.M. confronted several Moxy-represented Creators, regarding their use of Chatters, and each denied using Chatters and claimed to be directly messaging S.M. SAC ¶¶ 510-511.

#### c. The common purpose uniting the Content Fraud Enterprise is clear

Moxy also claims that Plaintiffs failed to substantiate the common purpose underlying the Content Fraud Enterprise beyond a single, conclusory allegation. Dkt. 228 at 18. Moxy's overly reductionistic reading of the SAC ignores the countless allegations setting out the Content Fraud Enterprise's common purpose.

The primary flaw in Moxy's argument is that it continues to conflate common purpose with specific evidence of coordination, such as communications or evidence that every conspirator knew every other co-conspirator. But that is not what common purpose requires. Rather, "an associated-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Odom*, 486 F.3d at 552 (quoting *United States v. Turkette*, 452 U.S. 576,

583 (1981)). The common purpose requirement may be met so long as the defendants were "each aware of the essential nature and scope of [the] enterprise and intended to participate in it." *United States v. Christensen*, 828 F.3d 763, 781 (9th Cir. 2015), *as amended on denial of reh'g* (July 8, 2016).

Courts consistently recognize a common purpose in schemes like this where defendants collaborate to deceive customers for financial gain.[3] In *Odom*, the plaintiff alleged that Microsoft and Best Buy had the common purpose to increase the number of people using Microsoft's Internet Service by fraudulent means, which Best Buy furthered by distributing Microsoft Internet Trial CD's and conveying its customers' debit and credit card information to Microsoft. *See Odom*, 486 F.3d at 552. Microsoft then used the information to activate customer accounts. *Id.*

In denying the defendants' motion to dismiss, the Ninth Circuit confirmed that a coordinated effort to defraud satisfies the common purpose requirement: "[t]hese allegations are more than adequate to establish, if true, that Microsoft and Best Buy had a common purpose of increasing the number of people using Microsoft's Internet service through fraudulent means." *Id.*

---

[3] *See LD v. United Behavioral Health*, 508 F. Supp. 3d 583, 602 (N.D. Cal. 2020) (common purpose sufficiently alleged where defendants conspired to keep the difference between artificially low amounts United reimbursed for certain claims and the amount that should have been reimbursed); *In re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, 295 F. Supp. 3d 927, 980 (N.D. Cal. 2018) (defendants shared common purpose of deceiving regulators into believing certain vehicles were compliant with emission standards); *In re WellPoint, Inc. Out of Network UCR Rates Litigation*, 805 F. Supp. 2d 1002, 1033 (C.D. Cal. 2011) (defendants manipulated database to reduce price paid for services and increase the profits of the enterprise).

Plaintiffs have also alleged that the Content Fraud Enterprise is doing far more than conducting "ordinary business activity;"[4] it is instead facilitating a deliberate effort to obtain subscriber fees through fraudulent means:

- The OnlyFans website promises "authentic" and "meaningful" engagement and its marketing deliberately promotes personal interaction as its core proposition. SAC ¶¶ 3, 14-15.
- Every Creator profile on the OnlyFans platform auto-generates the following, unmodifiable, tagline: "SUBSCRIBE AND GET THESE BENEFITS: Full access to this user's content; Direct message with this user." SAC ¶ 227-28.
- OnlyFans' Twitter/X account promotes the ability to directly message Creators, including posts from Creators touting one-to-one messaging. SAC ¶ 230.
- OnlyFans markets to Agencies and actively facilitates/allows the use of CRMs to enhance the Chatter Scams. SAC ¶¶ 313-16.
- The Fenix Defendants have engineered the OnlyFans website to allow Chatter Scams to proliferate, particularly through third-party CRM tools:
    - "OnlyFans actively maintains logs that would identify simultaneous message transmissions at volumes no individual could plausibly generate … it is unclear how the OnlyFans platform could maintain any semblance of integrity or network security without actively

[4] The law requires that Plaintiffs "set forth sufficient allegations to distinguish ordinary business conduct from fraudulent conduct." *In re Jamster Mktg. Litig.*, 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009); (Dkt. 209 at 19).

accounting for the Chatter Scams." SAC ¶¶ 311-12; *see also* SAC ¶¶ 300-312.

