Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Robert B. Carey (*pro hac vice*)
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
leonarda@hbsslaw.com
michellak@hbsslaw.com

*Counsel for Plaintiffs*

*(Additional Counsel on Signature Page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC (d/b/a Siren Agency), MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC (d/b/a CREATORS INC.),

Defendants.

Case No. 8:24-cv-01655-FWS-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS FENIX INTERNATIONAL LIMITED'S AND FENIX INTERNET LLC'S MOTION TO DISMISS SECOND AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER AND PERSONAL JURISDICTION, FAILURE TO STATE A CLAIM, AND IMPROPER VENUE**

| | |
|---|---|
| Judge: | Hon. Fred W. Slaughter |
| Courtroom: | 10D |
| Date: | March 19, 2026 |
| Time: | 10:00 a.m. |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 1

A. The Court has specific personal jurisdiction over Fenix. ..... 1

1. Defendants meet the purposeful availment and purposeful direction tests. ..... 3

a. Purposeful Availment ..... 3

b. Purposeful Direction ..... 4

2. Plaintiffs' claims arise from and are related to Fenix's California contacts. ..... 5

3. Exercising jurisdiction is fair and reasonable. ..... 6

B. The Court has personal jurisdiction over Fenix Defendants under RICO. ..... 6

C. Section 230 does not immunize Defendants from their own statements and conduct. ..... 8

1. None of Plaintiffs' claims require content monitoring. ..... 9

D. The SAC establishes colorable RICO and RICO conspiracy claims. ..... 12

1. The SAC demonstrably outlines a racketeering enterprise. ..... 13

a. The common purpose uniting the Content Fraud Enterprise is clear. ..... 14

b. The Content Fraud Enterprise only exists because of the coordination among its members. ..... 15

2. The SAC overwhelmingly identifies predicate acts. ..... 16

E. Venue in this District is proper for R.M.'s claims. ..... 17

F. Plaintiffs have stated contract claims. ..... 18

G. Plaintiffs have alleged a VPPA claim. .......... 22

H. Plaintiffs have alleged claims for fraud and deceit. .......... 24

I. Plaintiffs have stated UCL and FAL claims. .......... 26

III. CONCLUSION .......... 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AirWair Int'l Ltd. v. Schultz*,
73 F.Supp.3d 1225 (N.D. Cal. 2014) .... 4

*AMC Tech., LLC v. Cisco Sys., Inc.*,
No. 11-CV-03403 PSG,
2012 WL 174949 (N.D. Cal. Jan. 20, 2012) .... 20

*Anthonis-Smith v. Lincoln Fin. Co.*,
No. CV 18-7463-MWF (ASX),
2019 WL 4137413 (C.D. Cal. Apr. 30, 2019) .... 17

*Balsam v. Tucows Inc.*,
627 F.3d 1158 (9th Cir. 2010) .... 22

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .... 8, 19

*Baumer v. Pachl*,
8 F.3d 1341 (9th Cir. 1993) .... 7

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
No. 17-CV-04570 (LAK) (KHP),
2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017) .... 19, 24

*Bias v. Wells Fargo*,
942 F. Supp. 2d 915 (N.D. Cal. 2013) .... 15, 16

*Boyle v. United States*,
556 U.S. 938 (2009) .... 13, 15

*Estate of Bride v. Yolo Technologies, Inc.*,
112 F.4th 1168 (9th Cir. 2024) .... 10, 11

*Briskin v. Shopify, Inc.*,
135 F.4th 739 (9th Cir. 2025) .... 3, 4, 6

*Calder v. Jones*,
465 U.S. 783 (1984) .... 4, 6

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) .......... 9, 10

*Cascade Yarns, Inc. v. Knitting Fever, Inc.*,
2011 WL 31862 (W.D. Wash. Jan. 3, 2011) .......... 8

*Depot, Inc. v. Caring for Montanans, Inc.*,
915 F.3d 643 (9th Cir. 2019) .......... 25

*Doe 1 v. Twitter, Inc.*,
148 F.4th 635 (9th Cir. 2025) .......... 10

*Doe v Deutsche Lufthansa*,
157 F.4th 1103 (9th Cir. 2025) .......... 3, 4

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) .......... 10

*Doe v. Walmart Inc.*,
No. 18-CV-02125-LHK,
2019 WL 499754 (N.D. Cal. Feb. 8, 2019) .......... 7

*Ebeid v. Facebook, Inc.*,
No. 18-CV-07030-PJH,
2019 WL 2059662 (N.D. Cal. May 9, 2019) .......... 21

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .......... 12, 13

*EPA Real Est. P'ship v. Kang*,
12 Cal. App. 4th 171 (1992) .......... 20

*GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, Nat. Ass'n*,
671 F.3d 1027 (9th Cir. 2012) .......... 22

*Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*,
972 F.3d 1101 (9th Cir. 2020) .......... 3

*Hernandez v. Balakian*,
480 F. Supp. 2d 1198 (E.D. Cal. 2007) .......... 7

*Hodes v. Van's Int'l Foods*,
No. CV0901530RGKFFMX,
2009 WL 10674101 (C.D. Cal. June 23, 2009) .......... 25

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) .......... 11

*Howard v. America Online, Inc.*,
208 F.3d 741 (9th Cir. 2000) .......... 13

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... 23, 24

*Impossible Foods Inc. v. Impossible X LLC*,
80 F.4th 1079 (9th Cir. 2023) .......... 4, 5

*In re Jamster Mktg. Litig.*,
No. 05CV0819 JM (CAB),
2009 WL 1456632 (S.D. Cal. May 22, 2009) .......... 14

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) .......... 25

*LD v. United Behavioral Health*,
508 F. Supp. 3d 583 (N.D. Cal. 2020) .......... 14

*Lewis v. Google LLC*,
461 F. Supp. 3d 938 (N.D. Cal. 2020) .......... 21

*Manderville v. PCG&S Group, Inc.*,
146 Cal. App. 4th 1486 (2007) .......... 17

*Markels v. AARP*,
689 F. Supp. 3d 722 (N.D. Cal. 2023) .......... 23, 24

*MJT Water Tech., LLC v. First Fed Bank*,
No. 8:24-CV-01002-FWS-KES,
2024 WL 5424411 (C.D. Cal. Oct. 28, 2024) .......... 17

