Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Robert B. Carey (*pro hac vice*)
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
leonarda@hbsslaw.com
michellak@hbsslaw.com

*Counsel for Plaintiffs*

*(Additional Counsel on Signature Page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

N.Z., R.M., B.L., S.M., and A.L., individually and on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FENIX INTERNATIONAL LIMITED, FENIX INTERNET LLC, BOSS BADDIES LLC (d/b/a Siren Agency), MOXY MANAGEMENT, UNRULY AGENCY LLC (also d/b/a DYSRPT AGENCY), BEHAVE AGENCY LLC, A.S.H. AGENCY, CONTENT X, INC., VERGE AGENCY, INC., AND ELITE CREATORS LLC (d/b/a CREATORS INC.),

Defendants.

Case No. 8:24-cv-01655-FWS-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS FENIX INTERNATIONAL LIMITED'S AND FENIX INTERNET LLC'S MOTION TO DISMISS COUNTS II AND III OF THE FOURTH AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

Judge: Hon. Fred W. Slaughter
Courtroom: 10D
Date: October 22, 2026
Time: 10:00 a.m.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1

II. ARGUMENT ........ 2

A. Fenix's arguments were previously considered and were either rejected or not adopted by this Court. ........ 2

B. Section 230 does not preclude Plaintiffs' breach of contract claims (Counts II and III). ........ 3

1. The Court has recognized §230's limited application. ........ 3

2. Plaintiffs' breach of contract claims do not seek to hold FIL liable for facilitating communications. ........ 4

3. FIL breached its contract with Plaintiffs through affirmative acts of design, construction, operation, and performance. ........ 8

4. FIL's promise to "use reasonable care and skill" is enforceable and separate from moderating content. ........ 13

C. The TOS supports Plaintiffs' allegations that FIL owed Fans a duty to use reasonable care and skill in providing OnlyFans. ........ 14

1. FIL's disclaimer argument relates to "Content," while Plaintiffs' claims allege a breach of FIL's service. ........ 14

2. FIL's contract interpretation contravenes California law and would read the promise to "use reasonable care and skill" out of the TOS entirely. ........ 15

3. FIL's interpretation is also contrary to California Civil Code § 1668. ........ 16

4. The TOU's discussion about "third parties" does not disclaim FIL's enforceable promises, but serves as a warning regarding liability. ........ 17

D. Plaintiffs state a valid claim for breach of the implied covenant of good faith and fair dealing. ........ 21

III. CONCLUSION ........ 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .......... 5, 8, 13

*Boghos v. Certain Underwriters at Lloyd's of London*,
36 Cal. 4th 495 (2005) .......... 15

*Bouck v. Meta Platforms, Inc.*,
No. 25-cv-05194-RS,
2026 WL 810036 (N.D. Cal. March 24, 2026) .......... 12

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) .......... 3, 5, 8

*Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*,
2 Cal. 4th 342 (1992) .......... 23, 24

*Doe 1 v. Meta Platforms, Inc.*,
174 F.4th 1159 (9th Cir. 2026) .......... 6, 7, 9

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025) .......... 11

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) .......... 7

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) .......... 11

*Ebeid v. Facebook, Inc.*,
No. 18-cv-07030-PJH,
2019 WL 2059662 (N.D. Cal. May 9, 2019) .......... 21

*Est. of Bride v. YOLO Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024) .......... 5

*Forrest v. Meta Platforms, Inc.*,
737 F. Supp. 3d 808 (N.D. Cal. 2024) .......... 12

*Hall v. YouTube, LLC*,
No. 24-cv-04071-WHO,
2025 WL 1482007 (N.D. Cal. May 5, 2025) .................................................... 20

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) .................................................................... 3, 4

*Karam v. Meta Platforms*,
No. 3:25-cv-01397-AMO,
2025 WL 3079048 (N.D. Cal. Nov. 4, 2025) .................................................. 20

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021) .................................................................. 8, 9

*LevelFields, Inc. v. Reddit, Inc.*,
No. 24-cv-02760-WHO,
2024 WL 5161951 (N.D. Cal. Dec. 17, 2024) ........................................... 20, 21

*Locke v. Warner Bros.*,
57 Cal. App. 4th 354 (1997) ........................................................................ 23

*Monaco v. Bear Stearns Residential Mortg. Corp.*,
554 F. Supp. 2d 1034 (C.D. Cal. 2008) ........................................................ 16

*Murphy v. LinkedIn Corp.*,
No. 25-CV-04036-EKL,
2026 WL 881710 (N.D. Cal. Mar. 30, 2026) ............................................ 13, 14

*Perdue v. Crocker National Bank*,
38 Cal. 3d 913 (1985) ................................................................................. 23

*Sifuentes v. Meta Platforms, Inc.*,
No. 25-cv-04479-JST,
2026 WL 1143542 (N.D. Cal. Apr. 28, 2026) ................................................ 20

*Suddeth v. Meta Platforms, Inc.*,
No. 25-cv-08581-RS,
2026 WL 810252 (N.D. Cal. Mar. 24, 2026) .................................................. 11

*The Manning Grp. LLC v. Neudesic LLC*,
No. 8:23-cv-01997-FWS-KES,
2024 WL 3543472 (C.D. Cal. May 14, 2024) .................................................. 23

*Wasjutin v. Countrywide Bank N.A.*, No. CV-15-09401-MWF-JC, 2016 WL 7443219 (C.D. Cal. June 8, 2016) .......... 22