- **Moxy hires, trains, and directs the Chatters who animate the scheme**:
  - Moxy obtains full access to and control over each Creator's OnlyFans account, stipulating: "Talent has a duty to irrevocably grant to Company unfettered administrative access to [OnlyFans], for as long as Gross Earnings are generated." SAC ¶ 375.
  - Moxy requires its Creators to contractually agree to use Chatters: "On a daily basis, [Moxy] will respond to messages on Paid Content Platforms on behalf of [the Creator], and use its reasonable, good faith efforts to upsell the products and content Talent offers on Paid Content Platforms." SAC ¶ 790.

The SAC provides painstaking detail and abundant examples of the common purpose uniting the Content Fraud Enterprise.

**2. The SAC thoroughly outlines Moxy's role and its predicate acts.**

Moxy conflates the conduct and racketeering pattern elements when arguing that it "did not engage in any conduct in furtherance of the scheme." Dkt. 228 at 19. Moxy argues that it "did not give or take directions," and that Plaintiffs have not alleged that it committed any predicate acts.[5] Dkt. 228 at 19, 21. Moxy is wrong.

[5] Defendants generally ignore, and appear to concede, that a RICO conspiracy under 18 U.S.C. § 1962(d) does not require evidence of predicate acts, only "an agreement that is a substantive violation of RICO." *Howard v. America Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000); *accord Salinas v. United States,* 522 U.S. 52, 65 (1997).

As to predicate acts, Plaintiffs have alleged more than two instances of wire fraud under 18 U.S.C. § 1343—which occurs whenever interstate wire transmissions are used to execute a scheme to defraud, or to obtain money or property by fraud. 18 U.S.C. § 1343;[6] *see also United States v. Stapleton*, 293 F.3d 1111, 1116–17 (9th Cir. 2002) (each "defendant need not personally have mailed the letter or made the telephone call; the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen"); *Carey v. J.A.K.'s Puppies, Inc.*, 763 F. Supp. 3d 952, 983–84 (C.D. Cal. 2025) ("Plaintiffs must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation, and allege the role each defendant performed in the alleged fraudulent scheme involving U.S. mail and/or wire.") (internal quotations and citations omitted).

The SAC amply alleges when, where, and how Moxy utilized interstate wires to further the overarching Content Fraud Enterprise. For instance, several of Moxy's own represented creators told Plaintiff S.M. that they were the ones directly responding to messages without using Chatters. SAC ¶¶ 510-11. Similarly, "S.M. subscribed to Kaitlyn Krems (a Moxy-represented Creator) from 2023-2024. He

[6] Wire fraud (18 U.S.C. § 1343) requires the following elements: (1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deprive the victim of property. *Bryant v. Mattel, Inc.,* 573 F. Supp. 2d 1254, 1264 (C.D. Cal. 2007); *United States v. Miller*, 953 F.3d 1095, 1102-03 (9th Cir. 2020); *see also United States v. Milheiser*, 98 F.4th 935, 944 (9th Cir. 2024) (explaining that "the lie must instead go to the nature of the bargain … A misrepresentation will go to the nature of the bargain if it goes to … essential aspects of the transaction").

paid $100.00 to become a VIP subscriber and purchased additional content based on the belief that he was communicating directly with Krems." SAC ¶ 788(b). Moxy's additional use of social media to induce Fan subscriptions based upon the false promise of direct contact with Represented Creators are further acts of wire fraud. SAC ¶ 366; *see RJ v. Cigna Health & Life Ins. Co.*, 625 F. Supp. 3d 951, 963 (N.D. Cal. 2022) (finding "three [verification of benefits] calls" were sufficient predicate acts for RICO claim).