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) .......... 23

*Moody v. Hot Topic, Inc.*,
No. EDCV 23-0447 JGB,
2023 WL 9511159 (C.D. Cal. Nov. 15, 2023) .................................................. 25

*Morton v. Twitter, Inc.*,
No. CV 20-10434-GW-JEMX,
2021 WL 1181753 (C.D. Cal. Feb. 19, 2021) ........................................... 10, 26

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007) ................................................................ 12, 13, 14

*Oki Semiconductor Co. v. Wells Fargo Nat'l Bank, Ass'n*,
298 F.3d 768 (9th Cir. 2002) .......................................................................... 7

*Paleo Certified, Inc. v. TBE Beverages, LLC*,
No. 23-CV-2296 TWR (MSB),
2023 WL 10407132 (S.D. Cal. Dec. 20, 2023) ................................................ 18

*Realnetworks, Inc. v. DVD Copy Control Ass'n*,
641 F. Supp. 2d 913 (N.D. Cal. 2009) ............................................................ 19

*Salinas v. United States*,
522 U.S. 52 (1997) ...................................................................................... 7, 13

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004) .......................................................................... 3

*Serrano Square LLC v. First Republic Bank*,
No. 2:23-CV-04298-RGK-MAA,
2024 WL 5162126 (C.D. Cal. Oct. 29, 2024) .................................................. 20

*SK Networks Co. Ltd. v. Bentley Forbes Holdings, LLC*,
No. CV1208997MMMSHX,
2013 WL 12131715 (C.D. Cal. Nov. 7, 2013) .................................................. 22

*Suski v. Coinbase, Inc.*,
55 F.4th 1227 (9th Cir. 2022) ........................................................................ 20

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) .......................................................................... 7

*Walter v. Drayson*,
538 F.3d 1244 (9th Cir. 2008) ........................................................................ 12

*Wasjutin v. Countrywide Bank N.A.*,
No. CV 15-09401-MWF-JC,
2016 WL 7443219 (C.D. Cal. June 8, 2016) .......... 21

*Yamashita v. LG Chem, Ltd.*,
62 F.4th 496 (9th Cir. 2023) .......... 5

*Yerkovich v. MCA, Inc.*,
11 F. Supp. 2d 1167 (C.D. Cal. 1997) .......... 24

**Statutes**

18 U.S.C. § 1961 .......... 13

18 U.S.C. § 1965 .......... 6, 8

18 U.S.C. § 2710 .......... 24

28 U.S.C. § 1391 .......... 17

47 U.S.C. § 230 .......... 8, 9, 10, 11

**Rules**

Fed. R. Civ. P. 9 .......... 24, 25

## I. INTRODUCTION

Fenix International Limited and Fenix Internet LLC (together "Fenix," "OnlyFans," or "Defendants")[1] move to dismiss Plaintiffs' Second Amended Complaint ("SAC"). Dkt. 225 (hereinafter "Mot."). This case is about OnlyFans' promise of direct, authentic messaging, while profiting from a massive impersonation scheme. Plaintiffs have amended the SAC to include the required elements for jurisdiction and identified how each claim is based on Fenix's affirmative conduct. Fenix's motion should be denied.

## II. ARGUMENT

### A. The Court has specific personal jurisdiction over Fenix.

Plaintiffs' jurisdictional facts tie Plaintiffs' claims of Fenix's false promises and Fenix actively taking part in the Chatter Scams directly to California. Fenix argues it can recruit California Creators, hire and place corporate officers in California, focus its advertising on California, decide to concoct and conceal false claims in California, and enter into and breach its contracts in California, but Plaintiffs cannot hale them into California courts because "[n]othing in Plaintiffs' claims arises from or has a close connection" with Plaintiffs' jurisdictional allegations. Mot. at 7. The allegations show Fenix's California contacts are inextricable from the harms Plaintiffs suffered.

To jumpstart OnlyFans in 2017, Fenix engaged California resident Bill Fox to target California-based adult film stars, as well as advertise for OnlyFans and promote the company. SAC ¶69-86. Fox was a "prominent figure in California's

---

[1] Plaintiffs adopt the definitions and terms from the SAC. Dkt. 221. Plaintiffs also incorporate by reference their responses to Dkts. 227-32.

porn industry" and OnlyFans relied on his connections to California's adult film industry to rapidly expand its Creator base. *Id.*

While residing in California, Amrapali "Ami" Gan was Fenix's Chief Marketing Office ("CMO") from September 2020 to September 2021. SAC ¶¶94-96. During Gan's tenure as CMO, OnlyFans' marketing anchored around direct and authentic connections, with great success and growth. *Id.* ¶¶61-65. Gan was promoted to CEO in December 2021, where she remained until July 2023, still while residing in California. Under Gan's tenure as CEO, OnlyFans continued promising direct connections while marketing in California, was aware of the Chatter Scams' existence, actively facilitated the Chatter Scams, recruited Agencies, and profited from the Chatter Scams through accommodations made to the OnlyFans platform. *Id.* ¶¶296, 300-312, 324-325, 328-329. During this time, Fenix was heavily marketing in California to grow its business, which experienced exponential growth, including through OFTV, a key marketing initiative. SAC ¶¶64, 139-150. OFTV, which remained a key marketing initiative after Gan's departure, was often filmed in and heavily relied on California Creators. *Id.* ¶¶151-200.

OnlyFans' contacts in California continue today with OnlyFans targeting California celebrities and comedians, contracting with tens of thousands of California Creators, and establishing relationships with independent contractors and banking in California. SAC ¶¶87-93, 100-137.

To establish specific jurisdiction Plaintiffs must show: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully

avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."[2] *Briskin v. Shopify, Inc.*, 135 F.4th 739, 750-51 (9th Cir. 2025) (citation omitted).

**1. Defendants meet the purposeful availment and purposeful direction tests.**

**a. Purposeful Availment**

As outlined above, Defendants deliberately reached out to California, exploiting the market and running its business from California. Fenix's conduct satisfies the purposeful availment test, which asks whether a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (citation omitted). Courts assess a defendant's "entire course of dealing" with the forum—not merely the particular contract or incident giving rise to the claim. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1108 (9th Cir. 2020).