*Williams v. Apple, Inc.*, 449 F. Supp. 3d 892 (N.D. Cal. 2020) .......... 2, 16

*Yerkovich v. MCA, Inc.*, 11 F. Supp. 2d 1167 (C.D. Cal. 1997) .......... 18

**Statutes**

47 U.S.C. § 230 .......... *passim*

Cal. Civ. Code § 1641 .......... 2, 15, 19

Cal. Civ. Code § 1643 .......... 17, 19

Cal. Civ. Code § 1654 .......... 16

Cal. Civil Code § 1668 .......... 16, 17

**Other Authorities**

Fed. R. Civ. P. 12 .......... 16

## I. INTRODUCTION

Fenix International Limited ("FIL") and Fenix Internet LLC (together "Fenix")[1] move to dismiss Plaintiffs' Fourth Amended Class Action Complaint ("4AC"). Dkt. 265 (hereinafter "Motion"). Fenix urges this Court to dismiss the two contract-based claims alleged against FIL,[2] based on arguments that this Court has previously considered and rejected or failed to adopt. Those arguments fare no better this time. Plaintiffs' remaining claims against FIL are not precluded by Section 230 of the Communications Decency Act or barred by the Terms of Service ("TOS"). Two threshold points frame the Motion. First, this Court has twice held that Section 230 does not immunize FIL from liability for its own promises, and has twice explained why: Plaintiffs' theory does not "hinge[] on a 'monitoring obligation' to exclude material," but on "Fenix Defendants' fulfillment of the alleged promises and representations." Dkt. 209 at 17; *accord* Dkt. 251 at 21-22. Fenix's Motion relitigates this holding. Second, the Court identified what was missing from the prior pleading—allegations of "how tools such as Fan spending analytics and inter-shift notes features enable, or were specifically designed for, the Chatter Scam," (Dkt. 251 at 31), and Plaintiffs supplied precisely that. The 4AC now pleads, with reference to specific tools and features, the affirmative acts of "design, construction, operation, and performance" FIL adopted to serve shift-working Chatters, acts that shaped the platform in ways that serve shift-working Chatters rather than a Creator personally messaging her own Fans. 4AC ¶¶ 600-04.

---

[1] Plaintiffs adopt the definitions and terms from the 4AC. Dkt. 262.

[2] Plaintiffs concede that Counts II and III are only alleged against FIL and that these counts can be dismissed as to Fenix Internet LLC.

The Motion's remaining arguments ask the Court to read its disclaimers about Content—a defined term meaning material users upload—to erase its separate, express promise to "use reasonable care and skill in providing OnlyFans," the platform itself. Yet, California law requires every part of a contract to be given effect, if reasonable, precluding FIL's approach. Cal. Civ. Code § 1641. At a minimum, Plaintiffs present competing reasonable constructions, which cannot be resolved on the pleadings. *Williams v. Apple, Inc*., 449 F. Supp. 3d 892, 909-10 (N.D. Cal. 2020). Plaintiffs' two remaining claims against FIL should proceed to discovery.

Fenix's Motion should be denied.

## II. ARGUMENT

### A. Fenix's arguments were previously considered and were either rejected or not adopted by this Court.

***Section 230***. In Fenix's previous motions to dismiss, they argued that §230 immunized Defendants from Plaintiffs' breach of contract claims. The Court considered this argument but ruled in Plaintiffs' favor. The Court found that Plaintiffs seek to hold FIL "accountable for a promise or representation, and not for failure to take certain moderation actions," which is a duty that is not protected by §230. Dkt. 251 at 22 (citing *Est. of Bride v. YOLO Techs., Inc.*, 112 F.4th 1168, 1178 (9th Cir. 2024)). The Court made clear that it was not "persuaded that such allegations seek to hold Fenix Defendants liable solely for facilitating communications but rather require Fenix Defendants to ensure the users are operating OnlyFans properly and that Fenix Defendants are acting on the simultaneous logins." Dkt. 251 at 21. Fenix's attempt to change the Court's mind

on this issue is still unpersuasive and has no new facts or legal authority supporting it.

Plaintiffs do not overstate the prior rulings. The Court dismissed contract theories resting on extra-contractual marketing promises (Dkt. 209 at 27-28) and on FIL's "permitting" the agencies to use Chatters (Dkt. 251 at 31). The 4AC pleads neither. It rests on an express term of the integrated TOS—the promise to "use reasonable care and skill in providing OnlyFans"—and on FIL's own affirmative conduct in designing and operating the platform. That is the theory the Court's Orders left open, and it is the only theory Plaintiffs press.

***Contractual Claims***. Defendants also re-raise their argument that OnlyFans' TOS did not require FIL to "use reasonable care and skill in providing OnlyFans" to the Fans. 4AC ¶ 599; Motion ("Mot.") at 16-18. FIL made this same argument in its previous motion to dismiss, which the Court did not adopt. Instead, the Court found Plaintiffs failed to "allege how tools such as Fan spending analytics and inter-shift notes features enable, or were specifically designed for, the Chatter Scam." Dkt. 251 at 31. The Court had good reason not to adopt FIL's disclaimer theory; for the reasons stated below, it fails on the merits.

## B. Section 230 does not preclude Plaintiffs' breach of contract claims (Counts II and III).

### 1. The Court has recognized §230's limited application.

The Ninth Circuit has found that §230 immunity is not limitless. *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 736 (9th Cir. 2024). "The text of the CDA is clear that neither this subsection nor any other declares a general immunity from liability deriving from third-party content." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) (citation omitted). "To provide broad

immunity every time a website uses data initially obtained from third parties would eviscerate the CDA." *Id.* (citation modified).