The SAC also makes clear that "[m]any of the precise dates of the fraudulent use of the interstate wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records." SAC ¶ 796. This is not surprising as Plaintiffs have no access to Moxy's internal messaging platform, the messages involving its Chatters, or its CRM platforms. Because there is no dispute that this information exists, the Ninth Circuit has repeatedly held that Rule 9(b) "may be relaxed as to matters within the opposing party's knowledge." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). "[I]n cases where fraud is alleged, we relax pleading requirements where the relevant facts are known only to the defendant." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995).[7]

[7] Moxy's repeated argument regarding the lack of communications between Defendants is also a red herring. Plaintiffs have no mechanism to obtain those communications prior to discovery. "An inability to describe the exact inner workings of the relationships between the enterprise members, without the benefit of discovery, is not dispositive at this stage." *Alaska v. Express Scripts, Inc.*, 774 F. Supp. 3d 1150, 1175 (D. Alaska 2025).

### a. Moxy plays a vital role directing the Content Fraud Enterprise.

Moxy's most surprising argument is that it "did not give or take directions from anyone." Dkt. 228 at 21. To be clear, *Moxy hires, trains, and directs Chatters*, the base elements for the entire scheme. SAC ¶¶ 748-49. Moxy also implements CRM platforms, which exist to scale the Chatter scams. SAC ¶ 752. This is no secret. Indeed, CRM platforms directly market to the Agency Defendants, who then contract with and implement the CRM platforms for each of their Creators:




***Figure** 7. Screenshot from Supercreator website.*




***Figure** 8. Screenshot from Supercreator website.*

SAC ¶ 289.

Finally, **Moxy directs its represented Creators**. There is no dispute

regarding the level of direction either, as Moxy's Services Agreement requires that its Creators have "a duty to irrevocably grant to Company unfettered administrative access to [OnlyFans], for as long as Gross Earnings are generated." SAC ¶ 375. Moxy gives direction at nearly every level of the conspiracy.

**b. Moxy is liable for the acts of its co-conspirators.**

Moxy's final coordination-related argument appears to concede that Plaintiffs have pleaded sufficient information as to Fenix's role in the scheme, but nevertheless claims that whatever wrongs Fenix has committed, those cannot be "imputed" to Moxy. For more than 100 years, American courts have *rejected this exact argument* "because it would erode the common-law principle that, so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators." *Salinas v. United States*, 522 U.S. 52, 64 (1997).

As early as 1895, the Supreme Court confirmed that "[t]o require an overt act to be proven against every member of the conspiracy, or a distinct act connecting him with the combination to be alleged … would render most prosecutions for the offense nugatory." *Bannon v. United States*, 156 U.S. 464, 469 (1895). Thus, "[i]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." *Salinas*, 522 U.S. at 64 (citing *United States v. Rabinowich*, 238 U.S. 78, 86 (1915) ("A person, [ ] may be liable for conspiracy even though he was incapable of committing the substantive offense.")).

As a member of the Content Fraud Enterprise, Moxy is liable for Fenix's acts in furtherance of the scheme.

**c. The SAC appropriately alleges damages.**

On damages, Moxy again misconstrues the SAC, arguing that Plaintiffs' damages are solely related to "lost expectation." Dkt. 228 at 22-23. But this is false. Plaintiffs allege that they paid Premium Content Fees that they would not have otherwise paid had they known they were speaking with a Chatter. The SAC alleges that "Plaintiff R.M. … would not have paid any Premium Content Fees—and certainly would not have paid as much—if he had known that he was communicating not with the Creators themselves, but with Chatters paid to impersonate the Creators." SAC ¶¶ 483, 458, 464-65, 482, 491, 498, 518-519, 535-536. This is about concrete loss due to Defendants' fraud.

Consistent with the SAC's allegations, RICO requires that plaintiffs allege "concrete financial loss" rather than "mere injury to a valuable intangible property interest." *Glob. Master Int'l Group, Inc. v. Esmond Nat., Inc.*, 76 F.4th 1266, 1274 (9th Cir. 2023). Courts also recognize "the overpayment of money is a tangible injury." *Id.* (citation omitted).