Defendants entered numerous contractual relationships in California, contracted with California Creators, ran the company and/or its marketing from California while promising direct connections and facilitating the Chatter Scams

[2] Since the Court considered this issue, the Ninth Circuit has emphasized that the first prong "may be satisfied by purposeful availment… by purposeful direction… *or* by some combination thereof." *Doe v Deutsche Lufthansa*, 157 F.4th 1103, 1111 (9th Cir. 2025).

being run by California Agencies, and marketed in and from California. *Supra* Section II.A. Plaintiffs' injuries arise out of, relate to, and were caused by Fenix's California-directed conduct and forum contacts.[3]

**b. Purposeful Direction**

Purposeful direction is governed by the "effects test" drawn from *Calder v. Jones*, 465 U.S. 783 (1984), asking whether the defendant: (1) committed an intentional act, (2) expressly aimed at the forum, and (3) caused harm that the defendant knew would be suffered in the forum. *Briskin*, 135 F.4th 739, 751. In-state conduct can satisfy the purposeful direction test ***even without meeting the third prong***. *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1090 (9th Cir. 2023).

Here, Fenix committed intentional acts expressly aimed at California—hiring Californian Gan to market for and run OnlyFans from California while focusing on OnlyFans' promise of a direct connection between Creators and Fans; engaging Fox as its key agent to recruit California adult film stars as Creators and expand its market; and executing a marketing campaign in California, including OFTV. Defendants' intentional acts were expressly aimed at California. Where a defendant "continuously and deliberately exploited the market of the forum state, that evinces conduct expressly aimed at the forum." *AirWair Int'l Ltd. v. Schultz*, 73 F.Supp.3d 1225, 1234 (N.D. Cal. 2014) (cleaned up).

Fenix knew these intentional actions, aimed at California, would cause the alleged harm in California. Fenix had constructive and actual knowledge of the

---

[3] Plaintiffs need not allege the harms are caused by Defendants' contacts with the forum to show purposeful availment. *Deutsche Lufthansa*, 157 F.4th at 1111.

Chatter Scams. Fenix knew of its extensive California user base, both Creators and Fans. Fenix furthered the Chatter Scams, which could not have occurred without Fenix's participation. Likewise, OnlyFans could not have grown to where Chatter Scams were feasible without Fenix's marketing efforts aimed at California to get established Creators to join and to market the promise of a "direct connection." Even contacts that predate the harm are still relevant to jurisdiction. *See, e.g.*, *Impossible Foods*, 80 F.4th at 1086 (overruling district court's finding that defendant's "contacts with California prior to [the parties' live dispute] were irrelevant to personal jurisdiction"). Fenix's in-state conduct supports finding purposeful direction even if they did not knowingly cause the harm. *Id.* at 1090. Fenix, moreover, knew about the false promises and the Chatter Scams, and it was likely that this conduct would harm California Fans.

**2. Plaintiffs' claims arise from and are related to Fenix's California contacts.**

Plaintiffs' claims arise from or relate to Defendants' forum contacts. Claims relate to a defendant's forum contacts "if similar injuries will tend to be caused by those contacts." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 505 (9th Cir. 2023). Claims arise from a defendant's forum contacts when those contacts are the "but for" cause. *Id.* at 504. Plaintiffs alleged sufficient facts to satisfy either test.

Plaintiffs' injuries relate to Fenix's California contacts. From OnlyFans' earliest days, Defendants knew attaining growth depended on its unique promise that Fans would receive direct, personal interaction with Creators. Gan, through marketing and running OnlyFans from California, continued to advertise and promise that direct connection, marketing efforts that both pre-dated her with Fox and continued after she left, through OFTV. Fenix's efforts to recruit California

Creators, including well-known porn stars and celebrities, while increasing profits and Fans, caused friction with the promise of a direct connection. Fenix eliminated this friction by facilitating the Chatter Scams and seemingly abandoning the lack of personal connection. The false authenticity promises this lawsuit challenges, and the proliferation of deceptive Chatter Scams, are precisely the types of harm caused by Fenix's California-based efforts to attract Creators and Fans to a promised direct connection.

Plaintiffs' continuing harms arise from Fenix's forum-related activities. The SAC sufficiently alleges that the contacts are the "but for" cause of the harms, demonstrated above in meeting the third prong of the *Calder* test. *See* Sections II.A and II.A.1.b, *supra*.

**3. Exercising jurisdiction is fair and reasonable.**

Plaintiffs have satisfied the first two prongs required for specific jurisdiction. Defendants now bear the burden of proving the Court's exercise of jurisdiction would be unreasonable. *Briskin*, 135 F.4th at 751. Defendants waived that argument by not raising it. Moreover, it is fair and reasonable given that California was the center of Fenix's relevant operations and a massive contributor to its Creator and revenue base.

**B. The Court has personal jurisdiction over Fenix Defendants under RICO.**

To establish personal jurisdiction under § 1965(b), a plaintiff must show (1) the Court has personal jurisdiction over at least one participant; (2) there is no other district in which a court will have personal jurisdiction over the alleged co-conspirators; and (3) the facts show a single nationwide RICO conspiracy exists.

*Doe v. Walmart Inc.*, No. 18-CV-02125-LHK, 2019 WL 499754, at *6 (N.D. Cal. Feb. 8, 2019).

To plead a single nationwide conspiracy, a plaintiff must allege facts showing that the "conspirator … intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas v. United States*, 522 U.S. 52, 65 (1997). Critically, the plaintiff need not show the conspirator agreed "to undertake all of the acts necessary for the crime's completion;" rather, "it suffices that he adopt the goal of furthering or facilitating the criminal endeavor," including "by agreeing to facilitate only some of the acts leading to the substantive offense." *Id.* Additionally, the plaintiff must show the defendant "was aware of the essential nature and scope of the enterprise and intended to participate in it." *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) (citation omitted).

It is not necessary that each conspirator know all the conspiracy's details, *Hernandez v. Balakian*, 480 F. Supp. 2d 1198, 1212 (E.D. Cal. 2007), or "be aware of the specific identity or activity of the other" co-conspirators. *United States v. Christensen*, 828 F.3d 763, 781 (9th Cir. 2015). The agreement "need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Nat'l Bank, Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002).