*HomeAway* also supplies the operative test. Rejecting the platforms' broad reading of Section 230, the Ninth Circuit held that "CDA immunity [does not] attach[] any time a legal duty might lead a company to respond with monitoring or other publication activities." 918 F.3d at 682. Instead, courts "look … to what the duty at issue actually requires: specifically, whether the duty would necessarily require an internet company to monitor third-party content." *Id*. That is the same question this Court has twice asked and twice answered in Plaintiffs' favor. Dkt. 251 at 21 ("The court is not persuaded that such allegations seek to hold Fenix Defendants liable solely for facilitating communications but rather require Fenix Defendants to ensure the users are operating OnlyFans properly and that Fenix Defendants are acting on the simultaneous logins."); *see also id.* at 22 (Plaintiffs' claims "not barred by Section 230 because the claims do not require Fenix Defendants to monitor third-party communications to avoid liability."); Dkt. 209 at 17 ("The Court is not persuaded that Fenix Defendants' alleged role in the Chatter Scams hinges on a 'monitoring obligation' to exclude material, but rather focuses on Fenix Defendants' fulfillment of the alleged promises and representations.").

**2. Plaintiffs' breach of contract claims do not seek to hold FIL liable for facilitating communications.**

As this Court made clear, the appropriate §230 analysis requires the Court "to consider each cause of action alleged to determine whether a plaintiff's *theory of liability* would treat a defendant as a publisher or speaker of third-party content." Dkt. 251 at 20 (citing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009)). Specifically, courts analyze the applicability of §230 by understanding the

legal "duty" of the defendant. *Calise,* 103 F.4th at 742. If the "duty" springs from "something separate from the defendant's status as a publisher, such as from an agreement, or from obligations the defendant has in a different capacity, then §230(c)(1) does not apply." *Id.* (citation modified); *see also Barnes*, 570 F.3d at 1107 ("Contract liability here would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication."). "Section 230 prohibits holding companies responsible for moderating or failing to moderate content. It does not immunize them from breaking their promises. Even if those promises regard content moderation, the promise itself is actionable separate from the moderation action, and that has been true at least since *Barnes*." *YOLO Techs., Inc.*, 112 F.4th at 1182.

Next, this Court must determine what the duty is requiring the defendant to do; if it requires the defendant to monitor third-party content—or else face liability—then that too is barred by §230. Dkt. 251 at 20; *Calise,* 103 F.4th at 742. Immunity does not attach anytime a defendant could respond to a legal duty by removing content, rather, "moderation must be more than one option in [defendant]'s menu of possible responses; it must be the only option." Dkt. 251 at 20 (citing *YOLO Techs.*, 112 F.4th at 1177, n.3).

When analyzing this issue in Fenix's previous motion to dismiss, the Court summarized Plaintiffs' allegations in the following manner: "Plaintiffs allege that Fenix International breached a contractual promise that it 'will use reasonable care and skill in providing OnlyFans' by collecting 'data sufficient to identify Chatter-operated accounts—including multiple simultaneous logins from disparate

geographic locations—and failed to act on this information.'" Dkt. 251 at 21. Based on those allegations, the Court held that the duty required of Fenix was not monitoring third-party content, rather it "require[d] Fenix Defendants to ensure the users are operating OnlyFans properly and that Fenix Defendants are acting on the simultaneous logins." *Id.* Nothing has changed in that analysis.

FIL attempts to get around the Court's ruling by citing *Doe 1 v. Meta Platforms, Inc.*, 174 F.4th 1159, 1168 (9th Cir. 2026). Mot. at 8. But that case is inapposite. That case, unlike this one, was "about the content of third-party posts." *Doe 1*, 174 F.4th at 1168. Specifically, plaintiffs—members of an ethnic minority population in Myanmar—brought a claim against Facebook for allowing hate speech to proliferate that led to real world violence. *Id.* at 1163. Plaintiffs alleged claims of strict products liability and negligence, which the trial court dismissed and the Ninth Circuit affirmed. *Id.* at 1164. Plaintiffs alleged that Facebook "did not do enough to screen and moderate content." *Id.* at 1167. But "asking a platform to monitor and review third-party content goes to Section 230's core." *Id.* (citation modified).

*Doe 1* does not help FIL. First, the sentence FIL quotes appears in the court's disposition of the plaintiffs' third alleged defect—Facebook's failure to permit reporting of problematic posts in Burmese—a pure failure-to-moderate theory that the panel also treated as forfeited. 174 F.4th at 1167 & n.4.

Indeed, the footnote appended to the very sentence FIL quotes supports Plaintiffs here. There the panel reaffirmed that "a [reporting infrastructure] claim alleging a duty that does not treat a defendant as a publisher is not barred by § 230, even if that legal duty 'might lead a company to respond with monitoring or other

publication activities.'" *Id*. at 1167 n.4 (citations omitted). That is precisely Plaintiffs' claim: a duty sourced in FIL's own promise, which does not treat FIL as a publisher, and which FIL could satisfy without deleting a single message.

Properly read, *Doe 1* confirms Plaintiffs' position. The panel expressly reaffirmed that "a products liability claim against a web platform can survive Section 230," and drew the line at content-mediation rather than at the label "design." *Id*. at 1168.

In its previous Order, the Court found Plaintiffs' claim deficient based on "Fenix Defendants permitting management agencies to use Chatters to impersonate Creators because this theory of liability imposes a monitoring obligation on Fenix Defendants." Dkt. 251 at 31. The Court rejected a theory of FIL *passively permitting* the use of agencies, which would require FIL to detect and act on third-party conduct. *Id.* The 4AC's allegations are different; they allege that FIL's *own affirmative commercial conduct*—soliciting the agency channel, building partner programs, running OnlyFans TV promotions of agency managed Creators, building payout/verification infrastructure for agencies—is what supports the breach. 4AC ¶¶ 601(a)-(b), 603. Those are FIL's acts, knowable without monitoring anyone.