In *Carey v. J.A.K.'s Puppies, Inc.*, this district found that plaintiffs had properly alleged a concrete financial loss after purchasing puppies they didn't know were procured from a puppy mill. 763 F. Supp. 3d 952, 980-81 (C.D. Cal. 2025). Just like here, plaintiffs alleged "they would not have paid as much as they did," which the court found demonstrated a concrete, financial loss. *Id.* The same was sufficient in *Global Master International Group*, where the plaintiff claimed it overpaid for "fraudulently non-conforming supplements." 76 F.4th at 1274.

Here, the SAC alleges multiple categories of concrete financial losses directly resulting from Defendants' fraudulent scheme, including Premium Content

Fee overpayment and Subscription Fee overpayments. SAC ¶¶ 586, 597, 621, 655, 712. These fees were only obtained because Defendants misrepresented the fundamental nature of the Fans' ability to connect with Creators.

**C. Plaintiffs have alleged that Moxy violated the VPPA.**

The VPPA "requires a plaintiff to allege that '(1) a defendant is a video tape service provider; (2) the defendant disclosed personally identifiable information concerning any customer to any person; (3) the disclosure was made knowingly; and (4) the disclosure was not authorized by § 2710(b)(2).'" *Archer v. NBCUniversal Media, LLC*, 794 F. Supp. 3d 716, 720 (C.D. Cal. 2025) (quoting *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1063 (9th Cir. 2015)). This Court previously held that the Agency Defendants are video tape service providers.[8] Dkt. 209 at 33. Thus, Plaintiffs only need to allege that Moxy disclosed personally identifiable information ("PII") to a third party, the disclosure was made knowingly, and it was not authorized.

**1. Moxy disclosed PII to Chatters.**

Under the VPPA, PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). This has been interpreted to mean "information that would readily permit an ordinary person to identify an individual's video-watching behavior." *Archer*, 794 F. Supp. 3d at 720. Here, Plaintiffs allege that they provided their legal names and photos when direct messaging with the Creators. SAC ¶¶ 1198-1201. They also allege the personal

---

[8] Moxy notes that it contests this finding, but does not make any arguments to the contrary, and instead reserves its right to argue it at a later time.

information they provided is linked to the content they requested and viewed. *Id.* ¶ 1202. And Plaintiffs who subscribed to Moxy-managed Creators allege that they requested and viewed videos, including paying for digital content and Premium Content Fees. *Id.* ¶¶ 209-213, 452, 458, 464, 467, 472-473, 481-482, 485, 489-491, 498, 501, 507, 518, 522, 527, 535, 622, 627, 639-641. Finally, Plaintiffs allege that unbeknownst to them, Moxy was employing Chatters who were direct messaging with Plaintiffs instead of the Creators. *Id.* ¶¶ 371-377, 1203. Thus, the disclosure of Plaintiffs' full names and photos while direct messaging with chatters, along with their requests for and viewing history, would permit chatters to identify their "video-watching behavior." *Archer*, 794 F. Supp. 3d. at 720.

Despite these robust allegations, Moxy argues that Plaintiffs' VPPA claim fails because Moxy never requested or collected PII, and Plaintiffs never alleged they requested or obtained videos from Moxy. Moxy provides no support for its claim that ***it*** must "collect" or "request" PII. The VPPA only requires that the information Moxy has "identifies a person as having requested or obtained specific video materials or services." 18 U.S.C. § 2710. As outlined above, Moxy is also incorrect that Plaintiffs fail to allege that they requested or obtained videos from Moxy. Moxy cites *In re Hulu Priv. Litig.*, but there "[t]he user's identity and that of the video material were transmitted separately." 86 F. Supp. 3d 1090, 1096 (N.D. Cal. 2015). Here, Plaintiffs allege that the disclosure of names and faces and the video viewing history all occurred within the direct messages with Creators and that communication history was all viewable by the Chatters. SAC ¶¶ 1197-1203. Plaintiffs further allege that their video viewing history was stored by OnlyFans and

accessible by Creators. *Id.* ¶ 1206. This is sufficient to connect the Plaintiffs' identities with their video viewing history.