The SAC establishes a single conspiracy among all Defendants. The purpose is clear: to extract money from Fans by fraudulently misrepresenting the nature of the relationship between Fans and Creators. SAC ¶¶7, 14-19, 65, 201, 214-31, 255-339, 351, 358, 365-66, 371, 376-77, 383, 386, 392, 407, 413, 418, 421, 424, 427,

432, 436-37, 446, 450-51, 576-660. Indeed, "the core promise of its platform hinges on the **authenticity of the personal interaction between Fans and Creators**." SAC ¶218. As discussed *infra* (Section II.D), Fenix and the Agency Defendants' relationship demonstrates functional coordination and organizational structure operating through defined roles and interdependent relationships. *See Cascade Yarns, Inc. v. Knitting Fever, Inc.*, 2011 WL 31862, at *10 (W.D. Wash. Jan. 3, 2011) ("Taking these allegations as true, the Court can infer from the specific acts and relationships alleged … that an agreement existed between these parties.").

Plaintiffs established the requirements for § 1965(b) jurisdiction.

### C. Section 230 does not immunize Defendants from their own statements and conduct.

As this Court held, Defendants cannot rely on Section 230 of the Communications Decency Act ("CDA") to immunize themselves from liability. Section 230 states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Nothing has changed from the Court's prior Order. Nothing in Section 230 "declares a general immunity from liability deriving from third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009). The Ninth Circuit applies a three-pronged test: A defendant enjoys immunity only if it is "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Id.* at 1100-01.

Defendants' recycled arguments center on whether Plaintiffs' claims treat them as publishers or speakers of third-party content. Mot. at 8-10. Under that

prong, courts ask whether the duty defendant allegedly violated "derives from the defendant's status or conduct as a publisher or speaker." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 740 (9th Cir. 2024) (cleaned up).

Here, the duty Fenix violated is the requirement not to breach their contracts, and not to make deceptive misrepresentations and material omissions with their own marketing efforts. Put another away, the claims do not turn on whether Fenix published or withdrew third-party content from the OnlyFans website. Each of Plaintiffs' claims rest on the theory that Defendants knew about the Chatter Scams and then promoted the fraud for financial gain via, *inter alia*, their *own* public misrepresentations and their *own* unlawful conduct.

This is the same theory of liability Plaintiffs pled previously, and this Court held: "Plaintiffs' claims regarding Fenix Defendants' own representations are not barred under Section 230 … The court is not persuaded that Fenix Defendants' alleged role in the Chatter Scams hinges on a 'monitoring obligation' to exclude material, but rather focuses on Fenix Defendants' fulfillment of the alleged promises and representations." Dkt. 209 at 17. Nothing has changed.

**1. None of Plaintiffs' claims require content monitoring.**

Defendants slightly reframe the same Section 230 arguments this Court largely rejected. They are no more persuasive this time around; arguing the CDA bars all Plaintiffs' liability theories because each is founded on the OnlyFans platform's facilitation of communications between Fans and Creator accounts. Mot. at 9. Not so. Citing *Calise*, 103 F.4th at 742, Defendants assert a claim treats a platform as a publisher if the alleged legal duty "'obliges [it] to monitor third-party content—or else face liability.'" Mot. at 8.

Yet, *Calise* does not support the wide-ranging proposition that Fenix suggests. *Calise* held: "it is not enough that a claim, including its underlying facts, stems from third-party content for § 230 immunity to apply." 103 F.4th at 742. And it rejected that Section 230 applies whenever a legal duty requires a platform to "consider the content posted." *Id.* Indeed, *Calise* held such a rule "runs up against our precedent." *Id.* The Ninth Circuit discussed content "monitoring" only insofar as it was tied to publishing activity, not content monitoring of any sort in any context. *Id.* at 743-46.

*Estate of Bride v. Yolo Technologies, Inc.*, 112 F.4th 1168 (9th Cir. 2024) follows the same approach. Defendants cite *Yolo*,[4] but there, the court held that Section 230 did *not* bar a misrepresentation cause of action premised on the defendant's promise to "unmask and ban abusive users." *Id.* at 1178. Because the plaintiff challenged the defendant's representation, the legal duty did not arise from "failure to take certain moderation actions"—even if living up to its promise would necessarily involve monitoring third-party content. *Id.* Conversely, the court held that Section 230 prohibited product liability claims because each of those claims fundamentally "attempt[ed] to hold YOLO responsible for users' speech or YOLO's decision to publish it." *Id.* at 1180. Further, the court emphasized "this

[4] Defendants also cite *Doe v. Grindr Inc.*, 128 F.4th 1148 (9th Cir. 2025) and *Doe 1 v. Twitter, Inc.*, 148 F.4th 635 (9th Cir. 2025). The *Grindr* plaintiff alleged defective design and negligence related to the website's operation for third-party content posted on the website, which "necessarily implicate[d] Grindr's role as a publisher of third-party content." 128 F.4th at 1151. And the *Twitter* plaintiff brought distinct product liability claims of design defect challenging content-neutral search features and hash tags that third parties allegedly used to signal child pornography. 148 F.4th at 644-45.

does not mean immunity attaches anytime YOLO *could* respond to a legal duty by removing content." *Id.* at 1177 n.3. Instead, content monitoring and moderation "must be more than one option in YOLO's menu of possible responses; it must be the only option." *Id.*

Indeed, the Ninth Circuit has expressly rejected "the view that CDA immunity follows whenever a legal duty 'affects' how an internet company 'monitors' a website." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019). Section 230 extends only where a duty "necessarily require[s] an internet company to monitor third-party content" in the manner of a publisher. *Id.* It does not encompass situations where monitoring and removing third-party content would be the "best option 'from a business standpoint'" or even "the most practical … option." *Id.* at 683.

Applying the Ninth Circuit's rationale under these cases (not the cherry-picked excerpts Defendants cite), Plaintiffs' claims survive Fenix's Section 230 challenge. First, for the VPPA claim, Plaintiffs allege that Defendants *themselves* are selling and/or delivering audiovisual materials from Creators to Fans and from Fans to Creators. SAC ¶1205. Defendants knowingly operate and advertise their own "Vault" where they both store *and* employ sophisticated tools to organize videos for Creators to share with Fans. *Id*. ¶1206. Defendants operate the OnlyFans platform to disclose Plaintiffs' PII via identifying names and private photographs and videos, without consent, to Agencies and Chatters (rather than the intended Creators). *Id*. ¶1213.

Second, Plaintiffs' contract and misrepresentation-based claims do not implicate content monitoring as it relates to publishing activity. Defendants posit

that to avoid liability on these claims they would have to "'actively vet and evaluate' every single Creator message to Fans [to ensure the] alleged representations regarding that content were true." Mot. at 10. This argument is specious, as discussed in Section II.F, *infra*. As the Court already recognized, Fenix need only change their own conduct to comply with their contractual promises rather than monitor third-party content.