The Ninth Circuit has drawn this line repeatedly outside the contract setting as well. In *Doe v. Internet Brands, Inc*., the court held that Section 230 did not bar a claim premised on the defendant's own duty because the plaintiff "does not seek to hold Internet Brands liable as a 'publisher or speaker' of content someone posted," nor did the claim require Internet Brands to remove any user content. 824 F.3d 846, 851 (9th Cir. 2016). The same is true here: no ruling for Plaintiffs would require

FIL to take down a single message. It would require FIL to answer for the platform it built and the agency channel it accommodated and actively courted.

Because the duty is contractual rather than editorial, Section 230 does not reach Count III for the same reasons it does not reach Count II. *Calise*, 103 F.4th at 736-42 (holding *Barnes* framework governs contract-related claims).

**3. FIL breached its contract with Plaintiffs through affirmative acts of design, construction, operation, and performance.**

Plaintiffs do not allege FIL breached the contract by failing to "screen and moderate," but, rather to "ensure the users are operating OnlyFans properly" and "acting on the simultaneous logins." Dkt. 251 at 21. Plaintiffs go further than before in explaining how FIL breached its promise through multiple "affirmative acts of design, construction, operation, and performance that facilitate the agencies' circumvention of the default one-user design." 4AC ¶ 601. Accordingly, the 4AC is more analogous to the complaint filed by plaintiffs in *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021).

In *Lemmon*, plaintiffs—parents whose kids died in a high-speed car accident—brought a lawsuit against Snap, a social media provider that operates Snapchat. *Id.* at 1087. Plaintiffs alleged Snap was liable for negligent design for permitting users to utilize a "speed filter" that allowed Snapchat users to "record their real-life speed." *Id.* at 1088. The trial court dismissed plaintiffs' claims as barred under §230. *Id.* The Ninth Circuit reversed finding that §230 immunity was unavailable because plaintiffs' claim did not seek to hold Snap responsible as a publisher or speaker, but merely "seek[s] to hold Snapchat liable for its own conduct, principally for *the creation* of the Speed Filter." *Id.* at 1093 (citation omitted). The *Lemmon* Court made clear that if the claim targets the website's

"design," then the claim does not fall within §230's ambit. *Lemmon*, 995 F.3d at 1092. "The duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content." *Id*.

The allegations in the 4AC are much closer to those raised in *Lemmon* as opposed to *Doe 1*. FIL fails in its attempts to reframe the 4AC's allegations as describing "moderation methods." Mot. at 9. The plain language in the complaint refutes this argument. First, the 4AC makes clear that FIL designed the website "for individual creators, not for agencies." 4AC ¶ 600. "A person can only be logged into one *OnlyFans* account at a time, and an *OnlyFans* account is limited to only one creator." *Id.* Second, the 4AC alleges four distinct breaches by FIL—none of which involve moderating third-party content. These include:

- Implementing an agency-accommodating payout/verification infrastructure that necessarily contemplates the inappropriate use of agencies;
- Engaging with Creator agencies for commercial gain, including targeting and marketing to the Creator agency channel, developing partner programs, producing OnlyFans TV promotions of agency-managed Creators, direct agency meetings and communications to build a stronger partnership;
- Collecting data sufficient to identify Chatter-operating accounts that were clearly bypassing the one-user protocols; and
- Building into the OnlyFans platform a suite of tools whose functional design has no plausible operational use for a Creator personally engaged with their own Fans in real time, and whose functional design instead

> serves the operational requirements of agency-employed Chatters operating Creator accounts in shifts.

4AC ¶ 601.

The 4AC also provided granular examples for how FIL both collected data to identify the Chatter-operating accounts and built a plethora of tools that only functioned to benefit the Chatters, rather than individual Creators. FIL attempts to counteract the effect of these allegations by arguing that the tools are actually "content-neutral and have obvious utility to all Creators." Mot. at 11. The 4AC's allegations, taken as true, foreclose that characterization.

As alleged, these facts support the design and implementation of the Chatter Scams. The ability to send a "mass message" through a design that conceals the broadcast nature from the recipient-Fan, is tailor made to co-exist with agency Chatters who are "logged into multiple *OnlyFans* creator accounts at the same time, which they can easily manage from an operational perspective." 4AC ¶ 601(d)(i); Dkt. 246-2 ¶ 25. Similarly, the per-Fan spending and behavior analytics allow Chatters working in different parts of the world to share the same information, which include granular intel about the particular Fan's spending habits and even when they get paid. 4AC ¶ 601(d)(ii); Dkt. 246-2 ¶¶ 27-28. This tool built by FIL permits the Chatters to try and "extract maximum financial benefits" from their interactions with Fans. *Id.* Finally, the per-Fan notes fields that are tied to each Fan profile allow the Creators to constantly record information documenting their Fan interactions, which provides the oxygen that "a team of five chatters working in shifts to provide 24/7 coverage" needs to thrive. 4AC ¶ 601(d)(iii); Dkt. 246-2 ¶¶

31. This tool helps fuel the Chatter Scams by allowing the agencies "to maintain consistent engagement with the substantial fan base." *Id.*

Fenix Defendants urge this Court to disregard Plaintiffs' well-pled allegations that cite to a United Kingdom High Court matter that outlined the Chatter Scams in great detail, because "FIL neither appeared nor provided any evidence" in the case. Mot. at 9, n.5. But such an inquiry into FIL's participation in the UK case is neither necessary nor appropriate at this stage. This Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." Dkt. 251 at 9 (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008)).