**2. Moxy knowingly disclosed PII to the Chatters.**

Plaintiffs also allege that the disclosure was done knowingly. SAC ¶ 1208. This is supported by the allegations that Moxy specifically controls its Creators' accounts and uses Chatters to chat with and upsell content to Fans, including Plaintiffs. *Id.* ¶¶ 371-377. Additionally, the Chatter Scams are designed to solicit personal information from Fans and create a personal relationship to increase revenue from Premium Content Fees. *Id.* ¶¶ 271-275. Moxy gave Chatters access to the Creators' accounts and chat history where the PII was contained. This constitutes a "consciousness of transmitting the private information" satisfying the "knowingly" requirement of the VPPA. *In re Hulu Priv. Litig.*, No. C 11–03764 LB, 2014 WL 1724344, at *15 (N.D. Cal. Apr. 28, 2014). Moxy argues the disclosure had to "affirmatively and consciously [transmit] Plaintiffs' PII to another," citing *Nguyen v. Elsevier Inc.*, No. 25-CV-00825-NC, 2025 WL 2901059, at *4 (N.D. Cal. Oct. 7, 2025). Dkt. 228 at 27. That language does not appear in the case. Rather, the court found that the allegation that "the Intercom cookies and scripts Elsevier installed on Osmosis disclosed their names, email addresses, and the title of any video they watched in a single transmission to Intercom each time they watched a video . . . [was] sufficient at the pleading stage." *Nguyen*, 2025 WL 2901059, at *4. Plaintiffs' allegations that Moxy knowingly disclosed PII is sufficient at the pleading stage.

Moxy also argues that the disclosure was out of their control because it "was Plaintiffs' own disclosure to chatters 'in chats' that occurred after Moxy allegedly

had facilitated chatters' access to Creators' accounts." Dkt. 228 at 26. Moxy cites nothing to support its claim that it should escape liability because it granted the Chatters access to the chats before the disclosure occurred. And Moxy continued to allow Chatters to access Plaintiffs' chats and PII without their consent. Moxy cites *Mollett*, 795 F.3d at 1066, to argue that Plaintiffs' disclosure of PII is outside of Moxy's control. Dkt. 228 at 26. *Mollett* is distinguishable because the plaintiffs in that case knowingly shared their login with friends and family or stayed logged into their account on devices that could be viewed by friends and family. *Mollett*, 795 F.3d at 1063-64. Netflix could not be liable under the VPPA where the disclosure was out of Netflix's control and controlled by the subscriber. *Id.* at 1067. Here, Plaintiffs did not know they were talking to Chatters, did not knowingly share any personal information with Chatters, and Moxy controls the Chatters access to PII. Moxy's disclosure of PII to Chatters is squarely in Moxy's control.

**3. Moxy's disclosure of PII was not authorized under the ordinary course of business exception.**

Under the VPPA, a video service provider may disclose PII for certain enumerated reasons, including if it is in the ordinary course of business. 18 U.S.C. § 2710(b)(2)(E). "[T]he term 'ordinary course of business' means only debt collection activities, order fulfillment, request processing, and the transfer of ownership." 18 U.S.C. § 2710(a)(2). Moxy argues that because the chatters were selling products and fulfilling orders, that was done in the ordinary course of Moxy's business—specifically order fulfillment. But Moxy is not in the business of selling products. It is in the business of managing Creator accounts. SAC ¶¶ 362-69. But more importantly, Plaintiffs were purchasing content directly from the Creators using the OnlyFans platform. The Chatters are not required to fulfill

orders—rather they were there to deceive and upsell the Plaintiffs. And the Chatters were not merely filling orders, which would not require giving Chatters access to and allowing them to run the chats.