Finally, Fenix's arguments concerning Plaintiffs' RICO claims are easily rejected. Fenix ignores Plaintiffs' allegation that Fenix conspired to and conducted the challenged Enterprise by making false representations of direct messaging and by processing fraudulently obtained electronic payments from Fans. SAC ¶644. Fenix's liability under RICO arises from their false and misleading representations and their choice to process and profit from these transactions.

**D. The SAC establishes colorable RICO and RICO conspiracy claims.**

Defendants misconstrue the requirements for viable RICO claims under 1962(c) and (d). The Ninth Circuit and the Supreme Court have repeatedly instructed trial courts that "'RICO is to be read broadly'" and "liberally construed to effectuate its remedial purposes." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (citation omitted). Indeed, the Ninth Circuit has recognized the need to be "mindful of *Odom*'s enjoinder not to be stingy in interpreting and applying RICO." *Walter v. Drayson*, 538 F.3d 1244, 1247 (9th Cir. 2008).

RICO requires four elements: (1) conduct of (2) an enterprise affecting interstate commerce, (3) through a pattern (4) of racketeering activity. *Eclectic*

*Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).[5] Defendants only challenge Plaintiffs' RICO pleading on two grounds: (i) failure to plead a racketeering enterprise, and (ii) insufficient predicate acts. Mot. at 11-14. Defendants are wrong on each.

**1. The SAC demonstrably outlines a racketeering enterprise.**

A RICO enterprise is "any union or group of individuals associated in fact … proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle v. United States*, 556 U.S. 938, 944-45 (2009) (cleaned up); 18 U.S.C. § 1961(4).

In *Odom*, an *en banc* Ninth Circuit panel, clarified that the statutory definition of an enterprise under 18 U.S.C. § 1961(4) is "not very demanding" and "an associated-in-fact enterprise [ ] does not require any particular organizational structure, separate or otherwise." *Odom*, 486 F.3d at 548, 551. In short, Plaintiffs must plead that the Content Fraud Enterprise between Fenix and the Agency Defendants has "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Properties*, 751 F.3d at 997 (citation omitted).

Here, Fenix challenges the Enterprise based upon a lack of common purpose, and "coordination among the members," which is not a formal element.

[5] A conspiracy claim under 1962(d), needs only allegations of "an agreement that is a substantive violation of RICO." *Howard v. America Online*, *Inc.*, 208 F.3d 741, 751 (9th Cir. 2000); *see also Salinas*, 522 U.S. at 65. ("it suffices that he adopt the goal of furthering or facilitating the criminal endeavor").

**a. The common purpose uniting the Content Fraud Enterprise is clear.**

Fenix and the Agency Defendants are united in their scheme to extract money from Fans by fraudulently misrepresenting the relationship between Fans and Creators. Courts consistently recognize a common purpose in schemes where defendants collaborate to deceive customers for financial gain. *See LD v. United Behavioral Health*, 508 F. Supp. 3d 583, 602 (N.D. Cal. 2020) (common purpose sufficiently alleged where defendants conspired to keep reimbursement differential).

Fenix's primary argument—that the conduct alleged is merely the "day-to-day business activit[y] of running the OnlyFans website"—fails. Mot. at 11-12. It has never been the law that an enterprise can disguise blatant fraud as "ordinary business activity." The law requires plaintiffs to "set forth sufficient allegations to distinguish ordinary business conduct from fraudulent conduct." *In re Jamster Mktg. Litig.*, No. 05CV0819 JM (CAB), 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009); Dkt. 209 at 19.

This is where Fenix's avoidance of *Odom* is most conspicuous. In *Odom*, the Ninth Circuit denied the motion to dismiss confirming that a coordinated effort to defraud satisfies the common purpose requirement. 486 F.3d at 552. It found plaintiffs allegations were sufficient to establish that defendants "had a common purpose of increasing the number of people using Microsoft's Internet service through fraudulent means." *Id.*

Here, Plaintiffs have similarly alleged Fenix is doing far more than conducting "ordinary business activity." OnlyFans' success comes from its promise

of authentic and direct connections (SAC ¶¶12-18, 214-17); it is instead participating in a deliberate effort to obtain Premium Content Fees through fraudulent means. More specifically, OnlyFans promises "authentic" and "meaningful" engagement, direct messaging, and personal interaction as its core values. SAC ¶¶3, 14–15, 218-19, 227-28, 230. OnlyFans also markets to Agencies, actively allows the use of CRMs to enhance the Chatter Scams and engineered its website to allow the Chatter Scams to proliferate. SAC ¶¶300-316. The SAC provides painstaking detail and abundant examples of the common purpose uniting the Content Fraud Enterprise.

**b. The Content Fraud Enterprise only exists because of the coordination among its members.**

Fenix's final challenge to the enterprise requirement is that Plaintiffs "fail to allege any coordination between Fenix and the Agency Defendants." Mot. at 12. That is a dubious reading of the SAC and the law.

To meet RICO's structural element, Plaintiffs must plead the existence of a "relationship[] among those associated with the enterprise." *Boyle*, 556 U.S. at 946. Neither a "hierarchy, role differentiation . . . [or] a chain of command" is required. *Id.* (cleaned up). In *Boyle*, defendants participated in bank thefts through a group that was "loosely and informally organized," "did not appear to have had a leader or hierarchy," and did not appear to ever formulate any long-term master plan or agreement. *Id.* at 941.

Federal courts have likewise applied a flexible standard to complex multi-party arrangements. In *Bias v. Wells Fargo*, a district court found sufficient organization where Wells Fargo, certain "'property preservation' vendors," and real

estate brokers "associated together for the *common purpose* of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up fees for default-related services on borrowers' accounts." 942 F. Supp. 2d 915, 925 (N.D. Cal. 2013) (emphasis added). The key is coordinated effort to achieve a shared fraudulent objective.

The same analysis applies here. OnlyFans' relationship with the Agency Defendants evidences functional coordination and organizational structure through defined roles. Fenix provides the technological infrastructure and establishes credibility by promising "the authenticity of the personal interaction between Fans and Creators," and Agency Defendants operationalize the deception by directing Chatters to impersonate Creators, while also implementing sophisticated CRM platforms designed to scale the fraud.