Finally, FIL improperly analogizes this matter to facts from inapposite cases where courts found the websites created "content-neutral" tools, which were then manipulated by third parties. Mot. at 12 (citing *Suddeth v. Meta Platforms, Inc.*, No. 25-cv-08581-RS, 2026 WL 810252, at *2-3 (N.D. Cal. Mar. 24, 2026); *Dyroff v. Ultimate Software Grp., Inc.,* 934 F.3d 1093 (9th Cir. 2019); *Doe v. Grindr Inc.*, 128 F.4th 1148 (9th Cir. 2025)). All three cases involve wholly distinct fact patterns where plaintiffs attempted to hold websites liable for monitoring third-party content—not allegations supporting an independent breach of contract by knowingly designing a website that supported violations to the TOS. *Suddeth,* 2026 WL 810252, at *1-2 (financial professionals sued Facebook for its alleged role in a fraudulent scheme involving Chinese penny stocks); *Dyroff*, 934 F.3d at 1095 (mother whose son died of a drug overdose sued website that permitted anonymous users to share first-person experiences that led to the son buying heroin); *Grindr*,

128 F.4th at 1152 (plaintiff, a 15-year-old boy, sued Grindr after he used the app to match with four adult men who raped him on consecutive days).

This case is much closer to several recent website scam lawsuits that were permitted to proceed notwithstanding §230. For example, in *Forrest v. Meta Platforms, Inc.,* a prominent businessman sued Facebook after his name and likeness had been used to endorse cryptocurrency and other fraudulent investment products. 737 F. Supp. 3d 808, 813 (N.D. Cal. 2024). In *Forrest*, the plaintiff alleged that Facebook offered "a suite of tools" that contributed to the fraudulent ads. *Id.* at 814. The trial court denied Facebook's motion to dismiss under §230 finding, "these allegations present a factual dispute regarding whether Meta's ad systems were neutral tools that anyone could use (or misuse) or whether the tools themselves contributed to the content of the ads, including to the aspects of the content that are allegedly illegal." *Id.* at 818 (citation modified).

In a similar example, class investors sued Facebook for its role in facilitating a pump-and-dump scheme. *Bouck v. Meta Platforms, Inc.*, No. 25-cv-05194-RS, 2026 WL 810036, at *1 (N.D. Cal. March 24, 2026). The court denied Meta's motion to dismiss premised on §230 because the complaint alleged that Facebook contributed materially to the ads by offering generative-AI tools that developed the ultimate content of the fraudulent ads. *Id.* at *3-4. Meta's role in that scheme, according to the complaint, went beyond offering neutral tools which precluded application of §230.

*Forrest* and *Bouck* are instructive. Both courts declined to dismiss at the pleading stage where the plaintiff alleged the defendant's tools were not merely neutral instruments manipulated by third parties but were designed or deployed in

ways that contributed to the challenged conduct. The 4AC alleges the same: through "affirmative acts of design, construction, operation, and performance" FIL breached its promise to provide a product with reasonable care and skill. 4AC ¶ 601. Plaintiffs' allegations are sufficient to defeat FIL's §230 arguments.

**4. FIL's promise to "use reasonable care and skill" is enforceable and separate from moderating content.**

FIL argues that its express promise to "use reasonable care and skill in providing OnlyFans" imposes no enforceable obligation at all. Mot. at 16-18. This argument is belied by the TOS (*see infra* § II(C)), and despite FIL's protestations, not supported by case law.

As an initial matter, Plaintiffs do not claim FIL breached its agreement by failing to monitor third-party content. *See, e.g.,* 4AC ¶ 606. FIL breached the TOU through its own affirmative acts: designing a website structured for a single-Creator, one-account operation (4AC ¶ 600), and imposing terms on all users that any use of third-parties to access OnlyFans accounts would violate the TOS (4AC ¶¶ 218-240), but then actively marketing to Agencies (4AC ¶¶ 299-303), and designing a suite of tools that only have value for Chatters (4AC ¶¶ 601-602). FIL misconstrues *Barnes*, which involved a promissory estoppel claim against Yahoo for promising it would remove fake profiles made by the plaintiff's ex-boyfriend. The court was not deciding whether the plaintiff has a viable contract claim but noted that "a general monitoring policy . . . does not suffice for contract liability." 570 F.3d at 1108. Here, the breach of contract claims are based on FIL's conduct in actively facilitating the use of Chatters and breaches of the TOS, not content moderation. FIL attempts to bolster its argument by relying on *Murphy v. LinkedIn Corp.*, No. 25-CV-04036-EKL, 2026 WL 881710 (N.D. Cal. Mar. 30,

2026). Mot. at 14-15. *Murphy* involved victims of a sophisticated fraudulent scheme attempting to hold LinkedIn liable because plaintiffs were first contacted by the fraudsters on defendant's website. 2026 WL 881710, at *1-2. Plaintiffs' claims were barred by §230 because they sought to "hold LinkedIn liable solely based on its general monitoring policy and aspirations to remove fraudulent users from its platform." *Id.* at *3. LinkedIn, however, did not create a website designed to limit an account to one user, make any sharing of login credentials by users violative of the company's terms of service, and then actively market to third parties to help run the users accounts and create a myriad of tools to support the third parties as they violated the website's agreement.

### C. The TOS supports Plaintiffs' allegations that FIL owed Fans a duty to use reasonable care and skill in providing OnlyFans.

FIL's argument that this claim is barred by the TOS falls short. FIL assembles a series of provisions addressed to a different subject—Content—and asks the Court to read them as canceling a promise about platform operation.