Moxy's cited case does not help its argument. In *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 625 (7th Cir. 2014), the plaintiff claimed that customer service was not part of a video rental company's "ordinary course of business." The court rejected that claims finding "Congress contemplated customer service as part and parcel of the ordinary rental experience." *Id.* Here, the Chatters are not part of the service OnlyFans or the Creators offer, and their function of defrauding Plaintiffs does not fall within the ordinary course of business exception. *See In re Hulu Priv. Litig.*, 2014 WL 1724344, at *7 (tracking users' activities was not part of order fulfillment or request processing); *Markels v. AARP*, 689 F. Supp. 3d 722, 729 (N.D. Cal. 2023) (no evidence that "marketing" fell under ordinary course of business exception).

**D. Plaintiffs have alleged that Moxy violated the UCL.**

Moxy argues that because Plaintiffs' RICO and VPPA claims fail, the UCL claim subsequently fails. Moxy's argument fails because RICO and VPPA are distinctly different from the UCL. Moxy misconstrues *Punian v. Gillette Co.*, which explains that the UCL may be analyzed with FAL and CLRA claims because the same standard governs all the statutes. *Punian*, No. 14-CV-05028-LHK, 2016 WL 1029607, at *5-6 (N.D. Cal. Mar. 15, 2016). The RICO and VPPA claims vary from the UCL claim because of the type of conduct prohibited by the statutes and the elements required to meet each claim. As explained in *Punian*, the FAL, CLRA, and fraudulent prong of the UCL all prohibit false or misleading representations. *Id.*

at *5. Conversely, RICO prohibits a person from engaging in a pattern of racketeering activity and the VPPA prohibits video tape service providers from knowingly disclosing a consumer's PII. As such, even if the RICO and VPPA are dismissed—they should not be—that would not dictate dismissal of the UCL claim, as the elements of such a claim are substantially different.

Further, Moxy cites *In re Actimmune Mktg. Litig.*, which dismissed the UCL unfair prong claim because it overlapped with plaintiffs' other claims of fraud. *In re Actimmune*, No. C08-02376 MHP, 2009 WL 3740648, at *14 (N.D. Cal. Nov. 6, 2009). However, in *In re Actimmune*, the other fraud claims failed under a Rule 9(b) analysis and so did their UCL claim. As set forth in Plaintiffs' Response in Opposition to Elite Creators LLC's Motion to Dismiss, Plaintiffs allege their UCL claim with sufficient particularity under Rule 9(b). As such, the UCL claim should not be dismissed.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant Moxy Management's Motion to Dismiss the Second Amended Complaint.

DATED: February 19, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ *Robert B. Carey*

Robert B. Carey (*pro hac vice)*
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900

Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
leonarda@hbsslaw.com
michellak@hbsslaw.com

Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Andrea R. Gold (*pro hac vice*)
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC 20006
Phone: (202) 973-0900
Facsimile: (202) 973-0950
Email: agold@tzlegal.com

Keith T. Vernon (*pro hac vice*)
TIMONEY KNOX LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Phone: (202) 349-9864
Facsimile: (215) 540-2643
Email: kvernon@timoneyknox.com

Andrew W. Knox (*pro hac vice*)
TIMONEY KNOX LLP
400 Maryland Ave.
Fort Washington, PA 19034
Phone: (215)540-2643
Facsimile: (215) 540-2643
Email: aknox@timoneyknox.com

Andrew C. Stone (*pro hac vice*)
Seth T. Goertz (*pro hac vice*)
DORSEY & WHITNEY LLP
2325 E Camelback Road, Suite 300
Phoenix, AZ 85016

Phone: (602) 735-2691
Facsimile: (602) 926-2471
Email: stone.andy@dorsey.com
goertz.seth@dorsey.com

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,688 words, which complies with the word limit of L.R. 11-6.1. The undersigned also certifies that all citations were checked and accurately reflect the propositions put forth which complies with this Court's Order entered on December 12, 2025 (ECF No. 207).

Dated: February 19, 2026

HAGENS BERMAN SOBOL SHAPIRO LLP

*/s/ Robert B. Carey*

Robert B. Carey