The SAC identifies each level of coordination between Fenix and the Agency Defendants: OnlyFans' affirmatively markets to Agency Defendants, OnlyFans produces TV content featuring Represented Creators, both Fenix and the Agency Defendants enable/utilize third-party CRM tools, whose developers market the products to Agencies, to scale the Chatter Scams, and Fenix deliberately refuses to enforce its own well-touted policies. SAC ¶¶192-99, 300-35.

**2. The SAC overwhelmingly identifies predicate acts.**

The SAC outlines a coordinated scheme to defraud and alleges that Fenix committed *numerous* predicate acts, including deliberately misrepresenting the direct relationship Fans are told they will have with Creators on OnlyFans. The SAC identified 19 Twitter/X posts in which OnlyFans falsely promoted the one-to-one connection between Fans and Creators. SAC ¶230.

The SAC explained how Fenix is aware of and actively facilitates the conspiracy. Indeed, Fenix knows about and facilities the Agency Defendants' use of Chatters through its own network monitoring, Fan complaints, media exposés, and its financial relationship with Agencies. SAC ¶¶292, 300-39. According to its former CEO: "Everything on OnlyFans, we see it" and "we have no anonymity on the platform; we know who everyone is." SAC ¶301-02.

The SAC both identifies voluminous predicate acts committed by Fenix, *and* outlines Fenix's knowledge of, and participation in, the Content Fraud Enterprise.[6]

**E. Venue in this District is proper for R.M.'s claims.**

Venue is proper in this District for R.M.'s claims under 28 U.S.C. § 1391(b)(2), which requires that "a substantial part of the events" occur in the district. It "does not require that a majority of the events have occurred in the district where suit is filed, nor does it require that the events in that district predominate." *Anthonis-Smith v. Lincoln Fin. Co.*, No. CV 18-7463-MWF (ASX), 2019 WL 4137413, at *3 (C.D. Cal. Apr. 30, 2019) (citation omitted). Venue is proper "even if other material events occurred elsewhere." *MJT Water Tech., LLC v. First Fed Bank*, No. 8:24-CV-01002-FWS-KES, 2024 WL 5424411, at *5 (C.D. Cal. Oct. 28, 2024) (citation omitted).

R.M. subscribed to Creators managed by Moxy and Unruly. Both are headquartered in this District and controlled the Creators' accounts and devised and

[6] Fenix is not shielded by any "disclosures" in its TOS. Mot. at 13. "It is well-established in California that a party to a contract is precluded under section 1668 from contracting away his or her liability for fraud or deceit based on intentional misrepresentation." *Manderville v. PCG&S Group, Inc.*, 146 Cal. App. 4th 1486, 1500 (2007) (citing Cal. Civ. Code § 1668).

ran the Chatter Scams from their headquarters. SAC ¶¶362, 371-73, 393, 407-09, 467-68. Fenix argues that these allegations contradict paragraphs 4 and 267-79 of the SAC. There is no contradiction. The SAC alleges: The Chatters are hired by the Agencies (¶4), the Agencies operate the accounts (¶265), the Agencies contract with the Chatters (¶266), the Agencies send the Chatters the scripts (¶¶271-272), the Agencies collect the stock content from the Creators (¶274(a)), and the Agencies provide the Chatters with access to the Creators' accounts (¶274(b)). Nowhere in the SAC does it suggest that the Chatters act without "direct agency control and supervision," as Fenix suggests. Mot. at 4. That some of the conduct occurred elsewhere does not make venue improper when significant events occurred in this District.

Fenix also argues that R.M. does not plead specific, non-conclusory allegations, citing *Paleo Certified, Inc. v. TBE Beverages, LLC*, No. 23-CV-2296 TWR (MSB), 2023 WL 10407132, at *1 (S.D. Cal. Dec. 20, 2023). In *Paleo*, the plaintiff provided a single allegation to support that substantial events occurred in the district. *Id.* R.M. pleads significantly more—the allegations made "on information and belief" are supported by other allegations in the SAC as outlined above. *See* SAC ¶¶374-75, 411-12.

### F. Plaintiffs have stated contract claims.

Count XI is based on language in the TOU promising OnlyFans "will use reasonable care and skill in providing OnlyFans." SAC ¶1222. Fenix argues it escapes liability because that provision also disclaims any responsibility to moderate content, detect breaches of the TOS, or control users. Mot. at 17. But Plaintiffs do not claim that Fenix failed to moderate content or control users. Fenix breached the

TOU through its own affirmative acts: actively marketing to Agencies, and designing tools for the Chatters. SAC ¶¶313-317, 1223. Fenix disclaims any obligation to "detect breaches" of the TOS, but that does not mean it can actively take part in breaches of its own. SAC ¶¶292-312, 318-339, 1223.

Fenix misconstrues *Barnes*, which involved a promissory estoppel claim against Yahoo for promising it would remove fake profiles made by the plaintiff's ex-boyfriend. The court was not deciding whether the plaintiff has a viable contract claim but noted that "a general monitoring policy … does not suffice for contract liability." 570 F.3d at 1108. Here, Plaintiffs are not alleging Fenix must monitor content or detect breaches. Fenix's cited TOU provision does not disclaim liability for actively taking part in and ignoring the use of Chatters and breaches of the TOS.

Fenix argues the remaining claims are barred by the integration clause.[7] The integration clause, consistent with California law, does not bar enforcement of subsequent promises Fenix made to Fans. It states: "The [TOS] form the entire agreement between us and you regarding your access to and use of OnlyFans, and supersede any and all prior oral or written understandings or agreements between us and you." Dkt. 60-1 at 21-22. Count XII is not barred by the integration clause, because the promise to "direct message" was made *after* Plaintiffs agreed to the TOS. Fenix represented to the Court that "every user of OnlyFans has had to affirmatively agree to the Terms when creating a user account." Dkt. 60 at 3.

[7] Fenix and the Court cite the implied licenses provision (TOU ¶15(d)), as the integration clause. Courts uniformly interpret similar provisions as a reservation-of-rights designed to prevent users from claiming implied intellectual property licenses. *E.g.*, *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 924, 950 (N.D. Cal. 2009).