#### 1. FIL's disclaimer argument relates to "Content," while Plaintiffs' claims allege a breach of FIL's service.

FIL's lead argument is that the TOS disclaims any requirement that it has a duty to use reasonable care and skill due to other terms within the agreement. Mot. at 3-5, 12-18. This argument is wrong. Each allegation that FIL cites in its Motion relates to "content." *See, e.g.,* Mot. at 3 ("We do not authorize or approve ***Content*** on OnlyFans." "We do not grant you any rights in relation to ***Content***." "We are not responsible for reviewing or moderating ***Content***. . . . We are under no obligation to monitor ***Content*** or to detect breaches of the Terms of Service (including the Acceptable Use Policy)".) "Content" is defined in the TOU as "any material

uploaded to OnlyFans by any User (whether a Creator or a Fan), including any photos, videos, audio (for example music and other sounds), livestream material, data, text (such as comments and hashtags), metadata, images, interactive features, emojis, GIFs, memes, and any other material whatsoever." TOU ¶ 2(c) (Dkt. 60-1 at 10). Yet, Plaintiffs' allegations relate to FIL's breach of its promise to "use reasonable care and skill in providing OnlyFans to you." 4AC ¶ 219. "OnlyFans" is defined as the web platform. 4AC ¶ 220. Plaintiffs' theory concerns platform architecture, session and device controls, delegated-access design, payout/verification infrastructure, and FIL's own commercial dealings with agencies. 4AC ¶¶ 601-604. Not one carve-out mentioned in the Motion or the TOS applies. A disclaimer of responsibility for reviewing User ***Content*** does not disclaim the obligation to build and operate the web platform with care.

**2. FIL's contract interpretation contravenes California law and would read the promise to "use reasonable care and skill" out of the TOS entirely.**

If the Court were to accept FIL's argument, the disclaimer would swallow the promise it qualifies. California law does not permit this reading: "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641; *see also Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 503 (2005) (The effect of Cal. Civ. Code § 1641 is "to disfavor constructions of contractual provisions that would render other provisions surplusage."). The Court should resist FIL's attempt to render the "use reasonable care and skill" term meaningless.

At a minimum, FIL's argument raises an ambiguity with the contract's interpretation. A court may only resolve contractual claims on a motion to dismiss if the terms of the contract are unambiguous. *Monaco v. Bear Stearns Residential Mortg. Corp.*, 554 F. Supp. 2d 1034, 1040 (C.D. Cal. 2008). "A contract provision will be considered ambiguous when it is capable of two or more reasonable interpretations," and "where the language leaves doubt as to the parties' intent the motion to dismiss must be denied." *Id.* (citation modified); *see also Williams*, 449 F. Supp. 3d at 909-10 (when there are two reasonable interpretations of the contract, the court must deny the motion at the pleading stage). FIL's Motion does the opposite: it asks this Court to adopt a single construction of the TOS—reading the Content disclaimers to nullify the express promise to "use reasonable care and skill in providing OnlyFans"—and to dismiss on that basis. Plaintiffs present a competing, reasonable construction that gives independent effect to both provisions. Because the TOS is susceptible to more than one reasonable interpretation, making it ambiguous, the contract's meaning is a question of fact that cannot be resolved on a Rule 12(b)(6) motion. *See also* Cal. Civ. Code § 1654 ("In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.").

**3. FIL's interpretation is also contrary to California Civil Code § 1668.**

Plaintiffs allege that FIL knew agency Chatters were operating Creator accounts, built and marketed features that served them, collected the login and session data that identified them, and continued to display "direct message with this user" as a subscription benefit to Fans while taking a cut of every transaction. 4AC ¶¶ 213, 601-04, 613. A contractual provision read to exempt FIL from

responsibility for its own knowing participation in that conduct is void: "All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Cal. Civ. Code § 1668. The Court should not adopt an interpretation of the TOS that would make part of it unenforceable when there is an interpretation that would make the whole contract enforceable. *See* Cal. Civ. Code § 1643 (interpretation in favor of upholding contract).

**4. The TOU's discussion about "third parties" does not disclaim FIL's enforceable promises, but serves as a warning regarding liability.**

In the TOU, OnlyFans promises: "We will use reasonable care and skill in providing OnlyFans to you." 4AC ¶ 219. "OnlyFans" in this context means the website: www.onlyfans.com. *Id.* ¶ 220; TOU ¶ 2(a) (Dkt. 60-1 at 10). When Creators or Fans register with OnlyFans, they promise to maintain their "account/login details confidential and secure . . . [and] not disclose these to anyone else." *Id.* ¶ 222(e); TOU ¶ 7(e) (Dkt. 60-1 at 13). In addition, Fans and Creators agree that they are "responsible for all activity on [their] account even if, ***contrary to the Terms of Service***, someone else uses [their] account." *Id.* ¶ 222(f); TOU ¶ 7(f) (Dkt. 60-1 at 13) (emphasis added). These terms, which are part of the TOU and apply to "all Users," reflect FIL's own website design that created a single-Creator, one-account operation. *Id.* ¶¶ 218, 600; TOU ¶ 1(Dkt. 60-1 at 10). This design is also codified in FIL's own Standard Contract—which FIL drafts and imposes at every Fan/Creator Transaction—that reads: "The Creator is solely responsible for creating and uploading the Relevant Content." 4AC ¶ 600.

FIL next argues that its promise to use reasonable care and skill is not enforceable. Specifically, FIL argues that the terms prohibiting users from sharing their account/login details with anyone else is not actually an enforceable term, because in the Creator TOU, there is language that reads: "If you have an agent, agency, management company or other third party which assists you with the operation of your Creator account (or operates it on your behalf), this does not affect your personal legal responsibility. Our relationship is with you, and not with any third party, and you will be legally responsible for ensuring that all Content posted and all use of your account complies with the Terms of Service." Mot. at 4-5 (citing Creator TOU ¶ 7 (Dkt. 60-1 at 30)). But all this language provides is a warning to Creators that if they choose to breach the TOU by permitting someone else to use their account, they will remain liable to FIL for any violation of the TOS. It also is a term that does not apply to Fans. 4AC ¶ 228, Fan TOU ¶¶ 3-4 (Dkt. 60-1 at 24-25). As such, this term was never disclosed to Fans and does not disclaim the promises FIL made to them. *See Yerkovich v. MCA, Inc.*, 11 F. Supp. 2d 1167, 1177 n.18 (C.D. Cal. 1997) (exhibit that "was not part of the contract . . . cannot be used to contradict an express term" of contract).