Plaintiffs could only subscribe to a Creator *after* they created an account. SAC ¶¶227-29. Plaintiffs' contracts with OnlyFans about direct messaging arose *after* the TOS applied.[8]

Under California law, "an integration clause would not supersede any agreements or statements made after a contract is executed." *Serrano Square LLC v. First Republic Bank*, No. 2:23-CV-04298-RGK-MAA, 2024 WL 5162126, at *3 n.3 (C.D. Cal. Oct. 29, 2024) (citing *In re Ins. Installment Fee Cases*, 211 Cal. App. 4th 1395, 1413-14 (2012)); *accord Suski v. Coinbase, Inc.*, 55 F.4th 1227, 1231 (9th Cir. 2022). The integration clause here could not bar Count XII, because that claim arose after the integrated contract was executed.

Importantly, while the Court found the integration clause barred Plaintiffs' previous claim (Dkt. 209 at 28), the cited cases involved promises that predated or were contemporaneous with the integration clause. *See EPA Real Est. P'ship v. Kang*, 12 Cal. App. 4th 171, 177 (1992) (integrated contract "superseded all prior understandings"); *AMC Tech., LLC v. Cisco Sys., Inc.*, No. 11-CV-03403 PSG, 2012 WL 174949, at *6 (N.D. Cal. Jan. 20, 2012) (integration clause precluded "prior or contemporaneous promises").

Fenix next argues the implied covenant claim fails because it imposes duties that the TOS disclaims. The implied covenant claim revolves around Fenix's promise that Fans can direct message, its recruitment of Agencies, tools it provides for the Chatter Scams, and its refusal to enforce the TOS. As already discussed, the direct messaging contract (SAC ¶1252(a)) is a subsequent agreement outside of the

---

[8] While all users re-accepted the TOS in 2021, that would not bar Count XII, as Plaintiffs subscribed to Creators after 2021. SAC ¶¶452, 467, 621, 642.

TOS. And Fenix does not identify any provision of the TOS that disclaims the remaining actions identified in the implied covenant claim, because none exist. *Id.* ¶1252(b)-(e). Instead, it argues that Plaintiffs are targeting obligations not contemplated by the TOS. The purpose of the covenant of good faith and fair dealing is "to prevent a contracting party from engaging in conduct which …frustrates the other party's rights [to] the benefits of the contract." *Wasjutin v. Countrywide Bank N.A.*, No. CV 15-09401-MWF-JC, 2016 WL 7443219, at *3 (C.D. Cal. June 8, 2016) (citation omitted). Plaintiffs only need show that Fenix failed or refused "to discharge contractual responsibilities, prompted ... by a conscious and deliberate act.'" *Ebeid v. Facebook, Inc.*, No. 18-CV-07030-PJH, 2019 WL 2059662, at *8 (N.D. Cal. May 9, 2019) (citation omitted). Plaintiffs target responsibilities contemplated by the TOS. The TOS promises to provide OnlyFans with reasonable care and skill, that all Users will comply with the TOS and AUP, and that OnlyFans will terminate accounts that do not comply with the TOS. SAC ¶¶233, 236, 239, 247-249; Dkt. 60-1 at 13-14 ¶8(b). Fenix's actions—soliciting Agencies, providing Chatter tools, and refusing to enforce the TOS—frustrate the purpose of the TOS.

Fenix also argues its actions were authorized by the TOS, but fails to identify what in the TOS authorized its actions. Fenix cites *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 962 (N.D. Cal. 2020), where the contract allowed YouTube to remove the plaintiff's hate speech. And in *Ebeid*, 2019 WL 2059662, at *8, the contract allowed Facebook to remove posts. Here, there are no such authorizations.

Last, Fenix argues Plaintiffs are not third-party beneficiaries of the Creator TOU because the Creator TOU and TOU disclaim third-party beneficiaries. The

Creator TOU does not disclaim third-party rights; it states the contract is between Fenix and Creators, not a third party. Mot. at 18. The purpose of that provision is to alert Creators that they still have "personal legal responsibility" if a third party assists with their account. The Creator TOU is designed to benefit the Fans because it requires Creators to be individuals and safeguard their accounts, and it promises that OnlyFans will use its best efforts to return funds to Fans when necessary. SAC ¶¶245-46. These promises do not just "incidentally benefit" the Fans but are "intended to benefit" the Fans. *GECCMC 2005-C1 Plummer St. Off. Ltd. P'ship v. JPMorgan Chase Bank, Nat. Ass'n*, 671 F.3d 1027, 1033 (9th Cir. 2012).

Fenix argues that the TOU, an entirely different contract, does not confer third-party rights. Plaintiffs are parties to the TOU so the third-party language cannot bar their claims. And Fenix's cited case establishes that "specific contractual provisions may control over a general clause." *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1161 (9th Cir. 2010); *accord SK Networks Co. Ltd. v. Bentley Forbes Holdings, LLC*, No. CV1208997MMMSHX, 2013 WL 12131715, at *21 (C.D. Cal. Nov. 7, 2013). Here, the specific promises in the Creator TOU that benefit Fans control.

### G. Plaintiffs have alleged a VPPA claim.

Fenix argues that the TOU absolves Fenix of VPPA liability because the Plaintiffs agreed their PII could be viewed by third parties. Nothing in the TOU states that PII shared by direct message with a Creator would be viewable by third parties. The TOU states a Fan's "Content" may be viewed by individuals that recognize their identity. Mot. at 14. But "Content" is defined as "any material uploaded to OnlyFans by any User," providing examples such as photos,

comments, and GIFs. Dkt. 60-1 at 10. Nothing in that definition indicates that a direct message with a Creator is "Content." Nor are direct messages "uploaded" to OnlyFans. Rather they are a private "fan interaction" as defined in "Fan/Creator Transaction." *Id.* at 11.

Fenix cites *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015), arguing Fenix is tangentially related to the disclosure of PII and Fenix must have "taken the affirmative act of disclosing" PII. Mot. at 15. But the phrase "taken the affirmative act of disclosing" does not appear anywhere in *Mollett* or the other cases Fenix cites. In *Mollett*, Netflix did not disclose video viewing history to third parties, rather it was the subscriber who shared their login with friends and family. *Id.* at 1063-64. Netflix was not liable where the disclosure was controlled by the subscriber. *Id.* at 1067. Here, Plaintiffs are not knowingly sharing information with third parties; Fenix controls what can be shared. SAC ¶1197. Fenix collects and stores the chats, affirmatively created tools to allow Chatters to access chats, and refuses to terminate accounts, despite its affirmative promise in the TOU to do so. *Id.* ¶¶239, 323-339, 1198.