More fundamentally, Creator TOU ¶ 7 defeats FIL's own argument. FIL reads ¶ 7 as a disclosure that third parties may operate Creator accounts. But the operative sentence FIL relies on—¶ 7(f)—describes that scenario in terms of breach: the user "is responsible for all activity on [their] account even if, contrary to the Terms of Service, someone else uses [their] account." TOU ¶ 7(f) (Dkt. 60-1 at 13). A clause that allocates responsibility for conduct it expressly labels "contrary to the Terms of Service" cannot simultaneously authorize that conduct. Read

together with TOU ¶ 7(e) (users must keep login details confidential and "not disclose these to anyone else") and AUP ¶ 1 ("do not … share your account … with anyone else"), the TOS says the opposite of what FIL claims: third-party account operation is a violation FIL prohibited — not a practice FIL disclosed. Dkt. 60-1 at 13, 39. *See* Cal. Civ. Code § 1641 ("whole of a contract is to be taken together, so as to give effect to every part"); *id.* § 1643 (contract to be interpreted to "make it lawful, operative, definite, reasonable, and capable of being carried into effect").

This point is clarified further by the language in the TOU. The final term in the TOU reads: "These Terms of Use for all Users govern your agreement with us. . . . If there is a conflict between Terms of Use for all Users and any of the terms or policies listed at section 17(a) to (h) above, ***the Terms of Use for all Users will apply to the extent of the conflict***." 4AC ¶¶ 223-24, TOU ¶ 17 (Dkt. 60-1 at 23-24) (emphasis added). The language in the Creator TOU cited by FIL as dispositive, accordingly, is nothing of the sort. The TOU's clear language is unambiguous that third parties are not permitted to access or assist Creators in running their accounts. The use of Chatters therefore runs afoul of the obligations FIL established for OnlyFans Users.

The TOS provides additional terms that support these facts. Specifically, the AUP, which "forms part of [all users] agreement with [OnlyFans]," provides: "**Do not** use OnlyFans except for your own personal use and do not sell, rent, transfer, or share your account or any Content obtained for your use of OnlyFans to or with anyone else." 4AC ¶ 233, AUP ¶ 1 (Dkt. 60-1 at 39) (emphasis in original). Further, the AUP makes clear that users cannot "post or cause to be posted any Content which is spam, ***which has the intention or effect of artificially increasing any***

***Creator's views or interactions, or which is otherwise inauthentic,*** repetitive, ***misleading*** or low quality." AUP ¶ 13 (Dkt. 60-1 at 42) (emphasis added). And: "**Do not** use any automated program, tool or process (such as web crawlers, robots, bots, spiders, and automated scripts) to access OnlyFans or any server, network or system associated with OnlyFans, or to extract, scrape, collect, harvest or gather Content or information from OnlyFans." AUP ¶ 20 (Dkt. 60-1 at 42) (emphasis in original).

The cases cited by FIL to buttress this argument fall short. Mot. at 16-17 (citing *Karam v. Meta Platforms*, No. 3:25-cv-01397-AMO, 2025 WL 3079048, at *3-4 (N.D. Cal. Nov. 4, 2025); *Sifuentes v. Meta Platforms, Inc.*, No. 25-cv-04479-JST, 2026 WL 1143542, at *8-9 (N.D. Cal. Apr. 28, 2026); *Hall v. YouTube, LLC*, No. 24-cv-04071-WHO, 2025 WL 1482007, at *1, 5 (N.D. Cal. May 5, 2025); *LevelFields, Inc. v. Reddit, Inc.,* No. 24-cv-02760-WHO, 2024 WL 5161951 (N.D. Cal. Dec. 17, 2024)). All these cases involve wholly distinguishable facts. In *Karam*, plaintiff sued Meta with a "core complaint . . . that Meta purportedly banned or restricted his Facebook account, which allegedly prevented him from advertising his business or from engaging with potential customers" on the website. 2025 WL 3079048, at *1. In *Sifuentes*, plaintiff brought an action against Meta alleging the company failed to notify him that his personal information had been compromised in a data breach. 2026 WL 1143542, at *1. In *Hall*, the plaintiff alleged that YouTube improperly removed his content and unfairly terminated his channel in breach of the terms of service. 2025 WL 1482007, at *1. Finally, in *LevelFields*, which FIL asserts is "instructive," plaintiff sued Reddit for breach of contract related to how Reddit charged for advertisements. 2024 WL 5161951, at

*2. The case depended entirely on the agreement's definition of "clicks," but the plain language of the agreement provided no support for plaintiff's "clicks" theory, which led to the dismissal. *Id.* at *2-4. The contract in *LevelFields* addressed the exact subject matter of the breach, while the disclaimers raised by FIL address a different subject (Content moderation) than the alleged breach (platform design and account-integrity architecture).

None of these cases support FIL's argument. Here, Plaintiffs have (1) documented an enforceable promise by FIL, (2) terms supporting that promise, and a (3) breach of that promise through affirmative acts of design, construction, operation, and performance. FIL's motion to dismiss Plaintiffs' breach of contract claim should be denied.

**D. Plaintiffs state a valid claim for breach of the implied covenant of good faith and fair dealing.**

Contrary to FIL's argument, Plaintiffs' covenant of good faith and fair dealing claim does not impose substantive duties beyond the contractual terms but alleges that FIL failed to discharge contractual responsibilities. *Ebeid v. Facebook, Inc.*, No. 18-cv-07030-PJH, 2019 WL 2059662, at *8 (N.D. Cal. May 9, 2019) (citation omitted) (articulating standard for breach of good faith and fair dealing). Plaintiffs seek to enforce FIL's obligation to exercise in good faith the contractual discretion FIL reserved for itself, in a manner consistent with the benefits of the agreements. 4AC ¶ 618.