Plaintiffs also allege that all Defendants knowingly disclosed Plaintiffs' PII without their consent. *Id.* ¶1208. Fenix points to two paragraphs where Plaintiffs allege that Fenix should have known about the Chatters. But Fenix ignores the allegations pleading direct knowledge of the Chatters. SAC ¶¶323-339. This is sufficient on a motion to dismiss. *See Markels v. AARP*, 689 F. Supp. 3d 722, 729 (N.D. Cal. 2023) ("plaintiffs' allegations that defendant knowingly installed the Pixel and shared plaintiffs' information is adequate"). Fenix cites *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015), but that case was decided on

summary judgment. *Id.* at 1091; *see also Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017) (discussing *proving* a VPPA claim).

Last Fenix argues the ordinary course of business exception applies, which is defined as "only debt collection activities, order fulfillment, request processing, and the transfer of ownership." 18 U.S.C. § 2710. Fenix argues it can use third parties for order fulfillment or sending newsletters/updates. But Agencies and Chatters have nothing to do with order fulfillment and even if they were viewed as marketing OnlyFans's services, marketing does not fall withing that exception. *See Markels*, 689 F. Supp. 3d at 729 (no evidence "marketing" fell under exception).

**H. Plaintiffs have alleged claims for fraud and deceit.**

Fenix claims Plaintiffs' fraud and deceit claims fail because Fenix disclosed that Creators could use an agent. This fails for two reasons. First, this disclosure was never given to Plaintiffs. The Creator TOU includes the language that an agent may "assist[] you with the operation of your Creator account." SAC ¶245. But both the TOU and Fan TOU clearly state that the Creator TOU is not part of the contract between Fans and OnlyFans. *Id.* ¶¶237, 241-243. As such, it was never disclosed to Fans. *See Yerkovich v. MCA, Inc.*, 11 F. Supp. 2d 1167, 1177 n.18 (C.D. Cal. 1997) (exhibit that "was not part of the contract … cannot be used to contradict an express term" of contract). Second, nothing in that provision states that Creators can use third parties to impersonate them or that it supersedes OnlyFans' promise that a Fan is directly messaging with Creators.

Fenix argues the SAC does not meet the requirements of Rule 9(b). To satisfy Rule 9(b) "the complaint must include an account of the time, place, and

specific content of the false representations [and] the identities of the parties to the misrepresentations." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (cleaned up). Plaintiffs allege that Fenix promised they would be able to "direct message" with specific Creators, that the representation was false, the exact dates or approximate dates those representations were made and for which Creators, and Plaintiffs saw and relied on those representations.[9] SAC ¶¶1273-1285. In the cases Fenix cites, the plaintiffs did not allege that they saw and relied on specific statements. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009); *Moody v. Hot Topic, Inc.*, No. EDCV 23-0447 JGB (SPX), 2023 WL 9511159, at *7 (C.D. Cal. Nov. 15, 2023).

Fenix next argues that Plaintiffs "conclusory" allegations of "scienter and intent to defraud" fail, cherry picking two allegations from the SAC. Mot. at 19-20. But knowledge and intent may be alleged generally, Fed. R. Civ. P. 9(b), and Plaintiffs have generally alleged these elements: OnlyFans allows Chatters on the platform, advertises to Agencies, actively reviews platform traffic, facilitates tools for Chatters, ignores complaints about Chatters, and participates in and benefits from the Chatter Scams. SAC ¶¶292-339. And *Hodes v. Van's Int'l Foods*, No. CV0901530RGKFFMX, 2009 WL 10674101, at *3 (C.D. Cal. June 23, 2009) is inapplicable because there the defendant's "representation to its customers is different from the misrepresentation" Plaintiffs based their suit on.

---

[9] While Fenix claims the deceit claim was unchanged, it refers to the amended allegations made in the fraud claim because they are based on the same conduct. SAC ¶1294.

Last, Fenix argues that Plaintiffs' fraud claims are based on "vague and subjective statements," citing the "authentic relationships" allegations. Mot. at 20. But Plaintiffs claims are based on the "direct message" misrepresentation, which Fenix does not argue is vague or nonspecific.

**I. Plaintiffs have stated UCL and FAL claims.**

Fenix cites *Morton v. Twitter, Inc.*, No. CV 20-10434-GW-JEMX, 2021 WL 1181753, at *5 (C.D. Cal. Feb. 19, 2021), to argue the UCL claim fails because Fenix is not obligated to ensure Creators are directly interacting with Fans. The *Morton* plaintiff alleged Twitter was responsible for Twitter users, although Twitter's terms of service disclaimed such responsibility. *Id.* Nor did the terms "impose[] a duty on Twitter to suspend offending accounts." *Id.* Here, Plaintiffs allege that Fenix is not only aware of and not enforcing breaches of the TOS, it actively makes false promises to Plaintiffs and refuses to suspend accounts as promised in the TOS. SAC ¶1318-19.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Fenix Defendants' Motion to Dismiss.

DATED: February 19, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ *Robert B. Carey*

Robert B. Carey (*pro hac vice)*
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900

Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
leonarda@hbsslaw.com
michellak@hbsslaw.com

Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Andrea R. Gold (*pro hac vice*)
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC 20006
Phone: (202) 973-0900
Facsimile: (202) 973-0950
Email: agold@tzlegal.com

Keith T. Vernon (*pro hac vice*)
TIMONEY KNOX LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Phone: (202) 349-9864
Facsimile: (215) 540-2643
Email: kvernon@timoneyknox.com

Andrew W. Knox (*pro hac vice*)
TIMONEY KNOX LLP
400 Maryland Ave.
Fort Washington, PA 19034
Phone: (215)540-2643
Facsimile: (215) 540-2643
Email: aknox@timoneyknox.com

Andrew C. Stone (*pro hac vice*)
Seth T. Goertz (*pro hac vice*)
DORSEY & WHITNEY LLP
2325 E Camelback Road, Suite 300
Phoenix, AZ 85016

Phone: (602) 735-2691
Facsimile: (602) 926-2471
Email: stone.andy@dorsey.com
goertz.seth@dorsey.com

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,978 words, which complies with the word limit of L.R. 11-6.1. The undersigned also certifies that all citations were checked and accurately reflect the propositions put forth which complies with this Court's Order entered on December 12, 2025 (Dkt. No. 207).

Dated: February 19, 2026

HAGENS BERMAN SOBOL SHAPIRO LLP
*/s/ Robert B. Carey*
Robert B. Carey