In the 4AC, Plaintiffs outline the benefits supplied to Fans in their agreement with FIL. 4AC ¶ 615. These benefits include, (a) access to a platform delivered with reasonable care and skill (TOU ¶ 9); (b) the single-user-per-session, one-Creator-per-account architecture FIL designed, represented, and codified in the

TOS and Standard Contract; and (c) the contractual rules against sharing, unauthorized transfer, and non-personal use (TOU § 7(e)-(f); AUP § 1); against impersonation (AUP § 11); against publication of fraudulent Content (AUP § 3); and against misleading or deceptive conduct (AUP § 8) that FIL reserved to itself the right to enforce. *Id.*

FIL breached the covenant through the following actions:

a. Displaying "direct message with this user" while knowing it was false for Agency-operated Creator accounts that used Chatters;

b. Recruiting, enabling, or tolerating on FIL's site Agencies that use Chatters to impersonate Creators;

c. Providing tools designed to facilitate Chatter deception;

d. Collecting data that revealed Chatter-operated accounts and refusing to act; and

e. Declining to enforce platform rules prohibiting account sharing, impersonation, and misleading conduct.

4AC ¶ 613.

The purpose of the covenant of good faith and fair dealing is "to prevent a contracting party from engaging in conduct which . . . frustrates the other party's rights [to] the benefits of the contract." *Wasjutin v. Countrywide Bank N.A.*, No. CV-15-09401-MWF-JC, 2016 WL 7443219, at *3 (C.D. Cal. June 8, 2016) (quoting *Marsu B.V. v. Walt Disney Co.*, 185 F.3d 932, 938 (9th Cir. 1999)). FIL's actions as alleged in the 4AC frustrated Plaintiffs' rights to enjoy the benefits of the TOS.

FIL argues that because many of the TOS enforcement powers are permissive—FIL "may" withhold, "may" suspend, may act "in [its] sole discretion"—that therefore no obligation was breached. Mot. at 6, 15-16, 18, 20. But under California law, the "covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 372 (1992); *see also Perdue v. Crocker National Bank*, 38 Cal. 3d 913, 923 (1985) ("where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing") (citation omitted); *Locke v. Warner Bros.*, 57 Cal. App. 4th 354, 363 (1997) (same).

Plaintiffs' claim is not premised on a requirement that FIL suspend any particular account. Rather it is the discretion that FIL reserved for itself that triggers the covenant of good faith and fair dealing. 4AC ¶ 618 (Count III "seeks . . . to enforce FIL's obligation to exercise in good faith the contractual discretion FIL reserved for itself, in a manner consistent with the benefits of the agreement actually made.").

Relatedly, FIL's reliance on *The Manning Grp. LLC v. Neudesic LLC*, No. 8:23-cv-01997-FWS-KES, 2024 WL 3543472, at *4-5 (C.D. Cal. May 14, 2024), is misplaced. Mot. at 19. The conduct supporting Plaintiffs' good faith and fair dealing claim differs from the allegations supporting their breach of contract claim. Whereas Count II rests on affirmative design, construction, and operation, Count III is supported by selective and bad-faith exercise of retained discretion—enforcing

anti-impersonation and account-sharing rules against low revenue accounts while declining to enforce against high-revenue agency accounts (4AC ¶ 617(a)-(b)), and choosing to build age-verification and prohibited-content controls while declining to build account-integrity controls (*Id.* ¶ 617(f)). This is a distinct theory that should survive even if TOU ¶ 9 were held unenforceable. Under California law, the covenant governs how reserved discretionary power is exercised. *Carma Developers*, 2 Cal. 4th at 372. The discretion FIL reserved is why Plaintiffs' claim in Count III exists. Whether FIL exercised that discretion in good faith—enforcing account-integrity rules against small accounts while declining to enforce them against the high-revenue agency accounts that generated its fees—is a factual question. 4AC ¶¶ 613, 617(a)-(b), (f).

## III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Fenix Defendants' Motion to Dismiss.

DATED: September 1, 2026 Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ *Robert B. Carey*

Robert B. Carey (*pro hac vice)*
Leonard W. Aragon (*pro hac vice*)
Michella A. Kras (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
leonarda@hbsslaw.com
michellak@hbsslaw.com

Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Andrea R. Gold (*pro hac vice*)
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC 20006
Phone: (202) 973-0900
Facsimile: (202) 973-0950
Email: agold@tzlegal.com

Keith T. Vernon (*pro hac vice*)
TIMONEY KNOX LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Phone: (202) 349-9864
Facsimile: (215) 540-2643
Email: kvernon@timoneyknox.com

Andrew W. Knox (*pro hac vice*)
TIMONEY KNOX LLP
400 Maryland Ave.
Fort Washington, PA 19034
Phone: (215) 540-2643
Facsimile: (215) 540-2643
Email: aknox@timoneyknox.com

Andrew C. Stone (*pro hac vice*)
Seth T. Goertz (*pro hac vice*)
DORSEY & WHITNEY LLP
2325 E Camelback Road, Suite 300
Phoenix, AZ 85016
Phone: (602) 735-2691
Facsimile: (602) 926-2471
Email: stone.andy@dorsey.com
goertz.seth@dorsey.com

Jonathan Shub (SBN 237708)
SHUB JOHNS & HOLBROOK LLP
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Phone: (610) 477-8380
Email: jshub@shublawyers.com

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,767 words, which complies with the word limit of L.R. 11-6.1. The undersigned also certifies that all citations were checked and accurately reflect the propositions put forth, which complies with this Court's Order entered on December 12, 2025 (Dkt. 207).

Dated: September 1, 2026

HAGENS BERMAN SOBOL SHAPIRO LLP
*/s/ Robert B. Carey*
Robert B. Carey